**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| WHOLE WOMAN'S HEALTH ALLIANCE; ALL-OPTIONS, INC.; and JEFFREY GLAZER, M.D. )<br><br>Plaintiffs, )<br><br>v. )<br><br>CURTIS T. HILL, JR., Attorney General of the State of Indiana, in his official capacity; KRISTINA BOX, M.D., Commissioner of the Indiana State Department of Health, in her official capacity; JOHN STROBEL, M.D., President of the Medical Licensing Board of Indiana, in his official capacity; and KENNETH P. COTTER, St. Joseph County Prosecutor, in his official capacity and as representative of a class of all Indiana prosecuting attorneys with authority to prosecute felony and misdemeanor offenses, )<br><br>Defendants. ) | CASE NO. 1:18-cv-1904<br><br>CIVIL ACTION<br><br>CLASS ACTION |

**COMPLAINT**

Plaintiffs, by and through their undersigned attorneys, bring this complaint against the above-named Defendants and their employees, agents, and successors in office, and in support thereof allege the following:

**PRELIMINARY STATEMENT**

1.     Plaintiffs are nonprofit organizations and healthcare professionals who provide abortion care, would like to provide abortion care, or facilitate access to abortion care. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 on behalf of themselves and their patients and clients seeking abortion care. They seek relief from Indiana's unconstitutional abortion laws.

1

2.      Defendants are responsible for administering, implementing, and enforcing the challenged laws.

3.      Through an unbroken line of precedent spanning more than forty years, the Supreme Court has clearly established that the right to end a pregnancy is a fundamental component of the liberty protected by the Due Process Clause.[1] *See, e.g.*, *Whole Woman's Health v. Hellerstedt*, ___ U.S. ___, 136 S. Ct. 2292, 2309–10 (2016); *Lawrence v. Texas*, 539 U.S. 558, 565, 573–74 (2003); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851–53 (1992); *Roe v. Wade*, 410 U.S. 113, 152–54 (1973). This right is critical to a person's dignity, equality, and bodily integrity. *See, e.g.*, *Casey*, 505 U.S. at 851–52, 856–57.

4.      The Supreme Court has held that states may subject abortion to reasonable regulation, so long as it does not impose an undue burden on abortion access. The Supreme Court recently clarified that a law fails this standard if it imposes burdens on abortion access that are not justified by proportional benefits. *See Whole Woman's Health*, 136 S. Ct. at 2300.

5.      Indiana has failed to respect these clear constitutional limits.

6.      Over a forty-five-year period, Indiana has enacted abortion restriction on top of abortion restriction, further and further curtailing the constitutional right to an abortion. The State has replaced reasonable health and safety rules with unreasonable ones that are more likely to harm patients. Ideological opposition to abortion has supplanted concerns about patient health. The result has been the slow and steady legislative chipping away at the right to abortion. Today, the State imposes burdensome and medically unnecessary licensure, facility, and personnel requirements on abortion providers. Indiana requires abortion patients to receive irrelevant,

---

[1] Although the vast majority of people capable of becoming pregnant identify as women, not all do. *See, e.g.*, Juno Obedin-Maliver & Harvey J. Makadon, *Transgender Men and Pregnancy*, 9 Obstetric Med. 4, 4–6 (2016). The Constitution protects the right of all individuals to end an unwanted pregnancy, regardless of gender identity.

medically inaccurate, and ideologically charged information. Indiana withholds the benefits of scientific progress and evidence-based care from abortion patients. Indiana forces abortion patients to undergo redundant and medically unnecessary medical procedures. Indiana forces them to unnecessarily delay abortion care. Indiana denies minors the fundamental right to abortion. Indiana singles out abortion providers for punitive criminal penalties for failure to abide by its morass of abortion restrictions.

7.      Indiana's laws have severely limited the availability and accessibility of abortion care, driven up the costs of providing and receiving abortion care, and made providing and receiving abortion care more and more difficult, sometimes prohibitively so.

8.      Over time, the State has steadily increased the burdens on individuals seeking to end their pregnancies. It has imposed these burdens without adding any proportional benefits.

9.      Plaintiffs ask the Court to return the State to a system of reasonable and medically appropriate abortion regulation by striking down Indiana's unduly burdensome abortion laws.

## JURISDICTION AND VENUE

10.      The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 because this case is a civil action "arising under the Constitution, laws, or treaties of the United States," and 28 U.S.C. § 1343(a)(3) because this case seeks to redress the deprivation of federal constitutional rights under color of State law.

11.      At all times relevant herein, Defendants have acted under color of State law.

12.      This Court is authorized to award Plaintiffs' requested relief under 28 U.S.C. §§ 2201–2202, 42 U.S.C. § 1983, and this Court's general legal and equitable powers.

13.      Venue is appropriate in the Southern District of Indiana pursuant to 28 U.S.C. § 1391(b)(2) because Defendants Curtis T. Hill, Jr., Attorney General of the State of Indiana,

Kristina Box, M.D., Commissioner of the Indiana State Department of Health (the "Department"), and John Strobel, M.D., President of the Medical Licensing Board of Indiana, operate and perform their official duties in this district, and thus reside here for purposes of venue, and because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

**PLAINTIFFS**

**A. Whole Woman's Health Alliance**

14.     Plaintiff Whole Woman's Health Alliance ("WWHA") is a nonprofit organization committed to providing holistic reproductive healthcare, particularly abortion care. WWHA centers the patient and treats her as a full individual, with her own beliefs, ambitions, and constraints. WWHA believes that every woman deserves the ability to safely and legally end a pregnancy. WWHA focuses its efforts on making high-quality, compassionate abortion care available in underserved areas.

15.     WWHA engages in advocacy, education, and community outreach to eradicate abortion stigma. It recognizes that silence and shame around abortion care, which are amplified by abortion restrictions, harm women's health, demean women, perpetuate sex-stereotypes, and threaten to deprive abortion patients of innovation and progress in medicine. WWHA devotes considerable time and resources to fighting restrictive abortion laws, including by speaking out against these laws, challenging them in court, and helping patients and clients cope with their burdensome impacts.

16.     WWHA's largest programs involve the operation of clinics providing abortion care. WWHA operates licensed abortion facilities in Austin, Texas and Charlottesville, Virginia.

17.     WWHA intends to open a medical facility providing abortion care in South Bend, Indiana, located within St. Joseph County. It applied to the Department for a license to operate an abortion clinic in fall of 2017. In January 2018, the Department denied WWHA's license, finding that WWHA was not of so-called "reputable and responsible character." WWHA appealed that denial. The administrative proceeding, which the Department has dragged out and exploited, is pending.

18.     WWHA sues on behalf of itself and the patients it intends to serve.

**B. All-Options, Inc.**

19.     Plaintiff All-Options, Inc. d/b/a All-Options Pregnancy Resource Center ("All-Options") is a nonprofit organization that uses direct service and social change strategies to promote unconditional, judgment-free support for people in their decisions, feelings, and experiences with pregnancy, parenting, abortion, and adoption. It is a secular, client-centered organization committed to ensuring that all people have the information, support, and resources they need to make the reproductive decisions that are right for them, without coercion or limitation. All-Options is a place where the dignity of a person's lived experience is affirmed and honored.

20.     When a client is already a parent or seeks to carry their pregnancy to term, All-Options offers unbiased, accurate, and judgment-free peer counseling, information, and referrals for community services related to pregnancy, parenting, and adoption. It also provides parents with some of the materials they need to care for their children, including free diapers and wipes, clothing, and toys.

21.     When a client seeks to terminate their pregnancy, All-Options helps them exercise their constitutionally protected right to abortion by removing barriers to access. It provides

counseling and information about abortion, including about Indiana's burdensome abortion laws, to its clients. It offers financial assistance to people in Indiana who want to end their pregnancies but cannot afford the cost of an abortion procedure. Unfortunately, financial constraints prevent All-Options from paying for the full cost of an abortion procedure. Last year, the average procedure cost for All-Options' clients was $510 (which has since gone up), and All-Options' average grant amount was $200–250. All-Options also helps clients develop a strategy for raising the additional funds they will need to pay for their abortion procedure and for the ancillary expenses they will incur, like transportation and childcare. It helps clients find an abortion provider and works closely with clients to create a plan to get to that provider and obtain care. Ultimately, some of All-Options' clients must travel out of state to obtain abortion care because the burdens created by Indiana law make it too difficult to obtain timely care in Indiana.

22.     All-Options has an office in Monroe County. All-Options sues on behalf of itself and its clients seeking abortion care.

