UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| WHOLE WOMAN'S HEALTH ALLIANCE; ALL-OPTIONS, INC.; and JEFFREY GLAZER, M.D. <br><br> Plaintiffs, <br><br> v. <br><br> CURTIS T. HILL, JR., Attorney General of the State of Indiana, in his official capacity; KRISTINA BOX, M.D., Commissioner of the Indiana State Department of Health, in her official capacity; JOHN STROBEL, M.D., President of the Medical Licensing Board of Indiana, in his official capacity; and KENNETH P. COTTER, St. Joseph County Prosecutor, in his official capacity and as representative of a class of all Indiana prosecuting attorneys with authority to prosecute felony and misdemeanor offenses, <br><br> Defendants. | CASE NO. 1:18-cv-1904-SBE-MJD <br><br> CIVIL ACTION <br><br> CLASS ACTION |

## **DECLARATION OF ELLYN STECKER, M.D.**

ELLYN STECKER, M.D., hereby declares under penalty of perjury that the following statements are true and correct:

### **Background**

1. I am a retired physician who remains licensed to practice medicine in Indiana and Wisconsin. I received my M.D. from Michigan State University in 1977 and a B.A. in Chemistry from the University of Wisconsin in 1967. I have been continuously board certified in Family Medicine since 1980. I have had admitting privileges at four different hospitals.

2. I moved to South Bend, Indiana, in 1977 to complete my medical residency in Family Medicine. For over thirty-five years, I provided a wide range of healthcare services,

1

including obstetrics and gynecology. I delivered hundreds of babies and provided referrals for abortion care.

3. I owned my own practice for nearly 18 years. After I closed my practice, I worked as a substitute physician in local family practice clinics and urgent care centers. I also provided care in developing countries.

4. I have worked occasionally as a part-time and volunteer physician with Planned Parenthood clinics in South Bend and Wisconsin, providing a variety of reproductive health services, such as contraceptive care, counseling, sexually transmitted disease management, and well-woman exams. I also served on the Board of Directors for Planned Parenthood of Indiana and Kentucky from 2009-2014.

5. I volunteered as an abortion clinic escort in South Bend until our local clinic closed.

6. I am a member of Pro-Choice South Bend, a coalition of individuals that seeks to increase access to abortion services in South Bend.

**Backup Physician**

7. Stigma around abortion care is pervasive in South Bend. For example, there are billboards around town that try to shame patients for wanting or seeking an abortion. Anti-abortion protestors also regularly shouted at and harassed the staff and patients providing and seeking care at our local abortion clinic, which closed years ago.

8. The University of Notre Dame and St. Mary's College are located in the area, and both institutions are staunchly anti-abortion. For example, a person associated with Notre Dame once told a member of the Planned Parenthood Board of Directors to end her participation on that board or risk adversely affecting her spouse's career at the University. The spouse of a St. Mary's College faculty member told me she would not participate in a national reproductive rights march

until after her husband became tenured at St. Mary's College out of fear that her participation would jeopardize his tenure prospects.

9. The stigma around abortion care also pervades the local physician community.

10. In 2017, Whole Woman's Health Alliance ("WWHA") reached out to me and several other physicians for help finding a physician in or around the South Bend area with hospital admitting privileges to agree, in writing, to admit to the hospital any patient who requires hospital admission following an abortion ("backup physician").

11. Indiana did not always require abortion providers to have either admitting privileges or a backup physician agreement. The law changed, however, over the course of approximately a decade. At first, there was no admitting privileges or back up physician requirement. Then, there was such a requirement, but the agreement with the backup physician could be an oral one. Then, the law changed again so that the agreement with the backup physician had to be in writing and provided to the Indiana State Department of Health. That is the requirement now in effect. Under today's law, the State must also share the written agreement with all hospitals in St. Joseph County and adjacent counties.

12. I gave up my hospital admitting privileges in 2009. The requirements for maintaining privileges were too burdensome relative to the needs of my then solely outpatient practice. The hospitals in South Bend also required a minimum number of annual patient admissions, which I could no longer meet. Because I could not admit patients to the hospital at the time that WWHA approached me, I could not be the backup physician.

13. Other healthcare providers and I reached out to dozens of colleagues to see if they would enter into a written agreement to be the backup. We contacted physicians we knew and also asked other healthcare providers for leads. Everyone we contacted ultimately said no.

14. Many physicians we reached out to were very supportive of WWHA opening an abortion clinic in South Bend. They told us that the clinic would fill a much-needed gap in care. But no one was willing to serve as the backup physician.

15. One reason physicians identified for being unwilling to serve as the backup was fear that their names would be publicly disclosed. They told us that they worried about the negative consequences such a disclosure would have on their personal and professional lives.

