# Administrative Record Excerpts I

*Whole Women's Health Alliance v. Indiana State Department of Health*

Cause No. ACL-000132-18

(Bates Prefix WWHA_RR)

| | | |
|---|---|---|
| STATE OF INDIANA | ) | INDIANA STATE DEPARTMENT OF HEALTH |
| | ) SS: | |
| COUNTY OF MARION | ) | CAUSE NO. ACL-132-18 |

WHOLE WOMAN'S HEALTH ALLIANCE, )
)
       Petitioner, )
)
vs. )
)
INDIANA STATE DEPARTMENT OF HEALTH, )
)
       Respondent. )

Indiana State Department of Health
Office of Legal Affairs

OCT 02 2018

FILED

## <u>OBJECTION TO RECOMMENDED ORDER AND NOTICE OF APPEAL</u>

      Respondent Indiana State Department of Health ("ISDH"), by counsel, respectfully

objects to the "Findings of Fact, Conclusions of Law, and Recommended Order" issued on

September 14, 2018 in this cause, and appeals this matter to the ISDH Appeals Panel.

                            Respectfully submitted,

                            *Rebecca M. Brelage*

Rebecca Brelage, Senior Counsel (26960-19)
(317) 233-7746 / RBrelage@isdh.in.gov

Matthew Foster, Special Counsel (16400-49)
(317) 233-7289 / MFoster@isdh.in.gov

Angela Rinehart, Staff Attorney (34753-49)
(317) 234-8361 / ARinehart@isdh.in.gov

ISDH Office of Legal Affairs
2 North Meridian Street
Indianapolis, Indiana 46204

Attorneys for Respondent

WWHA_RR00001114

## CERTIFICATE OF SERVICE

I certify that on October 2, 2018, copies of the foregoing were served by first-class

prepaid U.S. mail and email upon the following:

Kathrine D. Jack
JACK LAW OFFICE LLC
One Courthouse Plaza
P.O. Box 813
Greenfield, IN 46140
kjack@jacklawoffice.com

Stephanie Toti
Lawyering Project
25 Broadway, 9th Floor
New York, NY 10004
stoti@lawyeringproject.org

Dipti Singh
Lawyering Project
1601 Vine Street, 6th Floor
Los Angeles, CA 90028
dsingh@lawyeringproject.org

_____
Attorney for Respondent

<u>Copies to:</u>  Hon. Clare Deitchman, ALJ

2

WWHA_RR00001115

...

**Page 1**

```
STATE OF INDIANA )
               ) SS:
COUNTY OF MARION )

        BEFORE THE INDIANA STATE
           DEPARTMENT OF HEALTH
          CAUSE NO. ACL-000132-18

WHOLE WOMAN'S HEALTH        )
ALLIANCE,                   )
                            )
        Petitioner,         )
                            )
    VS.                     )
                            )
INDIANA STATE               )
DEPARTMENT OF HEALTH,       )
                            )
        Respondent.         )
```

Transcript of the proceedings held on the 22nd day of August, 2018, at 402 West Washington Street, Conference Center Room A, Indianapolis, Indiana, before Heather S. Orbaugh, Notary Public in and for the County of Boone, State of Indiana, CCR: LA.

```
        ACCURATE REPORTING OF INDIANA
     William F. Daniels, Prop., RPR/CP, CM
            12922 Brighton Avenue
            Carmel, Indiana  46032
               (317) 848-0088
```

**Page 2**

A P P E A R A N C E S

ADMINISTRATIVE LAW JUDGE:

Ms. J. Clare Deitchman

FOR PETITIONER:

Ms. Dipti Singh
LAWYERING PROJECT
811 W. 7th Street
12th Floor
Los Angeles, California 90017

Ms. Stephanie Toti
LAWYERING PROJECT
25 Broadway
9th Floor
New York, New York 10004

Ms. Kathrine D. Jack
LAW OFFICE OF KATHRINE D. JACK
One Courthouse Plaza
PO Box 813
Greenfield, Indiana 46140

FOR RESPONDENT:

Mr. Matthew W. Foster
INDIANA STATE DEPARTMENT OF HEALTH
Director
Division of Long Term Care
2 North Meridian Street
Section 4-B
Indianapolis, Indiana 46204

Ms. Rebecca Brelage
INDIANA STATE DEPARTMENT OF HEALTH
2 North Meridian Street
Section 4-B
Indianapolis, Indiana 46204

Ms. Angela Rinehart
INDIANA STATE DEPARTMENT OF HEALTH
2 North Meridian Street
Section 4-B
Indianapolis, Indiana 46204

**Page 3**

I N D E X

WITNESS TRENT FOX

DIRECT EXAMINATION BY MS. BRELAGE ............ 19
CROSS-EXAMINATION BY MS. TOTI................. 54
REDIRECT EXAMINATION BY MS. BRELAGE .......... 100
RECROSS-EXAMINATION BY MS. TOTI .............. 104

WITNESS JOHN BUCY

DIRECT EXAMINATION BY MR. FOSTER ............. 109
CROSS-EXAMINATION BY MS. SINGH ............... 139

WITNESS MERRY MULLINS

DIRECT EXAMINATION BY MS. SINGH .............. 141
CROSS-EXAMINATION BY MR. FOSTER .............. 163

WITNESS BEVERLY WHIPPLE

DIRECT EXAMINATION BY MS. SINGH .............. 168
CROSS-EXAMINATION BY MR. FOSTER .............. 191
REDIRECT EXAMINATION BY MS. SINGH ............ 200
RECROSS-EXAMINATION BY MR. FOSTER ........... 202
FURTHER DIRECT EXAMINATION BY MS. SINGH ...... 204
FURTHER CROSS-EXAMINATION BY MR. FOSTER ...... 205

**Page 4**

E X H I B I T S

Joint Exhibit Number 1 .......... 32
Joint Exhibit Number 2 .......... 28
Joint Exhibit Number 3 .......... 28
Joint Exhibit Number 4 .......... 28
Joint Exhibit Number 6 .......... 39
Joint Exhibit Number 7 .......... 39
Joint Exhibit Number 8 .......... 39
Joint Exhibit Number 9 .......... 39
Joint Exhibit Number 10 ......... 39
Joint Exhibit Number 11 ......... 39
Joint Exhibit Number 12 ......... 39
Joint Exhibit Number 13 ......... 39
Joint Exhibit Number 14 ......... 53
Joint Exhibit Number 17 ......... 207
Joint Exhibit Number 19 ......... 28
Joint Exhibit Number 20 ......... 133
Joint Exhibit Number 22 ......... 33
Joint Exhibit Number 23 ......... 47
Joint Exhibit Number 24 ......... 47
Petitioner's Exhibit Number 15 .. 129
Petitioner's Exhibit Number 16 .. 59
Petitioner's Exhibit Number 18 .. 178
Petitioner's Exhibit Number 50 .. 184
Petitioner's Exhibit Number 58 .. 163
Petitioner's Exhibit Number 62 .. 63
Respondent's Exhibit I .......... 28
Respondent's Exhibit J .......... 28
Respondent's Exhibit Y .......... 47
Respondent's Exhibit Z .......... 47
Respondent's Exhibit AA ......... 53
Respondent's Exhibit CC ......... 207
Respondent's Exhibit DD ......... 207

WWHA_RR00001117

5

1               9:30 AM

2           AUGUST 22, 2018

3

4        JUDGE DEITCHMAN:  We are on the record

5 in Cause Number ACL-000132-18.  My name is Clare

6 Deitchman.  I am the duly appointed Administrative Law

7 Judge for the Indiana State Department of Health.  We

8 are here today at the South Government Center in

9 Indianapolis, Indiana, to conduct a hearing as to

10 Whole Woman's Health Alliance's appeal of the denial

11 of licensure by the Indiana State Department of

12 Health.

13       On behalf of Whole Woman's Health we have

14 multiple counsel.  Counsel, would you please state

15 your name so we can get voice recognition and spell

16 your name for the record?

17        MS. TOTI:  Stephanie Toti,

18 S-t-e-p-h-a-n-i-e T-o-t-i, for the Petitioner.

19        MS. SINGH:  Dipti Singh, D-i-p-t-i

20 S-i-n-g-h, for the Petitioner.

21        MS. JACK:  And Kathrine Jack,

22 K-a-t-h-r-i-n-e J-a-c-k, also for the Petitioner.

23        JUDGE DEITCHMAN:  Counsel for the

24 Department of Health, would you please state your name

25 and spell it for the record?

6

1        MS. BRELAGE:  Rebecca Brelage,

2 R-e-b-e-c-c-a B-r-e-l-a-g-e, for the Respondent.

3        MR. FOSTER:  Matthew Foster,

4 M-a-t-t-h-e-w F-o-s-t-e-r.

5        MS. RINEHART:  Angela Rinehart,

6 A-n-g-e-l-a R-i-n-e-h-a-r-t, for the Respondent.

7        JUDGE DEITCHMAN:  Very good.  Thank you.

8 Counsel, are you prepared today to proceed?

9        MS. TOTI:  Yes, Your Honor.

10       MS. BRELAGE:  Yes, Your Honor.

11       JUDGE DEITCHMAN:  Okay.  And the burden

12 of proof of today is on the -- actually, it is on the

13 Department of Health to prove by a preponderance of

14 the evidence that it is more likely than not that

15 their denial of the application for the licensure to

16 operate an abortion clinic in South Bend, Indiana,

17 that was sent out by certified mail on or about

18 October -- I am sorry, January 3, 2018, was

19 appropriate.  Are you ready to proceed?

20       MS. BRELAGE:  We are, Your Honor.

21       JUDGE DEITCHMAN:  Okay.

22       MS. BRELAGE:  We do have some

23 preliminary matters that we would like to address.

24       JUDGE DEITCHMAN:  Let's go ahead and get

25 those taken care of.

7

1        MS. BRELAGE:  Your Honor, additionally

2 we have provided the court with some stipulations

3 regarding exhibits.  There are certain exhibits that

4 we have stipulated to the admission to.  There are

5 others that we have stipulated to the authenticity of

6 but not necessarily to the relevancy for -- to whether

7 or not they can prove the matter asserted, and those

8 stipulations have been presented to the court

9 previously.

10       We also are requesting a separation of

11 witnesses in this matter.  I would ask that the court

12 direct that to be so.

13       JUDGE DEITCHMAN:  All right.  Separation

14 of witnesses has been asked for, and basically what

15 that means is those of you who are not actual parties

16 to the case, the parties to the case would be Mr. Fox,

17 I believe, as well as I believe that the primary

18 representative for the Whole Woman's Health, Amy

19 Hagstrom Miller, you may stay in the room.

20       The rest of you who have been subpoenaed to be

21 called as witnesses will need to leave.  You may not

22 discuss your testimony or anything about this case

23 during the time that we are conducting the hearing and

24 we ask that -- we have I think made arrangements for a

25 place for you to be able to go and sit.  If you are

8

1 working for the Department of Health or a state agency

2 and you want to go back to your office, I have asked

3 counsel to contact you about 10 to 15 minutes in

4 advance of your needing to get back here, but you are

5 more than welcome to stay in the adjoining room during

6 that time.  So all those who know that they are

7 witnesses today and not a party to this case, will you

8 follow this young lady here, please?

9        MS. SINGH:  Your Honor, just one

10 question.  Mr. Bucy has been subpoenaed here today.

11 He is on the board of Petitioner as well as outside

12 counsel.  I wasn't clear in what capacity he was

13 subpoenaed, so to the extent he is testifying as a

14 board member, we request he is a party and therefore

15 allowed to stay.  But he can leave if it is in a

16 different capacity.

17       JUDGE DEITCHMAN:  Counsel?

18       MS. BRELAGE:  Your Honor, many of our

19 witnesses are also employees of the Indiana State

20 Department of Health but I think it is appropriate

21 they also be asked to be separated, and so I think

22 even if he is a member of the board, that their

23 representative here is --

24       JUDGE DEITCHMAN:  Is he testifying as a

25 member of the board or is he testifying as an

9

1 individual who may have other knowledge about these
2 proceedings?
3              MR. FOSTER: The latter, Your Honor.
4              JUDGE DEITCHMAN: All right. Then he
5 will need to leave the room. I am sorry. Anyone else
6 who has been subpoenaed? Okay. They must have left
7 earlier. Oh, there is a couple of them. All right.
8 Anything else, Ms. Brelage?
9              MS. BRELAGE: Yes, Your Honor. As is
10 the norm in these administrative hearings, we are
11 asking that the Court take judicial notice of relevant
12 statutes and administrative rules involved in this
13 proceeding, and those would be a copy of Indiana Code
14 162 1-7, Indiana Code 162 1-2, Indiana Code 162 1-4,
15 and a copy of 410, the Indiana Administrative Code 26
16 pertaining to abortion clinics.
17              JUDGE DEITCHMAN: Are they marked as
18 exhibits?
19              MS. BRELAGE: They are marked as
20 Exhibits A, B, C, and D.
21              JUDGE DEITCHMAN: A through D. Counsel,
22 do you have any objection to my taking judicial --
23 excuse me. We need to pause the record.
24              (Short recess.)
25              JUDGE DEITCHMAN: We are back on the

10

1 record. All right. Do you have any objection to my
2 taking judicial notice of A through D?
3              MS. SINGH: No, Your Honor.
4              JUDGE DEITCHMAN: A through D is going
5 to be accepted for judicial notice.
6              MS. BRELAGE: Thank you, Your Honor.
7              JUDGE DEITCHMAN: Without objection.
8              MS. BRELAGE: I would also request the
9 judge take judicial notice of the various filings of
10 record in this matter, including but not limited to
11 the Indiana State Department of Health Motion to
12 Compel Discovery filed on May 24, 2018; Whole Woman's
13 Health Alliance's Motion for Summary Judgment and
14 supporting documents filed on May 25, 2018; on June 4,
15 2018, Indiana State Department of Health's Motion to
16 Stay the Deadline for Depositions and any response to
17 Whole Woman's Health Alliance's Motion for Summary
18 Judgment; the Order of the Administrative Law Judge
19 setting a hearing on outstanding motions for July 9,
20 2018, and that was received on June 18, 2018; the
21 Response and Cross Motion for Summary Judgment and
22 supporting documents by the Indiana State Department
23 of Health on or about June 25, 2018; and the Order
24 denying all outstanding motions of both parties and
25 setting this matter for hearing, and that Order was

11

1 dated July 19, 2018.
2              I know that the Court has been very consistent
3 in its request that this have a timely conclusion to .
4 hearing and so we are preserving all of our issues for
5 appeal and we are asking that the Court take notice of
6 all of those matters today.
7              JUDGE DEITCHMAN: Any objection to my
8 taking notice of their right to preserve concerns with
9 regard to the filings that have taken place previously
10 to today for appeal purposes?
11              MS. SINGH: No, Your Honor.
12              JUDGE DEITCHMAN: All right.
13 Ms. Brelage, are you ready to call your first witness
14 or do you want to do an opening statement?
15              MS. BRELAGE: We have a very brief
16 opening statement.
17              JUDGE DEITCHMAN: All right. Your
18 Honor, we are here today regarding Whole Woman's
19 Health Alliance's application for license to open an
20 abortion clinic in South Bend, Indiana, and the
21 Indiana State Department of Health denial of that
22 application. The Indiana State Department of Health
23 has a statutory duty to license and regulate abortion
24 clinics and that duty is pursuant to Indiana Code
25 16-21-2-2, Section 4. The agency must review any

12

1 application for abortion clinic license to determine
2 that the applicant has met all statutory requirements.
3              You are going to hear a lot of testimony over
4 the next two days about this application and the
5 information provided to the Agency, but more
6 importantly the information that was not provided to
7 the agency. You are going to hear a lot from the
8 Petitioner about how Whole Woman's Health Alliance
9 provided the agency with all the information that the
10 agency requested. The Whole Woman's Health Alliance
11 answered all of our questions.
12              You are also going to see and hear statements
13 of Whole Woman's Health Alliance that simply did not
14 add up, how certain information given by Whole Women's
15 Health Alliance was inaccurate, vague, and gave
16 limited information and, in fact, omitted important
17 information.
18              By the conclusion of this hearing you will
19 have heard and seen enough evidence to conclude
20 exactly as the Indiana State Department of Health did,
21 that the agency decisionmaker in this case simply
22 could not grant this application with the information
23 he had before him at the time of the denial.
24              JUDGE DEITCHMAN: Whole Woman's Health,
25 would you like to give an opening statement at this

13

1  time?

2            MS. SINGH:  I would, Your Honor.

3            JUDGE DEITCHMAN:  Good morning.  Dipti

4  Singh for Petitioner Whole Woman's Health Alliance.

5  The issue before Your Honor is a narrow one:  The

6  Department denied Whole Woman's Health Alliance's

7  licensure application based on its finding that Whole

8  Woman's Health Alliance failed to meet the requirement

9  that it is of, quote reputable and responsible

10 character, end quote, and that the supporting

11 documentation Whole Woman's Health Alliance provided

12 with its application had, quote, inaccurate statements

13 or information, end quote.

14           There is no governing definition of the phrase

15 "reputable and responsible character," but the

16 department has provided one to the (inaudible) case

17 stating that a person or entity of reputable or

18 responsible character would be truthful and

19 forthcoming with the information requested in the

20 department's October 2017 E-mail requesting additional

21 information.

22           This appeal thus turns on whether Whole

23 Woman's Health Alliance truthfully responded to that

24 E-mail, which asked the organization to provide a

25 complete ownership structure or description pertaining

14

1  to the applicant, Whole Woman's Alliance, including

2  but not limited to any individuals, parent, affiliate,

3  or subsidiary organizations.  The evidence will

4  establish that Whole Woman's Health Alliance responded

5  truthfully and completely.  It explained that as a

6  non-profit organization, as a non-profit it has no

7  owners, no shareholders, management, or control is

8  vested in a board of directors.  All of this

9  information was disclosed to the department.

10           The department now contends that in response

11 to its request, that Whole Woman's Health Alliance

12 provided complete ownership structure, the

13 organization should have disclosed its so-called

14 affiliates.  Notably the department never not once

15 during the application process told Whole Woman's

16 Health Alliance it had questions about the

17 organization's relationship with specific entities or

18 that it thought Whole Woman's Health Alliance had

19 affiliates.

20           At all times relevant to this matter affiliate

21 was not a term defined or even mentioned in any of the

22 department's governing statutes or regulations, its

23 publicly available materials, or its state issued

24 application form.  In its interrogatory responses the

25 Department provided 14 different definitions of the

15

1  term "affiliate" stating ultimately that it would

2  state that affiliate means a person or legal entity

3  that directly or indirectly controls, is controlled

4  by, or is under common control with a specified person

5  or entity.

6           The evidence will establish that under any

7  definition including the department's, Whole Woman's

8  Health Alliance has no affiliates.  The department's

9  determination that the organization has affiliates is

10 based on what the department concedes with his own

11 cursory research, research that consisted of the

12 unsupported assumptions and statements of

13 anti-abortion third parties without any actual

14 knowledge of the organization structure, and it relied

15 exclusively on that cursory research to deny the

16 application.

17           In contrast you will hear from individuals

18 that serve on the board of the organization.  They

19 will tell you about the people that comprise the

20 organization's board; well-respected professionals who

21 discharge their duties to the organization in good

22 faith with care and in the best interest of the

23 organization.  You will hear from board members

24 Ms. Amy Hagstrom Miller and Ms. Beverly Whipple who

25 will testify that the board controls Whole Woman's

16

1  Health Alliance, that the board controls no other

2  organization, and that no other entity or person

3  controls Whole Woman's Health Alliance.

4           The abortion clinics that the department

5  contends are affiliated with Whole Woman's Health

6  Alliance are operated by limited liability companies

7  that Ms. Hagstrom Miller owns.  Under any definition

8  of affiliate, including the department's, those

9  clinics are not affiliates of Whole Woman's Health

10 Alliance.  Neither one of them controls the

11 organization or its board, and the board does not

12 control any of them.

13           Similarly, the health care management company

14 that Whole Woman's Health Alliance contracts with

15 isn't an affiliate.  Even more, the organization

16 disclosed its relationship with the management company

17 to the department.  It even provided a copy of the

18 underlying management services agreement.

19           You are going to hear from Ms. Beverly Whipple

20 who voted to enter into that management services

21 agreement with the management company.  She will

22 testify that the board was well aware that

23 Ms. Hagstrom Miller owned the management company, that

24 the board had a robust conversation about the

25 potential conflict of interest that might pose, and

17

1  that for that reason Ms. Hagstrom Miller did not
2  participate in the board vote that ultimately led to
3  ratifying the contract. Ms. Whipple will testify that
4  what the board delegated certain day-to-day
5  administrative and back-office functions to the
6  management company, it did not give up its control to
7  the management company.
8       You will also hear from an expert in the field
9  of health care management, Ms. Merry Mullins. She
10  will testify that health care providers very commonly
11  contract with health care management companies for
12  administrative and back office services, that there is
13  nothing unique or improper about such a relationship
14  or arrangement. And finally, you are going to hear
15  from Ms. Hagstrom Miller herself. She will tell you
16  about the limited liability company she owns and that
17  during the application process the department never
18  asked her about those companies.
19       She will tell you about the founding story of
20  Whole Woman's Health Alliance, its mission to provide
21  abortion care to individuals who need it most, in
22  areas where access has been devastated. She will tell
23  you about the independent board of directors that
24  ensures that Whole Woman's Health Alliance achieves
25  that mission, and she will tell you about the

18

1  importance of an abortion, opening an abortion clinic
2  in South Bend to that mission.
3       She will tell you why the organization did
4  everything in its power to obtain licensure, a
5  prerequisite to opening that clinic, and that included
6  providing the department complete and accurate
7  information.
8       In conclusion, the evidence will establish
9  that Whole Woman's Health Alliance provided the
10 Department with all of the information required by law
11 and requested by the Department. The Department
12 assumed in error that Whole Woman's Health Alliance
13 has affiliates. According to the Department's own
14 definition, for that to be true some specific person
15 or legal entity must control, be controlled by, or be
16 under common control with Whole Woman's Health
17 Alliance. No such entity or person exists. The
18 Department's denial should therefore be reversed and
19 Whole Woman's Health Alliance application for
20 licensure granted.
21       JUDGE DEITCHMAN: All right.
22 Ms. Brelage, are you ready to call your first witness?
23       MS. BRELAGE: Yes, Your Honor. I call
24 Mr. Trent Fox.
25       JUDGE DEITCHMAN: Mr. Fox, if you could

19

1  sit up here for us, please?
2       (Witness sworn.)
3       JUDGE DEITCHMAN: Would you please state
4  your name and spell it for the record?
5       MR. FOX: Trent Fox, T-r-e-n-t F-o-x.
6       JUDGE DEITCHMAN: And what is your
7  position?
8       MR. FOX: Chief of staff of the State
9  Department of Health.
10      JUDGE DEITCHMAN: Chief of staff? Okay.
11 Ms. Brelage?
12           TRENT FOX,
13      Having first been duly sworn was called by the
14 ISDH to testify as follows:
15           DIRECT EXAMINATION
16 BY MS. BRELAGE:
17 Q      Thank you. Trent, can you hear me okay?
18 A      Yes.
19 Q      All right. Trent, can you describe for us
20 your employment history with the -- your employment
21 history specifically with the Indiana State Department
22 of Health?
23 A      Yes. Currently I am the chief of staff. I
24 have served in this role since November of 2017.
25 Prior to that I was the legislative director for the

20

1  agency. Prior to that I was the legislative and
2  communications director for the Professional Licensing
3  Agency.
4  Q      And describe your general role as the Indiana
5  State Department of Health chief of staff?
6  A      Generally overseeing the operations of the
7  agency, whether it be programming, the divisions,
8  contracting, support divisions, personnel matters, so
9  just the general operational role and also advisor to
10 the commissioner.
11 Q      What types of programs does the Indiana State
12 Department of Health administer?
13 A      It varies widely. The agency has everything
14 from immunizations, lab services, HIV and STD
15 division, maternal child health, and then regulatory
16 over hospitals and other facilities including abortion
17 clinics. And then we have support divisions such as
18 legal, communications, and finance.
19 Q      And have any of these programs that the agency
20 oversees been the subject of substantial media and
21 public attention?
22 A      Yes, and it depends on the issue. It really
23 depends on the day and what's happening. You know,
24 there are issues recently, I think the department --
25 before my time at the department though probably got

WWHA_RR00001121

21

1  the most attention through the HIV outbreak in Scott
2  County so that put us on the map on an international
3  level. But since then different issues have popped up
4  that require attention, yes.
5  Q      And in your role as chief of staff are you
6  occasionally called to answer questions posed by
7  various legislators or even the governor?
8  A      Yes, quite often. And, again, it just depends
9  on what the issue is, but the communications from
10 outside parties, legislators, the governor's office
11 require me to gather information and act as a liaison
12 to relay that information back.
13 Q      And as chief of staff and particularly as
14 advisor to the commissioner, do your duties ever cause
15 you to become involved in actual program decisions?
16 A      Yes. Again, it depends on the issue. My role
17 overseeing the many different areas of the agency
18 don't allow me to dive too deeply into the weeds of
19 each division. But, yes, there are topics that I
20 would get involved with depending on the issue.
21 Q      So I think what you basically said is that you
22 aren't in a position to know everything about every
23 program at ISDH. When you become involved in a matter
24 where you may be assuming a decisionmaking role, what
25 steps do you take to obtain the background and

22

1  understanding of the program necessary to make
2  informed decisions?
3  A      So as I see the operations at a 30,000 foot
4  view, my first step is to go to the folks who know
5  what they are doing on a day-to-day basis, so I will
6  go to the division, the program, the commission and
7  simply ask.
8  Q      And are there situations where you are
9  actually called upon to become a direct decisionmaker
10 in program areas?
11 A      Yes. Some of those issues, and I mentioned,
12 you know, the operations of the agency, we have a lot
13 of different programs which results in us having a lot
14 of contracts. So contracting is one of the issues
15 that takes up a lot of my time. In those situations I
16 will be involved and ensure that the guidelines are
17 followed appropriately. And so those usually take up
18 a lot of my time as far as what program is contracting
19 with what.
20 Q      Okay. And did you become a direct
21 decisionmaker in the matter involving the application
22 of Whole Woman's Health Alliance for a license to open
23 an abortion clinic in South Bend, Indiana?
24 A      Yes. A decisionmaker? Yes, I would say I was
25 the decisionmaker. The team helped gather information

23

1  as did I on my own, took that information and
2  determined and then advised the commissioner.
3  Q      And why is it that you became involved in that
4  licensing issue?
5  A      This application was the first of its kind. I
6  believe in 2008 Indiana started regulating abortion
7  clinics. Since then we have not received a new entity
8  applying for a new license at a physical location so
9  that was the reason that I became involved since it
10 was -- I mentioned -- I go to the divisions and ask
11 what do you normally do in a situation? In this case
12 we have not received that situation yet so that's why
13 I was involved.
14 Q      So any existing abortion clinic in Indiana I
15 understand that existed prior to the time when we
16 began licensing and regulating abortion clinics?
17 A      Yes.
18 Q      So do you recall when you first became
19 involved in this matter?
20 A      Yes. I was -- it was brought to my attention
21 in late September of 2017.
22 Q      And what did you do at that time to
23 familiarize yourself with the matter?
24 A      As I do with other programs, I went to the
25 division and asked, you know, how this process works

24

1  to make sure I understood. And I appreciate every
2  division being as patient as they are with me as I go
3  and educate myself on the process.
4  Q      I am going to show you a few exhibits. I
5  would like for you to identify them for me.
6          JUDGE DEITCHMAN: There is a book
7  next --
8          MS. BRELAGE: They are not going to be
9  in order so I don't think they are going to be
10 anything we will be able to use at this point.
11         JUDGE DEITCHMAN: All right.
12         MS. TOTI: Your Honor, Ms. Brelage, I
13 believe that those were part of the exhibits that we
14 exchanged in advance. They are all in the binder.
15 The binder has the joint exhibits, the Petitioner's
16 exhibits, and the Respondent's Exhibits.
17         JUDGE DEITCHMAN: You do however -- you
18 present your case in whatever manner you want.
19         MS. BRELAGE: The issue is that the
20 exhibits were got to us marked about 8:30 last night
21 so we have not had a chance to --
22         JUDGE DEITCHMAN: That's no problem.
23 Just go ahead and put your case on.
24         MS. BRELAGE: We will be using the same
25 exhibits, we have just marked them according to your

25

1 stipulation.

2            JUDGE DEITCHMAN:  The State is going

3 alpha, right?

4            MS. BRELAGE:  We do have some joint

5 exhibits and they are numerical.

6            JUDGE DEITCHMAN:  Okay.

7 Q    I am going to show you what's been marked as

8 Joint Exhibit 19.  Can you identify this document?

9 A    Yes, this is the initial application from

10 Whole Woman's Health to operate an abortion clinic.

11 Q    All right.  And what date was that dated?

12 A    Received on August 11, 2017.

13 Q    All right.  And next I will show you what's

14 been marked as Joint Exhibit 2; can you identify that

15 for me?

16 A    This is -- so this is -- yes, I am sorry, it

17 is a little blurry.  This is the attachment to the

18 application submitted for admitting privileges.

19 Q    And Joint Exhibit 3?

20 A    This is another attachment, the Emergency

21 Services Agreement submitted by the applicant.

22 Q    And Joint Number 4?

23 A    This is the waiver request from the applicant

24 submitted by Mr. Bucy requesting waiver of certain

25 pieces of administrative code.

26

1 Q    And if you could describe briefly for us, what

2 is a waiver request?

3 A    So Indiana allows several types of abortion

4 clinics; one surgical and one medical.  And since

5 there are two sets of rules, there is a procedure that

6 a clinic if they don't operate a surgical clinic, they

7 can request to waive certain rules so they won't be

8 required to follow them.

9 Q    Okay.  And is receiving a waiver in any type

10 of medical licensing area a common thing?

11 A    Yes.

12 Q    Request for a waiver?

13 A    There are a few rules in the books that have

14 been there quite awhile and with the update to

15 technology and whatnot some just simply don't apply

16 anymore.

