UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WHOLE WOMAN'S HEALTH ALLIANCE; ALL-OPTIONS, INC.; and JEFFREY GLAZER, M.D. | ) ) ) | CASE NO. 1:18-cv-1904-SBE-MJD |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | CLASS ACTION |
| | ) | |
| CURTIS T. HILL, JR., Attorney General of the State of Indiana, in his official capacity; KRISTINA BOX, M.D., Commissioner of the Indiana State Department of Health, in her official capacity; JOHN STROBEL, M.D., President of the Medical Licensing Board of Indiana, in his official capacity; and KENNETH P. COTTER, St. Joseph County Prosecutor, in his official capacity and as representative of a class of all Indiana prosecuting attorneys with authority to prosecute felony and misdemeanor offenses, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF WHOLE WOMAN'S HEALTH ALLIANCE'S MOTION FOR PRELIMINARY INJUNCTION AND FOR EXPEDITED BRIEFING AND HEARING ON THAT MOTION, OR FOR A TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... iii

STATEMENT OF ISSUES ......................................................................... viii

STATEMENT OF FACTS ............................................................................. 2

I.      WWHA Seeks to Fill the Unmet Need for an Abortion Provider in South Bend ............. 2

     A.     Indiana's Abortion Access Crisis ................................................... 2

     B.     WWHA's Plans to Open the South Bend Clinic ..................................... 3

II.     The Department's Application of the Challenged Laws Is Preventing the South Bend Clinic from Providing Abortion Care ............................................. 5

     A.     The Licensing Law ................................................................. 5

     B.     The Admitting Privileges Requirement ............................................ 7

     C.     Denial of WWHA's First License Application ...................................... 8

     D.     Administrative Appeal ............................................................ 11

     E.     WWHA's Second License Application .............................................. 13

     F.     The Department's Silence Concerning the Admitting Privileges Requirement .............................................................................. 14

III.    The Department's Application of the Challenged Laws to the South Bend Clinic Provides No Health or Safety Benefits to Abortion Patients ......................... 16

     A.     Medication Abortion May be Safely Provided in an Unlicensed Facility ............. 16

     B.     The Admitting Privileges Requirement Does Not Enhance the Safety of Medication Abortion ............................................................................ 16

IV.    People Seeking Abortion Care in Northern Indiana Are Harmed by the Department's Application of the Challenged Laws to the South Bend Clinic ................. 17

ARGUMENT ........................................................................................ 20

I.      Standard for Granting a Preliminary Injunction .................................... 20

II.     WWHA is Likely to Succeed on the Merits of Its Claims That the Department's Application of the Challenged Laws is Unconstitutional ............................. 21

i

A.    The Department's Application of the Licensing Law is Unconstitutionally Vague ...................................................................................21

B.    The Department's Application of the Challenged Laws Imposes an Undue Burden on Northern Indiana Residents Seeking Abortion Care ..........................24

    1.    The Department's Application of the Challenged Laws is Subject to the Undue Burden Standard ....................................................24

    2.    As Applied to the South Bend Clinic, the Licensing Law Fails to Serve the State's Interest in Patient Health and Safety ............................25

    3.    As Applied to the South Bend Clinic, the Admitting Privileges Requirement Fails to Serve the State's Interest in Patient Health and Safety ....................................................................30

    4.    The Department's Application of the Challenged Laws Imposes Undue Burdens on Northern Indiana Residents .........................................32

C.    The Department Denied Equal Protection of the Laws to WWHA and Its Prospective Patients ...........................................................................34

    1.    The Department's Application of the Licensing Law Treats WWHA and Its Patients Differently Than Others Who Are Similarly Situated ....................................................................35

    2.    The Licensing Law's Classifications Fail Heightened Scrutiny ...............36

    3.    The Department's Application of the Admitting Privileges Requirement Treats WWHA and Its Patients Differently Than Others Who Are Similarly Situated ..........................................................37

    4.    The Admitting Privileges Requirement's Classifications Fail Heightened Scrutiny .............................................................38

III.    The Other Requirements for a Preliminary Injunction Are Satisfied ...............................39

IV.    The Requirements for a TRO Are Satisfied ....................................................................40

CONCLUSION .............................................................................................................................41

CERTIFICATE OF SERVICE .......................................................................................................43

# TABLE OF AUTHORITIES

## CASES

*Aprimo, Inc. v. Executive Computing Pty Ltd.*,
   No. 1:07-CV-1419-LJM-TAB, 2007 WL 3286479 (S.D. Ind. Nov. 6, 2007) ................40

*Baskin v. Bogan*,
   12 F. Supp. 3d 1137 (S.D. Ind. 2014) ...........................................................................40

*City of Cleburne, Texas v. Cleburne Living Center*,
   473 U.S. 432 (1985) .......................................................................................................35

*Coates v. City of Cincinnati*,
   402 U.S. 611 (1971) .................................................................................................22, 23

*Colautti v. Franklin*,
   439 U.S. 379  (1979) ................................................................................................21, 22

*Comprehensive Health of Planned Parenthood of Great Plains v. Hawley*,
   903 F.3d 750 (8th Cir. 2018) ...................................................................................30 n.12

*Connally v. General Construction Co.*,
   269 U.S. 385 (1926) .......................................................................................................21

*Elrod v. Burns*,
   427 U.S. 347 (1976) .......................................................................................................39

*Gentile v. State Bar of Nevada*,
   501 U.S. 1030 (1991) .....................................................................................................23

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.*,
   549 F.3d 1079 (7th Cir. 2008) .......................................................................................39

*H.D. Michigan, LLC v. Hellenic Duty Free Shops S.A.*,
   694 F.3d 827 (7th Cir. 2012) .........................................................................................41

*Habitat Education Center v. U.S. Forest Service*,
   607 F.3d 453 (7th Cir. 2010) ....................................................................................21 n.9

*Hopkins v. Jegley*,
   267 F. Supp. 3d 1024 (E.D. Ark. 2017), *amended on other grounds*, No. 4:17-cv-
   404-KGB, 2017 WL 6946638 (E.D. Ark. Aug. 2, 2017), *and appeal filed*, No. 17-
   2879 (8th Cir. Aug. 28, 2017) ........................................................................................25

*Kolender v. Lawson*,
   461 U.S. 352 (1983) .............................................................................................21, 22, 23

iii

*Levas & Levas v. Village of Antioch, Illinois*,
    684 F.2d 446 (7th Cir. 1982) ..........................................................40

*Obergefell v. Hodges*,
    __ U.S. __, 135 S. Ct. 2584 (2015)...............................................34

*Planned Parenthood of Indiana & Kentucky v. Commissioner of the Indiana State Department of Health*,
    194 F. Supp. 3d 818 (S.D. Ind. 2016) ............................................40

*Planned Parenthood of Indiana & Kentucky v. Commissioner, Indiana State Department of Health*,
    258 F. Supp. 3d 929 (S.D. Ind. 2017) ............................................39

*Planned Parenthood of Indiana & Kentucky, Inc. v. Commissioner, Indiana State Department of Health*,
    64 F. Supp. 3d 1235 (S.D. Ind. 2014) ........................................5, 27

*Planned Parenthood of Indiana & Kentucky, Inc. v. Commissioner, Indiana State Department of Health*,
    896 F.3d 809 (7th Cir. 2018),
    *petition for cert. filed* (U.S. Feb. 4, 2019) (No. 18-1019)..........................................*passim*

*Planned Parenthood of Indiana & Kentucky, Inc. v. Commissioner, Indiana State Department of Health*,
    984 F. Supp. 2d 912 (S.D. Ind. 2013) ........................................5, 37

*Planned Parenthood of Indiana & Kentucky, Inc. v. Commissioner, Indiana State Department of Health*,
    No. 1:13-cv-01335-JMS-MJD, 2015 WL 4065441 (S.D. Ind. July 2, 2015) ...............5, 27

*Planned Parenthood of Kansas & Mid-Missouri, Inc. v. Drummond*,
    No. 07-4164-CV-C-ODS, 2007 WL 2463208 (W.D. Mo. Aug. 27, 2007) ......................29

*Planned Parenthood of Kansas & Mid-Missouri, Inc. v. Drummond*,
    No. 07-4164-CV-C-ODS, 2007 WL 2811407 (W.D. Mo. Sept. 24, 2007).....................30

*Planned Parenthood of Southeastern Pennsylvania v. Casey*,
    505 U.S. 833 (1992)....................................................24

*Planned Parenthood of Wisconsin, Inc. v. Schimel*,
    806 F.3d 908 (7th Cir. 2015) ..............................................*passim*

*Planned Parenthood of Wisconsin, Inc. v. Van Hollen*,
    738 F.3d 786 (7th Cir. 2013) ..........................................30 & n.13, 31, 33, 38

*Roe v. Wade*,
    410 U.S. 113 (1973)....................................................24

*SEC v. Cherif,*
    933 F.2d 403 (7th Cir. 1991) ........................................................................21

*Siner v. Kindred Hospital Ltd. Partnership,*
    51 N.E.3d 1184 (Ind. 2016) .........................................................................26

*Smith v. Goguen,*
    415 U.S. 566 (1974)..............................................................................21, 23

*United States v. Virginia,*
    518 U.S. 515 (1996)..............................................................................36, 38

*University of Texas v. Camenisch,*
    451 U.S. 390 (1981)..............................................................................20, 21

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982)......................................................................................21

*Vision Church v. Village of Long Grove,*
    468 F.3d 975 (7th Cir. 2006) .......................................................................35

*Whole Woman's Health v. Hellerstedt,*
    136 S. Ct. 2292 (2016)........................................................................ *passim*

*Women's Medical Center of Northwest Houston v. Bell,*
    248 F.3d 411 (5th Cir. 2001) .......................................................................22

## STATUTES

Ind. Code § 4-22-2-37.1 ............................................................................................7

Ind. Code § 12-15-5-1 .............................................................................................19

Ind. Code § 16-18-2-1.5 .................................................................................1, 6, 36

Ind. Code § 16-18-2-9.4 ............................................................................................7

Ind. Code § 16-21-2-2.5 ...................................................................................1, 2, 6

Ind. Code § 16-21-1-9 .........................................................................................1, 6

Ind. Code § 16-21-2-10 .........................................................................................1, 2

Ind. Code § 16-21-2-11 .............................................................................1, 6, 21 n.10

Ind. Code § 16-34-2-1.1 .....................................................................................18, 33

Ind. Code § 16-34-2-4.5 ........................................................................1, 7, 8, 37, 38

Ind. Code § 16-34-2-7 ................................................................................8

Ind. Code § 25-1-9-4 ..................................................................................8

Ind. Code § 25-1-9-9 ..................................................................................8

Ind. Code § 25-22.5-2-8 ...........................................................................25

Ind. Code § 25-22.5-3-1 ...........................................................................25

Ind. Code § 25-22.5-8-1 ...........................................................................26

Ind. Code § 27-8-13.4-2 ...........................................................................19

Ind. Code § 27-8-33-4 ..............................................................................19

Ind. Code § 27-13-7-7.5 ...........................................................................19

Pub. L. No. 92 (2015) .................................................................................6

Pub. L. No. 96 (2005) .................................................................................5

Pub. L. No. 98 (2014) .................................................................................7

Pub. L. No. 136 (2013) ...............................................................................5

Pub. L. No. 173 (2017) ...............................................................................6

Pub. L. No. 193 (2011) ...............................................................................7

Pub. L. No. 205 (2018) ...........................................................................7 n.5

Pub. L. No. 213 (2016) ...............................................................................7

## RULES & REGULATIONS

Fed. R. Civ. P. 65 ...........................................................................21 n.9, 40

Ind. R. Trial P. 26 .....................................................................................12

410 Ind. Admin. Code 26-2-1 .....................................................................2

410 Ind. Admin. Code 26-2-3 .....................................................................6

410 Ind. Admin. Code 26-2-4 ............................................................21 n.10

410 Ind. Admin. Code 26-2-5 ............................................................21 n.10

844 Ind. Admin. Code 5-5-13 ..........................................26 n.11, 37, 38 n.16

844 Ind. Admin. Code 5-5-19 to 5-5-22 ........................................................ 26 n.11, 37, 38 & n.16

Ind. Reg., tit. 410, Ind. State Dep't of Health, LSA Doc. No. 19-8(E) .............................................6

Ind. Red., tit. 410, Ind. State Dep't of Health, LSA Doc. No. 19-163.............................................7

**STATEMENT OF ISSUES**

(1)     Should the Court preliminarily enjoin Defendants from enforcing Indiana's abortion clinic licensing requirements against Whole Woman's Health Alliance ("WWHA") so that its South Bend clinic may begin providing medication abortions to northern Indiana residents after seventeen months of lying dormant?

