UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WHOLE WOMAN'S HEALTH ALLIANCE, et al. | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-01904-SEB-MJD |
| | ) | |
| CURTIS T. HILL, JR. Attorney General of the State of Indiana, in his official capacity, et al. | ) ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION (DKT. 76)**

Plaintiff Whole Woman's Health Alliance (WWHA) applied to the Indiana State

Department of Health ("the Department") and its commissioner Kristina Box, Defendant

here in her official capacity, for a license to operate an abortion clinic in South Bend,

Indiana ("the South Bend Clinic"). The Department initially denied WHHA's application.

WWHA applied again but abandoned its effort when it came to perceive its second

application was futile.

Now before the Court is Plaintiffs' motion for a preliminary injunction enjoining

the Department's implementation of the licensing requirement as to the South Bend

Clinic. Dkt. 76. For the reasons given below, the motion is granted.

## Background

We begin with (I) an overview of the abortion procedure to be offered at the South

Bend Clinic and (II) a review of the availability of abortions generally to women in and

around South Bend. We next (III) review Indiana's history of abortion regulation and

specifically (IV) its licensure requirements. We conclude (V) by summarizing the administrative proceedings on WWHA's license applications and (VI) by setting forth a discussion as to the posture of the instant motion.

## I. Medical Abortions

As one researcher has noted, "in the United States, nearly half of [all] pregnancies are unintended, and 22% of all pregnancies (excluding miscarriages) end in termination." Defs.' Ex. 6, at 1.[1] Medical (or medication) abortions, as opposed to surgical abortions, are performed by the administration of a chemical abortifacient or combination of them. According to the American College of Obstetricians and Gynecologists (ACOG), most medical abortions in the United States today are performed by administering the drug mifepristone in conjunction with the drug misoprostol. Defs.' Ex. 8, at 1–2. Both are dispensed in pill form. WWHA proposes to provide medical abortions using this regimen at the South Bend Clinic; it does not intend to provide surgical abortions at that location. Pls.' Ex. 10, at 32.

Mifepristone, also known by the brand name Mifeprex or the developer's code RU 486, was first developed in the early 1980s and made publicly available in 1988 after the French Minister of Health, declaring it "the moral property of women, not just the

---

[1] Citations to "Tr." refer to the transcript of the hearing on Plaintiffs' motion we conducted on April 22, 2019. Citations to "Pls.' Ex." refer to the submissions in support of Plaintiffs' opening brief at Dkt. 76. Citations to "Pls.' Reply Ex." refer to the submissions in support of Plaintiffs' reply brief at Dkt. 104. Citations to "Defs.' Ex." refer to the submissions in support of Defendants' opposition brief at Dkts. 92–97, 101. The pagination used is that of the .pdf files on the CM/ECF system except when cited in the form "XX:YY," which refers to the internal pagination and lineation of a deposition transcript.

property of the drug company," ordered its developer to begin marketing it in France. Steven Greenhouse, *France Ordering Company to Sell Its Abortion Drug*, N.Y. Times, Oct. 29, 1988, at A1.

It was first approved for marketing in the United States by the U.S. Food and Drug Administration (FDA) in 2000 for use with misoprostol, also known by the brand name Cytotec. Defs.' Ex. 16, at 1; Pls.' Ex. 1, at 4. In addition to their use as abortifacients, mifepristone and misoprostol are also used together in the treatment of incomplete or difficult miscarriages. Courtney A. Schreiber *et al.*, *Mifepristone Pretreatment for the Medical Management of Early Pregnancy Loss*, 378 New Eng. J. Med. 2161 (2018). Mifepristone is among the small number of drugs FDA subjects to a Risk Evaluation and Mitigation Strategy (REMS), which among other things prohibits mifepristone from being dispensed in pharmacies; it is available to patients only directly from physicians who have executed supplier agreements with the drug's U.S. licensee. Defs.' Ex. 16, at 1. But for the REMS, mifepristone would be available by prescription.

Today, the FDA-approved abortifacient regimen provides for administration of the two drugs through 70 days of fetal gestation, as measured by the number of days from the patient's last menstrual period (LMP). Defs.' Ex. 16, at 1. (The current FDA-approved regimen was adopted in 2016. The originally approved regimen was found by clinicians and researchers to be suboptimal; an "evidence-based regimen" was developed in response. In 2016, FDA approved a new label for mifepristone incorporating the "evidence-based regimen." *See* Defs.' Ex. 16, at 1; Pls.' Ex. 1, at 4–5.) The patient first takes a dose of mifepristone orally. The mifepristone blocks the further growth and

development of the fetus. Between 24 to 48 hours later, she takes a dose of misoprostol buccally "at a location appropriate for the patient." Defs.' Ex. 16, at 1. Often this location is the patient's home. *See* Pls.' Ex. 1, at 6. The misoprostol causes the uterus to contract and expel its contents in a process "resembl[ing] a miscarriage[.]" *Id.* "If there were a major complication associated with a medication abortion, it would occur after the patient left the abortion facility since the medications take time to exert their effects." *Id.* at 8.

Fewer than 5 percent of patients remain pregnant following a medical abortion; fewer than 1 percent remain pregnant following a medical abortion within 63 days LMP. Defs.' Ex. 8, at 5; Pls.' Ex. 1, at 6. Patients with "a persistent gestational sac" one week after receiving mifepristone may be treated by an additional dose of misoprostol, by surgical intervention, or may not require any additional intervention. Defs.' Ex. 8, at 5. ACOG recommends that medical abortion providers either be trained to perform surgical abortions as needed or else be able to refer a patient to a clinician who is. *Id.*

"Bleeding and cramping will be experienced by most women undergoing medical abortion and are necessary for the process to occur." *Id.* at 3. Other common adverse effects include "nausea, vomiting, diarrhea, headache, dizziness, and thermoregulatory effects." *Id.* Abortion generally has a low risk of fatal and nonfatal complications. The risk of death is lower than that from a penicillin injection, as well as that from childbirth. Pls.' Ex. 1, at 3. One study of more than 230,000 medical-abortion patients found an overall complication rate of 0.65 percent. Pls.' Reply Ex. 2, at 2. The rate of complications requiring hospital admission was found to be 0.06 percent; of complications requiring emergency-room treatment, 0.10 percent. *Id.* The risk to the

patient varies directly with the gestational age of the fetus: the longer she waits, the more dangerous abortion becomes. Pls.' Ex. 1, at 3.

One study concluded that "[t]heoretically, it appears that the mechanisms of mifepristone action favor the development of [*Clostridium sordellii*] infection that leads to septic shock," Defs.' Ex. 9, at 1, though "it has since become evident that no specific connection exists between clostridial organisms and medical abortion." Defs.' Ex. 8, at 8. Another study, a review of fourteen years' literature on the topic, found a "moderate to highly increased risk of mental health problems after abortion" generally. Defs.' Ex. 7, at 1. Further literature reviews, however, including of the previously cited study, have found that unwanted pregnancies carry the same risks to mental health no matter whether the pregnancy is carried to term. *See* Pls.' Reply Ex. 2, at 3. Mifepristone may be the cause of "excessive hemorrhage" not seen in surgical abortions. Defs.' Ex. 10, at 1. Similarly, one study found that, while surgical and medical abortions "are generally safe, . . . medical termination is associated with a higher incidence of adverse events" relative to surgical termination. Defs.' Ex. 6, at 1. Dr. Allison Cowett, one of Plaintiffs' experts, finds that study "to have several limitations which call into question its findings[,]" Pls.' Reply Ex. 2, at 2, though she does not elaborate her concerns for a lay readership. *See id.*

Undisputed, however, is the gravity of the abortion decision, as well as the fact that the personal experiences of women who have received medical abortions vary widely. For some, the prospect of taking the misoprostol at home promises "comfort and familiarity." Pls.' Ex. 2, at 4. Further, "[p]atients have reported that they feel more in control of what is happening to their bodies with medication abortion" as opposed to

surgical abortions. Pls.' Ex. 1, at 5. Others, however, experienced intense physical pain, found themselves traumatized by the experience of passing their pregnancies by themselves, and deeply regret their decisions. Defs.' Ex. 11, at 3; Defs.' Ex. 12, at 3, 6; Defs.' Ex. 13, at 3–4; Defs.' Ex. 14, at 2; Defs.' Ex. 15, at 3.

## II. Access to Abortion in Northern Indiana

Indiana currently has six licensed abortion clinics. Three are located in Indianapolis, at the center of the state. One is located in Lafayette, northwest of Indianapolis and approximately one third of the way between Indianapolis and Chicago. One is located in Bloomington, southwest of Indianapolis and approximately halfway between Indianapolis and Indiana's southern border. One is located in Merrillville, in the northwest corner of the state close to Chicago.

South Bend, Indiana's fourth most populous city, is located north of Indianapolis near the Indiana-Michigan state line and approximately halfway between Indiana's western and eastern borders. It is home to two universities, Indiana University South Bend and the University of Notre Dame, as well as several smaller colleges, including St. Mary's College. South Bend is approximately 65 miles from Merrillville, 107 miles from Lafayette, 150 miles from Indianapolis, and 199 miles from Bloomington. Fort Wayne, Indiana's second most populous city after Indianapolis, lies in the northeastern corner of the state near the Indiana-Ohio state line and is approximately 86 miles from South Bend, 114 miles from Lafayette, 124 miles from Merrillville, 126 miles from Indianapolis, and 176 miles from Bloomington.

There is an unmet demand for abortion services in and around South Bend, and

more broadly in north-central and northeastern Indiana. That is, there are women living in these areas who desire to terminate their pregnancies but, in Indiana, cannot. *See* Pls.' Ex. 1, ¶ 35 (Cowett Decl.) ("WWHA is trying to open a clinic in South Bend because abortion access is very limited in northern Indiana. . . . [As an abortion provider in Chicago,] [a]t least 20% of [Cowett's] patients are from out of state, including Indiana."); Pls.' Ex. 3, ¶¶ 32 (Hagstrom Miller Decl.) ("Based on . . . outreach [from a group of local physicians, academics, and activists] and [WWHA's] own independent research, [WWHA] determined that South Bend is an underserved community. There is substantial demand for abortion care in the region, but no local providers."), 65 ("Nearly all the physicians to whom [WWHA] reached out [to serve as the South Bend Clinic's backup doctor] were supportive of WWHA's plans to open an abortion clinic in South Bend[.]"); Pls.' Ex. 5, ¶¶ 12 (Guerrero Decl.) (Plaintiff All-Options, Inc., has "facilitated rides" to abortion providers for women seeking abortions in South Bend but is "unable to meet the transportation needs of all people in northern Indiana seeking abortion."), 17 ("The barriers [Plaintiff All Options's] clients face make[] it difficult, and sometimes impossible, for them to obtain abortion care in Indiana."); Pls.' Ex. 6, ¶ 9 (Lidinksy Decl.) ("Some [of Lidinsky's undergraduate students] find the burdens of obtaining abortion care within Indiana to be insurmountable. Many of these students travel to Chicago[.]"); Pls.' Ex. 7, ¶ 14 (Stecker Decl.) ("Many physicians [WWHA] reached out to [to serve as the South Bend Clinic's backup doctor] were very supportive of WWHA opening an abortion clinic in South Bend. They told [WWHA] that the clinic would fill a much-needed gap [*sic*] in care."); Pls.' Ex. 8, ¶ 24 (Whipple Decl.) (Unless the South

Bend Clinic opens, "[a]t worst, [abortion care] will be for[e]gone altogether."); Defs.' Ex. 1, 71:14–19 (Hagstrom Miller Dep.) ("[WWHA] ha[s] formed relationships in South Bend with many people who've lived in the community for a long time, and [Hagstrom Miller] know[s] that having a safe abortion facility in that community would meet a need in Northern Indiana that's currently not being met[.]").

Why the demand for abortion care in north-central and northeastern Indiana cannot be met by the six extant Indiana abortion clinics may be traced to a confluence of factors, though the shortest correct answer, as often, is power. It can be difficult for federal judges and federal litigators, from our comfortable vantage points, to understand how completely the everyday life of another may be outside of her control—but we must try to understand it. For women in northern Indiana who enjoy ample financial means, supportive personal relationships, and power over their own conditions of labor and movement, the scarcity of abortion access there likely presents an insubstantial burden. But many women in these areas (as in most) do not enjoy those advantages, and lacking even one of them can cause substantial difficulties. *See* Pls.' Ex. 2, ¶ 14; Pls.' Ex. 3, ¶ 32; Pls.' Ex. 6, ¶ 11.

The primary burden is travel. No direct lines of public transportation connect South Bend to Merrillville, Indianapolis, Lafayette, or Bloomington. Thus, reliable private transportation is almost required to make the minimum 130-mile, maximum 398-mile, round trip. Naturally the poorer the patient the less likely that such reliable private transportation is available. The well known vagaries of weather- and road conditions in northern Indiana can make the extent of the travel burden difficult to anticipate precisely,

especially when coupled with unreliable transportation. This unpredictability in turn increases the difficulty of making all other necessary arrangements, as detailed below. Moreover, because "patients usually begin passing the pregnancy between one and four hours after taking the misoprostol, the second medication in the medical abortion regimen[,]" medical-abortion patients driving long distances to obtain the abortion may be "le[ft] . . . to cramp and bleed en route to home." Pls.' Ex. 1, ¶ 18. Finally, requiring women seeking abortions to leave their communities causes in some feelings of criminalization or ostracization. Pls.' Ex. 6, ¶ 11.

The travel burden increases the overall cost of the procedure, which is substantial for those on fixed or limited incomes, for whom "[u]nexpected expenses are difficult to manage[,]" Pls.' Ex. 2, ¶ 13; those without private health insurance covering abortion; and those on Indiana's low-income health insurance program, "which cover[s] abortions only in very limited circumstances." Pls.' Ex. 5, ¶ 9. As many as twenty northern Indiana clients of Plaintiff All Options "have been unable to pay rent or utility bills due to having to pay for abortion care[.]" Defs.' Ex. 18, 37:6–15. Five have pawned belongings. *Id.* 37:16–22. Some have taken out short-term "payday" loans at confiscatory interest rates. As abortion costs (as well as risks) increase with gestation, even minor delays in obtaining an abortion can increase costs significantly. *See* Pls.' Ex. 5, ¶ 16; Defs.' Ex. 18, 43:2–9.

