# Ex. 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| WHOLE WOMAN'S HEALTH ALLIANCE; ALL-OPTIONS, INC.; and JEFFREY GLAZER, M.D., | Case No.: 1:18-cv-01904-SEB-MJD |
| Plaintiffs, | CIVIL ACTION |
| v. | CLASS ACTION |
| CURTIS T. HILL, JR., Attorney General of the State of Indiana, in his official capacity; KRISTINA BOX, M.D., Commissioner of the Indiana State Department of Health, in her official capacity; JOHN STROBEL, M.D., President of the Medical Licensing Board of Indiana, in his official capacity; and KENNETH P. COTTER, St. Joseph County Prosecutor, in his official capacity and as representative of a class of all Indiana prosecuting attorneys with authority to prosecute felony and misdemeanor offenses, | |
| Defendants. | |

**EXPERT REPORT OF BYRON C. CALHOUN, M.D.**

1. I, Byron C. Calhoun, am over 18 years of age, have personal knowledge of the matters set forth herein, and am competent to make this declaration.

## I. BACKGROUND

2. I received my B.S. in Biosciences Magna Cum Laude from the United States Air Force Academy in 1979 and my M.D. degree from the University of Iowa Medical School in 1983. My residency training took place at the University of Missouri in Columbia in general Obstetrics & Gynecology for four years (1983-87) at a program that delivered obstetrical care to several hundred teenage girls annually. I received additional training in maternal-fetal medicine (1987-89) at the Oregon Health Sciences University in Portland, where I had primary responsibility for the care of several hundred women with high-risk pregnancies including numerous adolescents.

3. My current position is at West Virginia University-Charleston at Women and Children's Hospital where I am a Professor of Obstetrics and Gynecology and Vice Chair. I routinely teach medical students and residents, and I am also responsible for high-risk obstetrical clinics in the resident clinics. As a specialist in maternal-fetal medicine, my practice and clinical research involve a sub-specialty of obstetrics and gynecology concentrating on pregnancies

complicated by maternal and/or fetal disease. I practice medicine in a combination of hospital, clinic, and office settings, and I am familiar with the differences between those settings. As part of my practice, I regularly consider which of those settings is most appropriate for performing a given medical procedure.

4. I have taught at the West Virginia University-Charleston since 2006. Prior to that, I was Clinical Professor in Obstetrics and Gynecology, University of Illinois at Chicago, Department of Obstetrics and Gynecology, College of Medicine at Rockford, Rockford, Illinois (2003-2005), Adjunct Professor of Obstetrics and Gynecology, Midwestern University, Chicago College of Osteopathic Medicine (2002-2005), and Director, Maternal-Fetal Medicine Fellowship, Madigan Army Medical Center, Tacoma, Washington (1997-2002).

5. I am board-certified in obstetrics and gynecology as well as in maternal-fetal medicine. I also hold membership in a number of medical societies, including the American College of Obstetricians and Gynecologists, the American College of Surgery, the Association of Professors of Gynecology and Obstetrics, the American Institute of Ultrasound in Medicine, the Society of Maternal-Fetal Medicine, and the Society for Gynecologic Investigation.

6. I am a peer reviewer for various medical journals including The American Journal of Obstetrics and Gynecology, Obstetrics and Gynecology, Military Medicine, The American Journal of Kidney Diseases, The American Journal of Managed Care, The Journal of Maternal-Fetal Medicine, Gynecologic and Obstetric Investigation, Fetal Diagnosis and Therapy, and The Journal of Reproductive Medicine. I have authored more than ninety peer-reviewed medical publications, five book chapters, seven non-peer-reviewed medical publications, and one book. Throughout the course of my career, I have been invited to present numerous topics/papers at national and international meetings.

7. I was identified in Best Doctors in America 2008-2009 and received the National Faculty Award for Excellence in Resident Education-Council on Resident Education in Obstetrics & Gynecology in 1998. In 2014 and 2015, I was named the Outstanding Student Educator, Department of Obstetrics and Gynecology, West Virginia University-Charleston. In 2016 and 2017, I received the National Faculty Award for Excellence in Resident Education from the Council on Resident Education in Obstetrics and Gynecology.

8. My curriculum vitae, which includes a list of my publications, is attached as Exhibit A.

9. As a clinician and professor, I am familiar with the practice of obstetrics and gynecology, including abortion procedures. I have provided obstetric and gynecologic health care to thousands of women, including those who have experienced an unanticipated and undesired pregnancy, minors, poor women, and abuse victims. I am responsible daily for the medical assessment and management of women with high-risk pregnancies. In my practice, I routinely perform diagnostic obstetrical ultrasound, provide prenatal diagnosis counseling and obtain informed consent through a process of physician/patient dialogue. In the course of my medical practice, I have treated and counseled numerous women who have obtained abortions. I am also

familiar with post-abortion care and the accepted standard of care for physicians obtaining informed consent for medical procedures, including surgeries which terminate a pregnancy.

10. I am familiar with Indiana's informed-consent requirements, Ind. Code § 34-18-12-3, as well as the requirements for obtaining informed consent prior to performing an abortion. I am also aware that Indiana requires physicians to disclose anything a prudent person in the patient's position would consider significant in his or her decision-making process. *See Weinberg v. Bess*, 717 N.E.2d 584, 588 n.5 (Ind. 1999).

## II. INDIANA'S ABORTION CLINIC LICENSING REQUIREMENTS ARE REASONABLE.

### A. Abortion complications, including mortality, are likely to be seriously underreported.

11. A major contention of Plaintiffs' experts is that abortion is a safe procedure that rarely results in complications. Dr. Grossman in his expert report (¶ 14) states that "[a]bortion complications are exceedingly rare: nationwide, fewer than one-quarter (0.23%) of 1% of all abortion patients (all procedures and gestational ages) experience a complication that requires hospital admission, surgery, or blood transfusion." (Upadhyay et al., 2015) Further, Dr. Grossman (¶ 15) states that "[i]n contrast, carrying a pregnancy to term and delivering the baby is significantly riskier than abortion. The national risk of maternal mortality associated with live birth is approximately 14 times higher than that of induced abortion." (Raymond & Grimes, 2012).

12. Dr. Cowett also asserts that:

> The rate of serious complication from medication abortion is approximately 0.06% for hospital admission and 0.10% for emergency department treatment. [Cleland et al., 2013] The rate of serious complications (defined as hospitalization, additional surgery, or blood transfusion) resulting from aspiration abortion is also extremely low, approximately 0.16%. [Upadhyay et al., 2015] The rate of complications resulting from D&E abortion is between 0.5-4%, the risk increasing with increasing gestational age. [National Academies of Science, 2018]

(Cowett ¶ 3).

13. Those claims are unproven and likely false. Abortion carries the risk of serious complications, and the true incidence of complications is likely to be significantly greater than Plaintiffs' experts suggest. Given the importance of Plaintiffs' erroneous assertions about abortion mortality, the lack of credible and reliable scientific evidence supporting their representations requires substantial discussion.

#### 1. Data on maternal mortality is inconsistent, uncertain, and unreliable.

14. Maternal deaths, a category which includes deaths related to abortion, are categorized based on their causation and proximity to the end of the pregnancy:

- "Maternal death" is the death of a woman while pregnant or within 42 days of the end of her pregnancy, irrespective of the duration or site of the pregnancy, from any cause related to or aggravated by the pregnancy or its management, but not from accidental or incidental causes.

- "Pregnancy-related death" is the death of a woman while pregnant, or within 42 days of end of pregnancy, irrespective of the cause of the death.

- Additionally, a "Late maternal death" is the death of a woman from direct or indirect obstetric causes more than 42 days, but less than one year after end of the pregnancy.

(Bartlett et al., 2004).

15. The maternal mortality rate encompasses all three categories and is reported as the number of deaths/100,000 live births. So, four numbers are needed to calculate the maternal mortality rate: the number of maternal deaths, the number of pregnancy-related deaths, the number of late maternal deaths and the number of live births.

16. The World Health Organization (WHO) has acknowledged that "all existing estimates of maternal mortality are subject to greater or lesser degrees of uncertainty" (World Health Organization, 2004). Only the number of live births can be accurately measured due to mandated reporting on birth certificates. The number of maternal deaths, on the other hand, is consistently understated. The United States does a poor job of accurately detecting maternal deaths and studies show as many as 50% of maternal deaths may be missed on death certificates (Horon, 2005; Dye et al., 1992). Only recently has awareness risen that non-physiological causes (such as mental health issues) may also directly contribute to a woman's death. Likewise, an event related to pregnancy may not manifest until more than a year after the pregnancy ends yet may still contribute to a woman's death. Because the data are so incomplete, the WHO has used seven different methods to estimate maternal death (World Health Organization 2004; World Health Organization 2007).

17. Underreporting of maternal mortality is especially serious for pregnancies that do not result in live births, such as abortions. When a woman becomes pregnant, there are several ways that the pregnancy can end. A woman may suffer an early natural loss, such as a miscarriage, ectopic pregnancy, or gestational trophoblastic disease (15%); or suffer a later loss, such as a stillbirth (<1%). She may choose to terminate the pregnancy through induced abortion (19%) which occurs about a million times yearly in the U.S: 90% of these induced abortions occur in the first trimester, 10% in the second trimester or later, and 1.3% after viability (ACOG Practice Bulletin 135, 2013). The pregnancy may also continue until delivery of a live baby, around 4 million a year (65%). (Centers for Disease Control and Prevention, n.d.a) Abortion-related deaths are captured in some standardized definitions of maternal mortality but not in others where they are undifferentiated from spontaneous abortions (Chang et al., 2003; Harrison, 2009). In order to fully capture all maternal mortality, researchers thus must broaden their net to include mortality from all pregnancy outcomes.

18. There are several reasons that statistics on maternal mortality do not capture all abortion-related deaths. First, the total number of legal abortions in the U.S., and their resulting morbidity and mortality, is unknown (Studnicki et al., 2017). The estimated numbers of abortions are only voluntarily reported to the Centers for Disease Control and Prevention (CDC) by state health departments, and several states—including California, the state with the largest volume of abortions—do not report any data (Pazol et al., 2012). The Guttmacher Institute (GI) also tracks these numbers, and they consistently report higher numbers than the states. For example, for the most recent year where statistics are available, the states (California again excluded) reported 638,169 (Jatlaoui et al., 2018) abortions whereas GI reported 926,000 in 2014 (Guttmacher, 2018). The exact figure is unknown.

19. Second, state-level reporting of abortion complications is inconsistent as well. Only 28 states require abortion providers to report their complications at all (Guttmacher, 2019). I understand that Indiana currently has a mandatory reporting law, but that it has been enjoined. Even where complications are reported to the states, states only voluntarily provide that information to the CDC—California, for example, does not provide that information. (Jatlaoui et al., 2018). That makes it impossible to get a rigorous national picture of abortion complications based on robust, comprehensive data.

20. Third, it is difficult to connect some abortion-related deaths to the abortion. Deaths in immediate proximity to live births are likely to be the most accurately recorded, since most live births occur in a hospital setting or with the assistance of medical personnel. In contrast, deaths from other pregnancy outcomes, or remote from pregnancy termination, are less accurately reported (American Center for Law and Justice, 2006). This is particularly true of abortion-linked deaths related to mental health issues, such as suicides, homicides (Perlow & Lesmes, 2014), substance abuse, and risk-taking behavior. Although it is well-accepted that such deaths should be counted for maternal mortality figures, they are not often included in the absence of a live birth.

21. Fourth, death certificates, the primary means of tracking causes of death, are not a reliable indicator of maternal mortality, perhaps especially for abortions. A pregnancy question was added to the U.S. standard death certificate in 2003 in order to improve the identification of maternal deaths. But individual states inconsistently implemented the pregnancy checkbox on state death certificates. As a result, state-level data is impossible to combine or compare. Because of those data collection concerns, the U.S. has not published an official maternal mortality rate since 2007 (MacDorman et al., 2016). A 2016 study using novel correction factors to standardize death certificate data documented a 26% increase in maternal mortality (including abortion-related mortality) from 18.8/100,000 live births in 2000 to 23.8 in 2014 (Maternal Mortality Review, 2017).

22. Similarly, the codes used to document causes of death—referred to as "ICD-10" codes, derived from the International Statistical Classification of Diseases and Related Health Problems, 10th Revision, published by the World Health Organization—may not be entered correctly on death certificates. Search engines used to identify ICD-10 codes for certificates might fail to provide the right codes (Creanga & Callaghan, 2017). In addition, based on my personal experience with death certificates and doctors who complete them, doctors often do not use the cause-of-death codes correctly. The current codes are new and quite complicated. Doctors using

them may misclassify maternal mortality by placing a maternal death as a result of an ectopic, induced abortion, or spontaneous miscarriage into the wrong category for maternal death, thus attributing the maternal mortality into the wrong area.

