# In the Matter Of:

*WHOLE WOMAN'S HEALTH ALLIANCE, ET AL.*

*-v-*

*CURTIS T. HILL, JR., ET AL.*

---

**Byron Craig Calhoun, M.D.**

*October 01, 2019*

---

StewartRichardson
DEPOSITION SERVICES

800.869.0873 | www.StewartRichardson.com

*Reporting Driven by Excellence — Since 1975*

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

**EXHIBIT 4**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WHOLE WOMAN'S HEALTH ALLIANCE; ALL-OPTIONS, INC.; JEFFREY GLAZER, M.D.,

Plaintiffs,

-v-

CURTIS T. HILL, JR., KRISTINA BOX, M.D., JOHN STROBEL, M.D., KENNETH P. COTTER,

Defendants.

CASE NO. 1:18-cv-01904-SEB-MJD

The deposition upon oral examination of BYRON CRAIG CALHOUN, M.D., a witness produced and sworn before me, Debbi S. Austin, RMR, CRR, Notary Public in and for the County of Hendricks, State of Indiana, taken on behalf of the Plaintiffs at the offices of Stewart Richardson & Associates, 211 North Pennsylvania, Suite 2425, Indianapolis, Indiana, on October 1, 2019, at 9:30 a.m., pursuant to the Federal Rules of Civil Procedure.

STEWART RICHARDSON & ASSOCIATES
Registered Professional Reporters
One Indiana Square, Suite 2425
Indianapolis, IN 46204
(317)237-3773

APPEARANCES

FOR THE PLAINTIFFS:

Stephanie Toti, Esq.
Juanluis "Pepis" Rodriguez, Esq.
LAWYERING PROJECT
25 Broadway, 9th Floor
New York, NY 10004

FOR THE DEFENDANTS:

Thomas R. Fisher, Esq.
OFFICE OF THE ATTORNEY GENERAL
302 West Washington Street
IGCS Fifth Floor
Indianapolis, IN 46204

Q All right. So we can move on to the next section about telemedicine. So in your expert report, you offer certain opinions about telemedicine; is that correct?
A Yes.
Q Have you -- do you have any experience providing medical care by telemedicine?
A I actually do.
Q Can you tell me about that experience?
A I did most of it when I was in the military. We were very ahead. We were doing it back in the early '90s, actually. And we tried to do it, because of technology and because of the way our system worked, it just didn't work very well. Plus for what I do as maternal fetal medicine, it doesn't save me time. I still have to be there for the appointments, and so it didn't help me.
I also had the problem with ultrasounds, which were really important to me, having somebody that can do the ultrasound for me so I didn't do those. I couldn't get them done the way I wanted to, so I really haven't done a lot of that since then. We tried it a little bit in West Virginia, but it didn't go very well, so we basically don't do it now.

Q What kinds of medical care, if any, do you think it's appropriate to provide by telemedicine?
MR. FISHER: Objection, calls for speculation.
A I'm not a really big fan of telemedicine because of what I do and my own personal experience with it. There's some people believe it can be used for psychiatry maybe, for group psychiatry meetings perhaps. Some people believe they can use it for remote consults, dermatologic in particular, you can see the rash and then you can do that. Some people believe you can do it to try to do other diagnosis. I'm not believing -- I've not seen that to be particularly helpful, but those are the two biggest areas.
Sometimes radiology, people believe they can send images, teleradiology and read images, still images or images from a remote place to another place. And I think that's the biggest that I've seen use of.
Q Are you familiar with the telemedicine program at West Virginia University health system?
A I'm sorry, which one are we talking about?
Q Throughout the West Virginia University health system, are you aware of the ways that West Virginia University health system utilizes

