UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WHOLE WOMAN'S HEALTH ALLIANCE, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:18-cv-01904-SEB-MJD |
| CURTIS T. HILL, JR., Attorney General of the State of Indiana, in his official capacity, *et al.*, | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY**

CURTIS T. HILL
Attorney General of Indiana

THOMAS M. FISHER
Solicitor General

DIANA MOERS
CHRISTOPHER M. ANDERSON
JULIA C. PAYNE
Deputy Attorneys General

Office of the Attorney General
IGC-South, Fifth Floor
Indianapolis, Indiana 46204
Tel: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ........ 1
LEGAL STANDARD ........ 2
ARGUMENT ........ 2
I. EXCLUDING THE OPINIONS OF STASIA ROTH WOULD BE ERROR. ........ 2
II. EXCLUDING THE OPINIONS OF DR. PRISCILLA COLEMAN WOULD BE ERROR. ........ 8
III. EXCLUDING THE OPINIONS OF DR. BYRON CALHOUN WOULD BE ERROR. ........ 14
A. Dr. Calhoun's opinions about abortion-related morbidity and mortality are adequately supported and relevant. ........ 14
B. Dr. Calhoun has adequate knowledge to offer opinions on telemedicine. ........ 16
C. Dr. Calhoun's opinions about vulnerable women are admissible. ........ 20
D. Dr. Calhoun's opinions about mental health are admissible. ........ 20
IV. EXCLUDING THE OPINIONS OF DR. JAMES STUDNICKI WOULD BE ERROR. ........ 21
A. Errors in dates of enactment are not attributable to Dr. Studnicki, and so do not concern his methodology or conclusions. ........ 21
B. Plaintiffs' other objections to Dr. Studnicki's methods are meritless. ........ 23
V. EXCLUDING THE OPINIONS OF DR. NANCY GOODWINE-WOZNIAK WOULD BE ERROR. ........ 26
VI. EXCLUDING THE OPINIONS OF DR. AARON KHERIATY WOULD BE ERROR. ........ 27
CONCLUSION ........ 31

# TABLE OF AUTHORITIES

## Cases

*Alexander v. F.B.I.*,
186 F.R.D. 137 (D.D.C. 1998) ........ 30

*Baugh v. Cuprum S.A. de C.V.*,
845 F.3d 838 (7th Cir. 2017) ........ 15

*Daubert v. Merrell Dow Pharm., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ........ 12

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ........ 12, 16

*King-Ind. Forge, Inc. v. Millennium Forge, Inc.*,
No. 1:07–cv–00341–SEB–DML, 2009 WL 3187685 (S.D. Ind. Sept. 29, 2009) ........ 30

*Lapsley v. Xtek, Inc.*,
689 F.3d 802 (7th Cir. 2012) ........ 3, 21

*Manpower, Inc. v. Ins. Co. of Pa.*,
732 F.3d 796 (7th Cir. 2013) ........ 12, 14, 21, 22

*Milligan v. Bd. of Trs. of S. Ill. Univ.*,
686 F.3d 378 (7th Cir. 2012) ........ 10, 23, 32

*Planned Parenthood Minn, N. D., S.D. v. Rounds*,
686 F.3d 889 (8th Cir. 2012) ........ 9

*Planned Parenthood of Idaho, Inc. v. Lance*,
No. CIV 00-0353-S-MHW, 2001 WL 36102077 (D. Idaho July 12, 2001) ........ 5

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*,
896 F.3d 809 (7th Cir. 2018) ........ 16

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health*,
273 F. Supp. 3d 1013 (S.D. Ind. 2017) ........ 16

*Schultz v. Akzo Nobel Paints, LLC*,
721 F.3d 426 (7th Cir. 2013) ........ 16, 21

*Smith v. Ford Motor Co.*,
215 F.3d 713 (7th Cir. 2000) ........ passim

*Stollings v. Ryobi Techs., Inc.*,
725 F.3d 753 (7th Cir. 2013) ........ 2, 9

*Walker v. Soo Line R. Co.*,
208 F.3d 581 (7th Cir. 2000) ........ 4, 7, 8

## Rules

Fed. R. Evid. 702 ........ 2

Fed. Rule Civ. P. 26 ........ 30

**Other Authorities**

Broen, A. N., Moum, T., Bödtker, A. S., & Ekeberg, O. (2006). Predictors of anxiety and depression following pregnancy termination: A longitudinal five-year follow-up study. *Acta Obstetricia et Gynecologica Scandinavica, 85*(3). doi:10.1080/00016340500438116. ............ 12

Coleman, P. K. (2006). Resolution of unwanted pregnancy during adolescence through abortion versus childbirth: Individual and family predictors and psychological consequences. *The Journal of Youth and Adolescence*, *35*(6). doi: 10.1007/s10964-006-9094-x ........................... 13

Coleman, P. K. (2016). Deriving sensible conclusions from the scientific literature on abortion and women's mental health. In R. McNair (Ed.) Peace psychology perspectives on abortion. . 11

Coleman, P. K., Reardon, D. C., Rue, V., & Cougle, J. (2002). State-funded abortions vs. deliveries: A comparison of outpatient mental health claims over four years. *American Journal of Orthopsychiatry*, *72*(1). doi: 10.1037/0002-9432.72.1.1410155.......................................... 13

Glasziou, P., Vandenbroucke, J. P., & Chalmers, I. (2004). Assessing the quality of research. *The BMJ*, *328* (7430). doi: 10.1136/bmj.328.7430.39..................................................................... 11

Grossman, D., Grindlay, K., Buchacker, T., Lane, K., & Blanchard, K. (2011). Effectiveness and Acceptability of Medical Abortion Provided Through Telemedicine. *Obstetrics & Gynecology*, *118* (2, Part 1) ........................................................................................................... 19

Jager, K. J., Zoccali, C., Macleod, A., & Dekker F. W. (2008). Confounding: What it is and how to deal with it. *Kidney International*, *73*(3). doi: 10.1038/sj.ki.5002650 .................................. 12

Kurth, T. & Sonis, J. (2007). Assessment and control of confounding in trauma research. *Journal of Traumatic Stress*, *20*(5). doi: 10.1002/jts.20298 .................................................................. 12

Lucas, R. M., & McMichael, A. J. (2005). Association or causation: Evaluating links between "environment and disease." Bulletin of the World Health Organization, 83(10)...................... 10

Offord, D.R., & Kraemer, H. C. (2000). Risk factors and prevention. Evidence-Based Mental Health, *3*. doi:10.1136/ebmh.3.3.70........................................................................................ 10

Stovitz, S.D., Verhagen, E., & Shrier, I. (2019). Distinguishing between causal and non-causal associations: Implications for sports medicine clinicians. British Journal of Sports Medicine, *53*. doi: 10.1136/bjsports-2017-098520........................................................................ 10

# TABLE OF EXHIBITS


| Name | Exhibit |
|---|---|
| Declaration of Stasia Roth | 1 |
| Excerpts from Transcript of Deposition of Stasia Roth | 2 |
| Expert Report of Allison A. Cowett, M.D., M.P.H. | 3 |
| Expert Report of Jeanne Flavin, Ph.D. | 4 |
| Expert Report of Daniel Grossman, M.D. | 5 |
| Expert Report of Lucia D. Wocial, Ph.D., R.N., F.A.A.N. | 6 |
| Expert Report of Rebecca Gudeman, J.D., M.P.A. | 7 |
| Expert Report of Judge Susan Fox Gillis | 8 |
| Expert Report of Katherine E. Flood, J.D. | 9 |
| Expert Report of Priscilla K. Coleman, Ph.D. | 10 |
| Expert Report of Aaron Kheriaty, M.D. | 11 |
| Expert Report of Byron C. Calhoun, M.D. | 12 |
| Excerpts from Transcript of Deposition of Byron Craig Calhoun, M.D. | 13 |
| Expert Report of Diana Romero, Ph.D., M.A. | 14 |
| Excerpts from Transcript of Deposition of Jeffrey Glazer, M.D. | 15 |
| Excerpts from Transcript of Deposition of Daniel Grossman, M.D. | 16 |
| Expert Report of James Studnicki, M.P.H., M.B.A., Sc.D. | 17 |
| Table of Abortion Regulations | 18 |
| Email and Response to Third Requests for Production | 19 |
| Spreadsheet Concerning the History of Indiana Abortion Laws | 20 |
| Excerpts from Transcript of Deposition of James Studnicki, M.P.H., M.B.A., Sc.D. | 21 |
| Expert Report of Nancy Goodwine-Wozniak, M.D. | 22 |
| Excerpts from Transcript of Deposition of Nancy Goodwine-Wozniak, M.D. | 23 |
| Excerpts from Transcript of Deposition of Aaron Kheriaty, M.D. | 24 |

## INTRODUCTION

Defendants have assembled a panel of more than a dozen well-qualified experts, many with national reputations in their fields, who offer opinions on topics that Plaintiffs' own pleadings and experts put at issue. Plaintiffs move to exclude the opinions of six of those experts in whole or part. Yet Plaintiffs provide little genuine discussion of those experts' qualifications, knowledge, or methods. Instead, Plaintiffs principally bring a blizzard of out-of-context quotations and procedurally improper merits arguments. None of their arguments has merit.