**C.  Jeffrey Glazer, M.D.**

23.     Jeffrey Glazer, M.D. is a board-certified obstetrician-gynecologist licensed to practice medicine by the State of Indiana. Dr. Glazer is an abortion provider. He intends to serve as the Medical Director of WWHA's prospective South Bend clinic, where he will provide abortion care. Dr. Glazer sues on behalf of himself and his patients.

**DEFENDANTS**

24.     Defendant Curtis T. Hill, Jr., Attorney General of the State of Indiana, is sued in his official capacity. He has broad powers to enforce the criminal laws of the State, which are relevant as described below. The Office of the Attorney General maintains its headquarters in Marion County.

25.     Defendant Kristina Box, M.D., Commissioner of the Department, is sued in her official capacity. She is responsible for licensing and disciplining healthcare clinics that provide abortion care. The Department maintains its office in Marion County.

26.     Defendant Kenneth P. Cotter, St. Joseph County Prosecutor, is sued in his official capacity and, pursuant to Fed. R. Civ. P. 23(a)–(b), as a representative of a class of all Indiana prosecuting attorneys with authority to prosecute misdemeanor and felony offenses. He has statutory authority to prosecute crimes in St. Joseph County, the county in which WWHA seeks to locate its facility to provide abortion care.

27.     Defendant John Strobel, M.D., President of the Medical Licensing Board of Indiana, is sued in his official capacity. He is responsible for licensing and disciplining physicians, including abortion providers. The Medical Licensing Board of Indiana maintains its office in Marion County.

## FACTUAL ALLEGATIONS

### A.  Abortion Care in the United States

28.     The decision of whether and when to remain pregnant and give birth has significant implications for a person. It affects, among other things, the person's bodily integrity, autonomy, financial and job security, workforce participation, educational attainment, ability to parent existing children, and health.

29.     The lives of people seeking to end their pregnancies are complex. Gender, race, religion, geography, and immigration, familial, relationship, and socioeconomic status all interact with one another. Like their lives, people's reasons for terminating a pregnancy can also be complex and varied. The most cited reasons for having an abortion include that having a child would interfere with education, work, or the ability to care for other dependents; the inability to afford to parent a child; the desire to postpone or space childbearing; not wanting to be a single

parent; relationship problems, including having a partner who is not supportive, does not want a baby, or is abusive; and health problems affecting the fetus or pregnant person.[2]

30.    Each year, nearly half of the pregnancies in the United States are unintended—meaning they were either mistimed or unwanted.[3]

31.    Forty-two percent of unintended pregnancies end in abortion.[4] By age forty-five, nearly one in four women will have had an abortion.[5] Abortion is thus a common medical procedure in the United States.

32.    Abortions are performed by one of four procedures: medication, aspiration, dilation and evacuation ("D&E"), or induction. The type of procedure performed generally depends on the patient's treatment preferences and how far the pregnancy has progressed.

33.    Medication abortion involves the administration of medications that end a pregnancy and cause the uterus to expel its contents. This method may be used from the start of pregnancy up to ten weeks' gestation as measured by the amount of time since a person's last menstrual period ("lmp").

34.    Aspiration abortion entails the use of suction to empty the contents of the uterus. This method is typically used from six weeks lmp up to 14–16 weeks lmp.

35.    D&E abortion entails the use of suction and medical instruments to empty the contents of the uterus. When abortion by aspiration is no longer feasible, D&E may be used.

---

[2] *See, e.g.*, Lawrence B. Finer et al., *Reasons U.S. Women Have Abortions: Quantitative and Qualitative Perspectives*, 37 Perspectives on Sexual & Reprod. Health 110, 112–18 (2005).
[3] Lawrence B. Finer & Mia R. Zolna, *Declines in Unintended Pregnancy in the United States, 2008–2011*, 374 New Eng. J. Med. 843, 843–45 (2016); *See* Kathryn Kost, *Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002*, Guttmacher Institute at 7–9 (2015).
[4] Finer & Zolna, *supra* note 3, at 847.
[5] Rachel K. Jones & Jenna Jerman, *Population Group Abortion Rates and Lifetime Incidence of Abortion: United States, 2008–2014*, 107 Am. J. Pub. Health 1904, 1906–08 (2017).

36.     The fourth method, induction, is rarely used in the United States. It entails the administration of medications to induce labor and delivery of a fetus, typically after sixteen weeks lmp.

37.     A Committee of the National Academies of Science, Engineering, and Medicine, the nation's source of independent, objective expert advice on science, health, and engineering matters, recently published an evidence-based consensus study report concluding that legal abortion is one of the safest medical procedures in the United States.[6]

38.     A legal abortion is fourteen times medically safer than childbirth.[7]

39.     Complications from abortions are not only rare, but also rarely dangerous.[8]

40.     Although the risks associated with abortion are small throughout pregnancy, complications increase as the pregnancy progresses. Delaying an abortion procedure thus increases the potential harm and cost to the pregnant person.

41.     The vast majority of abortions can be safely performed in an office-based setting.[9] As with other office-based healthcare services, appropriate facility requirements depend on the level of sedation used. Medication abortions, which do not involve sedation, do not require any special equipment or emergency transfer plans.[10] If moderate sedation is used during an aspiration abortion, the facility should have equipment to monitor oxygen saturation, heart rate, and blood pressure and for emergency resuscitation, as well as an emergency transfer plan.[11] For

---

[6] See Nat'l Academies of Sci. Engineering, & Med., *The Safety and Quality of Abortion Care in the United States*, 1–16 (2018).
[7] Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 216–217 (2012).
[8] See Nat'l Academies of Sci., Engineering, & Med., *supra* note 6, at 10–11, 45–80; Ushma D. Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175, 175, 180–82 (Jan. 2015).
[9] Nat'l Academies of Sci., Engineering, & Med., *supra* note 6, at 10.
[10] *Id.*
[11] *Id.*

D&Es performed under deep sedation or general anesthesia, the facility should also have equipment to monitor ventilation.[12]

42.     Since the 1970s, advancements in technology have resulted in surgeries and medical procedures moving into less resource-intensive facilities—from hospitals to ambulatory surgical centers ("ASCs") to offices and clinics.[13] Some states, however, have prevented abortion care from benefiting from such technological advancements.

43.     States impose requirements on abortion providers that are different and more stringent than those imposed on comparable healthcare providers. These requirements on abortion providers are not reasonably related to preserving patient health.

44.     States also impose competency requirements on abortion providers that are different and more stringent than those imposed on comparable healthcare providers. These requirements on abortion providers are not reasonably related to preserving patient health.

45.     Despite the established safety of abortion, it is one of the most regulated medical procedures in the United States.[14] Other medical procedures are more dangerous to patients, and yet, much less regulated than abortion.[15]

46.     The Supreme Court recently concluded that abortion is safe and complications from abortion are rare. *See Whole Woman's Health*, 136 S. Ct. at 2311, 2315. Indeed, the Supreme Court found that abortion is safer than many other procedures commonly performed in outpatient settings. *Id.* at 2315. It also recognized that unnecessary regulatory requirements may diminish the quality of care that patients receive. *Id.* at 2318.

---

[12] *Id.*
[13] Bonnie S. Jones et al., *State Law Approaches to Facility Regulation of Abortion and Other Office Interventions*, 108 Am. J. Pub. Health L. & Ethics 486, 486 (2018).
[14] Nat'l Academies of Sci., Engineering, & Med., *supra* note 6, at 6.
[15] *See* Jones et al., *supra* note 13, at 491.

47.     The differential treatment of abortion stigmatizes and shames providers and people seeking abortion.

**B. Abortion Care in Indiana**

48.     There are approximately 1.2 million women of reproductive age (15–44 years old) in Indiana.

49.     In 2016, approximately thirty percent of women aged 18–24 in Indiana lived below the poverty level; nearly twenty percent of women aged 25–34; and nearly fifteen percent of women aged 35–44. That year, a person living below the poverty level had a household income of less than $11,880 per year for a household of one and less than $20,160 per year for a household of three.[16]

50.     In Indiana, twelve percent of white women live at or below the poverty level; 24.4% of Latinas; and 27.3% of Black women.[17]

51.     Indiana does not require paid family or medical leave.

52.     Indiana has a family cap policy that generally denies cash grants to babies born into families who are on on cash assistance.

53.     Indiana ranks thirty-eighth nationally in health outcomes.[18] The State's maternal mortality rate is around forty-one deaths per 100,000 births.[19] It has among the highest rates of

---

[16] Office of the Assistant Sec'y for Planning & Eval., U.S. Dep't of Health & Human Servs., *Computations for the 2016 Poverty Guidelines* (2016), https://aspe.hhs.gov/computations-2016-poverty-guidelines.