16. I am aware that several physicians were willing to assume the backup role, but when they requested permission to do so from the other partners in their medical practices, the partners said no. Some of the partners said that they feared harassment. They also said that they did not want anti-abortion protestors to picket and protest the practice, which could cause them financial harm. Other partners cited their personal opposition to abortion.

17. Some physicians told me that they said no because they feared that their names would be revealed, and their colleagues would ostracize them. Still others said that they did not want to risk creating untenable work situations for their spouses whose employers were anti-abortion. For example, one physician said that she did not want to jeopardize her spouse's employment at the University of Notre Dame.

18. Physicians also expressed concern about exposing their families to harassment and violence if their identities were revealed. They told me that they were not willing to risk the safety of their loved ones.

## Lack of a Local Abortion Provider Harms Patients

19. The stigma around abortion care in our local community has other negative consequences. For example, based on my conversations with patients and other physicians, I believe it leads providers in our community to fear counseling pregnant patients about their

4

options. As a result, some patients do not get the information they need to make an informed decision about their pregnancy or about how to prevent a future pregnancy.

20. When I was a family medicine doctor, I would regularly see patients who became pregnant. I counseled these patients about their options. Some of the patients I counseled decided to end their pregnancies. They had different reasons for wanting to do so. Some patients were already parents. Having another child would prevent them from parenting their existing children as well as they wanted to because of financial or personal limitations. Some patients did not have the family support they would need to be able to care for a child. Still others wanted to focus on school or their careers. I would refer patients who needed an abortion to the two closest clinics that provided abortion services: one in South Bend and one in Niles, Michigan, about 13 miles from South Bend. Those clinics have since closed.

21. I know of only six clinics currently providing abortions in the entire state of Indiana. The nearest one to South Bend is in Merrillville, which is about 70 miles away.

22. The lack of abortion providers in northern Indiana makes it difficult for patients in the region seeking care. As a Family Medicine doctor who treated patients in South Bend for decades, I know from experience that it is not uncommon for patients to miss a medical appointment because of unreliable or unavailable transportation. This is especially true in winter. Indiana's blizzards, cold winters, and often-unpredictable weather patterns would result in patients coming to an appointment late or missing it altogether.

23. As a longtime Indiana resident, and one who commuted to Michigan to work for a period of time, I know that driving longer distances can be time-consuming and dangerous in the winter months. Icy roads, snow, high winds, and below-freezing temperatures can significantly increase the amount of time it takes to complete a drive. This means that the roughly three-hour

drive, each way, from South Bend to Indianapolis under good driving conditions could be four or more; the slightly over one-hour one-way drive to Merrillville could turn into three or more.

24. Patients with lower incomes are more acutely burdened by having to travel to access healthcare. Some patients do not have a car. They are forced to depend on others to drive them. Some patients who have cars, have unreliable ones. Driving hours to an appointment could mean breaking down on the side of the road in a blizzard. Gasoline is also expensive and can be another barrier to driving to obtain care.

25. Public and commercial transportation options are limited in the area. For example, there is no direct bus or train that connects South Bend to Merrillville or Indianapolis.

26. Even when public or commercial transportation is available, patients still face logistical burdens. Buses can be unpredictable, fares can be costly relative to a person's disposable income, and poor road conditions can cause delays or cancellations. If a patient has an early morning appointment, it could require traveling the night before and staying overnight.

27. Patients who have dependent children also have greater difficulty making their appointments. They must either bring their children with them or find childcare. These difficulties increase the farther and longer the person has to travel.

28. It can also be hard for patients to take time off from work. The longer a person must be away, the more work they have to miss. Patients often want someone to accompany them to their appointments and that person will also have to take time off.

29. Because Indiana's state-mandated waiting period requires an in-person visit with a physician at least 18 hours prior to the abortion, patients must sometimes make two round-trip journeys or add an overnight stay, no matter how they get themselves to an in-state clinic.

30. Having to worry about getting to and from a clinic, navigating an unknown place, figuring out where to stay overnight, finding childcare, and missing work increase the stress and anxiety that some patients experience. It also increases the cost of obtaining care.

31. A local abortion provider will reduce, if not eliminate, many of the burdens patients experience as a result of being forced to leave northern Indiana to access care.

32. Local physicians would also welcome having an experienced abortion provider to consult with and refer patients.

33. As a Family Medicine physician, I believe that it is important for patients to have access to caring, personal counseling about their options and to abortion care in their own community.

Dated: March 24, 2019

*Ellyn Stecker, MD*

_____
ELLYN STECKER, M.D.