17 Q    Okay.  I am going to show you what's been

18 marked as Respondent's Exhibit I.  Can you identify

19 that for me, please?

20 A    Yes, this is an E-mail from our division to

21 Mr. Bucy requesting information on the fire inspection

22 that was missing.

23 Q    And last one for now, if you could identify

24 Exhibit J for me?

25 A    This is another E-mail from our division to

27

1 Mr. Bucy requesting some missing information.

2 Q    All right.  And who is this particular E-mail

3 from?

4 A    This one is from Randy Snyder, the Director of

5 Acute Care.

6 Q    All right.  Now, when you first became

7 involved in this matter, did you review these

8 applications and requests for additional information?

9 A    Yes.

10 Q    Upon your review did you see any glaring

11 deficiencies with these documents?

12 A    Well, as mentioned by Randy, but also the

13 first issue I noticed was the clinic administrator was

14 missing.

15 Q    And is that something that's required?

16 A    Yes.

17 Q    Is that something that Mr. Randy Snyder had

18 addressed in his E-mail on September 21st to Mr. Bucy?

19 A    Yes, it is Item Number 4 in his E-mail to

20 Mr. Bucy.

21            MS. BRELAGE:  Your Honor, at this time I

22 would move admission of those exhibits.  I believe

23 many are already stipulated to; however, I do move for

24 the administration of Exhibit I and J which has not

25 been stipulated as far as the admission.

28

1            JUDGE DEITCHMAN:  So does Whole Woman's

2 Health have an objection to the admission of Joint

3 Exhibits 19, 2, 3, 4 specifically and then we will get

4 to the Respondent's Exhibits?

5            MS. TOTI:  No objection, Your Honor.

6            JUDGE DEITCHMAN:  How about to the

7 Respondent's Exhibits I and J; do you have any

8 objection to those?

9            MS. TOTI:  No objection, Your Honor.

10            JUDGE DEITCHMAN:  Okay.  All of the

11 exhibits are admitted without objection.

12            (Joint Exhibit 19 admitted.)

13            (Joint Exhibits 2-4 admitted.)

14            (Respondent's Exhibits I-J admitted.)

15 Q    I am going to show you now what's been marked

16 as Joint Exhibit Number 1.  Can you identify this

17 document for me?

18 A    This is an E-mail from Mr. Bucy to our

19 division, specifically John Lee, with the revised

20 application attached.

21 Q    All right.  So what is the date of that

22 revised application?

23 A    October 6, 2017.

24 Q    And did that revised application provide the

25 name of a proposed administrator?

29

1  A    Yes, it did.

2  Q    And what is the name -- did anything about the

3  name of that proposed administrator cause any concern

4  for the agency?

5          MS. TOTI:  Ms. Brelage, I apologize for

6  the interruption but I think the exhibit that the

7  witness has is different from the copy that we have.

8  Would you mind giving us a copy of what he has been

9  given?

10         MS. SINGH:  Is it in the documents that

11  you gave me earlier?

12         MS. BRELAGE:  Joint Exhibit 1.  You may

13  have the E-mail attached with it.

14         MS. TOTI:  If you are going to be using

15  exhibits that are different from the ones you have

16  previously provided, we would appreciate if you could

17  provide us a copy.

18         MS. BRELAGE:  It is the same thing I

19  provided you.

20         MS. TOTI:  But you added a page that you

21  didn't provide us.

22         MS. BRELAGE:  It is one of the joint

23  exhibits.  This is Joint Exhibit 1, it is a copy of

24  your revised application.

25         MS. SINGH:  Did you provide us that in

30

1  these materials that you gave us?

2          MS. BRELAGE:  We didn't provide you

3  joint exhibits because they were joint exhibits that

4  we agreed upon.  Is there -- I can remove the top

5  page, it is just the E-mail that Mr. Bucy sent.

6          MS. TOTI:  We just like to make sure

7  that we have the same materials that are going into

8  the record.

9          JUDGE DEITCHMAN:  Absolutely.  So if

10  what had been agreed upon is a joint exhibit did not

11  include anything, then let's mark this as the Joint

12  Exhibit 1 and if you want to try to move to admit the

13  E-mail as a separate --

14         MS. BRELAGE:  The E-mail is not

15  relevant, Your Honor.  The issue that we are having is

16  the marked joint exhibits got to us after 8:30 last

17  night.  We were unable to print them or have them

18  prepared this morning.

19         JUDGE DEITCHMAN:  That's no problem.  I

20  do need to get this marked.  So this is going to be

21  marked as Joint Exhibit Number 1.  All right.

22         MS. BRELAGE:  Okay.

23         JUDGE DEITCHMAN:  Good to go.

24         MS. BRELAGE:  All right.

25  Q    Trent, tell me, did the agency have any

31

1  concerns with this revised application on its face?

2  A    Yes.  We noticed the name of the clinic

3  administrator provided was Ms. Liam Morley.  The

4  concern that immediately came to mind was her

5  connection with Dr. Ulrich Klopfer, and I don't -- I

6  recall she was an employee and I can't say for certain

7  if she was the clinic administrator for him, but a

8  couple years ago his medical license was revoked and I

9  believe so,-- and I believe the clinic license was

10  surrendered before it could be revoked for some pretty

11  serious violations.

12  Q    And so that name alone raised some red flags

13  with the agency?

14  A    Yes.

15         MS. BRELAGE:  Your Honor, I move the

16  admission of Joint Exhibit 1.

17         JUDGE DEITCHMAN:  Do you have any

18  objection to the admission of Joint 1 without the

19  E-mail attachment?

20         MS. BRELAGE:  Remove the E-mail

21  attachment.

22         MS. TOTI:  No, Your Honor.  We have

23  already stipulated to the admission of all the joint

24  exhibits.

25         JUDGE DEITCHMAN:  Okay.

32

1          (Joint Exhibit 1 admitted.)

2  Q    So let me show you what's been marked as Joint

3  Exhibit 22.  Can you identify that document for me?

4  A    This is a letter from State Senator Joseph

5  Zakas to the governor in regards to the application.

6  Q    And is this letter forwarded to the

7  Commissioner of the Indiana State Department of

8  Health?

9  A    Yes.  It is common for the governor, as I

10  mentioned, as I am am a liaison with information when the

11  Governor's Office receives communication about a

12  certain topic, they will forward it on to the agency

13  with jurisdiction over that topic.

14         MS. TOTI:  I am sorry to interrupt

15  again, which exhibit are you referring to?

16         MS. BRELAGE:  22.

17         MS. TOTI:  Okay.  Thank you.

18  Q    And in Exhibit 22 was there anything about

19  this communication -- again, I am not telling you to

20  tell me whether this communication is true or not

21  because you don't know whether the facts in this

22  communication are true or not, do you?

23  A    No.  This letter did create questions because

24  it certainly wasn't consistent with the application we

25  received.  Specifically the senator mentioned it

WWHA_RR00001124

33

1  appears that the company in question, Whole Woman's
2  Health, has had a history of serious health violations
3  in other clinics, so it certainly created some
4  questions in my mind that needed answered.
5  Q     All right.  And can you explain, are the
6  previous health and safety violations of a provider
7  something that's generally considered when determining
8  whether to grant a license, abortion or otherwise?
9  A     Absolutely.  I honestly can't think of one
10  regulatory body who doesn't consider them when
11  granting applications.
12        MS. BRELAGE:  Your Honor, I am going to
13  move the admission of Exhibit Number 22.  Again, this
14  is not being moved for the truth of the matter
15  asserted, it is being moved to help establish the
16  reasons for the Department of Health's actions
17  thereafter.
18        JUDGE DEITCHMAN:  I believe that counsel
19  for Whole Woman's Health has said that joint exhibits
20  are going to be able to come in without objection.
21        MS. TOTI:  That's correct, Your Honor.
22        JUDGE DEITCHMAN:  Okay.  Admitted
23  without objection.
24              (Joint Exhibit 22 admitted.)
25  Q     I will show you what's been marked as Joint

34

1  Exhibit 10.  Trent, can you identify that for me?
2  A     This is an E-mail from John Lee of the Acute
3  Care Division to Mr. Bucy dated October 27, 2017, with
4  follow-up questions for the application.
5  Q     I am sorry, it is 6.  I read that wrong.
6  Joint Exhibit 6.
7  A     Yes.
8  Q     And are you familiar with this document?
9  A     Yes.
10  Q     What role did you have in developing these
11  questions?
12  A     I determined that questions were necessary and
13  drafted them.  I looked at a few other states and what
14  sort of questions they asked.  As far as formatting
15  and the exact wording, I sought legal advice from our
16  legal team to make sure that they were legal.
17  Q     All right.  And just for the record, I was not
18  a part of that legal team that you were seeking advice
19  from at that time, correct?
20  A     Correct.
21  Q     All right.  And I am going to start a little
22  backwards.  Let's start with Question Number 4.  All
23  right?  Some of these questions, 4 G through K, would
24  you explain why particularly you asked those types of
25  questions?

35

1  A     As I mentioned, you know, the questions that
2  were created in my mind about the possibility of
3  health violations of clinics under the control of the
4  applicant, this was to get to that.  This was going to
5  help me understand.
6  Q     Describe for us generally what would questions
7  G through K --
8  A     So they dealt with -- so denials, suspension,
9  and revocations of licenses subject to administrative
10  adjudication, so they really go to any prior
11  disciplinary actions or violations of clinics.
12  Q     Okay.  Did you request if they had ever been
13  subject to Medicaid or Medicare sanctions?
14  A     Yes.  Medicare, Medicaid sanctions, ever
15  surrendered your license before its expiration for any
16  department for related action in connection with
17  Medicaid or Medicare.
18  Q     And were these types of questions designed to
19  just further investigate those allegations of previous
20  health and safety violations?
21  A     Yes.  Like I mentioned, this was going to help
22  me answer those questions that were created.  For us
23  to justify granting this license, I had to understand
24  why the information was inconsistent, and this was
25  going to help me understand that.

36

1  Q     Now, you also requested information in
2  Questions Number 1 and 2.  If you would, let's go
3  through that.
4  A     So, yes, in the follow-up questions 1 and 2,
5  that's where we asked for a complete ownership
6  structure and description pertaining to the applicant.
7  We asked that it include any individuals or any
8  parent, affiliate, subsidiary organization, and it
9  also asks for the full legal names and addresses for
10  the entities and lists the type and state of
11  incorporation.
12  Q     All right.  And why did you choose to ask that
13  question?
14  A     Again, similar thought process to why we asked
15  about the previous discipline actions.  There was
16  inconsistency in what information we were receiving so
17  this was going to help me bridge that gap and
18  understand what, if anything, is missing.
19  Q     Okay.  Now, Senator Zakas' communication
20  seemed to involve Whole Woman's Health; is that
21  correct?
22  A     I'm sorry?
23  Q     An entity named Whole Woman's Health.
24  A     Yes, ho mentions it in his letter.
25  Q     Okay.  And the entity that asked for a license

37

```
 1  was Whole Woman's Health Alliance; is that correct?
 2  A      Yes.  And so, again, this was going to help me
 3  bridge that gap.  At this point it just wasn't clear
 4  to me what was going on.
 5  Q      Okay.  And Question Number 2; can you tell us
 6  about this question and why you asked this question?
 7  A      Yes.  So this was -- we asked for a list of
 8  all the abortion and health care facilities currently
 9  operated by the applicant, including its parent
10  affiliate or subsidiary organization.  Again, this was
11  to identify that inconsistency that I had in my head
12  and to make sure that we got a full picture of what
13  was happening.
14  Q      And when you and the team drafted that
15  question, did you have some general idea of the
16  definition of an affiliate organization?
17  A      Yes.  So we searched through the Indiana Code
18  and I looked myself as well and there were a few
19  different ones throughout Indiana code, but the theme
20  I was finding in every definition was there was a
21  common control by one person or entity.
22  Q      All right.
23          MS. BRELAGE:  I believe Exhibit 6, the
24  admission has been stipulated to, Your Honor.
25          JUDGE DEITCHMAN:  Okay.  6 is admitted
```

38

```
 1  without objection.
 2          (Joint Exhibit 6 admitted.)
 3  Q      I will show you what's been marked as Exhibit
 4  7; can you identify that for me?
 5  A      This is an E-mail from Mr. Bucy's office to
 6  John Lee in our Acute Care Division, with the
 7  attachment of the responses to those additional
 8  questions.
 9  Q      All right.  And quickly I will provide to you
10  Joint Exhibits 8, 9, 10, 11, 12, and 13.  If you could
11  just briefly state what these documents are and tell
12  me if they were any of the documents that were
13  provided along with these responses to your question?
14  A      Yes.  So these are the incorporation forms
15  from other states that the applicant provided.  It was
16  attached to the responses, so we have the Secretary of
17  State from Texas form and certificate of formation of
18  the non-profit in Texas.  We have change of name
19  filing from Texas, Exhibit 10.  We have another MMI
20  filing in Texas, Exhibit 12.  And then we have 12 and
21  13 are the bylaws of the Whole Woman's Health Advocacy
22  Alliance and then the management services agreement
23  referred to in 13.  And these were provided attached
24  to the response to the additional questions.
25  Q      All right.
```

39

```
 1          MS. BRELAGE:  And I believe that these
 2  are all joint exhibits as well, correct, so we
 3  stipulate to their admission.
 4          JUDGE DEITCHMAN:  So Exhibits 7, 8, 9,
 5  10, 11, 12, and 13 are all admitted without objection.
 6          (Joint Exhibits 7-13 admitted.)
 7  Q      So this response, tell me the date that it was
 8  received?
 9  A      This was received by our office on December 8,
10  2017.
11  Q      All right.  And during this time period were
12  you doing some kind of Internet research on your own?
13  A      Yes.  So I did -- I started with the basic
14  Internet search of the organization.  It led me to
15  their website obviously, but then a few other sources
16  as well.
17  Q      All right.  Let me show you what has been
18  marked as Exhibit Y.  Can you identify that for me?
19  A      This is an article from the South Bend Tribune
20  dated October 30, 2017, reporting the applicant's
21  announcement of the South Bend abortion clinic.
22  Q      All right.  And briefly identify Exhibit Z for
23  me?
24  A      This is the Our Clinics portion of the Whole
25  Woman's Health website.
```

40

```
 1  Q      All right.  And so did you obtain that Our
 2  Clinics portion off Whole Woman's Health Alliance's
 3  website or off Whole Woman's Health's website?
 4  A      Whole Woman's Health.  It was
 5  wholewomanshealth.com.
 6  Q      Can you tell me at the time that you were
 7  looking at Whole Woman's Health website and at the
 8  clinics listed, does this board here, demonstrative
 9  board, does this show all of the clinics that they had
10  listed on their website?
11  A      Yes.  So their website listed those, yes.
12  Q      Okay.  So they listed as our clinics Whole
13  Woman's Health of Baltimore, Whole Woman's Health of
14  the Twin Cities, Whole Woman's Health of McAllen,
15  Whole Woman's Health of Boston, Whole Woman's Health
16  of Charlottesville, Whole Woman's Health of Fort
17  Worth, Whole Woman's Health of San Antonio, and Whole
18  Woman's Health of Peoria?
19  A      Yes.
20  Q      In their response to questions, what did they
21  list as their clinics?
22  A      Aside from the South Bend location that they
23  were applying for, they listed the Austin and the
24  Charlottesville locations.
25  Q      And were the addresses on their Austin and
```

41

1  their Charlottesville locations the same as the Whole
2  Woman's Health of Charlottesville and Whole Woman's
3  Health of Austin locations that were listed with all
4  of these other clinics on Whole Woman's Health's
5  website under Our Clinics?
6  A      Yes, they were similar.  They were the same.
7  Q      They were the same addresses?
8  A      Yes.
9  Q      Same clinics?
10 A      Yes.
11 Q      So they provided two clinics under their
12 responses, but when you looked at Whole Woman's Health
13 websites, you saw eight?
14 A      Yes.  And, again, that was a concern of ours
15 that it didn't add up so we needed to find out what
16 was going on.
17 Q      When you looked at this article that was filed
18 on October 30th, is there anything about that article
19 that caused you some confusion?
20 A      Yes.  So in reviewing it in the statement made
21 by the article, it mentions Hagstrom Miller operates
22 independent abortion clinics in five states, again
23 adding to my confusion as to why these numbers weren't
24 adding up, because the two disclosed in the
25 application or the follow-up questions, they certainly

· 42

1  couldn't be talking about the same clinics.
2  Q      And who is listed as the president in the
3  application of Whole Woman's Health Alliance?
4  A      Ms. Amy Hagstrom Miller.
5  Q      All right.  And is she also listed as the
6  president of Whole Woman's Health LLC in the Exhibit
7  13 that they provided to you?
8  A      Yes.
9  Q      Did that also cause some confusion?
10 A      It did, and it added to, you know, there was
11 at this point a few layers and I just -- I couldn't
12 put the pieces together as the information was
13 inconsistent.
14 Q      And the article of October 30, 2017, Amy
15 Miller had quoted that she was excited to welcome
16 Whole Woman's Health into the commonwealth where they
17 will continue to fearlessly care for women and
18 families; did that confuse you?
19 A      Yes.  When we see the statements made, there
20 was a common "we," "our," there was never a separation
21 of the two.  So, again, another level of confusion to
22 me was who are they talking about.
23 Q      I am going to show you what's been marked as
24 Exhibits 23 and 24.  Could you identify these for me?
25 A      So 23 is a letter from State Senator Erin

43

1  Houchin to Dr. Box voicing her opposition to the
2  application.  And Exhibit 24 is a letter from State
3  Senator Ryan Mishler to Dr. Box again opposing the --
4  voicing opposition to the application in the letter.
5  Q      And did those communications also relay that
6  Whole Woman's Health had a history of serious safety
7  and health -- health and safety violations?
8  A      Yes.  Separately they both did.  So Senator
9  Houchin mentioned that the record of this Texas based
10 company shows some serious operations stemming from
11 their inspection records.  Senator Mishler mentioned
12 in his letter the same, that there were some serious
13 violations and further mentions it has clinics in
14 Texas, Virginia, Minnesota, Maryland, and Illinois.
15 Q      Now, the response that you received listed two
16 clinics other than South Bend?
17 A      Yes.
18 Q      Were you able to ascertain when the clinic in
19 Austin had been opened?
20 A      So -- and I don't want to flip these.  One was
21 opened in I believe April of 2017, the next was opened
22 in October of 2017, so after the initial application
23 of South Bend.
24 Q      All right.  Now, in your experience is between
25 April and December a very long time for a clinic to be

44

1  open and have surveys performed for health and safety?
2  A      No --
3          MS. TOTI:  Objection, Your Honor.  Lack
4  of foundation.  There has been no testimony that this
5  is a matter that would be within his experience as a
6  legislative director or communications professional.
7          JUDGE DEITCHMAN:  I would agree.  Would
8  you like to --
9          MS. BRELAGE:  I can go ahead and lay
10 that foundation.
11         JUDGE DEITCHMAN:  Okay.
12 Q      When you were looking into this and trying to
13 determine how you were going to find the answers about
14 these previous health and safety violations, you
15 previously testified that you met with the program
16 directors and the people that had that kind of
17 knowledge; did you ascertain what the norm is
18 regarding surveys and health and safety surveys for
19 clinics?
20 A      Yes, through talking to the divisions,
21 specifically in this case acute care division, we are
22 looking at least a one-year time period before a
23 survey would happen.  So at this point neither of
24 those clinics were open long enough for that first
25 survey to happen.

45

1 Q    And one of the clinics hadn't even been open
2 at the time of that application, right?
3 A    Correct.
4 Q    So is it fair to say that we could be pretty
5 sure that the communications that were being made to
6 you wouldn't be involving those two clinics?
7 A    No. The communications, as I mentioned, one
8 mentioned multiple states but also just the timing.
9 There is no way -- there is no way that the violations
10 could be inspected, reported, and reported before this
11 application or this communication happened for the two
12 clinics to disclose in the follow-up questions.
13 Q    So taking a look at your answer, their answer,
14 in fact, they stated that Whole Woman's Health had
15 recently purchased a clinic in the state of Virginia
16 and that they had entered into a management agreement
17 with Whole Woman's Health LLC and that the management
18 company will provide certain designated management
19 services to Whole Woman's Health Alliance. When you
20 looked at that management agreement, I believe that's
21 Exhibit 13. Is that Exhibit 13?
22 A    Yes.
23 Q    Who signed as the president of Whole Woman's
24 Health LLC?
25 A    Amy Hagstrom Miller.

46

1 Q    The same individual listed as the president of
2 Whole Woman's Health Alliance?
3 A    Correct.
4 Q    And under Number 2 where you must provide a
5 list of all the abortion and health care facilities
6 currently operated by the applicant including its
7 parent, affiliate, subsidiary, or organizations, their
8 answer was, "Please refer to the answer to the first
9 question."
10 A    Yes.
11 Q    So that was limited to the Austin clinic
12 opened in 2017, April of 2017, and the Charlottesville
13 clinic which had just been opened at that time?
14 A    Yes.
15 Q    Did that response, did it answer all the
16 questions you had?
17 A    No, as I mentioned, the levels of confusion
18 are in now the -- the information was still
19 inconsistent with -- and the information we received
20 from communications laying out the possible violations
21 in these other clinics, we just didn't have an answer
22 for. At this point it was imperative that we find out
23 what clinics were referred to whether or not they
24 needed to be disclosed and then understand why the
25 inconsistent information was being provided.

47

1 Q    Now, your answer came December 8th. In the
2 month of December did you continue to mull this over
3 and do some more research on your own?
4 A    Yes. Like I said, through Internet searches
5 and working with the division.
6        MS. BRELAGE: Your Honor, before I
7 forget, I would like to move the admission of Exhibits
8 23 and 24.
9        JUDGE DEITCHMAN: Okay.
10       MS. BRELAGE: And Y and Z, I am sorry.
11       JUDGE DEITCHMAN: Okay. So I believe
12 Joint Exhibits 23 and 24 are acceptable. Do you have
13 an objection to Y and Z which are Respondent's
14 exhibits?
15       MS. TOTI: No objection, Your Honor.
16       JUDGE DEITCHMAN: Okay. So they are
17 admitted without objection.
18       (Joint Exhibits 23-24 admitted.)
19       (Respondent's Exhibits Y-Z admitted.)
20 Q    I will show you what's been marked as Exhibit
21 AA. Here we go. Can you identify that for me,
22 please?
23 A    So this is a blog post from the Whole Woman's
24 Health website entitled "2017: A Year in Review."
25 Q    All right. And this year in review, can you

48

1 tell me is there anything about this year in review
2 that you reviewed that again had you questioning the
3 voracity of the answers that Whole Woman's Health
4 provided?
5 A    Yes. So on Page 2 of the document there is a
6 section referring to the new clinics at
7 Charlottesville and South Bend. The statement that
8 was confusing to me was the first line, "In October we
9 excitedly open the doors to our eighth and ninth
10 locations in Charlottesville and South Bend."
11      Again, this is -- at this point is still not
12 adding up when they mentioned our eighth and ninth
13 clinics, but two were disclosed.
14 Q    So clearly every statement that is made by
15 Whole Woman's Health has lumped these clinics as their
16 clinics?
17 A    Yes, every piece of information I have found
18 other than the response to our follow-up questions
19 did.
20 Q    But at this time you still don't have the
21 answers to your questions regarding these clinics?
22 A    Correct. We have information from those
23 parties reaching out to us, but we need that
24 information from the applicant.
25 Q    And after you gathered up all this

49

1  information, was there a group discussion had with the
2  team that had been working on this?
3  A       Yes.  So the team who was gathering
4  information, I did touch base with them consistently
5  and that's when we were looking at this throughout the
6  entire period just keeping up to speed on any
7  information out there.  So I did touch base with them
8  consistently to get information that they had
9  available.
10 Q       And just briefly, who comprised that team?
11 A       So the information, the gatherers of
12 information for myself were in the Acute Care
13 Division.  I will run up the chain, Jennifer Hembree,
14 John Lee, Randy Snyder, and Terry Whitson.  We -- and
15 as I mentioned, we also sought legal advice on certain
16 issues throughout the information gathering.
17 Q       And I guess it is safe to say throughout the
18 process you were in contact with the commissioner?
19 A       Yes.  And so the timeline was a little
20 interesting with the commissioner as Dr. Box was
21 appointed in October, so Pam Pontones was deputy
22 commissioner, but interim commissioner when the
23 application was actually filed.  So throughout this
24 process we asked Pam Pontones as commissioner interim
25 status and then Dr. Box came in in October.

50

1  Q       I am going to show you what's marked as Joint
2  Exhibit 24.  Can you identify that document for me?
3  A       This is the letter from State Senator Ryan
4  Mishler.
5  Q       I'm sorry, give me one second, Trent.
6  A       Yes.
7  Q       Here it is.  Sorry, I handed you the wrong one
8  but thank you for identifying that for me.  Joint
9  Exhibit 14.
10 A       Yes, this is the Notice of Denial sent from
11 ISDH to the applicant.
12 Q       And is that the decision that you eventually
13 made then, to deny this?
14 A       Yes.
15 Q       And can you describe for the judge why you
16 made the decision?
17 A       At this point we simply didn't have enough
18 information to justify granting the license.  When we
19 determined the follow-up questions to ask and when two
20 clinics were disclosed, we had conflicting
21 information, and on -- when we see eight clinics
22 listed and we are notified of two, it simply doesn't
23 add up to me.  Now, that was a question I couldn't
24 answer and if I can't answer that question, then I
25 just can't justify granting the license?

51

1  Q       All right.  So you are looking at everything
2  that's been offered, you are looking at the response
3  that they gave you, you are looking at all of their
4  own statements about their eighth and ninth locations
5  in Charlottesville, their eight clinics located on
6  Whole Woman's Health website, about their statements
7  that they only have these two brand new clinics and no
8  other affiliates, and none of that is adding up?
9  A       Correct.  I mean at this point it is not only
10 inconsistent, we have determined it to be inaccurate.
11 The second part of this question creates a -- I think
12 a few other questions on our end when it refers to
13 some of the board members of the alliance as we had
14 asked for them to be identified, too.  So when we look
15 at this, the affiliate definition, this is where we
16 determine that there are some other clinics out there
17 affiliated and under the common control of Ms. Miller,
18 and those were not disclosed and I couldn't -- I
19 simply couldn't answer that question either.  So at
20 this point we could not justify granting.
21 Q       All right.  So when you say some of the
22 members and that you had requested that that be
23 identified, can you go into just a tiny bit of detail
24 there?
25 A       Yes.  So in Question 1 where they had

52

1  identified the two clinics in Austin and
2  Charlottesville, the question says "but not limited to
3  any individuals," and then it mentions -- their
4  response was "some of the board members of WWHA, Whole
5  Woman's Health Alliance, are affiliated directly or
6  indirectly with the management company, but the
7  majority of the board members are independent."
8  Q       They didn't tell you any of the names of the
9  board members?
10 A       No.
11 Q       And it didn't say, oh, by the way, Amy Miller
12 owns a hundred percent of the management company and
13 Amy Miller is the president of Whole Woman's Health
14 Alliance?
15 A       Correct.  And so as I mentioned, it created a
16 few other questions on our end.
17 Q       Okay.  And when you said you could not justify
18 granting the license, did you think you were going to
19 have to have some answers to all of the questions that
20 had come up throughout these proceedings?
21 A       Yes.  You know, it is -- as far as
22 communications we received, there was obviously a lot
23 of attention to this matter.  Those questions in my
24 role as a liaison of information, I have to answer
25 those questions and understand and be confident in

53

1  ISDH's ability to answer those. And at this point I
2  could not answer those.
3  Q     And has ISDH deemed to be comfortable prior to
4  granting the license in knowing whether or not there
5  are serious health and safety violations with these
6  clinics?
7  A     No. I mean that's one of the pieces of
8  confusion is if these clinics are out there and under
9  the control of the applicant and there are serious
10 violations, then those need to be disclosed.
11 Q     Okay.
12            MS. BRELAGE: Your Honor, at this time I
13 move for admission of Exhibit AA.
14            JUDGE DEITCHMAN: Do you have an
15 objection to the admission of AA?
16            MS. TOTI: No objection, Your Honor.
17            JUDGE DEITCHMAN: AA is admitted without
18 objection.
19            (Respondent's Exhibit AA admitted.)
20            MS. BRELAGE: And then Joint Exhibit 14.
21            JUDGE DEITCHMAN: Joint exhibits are
22 admitted without objection.
23            MS. TOTI: Correct.
24            JUDGE DEITCHMAN: Thank you.
25            (Joint Exhibit 14 admitted.)

54

1            MS. BRELAGE: Your witness. Thank you,
2  Trent.
3  A     Thank you.
4            JUDGE DEITCHMAN: All right. Cross?
5            MS. TOTI: Yes. Thank you, Your Honor.
6            CROSS-EXAMINATION
7  BY MS. TOTI:
8  Q     Good morning, Mr. Fox?
9  A     Good morning.
10 Q     You are aware that the Petitioner served
11 interrogatories on the department in connection with
12 this matter, correct?
13 A     Yes.
14 Q     And you signed off on the interrogatory
15 responses for the department; is that correct?
16 A     Yes.
17 Q     I am going to ask you to take a look at
18 Petitioner's Exhibit 16 in that white binder in front
19 of you. There are actually two --
20 A     I'm sorry, can you repeat the --
21 Q     It is Number 16, there are actually two 16s in
22 that binder, and it is the one -- it is the second
23 Number 16 with the wide tab. It is this one.
24 A     Perfect.
25 Q     So that's Petitioner's Exhibit 16?