(2)     Should the Court preliminarily enjoin Defendants from enforcing Indiana's admitting privileges requirement against WWHA if the Indiana State Department of Health concludes that WWHA's current agreement with a backup physician fails to satisfy the requirement?

Plaintiff Whole Woman's Health Alliance ("WWHA") respectfully submits this memorandum of law in support of its Motion for Preliminary Injunction and for Expedited Briefing and Hearing on that Motion, or for a Temporary Restraining Order ("TRO"). In a state where abortion care is increasingly scarce, Defendant Indiana State Department of Health ("Department") has prevented WWHA from providing medication abortions at its South Bend clinic ("South Bend Clinic") for more than seventeen months by applying Indiana's abortion clinic licensing requirements, Ind. Code §§ 16-18-2-1.5, 16-21-1-9, 16-21-2-2.5, 16-21-2-10, and 16-21-2-11 (collectively, the "Licensing Law"), in an unconstitutional manner. Each day that the South Bend Clinic remains unable to provide abortion care, northern Indiana residents are forced to travel long distances to reach an abortion provider, and mounting financial pressure threatens WWHA's ability to maintain possession of the facility. To end these irreparable harms, WWHA seeks preliminary relief from the Licensing Law. WWHA also seeks preliminary relief from the admitting privileges requirement set forth in Ind. Code § 16-34-2-4.5 (the "Admitting Privileges Requirement") to the extent that the Department's interpretation of it would prevent the South Bend Clinic from providing medication abortions.

Given the ongoing nature of the harms to WWHA and its prospective patients, WWHA seeks expedited briefing and hearing on its motion or, in the alternative, a TRO. Without the Court's intervention, the South Bend Clinic will remain unable to provide abortion care for the duration of this lawsuit, which is not scheduled for trial until August 17, 2020. Scheduling Order, Dkt. 42. Although WWHA ultimately seeks facial invalidation of the Licensing Law and Admitting Privileges Requirement (collectively, the "Challenged Laws"), as well as other Indiana abortion restrictions, so that it may provide comprehensive abortion care, the preliminary relief sought here is much narrower. At this stage of the litigation, WWHA seeks only as-applied

relief from the Challenged Laws so that it may provide medication abortions at the South Bend Clinic pending entry of final judgment.

## STATEMENT OF FACTS

I.   **WWHA Seeks to Fill the Unmet Need for an Abortion Provider in South Bend**.

    A.   *Indiana's Abortion Access Crisis*.

Abortion care is increasingly scarce in Indiana. Unlike many other states, Indiana generally prohibits physicians from providing abortions outside of a licensed abortion clinic.[1] *See* Ind. Code § 16-21-2-10; 410 Ind. Admin. Code 26-2-1(a); *see also* Ind. Code § 16-21-2-2.5(b)(1). Since 2011, the state has lost nearly half of these clinics.[2] *See* Defs.' Resps. to Pls.' First Set of Interrogs. ("Defs.' Resps. to Interrogs.") at 5. There are now only six abortion clinics for about 1.3 million women of reproductive age.[3] *Id.*

Abortion care is particularly limited in northern Indiana. There are only two abortion clinics north of Indianapolis, an area including Gary, South Bend, Elkhart, and Fort Wayne. *Id.* One facility is in Merrillville, in the northwest corner of the state. *Id.* The other is in Lafayette, about sixty miles northwest of Indianapolis.[4] *Id.*

---

[1]   *See* Bonnie S. Jones, Sara Daniel, & Lindsay K. Cloud, *State Law Approaches to Facility Regulation of Abortion and Other Office Interventions*, 108 Am. J. Pub. Health L. & Ethics 486, 488-89 (2018). Physicians may also provide abortions at acute care hospitals. "Of the 7,778 procedures performed in [Indiana]" in 2017, however, "99.40% were performed at abortion clinics and 0.60% at acute care hospitals." Indiana State Department of Health, Terminated Pregnancy Report 2017 (2018) ("ISDH 2017 Report") at 16, https://www.in.gov/isdh/files/2017%20Indiana%20Terminated%20Pregnancy%20Report.pdf.

[2]   *See* Rachel K. Jones & Jenna Jerman, *Abortion Incidence and Service Availability in the United States, 2014*, 49 Persp.on Sexual & Reprod. Health 17, 23 (2017), available at https://doi.org/10.1363/psrh.12015.

[3]   ISDH 2017 Report at 2, 7 (estimation based on data for 2016, the most recent year for which data was available).

[4]   All distances are estimates calculated using Google Maps.

**B.**     *WWHA's Plans to Open the South Bend Clinic*.

WWHA is a nonprofit organization with a mission to provide abortion care in underserved communities and shift the stigma around abortion in our culture. Decl. of Amy Hagstrom Miller ("Hagstrom Miller Decl.") ¶ 3; Decl. of Beverly Whipple ("Whipple Decl.") ¶¶ 1, 10. It currently operates abortion clinics in Austin, Texas, and Charlottesville, Virginia. Hagstrom Miller Decl. ¶¶ 11-13; Whipple Decl. ¶ 11. WWHA has significant expertise in providing abortion care. Its Board of Directors includes several highly-qualified experts: Dr. Daniel Grossman is a Board-certified obstetrician and gynecologist ("ob-gyn") and Fellow of the American College of Obstetricians and Gynecologists ("ACOG") who serves as Director of a leading research institute focused on reproductive health standards and provides abortion care at San Francisco General Hospital. Hagstrom Miller Decl. ¶ 8. Dr. Carrie Ann Terrell is a Board-certified ob-gyn who serves as Director of Obstetrics, Gynecology, Midwifery & Family Planning at the University of Minnesota Medical School and provides abortion care at Whole Woman's Health of the Twin Cities, LLC. *Id.* ¶ 9. Beverly Whipple founded Feminist Women's Health Center, a nonprofit organization that operates abortion clinics throughout Washington State, and served as its Executive Director for thirty-five years. Whipple Decl. ¶ 3. Ms. Whipple has also served on the Board of Directors of the National Abortion Federation ("NAF"), the largest professional association of abortion providers in North America, and California Feminist Women's Health Centers, which operates a network of abortion clinics in northern California. *Id.* ¶ 4. Ms. Hagstrom Miller, the President of WWHA's Board of Directors, has thirty years of experience in abortion clinic operations and management. Hagstrom Miller Decl. ¶ 6.

Each of the abortion clinics currently operated by WWHA is state-licensed, and each is a member of NAF, which requires compliance with NAF's Clinical Policy Guidelines. *Id.* ¶¶ 12-14; Whipple Decl. ¶ 11. The Clinical Policy Guidelines are evidence-based, clinical standards

developed to promote the provision of quality, patient-centered abortion care. Hagstrom Miller Decl. ¶ 14; Whipple Decl. ¶ 11. Each of WWHA's clinics has an excellent safety record. Hagstrom Miller Decl. ¶ 15.

WWHA decided to open the South Bend Clinic following outreach from a coalition of local community members, including Pro-Choice South Bend, an organization seeking to increase access to reproductive health care in South Bend. Hagstrom Miller Decl. ¶ 31; Whipple Decl. ¶ 12; Decl. of April Lidinsky ("Lidinsky Decl.") ¶¶ 4, 13. The coalition knew of WWHA from its work in other states and urged WWHA to fill the urgent need for an abortion provider in the region. Lidinsky Decl. ¶¶ 13, 17. WWHA invested over a year in finding a facility to house the South Bend Clinic, retrofitting it to make it a welcoming environment for patients, hiring staff, and purchasing equipment. Hagstrom Miller Decl. ¶ 33.

WWHA recruited Dr. Jeffrey Glazer to serve as the Medical Director of the South Bend Clinic. Hagstrom Miller Decl. ¶ 34; Glazer Decl. ¶ 10. Dr. Glazer is a Board-certified ob-gyn licensed to practice medicine in Indiana, Kentucky, and Ohio. *Id.* ¶ 1. He has more than three decades of experience as an ob-gyn and has provided abortion care in Indiana for more than five years. *Id.* ¶¶ 2, 5. He currently provides both surgical and medication abortion at a licensed abortion clinic in Indianapolis. *Id.* The Department has never made adverse findings concerning Dr. Glazer's ability to provide safe abortion care; nor has any other state health department. *Id.* ¶ 8. Likewise, the Medical Licensing Board of Indiana has never taken disciplinary action against Dr. Glazer; nor has any other state medical board. *Id.* ¶ 9.

II.    **The Department's Application of the Challenged Laws Is Preventing the South Bend Clinic from Providing Abortion Care**.

A.    *The Licensing Law*.

Indiana first enacted a licensing requirement for abortion clinics in 2005. *See* Pub. L. No. 96, §§ 2, 5-10, 14 (2005) (codified in relevant part at Ind. Code §§ 16-18-2-1.5, 16-21-2-1(a), 16-21-2-2(4), 16-21-2-2.5, 16-21-2-10, 16-21-2-11, 16-21-2-14). The requirement applied only to facilities providing surgical abortion, not facilities solely providing medication abortion. *See id.* § 2. In 2013, Indiana extended the licensing requirement to certain facilities providing medication abortion by amending the definition of "abortion clinic." *See* Pub. L. No. 136, §§ 2, 4 (2013) (codified in relevant part at Ind. Code §§ 16-18-2-1.5, 16-21-2-2.5). The amended requirement excluded "physician's office[s]" from the definition of abortion clinic "as long as . . . abortion inducing drugs [were] not the primarily dispensed or prescribed drug at the physician's office." Pub. L. No. 136, § 2 (2013) (codified in relevant part at Ind. Code § 16-18-2-1.5(b)(3)(B)). In November 2013, this Court preliminarily enjoined enforcement of the licensing requirement against a clinic in Lafayette that offered medication abortion, but not surgical abortion, after the Department denied the clinic a license. *See Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 984 F. Supp. 2d 912, 916, 931 (S.D. Ind. 2013). The Court entered a permanent injunction after holding that the differing treatment of abortion clinics and physician's offices violated the Equal Protection Clause. *See Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 64 F. Supp. 3d 1235, 1260 (S.D. Ind. 2014) (granting partial summary judgment to the plaintiff); *see also Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, No. 1:13-cv-01335-JMS-MJD, 2015 WL 4065441, at *2 (S.D. Ind. July 2, 2015) (noting subsequent entry of a permanent injunction).