The impacts of the travel burden are compounded by a mandatory eighteen-hour waiting period, the statutory basis for which is discussed in Part III, *infra*. The upshot is, a woman seeking a medical abortion must visit the abortion clinic twice, once at least

eighteen hours before receiving the medications, and again to receive them. Thus, the trip must be undertaken twice over two or more days, or overnight accommodations near the clinic must be secured.

These burdens are compounded again if the woman seeking an abortion is, as nearly all persons are, responsible to and for others. If she has dependent children, or dependents of any description, they must be accommodated on the trip or at home during her absence. If she is employed, her employer must be asked for time off work. If she is a student, she must miss class or an exam. If she is married or in a close relationship, she will be expected to explain her absence to her spouse or partner.

By all accounts, South Bend appears to be an inhospitable environment for abortion seekers and abortion providers. An unmarried woman may encounter difficulty obtaining even contraception there. *E.g.,* Pls.' Ex. 2, ¶¶ 2 (recounting physician advice that IUDs appropriate only for married women and that having multiple sexual partners causes infertility), 16 (student at university opposed to contraception has difficulty accessing birth control with university-sponsored insurance, increasing likelihood of unintended pregnancy). That is in part why WWHA seeks to operate there, as will be discussed further. Part V, *infra.* Dr. Ellyn Stecker practiced ob/gyn medicine in South Bend for thirty-five years and finds "pervasive" hostility to abortion there. Pls.' Ex. 7, ¶ 7. She furnishes anecdotal examples of that hostility and its consequences, both for abortion seekers and abortion providers. *See id.* ¶¶ 7–9, 15–18, 19 ("leads providers in our community to fear counseling pregnant patients about their options"). *Also* Pls.' Ex. 2, ¶ 17; Pls.' Ex. 3, ¶ 65.

This social context exacerbates the burdens on women seeking abortions who rely on and are responsible to others. Child care (or other dependent care) is more difficult to find or is foregone entirely because "there's a lot of folks that don't know who to ask[,]" particularly for two days' care. Defs.' Ex. 18, 41:11–15. An employer's, professor's, or partner's hostility to abortion may increase the necessity for, and risks of, "sneak[ing] around" them. *See* Pls.' Ex. 6, ¶ 10.

The obstacles to obtaining abortions in northern Indiana are such that women find it easier to travel out of state to Chicago, bypassing nearby Merrillville, to obtain abortions there. Pls.' Ex. 1, ¶ 35; Pls.' Ex. 6, ¶ 9.

## III.  Indiana's Regulation of Abortion Since *Roe*

Swift and hostile was the reaction of the Indiana General Assembly to the Supreme Court's 1973 decisions in *Roe v. Wade*, 410 U.S. 113, and *Doe v. Bolton*, 410 U.S. 179. Disavowing any "intent . . . to acknowledge that there is a constitutional right to abortion on demand," but finding itself "controlled to a certain extent" by *Roe* and *Doe*, the General Assembly that same year inaugurated Indiana's contemporary regime of abortion regulations. Act effective May 1, 1973, Pub. L. No. 322, § 1, 1973 Ind. Acts 1740, 1740–41. The history of that regime in relevant part is reviewed below.

From 1973, abortion was a felony under Indiana law unless, if performed in the first trimester, performed by a licensed physician in a licensed hospital, ambulatory outpatient surgical center, or other licensed health facility; or, if performed thereafter, performed by a physician in a hospital or ambulatory outpatient surgical center. *Id.*, § 2, 1973 Ind. Acts at 1742–43 (formerly codified at Ind. Code § 35-1-58.5-2(a)–(c)). The

patient was required to file with the physician her written consent to the abortion no fewer than twenty-four hours before receiving it, *id.* at 1744 (formerly codified at Ind. Code § 35-1-58.5-2(d)), and the physician was required to report to the Department ten items of information for each abortion he performed, including where it was performed. *Id.* (formerly codified at Ind. Code § 35-1-58.5-5).

The 1973 regulations were repealed and replaced in 1993, the year after the Supreme Court "reaffirm[ed]" *Roe*'s "central holding" in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 879 (1992). The substantive regulation of the abortion procedure was moved from title 35 of the Indiana Code, criminal law, to title 16, public health, a new article treating abortion exclusively being added to title 16 to accommodate the shift. Act of April 30, 1993, Pub. L. No. 2-1993, §§ 17, 209, 1993 Ind. Acts 244, 568, 1109 (codified in relevant part at Ind. Code art. 16-34).

The 1993 regulations permitted a first-trimester abortion to be performed in an unlicensed setting. *See id.*, § 17, 1993 Ind. Acts at 568–69 (codified at Ind. Code §§ 16-34-1-4, 16-34-2-1). Later-term abortions were still required to be performed in licensed hospitals or ambulatory outpatient surgical centers. *Id.* at 569 (codified at Ind. Code § 16-34-2-1). The 1993 regulations continued to require the filing of the patient's written consent and the reporting to the Department of the same ten items of information for each abortion performed. *Id.* at 569, 572–73 (codified at Ind. Code §§ 16-34-2-1, 16-34-2-5).

The General Assembly substantially expanded the written-consent requirement in 1995. Establishing the patient's "voluntary and informed consent" now required detailed disclosures to her by the physician, including information on the "probable gestational

age of the fetus" and "an offer to provide a picture or drawing of a fetus[.]" Act of April 26, 1995, Pub. L. No. 187-1995, § 4, 1995 Ind. Acts 3327, 3328 (internal subdivisions omitted) (codified at Ind. Code § 16-34-2-1.1). The informed-consent requirement has continued lobster-like to grow in scope and complexity until the present. *See* Ind. Code § 16-34-2-1.1 (most recently substantively amended by Act of March 24, 2016, Pub. L. No. 213-2016, § 14, 2016 Ind. Acts 3099, 3105). Today, as relevant here, the patient's consent is deemed "voluntary and informed only if" the required information is provided to her "[a]t least eighteen . . . hours before the abortion" in a "private, not group," setting by the physician who will perform the abortion, the physician who referred the patient for an abortion, or their qualified delegate. *Id.* § 16-34-2-1.1(a)(1). (It is possible that the required information may be communicated to the patient at a location other than the clinic at which the abortion will be performed, so long as all the statutory conditions are satisfied, *see* Defs.' Ex. 18, at 43–44, but it does not appear that this is an option for WWHA, which proposes to operate only one office or facility.)

From 1993 to 2005, abortions not performed in hospitals or ambulatory outpatient surgical centers were performed in unlicensed facilities. (As already noted, mifepristone was approved by FDA in 2000.) As the Indiana General Assembly debated a raft of new abortion-clinic regulations in 2006, state Representative Marlin Stutzman remarked, "It's been over 30 years that abortion clinics have operated without any type of [facilities] regulation[.] . . . We need to get them up to date as quickly as possible." Greg Hafkin, *Abortion Clinics May Have to Close*, Indianapolis Star, Feb. 3, 2006, at B1 (original alteration parentheses changed to brackets). In 2005, "abortion clinic" received for the

first time a statutory definition and "abortion clinics" were subjected to the same licensure requirements as hospitals and ambulatory outpatient surgical centers. Act of April 26, 2005, Pub. L. No. 96-2005, §§ 2, 6, 2005 Ind. Acts 1897, 1899, 1900 (codified at Ind. Code §§ 16-18-2-1.5, 16-21-2-2(4)). "Abortion clinic" was defined as "a freestanding entity that performs surgical abortion procedures"; facilities providing medical abortions were not within the definition. *Id.*, § 2, 2005 Ind. Acts at 1899 (codified at Ind. Code §§ 16-18-2-1.5).

From 2005 to 2013, a medical abortion that was not provided by a hospital (presumably none were provided in ambulatory outpatient surgical centers) was perforce provided in an unlicensed setting. In 2013, as part of a broader effort to regulate the provision of medical abortions specifically, medical-abortion providers were brought within the definition of "abortion clinics," and thereby subject to licensure requirements, unless "abortion inducing drugs [were] not the primarily dispensed or prescribed drug" at the provider's facility. Act of May 1, 2013, Pub. L. No. 136-2013, § 2, 2013 Ind. Acts 1002, 1002 (formerly codified at Ind. Code § 16-18-2-1.5(a)(2), (b)(3)(B)). Soon after the new definition took effect on July 1, 2013, this Court preliminarily enjoined its operation as violative of equal protection. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 984 F. Supp. 2d 912, 925, 931 (S.D. Ind. 2013) (Magnus-Stinson, J.). A permanent injunction to the same effect was entered late the following year. *See Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 64 F. Supp. 3d 1235, 1258, 1260 (S.D. Ind. 2013) (Magnus-Stinson, J.).

In 2015, the General Assembly repealed the enjoined definition of "abortion clinic" and replaced it with a new one, which continues in force today. Act of April 30, 2015, Pub. L. No. 92-2015, § 1, 2015 Ind. Acts. 633, 633 (codified at Ind. Code § 16-18-2-1.5(b)(3)). Now a medical-abortion provider is an "abortion clinic," and thereby subject to licensure requirements, unless the provider "provides, prescribes, administers, or dispenses an abortion inducing drug to fewer than five (5) patients per year for the purposes of inducing an abortion." Ind. Code § 16-18-2-1.5(b)(3). Unquestionably, the South Bend Clinic qualifies as an "abortion clinic" under this definition.

## IV.  The Licensing Law

Plaintiffs' lawsuit attacks a set of statutory provisions they refer to here as the "Licensing Law." Br. Supp. 1 (citing Ind. Code §§ 16-18-2-1.5, 16-21-1-9, 16-21-2-2.5, 16-21-2-10, 16-21-2-11). Other licensing provisions bear on this case as well, *see* Compl. ¶ 82(b), though Plaintiffs have not organized them under the "Licensing Law" rubric for purposes of the instant motion for a preliminary injunction. Below, we review these provisions and their role in Indiana's broader regime of abortion regulation.

The Licensing Law is codified in scattered sections of title 16 ("Health"), article 21 ("Hospitals") of the Indiana Code. As noted above, Indiana Code § 16-18-2-1.5 defines "abortion clinic," and thereby the universe of health care providers subject to regulation as such, as "a health care provider . . . that[] performs surgical abortion procedures[] or . . . provides an abortion inducing drug for the purpose of inducing an abortion[,]" excepting licensed hospitals, licensed ambulatory outpatient surgical centers, and providers who administer medical abortions to fewer than five patients per year.

"Abortion" is defined as "the termination of human pregnancy with an intention other than to produce a live birth or to remove a dead fetus[,]" *id.* § 16-18-2-1, thus excluding spontaneous pregnancy loss or miscarriage and its treatment.

Indiana Code § 16-21-2-10 provides that a person "must obtain a license" from the Department "before establishing, conducting, operating, or maintaining . . . an abortion clinic," as well as a hospital, ambulatory outpatient surgical center, or birthing center. Operating or advertising the operation of an unlicensed abortion clinic is a Class A misdemeanor. Ind. Code § 16-21-2-2.5(b). *See id.* § 35-50-3-2 (Class A misdemeanants liable to maximum one year's imprisonment and $5,000 fine). Indiana Code § 16-21-2-2 (cited at Compl. ¶ 82(b)) provides that the Department "shall license and regulate" abortion clinics, as well as hospitals, ambulatory outpatient surgical centers, and birthing centers. A license is valid for one year. Ind. Code § 16-21-2-14 (cited at Compl. ¶ 82(b)). It may be renewed annually. *Id.*

Indiana Code § 16-21-2-11 establishes the requirements for applying for and receiving a license. An abortion-clinic applicant must show that it is "of reputable and responsible character" and that it is "able to comply with the minimum standards for . . . an abortion clinic . . . and with rules adopted [by the Department] under this chapter [*scil.*, Ind. Code ch. 16-21-2]." Ind. Code § 16-21-2-11(a)(1)–(2). The application must also contain the applicant's name, proposed location of operation, and other similar information, as well as any "[o]ther information [the Department] requires." *Id.* § 16-21-2-11(b).

Beginning July 1, 2018, abortion-clinic applicants, and only they, must also

> (1) Disclose whether the applicant, or an owner or affiliate of the applicant, operated an abortion clinic that was closed as a direct result of patient health and safety concerns.
>
> (2) Disclose whether a principal or clinic staff member was convicted of a felony.
>
> (3) Disclose whether a principal or clinic staff member was ever employed by a facility owned or operated by the applicant that closed as a result of administrative or legal action.
>
> (4) Provide copies of:
>
>> (A) administrative and legal documentation relating to the information required under subdivisions (1) and (2);
>>
>> (B) inspection reports; and
>>
>> (C) violation remediation contracts;
>
> if any.

*Id.* § 16-21-2-11(d). "Affiliate" has its own statutory definition for these purposes, which is, "[A]ny person who directly or indirectly controls, is controlled by, or is under common control of another person." *Id.* § 16-18-2-9.4. Both the new application requirement and the "affiliate" definition were enacted in 2018. Act of March 25, 2018, Pub. L. No. 205-2018, §§ 3, 6, 2018 Ind. Acts 2930, 2931, 2934. The content of these provisions and the timing of their enactment strongly suggest that they were adopted in response to the first license application WWHA submitted for the South Bend Clinic, discussed further below.