23. In Europe more comprehensive healthcare surveillance makes it possible to link medical records for particular patients and compare those data with death certificates. Those studies reveal that 94% of abortion-related deaths and 73% of maternal deaths overall are not identified on death certificates alone (Gissler et al., 2004b). Assuming, as seems reasonable, that U.S. doctors are not significantly better at completing death certificates than their European counterparts, it is likely not only that death certificates leave out many maternal deaths, but that they disproportionately omit deaths linked to abortion.

24. Fifth, a doctor entering a woman's cause of death may not be aware that it was connected to an abortion. In most maternal deaths from a physical complication of pregnancy, there is a catastrophic cascade of events resulting in death, but only the most proximate events may be listed on a death certificate due to space limitations and provider time constraints. The failure of most abortion providers to maintain hospital privileges means that the abortion provider often does not care for severe complications resulting from his procedure. Since the practice model for abortion clinics is to refer their complications to the local ER (Grossman ¶¶ 64-68), the treating physician may mistakenly believe that a miscarriage or some other mishap led to the complications (Studnicki et al., 2019). In some cases a woman's family may not be aware that she obtained an abortion; even if they are aware, they may not inform the doctor. In either situation, the actual cause of the woman's death would be inaccurately reported

25. Sixth, for induced abortion there may also be an ideological motivation to obscure the initiating event that led to death. Doctors who are committed to promoting abortion or to downplaying the risks of abortion may fail to properly connect a death to an abortion.

26. In short, especially when it comes to abortion, there are many events that may result in mortality that are not accounted for in the maternal mortality numerator (# deaths/100,000 live births). In fact, CDC and Morbidity & Mortality Weekly Report surveillance of abortion outcomes estimate that only two out of three maternal deaths occur in conjunction with a live birth (Jatlaoui et al., 2018).

27. The data are likely to be even worse for abortions that occur in the first half of pregnancy. In the first half of pregnancy (usually < 20 weeks) is there is typically no requirement for a fetal death certificate. Indiana Code Ann. § 16-34-3-4(c). I understand that is the law in Indiana, where a fetal death after 20 weeks triggers an automatic death certificate that must be registered with the state and linked to the mother. *Id.* (a). The absence of a death certificate for earlier abortions (the vast majority of abortions) exacerbates problems with underreporting abortions. Because a death certificate would link an abortion to the mother, it also makes it harder to link maternal deaths to abortions. This glaring defect in the voluntary collection of abortion data by the CDC is highlighted in the European literature.

28. Maternal mortality rates are also likely to be especially skewed for populations that have differing percentages of pregnancies that result in live births. For example, in pregnant

women overall, 65% of all pregnancies result in a live birth, but only 48% of pregnancies in black women result in a live birth. This discrepancy leads to an *under*estimate of black maternal mortality, especially for abortion (Ventura et al., 2012).

**2. Higher quality studies, based on more thorough records, demonstrate the risks attributable to abortion.**

29. In the absence of accurate state reporting, and because of the causes of underreporting described above, abortion mortality is difficult to study. The "gold standard" study design is a randomized, controlled study where one group receives an intervention, and the other does not. Obviously, this would be unethical and impossible to perform regarding abortion. Retrospective studies of mortality are not possible; even as to morbidity, retrospective studies are often rejected due to the possibility of "recall bias" leading to inconsistent reporting of past abortions by women. It is postulated (though not proven) that the shame many women feel about a prior abortion may lead them not to volunteer this information to a researcher in the absence of an illness, whereas guilt may lead them to confess this history in the presence of a life-threatening disease (Lindefors-Harris et al., 1991). Researchers sometimes bring bias to their studies (Mullane & Williams, 2013), and there are often shortcomings in the study designs (*e.g.*, in National Academies of Science (2018), discussed further below).

30. Although maternal deaths are studied extensively, meta-analysis reveals a curious lack of interest by most investigators in the question of whether abortion is safer than childbirth. Of 989 studies that examined maternal deaths and pregnancy outcomes, only eleven provided results allowing comparison between the death rates associated with all possible pregnancy outcomes. Nonetheless, in the studies that could be analyzed, the meta-analysis demonstrated that within 180 days, the risk of death is over twice as high following abortion compared to following delivery and this risk remains elevated for at least 10 years (Reardon & Thorp, 2017).

31. The best study design to address abortion-linked mortality would link records for all deaths in reproductive aged women with all medical records of all pregnancies, so that no deaths were missed (Deneux-Tharaux et al., 2005). The only study done this way in the U.S. was retrospective, examining the medical records of California Medicaid recipients. Those women who had an induced abortion or delivery of a baby were followed for eight years. Compared with those who delivered a baby, those who aborted had significantly higher age-adjusted risks of death from all causes (162% higher), from suicide (254% higher), as well as from natural causes (144% higher) (Reardon et al., 2002).

32. Records-linkage studies in Finland (where very thorough records are kept) found that following an abortion, a woman was two to three times as likely to die within a year (Gissler, 1997), six times as likely to commit suicide (Gissler et al., 1996), four times as likely to die from an accident, and fourteen times as likely to be murdered (Karalis et al., 2017) compared with a woman who carried to term (Gissler et al., 1997; Gissler et al., 2005). The risk of death in a given year for a woman who was not pregnant was 57/100,000 women, but after an abortion the risk was 83/100,000, after miscarriage 52/100,000, and for those who carried a pregnancy to term 28/100,000 (Gissler et al., 2004a). Danish studies also confirmed these findings. A woman who had a first trimester abortion had an 84% higher risk of dying within 180 days and a 39% higher

risk of dying within ten years, compared with one who carried to term. After a late-term abortion she had a 341% higher risk of dying within a year, and a 131% higher risk of dying within ten years (Reardon & Coleman, 2012; Coleman et al., 2013).

33. One likely explanation for the association between abortion and non-natural deaths is that women who obtain abortions are likely to be in abusive relationships, engage in risky behavior, or suffer from depression, mental illness, or substance abuse. Although causation is difficult to determine, in my experience vulnerable women tend to make healthier health, relationship, and behavioral decisions after the birth of a child. A live birth can thus lead to improvements in a woman's condition in ways that abortion does not.

34. Plaintiffs' expert Dr. Grossman (¶ 15) simply ignores the linkage data demonstrating that abortion has an increased risk of maternal mortality and fails to acknowledge the significant published literature which shows the detrimental effects of abortion on women over longer time frames. They also overlook the weaknesses in U.S. abortion complications data. Those omissions mean that Plaintiffs' experts' opinions on abortion-related complications are incomplete and unreliable.

### B. Plaintiffs' experts discuss the nature of abortion-related complications inaccurately.

35. In addition to relying on underreported abortion-related mortality, Plaintiffs' experts downplay the incidence of other complications from abortions. Those risks are serious; they include both physical and mental sequelae, and can arise both in the short term and the long term.

#### 1. Abortion carries a risk of serious, short-term complications.

36. Consideration is often given in the literature only to abortion complications that could occur in a term, gravid uterus. That is not the correct approach. Rather, researchers should recognize that physiologic changes begin as soon as a pregnancy commences and continue until it ends naturally, and that induced abortion is an intervention that interrupts a normal bodily process. Some risk factors are unique to that intervention, such as the need to force open the cervix, which is designed to remain closed until natural childbirth. Causes of severe injury and death in women experiencing any type of pregnancy separation event can include vaginal and intra-abdominal hemorrhage, infection (local endometritis, cutaneous cellulitis, or systemic septicemia), thrombotic emboli (deep venous thrombosis or pulmonary embolus), intravascular amniotic or air emboli, complications of anesthesia, and cardiac or cerebrovascular events (heart attack or stroke). Damage to adjacent gynecologic, genitourinary, gastrointestinal or vascular organs may require additional uterine surgery, hysterectomy, bowel resection, bladder repair, or other surgeries (Cunningham et al., 1993; Niinimaki et al., 2009).

37. The two main methods now used for abortion in the U.S. are commonly known as medical and surgical abortions. Medical abortion performed through mifepristone and misoprostol administration (31% of U.S. abortions) is approved by the FDA until 10 weeks gestation. This medication combination disrupts the hormones that maintain the pregnancy and induces uterine

contractions to expel the baby and the placenta (ACOG Practice Bulletin no. 143, 2014). Women are being increasingly directed toward medical abortions because of the decreasing numbers of providers willing to perform surgical abortions. The complication rate is four times higher with medical compared to surgical abortion, usually due to infection and hemorrhage, and 3-7% of women experience an incomplete or failed abortion requiring surgical completion—not the 2.0% quoted by Dr. Grossman (Grossman ¶ 20; Niinimaki et al., 2009).

38. Medication abortions have a significant failure rate. Dr. Grossman (¶¶ 19-22) asserts that the failure rates for medical abortion is 2% (Grossman et al., 2011). However, Dr. Grossman ignores other studies, including one study of more than 7,000 women which demonstrated a 20% failure rate of medical abortion (Liao et al., 2011). This surgical completion rate of medical abortions places women at a 3.61 times greater risk of very preterm birth (< 32 weeks gestation) in subsequent pregnancies. Dr. Grossman completely ignores this complication of increased risk of preterm delivery in his references in his own papers (Grossman et al., 2011; Grossman & Grindlay, 2017).

39. Other abortions are performed surgically. A first trimester abortion may also be performed by dilation and vacuum suction curettage (60% of U.S. abortions). In these abortions (D&Cs), the baby and the placenta are surgically extracted by insertion of suction devices into the uterus after the cervix has been chemically or mechanically dilated. First trimester surgical abortions are functionally the same as D&Cs performed to manage miscarriages. I am familiar with the D&C procedure from that context, and I have performed it regularly.

40. Beginning in the second trimester, non-intact dilation and extraction/evacuation (D&E) is the main surgical method. At that stage of development, the baby's bones have hardened and the baby has grown large enough that he cannot be removed through suction alone (ACOG Practice Bulletin No. 135, 2013). Non-intact D&E (9%) is commonly referred to as a "dismemberment" abortion. In a D&E, instruments such as forceps are used to dismember a fetus inside the uterus by tearing off its limbs and extracting it piece by piece. Sometimes abortion providers use an injection or other means to kill the fetus before extracting it. If not, the fetus is dismembered while still alive, and it dies of trauma or loss of blood. Although late-term miscarriages are now typically managed through medical induction of labor, in the past I have managed them surgically with procedures resembling D&E abortions.

41. Complications from surgical abortions most commonly occur during one of two actions. As the cervix is dilated, the instruments may form a false channel, leading to damage to surrounding organs or vessels. Alternatively, once cervical dilation has occurred, multiple blind passages of the surgeon's suction curette or grasping forceps into the soft, gravid uterus could easily result in uterine perforation and damage to surrounding organs, even in experienced hands (Autry et al., 2002).

42. The frequency of complications increases in later gestational ages due to inherently greater technical complexity related to the anatomical and physiologic changes that occur as the pregnancy advances. Having performed procedures resembling D&Es for management of late-term miscarriages, I am of the opinion that the procedure—which can only be described as ghastly—is both difficult for the practitioner and risky for the patient. The increased size of the

baby and increased amount of placental tissue requires a greater degree of cervical dilation, the increased blood flow to a thin relaxed uterus predisposes to hemorrhage, and elongated myometrium is more subject to mechanical perforation (Hilgers & O'Hare, 1981; Peterson et al., 1983). Thus, it is important to emphasize that even if early abortions may appear to be relatively safe, they become less so as the pregnant uterus enlarges (Zane et al., 2015).

43. CDC researchers found that the risk of death increased by 38% for each additional week beyond 8 weeks. Compared to early abortions, the relative risk of death was 14.7 times higher at 13-15 weeks (rate 1.7/100,000 abortions), 29.5 times higher at 16-20 weeks (rate 3.4/100,000), and 76.6 times higher beyond 21 weeks (rate 8.9/100,000) (Bartlett et al., 2004). The underlying complication figures, it bears repeating, are likely underestimates. Numerous other studies have confirmed that abortions become more life threatening to the mother as pregnancy advances (Zane et al., 2015; Sykes, 1993; Grossman et al., 2008).

44. The American Board of Medical Specialties recognized the inherent danger in the performance of later abortions provided after the initial first trimester (after 13 weeks). It approved setting up a two-year fellowship to train abortionists to perform late-term abortions, euphemistically naming this new ACOG subspecialty "Complex Family Planning" (American Board of Medical Specialties, 2019). That amounts to an acknowledgement that surgical abortions are a complex, invasive procedure that call for special medical training.

45. The real non-fatal complication rates are undoubtedly much higher than those widely reported and relied upon by Plaintiffs' experts. Many of the same factors that lead to likely underestimates in abortion-linked maternal mortality—such as uncertainty in the total number of abortions and inconsistent disclosures of morbidity by states—also lead to underestimates in non-fatal complications.