telemedicine?
A I'm aware that they've been working on that for some time, yes, uh-huh.
MS. TOTI: I'm going to mark Exhibit 19.
(Deposition Exhibit 19 was marked for identification.)
Q So Exhibit 19 is titled "WVU Medicine 2018 Annual Report."
A Uh-huh.
Q Have you seen this document before?
A No. I've never read this annual report. Because I'm in Charleston, and they're in Morgantown.
Q I'm going to direct your attention to page 31.
A 31?
Q Yeah.
A Let me see if I can find it.
Q So they're -- in this copy, there are two pages per page.
A Page 31? Is this the right one, like that?
Q Yes. You've got the right one.
MR. FISHER: So I want to make sure. Is it this one?
MS. TOTI: Yes.
MR. FISHER: Okay. Thanks.
Q So page 31 of this report describes the

telemedicine offerings at the West Virginia University health system; is that correct?
A Are you talking about the children's one, or are you talking about the virtual ICU one? Are you talking about the telemedicine one?
Q Both. Basically the whole page.
A Okay. Got it.
MR. FISHER: Can we just give him a second to read it, and then you can ask your question?
MS. TOTI: Yeah.
A Okay.
Q So are you familiar with these telemedicine services at West Virginia University?
A Well, these are with Morgantown, again. I'm in Charleston. And it's 150 miles away, so I've heard about this. I misspoke if I said I didn't know anything. I have heard about this. But this is not being utilized at my campus that I'm aware of or the virtual ICU at this point. These are being done at Morgantown.
Q So you don't -- you don't have much personal knowledge about the telemedicine practices at the Morgantown hospital; is that fair?
A No, I don't. I really don't, I'm sorry.
Q What is your understanding of how telemedicine is

used to provide abortion care?
MR. FISHER: Objection, vague.
A Just what I've read really, that they provide a connection between the -- whatever the doctor and the advanced practice, whatever they're using in their particular jurisdiction and the patient is my understanding. And then talking to them, I think, virtually through the telemedicine portal, like a -- like a Facetime.
And after they're satisfied, then my understanding is dispensing the medication to the patient, the medication to the patient, and then providing some follow-up is my understanding. But that's as good as I know, actually.
Q And in formulating your opinions for your expert report, did you assume that the patient would be at home during the telemedicine visit or in some other location?
A From what I understand, it could be anywhere that they have a connection is my understanding. I don't think I thought it was limited based on what I saw or read.
Q And if the patient were at a healthcare facility that were -- that was fully equipped with ultrasound capabilities, would that alter your

opinion about the use of telemedicine and abortion care?
A It would be -- it would help me understand how they're going to provide it better. I'm not sure it would modify exactly how I would think about it. But if I thought they were going to get an ultrasound for gestational age, that would be better.
Q In paragraph 147 of your report, you mention the narcotic pain medication tramadol; is that correct?
A Yes, ma'am.
Q Is it your understanding that the standard of care prohibits the prescription of controlled substances via telemedicine?
A It depends on the jurisdiction. In West Virginia now, there are no more paper prescriptions for narcotics, and they can only be electronic or electronic fax now. So this is problematic if it's being prescribed over a connection to a patient who's not in a place where it's secure. That's a problem. And that's what I'm pointing out here, because you can't give narcotics out like this if you don't have an ability to control where they're going, because the diversion abuse is horrific.
Q So do you think it's bad medical practice to

prescribe a narcotic medication via telemedicine?
A I would not find that to be a good practice, because again, you need to make sure that you're going to get it to the right place for the right patient, and I'm not sure if you're doing a Facetime that's going to happen, if it's a patient at home. I don't know if it's the patient. If I don't know it's the patient, and I don't know where it's going to go, I'm a little -- I'm suspect of that.
Q Are you familiar with the FDA's risk evaluation and medication strategy program, the REMS program?
A I don't think I know that by that name, but I'm not familiar with that. Maybe it has another name. I'm just not sure.
Q Are you aware of any limitations that the FDA has imposed on the distribution of mifepristone?
A My understanding of what the guidelines are is that it has to be given to people who can appropriately prescribe it at this point and then are able to determine the right time of usage, number of days from last menstrual period, and then able to deal with complications. So that's my understanding of the FDA and the way it can be dispensed.
Q So I'm going to move on to the section on informed