A few examples, each discussed in more detail below, underscore the strangeness of Plaintiffs' Motion. Plaintiffs seek to exclude some opinions as irrelevant because, in effect, Defendants' experts disagree with Plaintiffs on the desires and needs of Indiana women considering abortions. Plaintiffs seek to exclude opinions of other experts because they disagree with Plaintiffs' experts on subjects of vigorous scholarly debate. Plaintiffs even seek to exclude the testimony of one expert on subjects he never opined on, and on which he repeatedly *disclaimed* any opinion. The thrust of Plaintiffs' Motion, in short, is not to apply the threshold standard of admissibility for expert testimony, but to prevent adversarial presentation of evidence on important subjects — and to tar eminent scholars and professionals as undeserving of being heard in this Court.

Plaintiffs' only argument going to expert methodology is their observation that Dr. James Studnicki's report employed incorrect dates of enactment for several challenged laws. As discussed below, that error is not attributable to Dr. Studnicki, but to Defendants' counsel, who inadvertently supplied Dr. Studnicki with dates of recodification rather than enactment. Because the error originated with counsel, it does not go to Dr. Studnicki's qualifications or credibility. Nor does it go to the validity of Dr. Studnicki's ultimate conclusions. And it will be corrected shortly in an amended expert report.

Plaintiffs' Motion to Exclude should be denied in its entirety.

## LEGAL STANDARD

As the Seventh Circuit has held, "[e]xpert testimony is admissible at trial under Federal Rule of Evidence 702 if the testimony [1] is relevant to a fact in issue, [2] is based on sufficient facts or data, and [3] is the product of reliable scientific or other expert methods that are properly applied." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013). A court's role under that Rule is to "determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). That threshold inquiry is distinct from judgments on the merits of the expert's opinions. The court's consideration of admissibility "does not ordinarily extend to the reliability of the *conclusions* those methods produce — that is, whether the conclusions are unimpeachable," *Stollings*, 725 F.3d at 765 (emphasis added), nor to "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis[.]" *Id.*; *see also, e.g.*, *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). Instead, the court's role is simply to ensure that the expert's "methodology" is sufficiently grounded in the relevant science. *Smith*, 215 F.3d at 718.

## ARGUMENT

### I. Excluding The Opinions Of Stasia Roth Would Be Error.

Plaintiffs' request to exclude the opinions of Stasia Roth should be denied. Ms. Roth is the founder and Executive Director of A Mother's Hope ("AMH"), a maternity home serving homeless, pregnant women in Fort Wayne, Indiana. Roth Rep. ¶ 2. (Ex. 1) Plaintiffs assert that their seven objections cover the entirety of the opinions Ms. Roth offers. None of Plaintiffs' arguments has merit.

*First*, Plaintiffs claim that Ms. Roth has had insufficient interaction with abortion patients to opine on their reasons for considering abortion. That is false. Ms. Roth has declared that she

regularly interacts with pregnant women facing difficult personal circumstances who tell her they "do not want to bring a baby into these struggles." *Id.* ¶ 2. Some of those women consider abortion. Roth Tr. at 65:6–7. (Ex. 2) Some even want abortions, at least at first. Roth Rep. ¶ 35. That experience more than qualifies Ms. Roth to testify about her experience with women facing the decision whether to obtain an abortion. *E.g.*, *Smith*, 215 F.3d at 720.

Plaintiffs' objection thus appears to be that the women Ms. Roth interacts with are insufficiently positive about their desire for an abortion. *See* Pls.' Memorandum ("Mem.") at 5 (objecting that "AMH's clients want to carry their pregnancies to term"). But that misses the point: Ms. Roth's experience shows that very few women, *if any*, actually want an abortion at all, but rather "seek abortions when they believe they have no other choice." Roth Rep. ¶ 8. Ms. Roth's experience does not show lack of knowledge; it shows a different perspective on the real desires and needs of the very women whom Plaintiffs purport to speak for. The difference of perspective between Ms. Roth and Plaintiffs and their experts is no ground for excluding Ms. Roth. *Walker v. Soo Line R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000) ("That two different experts reach opposing conclusions from the same information does not render their opinions inadmissible."). On the contrary, it makes Ms. Roth's opinions *more* valuable to this Court and to any future reviewing court.

Ms. Roth's opinions, moreover, go to important factual questions that Plaintiffs' own experts put at issue. Several of Plaintiffs' experts state or assume that women are already firm in their decisions when they present at abortion clinics, and that the State's efforts to ensure their informed consent are therefore ineffective at best and harmful at worst. *See, e.g.*, Cowett Rep. ¶¶ 36–58 (Ex. 3); Flavin Rep. ¶¶ 61–75 (Ex. 4); Grossman Rep. ¶¶ 103–39, 155–72 (Ex. 5); Wocial Rep. ¶¶ 10–17 (Ex. 6). But Ms. Roth's experience — showing that a substantial number of Indiana women who consider or obtain abortions do not affirmatively want abortions, but simply feel they have run out

of better options — is not consistent with Plaintiffs' theories. If Plaintiffs are wrong on this important factual issue, then the utility of the State's informed consent regulations is plain. Ms. Roth thus has personal experience that goes to the heart of significant factual issues in the case. Plaintiffs cannot transform a difference of opinion about the wishes and needs of Indiana women into an argument for silencing someone with personal knowledge contradicting their allegations.

*Second*, Plaintiffs object to Ms. Roth's description of resources available for pregnant women and young families. Plaintiffs describe her knowledge as "irrelevant to the issues in this case, which concern obstacles to abortion access." Mem. at 4. The fact that an expert's opinions do not go to the "ultimate issue" in the case is not grounds to exclude. *Smith*, 215 F.3d at 720–21. Rather, expert testimony is relevant when "the testimony will assist the trier of fact with its analysis of any of the issues involved in the case." *Id.* at 718. Plaintiffs' expert reports address not just alleged obstacles to abortion, but the alleged harms faced by women if they cannot obtain abortions. *See, e.g.*, Grossman Rep. ¶¶ 185, 190; Gudeman Rep. ¶¶ 27–29 (Ex. 7); Flavin Rep. ¶¶ 46–51. Ms. Roth's experience shows why those supposed burdens are overblown at best: A woman considering an abortion has other options, and extensive state and private resources available to her if she decides against abortion. That underscores the value of ensuring women's informed consent and giving them time to consider their decisions.

If Plaintiffs entered a binding stipulation conceding that Indiana women with unwanted or unintended pregnancies enjoy adequate resources to enable them to carry to term and raise the child, the issue's relevance would be reduced. *Cf. Planned Parenthood of Idaho, Inc. v. Lance*, No. CIV 00-0353-S-MHW, 2001 WL 36102077, at *3 (D. Idaho July 12, 2001) (excluding experts where adverse parties conceded that they no longer raised claims relevant to the experts' opinions). But Plaintiffs have not offered any such concession. Ms. Roth's experience therefore remains relevant.

Plaintiffs similarly object that Ms. Roth's description of the available programs "will add nothing to the Court's understanding of them beyond what the statutes and regulations governing these programs provide." Mem. at 4. But many of the programs Ms. Roth describes are not state programs at all, but private charities. Roth Rep. ¶ 15. In any event, Ms. Roth's *collection* of those public and private programs in her report, and her experience with how they work in *practice* for the women she serves, goes well beyond the bare terms of an authorizing law.

*Third*, Plaintiffs object to Ms. Roth's opinion "that pregnancy and childrearing give 'pregnant, homeless women, including many facing the threat of violence . . . the motivation to pull their lives together.'" Mem. at 4 (quoting Roth Rep. ¶ 22). Plaintiffs allege that opinion is irrelevant, but once more, Plaintiffs' own experts' reports tell a different story. Plaintiffs' experts opine that childbirth as opposed to abortion can be *harmful*, especially to poor women and women facing violence. *See, e.g.*, Grossman Rep. ¶¶ 185, 190; Gudeman Rep. ¶¶ 27–29; Flavin Rep. ¶¶ 33–40. The consequences of unintended pregnancy and childbirth — and by the same token, of regulated access to abortion — are thus at issue in this case at Plaintiffs' own behest. If Plaintiffs entered a binding stipulation that unregulated abortion access does *not* benefit women relative to childbirth, once more, the relevance of Ms. Roth's contrary opinions would diminish. But there is no prospect of Plaintiffs doing so.