[17] Nat'l Women's Law Ctr., *Women and Poverty, State by State*, https://nwlc.org/resources/women-and-poverty-state-state/ (last visited June 20, 2018).

[18] United Health Found., *America's Health Rankings: 2017 Annual Report*, https://www.americashealthrankings.org/learn/reports/2017-annual-report/findings-state-rankings (last visited June 20, 2018).

[19] United Health Found., *Health of Women & Children: Maternal Mortality in Indiana in 2018*, https://www.americashealthrankings.org/explore/health-of-women-and-children/measure/maternal_mortality/state/IN (last visited June 20, 2018).

11

neonatal deaths in the country.[20] Black infants in Indiana are more than twice as likely to die than white infants.[21]

54.     Indiana does not require health insurance plans to cover prescription contraception.[22]

55.     In 2014, more than fifty percent of Indiana women aged 13–44 needed contraceptive supplies and services.[23] Over forty percent of those women had incomes below 250% of the federal poverty level.[24] Publicly supported family planning centers met just nineteen percent of Indiana women's needs for contraceptive services and supplies.[25]

56.     In 2010, nearly half of all pregnancies in Indiana were unintended.[26]

57.     Indiana's teen (15–19 years old) birth rate is 23.6 per 1,000 teens, among the highest in the country.[27]

58.     In 2016, 6,767 Indiana women received abortions—an abortion rate of 5.2 abortions per 1,000 women aged 15–44.[28]

---

[20] Ctrs. for Disease Control & Prevention ("CDC"), *Infant Mortality Rates by States 2016* (last updated Jan. 2018), https://www.cdc.gov/nchs/pressroom/sosmap/infant_mortality_rates/infant_mortality.htm.
[21] Ind. State Dep't of Health, *Infant Mortality 2012–2016*, https://www.in.gov/isdh/27470.htm (last visited June 21, 2018).
[22] Kaiser Family Found., *State Requirements for Insurance Coverage of Contraceptives* (2018), https://www.kff.org/other/state-indicator/state-requirements-for-insurance-coverage-of-contraceptives/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.
[23] Jennifer J. Frost et al., *Contraceptive Needs and Services, 2014 Update*, Guttmacher Institute at 19 (2015).
[24] *Id.*
[25] *Id.* at 30.
[26] Kost, *supra* note 3, at 8.
[27] Kaiser Family Found., *Teen Birth Rate per 1,000 Population Ages 15–19* (2016), https://www.kff.org/other/state-indicator/teen-birth-rate-per-1000/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Teen%20Birth%20Rate%20per%201,000%22,%22sort%22:%22asc%22%7D.
[28] Ind. State Dep't of Health, *Terminated Pregnancy Report* (2016) at 2, https://www.in.gov/isdh/files/2016%20Indiana%20Terminated%20Pregnancy%20Report.pdf.

59.     In 2014, Indiana had an abortion rate of 5.9 abortions per 1,000 women.[29] During that year, the national abortion rate was 12.1 abortions per 1,000 women.[30]

60.     Sixty-two percent of abortion patients in Indiana have previously given birth to a child.[31]

61.     Fifty-seven percent of abortion patients in Indiana are white; thirty percent are Black; eight percent are Hispanic or Latino, three percent are Asian or Pacific Islander; and ten percent identify with other racial or ethnic classifications.[32]

62.     During the first trimester, abortions in Indiana may generally only be performed in a facility licensed as an abortion clinic by the Department. There are six licensed abortion clinics located in four of Indiana's ninety-two counties.[33] Half of Indiana's abortion clinics are located in Indianapolis. Over ninety-nine percent of all abortions are performed in these six clinics.[34]

63.     Under Indiana law, abortions may only be performed in an ASC or hospital after the first trimester. In 2016, only two hospitals, both in Indianapolis, provided abortion care.[35] Abortions at these locations are rare, with about half of one percent of all abortions performed in them.[36] Not a single abortion was performed in an ASC in 2016.[37]

---

[29] *Id.*
[30] CDC, *Abortion Surveillance – United States 2014*, 66 Morbidity & Weekly Rep. 24, at 5 (2017) (national abortion rate excludes California, Maryland, and New Hampshire). 2014 is the most recent year for which national data is currently available.
[31] Ind. State Dep't of Health, *Terminated Pregnancy Report*, *supra* note 28, at 15.
[32] *Id.* at 10–11.
[33] Ind. State Dep't of Health, *Abortion Center Directory* (created on May 10, 2018).
[34] Ind. State Dep't of Health, *Terminated Pregnancy Report*, *supra* note 28, at 19.
[35] *Id.*
[36] *Id.*
[37] *Id.*

64.     Less than one half of one percent of all abortions performed in Indiana occur after thirteen weeks.[38] Nationally, 8.5% of abortions occur after thirteen weeks.[39]

65.     Sixty-six percent of abortions are performed in Marion County.[40]

66.     Nearly ninety-five percent of Indiana counties lack an abortion clinic. Seventy-three percent of Indiana women live in a county without an abortion clinic.

## C. The Challenged Restrictions

67.     Plaintiffs challenge five categories of Indiana laws: targeted regulation of abortion providers laws; laws that deny abortion patients the benefits of scientific progress; mandatory disclosure and waiting period laws; parental involvement laws; and criminal penalties.

### 1)  Targeted Regulation of Abortion Providers

68.     Indiana has singled out abortion providers and facilities for regulatory requirements that are different, more stringent, and more pervasive than those governing comparable healthcare providers and facilities. These burdensome laws are known as Targeted Regulation of Abortion Providers ("TRAP") laws. *See Whole Woman's Health*, 136 S. Ct. at 2321 (Ginsburg, J. concurring).

69.     TRAP laws impose medically unnecessary requirements that are not based on differences between abortion and other medical procedures that are reasonably related to preserving patient health.

70.     TRAP laws do little or nothing for patient health. Instead, they impose unnecessary and burdensome impediments to abortion that harm patients.

---

[38] *Id.* at 20.
[39] CDC, *Abortion Surveillance*, *supra* note 30, at 11 (national abortion rate excludes California, Maryland, and New Hampshire).
[40] *See* Ind. State Dep't of Health, *Terminated Pregnancy Report*, *supra* note 28, at 22.

71.     Indiana enacted its first TRAP law in 1973. Under that law, an abortion had to be performed by a physician in a licensed healthcare facility during the first trimester of pregnancy. Pub. L. No. 322, § 2 (1973). After the first trimester and before viability, a physician had to perform the procedure in a hospital. *Id.* Since then, Indiana has added restriction on top of restriction—slowly but steadily increasing the burdens on abortion access.

72.     In 1993, Indiana recodified the 1973 law. Pub. L. No. 2, § 17 (1993). Indiana allowed a physician to perform a second-trimester abortion before viability in an "ambulatory outpatient surgical center." *Id.* But the State defined the center as a mini-hospital, requiring, for example, an operating room, physician with admitting privileges at a nearby hospital, and a written transfer agreement with a hospital. *Id.* § 1.

73.     In 2005, Indiana established a separate licensing scheme for "abortion clinic[s]." Pub. L. No. 96, §§ 2, 4–10, 14 (2005). The scheme applied only to surgical abortion, not medication abortions. *Id.* § 2. Despite the strong safety record of abortion, the State called for the Department to adopt rules, not only for obtaining and maintaining a license, but managing and operating a clinic. *Id.* § 7, 14. These included sanitation, staffing, emergency care, quality assurance, infection control, and medical record standards. *Id.*

74.     In 2006, the Department adopted nineteen rules for abortion clinics. 29 Ind. Reg. 3354 (July 1, 2006) (codified at 410 Ind. Admin. Code, art. 26). Under those rules, the State could prevent a facility from providing abortion services on seven different grounds, some as ill-defined as failing to show "reputable and responsible character." 410 Ind. Admin. Code 26-2-5. Further, the Department mandated preoccupancy inspections and licensing surveys, 410 Ind. Admin. Code 26-2-2, 26-3-2; exposed abortion providers to up to $10,000 fines, 410 Ind. Admin. Code 26-2-8(a)(6); opened up even non-medical records to unannounced inspections, 410 Ind.

Admin. Code 26-3-1(b); imposed an exhaustive staffing structure, 410 Ind. Admin Code 26-4-1 to 26-4-2, 26-5-1; established exacting infection control and sterilization policies, 410 Ind. Admin. Code 26-11-1 to 26-11-2; and introduced extensive physical plant requirements, including scrub facilities, 120-square-foot procedure rooms, and 44-inch-wide corridors. 410 Ind. Admin. Code 26-17-1 to 26-17-2.[41]

75.     The 2006 rules contained a grandfathering clause only for some of the physical plant requirements. *See* 410 Ind. Admin. Code 26-17-2(f). In other words, Indiana permitted abortion providers to practice in facilities subject to generally-applicable regulations for more than thirty years—then demanded they meet nineteen targeted regulations in little over a year. Pub. L. No. 96, § 14 (2005).