55

1  A     Yes.
2  Q     I am going to ask you to turn to the last
3  page.
4            MS. TOTI: And, Your Honor, they are
5  also in your binder if you want to follow along.
6            JUDGE DEITCHMAN: I normally will just
7  listen to testimony and review these when I am
8  drafting my Order.
9  Q     So, Mr. Fox, actually on the next-to-last page
10 of the exhibit, is that your signature at the top?
11 A     Yes.
12 Q     And you signed under the statement, "I affirm
13 under penalties of perjury that to the best of my
14 knowledge the foregoing answers to interrogatories are
15 true and accurate;" did I read that correctly?
16 A     Yes.
17 Q     And these are dated April 11, 2018; is that
18 correct?
19 A     Yes.
20 Q     Okay. And so now I am going to ask you to
21 turn back a page to Interrogatory Number 18. Do you
22 see there that the interrogatory asks the department
23 to identify each facility that is currently licensed
24 as an abortion clinic by the department and the year
25 in which the facility first obtained its license?

56

1  A     Uh-huh, yes.
2  Q     And do you see that the department's answer
3  includes a clinic in Lafayette that was licensed in
4  2015; is that correct?
5  A     Yes.
6  Q     So the department licensed an abortion clinic
7  in 2015, correct?
8  A     Yes.
9  Q     And that's inconsistent with the testimony
10 that you gave earlier today when you said the
11 department hasn't licensed any clinics since before
12 2008, correct?
13 A     No, the earlier statement was a new entity and
14 a new facility. So this application granted in 2015
15 was actually physically already there. So this new
16 application can be distinguished from the new
17 application type that we received last year.
18 Q     Can you explain why that difference would
19 warrant the intervention of the chief of staff in the
20 application?
21 A     Absolutely. The intervention of me in this
22 process was to understand the entity applying for a
23 license. Now, although 2015 was prior to my time at
24 the agency, it is my understanding that Planned
25 Parenthood is a known entity and has a relationship

57

1  with the state, and so there is that relationship with
2  the state and its regulators. Whole Woman's Health
3  does not have that relationship with Indiana. It is a
4  new entity coming into the state and that's why the
5  follow-up questions and that's why we put the due
6  diligence in that we did.
7  Q      So does that rule apply only to abortion
8  clinics or would it apply to any health care facility
9  that applies for a license? Any new health care
10 provider that applies for a facility license, would
11 that application come to your attention and your
12 office take charge of it?
13 A      It may, it may not. You know, my history with
14 the agency is not that deep. So certainly I would pay
15 attention to it, but I can't speak for what may have
16 happened before me.
17 Q      So what specifically about the application by
18 Whole Woman's Health Alliance triggered your
19 involvement in the process?
20 A      Like I said, it was a new application of its
21 kind that the -- it is a new entity coming into the
22 state so that's what triggered my involvement.
23 Q      Just to be clear, it wasn't a new type of
24 application because there were other applications by
25 abortion clinics, correct?

58

1  A      I mentioned a new entity coming into the state
2  that we don't have a relationship with.
3  Q      Right. So that's the factor? I am just
4  trying to understand what about this application the
5  department thought was different and merited a
6  different kind of process than the normal process?
7  A      As I mentioned, a new entity coming into the
8  state that we don't have a relationship with.
9  Q      Okay. You submitted an affidavit in this
10 matter; is that correct?
11 A      Yes.
12 Q      And you understand an affidavit to be a sworn
13 statement made under the penalty of perjury; is that
14 correct?
15 A      Yes.
16 Q      Okay. I am going to ask you to take a look at
17 your affidavit and it is Plaintiff's Exhibit 62. So
18 there should just be one Number 62 in the binder.
19        MS. TOTI: Oh, and Your Honor, I would
20 like to move the admission of Petitioner's Exhibit 16.
21        JUDGE DEITCHMAN: Do you have an
22 objection to Petitioner's Exhibit 16?
23        MS. BRELAGE: No.
24        JUDGE DEITCHMAN: Petitioner's Exhibit
25 16 is admitted without objection.

59

1        (Petitioner's Exhibit 16 admitted.)
2        JUDGE DEITCHMAN: And now we are looking
3  at --
4             MS. TOTI: Plaintiff's Exhibit 62.
5  Q      Okay. Mr. Fox, I would like to direct your
6  attention to Paragraph 5. The first sentence of that
7  paragraph states, "After WWHA filed their initial
8  licensure application, ISDH received a communication
9  from a non-party attorney which included information
10 and copies of surveys performed on clinics in other
11 states purportedly owned by Amy Hagstrom Miller,
12 President of WWHA." Did I read that correctly?
13 A      Yes.
14 Q      And does WWHA refer to Whole Woman's Health
15 Alliance?
16 A      Yes.
17 Q      And does ISDH refer to the Indiana State
18 Department of Health?
19 A      Yes.
20 Q      Who is the non-party attorney that you are
21 referring to in that paragraph?
22 A      John Sullivan sent this information.
23 Q      And what role did the communication from
24 Mr. Sullivan play in the department's deliberations?
25 A      Just as any other input, communications we

60

1  received, you know, that's not a communication we
2  control. We receive communication from a lot of
3  different parties. This is one piece that we reviewed
4  throughout the process.
5  Q      Why did you highlight it in your affidavit?
6  A      Because we received it. I mean it was part of
7  the information that we received.
8  Q      And you didn't include in your affidavit any
9  mention of the communications from state legislators
10 that were admitted into the record earlier; is that
11 correct?
12 A      Correct.
13 Q      And when did you receive the communication
14 from Mr. Sullivan, do you recall?
15 A      I don't recall an exact date.
16 Q      We can take a look at Plaintiff's Exhibit 54
17 in that binder.
18 A      I'm sorry, can you repeat the number?
19 Q      Sure. 54. Is Exhibit 54 the letter from
20 Mr. Sullivan that you were referring to?
21 A      Yes, it looks like the -- yes. So this was
22 the information that he passed along to the
23 department.
24 Q      And the first page of Plaintiff's Exhibit 54,
25 I am sorry, Petitioner's Exhibit 54, is an E-mail from

1 Mr. Sullivan transmitting his communication to the   61
2 department; is that correct?
3 A      Yes.
4 Q      And that is dated January 3, 2018; is that
5 correct?
6 A      Yes.
7 Q      And that is the same day that the department
8 issued the license denial to Whole Woman's Health
9 Alliance; is that correct?
10 A      Yes.
11 Q      So what steps did the department take to
12 investigate the allegations in Mr. Sullivan's letter?
13 A      Similar to the other communications we
14 received.  We wanted to ask the applicant directly so
15 the steps we took to find out information that we
16 could use was the follow-up questions that we asked.
17 We don't license Mr. Sullivan, we don't license those
18 legislators, we don't license an applicant for an
19 abortion clinic.  So that's the source of information
20 that we need from --
21 Q      But you relied on information in those
22 communications in evaluating the application of Whole
23 Woman's Health Alliance?
24 A      No, we -- and I would say that's incorrect.
25 We didn't really rely on.  As I mentioned before, they

1 did create questions that I would need to answer, and   62
2 so that's a part of my role is to get to the bottom of
3 these questions and to be able to answer them
4 accurately and fully.
5 Q      But you didn't take any steps to vet the
6 source of that information and determine whether it
7 was reliable or not; is that fair?
8 A      Through the information that we found, the
9 team found and I did, looking through different
10 sources, that's -- we determined that best route was
11 to ask the applicant directly and that's what we did.
12 Q      But you didn't ask the applicant any questions
13 after receiving Mr. Sullivan's communication; is that
14 correct?
15 A      Not after this January 3rd.  As you mentioned,
16 it is the same date as the denial.
17 Q      Did you provide Whole Woman's Health Alliance
18 with notice of any of the communications that you
19 received about its application and an opportunity to
20 respond directly to them?
21 A      I am sorry, can you repeat that?
22 Q      Yes.  Did you provide Whole Woman's Health
23 Alliance with notice of any of the third-party
24 communications that they received about its
25 application.  So for example, from the state

1 legislators and from Mr. Sullivan?   63
2 A      No.
3 Q      And so you didn't provide Whole Woman's Health
4 Alliance an opportunity to respond directly to the
5 allegations in those communications?
6 A      No.  That's not -- normally the agency
7 wouldn't do that.
8 Q      Let me come back to your affidavit which is
9 Petitioner's 62.
10          MS. TOTI:  I am not going to move 54
11 into evidence.  I just wanted to use that one as
12 reference material, but I would like to move Exhibit
13 62 into evidence.
14          JUDGE DEITCHMAN:  Do you have any
15 objection to the admission of Mr. Fox's affidavit
16 which is Exhibit 62?
17          MS. BRELAGE:  No.
18          JUDGE DEITCHMAN:  62 is admitted without
19 objection.
20          (Petitioner's Exhibit 62 admitted.)
21          JUDGE DEITCHMAN:  And you are not
22 offering 54?
23          MS. TOTI:  That's correct.
24          JUDGE DEITCHMAN:  All right.
25 Q      Mr. Fox, I would like to direct your attention

1 to Paragraph Number 9 of your affidavit.  It states,   64
2 "WWHA answers the ISDH's request for additional
3 information on its application was inaccurate and
4 misleading because WWHA and WWH LLC and their
5 respective clinics are all significantly intertwined
6 under the common leadership of Amy Hagstrom Miller."
7 Did I read that correctly?
8 A      Yes.
9 Q      And you there in your affidavit made under
10 penalty of perjury, you are not stating that you have
11 questions about that, you are stating that matter as
12 an affirmative fact; is that correct?
13 A      In the affidavit, yes.
14 Q      So what is the basis for your assertion in the
15 affidavit?
16 A      The information that we found and her own
17 statements.
18 Q      And can you be more specific?  What
19 specifically led you to the conclusion that these
20 clinics --
21          MS. BRELAGE:  I am going to object to
22 the -- to where this is going because this affidavit
23 was made after months of discovery during litigation
24 and you are implying that he made this affidavit
25 purely in January.  I mean there is apples and oranges

65

1  here.

2           JUDGE DEITCHMAN:  Would you like to

3  respond to that?

4           MS. JACK:  I don't think she was allowed

5  to finish her question.

6           JUDGE DEITCHMAN:  I am thinking you are

7  talking about something that hasn't come up yet

8  because you are anticipating something that has not

9  been asked, so why don't you go ahead and finish your

10 question and then if you want to put your objection,

11 we will deal with that.

12          MS. TOTI:  Sure, sure.  That's a good

13 note to be clear.  So let me withdraw that question

14 and first ask --

15 Q      Mr. Trent, on the last page of your affidavit

16 is there a date?

17 A      Yes.

18 Q      And is that date June 25, 2018?

19 A      Yes.

20 Q      So as of June 25, 2018, what was the basis for

21 your conclusion that the clinics operated by Whole

22 Woman's Health Alliance and Whole Woman's Health LLC

23 were intertwined and under the common leadership of

24 Amy Hagstrom Miller?

25 A      As I mentioned, her own statements.  Like I

66

1  mentioned, every piece of information we received

2  referred to them as we, our clinics; our clinics, our

3  clinics.  And so putting it out to the public that

4  they are under that common leadership.

5  Q      Okay.  Let's take a look -- let's take a look

6  at Joint Exhibit 7.  That's Whole Woman's Health

7  Alliance's response to the department's request for

8  information.  So that's --

9           JUDGE DEITCHMAN:  That should be in your

10 pile because I think it was admitted.

11 A      I have it right here, yes.

12 Q      Okay.  If you turn to the second page of that

13 exhibit, I am going to ask you to read the response to

14 your Request Number 1.

15 A      Okay.  The question being, "Provide a complete

16 ownership structure and description pertaining to the

17 applicant including but not limited to any individual

18 and/or parent, affiliate, subsidiary organizations.

19 Please list full legal names and addresses, and for

20 entities list the type of entity and the state of

21 incorporation or organization."

22          Response to that question, "Whole Woman's

23 Health Alliance, WWHA, is a Texas non-profit

24 corporation.  It does not have members.  Management of

25 the affairs of WWHA is vested in the board of

67

1  directors.  Since WWHA is a non-profit corporation, it

2  does not have any owners.  WWHA operates a clinic in

3  Austin, Texas.  The address of the clinic is 8401

4  North IH-35, Suite 200, Austin, Texas 78753.  It is

5  licensed as an abortion facility by the Texas

6  Department of State Health Services Regulatory

7  Licensing Unit.  Its license number is 140013.

8           "WWHA has recently purchased a clinic in the

9  state of Virginia.  The clinic address is 2321

10 Commonwealth Drive, Charlottesville, Virginia 22901.

11 The license number is AF-0020.  WWHA has entered into

12 a management agreement with Whole Woman's Health LLC,

13 the management company.  The management company will

14 provide certain designated management services to

15 WWHA.  The management company provides management

16 services to numerous clinics across the United States.

17 The management company is a Texas Limited Liability

18 Company.  Some of the board members of WWHA are

19 affiliated directly or indirectly with the management

20 company, but the majority of the board members are

21 independent."

22 Q      Thank you.  So Whole Woman's Health Alliance

23 disclosed that it is a non-profit organization led by

24 a board of directors, correct?

25 A      Yes.

68

1  Q      And Whole Woman's Health Alliance disclosed

2  that it owns abortion clinics in Texas and Virginia,

3  correct?

4  A      I'm sorry, can you repeat that?

5  Q      So Whole Woman's Health Alliance disclosed

6  that it owns abortion clinics in Austin, Texas, and

7  Charlottesville, Virginia; is that correct?

8  A      Yes.

9  Q      And Whole Woman's Health Alliance disclosed

10 that it entered into a management services agreement

11 with Whole Woman's Health LLC, a Texas Limited

12 Liability Company, correct?

13 A      Yes.

14 Q      And Whole Woman's Health Alliance disclosed

15 that Whole Woman's Health LLC provides management

16 services to numerous other clinics across the US,

17 correct?

18 A      Yes.

19 Q      So what about that response is incomplete with

20 respect to the question that the department asked?

21 A      Two-fold.  The common control of Amy Hagstrom

22 Miller and then also the -- the non-answer to the

23 listing of the individuals of the board members.

24 Q      Where does the question ask for the name of

25 the board members?

69

1  A       It says -- when it mentions, "Provide a
2  complete ownership structure or description pertaining
3  to the applicant including but not limited to any
4  individuals and/or any parent, affiliate, or
5  subsidiary organization." And it goes further to say
6  please list full legal names and addresses, and then
7  for entities list the type of entity.
8  Q       But the question doesn't explicitly ask for
9  the names of board members; is that correct?
10 A       I believe it does.
11 Q       Do the words "board members" appear in the
12 question?
13 A       Individuals.
14 Q       But it doesn't say board members. Do you
15 understand the board members to be owners of Whole
16 Woman's Health Alliance?
17 A       I mean I can't speculate. I don't know.
18 Q       Would you agree that a non-profit organization
19 doesn't have owners?
20 A       I would agree.
21         MS. BRELAGE: Objection, I think that's
22 calling for a legal conclusion.
23         JUDGE DEITCHMAN: I think he has
24 answered it.
25         MS. BRELAGE: Well, I am still

70

1  objecting.
2          JUDGE DEITCHMAN: I don't know how we
3  are going to back that up.
4          MS. BRELAGE: I am not sure that that's
5  something --
6          JUDGE DEITCHMAN: Do you want to strike
7  that answer?
8          MS. BRELAGE: Yes, because I am not sure
9  that that's something that he can answer and I think
10 it is inappropriate for them to ask.
11         JUDGE DEITCHMAN: Response?
12         MS. TOTI: I will withdraw that
13 question. Let me ask a different question, Your
14 Honor.
15 Q       What definition of ownership did the
16 department have in mind when it used the term
17 "ownership structure" in its question?
18 A       The definition I don't recall exactly.
19 Q       So if the department doesn't know what
20 ownership meant in that question, how is Whole Woman's
21 Health Alliance supposed to know what you meant other
22 than the common meaning of the term?
23 A       We look to the definition of affiliate, like I
24 mentioned earlier. And I don't recall offhand the
25 definitions we listed verbatim, but the theme was in

71

1  every one of those definitions was a common control by
2  one entity or person.
3  Q       So I am glad you brought that up. So you said
4  that in your research into the Indiana Code there were
5  multiple definitions of the term "affiliate," correct?
6  A       Yes.
7  Q       But in your request for information of Whole
8  Woman's Health Alliance, you didn't define that term;
9  is that correct?
10 A       No. In the follow-up questions I did not have
11 that definition.
12 Q       Now, suppose for a minute that Whole Woman's
13 Health Alliance is not under the control of Amy
14 Hagstrom Miller. Suppose that it is under the control
15 of an independent board of directors. If that's the
16 case, wouldn't you agree that the response that Whole
17 Woman's Health Alliance provided to the question that
18 you asked is complete and accurate?
19 A       I honestly don't -- I think that would call
20 for speculation on my end. I don't know if that is
21 appropriate for me to answer a hypothetical. I think
22 we had the information in the scenario we were in at
23 that point.
24 Q       Well, I am just trying to understand. So
25 suppose again that Whole Woman's Health Alliance is

72

1  not affiliated with any clinic other than the Texas
2  and Charlottesville clinic --
3          MS. BRELAGE: Objection. Again, it is
4  calling for speculation.
5          JUDGE DEITCHMAN: Go ahead, do you want
6  to respond to that? Your objection is it is
7  speculative?
8          MS. TOTI: It is not speculative, Your
9  Honor. I am trying to understand what the department
10 would do in that situation. Ultimately we are trying
11 to understand how Whole Woman's Health -- what was
12 expected of them, Whole Woman's Health Alliance, what
13 the department expected of them in responding to
14 these.
15         JUDGE DEITCHMAN: I am going to deny the
16 objection. You can go ahead and answer it. If you
17 want to rephrase your question so that he knows what
18 he is responding to.
19         MS. TOTI: Sure.
20 Q       So suppose that Whole Woman's Health Alliance
21 doesn't have any affiliated clinics other than the
22 Austin and Charlottesville clinics that were
23 identified; would you agree that it would be
24 inappropriate for them to list other clinics as part
25 of their ownership structure that aren't actually part

101

REDIRECT EXAMINATION

1
2 BY MS. BRELAGE:
3 Q    So, Trent, you were asked a couple of
4 questions about the clinic in Lafayette that the
5 agency licensed in 2015.  Can you tell me what type of
6 abortion does that clinic provide?
7 A    It is medical as opposed to surgical.
8 Q    Okay.  And medication abortions, when did
9 Indiana start licensing those?
10 A    So 2015, I can't recall if the legislation
11 passed in '14 or '15, but by the time it was
12 implemented 2015 was when those licenses started.
13 Q    So Lafayette medication abortion facility was
14 treated the same way as the other ones that they were
15 already providing that service at the time we went in
16 and provided them a license; is that correct?
17         MS. JACK:  Objection, leading.
18         MS. BRELAGE:  I think on Redirect I get
19 a little more broad latitude.
20         JUDGE DEITCHMAN:  Actually, no.  But,
21 again, we do need to watch the leading.  Okay?  You
22 can answer the question.
23 A    All right.  Yes.  So the type of license that
24 was legislated in I mentioned '14-'15 began, so that's
25 when we would have started those licenses.  Before

102

1 that we would not have granted or processed those
2 licenses.  That was -- and a point I mentioned
3 earlier, you know, distinguishing the current
4 application as a new scenario for the agency was just
5 that, because this application is just a new territory
6 for us.
7 Q    Okay.  Every other application at the agency
8 was called upon to license an abortion facility
9 involved a facility that was already providing
10 abortions in Indiana?
11 A    Correct.
12 Q    Now, at one point you were asked to look at
13 Whole Woman's Health Alliance's Exhibit 13, the
14 management service agreement?
15 A    Yes.
16         JUDGE DEITCHMAN:  Is that Joint Exhibit
17 13?
18         MS. BRELAGE:  Correct, Joint Exhibit 13.
19 Q    And they asked you about the portion of that
20 agreement that talked about the ability of the
21 management company to provide media services and the
22 like for the Alliance; do you recall that?
23 A    Yes.
24 Q    Did it say anything about commingling all of
25 those agencies together for the purposes of

103

1 advertising?
2 A    No.  As I mentioned, looking at the website
3 just as was recently put on the sign of the facility
4 applying for licensure listing wholewomanshealth.com,
5 when I am looking at that I assume Whole Woman's
6 Health is in control of every clinic they list as our
7 clinic.  So although this agreement and, you know, no
8 capacity to interpret it from a legal stance, the fact
9 was I was looking at this website as an average person
10 and an average person looked at this website and sees
11 those eight clinics listed.
12 Q    All right.  And when you asked these
13 questions, the responses that you were looking for,
14 were you looking for detailed responses?
15 A    Yes.  Honestly commonly applicants will
16 provide more information than would be necessary, but
17 in this case we just simply didn't have enough
18 information to justify granting.
19 Q    And at any time since these proceedings have
20 begun, have Whole Woman's Health Alliance filed a new
21 application and provided information about all of
22 these clinics?
23 A    No.  They are certainly free to do so, but no
24 such application was provided.  As I mentioned, when
25 we asked these questions, the follow-up questions, we

104

1 expected complete and accurate information and we
2 simply didn't get it.  So now we are in a scenario
3 where we are going back and forth on definition of a
4 term rather than determining information that should
5 have been provided for us to make a decision and we
6 just simply couldn't get there.
7 Q    Finally, the final thing I would like to just
8 touch on briefly, Mr. Sullivan's communication to the
9 agency of January 3rd came on the same date that our
10 decision was made; did that communication provide a
11 basis for that decision?
12 A    No.  It couldn't have, I mean as far as the
13 timeline goes.  But it was certainly consistent with
14 the information we were receiving from legislators.
15 Q    Okay.
16         MS. BRELAGE:  I have no further
17 questions.
18         JUDGE DEITCHMAN:  Recross?
19         MS. TOTI:  Just very briefly.
20         RECROSS-EXAMINATION
21 BY MS. TOTI:
22 Q    Mr. Fox, it seems like when you, when the
23 department reached out to Whole Woman's Health
24 Alliance to request some more information, you had in
25 mind some very specific information that you were

**LESS** [3]
184:7;
208:17, 18

**LET'S** [23]
6:24;  30:11;
34:22;  36:2;
66:5;  77:2;
94:8;  98:22;
99:2,  12;
100:11;
108:7;
109:5;
114:12;
115:18;
137:18,  23;
141:14;
163:23;
193:5;
196:11;
197:4

**LETTER** [22]
32:4,  6,  23;
36:24;
42:25;  43:2,
4,  12;  50:3;
60:19;
61:12;
88:19;
89:20;
108:10;
113:6;
120:5,  10,
15;  123:17;
124:9,  22;
129:11

**LETTERS** [1]
89:14

**LEVEL** [6]
21:3;  42:21;
143:17,  23;
144:25;
157:20

**LEVELS** [2]
46:17;
143:16

**LIABILITY**
[4]  16:6;
17:16;
67:17;  68:12

**LIAISON** [4]
21:11;
32:10;
52:24;  96:25

**LIAM** [1]
31:3

**LICENSE**
[54]  11:19,
23;  12:1;
22:22;  23:8;
31:8,  9;
33:8;  35:15,
23;  36:25;
50:18,  25;
52:18;  53:4;
55:25;
56:23;  57:9,
10;  61:8,
17,  18;
67:7,  11;
74:21;
79:25;
80:21;  88:8,
23;  89:6;
90:11,  25;
91:1,  25;
92:8;  96:21;
98:1;
101:16,  23;
102:8;
105:23;
106:3;
108:11;
116:5;
120:6,  15;
122:12,  24;
139:7,  13;
187:17;
188:5;  207:3

**LICENSED**
[7]  55:23;
56:3,  6,  11;
67:5;  101:5;
110:23

**LICENSES**
[4]  35:9;
101:12,  25;
102:2

**LICENSING**
[7]  20:2;

23:4,  16;
26:10;  67:7;
101:9;
187:21

**LICENSURE**
[8]  5:11;
6:15;  13:7;
18:4,  20;
59:8;  91:20;
103:4

**LIFE** [4]
98:1;
166:23;
206:22;
207:22

**LIKE** [71]
6:23;  12:25;
24:5;  30:6;
35:21;  44:8;
47:4,  7;
57:20;
58:20;  59:5;
60:21;
63:12,  25;
65:2,  25;
70:23;  75:1,
6;  76:19;
79:17;
80:14;
86:19,  20;
87:20;  90:1;
94:25;
96:18,  25;
97:2,  8;
98:24;
99:10;
100:16,  18;
102:22;
104:7,  22;
105:13;
106:2,  22;
114:2;
117:9;
118:25;
126:14;
130:17;
143:2;
144:3;
145:25;
146:10,  14,

16,  17,  18;
160:9;
161:21;
162:25;
177:14;
178:15;
180:20;
184:9,  22;
186:4;
187:10;
188:23;
189:21;
191:20;
194:15;
206:8;
208:20

**LIKELY** [1]
6:14

**LIMIT** [2]
132:5;
133:24

**LIMITED** [14]
10:10;
12:16;  14:2;
16:6;  17:16;
46:11;  52:2;
66:17;
67:17;
68:11;  69:3;
87:22;
118:4;
131:13

**LINE** [9]
48:8;  76:21;
86:12,  16;
119:7;
135:15;
136:1;
198:6, 16

**LIST** [15]
37:7;  40:21;
46:5;  66:19,
20;  69:6, 7;
72:24;
75:23;
103:6;
112:14;
115:25;
116:9;
122:8; 138:1

37

1  A      Yes.

2  Q      Why did you not identify the affiliate

3  organization in this answer?

4  A      Whole Woman's Health Alliance doesn't have any

5  affiliates.  The relationship that identified here

6  would be the one that would be answering the question,

7  Whole Woman's Health Alliance has a relationship with

8  the management company but it doesn't have affiliates.

9  Q      Was it important to Whole Woman's Health

10 Alliance's mission to operate an abortion clinic in

11 South Bend?

12 A      Absolutely.

13 Q      Why?

14 A      It fit squarely with our mission, which is a

15 challenging one, to be able to offer services and

16 direct services in communities where people have seen

17 clinics shuttered and have seen access to abortion

18 sort of decimated.  And knowing that some of these

19 communities might provide great challenges for not

20 only the provider to be able to open a facility but

21 for us to come up against stigma and shame and sort of

22 withering of self-esteem that's happened over

23 generations in those communities.  And so it was a

24 heavy lift but very much in the mission of what Whole

25 Woman's Health Alliance's mission and vision is.

38

1  Q      Has Whole Woman's Health Alliance spent any

2  money towards opening that clinic in South Bend?

3  A      Yes, we have.

4  Q      Has Whole Woman's Health Alliance incurred any

5  financial losses by not being able to open the clinic

6  in South Bend?

7  A      Yes, we have.

8  Q      Has Whole Woman's Health Alliance's inability

9  to open an abortion clinic in South Bend impacted

10 access in that community to abortion access?

11 A      Yes, it has.  There is no -- well, I would

12 argue that probably the same amount of women in the

13 community still need abortion services, there is no

14 actual clinic providing those services in the

15 community and so women are forced to travel outside of

16 the community.

17 Q      Could Whole Woman's Health Alliance operate a

18 clinic in South Bend without a license?

19 A      No.

20 Q      Your license application was ultimately

21 denied, correct?

22 A      Correct.

23 Q      How did you learn that that application was

24 denied?

25 A      My attorney told me that he got a denial

39

1  letter.

2  Q      The denial states that Whole Woman's Health

3  Alliance failed to disclose additional clinics in

4  response to the department's request to list all

5  affiliates; is that correct?

6  A      Yes.

7  Q      Did the department convey to you at any point

8  during the application process that they thought Whole

9  Woman's Health Alliance had affiliates?

10 A      No.

11 Q      Did the department ever tell you or anybody

12 else at Whole Woman's Health Alliance that they had

13 received communications from Indiana State legislators

14 that said Whole Woman's Health Alliance had

15 affiliates?

16 A      No.

17 Q      Did any Indiana State legislators contact you

18 or anyone else with Whole Woman's Health Alliance to

19 ask you about Whole Woman's Health Alliance's

20 ownership or corporate structure?

21 A      No.

22 Q      Did the department ever tell you or anyone

23 else at Whole Woman's Health Alliance that they had

24 questions about the relationship between Whole Woman's

25 Health Alliance and any specific entities?

40

1  A      No.

2  Q      When was the first time then that you came to

3  understand the department thought Whole Woman's Health

4  Alliance had an affiliate?

5  A      When we got the denial.

6  Q      Why did you think that when you got the denial

7  letter?

8  A      Because they say something about not only us

9  withholding information but they actually list the

10 kinds of information that they feel like we withheld.

11 It was a big surprise to us because our attorney, John

12 Bucy, had had a professional relationship with the

13 department prior to that and there had been numerous

14 times where there were calls and follow-up questions,

15 et cetera, and the department was very professional

16 and always very -- it felt like things were moving

17 forward fine, and if they weren't, the questions were

18 easy to answer and so this was really surprising that

19 after this list of questions that we supplied all the

20 answers to out of the blue it felt like we were

21 denied.

22 Q      Did Whole Woman's Health Alliance take any

23 action in response to the denial letter?

24 A      Yes.  I actually directed John to pick up the

25 phone and call the same people in the department he



**APPLICATION FOR LICENSE**
**TO OPERATE AN ABORTION CLINIC**
State Form 62233 (R3 / 3-14)
Approved by State Board of Accounts, 2014
Indiana State Department of Health-Division of Acute Care
*(Pursuant to IC 16-21-2 and 410 IAC 26)*

---

## Division of Acute Care Use Only

Date Received *(mm/dd/yyyy)*_____   Date Approved *(mm/dd/yyyy)*_____   Date Rejected *(mm/dd/yyyy)*_____

---

*Please Type or Print Legibly.*

### SECTION I - TYPE OF APPLICATION

**Application** *(Check appropriate item.)*

☑ New Facility   ☐ Renewal   ☐ Change of Ownership *(Anticipated date of Sale/Purchase/Lease (mm/dd/yyyy))* _____
Submit a dated and signed copy of the bill of sale, lease or other document of transfer.