In 2015, Indiana enacted the current Licensing Law. Pub. L. No. 92, §§ 1, 3 (2015) (codified in relevant part at Ind. Code §§ 16-18-2-1.5, 16-21-1-9, 16-21-2-2.5). The Licensing Law defines "abortion clinic" as "[a] health care provider . . . that: (1) performs surgical abortion procedures; or (2) . . . provides an abortion inducing drug for the purpose of inducing an abortion." Ind. Code § 16-18-2-1.5(a). It excludes from that definition any "health care provider that provides, prescribes, administers, or dispenses an abortion inducing drug to fewer than five (5) patients per year for the purposes of inducing an abortion." Ind. Code § 16-18-2-1.5(b)(3).

The Licensing Law makes it a crime to operate an abortion clinic without a license. *See* Ind. Code § 16-21-2-2.5(b). To obtain an abortion clinic license, "[a]n applicant must submit an application for a license on a form prepared by the [Department] showing that: (1) the applicant is of reputable and responsible character;" and "(2) the applicant is able to comply with the minimum standards for . . . an abortion clinic . . . and with rules adopted under this chapter." Ind. Code § 16-21-2-11(a); *see also* 410 Ind. Admin. Code 26-2-3. The minimum standards and rules in force prior to January 10, 2019, are set forth at Article 26 of Title 410 of the Indiana Administrative Code. "The state health commissioner may, for good cause shown, waive a rule" adopted by the Department. Ind. Code § 16-21-1-9(a).

A 2017 statute directed the Department, among other things, to "adopt separate rules . . . for abortion clinics that perform abortions only through the provision of an abortion inducing drug" and "establish procedures regarding the issuance of licenses to abortion clinics that . . . perform abortions only through the provision of an abortion inducing drug" by no later than January 1, 2019. Pub. L. No. 173, § 2 (2017) (codified in relevant part at Ind. Code § 16-21-2-2.5(c)(2), (c)(3)(B)). The Department missed this deadline. On or about January 16, 2019, it posted temporary "emergency" rules with an effective date of January 10, 2019. Ind. Reg., tit.

410, Ind. State Dep't of Health, LSA Doc. No. 19-8(E). These rules will expire on April 10, 2019. *See* Ind. Code § 4-22-2-37.1(g). On March 20, 2019, the Department posted a Notice of Intent to adopt "a new rule regulating abortion clinics performing drug induced abortions." Ind. Reg., tit. 410, Ind. State Dep't of Health, LSA Doc. No. 19-163.[5]

### B.     *The Admitting Privileges Requirement*.

Indiana's first admitting privileges requirement for abortion providers became effective on July 1, 2011. *See* Pub. L. No. 193, § 14 (2011). The requirement was amended in 2014 and 2016. *See* Pub. L. No. 98, § 3 (2014); Pub. L. No. 213, § 15 (2016). As amended, the Admitting Privileges Requirement provides that:

> A physician may not perform an abortion unless the physician:
>
> (1) has admitting privileges in writing at a hospital located in the county where abortions are provided or in a contiguous county; or
>
> (2) has entered into a written agreement with a physician who has written admitting privileges at a hospital in the county or contiguous county concerning the management of possible complications of the services provided.

Ind. Code § 16-34-2-4.5(a). The written agreement described in subsection (2) must be "renewed annually." *Id.* The Admitting Privileges Requirement further provides that an "abortion clinic" must maintain a copy of the abortion provider's or backup physician's admitting privileges at the clinic, Ind. Code § 16-34-2-4.5(c)(1), and must submit a copy of those privileges to the Department "as part of the abortion clinic's licensure," Ind. Code § 16-34-2-4.5(c)(2). The

---

[5]     In 2018, Indiana adopted a definition of "affiliate" for use in the abortion clinic licensing context for the first time. *See* Pub. L. No. 205, § 3 (2018) (codified at Ind. Code § 16-18-2-9.4). Effective July 1, 2018, this term means "any person who directly or indirectly controls, is controlled by, or is under common control of another person." *See* Ind. Code § 16-18-2-9.4. Indiana also adopted a requirement that abortion clinic license applicants provide the following information in connection with their applications: (1) "whether the applicant, or an owner or affiliate of the applicant, operated an abortion clinic that was closed as a direct result of patient health and safety concerns"; (2) "whether a principal or clinic staff member was convicted of a felony"; and (3) "whether a principal or clinic staff member was ever employed by a facility owned or operated by the applicant that closed as a result of administrative or legal action." Pub. L. No. 205, § 6 (2018) (codified in relevant part at Ind. Code § 16-21-2-11(d)).

Department must "verify the validity of the admitting privileges document." *Id.* Additionally, on an annual basis, the Department must provide a copy of the abortion provider's admitting privileges or written agreement with a backup physician to "(1) each hospital located in the county in which the hospital granting the admitting privileges . . . is located; and (2) each hospital located in a [contiguous] county." Ind. Code § 16-34-2-4.5(d). Performing an abortion absent compliance with the Admitting Privileges Requirement is a felony, *see* Ind. Code § 16-34-2-7(a), and grounds for professional discipline, including revocation of a physician's license to practice medicine. *See* Ind. Code §§ 25-1-9-4(a)(3), (13), 25-1-9-9(a).

### C.     *Denial of WWHA's First License Application*.

WWHA applied for a license to provide medication abortions at the South Bend Clinic on August 11, 2017, and submitted a revised application on October 6, 2017, based on feedback from the Department. *See* Hagstrom Miller Decl. ¶ 37; WWHA_RR00001353-62. On October 27, 2017, the Department asked WWHA to provide additional information, including "a complete ownership structure or description pertaining to the applicant, including, but not limited to, any individuals and/or any parent, affiliate or subsidiary organizations." WWHA_RR00001363-65. The Department also requested a "list of all the abortion and health care facilities currently operated by [the] applicant, including its parent, affiliate or subsidiary organizations." WWHA_RR00001363. The Department did not define "ownership structure" or "affiliate." WWHA_RR00001363-65, 1134.

On December 8, 2017, WWHA responded to the Department's requests, explaining that, as a nonprofit organization, it has no owners or members; instead, all governing authority is vested in its Board of Directors. WWHA_RR00001367.  WWHA identified the abortion clinics it owns in Austin, Texas, and Charlottesville, Virginia, and disclosed that it contracts with Whole Woman's Health, LLC (the "Management Company"), a healthcare management company that

specializes in managing abortion clinics, for certain management services.[6] *Id.*; *see* Hagstrom Miller Decl. ¶¶ 16, 26-27, 45. It also disclosed that the Management Company provides similar services to numerous abortion clinics across the country. WWHA_RR00001367. In addition, WWHA provided the Department copies of its Certificate of Formation, Bylaws, and the Management Services Agreement it entered into with the Management Company concerning the South Bend Clinic. WWHA_RR00001373-1400; *see* WWHA_RR00001371.

On January 3, 2018, the Department denied WWHA's application on the ground that WWHA lacked "reputable and responsible character." WWHA_RR00001401-02. The Department's rationale evolved over time, but it ultimately argued that WWHA should have identified the non-WWHA clinics served by the Management Company as its affiliates. WWHA_RR00001538-39; *see* WWHA_RR00001400.

Trent Fox, a political appointee, oversaw the evaluation of WWHA's application rather than the career staff who typically process licensure applications. *See* WWHA_RR00001122. There are no written procedures or guidelines for evaluating applications for a license to operate an abortion clinic in Indiana. WWHA_RR00001456–58. At a hearing following the Department's denial of WWHA's first license application, Mr. Fox admitted that the Department scrutinized WWHA's submission more than other facility license applications because WWHA was "a new entity coming into the state." WWHA_RR00001130-31.

Mr. Fox testified that two things concerned him about WWHA's application. First, the designated Clinic Administrator had once worked at an Indiana abortion clinic where a doctor

---

[6]   The Management Company is part of Whole Woman's Health, a consortium of limited liability companies incorporated under Texas law. Hagstrom Miller Decl. ¶ 16. In addition to the Management Company, the consortium includes a holding company, a property management company, and a network of abortion clinics. *Id.* Amy Hagstrom Miller, the President and CEO of WWHA is also the President and CEO of Whole Woman's Health. *Id.* ¶¶ 1-2. Nevertheless, the two organizations are legally and financially independent and conduct business at arm's length. *Id.* ¶ 24; Whipple Decl. ¶¶ 15-17.

had been disciplined by the Indiana Medical Licensing Board.[7] WWHA_RR00001124. But the Department did not take any steps to follow up on this concern, *see* Hagstrom Miller Decl. ¶ 43, and it did not cite this issue in the Notice of License Application Denial that it sent WWHA, *see* WWHA_RR00001401-02.

Second, Mr. Fox testified that the Governor and Department received unsolicited letters from three state legislators, each with a reputation for being staunchly anti-abortion, opposing WWHA's license application and making defamatory allegations about the health and safety record of Whole Woman's Health. WWHA_RR00001124-27; *see* WWHA_RR00001431-34; Hagstrom Miller Decl. ¶ 44. Once again, the Department did not take any reasonable steps to investigate the alleged concern raised by these letters: it did not ask the legislators about the basis for their allegations, and it did not notify WWHA about the letters and provide it with an opportunity to respond. *See* WWHA_RR00001125-26, 1132, 1248; Hagstrom Miller Decl. ¶ 44. The Notice of License Application Denial did not mention the legislators' letters. WWHA_RR00001401-02.

Apparently, the Department was confused about the relationship between WWHA and Whole Woman's Health, the organization referenced in the legislators' letters. It assumed that these entities were part of the same corporate umbrella. *See* WWHA_RR00001124-27. When WWHA responded to the Department's question about its ownership structure by identifying Whole Woman's Health, LLC, as its management company, rather than identifying it and the other Whole Woman's Health companies as its affiliates, the Department assumed that it was

---

[7]   Following the denial of WWHA's license application, WWHA could no longer afford to pay the Clinic Administrator's salary and had to let her go. Hagstrom Miller Decl. ¶ 35. She subsequently accepted employment at another reproductive health organization. *Id.* WWHA has identified another person who is qualified and willing to serve as Clinic Administrator once the South Bend Clinic is able to provide abortion care. *Id.*

trying to hide something. *See* WWHA_RR00001126-30. But that assumption was incorrect. WWHA did not identify Whole Woman's Health or any of its constituent companies as part of its ownership structure because they are *not* part of its ownership structure; rather, they are legally and financially independent organizations. *See* Hagstrom Miller Decl. ¶ 45; Whipple Decl. ¶¶ 15-16. WWHA had no reason to know that the Department's question about its ownership structure was an attempt to solicit information about WWHA's relationship with Whole Woman's Health. Had the Department simply asked WWHA to explain its relationship with Whole Woman's Health in more detail, WWHA would have done so. *See* Hagstrom Miller Decl. ¶ 47.