As Indiana Code § 16-21-2-11(a)(1)(2) requires a license applicant to show it is able to meet the "minimum standards" applicable to its proposed facility and to comply with the Department's rules, Indiana Code § 16-21-2-2.5 requires the Department to

adopt rules for abortion clinics (as well as birthing centers, but not hospitals or ambulatory outpatient surgical centers, though *cf.* Ind. Code § 16-21-1-7 (cited at Compl. ¶ 82(b)) which establish "minimum license qualifications"; prescribe policies for maintaining medical records; establish procedures for the issuance, renewal, denial, and revocation of licenses; prescribe procedures and standards for inspections by the Department; prescribe procedures for implementing and enforcing remedial plans designed to redress violations of the applicable standards; and establish eleven further requirements, including "[s]anitation standards," "[i]nfection control," and "[a]nnual training by law enforcement officers on identifying and assisting women who are[] coerced into an abortion[.]" Ind. Code § 16-21-2-2.5(a).

The Department's rules for abortion clinics are contained in title 410, article 26 of the Indiana Administrative Code. (Under Indiana Code § 16-21-1-9, the Department may waive a rule for good cause, so long as waiver will not endanger the clinic's patients. It is not clear why Plaintiffs attack this section as part of the Licensing Law.) Rule 2 governs licensure. Section 4 of that rule, 410 Ind. Admin. Code 26-2-4(a), provides that the Department will review license applications for compliance with the "reputable and responsible character" requirement, Ind. Code § 16-21-2-11(a)(1), and the requirement to show ability to comply with applicable standards. *Id.* § 16-21-2-11(a)(2). If the applicant fails to comply with the application or licensure standards, the Department may request additional information, conduct further investigation, or deny the application. 410 Ind. Admin. Code 26-2-4(b).

Section 5 of the rule states that the Department may deny an application

> (1) If the licensee or licensees are not of reputable and responsible character.

> (2) If the abortion clinic is not in compliance with the minimum standards for an abortion clinic adopted under this article.

> (3) For violation of any of the provisions of [Ind. Code art. 16-21] or [410 Ind. Admin. Code art. 26].

> (4) For permitting, aiding, or abetting the commission of any illegal act in the clinic.

> (5) For knowingly collecting or attempting to collect from[] a subscriber . . . or an enrollee . . . of a health maintenance organization . . . any amounts that are owed by the health maintenance organization.

> (6) If conduct or practices of the clinic are found to be detrimental to the patients of the abortion clinic.

> (7) If the application for a license to operate an abortion clinic or supporting documentation provided inaccurate statements or information.

410 Ind. Admin. Code 26-2-5 (internal subdivisions omitted). If the Department determines that the applicant qualifies for a license, it will issue to the applicant a provisional license, valid for ninety days, and then a full license upon satisfactory initial inspection of the clinic "to ensure that the clinic is operating in compliance with" article 26 of title 410. *Id.* § 26-2-4.

Section 8 of the rule states that the Department may revoke a license in consequence of the licensee's

> (1) Violation of any provision of this article.

> (2) Permitting, aiding, or abetting the commission of any illegal act in an abortion clinic.

> (3) Knowingly collecting or attempting to collect from[] a subscriber . . . or an enrollee . . . of a health maintenance

organization . . . any amounts that are owed by the health maintenance organization.

(4) Conduct or practice found by the council to be detrimental to the welfare of the patients of an abortion clinic.

410 Ind. Admin. Code 26-2-8(b) (internal subdivisions omitted).

The Department is required to inspect every abortion clinic in Indiana once annually and "may conduct a complaint inspection as needed." Ind. Code § 16-21-2-2.6. The Department refers to such inspections as "surveys." Governed by rule 3 of article 26 of the Department's regulations, the Department will perform regular "licensing surveys" "to ensure that the abortion clinic is operating in compliance" with article 26, and "complaint surveys" upon "credible complaints received by [the Department] that allege noncompliance" with article 26. 410 Ind. Admin. Code 26-3-2, 26-3-3. Nothing in the cited statutes or rules makes the Department's authority or ability to conduct such surveys contingent on the abortion clinic's licensure, the "licensing survey" appellation notwithstanding.

Most of the substantive regulations of the abortion procedure are found in title 16, article 34 ("Abortion") of the Indiana Code. This includes the informed-consent requirement, Ind. Code §§ 16-34-2-1.1, 16-34-2-1.5, and the physician-reporting requirement. *Id.* § 16-34-2-5. Outside the statutorily specified set of circumstances, abortion is "in all instances . . . a criminal act[.]" *Id.* § 16-34-2-1. Specifically, performing an abortion not in accordance with the provisions of chapter 2 of article 34 is a Level 5 felony, *id.* § 16-34-2-7(a), and see *id.* § 35-50-2-6(b) (Level 5 felons liable to one to six years' imprisonment and $10,000 fine), except that it is a Class A

misdemeanor to fail to comply with the parental consent requirement (codified at Ind. Code § 16-34-2-4), *id.* § 16-34-2-7(b), and a Class A infraction to fail to comply with the informed-consent requirement. *Id.* § 16-34-2-7(c). *See id.* § 34-28-5-4 (Class A infractor liable to $10,000 judgment). Again, no requirement imposed by these regulations on abortion providers is made contingent on the provider's licensure.

Finally, nothing in the Licensing Law displaces the licensure requirements imposed by Indiana on physicians and other medical professionals, *see* Ind. Code arts. 25-22.5 (physicians), 22-23 (nurses), or Indiana's common-law regulation of the same through negligence and other tort actions. *See, e.g., Spar v. Cha*, 907 N.E.2d 974, 980–81 (Ind. 2009) (lack of informed consent gives rise to action for professional negligence or battery).

## V.  WWHA's License Applications

WWHA was founded under the name "Whole Woman's Advocacy Alliance" by Amy Hagstrom Miller in 2014. It owns and operates two abortion clinics: one in Charlottesville, Virginia, and one in Austin, Texas. WWHA is a 501(c)(3) nonprofit corporation organized under the laws of Texas. It is governed by a board of directors, whose members are elected by majority vote of the board to serve three-year terms, and of which Hagstrom Miller has served as the chair since WWHA's inception. Today the board has nine members; it had three at the time of formation, all initially appointed by Hagstrom Miller.

Hagstrom Miller is also WWHA's president and CEO. WWHA's bylaws provide that the president and CEO,

> subject to the supervision of the Board of Directors, shall have general management and control of the business and property of the Corporation in the ordinary course of its business with all such powers with respect to such general management and control as may be reasonably incident to such responsibilities, including, but not limited to, the power to employ, discharge, or suspend employees and agents of the Corporation, to fix the compensation of employees and agents, and to suspend, with or without cause, any officer of the Corporation pending final action by the Board of Directors with respect to continued suspension, removal, or reinstatement of such officer. The President may, without limitation, agree upon and execute all division and transfer orders, bonds, contracts, and other obligations in the name of the Corporation.

Pls.' Ex. 10, at 55. A WWHA board member described Hagstrom Miller's duties as CEO as

> [v]ery similar to [those of] . . . an executive director; in charge of everything, making sure that the whole entire organization runs smoothly whether it be in finances or in compliance or in medical care or in ordering supplies. It can be a large area of responsibility or down to details, but just making sure that it happens.

Defs.' Ex. 2, at 161. The board members say they take their oversight responsibilities of Hagstrom Miller seriously but have never overruled one of her decisions.

Before founding WWHA in 2014, Hagstrom Miller had a substantial history of advocacy and activity related to abortion. In 2003 Hagstrom Miller began operating an abortion clinic in Austin, Texas, under the name "Whole Woman's Health." In 2007 Hagstrom Miller founded Whole Woman's Health, LLC (WWH), a for-profit limited liability company organized, like WWHA, under the laws of Texas. WWH is a "healthcare management company," Defs.' Ex. 1, at 16, which contracts with different

abortion providers, including WWHA, to provide "healthcare management services." *Id.* at 16–17. These include services related to bookkeeping, human resources, regulatory compliance, public relations, and marketing. Pls.' Ex. 8, at 5. Other for-profit limited liability companies operate abortion clinics in various American cities under the name "Whole Woman's Health." For example, Whole Woman's Health of Baltimore, LLC, owns and operates an abortion clinic in Baltimore, Maryland. These LLCs too contract with WWH for health care management services. All the LLCs are held by an entity, which is either an LLC or a corporation, called The Booyah Group ("Booyah"), named for a communally prepared stew. Booyah is in turn wholly owned by Hagstrom Miller.

Confusingly, it appears that Hagstrom Miller has used and continues to use "Whole Woman's Health" as an umbrella term or marketing slogan without referring to any specific entity or organization. She states that, today, "Whole Woman's Health" is "a consortium of limited liability companies [and perhaps one corporation]," though it is unclear whether this "consortium" has any legal status and, if so, what that status is. Pls.' Ex. 3, at 3. For example, in this Court and in the administrative proceedings on WWHA's license applications, Plaintiffs have adverted repeatedly to the fact that "Whole Woman's Health" was a plaintiff in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016). The complaint in that matter identified the plaintiff simply as "Whole Woman's Health," averring that "Whole Woman's Health" operated abortion clinics in Fort Worth, San Antonio, and McAllen, Texas. *Whole Woman's Health v. Lakey*, 1:14-cv-00284-LY, Dkt. 1, ¶ 16. But unless "Whole Woman's Health" has undergone significant structural changes since 2014 (for which there is no evidence), those clinics were in fact operated

by the entities Whole Woman's Health of Fort Worth, LLC; Whole Woman's Health of

San Antonio, LLC; and Whole Woman's Health of McAllen, LLC.

Hagstrom Miller described her decision to found WWHA as follows:

> I had the idea to found a non-profit organization really
> directly [stemming] from my experience in the field noticing
> that as we had increased laws and increased . . . restrictions
> on women's access to abortion care services, it was harder
> and harder to keep the doors open of the clinics, not only the
> clinics I had managed through Whole Woman's Health but
> watching clinics in Texas and Virginia and many other states
> close as a byproduct of targeted regulation of abortion
> providers. It became much more difficult to keep a practice
> open . . . like a regular medical practice from patient receipts
> only, and I saw that we needed to figure out a path for being
> able to invite donors and grantors and supporters to be able to
> support us so that we could weather the regulatory
> interference and still be able to keep the doors open. . . . So
> [WWHA was conceived as] a way to be sustainable in states
> that had a lot of regulation, whereas . . . in other places like
> Maryland and Minnesota where we don't have a similar sort
> of laws that interfere with the practice, the practice is able to
> run much more like a normal doctor's office.

Defs.' Ex. 2, at 242. In addition to providing abortions, WWHA's mission is in part to

combat the "lexicon of shame and stigma that really surrounds abortion in this country[,]"

which it aims to do by having "really open and honest conversations about abortion" and

presenting a favorable picture of abortion provision in communities where it is most

stigmatized. Defs.' Ex. 2, at 242.

In 2014, a group of local physicians, academics, and activists invited Hagstrom

Miller and WWHA to consider operating a clinic in South Bend. WWHA determined that

South Bend perfectly fit its bill for difficult legal and social environments in which to

operate. "[A]ccess to abortion [there] is difficult, . . . and also it is an unfriendly place for

providers . . . . [W]e wanted to go to places where it was unfriendly." Defs.' Ex. 2, at 164. After making the necessary preliminary arrangements over the course of a year or more, WWHA submitted to the Department an application for a license to operate the South Bend Clinic on August 11, 2017.

On September 21, 2017, the Department, by Randy Snyder, director of the Department's acute care division, asked John Bucy, one of WWHA's attorneys and a member of its board, to submit a revised application curing four minor deficiencies, including the failure to name a proposed clinic administrator. Bucy submitted a revised application on October 6, 2017.

Around this time, Trent Fox, the Department's chief of staff, began taking an active role in the Department's review of WWHA's application. Fox averred that his intervention was spurred by the fact that Indiana's existing abortion providers were well known to the Department but WWHA was not; it was "a new entity coming into the state . . . ." Defs.' Ex. 2, at 132. Moreover, the name of the proposed clinic administrator supplied by Bucy "raised some red flags . . . ." Defs.' Ex. 2, at 125. The clinic administrator was Liam Morley, who was known to the Department for having had a "connection," either "as an employee or administrator," with Dr. Ulrich Klopfer, "who in recent years [in or about 2016] . . . surrendered his abortion clinic license and had his medical license suspended for serious violations[.]" Defs.' Ex. 3, at 2.

Contemporaneously, the Department received a letter from then state Senator Joseph C. Zakas, dated October 18, 2017. It was addressed to the governor and had been forwarded by him to Box, and by her to Department staff. The letter noted WWHA's

attempts to operate the South Bend Clinic, and warned,

> I wanted you know the depth of concern from many people
> about this organization's application. I received over 200
> messages from my constituents in one weekend after the news
> broke [of WWHA's application via an article in the local
> newspaper]. . . . It appears that the company in question,
> Whole Woman's Health, has had a history of health
> violations at other clinics. Further, the article indicates that
> [Morley] used to work [for Klopfer]. Indiana has a long
> history of being a state that stands for pro-life policies. Many
> believe your administration will reflect that history. Thank
> you, Governor, for your consideration.

Pls.' Ex. 10, at 74. Over the following weeks, similar letters arrived from state Senators

Erin Houchin and Ryan Mishler, disparaging the safety record of "Whole Woman's

Health"; alleging that "[w]hile [WWHA] would like [the Department] and the public to

believe they have women's interests at heart, the record of this Texas-based company

shows otherwise[,]" Pls.' Ex. 10, at 75; and by turns raising alarm at "this threat to

women's health in Indiana," Pls.' Ex. 10, at 77, and invoking "the values of Hoosiers

who respect the right to life . . . ." Pls.' Ex. 10, at 76. Plaintiffs vigorously maintain that

each factual allegation made in these letters was "completely and utterly false[,]" and

Defendants have not argued the contrary. Pls.' Ex. 3, at 8.

Fox began searching "Whole Woman's Health" on the Internet. He found

www.wholewomanshealth.com, the website for the "Whole Woman's Health"

"consortium" of companies. The website supplied a list of "Our Clinics," featuring eight

"Whole Woman's Health"-branded abortion clinics across the country; the South Bend

Clinic was listed as the ninth. (More precisely, the website is owned and operated by

WWH, a fact the website discloses. Plaintiffs have suggested that the website features

"Whole Woman's Health" clinics as part of the marketing services WWH provides to the different "Whole Woman's Health" LLCs under their management services contracts. But Fox was unaware of these distinctions as he performed his searches and the website does not appear to make them itself.) Fox also found a number of public statements by Hagstrom Miller, listed on the license application as WWHA's president, referring similarly to "Whole Woman's Health" or "our" abortion clinics.