46. Other factors specific to non-fatal complications add additional uncertainty to public figures. As mentioned above, many states do not require complication reporting at all (Guttmacher, 2019), and states do not always make their data public (Jatlaoui et al., 2018). As a result, the CDC has tried to base its complication estimates on "a more complete source" (Jatlaoui et al., 2018). However, that source (Jones & Jerman, 2017) uses the data provided to the Guttmacher Institute. That data is also voluntarily reported, and in any event is suspect because of the Institute's abortion advocacy position (Guttmacher, 2019).

47. Even if complication reports were completely reported by states and abortion providers, most women who obtain abortions (approximately two thirds) never return to the clinic where the procedure was performed, and so abortion providers never become aware of many complications that take place (Picker Institute, 1999). The women may instead go directly to their primary care doctors or the emergency room. But when primary care or emergency room doctors treat women for abortion complications, they face difficulty in connecting morbidity to abortions, especially when women who had abortions refuse to admit it to doctors treating their complications. I believe, for example, that I regularly treat women for abortion complications who do not tell me the whole truth about their symptoms.

48. In my experience, doctors who are ideologically biased in favor of abortion fail to report complications. As described by Grossman (¶¶ 64-68), the protocols and guidelines used by the abortion provider to refer patients to other physicians for treatment of complications appears designed to shift responsibility away from the abortion provider and on to other doctors, who may or may not learn all the facts or be able to report them accurately. Especially where a complication is not seen in the clinic, the clinic presumably does not report it. The complication most likely will not be reported from the emergency room either, since the emergency room they did not perform the original surgical or medical procedure. Thus, by shifting accountability for treating complications, abortion clinics also avoid accountability for complication reporting. In my opinion, it is likely that one motivation for abortion providers' avoidance of responsibility for complications is for that specific reason, namely, to avoid accurate and complete accounting of the complications from abortions they perform.

**3. The potential long-term physical complications of abortion are similarly serious.**

49. In addition to the short-term complications described above, abortions can have long-term complications. Long-term physical complications can be serious as well, both for the mother and her family. The chronological distance of these long-term complications from the abortion make the two harder to link causally. Accordingly, they are not reported as abortion complications and not reflected in estimates of complication rates even if an abortion was their cause. This is yet another way in which reported figures systematically reduce the true rate of abortion complications.

50. Forced dilation of an unripe cervix may result in cervical trauma that weakens the cervix in future pregnancies. This weakened cervix may result in a condition called "cervical incompetence," in which the cervix dilates early in the next pregnancy. That predisposes a woman to premature rupture of membranes, intrauterine infections, and premature delivery. Many studies show strong connections between abortion and preterm birth. One meta-analysis found that there was a 25% increased risk of premature birth in a subsequent pregnancy after one abortion, 32% after more than one, and 51% after more than two abortions (Swingle et al., 2009). Likewise, another meta-analysis found a 35% increased risk of delivery of a very low birth weight infant after one abortion, and 72% after two or more abortions (Liao et al., 2011). In fact to date, there are 160 studies documenting a statistically significant increase in preterm birth with elective induced abortion. (See Exhibit B attached)

51. Prematurity is the number one cause of infant deaths (67% in 2017) (Ely & Driscoll, 2019). Prematurity also leads to substantial lifelong morbidity for many children. For example, researchers have found increased rates of cerebral palsy due to prematurity in very-low birth weight infants (Himpens et al., 2008). It is very likely that abortions contribute to infant mortality and morbidity rates in subsequent pregnancies. But because a preterm birth cannot be definitively attributed to a previous abortion, the child's death or disability is not statistically treated as an abortion complication.

52. Instrumental trauma to the uterus in a surgical abortion may lead to faulty adherence of the placenta in subsequent pregnancies. That, in turn, may result in chronic abruption or placenta previa/acreta/increta (invasion of the placenta into the cervix, uterine wall, or other adjacent

organs). Abnormal placentation may lead to one of the most dangerous delivery situations because removal of an invasive placenta can result in massive blood loss. Many mothers have died, even in high-level hospitals, and the fortunate survivors often require scores of units of blood transfusions to save their lives (Klemetti et al., 2012).

53. In 1950, the incidence of Placenta Accreta Spectrum (PAS) was 1:30.000 deliveries. This rose to 1:272 deliveries by 2016 (Mogos et al., 2016). This 110-fold increase in the incidence of this life-threatening condition is linked to prior uterine damage. Uterine surgery increases the risk, and the Cesarean rate of one out of three deliveries in the United States undoubtedly contributes, but so too does the country's high abortion rate of one in four women (Baldwin et al., 2018). Once more, there is no way to causally link any particular woman's abnormal placentation to a previous abortion, but in the aggregate, a significant number of women with that complication in a subsequent pregnancy are in fact experiencing a complication from a prior abortion.

54. It is physiologically plausible that the interruption of a normal pregnancy might place a young woman at increased risk for breast cancer later in life. In early pregnancy, dramatically increased estrogen levels promote the development of undifferentiated, immature type one and type two lobules in the breast, which have an increased potential to develop into cancer. Delivery at term, and breastfeeding the infant, will complete the breast development into mature type three lobules, which are more resistant to cancer. If a pregnancy is interrupted prior to 32 weeks gestation, this maturation does not occur, leaving breasts in a state more prone to breast cancer development (Lanfranchi & Fagan, 2014; Brind et al., 1996). When a young woman has a history of breast cancer in her family of origin, abortion is contraindicated because the protective factor of a first term pregnancy is eliminated (Melbye et al., 1999; Daling et al., 1994).

**3. In addition to abortion's physical risks, abortions are associated with risks of mental health disorders.**

55. In my opinion, the pro-abortion bias of many academic medical organizations leads them to minimize the potential for mental-health risks for women after abortion. It seems intuitively obvious, however, that abortion may harm the mental health of some women. Certainly there are many women who show no apparent adverse effects from an abortion, but there are also a number of risk factors that make it more likely that a woman will experience mental-health consequences: pressure from others to terminate, ending a desired pregnancy, lack of social support, ambivalence about the decision, history of mental health problems or previous abortions, and having an abortion later in pregnancy (Reardon, 2018).

56. A large meta-analysis found a moderate to highly increased risk (81% overall) of mental-health problems after abortion. Specifically, it found 34% increased risk of anxiety, 37% increased depression, 110% increased alcohol abuse, 230% increased marijuana abuse, and 155% increased suicidal behavior (Coleman, 2011). Joyful events (such as the birth of a child) are associated with improvement in health and well-being. Stress and guilt accompanying voluntary or spontaneous pregnancy loss may adversely impact a woman's health and well-being (Ney et al., 1994). In addition, motherhood may have a protective emotional effect, whereas an abortion may have a deleterious emotional effect, leading to greater risk-taking activities. The phenomenon of

abortion patients committing suicide on anniversaries connected to the abortion is well-documented as well (Tishler, 1981; Reardon et al., 2004a). It is evident that a suicide on the anniversary of an abortion should be linked to that pregnancy outcome, but none of the maternal mortality categories allow that late connection. Mental health issues may also contribute to drug overdoses, suicides, homicides or even accidents due to risk-taking behavior, but our current system of data collection is not capable of linking these events to pregnancy outcomes.

**C. <u>Special risk factors for women obtaining abortions</u>**

57. Besides the general risks associated with abortion described above, at least two aspects of abortion demographics make particular groups especially vulnerable to abortion-related complications or mortality.

58. First, abortion is likely to be disproportionately harmful to black women. There are significant differences in the type of birth outcomes in black women as compared to white women. The rates of natural losses are similar (16%), but 34% of pregnancies in black women end in induced abortion, compared to 11% for white women. Fewer than half of pregnancies in black women result in the birth of a live baby (48%). Induced abortion is 3.7 times more common in black than in white women (Jones & Kavanaugh, 2011). Black women also have the highest level of 2 or more abortions (4.5%) (Anum et al., 2010). The systematic underreporting of abortion morbidity and mortality thus uniquely detracts attention from the health needs of black women.

59. Maternal mortality is persistently higher for black women than white women (Petersen et al., 2019; Chang et al., 2003). And black women also have an elevated risk of pregnancy complications associated with abortion. For example, black women have a cervical insufficiency rate 2.45 higher than Caucasian women (Anum et al., 2010). Cervical insufficiency is a known risk factor for preterm delivery, and is related to the number of surgical procedures performed on the cervix including elective surgical abortions (Iams et al., 1996). This increase in cervical insufficiency in turn appears to be associated with an elevated risk of preterm delivery in black women (14%) versus Caucasian women (9%). (Centers for Disease Control and Prevention, n.d.b).

60. Given the much greater abortion rate for black women, it is possible that the higher rates of abortion may account for most of the racial disparity noted in pregnancy morbidity and mortality. Although Plaintiffs and several of their experts present unregulated access to abortion as benefiting black women (Complaint ¶ 184; Romero ¶¶ 19-20; Haugeberg ¶ 79; Grossman ¶ 16), in my opinion it is more likely that the opposite is true.

61. Second, abortion is associated with delayed childbearing, which carries risks for women. Abortion has led many women to delay the birth of their first child (rather than marry the child's father or put the child up for adoption). The average woman is thus older, and potentially in poorer health, when she becomes a mother. Nationally 30.9% of pregnancy-related deaths occurred in women who were older than 35 years of age. (Bichell, 2016) An older mother is at greater risk for adverse maternal outcomes. As patients age, they increase their risks for preterm delivery and maternal mortality (ACOG Practice Bulletin No. 130, 2012; Jacobsson et al., 2004).

62. The combination of abortion's effects on black women and older women is likely to be especially serious for older black women. The factors that make pregnancy dangerous in older women are especially common among black women. The prevalence of chronic hypertension in black women in pregnancy was found to 9.8% compared to 7.25% non-Hispanic white women in study of over 7.9 million women in 2010-2015 cohort (Singh et al., 2018). This increased incidence of elevated blood pressure is associated with increased risk for preterm delivery. In fact, the incidence of preterm delivery was 28% in a previous pooled study of patients with chronic hypertension due to complications of hypertension compared to the baseline risks of approximately 6% (Bramham et al., 2014). The aging of black mothers as a result of abortion, as well with the increasing rates of chronic hypertension and diabetes among black women as they age, contributes to their risk of subsequent preterm birth (ACOG Practice Bulletin No. 130, 2012).

**D. Plaintiffs' preferred studies on abortion safety are not reliable.**

63. Plaintiffs' experts rely on several studies purporting to establish that abortion is safe. Those studies are contrary to the weight of reliable evidence and ignore many of the factors discussed above. Two of the studies Plaintiffs' experts rely on deserve special attention.

64. First, one widely reported study asserted that abortion was fourteen times safer than childbirth (Grossman ¶ 15; Raymond & Grimes, 2012). In that study, abortion-related deaths were compared to the number of legal abortions, whereas all maternal deaths were compared to the number of live births. Of these four variables, only the number of live births can be accurately measured. Because the comparison is unsupported by data, it is meaningless from the beginning. In addition, the maternal mortality figure is falsely elevated compared to the abortion figure. The denominator is too low because it includes only live births (excluding not only abortions but early miscarriages, deliveries before 20 weeks, stillbirths, and ectopic pregnancies). And yet the numerator likely *does* include deaths connected to non-live births. The result is a skewed apples-to-oranges comparison based on unsound data.

65. Second, last year the National Academies of Science, Engineering and Medicine (NAS) published a book that concluded that induced abortion is safe. The authors wrote that serious complications or long-term physical or mental health effects are virtually non-existent, specifically denying that it increases the risk of preterm delivery, mental health disorders, or breast cancer (National Academies of Science, 2018). They stated that abortion is so safe that the only deterrent to its safety is legislative restrictions enacted by the states that may prevent a woman from accessing an abortion immediately, "creating barriers to safe and effective care." (National Academies of Science, 2018). Several of Plaintiffs' experts refer to the NAS study as supporting their conclusions about the supposed safety of abortion.

66. However, when one examines the research studies NAS used for their conclusions, the poor quality of the literature regarding long-term complications becomes apparent.

67. For many questions, there were very few or no studies that met their criteria, and they disqualified many studies (especially those regarding mental health) due to perceived study defects. Thus, in all cases, there were fewer than a handful of studies on which they based their

definitive conclusion of "no long-term impact." The sparse selection of studies does not support conclusions as definite as those drawn by the NAS.

68. The studies that were included have weaknesses of their own. One is bias: When evaluating for short-term abortion complications, their conclusions were limited to studies performed by the abortion providers themselves or organizations with which they are closely aligned, such as the David and Lucile Packard Foundation, Grove Foundation, The JPB Foundation, Susan Thompson Buffett Foundation, Tara Health Foundation, and William and Flora Hewlett Foundation, and the Guttmacher Institute (Grimes et al., 2004; Grossman et al., 2008; Grossman et al., 2011).