*Fourth*, Plaintiffs argue that Ms. Roth has insufficient facts or data to her opinion that coercion to obtain an abortion is more common than coercion to continue a pregnancy. Mem. at 4–5. Plaintiffs object that Ms. Roth does not cite any "study" on the subject — which is not required for experts to express opinions based on personal experience, *Smith*, 215 F.3d at 720 — and repeat their misinterpretation of Ms. Roth's experience with Indiana women. Moreover, several of Plaintiffs' experts rely on personal experience, including ones with far less apparent relevance to Indiana

women than Ms. Roth's. *See, e.g.*, Grossman Rep. ¶¶ 103–08 (describing experiences of a California doctor); Cowett Rep. ¶¶ 34–35 (Illinois doctor); Fox Gillis Rep. ¶¶ 6–25 (Illinois judge) (Ex. 8). It would not be proper to exclude Ms. Roth's opinions for that reason.

More fundamentally, Ms. Roth's experience and opinions on this subject go to an issue raised in Plaintiffs' own expert reports, which claim that men pressure women into becoming pregnant or prevent them from obtaining abortions. *E.g.*, Flavin Rep. ¶¶ 11, 25–28; *see also* Flood Rep. ¶¶ 10–15 (discussing minors whose families do not wish them to obtain abortions) (Ex. 9). But significantly, Plaintiffs' experts do not appear to present any opinion whether women are more likely to be pressured for or against abortion. That creates a fundamental flaw in their argument that unregulated abortion access is beneficial to vulnerable women. If pressure *against* abortion is relatively rare, then few women would benefit from unregulated abortion. On the other hand, if pressure to *obtain* abortions is more common — as Ms. Roth's experience shows — that fact underscores the importance of ensuring informed consent before abortion. Ms. Roth's opinions thus go, once again, to a significant fact issue raised in the first instance by Plaintiffs themselves.

*Fifth*, Plaintiffs claim that Ms. Roth lacks sufficient data or qualifications to comment on psychological or psychiatric issues. Because she is not "qualif[ied] … to make mental health diagnoses," they argue, Ms. Roth may not "offer an opinion about the psychological impact of abortion." Mem. at 5. That misunderstands Ms. Roth's opinions. She does not purport to make mental health diagnoses herself; rather, she refers to the self-reported mental health conditions of the women AMH supports. Roth Rep. ¶ 31; Roth Tr. at 93:21–94:6. Ms. Roth corroborates those self-reports, when possible, with women's medical records and by communicating directly with the women's health care providers. Roth Tr. at 94:20–95:19.

Such expert testimony would be admissible under cases permitting a medical expert to "rely on self-reported patient histories." *Walker*, 208 F.3d at 586. Plaintiffs cite no authority precluding an expert like Ms. Roth, whose expertise derives from experience, to rely on such histories as well. An expert in the care of pregnant homeless women may certainly rely on women's reports, corroborated by their doctors and medical records, in reaching opinions about the mental conditions of women she cares for. If Plaintiffs have further concerns about how Ms. Roth reached her opinions, they can cross-examine her. *Id.* at 586–87.

*Sixth*, Plaintiffs claim that Ms. Roth lacks a reliable basis for her opinions that Plaintiffs' experts overstate the burdens on women created by Indiana abortion regulations. Mem. at 5–6. That argument largely restates Plaintiffs' mistaken argument that Ms. Roth has no experience with women considering abortion. As explained above, she has a great deal of relevant experience that contradicts the opinions of Plaintiffs' experts. *See supra* 2–3. Although Ms. Roth has served scores of pregnant woman and new mothers, Roth Rep. ¶¶ 2–4, no woman she has counseled — "*including those women who originally wanted an abortion*" — has ever blamed the factors cited by Plaintiffs' experts as her reason for not obtaining an abortion. *Id.* ¶ 35 (emphasis added). That directly conflicts with the opinion of Plaintiffs' experts that Indiana women who want abortions are unable to obtain them because of the challenged laws. Once again, it would not be appropriate to exclude Ms. Roth's experience-based opinions merely because her observations about Indiana women considering abortion differ from the opinions of Plaintiffs' experts.

*Seventh*, Plaintiffs claim that Ms. Roth has insufficient familiarity with telemedicine to opine on the subject. Mem. at 6. Once more, Plaintiffs miss the point: Ms. Roth has extensive experience communicating with prospective *patients* and helping them navigate the health system, experience that gives her unique insight into the challenges that telemedicine might pose. Roth Rep.

¶¶ 42–43. Plaintiffs and their experts have no experience providing abortions by telemedicine to Indiana women either, and Plaintiffs' experts cite no study of abortion by telemedicine in Indiana. *All* arguments in this case about how telemedicine would work in practice in Indiana are thus predictions based on professional experience. Nobody is better qualified to make such predictions than Ms. Roth, who is in a position to observe how the women she cares for interact with people in positions of authority, including doctors. Roth Rep. ¶¶ 42–43. Her experience with disadvantaged women who need support in their interactions with doctors and who struggle to communicate with medical personnel fully supports her opinion that in-person interactions better serve those women. If Plaintiffs wish to challenge whether Ms. Roth's experience is probative of telemedicine, they may cross-examine her. *Stollings*, 725 F.3d at 768 (reversing a district court's refusal to admit expert testimony based on "uncertainty" about the experts' underlying assumptions).

In short, Plaintiffs fail to offer sufficient grounds to exclude any of Ms. Roth's opinions.

## II. Excluding The Opinions Of Dr. Priscilla Coleman Would Be Error.

Plaintiffs likewise offer no sound basis to exclude any opinions of Dr. Priscilla Coleman, Ph.D., a psychologist. Dr. Coleman's report applies psychological research to multiple areas connected to this case.

Plaintiffs do not attack Dr. Coleman's qualifications. Nor can they: She is a full professor at Bowling Green State University with scores of peer-reviewed publications and invited papers to her name, including dozens concerning the topics on which she now offers opinions. Coleman Rep. ¶¶ 4–6, Exhibit A (Ex. 10). Courts have relied on her opinions before, *see, e.g.*, *Planned Parenthood Minn, N. D., S.D. v. Rounds*, 686 F.3d 889, 895 (8th Cir. 2012), and Defendants are not aware of any case where her opinions were excluded under the Federal Rules of Evidence. Plaintiffs also do not challenge the relevance of Dr. Coleman's opinions. Instead Plaintiffs argue that some of her

opinions — broadly speaking, her opinions about the relationship between abortion and mental health — have insufficient scientific support.

An initial failing of Plaintiffs' Motion is that they request relief far beyond what their argument justifies. They ask that this Court exclude all the opinions addressed in Section V of Dr. Coleman's report. Mem. at 6. But that portion of the report comprises paragraphs 102 to 182, and Plaintiffs present no argument relevant to much of it. For example, Plaintiffs present no argument for excluding Dr. Coleman's rebuttal of the opinions of Plaintiffs' expert, Dr. Daniel Grossman, on psychological issues. *See* Coleman Rep. ¶¶ 154–79. To the extent Plaintiffs have failed to set out specific grounds for excluding specific opinions, their arguments are forfeited. *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument … but also to a litigant's failure to advance a specific point in support of a general argument.").

Insofar as Plaintiffs do specifically address Dr. Coleman's opinions, they largely attack a straw man. Plaintiffs argue, in essence, that Dr. Coleman's opinions are not reliable because the research she cites is insufficient to prove that abortion causes adverse mental health outcomes. But as Dr. Coleman expressly stated in her report, her opinion is not that abortion *causes* adverse mental health outcomes, but that it increases the *risk* of such outcomes. Coleman Rep. ¶ 144; *id.* ¶ 102, 103, 105, 145. Dr. Coleman was clear in her report that proof of causation is not possible, *id.* ¶ 145, and that she could offer no opinion on the subject, *id.* ¶ 144. Plaintiffs' description of the criteria for proving causation, which echoes Dr. Coleman's own explanation of the subject, *id.* ¶ 147, establishes the point: When it comes to mental health and abortion, there is no real-world way (and certainly no *ethical* way) to perfectly ensure time-precedence, ideal comparison groups, or complete

control of other variables. Mem. at 7–9. Plaintiffs attack Dr. Coleman, in other words, for failing to perform an impossible task that she expressly disclaimed.