76.     In 2011, the State focused on physicians providing abortion care and further restricted the pool of abortion providers in the state. It required they have 1) admitting privileges at a hospital in the county where they provided abortions or a contiguous county or have 2) an agreement for managing any complications with a physician with admitting privileges in that county or a contiguous county ("physician agreement"). Pub. L. No. 193, § 14 (2011).

77.     Two years later, the legislature redefined "abortion" and "abortion clinic" to include facilities providing medication abortion. Pub. L. No. 136, §§ 1–2 (2013). It simultaneously forbade the Department from exempting abortion clinics from any 2006 rule, including "physical plant requirements," and other licensure rules.[42] *Id.* § 4.

---

[41] The Department readopted the rules in 2012 because they were about to expire.

[42] This court ultimately forced the State to repeal its prohibition on exempting abortion clinics from licensure rules because it was unconstitutional. Pub. L. No. 92, § 4 (2015); *Planned Parenthood of Ind. & Ky. v. Comm'r, Ind. Dep't of Health*, 64 F. Supp. 3d 1235, 1259–60 (S.D. Ind. 2014) (holding prohibition violated the Equal Protection Clause of the U.S. Constitution).

78.    In 2014, the legislature authorized the Department to inspect abortion clinics upon complaint and at least annually. Pub. L. No. 98, § 1 (2014). It also required admitting privileges and physician agreements to be in writing. *Id.* § 3.

79.    In 2016, the legislature made its admitting privileges or physician agreement law even more difficult to satisfy by requiring renewal of the physician agreement every year. Pub. L. No. 213, § 15 (2016). Further, the legislature instructed the Department to annually send copies of the admitting privileges or physician agreement to every hospital in the county where the hospital granting privileges was located and in contiguous counties. *Id.*

80.    In 2017, the legislature ordered the Department to adopt additional rules for abortion clinics in even more areas. Pub. L. No. 173, § 2 (2017). The legislature directed the Department to promulgate separate rules, in the now dozens of areas it regulates, for clinics offering surgical abortion and clinics offering only medication abortion. *Id.* It also mandated that the Department establish procedures regarding the licensure of clinics performing surgical abortions, medication abortions, or both. *Id.*

81.    **Still unsatisfied,** Indiana adopted even more rules for abortion clinics in 2018. The State made it harder to obtain a license to operate an abortion clinic by enacting vague provisions that mandate additional disclosures by an applicant for a license. Pub. L. No. 205, § 6 (2018). It also imposed onerous annual inspection requirements on abortion clinics and reporting requirements on abortion providers and facilities. *Id.* §§ 5, 9.

82.    Plaintiffs challenge the following TRAP laws currently in force in Indiana:

a. the physician-only requirements codified at Ind. Code § 16-34-2-1(a)(1)(A); 410 Ind. Admin. Code 26-13-2(b), which prohibit licensed, qualified clinicians who are not physicians from providing abortions;

b. the <u>facility licensure requirements</u> codified at Ind. Code §§ 16-18-2-1.5(a), 16-21-1-7, 16-21-2-2(4), 16-21-2-2.5(a), 16-21-2-10 to 16-21-2-11, 16-21-2-14, P.L. No. 205, § 6 (2018) (to be codified at 16-21-2-11(d) (eff. July 1, 2018)); 410 Ind. Admin. Code, art. 26, which, as applied by Defendant Box, require facilities to obtain a license and meet medically inappropriate licensure requirements;

c. the <u>ASC or hospital requirement</u> codified at Ind. Code § 16-34-2-1(a)(2)(B), which requires abortions to be performed in an ASC or hospital after the first trimester of pregnancy;

d. the <u>admitting privileges or physician agreement requirement</u> codified at Ind. Code § 16-34-2-4.5, which requires a physician performing an abortion to have (i) admitting privileges in the county where the physician performs abortions or in a contiguous county or (ii) a written agreement with a physician with such privileges; and

e. the <u>reporting requirements</u> codified at Ind. Code § 16-34-2-5, which require abortion providers to complete and transmit to the Department a form reporting information about their patients and practices that the Department can make publicly available.[43]

83.     These laws are enforced through civil and administrative penalties, professional discipline, and criminal penalties. *See* Ind. Code §§ 16-34-2-7(a), 16-21-2-2.5(b), 16-21-5-1, 16-21-5-3, 25-1-9-9, 25-22.5-8-6, 25-1-9-4(a)(2)–(3), 16-34-2-5(d); 410 Ind. Admin. Code 26-2-8, 410 Ind. Admin. Code 26-2-5(1)–(4), (6)–(7).

84.     In the absence of these laws singling out abortion care, abortion providers would be subject to the generally-applicable laws and policies governing the practice of medicine in

---

[43] The reporting requirements set forth Ind. Code § 16-34-2-4.7 (eff. July 1, 2018) are the subject of a pending lawsuit and are not challenged herein, *see Planned Parenthood of Ind. & Ky. v. Comm'r, Ind. Dep't of Health*, No. 1:18-cv-1219 (S.D. Ind. filed Apr. 23, 2018).

Indiana. *See, e.g.*, Ind. Code § 25-22.5-1-1.1 (practice of medicine); 844 Ind. Admin. Code 5-5-

19 (standards for office-based procedures requiring sedation); 844 Ind. Admin. Code 5-5-22

(practitioner requirements for office-based procedures requiring sedation); Ind. Code §§ 25-27.5-

5-2 to 25-27.5-5-6, 25-27.5-6-3, 844 Ind. Admin. Code 2.2-1.1-1 to 844 Ind. Admin. Code 2.2-2-

8 (physician assistant requirements); Ind. Code §§ 25-23-1-1(b), 25-23-1-19.4(c), 25-23-1-19.5,

848 Ind. Admin. Code 5-1-1, 848 Ind. Admin. Code 5-2-1 (advance practice nurse scope of

practice); 848 Ind. Admin. Code 4-2-1 (nurse practitioner scope of practice); Ind. Code § 25-

23.4-1-9, 848 Ind. Admin. Code 3-3-1 (certified direct entry midwife scope of practice); Ind.

Code § 16-42-19-20 (medication dispensing); Ind. Code §§ 25-1-7-1 to 25-1-7-14 (investigation

and prosecution of complaints); 856 Ind. Admin. Code 2-6-1 to 856 Ind. Admin. Code 2-6-18

(issuance, filling, and filing of prescriptions); Ind. Code § 16-39-7-1, 844 Ind. Admin. Code 5-3-

6 (record-keeping); Ind. Code § 25-22.5-1-2.1 (experimental or nonconventional treatment); 844

Ind. Admin. Code 5-2-1 to 844 Ind. Admin. Code 5-2-22 (standards for professional conduct);

844 Ind. Admin. Code 5-1-3 (disciplinary action).

85.    The challenged TRAP laws impose burdens on abortion access that are not

justified by proportional benefits.

86.    These burdens disproportionately impact poor people, people living in rural areas,

younger people, immigrants, and other individuals experiencing various forms of oppression and

marginalization.

87.    The challenged laws reflect and reinforce sex-stereotypes. They impinge on

women's bodily integrity, including the right to control whether and when to give birth, and limit

their life opportunities. The challenged laws restrict and demean women in ways that the State

does not restrict and demean men, and they perpetuate women's subordination.

88.     The requirement that applicants for a license to operate an abortion clinic establish they are of "reputable and responsible character," Ind. Code § 16-21-2-11(a)(1); 410 Ind. Admin. Code 26-2-5(1), is vague and subject to arbitrary enforcement.

89.     The requirement that an applicant for a license to operate an abortion clinic disclose whether an abortion clinic closed "as a direct result of patient health and safety concerns," Ind. Code § 16-21-2-11(d)(1) (eff. July 1, 2008), or a "facility" closed "as a result of administrative or legal action," Ind. Code § 16-21-2-11(d)(3) (eff. July 1, 2008), is vague and subject to arbitrary enforcement.

**2)  Laws That Deny Abortion Patients the Benefits of Scientific Progress**

90.     Technological advancements enable patients to receive care today that is safer, more effective, less costly, and higher quality than before.

91.     One of the biggest advancements in the field of abortion care has been the development of mifepristone, a medication that enables a safe and effective abortion beginning early in pregnancy.