### SECTION II - IDENTIFYING INFORMATION

**A. Abortion Clinic Location**

| Name of Abortion Clinic | | | |
|---|---|---|---|
| Whole Woman's Health Alliance | | | |

| Street Address *(number and street)* | | | P.O. Box |
|---|---|---|---|
| 3511 Lincoln Way West | | | |

| City | County | | ZIP Code +4 |
|---|---|---|---|
| South Bend | St. Joseph | | 46628-1411 |

| Telephone Number | Fax Number | | |
|---|---|---|---|
| ( ) | ( ) | Abortion Clinic e-mail address:_____ | |
| | | Internet Web Address:_____ | |

**B. Mailing Address** *(if different from abortion clinic location)*

| Street Address *(number and street)* | | P.O. Box |
|---|---|---|
| | | |

| City | County | ZIP Code +4 |
|---|---|---|
| | | |

**C. Licensee/Ownership Information**

Licensee: The applicant entity as registered with the secretary of state

| Whole Woman's Health Alliance | | |
|---|---|---|
| Street Address *(number and street)* | | P.O. Box |
| 1812 Centre Creek Drive, Suite 205 | | |

| City | State | ZIP Code+4 |
|---|---|---|
| Austin | Texas | 78754 |

| Telephone Number | Fax Number | EIN Number | Fiscal Year End Date *(mm/dd)* |
|---|---|---|---|
| ( 512 ) 835-8858 | ( 512 ) 835-8586 | 46-5318393 | 12/31 |

1

**J.E. 1**

WWHA_RR00001353

**D. Services provided under this license:**

*Code items 1 and 2 as follows:   1. Provided directly by employee(s).   2. Provided by a contract service.   3. Both 1 and 2.*

1. Ancillary Services:  ☐ Laboratory: CLIA Certificate Number _____   ☐ Radiology   ☐ Counseling

[1] Family Planning   ☐ Pharmacy   ☐ Other *(List):* _____

2. Surgical Services:  ☐ Gynecology   ☐ Other *(List):* _____

*For item 3, indicate the total number of individuals (employees plus contractors) working in this clinic. This includes hourly, part-time, and full-time persons.*

3. Staffing :  Physicians: [1]   Registered Nurses: [ ]   Licensed Practical Nurses: [ ]

Licensed Social Workers: [ ]   Other *(List title and number):*  1ACP _____

**E. Number of Procedure Rooms Utilizing:**

Local analgesia/anesthetic [0]   Moderate/Conscious Sedation [0]

**F. Type of Entity:**

| For Profit | Non-Profit | Government |
|---|---|---|
| ☐ Individual | ☐ Church Related | ☐ State |
| ☐ Partnership | ☐ Individual | ☐ County |
| ☐ Corporation | ☐ Partnership | ☐ City |
| ☐ Limited Liability Company | ☒ Corporation | ☐ City/County |
| ☐ Sole Proprietorship | ☐ Limited Liability Company | ☐ Hospital District |
| ☐ Other *(specify)* _____ | ☐ Other *(specify)* _____ | ☐ Federal |
| | | ☐ Other *(specify)* _____ |

2

WWHA_RR00001354

**G. Officers** *(if the business entity is incorporated)*

| Position | Name | Address/City/State/ZIP |
|---|---|---|
| President/Chairperson/CEO | Amy Hagstrom Miller | 1812 Centre Creek Drive, Suite 205, Austin, Texas, 78754 |
| Vice-President/Vice-Chairperson/COO | N/A | |
| Treasurer/CFO | Bonnie Talbert | 1812 Centre Creek Drive, Suite 205, Austin, Texas, 78754 |
| Secretary | John H. Bucy II | 1812 Centre Creek Drive, Suite 205, Austin, Texas, 78754 |

**H. Ownership and/or Change in Ownership:**

List names and addresses of individuals or organizations having direct or indirect ownership or controlling interest of five percent (5%) in the applicant entity. Indirect ownership interest is an entity that has an ownership interest in the applicant entity. Ownership in any entity higher in a pyramid than the applicant constitutes indirect ownership. *(Use additional sheet if necessary.)*

| Name | Business Address/City/State/ZIP | EIN Number |
|---|---|---|
| N/A | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**CERTIFICATION OF APPLICATION**

The undersigned hereby makes application for a license to operate an Abortion Clinic (Clinic) in the State of Indiana, and in support of this application, represents and shows that the owner(s) and operator(s) are of reputable and reasonable character, are able to comply with the Abortion Clinic statutes (IC 16-21-2-2.5 and IC 16-34); and the rules promulgated there under, 410 IAC 26 and will operate and maintain the clinic in accordance with those rules.

I certify that the operational policies of the clinic will not provide for discrimination based upon race, color, creed, or national origin.

I swear and affirm under the penalty of perjury that all statements made in this application and any attachments thereto are correct and complete and that I will comply with all regulations, laws, and rules governing the licensing of clinics in Indiana.

| | |
|---|---|
| Signature of the Medical Director: | |
| Printed Name and Title: | Jeffrey D. Glazer, Med Dir |
| Date of Signature *(mm/dd/yyyy)*: | 07/25/2017 |
| Signature of the Clinic Administrator: | |
| Printed Name and Title: | Lisa McKay |
| Date of Signature *(mm/dd/yyyy)*: | 10/02/2017 |

**See the following page for instructions regarding licensure fees and submission of this application.**

3

| Position | Name | |
|---|---|---|
| President/Chairman/CEO | Amy Hughes-Gritzer | N/A |
| Vice-President/Vice-Chairperson/COO | N/A | |
| Treasurer/CFO | Brenda Tolbert | N/A |
| Secretary | Juhelia Basith | N/A |

| Name | | |
|---|---|---|
| | | |

**CERTIFICATION**

Signature of the Medical Director

Printed Name and Title: Stephen D. Wiazek   Med Dir

Date of Signature: 07/26/2017

See the following page for instructions regarding transmittal fees and submission of this information.

WWHA_RR00001356

| License Fee |
|---|

**Select the appropriate fee based upon the total number of first trimester procedures as reported to the Indiana State Department of Health (ISDH) on the Terminated Pregnancy Report (State Form 36526).**

| Check One | Total First Trimester Procedures in the Clinic | Fee |
|---|---|---|
| ✓ | Zero to 799 | $500.00 |
| | 800 to 3,499 | $1,000.00 |
| | 3,500 to 6,999 | $2,000.00 |
| | 7,000 and above | $3,000.00 |

*Indiana Hospital Council; 414 IAC 1-1-3*

*Enclose the following:*

*1. A completed Application for License to Operate an Abortion Clinic (this form).*

*2. Any supporting attachments.*

*3. For each physician performing procedures, either:*

   *(A) A copy (in writing) of the physician's admitting privileges; or*
   *(B) A copy of:*
      *(1) his/her written agreement with another physician with admitting privileges; and*
      *(2) a copy (in writing) of that physician's admitting privileges.*

*4. Payment made payable to "Indiana State Department of Health."*

*Mail to:*

**INDIANA STATE DEPARTMENT OF HEALTH
CASHIER'S OFFICE
P. O. BOX 7236
INDIANAPOLIS, INDIANA 46207-7236**

4

WWHA_RR00001357

July 5, 2017

, DO

Dear:

I am pleased to inform you that the ____ the Board of Trustees approved your reappointment to the ____ . ____ effective . If you requested a change in your delineation of privileges, a new copy of the privileges for which you were approved will be attached.

Please remember that 50 hours of continuing medical education activities relevant to the privileges granted are a requirement for practitioners with delineated clinical privileges. For the next reappointment period, credits will be accepted from continuing medical education activities held during the dates indicated above.

Your continued confidence and support of our Hospital is appreciated by the entire ____ . Please always feel free to bring matters you deem important to the attention of any one of us on the management staff. I can assure you that we will act promptly to address your concerns and/or ideas in order to assure that the highest quality of care and services are provided to your patients.

If you have any questions regarding your reappointment, please don't hesitate to call

Sincerely,

# J.E. 2

WWHA_RR00001358

Whole Woman's Health Alliance
Whole Woman's Health of South Bend
3511 Lincoln Way West
South Bend, IN 46628

Emergency Services Agreement

This agreement between _____ and _____ offers medical transfer services for Whole Woman's Health of South Bend in accordance with Ind. Code Ann. §16-34-2-4.5.

_____ agrees to accept referrals from _____ for patients who may require evaluation, treatment, or follow up care from any complications from services provided at Whole Woman's Health of South Bend. _____ affirms that _____ currently has privileges at a hospital in St. Joseph's County or a county contiguous thereto.

07-25-17
Date

# J.E. 3

WWHA_RR00001359

**Bucy & Associates, PLLC**

6633 Highway 290 East, Suite 104
Austin, Texas 78723
Phone: (512) 291-6505
Fax: (512) 291-6558
E-Mail: john@johnbucy.com

August 1, 2017

Jerome M. Adams, MD, MPH
State Health Commissioner
Indiana State Department of Health
2 North Meridian Street
Indianapolis, Indiana 46204

Dear Dr. Adams,

Whole Woman's Health Alliance, a 501c3 nonprofit organization is submitting an abortion clinic licensing application to the Indiana State Department of Health ("ISDH") for a clinic to be located at 200 Colfax Avenue, Suite 400, South Bend, Indiana. Our clinic on Colfax Avenue will not provide surgical abortions, but rather will only offer women the option of a non-surgical (medication) abortion using the medication mifepristone.

Ind. Code 16-21-1-9 states that the State Health Commissioner may grant a waiver of a rule for good cause shown, and if the granting of the waiver "will not adversely affect or increase any risk to the health, safety or welfare of existing or potential residents or patients". In connection therewith, and pursuant to IC 16-21-1-9, Whole Woman's Health South Bend requests a waiver of certain abortion licensing requirements itemized below; we respectfully submit that the waiver should be granted, as it will not adversely affect or increase any risk to the health, safety or welfare of existing or potential residents or patients. We also respectfully note that Planned Parenthood of Indiana and Kentucky has previously received a waiver of each of the requirements listed below from the State Health Commissioner for its clinic in Lafayette, based on the same rationale explained below.

As stated above, we will not offer surgical abortions, only non-surgical (medication) abortions, in compliance with all applicable Indiana regulations including the waiting period. Our patients will come to our clinic, take the medication in the presence of a physician, and then leave the clinic shortly after. Another medication is taken by the patient at home, one to two days later, after which the patient is scheduled for a follow up appointment to confirm that the pregnancy is terminated. As there is no surgery, or any procedure at all, performed in connection with a medication abortion, the waiver of the rules itemized below will have no adverse effect or increase in risk to the health, safety or welfare of our patients.

We respectfully request that the State Health Commissioner waive the following rules:

# J.E. 4

WWHA_RR00001360

Mr. Adams
August 1, 2017
Page 2 of 3

Bucy & Associates, PLLC

| RULE | RATIONALE |
|---|---|
| 410 IAC 26-10-1(b)(5): Observation during Recovery Period | There is no recovery period necessary in the provisions of a non-surgical abortion, since there is no surgery from which to recover. |
| 410 IAC 26-11-2(a): Sterilization of Equipment and Supplies | Non-surgical abortions will be performed by medication, not surgery; no sterile equipment or supplies are required in order to give patient an oral medication. |
| 410 IAC 26-11-3 Laundry | The clinic will use disposable linens and therefore there is no need for the laundry processing requirements to apply. |
| 410 IAC 26-13-1 Anesthesia | No anesthesia is used and therefore there is no need for the listed anesthesia services. |
| 410 IAC 26-13-3(b) and (c) Anesthesia and Surgical Services: emergency equipment and supplies | There is no procedure performed and no procedure room; there is no recovery needed and no recovery room. Therefore, there is no need for the itemized emergency supplies. |
| 410 IAC 26-17-2( c)(3): Toilet Room | The clinic does not have a separate restroom (toilet and hand washing station) in the waiting room. However, there is a patient restroom (toilet and hand washing station) that will also be available to visitors in the waiting room. |
| 410 IAC 26-17-2( c)(4) Drinking Fountain | The clinic does not have a water fountain. However, we will provide a water cooler and/or bottled water to patients and visitors. |
| 410 IAC 26-17-2(d)(1) Physical Plant Standards: procedure room size and traffic flow | As noted above, there is no procedure performed and no procedure room used for a non-surgical abortion. Medications may be dispensed in an examination room, which may be less than 120 |

WWHA_RR00001361

Mr. Adams
August 1, 2017
Page 3 of 3

**Bucy & Associates, PLLC**

| | |
|---|---|
| | square feet. There is no need for procedure rooms to be segregated/ removal from traffic flow as there are no such rooms. |
| 410 IAC 26-17-2(d)(2) Hand Washing Station in Procedure Room | As noted above, there are no procedure rooms. Hand washing stations are available in the patient restroom. |
| 410 IAC 26-17-2(d)(3) Scrub Facilities | As noted above, there are no procedures performed for non-surgical abortions, and no procedure rooms. Therefore, scrub facilities are not required near procedure rooms. |
| 410 IAC 26-17-2(d)(4) Recovery Area/ Rooms | As noted above, there is no procedure performed in a non-surgical abortion and therefore no need for a recovery area or recovery rooms. |
| 410 IAC 26-17-2(d)(6) Toilets | As described above, there is a patient restroom (toilet and hand washing facilities) in the clinic area, available for use by patients as well as visitors in the waiting area. |

We appreciate your timely consideration of our request, and we await your response. If you have any questions, please do not hesitate to contact me at (512) 291-6505 or john@johnbucy.com.

Sincerely,

John H. Bucy, II

## Lee, John

| | |
|---|---|
| **From:** | Lee, John |
| **Sent:** | Friday, October 27, 2017 3:11 PM |
| **To:** | 'John Bucy' |
| **Subject:** | WHOLE WOMAN'S HEALTH ALLIANCE, INC |

October 27, 2017

Dear Mr. Bucy:

Thank you for the information you have submitted to date regarding Whole Woman's Health Alliance on their application for a license to operate an abortion clinic located at 3511 Lincolnway West, South Bend, Indiana 46628-1411. This letter serves as a request for additional information from Whole Woman's Health Alliance on their application.

Pursuant to authority set forth in 410 IAC 26-2-4 et seq., the Indiana State Department of Health is requesting the below additional information concerning the application prior to conducting further review of the application. This additional information is necessary to ensure Whole Woman's Health Alliance's application conforms to the requirements set forth in IC 16-21-2-11.

Please provide additional information regarding the below items within forty-five (45) days of the date of this letter:

1. Provide a complete ownership structure or description pertaining to the applicant, including, but not limited to, any individuals and/or any parent, affiliate or subsidiary organizations. Please list full legal names and addresses, and for entities, list the type of entity and the state of incorporation/organization.

2. Provide a list of all the abortion and health care facilities currently operated by applicant, including its parent, affiliate or subsidiary organizations.

3. Provide a complete list of personnel (medical or otherwise) who will staff the abortion facility after it opens, including their positions and a description of their job responsibilities.

4. For the three-year period immediately preceding the application date, provide data for the applicant pertaining to the following (and include details about the circumstances, dates, and final action):

    (a) Any tax liens?
    (b) Ever defaulted under a lease or been evicted from a building or other property?
    (c) Any unsatisfied final judgments?
    (d) Ever been subject to injunctive orders from any court?
    (e) Any criminal arrests or convictions?
    (f) Ever been cited for violating any local laws or ordinances, such as building, utility, zoning and safety codes?
    (g) Any denial, suspension, or revocation of any abortion facility or health care facility licenses?
    (h) Ever been subject to an administrative adjudication or enforcement action?
    (i) Any Medicaid or Medicare sanctions or penalties relating to the operation of an abortion facility or health care facility?
    (j) Ever surrendered a license before its expiration?
    (k) Any debarment or related action in connection with Medicaid or Medicare?

## J.E. 6

WWHA_RR00001363

1

5. For the three-year period immediately preceding the application date, provide data for the medical director and the facility administrator pertaining to the following, so long as it is related to the provision of care or bears a direct or substantial relationship to the job responsibilities that he/she is to carry out for the applicant (and include details about the circumstances, dates, and final action):

   (a) Any criminal arrests or convictions?
   (b) Ever been subject to an administrative adjudication or enforcement action?
   (c) Any civil judgments?

6. Provide full and complete copies of the articles of incorporation, by-laws, and related organizational documents of the applicant.

7. Provide a list and description of all of the procedures or services that will be provided at the abortion facility after it opens.

8. Provide appropriate evidence (such as an affidavit or corporate resolution) establishing that the medical director and the facility administrator have been duly and properly authorized and empowered to sign the application for and on behalf of the applicant.

9. If the applicant has or will engage an entity (other than an employee of applicant) to manage or operate the abortion facility, provide the full legal name and address of that entity and also list the type of entity as well as its state of incorporation/organization. Also attach a complete copy of the proposed or executed management agreement.

10. If any person or entity can claim liabilities of the applicant or of the facility or service for which the license is requested, provide their full legal name and address, and percent and type of claim (if applicable).

11. Provide any other data or information, of which the applicant is aware or has knowledge, that may indicate that the applicant is not of reputable and responsible character, or that could bear upon the requisite showing in that regard.

Please do not hesitate to contact the Indiana State Department of Health should you need additional clarity on any of the above.

Sincerely,

John Lee, RN, MBA
*Deputy Director of Acute Care*

*Acute Care*
*Indiana State Department of Health*
*317.233.7487 office*
*317.233.7157 fax*
*jlee@isdh.in.gov*
*www.StateHealth.in.gov*

  



Confidentiality Statement:

WWHA_RR00001364

This message and any attachments may be confidential.  If you are not the intended recipient, please 1) notify me immediately; 2) do not forward the message or attachment; 3) do not print the message or attachment; and 4) erase the message and attachment from your system.

3

Lee, John

| | |
|---|---|
| **From:** | Kristie Amann <kristie@johnbucy.com> |
| **Sent:** | Friday, December 08, 2017 3:08 PM |
| **To:** | Lee, John; John H. Bucy, II |
| **Subject:** | Application Documents |
| **Attachments:** | Response to John Lee Email Requesting Additional Information 12-8-17.pdf; Job Description (Clinic Manager).pdf; Attachment #1.pdf; Attachment #2.pdf; Attachment #3.pdf |

**** This is an EXTERNAL email. Exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email. ****

Mr. Lee,

Attached please find the Responses to your email dated October 27, 2017 requesting additional information along with the attachments mentioned in the document. Please let me know if you have any other questions.

Regards,

Kristie Amann
Legal Assistant to
John H. Bucy, II
6633 Hwy 290 East
Suite 104
Austin, Texas 78723
Phone: (512) 291-6505
Fax: (512) 291-6558

# J.E. 7

1

WWHA_RR00001366

Mr. Lee:

    We will respond to your requests in the order presented:

    1.   **Provide a complete ownership structure or description pertaining to the applicant, including, but not limited to, any individuals and/or any parent, affiliate or subsidiary organizations. Please list full legal names and addresses, and for entities, list the type of entity and the state of incorporation/organization.**

**Response:**   Whole Woman's Health Alliance ("WWHA") is a Texas nonprofit corporation. It does not have members. Management of the affairs of WWHA is vested in the Board of Directors. Since WWHA is a nonprofit corporation it does not have any owners.

    WWHA operates a clinic in Austin, Texas. The address of the clinic is 8401 North IH 35, Suite 200, Austin, Texas 78753. It is licensed as an Abortion Facility by the Texas Department of State Health Services Regulatory Licensing Unit. Its license number is 140013.

    WWHA has recently purchased a clinic in the State of Virginia. The clinic address is 2321 Commonwealth Drive, Charlottesville, Virginia, 22901. The license number is AF-0020.

    WWHA has entered into a management agreement with Whole Woman's Health, LLC (the "Management Company"). The Management Company will provide certain designated management services to WWHA. The Management Company provides management services to numerous clinics across the United States. The Management Company is a Texas limited liability company.

    Some of the Board Members of WWHA are affiliated directly or indirectly with the Management Company, but the majority of the Board Members are independent.

    2.   **Provide a list of all the abortion and health care facilities currently operated by applicant, including its parent, affiliate or subsidiary organizations.**

**Response:**   Please refer to the answer to the first Question.

    3.   **Provide a complete list of personnel (medical or otherwise) who will staff the abortion facility after it opens, including their positions and a description of their job responsibilities.**

**Response:**   **(A)**                        , Physician and Medical Director

Description for Job Responsibilites:
Duties of Medical Director are as follows:

**(a)**   Supervision of medical services provided at the facility, including; nursing, clinical, and laboratory.

WWHA_RR00001367

(b)     Supervision of controlled substances – medications/logs.

(c)     Supervise quality assurance by participating in quarterly meetings, random chart reviews, complication and re-suction reviews, and periodic meetings with other facility providers (if needed).

(d)     Provide for or assist in arranging after hours coverage support for WWH staff/nurse on call – for patient problems and possible emergencies.

(e)     Maintain standing orders for routine patient care provided by ancillary staff, nurse triage, routine follow-up visits, pre and post op medications, and related matters.

(e)     Be an available resource for Nurse Practitioner, nursing team and clinic staff for both the Gyn and Abortion Care practice.

(f)     CLIA – function as Laboratory Director. Review CLIA compliance and proficiency testing as required.

(g)     Help the recruit providers for the facility as needed.

(h)     Network within the medical community in the facility's service area.

(i)     Participate in regulatory inspection process, including, but not limited to CLIA and NAF.

(j)     Review services offered, research and recommend new services or changes to protocols, materials, administration, dosing, and similar matters.

(k)     Annual review of facility practice guidelines, procedures and protocols.

(l)     Review crash cart and evaluate facility preparedness for an emergency.  Review/triage abnormal lab results.

(m)     Supervise any training programs for physicians or residents such as the Ryan program for abortion training.

(n)     Direct any research projects conducted at our facility.

**Duties of Physician:** The Physician will keep and maintain (or cause to be kept and maintained) in a timely fashion accurate and appropriate records relating to all professional services rendered by the Physician.

(a)     ·  Current license in the State of Indiana to practice medicine

(b)     Current unrestricted federal Drug Enforcement Agency certificate

(c)     Controlled Substances Registration Certificate

WWHA_RR00001368

(d)   Advanced Cardiac Life Support (ACLS) certificate

The Physician will review and follow all regulations of the Indiana State Department of Health pertinent to Abortion Facility, and review and follow all of the protocols and procedures developed by WWHA to ensure compliance with the state's regulations.

(a)   The Physician will review and follow all regulations of the Indiana Board of Pharmacy, and any other laws and regulations pertinent to the responsibilities and duties of the Physician under the terms of this Agreement.

(b)   The Physician will review and follow the Clinical and Policy Guidelines of the National Abortion Federation;

(c)   The Physician will in a timely fashion, record (or cause to be recorded), into each patient's medical chart, patient's history and physical, medical findings, test results, diagnosis, and prescribed treatment;

(d)   The Physician will supervise training physicians, mid-level providers (such as Nurse Practitioners, Nurse Midwives, and Physician's Assistants), and ancillary medical staff (such as nurses and medical assistants).

(e)   The Physician is free to exercise the Physician's own professional judgment regarding any particular patient; and

(f)   The Physician will submit to and participate in quality assurance, peer review, risk management, and utilization review programs on behalf of WWHA pursuant to agreements that WWHA has with hospitals, institutions, third-party payors, or physicians.

(g)   Review standing orders and all protocols.

(h)   Recommend changes in writing to clinic management team.

(B)            , Clinic Manager and Facility Adminstrator

Please see attached job description and responsibilities.


4.   For the three-year period immediately preceding the application date, provide data for the applicant pertaining to the following (and include details about the circumstances, dates, and final action):

(a)   Any tax liens?

Response:   None

(b)     Ever defaulted under a lease or been evicted from a building or other property?

Response:     No

(c)     Any unsatisfied final judgments?

Response:     None

(d)     Ever been subject to injunctive orders from any court?

Response:     No

(e)     Any criminal arrests or convictions?

Response:     None

(f)     Ever been cited for violating any local laws or ordinances, such as building, utility, zoning and safety codes?

Response:     No

(g)     Any denial, suspension, or revocation of any abortion facility or health care facility licenses?

Response:     None

(h)     Ever been subject to an administrative adjudication or enforcement action?

Response:     No

(i)     Any Medicaid or Medicare sanctions or penalties relating to the operation of an abortion facility or health care facility?

Response:     None

(j)     Ever surrendered a license before its expiration?

Response:     No

(k)     Any debarment or related action in connection with Medicaid or Medicare?

Response:     None

5.     For the three-year period immediately preceding the application date, provide data for the medical director and the facility administrator pertaining to the following, so

WWHA_RR00001370

long as it is related to the provision of care or bears a direct or substantial relationship to the job responsibilities that he/she is to carry out for the applicant (and include details about the circumstances, dates, and final action):

    (a)    Any criminal arrests or convictions?

**Response:**    No

    (b)    Ever been subject to an administrative adjudication or enforcement action?

**Response:**    No

    (c)    Any civil judgments?

**Response:**    No

    6.    Provide full and complete copies of the articles of incorporation, by-laws, and related organizational documents of the applicant.

**Response:**    Attached herewith as attachments are the following: Certificate of Filing, SOS Acknowledgment, Certificate of Formation, Certificate of Filing (Amendment), SOS Acknowledgment (Amendment), Certificate of Amendment, and Bylaws labeled as Attachment #1.

    7.    Provide a list and description of all of the procedures or services that will be provided at the abortion facility after it opens.

**Response:**    Medication abortions, Plan B, counseling, birth control counseling and prescriptions.

    8.    Provide appropriate evidence (such as an affidavit or corporate resolution) establishing that the medical director and the facility administrator have been duly and properly authorized and empowered to sign the application for and on behalf of the applicant.

**Response:**    The information is attached as Attachment #2.

    9.    If the applicant has or will engage an entity (other than an employee of applicant) to manage or operate the abortion facility, provide the full legal name and address of that entity and also list the type of entity as well as its state of incorporation/organization. Also attach a complete copy of the proposed or executed management agreement.

**Response:**    See response to Number 1, and Attachment #3.

WWHA_RR00001371

10.    If any person or entity can claim liabilities of the applicant or of the facility or service for which the license is requested, provide their full legal name and address, and percent and type of claim (if applicable).

Response:    None

11.    Provide any other data or information, of which the applicant is aware or has knowledge, that may indicate that the applicant is not of reputable and responsible character, or that could bear upon the requisite showing in that regard.

Response:    None



Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

Nandita Berry
Secretary of State

## Office of the Secretary of State

### CERTIFICATE OF FILING
### OF

### Whole Woman's Advocacy Alliance
File Number: 801965127

The undersigned, as Secretary of State of Texas, hereby certifies that a Certificate of Formation for the above named Domestic Nonprofit Corporation has been received in this office and has been found to conform to the applicable provisions of law.

ACCORDINGLY, the undersigned, as Secretary of State, and by virtue of the authority vested in the secretary by law, hereby issues this certificate evidencing filing effective on the date shown below.

The issuance of this certificate does not authorize the use of a name in this state in violation of the rights of another under the federal Trademark Act of 1946, the Texas trademark law, the Assumed Business or Professional Name Act, or the common law.

Dated: 04/03/2014

Effective: 04/03/2014



*Nandita Berry*

Nandita Berry
Secretary of State

## J.E. 8

Phone: (512) 463-5555

Come visit us on the internet at http://www.sos.state.tx.us/
Fax: (512) 463-5709
TID: 10306

Dial: 7-1-1 for Relay Services
Document: 537509420002

WWHA_RR00001373

<table>
<tr><td>

Form 202

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $25

</td><td>



**Certificate of Formation
Nonprofit Corporation**

</td><td>

**Filed in the Office of the
Secretary of State of Texas
Filing #: 801965127 04/03/2014
Document #: 537509420002
Image Generated Electronically
for Web Filing**

</td></tr>
</table>

### Article 1 - Corporate Name

The filing entity formed is a nonprofit corporation. The name of the entity is :

**Whole Woman's Advocacy Alliance**

### Article 2 — Registered Agent and Registered Office

☐ A. The initial registered agent is an organization (cannot be corporation named above) by the name of:

**OR**

☒ B. The initial registered agent is an individual resident of the state whose name is set forth below:

Name:
**Amy    Hagstrom Miller**

C. The business address of the registered agent and registered office address is:

Street Address:
**8401 North I-35, Suite 1A    Austin  TX  78753**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☒ B. The consent of the registered agent is maintained by the entity.

### Article 3 – Management

☐ A. Management of the affairs of the corporation is to be vested solely in the members of the corporation.

**OR**

☒ B. Management of the affairs of the corporation is to be vested in its board of directors. The number of directors, which must be a minimum of three, that constitutes the initial board of directors and the names and addresses of the persons who are to serve as directors until the first annual meeting or until their successors are elected and qualified are set forth below.

| Director 1: **Amy    Hagstrom Miller** | Title: **Director** |
| Address: **8401 North I-35, Suite 1A    Austin  TX, USA  78753** | |
| Director 2: **Andrew    Stanley** | Title: **Director** |
| Address: **8401 North I-35, Suite 1A    Austin  TX, USA  78753** | |
| Director 3: **Brenda    Tolbert** | Title: **Director** |
| Address: **8401 North I-35, Suite 1A    Austin  TX, USA  78753** | |

### Article 4 – Organization Structure

☐ A. The corporation will have members.

or

☒ B: The corporation will not have members.

### Article 5 - Purpose

The corporation is organized for the following purpose or purposes:
The purpose is to perform charitable activities with the meaning of Internal
Revenue Code Section 501(c)(3) and Texas Tax Code Section 11.18(c), including
but not limited to, providing for the organized solicitation and collection for

WWHA_RR00001374

distributions through gifts, grants, and agreements to nonprofit charitable, education, religious, and youth organizations that provide direct human, health, and welfare services.

| Supplemental Provisions / Information |
| --- |

At all times the following shall operate as conditions restricting the operations and activities of the corporation:

No part of the net earnings of the corporation shall inure to any member of the corporation not qualifying as exempt under Section 501(c)(3) of the Internal Revenue Code of 1986, as now enacted or hereafter amended, nor to any director or officer of the corporation, nor to any other private persons, excepting solely such reasonable compensation that the corporation shall pay for services actually rendered to the corporation, or allowed by the corporation as a reasonable allowance for authorized expenditures incurred on behalf of the corporation;

No substantial part of the activities of the corporation shall constitute the carrying on of propaganda or otherwise attempting to influence legislation, or any initiative or referendum before the public, and the corporation shall not participate in, or intervene in (including by publication or distribution of statements), any political campaign on behalf of, or in opposition to, any candidate for public office; and

Notwithstanding any other provision of these articles, the corporation shall not carry on any other activities not permitted to be carried on by a corporation exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code of 1986, as now enacted or hereafter amended.