WWHA has no reason to distance itself from Whole Woman's Health. The latter enjoys an excellent reputation as a provider of high-quality abortion care. *Id.* ¶ 46. Notably, Whole Woman's Health served as a plaintiff in numerous federal court challenges to restrictive abortion laws that unduly burden patients' access to care. *Id.* ¶ 21. In so doing, it has voluntarily exposed its clinics to broad civil discovery and judicial scrutiny. *Id.* Whole Woman's Health served as lead plaintiff in a lawsuit that went all the way to the Supreme Court in 2016. *Id.* ¶ 22. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2310-18 (2016) (holding that a pair of Texas abortion restrictions imposed an undue burden on abortion access). That case brought tremendous publicity to Whole Woman's Health and shined a spotlight on its clinics. Hagstrom Miller Decl. ¶ 23. The organization's willing participation in high-profile litigation is a clear indication that it has nothing to hide.

### D.   *Administrative Appeal*.

On January 22, 2018, WWHA appealed the Department's denial of its license application following the procedures outlined in the Notice of License Application Denial. *See* WWHA_RR00001401-02, 1435–39. Indiana permits liberal discovery in such proceedings, akin

to Federal Rule of Civil Procedure 26. *See* Ind. R. Trial P. 26. The Department served numerous interrogatories and document requests on WWHA, which answered the interrogatories to the extent required by Indiana law and produced over 1,500 hundred pages of responsive documents. The Department also sent seven separate document subpoenas to Whole Woman's Health. Even though the subpoenas were procedurally deficient and unenforceable, Whole Woman's Health voluntarily produced over 130 pages of responsive documents.

On August 22-23, 2018, an administrative law judge ("ALJ") for the Department held a hearing at which each party presented evidence and witnesses. WWHA_RR00001613. On September 13, 2018, the ALJ issued Findings of Fact, Conclusions of Law, and a Recommended Order ("Recommended Order") recommending that the Department grant WWHA's license application. WWHA_RR00001613-20. The ALJ concluded that "WWHA demonstrated by a preponderance of the evidence that their responses provided to the [Department's] request for additional information on October 27, 2017 was [sic] complete and accurate." WWHA_RR00001619. The ALJ further concluded that the Department "failed to show by a preponderance of the evidence that WWHA lacks a reputable and responsible character and should be denied a license for the South Bend clinic." WWHA_RR00001620.

The Department then appealed to a panel of its Executive Board. WWHA_RR00001114-15. On December 18, 2018, the panel reversed the Recommended Order by a vote of two to one. WWHA_RR00001602-12; *see* ISDH003057. The panel majority concluded that WWHA and Whole Woman's Health are "affiliates" under Indiana law, despite acknowledging that "'[a]ffiliate' and 'affiliated' are not defined in Indiana's abortion laws." WWHA_RR0001609-10. The panel majority did not make any findings or conclusions concerning WWHA's ability to safely provide medication abortion at the South Bend Clinic. *See* WWHA_RR00001602-12.

12

E. **WWHA's Second License Application**.

On January 16, 2019, WWHA accepted the Department's invitation "to reapply [for an abortion clinic license] at any time." ISDH003047-48; Hagstrom Miller Decl. ¶ 51. WWHA used the "Application for License to Operate an Abortion Clinic" form then available on the Department's website. Hagstrom Miller Decl. ¶ 51. Additionally, it provided copies of all inspection reports and plans of correction concerning its Austin and Charlottesville clinics. *Id.* WWHA also provided the names and addresses of all clinics owned by Whole Woman's Health, while maintaining that they are legally and financially independent of WWHA. *Id.*

On February 25, 2019, the Department notified WWHA that it would not evaluate WWHA's application further unless, among other things, WWHA resubmitted the information on a newly-available form and satisfied a series of broad document demands concerning the Whole Woman's Health clinics by March 15, 2019. *Id.* ¶ 52 & Ex. A. For example, one of the demands states: "Provide copies of all forms, correspondence, reports, and other documents that *concern, mention, or relate to* any application(s) by the affiliate for licensure of or other permission to operate an abortion clinic at any time since and including January 1, 2014." *Id.* Another demand requires all "submissions, correspondence and other documents that concern, mention, or relate" to any "administrative, civil or criminal court action involving the affiliate at any time since and including January 1, 2014" *Id.* On information and belief, the Department has never requested anything approaching this volume or breadth of documentation from another abortion clinic applicant. The Department did not explain why it needs these documents now, especially in light of the discovery and testimony it obtained in connection with the administrative appeal. Hagstrom Miller Decl. ¶ 52.

On March 15, 2019, WWHA resubmitted its application using the new form and provided a written declaration from Amy Hagstrom Miller attesting that no Whole Woman's

Health clinic has ever been denied a state license and, except for a quickly corrected error by the Texas State Department of Health Services ("Texas Department"), no Whole Woman's Health clinic has ever had its license suspended.[8] *See id.* ¶¶ 53-58 & Ex. B. WWHA provided documents concerning the Texas incident, but was unable to fully satisfy the Department's document demands, which would have required the production of hundreds of thousands of pages. *See id.* Ex. B. To date, WWHA has received no further response from the Department.

### F.    The Department's Silence Concerning the Admitting Privileges Requirement.

It would be difficult, if not impossible, for Dr. Glazer to obtain admitting privileges in the South Bend region. *See* Glazer Decl. ¶¶ 19-20; Hagstrom Miller Decl. ¶¶ 61-62; *infra* at 30 n.13. Accordingly, WWHA searched for a backup physician to satisfy the Admitting Privileges Requirement. *See* Hagstrom Miller Decl. ¶¶ 63-64. During an eight-month period, it reached out to numerous physicians in the South Bend area. Hagstrom Miller Decl. ¶ 64; *see also* Stecker Decl. ¶¶ 12-13. Many were supportive and eager to have an abortion provider in the underserved region. Stecker Decl. ¶ 14; Hagstrom Miller Decl. ¶ 65. But they ultimately declined, largely out of fear that intense hostility toward abortion in northern Indiana would lead to harassment and discrimination if they formed a relationship with WWHA that became publicly known. Stecker Decl. ¶¶ 13, 15-18; Hagstrom Miller Decl. ¶ 65.

In December 2017, "Dr. Poe," a local family medicine physician, agreed to seek admitting privileges at a hospital in South Bend where she was on staff. Hagstrom Miller ¶¶ 65-66. Dr. Poe ultimately obtained admitting privileges through the hospitalist group (a group of

---

[8]    On November 29, 2006, the Texas Department issued an Emergency Order revoking the license of a WWH clinic in Beaumont, Texas, based on erroneous inspection findings.  After Whole Woman's Health notified the Texas Department of the errors, it immediately lifted the revocation order, without a formal hearing or consent decree. That happened on December 7, 2006, eight days after the revocation order had been issued. Hagstrom Miller Decl. ¶ 57. Apart from that incident, no WWHA or Whole Woman's Health clinic has ever had a state license suspended or revoked.  *Id.* ¶ 56.

physicians who practice exclusively at the hospital) at the hospital, rather than through the hospital directly. *Id.* ¶ 66. Dr. Poe's privileges ensure that any patient for whom she is responsible will be admitted to the hospital when medically appropriate. *Id.* Accordingly, her name appears on a roster of physicians in the hospital's emergency room signifying that her patients should be admitted. *Id.* Dr. Poe entered into a written backup agreement with Dr. Glazer, and renewed the agreement after a year. *Id.* ¶ 68 & Ex. B. WWHA provided the Department with copies of those agreements as part of both license applications. *Id.* The Department never raised any concerns about the nature of Dr. Poe's privileges. *Id.*

When WWHA's attorneys began work on the instant motion, WWHA became aware that the Admitting Privileges Requirement may be subject to different interpretations, and that Dr. Poe's admitting privileges, which are through a hospital group rather than through the hospital directly, may not satisfy the Department's interpretation of the Requirement. *Id.* ¶ 68. On March 18, 2019, WWHA's attorneys requested confirmation from the Department that Dr. Poe's admitting privileges satisfy the Department's interpretation of the Admitting Privileges Requirement. *Id.* ¶ 69. To date, WWHA has received no response.

Should the Department take the position that Dr. Poe's admitting privileges do not satisfy the Admitting Privileges Requirement, it could take months—or longer—for WWHA to find another backup physician. *Id.* ¶ 71. Given the hardship faced by northern Indiana residents every day that the South Bend Clinic remains closed, WWHA seeks to avoid further delay in opening the clinic. *Id.* ¶ 72. It therefore asks the Court to preliminarily enjoin Defendants from enforcing the Admitting Privileges Requirement against it until such time as it is able to find a backup physician who satisfies the Department's interpretation of the law. Should the Department conclude that Dr. Glazer's agreement with Dr. Poe suffices, WWHA will withdraw this request.

III.   **The Department's Application of the Challenged Laws to the South Bend Clinic Provides No Health or Safety Benefits to Abortion Patients**.

   A.   *Medication Abortion May be Safely Provided in an Unlicensed Facility*.

Like abortion overall, medication abortion is extremely safe. *See* Cowett Decl. ¶¶ 8–11. *See also Planned Parenthood of Wisc., Inc. v. Schimel*, 806 F.3d 908, 912-13 (7th Cir. 2015) ("[C]omplications from an abortion are both rare and rarely dangerous . . . . For medical abortion (abortion by pill), the rate of complications is only 1 in 153."). In fact, medication abortion entails a much lower risk of complication than many other forms of medical care commonly provided in outpatient settings. *See* Cowett Decl. ¶ 9; *Whole Woman's Health*, 136 S. Ct. at 2315. Requiring that the medications used to induce a medication abortion be dispensed at a licensed facility does not provide any added safety benefit to patients. *See* Cowett Decl. ¶¶ 20-23, 37; *see also* Glazer Decl. ¶ 14; Hagstrom Miller Decl. ¶ 79. One reason why is that the medications take time to exert their effects; therefore, the abortion inevitably occurs after the patient has left the facility. *See* Cowett Decl. ¶ 18. *Accord Whole Woman's Health*, 136 S. Ct. at 2315. Additionally, medication abortion does not entail the administration of anesthesia. Cowett Decl. ¶ 23. The same regimen of medications used to induce a medication abortion is also commonly used to treat incomplete miscarriages in doctor's offices that are not subject to licensing requirements. *Id.* ¶ 22.

   B.   *The Admitting Privileges Requirement Does Not Enhance the Safety of Medication Abortion*.

Because medication abortion is exceptionally safe, *supra* at 16, with an extremely low rate of complications, *id.*, it rarely requires a visit to an emergency room, let alone admission to a hospital. Cowett Decl. ¶ 28. In fact, the Department is unable to identify a death or complication requiring hospitalization caused by any type of abortion in Indiana for at least the past decade. *Infra* at 27. The time it takes for the medications to exert their effects means that any

16

complications will arise after the patient has left the abortion clinic. Cowett Decl. ¶ 29. *See Whole Woman's Health*, 136 S. Ct. at 2315. In the rare instance that a patient needs treatment at a hospital, it would be in the patient's best interest to seek treatment at the nearest hospital, even if her abortion provider or a backup physician has admitting privileges at a hospital farther away. Cowett Decl. ¶ 29.