Spurred by the senators' letters and his own research, Fox had the Department propound requests for additional information to WWHA on October 27, 2017. Information was sought on eleven points, some with subparts, with a 45-day time limit in which to respond. The first request was as follows: "Provide a complete ownership structure or description pertaining to the applicant, including, but not limited to, any individuals and/or any parent, affiliate or subsidiary organizations. Please list full legal names and addresses, and for entities, list the type of entity and the state of incorporation/organization." Pls.' Ex. 10, at 34. The second request was as follows: "Provide a list of all the abortion and health care [*sic*] facilities currently operated by the applicant, including its parent, affiliate or subsidiary organizations." *Id.*

At the time, there was no applicable statutory definition of "affiliate." But when the requests were drafted, Fox had "some general idea" of what he meant by "affiliate": "We searched through the Indiana Code and I looked myself as well and there were a few different [definitions] throughout [the] Indiana [C]ode, but the theme I was finding in every definition was there was a common control by one person or entity." Defs.' Ex. 2, at 127. This general idea or theme was not communicated to WHHA, however. At oral

argument on Plaintiffs' motion, Defendants suggested that the Department's failure to furnish guidance to WWHA on this point was "part of [its] investigative technique," Tr. 53:23–24, designed to test whether WWHA would disclose the "affiliates" the Department had already deemed it to have by virtue of the common control exercised by Hagstrom Miller or "Whole Woman's Health."

WWHA failed the test. On December 8, 2017, WWHA by Bucy responded to the first request as follows:

> [WWHA] is a Texas nonprofit corporation. It does not have members. Management of the affairs of WWHA is vested in the Board of Directors. Since WWHA is a nonprofit corporation it does not have any owners. WWHA operates a clinic in Austin, Texas. [The clinic's address is given.] It is licensed as an Abortion Facility by the Texas Department of State Health Services Regulatory Licensing Unit. [The clinic's license number is given.] WWHA has recently purchased a clinic in the State of Virginia. [The clinic's address and license number are given.] WWHA has entered into a management agreement with [WWH] (the "Management Company"). The Management Company will provide certain designated management services to WWHA. The Management Company provides management services to numerous clinics across the United States. The Management Company is a Texas limited liability company. Some of the Board Members of WWHA are affiliated directly or indirectly with the Management Company, but the majority of the Board Members are independent.

Pls.' Ex. 10, at 38. Bucy responded to the Department's second request by referring the Department to his answers to the first.

Fox considered WWHA's response, identifying two additional clinics and denying the existence of any affiliates, in light of the senators' letters and in light of the seemingly unitary public face of "Whole Woman's Health" with its eight clinics, the South Bend

Clinic to be the ninth. In Fox's view,

> the levels of confusion are now in the—the information was
> still inconsistent with—and the information we received from
> communications laying out the possible violations in these
> other clinics, we just didn't have an answer for. At this point
> it was imperative that we find out what clinics were referred
> to whether or not they needed to be disclosed and then
> understand why the inconsistent information was being
> provided.

Defs.' Ex. 2, at 129. Fox concluded,

> At this point we simply didn't have enough information to
> justify granting the license. When we determined the follow-
> up questions to ask and when two clinics were disclosed, we
> had conflicting information, and on—when we see eight
> clinics listed and we are notified of two, it simply doesn't add
> up to me. Now, that was a question I couldn't answer and if I
> can't answer that question, then I just can't justify granting
> the license[.] . . . I mean at this point [WWHA's response] is
> not only inconsistent, we have determined it to be inaccurate.
> The second part of th[e] [response] creates a—I think a few
> other questions on our end when it refers to some of the board
> members of [WWHA] as we had asked for them to be
> identified, too, so when we look at this, the affiliate
> definition, this is where we determine that there are some
> other clinics out there affiliated and under the common
> control of Ms. Miller, and those were not disclosed and I
> couldn't—I simply couldn't answer that question either, so at
> this point we could not justify granting.

Defs.' Ex. 2, at 130. Fox understood himself and the Department to be under no duty to

investigate the matter further or to ask WWHA specific questions about Hagstrom Miller

or other "Whole Woman's Health" clinics.

   While Fox would later couch the Department's decision in terms of lack of

information, *see also* Pls.' Ex. 10, at 84 (Department's response to interrogatories in

administrative appeal) ("After attempting to extract the information required to process

the . . . application, [the Department] was unable to obtain the necessary information from [WWHA] to ascertain whether [WWHA] is of reputable and responsible character."), the Department took a more definite stance in its communications with WWHA. On January 3, 2018, the Department informed WWHA by letter that its license application had been denied. The letter charged that WWHA had "failed to disclose, concealed, or otherwise omitted information related to additional clinics." Pls.' Ex. 10, at 72. Accordingly, the Department found, "WWHA fail[ed] to meet the requirement that the Applicant is of reputable and responsible character and the supporting documentation provided inaccurate statements or information." Pls.' Ex. 10, at 72. *See* Ind. Code § 16-21-2-11(a)(1)–(2); 410 Ind. Admin. Code 26-2-5(1), (7).

WWHA lodged an administrative appeal with the Department on January 22, 2018. The petition for review, drafted by Bucy, insisted that WWHA's December 8, 2017, responses to the Department's October 27, 2017, requests, had not concealed anything from or in any way misled the Department. Because WWHA was a nonprofit, Bucy argued, it had no owners and therefore no parent organization. It had no subsidiaries because it held no ownership interest in any other entity. While WWHA had disclosed its management services contract with WWH as well as its Texas and Virginia clinics, it had not disclosed the other "Whole Woman's Health" clinics managed by WWH under similar contracts because they were not operated or owned by WWHA. "To the contrary," Bucy maintained, "those other clinics are independent [companies] that are not controlled by [WWHA][.]" Pls.' Ex. 10, at 80.

Bucy speculated that "it is possible that the Department considers [WWH] to be an affiliate of" WWHA. Pls.' Ex. 10, at 80. Bucy cited definitions of "affiliate" given in certain provisions of the Indiana Code for business corporations and nonprofit corporations, noting that both rested on the notion of control, *see* Ind. Code §§ 23-1-43-1, 23-17-21-2, in the latter case explicitly including "the power to select the corporation's board of directors." *Id.* § 23-17-21-2(c). Relying on these definitions (the Department would later point to this reliance as demonstrating that WWHA had understood all along what the Department meant by "affiliate"), Bucy argued that in no event was WWHA an affiliate of WWH because WWHA was controlled by its board and its board was not controlled by anyone else; and because WWHA, through its board, had no control over WWH. So, too, for the other "Whole Woman's Health" clinics which had management services agreements with WWH.

WWHA's administrative appeal was heard by an administrative law judge (ALJ) over two days, August 22 and 23, 2018. Substantial evidence, live and documentary, was presented by both sides relating to the progress of WWHA's license application and the Department's review of it; Hagstrom Miller and her relationship to WWHA, WWH, and the other "Whole Woman's Health" entities; and the relationship of those entities to one another—all towards a determination of whether WWHA had "affiliates" because both it and other "Whole Woman's Health" LLCs shared a common controller in Hagstrom Miller, and thus whether WWHA had truthfully represented that it had none. The Department pointed the unitary public face of "Whole Woman's Health"; Hagstrom Miller's undisputed "control" over the "Whole Woman's Health" LLCs of which she

(through Booyah) is the sole member; and Hagstrom Miller's allegedly dominant position

with respect to WWHA's board. WWHA pointed to the board's decisional independence,

especially as embodied in WWHA's conflict-of-interest policy, under which Hagstrom

Miller recuses herself from decisions involving WWH; and to the willingness of

Hagstrom Miller and "Whole Woman's Health" to expose themselves to public scrutiny

as exemplified by the *Hellerstedt* litigation.

In a recommended order of September 14, 2018, the ALJ framed the question

before her as, "Was [WWHA's] revised Application For License To Operate An

Abortion Clinic of October 6, 2017 regarding a clinic in South Bend incomplete and/or

inaccurate?" Pls.' Ex. 10, at 108. The ALJ concluded it was not. Specifically, the ALJ

found that there was

> no evidence provided during the proceedings that the
> responses provided by WWHA to [the Department's] October
> 27, 2017 eleven (11) questions were inaccurate, incomplete,
> or misleading. WWHA demonstrated by a preponderance of
> the evidence that their responses provided to [the
> Department's] request for additional information on October
> 27, 2017 was complete and accurate. [The Department]
> provided no evidence that they specifically inquired of
> WWHA regarding concerns that were raised based upon
> submissions to [the Department] by Indiana Senators in
> October and November 2017, or that were raised by
> [Department] staff's own 'informal investigation.' Therefore
> [the Department] has failed to show by a preponderance of
> the evidence that WWHA lacks a reputable and responsible
> character and should be denied a license for the South Bend
> clinic.

Pls.' Ex. 10, at 108–09. The ALJ recommended that the Department's denial be reversed

and that a license to operate the South Bend Clinic be granted to WWHA "based [on] the

information contained in the Revised Application of October 6, 2017, the December [8], 2017 information to [the Department] from WWHA, and the evidence from the proceedings." Pls.' Ex. 10, at 109.

The Department's lawyers were apparently bewildered by the ALJ's recommended order. Clearly, they thought, they had put on at least some evidence that Hagstrom Miller was a common controller of both WWHA and the other "Whole Woman's Health" entities; that WWHA therefore had "affiliates"; and that therefore WWHA's December 8, 2017, responses had been inaccurate. Further, though both sides had maintained that WWHA's veracity or lack of it turned on the definition of "affiliate" and on the subsidiary definition of "control," the Department's lawyers were surprised to find a discussion of that issue nowhere in the ALJ's recommended order.

Given that the ALJ did not answer the question whether WWHA had "affiliates" as a matter of state law, it appears her ruling addressed whether WWHA had *knowingly* provided inaccurate information to the Department. That is particularly evident in the ALJ's ruling on the "reputable and responsible character" requirement that, because WWHA had no specific notice of what information the Department was seeking, the Department had not shown WWHA lacked a reputable and responsible character. The implied major premise is that knowingly misleading the Department constitutes lack of reputable and responsible character. If that was the ALJ's approach, it appears to us to be an eminently sensible one, as the strictly interpretive question in which the parties mired themselves of whether other "Whole Woman's Health" clinics satisfied an unannounced definition of "affiliate" grew ever more remote from the question of whether the

Department ought to have granted WWHA a license to operate the South Bend Clinic.

The Department objected to the ALJ's proposed order and brought the matter before the Department's three-member Appeals Panel, its final decisionmaker. The Appeals Panel conducted a hearing on November 28, 2018, during which the parties rehearsed the same arguments as those before the ALJ as to whether Hagstrom Miller "controls" WWHA. By written order issued on December 18, 2018, by a two-to-one vote the Appeals Panel agreed with the Department that Hagstrom Miller does "control" WWHA. The Appeals Panel conceded that "[c]ontrol is not defined in Indiana's abortion laws[,]" Defs.' Ex. 2, at 114, but drew a definition from *Combs v. Daniels*, 853 N.E.2d 156 (Ind. Ct. App. 2006).

*Combs* considered whether a statute giving the Department "complete administrative control and responsibility" for a "state center for the short-term diagnostic and evaluative training of school-aged children with multiple developmental disabilities" included authority to close the center. *Id.* at 158, 161. The court concluded that it did, holding that "[t]he plain meaning of 'control' is 'the power or authority to manage, superintend, restrict, regulate, direct, govern, administer, or oversee,' as well as the power to restrain, check, or regulate." *Id.* (quoting *Williams v. State*, 253 N.E.2d 242, 246 (Ind. 1969) (upholding conviction for theft because "unauthorized control" did not require proof of unauthorized possession)).

In that light, the Appeals Panel concluded that Hagstrom Miller "controls Whole Woman's Health Alliance under Indiana law because she has 'the power or authority to manage, superintend, restrict, regulate, direct, govern, administer, or oversee, as well as

the power to restrain, check, or regulate' the activities and operations of the business."
Defs.' Ex. 2, at 114. The Appeals Panel appears to have rested its conclusion on the
authority given to Hagstrom Miller as president of WWHA under its bylaws and WWHA
board members' testimony as to Hagstrom Miller's management duties as chief
executive. *See* Defs.' Ex. 2, at 109–10. Accordingly, the Appeals Panel continued, given
Hagstrom Miller's basically undisputed "control" of the other "Whole Woman's Health"
LLCs, those LLCs and WWHA share a common controller and are therefore "affiliates."
Specifically, the Appeals Panel held,

> Whole Woman's Health, LLC; Whole Woman's Health of
> McAllen, LLC; Whole Woman's Health of Fort Worth, LLC;
> Whole Woman's Health of Baltimore, LLC; Whole Woman's
> Health of the Twin Cities, LLC; Whole Woman's Health of
> San Antonio, LLC; and Whole Woman's Health of Peoria,
> LLC are affiliates of Whole Woman's Health Alliance
> because those entities are under the common control of Amy
> Hagstrom Miller.

Defs.' Ex. 2, at 114. Because WWHA had failed to disclose these affiliates in response to
the Department's request, it was deemed to have provided inaccurate statements or
information and its license application was therefore properly denied under 410 Ind.
Admin. Code 26-2-5(7). The Appeals Panel expressed no opinion as to whether WWHA
had shown itself to have a reputable and responsible character.