69. The largest studies the NAS relied upon were performed in California, where an enormous number of abortions are performed, but which does not report complications. The three studies they quoted included greater than 233,000, 30,000, and 54,000 women (Ireland et al., 2015; Cleland et al., 2013; Upadhyay et al., 2015). Complication studies derived from California figures are inherently suspect.

70. The NAS report also fails to reckon with the limitations on complication data described above. Even outside the internal weaknesses in the NAS's study design and conclusions, there is strong reason to believe that abortion-related complications and mortality are underreported. The NAS study does not account for those risks.

71. The only conclusion that can reasonably be drawn from the NAS report regarding abortion complications is that the paucity of the literature review and the bias of the investigators should have prompted a call for more study, not a categorical dismissal of any possible complications in any situation. The fact that the NAS report leaps to its strong conclusion suggests that its conclusions are driven at least as much by ideology as by the data.

## III. IT WOULD NOT BE APPROPRIATE TO PERFORM AN ABORTION IN AN OFFICE SETTING, ESPECIALLY WITHOUT ADMITTING PRIVILEGES OR A TRANSFER AGREEMENT.

72. I am familiar with Indiana's law requiring abortions to be performed in a licensed clinic rather than a doctor's office, and in an ASC or hospital after the first trimester of pregnancy. In my opinion, this law offers significant health and safety benefits to abortion patients. It does no harm to Indiana women but enhances their medical care.

### A. Abortions should not be performed remotely or in an office, but at the very least in a licensed clinic.

73. I understand that Indiana requires that first trimester abortions be performed in a licensed clinic. In my opinion, that requirement is medically reasonable. If anything, it is highly accommodating to abortion providers because it permits them to perform first-trimester surgical abortions in clinics rather than hospitals, where similar procedures ordinarily belong. In no event should abortions be provided in a doctor's office.

74. As mentioned above, I am familiar with the D&C procedure and perform it regularly. I always perform D&Cs in a hospital setting with the patient under deep sedation or general anesthesia. I would not perform a D&C in a clinic, let alone in an office. Indeed, no one that I am familiar with would ever perform a D&C as an outpatient procedure in an office. That is because the serious complications that may occur in a D&C, and the lack of resuscitative equipment and personnel outside a hospital, make the procedure too risky for such an environment.

75. First, a D&C requires a facility that can safely manage the necessary anesthesia. That requires trained personnel and specialized equipment such as heart, lung, and oxygenation monitors, ventilators, and electrocardioversion devices. Second, a D&C requires a setting with immediate access to personnel and equipment necessary for managing complications. A hemorrhage could require immediate transfusion services and provision of clotting factors. A bowel injury would require immediate access to assistance from surgeons and surgical specialists. A responsible practitioner would not perform a D&C in a setting that does not have the necessary equipment and personnel. Requiring that D&Cs at least be performed in a licensed clinic thus provides necessary protections to patients.

76. My opinion is consistent with a the 2003 consensus statement from 32 medical and surgical academies, societies, associations and commissions (including ACOG) entitled "Core Principles of Patient Safety for Office-Based Surgery," (American College of Surgeons, 2003); the 2002 Report of the Special Committee on Outpatient (Office-Based) Surgery by the Federation of State Medical Boards of the United States (Federation, 2002); and the 2011 Office-Based Surgery Guidelines of the Massachusetts Medical Society (Massachusetts Medical Society, 2011). Although those documents nominally describe surgeries taking place in a doctor's "office," their descriptions of the equipment, training, and procedural safeguards necessary for surgeries requiring deep sedation or general anesthesia call for a much more sophisticated environment than the typical office. In effect, those organizations call for procedures like D&Cs to be performed in settings at least resembling an abortion clinic, as such a clinic would be constituted under Indiana law.

77. That position would include all surgical abortions, including first-trimester D&Cs, because they involve the forceful dilation of the normal cervix with dilators and then surgical removal of the fetus and other products of conception. In contrast, minor biopsies of the skin, endometrial biopsies, and insertion of an IUD would not be included. Performing abortions in an office would not be consistent with the consensus.

78. Performing abortions (including medical abortions) in an unlicensed office setting is also less than ideal because it complicates public health surveillance. Abortion is a procedure associated with significant public health risks, as well as law enforcement challenges such as sexual assault, sexual abuse of minors, and sex trafficking. For that reason, as discussed in more detail below, many states including Indiana have enacted reporting requirements related to abortions. Centralizing abortion practice in clinics and licensed facilities, subject to state inspection, is more conducive to the necessary surveillance than diffusing it among doctors' offices.

**B. <u>Indiana's requirement that second-semester abortions be performed in ambulatory surgical centers or hospitals is reasonable, appropriate, and consistent with the standard of care.</u>**

79. I understand that Indiana requires that second-trimester abortions be performed in an ASC or hospital. That requirement is consistent with the standard of care.

80. Second-trimester abortions can be performed by several methods, but are generally performed using D&E. As explained above, I am familiar with the procedure and have performed similar procedures to manage miscarriages.

81. D&Es cannot be safely performed in an outpatient, office-based setting. Such abortions are major surgery by anyone's definition due to the nature of the procedure, the anesthesia necessary, and the possibility of major complications resulting from the procedure.

82. D&E surgical abortions are often multiple day affairs. A patient has dilation devices placed in her cervix, leaves the facility for 24-48 hours for her cervix to "ripen and dilate," and then returns for the surgical procedure. Even more so than first-trimester D&Cs, D&E abortions require significant anesthesia since the cervix must be forcibly opened to accommodate the removal of fetal tissues (particularly the fetal skull), with significant use of surgical instruments inside the uterus.

83. These surgeries result in the destruction and dismemberment of the fetus by large grasping instruments, which tear arms and legs off the fetus. Doctors performing these procedures use powerful forceps to crush the fetal skull so it may be removed. All of this can produce sharp shards of fetal bone, which can penetrate the uterus and surrounding tissues causing significant damage and severe hemorrhage. In point of fact, abortion complications increase to 14.7/100,000 at 13-15 weeks; 29.5/100,000 at 16-20 weeks; 76.6/100,000 at > 21 weeks (Bartlett et al., 2004). Such surgeries should only be performed in facilities that can handle emergency complications.

84. Hospitals and ASCs typically have facilities equipped to handle the increased risk of complications. The above discussion of the facilities necessary to safely perform D&Cs applies even more strongly to D&Es, which are significantly more complex and more dangerous to the mother.

85. Other states have already taken steps to regulate outpatient surgical procedures due to increasing concerns about patient safety and quality of care. As early as 2001, six states (New Jersey, California, Pennsylvania, Rhode Island, Texas, and Florida) had taken steps to regulate outpatient surgical procedures; including termination of pregnancy (Sutton, 2001).

86. An abortion in the second trimester does not meet the criteria for a simple outpatient surgical procedure but rather a complicated and potentially morbid procedure. It should therefore be performed in a facility suited to manage serious emergency complications, such as a hospital or surgical center. They should not be performed in an outpatient clinic, and certainly should not be performed in an office.

87. Another advantage of performing second-trimester abortions in a hospital is that it ensures the training and credentialing of the personnel involved in such a difficult procedure. In my experience at many hospitals in multiple states, hospitals often require that providers/physicians meet specific standards of training necessary to care for patients within the hospital. It is my understanding that the same is true in Indiana, which requires hospitals to have credentialed medical and nursing staff that meet certain regulatory requirements to ensure the highest standards of health. *See generally* 410 Ind. Admin. Code 15-1.1-1 et seq. Ambulatory surgical centers are similarly heavily regulated according to stringent requirements. Indiana Code § 16-18-2-14; 410 Ind. Admin. Code 15-2.5-4(c)(1)(C). The expected training involves a specified course of study in the specialty the provider/physician is involved in for medical care. For example, to practice obstetrics and gynecology in a hospital, the doctor typically must complete four years of training under the auspices of the Accreditation Council for Graduate Medical Education (Accreditation Council, n.d.), then apply for board certification by the American Board of Obstetrics and Gynecology (American Board of Obstetrics and Gynecology, n.d.). Hospitals then strictly control providers' credentials to make sure that a provider's scope of practice is within the scope of his or her training. No one would be allowed to practice obstetrics-gynecology in a hospital who was not thoroughly trained and certified to do so.

88. Hospitals vet providers in other ways. Hospitals check potential providers against the National Provider Data Bank, a national database that tracks malpractice and other markers of substandard physician conduct. Further, hospitals place doctors under ongoing peer review to ensure the quality of care and to provide safety to patients.

89. Clinics that are based in hospitals, like my own, must follow these criteria for credentialing. The hospital my clinic is affiliated with does not permit my clinic to perform outpatient surgical procedures which require at least deep conscious sedation, such as D&Cs, due to the medical risks to patients.

### C. <u>Plaintiffs' experts' justifications for performing abortion in offices cannot withstand scrutiny</u>.

90. Plaintiffs' experts contend that abortion, including second-trimester D&E abortions, can be safely performed in offices rather than hospitals, ASCs, or even clinics. That is not consistent with the standard of care.

91. Grossman supports his opinion principally with reference to statistics on the supposed safety of abortions performed with clinics (Grossman ¶ 53). For the reasons discussed above, abortion complications are generally underreported. The figures Dr. Grossman relies on as to the setting for second-trimester abortions, for example, appear to derive from survey data voluntarily reported to the Guttmacher Institute, an abortion advocacy group. They should not be considered reliable. Grossman and Cowett also rely upon statements by professional organizations such as ACOG (Grossman ¶ 41; Cowett ¶ 33), but those organizations appear to rely on similarly flawed data.

92. In any event, even if complications were as rare as Plaintiffs' experts contend, doctors following the standard of care should be prepared to handle even rare complications. That

calls for performing the procedure in facilities better equipped than doctors' offices, and (at the very least in the second trimester) better equipped than a clinic. Complications seldom occur when I manage my patients' miscarriages, but I do not take that to mean that I should begin performing those procedures in an office. Rather, I continue to perform those procedures in the hospital so I am prepared if a complication does occur. All competent and ethical doctors I know follow the same rule.

93. Plaintiffs' expert Dr. Grossman (¶ 64) states his opinion that he is able to handle any complications from abortion in his clinic. At a minimum, that appears to reflect a concession that clinic rather than office facilities are needed for surgical abortions. However, that opinion lacks credible support. Surgical abortions, and especially surgical abortions in the second trimester or later, are complicated procedures requiring significant skill and deep sedation or general anesthesia to perform them. The outpatient guidelines for this type of surgery (American College of Surgeons, 2003) demand there be immediate access to anesthesia, blood banking, operating room, resuscitative equipment as well as a skilled surgeon to care for complications. These are not available in the normal outpatient clinic environment.

94. As a fallback, Dr. Grossman states that in the event of a complication, he will simply call the ER, wait for EMS arrive, and all will be taken care of by someone else (Grossman ¶¶ 62-64). Such a procedure is harmful to women and places them at risk. Dr. Grossman's assumption that he can simply refer complications for other doctors to manage is also outside the norm for doctors practicing in a community. In my experience, doctors have a strong norm of handling their own complications rather than merely referring the patients to others. Although doctors work in teams and involve colleagues with specialized skills when necessary, that is a complement to a doctor's professional responsibility to see a patient's care to completion, not a substitute. Doctors who practice in a hospital setting view doctors who take Dr. Grossman's view as unprofessional at best.

95. Another disturbing comment by Dr. Grossman (¶ 56) is his evident view that sterile technique is unnecessary for surgical abortions. Dr. Grossman does not appear to appreciate that a surgical abortion involves violating a sterile uterus with a surgical instrument, with real potential for harm and risk for infection. In my own practice, I regard sterile technique as valuable even when performing D&Cs.

96. One of the main reasons for Plaintiffs' opposition to licensing and clinical venue regulations appears to be economic. As Dr. Cowett puts it, "because many freestanding, office-based settings have less overhead, obtaining a D&E abortion in an office-based setting is far less expensive than obtaining care in an ASC or hospital setting" (Cowett ¶ 32). A clinic's financial interests do not justify excusing them from ordinary standards of care.

### D. <u>Indiana's admitting-privileges and transfer-agreement requirements are reasonable and consistent with the standard of care.</u>

97. I am familiar with Indiana's law requiring physicians who perform abortions to have (i) admitting privileges in the county where the abortion is performed or in a contiguous

county, or (ii) a written agreement with a physician who has such privileges (back-up physician). In my opinion, this law offers substantial health and safety benefits to abortion patients.

98. First, the requirement for hospital admitting privileges for abortion providers protects patients by requiring a peer-review process to maintain competency in the care of patients, particularly those undergoing surgical procedures. As noted above, hospitals ensure that doctors who perform surgical procedures are board certified, maintain certification in their field, routinely have their practice and outcomes reviewed for competence with adherence to standards of care, and have access to emergency assistance in the situation of a possible complication. Procedures performed outside the hospital in an unlicensed setting have no similar regulation or protection.