On the other hand, as Dr. Coleman has explained, it *is* possible to show that abortion increases the risk of adverse mental health outcomes. Coleman Rep. ¶ 144. The same criteria are relevant, but increased risk is easier to establish.[1] Even where studies do not perfectly satisfy the criteria for establishing causation, an inference that a factor increases a risk can be supported by careful collection and analysis of studies with relative strengths and weaknesses in different aspects of their experimental design. *Id.* ¶¶ 145–51. Though particular studies may not be designed in ways consistent with proving causation (which is impossible here in the first place), it is generally accepted in the scientific community that those studies may be used to support opinions about increased risk. *See id.*; *see also supra* n.1. Plaintiffs' concerns about the design of particular studies are thus beside the point, and do not undermine Dr. Coleman's overall opinions.

Plaintiffs cannot exclude Dr. Coleman's opinions about abortion-related risk merely by cherry-picking objections to the design of particular studies. *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 807 (7th Cir. 2013) ("[T]he selection of data inputs to employ in a model is a question separate from the reliability of the methodology reflected in the model itself."). All the studies Dr. Coleman discussed were subject to peer review. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594 (1993) ("The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised."); *Daubert v. Merrell Dow Pharm.*,

[1] *E.g.*, Lucas, R. M., & McMichael, A. J. (2005). Association or causation: Evaluating links between "environment and disease." Bulletin of the World Health Organization, 83(10), 792–795; Offord, D.R., & Kraemer, H. C. (2000). Risk factors and prevention. Evidence-Based Mental Health, *3*, 70-71. doi:10.1136/ebmh.3.3.70; Stovitz, S.D., Verhagen, E., & Shrier, I. (2019). Distinguishing between causal and non-causal associations: Implications for sports medicine clinicians. British Journal of Sports Medicine, *53*:398–399. doi: 10.1136/bjsports-2017-098520.

*Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("That the research is accepted for publication in a reputable scientific journal after being subjected to the usual rigors of peer review is a significant indication that it is taken seriously by other scientists, *i.e.*, that it meets at least the minimal criteria of good science."). And in fact Dr. Coleman approaches her selection of studies with great care, including by use of a published methodology that has itself been validated by peer review.[2] If Plaintiffs object to Dr. Coleman's inclusion of certain studies in her report, they may certainly cross-examine her. In that case Dr. Coleman would have the opportunity to explain the *strengths* of those studies that warranted including them in her conclusions. She would also have the opportunity to point out other studies she cites that do *not* have the supposed flaws Plaintiffs identify, and which would therefore be satisfactory even under Plaintiffs' criteria.

Plaintiffs' misunderstanding of Dr. Coleman's opinions and the studies supporting them fully disposes of their three objections to Dr. Coleman's opinion — that Dr. Coleman's studies supposedly fail to (1) "ensure that the abortion precedes the mental health outcome," (2) "make … comparison[s] to another appropriate group of women," and (3) "control for common risk factors." Mem. at 7–9. In each case, the methodology accepted in the scientific community still permits Dr. Coleman to rely on the studies she cited in support of an opinion about increased risk.

Plaintiffs' second and third objections fail for additional reasons. Plaintiffs' objection to the comparison groups used by the peer-reviewed studies Dr. Coleman cites is based on hotly disputed factual questions that it would be inappropriate to resolve in this procedural posture. Specifically, in asserting that abortion patients must be compared to "women who deliver an unintended or unwanted pregnancy," Mem. at 8, Plaintiffs are essentially arguing that Dr. Coleman's conclusions

---

[2] Coleman, P. K. (2016). Deriving sensible conclusions from the scientific literature on abortion and women's mental health. In R. McNair (Ed.) Peace psychology perspectives on abortion. *See also* Glasziou, P., Vandenbroucke, J. P., & Chalmers, I. (2004). Assessing the quality of research. *The BMJ*, *328* (7430), 39–41. doi: 10.1136/bmj.328.7430.39.

should be excluded because the studies she cites do not use the same comparison group as the so-called "Turnaway" study. But both Dr. Coleman and Dr. Aaron Kheriaty (in portions of their reports that Plaintiffs seek to exclude, but do not specifically address) explain why that comparison group is not ideal either, and that the Turnaway study is seriously flawed in other ways as well. Coleman Rep. ¶¶ 155–61; Kheriaty Rep. ¶¶ 90–94 (Ex. 11). While Plaintiffs also question various other comparison groups used by studies cited by Dr. Coleman, ultimately the merits of the comparison group in a given study's procedural design is a matter of debate, and it would not be appropriate to turn that debate into a question of admissibility that permits only one answer. *Manpower*, 732 F.3d at 807–08 ("The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury; the court's role is generally limited to assessing the reliability of the methodology — the framework — of the expert's analysis."). Dr. Coleman is prepared to address the proper selection of comparison groups on cross-examination.[3]

As to Plaintiffs' objections to controls for other variables in the studies Dr. Coleman cites, Mem. at 9–10, Plaintiffs not only fail to appreciate the criteria for establishing risk as opposed to causation, but they misunderstand the role of statistical controls in experimental design. An alternative to controlling for a confounding variable (like prior mental health) is to restrict the studied population to individuals with equivalent risk with respect to the variable.[4] Dr. Coleman's 2002 and

---

[3] Plaintiffs claim that Dr. Coleman's report contains an error in the description of studies at paragraph 105. Mem. at 9. They misread the studies in question, at least one of which *does* study term-birth data. Broen, A. N., Moum, T., Bödtker, A. S., & Ekeberg, O. (2006). Predictors of anxiety and depression following pregnancy termination: A longitudinal five-year follow-up study. *Acta Obstetricia et Gynecologica Scandinavica*, *85*(3), 317–323. doi:10.1080/00016340500438116. Even if Plaintiffs' point had merit, there is no cause to exclude Dr. Coleman's opinions on that basis alone.

[4] Jager, K. J., Zoccali, C., Macleod, A., & Dekker F. W. (2008). Confounding: What it is and how to deal with it. *Kidney International*, *73*(3), 256–260. doi: 10.1038/sj.ki.5002650; Kurth, T. & Sonis, J. (2007). Assessment and control of confounding in trauma research. *Journal of Traumatic Stress*, *20*(5), 807–820. doi: 10.1002/jts.20298.

2006 studies follow that approach for prior mental health.[5] Plaintiffs acknowledge that other studies Dr. Coleman cites *do* include controls for prior mental health, though Plaintiffs question the quality of those controls. Mem. at 10. None of Plaintiffs' arguments, in short, go to admissibility.

Plaintiffs finally seek to exclude Dr. Coleman's opinions because of supposed flaws in Dr. Coleman's landmark meta-analysis of abortion and mental illness. *Id.* at 10–11. Plaintiffs' claim that the meta-analysis has been "widely rejected by the scientific community" is false. *Id.* at 10. The paper was published in the British Journal of Psychiatry — one of the most respected journals in the psychiatric community, with a scholarly impact factor of 7.233 — and has never been retracted. Although some have criticized the study, others have vigorously defended it. *E.g.*, Coleman Rep. ¶¶ 112–13. Plaintiffs cite their own expert's objections to Dr. Coleman's study, but do not discuss the *responses* to common objections by both Dr. Coleman and Dr. Kheriaty. Coleman Rep. ¶¶ 137–53; Kheriaty Rep. ¶¶ 86–88. Disputes between disclosed experts and in the scholarly community are precisely the kinds of issues that should *not* be resolved as an evidentiary matter, but rather by cross-examination. *See, e.g.*, *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 847 (7th Cir. 2017) ("[I]t is often the case that experts reach conflicting conclusions based on applying different but nevertheless reliable methodologies to a set of partially known facts."); *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 433 (7th Cir. 2013) ("Rule 702 did not require, or even permit, the district court to choose between [two 'competing'] studies at the gatekeeping stage. Both experts were entitled to present their views, and the merits and demerits of each study can be explored at trial.").

---

[5] Coleman, P. K. (2006). Resolution of unwanted pregnancy during adolescence through abortion versus childbirth: Individual and family predictors and psychological consequences. *The Journal of Youth and Adolescence, 35*(6), 903-911. doi: 10.1007/s10964-006-9094-x; Coleman, P. K., Reardon, D. C., Rue, V., & Cougle, J. (2002). State-funded abortions vs. deliveries: A comparison of outpatient mental health claims over four years. *American Journal of Orthopsychiatry, 72*(1), 141–152. doi: 10.1037/0002-9432.72.1.1410155.

Even when acknowledging "criticism" of Dr. Coleman's work, this Court has considered her opinions admissible. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 273 F. Supp. 3d 1013, 1036 (S.D. Ind. 2017), *aff'd sub nom. Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809 (7th Cir. 2018). And even if it were true that support of Dr. Coleman's meta-analysis is a minority position in the scientific community — which Plaintiffs have not shown — scientific fact is not determined by majority vote. A minority scientific opinion is admissible so long as it follows the scientific method. *Daubert*, 43 F.3d at 1319. This Court should deem Dr. Coleman's opinions admissible and address them on their merits.