92.     Mifepristone blocks the hormone progesterone, which a person's body needs to continue a pregnancy. To induce an abortion, a person takes mifepristone along with misoprostol, a medication that causes the uterus to contract and expel its contents. A person takes mifepristone first; then, typically six to forty-eight hours later, misoprostol.

93.     A person can use medication abortion as soon as their pregnancy is confirmed. Many abortion providers will not provide an aspiration abortion until the pregnancy can be visualized, typically at 5–6 weeks lmp.

94.     Over 2.75 million women have safely used medication abortion in the United States.

20

95. Extensive clinical research has established the safety and effectiveness of medication abortion.

96. Complications from medication abortion are rare. When complications occur, it is usually after the patient has left the clinic.

97. Few people have contraindications to medication abortion. Screening for contraindication is straightforward.

98. Recognizing the potential of medication abortion to improve access to abortion care, abortion opponents have sought to halt its scientific development and restrict its availability.

99. Indiana has sought to halt medication abortion's scientific development and restrict its availability.

100. Indiana has singled-out medication abortion from other medical procedures. Its differential treatment of medication abortion is not reasonably related to preserving patient health.

101. Plaintiffs challenge the following Indiana laws that unreasonably restrict the use of medication abortion:

a. the dosage and administration restrictions codified at Ind. Code § 16-34-2-1(a)(1), to the extent they prevent abortion providers from incorporating scientific advancements in the provision of medication abortion;

b. the physician examination requirement codified at Ind. Code § 16-34-2-1(a)(1), which requires a medically unnecessary physical examination by the physician who provides the medication abortion; and

c. the <u>physical plant requirements</u> codified at Ind. Code §§ 16-21-2-2.5(a)(2), 16-18-2-1.5(a)(2); 410 Ind. Admin. Code, art. 26, including 410 Ind. Admin. Code 26-10-1(b)(5), 26-11-2(a), 26-11-3, 26-13-1, 26-13-3(b)–(c), 26-17-2(c)(3)–(4), 26-17-2(d)(1)–(4), (d)(6), 26-17-2(e)(1), (8), which impose medically unnecessary facility requirements on facilities providing medication abortion care.

102.    These laws are enforced through civil and administrative penalties, professional discipline, and criminal penalties. *See* Ind. Code §§ 16-34-2-7(a), 16-21-2-2.5(b), 16-21-5-1, 16-21-5-3, 25-1-9-4(a)(2)–(3), 25-1-9-9, 25-22.5-8-6(b)(2); 410 Ind. Admin. Code 26-2-8, 410 Ind. Admin. Code 26-2-5(1)–(4), (6)–(7).

103.    The challenged restrictions on medication abortion impose burdens on abortion access that are not justified by proportional benefits.

104.    These burdens disproportionately impact poor people, people living in rural areas, younger people, immigrants, and other individuals experiencing various forms of oppression and marginalization.

105.    Indiana has also prohibited the use of telemedicine in the provision of abortion care.

106.    Indiana defines "telemedicine" as the "delivery of health care services using electronic communications and information technology, including: (1) secure videoconferencing; (2) interactive audio-using store and forward technology; or (3) remote patient monitoring technology; between a provider in one (1) location and a patient in another location." Ind. Code § 25-1-9.5-6(a).

107.    Telemedicine increases healthcare access and decreases healthcare costs. It can also reduce delays in access to care. Telemedicine services are particularly beneficial to

individuals who are immobile, have transportation issues, or live in rural and remote communities and communities experiencing a healthcare provider shortage.

108.    Indiana recently amended its laws to facilitate the in-state use of telemedicine. Ind. Code §§ 25-1-9.5-7 to 25-1-9.5-8.

109.    Indiana permits providers to use telemedicine to prescribe medications that require monitoring and carry greater risks to patient health than medication abortion. *See, e.g.*, Ind. Code § 25-1-9.5-8(b)–(c) (permitting telemedicine for controlled substances).

110.    Indiana prohibits abortion providers from utilizing telemedicine. *See* Ind. Code §§ 16-34-2-1(a)(1), 25-1-9.5-8(a)(4).

111.    Medication abortion can be provided safely and effectively using telemedicine.[44]

112.    Other abortion-related services, including pre-abortion counseling, can be provided safely and effectively using telemedicine.

113.    Patients report a high degree of satisfaction with abortion care provided using telemedicine in states where it is allowed.[45]

114.    Plaintiffs challenge the following Indiana laws that impose explicit restrictions on the use of telemedicine abortion care:

    a.   the <u>telemedicine restrictions</u> codified at Ind. Code § 25-1-9.5-8(a)(4), which state that a prescriber may issue a prescription to a patient via telemedicine if the prescriber has

---

[44] *See* Daniel Grossman & Kate Grindlay, *Safety of Medical Abortion Provided Through Telemedicine Compared with In Person*, 130 Obstetrics & Gynecology 778, 778 (2017); Daniel Grossman et al., *Effectiveness and Acceptability of Medical Abortion Provided Through Telemedicine*, 118 Obstetrics & Gynecology 296, 296 (2011).
[45] *See* Kate Grindlay et al., *Women's and Providers' Experiences with Medical Abortion Provided Through Telemedicine: A Qualitative Study*, 23 Women's Health Issues e117, e117 (2013); *see* Grossman et al., *Effectiveness and Acceptability*, *supra* note 44, at 296; *see* Am. Coll. of Obstetricians & Gynecologists, *Practice Bulletin No. 143 on Medical Management of First Trimester Abortion* 11 (aff'd 2016).

not previously examined the patient in person, unless the prescription is for an abortion inducing drug; and

b.  the in-person examination requirement codified at Ind. Code § 16-34-2-1(a)(1), which requires that a physician examine a pregnant woman "in person" before prescribing or dispensing an abortion inducing drug and states that "'in-person' does not include the use of telehealth or telemedicine services."

115.    The challenged restrictions are enforced through civil and administrative penalties, disciplinary sanctions, and criminal penalties. *See* Ind. Code §§ 25-1-9.5-10, 25-22.5-8-6(b)(2), 25-1-9-4(a)(2)–(3), 25-1-9-9, 16-34-2-7(a); 410 Ind. Admin. Code 26-2-8; 410 Ind. Admin. Code 26-2-5(1), (4), (6).

116.    Plaintiffs also challenge the following Indiana law that imposes a de facto prohibition on the use of telemedicine in abortion care:

a.  the state-mandated information requirement codified at Ind. Code § 16-34-2-1.1(a)–(b), which prevents a healthcare provider from providing state-mandated counseling through telemedicine.

117.    The challenged restriction is enforced through civil and administrative penalties and disciplinary sanctions. *See* Ind. Code §§ 16-34-2-7(c), 25-22.5-8-6(b)(2), 25-1-9-4(a)(2)–(3), 25-1-9-9; 410 Ind. Admin. Code 26-2-8, 410 Ind. Admin. Code 26-2-5(1), (4), (6).

118.    In the absence of the challenged restrictions, abortion providers would be subject to generally-applicable regulations concerning the use of telemedicine to provide comparable healthcare services. *See* Ind. Code §§ 25-1-9.5-7 to 25-1-9.5-8.

119.    The challenged restrictions on the use of telemedicine in abortion care impose burdens on abortion access that are not justified by proportional benefits.

24

120.     These burdens disproportionately impact poor people, people living in rural areas, younger people, immigrants, and other individuals experiencing various forms of oppression and marginalization.

121.     These challenged laws reflect and reinforce sex-stereotypes. They impinge on women's bodily integrity, including the right to control whether and when to give birth, and life opportunities. The challenged laws restrict and demean women in ways that the State does not restrict and demean men, and they perpetuate women's subordination.

### 3)  Mandatory Disclosure and Waiting Period Laws

122.     In *Casey*, the Supreme Court held that states may take measures to ensure that a woman's decision to end a pregnancy is informed "as long as their purpose is to persuade the woman to choose childbirth over abortion" and they do not impose "an undue burden on the right." 505 U.S. at 878.

123.     Indiana's mandatory disclosure and waiting period laws cross the boundaries drawn in *Casey*. As with its TRAP laws, Indiana has made these laws more burdensome over time.