The corporation shall not lend any of its assets to any officer or director of this corporation, or guarantee to any person the payment of a loan by an officer or director of this corporation.

[The attached addendum, if any, is incorporated herein by reference.]

Letter of Consent.pdf

| Effectiveness of Filing |
| --- |

☑A. This document becomes effective when the document is filed by the secretary of state.

OR

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

| Organizer |
| --- |

The name and address of the organizer are set forth below.
Law Office of John H. Bucy, II        6633 Highway 290 East, Suite 104, Austin, Texas 78723

| Execution |
| --- |

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

John H. Bucy, II
Signature of organizer.

FILING OFFICE COPY

WWHA_RR00001376

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697



Carlos H. Cascos
Secretary of State

## Office of the Secretary of State

### CERTIFICATE OF FILING
### OF

### Whole Woman's Health Alliance
### 801965127

[formerly: Whole Woman's Advocacy Alliance]

The undersigned, as Secretary of State of Texas, hereby certifies that a Certificate of Amendment for the above named entity has been received in this office and has been found to conform to the applicable provisions of law.

ACCORDINGLY, the undersigned, as Secretary of State, and by virtue of the authority vested in the secretary by law, hereby issues this certificate evidencing filing effective on the date shown below.

Dated: 08/20/2015

Effective: 08/20/2015



Carlos H. Cascos
Secretary of State

## J.E. 10

Come visit us on the internet at http://www.sos.state.tx.us/
Fax: (512) 463-5709

Dial: 7-1-1 for Relay Services

WWHA_RR00001377

| Form 424<br><br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: See Instructions | <br><br>**Certificate<br>of Amendment** | **Filed in the Office of the<br>Secretary of State of Texas<br>Filing #: 801965127 08/20/2015<br>Document #: 62569208000002<br>Image Generated Electronically<br>for Web Filing** |

### Entity Information

The filing entity is a: **Domestic Nonprofit Corporation**

The name of the filing entity is: **Whole Woman's Advocacy Alliance**

The file number issued to the filing entity by the secretary of state is: **801965127**

### Amendment to Name

The amendment changes the formation document of the filing entity to change the article or provision that names the entity. The article or provision is amended to read as follows:

The name of the filing entity is:

**Whole Woman's Health Alliance**

A letter of consent, if applicable, is attached. **Form 509.pdf**

### Statement of Approval

The amendment has been approved in the manner required by the Texas Business Organizations Code and by the governing documents of the entity.

### Effectiveness of Filing

☒A. This document becomes effective when the document is filed by the secretary of state.
☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its filing by the secretary of state. The delayed effective date is:

### Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and declares under penalty of perjury that the undersigned is authorized under the Texas Business Organizations Code to execute the filing instrument.

Date: **August 20, 2015**

**John H. Bucy, II, Secretary**
Signature of authorized person

FILING OFFICE COPY

# J.E. 11

WWHA_RR00001378

# BYLAWS
## OF
## WHOLE WOMAN'S ADVOCACY ALLIANCE
## A NONPROFIT CORPORATION

### PREAMBLE

These bylaws (the "Bylaws") are subject to, and governed by, the Texas Business Corporation Act and the Articles of Incorporation of Whole Woman's Advocacy Alliance (the "Corporation"). In the event of a direct conflict between the provisions of these Bylaws and the mandatory provisions of the Texas Business Corporation Act or the provisions of the Articles of Incorporation of the Corporation, such provisions of the Texas Business Corporation Act or the Articles of Incorporation of the Corporation, as the case may be, will be controlling.

### ARTICLE ONE: OFFICES

**1.01. REGISTERED OFFICE AND AGENT.** The registered office and registered agent of the Corporation shall be as designated from time to time by the appropriate filing by the Corporation in the Office of the Secretary of State of Texas.

**1.02. OTHER OFFICES.** The Corporation may also have offices at such other places, both within and without the State of Texas, as the Board of Directors may from time to time determine or the business of the Corporation may require.

### ARTICLE TWO: BOARD OF DIRECTORS

**2.01. MANAGEMENT.** The business and property of the Corporation shall be managed by the Board of Directors, and subject to the restrictions imposed by law, the Certificate of Formation, or these Bylaws, the Board of Directors may exercise all the powers of the Corporation.

**2.02. NUMBER; ELECTION; TERM; QUALIFICATION.** The number of Directors will be three, or a number determined by the Board that is not less than three. Each director will serve for a term of three years, or until a successor is duly elected and qualified.

**2.03. NOMINATING DIRECTORS.** At any meeting at which the election of a director is held, a director may nominate a person with the second of any other director.

**2.04. ELECTING DIRECTORS.** A person who meets the qualifications for director and who has been duly nominated may be elected as a director. Directors will be elected by the vote of the Board of the Corporation. A director may be elected to succeed himself or herself as director.

**2.05. VACANCIES.** The Board will fill any vacancy in the Board and any director position to be filled due to an increase in the number of directors. A vacancy is filled by the affirmative vote of a majority of the remaining directors, even if it is less than a quorum of the

## J.E. 12

WWHA_RR00001379

Board, or if it is a sole remaining director. A director selected to fill a vacancy will serve for the unexpired term of his or her predecessor in office.

**2.06. ANNUAL MEETING.** The annual meeting of the Board shall be held during each calendar year on such date and at such time as shall be designated from time to time by the Board and stated in the notice of the meeting, if not a legal holiday in the place where the meeting is to be held, and, if a legal holiday in such place, then on the next business day following, at the time specified in the notice of the meeting may be held without notice other than as provided for in these Bylaws.

**2.07. REGULAR MEETINGS.** The Board may provide for regular meetings by resolution stating the time and place of such meetings. The meetings may be held inside or outside Texas, and will be held at the Corporation's registered office in Texas if the resolution does not specify the location of the meetings. No notice of regular Board meetings is required other than a Board resolution stating the time and place of the meetings.

**2.08. SPECIAL MEETINGS.** Special Board meetings may be called by, or at the request of, the president or any two directors. A person or persons authorized to call special meetings of the Board may fix any place within or without Texas as the place for holding a special meeting. The person or persons calling a special meeting will inform the secretary of the corporation of the information to be included in the notice of the meeting. The secretary of the Corporation will give notice to the directors as these Bylaws require.

**2.09. NOTICE.** Written or printed notice of any special meeting of the Board will be delivered to each director not less than seven (7), nor more than thirty (30) days before the date of the meeting. The notice will state the place, day, and time of the meeting; who called the meeting and the purpose or purposes for which it is called.

**2.10. QUORUM.** A majority of the number of directors then in office constitutes a quorum for transacting business at any Board meeting. The directors present at a duly called or held meeting at which a quorum is present may continue to transact business even if enough directors leave the meeting so that less than a quorum remains. However, no action may be approved without the vote of at least a majority of the number of directors required for a quorum. If a quorum is never present at any time during a meeting, a majority of the directors present may adjourn and reconvene the meeting once without further notice.

**2.11. DUTIES OF DIRECTORS.** Directors will discharge their duties, including any duties as committee members, in good faith, with ordinary care, and in a manner they reasonably believe to be in the Corporation's best interest. In this context, the term "ordinary care" means the care that ordinarily prudent persons in similar positions would exercise under similar circumstances. In discharging any duty imposed or power conferred on directors, directors may, in good faith, rely on information, opinions, reports, or statements, including financial statements and other financial data, concerning the Corporation or another person that has been prepared or presented by a variety of persons, including officers and employees of the Corporation, professional advisors or experts such as accountants or legal counsel. A director is not relying in good faith if he or she has knowledge concerning a matter in question that renders reliance

WWHA_RR00001380

unwarranted. Directors are not deemed to have the duties of trustees of a trust with respect to the Corporation or with respect to any property held or administered by the Corporation, including property that may be subject to restrictions imposed by the donor or transferor of the property.

**2.12.   DUTY TO AVOID IMPROPER DISTRIBUTIONS.** Directors who vote for or assent to improper distributions are jointly and severally liable to the Corporation for the value of improperly distributed assets, to the extent that, as a result of the improper distribution or distributions, the corporation lacks sufficient assets to pay its debts, obligations, and liabilities. Any distribution made when the Corporation is insolvent, other than in payment of corporate debts, or any distribution that would render the Corporation insolvent, is an improper distribution. A distribution made during liquidation without payment and discharge of or provision for payment and discharge of all known debts, obligations, and liabilities is also improper. Directors present at a Board meeting at which the improper action is taken are presumed to have assented, unless they dissent in writing. The written dissent must be filed with the secretary of the Corporation before adjournment of the meeting in question or mailed to the secretary by registered mail immediately after adjournment. A director is not liable if, in voting for or assenting to a distribution, the director (1) relies in good faith and with ordinary care on information, opinions, reports, or statements, including financial statements and other financial data, prepared or presented by one or more officers or employees of the Corporation; legal counsel, public accountants, or other persons as to matters the director reasonably believes are within the person's professional or expert competence; or a committee of the Board of which the director is not a member; (2) while acting in good faith and with ordinary care, considers the Corporation's assets to be at least that of their book value; or (3) in determining whether the Corporation made adequate provision for paying, satisfying, or discharging all of its liabilities and obligations, relied in good faith and with ordinary care on financial statements or other information concerning a person who was or became contractually obligated to satisfy or discharge some or all of these liabilities or obligations. Furthermore, directors are protected from liability if, in exercising ordinary care, they acted in good faith and in reliance on the written opinion of an attorney for the Corporation. Directors held liable for an improper distribution are entitled to contribution from persons who accepted or received the improper distributions knowing they were improper. Contribution is in proportion to the amount received by each such person.

**2.13.   DELEGATION DUTIES.** Directors may select advisors and delegate duties and responsibilities to them, such as the full power to buy or otherwise acquire stocks, bonds, securities, and other investments on the Corporation's behalf; and to sell, transfer, or otherwise dispose of the Corporation's assets and properties at a time and for a consideration that the advisor deems appropriate. The directors have no liability for actions taken or omitted by the advisor if the Board acts in good faith and with ordinary care in selecting the advisor. The Board may remove or replace the advisor at any time and without any cause whatsoever.

**2.14.   INTERESTED DIRECTORS.** Contracts or transactions between directors, officers, or members who have a financial interest in the matter are not void or voidable solely for that reason. Nor are they void or voidable solely because the director, officer, or member is present at or participates in the meeting that authorizes the contract or transaction, or solely because the interested party's votes are counted for the purpose. However, every director with any personal

WWHA_RR00001381

interest in the transaction must disclose all material facts concerning the transaction, including all potential personal benefit and potential conflicts of interest, to the other members of the Board or other group authorizing the transaction. The transaction must be approved by a majority of the uninterested directors or other group with the authority to authorize the transaction.

**2.15.   ACTIONS OF BOARD OF DIRECTORS.** The Board will try to act by consensus. However, if a consensus is not available, the vote of a majority of directors present and voting at a meeting at which a quorum is present is enough to constitute the act of the Board, unless the act of a greater number is required by law or by some other provision of these Bylaws. A director who is present at a meeting and abstains from a vote is considered to be present and voting for the purpose of determining the Board's decision. For the purpose of determining the decision of the Board, a director who is represented by proxy in a vote is considered present.

**2.16.   PROXIES.** A director may vote by proxy. All proxies must be in writing, must bear the signature of the director giving the proxy, and must be bear the date on which the proxy was executed by the director. No proxy is valid after three (3) months from the date of its execution.

**2.17.   COMPENSATION.** Directors may receive salaries for their services. The Board may adopt a resolution providing for paying directors a fixed sum and expenses of attendance, if any, for attending each Board meeting. A director may serve the Corporation in any other capacity and receive compensation for those services. Any compensation that the Corporation pays to a director will be reasonable and commensurate with the services performed.

**2.18.   REMOVING DIRECTORS.** The Board may vote to remove a director at any time, without cause. A meeting to consider removing a director may be called and noticed following the procedures provided in these Bylaws for a special meeting of the Board of Directors. The notice of the meeting will state that the issue of possibly removing the director will be on the agenda. At the meeting, the director may present evidence of why he or she should not be removed and may be represented by an attorney at and before the meeting. Also, at the meeting, the Corporation will consider possible arrangements for resolving the problems that are in the mutual interest of the Corporation and the director. A director may be removed by the affirmative vote of three-fourths of the Board.

## ARTICLE THREE: OFFICERS AND OTHER AGENTS

**3.01.   OFFICER POSITIONS.** The Corporation's officers will be a president, a secretary, and a treasurer. The Board may create additional officer positions, define the authority and duties of each such position, and elect or appoint persons to fill the positions. The same person may hold any two or more offices, except for president and secretary.

**3.02.   ELECTION AND TERM OF OFFICE.** The Corporation's officers will be appointed annually by the Board at the annual Board meeting. If officers are not appointed at this time, they will be appointed as soon thereafter as possible. Each officer will hold office until a successor is duly selected and qualifies. An officer may be appointed to succeed himself or herself in the same office.

WWHA_RR00001382

**3.03.   REMOVAL.** Any officer elected or appointed by the Board may be removed by the Board with or without cause. Removing an officer will be without prejudice to the officer's contractual rights, if any.

**3.04.   VACANCIES.** The Board may select a person to fill a vacancy in any office for the unexpired portion of the officer's term.

**3.05.   PRESIDENT.** The president shall be the chief executive officer of the Corporation and, subject to the supervision of the Board of Directors, shall have general management and control of the business and property of the Corporation in the ordinary course of its business with all such powers with respect to such general management and control as may be reasonably incident to such responsibilities, including, but not limited to, the power to employ, discharge, or suspend employees and agents of the Corporation, to fix the compensation of employees and agents, and to suspend, with or without cause, any officer of the Corporation pending final action by the Board of Directors with respect to continued suspension, removal, or reinstatement of such officer. The President may, without limitation, agree upon and execute all division and transfer orders, bonds, contracts, and other obligations in the name of the Corporation.

**3.06.   TREASURER.** The Treasurer shall have custody of the Corporation's funds and securities, shall keep full and accurate accounts of receipts and disbursements, and shall deposit all moneys and valuable effects in the name and to the credit of the Corporation in such depository or depositories as may be designated by the Board of Directors. The Treasurer shall audit all payrolls and vouchers of the Corporation, receive, audit, and consolidate all operating and financial statements of the Corporation and its various departments, shall supervise the accounting and auditing practices of the Corporation, and shall have charge of matters relating to taxation. Additionally, the Treasurer shall have the power to endorse for deposit, collection, or otherwise all checks, drafts, notes, bills of exchange, and other commercial paper payable to the Corporation and to give proper receipts and discharges for all payments to the Corporation. The Treasurer shall perform such other duties as may be prescribed by the Board of Directors or as may be delegated from time to time by the President.

**3.07.   SECRETARY.** The Secretary shall maintain minutes of all meetings of the Board of Directors and of the Shareholders or consents in lieu of such minutes in the Corporation's minute books, and shall cause notice of such meetings to be given when requested by any person authorized to call such meetings. The Secretary may sign with the President, in the name of the Corporation, all contracts of the Corporation. The Secretary shall have charge of the certificate books, stock transfer books, stock ledgers, and such other stock books and papers as the Board of Directors may direct, all of which shall at all reasonable times be open to inspection by any Director at the office of the Corporation during business hours. The Secretary shall perform such other duties as may be prescribed by the Board of Directors or as may be delegated from time to time by the President.

### ARTICLE FOUR: COMMITTEES

WWHA_RR00001383

**4.01. ESTABLISHING COMMITTEES.** The Board may adopt a resolution establishing one or more committees delegating specified authority to a committee, and appointing or removing members of a committee. A committee will include two or more directors and may include persons who are not directors. If the Board delegates any of its management authority to a committee, the majority of the committee will consist of directors. The Board may also delegate to the president its power to appoint and remove members of a committee that has not been delegated any management authority of the Board. The Board may establish qualifications for membership on a committee. Establishing a committee or delegating authority to it will not relieve the Board, or any individual director, of any responsibility imposed by these Bylaws or otherwise imposed by law. No committee has the authority of the Board to:

    (a)    Amend the Certificate of Formation.

    (b)    Adopt a plan of merger or of consolidation with another corporation.

    (c)    Authorize the sale, lease, exchange, or mortgage of all or substantially all of the Corporation's property and assets.

    (d)    Authorize voluntary dissolution of the Corporation.

    (e)    Revoke proceedings for voluntary dissolution of the Corporation.

    (f)    Adopt a plan for distributing the Corporation's assets.

    (g)    Amend, alter, or repeal these Bylaws.

    (h)    Elect, appoint, or remove a member of a committee or a director or officer of the Corporation.

    (i)    Approve any transaction to which the Corporation is a party and that involves a potential conflict of interest as defined in paragraph 7.04, below.

    (j)    Take any action outside the scope of authority delegated to it by the Board.

**4.02. TERM OF OFFICE.** Each committee member will continue to serve on the committee until the next annual members' meeting and until a successor is appointed. However, a committee member's term may terminate earlier if the committee is terminated, or if the member dies, ceases to qualify, resigns, or is removed as a member. A vacancy on a committee may be filled by an appointment made in the same manner as an original appointment. A person appointed to fill a vacancy on a committee will serve for the unexpired portion of the terminated committee member's term.

**4.03. CHAIR AND VICE-CHAIR.** One member of each committee will be designated as the committee chair, and another member of each committee will be designated as the vice-chair.

WWHA_RR00001384

The chair and vice-chair will be elected by the committee members or appointed by the president. The chair will call and preside at all meetings of the committee. When the chair is absent, cannot act, or refuses to act, the vice-chair will perform the chair's duties. When a vice-chair acts for the chair, the vice-chair has all the powers of, and is subject to all the restrictions on the chair.

**4.04.   NOTICE OF MEETINGS.** Written or printed notice of a committee meeting will be delivered to each member of a committee not less than seven nor more than 30 days before the date of the meeting. The notice will state the place, day, and time of the meeting, and the purpose or purposes for which it is called.

**4.05.   QUORUM.** One-half of the number of committee members constitutes a quorum for transacting business at any meeting of the committee. The committee members present at a duly called or held meeting at which a quorum is present may continue to transact business even if enough committee members leave the meeting so that less than a quorum remains. However, no action may be approved without the vote of at least a majority of the number of committee members required for a quorum. If a quorum is never present at any time during a meeting, the chair may adjourn and reconvene the meeting once without further notice.

**4.06.   ACTIONS OF COMMITTEES.** Committees will try to take action by consensus. However, if a consensus is not available, the vote of a majority of committee members present and voting at a meeting at which a quorum is present is enough to constitute the act of the committee unless the act of a greater number is required by statute or by some other provision of these Bylaws. A committee member who is present at a meeting and abstains from a vote is considered to be present and voting for the purpose of determining the act of the committee.

**4.07.   PROXIES.** A committee member may not vote by proxy.

**4.08.   COMPENSATION.** Committee members may receive salaries for their services. The Board may adopt a resolution providing for paying committee members a fixed sum and expenses of attendance, if any, for attending each meeting of the committee. A committee member may serve the Corporation in any other capacity and receive compensation for those services. Any compensation that the Corporation pays to a committee member will be reasonable and commensurate with the services performed.

**4.09.   RULES.** Each committee may adopt its own rules, consistent with these Bylaws or with other rules that may be adopted by the Board.

### ARTICLE FIVE: TRANSACTIONS OF CORPORATION

**5.01.   CONTRACTS.** The Board may authorize any officer or agent of the Corporation to enter into a contract or execute and deliver any instrument in the name of, and on behalf of, the Corporation. This authority may be limited to a specific contract or instrument, or it may extend to any number and type of possible contracts and instruments.

WWHA_RR00001385

**5.02.** DEPOSITS. All the Corporation's funds will be deposited to the credit of the Corporation in banks, trust companies, or other depositaries that the Board selects.

**5.03.** GIFTS. The Board may accept, on the Corporation's behalf, any contribution, gift, bequest, or devise for the general purposes or for any special purpose of the Corporation. The Board may make gifts and give charitable contributions not prohibited by these Bylaws, the Certificate of Formation, state law, and provisions set out in federal tax law that must be complied with to maintain the Corporation's federal and state tax status.

**5.04.** POTENTIAL CONFLICTS OF INTEREST. The Corporation may not make any loan to a director or officer of the Corporation. A director, officer, or committee member of the Corporation may lend money to, and otherwise transact business with, the Corporation except as otherwise provided by these Bylaws, the Certificate of Formation, and applicable law. Such a person transacting business with the Corporation has the same rights and obligations relating to those matters as other persons transacting business with the Corporation. The Corporation may not borrow money from, or otherwise transact business with a director, officer, or committee member of the Corporation unless the transaction is described fully in a legally binding instrument and is in the Corporation's best interests. The Corporation may not borrow money from or otherwise transact business with a director, officer, or committee member of the Corporation without full disclosure of all relevant facts and without the Board's approval, not including the vote of any person having a personal interest in the transaction.

**5.05.** PROHIBITED ACTS. As long as the Corporation exists, and except with the Board's prior approval, no director, officer, or committee member of the Corporation may:

(a)     Do any act in violation of these Bylaws or a binding obligation of the Corporation.

(b)     Do any act with the intention of harming the Corporation or any of its operations.

(c)     Do any act that would make it impossible or unnecessarily difficult to carry on the Corporation's intended or ordinary business.

(d)     Receive an improper personal benefit from the operation of the Corporation.

(e)     Use the Corporation's assets, directly or indirectly, for any purpose other than carrying on the Corporation's business.

(f)     Wrongfully transfer or dispose of Corporation property, including intangible property such as good will.

(g)     Use the Corporation's name (or any substantially similar name) or any trademark or trade name adopted by the Corporation, except on behalf of the Corporation in the ordinary course of its business.

WWHA_RR00001386

(h)    Disclose any of the Corporation's business practices, trade secrets, or any other information not generally known to the business community to any person not authorized to receive it.

## ARTICLE SIX: BOOKS AND RECORDS

**6.01.  REQUIRED BOOKS AND RECORDS.**  The Corporation will keep correct and complete books and records of account. The books and records include:

(a)    A file-endorsed copy of all documents filed with the Texas Secretary of State relating to the Corporation, including but not limited to the Certificate of Formation, and any articles of amendment, restated articles, articles of merger, articles of consolidation, and statement of change of registered office or registered agent.

(b)    A copy of all bylaws, including these Bylaws, and any amended versions or amendments to them.

(c)    Minutes of the proceedings of the Board, and committees having any of the authority of the Board.

(d)    A list of the names and addresses of the directors, officers, and any committee members of the Corporation.

(e)    A financial statement showing the Corporation's assets, liabilities, and net worth at the end of the three most recent fiscal years.

(f)    A financial statement showing the Corporation's income and expenses for the three most recent fiscal years.

(g)    All rulings, letters, and other documents relating to the Corporation's federal, state, and local tax status.

(h)    The Corporation's federal, state, and local tax information or income-tax returns for each of the Corporation's three most recent tax years.

**6.02.  INSPECTION AND COPY.**  Any director, officer, or committee member of the Corporation may inspect and receive copies of all the corporate books and records required to be kept under the bylaws. Such a person may, by written request, inspect or receive copies if he or she has a proper purpose related to his or her interest in the Corporation. He or she may do so through his or her attorney or other duly authorized representative. The inspection may take place at a reasonable time, no later than five working days after the Corporation receives a proper written request. The Board may establish reasonable copying fees, which may cover the cost of materials and labor but may not exceed fifty (50) cents per page. The Corporation will

WWHA_RR00001387

provide requested copies of books or records no later than five working days after receiving a proper written request.

### ARTICLE SEVEN: FISCAL YEAR

The fiscal year of the Corporation will begin on the first day of January and end on the last day in December in each year.

### ARTICLE EIGHT: INDEMNIFICATION

#### 8.01. WHEN INDEMNIFICATION IS REQUIRED, PERMITTED AND PROHIBITED.

(a)   The Corporation will indemnify a director, officer, member, committee member, employee, or agent of the Corporation who was, is, or may be named as a defendant or respondent in any proceeding as a result of his or her actions or omissions within the scope of his or her official capacity in the Corporation. For the purposes of this article, an agent includes one who is or was serving at the Corporation's request as a director, officer, partner, venturer, proprietor, trustee, partnership, joint venture, sole proprietorship, trust, employee-benefit plan, or other enterprise.

(b)   The Corporation will indemnify a person only if he or she acted in good faith and reasonably believed that his or her conduct was in the Corporation's best interests. In case of a criminal proceeding, the person may be indemnified only if he or she had no reasonable cause to believe that the conduct was unlawful. The Corporation will not indemnify a person who is found liable to the Corporation or is found liable to another on the basis of improperly receiving a personal benefit from the Corporation. A person is conclusively considered to have been found liable in relation to any claim, issue, or matter if the person has been adjudged liable by a court of competent jurisdiction and all appeals have been exhausted. Termination of a proceeding by judgment, order, settlement, conviction, or on a plea of nolo contendere or its equivalent does not necessarily preclude indemnification by the Corporation.

(c)   The Corporation will pay or reimburse expenses incurred by a director, officer, committee member, employee, or agent of the Corporation in connection with the person's appearance as a witness or other participation in a proceeding involving or affecting the Corporation when the person is not a named defendant or respondent in the proceeding.

(d)   In addition to the situations otherwise described in this paragraph, the Corporation may indemnify a director, officer, committee member, employee, or agent of the Corporation to the extent permitted by law. However, the Corporation will not indemnify any person in any situation in which indemnification is prohibited by paragraph 8.01(a), above.

WWHA_RR00001388

(e)   The corporation may advance expenses incurred or to be incurred in the defense of a proceeding to a person who might eventually be entitled to indemnification, even though there has been no final disposition of the proceeding.   Advancement of expenses may occur only when the procedural conditions specified in paragraph 8.03(c), below, have been satisfied. Furthermore, the Corporation will never advance expenses to a person before final disposition of a proceeding if the person is a named defendant or respondent in any proceeding brought by the Corporation or if the person is alleged to have improperly received a personal benefit or committed other willful or intentional misconduct.

8.02.   EXTENT AND NATURE OF INDEMNITY.   The indemnity permitted under these Bylaws includes indemnity against judgments, penalties, (including excise and similar taxes), fines, settlements, and reasonable expenses (including attorney's fees) actually incurred in connection with the proceeding.   If the proceeding was brought by or on behalf of the Corporation, the indemnification is limited to reasonable expenses actually incurred by the person in connection with the proceeding.

8.03.   PROCEDURES RELATING TO INDEMNIFICATION PAYMENTS.

(a)   Before the Corporation may pay any indemnification expenses (including attorney's fees), the Corporation must specifically determine that indemnification is permissible, authorize indemnification, and determine that expenses to be reimbursed are reasonable, except as provided in subparagraph (c), below.   The Corporation may make these determinations and decisions by any one of the following procedures:

(i)   Majority vote of a quorum consisting of directors who, at the time of the vote, are not named defendants or respondents in the proceeding.

(ii)   If such a quorum cannot be obtained, by a majority vote of a committee of the Board, designated to act in the matter by a majority vote of all directors, consisting solely of two or more directors who at the time of the vote are not named defendants or respondents in the proceeding.

(iii)   Determination by special legal counsel selected by the Board by the same vote as provided in subparagraphs (i) or (ii), above, or if such a quorum cannot be obtained and such a committee cannot be established, by a majority vote of all directors.

(b)   The Corporation will authorize indemnification and determine that expenses to be reimbursed are reasonable in the same manner that it determines whether indemnification is permissible.   If special legal counsel determines that

WWHA_RR00001389

indemnification is permissible, authorization of indemnification and determination of reasonableness of expenses will be made as specified by subparagraph (a)(iii), above, governing selection of special legal counsel. A provision contained in the Certificate of Formation, or a resolution of members or the Board that requires the indemnification permitted by paragraph 8.01, above, constitutes sufficient authorization of indemnification even though the provision may not have been adopted or authorized in the same manner as the determination that indemnification is permissible.

(c) The Corporation will advance expenses before final disposition of a proceeding only after it determines that the facts then known would not preclude indemnification. The determination that the facts then known to those making the determination would not preclude indemnification and authorization of payment will be made in the same manner as a determination that indemnification is permissible under subparagraph (a), above. In addition to this determination, the Corporation may advance expenses only after it receives a written affirmation and undertaking from the person to receive the advance. The person's written affirmation will state that he or she has met the standard of conduct necessary for indemnification under these Bylaws. The written undertaking will provide for repayment of the amounts advanced by the Corporation if it is ultimately determined that the person has not met the requirements for indemnification. The undertaking will be an unlimited general obligation of the person, but it need not be secured and may be accepted without reference to financial ability to repay.

ARTICLE NINE: NOTICES

**9.01. NOTICE BY MAIL OR TELEGRAM.** Any notice required or permitted by these Bylaws to be given to a director, officer, or member of a committee of the Corporation may be given by mail, fax or email if the director, officer or member agrees to accept notice by email. If mailed, a notice is deemed delivered when deposited in the mail addressed to the person at his or her address as it appears on the corporate records, with postage prepaid. A person may change his or her address in the corporate records by giving written notice of the change to the secretary of the corporation.

**9.02. SIGNED WAIVER OF NOTICE.** Whenever any notice is required by law or under the Certificate of Formation or these Bylaws, a written waiver signed by the person entitled to receive such notice is considered the equivalent of giving the required notice. A waiver of notice is effective whether signed before or after the time stated in the notice being waived.

**9.03. WAIVING NOTICE BY ATTENDANCE.** A person's attendance at a meeting constitutes waiver of notice of the meeting unless the person attends for the express purpose of objecting to the transaction of any business because the meeting was not lawfully called or convened.