Neither admitting privileges nor a backup agreement is needed to ensure that an abortion patient will receive good care at a hospital. Hospital physicians are qualified to evaluate and treat the possible complications of a medication abortion because the procedures for doing so mirror the procedures for managing a miscarriage, which both emergency room physicians and staff physicians practicing ob/gyn routinely encounter. *Id.* ¶ 31. Continuity of care can be achieved through a telephone call between the abortion provider and hospital physician, making "any benefit of admitting privileges in terms of continuity of care . . . incrementally small." *Schimel*, 806 F.3d at 913 (internal quotations marks omitted). *See* Cowett Decl. ¶ 32.

## IV.   People Seeking Abortion Care in Northern Indiana Are Harmed by the Department's Application of the Challenged Laws to the South Bend Clinic.

Because the Department's application of the Challenged Laws has blocked the South Bend Clinic from opening, people in northern Indiana are forced to travel much longer distances than they would otherwise need to in order to reach an abortion provider. These longer travel distances impose a variety of burdens on people seeking abortion care.

There is a large population of college students in the South Bend area. Hagstrom Miller Decl. ¶ 32; *see* Lidinsky Decl. ¶ 6; Declaration of Jane Doe ("Doe Decl.") ¶¶ 1, 13. Many do not have cars or much disposable income. Hagstrom Miller Decl. ¶ 32; *see* Lidinsky Decl. ¶¶ 6-8, 12; Doe Decl. ¶¶ 7, 13-14. Public and commercial transportation options are limited in the region; for example, there is no train or direct bus service between South Bend and Merrillville.

*See* Stecker Decl. ¶ 25; Doe Decl. ¶ 7.  Even when public or commercial transportation is available, patients face logistical burdens. Buses and trains run on limited schedules; fares can be costly relative to disposable income; and poor road conditions or track work sometimes cause delays or cancellations. *See* Stecker Decl. ¶ 26; Doe Decl. ¶ 8. Because of limited bus and train schedules, a patient with an early morning appointment may have to travel the day before and stay overnight. *See* Stecker Decl. ¶ 26; Doe Decl. ¶ 9. Likewise, someone with a late afternoon appointment may not be able to return until the next day.

People with access to cars also face burdens from long-distance travel. In the winter, icy roads, snow, high winds, and below-freezing temperatures can double the amount of time it takes to complete a drive. *See* Stecker Decl. ¶ 23. These conditions also increase the risk of a break-down or accident. *See id.* ¶¶ 23-24. It is not uncommon for northern Indiana residents to miss healthcare appointments because of winter road conditions. *See id.* ¶ 22.

For abortion patients, travel burdens are exacerbated by an Indiana law requiring them to meet in person with the physician who is going to perform the abortion or a referring physician at least eighteen hours before their abortion. *See* Ind. Code § 16-34-2-1.1(a). The law forces many patients to make two round trips to a clinic or stay near the clinic overnight. Stecker Decl. ¶ 29; *see* Doe Decl. ¶ 7; Lidinsky Decl. ¶ 9. Patients who must stay overnight have to secure lodging. This creates additional logistical challenges and often adds cost. *See* Lidinsky Decl. ¶¶ 12, 14; Stecker ¶ 30; Doe Decl. ¶ 11. The challenges that abortion patients face in travelling within Indiana lead a significant number of them to obtain abortion care out of state. *See* Doe Decl. ¶¶ 7-8; Cowett Decl. ¶ 35; Lidinsky Decl. ¶¶ 9, 11, 14.  Many go to Chicago because it is accessible by bus or train.  *See* Doe Decl. ¶ 8; Cowett Decl. ¶ 35; Lidinsky Decl. ¶ 9.

18

The time it takes to make the needed travel arrangements may push residents of northern Indiana past the gestational limit for obtaining a medication abortion, which is more suitable than surgical abortion for some patients. *See* Cowett Decl. ¶¶ 12, 17. Moreover, the price of abortion increases with gestational age, and Indiana prohibits public and private health insurance from covering abortion in most circumstances, requiring patients to pay for services out of pocket. *Id.* ¶ 12; *see* Doe Decl. ¶ 14. *See also* Ind. Code §§ 12-15-5-1(17), 27-8-13.4-2, 27-8-33-4, 27-13-7-7.5. Although abortion is one of the safest forms of healthcare provided in the United States, its medical risks also increase with gestational age. Cowett Decl. ¶ 12.

Having to arrange for transportation and lodging to obtain an abortion is a hardship for residents of northern Indiana for whom unexpected expenses are difficult to manage. *See* Doe Decl. ¶ 14; Lidinsky Decl. ¶¶ 7-8 (explaining that limited abortion access causes "a crisis" for many students). These consequences are most severe for people without any income, those who live paycheck to paycheck, and students, all of whom are less likely than others to have access to a car, money, or anyone to borrow from, potentially forcing them to continue an unwanted pregnancy. *See* Stecker Decl. ¶ 24; Lidinsky Decl. ¶¶ 6-9, 12; Doe Decl. ¶¶ 7, 13-14; Hagstrom Miller Decl. ¶ 32.

Further, longer time away from home requires patients to ask for leave from work or school. *See* Stecker Decl. ¶ 28; Lidinsky Decl. ¶¶ 8-9; Doe Decl. ¶ 12. Some have to choose between continuing an unwanted pregnancy and losing hourly wages, missing an exam, or forgoing important professional opportunities. *See id.* Some must find child care or bring their children with them on a long trip. *See* Stecker Decl. ¶ 27; Lidinsky Decl. ¶ 9. Additionally, there is a greater chance in these circumstances that an abusive partner will learn of the pregnancy and abortion. *See* Lidinsky Decl. ¶ 10. As with struggles to obtain transportation and lodging, these

hardships have the greatest impact on the most vulnerable patients, and exacerbate stress and anxiety relating to an unwanted pregnancy. *See id.* ¶¶ 7-9, 12; Stecker Decl. ¶ 30; Doe Decl. ¶ 15.

Having to seek an abortion far from their home, sometimes in another state, also makes some northern Indiana residents feel like "criminals." Lidinsky Decl. ¶¶ 10-11. The lack of abortion care in a nearby community can signal that their decision is wrong or unwelcome. *See id.* ¶¶ 10-11, 15; Doe Decl. ¶¶ 17-18. It also tends to deprive patients of the support of family and friends, making abortion a solitary experience. *See* Doe Decl. ¶ 11; Stecker Decl. ¶ 28. The need to concoct an explanation for a noticeable absence to an employer or abusive partner adds secrecy to the process of ending a pregnancy. *See* Lidinsky Decl. ¶ 10.

## ARGUMENT

### I.    Standard for Granting a Preliminary Injunction.

"To obtain a preliminary injunction, [the moving party] must establish that it has some likelihood of success on the merits; that it has no adequate remedy at law; that without relief it will suffer irreparable harm." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018), *petition for cert. filed* (U.S. Feb. 4, 2019) (No. 18-1019). "If that burden is met, the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest." *Id.* The Seventh Circuit "employs a sliding scale approach: 'The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Id.* (citation omitted).

"[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "A party thus is not required to prove his case in full at a

preliminary-injunction hearing." *Id.* "[H]earsay can be considered in entering a preliminary injunction." *SEC v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991).[9]

## II.   WWHA is Likely to Succeed on the Merits of Its Claims That the Department's Application of the Challenged Laws is Unconstitutional.

### A.   The Department's Application of the Licensing Law is Unconstitutionally Vague.

WWHA is likely to prevail on its claim that certain provisions of the Licensing Law (the "reputable and responsible character requirements") are unconstitutionally vague as applied to WWHA.[10] The Due Process Clause of the Fourteenth Amendment forbids laws so vague that people of common intelligence must guess at their meaning and apply them differently. *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). Courts must apply a "more stringent vagueness test" when a challenged law "threatens to inhibit the exercise of constitutionally protected rights." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *accord Colautti v. Franklin*, 439 U.S. 379 390-96 (1979).

A law is unconstitutionally vague if it gives inadequate notice of the conduct it prohibits or invites arbitrary and discriminatory enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The second criterion is "more important" than the first and "perhaps the most meaningful aspect of the vagueness doctrine." *Id.* at 358; *Smith v. Goguen*, 415 U.S. 566, 574 (1974). Laws

---

[9]   In general, the party seeking a preliminary injunction must "give[ ] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Here, entry of the preliminary injunction requested by WWHA would not subject Defendants to any costs or damages. Accordingly, security is unnecessary in this case. *See Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) ("[t]here is no reason to require a bond" when "the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction").

[10]   *See* Ind. Code § 16-21-2-11(a)(1) (requiring an applicant to show it has "reputable and responsible character"); 410 Ind. Admin. Code 26-2-4(b) (authorizing the Department to request additional information from abortion clinic applicant, conduct further investigation, or deny the application upon finding the applicant has failed to comply with an applicable regulation); 410 Ind. Admin. Code 26-2-5(1) (authorizing the Department to deny the application upon finding the applicant lacks "reputable and responsible character").

invite arbitrary and discriminatory enforcement when they lack objective standards for enforcement. *See Kolender*, 461 U.S. at 358, 361 (invalidating a statute that "contain[ed] no standard for determining what a suspect has to do in order to satisfy the requirement to provide a 'credible and reliable' identification"); *Coates v. City of Cincinnati*, 402 U.S. 611, 612, 614-16 (1971) (invalidating an ordinance prohibiting three or more people from assembling and "annoying" passersby because, though "annoying" is a "widely used and well understood word," the ordinance gave the police unfettered discretion to apply it).

The risk of arbitrary and discriminatory enforcement is especially high in the context of abortion because it is a "constitutionally protected right that has been a traditional target of hostility." *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 421-22 (5th Cir. 2001) (holding that abortion providers were likely to succeed on the merits of their claim that laws conditioning abortion clinic licensure on subjective standards were unconstitutionally vague)*; see also Colautti*, 439 U.S. at 381, 393-96 (invalidating a requirement that abortion providers take certain actions if a fetus "may be viable" because it "presents serious problems of notice, discriminatory application, and chilling effect on the exercise of constitutional rights").

Here, the reputable and responsible character requirements are unconstitutionally vague because they are inherently standardless, inviting arbitrary and discriminatory enforcement. No Indiana statute or regulation defines "reputable and responsible character" or provides the Department with objective criteria for assessing whether this requirement has been met. The Department concluded that WWHA lacks reputable and responsible character because it did not identify the companies in the Whole Woman's Health consortium as part of its ownership structure. *See supra* at 10-11. But WWHA maintains in good faith that these companies are not

part of its ownership structure. *See* Hagstrom Miller Decl. ¶¶ 45-46; Whipple Decl. ¶ 15. Even if WWHA is mistaken about this, that error does not bear on its character.

While "reputable" and "responsible" may be intelligible terms, the Department has no guidelines for applying them. *Cf. Coates*, 402 U.S. at 614. In this vacuum, enforcement officials could use the requirements to deny licensure to an applicant they dislike or channel personal animus toward abortion. Here, the Department scrutinized WWHA's application more than other facility license applications, *supra* at 9; credited unsubstantiated, defamatory allegations about WWHA by politicians opposed to abortion access, *supra* at 10; requested detailed information from WWHA without defining key terms or revealing the impetus for the questions, *supra* at 8; and concluded that WWHA's good-faith understanding of its ownership structure amounted to a character flaw. In these ways, the reputable and responsible character requirements have already resulted in arbitrary and discriminatory enforcement against WWHA, allowing the Department to pursue its "personal predilections" at the expense of the constitutional rights of people seeking abortion care. *See Kolender*, 461 U.S. at 357-58; *Smith*, 415 U.S. at 575. Further, the requirements invite arbitrary and discriminatory enforcement against WWHA with respect to its second license application. *See Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1051 (1991) (noting that plaintiff need not show that arbitrary or discriminatory enforcement occurred–just that it is "a real possibility" given the imprecision of the law); Hagstrom Miller Decl. ¶ 52 & Ex. A (explaining that the Department again requested detailed information from WWHA without defining key terms, revealing the impetus for the questions, or having any metric by which to assess the information it receives).