Rather than seek judicial review of the Department's decision, at the instigation of
the Department WWHA reapplied for a license on January 19, 2019. By letter dated
February 25, 2019, the Department requested among other things the following
disclosures "for each affiliate of WWHA identified" in the Appeals Panel's order by

March 15, 2019:

> [A]ll reports, complaints, forms, correspondence, and other documents that concern, mention, or relate to any investigation, inspection, or survey of the affiliate by any state or other regulatory authorities at any time since and including January 1, 2014[;] . . . all forms, correspondence, reports, and other documents that concern, mention, or relate to any application(s) by the affiliate for licensure of or other permission to operate an abortion clinic at any time since and including January 1, 2014[;] . . . all orders, submissions, correspondence and other documents that concern, mention, or relate to any regulatory or administrative enforcement action, or administrative, civil or criminal court action involving the affiliate at any time since and including January 1, 2014[;] . . . the legal name and current address of each person who, at any time since and including January 1, 2014, has been an organizer, manager, director, owner, and/or officer of the affiliate.

Pls.' Ex. 3, at 19 (internal subdivisions omitted).

On March 15, 2019, the day its responses were due, WWHA otherwise complied with the Department's February 25, 2019, letter but responded in part as follows to the above quoted production demands:

> The December 2018 Order upholds the denial of WWHA's previous application. That Order does not govern WWHA's current application. In any event, the Department is not entitled to the extensive information it now demands. . . . The Department's demands concerning Whole Woman's Health clinics are not only irrelevant to determining whether WWHA satisfies the requirements for licensure, but exceptionally broad and burdensome. For example, providing "all orders, submissions, correspondence, and other documents that concern, mention, or relate" to every case that Whole Woman's Health has filed challenging restrictive abortion laws . . . would require the production not only of privileged communications, but hundreds of thousands of pages. Further, Whole Woman's Health clinics operate in five different states; they are regulated by multiple state and

> federal agencies. Identifying every document that "concerns, mentions, or relates to" inspections or surveys of those entities over a five year-period . . . would take weeks of document review. Similarly, all "copies of all forms, correspondence, reports, and other documents that concern, mention, or relate to any application(s) by the affiliate for licensure of or other permission to operate an abortion clinic at any time since and including January 1, 2014" would take dozens of hours to identify, much less produce.

Pls.' Ex. 3, at 22–23. WWHA noted further that it had already made the disclosures required by the new affiliate-disclosure requirement of Indiana Code § 16-21-2-11(d).

Unsurprisingly, the Department was not persuaded by WWHA's opinion on the scope and relevance of its production demands. The administrative proceedings stalemated with WWHA's March 15, 2019, letter.

## VI. WWHA's Lawsuit and the Instant Motion

While review of the Department's denial of WWHA's first license application was pending before the ALJ, WWHA joined the other Plaintiffs here in filing this lawsuit on June 1, 2018. The suit raises sweeping challenges to Indiana's entire regime for the regulation of abortion. As relevant here, the complaint seeks "facial invalidation" of the Licensing Law as violative of due process and equal protection guarantees. Br. Supp. 1. *See* Compl. ¶¶ 197, 199. But Plaintiffs' instant motion for a preliminary injunction, filed on March 27, 2019, seeks "much narrower," "as-applied" relief from the Licensing Law so that WWHA "may provide medication abortions at the South Bend Clinic pending entry of final judgment." Br. Supp. 1.

Plaintiffs' motion as filed includes a request for a temporary restraining order or, in the alternative, for expedited proceedings on the preliminary injunction request. We

denied the request for a temporary restraining order and set a hearing on the preliminary injunction. Dkt. 82. The hearing was conducted on April 22, 2019. Dkt. 106.

## Standard of Decision

"[P]laintiff[s] seeking a preliminary injunction must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *D.U. v. Rhoades*, 825 F.3d 331, 335 (7th Cir. 2016) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

At the threshold, plaintiffs seeking a preliminary injunction must show a better than negligible likelihood of success on the merits and irreparable harm. *Girl Scouts of Manitou Council, Inc. v. Girls Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (citations omitted); *Baskin v. Bogan*, 983 F. Supp. 2d 1021, 1024 (S.D. Ind. 2014) (citations omitted).

If this showing is made, the court, "attempt[ing] to minimize the cost of potential error," must then balance the private and public equities on a sliding scale to determine whether the injunction should issue. *Id.* That is, "'the more likely it is the plaintiff[s] will succeed on the merits, the less the balance of irreparable harms need weigh towards [their] side; the less likely it is the plaintiff[s] will succeed, the more the balance need weigh towards [their] side.'" *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 795 (7th Cir. 2013) (*quoting Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013)). The plaintiffs' burden is proof by a preponderance of the evidence. *Baskin*, 983 F. Supp. 2d at 1024.

<u>**Analysis**</u>

Most constitutional injury is presumed irreparable, *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011); *Baskin v. Bogan*, 983 F. Supp. 2d 1021, 1028 (S.D. Ind. 2014), with here-irrelevant exceptions for constitutional torts sufficiently analogous to common-law personal-injury claims. *See Campbell v. Miller*, 373 F.3d 834, 835 (7th Cir. 2004). And for patients "who lose the opportunity to exercise their constitutional right to an abortion, the irreparability of the harm is clear." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018).

We proceed, therefore, to (I) Plaintiffs' likelihood of success before turning to (II) the remaining injunction factors.

## I. Likelihood of Success on the Merits

Plaintiffs maintain that (A) the "reputable and responsible character" requirement as applied to WWHA's license applications is vague in violation of the Due Process Clause of the Fourteenth Amendment and (B) the Department's application of the Licensing Law to WWHA license applications unduly burdens access to previability abortions in violation of the Due Process Clause. Plaintiffs maintain as well that the Licensing Law's classifications offend the Equal Protection Clause of the Fourteenth Amendment. For reasons explained below, we address these claims together, finding a negligible chance of success on the first claim but better than negligible chances on the second and third.

Two points of departure merit clarification. First, in deciding whether an injunction should issue, we ask whether the movant will suffer irreparable injury unless

the injunction issues. *D.U. v. Rhoades*, 825 F.3d 331, 335 (7th Cir. 2016). Here, unless the injunction issues, the Licensing Law will continue to apply to WWHA and the South Bend Clinic. It will do so in the context of how matters stood on March 15, 2019, the Department's deadline for responding to its February 25, 2019, production demand. That is true no matter whether continued application of the Licensing Law would involve excusing WWHA's lateness in failing to meet the deadline and resumption of the proceedings on WWHA's second application; a third application by WWHA, which would doubtlessly be subject to identical demands from the Department; or the Department's denial of the second application and refusal to entertain a third. Accordingly, we examine Plaintiffs' claims challenge in light of how matters stood on March 15, 2019.

Second, we draw no distinction between the Department's discretionary conduct, its regulations, and the state statutes. "If the action of [an executive or administrative body] is official action it is subject to constitutional infirmity to the same but no greater extent than if the action were taken by the state legislature." *Snowden v. Hughes*, 321 U.S. 1, 11 (1944). "In other words, if it is constitutional for the state legislature to write a statute that would permit the action taken by an administrative agency, then the agency's action is necessarily constitutional." *Thielman v. Leean*, 140 F. Supp. 2d 982, 997 (W.D. Wis. 2001) (Crabb, J.) (citing *Snowden*, 321 U.S. at 11).

A.  *Plaintiffs Have a Negligible Chance of Success on Their As-Applied Vagueness Challenge to the "Reputable and Responsible Character" Requirement*

The Fourteenth Amendment provides that no state may "deprive any person of

life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1, cl.

3. "It is a fundamental tenet of due process that 'no one may be required at peril of life,

liberty or property to speculate as to the meaning of . . . statutes.'" *United States v.*

*Batchelder*, 442 U.S. 114, 123 (1979) (alteration omitted) (quoting *Lanzetta v. New*

*Jersey*, 306 U.S. 451, 453 (1939)). Thus, the state violates the guarantee of due process

"by taking away someone's life, liberty, or property under a . . . law so vague that it fails

to give ordinary people fair notice of the conduct it punishes, or so standardless that it

invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015)

(citing *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983)).

Three constitutional policies are served by the proscription against vague

enactments:

> First, because we assume that [a person] is free to steer
> between lawful and unlawful conduct, we insist that laws give
> the person of ordinary intelligence a reasonable opportunity
> to know what is prohibited, so that he may act accordingly. . .
> . Second, . . . [a] vague law impermissibly delegates basic
> policy matters to policemen, judges, and juries for resolution
> on an ad hoc and subjective basis, with the attendant dangers
> of arbitrary and discriminatory application. Third, but related,
> where a vague statute "abuts upon sensitive areas of basic
> First Amendment freedoms," it "operates to inhibit the
> exercise of those freedoms." Uncertain meanings inevitably
> lead citizens to "steer far wider of the unlawful zone" . . . than
> if the boundaries of the forbidden areas were clearly marked."

*Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) (citations and alterations

omitted). The applicability of the third policy is not limited to the First Amendment,

however. *Colautti v. Franklin*, 439 U.S. 379, 391 (1979) (right to abortion) ("threatens to

inhibit the exercise of constitutionally protected rights"); *Karlin v. Foust*, 188 F.3d 446,

458 (7th Cir. 1999) (right to abortion) ("threatens to inhibit the exercise of constitutionally protected rights, such as the present case"); *Planned Parenthood of Wis. v. Doyle*, 162 F.3d 463, 469 (7th Cir. 1998) (right to abortion) ("so vaguely that it makes doctors afraid to perform constitutionally permissible abortions").

The vagueness analysis proceeds in light of the foregoing policies.

> Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. And the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed. Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982).[2]

Defendants raise a preliminary question regarding the applicability of these cases here. They point out that these cases address vagueness in relation to primary regulations of conduct, not in relation to license qualifications. This point is well taken, though of

---

[2] On the importance of the possibility for informal or administrative clarification, see further *Trustees of Indiana University v. Curry*, 918 F.3d 537, 541–42 (7th Cir. 2019) (citing *Civil Serv. Comm'n v. Letter Carriers*, 413 U.S. 548 (1973); *Bauer v. Shepard*, 620 F.3d 704 (7th Cir. 2010)).

uncertain significance.

The Supreme Court has entertained vagueness challenges to non-conduct-regulating rules (of which *Hoffman Estates* is not an example, for it addressed vagueness in the definition of the conduct requiring a license, not of the license qualifications, 455 U.S. at 492), but we have not found any case in which such a challenge has been successful, and Plaintiffs have not cited one. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588–89 (1998) (rejecting vagueness challenge to NEA grant qualifications) ("[I]t seems unlikely that speakers will be compelled to steer too far clear of any 'forbidden area' in the context of grants of this nature. . . .[T]he consequences of imprecision are not constitutionally severe."); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) (rejecting vagueness challenge to purported license "requirement" for operating an amusement center because no requirement at all) ("It is a basic principle of due process that an enactment is void for vagueness if its *prohibitions* are not clearly defined."); *Law Students Civil Rights Research Council, Inc. v. Wadmond*, 401 U.S. 154 (1971) (rejecting challenge to New York's character-and-fitness bar-admission requirement).

The Seventh Circuit has read *Aladdin's Castle* to suggest that the vagueness doctrine applies "in attenuated form" to licensing provisions and has assumed without deciding that there are at least some limits on the permissible degree of vagueness of such provisions—even in "refusal to license" cases (of which *Aladdin's Castle* was one), as distinct from license-revocation cases, where the prohibitory and quasi-penal effects are stronger. *Baer v. City of Wauwatosa*, 716 F.2d 1117, 1124 (7th Cir. 1983). *E.g., Hegwood*

*v. City of Eau Claire*, 676 F.3d 600 (7th Cir. 2012) (rejecting vagueness challenges to statute authorizing liquor-license revocation for keeping or maintaining "disorderly or riotous, indecent or improper house").

Whatever those limits may be, they were not transgressed here. Concededly, the precise factual predicates of Plaintiffs' as-applied challenge to the "reputable and responsible character" requirement are difficult to discern because the Department's application of the requirement had little force. *Cf. McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014); *Little Arm Inc. v. Adams*, 13 F. Supp. 3d 893, 909 (S.D. Ind. 2014) (Young., J.). The December 18, 2018, order of the Department's Appeals Panel embodied the Department's final action on WWHA's first license application, *see* Ind. Code § 4-24.5-1-6, but that order upheld the Department's denial on the basis of the "accurate statements and information" requirement only and never addressed the "reputable and responsible character" requirement. Except for one somewhat Delphic pronouncement, neither did the ALJ's September 14, 2018, recommended order.

However, to the extent that the Department's initial denial letter of January 3, 2018, rested in part on the "reputable and responsible character" requirement, and to the extent that the requirement continued to bear on the subsequent administrative proceedings, it is clear what the Department considered to be indicative of WWHA's lack of reputable and responsible character: the knowing misleading of the licensor from which WWHA was seeking a license. Though this theory was, so far as we can tell from the record, never stated in strong terms, its adoption by the Department may be inferred from various indicia.

The Department was perhaps first primed to find knowing dishonesty on WWHA's part by Senator Houchin's letter, which alleged that, "[w]hile [WWHA] would like [the Department] and the public to believe they have women's interests at heart, the record of this Texas-based company shows otherwise." Pls.' Ex. 10, at 75.

Hagstrom Miller, who was present as a witness and party representative for the entire proceeding before the ALJ, avers that, "[t]hroughout the hearing, the Department insinuated that WWHA sought to hide its relationship with WWH because of concerns about WWH's reputation." Pls.' Ex. 3, ¶ 46.

In response to WWHA's inquiry as to the criteria being used to determine whether an applicant had a reputable and responsible character, the Department responded, "[A] person or entity of 'reputable or responsible character' would be truthful and forthcoming with the information requested in the [October 27, 2017,] Request for Additional Information." Pls.' Ex. 10, at 85.

Matthew Foster, who currently oversees the Department's regulation of abortion clinics, avers that the Department believed WWHA's December 8, 2017, responses to the Department's October 27, 2017, requests to be "at best incomplete and perhaps deliberately misleading." Defs.' Ex. 2, ¶ 32.

As remarked on under "Background," Part V, *supra*, the ALJ's recommended order appears to be based on the assumption that the Department's only theory as to lack of reputable and responsible character was that WWHA knowingly misled it.