99. The credentialing and admitting privileges process in a hospital is detailed and requires specific documentation of the procedures and practice a doctor wishes to perform at the hospital. That process has developed over time in the interest of patient safety so that physicians/providers would not attempt to perform procedures or care outside of their skill set, *i.e*, so that a pediatrician would not attempt to do brain surgery.

100. Second, admitting privileges (and transfer agreements) also aid in management of complications. Assuming that doctors do not perform abortion in a hospital, they should at least be able to admit the patients into hospitals if need be, either personally or through a transferee.

101. A transfer agreement gets patients better care than merely calling the emergency room. The agreement should be in writing, and identifies the transferring and receiving doctors. It identifies whom the transferring doctor should call when a patient needs a transfer, and exactly how to activate EMS transport. It ensures that when the patient reaches the hospital, there will be someone able and willing to handle her conditions. That means, for example, that a patient transferred from an abortion clinic could be delivered to an obstetrician-gynecologist, not an emergency room doctor. It may even permit the patient to bypass the emergency room and go straight to the right specialists. All this, in my opinion, improves the care of patients.

102. My opinions are consistent with the 2003 statement of the American College of Surgeons on "Patient Safety Principles for Office-Based Surgery," joined by the American College of Obstetricians & Gynecologists, stated that even doctors performing office-based surgery "must have admitting privileges at a nearby hospital, or a transfer agreement with another physician who has admitting privileges at a nearby hospital, or maintain an emergency transfer agreement with a nearby hospital"(American College of Surgeons, 2003).

103. The 2002 report by Report of the Special Committee on Outpatient (Office-Based) Surgery by the Federation of State Medical Boards of the United States likewise directed that:

> There should be written protocols in place for the timely and safe transfer of patients to a pre-specified alternate care facility within a reasonable proximity when extended or emergency services are needed. Protocols must include a written transfer agreement with a reasonably convenient hospital(s) or all physicians performing surgery should have admitting privileges at such facility.

104. The Office-Based Surgery Guidelines of the Massachusetts Medical Society also require provisions for hospital transfer (Massachusetts Medical Society, 2011).

105. No other surgical specialty that I am aware of is allowed to send their postoperative patients to the ER without having emergency coverage for their patients by their own practice members or their practice group.

106. Dr. Grossman (¶¶ 66-69) asserts that admitting privileges are not necessary because an abortion provider who needs to transfer a patient to a hospital can simply call the emergency room where the patient is being sent. Contrary to Dr. Grossman's opinion, mere communication between the clinic and the emergency room is *not* good enough. As noted before, physicians such as myself and others who practice in hospital settings, do not desire to have abortion providers send their patients to the ER as unassigned patients. Doing so creates significant medico-legal issues for the receiving doctor, since the doctor who maintains privileges to practice at the hospital must then assume legal liability for the abortion provider's medical complication and follow up care. Rather, hospital providers expect that outside doctors will continue to care for patients with complications. That is important both as a matter of patient care (because the original doctor's experience with the patient remains important even if he or she needs the involvement of other doctors) and professional courtesy.

107. The scenario that Dr. Grossman paints (¶¶ 64-68), in which abortion providers avoid their responsibilities by dumping their patients into a local emergency room, is a form of bad medical citizenship. No other group of doctors performing significant medical procedures away from hospitals conduct themselves that way: it is simply not done. In my experience of over 30 years of obstetrical and gynecologic practice, no one has ever done a surgery or provided care to a patient and then expected the emergency room's on-call obstetrician-gynecologist to simply assume their care. Plaintiffs and their experts are thus asking for special treatment that no other doctors in the medical community receive, and which would set them apart as irresponsible free-riders among their medical peers.

108. Further, Dr. Grossman actually concedes that abortion providers should "have arrangements for transferring patients who require emergency treatment" (Grossman ¶ 74). He therefore appears to recognize that merely sending patients to the emergency room does not satisfy the standard of care. But that renders his opinion incoherent. Given his concession that transfer arrangements are necessary to protect patients who need emergency treatment, Dr. Grossman's opinion amounts to disagreement that such arrangements should take the form of admitting privileges or a detailed agreement with a particular doctor. Dr. Grossman will allow for a transfer plan as long as the abortion provider takes no personal responsibility and avoids formulating a detailed plan for exactly how emergency care will be provided. This, too, is unfair and unprofessional to other obstetrician-gynecologists, and harmful to women.

109. Plaintiffs' experts express concern that hospitals would not grant privileges to abortion providers who seldom admit patients (Grossman ¶ 76). In my opinion, that concern is exaggerated. Hospitals typically grant "courtesy" privileges in that situation in order to enable doctors who do not often admit patients to provide care if need be. Hospitals and hospital staff, in fact, have a strong incentive to grant courtesy privileges in that situation. As mentioned above,

doctors expect each other to take responsibility for their own complications. Providing courtesy privileges is one way to ensure that happens, by protecting hospital doctors from unfairly having to assume responsibility for complications caused by another.

110. Plaintiffs' experts also express concern that hospitals might discriminate against abortion providers. (Grossman ¶ 76; Haugeberg ¶ 62) That concern is exaggerated at best. Under federal laws governing credentialing, hospitals provide extensive due process protections to privileges applicants. 42 U.S.C. §§ 11111(a), 11112. I have served on hospital credentialing committees, and I have never seen a qualified candidate denied privileges.

111. In fact, the incentives of hospitals push the other way. In my hospital, at least one abortion provider has admitting privileges. At one time, he let his privileges lapse, and some of his patients were admitted to the hospital with serious complications that he could not treat. The provider took extensive criticism in the local medical community, lost the professional cooperation of certain other doctors, and ultimately found it necessary to renew privileges in order to continue practicing. The local doctors did not discriminate against his privileges application; on the contrary, they demanded that he obtain them.

112. In short, admitting privileges and/or written agreements of care would ensure that patients who had serious complications (even rare ones) would have access to competent physicians who are familiar with their care and their surgical procedure, and are invested in the patient outcomes.

## IV. NON-PHYSICIANS SHOULD NOT PERFORM ABORTIONS.

113. I am familiar with Indiana's law prohibiting clinicians who are not physicians from providing abortions. In my opinion, this law helps safeguard the health and safety of the women of Indiana.

114. Provision of surgical and medical obstetrics and gynecology care requires four years of intensive training. That training enables a physician not only to perform surgical procedures, but to recognize and manage complications. In the context of surgical abortion, those complications might include hemorrhage from an artery laceration or perforation of the uterus, perhaps injuring the bowels. Management of those complications could require interventions as drastic as a hysterectomy. Only trained physicians, often acting as a team, can manage those circumstances.

115. Intensive medical training also provides doctors with a deep, holistic understanding of patient care. That gives doctor special insight not just into how to perform medical procedures or prescribe drugs, but how to work with a patient to decide what is best for her. Real care for patients involves not just assessing the patient's physical condition in way that only doctors can do, but assessing a patient's real needs. For example, I regularly have to consider whether to manage a patient's miscarriage surgically (which carries risks for her future childbearing) or medically (which can be an emotionally complex process that demands great mental stability and often a network of personal support). My training and experience allow me to help a patient make those decisions. I would not delegate that responsibility to an APC.

116. APCs do not receive that kind of advanced training. APCs may hold a bachelor's degree in nursing, but some may also enter training with only a 3-year associate's degree. APC programs typically require 1-3 years additional training, with some training done online. They are not trained in these surgical procedures at the same level as doctors; they are not as well trained in how to identify complications from such procedures, and they cannot manage surgical complications.

117. I have a significant experience with APCs over the last 30 years of practice, including nurse practitioners (NP), physician assistants (PA), and clinical nurse midwives (CNMs). In my practice, APCs have a limited role as physician extenders. It is perfectly acceptable for PAs, NPS, and CNMs to perform routine physical examinations, do vaginal deliveries, and perform minor procedures (such as colposcopies, IUD insertions, and minor skin biopsies) under the supervision of a licensed physician. But in no way does this prepare them for the complicated surgical care of women, including D&Cs or surgical abortions. They simply do not have the training to be able to make complex judgments about patient care or perform significant surgical procedures.

118. Just as APC should not be tasked with surgical procedures, they are not qualified to recognize complications or handle any surgical complications that arise. A responsible doctor would not expect an APC to recognize or care for a D&C complication like an artery laceration or perforation of the uterus. An APC would never be credentialed by a hospital to provide advanced surgical services to perform hysterectomies or other procedures that might be necessary as a result of a D&C complication. Even if an APC could perform many D&Cs uneventfully—even if, hypothetically, the APC's complication rate were comparable to a doctor's—it is all but certain that he or she would eventually encounter a complication but be unable to recognize or treat it, with potentially disastrous consequences for the patient. The limitations in APCs' training makes it inappropriate for them to handle surgical abortions.

119. The limitations in an APC's qualifications extend to medical abortions as well. APCs do not typically provide ultrasound interpretation since diagnosis is limited to licensed physicians. This means they are not able to provide the most accurate information on gestational age of the fetus, the location of the pregnancy, or any other important information regarding female anatomy or anomalies. These tasks require a physician's skill and judgment. But in the case of a medication abortion, performing those tasks accurately is crucial to determining whether a medication abortion is indicated. A responsible doctor would not entrust that decision to an APC either.

120. Most fundamentally, a patient's decision whether to obtain an abortion is an important one that involves not only complex medical questions, but deeper questions about a patient's emotional needs and wellbeing. Although APCs serve important functions when extending the reach of physicians (and even if an APC could often perform an abortion without complications), major decisions with medical and personal implications require a doctor's personal involvement.

121. Dr. Grossman analogizes abortion to tasks such as prescribing drugs and delivering babies (Grossman ¶¶ 29, 34). There is no analogy between those roles and performing abortions and dealing with operative complications. Permitting APCs to perform abortions would not be consistent with APCs' ordinary functions, but a dramatic extension of APCs to new kinds of responsibility they are not trained for.

122. The provision by other states for APCs to perform abortions does not mean this is done in the best interest of patients. Nor is there data sufficient to establish that APCs can perform abortions safely. The research quoted by Dr. Grossman draws from studies that are underpowered, contain incomplete data, or suffer from the bias of abortion industry sponsorship (Barnard et al., 2015). The Cochrane review by Barnard actually only include 5 small studies evaluating the safety for surgical abortions provided by APCs (9,339 patients) versus physicians (9,623 patients). The majority of patients were not evaluated by ultrasound, there were high levels of detection bias since no one was blinded to outcomes, and the studies were underpowered to make any assertions regarding safety, failure rates, or effectiveness of APCs (Ngo et al., 2013). Further, at least 2 of the prospective cohort studies which include over 20% of the patients (3,821/18,962) were done at abortion clinics (Vermont Women's Health Center – 2,458 patients and Feminist Health Center of Portsmouth, NH – 1,363 patients), which suggests a conflict of interest with suspect scientific validity. Nothing I am aware of approaches definitive evidence that APCs can provide abortion services as well as doctors.

123. Grossman also once again completely ignore the 2003 consensus statement from the American College of Surgeons, which outlines the requirements for patient safety during a surgical procedure. The report was intended to address the proper use of conscious sedation for surgical procedures. That type of sedation (which includes deep sedation) involves a twilight-like state, possible loss of respiration, possible depression of cardiac function, and risk for possible major vascular complications. Colonoscopy, laryngoscopy, and D&Cs can all fall into this category (American College of Surgeons, 2003). All of the 10 core principles subscribed to by this group in 2003, including ACOG, presume that the person involved in the procedure is a physician. In fact, there are six of the ten core principles that are violated by allowing APCs or CNMs to perform office-based surgery. The core safety principles violated are:

> ***Core Principle #3*** *– Physicians who perform office-based surgery should have their facilities accredited by the JCAHO, AAAHC, AAAASF, AOA, or by a state-recognized entity such as the Institute for Medical Quality, or be state licensed and/or Medicare-certified.*
>
> ***Core Principle #4*** *– Physicians performing office-based surgery must have admitting privileges at a nearby hospital, a transfer agreement with another physician who has admitting privileges at a nearby hospital, or maintain an emergency transfer agreement with a nearby hospital.*
>
> ***Core Principle*** *#7 – Physicians performing office-based surgery must obtain and maintain board certification from one of the boards recognized by the American Board of Medical Specialties, AOA, or a board with equivalent standards approved by the state medical board within five years of completing an approved residency*

*training program. The procedure must be one that is generally recognized by that certifying board as falling within the scope of training and practice of the physician providing the care.*

***Core Principle #8*** *– Physicians performing office-based surgery may show competency by maintaining core privileges at an accredited or licensed hospital or ambulatory surgical center, for the procedures they perform in the office setting. Alternatively, the governing body of the office facility is responsible for a peer review process for privileging physicians based on nationally recognized credentialing standards.*

***Core Principle #9*** *– At least one physician, who is credentialed or currently recognized as having successfully completed a course in advanced resuscitative techniques (Advanced Trauma Life Support®, Advanced Cardiac Life Support, or Pediatric Advanced Life Support), must be present or immediately available with age- and size-appropriate resuscitative equipment until the patient has met the criteria for discharge from the facility. In addition, other medical personnel with direct patient contact should at a minimum be trained in basic life support.*

***Core Principle #10*** *– Physicians administering or supervising moderate sedation/analgesia, deep sedation/analgesia, or general anesthesia should have appropriate education and training.*

124. The American College of Surgeons report thus would not authorize APCs performing the procedures it covers.

## V. INDIANA'S LICENSING REQUIREMENTS ARE REASONABLE AND APPROPRIATE CONSIDERING THE NATURE OF ABORTIONS.

125. I am familiar with Indiana's law requiring clinics where abortions are performed to be licensed by the Indiana State Department of Health.