## III. Excluding The Opinions Of Dr. Byron Calhoun Would Be Error.

Plaintiffs' attempts to exclude certain opinions of Dr. Byron Calhoun, M.D., an obstetrician-gynecologist ("ob-gyn") at West Virginia University-Charleston, are also misguided. Dr. Calhoun has offered opinions about abortion morbidity and medical standards of care, among other topics. Plaintiffs do not challenge his qualifications, which rest on decades of medical practice, scholarship, and teaching. Calhoun Rep. ¶¶ 2–7, Exhibit A (Ex. 12). Plaintiffs instead raise four groundless challenges to the basis and relevance of Dr. Calhoun's opinions.

### A. Dr. Calhoun's opinions about abortion-related morbidity and mortality are adequately supported and relevant.

Plaintiffs seek to exclude Dr. Calhoun's opinion that black women and older women are "especially vulnerable to abortion-related complications or mortality." Calhoun Rep. ¶¶ 57–62; Mem. at 11–12. Plaintiffs assert — with no explanation — that Dr. Calhoun reached those conclusions "without any causal evidence" and without "follow[ing] any reliable scientific methodology." Mem. at 12. Plaintiffs' reading of Dr. Calhoun's report is inexplicable. In fact Dr. Calhoun details (1) how elevated abortion rates among black women mean that abortion-related morbidity and mor-

tality disproportionately harm black women, Calhoun Rep. ¶ 58, (2) how elevated maternal mortality and pregnancy complications of black women could be accounted for by the elevated abortion rate, *id.* ¶¶ 59–60, and (3) how the association between abortion and delayed childbearing connects abortion to riskier pregnancies by older women, *id.* ¶ 61; *see also* Calhoun Tr. at 69:1–14, 168:16–169:8 (Ex. 13). Plaintiffs do not contest the validity of any of the underlying data, and they do not elaborate on their objections to Dr. Calhoun's inferences. Thus, although Plaintiffs may *disagree* with Dr. Calhoun's data or inferences, they have offered no argument that his opinions are inadmissible.

Plaintiffs also claim that Dr. Calhoun's opinions are irrelevant because he "offers no explanation of how Indiana's abortion clinic licensing requirements mitigate these alleged harms to Black women and older women." Mem. at 12. Dr. Calhoun's opinions may not be excluded merely because they do not go to the "ultimate issue" in the case as Plaintiffs prefer to define it. *Smith*, 215 F.3d at 720–21. And in any event Dr. Calhoun's opinions are relevant to questions that Plaintiffs themselves have put at issue. Several of Plaintiffs' experts assert that abortion is "safe" both in the short term and the long term. *See, e.g.*, Cowett Rep. ¶¶ 2–8; Grossman Rep. ¶¶ 12–27. Dr. Calhoun's opinions show that is not true. Plaintiffs also highlight elevated maternal mortality and pregnancy complications among black women, and argue that regulated abortion access places special burdens on those women. Grossman Rep. ¶ 16; Romero Rep. ¶¶ 2, 19–20 (Ex. 14); Compl. ¶ 184. Dr. Calhoun's opinions show that those observations are in fact associated with abortion, and that unregulated abortion is not a solution. Dr. Calhoun's opinions easily satisfy the criterion of relevance. *Smith*, 215 F.3d at 718.

### B. Dr. Calhoun has adequate knowledge to offer opinions on telemedicine.

Plaintiffs next claim that Dr. Calhoun has insufficient experience with telemedicine to offer opinions on the subject. Mem. at 12–15. That argument rests on a series of misunderstandings of Dr. Calhoun's report and testimony.

*First*, Plaintiffs argue that Dr. Calhoun "has no experience using contemporary telemedicine technology, and he is not familiar with the way that telemedicine is used at the hospital system where he currently practices." Mem. at 13. That is misleading: In fact, he testified at his deposition that he "tried" telemedicine both during his military service and in West Virginia — where he began practicing in 2006, Calhoun Rep. ¶ 4 — and decided that it did not work well for his ob-gyn practice. Calhoun Tr. at 134:10–25. He analogized current telemedicine technology to "Facetime," which allows real-time video interaction. *Id.* at 138:9. But Dr. Calhoun testified that in in his practice, he needs to be present for appointments, so telemedicine does not assist him. *Id.* at 135:14–17. Dr. Calhoun's report further explains why important aspects of medical practice — like informed consent and confirming the indications and contraindications for medication abortion — are best done by a doctor in person. Calhoun Rep. ¶¶ 143–47.

To exclude Dr. Calhoun's opinions on the grounds Plaintiffs argue would imply that the only doctors even qualified to testify about telemedicine are ones who believe it helps their practices — a circular and one-sided result. The proper course is to leave questions about Dr. Calhoun's experience for the merits. If there are specific aspects of modern telemedicine technology that Plaintiffs believe Dr. Calhoun is not aware of and failed to take into account, they may cross-examine him.

Plaintiffs' claim that Dr. Calhoun lacks familiarity with telemedicine in his own hospital system also misstates his testimony. At his deposition, Plaintiffs showed Dr. Calhoun a report discussing telemedicine services at a different West Virginia University hospital in Morgantown, "150

miles away" from where he practices. Calhoun Tr. at 136:7–12, 137:12–24. He testified that he *had* heard about the telemedicine services, but that he lacked "personal knowledge" of what that separate, distant hospital does. *Id.* at 137:12–24. There is nothing surprising about that, and it casts no doubt on Dr. Calhoun's personal experience.

*Second*, Plaintiffs misunderstand Dr. Calhoun's testimony in arguing that he lacks "knowledge of the process by which telemedicine is used to provide medication abortion." Mem. at 13. As for the mifepristone Risk Evaluation and Mitigation Strategies ("REMS") program, Dr. Calhoun testified that he was not familiar with the program's *name*, but in response to the very next question he showed that he knows its substance:

> Q Are you familiar with the FDA's risk evaluation and medication strategy program, the REMS program?
>
> A I don't think I know that by that name, but I'm not familiar with that. Maybe it has another name. I'm just not sure.
>
> Q Are you aware of any limitations that the FDA has imposed on the distribution of mifepristone?
>
> A My understanding of what the guidelines are is that it has to be given to people who can appropriately prescribe it at this point and then are able to determine the right time of usage, number of days from last menstrual period, and then able to deal with complications. So that's my understanding of the FDA and the way it can be dispensed.

Calhoun Tr. at 140:11–24. Plaintiffs do not argue that Dr. Calhoun's understanding was inaccurate. Dr. Calhoun's testimony compares favorably with that of Plaintiff Dr. Jeffrey Glazer, who personally prescribes medication abortion, but who did not recognize the FDA's REMS documents and did not remember if he was certified to prescribe the drugs. *See* Glazer Tr. at 24:12–25:3 (Ex. 15).

Plaintiffs are also wrong to argue that Dr. Calhoun is insufficiently familiar with abortion clinics' use of telemedicine. Dr. Calhoun did not "assume[] that the patient would not visit a

healthcare facility." Mem. at 13. Instead, he recognized (correctly) that if telemedicine were permitted, the patient could theoretically be anywhere at the time of the doctor consultation, subject to the practice methods of a particular abortion provider. Calhoun Tr. at 138:15–22. Even if a patient can only obtain mifepristone in an abortion clinic, Mem. at 13, ensuring that the patient receives an *examination* from a qualified individual is a separate and important concern.

On that score, Plaintiffs' argument is highly misleading. The only evidence Plaintiffs cite for the protocol they propose to employ if allowed to use telemedicine is the declaration of Amy Hagstrom Miller dated December 4, 2019, Pls. MSJ App. 301 (ECF 234-1) — months after Dr. Calhoun was deposed. At the time of Dr. Calhoun's report and testimony, Plaintiffs had made no such statement. Plaintiffs' expert Dr. Grossman testified at his deposition that even *he* did not know what telemedicine protocol Plaintiffs would use if allowed to do so. Grossman Tr. at 90:19–24 (Ex. 16). Dr. Grossman had opined instead that an ultrasound was not necessary before a medication abortion, Grossman Rep. ¶¶ 136–37, a practice that Dr. Calhoun showed would violate the standard of care. Calhoun Rep. ¶ 145. It makes no sense to exclude Dr. Calhoun's opinions because they did not address factual assertions Plaintiffs had not yet made, which he never had any opportunity to respond to, and which conflict with Plaintiffs' own expert reports. Any confusion is of Plaintiffs' creation, and their recourse is to cross-examine Dr. Calhoun at trial.