124.     In 1995, the State enacted a law requiring medical personnel to provide patients state-mandated information, including the name of the physician performing the abortion, risks of and alternatives to abortion, probable gestational age of the fetus, and risks associated with carrying to term. Pub. L. No. 187, § 4 (1995). By requiring medical personnel to provide this information in person and at least eighteen hours before the abortion, Indiana forced patients to make two trips to the abortion clinic. *Id.* Patients were also required to receive information regarding social services and legal information, such as the possible availability of public

25

benefits for the medical costs of carrying their pregnancy to term. *Id.* They could receive this information by phone. *Id.*

125.   In 2005, the State compelled medical personnel to make another in-person disclosure, this time about the availability of ultrasound services and how to obtain those services. Pub. L. No. 36, § 1 (2005). It also added a provision stating that a patient could view fetal ultrasound imaging and listen to the fetal heartbeat, if audible, upon request. *Id.*

126.   Indiana transformed its mandatory disclosure requirements in 2011. Pub. L. No. 193, § 9 (2011). Now, all compulsory information also had to be provided in writing. *Id.* This spawned a new statutory section detailing the Department's responsibility to publish the information online. *Id.* § 10. In addition to the name of the physician performing the abortion, Indiana required staff to provide the physician's medical license number and an emergency contact number at which patients could reach the physician or a designee at all hours. *Id.* § 9. Indiana required staff at abortion facilities to give patients false and misleading information, which it calls "[o]bjective scientific information," about the risks of abortion, e.g., "the potential danger of infertility." *Id.* Also under this pretense, Indiana compelled medical personnel to state that "human physical life begins when a human ovum is fertilized by a human sperm" and "that a fetus can feel pain at or before twenty (20) weeks of postfertilization age." *Id.* The State further required medical personnel to offer a patient the opportunity to view fetal ultrasound imaging and hear the fetal heartbeat, if audible. *Id.* The patient then had to certify in writing that the patient was given that opportunity and whether the patient declined. *Id.*

127.   In 2013, Indiana required the Department to develop a brochure with state-mandated information. Pub. L. No. 136, § 7 (2013). It required the abortion provider, referring physician, or other specified delegee, to give the patient a color copy of the brochure, which also

had to include information about the provider. *Id.* § 6. Unsatisfied with giving a patient the opportunity to have an ultrasound, the State decided to force one on the patient by requiring providers to perform a mandatory ultrasound before an abortion. *Id.* Indiana also required the patient to certify, now on a form created by the State, that the patient received the state-mandated information. *Id.*

128.    In 2015, Indiana added even more mandatory disclosures for abortion patients: 1) tissue disposal rights, 2) disposal options, and 3) information about any available post-abortion counseling. Pub. L. No. 113, § 5 (2015). These mandatory disclosures gave rise to even more state-developed and mandated forms. *Id.*

129.    Indiana was unrelenting the following year. It required physicians to discuss and provide a patient diagnosed with a lethal fetal anomaly Department-issued resources on perinatal hospices eighteen hours before an abortion. Pub. L. No. 213, § 14 (2016). And it required patients who "cho[se] to have an abortion rather than continue the pregnancy in perinatal hospice care" to certify they had received these materials. *Id.* Further, Indiana barred staff from making mandatory in-person disclosures in a group setting. *Id.* At the same time, it added yet another mandatory disclosure: that Indiana bans abortion due solely to the race, sex, or disability of the fetus. *Id.* Finally, Indiana altered the requirement that a person receive an ultrasound at some point before the abortion procedure to require that the person obtain the ultrasound at least eighteen hours before the abortion, when state-mandated information is provided. *Id.*

130.    Plaintiffs challenge the following mandatory disclosure and waiting period laws currently in force in Indiana:

a. the <u>state-mandated information requirements</u> codified at Ind. Code § 16-34-2-1.1(a)–(b), which, as applied by Defendant Box, require abortion providers to give irrelevant, medically inaccurate, and ideologically charged information to their patients; and

b. the <u>state-printed materials requirements</u> codified at Ind. Code § 16-34-2-1.1(a)–(b), 16-34-2-1.5, which require abortion providers to distribute materials published by Defendant Box that contain irrelevant, medically inaccurate, and ideologically charged information;

c. the <u>ultrasound requirement</u> codified at Ind. Code § 16-34-2-1.1(a)(5), to the extent it requires providers to perform, and patients to undergo, often redundant and medically unnecessary ultrasound examinations;

d. the <u>waiting period requirements</u> codified Ind. Code § 16-34-2-1.1(a)(1)–(2), (a)(4), (b)–(c), to the extent they require patients to receive certain state-mandated information at least eighteen hours before obtaining an abortion;[46] and

e. the <u>procedural requirements</u> codified at Ind. Code §§ 16-34-2-1.1, 16-34-2-5.1, which impose burdensome and medically unnecessary procedural mandates on abortion providers and patients in connection with the foregoing requirements.

131.  The challenged restrictions are enforced through civil and administrative penalties, disciplinary sanctions, and criminal penalties. *See* Ind. Code §§ 16-34-2-7(c), 25-1-9-4(2)–(3), 25-1-9-9, 25-22.5-8-6(b)(2); 410 Ind. Admin. Code 26-2-8, 410 Ind. Admin. Code 26-2-5(1), (4), (6).

---

[46] Indiana also requires that the forced ultrasound be performed at least eighteen hours before an abortion when the patient receives certain state-mandated information. *See* Ind. Code Ann. § 16-34-2-1.1(a)(5). This court has preliminary enjoined that requirement, *see Planned Parenthood of Ind. and Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 273 F.Supp.3d 1013, 1043 (S.D. Ind. 2017), and it is not challenged here.

132.    Independent of the state-mandated information laws that are specific to abortion, Indiana imposes informed consent requirements on healthcare providers. *See, e.g.*, Ind. Code §§ 34-18-12-3 to 34-18-12-4; 844 Ind. Admin. Code 5-2-3.

133.    The state-mandated information requirements compel medical personnel to inform a person seeking an abortion that "human physical life begins when a human ovum is fertilized by a human sperm." Ind. Code § 16-34-2-1.1(a)(1)(E).

134.    The state-printed materials similarly state that "human physical life begins when a human ovum is fertilized by a human sperm." Ind. State Dep't of Health, *Abortion Informed Consent Brochure* 1 (Jan. 4, 2017), https://www.in.gov/isdh/files/Abortion_Informed_Consent_ Brochure.pdf (last visited June 21, 2018).

135.    This and other mandatory disclosure restrictions contain false, misleading, medically inaccurate, and ideologically charged information.

136.    The challenged mandatory disclosure and waiting period laws are not reasonable measures.

137.    The challenged mandatory disclosure laws compel abortion providers to say things to patients that contradict their consciences and medical ethics.

138.    The challenged mandatory disclosure and waiting period laws impose burdens on abortion access that are not justified by proportional benefits.

139.    These burdens disproportionately impact poor people, people living in rural areas, younger people, immigrants, and other individuals experiencing various forms of oppression and marginalization.

140.    The challenged mandatory disclosure laws reflect and reinforce sex-stereotypes. They impinge on women's bodily integrity, including the right to control whether and when to

give birth, and life opportunities. They restrict and demean women in ways that the State does not restrict and demean men, and they perpetuate women's subordination.

### 4) Parental Involvement Laws

141.    Indiana's parental involvement laws require minors, i.e., people younger than eighteen years old, to obtain approval from a parent, legal guardian, custodian, or judge before having an abortion, even if the minor's parents are estranged, deceased, negligent, or abusive.

142.    Most minors voluntarily involve a parent in decisions about pregnancy and abortion.

143.    Some minors have good reasons for not involving a parent in decisions about pregnancy and abortion—including that their parents are not involved in their lives or they reasonably fear violence or abandonment by their parents.

144.    As with the other laws challenged herein, Indiana's parental involvement laws have become incrementally more burdensome over time.

145.    In 1993, Indiana adopted its parental consent requirement. Pub. L. No. 2, § 17 (1993). It prohibits a physician from providing an abortion to a minor without the written consent of the pregnant minor's parent or legal guardian or a judicial bypass order. *Id.*

146.    In 2011, Indiana limited where a minor could file a judicial bypass application. Pub. L. No. 193, § 13 (2011). Previously, a minor could file in any county in Indiana. Now, minors can only file in their county of residence or the county in which their abortion is to be performed. *Id.* Indiana also added a prohibition preventing a physician or abortion provider from serving as a "next friend" and filing a petition on the minor's behalf. *Id.*

147.    In 2017, Indiana made it even more difficult for a minor to obtain an abortion. Among other things, it added a parental notice requirement, as well as burdensome identification

and documentation requirements. Pub. L. No. 173, § 4 (2017). It narrowed the emergency

exceptions to parental consent or judicial bypass. *Id.* Indiana added more prohibitions and

penalties related to assisting a minor with obtaining an abortion without parental consent. *Id.* §§

5-6. It also prohibited the State or an agency of the State with wardship or guardianship of a

minor from consenting to an abortion on behalf of the minor, except in very limited situations.