ARTICLE TEN: SPECIAL PROCEDURES CONCERNING MEETINGS

WWHA_RR00001390

**10.01. MEETING BY TELEPHONE.** The Board of Directors, and any committee of the Corporation, may hold a meeting by telephone conference-call procedures. In all meetings held by telephone, matters must be arranged in such a manner that all persons participating in the meeting can hear each other; the notice of a meeting by telephone conference must state the fact that the meeting will be held by telephone as well as all other matters required to be included in the notice; and a person's participating in a conference-call meeting constitutes his or her presence at the meeting.

**10.02. DECISION WITHOUT MEETING.** Any decision required or permitted to be made at a meeting of the Board, or any committee of the Corporation may be made without a meeting. A decision without a meeting may be made if a written consent to the decision is signed by all the persons entitled to vote on the matter. The original signed consents will be placed in the Corporation minute book and kept with the corporate records. Furthermore, in accordance with the Certificate of Formation, action may be taken without a meeting when there are signed written consents by the number of members, directors, or committee members whose votes would be necessary to take action at a meeting at which all such persons entitled to vote were present and voted. Each written consent must be signed and bear the date of signature of the person signing it. A photographic, facsimile, or similar reproduction of a signed writing, will be treated as an original being signed by the member, director, or committee member. Consents must be delivered to the Corporation. A consent signed by fewer than all members, directors, or committee members is not effective to take the intended action unless the required number of consents are delivered to the Corporation within 60 days after the date that the earliest-dated consent was delivered to the Corporation. The delivery may be made to the Corporation's registered office, registered agent, principal place of business, or an officer or agent having custody of books in which the relevant proceedings are recorded. If the delivery is made to the Corporation's principal place of business, the consent must be addressed to the president or principal executive officer. The Corporation will give prompt notice of the action taken to persons who do not sign consents. If the action taken requires documents to be filed with the secretary of state, the filed documents will indicate that these written consent procedures were followed to authorize the action and filing.

**10.03. PROXY VOTING.** A person authorized to exercise a proxy may not exercise the proxy unless it is delivered to the officer presiding at the meeting before the business of the meeting begins. The secretary or other person taking the minutes of the meeting will record in the minutes the name of the person who executed the proxy and the name of the person authorized to exercise the proxy. If a person who has duly executed a proxy personally attends a meeting, the proxy will not be effective for that meeting. A proxy filed with the secretary of the Corporation or other designated officer remains in force until the first of the following occurs:

    **(a)**    An instrument revoking the proxy is delivered to the secretary or other designated officer.

    **(b)**    The proxy authority expires under the proxy's terms.

    **(c)**    The proxy authority expires under the terms of these Bylaws.

WWHA_RR00001391

## ARTICLE ELEVEN: AMENDING BYLAWS

These Bylaws may be altered, amended, or repealed, and new bylaws may be adopted by the Board of Directors. The notice of any meeting at which these Bylaws are altered, amended, or repealed, or at which new bylaws are adopted will include the text of the proposed bylaw provisions as well as the text of any existing provisions proposed to be altered, amended, or repealed. Alternatively, the notice may include a fair summary of those provisions.

## ARTICLE TWELVE: MISCELLANEOUS PROVISIONS

**12.01. LEGAL AUTHORITIES GOVERNING CONSTRUCTION OF BYLAWS.** These Bylaws will be construed under Texas law. All references in these Bylaws to statutes, regulations, or other sources of legal authority will refer to the authorities cited, or their successors, as they may be amended from time to time.

**12.02. LEGAL CONSTRUCTION.** To the greatest extent possible, these Bylaws shall be construed to conform to all legal requirements and all requirements for obtaining and maintaining all tax exemptions that may be available to nonprofit corporations. If any bylaw provision is held invalid, illegal, or unenforceable in any respect, the invalidity, illegality, or unenforceability will not affect any other provision, and the bylaws will be construed as if they had not included the invalid, illegal, or unenforceable provision.

**12.03. HEADINGS.** The headings used in the bylaws are for convenience and may not be considered in construing the bylaws.

**12.04. NUMBER.** All singular words include the plural, and all plural words include the singular.

**12.05. SEAL.** The Board of Directors may, but are not required to, provide for a corporate seal.

**12.06. POWER OF ATTORNEY.** A person may execute any instrument related to the Corporation by means of a power of attorney if an original executed copy of the power of attorney is provided to the secretary to be kept with the corporate records.

**12.07. PARTIES BOUND.** The Bylaws will bind and inure to the benefit of the directors, officers, committee members, employees, and agents of the Corporation and their respective heirs, executors, administrators, legal representatives, successors, and assigns except as the Bylaws otherwise provide.

WWHA_RR00001392

CERTIFICATE OF SECRETARY

The undersigned, the Secretary of the Corporation, hereby certifies that the foregoing Bylaws were adopted by the Board of Directors of the Corporation as of April 3, 2014.

BRENDA TOLBERT, SECRETARY

BYLAWS

WWHA_RR00001393

## MANAGEMENT SERVICES AGREEMENT

This Management Services Agreement (the "Agreement") is entered into by and between Whole Women's Health Alliance ("WWHA") and Whole Woman's Health, LLC (the "Company"). The Company and WWHA are sometimes referred to herein collectively as the "Parties" and individually as a "Party".

### RECITALS:

A.    WWHA operates a medical clinic in South Bend, Indiana (the "Clinic").

B.    The Company has experience and expertise in providing management services to similar facilities.

C.    WWHA desires that Company provide management services to WWHA.

D.    Company is willing to provide to WWHA practice management services for the Clinic pursuant to the terms hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

### ARTICLE 1
### APPOINTMENT AND TERM

Section 1.01.  Appointing Company as Agent for the WWHA:  The WWHA appoints the Company as exclusive agent for managing the Clinic, and the Company accepts the appointment.  During the term of this Agreement, the Company may accept work performing similar services to other entities.  The Company will be an independent contractor.  The Company will not be liable for financial losses of WWHA.

Section 1.02.  Term:    This Agreement shall commence on April 1, 2017 (the "Commencement Date") and expire on March 31, 2020 (the "Initial Term").  Following the expiration of the Initial Term, and provided that neither Party is in breach or default of a material provision of this Agreement, this Agreement shall renew for successive one (1) year terms ("Extended Term") unless either Party provides written notice of its intent not to renew within sixty (60) days prior to the expiration of the Initial Term.  Notwithstanding the foregoing, at any time during the Initial Term or the Extended Term, this Agreement may be terminated as provided in Article 6.  The Initial Term and any Extended Term are referred to as the "Term".

Section 1.03.  Location of the Facility:    The Clinic is located at 3511 Lincoln Way West, South Bend, Indiana 46628-1141.

Section 1.04.  License:  WWHA has filed an Application to Operate an Abortion Clinic (the "Application") with the Indiana State Department of Health that will enable WWHA to own

**J.E. 13**

WWHA_RR00001394

and operate the Clinic.

## ARTICLE 2
## GENERAL DESCRIPTION OF SERVICES PROVIDED AND EXCLUDED SERVICES

**Section 2.01. General Description of Services Provided:** The Company will furnish the services of its organization, and exercise professional skill and competence in managing the Clinic. The services provided by Company shall, include, but not be limited to, accounting and bookkeeping, other financial matters, risk management, personnel benefits, training, training protocols and procedures, manuals, practice forms and documentation, policies and procedures, licensing and regulatory compliance, inventory management, supplies, including medical supplies, contract negotiations and vendor relations, accounts payable and receivables, marketing, advertising, communications, including public relations, social media, and conventional media, and related matters of the Clinic.

**Section 2.02. Supervision of Personnel:** The Company will supervise all personnel it provides in its role as manager to the practice. The Company will not provide or supervise any medical care or medical services provided by the Clinic that legally has to be provided and supervised by a medical professional.

**Section 2.03. Legal Compliance:** The Company will comply with all federal, state, and local laws, ordinances, regulations, orders, and other legal requirements that now or during the term of this Agreement apply to managing the Clinic as this Agreement provides.

## ARTICLE 3
## SPECIFIC SERVICES PROVIDED

**Section 3.01. Books and Records:** The Company will maintain accurate, complete, and separate books and records according to generally accepted accounting standards and procedures. The records will show income and expenditures relating to operation of the Clinic and will be maintained so that individual items and aggregate amounts of accounts payable and accounts receivable, available cash, and other assets and liabilities relating to the Clinic may be readily determined at any time.

**Section 3.02. Preparing Payroll-Tax Returns:** The Company will prepare and file all required payroll-tax returns and other documents, including but not limited to those required under the Federal Insurance Contributions Act and the Federal Unemployment Tax Act, and any similar federal, state, or local legislation, and all withholding-tax returns required for employees of the Clinic and Company whose work relates to the Clinic.

**Section 3.03. Information Requested by the Company:** The Company will furnish any information relating to the financial, physical, or operational condition of the WWHA that WWHA may request from time to time.

**Section 3.04. Employees and Independent Contractors:** The Company shall be responsible for recruiting, interviewing, and hiring all employees who will be working in the

WWHA_RR00001395

Clinic, including additional physicians and medical professionals that may enter into contracts with the Clinic, but not be retained as employees.

**Section 3.05.  Human Resources:**  The Company shall provide the human resources services necessary for the Clinic, including (i) establishment of human resources policies and procedures, and (ii) fringe benefit programs.

**Section 3.06.  Billing and Collections:**  The Company shall be responsible for all patient billing, collection and accounts receivables management.

**Section 3.07.  Marketing and Public Relations:**  The Company shall provide marketing, advertising, communications services to WWHA, including public relations, press releases, social media, and conventional media, and related matters.

**Section 3.08.  Access to Patient Information and Records:**  The Company shall implement a system for the maintenance of medical records in compliance with HIPPA.

**ARTICLE 4**
**DUTIES AND RESPONSIBILITIES OF WWHA**

**Section 4.01.  Organization and Operation:**  WWHA shall, at all times during the Term, be and remain legally organized and authorized to provide medical services in a manner consistent with all applicable state and federal laws.

**Section 4.02.  Insurance:**  The Company shall be responsible for maintaining medical professional liability insurance for the physicians providing medical services in the Clinic.  The Company shall also be responsible to maintain general liability, worker's compensation, building and contents, and other insurance in accordance with sound business practices.

**ARTICLE 5**
**COMPENSATION**

**Section 5.01.  Compensation to the Company:**

**Section 5.02.  Reimbursement for Expenses:**  WWHA agrees to pay reasonable out-of-pocket expenses to the Company in accordance with the standard procedures of WWHA, which are subject to change from time to time at the sole discretion of WWHA.  The Company shall provide WWHA with written receipts for reimbursable expenses.

**SECTION 6**
**TERMINATION**

**Section 6.01.  Termination for Default:**  Either Party may terminate this Agreement if it determines that the other Party has materially failed to perform its duties and responsibilities

MANAGEMENT SERVICES AGREEMENT                                                                      PAGE 3

WWHA_RR00001396

hereunder; provided, however, that the Party asserting a breach must provide the other party notice of the material default and an opportunity to cure within thirty (30) days of receipt of the written notice of default. If, however, the Party's non-compliance reasonably requires more than thirty (30) days to cure, the Party will not be in default if the cure is commenced within the ten (10) day period and is diligently pursued.

**Section 6.02. Termination by Operation of Law:** Either Party may terminate the Agreement, or any portion hereof, in the event the Agreement, or such part hereof, is deemed to be contrary to local, state, or federal law and it cannot be modified or amended in a way that is mutually agreeable to the Parties and is in compliance with applicable law. The Parties agree to use their best efforts to modify the Agreement consistent with applicable law and to make changes to the minimum extent necessary to try to retain as closely as possible the original economic and other terms, as are reflected in this Agreement.

**Section 6.04. Effect of Termination:** If this Agreement is terminated, the following will apply:

(a)    The Company will promptly deliver to WWHA all books and records in the Company's possession relating to the Clinic and WWHA, and all other items of property owned by WWHA and in the Company's possession.

(b)    The Company's right to compensation will cease, but the Company will be entitled to be compensated for services rendered before the termination date.

(c)    The agency created under this Agreement will cease, and the Company will have no further right and authority to act for the WWHA.

### ARTICLE 7
### CONFIDENTIALITY AND PROPRIETARY MATERIAL

**Section 7.01. Confidentiality:** During the Term and for a period of two (2) years thereafter, or for such greater period as permitted required by law, each Party shall not, nor shall it permit, its employees, agents or other persons, organizations, or entities to utilize or divulge any trade secret, process, method, or any other information concerning the personnel, finances, or other business or operations of the other Party, its employees, agents, or its diagnoses, treatment and results thereof relating to any medical care furnished by WWHA which the Company, its employees, agents or such other person, organization or entity may have learned as a result of the relationship of the Parties pursuant to this Agreement.

**Section 7.02. Proprietary Material:** Each Party on behalf of its employees and agents, acknowledges that the other Party has developed and during the Term may develop, confidential proprietary plans, programs, formulae, methods, policies, procedures, techniques, protocols and other products, services and information (collectively, "Proprietary Material") relating to the business, services, or other activities of each Party. The Parties, on behalf of their respective employees and agents, agree that the Proprietary material is and shall remain the sole and

WWHA_RR00001397

exclusive property of each respective party, and that the other party, its employees and agents, shall maintain the confidentiality of the Proprietary Material that is not intended for disclosure to the public, and it shall not use, divulge, furnish, or make accessible any Proprietary material to any person or entity, except if necessary to the fulfillment of the Parties' obligations pursuant to this Agreement, and in such cases, then only to the extent necessary or as required by law.

Section 7.03.  Return of Proprietary Material:  Upon termination of this Agreement, each Party shall immediately discontinue use of the Proprietary Material of the other Party and shall promptly return to the other Party all Proprietary Material in its possession, including, but not limited to, all financial materials, patient files, billing information, computer data tapes, all collateral materials, notebooks, papers, operating and procedure manuals and other materials prepared for or provided by, or otherwise acquired on behalf of, the Party, including the return to the respective Parties of copies of all reports, patient records and information relating to the foregoing.  WWHA shall return all software to Company upon termination of this Agreement and shall also pay any outstanding balances due to Company.

Section 7.04.  Injunctive Relief:  The Parties acknowledge that the breach of any provision of this Article 7 will result in irreparable injuries to the non-breaching party for which damages would be inadequate.  Therefore, in the event of such breach, the non-breaching party shall be entitled to have an injunction issued by any court of competent jurisdiction, enforcing and restraining the breach in addition to any and all other available legal and equitable remedies. If the non-breaching party utilizes the services of any attorney to enforce successfully any part of this Article 7, including, but not limited to, obtaining an injunction, and the non-breaching party's efforts are successful, then, whether or not suit is brought, the breaching party shall be liable for the payment of all reasonable attorneys' fees, and all other reasonable costs and expenses incurred by the non-breaching party in connection with such litigation. The provisions of this Article 7 shall be a continuing agreement and covenant and shall survive following termination of this Agreement.

## ARTICLE 8
## MISCELLANEOUS

Section 8.01,  Health Care Delivery:  Nothing in this Agreement is intended or shall be construed to allow Company to exercise control of or direction over the manner or method by which WWHA and its physicians or other providers perform medical services or other professional health care services.  The rendition of all medical services, including, but not limited to, the prescription or administration of medicine and drugs, shall be the sole responsibility of WWHA and its physicians.  Nothing in this Agreement shall be construed to permit the Company to engage in the practice of medicine, it being the sole intention of the Parties hereto that the Services rendered to WWHA by the Company are solely for the purpose of providing non-medical management and administrative services.

Section 8.02,  Relationship of the Parties:  Neither this Agreement nor any of its provisions shall be construed to create any partnership, agency relationship, nor joint venture relationship between WWHA and Company.  It is expressly understood and agreed by the parties that the Company and WWHA shall at all times be acting as independent contractors during the

WWHA_RR00001398

performance of services hereunder. Neither Party, by virtue of its performance hereunder, shall assume or become liable for any obligations, debts, liabilities, claims, or suits of the other Party.

Section 8.03. Indemnification: WWHA agrees to indemnify the Company, its officers, directors, agents, and assigns against all claims, causes of action, losses or liabilities (including reasonable attorneys' fees) related to the negligent acts or omissions of WWHA. Company shall indemnify WWHA, its officers, directors, agents, and assigns against all claims, causes of action, losses or liabilities (including reasonable attorneys' fees) related to the negligent acts or omissions of the Company in performing its duties hereunder.

Section 8.04. Notices: Any notices required pursuant to this Agreement shall be deemed given (a) three (3) business days after mailing by registered or certified mail, postage prepaid, return receipt requested; (b) one (1) business day after deposit with a recognized overnight courier (such as Federal Express); or (c) upon delivery if sent by a bonded messenger, or (d) upon actual receipt, in each case to the following address:

To the Company:    Whole Woman's Health, LLC
    Attn: Amy Hagstrom Miller
    1812 Centre Creek Drive, Suite 205
    Austin, TX 78754

To WWHA:    Whole Woman's Health Alliance
    Attn: Brenda Tolbert
    914 East Jefferson, Suite 204
    Charlottesville, VA 22902

or such other addresses as the Parties may be notified of as described above.

Section 8.05. Assignment: Either Party may assign this Agreement or its obligations hereunder with the express written consent of the other Party; such approval shall not be unreasonably withheld.

Section 8.06. Force Majeure: Neither Party shall be deemed to be in violation of this Agreement if it is prevented from performing any of its obligations hereunder, other than the payment of any fees or costs for any reason beyond its control; including, without limitation, acts of nature, strikes, statute, regulation, or rule of federal or state or local government, or any agency thereof.

Section 8.07. Entire Agreement: This Agreement supersedes any and all other agreements, either written or oral, between the Parties hereto with respect to its subject matter and contains all of the agreements between the Parties with respect to the management of the Clinic. Each Party to this Agreement acknowledges that no representation, inducements, promises, or agreements, oral or otherwise, have been made by any party or person, and that no other agreement, statement, or promise not contained in this Agreement shall be binding.

WWHA_RR00001399

Section 8.08.  Amendment, Waiver, Discharge, and Termination:  This Agreement and any term or provision hereof may be changed, amended, waived, discharged, or terminated only by an instrument in writing signed by all of the Parties or their respective successors in interest.

Section 8.09.  Governing Law:  This Agreement shall be construed in accordance with the laws of the State of Texas.

Section 8.10.  Confidentiality and Nondisparagement:  The Parties agree that the terms of this Agreement are confidential.  The Parties will not disclose the terms of this Agreement to any third parties except as may be necessary to obtain advice and counseling from the Parties' attorneys, accountants, or financial advisors, or as may otherwise be required by law.  The Parties agree not to make any comments or representations during and after the termination of this Agreement concerning the other Party, their affiliates, directors, employees, or agents, that may disparage or otherwise damage the reputation, good will, or other interests of the Parties, or their affiliates, directors, employees, or agents.

Section 8.11.  Counterparts; One Agreement:  This Agreement and all other copies of it are considered one agreement.  This Agreement may be executed concurrently in one or more counterparts, each of which will be considered an original, but all of which together constitute one instrument.

THE EFFECTIVE DATE OF THIS AGREEMENT SHALL BE APRIL 1, 2017.

THE COMPANY:

WHOLE WOMAN'S HEALTH, LLC

By: _____
AMY HAGSTROM MILLER, PRESIDENT

THE WWHA:

WHOLE WOMAN'S HEALTH ALLIANCE

By: _____
BRENDA TOLBERT, TREASURER

MANAGEMENT SERVICES AGREEMENT

PAGE 7

WWHA_RR00001400



Eric J. Holcomb
*Governor*

Kristina Box, MD, FACOG
*State Health Commissioner*

**Indiana State Department of Health**
*An Equal Opportunity Employer*

CERTIFIED MAIL

Re: Licensure Application

## NOTICE OF LICENSE APPLICATION DENIAL

Whole Woman's Health Alliance
1812 Centre Creek Drive, Suite 205
Austin, Texas 78754

To Whom It May Concern:

The Commissioner of the Indiana State Department of Health (hereinafter referred to as "Commissioner"), pursuant to Ind. Code § 16-21-2-11, Ind. Code § 4-21.5-3-5, and 410 IAC 26, hereby issues this *Notice of License Application Denial* to Whole Woman's Health Alliance ("WWHA" or "Applicant").

On August 11, 2017, the Indiana State Department of Health (the "Department") received an *Application for License to Operate an Abortion Clinic* from WWHA. On September 21, 2017, the Department requested additional information based on discrepancies noted in WWHA's application. On October 6, 2017, the Department received a revised application from WWHA. After reviewing the revised application, the Department requested additional information to determine compliance with 410 IAC 26. In response to the Department's request to list all of the abortion and health care facilities currently operated by WWHA, its parent, affiliate, and subsidiary organizations, WWHA failed to disclose, concealed, or omitted information related to additional clinics.

Based upon the Department's review, the Commissioner finds WWHA failed to meet the requirement that the Applicant is of reputable and responsible character and the supporting documentation provided inaccurate statements or information. *See* 410 IAC 26-2-5. You are hereby notified that the Commissioner has **DENIED** the license application of WWHA dated August 11, 2017 (supplemented on October 6, 2017 and December 8, 2017).

A person may not provide abortion services unless the person holds a license issued by the Indiana State Department of Health. A person who knowingly or intentionally operates or advertises the operation of an unlicensed abortion clinic commits a Class A misdemeanor. Ind. Code § 16-21-2-10, Ind. Code § 16-21-2-2.5.

If WWHA wishes to seek administrative review of the *Notice of License Application Denial* pursuant to Indiana Code 4-21.5-3-5, it must file a petition for review within eighteen (18) days after this *Notice of Licensure Application Denial* is served. The petition for review and petition of stay of effectiveness must be postmarked no later than **January 23, 2018.**

**J.E. 14**

CONFIDENTIAL    WWHA_RR00001401

Page 2 of 2

The petition for review and petition of stay of effectiveness must be in writing and must include facts demonstrating that:

> The petitioner is a person to whom the order is specifically directed;
> The petitioner is aggrieved or adversely affected by the order; or
> The petitioner is entitled to review under any law.

If the petition for review and petition for stay of effectiveness is not filed timely, this *Notice of License Application Denial* becomes a **FINAL ORDER**.

Any Petition for review should be submitted in writing to:

> Court Administrator
> Office of Legal Affairs, #3H
> Indiana State Department of Health
> 2 North Meridian Street
> Indianapolis, IN 46204-3006

So ordered this ___3RD___ day of ___JANUARY___, 2018.

Respectfully,

KRISTINA BOX, MD, FACOG
STATE HEALTH COMMISSIONER

By: _____
Terry L. Whitson
Assistant Commissioner
Health Care Quality & Regulatory Commission

CC:   Preston Black, Office of Legal Affairs
       Bucy & Associates, PLLC c/o John Bucy, II
       File

CONFIDENTIAL

WWHA_RR00001402



# State of Indiana

# Senate

Senator Joseph C. Zakas
16372 Wild Cherry Drive
Granger, Indiana 46530-8544
Business: (574) 294-7473
Office: (317) 232-9490
E-mail: S11@iga.in.gov

Committees:
Judiciary
Civil Law, R.M.
Insurance and Financial Institutions

*ATTN:*
*DR. BOX*

October 18, 2017

Governor Eric Holcomb
200 West Washington Street, Room 206
Indianapolis, IN 46204

Re: New abortion clinic in South Bend

Dear Governor *Eric* Holcomb:

An Austin, Texas-based company is seeking an Indiana license to open a non-surgical abortion facility in South Bend, as outlined in the enclosed article from the *South Bend Tribune*. I wanted you to know of the depth of concern from many people about this organization's application. I received over 200 messages from my constituents in one weekend after the news broke. I know other members of the General Assembly and our federal representatives have been hearing from folks, as well.

It appears the company in question, Whole Woman's Health, has had a history of health violations at its other clinics. Further, the article indicates that the proposed administrator of the facility used to work for a South Bend abortion provider whose practice was closed in 2015 after the state revoked his medical license.

Indiana has a long history of being a state that stands for pro-life policies. Many believe your administration will reflect that history. Thank you, Governor, for your consideration.

Sincerely yours,

Joe

Senator Joe Zakas

JZ/kd

Enclosure

# J.E. 22

CONFIDENTIAL

WWHA_RR00001431



# State of Indiana

# Senate

Senator Erin Houchin
State House
200 West Washington Street
Indianapolis, IN 46204-2785
Phone: (317) 232-9488
E-mail: S47@iga.in.gov

**Committees:**
Tax and Fiscal Policy
Commerce and Technology
Utilities
Elections
Family and Children Services

November 9, 2017

Dr. Kristina Box
State Health Commissioner
Indiana State Department of Health
2 North Meridian Street
Indianapolis, IN 36204

Dear Dr. Box,

I am writing to express my serious concern regarding the pending application from Whole Woman's Health Alliance to open an abortion facility in South Bend, Indiana.

I respectfully voice my opposition to this application in the strongest possible terms. While Whole Woman's Health Alliance would like you and the public to believe they have women's interests at heart, the record of this Texas-based company shows otherwise. In states where this organization operates clinics, inspection records have uncovered numerous cases which demonstrate a pattern of negligence regarding basic health and safety standards, from rusty equipment, to open syringes, and more. I do not believe their standards of women's health reflect those of the State Department of Health, or our citizens.

Indiana has made great strides in protecting the sanctity of life. Abortion numbers have dropped every year for the past five years, according to the 2016 annual Terminated Pregnancy Report compiled by your department. This is good news for Indiana, as fewer and fewer women are choosing to make dramatically life-changing decisions they can never take back.

I urge you to reject the application for a new abortion facility in South Bend in the interest of women and children across our state. Thank you for your attention to this matter.

Sincerely,

Erin Houchin
Senator
State of Indiana

## J.E. 23

CONFIDENTIAL

WWHA_RR00001432



# State of Indiana

# Senate

Senator Ryan Mishler
200 W. Washington Street
Indianapolis, Indiana 46204-2785
State House: (800) 382-9467
E-mail: s9@in.gov

Committees:
Appropriations, Chair
Health & Provider Services, RM
Tax & Fiscal Policy

November 21, 2017

Dear Dr. Box,

I write to you on behalf of my constituents, as one of the State Senators that represents St. Joseph County where Whole Women's Health Alliance has applied for a license to operate an abortion clinic in South Bend.

I ask that you consider the values of Hoosiers who respect the right to life as you deliberate the granting of a license. I also point to the values of our Indiana General Assembly, which has passed numerous bills in the past decade, many that upgrade the health and safety standards and informed consent and other requirements of the abortion industry as it is regulated in the state of Indiana. Note that abortion clinics do not fall under any other type of regulation or oversight – only our own legislative and administrative requirements.

Indiana insists on standards of care that would be found in the traditional medical marketplace. It appears, however, that Whole Women's Health Alliance does not. It has clinics in Texas, Virginia, Minnesota, Maryland and Illinois that have had multiple violations of clinic standards in those states.

Here in Indiana, the individual that Whole Women's Health Alliance lists on its application to be the South Bend clinic director should be well known to the Indiana State Department of Health. She had a direct role at the former clinic operated by Dr. Klopfer in South Bend that was closed due to pending state intervention after poor performance there. In other words, the person who assisted the former abortionist who closed his doors to avoid state censure and ultimately had his medical license pulled by the Indiana State Medical Licensing Board, is listed to be the director of the new clinic in South Bend.

# J.E. 24

CONFIDENTIAL

WWHA_RR00001433



I have received hundreds of emails and letters from my constituents expressing their opposition to the granting of a license for this facility. Not a single person has reached out expressing support for the clinic to receive a license.

I, along with my constituents, have grave concerns about the Whole Women's Health Alliance's commitment to professionalism and patient safety. I urge you to deny the license and avoid this threat to women's health in Indiana.

Sincerely,

State Senator Ryan Mishler

CONFIDENTIAL

WWHA_RR00001434

**Bucy & Associates, PLLC**

6633 Highway 290 East, Suite 104
Austin, Texas 78723
Phone: (512) 291-6505
Fax: (512) 291-6558
E-Mail: john@johnbucy.com

Indiana State Department of Health
Office of Legal Affairs

JAN 22 2018

FILED

January 22, 2018

**VIA CERTIFIED MAIL:**
7016 3010 0000 2601 3662

Court Administrator
Office of Legal Affairs, #3H
Indiana State Department of Health
2 North Meridian Street
Indianapolis, IN 46204-3006

## PETITION FOR REVIEW OF LICENSE APPLICATION DENIAL BY INDIANA STATE DEPARTMENT OF HEALTH

**Applicant Information:**

Whole Woman's Health Alliance
1812 Centre Creek Drive, Suite 205
Austin, Texas 78734

**Representative's Name (Person Submitting the Appeal):**

John H. Bucy, II
Bucy & Associates, PLLC
6633 Highway 290 East, Suite 104
Austin, Texas 78723
Telephone Number: (512) 731-2638

**Background Information:**

Whole Woman's Health Alliance (the "Applicant") filed an Application for License to Operate an Abortion Clinic on August 11, 2017. On October 6, 2017, the Applicant filed a revised application in response to additional information requested by the Indiana State Department of Health (the "Department").

By Notice of License Application Denial dated January 3, 2018, the Department denied the Application of Applicant (the "Notice").

**Reason for Denial:**

PET'R P/H 15

In paragraph 2 of the Notice, the Department determined:

"In response to the Department's request to list all of the abortion and health care facilities currently operated by WWHA, its parent, affiliate, and

CONFIDENTIAL

WWHA_RR00001435

Court Administrator
January 22, 2018
Page 2 of 4

Bucy & Associates, PLLC

subsidiary organizations, WWHA failed to disclose, concealed or omitted information related to additional clinics."

The Department relied on this determination to find that the Applicant "...failed to meet the requirement that the Applicant is of reputable and responsible character and the supporting documentation provided inaccurate statements or information. See 410 IAC 26-2-5."

Response of Applicant:

Factual Dispute: The factual dispute relates to Requests 1 and 2 submitted by the Department to the Applicant on October 6, 2017 and the responses submitted by the Applicant to the Department on December 8, 2017. For ease of reference, the requests and the responses of the Applicant follow:

1.    Provide a complete ownership structure or description pertaining to the applicant, including, but not limited to, any individuals and/or any parent, affiliate or subsidiary organizations. Please list full legal names and addresses, and for entities, list the type of entity and the state of incorporation/organization.