For these reasons, WWHA is likely to prevail on its claim that the reputable and responsible character requirements are unconstitutionally vague.

**B.** *The Department's Application of the Challenged Laws Imposes an Undue Burden on Northern Indiana Residents Seeking Abortion Care*.

But for the Department's refusal to grant WWHA an abortion clinic license, WWHA would have begun providing abortion care at the South Bend Clinic in October 2017, more than seventeen months ago. *See* Hagstrom Miller Decl. ¶¶ 37, 73. The Department's continuing refusal to grant WWHA a license fails to serve the State's interest in patient health and safety. *See infra* at 25-26. It does, however, substantially burden people in northern Indiana who want to terminate an unwanted pregnancy, requiring them to travel long distances or leave the State to access time-sensitive medical care. *See infra* at 32-34. Should the Department determine that Dr. Glazer's written agreement with Dr. Poe does not satisfy the Admitting Privileges Requirement, that requirement would likewise burden northern Indiana residents without providing offsetting benefits. *See infra* at 30-34. Accordingly, WWHA is likely to prevail on the merits of its undue burden claims.

**1.** **The Department's Application of the Challenged Laws is Subject to the Undue Burden Standard**.

In an unbroken line of precedent spanning nearly five decades, the Supreme Court has held that the right to end a pregnancy is a fundamental component of the liberty protected by the Due Process Clause. *See, e.g.*, *Whole Woman's Health*, 136 S. Ct. at 2309-10; *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851-53 (1992) (opinion of the Court); *Roe v. Wade*, 410 U.S. 113, 152-54 (1973). Laws that infringe on the abortion right are subject to the undue burden standard set forth in *Casey*, which provides that a law is unconstitutional if it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877 (joint opinion of O'Connor, J., Kennedy, J. & Souter, J.). The Supreme Court recently clarified that "[t]he rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits

24

those laws confer." *Whole Woman's Health*, 136 S. Ct. at 2309. Where the burdens are disproportionate to the benefits, the law is unconstitutional. *See id.* at 2300, 2309-10; *Schimel*, 806 F.3d at 919-20. "[C]ourts must apply the undue burden balancing test . . . to all abortion regulations," and in so doing, they must "consider the evidence in the record—including, expert evidence." *Planned Parenthood of Ind.*, 896 F.3d at 818. "[A] statute likely to restrict access to abortion with no offsetting medical benefit cannot be held to be within the enacting state's constitutional authority." *Schimel*, 806 F.3d at 916.

> ## 2. As Applied to the South Bend Clinic, the Licensing Law Fails to Serve the State's Interest in Patient Health and Safety.

In an undue burden challenge, the State bears the burden of proving the extent to which the challenged law actually advances a valid state interest. *See Hopkins v. Jegley*, 267 F. Supp. 3d 1024, 1056 (E.D. Ark. 2017) ("Generally, the state has the burden of demonstrating a link between the legislation it enacts and what it contends are the state's interests."), *amended on other grounds*, No. 4:17-cv-404-KGB, 2017 WL 6946638 (E.D. Ark. Aug. 2, 2017), *and appeal filed*, No. 17-2879 (8th Cir. Aug. 28, 2017); *see also Whole Woman's Health*, 136 S. Ct. at 2311 (concluding that the State had failed to meet its burden: "We have found nothing in Texas' record evidence that shows that, compared to prior law . . . , the new law advanced Texas' legitimate interest in protecting women's health.").

Defendants are unable to meet their burden of proof here. Medication abortion can be safely provided in an unlicensed facility. *See supra* at 16. Compliance with the Licensing Law does not enhance the safety or efficacy of medication abortion. *See id*. Independent of the Licensing Law, clinicians providing medication abortion in Indiana must be licensed and meet generally applicable medical standards. *See, e.g.*, Ind. Code § 25-22.5-2-8 (providing penalties for physician misconduct), Ind. Code § 25-22.5-3-1 (providing minimum requirements for

physician licensure); Ind. Code § 25-22.5-8-1 (prohibiting the unlicensed practice of medicine); *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187-88 (Ind. 2016) (describing the elements of medical malpractice). The requirements of the Licensing Law do not add health or safety benefits over-and-above Indiana's generally-applicable licensure requirements and standards. *See supra* at 16. *Cf. Planned Parenthood of Ind.*, 896 F.3d at 826 (noting with approval that "the district court emphasized that the question it was required to consider was 'whether the [challenged] law provides the asserted benefits *as compared to the prior law*'") (citations omitted); *accord Whole Woman's Health*, 136 S. Ct. at 2311.

Under Indiana law, only abortion care must be provided in specially licensed facilities; other medical care entailing equal or greater risk may be performed in unlicensed facilities.[11] This is further evidence that the Licensing Law fails to advance the State's interest in patient health and safety. *Cf. Whole Woman's Health*, 136 S. Ct. at 2315 ("The record also contains evidence indicating that abortions . . . [are] safer than numerous procedures that take place outside hospitals and to which Texas does not apply its surgical-center requirements. . . . These facts indicate that the surgical-center provision imposes a 'requirement that simply is not based on differences' between abortion and other surgical procedures that are reasonably related to preserving women's health . . . .") (quoting *Doe v. Bolton*, 410 U.S. 179, 194 (1973)). Indeed, qualified clinicians are permitted to provide the *same* medications used for medication abortion to patients in an unlicensed facility for the purpose of treating an incomplete miscarriage. *See* Cowett Decl. ¶ 22.

---

[11]   Apart from general standards of care, Indiana law imposes no limits on the kinds of procedures that may be performed in an unlicensed facility—also known as an "office-based setting"—and it regulates such facilities only if they administer anesthesia. *See* 844 Ind. Admin. Code 5-5-13, 5-5-19 to 5-5-22. Medication abortion does not entail the administration of anesthesia. *See* Cowett Decl. ¶ 23.

Indiana first enacted a licensure requirement for clinics providing medication abortion in 2013. *See supra* at 5; *See also Planned Parenthood of Ind.*, 64 F. Supp. 3d at 1239. Prior to that, Indiana law permitted the provision of medication abortion in unlicensed facilities. *See id.* The 2013 statute exempted physician's offices, *see id. See also Planned Parenthood of Ind.*, 64 F. Supp. 3d at 1239, and this Court enjoined the Department from enforcing it against a clinic in Lafayette, *id.* at 1257-58, 1260. Accordingly, even after its enactment, many medication abortions were performed in unlicensed facilities. The current Licensing Law was not enacted until 2015. *See supra* at 6. *See also Planned Parenthood of Ind.*, 2015 WL 4065441, at *3. There is no evidence of health or safety issues related to the provision of medication abortion in Indiana prior to 2015. Indeed, the Department is not aware of any patient death or hospitalization resulting from any abortion performed in Indiana during the period from 2008 to the present. *See* Defs.' Resps. to Interrogs. at 7-8. Moreover, many states permit medication abortion to be provided in unlicensed facilities, *see, e.g.*, Hagstrom Miller Decl. ¶ 80; *see generally* Jones, Daniel & Cloud, *supra* at 2 n.1, at 488-89 (finding that 14 states permit all abortions to be performed in unlicensed facilities, and some state licensure requirements exclude facilities that provide non-surgical abortions), and no evidence suggests that medication abortion is less safe or effective in those states.

In addition, the record demonstrates that WWHA and Dr. Glazer are qualified abortion providers who would be able to safely provide medication abortion at the South Bend Clinic. *See supra* at 3-4. Indeed, Dr. Glazer has been providing safe abortion care in Indiana for more than five years. *See* Glazer Decl. ¶¶ 5, 8-9.

The Department's evaluation of WWHA's license application was not well-designed to ascertain whether the South Bend Clinic could operate safely. Mr. Fox testified that two things

27

concerned him about WWHA's application for an abortion clinic license. *See* WWHA_RR00001124-25. First, WWHA's original Clinic Administrator had previously worked at an abortion clinic with a doctor who was disciplined by the Indiana Medical Licensing Board. WWHA_RR00001124; *see* Hagstrom Miller Decl. ¶ 35. Second, the Governor and Department received unsolicited letters from three state legislators opposed to abortion that made defamatory allegations about Whole Woman's Health. WWHA_RR00001124-25; *see* Hagstrom Miller Decl. ¶ 44; WWHA_RR00001431-34. But the Department did not take any reasonable steps to investigate these issues. It did not ask WWHA for further information about the Clinic Administrator or seek to interview her; it did not follow up with the state legislators to determine whether there was a credible basis for their allegations; and it did not notify WWHA of those allegations and ask it to respond. *See* Hagstrom Miller Decl. ¶¶ 43-44; WWHA_RR00001132.  If it had, it would have learned that the Clinic Administrator was well-qualified for the position and had no history of wrongdoing, and the allegations made by the state legislators were completely unfounded. *See* Hagstrom Miller Decl. ¶¶ 35, 43-44.

The Department ultimately denied WWHA's license application because it disagreed with WWHA's characterization of its ownership structure—specifically whether the abortion clinics that are part of the Whole Woman's Health consortium, which are organized as limited liability companies, are properly characterized as "affiliates" of WWHA, a nonprofit organization.  *See supra* at 9.  The Department believes that they are, but WWHA maintains in good faith that they are not.  *See supra* at 10-11.  This difference of opinion about an arcane matter of corporate law has no bearing whatsoever on whether WWHA can safely provide medication abortion at the South Bend Clinic.

Contrary to the Department's suggestion in the administrative proceedings, WWHA did not deny an affiliate relationship with Whole Woman's Health to avoid being linked with the latter's reputation. *See* Hagstrom Miller Decl. ¶ 46. Whole Woman's Health has an outstanding reputation as a provider of high-quality abortion care, and in 2016, the U.S. Supreme Court credited findings that its clinics are safe. *See id.* ¶¶ 19-20 22; *supra* at 11; *see also Whole Woman's Health*, 136 S. Ct. at 2311 ("[A]bortion in Texas was extremely safe with particularly low rates of serious complications and virtually no deaths occurring on account of the procedure."). Rather, WWHA denied having an affiliate relationship with Whole Woman's Health because they are legally and financially independent of one another and transact business at arm's length. *See* Hagstrom Miller Decl. ¶¶ 24, 45; Whipple Decl. ¶¶ 15-17, 23.

In any event, through liberal discovery in the administrative appeal, WWHA and Whole Woman's Health provided the Department with extensive information about their respective clinics. *See supra* at 11-12. Yet the Department still refuses to grant a license to the South Bend Clinic.