Finally, at oral argument on Plaintiffs' motion, Defendants explained the Department's failure to give guidance in its October 27, 2017, requests as to the meaning

of "affiliate" was "part of [its] investigative technique." Tr. 53:23–24. In other words, the Department was less explicit than it could have been because it wanted to know whether WWHA would disclose the "affiliates" the Department already "knew" it to have. The Department was waiting for WWHA to deliberately mislead it, as a police officer follows car waiting for it to commit a moving violation.

A person of ordinary intelligence would understand that, if a licensor requires her to have a "reputable and responsible character" to be awarded a license, that requirement encompasses not knowingly misleading the licensor during the license-application process. To that extent, the "reputable and responsible character" requirement establishes "an imprecise but comprehensible normative standard," *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971), which is directly related and relevant to the licensor's task. *See Wadmond*, 401 U.S. at 159 (character-and-fitness bar-admission requirement applied only to "dishonorable conduct relevant to the legal profession" and "instances of misconduct clearly inconsistent with the standards of a lawyer's calling"). Dishonesty at the application stage seriously, sometimes fatally, weakens any regulatory goal the licensing scheme is designed to serve given its false predicates. In other words, no license is worth very much if the applicant lied to get it. Conversely, liars are poor candidates for licensure.

Plaintiffs correctly point out that the Department has promulgated no standards (at least none that appear in the record) for determining what constitutes a reputable and responsible character. Plaintiffs seize on this lack of more definite standards to argue that the requirement can be and in this case has been arbitrarily and discriminatorily applied

on the basis of nothing more than an animus toward abortion and abortion providers.

Plaintiffs emphasize as well the fundamental constitutional right at stake in licensure of

abortion providers, as opposed to, say, licensure of operators of amusement centers.

As for the lack of more definite standards fleshing out the "reputable and

responsible character requirement," breadth or the necessity for subjective judgments do

not equal vagueness where these are appropriate and even necessary to accomplish

permissible regulatory goals. *See Wadmond*, 401 U.S. at 159; *Konigsberg v. State Bar*,

366 U.S. 36, 40–41 (1961) ("good moral character" bar-admission requirement "is not,

nor could well be, drawn in question"); *Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232,

239 (1957) ("good moral character" bar-admission requirement "must have a rational

connection with the applicant's fitness or capacity to practice law"); *id.* at 249

(Frankfurter, J., concurring) ("It cannot be that that conception—moral character—has

now been found to be so indefinite, because necessarily implicating what are called

subjective factors, that the States may no longer exact it from those who are to carry on

'the public profession of the law.'").

Defendants point to no fewer than twenty-nine statutes from jurisdictions across

the country which employ "reputable and responsible character" as a licensing criterion

for health-care and related facilities.[3] We view this as good evidence for the proposition

---

[3] Defendants cite the following provisions: "Ind. Code § 12-25-1-4 (mental health facilities); Ind. Code § 16-28-2-2 (health facilities generally); Ind. Code § 16-21-2-11 (hospitals); Ala. Code § 22-21-23 (hospitals, nursing homes, and other health facilities); Cal. Health & Safety Code § 1596.95 (daycare centers); Cal. Health & Safety Code § 1569.15 (nursing homes); Cal. Health & Safety Code § 1265.3 (health facilities generally); Cal. Health & Safety Code § 1796.19 (home care aides); Cal. Health & Safety Code § 1575.2 (adult daycare homes); Cal. Health & Safety

that state health regulators find it appropriate and even necessary to a take a broad view of an applicant's fitness for having the health and safety of patients and clients entrusted to it. *See Wadmond*, 401 U.S. at 160 (noting fifty states, District of Columbia, Puerto Rico, Virgin Islands, and Court itself all required good character for bar admission).

In any event, the susceptibility of the "reputable and responsible character" requirement to arbitrary and discriminatory enforcement is of little help to Plaintiffs unless the requirement actually has been applied in this manner. In the relevant sense, it has not been. Every rule is susceptible of arbitrary enforcement in the sense that charges may be laid without sufficient evidence to support them. That does not make every rule vague. Rather, it falls to those who review the enforcement decision to ferret out the lack of evidentiary support, as measured against a nonvague rule application.

Assuming for the sake of argument that there was arbitrariness here, it was of this type. Plaintiffs proceed from a mistaken premise in arguing that the Department abused the "reputable and responsible character" requirement by "conclud[ing] that WWHA's good-faith understanding of its ownership structure amounted to a character flaw." Br.

---

Code § 1416.22 (nursing homes); Cal. Health & Safety Code § 1597.54 (family daycare homes); Cal. Health & Safety Code § 1212 (medical clinics); Ga. Code Ann. § 43-27-6 (nursing homes); Haw. Rev. Stat. Ann. § 346-154 (childcare facilities); Md. Code Ann., Health-Gen. § 19-319 (hospitals); Md. Code Ann., Health-Gen. § 19-906 (hospice care facilities); Minn. Stat. Ann. § 144.51 (hospitals and other health facilities); Nev. Rev. Stat. Ann. § 449.4311 (intermediary service organizations); Nev. Rev. Stat. Ann. § 449.040 (medical facilities generally); N.D. Cent. Code Ann. § 23-17-02 (chiropractic hospitals); Okla. Stat. Ann. tit. 63, § 1-703 (hospitals); Okla. Stat. Ann. tit. 10, § 1430.14 (homes for the disabled); Okla. Stat. Ann. tit. 63, § 330.53 (long-term care facilities); Okla. Stat. Ann. tit. 63, § 1-1904 (nursing homes); S.C. Code Ann. § 40-35-40 (health care administrators); Tenn. Code Ann. § 33-2-406 (mental health and substance abuse facilities); Tenn. Code Ann. § 71-2-404 (adult day care); Tenn. Code Ann. § 68-11-206 (traumatic brain injury residential homes); W. Va. Code Ann. § 16-5B-2 (hospitals, ambulatory surgical centers, and extended care facilities)." Defs.' Br. Opp. 17 n.2.

Supp. 23. It was precisely *not* the Department's conclusion, or strong surmise, that WWHA had done no more than communicate its "good-faith understanding of its ownership structure." And the lack of evidentiary support for a finding of knowing dishonesty, arbitrary or not, was ferreted out when first the ALJ and then the Appeals Panel declined to sustain the Department's license denial on "reputable and responsible character" grounds.

See *Schware*, in which the Court accepted that advocating the violent overthrow of the federal government would support a finding of "bad moral character" in the bar-admission context, but found that state bar examiners had impermissibly used an applicant's former membership in the Communist Party as a proxy for such advocacy, of which *per se* there was no evidence. 353 U.S. at 243–47. There was no suggestion, however, that the fault lay in the vagueness of the "good moral character" standard. *See id.* at 239; *id.* at 249 (Frankfurter, J., concurring).

Finally, as for the fundamental constitutional right at stake in this case, Plaintiffs have not made (or attempted) any showing that uncertainty around the "reputable and responsible character" requirement has caused any prospective abortion provider, still less WWHA, to "steer far wider" of the zone of "no reputable or responsible character" than they otherwise would have absent the requirement. *Grayned*, 408 U.S. at 109. It is difficult even to conceive of how such a showing could be made.

Defendants suggest that the Department's March 15, 2019, production demand relates to the its need to determine whether WWHA has a reputable and responsible character. Br. Opp. 4–5, 36. It thus appears certain that, if WWHA continues to pursue a

license, absent an injunction the "reputable and responsible character" requirement will again be applied to it. However, we cannot know whether that application will be to WWHA's detriment nor, if so, what facts it will purport to rest on. We cannot grant as-applied relief by conceiving of some "'set of hypothetical facts under which the statute might be unconstitutional.'" *Little Arm*, 13 F. Supp. 3d at 909 (quoting *Hegwood*, 676 F.3d at 603). Until it "is soon to occur and the way in which it works can be determined[,]" *id.* (quoting *Brandt v. Village of Winnetka*, 612 F.3d 647, 650 (7th Cir. 2010)), we will not assume a future application will be arbitrary or discriminatory where the only application to date "show[s] . . . willingness to keep . . . investigation[] within constitutionally permissible limits." *Wadmond*, 401 U.S. at 167.

Plaintiffs have a negligible chance of success on their vagueness challenge to the "reputable and responsible character" requirement as applied to WWHA's license applications.

B. *Plaintiffs Have in Part a Better Than Negligible Chance of Success on Their Undue-Burden and Equal Protection Challenges to the Department's Application of the Licensing Law*

We note at the outset that, with respect to Plaintiffs' as-applied undue-burden challenge, Plaintiffs' motion for a preliminary injunction is not strictly preliminary to anything. The complaint pleads only that "[t]he challenged laws," including the Licensing Law, are unconstitutional—that is, on their face, not as applied to WWHA by the Department. Compl. ¶ 197. Understandably: the complaint was filed on June 21, 2018, six months before the December 18, 2018, order of the Appeals Panel finally denied WWHA's license application for the South Bend Clinic. Thus, none of the facts

related to the administrative proceeding relied upon by Plaintiffs in support of their as-applied undue-burden challenge are pleaded in the complaint. None would be heard at the time of final judgment on Plaintiffs' facial challenges. *See Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011) ("In a facial constitutional challenge, individual application facts do not matter."). But neither Plaintiffs nor, more importantly, Defendants have raised this point.

The question presented by Plaintiffs' as-applied undue-burden claim—as well as its facial equal protection claim, as explained below—is whether the Department in purpose or effect has placed a substantial obstacle in the path of women in northern Indiana seeking previability abortions by prohibiting WWHA from providing medical abortions at the South Bend Clinic, first by denying WWHA's first license application, then by refusing to grant WWHA's second application until it complies with the Department's February 25, 2019, production demand and the materials produced establish WWHA's "reputable and responsible character." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2300 (2016); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 878 (1992) (joint op. of O'Connor, Kennedy, Souter, JJ.[4] [hereinafter joint op.]); *Roe v. Wade*, 410 U.S. 113, 152–53 (1973).

Among the liberties protected by the Due Process Clause is freedom from state-required motherhood. *Roe*, 410 U.S. at 152–53. In part that liberty is protected from state deprivation without due process of law by guaranteeing a pregnant woman's choice to

---

[4] The joint opinion constitutes the holding of the *Casey* Court in relevant part under *Marks v. United States*, 430 U.S. 188, 193–94 (1977).

terminate her pregnancy before fetal viability without undue state interference. *Casey*,

505 U.S. at 846 (maj. op.). Without exception, "a State may not prohibit any woman from

making the ultimate decision to terminate her pregnancy before viability." *Id.* at 879

(joint op.). *Accord id.* at 846 (maj. op.). Further, a provision of law imposes "an 'undue

burden' on a woman's right to decide to have an abortion, and consequently . . . is

constitutionally invalid, if the 'purpose or effect' of the provision 'is to place a substantial

obstacle in the path of a woman seeking an abortion before the fetus attains viability.'"

*Hellerstedt*, 136 S. Ct. at 2300 (emphasis omitted) (quoting *Casey*, 505 U.S. at 878 (joint

op.)).

The Fourteenth Amendment also provides that no state may "deny to any person

within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1, cl.

4. This is "essentially a direction that all persons similarly situated should be treated

alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "When social

or economic legislation is at issue, the Equal Protection Clause allows the States wide

latitude" to draw appropriate lines: their "legislation is presumed to be valid and will be

sustained if the classification drawn by the statute is rationally related to a legitimate state

interest." *Id.* But a heightened standard of judicial review applies to state laws predicated

on certain "suspect" classifications such as race, as well as to those which "impinge on

personal rights protected by the Constitution[,]" *id.*, such as the right to obtain a

previability abortion. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 n.3 (1976).

Plaintiffs and Defendants disagree over the appropriate standard of review for

Plaintiffs' equal protection claims: Plaintiffs say intermediate scrutiny, Br. Supp. 35;

Defendants say rational-basis review. Br. Opp. 34. We think the standard under the Equal Protection Clause is the same as that under the Due Process Clause, that is, the undue-burden standard. Defendants agree at least that the Equal Protection Clause cannot be more protective of the abortion right than is the Due Process Clause. Br. Opp. 33–34.

In *Harris v. McRae*, 448 U.S. 297 (1980), the Court overruled a raft of constitutional objections to a provision of federal law generally prohibiting reimbursement of abortion costs by Medicaid known as the Hyde Amendment. The Court held first that the Hyde Amendment did not violate the substantive abortion right. *Id.* at 318. The Court then subjected the plaintiffs' equal protection claim to rational-basis review because the Hyde Amendment was not predicated on a suspect classification and because the Court "ha[d] already concluded that the Hyde Amendment violates no constitutionally protected substantive rights." *Id.* at 322.

As the Court explained, "The guarantee of equal protection . . . is not a source of substantive rights or liberties, but rather a right to be free from invidious discrimination in statutory classifications and other governmental activity." *Id.* Thus no heightened review applies where the law "does not itself impinge on a right or liberty protected by the Constitution," or, in other words, where the law "violates no constitutionally protected substantive rights." *Id.*

Whether the Licensing Law impinges on the abortion right is defined by the Due Process Clause. And because the Equal Protection Clause is not itself "a source of substantive rights," *id.*, Plaintiffs cannot expand the substantive scope of the abortion right by resort to the Equal Protection Clause. *See San Antonio Indep. Sch. Dist. v.*

*Rodriguez*, 411 U.S. 1, 33 (1973) ("It is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws.").

Plaintiffs cite *Obergefell v. Hodges*, 133 S. Ct. 2584 (2015), which emphasizes that "the two Clauses may converge in the identification and definition of [a] right." *Id.* at 2603. If *Obergefell* is inconsistent with *Harris* or *Rodriguez*, the inconsistency is not material here. *See Plyler v. Doe*, 457 U.S. 202, 232 (1982) (Blackmun, J., concurring) ("Classifications infringing substantive constitutional rights necessarily will be invalid, if not by force of the Equal Protection Clause, then through operation of other provisions of the Constitution."); *Rodriguez*, 411 U.S. at 61 (Stewart, J., concurring) ("[Q]uite apart from the Equal Protection Clause, a state law that impinges upon a substantive right or liberty created or conferred by the Constitution is, of course, presumptively invalid, whether or not the law's purpose or effect is to create any classifications.").