126. In my opinion, this licensure requirement offers significant health and safety benefits to women and public health. Licensure requires regular inspection of clinics, clinic operations, and interaction with the State regulators. Those aspects of a licensing system protect women from exploitation. As the Kermit Gosnell case illustrates, abortion patients are in special need of those protections (In re Cnty. Investigating Grand Jury XXIII, Misc. No. 0009901-2008 (Pa. Ct. C.P. Jan. 14, 2011)). Given that abortions are significant medical procedures that should be performed in settings more sophisticated than a doctor's office (as discussed above), regular licensing and inspection is unexceptional. Licensure and inspection help prevent and uncover possible violations of care.

127. Competent and ethical doctors recognize that facility licensure is an ordinary part of the practice of medicine, especially when it comes to performing significant surgical procedures. As previously noted, I have considerable experience with all levels of care including outpatient clinics, outpatient surgical centers, and hospital care. Outpatient surgical centers and hospital

surgical areas all require licensure to ensure the basic standards of staff training, facilities, equipment, and resources such as blood banking and anesthesia. Indiana appropriately licenses other, non-medical facilities, such as beauty culture salons, funeral homes, and child-care centers; medical facilities that perform significant surgical procedures should be licensed too. Ind. Code § 25-8-7-1 et seq.; Ind. Code § 25-15-4-1; 832 Ind. Admin. Code 5-1-0.5; Ind. Code § 12-17.2-4-1 et seq.

128. Plaintiffs' experts do not focus on particular health and safety standards created by the Indiana licensing regulations, but on the existence of a licensing system in the first place. Their failure to identify particular standards that allegedly do not serve the health of abortion patients implies that they consider the standards themselves to be consistent with the standard of care.

129. Instead, Dr. Grossman asserts that licensure is not necessary for abortion practices, based principally on the theory that abortion is safe and the complication rates are low (Grossman ¶¶ 38-40). For the reasons discussed above, Dr. Grossman underestimates the risk of complications, the seriousness of complications that might result, and the need for medical care. A serious laceration may result from a surgical abortion, and considerable skill and acumen are necessary to identify and treat it. An ordinary doctor's office, without direct access to transfusions, proper anesthesia, or an operating room, is not the arena for surgical abortions. This, again, is why neither I nor any of my colleagues will perform D&Cs of any sort in an outpatient clinic. It is simply too dangerous and bad for women.

130. Dr. Grossman asserts that it is not necessary to license abortion clinics since the physicians are all licensed and "held accountable to professional standards of practice." (Grossman ¶¶ 37-38). Unfortunately, as the Kermit Gosnell case illustrates. mere licensure of physicians, or even clinics, is unlikely to be adequate without regular state inspections for compliance with health and safety standards. Oversight ensures that records and equipment are properly maintained, particularly when a physician is not always on-site to monitor facility standards. It also ensures access to patient records for public health purposes.

131. Clinic licensure is also consistent with the broader history of licensure for outpatient surgeries. In the early 1990s, a trend of surgeries performed under deep sedation at unlicensed surgical centers led to an increase in complications and mortality rates. State health authorities responded by establishing licensing and inspection systems. The American College of Surgeons found as early as 2001 that several states were enacting statutes to protect patients in offices providing "outpatient surgery" (Sutton, 2001). It would be anomalous if abortion facilities were *not* included in that trend.

132. If the physicians in these various reports truly care about women's health, they ought to applaud the efforts by the State of Indiana to insure safe and quality care to women. Requiring licensure and inspection of the clinics is one more way to make certain that provider's and clinics meet the usual standards of care for outpatient surgical procedures.

## VI. **INDIANA'S REPORTING REQUIREMENTS FURTHER THE STATE'S INTEREST IN COLLECTING THE MEDICAL INFORMATION WITHOUT BURDENING PHYSICIANS.**

133. I am familiar with Indiana's law requiring clinics where abortions are performed to satisfy state reporting requirements. These requirements do not appear costly or burdensome, but rather serve the State's interests in the care and protection of women and the development of public policy.

134. First, good epidemiological practice calls for good information regarding abortion demography and practice. These statistics could then be used by the State of Indiana for many purposes. One is to identify public health concerns, such as a trend of complications or deaths associated with a particular clinic, or law enforcement issues, such as victims of sex abuse. Ind. Code § 16-34-2-5(a)(1), (7), (19).

135. Second, reporting of abortions complements information collected on abortion procedure outcomes—*e.g.*, how many specific complications are found comparing surgical and medical abortions, data regarding gestational age of complications. Ind. Code § 16-34-2-4.7. Clinics and the state could also use this information to do quality improvement at individual sites, in the event of variances in care or increase in complication rates, and to further informed consent requirements.

136. Third, comprehensive data collection is the foundation of good epidemiological study. As explained earlier, the data collection for abortion is woefully lacking in the U.S. This has significant implications for the healthcare of women. Detailed data need to be collected and analyzed to be able to provide better care. That, in turn, requires long-term collection of large amounts of data, because the State cannot know in advance what pieces of data will be significant and which will not.

137. For these reasons, it is imperative the State of Indiana fill in the gaps in the collection of abortion data to protect the women of their state and prevent them from harm.

138. Dr. Grossman's statement that these "requirements offer no health or safety benefits to abortion patients and provide little benefit to the public" ignores those realities (Grossman ¶ 77). This statement is made with no supporting evidence and simply ignores the significant risks, morbidities, and mortality associated with induced abortions. Given the paucity of robust data on abortion demographics, morbidity, and mortality, and the many short- and long-term uses for that data, the benefits of data collection appear manifest.

139. Dr. Grossman (¶ 77) and Professor Wocial (¶ 2) complain that the data regarding abortion that Indiana collects is "intrusive" (Grossman ¶ 77), that the data reporting requirements "are inconsistent with ethical principles concerning informed consent to medical treatment," and that "they do not promote the integrity or ethics of the medical profession" (Wocial ¶ 2). In my opinion these are unfounded complaints.

140. Data for outcomes in medicine is routinely collected for all types of surgical procedures, medical care, infectious diseases, and therapeutic interventions. In my practice, all infectious diseases, substance abuse, and drug screens are reported to the state and the county. That can include sensitive patient information about drug use and sexually transmitted diseases. In my

practice, we also prepare death certificates and birth certificates, both of which include detailed information. Birth certificates, for example, cover personal information such as pregnancy complications and birth defects. Responsible doctors understand that reporting is necessary to provide the best patient care and to protect public health.

141. Ultimately, data collection enables the State to ask questions about abortion practice in the State and obtain empirical answers. What is truly striking about Plaintiffs' challenge, then, is that Plaintiffs and their experts rely on partial, incomplete data about abortion complications to prevent the State from asking and answering those legitimate questions based on better information.

## VII. MEDICATION ABORTIONS SHOULD NOT BE PERFORMED BY TELEMEDICINE.

142. I understand that Plaintiffs have challenged Indiana laws preventing abortion providers from prescribing medication abortion by telemedicine. In my opinion, it is reasonable to require an in-person meeting for medication abortion.

143. First, medication abortion, like any other abortion, carries serious risks of complications and has great moral significance, both of which a patient should consider carefully. In my experience, in-person interactions are superior to remote interactions for decisions of that weight. An in-person interaction enables better communication because the people involved see the "whole person." That leads to better eye contact, greater ability to read body language, and overall development of a real person-to-person relationship between doctor and patient. It also enables me to immediately perform a physical examination if the conversation reveals cause for one.

144. Second, the indications for medication abortion are strict and must be determined precisely. The fetus must be no more than 10 weeks gestation, and the pregnancy cannot be ectopic, among other restrictions. An in-person examination including an ultrasound is the best method for ensuring that a medication abortion is indicated.

145. Dr. Grossman (¶¶ 136-137) suggests as an alternative that "providers may also use a patient's reported last menstrual period and perform a physical examination to assess gestational age." This is impossible if the patient is only seen on a telemedicine screen and not examined. Further, Grossman's suggestion is not the standard of care for estimating due dates and gestational age for abortion provision. ACOG Committee Opinion No. 700 emphatically states, "A pregnancy without an ultrasound examination that confirms or revises the EDD before 22 0/7 weeks of gestational age should be considered suboptimally dated" (ACOG Committee Opinion No. 700, 2017). Finally, there is no way without an ultrasound that an abortion provider can determine where the pregnancy is located, and therefore cannot rule out a possible ectopic pregnancy.

146. Third, in the case of telemedicine it is not possible for the doctor to be sure who takes the prescribed drugs. Further, there is no ability to examine the patient or even evaluate who is in attendance with her. That creates a risk that the drugs will be diverted to another woman.

147. That is especially risky because Plaintiffs' expert Dr. Cowett (¶ 27) prescribes Tramadol, a narcotic pain medication with addictive potential, to her medication abortion patients. The control of such medications with abuse potential when prescribed via telemedicine is problematic.

## VIII. INDIANA'S INFORMED-CONSENT REQUIREMENTS ARE CONSISTENT WITH THE STANDARD OF CARE.

### A. The information disclosed to patients is accurate and necessary for patients to be fully informed about the risks and implications of the abortive procedure.

148. I am familiar with Indiana's law's mandating providers make certain disclosures to their patients prior to providing abortion care. In my opinion these laws do enhance the informed consent process and do contribute to a more completely thoughtful process for patients. The Indiana Abortion Informed Consent Brochure and the statute governing informed consent provide accurate clinical information to assist pregnant patients in giving informed consent for elective abortion. The information is scientifically accurate, important, nonmisleading, and relevant to the woman's decision.

149. Informed consent involves not only my assessment of the ability of my patient to understand and comprehend the various treatment options, risks and benefits, but also her voluntariness to make a decision free of coercion. In addition, informed consent requires my patient to convey to me an accurate and complete medical history so I can better assess the risks and benefits of treatment and provide the appropriate medical interventions if required**.**

150. Several aspects of abortion practice make full informed consent especially important.

151. One is the vulnerability of abortion patients to coercion, abuse, and malpractice. Abortion patients are often low-income, with limited education. Many are victims of sexual abuse or violence. Without special care, such patients may easily be rushed into procedures they do not choose or do not fully understand, with few legal or other recourses afterward. In my practice, when I encounter patients with those characteristics, I recognize their special needs for informed consent purposes. An ethical abortion provider should recognize, in my opinion, that those factors call for special care in obtaining an abortion patient's full consent.

152. Another factor is the weakness of the doctor-patient relationship. Abortion providers and their patients often meet very briefly and never interact again. Published data on informed consent for abortion without state mandated guidelines reveals the gross disregard of patient's informed consent. In states without a guideline for informed consent in elective abortion, fewer than half of patients reporting a face-to-face interview prior to their abortions (Picker Institute, 1999). The patients and doctors meet for short procedures, often when the patient is under anesthesia, and never meet again. Up to two-thirds of patients with abortion complications do not return for follow-up appointments at the abortion clinics (Picker Institute, 1999). It is highly doubtful that in such circumstances, doctors are providing adequate informed consent. In my

opinion, given the likely failures of informed consent under unregulated conditions, a statute would provide the necessary protection to women so they receive the information they need.

153. Plaintiffs' own views of informed consent suggests that without state supervision, they would not provide adequate informed consent. Plaintiffs' experts appear to assume that their role in ensuring informed consent is to enact the decisions of their patients who appear "certain" that they want an abortion (Grossman ¶¶ 138-39; Glazer ¶ 35). That is exactly the wrong mindset for an ethical doctor, who must take responsibility for obtaining a patient's consent even when the patient appears to be sure at the first meeting. Indiana's informed consent ensures consistency with ordinary standards of informed consent, which abortion clinics would not otherwise follow.

154. Plaintiffs' experts' objections to the informed consent disclosure are generally ideological rather than ethical or scientific. Grossman (¶ 98) says that "pregnancy does not begin until implantation of the blastocyst on the uterine wall (ACOG Definitions, 2017). This is clearly false. Scientifically and embryologically, the new life begins at conception when the sperm and egg unite.