Plaintiffs also fault Dr. Calhoun for failing to explain why in-person examinations are better than telemedicine for preventing the diversion of the mifepristone and narcotics used in medication abortion. Mem. at 14; Calhoun Rep. ¶¶ 146–47. It is not clear, though, what additional clarity Plaintiffs expect. If they wish to test him further, they may do so on cross-examination. *Lapsley*, 689 F.3d at 810; *see also, e.g.*, *Manpower*, 732 F.3d at 809; *Schultz*, 721 F.3d at 432. And Plaintiffs' proposed protocol, as described by Ms. Hagstrom Miller, exacerbates the potential problem because

it is actually *less* secure than some alternatives. One study touted by Plaintiffs' expert Dr. Grossman involved a protocol in which a doctor remotely unlocked a drawer containing abortion medications drugs, then observed the patient take the drugs. *See* Grossman Rep. ¶¶ 20, 80 (citing Grossman, D., Grindlay, K., Buchacker, T., Lane, K., & Blanchard, K. (2011). Effectiveness and Acceptability of Medical Abortion Provided Through Telemedicine. *Obstetrics & Gynecology*, *118*(2, Part 1), 296–303). Ms. Hagstrom Miller's declaration, in contrast, describes *no* safeguard against diversion, and *no* requirement that clinic personnel observe the patient ingest the drugs. Pls. MSJ App. 301. Plaintiffs have only underscored the value of Dr. Calhoun's opinions.

*Third*, Plaintiffs argue that Dr. Calhoun's concerns about obtaining informed consent by telemedicine are "conclusory." Mem. at 14–15 (citing Calhoun Rep. ¶ 158). In fact, as Plaintiffs' acknowledge, Mem. at 15 n.7, Dr. Calhoun had previously explained in his report that medically and morally significant decisions call for an in-person interaction; that in-person interactions facilitate communication in several ways; and that obtaining consent in person allows the doctor to immediately perform a physical examination if necessary. Calhoun Rep. ¶ 143. Those opinions, based on Dr. Calhoun's extensive experience, go far beyond "*ipse dixit*." Mem. at 15 n.8; *see Manpower*, 732 F.3d at 809 (expert's conclusion not *ipse dixit* when there is "a rational connection between the [expert's] data and the opinion"). To the extent Plaintiffs' real concern is that Dr. Calhoun has limited experience with the relevant technology, those concerns — as discussed above — are better suited to cross-examination than threshold evidentiary resolution. And contrary to Plaintiffs' argument, there is nothing "internally inconsistent" about observing both (1) that omitting an in-person meeting is inconsistent with the standard of care, and (2) that abortion providers omit the in-person meeting in a large number of cases. *See* Mem. at 15 (citing Calhoun Rep. ¶ 158). The

combination of these observations simply means that abortion providers regularly *violate* the standard of care.

In short, Dr. Calhoun's opinions about telemedicine are well supported and admissible.

**C. Dr. Calhoun's opinions about vulnerable women are admissible.**

Plaintiffs also err in arguing that Dr. Calhoun's testimony about the significance of abortion for vulnerable and disadvantaged women should be excluded as irrelevant. Mem. at 15–16. Plaintiffs claim that the sole issue in the case is "whether the challenged laws impose an undue burden[.]" *Id.* at 15. As discussed above, however, Plaintiffs' own allegations and expert reports are replete with claims that regulating the choice to obtain an abortion has harmful consequences for vulnerable women, and that deregulating abortion access has potential benefits. *See supra* 3–4. Having put the matter at issue, Plaintiffs cannot claim that Dr. Calhoun's contrary opinions are irrelevant — barring a stipulation that they will withdraw their own allegations on the subject.

Plaintiffs also repeat their argument that because Defendants' experts have a different interpretation of the desires and needs of women considering abortion, they are disqualified from opining on the subject. Mem. at 16. But much like Ms. Roth, Dr. Calhoun has extensive experience tending to the needs of women who consider and choose abortion. Calhoun Rep. ¶¶ 207–08. He has simply come to the conclusion, like Ms. Roth, that women typically consider abortion a fallback option "when they feel they lack the support systems they need to care for a baby." *Id.* ¶ 208. The women in that category are not irrelevant to the case; they are essential to it, and especially to laws ensuring informed consent.

**D. Dr. Calhoun's opinions about mental health are admissible.**

Plaintiffs lastly object that Dr. Calhoun's opinions "concerning the impact of abortion on patients' mental health suffer from the same methodological flaws as the opinions expressed by Dr.

Coleman." Mem. at 16. Plaintiffs do not question Dr. Calhoun's qualification to opine on the subject, and so have forfeited any such argument. *Milligan*, 686 F.3d at 386. Like Dr. Coleman, Dr. Calhoun was careful to state that "abortions are associated with risks of mental health disorders" without reaching the harder question of causation. Calhoun Rep. at 12. Plaintiffs provide no elaboration of their argument beyond a cross-reference to their arguments related to Dr. Coleman, and no argument specific to Dr. Calhoun's discussion of the issue. Those arguments are addressed above, and should be rejected for the same reasons.

## IV. Excluding The Opinions Of Dr. James Studnicki Would Be Error.

Plaintiffs' attempt to exclude the testimony of Dr. James Studnicki, M.P.H., M.B.A., Sc.D., Mem. at 16–21, is likewise meritless. Dr. Studnicki is an expert on data analytics and public health, Studnicki Rep. ¶¶ 2–5 (Ex. 17); Plaintiffs do not question his qualifications. Instead they incorrectly challenge the methodology underlying eight of his conclusions.

### A. Errors in dates of enactment are not attributable to Dr. Studnicki, and so do not concern his methodology or conclusions.

Four of Plaintiffs' eight objections come down to a single issue: Dr. Studnicki's reference to incorrect dates of enactment for certain challenged statutes. Mem. 16–17 (objections 1 and 2), 19–20 (objections 5 and 7). Plaintiffs are correct that Dr. Studnicki's report uses incorrect dates, but they are wrong for two reasons about the significance of that fact.

*First*, the error is entirely that of Defendants' counsel, not Dr. Studnicki himself. Counsel provided Dr. Studnicki with a timeline of dates on which the challenged statutes were enacted, but inadvertently made two mistakes: (1) reliance on a 1993 recodification as the original enactment date of several statutes, and (2) failure to note when particular challenged subsections were added to the statutes.[6]

[6] A table showing the errors is attached as Exhibit 18.

The source of the errors in Dr. Studnicki's report has been clear to Plaintiffs all along. Plaintiffs requested that Defendants produce "facts or data that Defendants provided to a testifying expert that the expert considered in forming the opinions to be expressed," and Defendants responded by producing the timeline, describing it as "a document which reflects a data chart concerning the history of Indiana abortion laws and injunctions which was compiled by the Defendants' attorneys in this case." *See* Email and Response to Third Requests for Production 7 (Ex. 19); *see also* Spreadsheet Concerning the History of Indiana Abortion Laws, ISDH_9302 (Ex. 20). Because the error is not attributable to Dr. Studnicki, his personal methodology and credibility are not in doubt.

*Second*, although several of the enactment dates Dr. Studnicki relied on are incorrect, the effect on his conclusions is limited. To begin with, the underlying data on Indiana abortions remain accurate, meaning that Dr. Studnicki's comparison of changes in Indiana and national abortion rates remain valid. *See* Studnicki Rep. ¶¶ 17–28.

More fundamentally, Plaintiffs' arguments misconstrue Dr. Studnicki's opinions. Plaintiffs appear to assume that Dr. Studnicki sought to prove that the challenged laws did *not* impose burdens on the abortion decision. Mem. at 17 (referring to Dr. Studnicki's "conclusions … about the impact of the enactment of these laws on Indiana's abortion rates"). That is not accurate. Rather, Dr. Studnicki considered the different question of whether Plaintiffs had carried *their* burden of proof as to causation. Studnicki Rep. ¶ 7; Studnicki Tr. at 42:11–43:10 (Ex. 21). He hypothesized multiple possible factors that might affect abortion rates and then looked for evidence supporting such factors. His main point was not that such factors definitively explained abortion rates in Indiana, but rather that *Plaintiffs'* experts failed to address those factors through normal statistical and scientific methods — meaning Plaintiffs' assertion that alleged disparities are caused by abortion-related laws lacks a credible statistical or scientific basis. Because the burden to establish a substantial obstacle

to the abortion decisions rests with Plaintiffs, those failures mean that Plaintiffs have failed to carry their burden of proof.

Plaintiffs' objections reflect that fundamental misconception. Plaintiffs' first and second objections — both noting that the 25-year timeframe of abortion data used by Dr. Studnicki does not encompass laws passed prior to that timeframe, Mem. at 16–17 — are literally true, but have nothing to do with the validity of his opinions. Plaintiffs themselves have shown no correlation (controlled for other factors) between the passage of earlier laws and any reduction in abortions, and thus have not met their burden of proof. His conclusion that Plaintiffs have failed to establish, by reliable statistical and scientific methods, any relation between such laws and a burden on abortion thus remains completely unchallenged and unrebutted.