*Id.* § 3.

148.     Plaintiffs challenge the following parental involvement laws currently in force in

Indiana:

a.   the <u>parental consent requirement</u> codified at Ind. Code §§ 16-34-2-1(a)(1)(C), 16-34-

2-4(a), which requires abortion providers to obtain written consent from a parent,

legal guardian, or custodian of a minor patient before performing an abortion;

b.   the <u>requirements for judicial bypass</u> codified at Ind. Code § 16-34-2-4(b)–(e), which

govern the process by which pregnant minors or their "next friend[s]" may obtain a

court order authorizing them to obtain an abortion without parental consent, including

i.      the requirement that a pregnant minor's application be filed in the

minor's county of residence or county in which the abortion is to

be performed, Ind. Code § 16-34-2-4(b);

ii.     the prohibition against an abortion provider serving as the minor's

next friend, Ind. Code § 16-34-2-4(b); and

iii.    the requirement that a physician who believes compliance with the

parental consent requirement would have an adverse effect on the

pregnant minor file a petition seeking waiver of the requirement

within twenty-four hours of the minor requesting the abortion, Ind. Code § 16-34-2-4(c).

c.   the <u>abortion ban for minors who are a ward of the State</u> codified at Ind. Code § 16-34-1-10, which prohibits the State or agency of the State with wardship or guardianship of a minor from consenting to an abortion unless a physician certifies that the abortion is necessary to avert the minor's death or a substantial and irreversible impairment of a major bodily function;

d.   the <u>reporting requirements for minor patients</u> codified at Ind. Code § 16-34-2-5(b), which require providers to transmit to the State, sometimes within three days after an abortion is performed, information about their minor patients, which the State can make publicly available.

149.   The challenged restrictions are enforced through civil and administrative penalties, professional discipline, and criminal penalties. *See* Ind. Code §§ 16-34-2-7(b), 16-34-2-4.2(c)–(d), (f), 25-22.5-8-6(b)(2), 25-1-9-4(a)(2)–(3), 25-1-9-9, 16-34-2-5(d); 410 Ind. Admin. Code 26-2-8, 410 Ind. Admin. Code 26-2-5(1), (4), (6).

150.   The challenged parental involvement laws impose burdens on abortion access that are not justified by proportional benefits.

151.   These burdens disproportionately impact poor people, rural people, people of color, immigrant people, and other individuals experiencing various forms of oppression and marginalization.

**5) Criminal Penalties**

152.   Indiana imposes generally-applicable criminal liability on physicians who engage in the unlawful practice of medicine and certain other acts impacting public health and safety. *See,*

*e.g.*, Ind. Code §§ 25-22.5-8-2 (unlawful practice of medicine), 35-47-7 (failure to report wounds), 16-41-7-5 (notification regarding communicable disease).

153.   In addition to generally-applicable criminal liability, Indiana targets abortion providers for additional criminal liability related to the provision of abortion care.

154.   By imposing additional criminal liability on abortion providers, Indiana singles out abortion and abortion providers for differential treatment.

155.   Plaintiffs challenge the following provisions that subject abortion providers to special criminal penalties:

    a.   Ind. Code § 16-34-2-7(a)–(b), which makes it a crime to perform an abortion in violation of Indiana law and carries a prison sentence of up to six years and fines up to $10,000;

    b.   Ind. Code § 16-21-2-2.5(b), which makes it a crime to advertise or operate an unlicensed abortion clinic and carries a jail sentence of up to one year and fines up to $5,000; and

    c.   Ind. Code § 16-34-2-5(d), which makes it a crime to fail to complete or timely transmit a state-mandated form reporting detailed information about a provider's patients and practices and carries a jail sentence of up to one hundred eighty days and fines up to $1,000.

156.   The challenged criminal penalties impose burdens on abortion access that are not justified by proportional benefits.

157.   These burdens disproportionately impact poor people, people of color, people living in rural areas, immigrants, and other individuals experiencing various forms of oppression and marginalization.

158.     The challenged criminal penalties reflect and reinforce sex-stereotypes. They impinge on women's bodily integrity, including the right to control whether and when to give birth, and life opportunities. They restrict and demean women in ways that the State does not restrict and demean men, and they perpetuate women's subordination.

**D. Nature of the Burdens Imposed by the Challenged Laws**

159.     Individually and collectively, the challenged laws burden abortion access.

160.     Each of the challenged laws compounds the burdensome effects of another.

161.     The challenged laws directly burden individuals seeking abortion care; the burdens compound, and are compounded by, other challenges that individuals seeking abortion care battle; and they threaten the long-term sustainability of abortion care.

**1)  Direct Burdens on Individuals**

162.     The challenged laws directly burden people seeking access to abortion care.

163.     The challenged laws decrease the availability and accessibility of abortion care, unnecessarily limiting the number of abortion providers, the geographic distribution of abortion providers, and the practice settings in which abortion care is provided. As a result, people have fewer options for where to obtain abortion care.

164.     The challenged laws prevent some people seeking a medication abortion from having one.

165.     The challenged laws delay access to abortion care. As a result, people must unnecessarily wait longer to obtain abortions and delay obtaining care until later in their pregnancies. In some cases, the delay prevents a person from obtaining abortion care in Indiana.

166.     The challenged laws increase the cost of abortion care. As a result, people must pay more money to obtain an abortion. Indiana law prohibits public and private health insurance from covering abortion care in most circumstances, forcing people to pay out-of-pocket for their care.

167.    The challenged laws increase the distance that many people must travel to access abortion care. These increased travel distances, combined with practical concerns unique to every person (e.g., lack of childcare, reliable transportation, and time off from work or school), make it more difficult (and more expensive) to access abortion care. It also makes it harder to find an affordable mode of reliable transportation.

168.    The challenged laws increase the time that a person must spend at an abortion facility to obtain an abortion. As a result, the challenged laws force a person to be absent from work, school, and/or family responsibilities for longer periods of time.

169.    The challenged laws make it harder for people to keep their pregnancies confidential. This burdens the privacy of all and exposes some to the threat of violence and harassment.

170.    The challenges laws force some people to leave the state to obtain an abortion.

171.    The challenged laws increase a person's health risks from pregnancy and abortion.

172.    The challenged laws increase the stress and anxiety of people with unwanted pregnancies.

173.    The challenged laws stigmatize abortion care.

174.    The challenged laws reinforce sex-stereotypes.

175.    The burdens imposed by the challenged laws exacerbate one another. Decreased availability of abortion care, for example, leads to increased delay and expense. Increased expense leads to further delay for a person who must save or raise the money for an abortion procedure. Delay makes it harder for a person to keep their pregnancy confidential and leads to increased cost, stress, and health risks. It also imposes emotional and spiritual burdens on a person who finds later abortion less acceptable than earlier abortion.

176.     These burdens prevent some people from obtaining an abortion. Others find a way to overcome the burdens. In all cases, they undermine an individual's dignity and status as an equal member of society by forcing that person to endure unnecessary hardship as a condition of obtaining abortion care.

177.     The Constitution prohibits states from imposing any burden on a person seeking abortion care that is not justified by a proportional benefit, regardless of whether the burden ultimately prevents her from ending her pregnancy. *Whole Woman's Health*, 136 S. Ct. at 2300, 2309–10. States cannot heap burdens on people seeking abortion care without valid reason. The desire to punish or stigmatize people for their reproductive choices is not a valid reason under the Constitution. *Casey*, 505 U.S. at 851–52, 877.

### 2)  Compounding Other Challenges Faced by People Seeking Abortion Care

178.     The challenged laws burden all people seeking abortion access.

179.     The challenged laws interact with people's lived experiences and socioeconomic disadvantages to unconstitutionally restrict the right to abortion.

180.     The challenged laws compound the effects of other forms of discrimination and oppression, such as racism and poverty.

181.     The burdens imposed by the challenged laws disproportionately impact poor people, people of color, people living in rural areas, immigrants, and other individuals experiencing various forms of oppression and margination.

182.     Low-income people have greater difficulty accessing healthcare, including contraception and abortion care, than people with greater financial means. People living in poverty too often must delay or forgo healthcare. Unintended pregnancy rates are highest among low-income women and lowest among higher-income women. The challenged laws compound the

difficulties faced by low-income individuals, making it exponentially harder for them to access abortion care and increasing inequities both in the distribution of healthcare and in the ability to exercise constitutional rights.

183.    Low-income people are more likely to have trouble getting or paying for reliable transportation, which can result in missed appointments even when medical care is available in their communities. Transportation difficulties also impact people differently depending on the other challenges they face. These difficulties can also be more pronounced for individuals living in rural areas.