Response: Whole Woman's Health Alliance ("WWHA") is a Texas nonprofit corporation. It does not have members. Management of the affairs of WWHA is vested in the Board of Directors. Since WWHA is a nonprofit corporation it does not have any owners.

WWHA operates a clinic in Austin, Texas. The address of the clinic is 8401 North IH 35, Suite 200, Austin, Texas 78753. It is licensed as an Abortion Facility by the Texas Department of State Health Services Regulatory Licensing Unit. Its license number is 140013.

WWHA has recently purchased a clinic in the State of Virginia. The clinic address is 2321 Commonwealth Drive, Charlottesville, Virginia, 22901. The license number is AF-0020.

WWHA has entered into a management agreement with Whole Woman's Health, LLC (the "Management Company"). The Management Company will provide certain designated management services to WWHA. The Management Company provides management services to numerous clinics across the United States. The Management Company is a Texas limited liability company.

Some of the Board Members of WWHA are affiliated directly or indirectly with the Management Company, but the majority of the Board Members are independent.

CONFIDENTIAL

Bucy & Associates, PLLC

Court Administrator
January 22, 2018
Page 3 of 4

2.  **Provide a list of all the abortion and health care facilities currently operated by applicant, including its parent, affiliate or subsidiary organizations.**

**Response:**   Please refer to the answer to the first Question.

**Arguments of Applicant (Factual Matters):**   The Applicant did not conceal or mislead the Department regarding the clinics operated by the Applicant, its parent, affiliate or subsidiary organizations. As stated in the above responses, the Applicant is a Texas nonprofit corporation. It does not have members. Management of the affairs of WWHA is vested in the Board of Directors. Nonprofit entities, including the Applicant, do not have shareholders or owners. The Applicant does not own shares, membership interests or any other type of ownership interest in any entity. Consequently, the Applicant does not have a parent or subsidiary organization.

The Applicant in its response disclosed all of the clinics that it operates, which are located in Texas and Virginia. It also disclosed that it had entered into a management agreement with Whole Woman's Health, LLC—an independent legal entity that is distinct from the Applicant—and that Whole Woman's Health, LLC provides "management services to numerous clinics across the U.S." Applicant's Responses of Dec. 8, 2017. The Applicant did not list the other clinics managed by Whole Woman's Health, LLC, because they are not operated by Whole Woman's Health Alliance, nor are they parent, affiliate, or subsidiary organizations. To the contrary, those other clinics are independent corporations that are not controlled by the Applicant, and the Applicant has no financial or other interest in those clinics.

Although not responsive to the Department's Requests, a list of the other clinics managed by Whole Woman's Health, LLC is provided in Exhibit "A", attached hereto and incorporated herein by reference.

The Department was not specific about its basis for denying the Applicant's Application, but it is possible that the Department considers Whole Woman's Health, LLC to be an affiliate of the Applicant.

The Indiana Code defines "affiliate" as "an entity that directly or indirectly controls, is controlled by, or is under common control with" another entity, where "[c]ontrol includes the power to select the corporation's board of directors." Ind. Code§ 23-17-21-2; *accord* Ind. Code§ 23-1-43-1. The Applicant does not control and is not controlled by any other entity. As a Texas nonprofit corporation, the Applicant has scrupulously maintained its independent status. While Whole Woman's Health, LLC provides certain management services to the Applicant pursuant to a contractual agreement, it does not control and is not controlled by the Applicant, nor are the two companies under common control by a third party. The other clinics managed by Whole Woman's Health, LLC are independent corporations that similarly do not control, are not controlled by, and are not subject to common control with the Applicant.

CONFIDENTIAL

WWHA_RR00001437

Exhibit "A"

Whole Woman's Health of the Twin Cities, LLC

Whole Woman's Health of Peoria, LLC

Whole Woman's Health of Baltimore, LLC

Whole Woman's Health of Fort Worth, LLC

Whole Woman's Health of San Antonio, LLC

Whole Woman's Health of McAllen, LLC

CONFIDENTIAL



U.S. POSTAGE
AUSTIN, TX
78730
JAN 30, 18
AMOUNT
**$6.91**
R2305H126391-04

46204

CERTIFIED MAIL

7016 3010 0000 2601 3642

Indiana State Department of Health

Court Administrator
Office of Legal Affairs, #3H
2 North Meridian Street
Indianapolis, IN 46204-3006

Bucy & Associates, PLLC

6633 Highway 290 East, Suite 104
Austin, Texas 78723

RETURN RECEIPT
REQUESTED

CONFIDENTIAL

WWHA_RR00001439

possession and control of Petitioner and was not provided in response to Respondent's request for additional information. Respondent contends Petitioner was required to report the existence of clinics and the information requested about those entities.

**INTERROGATORY No. 9:** Please identify all reasons for denying Petitioner's Application.

**ANSWER:**   Please refer to Respondent's *Notice of License Application Denial* and the explanation contained therein. The *Notice of License Application Denial* speaks for itself.

**INTERROGATORY No. 10:**   Identify each person outside the Department—other than Petitioner, Judge Claire Deitchman, and Judge Deitchman's staff— with whom You communicated about Petitioner, Petitioner's Application, or Your decision to deny Petitioner's Application.

**ANSWER:** Respondent objects to the extent this Interrogatory calls for privileged information. Respondent objects to the extent this Interrogatory calls for irrelevant information not reasonably calculated to lead to the discovery of admissible evidence. Without waiving those objections, Respondent, as it does in many matters in the normal course of business, communicates with the Governor's Office. All communications with persons and/or media who have requested information pursuant to Indiana's Access to Public Records Act are included in the communications provided in Respondent's Responses to Petitioner's First Request for Production of Documents.

**INTERROGATORY No. 11:**   For each person identified in Interrogatory No. 10, provide a summary of Your communications with the person concerning the matters identified in

Interrogatory No. 10 and indicate whether Your communications with the person were oral, written, or both.

**ANSWER:** Respondent objects to the extent this Interrogatory calls for privileged information. Respondent objects to the extent this Interrogatory calls for irrelevant information not reasonably calculated to lead to the discovery of admissible evidence. Without waiving those objections, Respondent, as it does in many matters in the normal course of business, communicates with the Governor's Office. For written and electronic communications, please see communications provided in Respondent's Responses to Petitioner's First Request for Production of Documents.

**INTERROGATORY No. 12:**     The Denial Notice states that: "Based upon the Department's review, the Commissioner finds WWHA failed to meet the requirement that the Applicant is of reputable and responsible character and the supporting documentation provided inaccurate statements or information." Provide all the facts and laws that You relied on in reaching this conclusion.

**ANSWER:**     After attempting to extract the information required to process the abortion clinic license application from Petitioner, Respondent was unable to obtain the necessary information from Petitioner to ascertain whether Petitioner is of reputable and responsible character. Otherwise, see Answers to Interrogatories Nos. 7, 8, 9, 13, and 14, which are incorporated herein.

**INTERROGATORY No. 13:**     Please describe the criteria that You use to determine whether an applicant for a license to operate an abortion clinic is of "reputable or responsible character."

WWHA_RR00001455

ANSWER: Respondent uses the abortion licensure criterion found in Ind. Code § 16-34, Ind. Code § 16-21, and 410 IAC 26. The Respondent states that a person or entity of "reputable or responsible character" would be truthful and forthcoming with the information requested in the Request for Additional Information.

**INTERROGATORY No. 14:**     The Denial Notice states: "After reviewing the revised application, the Department requested additional information to determine compliance with 410 IAC 26." Please explain what prompted the Department to request additional information, including a description of any communications with persons outside the Department that contributed to the Department's decision to request additional information.

ANSWER:  Respondent objects to the extent this Interrogatory calls for privileged information. Respondent objects to the extent this Interrogatory calls for irrelevant information not reasonably calculated to lead to the discovery of admissible evidence. Respondent did not have enough information to issue a licensure decision or to ascertain whether Petitioner met the licensure requirements. The decision to request additional information was made so a fully informed review of the Application was possible.

**INTERROGATORY No. 15:**     Describe the organizational structure of the Department.

ANSWER:   Please see Respondent's Response to Request for Production containing Respondent's Organizational Chart.

**INTERROGATORY No. 16:**     Identify and describe in detail all formal or informal

WWHA_RR00001456

policies, procedures, criteria, or assessment tools that You use to evaluate an application for a license to operate an abortion clinic, as well the date on which those policies, procedures, criteria, or assessment tools were created.

**ANSWER:**   The Program evaluates applications and accompanying documentation for compliance pursuant to Ind. Code§ 16-34, Ind. Code§ 16-21, and 410 IAC 26. Evaluation of an application may include review of additional information requested by the program and its decision makers and provided by the applicant.

**INTERROGATORY No.17:**   Provide a step-by-step description of the process that the Department follows in evaluating an application for a license to operate an abortion clinic, from the time the application is received until final disposition. For each step in the process, identify the personnel who are involved and the timeline for completion.

**ANSWER:**

1.   Respondent receives application.

2.   Acute Care Division staff will process application to determine whether application meets requirements of Ind. Code§ 16-34, Ind. Code§ 16-21, and 410 IAC 26 or other applicable statutes and rules depending on type of facility.

3.   If Acute Care Division staff determines applications is deficient in some way, additional information or clarification may be requested at the discretion of Respondent.

4.   Acute Care Division staff will consult with Office of Legal Affairs and ISDH Leadership as necessary.

5.   If Respondent satisfied requirements of Ind. Code§ 16-34, Ind. Code§ 16-21,

WWHA_RR00001457

and 410 IAC 26, or other applicable statutes and rules depending on type of facility, it will approve application.

6. Additional information may be requested at the discretion of Respondent.

7. If, after additional information is received and does not sufficiently and satisfactorily demonstrate requirements of Ind. Code§ 16-34, Ind. Code§ 16-21, and 410 IAC 26, or other applicable statutes and rules depending on type of facility, Respondent will deny application.

**INTERROGATORY No.18:**     Identify each facility that is currently licensed as an abortion clinic by the Department and the year in which the facility first obtained its license.

**ANSWER:**

1. Clinic for Women (Indianapolis); licensed 2008.

2. Planned Parenthood of Indiana and Kentucky (Lafayette); licensed 2015.

3. Planned Parenthood of Indiana and Kentucky (Merrillville); licensed 2008.

4. Planned Parenthood of Indiana and Kentucky (Bloomington); licensed 2008.

5. Planned Parenthood of Indiana and Kentucky (Indianapolis); licensed 2008.

6. Women's Med Group Professional Corporation (Indianapolis); licensed 2008.

**INTERROGATORY No. 19:**     Identify the number of times that the Department has denied an application for a license to operate an abortion clinic since January 1, 2008.

**ANSWER:**     The ISDH has denied an application for a license to operate an abortion clinic three times since January 1, 2008.

                                                          WWHA_RR00001458

BEFORE AN APPEALS PANEL OF THE EXECUTIVE BOARD
OF THE INDIANA STATE DEPARTMENT OF HEALTH

In re Petition for Review of Recommended Order in   )
                                                                    )

WHOLE WOMAN'S HEALTH ALLIANCE,        )
    Petitioner/Appellee,                   )
                                                    )   CAUSE NO. AP-ACL-000132-18

v.                                   )

                                                  )    Indiana State Department of Health
INDIANA STATE DEPARTMENT OF HEALTH,   )        Office of Legal Affairs
    Respondent/Appellant.               )
                                                 NOV 0 5 2018

                                                        FILED

## BRIEF OF RESPONDENT/APPELLANT
## INDIANA STATE DEPARTMENT OF HEALTH

      Respondent/Appellant Indiana State Department of Health (the "ISDH") respectfully submits this brief in support of its objection to and request for reversal of the September 13, 2018 "Findings of Fact, Conclusions of Law, and Recommended Order" (the "Order") issued by Administrative Law Judge J. Clare Deitchman (the "ALJ").

## PRELIMINARY STATEMENT

      The ALJ's Order is quite puzzling compared to the actual evidence in this proceeding. For example, the ALJ confirmed at hearing that this case turns on the meaning of "affiliate." The ALJ's Order, however, **never** analyzes the term or discusses the "affiliate" issue. Also, the ISDH put on extensive testimony and exhibits showing distinctly that Whole Woman's Health Alliance ("WWHA") "provided inaccurate statements or information" to the ISDH, which means the agency's denial of WWHA's application was lawful and proper. The ALJ's Order, however, concludes that the ISDH presented "no evidence" of any inaccurate statements or information. Such a conclusion could be reached only if **everything** the ISDH submitted was ignored. Apparently, that is what happened here.

CONFIDENTIAL

WWHA_RR00001531

**2.    *WWHA and the affiliate "Whole Woman's Health" entities are under the "common control" of Amy Hagstrom Miller.***

Amy Hagstrom Miller "controls" WWHA, because she has "the power or authority to manage, superintend, restrict, regulate, direct, govern, administer, or oversee, as well as the power to restrain, check, or regulate" every aspect of the business. Id. The WWHA bylaws give her full "management and control of the business and property of the Corporation in the ordinary course of its business with all such powers with respect to such general management and control as may be reasonably incident to such responsibilities." [Jt. Ex. 20 § 5.05 (emphasis added), Tr. 1/133]. Miller testified that as president, she "has general management control" of WWHA. [Tr. 2/64-66 (emphasis added)], and her broad control was confirmed by WWHA board members. Beverly Whipple testified that Miller is "in charge of everything" and "runs" WWHA at all levels. [Tr. 1/175-76 (emphasis added)]. Member John Bucy also stated that the WWHA board has never limited Miller's powers or overruled any decision she has made as president. [Tr. 1/134, 202]

Miller also "controls" several LLCs that operate "Whole Woman's Health" abortion clinics across the country. All of those LLCs are "affiliates" that WWHA should have but failed to disclose to the ISDH:

- Whole Woman's Health, LLC ("WWH, LLC") was founded by Amy Hagstrom Miller in 2007. [Jt. Ex. 21] Since 2011, WWH, LLC has been 100% owned by a company called Booyah, Inc. ("Booyah"). Booyah, in turn, is 100% owned by Amy Hagstrom Miller. [Tr. 1/138, 2/42-44, 2/62-63]

- Whole Woman's Health of McAllen, LLC ("WWH McAllen") is one of the six clinics identified with Charlottesville and Austin as "our clinics" on wholewomanshealth.com and in repeated public statements by Amy Hagstrom Miller. [Tr. 1/40-42] WWH McAllen is 100% owned by Booyah which, in turn, is 100% owned by Amy Hagstrom Miller. [Tr. 1/138, 2/42-44, 2/62-63]

8

CONFIDENTIAL

- Whole Woman's Health of Fort Worth, LLC ("WWH Fort Worth") is one of the six clinics identified with Charlottesville and Austin as "our clinics" on wholewomanshealth.com and in repeated public statements by Amy Hagstrom Miller. [Tr. 1/40-42] WWH Fort Worth is 100% owned by Booyah which, in turn, is 100% owned by Amy Hagstrom Miller. [Tr. 1/138, 2/42-44, 2/62-63]

- Whole Woman's Health of Baltimore, LLC ("WWH Baltimore") is one of the six clinics identified with Charlottesville and Austin as "our clinics" on wholewomanshealth.com and in repeated public statements by Amy Hagstrom Miller. [Tr. 1/40-42] WWH Baltimore is 100% owned by Booyah which, in turn, is 100% owned by Amy Hagstrom Miller. [Tr. 1/138, 2/62-63]

- Whole Woman's Health of the Twin Cities ("WWH Twin Cities") is one of the six clinics identified with Charlottesville and Austin as "our clinics" on wholewomanshealth.com and in repeated public statements by Amy Hagstrom Miller. [Tr. 1/40-42] WWH Twin Cities is 100% owned by Booyah which, in turn, is 100% owned by Amy Hagstrom Miller. [Tr. 1/138, 2/62-63]

- Whole Woman's Health of Peoria ("WWH Peoria") is one of the six clinics identified with Charlottesville and Austin as "our clinics" on wholewomanshealth.com and in repeated public statements by Amy Hagstrom Miller. [Tr. 1/40-42] WWH Peoria is 100% owned by Booyah which, in turn, is 100% owned by Amy Hagstrom Miller. [Tr. 1/138, 2/62-63]

3.   ***WWHA knew exactly what the ISDH meant by "affiliate," because it used the same definition throughout the application process.***

WWHA has suggested it was confused about the meaning of "affiliate" because the ISDH did not explicitly define the term in its October 27, 2017 email. WWHA has ***never*** been confused. On the contrary, it has embraced the ***same definition*** of "affiliate" followed by the ISDH in this matter. This is clearer nowhere than in WWHA's January 22, 2018 "Petition for Review" letter:

> [I]t is possible that the [ISDH] considers Whole Woman's Health, LLC to be an affiliate of the Applicant.... **The Indiana Code defines "affiliate" as "an entity that directly or indirectly controls, is controlled by, or is under common control with" another entity,** where "[c]ontrol includes

9

WWHA_RR00001539

BEFORE AN APPEALS PANEL OF THE EXECUTIVE BOARD
OF THE INDIANA STATE DEPARTMENT OF HEALTH

| | | |
|---|---|---|
| IN RE THE MATTER OF APPEAL OF | ) | CAUSE NO. AP-ACL-000132-18 |
| | ) | |
| PETITION FOR REVIEW OF | ) | |
| RECOMMENDED ORDER OF | ) | Indiana State Department of Health |
| WHOLE WOMAN'S HEALTH ALLIANCE | ) | Office of Legal Affairs |

DEC 1 8 2018

FILED

## ORDER OF THE APPEALS PANEL

The Appeals Panel appointed to hear this case met on November 28, 2018 at the Indiana State Department of Health (ISDH) in Indianapolis, Indiana. Appeals Panel members present were ISDH Executive Board member Joanne Martin; ISDH Executive Board member Richard Martin, D.D.S.; and Chairperson Brian K. Lowe, Administrative Law Judge (ALJ). The Indiana State Department of Health appeared by counsel. Whole Woman's Health Alliance appeared by counsel. Counsel for both parties made oral arguments. The Appeals Panel issues the following Findings of Fact, Conclusions of Law and Order:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Appeals Panel dissolves the Recommended Order issued by Administrative Law Judge J. Clare Deitchman by a two (2) to one (1) vote. The Appeals Panel serves as the ultimate authority for ISDH. I.C. Sec. 4-21.5-3-28 requires the Appeals Panel to submit Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. The Appeals Panel is the ultimate authority for the ISDH. This matter is properly before the Appeals Panel pursuant to I.C. Sec. 4-21.5 et seq. which is the Administrative Orders and Procedures Act (AOPA). AOPA requires these Findings of Fact be based exclusively on the evidence of record, upon evidence that is substantial and reliable, and upon matters officially Noticed in such proceedings. Members of the Appeals Panel may also utilize their respective experience, technical competence, and specialized knowledge in evaluation of the evidence.

2. These Proceedings have been conducted in accordance with and are governed by AOPA.

3. All Findings of Fact which can be deemed Conclusions of Law are deemed Conclusions of Law. All Conclusions of Law which can be deemed Findings of Fact are hereby deemed Findings of Fact.

4. On September 13, 2018, Administrative Law Judge (ALJ) J. Clare Deitchman entered Findings of Fact, Conclusions of Law, and Recommended Order. ISDH file-stamped ALJ Deitchman's recommended Order on September 14, 2018.

1

CONFIDENTIAL

5. I.C. Sec. 4-21.5-3-28(g) states in relevant part, "[t]he final order of the ultimate authority or its designee must: (1) identify any differences between the final order and the nonfinal order issued by the administrative law judge under section 27 of this chapter; (2) include findings of fact meeting the standards of section 27 of this chapter or incorporate the findings of fact in the administrative law judge's order by express reference to the order."

6. Pursuant to I.C. Sec. 4-21.5-3-28(g)(2), the Appeals Panel incorporates by express reference paragraphs 1, 2, 3, 4, 5, 7, 9, 10, 11, 15, 16, and 18. The Appeals panel identifies, pursuant to I.C. Sec. 4-21.5-3-28(g)(1), differences between this final Order of the Appeals Panel and the ALJ's Recommended Order include the dissolution of the paragraphs not otherwise incorporated herein. Additional differences include the findings of fact contained in the following enumerated paragraphs.

7. On September 21, 2018, ISDH's Acute Care Division Director, Randy Snyder, PT, MBA notified Whole Woman's Health Alliance of additional discrepancies ISDH discovered in Whole Woman's Health Alliance's license application and waiver request. Snyder notified Whole Woman's Health Alliance that its application listed a different clinic name than what it listed on its waiver request; that its application provided a different clinic address than what it provided on its waiver request; that the application contained an undated signature; and that it failed to disclose the name of a clinic administrator as required by 410 IAC 26-4-1(f). Snyder informed Whole Woman's Health Alliance, "If corrected documentation is not received by the close of business on Friday, October 6, 2017, the application will be denied." [Resp. Exhibit J].

8. Whole Woman's Health Alliance, by John Bucy, submitted a revised application to ISDH on October 6, 2017. Whole Woman's Health Alliance's revised application corrected the specific discrepancies communicated by Snyder in his September 21, 2017 email.

9. In late September of 2017, ISDH Chief of Staff, Trent Fox, became involved in the review process of Whole Woman's Health Alliance's license application. [Tr. Vol. 1, 23:21].

10. Fox had immediate concern upon review of Whole Woman's Health Alliance's revised license application. The revised license application listed Liam Morley as Whole Woman's Health Alliance's clinic administrator. Fox knew Morley had a connection as an employee or administrator with Dr. Ulrich Klopfer. In recent years, Klopfer surrendered his clinic license and had his medical license revoked for serious violations. [Tr. Vol. 1, 31:1-11].

11. During the application review process, ISDH received and reviewed correspondence from three state senators. The letter from Senator Zakas alleged, "the company in question, Whole Woman's Health, has had a history of health violations at its other clinics." [Jt. Exhibit 22; Tr. Vol. 1, 32-33]. State senators Ryan Mishler and Erin Houchin expressed similar concerns to Zakas. Mishler's letter described Whole Woman's Health as having, "clinics in Texas, Virginia, Minnesota, Maryland, and Illinois." [Tr. Vol. 1, 42-43].

12. The information contained in the Zakas letter did not align with the information contained in Whole Woman's Health Alliance's original or revised license application.

2

CONFIDENTIAL

WWHA_RR00001603

13. To evaluate the content of the Zakas letter, to determine the veracity of possible undisclosed health violations, and to obtain clarity on the relationship of entities with a variation of the name Whole Woman's Health, Fox and other ISDH team members drafted a list of supplemental questions for Whole Woman's Health Alliance. [Tr. Vol. 1, 32-37].

14. As part of the review process of Whole Woman's Health Alliance's revised license application, ISDH's Deputy Director of Acute Care, John Lee, RN, MBA sent an email to Bucy on October 27, 2017. Lee's email contained eleven (11) questions with additional subparts. [Jt. Exhibit 6].

15. Question 1 of Lee's October 27, 2017 email to Bucy asked: "Provide a complete ownership structure or description pertaining to the applicant, including, but not limited to, any individuals and/or parent, affiliate or subsidiary organizations. Please list full names and addresses, and for entities, list the type of entity and the state of incorporation/organization." [Jt. Exhibit 6].

16. Question 2 of Lee's October 27, 2017 email to Bucy asked: "Provide a list of all the abortion and health care facilities currently operated by applicant, including its parent, affiliate or subsidiary organizations." [Jt. Exhibit 6].

17. In Whole Woman's Health Alliance's responses to ISDH's supplemental questions on December 8, 2017, Whole Woman's Health Alliance listed two other clinics that it operates in Austin, Texas and Charlottesville, Virginia. In response to question 1, Whole Woman's Health Alliance answered in part, "WWHA has entered into a management agreement with Whole Woman's Health, LLC (the "Management Company")." Whole Woman's Health Alliance also answered in part, "Some of the Board Members of WWHA are affiliated directly or indirectly with the Management Company, but the majority of the Board Members are independent." [Jt. Exhibit 7].

18. On January 3, 2018, ISDH issued its Notice of License Application Denial to Whole Woman's Health Alliance. The Notice stated in relevant part:

> In response to the Department's request to list all of the abortion and health care facilities currently operated by WWHA, its parent, affiliate, and subsidiary organizations, WWHA failed to disclose, concealed, or omitted information related to additional clinics.

> Based upon the Department's review, the Commissioner finds WWHA failed to meet the requirement that the Applicant is of reputable and responsible character and the supporting documentation provided inaccurate statements or information. *See* 410 IAC 26-2-5. You are hereby notified that the Commissioner has **DENIED** the license application of WWHA dated August 11, 2017 (supplemented on October 6, 2017 and December 8, 2017). [Jt. Exhibit 14].

19. wholewomanshealth.com and public statements made by Amy Hagstrom Miller accounted for eight (8) Whole Woman's Health clinics in five (5) different states. [Tr. Vol. 1, 41-42]. wholewomanshealth.com listed "our clinics" as: Whole Woman's Health of Baltimore, Whole

3

Woman's Health of Charlottesville, Whole Woman's Health of Fort Worth, Whole Woman's Health of The Twin Cities, Whole Woman's Health of Austin, Whole Woman's Health of San Antonio, Whole Woman's Health of McAllen, and Whole Woman's Health of Peoria. wholewomanshealthblog.com. published an article titled "2017: Year In Review." The article averred: "we relaunched our Whole Woman's Health website. . . . We excitedly opened the doors to our 8th and 9th locations in Charlottesville, Virginia and South Bend, IN. . . . we launched our non-profit, Whole Woman's Health Alliance . . . (WWHA) . . .Our Austin, Charlottesville, and South Bend clinics operate under WWHA."

20. Amy Hagstrom Miller founded Whole Woman's Health Alliance under the name Whole Woman's Advocacy Alliance in 2014 [Jt. Exhibits 8 and 9]. Miller appointed Whole Woman's Advocacy Alliance's initial board of directors, served as the President, and chaired the board during Whole Woman's Advocacy Alliance's existence under the name Whole Woman's Advocacy Alliance. [Tr. Vol. 2, 63-64].

21. As President of Whole Woman's Advocacy Alliance, Miller had the following powers under the Whole Woman's Advocacy Alliance bylaws not limited to:

> The president shall be the chief executive officer of the Corporation and, subject to the supervision of the Board of Directors, shall have general management and control of the business and property of the Corporation in the ordinary course of its business with all such powers with respect to such general management and control as may be reasonably incident to such responsibilities, including, but not limited to, the power to employ, discharge, or suspend employees and agents of the Corporation, [and] to fix the compensation of employees and agents . . . [Jt. Exhibit 12].

22. Whole Woman's Advocacy Alliance's board of directors never took any action to limit the powers given to Miller under Whole Woman's Advocacy Alliance's bylaws. [Tr. Vol. 1, 132:3-7].

23. In 2015, Whole Woman's Advocacy Alliance changed its name to Whole Woman's Health Alliance. At all times since the name change, Miller served as president of the board of directors and chief executive officer (CEO) of Whole Woman's Health Alliance. Miller retained the following powers in Article Three of the Whole Woman's Health Alliance bylaws:

> The president shall be the chief executive officer of the Corporation and, subject to the supervision of the Board of Directors, shall have general management and control of the business and property of the Corporation in the ordinary course of its business with all such powers with respect to such general management and control as may be reasonably incident to such responsibilities, including, but not limited to, the power to employ, discharge, or suspend employees and agents of the Corporation, to fix the compensation of employees and agents, and to suspend, with or without cause, any officer of the Corporation pending final action by the Board of Directors . . . [Jt. Exhibit 12].

4

CONFIDENTIAL

The Appeals Panel weighed Article Three of the Whole Woman's Health Alliance bylaws against the rest of the evidence presented including the remaining provisions of the bylaws including but not limited to Article Two which states in part:

> "The business and property of the Corporation shall be managed by the Board of Directors, and subject to the restrictions imposed by law, the Certificate of Formation, or these Bylaws, the Board of Directors may exercise all the powers of the Corporation. [Jt. Exhibit 12].

24. Miller has general management and control of Whole Woman's Health Alliance. [Tr. Vol. 2., 66:11-13].

25. Miller is in charge of everything at Whole Woman's Health Alliance. [Tr. Vol. 1, 175:20-23].

26. Whole Woman's Health Alliance's Board of Directors has never overruled a decision made by Miller. [Tr. Vol. 1, 134 and 202].

27. Miller owns a corporation known as Booyah Group, Inc. (Booyah). Booyah owns Whole Woman's Health, LLC. [Tr. Vol. 1, 138; Tr. Vol. 2, 42-44 and 62-63].

28. On April 1, 2017, Whole Woman's Health Alliance (a nonprofit entity) entered into a Management Services Agreement with Whole Woman's Health, LLC (a for profit entity) to provide wide-ranging management services for Whole Woman's Health Alliance's South Bend Clinic. Whole Woman's Health Alliance agreed to pay Whole Woman's Health, LLC 20% of its gross revenues [Jt. Exhibit 13]. Article 2, Section 2.02 of the Management Services Agreement states: "The Company will not provide or supervise any medical care or medical services provided by the Clinic that legally has to be provided and supervised by a medical professional." The Appeals Panel reviewed and weighed this paragraph of the Management Services Agreement and the entirety of the agreement with all of the evidence provided by both parties.

29. Whole Woman's Health of McAllen (Whole Woman's Health of McAllen, LLC) is one of the six clinics identified with Charlottesville and Austin as "our clinics" on wholewomanshealth.com and in public statements by Miller. [Tr. Vol. 1, 40-42]. Booyah owns Whole Woman's Health of McAllen, LLC. Miller owns Booyah. [Tr. Vol. 1, 138; Tr. Vol. 2, 42-44 and 62-63].

30. Whole Woman's Health of Fort Worth (Whole Woman's Health of Fort Worth, LLC) is one of the six clinics identified with Charlottesville and Austin as "our clinics" on wholewomanshealth.com and in public statements by Miller. [Tr. Vol. 1, 40-42]. Booyah owns Whole Woman's Health of Fort Worth, LLC. Miller owns Booyah. [Tr. Vol. 1, 138; Tr. Vol. 2, 42-44 and 62-63].