Given that WWHA and Dr. Glazer are experienced abortion providers and medication abortion can be safely provided in an unlicensed facility, the Department's continued application of the Licensing Law to prevent the South Bend Clinic from providing medication abortion provides no benefits to individuals seeking abortion care in northern Indiana. *Cf. Planned Parenthood of Kan. & Mid-Mo., Inc. v. Drummond*, No. 07-4164-CV-C-ODS, 2007 WL 2463208, at *4-5 (W.D. Mo. Aug. 27, 2007) (entering a temporary restraining order against enforcement of an abortion facility licensure requirement enacted by Missouri) ("Defendant contends protecting the health of women is an important public interest . . . . [T]he Court is not presently persuaded that applying the Act to [a clinic that provides only medication abortion]

actually furthers that interest . . . ."); *accord Planned Parenthood of Kan. & Mid-Mo., Inc. v. Drummond*, No. 07-4164-CV-C-ODS, 2007 WL 2811407, at *9-10 (W.D. Mo. Sept. 24, 2007) (entering a preliminary injunction in the same case).[12]

### 3. **As Applied to the South Bend Clinic, the Admitting Privileges Requirement Fails to Serve the State's Interest in Patient Health and Safety**.

The record evidence demonstrates that, like the Licensing Law, the Admitting Privileges Requirement fails to enhance the safety of medication abortion. *See supra* at 16-17. This evidence is consistent with findings made by the Seventh Circuit and Supreme Court when evaluating similar laws. *See Whole Woman's Health*, 136 S. Ct. at 2311-12; *Schimel*, 806 F.3d at 912 ("The district court correctly found that there is no reason to believe" "that the health of women who have abortions is endangered if their abortion doctors don't have admitting privileges."); *Planned Parenthood of Wisc., Inc. v. Van Hollen*, 738 F.3d 786, 793 (7th Cir. 2013).[13]

Notably, medication abortion very rarely results in complications requiring hospital admission. *See supra* at 16; *Schimel*, 806 F.3d at 913 (crediting evidence that only 1 in 1,732 medication abortion patients requires hospital admission). When a patient does experience a complication requiring hospitalization, it is medically appropriate for the patient to seek treatment at the nearest hospital to her location, even if the patient's abortion provider or a

---

[12]   This case subsequently settled, and Missouri amended the requirement at issue to exempt facilities that provide only medication abortion. *See Comprehensive Health of Planned Parenthood of Great Plains v. Hawley*, 903 F.3d 750, 753 & n.2 (8th Cir. 2018).

[13]   These courts also found that a variety of factors make it difficult for abortion providers to obtain hospital admitting privileges, including minimum patient admission requirements and intense hostility toward abortion in some communities. *See Whole Woman's Health*, 136 S. Ct. at 2312-13; *Schimel*, 806 F.3d at 911, 917; *Van Hollen*, 738 F.3d at 792. Hostility toward abortion in the South Bend region has likewise made it difficult for WWHA to find a backup physician. *See supra* at 14; *see generally Schimel*, 806 F.3d at 917 ("But it is difficult to hire such doctors . . . because of the vilification, threats, and sometimes violence directed against abortion clinics and their personnel in states . . . in which there is intense opposition to abortion.").

backup physician has admitting privileges at a different hospital.  *See supra* at 17; *Schimel*, 806 F.3d at 912, 915; *Van Hollen*, 738 F.3d at 798. "A hospital that has an emergency room is obligated to admit and to treat a patient requiring emergency care" regardless of whether the patient's abortion provider or a backup physician has admitting privileges there. *Schimel*, 806 F.3d at 909 (citing 42 U.S.C.§ 1395dd(b)(1)); *accord id.* at 912 ("A woman who experiences complications from an abortion . . . will go to the nearest hospital, which will treat her regardless of whether her abortion doctor has admitting privileges."). The quality of care that a patient receives at a hospital is not affected by whether her abortion provider or a backup physician has admitting privileges there. *See* Cowett Decl. ¶ 32 ("Neither admitting privileges nor a backup agreement are needed to ensure continuity of care between an abortion provider and hospital physician."); *Whole Woman's Health*, 136 S. Ct. at 2311 (crediting evidence that "the quality of care that the patient receives is not affected by whether the abortion provider has admitting privileges at the hospital.").

Moreover, Dr. Glazer's written agreement with Dr. Poe provides added assurance that any WWHA patient seeking treatment at Dr. Poe's hospital will be admitted there. *See supra* at 15. The Admitting Privileges Requirement provides no medical benefits in general, and certainly no medical benefits as compared to Dr. Glazer's current agreement with Dr. Poe. *Cf. Whole Woman's Health*, 136 S. Ct. at 2311 ("[C]ompared to prior law (which required a 'working arrangement' with a doctor with admitting privileges), . . . [the challenged admitting privileges requirement fails to] advance[] Texas' legitimate interest in protecting women's health.").

Finally, Indiana imposed no admitting privileges requirement on medication abortion providers prior to July 1, 2011, and it did not enact the current requirement until 2016. *See supra*

31

at 7. There is no evidence that medication abortion was less safe prior to the adoption of an admitting privileges requirement.

In sum, as applied to WWHA's provision of medication abortion at the South Bend Clinic, the Admitting Privileges Requirement fails to advance Indiana's interest in patient health and safety. It thus provides no medical benefits.

### 4. The Department's Application of the Challenged Laws Imposes Undue Burdens on Northern Indiana Residents.

By preventing WWHA from providing medication abortions at the South Bend Clinic, the Department's application of the Challenged Laws is making it more difficult than necessary for individuals in northern Indiana to access abortion care.  According to data published by the Department, individuals residing in every county in northern Indiana had abortions in 2017.[14] Currently, the only licensed abortion clinics in northern Indiana are located in Merrillville and Lafayette. *See* Defs.' Resps. to Interrogs. at 5. A person residing in South Bend must travel 130 miles to make a round trip to Merrillville and over 200 miles to make a round trip to Lafayette.[15] Nearly all abortion patients in north-central and northeastern Indiana must travel significantly farther to reach Merrillville or Lafayette than to reach South Bend. For example, a person residing in Mishawaka must travel 150 miles to make a round trip to Merrillville and 222 miles to make a round trip to Lafayette, but only 12 miles to make a round trip to South Bend.  A person residing in Fort Wayne must travel 250 miles to make a round trip to Merrillville and 230 miles to make a round trip to Lafayette, but only 170 miles to make a round trip to South Bend. Thus, permitting the South Bend Clinic to provide medication abortions would significantly reduce the distance that people in northern Indiana must travel to access abortion.

---

[14]   ISDH 2017 Report at 20-21.

[15]   All distances were calculated using Google Maps.

The need to travel outside of one's community to reach an abortion provider imposes significant burdens on people seeking abortion care, which are exacerbated by Indiana's mandatory waiting-period law. *See supra* at 17-20; Ind. Code § 16-34-2-1.1; *Van Hollen*, 738 F.3d at 796 ("When one abortion regulation compounds the effects of another, the aggregate effects on abortion rights must be considered."). These burdens extend beyond the need to secure transportation and lodging. *See Planned Parenthood of Ind.*, 896 F.3d at 819 ("Although the travel distance is the origin of the burden, the district court found that the strain of the law extends into the realm of finances, employment, child care, and domestic safety."). Some patients are forced to miss work or school for longer periods of time. *See* Guerrero Decl. ¶ 14; Doe Decl. ¶ 12; Stecker Decl. ¶ 28; Lidinsky Decl. ¶¶ 8-9, 14. Patients with dependent children must find childcare for longer periods of time or take their children with them. *See* Guerrero Decl. ¶ 13; Stecker Decl. ¶ 27; Lidinsky Decl. ¶¶ 9, 14. Patients seeking to keep an abusive partner or relative from finding out about their pregnancy will have a harder time explaining their whereabouts. *See* Lidinsky Decl. ¶ 10. Patients will experience increased stress, anxiety, and stigma, and will have a harder time finding someone to accompany them to the abortion clinic for support. *See* Guerrero Decl. ¶ 16; Doe Decl. ¶¶ 11, 15; Stecker Decl. ¶¶ 28, 30; Lidinsky Decl. ¶¶ 10-11, 15. Additionally, delays that result from the need to make travel arrangements and secure time off from work or school increase the health risks and financial costs for abortion patients and may preclude them from having a medication abortion. *See* Cowett Decl. ¶ 12; Guerrero Decl. ¶ 16. These burdens disproportionately impact low-income individuals and others without access to reliable transportation. *See Schimel*, 806 F.3d at 919 ("It's . . . true . . . that a 90-mile trip is no big deal for persons who own a car or can afford an Amtrak or Greyhound ticket. But . . . [for] women seeking abortions [who] have incomes below

33

the federal poverty line . . . [it] may be prohibitively expensive . . . . These women may also be unable to take the time required for the round trip away from their work or the care of their children."); *see also Planned Parenthood of Ind.*, 896 F.3d at 819-20.

The challenges that abortion patients face in traveling within Indiana lead many to seek abortion care out of state, often in Chicago. *See supra* at 18. The Seventh Circuit has held that the availability of abortion care in a neighboring state does not alleviate the constitutional violation caused by a law unduly burdening abortion access *within* a state. *See Schimel*, 806 F.3d at 918-19 (rejecting "the state's position . . . that it could forbid both abortion clinics in Milwaukee to perform abortions . . . given that Chicago clinics are only about 90 miles away"). Moreover, the trip to Chicago is itself burdensome for many people in northern Indiana. *See* Doe Decl. ¶ 12; *cf. Schimel*, 806 F.3d at 919.

Because the burdens imposed by the Department's application of the Challenged Laws to WWHA are not offset by proportional benefits, *see supra* at 16-19, they are undue and therefore unconstitutional. *See Whole Woman's Health*, 136 S. Ct. at 2300; *Planned Parenthood of Ind.*, 896 F.3d at 831-32; *Schimel*, 806 F.3d at 921-22. Accordingly, WWHA is likely to prevail on the merits of its substantive due process claims.

      **C.**    **The Department Denied Equal Protection of the Laws to WWHA and Its Prospective Patients**.

Finally, the Department's application of the Challenged Laws to the South Bend Clinic violates the equal protection rights of WWHA and its prospective patients. The Supreme Court has recognized that "[t]he Due Process Clause and the Equal Protection Clause are connected in a profound way, though they set forth independent principles." *Obergefell v. Hodges*, __ U.S. __, 135 S. Ct. 2584, 2602-03 (2015) ("Rights implicit in liberty and rights secured by equal protection may rest on different precepts and are not always co-extensive, yet in some instances

each may be instructive as to the meaning and reach of the other."). The Equal Protection Clause commands that no state shall deny "'to any person within its jurisdiction equal protection of the laws' . . . which essentially is a direction that all persons similarly situated should be treated alike." *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006) (citations omitted). Classifications that implicate a fundamental right are subject to heightened scrutiny. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41 (1985).

Heightened review applies here because the Department's application of the Challenged Laws burdens the fundamental right to abortion. *See City of Cleburne*, 473 U.S. at 440; *see also Whole Woman's Health*, 136 S. Ct. at 2309-10 (reaffirming that the right to end a pregnancy is a fundamental right). Indeed, in *Whole Women's Health*, the Supreme Court recognized that it would be "wrong to equate the judicial review applicable to the regulation of a constitutionally protected personal liberty with the less strict review applicable where, for example, economic legislation is at issue." *Whole Woman's Health,* 136 S. Ct. at 2309 (citing *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 491 (1955)).

### 1.       The Department's Application of the Licensing Law Treats WWHA and Its Patients Differently Than Others Who Are Similarly Situated.