Accordingly, under the Equal Protection Clause, we review whether the Licensing Law's classifications impinge on the exercise of the fundamental abortion right, *Plyler*, 457 U.S. at 216–17, as defined by the Due Process Clause. *Casey*, 505 U.S. at 846 (maj. op.). Defendants bear the burden of showing constitutionality under either clause. *See Ezell*, 651 F.3d at 706 (citing *District of Columbia v. Heller*, 554 U.S. 570, 628 n.27 (2008); *United States v. Carolene Prods. Co.*, 304 U.S. 144, 154 n.4 (1938)).

"The rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Hellerstedt*, 136 S. Ct. at 2309. The benefits of a law are measured against the state's legitimate interests

in this field and in comparison to those derived from prior law. *Id.* at 2311. First, "[a]s with any medical procedure, the State may enact regulations to further the health and safety of a woman seeking an abortion." *Casey*, 505 U.S. at 878 (joint op.). But "'unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right'" to seek a previability abortion. *Hellerstedt*, 136 S. Ct. at 2300 (alteration omitted) (quoting *Casey*, 505 U.S. at 878 (joint op.)).

Second, the state has a legitimate interest in preserving life that may one day become a human being. *Casey*, 505 U.S. at 878 (joint op.). To promote that interest, the state may enact measures to ensure the woman's choice is philosophically and socially informed and to communicate its preference (if it has one) that the woman carry her pregnancy to term. *Id.* at 872 (joint op.). But such measures "must be calculated to inform the woman's free choice, not hinder it[,]" and even if so calculated may not present a substantial obstacle to its exercise. *Id.* at 877 (joint op.).

Third, the state may choose to further the same interest by enacting measures "'protecting the integrity and ethics of the medical profession' . . . in order to promote respect for life," *Gonzales v. Carhart*, 550 U.S. 124, 158 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997)), but such measures equally may not impose undue burdens. *Id.*

The burdens of a law are measured by their impacts on women for whom they are a relevant restriction on the choice to seek a previability abortion. *Hellerstedt*, 136 S. Ct. at 2313; *Casey*, 505 U.S. at 895. "The proper focus of constitutional inquiry is the group

for whom the law is a restriction, not the group for whom the law is irrelevant." *Casey*,

505 U.S. at 895. If the impacts amount to a substantial obstacle to the abortion decision

for a "large fraction" of that group, the burdens imposed are undue. *Hellerstedt*, 136 S.

Ct. at 2313; *Casey*, 505 U.S. at 895. If a law imposes several incremental burdens, their

impacts are assessed together. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind.*

*State Dep't of Health*, 896 F.3d 809, 827 (7th Cir. 2018) (citing *Hellerstedt*, 136 S. Ct. at

2313), *petition for cert. filed* (Feb. 4, 2019).

Against the backdrop of these principles, the court then turns to

> its ultimate task of determining whether the burdens of the
> law's requirements were "disproportionate, in their effect on
> the right to an abortion" compared "to the benefits that the
> restrictions are believed to confer." To determine whether a
> burden is undue, the court must "weigh the burdens against
> the state's justification, asking whether and to what extent the
> challenged regulation actually advances the state's interests.
> If a burden significantly exceeds what is necessary to advance
> the state's interests, it is 'undue,'" and thus unconstitutional.

*Id.* (quoting *Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 919 (7th Cir.

2015)).

*Hellerstedt* ratified *Schimel*'s conclusion that *Casey* balancing is not conducted

under a simple preponderance standard. *See id.* Rather, when striking down provisions of

law as imposing undue burdens on the previability abortion right, the Supreme Court and

the Seventh Circuit have found the state's asserted legitimate interests to be nil or their

marginal advancement *de minimis*, and the burdens on the abortion right to be substantial.

*Hellerstedt*, 136 S. Ct. at 2311–13 (striking down admitting-privileges requirement

because resulting in closure of half of state's abortion clinics with "virtual absence of any

health benefit"); *id.* at 2318 (striking down surgical-center requirement because "provid[ing] few, if any, health benefits for women" and "pos[ing] a substantial obstacle to women seeking abortions"); *Casey*, 505 U.S. at 887–898 (striking down spousal-notification requirement because no legitimate state interest in enforcing view of marriage "repugnant to our present understanding" and safety of women and their children endangered); *Planned Parenthood of Ind. & Ky.*, 896 F.3d at 831 (striking down ultrasound requirement because "impos[ing] significant burdens against a near absence of evidence that the law promotes either of the benefits asserted by the State"); *Schimel*, 806 F.3d at 916 (striking down admitting-privileges requirement because "substantially curtail[ing]" statewide availability of abortion "without . . . any [legitimate] benefit").

We begin our analysis with an examination of the benefits derived from the Department's application of the Licensing Law. There are three sets of distinct though interrelated benefits presented, which must be examined in light of their interrelation. First, there are the benefits to the state derived from the Department's enforcing its production demand of February 25, 2019. Defendants suggest those benefits run to the Department's capacity to determine whether WWHA has a reputable and responsible character. Br. Opp. 4–5, 36. Thus, second, there are the benefits to the state derived from the Department's determination of WWHA's reputable and responsible character as a condition of licensure. Third and finally, therefore, there are the benefits to the state in enforcing the licensure requirement against WWHA in particular.

We further divide the last-mentioned into those benefits derived from the licensure requirement as a whole, for the purposes of the due process claim, and, for the purposes

of the equal protection claim, into those derived from the Licensing Law's challenged classifications.

The first of these challenged classifications is the Licensing Law's distinction between a health care provider who provides an abortion-inducing drug "for the purposes of inducing an abortion" and one who does so for another purpose. Ind. Code § 16-18-2-1.5(a)(2). The former requires a license; the latter does not. *Id.* § 16-21-2-10. Necessarily implied by this distinction is another between women seeking an abortion-inducing drug for the purposes of inducing an abortion, who are restricted to licensed providers, and women seeking an abortion-inducing drug for the purposes of treating miscarriages (the only nonabortion purpose of abortion-inducing drugs appearing in the record), who are unrestricted in their choice of provider. Br. Supp. 36. Thus, we ask what benefits accrue to the state by classifying abortion patients differently from miscarriage patients in this respect.

The second and third challenged classifications are in reality none at all, and again (without objection from Defendants) play fast and loose with the scope of the facial challenges pleaded in the complaint. *See* Compl. ¶ 199. Plaintiffs maintain that the Licensing Law's five-patient floor "treats the South Bend Clinic's first four medication abortion patients each year differently than its subsequent patients." Br. Supp. 36. It does not. WWHA intends to and, if permitted to, will almost certainly provide more than four medical abortions annually at the South Bend Clinic. The Licensing Law requires it to have a license to do so. Its first patient and its hundred-and-first patient are treated precisely equally in this respect: neither may obtain an abortion at the South Bend Clinic

unless it is licensed. It defies credulity and common sense to suggest that WWHA will ask the South Bend Clinic's every fifth annual patient to please wait while it seeks a license or license renewal from the Department before treating her.

The Licensing Law does treat classes of medical-abortion providers differently in this respect, but by seeking application of heightened scrutiny we understand Plaintiffs' to be raising their patients' equal protection rights, not their own. *See Birth Control Ctrs., Inc. v. Reizen*, 743 F.2d 352, 358 (6th Cir. 1984) (applying rational-basis standard to abortion providers' equal protection claim) ("[W]e are not aware of any authority that allows plaintiffs to use their patients' due process rights as a means of elevating the standard of review for their own equal protection rights."); *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 984 F. Supp. 2d 912, 921–22 (S.D. Ind. 2013) (Magnus-Stinson, C.J.) (applying rational-basis standard to abortion providers' equal protection claim).

Plaintiffs maintain further that the Department's application of the Licensing Law has "subject[ed] WWHA to greater scrutiny than other abortion clinic applicants." Br. Supp. 35. This alleges not a class-based equal protection claim in the conventional sense but a "class of one" claim, in which a plaintiff alleges it has been arbitrarily singled out for oppressive treatment. *Engquist v. Or. Dep't of Ag.*, 553 U.S. 591, 601 (2008) ("even if the plaintiff has not alleged class-based discrimination," class-of-one doctrine may apply); *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam). Yet Plaintiffs insist they do not allege a class-of-one claim; consequently, they fail to argue under the correct standard ("'something other than the normal rational-basis test . . . ,' [though] that

something has not been clearly delineated[,]" *Brunson v. Murray*, 843 F.3d 698, 708 (7th Cir. 2016) (quoting *Del Marcelle v. Brown Cty. Corp.*, 680 F.3d 887, 900 (7th Cir. 2012) (Easterbrook, J., concurring in the judgment))); and consequently, they fail to show a likelihood of success on the merits.

We examine the three sets of benefits in the order outlined above. First, the benefits to the state, specifically to the Department's enforcement of the Licensing Law and the "reputable and responsible character" requirement, derived from the Department's enforcing its production demand of February 25, 2019, are not negligible, as Plaintiffs maintain.

There is no longer any room for confusion on the meaning of "affiliate." That question has been settled, whether by the preclusive effect of the Appeals Panel's determination of WWHA's "affiliates," as the Department apparently correctly believes, *see Dev. Servs. Alts., Inc. v. Ind. Family & Soc. Servs. Admin.*, 915 N.E.2d 169, 180, 180 n.11 (Ind. Ct. App. 2009), or by the newly minted statutory definition of "affiliate" for abortion-clinic licensure. Ind. Code § 16-18-2-9.4. WWHA's "affiliates" are abortion clinics under the control of Hagstrom Miller. Plaintiffs tilt at windmills in steadfastly maintaining the contrary. In any event the correctness of that state-law determination "can neither add to nor subtract from" the constitutionality of the Department's conduct, *Snowden v. Hughes*, 321 U.S. 1, 11 (1944), which we must, and here do, evaluate only under the applicable constitutional standard.

It is apparent that Hagstrom Miller is significantly involved in the governance and operation of WWHA, the board's formal decisional independence notwithstanding; that

Hagstrom Miller is solely responsible for the other "Whole Woman's Health" clinics; and that in all areas other than this litigation (including the *Hellerstedt* litigation) the "Whole Woman's Health" "consortium" draws no such technical organizational distinctions as Plaintiffs now insist are controlling here. It cannot be said that how those clinics operate is not instructive as to how WWHA will operate the South Bend Clinic, nor to WWHA's "reputable and responsible character." Information relating to other "Whole Woman's Health" clinics as demanded by the Department on February 25, 2019, is clearly germane to the Department's task and advances the Licensing Law's purposes.

To the benefits derived from such advancement we turn next. The "reputable and responsible character" requirement has obvious utility as an *ex ante* credentialing mechanism. Plaintiffs have not argued (nor could they) that, in the abstract, the state gains nothing by licensing only those health care providers shown to have reputable and responsible characters in respects relevant to the provision of health care and to the soundness of the licensing procedure itself. (As discussed in relation to vagueness, Part I, Section A, *supra*, there is no evidence that the Department has yet applied the "reputable and responsible character" requirement in respects irrelevant to these concerns.)

On the facts of this case, however, the benefits derived from *further* application of the "reputable and responsible character" requirement appear slight. Defendants have come to know a great deal about WWHA and "Whole Woman's Health" since August 11, 2017, but nonetheless point to two areas they believe justify further inquiry. Defendants point to testimony given by Plaintiff Dr. Jeffrey Glazer in discovery on Plaintiffs' motion as suggesting that his treatment practices merit particular scrutiny, in

furtherance of the state's interest in preserving the integrity of the medical profession. Plaintiffs stridently resist Defendants' characterization of Plaintiff Glazer's testimony. We agree with Plaintiffs that the evidence overall suggests that Plaintiff Glazer is a competent, responsible provider of ob/gyn care generally and abortion care specifically.

But the point as framed by Defendants is in any event of dubious relevance to Defendants' case. It is undisputed that Plaintiff Glazer has provided medical abortions in Indiana subject to this state's (and others') physician and clinic licensure rules without a whisper of concern on the Department's part. As Indiana today has only six licensed clinics, it is not credible, and Defendants do not suggest, that Plaintiff Glazer's practice has only until now escaped the Department's notice. If Defendants have only in the course of this litigation unearthed causes for concern with Plaintiff Glazer's practice, that says little or nothing about the benefits derived from the Licensing Law as written.

Defendants contend next that "specific identified evidence" shows that other Whole Woman's Health clinics have failed to operate safely." Br. Opp. 28. That contention is not well supported. Defendants cite reports of inspections conducted by the Texas Department of State Health Services of three "Whole Woman's Health" clinics in Texas. Those reports assessed each clinic inspected with several deficiencies. According to Plaintiffs' unrebutted expert testimony, however, such deficiencies are "common" in the inspection of any health care facility ("Indeed, it is extremely rare for an inspector not to find a deficiency during an inspection.") and "are not indicative of a threat to patient health and safety." Pls.' Reply Ex. 1, ¶ 10. Deficiencies are cured through development and implementation of a plan of correction as a normal part of health-care-facility

regulation. *Id. See* 410 Ind. Admin. Code 26-3-4(a) ("The abortion clinic must file an acceptable plan of correction with [the Department] within ten . . . days of receipt of a survey report . . . that documents noncompliance with state rules.").

Unsurprisingly, actual ongoing threats to patient safety are not tolerated while a plan of correction is developed and implemented. Rather, "[i]f a health inspection determined that patient health was being endangered, it would typically lead to a suspension or termination of a facility's license or accreditation standards." Pls.' Reply Ex. 1, ¶ 12. And it is uncontested that no "Whole Woman's Health" clinic has had its license or accreditation revoked, save for one erroneous revocation in 2006 followed by corrective restoration within eight days at the "Whole Woman's Health" clinic in Beaumont, Texas. Pls.' Ex. 3, ¶ 4. In any event, the relevance of other "Whole Woman's Health" clinics' standards of operation as a general matter notwithstanding, none of the particular cited deficiencies (such as keeping bleach and other cleaning chemicals in "the laundry area (closed off only by a curtain)," Defs.' Ex. 2, at 37) furnish a substantial basis for doubting WWHA's reputable and responsible character.