155. According to the science of embryology, human life begins at conception and thus, the start of each unique human person begins at that time. In his text on embryology, Moore states emphatically, *"Human development begins at fertilization,* when a sperm unites with an ovum to form a unicellular organism call a *zygote* (Gr. *Zygotos,* yoked together). This cell marks the *beginnings* of each of us as a unique individual" (Moore, 1982) (italics in original quote). The separate moral question whether a human embryo is a *person* is subject to debate, but there is no scientific question about the fact presented in the Indiana disclosure.

156. Grossman denies the relevance of fetal pain (¶ 100) but this has been scientifically debunked by other researchers (Lowery et al., 2007; Vanhatalo & van Nieuwenhuizen, 2000). Vanhatalo and Nieuwenhuizen note, "Hence, after the development of the spinal cord afferents around the gestational week 10, there may be no age limit at which one can be sure noxae are harmless." Clearly, an abortion would be a "noxus." Disclosure "[t]hat objective scientific information shows that a fetus can feel pain at or before twenty (20) weeks of postfertilization age," as the statute requires, is thus scientifically supportable. Ind. Code § 16-34-2-1.1(a)(1)(G).

157. Dr. Grossman also objects to providing informed consent disclosures in person (Grossman ¶ 101). He states categorically that "I do not believe that providing information about abortion in person is required to ensure that patients are well informed" citing the Guttmacher Institute (Grossman ¶ 101). He even believes an abortion patient can provide consent by telemedicine (Ehrenreich et al., 2019).

158. Providing information for abortion without meeting in person for informed consent clearly does not meet any regular standard of care, and in my opinion, it does a grave disservice to women who are about to make a life-or-death decision for their baby. It trivializes the whole process to believe you may obtain consent with a booklet or by a face-time type video interview. Consents for surgical and major medical decisions demand a face-to-face interview. Abortion providers currently do not follow that standard for roughly half of their patients (Picker Institute, 1999).

159. Plaintiffs' experts take special exception to the Indiana ultrasound requirement (Haugeberg ¶ 86; Martin ¶ 16; Flavin ¶¶ 67-69). The use of ultrasound in provision of elective abortion is critical in verifying fetal gestational age, fetal viability and location of the fetus. Visualization of the live fetus by ultrasound allows the patient to understand what the consent to an elective abortion actually means: the ending of the baby's life. To hide this important information deprives women of making a knowledgeable, full-informed consent.

160. One of Dr. Grossman's own quoted studies (Gatter et al., 2014) reveals that significant numbers of women (7.4%) are ambivalent (medium/low decisional certainty) when they come to abortion clinics and decide against abortions afterward when visualizing an ultrasound (Grossman ¶ 138). Another study of 5,000 women in Wisconsin quoted by Grossman (¶ 139) found that there was a decrease in the abortion rate in women who viewed the mandatory scan of their baby prior to their abortion (Upadhyay et al., 2017). Grossman's own evidence thus establishes that viewing an ultrasound can change the minds of significant numbers of women ambivalent about the abortion decision.

161. Finally, Grossman (¶ 102) tries to evade the increased risk of maternal mortality with abortion as well as the increased risk for mental health issues. This untruth has been thoroughly debunked by the discussion above. The prudent patient would want to know if she has an increased risk of death with an induced abortion and that she is at risk for mental health issues. Full informed consent for the prudent patient demands a complete sharing of all known risks.

**B. <u>The 18-hour waiting requirement is reasonable and consistent with other non-emergency or elective procedures.</u>**

162. I am familiar with Indiana's law requiring patients to wait 18 hours after receiving state mandated disclosures to have an elective abortion. I consider an 18-hour period to be reasonable to serve the interests of informed consent.

163. In my experience, it is normal for a non-emergent medical procedure to take place some time, and often several days, after an initial consultation. Medical care for women often involves multiple visits over a period of time. Such scheduling occurs for many reasons, including the convenience of doctors and patients, and is not considered inconsistent with the standard of care.

164. Plaintiffs' experts express concern that the 18-hour period may affect the medical situation of an abortion patient (Grossman ¶¶ 115, 125, 134; Guerrero ¶ 26). It is statistically highly unlikely, however, that a day or two would affect any abortion procedure, and so the vast majority of abortion patients would be unaffected. Nonetheless, the medical commitment to fully informed consent and the need to be firm in the acknowledgement of patient autonomy are so critically important that the time period ought to be required. To do otherwise is a guise to undermine the critical nature of patient autonomy in the informed consent. Plaintiffs' apparent unwillingness to make sure their patients take time to consider the abortion decision confirms the importance of the statute.

165. ACOG strongly supports this concept (ACOG Committee Opinion No. 439, 2009). In the opinion, they discuss the key eight components of informed consent. Component number 5 states, "Informed consent should be looked on as a process rather than a signature on a form. This process includes mutual sharing of information *over time* [my emphasis] between the clinician and the patient to facilitate the patient's autonomy in the process of making ongoing choices" (ACOG Committee Opinion No. 439, 2009). ACOG acknowledges that it takes time to provide informed consent for elective procedures. This is particularly critical in elective abortion where a human life is ended.

166. In my practice, patients considering a significant elective procedure, *i.e.* a tubal ligation, have multiple meetings with physicians over the course of weeks. At an initial meeting. the various other methods of prevention of pregnancy would be discussed in detail as alternatives to permanent sterilization. Then, we would discuss in detail the various forms of tubal sterilization and/or removal for sterilization. After this discussion, federal medical aid recipients must sign a Medicaid consent that requires the patient to be at least 21 years of age and wait 30 *days* for her tubal ligation so the patient may have time to contemplate the permanence of the procedure.

167. After 30 days, she would meet our physicians again for a preoperative appointment, undergo informed consent regarding the procedure, and then be scheduled for her tubal ligation that would be performed sometime in the next month. Finally, she will have to once again meet with the physicians in the preoperative holding area to receive and sign her final informed consent from her physician who will perform the procedure (most generally the physician who discussed the procedure initially).

168. Several days between an initial consultation and a procedure are especially important for procedures that require serious consideration on the patient's part. Abortions plainly fit into that category because of their moral dimensions and the potential for complications. Women (including poor and otherwise vulnerable women) are better served by this aspect of informed consent than by immediate performance of procedures, even where an immediate procedure is possible. Most of my patients (approximately 60%+) are Medicaid patients. These women are particularly vulnerable due to educational, socioeconomic, and financial issues. They often require multiple visits in order to understand and consider options with regard to medical and surgical procedures. Coleman et al. found that women with lower income desired information on every potential risk (even small risks) especially with regard to elective procedures like abortion (Coleman et al., 2006). I therefore believe that detailed informed consent, allowing ample time for consideration of important decisions, best accords with the interests and wishes of patients.

169. In my experience, women also accept that time between an initial consultation and a procedure they wish to obtain is an ordinary feature of their medical care that contributes to their informed decision making.

170. That is true even when patients must travel for care. Many of my pregnant patients drive over 1-2 hours to attend my prenatal clinics. Some even come twice a week for fetal testing for well-being. In my experience, patients do not consider such travel to be an obstacle to their health care decisions.

171. Dr. Grossman relates in several paragraphs how his patients typically come to him "firm in their decision to terminate their pregnancy" (Grossman ¶¶ 105-108).

172. Contrary to Dr. Grossman's claim, data demonstrate that pre-abortion ambivalence is common, with 54% of women who *had* abortions reporting that they were unsure of their decision in one study (Rue et al., 2004). As discussed above, at least 7% of women will decide against abortion when allowed to see an ultrasound of their baby (Gatter et al., 2014). Further, the study by Upadhyay et al. found that with the mandatory ultrasound law in Wisconsin, women choosing to continue their pregnancies went from 8.7% to 11.2%. In-depth analysis with 23 women found that 19/23 viewed the ultrasound and that 2/19 (10%) chose to not abort based on the ultrasound (Upadhyay, et al. 2017). All this confirms that ambivalence and indecision among women who present at abortion clinics is an important issue to be addressed in the informed consent process. The fact that Plaintiffs and their experts obscure their patients' indecision as they do underscores the importance of state involvement to ensure that informed consent takes place.

173. In any event, even if women appear certain that they want abortions, the firmness of a patient's decision to have a medical procedure does not bind a doctor to perform the procedure promptly, especially where the seriousness of the procedure calls for giving the patient time to make her decision.

174. Grossman relates (¶¶ 111-134) a litany of how harmful a waiting period is for women. The reasons given are basically financial and/or time related. Yet, Grossman does not really get to the heart of the matter: induced abortions are elective and therefore there is no reason in medical ethics for the abortion procedure to have to be performed the same day. It would be similar to performing a breast implantation the day the patient arrived in the surgeon's office, which no ethical and competent physician would do. Such an action would violate the ethic of nonmalficence since the doctor would be "doing harm" to the patient by not allowing them the time to receive, understand, and process the issues involved with breast augmentation (American College of Obstetricians & Gynecologists, 2007). Elective procedures like abortion need not be performed on the same day as the initial physician consultation, and informed consent requires that the patient have time to consider her decision.

## IX. <u>INDIANA'S PARENTAL CONSENT REQUIREMENTS FOR MINORS SEEKING AN ABORTION ARE REASONABLE AND CONSISTENT WITH THE STANDARD OF CARE.</u>

175. I am familiar with Indiana Code § 16-34-2-4, which requires most minors under 18 years of age to obtain the consent of a legal parent, guardian, or custodian before receiving an abortion unless they obtain a court order excusing them from this requirement.

### A. <u>Ordinary ethical practice requires minors, to get parental consent before major medical procedures, including ones that might involve privacy issues.</u>

176. In my 30 plus years of medical practice, I have regularly provided care for minors and adolescents. For example, I have treated numerous adolescent women who have complicated pregnancies, including those with fetal anomalies. Unanticipated or unexpected complications in

a pregnancy demand critical decision-making and support for women of any age. In a non-emergent situation, however, I consider it highly inappropriate to perform a medical procedure without parental consent.

177. The human brain does not develop to full maturity until a person's mid-twenties (The National Campaign to Prevent Teen Pregnancy, 2005).

178. The last portion of the brain to mature is the prefrontal cortex (the front of brain behind the forehead). This is the seat of cognitive thinking: decision making, judgment, critical thinking, ability to "see" the future consequences of present action/decision today, and moral reasoning (Giedd, 2004). Grootens-Wiegers et al. point out in their review paper that adolescents demonstrate more impulsive behaviors and decreased competence in responsible medical decision making. They note that adolescents find that "[s]hort-term rewards become more important that long-term rewards, even when choosing for an immediate reward can mean a loss on the long term" (Grootens-Wiegers et al., 2017).

179. This means the adolescent-minor has poorer ability to make thoughtful decisions, is more impulsive, and is less likely to consider the long-term consequences (including long-term effects on her own brain) when making medical decisions than an adult woman would be in the same circumstances.

180. Few young people consider the importance of an accurate medical history from their past when they are facing situations that are unfamiliar, frightening and overwhelming in the present. Fewer still could accurately convey their own medical history without the benefit of parental input. In my experience, minors including adolescents are not reliable medical historians (Grooten-Wigers et al., 2017).

181. Further, young brains are being molded at all times (Giedd, 2008). Each experience, including an induced abortion or other medical procedure, changes the adolescent brain by connecting that experience to a memory. Adolescent brains change in light of experience to support activities and behaviors.

182. For these reasons, ethical medical providers do not perform non-emergent medical procedures on unemancipated minors without obtaining parental consent.

183. I have performed, over the years, numerous emergency Cesarean sections on unemancipated minors. As a matter of sound clinical practice, I have never performed an *elective* C-section on an unemancipated minor without obtaining parental consent prior to the procedure. I would only make an exception to this rule of not involving the parents in the informed-consent process in the case of a medical emergency.

184. I do not believe that it would be prudent to perform C-sections on minors without parental involvement, as I would be exposing myself to unnecessary liability claims of medical malpractice for lack of informed consent. I know of no obstetrician-gynecologist who would do otherwise. What this means for the pregnant minor is that parental involvement is virtually

ensured, in spite of the lack of a legal requirement. In this way her decision-making is reviewed and monitored by both her parents and her physician so as to minimize any untoward health risks.

185. Drs. Grossman and Cowett wrongly assert that children are fully capable of understanding and processing information regarding medical conditions and the treatment options and of providing informed consent (Grossman ¶¶ 156, 163; Cowett ¶¶ 38-40). There is no evidence to support this assertion, and in fact, the medical literature suggests the opposite. (See above.) Children and adults are not equally capable of making medical decisions, and medical ethical principles do not permit physicians to treat them as equivalent to adults.

**B. <u>Parental consent is no less important for minors seeking abortions than it is for other medical procedures.</u>**

186. Parental consent is at least as important for an abortion as for any other medical procedure, if not more.

187. The unemancipated pregnant child who faces the risk of an unintended pregnancy, possible complications, and childbirth does not typically do so alone and in a decision-making vacuum. Instead, she most often relies upon the advice and love of her parents and the trust she has developed with her physician. She also has both the time and the opportunity to do so. The same should be true when adolescents consider abortion.