Plaintiffs' fifth and seventh objections are similarly irrelevant. Plaintiffs correctly note that the law requiring that second-trimester abortions be conducted in ambulatory surgical centers or hospitals was enacted in 1973, Mem. at 19, and that the parental consent law was enacted in 1984, Mem. at 20. Defendants erroneously informed Dr. Studnicki that both laws were enacted in 1993. But Plaintiffs have provided no evidence that the laws had any effect on abortion *before* 1993 either. Dr. Studnicki's underlying point that Plaintiffs failed to carry their burden of proof remains correct.

To be clear, Defendants take their error seriously. They have made Dr. Studnicki aware of the error, and are in the process of addressing amendments to his report. Defendants will seek leave to amend in due course. Nonetheless, it is important to recognize (1) that Dr. Studnicki is blameless, and (2) that the underlying failure of proof is Plaintiffs', not his.

**B. Plaintiffs' other objections to Dr. Studnicki's methods are meritless.**

Plaintiffs raise four other challenges to Dr. Studnicki's opinions — the third, fourth, sixth, and eighth objections mentioned in their Memorandum. None carries any weight.

*First*, Plaintiffs object to Dr. Studnicki's consideration of the Guttmacher Institute's "hostility" index as a potential reference point when analyzing burdens of abortion regulations. Mem. at 17–18 (third objection). That argument in fact supports Defendants. The hostility index is based on the number of abortion regulations in place in a state. Studnicki Rep. ¶ 29. If Plaintiffs concede that the hostility index's counting of laws "does not in fact illuminate whether any particular abortion law has the purpose or effect of burdening abortion access for the population for whom it is relevant," Mem. at 18, it only goes to show that the existence of given abortion regulations (singly or in combination) cannot be assumed to create any burdens on the abortion decision. That underscores Plaintiffs' burden to prove causation *in Indiana*, which they failed to do.

In any event, Plaintiffs misunderstand the significance of the hostility index in Dr. Studnicki's analysis. He did not *assume* that the hostility index was peer reviewed, validated, or capable of illuminating practical effects on abortion; he merely gave Plaintiffs the benefit of the doubt by *hypothesizing* (and disproving) that the combination of laws in effect in a state, as measured by the hostility index, bears on abortion rates. Studnicki Rep. ¶¶ 29–33; Studnicki Tr. at 89:13–90:4. The fact that the hostility index does not show that "any particular abortion law has the purpose or effect of burdening abortion access for the population for whom it is relevant" is not inconsistent with Dr. Studnicki's analysis. Mem. at 18. On the contrary, it is another way of stating Dr. Studnicki's conclusion. Studnicki Tr. at 89:13–90:4. The fact that he asked the question about the significance of the hostility index is no reason to exclude that conclusion — especially since Plaintiffs appear to *agree* with it.

*Second*, Plaintiffs object to Dr. Studnicki's discussion of Indiana's adoption rates. Mem. at 18–19 (fourth objection). Plaintiffs mistake Dr. Studnicki's meaning, wrongly assuming that he was trying to prove causality between that factor and Indiana abortion rates. *Id.* at 18 ("Dr. Studnicki

assumes, without any evidence, that Indiana's high adoption rate is the cause of its low abortion rate rather than the effect of insufficient access to abortion."). In fact Dr. Studnicki simply observed that high adoption rates suggested a potential alternative causality for Indiana's abortion rates. Studnicki Rep. ¶¶ 39–41; Studnicki Tr. at 109:13–110:3. Plaintiffs have failed to discount that alternative as a potential cause of the effects they observe, and so failed to carry their burden of proof. The methodological flaw is on Plaintiffs' part, not Dr. Studnicki's.

Plaintiffs also misunderstand Dr. Studnicki's deposition testimony. He did not testify that "a woman who would place her child for adoption is necessarily morally opposed to abortion." Mem. at 19 (Plaintiffs' words). Instead, he testified that when a woman is faced with a choice between abortion and adoption, choosing the latter may mean that the woman "prefer[s] the process of adoption to abortion," Studnicki Dep. at 107:13–21, which in turn "must represent an attitude toward abortion," *id.* 108:1–6. That insight is indeed a matter of "common sense," *id.* at 107:14, and Plaintiffs give no ground for excluding it. If Plaintiffs wish to challenge it, they may cross-examine him.

*Third*, Plaintiffs object to Dr. Studnicki's reference to the timeframe of 2000 to 2014 as arbitrary and unrelated to their claims. Mem. at 20 (sixth objection). That again misses the point. Even if not all of the alleged restrictions were enacted during that timeframe, some undisputedly were, and others were in effect — yet there is no evidence of any correlation, much less causation, between such laws and travel time for abortions. Studnicki Rep. ¶ 78(i). That timeframe thus cannot be *irrelevant* to Plaintiffs' claims, even if they question its exact utility. *Smith*, 215 F.3d at 718. Their recourse is not to exclude Dr. Studnicki's testimony, but to cross-examine him,

*Fourth*, Plaintiffs take issue with Dr. Studnicki's opinion that "plaintiffs cannot establish that the alleged burden created by Indiana's legal regime for abortions falls disproportionately on

women of color." Studnicki Rep. ¶ 78(k); Mem. at 20–21 (eighth objection). Plaintiffs give the game away almost immediately by mischaracterizing Dr. Studnicki's opinion as a conclusion "that none of the challenged laws disproportionately burden Black women[.]" Mem. at 21. Dr. Studnicki's own words show that Plaintiffs have things backwards: Dr. Studnicki's conclusion was not that there is no burden, but that Plaintiffs failed to carry their burden of proof. Studnicki Rep. ¶ 78(k). That mischaracterization is fatal to Plaintiffs' objection not only because it erroneously shifts their burden of proof onto Defendants, but also because it faults Dr. Studnicki for not supporting a conclusion he never purported to offer. Because Plaintiffs do not present any argument to exclude the opinion that Dr. Studnicki actually offered, the objection should be rejected.

In the end, Dr. Studnicki never attempted to prove that abortion laws have *no* impact. Rather, he offered the far more modest opinion that Plaintiffs and their experts have failed to prove, by statistically reliable evidence and methods, that abortion related law *do* have a burdensome impact. Given that the burden of proof of a burden on abortion access lies with Plaintiffs, such failures of proof are fatal to *their* case, not to Dr. Studnicki's appropriately modest claims.

## V. Excluding The Opinions Of Dr. Nancy Goodwine-Wozniak Would Be Error.

Nor is there any merit to Plaintiffs' attempt to exclude the expert opinions of Dr. Nancy Goodwine-Wozniak, M.D., as to the reporting requirements applicable to abortion providers. Mem. at 21–22.

Dr. Goodwine-Wozniak declared under oath in her report that she was "familiar with the reporting requirements for abortion in the State of Indiana," Goodwine-Wozniak Rep. ¶ 48 (Ex. 22), and that the requirements were reasonable. *Id.* ¶ 49. Under questioning by Plaintiffs at her deposition, however, Dr. Goodwine-Wozniak apparently did not recall the precise reporting requirements or that she had offered an opinion on the subject. Plaintiffs did not prompt her to refer to the relevant section of her report. On cross examination by the state's counsel, she explained that

while she is not subject to reporting requirements applicable to abortion providers, she understands her own reporting obligations and considers them reasonable. Goodwine-Wozniak Tr. at 185:15–186:18 (Ex. 23).

Dr. Goodwine-Wozniak's memory lapse is not a proper ground for exclusion of her opinion. A deposition is not a memory test or a quiz. *See Alexander v. F.B.I.*, 186 F.R.D. 137, 143 (D.D.C. 1998) (discussing Rule 30(b)(6) depositions). Plaintiffs cite no authority holding that a memory lapse at a deposition justifies excluding an opinion. Their insinuation that Dr. Goodwine-Wozniak "merely parrot[ed] information provided" by Defendants is a slur unjustified by any evidence, Mem. at 22 (quoting *King-Ind. Forge, Inc. v. Millennium Forge, Inc.*, No. 1:07–cv–00341–SEB–DML, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009)), and contradicted by Dr. Goodwine-Wozniak's own testimony. *See* Goodwine-Wozniak Tr. at 39:6–41:3 (testifying that she drafted her report herself, and describing the information upon which she relied). The fact that Dr. Goodwine-Wozniak did not recall an aspect of her report at her deposition does not contradict her opinions. If Plaintiffs wish to challenge her knowledge, they may do so on cross-examination.