184.    People of color are more likely to be low-income than white people. Nationally, unintended pregnancy rates tend to be lowest among white women as compared to women of color. Controlling for income, people of color are more likely to experience poor health outcomes than white people because of the effects of structural racism in our society. In Indiana, for example, Black women are more than twice as likely as other women to die from pregnancy. The challenged laws' adverse effects are particularly pronounced among people of color.

185.    Immigrants often must contend with barriers to healthcare access that people born and raised in the United States do not. These barriers include lack of English proficiency, limitations on movement within a state, and fear of detention by immigration authorities. The challenged laws compound these barriers.

186.    The harms imposed by the challenged laws are amplified by the life circumstances of the individuals they impact.

### 3) Threatening the Sustainability of Abortion Care

187.    In addition to imposing immediate burdens on abortion access, the challenged laws also threaten the long-term sustainability of abortion care.

188.     As improved access to contraceptives causes the abortion rate to decline, it becomes less economically feasible to provide abortion care in discrete, specialized clinics.

189.     This problem is most acute in rural areas that lack a large patient base, but it is a threat even to clinics in large, metropolitan areas.

190.     Abortion providers must be able to adapt their practice models to ensure that abortion care will be accessible.

191.     The challenged laws do not afford abortion providers the flexibility they need to evolve in the face of changing circumstances.

192.     The challenged laws make it practically impossible to integrate abortion care into more diversified medical practices, including primary care practices.

193.     The challenged laws prevent abortion providers from using telemedicine to serve patients.

194.     If the long-term burdens imposed by these restrictions are not addressed until most or all the clinics in Indiana close, there will be a shortage of abortion providers that prevents people from accessing abortion care.

195.     If abortion providers were not subject to the unique, onerous, and medically unnecessary requirements, restrictions, and penalties embodied in the challenged laws, then more healthcare providers would be willing to provide abortion care, and they could do so in a wider variety of practice settings with more diverse revenue streams. As a result, the number and geographic distribution of abortion providers in Indiana would increase, and their practice models would be economically sustainable.

## CLAIMS

## COUNT I

### (Substantive Due Process)

196.     The allegations of paragraphs 1 through 195 are incorporated as though fully set forth herein.

197.     The challenged laws, individually and collectively, impose an undue burden on access to previability abortion in Indiana in violation of the Due Process Clause of the Fourteenth Amendment.

## COUNT II

### (Equal Protection)

198.     The allegations of paragraphs 1 through 195 are incorporated as though fully set forth herein.

199.     Each of the challenged laws denies equal protection of the laws to women, abortion patients, and abortion providers in violation of the Equal Protection Clause of the Fourteenth Amendment.

## COUNT III

### (First Amendment—Free Speech)

200.     The allegations of paragraphs 1 through 195 are incorporated as though fully set forth herein.

201.     The state-mandated information and state-printed materials requirements violate the freedom of speech of Plaintiffs WWHA and Dr. Glazer.

## COUNT IV

### (Vagueness)

202.     The allegations of paragraphs 1 through 195 are incorporated as though fully set forth herein.

203.    As applied by the Department, the requirement that an applicant for a license to operate an abortion clinic be of "reputable and responsible character" is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment.

204.    The requirement that an applicant for an abortion clinic disclose whether "the applicant, or an owner or affiliate of the applicant, operated an abortion clinic that was closed as a direct result of patient health and safety concerns" or whether "a principal or clinic staff member was ever employed by a facility owned or operated by the applicant that closed as a result of administrative or legal action" is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment.

205.    The dosage and administration restriction for medication abortion is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

1.  Permanently enjoin Defendants and their employees, agents, and successors in office from enforcing:

    a.  the challenged TRAP laws; and/or

    b.  any challenged TRAP law or portion of a challenged TRAP law that is unconstitutional; and/or

    c.  the challenged reporting requirements law to the extent it permits information reported to the Department to be made publicly available; and/or

    d.  the challenged laws denying abortion patients the benefits of scientific progress; and/or

e.  any challenged law denying abortion patients the benefits of scientific progress or portion of a law denying abortion patients the benefits of scientific progress that is unconstitutional; and/or

f.  the telemedicine ban as applied to the provision of medication abortion; and/or

g.  the telemedicine ban as applied to the provision of state-mandated information; and/or

h.  the challenged dosage and administration restriction for medication abortion; and/or

i.  the challenged mandatory disclosure and waiting period laws; and/or

j.  any challenged mandatory disclosure or waiting period law or portion thereof that is unconstitutional; and/or

k.  the challenged parental involvement laws; and/or

l.  any challenged parental involvement law or portion of a challenged parental consent law that is unconstitutional; and/or

m.  the challenged parental involvement laws as applied to seventeen-year olds; and/or

n.  the challenged parental involvement laws to the extent that they do not permit grandparents, other adult relatives, and de facto guardians to give the required consent and receive the required notice; and/or

o.  the challenged abortion ban concerning a minor who is a ward of the State; and/or;

p.  the challenged reporting requirements law for minor patients to the extent it permits information transmitted to the State to be made publicly available; and/or

q.  the challenged criminal penalties; and/or

r.  any challenged criminal penalty or portion of a challenged criminal penalty that is unconstitutional; and/or

2.  Issue a declaratory judgment that the following provisions are unconstitutional:

a.  the challenged TRAP laws; and/or

b.  any challenged TRAP law or portion of a challenged TRAP law that is unconstitutional; and/or

c.  the challenged reporting requirements law to the extent it permits information reported to the Department to be made publicly available; and/or

d.  the challenged laws denying abortion patients the benefits of scientific progress; and/or

e.  any challenged law denying abortion patients the benefits of scientific progress or portion of a law denying abortion patients the benefits of scientific progress that is unconstitutional; and/or

f.  the telemedicine ban as applied to the provision of medication abortion; and/or

g.  the telemedicine ban as applied to the provision of state-mandated information; and/or

h.   the challenged dosage and administration restriction for medication abortion; and/or

i.   the challenged mandatory disclosure and/or waiting period laws; and/or

j.   any challenged mandatory disclosure and/or waiting period or portion thereof that is unconstitutional; and/or

k.   the challenged parental involvement laws; and/or

l.   any challenged parental involvement law or portion of a challenged parental consent law that is unconstitutional; and/or

m.   the challenged parental involvement laws as applied to seventeen-year olds; and/or

n.   the challenged parental involvement laws to the extent that they do not permit grandparents, other adult relatives, and de facto guardians to give the required consent and receive the required notice; and/or

o.   the challenged abortion ban concerning a minor who is a ward of the State; and/or

p.   the challenged reporting requirements law for minor patients to the extent it permits information transmitted to the State to be made publicly available; and/or

q.   the challenged criminal penalties; and/or

r.   any challenged criminal penalty or portion of a challenged criminal penalty that is unconstitutional; and/or

3.   Issue a declaratory judgment that the challenged dosage and administration restriction for medication abortion is inoperative; and/or

4.  Award Plaintiffs attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and/or

5.  Grant such other and further relief as the Court may deem just, proper, and equitable.

Dated: June 21, 2018

Respectfully submitted,

| | |
|---|---|
| Dipti Singh* | /s/*Kathrine D. Jack* |
| LAWYERING PROJECT | Kathrine D. Jack |
| 811 W. 7th St., Fl. 12 | JACK LAW OFFICE LLC |
| Los Angeles, CA 90017 | One Courthouse Plaza |
| 646-480-8973 | P.O. Box 813 |
| dsingh@lawyeringproject.org | Greenfield, IN 46140 |
| | (317) 477-2300 |
| Amanda Allen** | kjack@lawoffice.com |
| 646-490-1254 | |
| aallen@lawyeringproject.org | Paul M. Eckles** |
| David Brown** | paul.eckles@probonolaw.com |
| 646-490-1225 | Erin A. Simmons** |
| dbrown@lawyeringproject.org | erin.simmons@probonolaw.com |
| Juanluis Rodriguez** | Bradley E. Honigman** |
| 646-490-1080 | bradley.honigman@probonolaw.com |
| prodriguez@lawyeringproject.org | Michael M. Powell** |
| Stephanie Toti*** | michael.powell@probonolaw.com |
| 646-490-1083 | 4 Times Square, Fl. 24 |
| stoti@lawyeringproject.org | New York, New York 10036 |
| LAWYERING PROJECT | (212) 735-3000 |
| 25 Broadway, Fl. 9 | |
| New York, NY 10004 | |

*Application for admission pending
**Motion for admission *pro hac vice* forthcoming
***Application for admission forthcoming

*Attorneys for Plaintiffs*