31. Whole Woman's Health of Baltimore (Whole Woman's Health of Baltimore, LLC) is one of the six clinics identified with Charlottesville and Austin as "our clinics" on wholewomanshealth.com and in public statements by Miller. [Tr. Vol. 1, 40-42]. Booyah owns

5

WWHA_RR00001606

Whole Woman's Health of Baltimore, LLC. Miller owns Booyah. [Tr. Vol. 1, 138; Tr. Vol. 2, 42-44 and 62-63].

32. Whole Woman's Health of The Twin Cities (Whole Woman's Health of The Twin Cities, LLC) is one of the six clinics identified with Charlottesville and Austin as "our clinics" on wholewomanshealth.com and in public statements by Miller. [Tr. Vol. 1, 40-42]. Booyah owns Whole Woman's Health of The Twin Cities, LLC. Miller owns Booyah. [Tr. Vol. 1, 138; Tr. Vol. 2, 42-44 and 62-63].

33. Whole Woman's Health of Peoria (Whole Woman's Health of Peoria, LLC) is one of the six clinics identified with Charlottesville and Austin as "our clinics" on wholewomanshealth.com and in public statements by Miller. [Tr. Vol. 1, 40-42]. Booyah owns Whole Woman's Health of Peoria, LLC. Miller owns Booyah. [Tr. Vol. 1, 138; Tr. Vol. 2, 42-44 and 62-63].

34. Whole Woman's Health of San Antonio (Whole Woman's Health of San Antonio, LLC) is one of the six clinics identified with Charlottesville and Austin as "our clinics" on wholewomanshealth.com and in public statements by Miller. [Tr. Vol. 1, 40-42]. Booyah owns 80% of Whole Woman's Health of San Antonio, LLC. Miller owns Booyah. [Tr. Vol. 1, 138; Tr. Vol. 2, 42-44 and 62-63].

35. Whole Woman's Health Alliance; Whole Woman's Health of San Antonio, LLC; Whole Woman's Health of Peoria, LLC; Whole Woman's Health of The Twin Cities, LLC; Whole Woman's Health of Baltimore, LLC; Whole Woman's Health of Fort Worth, LLC; Whole Woman's Health of McAllen, LLC; and Whole Woman's Health, LLC are under common control by Amy Hagstrom Miller.

36. Whole Woman's Health Alliance's December 8, 2017 responses to ISDH's October 27, 2017 inquiry failed to address Amy Hagstrom Miller's common control of multiple Whole Woman's Health entities including Whole Woman's Health Alliance; Whole Woman's Health of San Antonio, LLC; Whole Woman's Health of Peoria, LLC; Whole Woman's Health of The Twin Cities, LLC; Whole Woman's Health of Baltimore, LLC; Whole Woman's Health of Fort Worth, LLC; Whole Woman's Health of McAllen, LLC; and Whole Woman's Health, LLC. [Tr. Vol. 1, 68].

37. Whole Woman's Health Alliance's December 8, 2017 responses to ISDH's October 27, 2017 inquiry referenced board members who were affiliated with other Whole Woman's Health entities, but Whole Woman's Health Alliance did not name those individuals as ISDH requested. [Tr. Vol. 1, 68].

38. Whole Woman's Health Alliance provided inaccurate statements to ISDH in Whole Woman's Health Alliance's supporting documentation.

39. Whole Woman's Health Alliance provided inaccurate information to ISDH in Whole Woman's Health Alliance's supporting documentation.

CONFIDENTIAL

WWHA_RR00001607

40. As the licensing agency, ISDH was in the best position to determine what information it needed to grant a license. ISDH's requests were reasonable and ascertainable.

## CONCLUSIONS OF LAW

1. This matter is properly before the Appeals Panel, pursuant to I.C. Sec. 4-21.5. The Appeals Panel is the ultimate authority for ISDH.

2. No procedural defect occurred in the hearing process.

3. The AOPA, I.C. 4-21.5, requires that this decision be rendered solely on the record before the Appeals Panel, upon evidence that is substantial and reliable, and upon matters officially Noticed in such proceedings. The ALJ's experience, technical competence and specialized knowledge may be used in evaluating evidence. Members of the Appeals Panel may also utilize their respective experience, technical competence, and specialized knowledge in evaluation of the evidence.

4. All Conclusions of Law which can be deemed Findings of Fact are hereby deemed Findings of Fact. All Findings of Fact that can be deemed Conclusions of Law are hereby deemed Conclusions of Law.

5. The Appeals panel identifies, pursuant to I.C. Sec. 4-21.5-3-28(g)(1), differences between this final Order of the Appeals Panel and the ALJ's Recommended Order include the dissolution of the conclusions of law contained in the ALJ's Recommended Order. Additional differences include the conclusions of law contained in the following enumerated paragraphs.

6. I.C. Sec. 4-21.5-3-29 sets forth the Appeals Panel's authority and standard of review as follows in relevant part:
(a) This section does not apply if the administrative law judge issuing an order under section 27 of this chapter is the ultimate authority for the agency.
(b) After an administrative law judge issues an order under section 27 of this chapter, the ultimate authority or its designee shall issue a final order:
(1) affirming;
(2) modifying; or
(3) dissolving;
The administrative law judge's order. The ultimate authority or its designee may remand the matter, with or without instructions, to an administrative law judge for further proceedings.

7. I.C. Sec. 16-21-2-11 requires an application for an abortion clinic license in Indiana, among other requirements, the following:
(a) An applicant must submit an application for a license on a form prepared by the state department showing that:
(1) the applicant is of reputable and responsible character . . .
(b) The application must contain the following additional information:

7

WWHA_RR00001608

(1) The name of the applicant.
(2) The type of institution to be operated.
(3) The location of the institution.
(4) The name of the person to be in charge of the institution. . . .
(6) Other information the state department requires. . . .
(d) An application for an abortion clinic license must require the applicant to do the following:
(1) Disclose whether the applicant, or an owner or affiliate of the applicant, operated an abortion clinic that was closed as a direct result of patient health and safety concerns. . . .

8. 410 IAC 26-2-4 states in relevant part:

(a) Upon receipt of a completed application for an abortion clinic license, the department will review the application and accompanying documentation to determine that the applicant has met the requirements of IC 16-21-2-11(a)(1) and IC 16-21-2-11(a)(2).
(1) Upon determination by the commissioner that the applicant has failed to comply with this article, the commissioner may:
(1) request additional information concerning the application;
(2) conduct a further investigation to determine whether a provisional license should be granted; or
(3) deny the application

9. 410 IAC 26-2-5 grants ISDH discretion to deny a license and states in pertinent part:

The commissioner may deny a license to operate an abortion clinic for any of the following reasons:
(1) If the licensee or licensees are not of reputable and responsible character.
. . .
(7) If the application for a license to operate an abortion clinic or supporting documentation provided inaccurate statements or information.

10. Lee's October 27, 2017 email to Bucy asked Whole Woman's Health Alliance to provide ISDH with information regarding its affiliates. 410 IAC 26-2-4(a)(1) gave ISDH the authority for this request and to conduct a further investigation. ISDH did not deny the application under this authority based on the application's original deficiencies or the discrepancies outlined in Snyder's September 21, 2018 letter.

11. "Affiliate" and "affiliated" are not defined in Indiana's abortion laws although I.C. Sec. 16-21-2-11(d)(1) uses the word "affiliate."

12. Pursuant to Indiana law, two entities are affiliates if those two entities are under the common control of another person.[1]

---

[1] See e.g., I.C. Sec. 4-33-23-1; I.C. Sec. 23-2-2.5-1(m); I.C. Sec. 23-2-3.1-1; I.C. Sec. 24-4.4-1-301; I.C. Sec. 24-4.5-1-301.5; I.C. Sec. 27-1-23-1; I.C. Sec. 27-1-38-1; I.C. Sec. 27-14-1-6; I.C. Sec. 28-6.2-1-4; I.C. Sec. 27-1-23-1;

8

CONFIDENTIAL

WWHA_RR00001609

13. Whole Woman's Health Alliance expressed a similar definition of the word affiliate in its appeal of license denial. [Pet. Exhibit 15].

14. "Control" is not defined in Indiana's abortion laws. Control of an entity does not necessarily require ownership or voting (board) control. "The plain meaning of control is the power or authority to manage, superintend, restrict, regulate, direct, govern, administer, or oversee, as well as the power to restrain, check, or regulate."[2]

15. Amy Hagstrom Miller controls Whole Woman's Health Alliance under Indiana law because she has "the power or authority to manage, superintend, restrict, regulate, direct, govern, administer, or oversee, as well as the power to restrain, check, or regulate" the activities and operations of the business.

16. Booyah owns and controls Whole Woman's Health, LLC; Whole Woman's Health of McAllen, LLC; Whole Woman's Health of Fort Worth, LLC; Whole Woman's Health of Baltimore, LLC; Whole Woman's Health of the Twin Cities, LLC; 80% of Whole Woman's Health of San Antonio, LLC; and Whole Woman's Health of Peoria, LLC. Amy Hagstrom Miller owns and controls Booyah.

17. Whole Woman's Health, LLC; Whole Woman's Health of McAllen, LLC; Whole Woman's Health of Fort Worth, LLC; Whole Woman's Health of Baltimore, LLC; Whole Woman's Health of the Twin Cities, LLC; Whole Woman's Health of San Antonio, LLC; and Whole Woman's Health of Peoria, LLC are affiliates of Whole Woman's Health Alliance because those entities are under the common control of Amy Hagstrom Miller.

18. Whole Woman's Health Alliance failed to provide ISDH with all of the information ISDH required in its license application and supporting materials pursuant to 410 IAC 26-2-5 by failing to list Whole Woman's Health, LLC; Whole Woman's Health of McAllen, LLC; Whole Woman's Health of Fort Worth, LLC; Whole Woman's Health of Baltimore, LLC; Whole Woman's Health of the Twin Cities, LLC; Whole Woman's Health of San Antonio, LLC; and Whole Woman's Health of Peoria, LLC as affiliates in response to ISDH's October 27, 2017 inquiry.

19. ISDH had the authority to deny and properly denied Whole Woman's Health Alliance's license application.

20. Whole Woman's Health Alliance provided inaccurate statements to ISDH in Whole Woman's Health Alliance's supporting documentation and its license application should be denied pursuant to 410 IAC 26-2-5.

21. Whole Woman's Health Alliance provided inaccurate information to ISDH in Whole Woman's Health Alliance's supporting documentation and its license application should be denied pursuant to 410 IAC 26-2-5.

---

I.C. Sec. 27-1-12-2.4; I.C. Sec. 27-1-25-1(b); and I.C. Sec. 28-1-29-1.
[2] Combs v. Daniels, 853 N.E.2d 156, 161 (Ind. Ct. App. 2006).

9

CONFIDENTIAL

22. The ALJ's Recommended Order was unsupported by substantial evidence.

23. The mission of ISDH is to promote, protect, and improve the health and safety of all Hoosiers. The Indiana General Assembly empowered ISDH with broad authority to promulgate and "adopt rules under IC 4-22-2 necessary to protect the health, safety, rights, and welfare of patients, including the following: (1) Rules pertaining to the operation and management of hospitals, ambulatory outpatient surgical centers, abortion clinics, and birthing centers." [I.C. Sec. 16-21-1-7]. As the licensing agency with specific expertise, ISDH, was in the best position to gather and evaluate information prior to granting or denying a license and to serve its mission. If the licensing agency, based on its experience and expertise, has reason to question the applicant's credentials, the agency has an obligation to deny the license. [See e.g. 410 IAC 26-2-4 and 5]. The ALJ did not correctly weigh these obligations and authority or the substantial evidence of Whole Woman's Health Alliance's provision of inaccurate statements and information.

24. The ALJ found, in Conclusions of Law paragraphs 8 and 9 of the Recommended Order that:

> 8. *No* evidence was provided during the proceedings to indicate that the Revised Application was incomplete or inaccurate. [emphasis added].

> 9. There was *no* evidence provided during the proceedings that the responses provided by WWHA to the ISDHs October 27, 2017 eleven (11) questions were inaccurate, incomplete, or misleading. [emphasis added].

All three Appeals Panel Members agreed that even if the ALJ believed ISDH provided insufficient or unconvincing evidence, ISDH did not fail to provide any evidence. Both parties submitted evidence. The Appeals Panel reviewed and weighed all evidence submitted.

25. ISDH's denial of a license was not arbitrary or capricious.

26. ISDH has the burden of proof, the standard of which is by the preponderance of the evidence. ISDH satisfied its burden.

27. "Preponderance of the evidence, when used with respect to determining whether or not one's burden of proof has been met, simply means the greater weight of the evidence." Traveler's Indemnity Company v. Armstrong, 442 N.E.2d. 349, 361 (Ind. 1982).

28. Indiana Model Civil Jury Instruction 111 is helpful in explaining this standard as it adopts and expands on the definition from Traveler's by stating, "Evidence is of the greater weight if it convinces you most strongly of its truthfulness. In other words, it is evidence that convinces you that a fact is more probably true than not true. A greater number of witnesses testifying to a fact on one side or a greater quantity of evidence introduced on one side does not necessarily amount to the greater weight of the evidence."

CONFIDENTIAL                                                                    WWHA_RR00001611

## ORDER

The Appeals Panel DISSOLVES the Recommended Order of Administrative Law Judge J. Clare Deitchman. ISDH properly denied Whole Woman's Health Alliance's license application. Joanne Martin dissents from the majority. Whole Woman's Health Alliance's license application is DENIED.

SIGNED AND ISSUED:

_____
Brian K. Lowe, Chairperson
Administrative Law Judge
Date: 12/18/18

_____
Joanne Martin, DrPH, RN, FAAN
Date: 12/15/18

_____
Richard Martin, D.D.S.
Date: 12/10/18

11

CONFIDENTIAL

WWHA_RR00001612

Indiana State Department of Health
Office of Legal Affairs

SEP 14 2018

FILED

ADMINISTRATIVE HEARING
BEFORE THE INDIANA STATE DEPARTMENT OF HEALTH

WOMEN'S WHOLE HEALTH ALLIANCE,                )
        Petitioner,                                              )
                                   )
        v.                                                          )      CAUSE NO:   ACL-000132-18
                                   )
INDIANA STATE DEPARTMENT OF HEALTH,   )
        Respondent.                                            )

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
## RECOMMENDED ORDER

      This matter came before the Administrative Law Judge (ALJ) J. Clare Deitchman following the timely request to appeal filed by Woman's Whole Health Alliance (hereinafter WWHA) of the Notice of License Application Denial issued January 3, 2018 by the Indiana State Department of Health (hereinafter ISDH).

      The parties convened for the hearing on August 22, 2018 and August 23, 2018 at the Indiana State Government South Conference Center located at 301 W. Washington Street, Indianapolis, Indiana.  A Court Reporter created a transcript of the proceedings.

      In attendance at the hearing on behalf of the Petitioner were, Counsel Dipti Singh, Counsel Stephanie Toti, and Counsel Katherine Jack (Indiana counsel).  Appearing for the Respondent were Counsel Rebecca Brelage, Counsel Angela Rinehart, and Counsel Matthew Foster.

      Appearing as witnesses were: ISDH Chief of Staff Trent Fox, John Bucy, Esq. of Bucy & Associates, Merry Mullins, MBA, FACMPE (Expert), Beverly Whipple Vice President and Treasurer of WWHA, Amy Hagstrom Miller, President & CEO of WHHA.

      The witnesses were sworn and evidence was heard.

1

CONFIDENTIAL

## FINDINGS OF FACT

1. That the matter is properly before the ALJ pursuant to IC 4-21.5, et. sec., which is the Administrative Orders and Procedures Act (AOPA).

2. Any finding of fact may also be considered a conclusion of law. Any conclusion of law may also be considered a finding of fact.

3. Counsel for the ISDH requested that judicial notice be taken of the following which was granted when WWHA did not object:

a.) Exhibit A: IC 16-21-1-7 through 16-21-1-10;

b.) Exhibit B: IC 16-21-2 et seq;

c.) Exhibit C: IC 16-21-4-1 and 16-21-4-2;

d.) Exhibit D: 410 IAC Article 26 Abortion Clinics.

4. Exhibits which were admitted at the hearing:

a.) Joint Exhibit 1: WWHA Revised Application for License to Operate an Abortion Clinic (10/6/2017)[1];

b.) Joint Exhibit 2: Letter documenting Admitting Privileges at Hospital (7/15/2017);

c.) Joint Exhibit 3: Medical Transfer Services Agreement Re: Whole Woman's Health of South Bend (7/25/2017);

d.) Joint Exhibit 4: Letter from John Bucy to State Health Commissioner Requesting Waiver of Various Licensing Requirements (8/1/2017);

e.) Joint Exhibit 6: Email from John Lee, Deputy Director of Acute Care at ISDH, to John Bucy, Counsel for WWHA, Requesting Additional Information (10/27/2017);

f.) Joint Exhibit 7: Email from Kristie Amman, Legal Assistant to John Bucy, Counsel for WWHA, to John Lee, Deputy Director of Acute Care at ISDH, Responding to Request for Additional Information (12/18/2017);

g.) Joint Exhibit 8: The State of Texas, Office of Secretary of State, Certificate of Filing of Certificate of Formation of Whole Woman's Advocacy Alliance (now WWHA)(4/3/2014);

h.) Joint Exhibit 9: The State of Texas, Office of Secretary of State, Certificate of Formation

---

[1] Upon review of the Joint Exhibits 1 & 19 at the time of drafting the Recommended Order and request was made by the Administrative Law Judge (ALJ) for a clean, accurate, and legible copies of same. The parties subsequently responded to the request and submitted by stipulation substitute copies of Exhibits 1 & 19 which met the necessary criteria and the ALJ accepted the substitution for the record.

2

WWHA_RR00001614

Nonprofit Corporation, Whole Woman's Advocacy Alliance (now WWHA) (4/3/2014);

i.) Joint Exhibit 10: The State of Texas, Office of the Secretary of the State, Certificate of Filing of Certificate of Amendment of WWHA (8/20/2015)

j.) Joint Exhibit 11:  The state of Texas, Office of the Secretary of State, Certificate of Amendment Domestic Nonprofit Corporation, WWHA (8/20/2015);

k.) Joint Exhibit 12: Bylaws of Whole Woman's Advocacy Alliance (now WWHA), A Nonprofit Corporation (4/3/2014);

l.) Joint Exhibit 13:  Management Services Agreement Between WWHA and Whole Woman's Health, LLC Re: Whole Woman's of South Bend (4/1/2017);

m.) Joint Exhibit 14:  ISDH Notice of License Application Denial (1/3/2018);

n.) Joint Exhibit 17: License Agreement Between WWHA and Whole Women's Health, LLC RE:  Whole Woman's of South Bend (3/1/2017);

o.) Joint Exhibit 18: Asset Purchase Agreement Between Whole Woman's Health Austin and WWHA (5/1/2017);

p.) Joint Exhibit 19: WWHA Application for License to Operate an Abortion Clinic (Received 8/11/2017);

q.) Joint Exhibit 20: Amended and Restated Bylaws (4/3/2014);

r.) Joint Exhibit 22:  Letter to Governor Eric Holcomb from Senator Joe Zakas, forwarded to Dr. Kristina Box (10/18/2017);

s.) Joint Exhibit 23: Letter to Dr. Kristina Box from Senator Erin Houchin (11/9/2017);

t.) Joint Exhibit 24: Letter to Dr. Kristina Box from Senator Ryan Mishler (11/21/2017);

u.) Petitioner's Exhibit 58: CV of Merry Mullins;

v.) Respondent's Exhibit I: Email from John Lee, Deputy Director of Acute Care at ISDH, to John Bucy, Counsel for WWHA, Requesting Additional Information (8/8/2017);

w.) Respondent's Exhibit J: Email from Randall Snyder, Deputy Director of Acute Care at ISDH, to John Bucy, Counsel for WWHA, Requesting Additional Information (8/21/2017);

x.) Respondent's Exhibit Y: Announcement of South Bend abortion clinic plans dated 10/30/2017 on WNDU.com;

y.) Respondent's Exhibit Z:  A copy of Whole Woman's Health, LLC website page "Find a

3

CONFIDENTIAL

WWHA_RR00001615

Clinic Near You";

z.) Respondent's Exhibit AA:  Copy of WWHA blog: 2017 Year in Review;

aa.) Respondent's Exhibit CC:  Heavily redacted responses to request for production pertaining to relationship of 501(c)3s to LLC from WWHA Board meeting and dinner dated April 19, 2015;

bb.) Respondent's Exhibit DD:  Redacted response to discovery - WWHA Board Meeting Minutes dated June 7-8, 2017.

5. Petitioner, Whole Woman's Health Alliance (WWHA), is a nonprofit Texas corporation authorized to to business in the state of Indiana. (Jt. Ex. 5)

6. WWHA as a nonprofit organization has no owners and the Certificate of Formation and bylaws vest management of the organization in a Board of Directors comprised of nine (9) individuals who vote on issues of governance, finances, mission-setting, and overall strategy based upon majority rule. (Tr. 1 @171, 172, and 174)

7. The Board of Directors of WWHA has officers:  President Amy Hagstrom Miller, Vice-President and Treasurer Beverly Whipple, and Secretary John Bucy. (Tr. 1 @175)

8. Hagstrom Miller is WWHAs CEO and pursuant to the nonprofit bylaws, she has "general management and control of [WWHA] . . . in the ordinary course of its business . . . with all such powers with respect to such general management and control as may be reasonably incident to such responsibilities" and subject at all times to the "supervision of the Board of Directors" of WWHA. (Tr. 1 @ 175; Tr. 2 @19; Joint Exhibit 12 and Joint Exhibit 20)

9. Respondent, Indiana State Department of Health (ISDH) is charged with licensing facilities that provide health care and specifically abortion care. (Ind. Code § 16-21-2-10, 410 Ind. Admin. Code 26-2-1; *see* Ind. Code § 16-21-2-11(a).)

10. On or about August 11, 2017, WWHA submitted an Application For License To Operate An Abortion Clinic to the ISDH (Joint Exhibit 19) and a request for waiver of licensing requirements under Indiana Code 16-21-1-9. (Joint Exhibit 4)

11. ISDH in reviewing the August 11, 2017 Application determined that there were deficiencies in the Application as it was missing a fire inspection report by either the state or local fire inspector as well as a copy of the approval from the Indiana Homeland Security Office, and

4

WWHA_RR00001616

these deficiencies were communicated to WWHA via an email dated September 8, 2017 from John Lee, RN, MBA Nurse Surveyor Supervisor. (Respondent's Exhibit I)

12. Inconsistent information was contained within the WWHA August 11, 2017 Application and accompanying waiver request documents submitted by WWHA as noted in an email from Randall (Randy) Snyder, PT, MBA of ISDH to WWHA on September 22, 2017. (Respondent's Exhibit J)

13. On or about October 6, 2017, a revised Application For License To Operate An Abortion Clinic was submitted by WWHA to ISDH and which corrected the inconsistent information contained with the WWHA August 11, 2017 Application. (Joint Exhibit 1)

14. During the ISDH review process of the October 6, 2017 Revised Application from WWHA, Chief of Staff for ISDH, Trent Fox, became involved in the review process. (Tr. 1@ 23)

15. ISDH received from Indiana Governor Holcomb's office correspondence dated October 18, 2017 from Indiana Senator Joe Zakas regarding the WWHA Application. (Joint Exhibit 22)

16. Trent Fox conducted an internet search regarding WWHA. Transcript 8/22/2018, p 39:11-16

17. On October 27, 2017, ISDH John Lee submitted to WWHA a list of eleven (11) questions some with subparts which were drafted by Trent Fox and reviewed by the ISDH legal staff. (Tr. 1 @34)(Joint Exhibit 6)

18. ISDH's Commissioner Dr. Kristina Box received correspondence dated November 9, 2017 from Senator Erin Houchin and correspondence dated November 21, 2017 from Senator Ryan Mishler regarding concerns they and their constituents had raised regarding the license application by WWHA. (Joint Exhibit 23 and Joint Exhibit 24)

19. WWHA submitted a reply email on December 8, 2017 to John Lee of ISDH regarding the eleven (11) questions and supplied attachments of additional documents that had been specifically requested by ISDH in the October 27, 2017 email. (Joint Exhibits 7, 8,9,10,11,12, and 13)

20. On January 3, 2018 ISDH issued a Notice Of License Application Denial to WWHA stating that the basis for the denial was:

"In response to the Department's request to list all of the abortion and health care facilities currently operated by WWHA, its parent, affiliate, and subsidiary organizations, WWHA failed

5

to disclose, concealed, or omitted information related to additional clinics."

and further that

"Based upon the Department's review, the Commissioner finds WWHA failed to meet the requirement that the Applicant is of reputable and responsible character and the supporting documentation provided inaccurate statements or information. *See* 410 IAC 26-2-5." (Joint Exhibit 14)

21. WWHA operates two (2) abortion clinics; one in Austin, Texas and the other in Charlottesville, Virginia, both of which were disclosed to the ISDH in the responses from WWHA on December 8, 2017. (Joint Exhibit 6)

22. Whole Woman's Health, LLC (WWH, LLC) is a management company owned and operated by Amy Hagstrom Miller. WWH, LLC is contracted by WWHA to provide a variety of services under a Management Agreement including but not limited to:

"Section 3.07. Marketing and Public Relations: The Company shall provide marketing, advertising, communications services to WWHA, including public relations, press releases, social media, and conventional media, and related matters." (Joint Exhibit 15)

23. WWH, LLC hosts a web based site for all of the women's health care clinics that it provides management services for at wholewomanshealth.com and that site includes the names and locations of other clinics not owned and operated by WWHA which was viewed by Trent Fox. (Tr. 1 @ 39 and 40)(Respondent Exhibit Z)

24. ISDH never specifically asked WWHA about the concerns and issues raised from Indiana Senators Zakas, Erin Houchin, or Ryan Mishler. (Tr. 1 @ 62 and 63)

25. ISDH never specifically asked WWHA about the wholewomanhealth.com website or about any affiliations WWHA might have to clinics featured on the website, as to other clinics that might contain the phrase "Whole Woman's Health" as part of the name, or as to other clinics that one or more of the WWHA Board Members might own separately from those owned by WWHA. (Tr. 1 @ 74 and 75)

26. ISDH never requested any additional information or clarifications from WWHA after WWHA submitted their December 8, 2017 responses and prior to ISDH issuing its Notice Of License Application Denial on January 3, 2018. (Tr. 1 @ 75)

6

CONFIDENTIAL

WWHA_RR00001618

CONCLUSIONS OF LAW

1. That the matter is properly before the ALJ, pursuant to IC 4-21.5, 410 IAC 16.2-3.1-12, and 42 CFR 483.12, and that she has the authority and jurisdiction to hear and rule upon all matters presented herein.

2. That the AOPA, IC 4-21.5, requires that the decision be rendered solely on the record before the ALJ, upon evidence that is substantial and reliable, and upon matters officially noticed in such proceedings.

3. The ALJs experience, technical competence and specialized knowledge may be used in evaluating evidence.

4. The issue in this matter is as follows:

> Was the WWHAs revised Application For License To Operate An Abortion Clinic of October 6, 2017 regarding a clinic in South Bend incomplete and/or inaccurate?

5. The standard of review is a preponderance of the evidence such that there is sufficient evidence to make it more likely than not that the party seeking to prove the allegation that is asserted is true.

6. The burden of proof is on ISDH to show that their denial of the Application for Licensure by WWHA of the South Bend Abortion Clinic was appropriate.

7. The evidence provided during the day and a half proceedings on August 22, 2018 and August 23, 2018 supports WWHAs claim that they are a Texas nonprofit organization authorized to conduct business in Indiana and that they also own and operate two other clinics in Austin, Texas and in Charlottesville, Virginia.

8. No evidence was provided during the proceedings to indicate that the Revised Application was incomplete or inaccurate.

9. There was no evidence provided during the proceedings that the responses provided by WWHA to the ISDHs October 27, 2017 eleven (11) questions were inaccurate, incomplete, or misleading.

10. WWHA demonstrated by a preponderance of the evidence that their responses provided to the ISDHs request for additional information on October 27, 2017 was complete and accurate.

11. ISDH provided no evidence that they specifically inquired of WWHA regarding concerns

7

CONFIDENTIAL

WWHA_RR00001619

that were raised based upon submissions to the ISDH by Indiana Senators in October and November 2017, or that were raised by ISDH staff's own "informal investigation"

12. Therefore ISDH has failed to show by a preponderance of the evidence that WWHA lacks a reputable and responsible character and should be denied a license for the South Bend clinic.

## RECOMMENDED ORDER

Based on the foregoing, the Administrative Law Judge recommends the following order: That Whole Woman's Health Alliances be issued a license to operate an abortion clinic in South Bend, Indiana based the information contained in the Revised Application of October 6, 2017, the December 10, 2017 information to ISDH from WWHA, and the evidence from the proceedings.

Entered this 13th day of September, 2018.

*Clare Deitchman*

J. Clare Deitchman, Administrative Law Judge

APPROVED AND ORDERED THIS ____ DAY OF _____, 2018.

_____
Dr. Kristina Box, Commissioner

8

that were raised based upon submissions to the ISDH by Indiana Senators in October and November 2017, or that were raised by ISDH staff's own "informal investigation"

12. Therefore ISDH has failed to show by a preponderance of the evidence that WWHA lacks a reputable and responsible character and should be denied a license for the South Bend clinic.

## RECOMMENDED ORDER

Based on the foregoing, the Administrative Law Judge recommends the following order: That Whole Woman's Health Alliances be issued a license to operate an abortion clinic in South Bend, Indiana based the information contained in the Revised Application of October 6, 2017, the December 10, 2017 information to ISDH from WWHA, and the evidence from the proceedings.

Entered this 13th day of September, 2018.

*J. Clare Deitchman*

J. Clare Deitchman, Administrative Law Judge

APPROVED AND ORDERED THIS ____ DAY OF _____, 2018.

_____
Dr. Kristina Box, Commissioner

8

CONFIDENTIAL