The Department's application of the Licensing Law creates three impermissible classifications. First, it subjects WWHA to greater scrutiny than other abortion clinic license applicants. In applying the Licensing Law to WWHA, the Department relied on a political appointee to evaluate WWHA's application instead of the career staff who typically review licensure applications. *See* WWHA_RR00001122. It also demanded that WWHA provide extensive information and documentation not required of other applicants. *See* supra at 8. In fact, Mr. Fox admitted that the Department treated WWHA's application differently than other applications for abortion clinic licensure. WWHA_RR00001130-31, 1142.

35

Second, the Licensing Law treats the South Bend Clinic's first four medication abortion patients each year differently than its subsequent patients. The first four medication abortion patients may obtain care at the South Bend Clinic even if it remains unlicensed, but subsequent patients must travel long distances to reach a licensed abortion clinic. *See* Ind. Code § 16-18-2-1.5(b); *supra* at 6, 17-20.

Third, the Licensing Law treats patients seeking medication abortions differently than patients seeking medical management of a miscarriage using the exact same medication regimen. The Licensing Law prevents patients from obtaining medications from a qualified provider in an unlicensed facility for the purpose of inducing an abortion. *See supra* at 6. Yet, it allows patients to obtain the same medications in the same dosages from a qualified provider in an unlicensed facility for the purpose of treating an incomplete miscarriage. *See* Ind. Code § 16-18-2-1.5(a) (requiring licensure if a health care provider "provides an abortion inducing drug for the *purpose of inducing an abortion*") (emphasis added); Cowett Decl. ¶ 22.

### 2.    The Licensing Law's Classifications Fail Heightened Scrutiny.

At a minimum, heightened scrutiny requires the Department to demonstrate that the challenged classifications are substantially related to achieving important governmental interests. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) (explaining that, under intermediate scrutiny, the state bears the burden of showing "at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives") (citation omitted). The Department cannot meet this burden.

The Department's only possible interest in applying the Licensing Law is the protection of patient health and safety. But there is no health or safety reason to scrutinize WWHA more than other abortion clinic license applicants, including those providing surgical abortion. *See*

36

*supra* at 16-17. Likewise, the Department does not protect patient health and safety by treating the first four patients who seek medication abortions at the South Bend Clinic each year differently than subsequent patients. *Cf. Planned Parenthood of Ind.*, 984 F. Supp. 2d at 924-25 (holding that differential treatment of medication abortion providers by an earlier version of the Licensing Law failed even rational basis scrutiny). Nor does the Department protect patient health and safety by treating facilities that provide certain medications for purposes of inducing an abortion differently than facilities that provide the very same medications for purposes of treating an incomplete miscarriage. *See* Cowett Decl. ¶ 22.

### 3. The Department's Application of the Admitting Privileges Requirement Treats WWHA and Its Patients Differently Than Others Who Are Similarly Situated.

The Admitting Privileges Requirement treats medication abortion patients differently from patients seeking comparable medical interventions. In general, patients seeking medical care that does not entail the administration of anesthesia may seek that care from any licensed clinician acting within their scope of practice, regardless of whether the clinician has admitting privileges at a local hospital. *See supra* at 26 n.11; *infra* at 38 & n. 16; 844 Ind. Admin. Code § 5-5-13. Patients seeking medication abortion, however, are limited in their choice of provider to a physician who has admitting privileges at a local hospital or has entered into a written agreement with a backup physician who has admitting privileges. Ind. Code § 16-34-2-4.5(a).

While Indiana requires "[a] practitioner who performs a procedure that requires anesthesia in an office-based setting" to satisfy an admitting privileges requirement, 844 Ind. Admin. Code 5-5-22(a), that requirement is far less burdensome than the Admitting Privileges

Requirement applicable to abortion providers.[16] *Compare id.*, *with* Ind. Code § 16-34-2-4.5. Notably, the generally applicable regulation gives practitioners three options for compliance rather than two, *see* 844 Ind. Admin. Code 5-5-22(a), and it does not require that an agreement with a backup physician be reduced to writing and distributed to every hospital in the region. *Compare* Ind. Code § 16-34-2-4.5(d), *with* 844 Ind. Admin. Code 5-5-22.

The Admitting Privileges Requirement thus singles out abortion providers for more stringent regulation than healthcare providers performing comparable medical interventions. *See* Ind. Code § 16-34-2-4.5. In so doing, it limits abortion patients' choice of healthcare provider.

### 4. The Admitting Privileges Requirement's Classifications Fail Heightened Scrutiny.

There is no legitimate health and safety reason to treat medication abortion patients differently than patients obtaining outpatient procedures of equal or greater risk. *See Van Hollen*, 738 F.3d at 790 (stating that an equal protection problem was "lurking" where Wisconsin singled out abortion providers for an admitting privileges requirement given abortion's relative safety to other outpatient interventions). In particular, the State's interest in patient health and safety is not served by treating medication abortion patients differently than patients receiving the exact same medication regimen for the treatment of incomplete miscarriage. *See supra* 16-17, 30-31. Thus, Defendants cannot demonstrate that the Admitting Privileges Requirement is substantially related to achieving important governmental interests. *See Virginia*, 518 U.S. at 533.

---

[16] Indiana defines "office-based setting" as "any: (1) facility; (2) clinic; (3) center; (4) office; or (5) other setting; where procedures are performed that require moderate sedation/analgesia, deep sedation sedation/analgesia, general anesthesia, or regional anesthesia." 844 Ind. Admin. Code 5-5-13. The definition excludes licensed hospitals, ambulatory surgical centers, abortion clinics, and birthing centers. *Id.* Office-based settings that meet the definition set forth in Indiana law are subject to regulations promulgated by the Medical Licensing Board of Indiana. *See* 844 Ind. Admin. Code 5-5-19 to 5-5-22. Unlicensed medical settings that do not administer anesthesia are not subject to any special regulations, only generally applicable laws governing the practice of medicine. *See supra* at 26 & n.11.

Because the Challenged Laws' classifications penalize WWHA and its prospective patients without bearing a substantial relationship to any health and safety interest, WWHA is likely to prevail on the merits of its equal protection claims.

## III. The Other Requirements for a Preliminary Injunction Are Satisfied.

First, absent a preliminary injunction, WWHA and its prospective patients will continue to face irreparable harm for which there is no adequate remedy at law.  Harm is irreparable when it "cannot be prevented or fully rectified" by the final judgment after trial. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008) (citation omitted). A threatened violation of a constitutional right is enough to satisfy the requirement for irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Planned Parenthood of Ind. & Ky. v. Comm'r, Ind. State Dep't of Health*, 258 F. Supp. 3d 929, 954-55 (S.D. Ind. 2017) ("It is well established that '[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'") (alteration in original) (quoting *Campbell v. Miller*, 373 F.3d 834, 840 (7th Cir. 2004)). Here, the Department's application of the Challenged Laws violates the constitutional rights of people seeking abortion care in northern Indiana. *See supra* at 24-39. Its application of the Licensing Law also violates WWHA's right to be free from arbitrary and discriminatory enforcement of a vague law. *See supra* at 21-23.  These constitutional deprivations, which cannot be remedied by monetary damages, are compounded by the risk that WWHA will be unable to maintain possession of the South Bend Clinic absent a preliminary injunction. Hagstrom Miller Decl. ¶¶ 76-78.

Second, the balance of equities favors WWHA.[17] As applied to the South Bend Clinic, the Challenged Laws do not serve the State's interest in patient health and safety. *See supra* at 16-17. Thus, Defendants will suffer no harm from a preliminary injunction. On the other hand, every day that the South Bend Clinic remains closed, people in the region are forced to travel unnecessarily long distances to access abortion care, and WWHA risks losing possession of the facility. *See supra* at 17-20.

Third, granting WWHA a preliminary injunction would serve the public interest by protecting the constitutional rights of WWHA and its prospective patients. *Planned Parenthood of Ind. & Ky. v. Comm'r of the Ind. State Dep't of Health*, 194 F. Supp. 3d 818, 836 (S.D. Ind. 2016) ("[T[he vindication of constitutional rights serves the public interest.").

## IV.   The Requirements for a TRO Are Satisfied.

The standard for granting a TRO is identical to the standard for granting a preliminary injunction. *See Baskin v. Bogan*, 12 F. Supp. 3d 1137, 1140 (S.D. Ind. 2014); *see also Aprimo, Inc. v. Exec. Computing Pty Ltd.*, No. 1:07-CV-1419-LJM-TAB, 2007 WL 3286479, at *1 (S.D. Ind. Nov. 6, 2007) ("A temporary restraining order shall issue upon the same showing as a motion for preliminary injunction."); *Levas & Levas v. Vill. of Antioch, Ill.*, 684 F.2d 446, 448 (7th Cir. 1982) (holding that the movant is not required to make the higher showing contemplated by Fed. R. Civ. P. 65(b) where the TRO is not sought ex parte).

Generally, a TRO may last up to 14 days. Fed. R. Civ. P. 65(b)(2). The Court may extend it for another 14 days (for a total of 28 days) if it finds "good cause" or the party to be enjoined consents. *Id.* If the Court extends the TRO beyond 28 days without consent of the enjoined party,

---

[17]   The balance of equities need not favor WWHA heavily for it to prevail because it is highly likely to succeed on the merits of its claims. *See Planned Parenthood of Ind.*, 896 F.3d at 816.

it becomes an enforceable preliminary injunction that can be appealed. *See H.D. Mich., LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 844-45 (7th Cir. 2012) (recognizing that there "will be cases where the maximum 28–day limit does not give the parties sufficient time to prepare for a preliminary injunction hearing, let alone time for the district court to decide it" and stating that "[i]n those cases . . . the district court should provide a sufficient explanation of its decision to allow meaningful appellate review").

## CONCLUSION

WHEREFORE, Plaintiff WWHA respectfully asks this Court to enter a preliminary injunction, without bond, restraining Defendants from enforcing the Challenged Laws against WWHA, and to enter such other and further relief as the Court deems just, proper, and equitable. WWHA respectfully requests expedited briefing and hearing on its preliminary injunction motion, or alternatively, a TRO pending disposition of the preliminary injunction motion.

Dated: March 27, 2019

Respectfully submitted,

/s/ Rupali Sharma

Rupali Sharma
LAWYERING PROJECT
99 Silver St., 4-10
Portland, ME 04101
(908) 930-6645
rsharma@lawyeringproject.org

Dipti Singh
LAWYERING PROJECT
3371 Glendale Blvd., # 320
Los Angeles, CA 90039
(646) 480-8973
dsingh@lawyeringproject.org

Amanda Allen*
(646) 490-1254
aallen@lawyeringproject.org
Stephanie Toti
(646) 490-1083
stoti@lawyeringproject.org
LAWYERING PROJECT
25 Broadway, Fl. 9
New York, NY 10004

Kathrine D. Jack
JACK LAW OFFICE LLC
One Courthouse Plaza
P.O. Box 813
Greenfield, IN 46140
(317) 477-2300
kjack@lawoffice.com

Paul M. Eckles*
paul.eckles@probonolaw.com
Michael M. Powell*
michael.powell@probonolaw.com
4 Times Square, Fl. 24
New York, New York 10036
(212) 735-3000

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 27, 2019, a true and correct copy of the foregoing document was served on all counsel of record via the Court's Electronic Court Filing (ECF) system.


Dated: March 27, 2019


By: *_/s/ Rupali Sharma_*
        Rupali Sharma