Thus we turn to the benefits derived from applying the Licensing Law at all. We begin with those benefits as a general matter, as relates to Plaintiffs' due process claim. Foster avers that licensure "enables [the Department] to enforce important safety and health regulations." Defs.' Ex. 2, ¶ 7. (We note that, for the purposes of the instant motion, Plaintiffs have not challenged any of these regulations. We therefore assume them to be permissible.) Specifically, "[l]icensure enables [the Department] to do regular surveys of abortion clinics, and to perform complaint investigations according to

standardized protocols and criteria. Without licensure, [the Department] would be unable to perform such standardized surveys and investigations[.]" *Id.* ¶ 8. Further, "[l]icensure also enables [the Department] to collect and update important information about abortion providers . . . . Without licensure . . . , it would be difficult and perhaps impossible for [the Department] to know where clinics are operating, who is running them, or what they are doing. Without licensure, abortion clinics would have little or no meaningful regulatory oversight[.]" *Id.* ¶ 9.

Defendants have not adequately explained how Foster is correct in this. *See generally* "Background," Part III, *supra*. Article 34 of title 16 of the Indiana Code deals exclusively with abortion and was codified in 1993. But licensure was not required of any abortion clinic from 1993 until 2005. Mifepristone having first been approved by FDA in 2000, licensure of clinics providing only medical abortions was not required until 2013 and the requirement could not for practical purposes be enforced until 2015. We are hard pressed to believe that article 34 simply lay dormant for twelve years (1993–2005, with respect to surgical-abortion providers) or thirteen years (2000–2013, with respect to medical-abortion providers). And it strains credulity to believe that for those periods abortion clinics in Indiana operated with "little or no meaningful regulatory oversight."

For example, Defendants argue that licensure ensures that abortion providers "follow the State's informed-consent and reporting requirements." Br. Opp. 20. But those requirements have been on the books since 1995 and 1973, respectively. Publicly available Department records of pregnancies terminated in Indiana stretch back until at least 1996. *See* Ind. State Dep't of Health, *Indiana Induced Termination of Pregnancy*

*Report (2000)*, tbl. 15, *available at* https://www.in.gov/isdh/reports/itp/2000/tbl15.html. As such records are generated from the fruits of the reporting requirement, *see* Ind. State Dep't of Health, *Terminated Pregnancy Reports*, https://www.in.gov/isdh/26843.htm, it appears that compliance with the reporting requirement has been reliably obtained for some time without resort to licensure.

Defendants place great reliance on the Department's authority to inspect (or conduct "surveys" of) abortion clinics, but have not shown how that authority is contingent on the clinics' licensure. The statute says simply, "[The Department] shall inspect an abortion clinic at least one (1) time per calendar year and may conduct a complaint inspection as needed." Ind. Code § 16-21-2-2.6. All that is required is for the Department to know where the clinic is located, a goal which licensure does achieve, but which could equally well be achieved by a registration requirement. *Cf.* Defs.' Ex. 2, ¶ 9 ("Without licensure . . . , it would be difficult and perhaps impossible for [the Department] to know where clinics are operating, who is running them, or what they are doing."). We discuss this further below in balancing the benefits and burdens.

The most useful feature of a license appears to be the threat of its revocation as a means for preventing noncompliant abortion providers from persisting in their noncompliance. However, we cannot perceive what marginal benefit this *ex post* enforcement mechanism has over the similarly *ex post* enforcement mechanisms of prosecution for failing to comply with article 34, *see* Ind. Code § 16-34-2-7; physician-license suspension or revocation; or a civil action for medical negligence or other torts. Defendants point to the Klopfer case, but Klopfer was prevented from continuing his

noncompliant abortion practice, not through revocation of the licenses of the clinics at which he practiced, but through suspension of his physician's license and criminal prosecution. Br. Opp. 24.

For purposes of Plaintiffs' due process claim, Defendants have shown little more than *de minimis* marginal advancement, relative to pre-2013 law, of the state's legitimate interests in maternal health and fetal life derived from requiring licensure as a condition of providing medical abortions.

For purposes of Plaintiffs' equal protection claim, Defendants' case is weaker yet. Here the state must justify its disparate treatment of, on one hand, women seeking an abortion-inducing drug for the purposes of inducing an abortion, and, on the other, women seeking an abortion-inducing drug for the purposes of treating a miscarriage. As the medical and physiological impacts are identical or practically identical in both cases, the state's interest in patient health falls away. The classification can be sustained only on the strength of the state's interest in fetal life, which operates in the abortion context but not in the miscarriage context. But that interest is advanced by licensure only to the extent enforcement of the informed-consent requirement is advanced, and, as we have already explained, the connection between the two is exceedingly tenuous.

Finally, Defendants gesture in the direction of, without quite asserting, the state's interest administering its own licensing and regulatory regimes on its own terms, an interest which would undoubtedly be advanced by permitting continued application of the Licensing Law to WWHA by the Department without federal-court interference. *See, e.g.,* Br. Opp. 28 ("[The questions as to WWHA's reputable and responsible character]

are not questions that should be resolved with this preliminary injunction motion. These disputes should be left to the state administrative proceeding—and, if necessary, state judicial review."). But we do not find such an interest admissible under *Casey* or *Hellerstedt*, and Defendants cite no case holding that it is.

*Hellerstedt* emphasized strongly that "the 'Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake.'" 136 S. Ct. at 2310 (emphasis omitted) (quoting *Gonzales*, 550 U.S. at 165). Where state agencies and state courts must be allowed a chance to resolve disputes touching on constitutional rights before a federal "'safety valve'" may be resorted to, the Supreme Court has so held, as it has in the context of regulating the secondary effects of sexually indecent speech. *HH-Indianapolis LLC v. Consol. City of Indianapolis/Marion Cty.*, 265 F. Supp. 3d 873, 886 (S.D. Ind. 2017) (Barker, J.) (quoting *City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774, 782 (2004)), *aff'd*, 889 F.3d 432 (7th Cir. 2018).

Having considered the benefits to the state in applying the Licensing Law to WWHA and refusing to allow the South Bend Clinic to operate, we consider now the burdens on the abortion right imposed by the same. We have set forth this material fully under "Background," Part II, *supra*. This material suggests that the women for whom the burdens are relevant are women seeking abortions in and around South Bend, and more broadly in north-central and northeastern Indiana, of limited financial and social resources. But as Plaintiffs' evidence bears more heavily on the South Bend area's population of college- and university students, so too does our analysis.

Plaintiffs' evidence suggests further that, in a large fraction of such cases, the unavailability of abortion in South Bend imposes a substantial obstacle to its access. It establishes that there is a demand for abortion care in and around South Bend which is currently unmet. In the absence of the South Bend Clinic, the demand is unmet because of a confluence of factors: the long-distance travel burden, compounded by the eighteen-hour informed-consent waiting-period requirement; high monetary costs undefrayed by state aid to those whose poverty would otherwise entitle them to it or by university-sponsored coverage in the case of students; the necessity of securing the help and support of others in the exercise of a right to which the social environment is reportedly hostile (applying with special force to students, who are likely to be young and unmarried); the high opportunity costs incurred by operation of all the foregoing, including lost wages, missed educational opportunities, and missed rent and utility payments; and the prospect of undergoing the abortion in an unfamiliar, unsupportive setting, undermining one of the chief virtues of the mifepristone-misoprostol regimen.

To the extent that the impact of these burdens, assessed together, do not preclude obtaining an abortion, each delay imposed by them increases the costs to the patient and the risks to her health

Defendants point to Plaintiffs' Jane Doe declarant and her capacity to obtain an abortion in Illinois. But, as Doe makes clear, even that step was possible for her owing only to her enjoyment of a number of personal and social advantages which many women do not enjoy. And in any event, it is a "'profoundly mistaken assumption'" that "'the harm to a constitutional right can be measured by the extent to which it can be exercised

in another jurisdiction.'" *Schimel*, 806 F.3d at 918 (quoting *Ezell*, 651 F.3d at 697).

We turn finally to the "ultimate task of determining whether the burdens of the law's requirements were 'disproportionate, in their effect on the right to an abortion' compared 'to the benefits that the restrictions are believed to confer.'" *Planned Parenthood of Ind. & Ky., Inc.*, 896 F.3d at 827 (quoting *Schimel*, 806 F.3d at 919).

On the facts of this case, the marginal benefits to the state in requiring WWHA to obtain a license before operating the South Bend Clinic are slight or none. Defendants have not shown why the state's interests, to the extent they are advanced by a licensing requirement at all, may not be equally well advanced by a registration requirement. A licensing requirement is thus "not necessary" to achieve the state's proffered ends. *Hellerstedt*, 136 S. Ct. at 2315. Moreover, to the extent the Licensing Law advances state interests, continued application of the "reputable and responsible character" requirement does little to advance the Licensing Law.

These *de minimis* benefits are dwarfed by the burdens of women's access to abortion in and around South Bend.

Simply put, there is unmet demand for abortions in and around South Bend which is, at this point, state-created, without any appreciable benefit to maternal health or fetal life. *See id.* at 2316–18 (same). We conclude that Plaintiffs have a better than negligible chance of showing that the burdens on abortion access imposed by the Licensing Law "'significantly exceed[] what is necessary'" to advance the state's interests. *Planned Parenthood of Ind. & Ky., Inc.*, 896 F.3d at 827 (quoting *Schimel*, 806 F.3d at 919).

## II.  Remaining Injunction Factors

Having found irreparable injury and likelihood of success on the merits, we turn now to balancing the injunction factors.

The predominant factor in this case is Plaintiffs' likelihood of success on the merits. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018); *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013). We find Plaintiffs have shown a fair likelihood of success. While the specific claim (imposition of licensure requirement as undue burden and equal protection violation) appears novel, application of settled principles, so far as these exist in the abortion context, points reliably to Plaintiffs' ultimate success.

The irreparable harm to women who lose the opportunity to exercise their constitutional right to an abortion is significant and obvious: a period of state-compelled gestation followed by a lifetime of state-compelled motherhood. By contrast, little irreparable harm appears likely to afflict the state if Plaintiffs' motion is granted. Enjoining enforcement of the Licensing Law as to WWHA will do no more than return the state, vis-à-vis WWHA, to the status quo that reigned from 1993 to 2013 or, as a practical matter, 2015. We do not accept that the state inflicted irreparable harm on itself for those two decades.

The public interest to be equitably balanced in Defendants' favor is usually coextensive with any governmental interest appearing in the merits analysis. *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 789 (7th Cir. 2011); *United States v. Rural Elec. Convenience Coop.*, 922 F.2d 429, 440 (7th Cir. 1991). We have found this

to be slight. Otherwise, injunctions enforcing the Constitution are in the public interest. *See Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004).

Accordingly, the balance of equities, adjusted for Plaintiffs' fair likelihood of success on the merits, favors Plaintiffs.

## Conclusion and Order

In ruling on Plaintiffs' motion for a preliminary injunction seeking relief from the Department's decision to withhold a license for WWHA's South Bend Clinic, we hold that the "reputable and responsible character" requirement set out in the Licensing Law applicable to abortion clinics is not unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment.

However, we also hold that the Department's application of the Licensing Law to WWHA's license application for the South Bend Clinic places a substantial obstacle in the path of northern Indiana women seeking previability abortions without promoting women's health (indeed, tending to increase the risks to women's health) and without promoting informed decisionmaking or any other admissible state interest.

The Licensing Law's disparate treatment of miscarriage patients versus abortion patients also presents a substantial obstacle to the abortion decision without any offsetting state benefits.

Thus, we have determined for the reasons explicated here that the Department's application of the Licensing Law violates the Due Process Clause and the Equal Protection Clause.

Finally, we hold that the state stands to lose little if an injunction is issued, but

women in northern Indiana stand to lose a great deal if it is not.

Accordingly, Plaintiffs' motion for a preliminary injunction, Dkt. 76, is GRANTED.

Defendants are ENJOINED from enforcing the provisions of Indiana Code § 16-21-2-2(4) (requiring Department to license); Indiana Code § 16-21-2-2.5(b) (penalty for unlicensed operation); and Indiana Code § 16-21-2-10 (necessity of license) against WWHA with respect to the South Bend Clinic.

IT IS SO ORDERED.

Date:    5/31/2019

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Amanda Lauren Allen
LAWYERING PROJECT
aallen@lawyeringproject.org

Christopher Michael Anderson
INDIANA ATTORNEY GENERAL
christopher.anderson@atg.in.gov

David Patrick Brown
LAWYERING PROJECT
dbrown@lawyeringproject.org

Paul M. Eckles
ATTORNEY AT LAW
paul.eckles@probonolaw.com

Thomas M. Fisher
INDIANA ATTORNEY GENERAL
tom.fisher@atg.in.gov

Bradley H. Honigman
ATTORNEY AT LAW
bradley.honigman@probonolaw.com

Kathrine D. Jack
LAW OFFICE OF KATHRINE JACK
kjack@jacklawoffice.com

Mollie M. Kornreich
mollie.kornreich@probonolaw.com

Diana Lynn Moers Davis
INDIANA ATTORNEY GENERAL
diana.moers@atg.in.gov

Julia Catherine Payne
INDIANA OFFICE OF THE ATTORNEY GENERAL
Julia.Payne@atg.in.gov

Michael M. Powell
ATTORNEY AT LAW
michael.powell@probonolaw.com

Juanluis Rodriguez
LAWYERING PROJECT
prodriguez@lawyeringproject.org

Rupali Sharma
LAWYERING PROJECT
rsharma@lawyeringproject.org

Erin A. Simmons
ATTORNEY AT LAW
erin.simmons@probonolaw.com

Dipti Singh
LAWYERING PROJECT
dsingh@lawyeringproject.org

Stephanie Toti
LAWYERING PROJECT
stoti@lawyeringproject.org