188. Without Indiana's law, a young girl choosing an abortion would often be inclined to trust her own feelings and swiftly make a decision without the opportunity to discuss her options with those who typically care for her the most, her parents. In addition, adolescent girls do not have the level of experience and medical sophistication required to choose a competent abortion provider on their own. Nothing could be more unhelpful for a vulnerable child facing an unwanted pregnancy than a lack of assistance and support from parents who in reality would most likely be her primary support system and willing to help in any way possible. In fact, Sabia and Rees (2012) found that the enactment of parental involvement in abortion was associated with an 11 to 21 percent reduction in suicide in 15-17 year old females during the study years from 1987 to 2003 (Sabia & Rees, 2012).

189. I understand that many adolescent women are uncomfortable discussing unintended pregnancies with their parents. I have experience with patients facing that concern. Even in those situations, however, their parents are virtually always the ones who love them most, and who can best be trusted to help them seek their own best interests. The discomfort of sharing the truth with parents who might disapprove is ultimately part of the process that allows them to make the best decisions for her personal situation.

190. The potential harms to adolescents from abortions are real and significant. The potentially traumatic act of an abortion cannot help but to negatively impact an adolescent's developing brain. This is reflected in aborting adolescents 5 times more likely to seek mental health counseling than adolescents did not get abortion, 4 times more frequent sleep issues and 6 times more likely to use marijuana during the time studied from 1994-2004 (Coleman, 2006). Further, Gissler et al. found that the age group from 15 to 24 years is significantly prone to suicide

in the context of an abortion with an increase of almost 50 percent in the suicide rate compared to non-pregnant women (Gissler et al., 2005). Serious mental health risks of abortion, including depression and suicidal thinking, are greater following abortion for minors than for young women who choose to give birth (Coleman, 2011; Fergusson et al., 2006).

191. There is a further significant association between abortion and other substance abuse, including not only marijuana but alcohol and other illicit drugs (Coleman et al., 2002a; Klassen & Wilsnack, 1986; Reardon et al., 2004b; Reardon & Ney 2000).

192. Grossman (¶¶ 156-164) brings a host of arguments regarding adolescent involvement of parents and "others" in the abortion decision. What Grossman glosses over is the significant lack of parental input in abortion the studies quoted: almost 53% of the adolescents "involved an adult who was not their parent" (Henshaw & Kost, 1992). This supports previous research by Barglow and Weinstein that teens are more likely to abort because of pressure from their partner (often significantly older). Involvement by other "non-parental adults" does not help adolescents in making the abortion decision when it involves coercion from non-parental adults. (Barglow & Weinstein, 1973; Franz & Reardon, 1992). All of this confirms that there is no true substitute for parental involvement when minors make difficult medical decisions. The expectation of parental consent for a minor's healthcare presumes that the best source of guidance is likely to be a parent. Doctors should not assume that a minor can substitute the guidance of an adult of her choice.

193. Further, the majority of adolescents, according to Franz and Reardon, believed that they were misinformed at the time of the abortion and did not receive full counseling with regard to abortion complications and long-term morbidities (Franz & Reardon, 1992).

194. An adolescent who attempts to obtain an abortion in secrecy has no monitoring systems in place to detect complications. If complications do arise, she may not understand them or may not even perceive them to be a threat until too late. This risk is especially serious for medical abortion where a second medication (misoprostol) is administered and its effects are monitored by the minor at home. From my own personal experience, I have learned that adolescents are notoriously unreliable in following medical care instructions. Parental involvement is thus crucial to ensuring the safety of adolescents who choose medication abortions.

### C. **Abortion is an elective procedure that should not be equated with other necessary medical treatments or procedures.**

195. Plaintiffs' experts have argued that an adolescent's decision to obtain an abortion is no different than the decision to obtain treatment for venereal diseases or prenatal care. Dr. Cowett argues (¶ 44) that "[t]here is no medical justification for allowing Indiana adolescents control over their STI, sexual assault and addiction care but not over their decision to end a pregnancy." Based on my clinical experience and common sense, I do not find this to be credible. In my opinion, the analogy between aborting a fetus and treating a venereal disease trivializes abortion. The counseling for abortion also needs to include all the long-term consequences of abortion to include preterm birth, mental health effects, and possible short-term abortion

complications. It should also be emphasized that elective abortion is just that: an elective procedure and not part of health care to cure any disease.

196. In addition, contrary to what has been asserted by Plaintiffs, the potential adverse health outcomes of abortion are considerable: (a) the health risks of abortion are significantly higher and more serious than childbirth after 16 weeks (see above discussion on maternal mortality); (b) termination of the first pregnancy significantly affects the success of subsequent pregnancies, particularly cervical incompetence/chronic intrauterine infection in young girls leading to increased risk for preterm delivery (see Exhibit B); (c) when a young woman has a history of breast cancer in her family of origin, abortion is contraindicated because the protective factor of a first term pregnancy is eliminated (Melbye et al., 1999; Daling et al., 1994); and (d) as the number of abortions increase in a child's/woman's life, so also does the likelihood of subsequent infertility and low birth weight babies as well as the risks to her psychological health.

**D. <u>Medical abortion and adolescents.</u>**

197. The privacy and lack of invasiveness of a medical abortion is appealing to many women, but in some cases, especially among adolescents, this experience can be traumatizing. A pregnant minor's desire for privacy and discomfort with the idea of a surgical procedure can often lead her to elect to abort in the comfort of her home, but she can also be ill-prepared to face the realities of her decision. She is likely to be confronted with the fetal remains once the medications take effect, which can be shocking, leaving the young girl emotionally scarred. For this reason, it is even more important for adolescent girls to receive counseling prior to a medically induced abortion than a surgical abortion.

198. In order for a medical abortion to be completed successfully, patient compliance with the administration and monitoring protocol is critical. This can pose a problem for adolescents, who as previously stated, are unreliable in following medical care instructions.

199. In spite of following instructions, at least one study from Sweden by Carlsson et al. notes that there is an increase in complications with the advent of "home abortions" due to medical abortion. They found an increase in complications from 4.2% (2008) to 8.2% (2015) with a 4.1% failure rate requiring surgical completion (Carlsson et al., 2018).

200. After the administration of Mifeprex and then misoprostol 24-48 hours later, side effects and complications may arise and must be managed properly by the young girl, optimally with the guidance of her parents. Having her mother and father aware of the abortion would give them the opportunity to supervise and ensure that any side effects or complications are handled properly. In addition, after the misoprostol has been taken, it is essential for the pregnant minor to obtain follow-up care to confirm the completeness of her abortion and whether or not she continues to be pregnant. Having the parents involved would assure that the child seeks this necessary component of the abortion process.

**E. <u>Indiana's judicial-bypass procedure is reasonable and allows a neutral, unconflicted third party to independently evaluate whether abortion is appropriate for a minor who lacks parental consent.</u>**

201. I understand that a minor who wishes to obtain an abortion may petition the juvenile court for a judicial bypass. The physician treating the minor, or anyone who receives financial gain from the abortion, may not be the "next friend" in the petition by the minor. The juvenile court then has 48 hours to rule on the request by the minor and/or physician. Given that parental consent is necessary for any other elective/non-emergent medical procedure or care, it is reasonable and within the purview of the State of Indiana to protect minor women in this way.

202. Since elective abortion is not a medical emergency (or even medical care in the sense that it cures or treats a disease), the minor delay of a few days (3-4 days) is not a critical aspect to the provision of care. Parental consent is ordinarily required for non-emergent medical procedures, especially ones not intended to save the patient's life or health, even ones that may be in the minor's best interests. From a perspective of medical ethics, requiring a judicial bypass is unexceptional.

203. The need for an impartial third party (the judge), who is not involved in the actual surgical procedure and receiving no monetary compensation for care, is specifically necessary for unbiased evaluation of the adolescent's consent to abortion. As discussed above, if adolescents faced with unintended pregnancies do not involve their parents, they may seek the advice of adults who do not have their best interests at heart. An abortion provider has a conflict of interest with a minor seeking a bypass. The physician who stands to gain financially from the procedure is seeking to influence the court (and go against parental desires) for their own monetary gain. This violates the ethical principle of justice by seeking to subvert what is best for the patient for money. An ethical doctor would not present himself as the minor's next friend in those circumstances. ACOG agrees in their Committee Opinion No. 390, where they state that a conflict of interest exists when "a physician refers patients for tests or procedures at an entity in which the physician has a financial interest" (ACOG Committee Opinion No. 390, 2007) Clearly, advocating for an abortion for a minor in a clinic in which you are a provider or have a vested interest violates this conflict statement.

### F. When Indiana is a minor woman's guardian, it can appropriately withhold consent.

204. The consent to abortion is not appropriate for those children under the direct guardianship of the State except for health reasons. As discussed above, minors face special risks from abortion that their guardians can seek to protect them from by withholding consent. The State can make that decision as guardian to the same extent as parents.

### G. The State's interest in safeguarding the well-being of children justifies special reporting obligations for minors seeking abortions.

205. As mentioned above, the health risks for minors who obtain abortion are considerable. In addition, minors face special risks of sexual exploitation that should be identified and punished.

206. For these reasons, the reporting obligations of the Indiana statute are necessary to ensure that minors and adolescents receive the proper medical care and are not being targeted for abuse by predatory older males who use abortion to hide their sexual abuse of minor female victims.

## X. ABORTION DOES NOT SOLVE PROBLEMS FOR VULNERABLE WOMEN.

207. Over my whole career I have cared for women in abusive relationships, women involved in substance abuse, minority women, and women in poverty. Over 60% of my patients are on some form of public assistance. Significant numbers of my patients (approximately one-half) have psychiatric co-morbidities, and many also suffer from substance abuse (approximately one-third). Many of my patients are also post-abortive and some point to the abortion as the source of their mental health issues or substance abuse. Further, since my practice includes maternal-fetal medicine, my patients often have severe or life-limiting anomalies in their babies.

208. The women I provide care for in West Virginia desire assistance for safety for themselves, their unborn child, and other children. They desire support for mental health and substance abuse issues, not abortion access. In my experience, women tend to consider abortion when they feel they lack the support systems they need to care for a baby. When they have that support, they almost invariably decide against elective abortions.

209. Contrary to the assertions of Plaintiffs' experts, abortion is not a real solution for the challenges faced by my vulnerable patients (Flavin ¶¶ 46-51; Glazer ¶ 35; Martin ¶¶ 42-43; Romero ¶ 14).

210. Abortion does not address mental health problems, and actually increases the risk of mental health issues in the vulnerable low-income population. Coleman found that by controlling for demographic variables, prior mental health issues, and comorbidities fully 10% of mental health problems and 35% of suicidal behaviors were associated with abortion (Coleman, 2011). I am aware of criticisms of that study, but consider it to be credible. A study of women (low-income women) in the Medi-Cal database using record linkage found women with abortion were 2.6 times more likely to die from suicide compared to women who gave birth over the same time period (Coleman et al., 2002b).

211. Abortion also does not help women vulnerable to physical abuse. Abortion tends to perpetuate a cycle of abuse in which abused women then abuse their existing or subsequent children. With regard to physical abuse, Coleman, et al. (2005) found that low-income women with prior induced abortion had a 144% higher risk for physical child abuse. In fact, the authors found a 1,237% increase for physical abuse of the child and a 605% increased risk of child neglect (Coleman et al., 2005).

212. In light of the above findings, abortion is not the best solution to an unplanned pregnancy. The data, in fact, demonstrate the opposite effect on women with an increase in mental health issues, suicide, and mortality. Using excellent data in Finland, with a comprehensive health data linkage system, Gissler et al. examined death rates up to one year after abortion and found a 4 times higher risk of death among women who aborted versus those who carried to term (1997).

Similar adverse findings were reported in subsequent linkage studies: mortality was lower after a birth (28.2/100,000) than after an induced abortion (83.1/100,000)—a 3 times higher mortality risk for abortion compared to childbirth (Gissler et al., 2004a). So, from a maternal mortality standpoint, it is definitely better for a woman to give birth than to have an abortion.

213. The State of Indiana, therefore, has a compelling interest in the protection of these particularly vulnerable women.

## XI. HISTORY OF EXPERT TESTIMONY

214. In the last four years, I have provided expert testimony in the following case:

*Timmons et al., Plaintiffs v. Prevas et al., Defendants*. No. 03-C-18-0022889, Cir. Ct. Balt. Cty.

## XII. STATEMENT OF COMPENSATION

215. I am being compensated for all work performed in conjunction with this case at the rate of $500 per hour. I charge $5,000 per day for my time spent testifying in deposition or at trial. It is my understanding that all expenses incurred while working on this case will also be reimbursed by the State of Indiana.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Date: September 3, 2019

By: s/ Byron C. Calhoun
______________________________
Dr. Byron Calhoun