## VI. Excluding The Opinions Of Dr. Aaron Kheriaty Would Be Error.

Plaintiffs' argument for excluding aspects of the expert opinions of Dr. Aaron Kheriaty, M.D, is likewise misguided. Dr. Kheriaty is a psychiatrist at University of California Irvine School of Medicine ("UCI Medicine"). Kheriaty Rep. ¶ 4. He is also an expert on medical ethics and bio-ethics, serving as chairman of the Medical Ethics Committee and Director of the Ethics Consultation Service at UCI Health, Director of the Medical Ethics Program at UCI School of Medicine, and chair of the statewide Bioethics Committee at the California Department of State Hospitals. *Id.* He offers his opinions based on his "medical education, training, research, and over 16 years of clinical experience as a psychiatrist and bioethicist, as well as [his] familiarity with the medical and bioethics literature." *Id.* ¶ 2. Plaintiffs do not question his qualifications to do so. Instead they

mainly challenge his qualifications on subjects on which he never offered opinions. This Court should not reward that strange argument with an order excluding his testimony.

*First*, Plaintiffs argue that Dr. Kheriaty is not qualified to offer opinions on the informed consent disclosures required by Indiana law, and they move to exclude all opinions expressed in paragraphs 9(3), 10, and 53–54 of his report. Mem. at 22–23. That argument rests on baseless misconstructions of Dr. Kheriaty's report and deposition, and it is procedurally pointless under the Federal Rules.

Dr. Kheriaty's opinions about the informed consent disclosure are based on his expertise in medical ethics, which Plaintiffs do not challenge. Contrary to Plaintiffs' argument, he never purported to opine on substantive topics of informed consent outside his area of expertise. Rather, in a paragraph of his report that Plaintiffs do not cite, he candidly limited his opinions to areas within his expert knowledge: "After thoroughly examining [the informed consent brochure], I could find no inaccuracies from *within my area of expertise*." Kheriaty Rep. ¶ 58 (emphasis added). He made exactly the same point several times at his deposition. Kheriaty Tr. at 88:12–21, 171:24–172:8, 245:17–20 (Ex. 24). Although Plaintiffs cite various fields that Dr. Kheriaty agreed are outside his expertise, Mem. at 22–23, they cite *nothing* in Dr. Kheriaty's report or deposition where he actually purports to opine on those subjects.

A more careful reading of Dr. Kheriaty's report — and specifically, of the paragraphs Plaintiffs seek to exclude — shows that he offered opinions from the perspective of medical *ethics*, where his qualifications are beyond question. *See* Kheriaty Rep. ¶ 9(3) ("[T]he information regarding fetal development, abortion, and other available options and resources as required by statute and/or contained in the Abortion Informed Consent Brochure from the Indiana State Department of Health, are *medically and ethically* appropriate and justified[.]") (emphasis added); *id.* ¶ 10 ("The Plaintiffs

and their expert witnesses are incorrect in their assessment of these laws *as they relate to informed consent and access to medical or surgical abortion*.") (emphasis added); *id.* ¶ 53 ("After carefully reviewing the Abortion Informed Consent Brochure from the Indiana State Department of Health, in my professional opinion it is *medically and ethically reasonable and justifiable* for this document to be required as part of the informed consent process for abortion in Indiana.") (emphasis added). None of this verges on areas where Dr. Kheriaty lacks personal expertise, and *all* of it must be interpreted consistently with paragraph 58 and the portions of his deposition where he disclaimed opinions outside his expertise.

As for the substantive medical content of the required disclosures, Dr. Kheriaty was careful to identify and respect the limits of his expertise. In one paragraph Plaintiffs seek to exclude, he observed that the Indiana informed consent brochure:

> includes factual and unbiased medical information about fetal development, medical and surgical abortion procedures and their potential risks and complications, information on other available options (such as adoption), and other relevant support services. The information in the brochure is taken from the U.S. National Library of Medicine, a reliable and unbiased source of scientific and medical information widely utilized by physicians and medical researchers.

*Id.* ¶ 54. Those observations are well within the expertise of Dr. Kheriaty, who — as an authority on medical ethics — is familiar with evaluating scientific reliability and informed consent disclosures in a variety of settings. Elsewhere he took up Plaintiffs' argument that the informed consent brochure contains an incorrect statement about when human life begins, and explained why Plaintiffs were wrong as a matter of basic biology and bioethics, *id.* ¶¶ 58–61, where his expertise is also unquestioned. The remainder of Dr. Kheriaty's discussion of the informed consent disclosures is from the perspective of ethics, and Plaintiffs forfeit any argument that it should be excluded. *Milligan*, 686 F.3d at 386.

Dr. Kheriaty's intellectual honesty obviates Plaintiffs' overblown concerns. His opinions focus on topics where his expertise is plain, and he disclaims opinions outside his field. Besides, under Fed. R. Civ. P. 26(a)(2)(B)(i), Dr. Kheriaty was required to include in his report "a complete statement of all opinions the witness will express and the basis and reasons for them," so an order excluding opinions that Dr. Kheriaty never offered would accomplish nothing. Plaintiffs' effort to exclude testimony on subjects where he never offered opinions, and despite his candor at every stage about the nature and limits of his expertise, serves no legitimate purpose. At a minimum, Plaintiffs' Motion to exclude all opinions expressed in paragraphs 9(3), 10, and 53–54 is overbroad because it covers matters undisputedly within Dr. Kheriaty's expertise.

*Second*, Plaintiffs move to preclude Dr. Kheriaty from offering opinions about "the medical benefits of Indiana's laws prohibiting the use of telemedicine in abortion care[.]" Mem. at 23. That request is even odder than the first because Dr. Kheriaty's report does not offer any opinion on telemedicine. He did not even use the word, and he makes no mention of the Indiana prohibition. Plaintiffs cite nothing in his report presenting such an opinion. He *did* opine that informed consent generally requires a "face-to-face" interaction, Kheriaty Rep. ¶ 21, but at his deposition he made clear that in appropriate circumstances that can sometimes be accomplished by telemedicine, *i.e.*, "face to face through a screen." Kheriaty Tr. at 241:5. On further questioning, he repeatedly disclaimed an opinion on how that view applies to abortion and telemedicine, *id.* at 241:6–11, 243:7–244:17, a subject that he agreed his report did not discuss, *id.* at 244:18–20.

Plaintiffs, in other words, are moving to exclude an opinion that everyone agrees Dr. Kheriaty never offered — and which he cannot offer under Rule 26(a)(2)(B)(i) — citing nothing but his repeated *disclaimer* of such an opinion. This effort, too, serves no apparent legitimate purpose.

*Third*, and finally, Plaintiffs incorporate the same arguments they raised against Dr. Coleman's opinions about abortion and mental health. Mem. at 23–24. Although Dr. Kheriaty's conclusions are similar to Dr. Coleman's, Dr. Kheriaty — another experienced psychiatrist — approaches the subject in a distinct way, with his own scope and emphases. Kheriaty Rep. ¶¶ 67–101. But just as in their motion on this topic regarding Dr. Calhoun, Plaintiffs move to exclude his opinions in a single paragraph that merely cross-references their earlier attack on Dr. Coleman. Mem. at 23–24. Plaintiffs thus neglect to discuss several aspects of Dr. Kheriaty's own treatment of the subject, *e.g.*, his rebuttals of Dr. Grossman on matters such as Dr. Coleman's meta-analysis, the merits of various studies including the Turnaway study, the psychiatric effects of perinatal hospice, and decisional regret. Kheriaty Rep. ¶¶ 82–101. Like Dr. Coleman and Dr. Calhoun, Dr. Kheriaty carefully observed the distinction between increased risk and causation. *Id.* ¶¶ 69–73, 75, 77, 79–81, 84–85, 100, 101.

Plaintiffs' warmed-over incorporation of their arguments against Dr. Coleman fails for the reasons described above. *See supra* 9–14. More fundamentally, the fact that Plaintiffs challenge Dr. Calhoun's and Dr. Kheriaty's distinct discussions of the same subject without providing *any* unique analysis goes to show that Plaintiffs' argument goes not to the experts' qualifications or methodology, but their *conclusions* — in other words, to the merits rather than to admissibility. Those arguments, by definition, should be addressed on the merits rather than on a motion to exclude.

## CONCLUSION

Plaintiffs' motion to exclude expert testimony should be denied.

Respectfully submitted,

Curtis T. Hill, Jr.
Indiana Attorney General

By: *Thomas M. Fisher*
Thomas M. Fisher
Solicitor General

Diana Moers
Christopher M. Anderson
Julia C. Payne
Robert A. Rowlett
Deputy Attorneys General

Office of the Indiana Attorney General
IGC-South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2020, I electronically filed this document with the Clerk of Court using the CM/ECF system. Notice of this filing will be served on all counsel of record by operation of the Courts electronic filing system. Parties may access this filing through the courts system.

Dated: March 23, 2020 *Thomas M. Fisher*