UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WHOLE WOMAN'S HEALTH ALLIANCE, | ) | |
| ALL-OPTIONS, INC., | ) | |
| JEFFREY GLAZER M.D., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-01904-SEB-MJD |
| | ) | |
| CURTIS T. HILL, JR. Attorney General of the | ) | |
| State of Indiana, in his official capacity, | ) | |
| KRISTINA BOX Commissioner of the Indiana | ) | |
| State Department of Health, in her official | ) | |
| capacity, | ) | |
| JOHN STROBEL M.D., President of the | ) | |
| Indiana Medical Licensing Board of Indiana, | ) | |
| in his official capacity, | ) | |
| KENNETH P. COTTER St. Joseph County | ) | |
| Prosecutor, in his official capacity and as | ) | |
| representative of a class of all Indiana | ) | |
| prosecuting attorneys with authority to | ) | |
| prosecute felony and misdemeanor offenses, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |
| | ) | |
| INDIANA DEPARTMENT OF | ) | |
| CORRECTION, | | |
| Marion Superior Court, | ) | |
| | ) | |
| Interested Parties. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Whole Woman's Health Alliance, All-Options, Inc., and Jeffrey Glazer,

M.D. (collectively, "Plaintiffs") have sued Defendants Curtis T. Hill, Jr., Attorney

General of Indiana; Kristina Box, M.D., Commissioner of the Indiana State Department

of Health; John Strobel, M.D., President of the Medical Licensing Board of Indiana; and Kenneth P. Cotter, St. Joseph County Prosecutor ("the State") under 42 U.S.C. § 1983, challenging as unconstitutional a wide array of Indiana's statutory and regulatory restrictions on providing and obtaining abortions. More specifically, Plaintiffs allege that Indiana's legal regime for the regulation of abortion violates the Substantive Due Process Clause of the Fourteenth Amendment (Count I), the Equal Protection Clause of the Fourteenth Amendment (Count II), and the Freedom of Speech Clause of the First Amendment (Count III). Plaintiffs have also challenged various statutes as unconstitutionally vague in violation of the Fourteenth Amendment's Procedural Due Process Clause (Count IV). Now before the Court is the State's Motion for Summary Judgment, [Dkt. 213].[1] For the reasons stated herein, we **grant in part and deny in part** the State's Motion.

## <u>Background</u>

Among the liberties protected by the United States Constitution is the freedom from state-required motherhood. *Roe v. Wade*, 410 U.S. 113, 152–53 (1973). In bringing this lawsuit, Plaintiffs—comprised of abortion providers and nonprofit intermediaries—challenge a broad array of Indiana's statutory and regulatory restrictions on providing and obtaining abortions as infringing upon that freedom. The reach of Plaintiffs' challenges is wide, ranging from assertions that Indiana law places futile regulatory burdens on

---

[1] The State's Motion was filed on November 8, 2019. In light of the Supreme Court's June 29, 2020 decision in *June Medical Services v. Russo*, 140 S. Ct. 2103 (2020), the parties jointly moved for permission to file supplemental briefing on the State's motion. The request was granted, and, as of August 31, 2020, this motion was fully briefed.

healthcare providers who administer abortion care, to claims that Indiana mandates the distribution of misleading information relating to the mental and physical health risks of abortion as a condition of a woman's informed consent, to arguments that the State unreasonably restricts minors from accessing abortions. Plaintiffs challenge no fewer than twenty-five sections and subsections of the Indiana abortion code and their accompanying regulations as being facially violative of the Fourteenth Amendment's Substantive Due Process Clause. Plaintiffs also assert violations of the Fourteenth Amendment's Procedural Due Process and Equal Protection Clauses and the First Amendment.

Plaintiffs have cast their wide net in this lawsuit in an effort to reduce Indiana's burdensome scheme of regulations and prohibitions governing abortion services, which have grown increasingly cumbersome in the decades following *Roe v. Wade*. They allege these controls impose individual as well as combined effects, resulting in the imposition of substantial obstacles in the paths of women seeking abortion services in Indiana. Plaintiffs' overarching purpose is to "return [Indiana] to a system of reasonable and medically appropriate abortion regulations by striking down Indiana's unduly burdensome abortion laws." [Comp. ¶ 9].

As explained in detail below, the facial challenges to the constitutionality of several of these statutes ignore or seek to contravene well-established legal precedents, thereby entitling the State to summary judgment. The constitutionality of other statutes, however, is less clear and less fulsomely litigated. Our review of the constitutionality of these statutes and regulations in the context of the Substantive Due Process Clause

3

requires a consideration of "the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health Alliance v Hellerstedt¸* 136 S. Ct. 2292, 2309 (2016).

## Procedural Background

On May 31, 2019, we issued a Preliminary Injunction, which Order was thereafter modified on October 1, 2019. While Plaintiffs' Complaint advances facial challenges to Indiana's abortion statutes, the motion for preliminary injunction had sought specific relief from various procedural prerequisites to licensure relative to the opening and operation of an abortion clinic by Whole Woman's Health Alliance ("WWHA"),[2] located in South Bend. We held that Plaintiffs had shown a likelihood of prevailing on the merits of their claim that those licensing requirements had been applied in an unconstitutional fashion. We held that the Indiana State Department of Health ("Health Department") had unconstitutionally denied WWHA's application for licensure, which decision had thereafter been affirmed by the Health Department's three-member Appeals Panel, its final decisionmaker. Though WWHA had filed a second application, it believed its efforts to be futile following additional procedural roadblocks erected by the Health Department. Plaintiffs sought injunctive relief in our Court to circumvent the bureaucratic stalemate.

---

[2] WWHA "is a nonprofit organization with a mission to provide abortion care in underserved communities . . . [It] operates abortion clinics in Austin, Texas, and Charlottesville, Virginia." [Pl. Br., at 3-4].

Following expedited briefings and oral arguments, we granted Plaintiffs' motion for preliminary injunctive relief.  Specifically, Plaintiffs had established a likelihood of success on the merits on their claim that Indiana's requirements of licensure for clinics providing medication abortions (that is, those abortions induced by ingesting certain medications) had been applied to WWHA in a manner that was violative of the Fourteenth Amendment's Substantive Due Process and Equal Protection Clauses. This ruling was affirmed with procedural modifications by the Seventh Circuit. The modified preliminary injunction requires the Health Department to treat WWHA's clinic (hereinafter, the "South Bend Clinic") as provisionally licensed until a final judgment could issue on the merits of this case. The South Bend Clinic thus commenced and continues to provide medication abortions up to ten weeks following gestation.

Given that Plaintiffs' request for preliminary injunctive relief was unrelated to other allegations in their Complaint,[3] the parties' extensive summary judgment briefing now before us does not include the issues resolved in connection with the preliminary injunction. Instead, the State's motion for summary judgment instead centers on Plaintiffs' challenges to the facial validity of the licensure requirements and various other statutes.

---

[3]As noted in our Preliminary Injunction, Plaintiffs' motion was "not strictly preliminary to anything" because the Complaint had alleged that the challenged laws were facially unconstitutional, not as applied to WWHA, which reflected the fact that the Complaint was filed six months before WWHA received the final decision on its first licensure application. "Thus," as we explained, "none of the facts related to the administrative proceeding relied upon by Plaintiffs in support of their as-applied undue-burden challenge are pleaded in the [C]omplaint. None would be heard at the time of final judgment on Plaintiffs' facial challenges." [Dkt. 116, at 50-51].

**Procedural Disputes**

**I.      Dr. Glazer's Standing to Litigate the Complaint**

Jeffrey Glazer, M.D. is the lead plaintiff in this action. His credentials and background are summarized below. [4] The State challenges Dr. Glazer's standing as well as that of the nonprofit plaintiff, WWHA. The requirements of standing are reflected in well-established legal principles and authorities. A party invoking federal jurisdiction must demonstrate "(1) injury in fact; (2) a causal connection between the injury and the challenged conduct, i.e., traceability; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Plotkin v. Ryan*, 239 F.3d 882, 884 (7th Cir. 2001). Plaintiffs argue that the issue of standing has previously been resolved in our March 28, 2019 Order denying the State's motion to dismiss on this basis. [5] There, the State contended that Plaintiffs had not alleged an injury-in-fact redressable by a favorable ruling. We held:

> "Where at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not." *Korte v. Sebelius*, 735 F.3d 654, n.8 (7th Cir. 2013) (alteration omitted) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 696 n.7 (7th Cir. 2011)). We therefore restrict our

---

[4] Dr. Glazer "is a board-certified obstetrician-gynecologist licensed to practice medicine by the State of Indiana." Comp. ¶ 23. He has provided abortion care in Indiana for more than five years and currently serves as the Medical Director of WWHA's South Bend Clinic, where he provides abortions. [Dkt. 234, at 2]. Additionally, Dr. Glazer provides medication and aspiration abortions at Women's Med Professional Corporation, an abortion clinic in Indianapolis, Indiana. [Id.].
[5] For a full review of the standing doctrine, see docket 81 at 11-14.

discussion to Glazer's standing. *See Ezell*, 651 F.3d at 696 n.7 ("The district court's emphasis on the organizational plaintiffs' standing is puzzling. As we have noted, it's clear the individual plaintiffs have standing.").

[Dkt. 81, at 12].

As the Seventh Circuit has explained,

> The cases are legion that allow an abortion provider, such as Planned Parenthood of Wisconsin or AMS [or Glazer here], to sue to enjoin as violations of federal law (hence litigable under 42 U.S.C. § 1983) state laws that restrict abortion. These cases emphasize not the harm to the abortion clinic of making abortions very difficult to obtain legally, though that might be an alternative ground for recognizing a clinic's standing, but rather "the confidential nature of the physician-patient relationship and the difficulty for patients of directly vindicating their rights without compromising their privacy," as a result of which "the Supreme Court has entertained both broad facial challenges and pre-enforcement as-applied challenges to abortion laws brought by physicians [such as Glazer] on behalf of their patients."

*Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 910 (2015) (quoting *Isaacson v. Horne*, 716 F.3d 1213, 1221 (9th Cir. 2013)).

Having carefully reviewed the State's objections to Dr. Glazer's standing, we

overruled them, with the following explanation:

> Defendants contend that Glazer's "patients do not exist because he does not allege that he provides abortions in Indiana at this time." Br. Supp. 9. That is simply wrong. "Jeffrey Glazer, M.D., is a board-certified obstetrician-gynecologist licensed to practice medicine by the State of Indiana. Dr. Glazer is an abortion provider. . . . Dr. Glazer sues on behalf of himself and his patients." Compl. ¶ 23. If this leaves any room for doubt, obligating us to look into the truth of the matter, such doubt is swiftly dispelled: "I currently provide both surgical and medication abortions to patients at the Indianapolis Clinic for Women . . . in Indianapolis, Indiana. . . . On average, I provide abortions to approximately twenty-five patients per week at the Indianapolis Clinic for Women." Glazer Decl. (Dkt. 43 Ex. 4) ¶¶ 5–6. As to the challenged licensing regulations, specifically, the complaint adequately alleges that new abortion clinics, which would operate in Indiana but for the challenged licensing regulations, would reduce the severity of the burdens

on obtaining abortions for Glazer's patients and allow Glazer to expand his professional practice. Compl. ¶¶ 69, 70, 82–89, 187–88, 190–91, 194–95. Glazer's and his patients' injuries would be addressed by a ruling invalidating and enjoining the challenged statutes. Glazer thus clearly has standing to bring this lawsuit.

[Dkt. 81, at 12-13].

Here, the State again challenges the standing of both WWHA and Dr. Glazer. With respect to WWHA, the State has presented no arguments to explain the reasons why we should entertain its challenges in light of the well-established principles cited in our dismissal order, including: "Where at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not." *Korte v. Sebelius*, 735 F.3d 654, n.8 (7th Cir. 2013).

Plaintiffs urge us to rely on our prior determination that Dr. Glazer has standing, arguing: "[A] court ought not to re-visit an earlier ruling in a case, absent a compelling reason, such as manifest error or a change in law, that warrants a re-examination." *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007). The State has not responded to this argument.

The State, apparently anticipating that the Supreme Court would overrule controlling precedents concerning third-party standing in *June Medical* upon which our previous order relied, lost the underpinnings of its argument when the Supreme Court reaffirmed that abortion providers are permitted to invoke the rights of their actual or potential patients in challenges to abortion-related regulations. *June Med.*, 140 S. Ct. at 2118. The Supreme Court also upheld the general rule "permitt[ing] plaintiffs to assert third-party rights in cases where the enforcement of the challenged restriction against the

8

litigant would result indirectly in the violation of third parties rights." *Id.* at 2119 (noting

that *June Medical* "lies at the intersection of these two lines of precedent"). Our prior

ruling as to Dr. Glazer's standing to bring this lawsuit therefore stands.[6]

## II.     Evidentiary Disputes

### A.   The Opinions of Plaintiffs' Experts Are Admissible and Will Not Be Stricken

"A district court's decision to exclude expert testimony is governed by Federal

Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell*

*Dow Pharms., Inc*., 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993)." *Brown v.*

*Burlington N. Santa Fe Ry. Co*., 765 F.3d 765, 771 (7th Cir. 2014).  Rule 702 provides

that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

---

[6] The State offers two specific attacks on Dr. Glazer's standing not previously raised or resolved: whether he can demonstrate an injury-in-fact regarding challenges to Indiana's ultrasound and in-person examination requirements. The State argues that there is no "injury" from the ultrasound requirement because it provides benefits to women in Indiana. Plaintiffs counter that they furnished significant record evidence undermining this assertion and establishing that the requirement does cause harm to women. The State did not respond.  We agree that Dr. Glazer has sufficiently alleged an injury-in-fact in this regard. For standing purposes, he must show only that he is seeking to vindicate "the sort of interest that the law protects when it is wrongfully invaded." *Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006). Dr. Glazer has articulated such an interest here. The State may argue that the ultrasound requirement is constitutionally sound, but whether this is a "meritorious legal claim" need not be determined in finding that he has standing. *Id.* The State also asserts that Dr. Glazer has no standing to challenge the in-person examination requirement because he "has already testified that he performs physical examinations of his patients as part of his current abortion practice," "bely[ing] any claim that physical examinations are not medically necessary." Plaintiffs rejoin (and the State again does not rebut) that this is a distortion of Dr. Glazer's deposition testimony. Dr. Glazer was never asked if he would perform an examination absent the statutory requirement, and his testimony indicates he would not do so unless a patient presented with an abnormality. The State's challenges to Dr. Glazer's standing are, once again, unavailing.

understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Where the "testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire*, 526 U.S. at 149 (*quoting Daubert*, 509 U.S. at 592).

Pursuant to *Daubert* and Rule 702, the State seeks an order striking portions of the declarations provided by Plaintiffs' experts, Dr. Heidi Moseson and Dr. Daniel Grossman.

The State attacks the following assertion by Dr. Moseson in her expert report: "Indiana's abortion restrictions create substantial obstacles to abortion access in the State." The State contends that because Dr. Moseson has not performed any scientific analysis that would qualify her to opine on the causal relationship between the challenged laws and the access to abortion in Indiana, her conclusion lacks a foundation and should be stricken. In response, Plaintiffs assert that they have not relied on Dr. Moseson's statement in defending against the State's summary judgment motion, thus mooting this issue. We agree: this objection is therefore denied as moot.

The State next contends that Dr. Grossman is unqualified to proffer expert opinions on various subjects, including medical ethics, fetal pain, and mental health.  We consider each of these categories of proffered testimony below:

*1.   Medical Ethics*

As to medical ethics, Plaintiffs assert, and the State does not dispute, Dr.

Grossman is not offering any testimony of this nature, rendering this objection moot. We

so find.

*2.   Fetal Pain and Mental Health*

The State next claims that Dr. Grossman—a practicing obstetrician-gynecologist,

a Fellow of the American College of Obstetricians and Gynecologists ("ACOG"), and the

director of an interdisciplinary research institute focused on reproductive health—is not

qualified to offer expert opinions on fetal pain or mental health.  We disagree.

### a.  Fetal Pain

With respect to whether pain is experienced by a fetus during an abortion, Dr.

Grossman has stated that leading medical associations, including the ACOG and the

Royal College of Obstetricians and Gynecologists ("RCOG"), have concluded that there

is no reliable evidence supporting a finding that a previability fetus can feel pain. This

opinion comes from his familiarity with what he describes as "the most authoritative

papers on fetal pain," including two literature reviews relied on by the ACOG's

publications. This is sufficiently within Dr. Grossman's knowledge and expertise to

withstand the State's objection.

The State challenges the admissibility of Dr. Grossman's opinions as to fetal pain

on the grounds that they were not reached "through his own expertise or research." The

State accuses him of merely "parroting the opinions" of others, specifically, the ACOG

11

and RCOG. *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613, 2002 WL 501027 (7th Cir. 2002). According to the State, Dr. Grossman, at his deposition, was unable to demonstrate a familiarity "with the limitations of the studies he relies upon."

Plaintiffs counter these objections, arguing that Dr. Grossman's professional expertise amply qualifies him to offer testimony as to his opinion of the prevailing view on fetal pain within the medical community as determined based on his review of relevant medical literature.

We share Plaintiffs' views as to the admissibility of this evidence. The State does not challenge Dr. Grossman's qualifications with respect to evaluating medical literature or his qualifications to testify to generally accepted medical opinions within the medical community. Dr. Grossman's testimony is, in fact, limited to this issue. Contrary to the State's characterization of his testimony, Dr. Grossman has not attempted to masquerade behind the expertise of others or advance any opinions other than his own, even when consistent with those espoused by the ACOG and RCOG. We find no basis to conclude that Dr. Grossman has "parroted" others' opinions regarding whether a fetus can feel pain; he has, instead, testified that, based on his own determinations and his review of the medical literature that major professional medical associations reject the State's position.

In claiming that Dr. Grossman is unable to discuss the "limitations of the studies" on which he relies, the State has exaggerated Dr. Grossman's deposition testimony, seizing on his admitted unfamiliarity with a particular study that the State describes as contrary to the conclusions of the ACOG and RCOG. Such an unfamiliarity with a single

study hardly suffices to disqualify a witness from offering opinions such as those proffered by Dr. Grossman.

The State also emphasized Dr. Grossman's inability to discuss other specific studies allegedly relied upon by the ACOG and RCOG to support portions of their analyses and conclusions. Such a lack of familiarity does not provide a legitimate basis on which to exclude Dr. Grossman's otherwise admissible testimony, including his opinion that major, reputable medical associations have reached competing conclusions on whether and to what extent a fetus feels pain during and in the course of an abortion. The State's attempts to discredit Dr. Grossman's opinions might be better served through cross-examination of his testimony, rather than a request seeking their exclusion. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (*quoting with unmarked alterations Daubert*, 509 U.S. at 596) ("[T]he accuracy of the actual evidence is to be tested . .  with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'"). There is no serious dispute over Dr. Grossman's impressive qualifications or the foundations for his expert opinions. *See Dura Auto.,* 285 F.3d at 613. Accordingly, we admit into evidence Dr. Grossman's expert opinions to the extent and within the context of Plaintiffs' proffer.

### b.  Mental Health

Similarly, we find no basis on which to exclude Dr. Grossman's testimony based on any lack of qualifications to opine on the mental health impact of abortion on the patient.

13

The State notes that Dr. Grossman is not a psychologist. Therefore, it argues, any opinions relating to the mental health impact of an abortion must have come from others in that field who apparently collaborated with Dr. Grossman in the preparation of his report.

There is no requirement that an expert witness must be actively engaged in a field about which he may be asked to testify.  "[W]hether basing testimony upon professional studies or personal experience," the expert witness must "employ the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. Whatever drafting assistance Dr. Grossman may have received on some portion of his report by consulting experts in the field of psychology, such collaboration is not a disqualifying factor. Dr. Grossman is reportedly the sole author of his report, which work reflects his own opinions and independent analyses as to the scientific evidence concerning abortion and mental health. We note in passing that the State's own experts have also apparently received similar assistance from consulting experts in drafting their reports

Dr. Grossman's opinions are based on his advanced medical education and training, his employment and experience as a researcher and director of a major institution engaged in wide-ranging research on human reproductive science as well as his careful review of numerous professional learned treatises, published studies, and literature reviews. Thus, there can be no credible dispute that Dr. Grossman has acquired, and is bringing to bear on his testimony, extraordinary skills and knowledge and

experience, certainly to a degree that qualifies him to testify as an expert in the areas for which he has been proffered by Plaintiffs.

Accordingly, we overrule the State's objections and hold that Dr. Grossman's testimony is admissible

> ### B. The "Previously Undisclosed Portions" of Dr. Grossman's Declaration Are Not Inadmissible, Requiring an Order to Strike

The State has also challenged certain portions of Dr. Grossman's declaration set out in Plaintiffs' opposition briefing on the grounds that these sections were not included in his previously disclosed expert report. We do not share the State's concerns or objections on this issue.

The purpose of an expert report "is not to replicate every word that the expert might say on the stand." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (quoting *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009)). "It is instead to convey the substance of the expert's opinion . . . so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." *Id.* So long as the State has been provided "adequate notice" of the substance of the expert's opinions, testimony related to those opinions is admissible. The State has not argued here that Dr. Grossman's expert report was produced in any untimely or incomplete manner or that it failed to provide sufficient notice of the substance of Dr. Grossman's opinions as set out in his declaration. Accordingly, we deny the State's request to strike these sections.

## **Facts**

Given the expansive reach of Plaintiffs' Complaint in challenging virtually the entire panoply of the State's abortion restrictions, we began our analysis with an examination of certain scientific background information dealing generally with the prevalence and the safety of abortion procedures by drawing on the submissions and arguments of both parties as well as an overview of the Indiana statutes challenged in this lawsuit.

## I.     Safety of Abortion Procedures

The National Academies of Sciences, Engineering, and Medicine recently completed a broad-based survey and analysis of legal abortion procedures as performed clinically through the United States, noting that abortion is generally a safe and effective process, involving minimal medical risks.[7]  Obviously, not all risks can be avoided, as is true with all medical procedures. The level of risk in this area varies, depending on the type of abortion performed. In the United States, abortion is ordinarily performed by one of the following methods: medication abortion, aspiration abortion, or dilation & evacuation ("D&E"). [Dec. Grossman, ¶ 6]. The parties are in fundamental disagreement over the inherent risks, respectively.

### A.   Medication Abortion

Medication abortion is generally available to a woman through the first seventy days (ten weeks) of gestation as measured from her last menstrual period (lmp). [*Id,* ¶ 7].

---

[7] NATIONAL ACADEMIES OF SCIENCES, ENGINEERING, AND MEDICINE (NAS), THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES, at 77 (2018), *available at* http://nap.edu/24950 ("The clinical evidence makes clear that legal abortions in the United States—whether by medication, aspiration, D&E, or induction—are safe and effective.").

Medication abortion involves termination of a pregnancy through the combined administration of two medications: mifepristone and misoprostol.[8] [*Id.*].  Prior to receiving a medication abortion, a woman is screened for eligibility and contraindications, is provided counseling, and is then administered the medications. [*Id.*]. The dose of mifepristone is ingested, the effect of which is to block the hormone progesterone, which halts further growth and development of the fetus. [*Id.*]. Within 24 to 48 hours thereafter, misoprostol is taken by mouth wherever the patient chooses, typically at home. This drug causes the uterus to contract and expel its contents, thereby completing the abortion.[9] The patient follows up with a healthcare provider within seven-to-fourteen days.  [*Id.*, ¶ 7, 24]. Medication abortions require no anesthesia or sedation. [*Id.*, ¶ 7].

Because the abortion-inducing medications take time to exert their effects, most complications associated with a medication abortion typically occur after the patient has left the abortion facility. [*Id.*, ¶ 22]. However, complications are rare, explain Plaintiffs, based on their experts' evidence, and are generally handled on an out-patient, non-emergency basis; indeed, serious complications connected with a medication abortion requiring emergency care have been determined to affect less than one percent of patients. [*Id.* ¶¶ 22, 26].

---

[8] Mifepristone is among a small number of drugs the FDA subjects to a Risk Evaluation and Mitigation Strategy (REMS), which among other things prohibits mifepristone from being dispensed in pharmacies; it is available to patients only from healthcare providers who have entered it supplier agreements with the drug's U.S. licensee.

[9] Mifepristone and misoprostol are also commonly used to treat incomplete miscarriages.

The State's contrary view of these risks is that medication abortions do, in fact, pose "significant risks." Dr. Nancy Goodwine-Wozniak, a board-certified obstetrician-gynecologist, opines that "[m]ifespristone use in ectopic pregnancy has been associated with sepsis and cases of maternal death." [Goodwine-Wozniak Exp. Rep, ¶ 55]. Dr. Donna Harrison, also a board-certified obstetrician-gynecologist, asserts that medication abortion is contraindicated for women with "undiagnosed adnexal mass," "chronic adrenal failure," "concurrent long-term corticosteroid therapy," "history of allergy to mifepristone, misoprostol, or other prostaglandins," hemorrhagic disorders or concurring anticoagulant therapy, "inherited porphyria," or an "intrauterine device." [Harrison Exp. Rep. ¶ 25]. These risks are mitigated when a competent physician evaluates and physically examines a patient, diagnosing any possible contraindications and confirming her mental and physical capacity to undergo the medication abortion, prior to proceeding with the procedure. [Exp. Rep. Harrison. ¶ 26].

There is no dispute between the parties that the risks associated with medication abortion, including increased rates of infection and rate of failure necessitating surgical abortion, increase with gestational age. [*Id.* ¶ 16; Pl. Br., p. 16].

**B. Surgical Abortion**

Aspiration abortion, sometimes referred to as suction curettage, involves the use of suction to empty the contents of the uterus. A hollow curette is inserted into the patient's uterus. At the other end of the curette, a hand-held syringe or electric device is applied to create suction and remove the contents of the uterus. The procedure typically takes approximately ten minutes to complete. Oral medications or a local anesthetic are

commonly used for pain management, although moderate or deep sedation as well as general anesthesia may sometimes be utilized. This abortion method is common in the first and early second trimester, until fourteen to sixteen weeks lmp. [Dec. Grossman, ¶¶ 11-15].

Complications following aspiration abortions are rare: the incident rate for such complications, including both major and minor events, is around 1.3%. Only 0.16% of women experience major complications requiring hospital admission, surgery, or blood transfusion following an aspiration abortion. [*Id.* ¶ 27].

Though aspiration abortion and D&E abortion are forms of surgical abortion, neither requires making an incision in a patient's body. [*Id.* ¶¶ 12, 15].

D&E is an abortion method used during the second trimester of pregnancy, beginning at fourteen to sixteen weeks lmp. It utilizes both suction and medical instruments to empty the contents of the uterus. The first step in this procedure is the dilation of the cervix using oxmotic dilators and/or medications. At the beginning of the second trimester, cervical dilation is typically completed on the same day as the abortion procedure. From sixteen to eighteen weeks lmp, the dilation process is begun one to two days in advance of the abortion. Once the cervix is dilated, a combination of suction and forceps is used to empty the uterus, requiring ten to twenty minutes to complete. Plaintiffs assert that the pain management options for D&E abortion are similar to those provided for aspiration abortion, but moderate or deep sedation is more likely to be utilized in D&E. [*Id.* ¶ 14; Dec. Cowett, ¶¶ 22-26]. The State believes that general

anesthesia should be used when a patient undergoes this procedure. [*See* Exp. Rep. Goodwine-Wozniak, ¶ 28, 37].

Second trimester abortions are rare, with fewer than 9% of abortions in the United States occurring after thirteen weeks lmp. Of those few abortions that do occur, the vast majority are performed using D&E. [Dec. Grossman, ¶¶ 55-56].

Plaintiffs maintain that D&E abortions pose minimal risks, with complication rates ranging from 0.05 to 4.0%. [*Id.* ¶ 30].

Though the rate of complications associated with aspiration and D&E abortions is not in dispute,[10] the State details these risks as including "bleeding, infection, or injury to the cervix, vagina or uterus" as well as "anesthesia complications, hemorrhage, blood clot, uterine perforation, [and] vessel injury." [Exp. Rep. Stroud, ¶ 8; Exp. Report. Goodwine-Wozniak, ¶ 64]. Moreover, according to the State, these complications could lead to serious long-term effects such as cervical incompetence, which occurs when the cervix dilates early in a woman's next pregnancy, predisposing her to intrauterine infections and premature delivery. [Exp. Rep. Stroud, ¶ 8; Exp. Rep. Calhoun, ¶ 60]. Additionally, the State asserts, complications from surgical abortion could prevent a woman from achieving future pregnancies. [Exp. Rep. Stroud, ¶ 8]. Plaintiffs dispute that cervical incompetence or infertility are significant risks posed by surgical abortions. [Dec. Bernard, ¶ 9; Dec. Wocial, ¶ 20;].

C. Mental Health Risks

---

[10] The State does not distinguish between the different forms of surgical abortions.

Regardless of the specific abortion procedure performed, the State insists that women who terminate their pregnancies are as a result more likely to suffer from various forms of mental illness—e.g., depression, anxiety, substance abuse, suicidal thoughts and behaviors—than women who chose to continue their pregnancies to full-term births. According to Dr. Priscilla Coleman, the lead author of a 2011 meta-analysis of research on mental-health outcomes of abortion, women with a history of abortion experience a 55% increased risk for various mental health problems compared to women who carried unplanned pregnancies to term. Dr. Coleman further reports that abortion renders women 155% more likely to exhibit suicidal behaviors compared to women who have not had an abortion. Dr. Aaron Kheriaty, a board-certified psychiatrist who evaluates and treats women who have received abortions, concurs, noting that "a significant number of women are psychologically harmed by abortion[.]" However, the State maintains that a likelihood of suffering psychological harm following an abortion is reduced when patients are provided adequate information that permits them to arrive at well-considered decisions.

Plaintiffs deny that abortion increases the risk of mental illness in the patient. In specific response to the meta-analysis published by Dr. Coleman, eight commentaries were published refuting these findings and pointing to "serious methodological concerns." [Dec. Grossman, ¶ 150]. Other reports have similarly undermined theories associating mental health risks with abortion. For example, an analysis in one report published by the John Hopkins Bloomberg School of Public Health found that articles reporting a relationship between abortion and detrimental mental health outcomes were

often the result of flawed methodology; by comparison, the highest quality studies have produced findings that were generally neutral as to the mental health consequences. [*Id.*, ¶ 146]. In contrast to those studies referenced by the State, other reports by the American Psychological Association have concluded that abortion typically does not negatively impact a woman's mental health. [*Id.*, ¶ 145].

## II.    Prevalence of and Access to Abortion in Indiana

The number of medical practices offering abortions services in Indiana has significantly declined in recent years. Between 2014 and 2018, one-third of Indiana's abortion clinics closed or stopped providing abortion care, though the number of abortions performed during these years remained relatively steady. [Dec. Moseson, ¶ 23]. ("In 2014, the state documented nine clinics that were providing abortions — but by 2018, this number fell to only six clinics."); Health Dept. Report, p. 3[11]].  Dr. Studnicki, the State's expert on data analytics, reports that Indiana's abortion rate is consistent with national trends and any decline is not associated with Indiana's regulations. [Studnicki, ¶¶ 8, 18-19].[12]

---

[11] This refers to the Health Department's Terminated Pregnancy Report.

[12] Throughout its briefing, the State argues that Indiana's regulations have not affected access to abortion, referencing Dr. Studnicki's expert opinion that the challenged laws have not impacted the level of abortion in Indiana. The State contends that the laws do not prevent women from obtaining abortions and, in any event, must be deemed constitutional. However, our analysis of the challenged laws turns on whether they create substantial obstacles to accessing abortion, even if a woman is ultimately successfully in this pursuit, and not on the overall number of abortion. *June Medical*, 140 S. Ct. at 2133 (Breyer, J., plurality op.).

In 2018, the year this lawsuit was filed, six abortion clinics were in operation in Indiana, three of which were located in Indianapolis. [Health Dept. Report, p. 18]. A seventh clinic, the WWHA South Bend Clinic opened in 2019, *see* Dkt. 186 Modified Preliminary Injunction. Of these clinics, two provided only medication abortions and no clinic provided abortion after the first trimester. These clinics offered abortions primarily on only one or two days of the week. [Dec. Laura Miller, ¶¶ 5, 11; Dec. Guerrero, ¶ 43; Dec. Haskell, ¶ 4-5, 12, 20; Dec. Amy Miller, ¶¶ 49, 54-56, 63; Dec. Herr, ¶ 18; Dec. McKinney, ¶ 16]. Additionally, as of 2018, four Indiana hospitals provided abortion services, each located in Indianapolis. [Health Dept. Report, p. 18].  No Indiana ambulatory surgical center provided abortions. [*Id.*].

No abortion providers in Indiana are located east of Indianapolis or south of Bloomington, depriving citizens in Indiana's second-largest and third-largest cities, Fort Wayne and Evansville, respectively, [*Id.*, at 18, 20], of these services. Women who live in these cities must travel 250 miles round trip to obtain abortion care.[13]

Indiana is home to approximately 1.3 million women of reproductive age (15-44 years old). [Dec. Moseson, ¶¶ 7-9]. Based on available statistical data, Hoosier women are more likely to confront  adverse pregnancy-related health outcomes compared to women in other states: Indiana ranks in the top ten *worst* states for maternal mortality (fifth worst), infant mortality (ninth worst), and neonatal mortality (sixth worst). [Dec.

---

[13] Excluding the South Bend Clinic, which is approximately 90 miles from Fort Wayne, the closest facilities for women in Fort Wayne are located in Merrillville and Indianapolis, both at a distance of approximately 125 miles. The closest facility for women in Evansville is in Bloomington, approximately 125 miles away.

Romero, ¶¶ 21-23]. Women of color in Indiana are also disproportionality impacted by these mortality rates.

The majority of women most impacted by Indiana's highly restrictive regulation of abortion are low-income, living in households below 200% of the poverty level. [Dec. Grossman, ¶ 213]. Low-income women face greater barriers in accessing healthcare than others; more than a third report missing or delaying medical treatment because of the inability to take time off from work. Women of color face heightened barriers in these areas. [Dec. Guerrero, p. 8-9, 11; Dec. Moseson, p. 4-5, 13, 17-19; Dec. Romero, 3-7; Dec. Stecker, 7-8].

For women with limited financial means or an inability to travel—that is, the majority of Indiana women seeking abortion services—the potential burdens imposed by abortion regulations, including personal costs and health risks, are exacerbated. To start, many women lack reliable transportation, cannot afford the gasoline necessary to travel to a clinic, or live in cities with limited public transit. [Dec. Guerrero, ¶¶ 47-51, ¶ 57; Dec. Stecker, ¶¶ 31-33; Dec. Romero, p. 6-9; Dec. Glazer, ¶ 26]. Additionally, traveling for abortion care necessitates time off work, which, for many who do not have jobs with flexible hours or paid time off, jeopardizes employment or results in lost wages. If a woman must travel a substantial distance to receive an abortion, she may need to take additional time off work and pay for lodging close to the clinic—or if she lacks such financial means, sleep in her car outside the clinic. [Dec. Glazer, p. 5-7; Dec. Guerrero, p. 12-14; Dec. Stecker, p. 7-9; Dec. Herr, ¶¶ 21-22]. The burdens of travel also often lead to delays in accessing abortion care, which, in turn, increase the likelihood that a woman

will face complications from an abortion. [Dec. Cowett, ¶ 14; Dec. Grossman, ¶¶ 186-187]. Patients delayed in receiving abortion services past 10 weeks lmp cannot receive a medication abortion, and patients delayed past the first trimester must seek an abortion at a hospital—which, as will be discussed herein, is extraordinarily expensive.

Though the State insists that Indiana's abortion regulations do not prevent women from accessing abortion in Indiana nor qualified practitioners from providing these services, Plaintiffs have presented substantial persuasive evidence to establish that numerous Indiana women have confronted the above-referenced burdens or traveled to neighboring states to access abortion because of Indiana's restrictions. Additionally, some healthcare providers attribute their unwillingness to provide abortion care to the "stigma, fear of retaliations and restrictions" existing within Indiana. These burdens to access provide the framework for our review of the challenged regulatory and statutory provisions.

## III.    Plaintiffs' Challenges to Indiana's Regulations of Abortion

Plaintiffs challenge five categories of abortion law in Indiana, which they group as follows: (A) targeted regulations of abortion provider laws; (B) laws prohibiting the use of telemedicine in abortion care; (C) mandatory disclosure and delay law(s); and (D) parental consent laws. Plaintiffs also challenge (E) the criminal penalties imposed for violating these regulations. We analyze in detail each category below.

A.    <u>Regulation of Abortion Providers</u>

1.    *Physician-Only Law*

25

The "Physician-Only Law" provides that only a physician is authorized to perform a first trimester abortion in Indiana. Ind. Code § 16-34-2-1(a)(1); *see also* 410 Ind. Admin. Code § 26-13-2(b). This law, first enacted in 1973, is challenged for being "out of step with contemporary medical practice." In 2016, for example, the FDA removed language from the label of the abortion-inducing drug, Mifeprex, previously specifying that it should be administered only by a physician. [Exp. Rep. Grossman, ¶ 37]. Indeed, the ACOG, the American Public Health Association, and the World Health Organization have all endorsed abortion care provided by Advanced Practice Clinicians ("APCs"), such as physician assistances, nurse practitioners, and certified nurse midwives. [*Id.* ¶ 36]. As of June 1, 2019, sixteen other states permit APCs to provide medication abortions. [*Id.* ¶ 34]. In six states, APCs are also permitted to provide first-trimester aspiration abortions. [*Id.*].

In Indiana, APCs are authorized to provide a range of types of medical care, including gynecological procedures that are comparable in levels of risk to first-trimester abortions. An APC may, for example, perform medical miscarriage management, insert and remove intrauterine devices, and suture torn vaginal tissue and remove retained placenta tissue following childbirth. [Dec. Bernard, ¶ 38-40; Stroud. Tr. at 35:22-36:3, 53:18-54:8, 55:15-55:18].

In non-abortion settings, APCs are regulated by generally applicable laws concerning scope of practice and professional standards. *See* Ind. Code §§ 25-22.5-1-1.1(i)(1), 25-23-1-1, 25-23-1-19.4; 844 Ind. Admin. Code §§ 2.2-1.1-13, 2.2-1.1-16, 2.2-2-6; 848 Ind. Admin. Code §§ 3-1-1, 3-1-2, 4-1-4, 4-2-1. Physician assistants must be

supervised by licensed physicians pursuant to written supervisory agreements. *See* Ind. Code § 25-22.5-1-1.1(i)(1); 844 Ind. Admin. Code 2.2-1.1-16. Nurse practitioners and certified nurse midwives practicing in outpatient settings are required to collaborate with licensed physicians, also pursuant to written agreements.  *See* Ind. Code § 25-23-1-19.4.

The State argues that the risks associated with abortions are mitigated by the Physician-Only Law. Requiring a physician to be the only medical professional to perform the abortion places a licensed physician with the patient for the purposes of "mak[ing] decisions and correct[ing] problems or complications without having to call other MDs in because they have the background, experience, and training an advanced practice provider does not have." [Exp. Rep. Goodwine-Wozniak, ¶ 64]. Because APCs do not possess the specialized training of licensed medical doctors, "their ability to recognize and appropriately respond to complications, particularly serious ones, is limited." [*Id.* ¶ 65; Exp. Rep. Stroud ¶ 37]. The State maintains that licensed physicians are also best equipped to counsel patients and determine the appropriate medical procedures and avoid and treat complications. [*Id.* ¶ 65]. As discussed more fully in subsequent sections of this entry, a physician is best equipped to provide the necessary care through in-person physical examinations and ultrasounds, according to the State.[14]

The State cites further as support the opinion of the American Board of Medical Specialties  that surgical abortion procedures should be handled by physicians. The State

---

[14] The State argues that Plaintiffs' expert, Dr. Grossman, has conceded that "non-doctors performing abortions have a higher rate of complications and failure." However, the excerpts of Dr. Grossman's deposition testimony submitted by the State do not contain the pages to which they refer for this alleged concession. [*See* Dkt. 279-1].

argues that "medication abortions do not reduce the need for a physician," since complications might occur if, for example, the medication did not completely expel the contents of uterus, thereby necessitating a surgical abortion. [*Id.* ¶ 65, 68; Exp. Rep. Stroud ¶ 37].

Plaintiffs note the obvious in pointing out that Indiana's pool of abortion providers eligible to perform first-trimester abortions is reduced by the Physicians-Only Law. Because of a shortage of physicians, existing abortion clinics have limited capacity for patients and long wait times. Reflective of this shortage is the fact that no abortion clinic operated by Planned Parenthood in Indiana is able to offer abortions more frequently than three days a week. As a consequence, patients must wait a minimum of one to two weeks for an appointment at one of Planned Parenthood's abortion clinics in Indiana, at WWHA's South Bend Clinic, and elsewhere. [*See* Dec. Guerrero, ¶¶ 43-46; Dec. Miller, ¶¶ 8, 54-57, 63-65l; Dec. Haskell, ¶ 10, 12-14; Dec. Herr, ¶¶ 3-4]. There is a supply of APCs willing and able to provide abortion care, but for the Physician-Only Law, say Plaintiffs. Some are already employed by licensed abortion clinics. Dec. Miller, ¶¶ 20-23; Dec. Herr, ¶¶ 3-4; Dec. McKinney ¶ 13]. If APCs were eligible to provide abortion services, they could staff the clinics on days when physicians are unavailable, thereby increasing the availability of abortion services. [*See* Dec. Herr, ¶¶ 3-4; 465, Dec. Miller, ¶¶ 20-23, 63-65; Dec. Haskell, ¶ 12-14; Dec. McKinney ¶¶ 13-20].

2. *Admitting-Privileges Requirement*

Indiana's statute imposing the "Admitting Privileges Requirement" provides that:

A physician may not perform an abortion unless the physician:

(1) has admitting privileges in writing at a hospital located in the county where
abortions are provided or in a contiguous county; or

(2) has entered into a written agreement with a physician who has written
admitting privileges at a hospital in the county or contiguous county
concerning the management of possible complications of the services provided.

Ind. Code. § 16-34-2-4.5(a). The written agreements entered into pursuant to this
Section must be renewed annually and submitted to the State's Health Department. *Id.* §
16-34-2-4.5(a)(2), (c)(2).

The State's justification for this restriction is that abortion safety is bolstered when
the physician performing the procedure has admitting privileges at a nearby hospital, or
an agreement with another physician who has such privileges. Admitting privileges allow
a physician to provide direct, continuous care for a patient  in the event of an emergency,
particularly in the context of surgical abortions. [Stroud Exp. Rep. ¶ 18]. In this setting,
the State argues, the physician who performs the surgical abortion is best positioned to
know the course of treatment and the kind of follow  up emergency care required. As the
State emphasizes, mere communication with an emergency room physician does not
result in the same quality of care. [Exp. Rep. Calhoun, ¶¶ 98, 106; *see also* Def. Exh. 12].

This position, the State contends, is consistent with "Core Principle #4" of the
American College of Surgeons, also shared by the ACOG: "Physicians performing
office-based surgery must have admitting privileges at a nearby hospital, or maintain an
emergency transfer agreement with a nearby hospital." [Def. Exh. 10]. This position is
also held by the Federation of State Medical Boards, which requires providers to maintain
"written transfer agreements with a reasonably convenient hospital(s) or all physicians

29

performing surgery should have admitting privileges at such facilities."  [Def. Exh. 11].

In sum, admitting privileges, according to the State, ensure continuity of care in the event

of emergencies following surgical abortions. [Dec. Calhoun, ¶ 98].[15]

Plaintiffs reject this justification, pointing out that the admitting privileges

requirement exists only with respect to abortion services. In non-abortion settings, they

note, practitioners providing similar care and medical services in doctor's office and

clinics are typically not subject to any admitting privileges requirements. *See* 844 Ind.

Admin. Code 5-5-22(a), (e). Non-abortion practitioners can satisfy the necessary

standards by entering into "an emergency transfer agreement with a nearby hospital," as

opposed to an agreement with an individual physician who holds admitting privileges.

844 Ind. Admin. Code 5-5-22(a)(3). Plaintiffs assert that the admitting privileges

requirement applicable only to abortion providers has little if anything to do with

protecting or safeguarding patient health.  Plaintiffs also point out that this requirement is

often futile, since emergency care may either not be sought or otherwise available at the

---

[15] Plaintiffs attack several of the State's proffered exhibits—including various reports related to the general safety of abortion in office-based settings—which Plaintiffs contend contain "outdated" guidance that has been "superseded or abrogated" by more recent promulgations. The purportedly outdated guidance may impact the weight given to this evidence, as the State argues, but does not require exclusion of the exhibits in their entirety. Whether Plaintiffs in contrast have relied on arguably more accurate, updated information is a matter that will be resolved when a final determination on the merits is made. Plaintiffs' hearsay objection to these exhibits is overcome by the State's assurances that none of the exhibits is being offered for the "truth of the matter[s] asserted." FED. R. EVID. 801. Because the State has not offered any of these exhibits to establish best safety practices for abortion, but only to demonstrate that Indiana's regulations are consistent with recommendations from the medical community, we find them admissible for this limited purpose.

hospital where a woman's provider has admitting privileges or an agreement with a physician who does. [Dec. Grossman, ¶ 79; Dec, Haskell; ¶ 24].

Plaintiffs note that compliance with admitting privileges requirements is often difficult and, in some cases, impossible. For example, many hospitals set minimum patient admission requirements for physicians in order to receive admitting privileges; because abortion patients rarely require hospitalization, physicians specializing in abortion are unlikely to be able to satisfy these requirements. In addition, hospitals affiliated with certain religious institutions or sensitive to community criticism and backlash may not choose to allow abortion providers on their staffs. [Dec. Grossman, ¶ 81; Dec. Steckler, ¶¶ 18-20].

The alternative option of a "backup physician" option to satisfy the admitting privileges requirement does not reduce physicians' difficulties in complying with the statute, say Plaintiffs. The bureaucratic rigamarole of requiring the backup physician agreement to be reduced to writing and shared with the Health Department as well as numerous local hospitals likely deters some physicians from serving as backup physicians. [Dec. Clark, p. 3; Steckler, ¶ 20]. We are informed that several physicians in South Bend have declined to serve as backup physicians for the South Bend Clinic out of fear of retaliation, despite their expressed support for providing abortion care to patients who seek it. Others willing to fill this role were reportedly blocked from doing so by the views of their medical practice partners. [*Id.*; Dec. p. Hagstrom Miller]. Following weeks of outreach, WWHA has been able to identify only one physician willing to serve and currently doing so as the backup physician for the South Bend Clinic. Should this

31

physician retire, move, or relinquish admitting privileges, WWHA would be without such services unless and until it can locate a replacement backup physician. [*Id.*].

### 3.  *Licensure, Inspection, and Facilities Requirements*

Plaintiffs' lawsuit challenges a set of statutory requirements they group and refer to here as the "Licensure Requirement." This requirement generally prohibits the performance of abortions outside licensed abortions clinics, ambulatory surgical centers, or hospitals. *See* Ind. Code §§ 16-18-2-1.5, 16-21-2-2(4), 16-21-2-2.5, 16-21-2-10, 16-21-2-11, 16-21-2-14.

Plaintiffs challenge this limitation on the place of care as well as Indiana's "Inspection Requirement" requiring Indiana's Health Department to inspect every abortion clinic within the state once annually and to "conduct a complaint inspection as needed." Ind. Code § 16-21-2-2.6.[16]

Plaintiffs contend that Indiana's physical plant requirements impose medically unnecessary facility requirements on at least some abortion clinics. Ind. Code §§ 16-21-2-2.5(a)(2), 16-18-2-1.5(a)(2); 410 Ind. Admin. Code, art. 26, including 410 Ind. Admin.

---

[16] Plaintiffs object to the admissibility of certain evidence proffered by the State in support of its argument that Indiana's licensure and inspection requirements are necessary to prevent threats to the health and safety of Indiana women, similar to those allegedly committed by Dr. Ulrich Klopfer, the former operator of an abortion clinic in South Bend, Indiana, whose conduct is currently under state investigation, though he, himself, is deceased. The State's references to Dr. Klopfer have no bearing on our determinations as to the constitutionality of the cited portions of the Indiana code. Thus, the related evidentiary submissions are irrelevant and Plaintiffs' objection is sustained.

Code 26-10-1(b)(5), 26-11-2(a), 26-11-3, 26-13-1, 26-13-3(b)–(c), 26-17-2(c)(3)–(4), 26-17-2(d)(1)–(4), (d)(6), 26-17-2(e)(1), (8).[17]

Medical practitioners are generally required to hold valid licenses, but medical practices are not. Apart from abortion clinics, Indiana does not require doctor's offices and clinics to be licensed, even for those facilities performing procedures medically comparable to abortion. Thus, according to Plaintiffs, the Licensure Requirement for abortion clinics is an anomaly and unnecessary to ensure or enhance patient safety. Moreover, it singles out abortion providers and operates as a barrier to their entry into the practice area.[18] [Dec. Stecker, ¶¶ 17, 39-40; Dec. Grossman, p. 13-15; Dec. Hagstrom Miller, p. 15-16].].

The Inspection Requirement is also unique to abortion clinics, note Plaintiffs. Doctor's offices and clinics in Indiana generally are not subject to any similar inspection

---

[17] We note one area of confusion here that neither party has addressed. Plaintiffs' Complaint takes issue with Indiana's facility requirements governing "facilities providing *medication* abortion." [Compl. ¶ 101(c) (emphasis added)]. However, Plaintiffs' Complaint cites to the Indiana regulations governing facilities providing *surgical* abortion, i.e., the regulations found in 410 Ind. Code article 26. The State's summary judgment briefing addresses the regulations cited by Plaintiffs, that is, those related to surgical abortion facilities. Plaintiffs respond to the State's arguments on these regulations while also criticizing the State for its failure to address their allegations with respect to the regulations governing facilities providing medication abortions, found in 410 Ind. Admin. Code article 26.5. The State replies that the Complaint does not address article 26.5. Given that the regulations governing surgical abortion facilities are cited in Plaintiffs' Complaint and the parties have briefed the issue of whether these provisions are constitutional, we will review this portion of Indiana's administrative code (410 Ind. Admin Code article 26). Plaintiffs' failure to clarify which article of the Indiana administrative code they are challenging is confusing, especially since their Complaint improperly conflates article 26 and article 26.5.

[18] Plaintiffs refer to the South Bend Clinic's struggles in obtaining a license from the State, noting that this process took two years and resulted in Plaintiffs having to seek a preliminary injunction. However, as we have already noted, Plaintiffs' preliminary injunction request was not related to the *facial* constitutionality of the Licensing Requirements.

requirements, and other licensed facilities, such as hospitals, are inspected less

frequently. Plaintiffs assert that the Health Department's inspections, which typically

involve an inspector spending two full days at a clinic and then engaging in weeks or

months of follow up with clinic staff members, disrupt abortion clinic operations, divert

resources away from patient care, and increase costs.  [Dec. Hagstrom Miller, p. 15-16;

Dec. Haskell, ¶ 21].

Though Indiana does not require other practice facilities to maintain licenses with

the state, the State cites to the ACOG's requirements that abortion facilities protect the

health and safety of pregnant women. [*See* Def. Exh. 13, *American College of*

*Obstetricians & Gynecologists*, Report of the Presidential Task Force on Patient Safety in

the Office Setting (2010), hereinafter "ACOG Report."].  Indiana attempts to ensure such

safety through its licensing process, which permits the Health Department to conduct

surveys on licensed clinics utilizing state inspectors to review medical records, check for

compliance to medication protocols and equipment sterilization, among other things.

Clinics are provided advance notice of the Health Department's inspections to minimize

disruptions. According to the State, frequent inspections yield higher levels of

compliance by  abortion clinics as evidenced by the issuance of fewer medical-related

sanctions or other performance deficiencies. [*See* Def. Exhs. 16, 17].

Indiana's facility requirements governing first-trimester surgical abortions also

promote safe and healthy abortions, argues the State. The State contends that these

requirements are consistent with ACOG's recommendations particularly with respect to

the physical aspects of abortion facilities that provide first-trimester surgical abortions.

[*See* ACOG Report]. For example, clinics are required to comply with local building codes and fire codes as well as rules adopted by the Occupational Safety and Health Administration, the state board of pharmacy, and the Drug Enforcement Administration. [*Id.* at 4]. Clinics must train and enable personnel to respond quickly to emergency situations and provide designated recovery areas and spaces for the treatment of possible complications. These treatment spaces must also be equipped with resuscitation equipment, including a defibrillator and emergency medication. [*Id.* at 4, 6]. The clinic's premises and equipment also must meet standards of cleanliness. [*Id.* at 7]. These standards ensure the safety of facilities providing surgical abortion, according the State.

Thus, the State defends the Licensing Requirement on the grounds that it provides the Health Department with the ability to prevent or resolve problems arising from the operation of abortion clinics.

### 4.  *Second-Trimester Hospitalization Requirement*

Indiana's "Second Trimester Hospitalization Requirement" provides, "after the first trimester of pregnancy," an abortion may only be "performed in a hospital or ambulatory outpatient surgical center." Ind. Code § 16-34-2-1(2). Most second-trimester abortions are performed using D&E, though some early first-trimester abortions may be performed via aspiration. [Dec. Grossman, ¶¶ 54, 56; Exp. Rep. Goodwine-Wozniak, ¶ 36 ].

Hospitals and ambulatory surgical centers ("ASCs") are subject to heightened construction requirements aimed at maintaining a sterile operating environment. They ensure, for instance, the safety of surgeries that involve cutting into the sterile body tissue

by reducing the chances of infection. [*Id.* ¶ 61]. However, neither aspiration nor D&E abortion requires such an incision, and thus the enhanced safety precautions that hospitals and ASCs provide are of no benefit to second-trimester abortion patients, according to Plaintiffs. [*Id.*, at ¶¶ 60-61 ]. Hospitals and ASCs also have enhanced staffing requirements, ensuring that scrub nurses, technicians, or circulatory nurses are available for complex procedures. But these individuals are not involved in second-trimester abortions. [*Id.* ¶¶ 61, 62].

Plaintiffs stress that both second-trimester aspiration and D&E abortions can be and are elsewhere safely performed in out-patient, office-based settings. One study recently published by the Journal of the American Medical Association found that there was no statistically significant difference with respect to abortion-related adverse events or morbidity between women who underwent a second-trimester abortion in a clinic as compared to those whose second-trimester abortions were performed in an ASC. [*Id.* ¶ 63].

The State argues in response that D&Es must be performed in a hospital or ACS to ensure that safety standards are fully met. [Exp. Rep. Goodwine-Wozniak, ¶ 38; Exp. Rep. Stroud, ¶ 10]. Dr. Goodwine-Wozniak explains that the use of surgical instruments in a D&E "introduces additional risk of complications," and Dr. Christopher Stroud, a board-certified obstetrician-gynecologist, agrees that "the standard of care requires suction D&Cs following pregnancy loss to be performed in a surgery center or hospital[.]" [Exp. Rep. Goodwine-Wozniak, ¶ 37, Exp. Report Stroud, ¶ 10]. As a general matter, the likelihood of complications increases with gestational age. [Exp. Rep.

36

Harrison, ¶ 16]. Dr. Goodwine-Wozniak also views general anesthesia as necessary for a D&E, though Plaintiffs' expert, Dr. Grossman, reports that deep sedation is ordinarily sufficient. [*Compare* Exp. Report Goodwine-Wozniak, ¶ 28 *with* Dec. Grossman, ¶¶ 15, 36]. With general anesthesia comes the need for a hospital or surgery center, insists the State. [Exp. Report Goodwine-Wozniak, ¶ 29].

There is no dispute that the Second-Trimester Hospitalization Requirement increases the costs and reduces the availability of second-trimester abortion care. Few hospitals and no ASCs currently provide abortion care. The cost of receiving a second-trimester abortion in a hospital, if that service were provided, would be exponentially greater than it would be in a clinic. [Dec. Bernard. ¶¶ 25-28; Dec. Cowett, ¶ 38]. It is estimated that a late-first trimester abortion at Planned Parenthood costs $750-800, whereas the cost of second-trimester abortion in a hospital ranges from $10,000 to $20,000. [Dec. Bernard. ¶¶ 25-28]. For those patients fortunate to have insurance, it often does not cover these costs. [Dec. Bernard, ¶ 29; Dec. Guerrero ¶ 29]. As a result, many women must travel out-of-state to obtain second-trimester abortions. [Dec. Bernard. ¶¶ 23-24, 30-31; Dec. Cowett, ¶ 66; Dec. Glazer, ¶ 20; Dec. Greenblum, ¶¶ 13-17; Dec. Guerrero ¶ 44; Dec. Hagstrom-Miller, ¶ 57; Dec. Haskell, ¶22; Dec. Herr, ¶ 28; Dec. McKinney, ¶ 35; Dec. Laura Miller, ¶ 19; Dec. Moseson, ¶ 32; Dec. Stern, ¶ 26]. If this requirement were enjoined, Plaintiffs contend, second-trimester abortions would become available at clinics operating at lower cost in various regions of Indiana. [Dec. Hagstrom Miller, ¶ 49 (WWHA of South Bend would like to provide second-trimester abortions); Dec. Laura Miller, ¶ 17 (Planned Parenthoods in Bloomington, Indianapolis,

and Merrillville reportedly would perform second-trimester abortions but for the restrictions in this statute)].

　　5.　*Reporting Requirements*

Indiana's "Reporting Requirements" mandate that "every health care provider who performs a surgical abortion or provides [a medication abortion]" collect detailed information about each of their abortion patients and enter these details into a central database operated by the Health Department. *See* Ind. Code § 16-34-2-5. This includes basic demographic information along with the location of the facility where the abortion was performed; identity of the physician and procedure used; the patient's maternal history and date of last menses; the age and gender of the fetus; and whether the patient was seeking an abortion as a result of abuse, coercion, harassment, or trafficking. *Id.* In cases where the patient was under sixteen years of age, the report must include the date that notice of the minor's abortion was issued to the Department of Child Services.

Generally, this information must be transmitted to the government within thirty days following the date of the abortion, but if the patient is younger than sixteen years old, the information must be transmitted within three days following the abortion to both the Health Department and the Department of Child Services. Ind. Code § 16-34-2-5(b). On an annual basis, the Health Department is required to compile the reported data, publish a statistical report, and submit aggregate data to the U.S. Centers for Disease Control and Prevention ("CDC"). Ind. Code § 16-34-2-5(e)-(f).

The State believes that "comprehensive data collection is the foundation of good epidemiological study" but that data collection for abortion generally speaking is

"woefully lacking." [Exp. Rep. Calhoun, ¶¶ 134, 136]. Proper epidemiological reporting assists with the identification of public health concerns, such as complications arising within a particular clinic, as well as ensuring that abortions are performed in accordance with Indiana law. [*Id.*]. The State views Indiana's Reporting Requirements to be reasonable in light of the important public health interests they advance. [Exp. Rep.. Stroud, ¶¶ 41-42]. Physicians practicing in various medical fields are routinely required to record and submit data to numerous governmental authorities, and, while such reporting takes time and resources, "physicians understand that it serves various economic and public-health purposes" and accept the obligations as part of their professional duties in order to increase quality and safety. [*Id.* ¶ 43]. Dr. Goodwine-Wozniak regards the reporting requirements as reasonable and necessary to "generate information about medical services, the population served, and potential public health problems." [Exp. Rep. Goodwine-Wozniak, ¶ 50].

Plaintiffs characterize Indiana's requirements as burdensome beyond any legitimate public health benefits. They note that the extensive data that abortion providers must report "goes far beyond the information that the CDC solicits in connection with its abortion surveillance system." [Dec. Wocial, ¶ 34].  Further, the data collected through the Reporting Requirements is not utilized by the State to develop any sort of public health programming. [Pl. App., 749-555, 758]. In some instances, the Medical Licensing Board of Indiana has determined that providers have been fined for violations of the Reporting Requirements that are "not connected to the delivery of health services and [are] not in any way related to professional competence, conduct, or licensure." [Pl. App.

853, 864, 875]. These Reporting Requirements are "time consuming" and costly and intrusive. [Dec. Grossman, ¶ 82; Dec. Hagstrom Miller ¶¶ 83-89; Dec. Miller, ¶¶ 28-29].

B. Laws Prohibiting the Use of Telemedicine in Abortion Care: the Telemedicine Ban, In-Person Examination Requirement, and In-Person Counseling Requirement

Plaintiffs also challenge Indiana's prohibition on telemedicine as a means of providing abortion related services and care. Three sections of Indiana's abortion code are highlighted, each of which restricts a woman's ability to receive abortion services through telemedicine.

Indiana's "Telemedicine Ban" prohibits healthcare providers from using telemedicine to prescribe "an abortion inducing drug." Ind. Code § 25-1-9.5-8(a)(4).[19] The "In-Person Examination Requirement," Ind. Code § 16-34-2-1(a)(1), mandates that "[a] physician shall examine a pregnant woman in person before prescribing or dispensing an abortion inducing drug." In this context, "'in person' does not include the use of telehealth or telemedicine services." *Id.* The In-Person Examination Requirement imposes a *de facto* ban on telemedicine, thereby creating identical burdens and disadvantages as the Telemedicine Ban.[20] Plaintiffs also challenge Indiana's requirement

---

[19] Indiana defines "telemedicine" as "the delivery of health care services using electronic communications and information technology, including: (1) secure videoconferencing; (2) interactive audio-using store and forward technology; or (3) remote patient monitoring technology; between a provider in one (1) location and a patient in another location." Ind. Code § 25-1-9.5-6(a).

[20] Plaintiffs Complaint challenges Ind. Code § 16-34-2-1(a)(1) on multiple levels: by precluding the use of telemedicine and by requiring a "medically unnecessary physical examination."

that all preabortion counseling be provided "in the presence" of the patient. *See.* Ind. Code § 16-34-2-1.1(a).[21]

In non-abortion contexts, telemedicine is available and its use encouraged as a means of reducing healthcare costs, increasing access to specialty care, and improving healthcare access for people in underserved communities. [Dec. Stecker, ¶ 28]. In fact, Indiana has authorized a widespread expansion of telemedicine services over the past five years. In 2015, Indiana enacted a statute requiring that health insurance policies include coverage for telemedicine services on the same terms as coverage is provided for healthcare services delivered in person. *See* Pub. L. No. 185-2015, §§ 25-27, 2015 Ind. Acts 2102-04 (codified at Ind. Code §§ 27-8-34-1 to 27-8-34-7, 27-13-1-34, 27-13-7-22). In 2016, Indiana enacted another statute broadly authorizing healthcare providers to use telemedicine to treat patients in Indiana. *See* Pub. L. No. 78-2016, § 2, 2016 Ind. Acts 711-15 (codified at Ind. Code §§ 25-1-9.5-1 to 25-1-9.5-12). One year later, in 2017, Indiana expanded the telemedicine authority to include the prescription of controlled substances. *See* Pub. L. No. 150-2017, § 7, 2017 Ind. Acts 1430-31 (codified in relevant part at Ind. Code § 25-1-9.5-8).

Dr. Grossman counsels that utilizing telemedicine for medication abortions is as safe and effective as in-person treatment. Providers are able to obtain informed consent via telemedicine as effectively as if the participants were present in person, and

---

[21] Plaintiffs' challenge to this requirement appears as part of their objections to Indiana's mandatory disclosures provision, but they have also been included in objections to the ban on telemedicine in providing abortion care. We thus incorporate a discussion of the issue here as well.

physicians can remotely review patients' medical histories and ultrasound results (which have typically been obtained from qualified personnel at an abortion clinic). The physician can also conduct direct, face-to-face communications with the patients through videoconferencing to determine the appropriateness of the medication abortion. The physician reviews with the patient the risks and benefits of medication abortion, including information about normal side effects, warning signs, and follow up care. [Dec. Grossman ¶¶ 25-29, 85].

In terms of safety, Dr. Grossman's research indicates that the complications rate for medication abortion remains exceedingly low (less than 0.5%), regardless of whether the procedure is provided in-person or through telemedicine. Between telemedicine and in-person medication abortions, Dr. Grossman has found no significant differences in the occurrence of adverse events. [*Id.*, ¶ 26].

Dr. Grossman further notes that the National Academies of Sciences, Engineering, and Medicine has concluded that there is no medical benefit from requiring that a medication abortion be administrated in the physical presence of a healthcare provider. [*Id.*, ¶ 87].  A 2019 review found that administering a medication abortion via telemedicine is safe, effective, and well-liked by both patients and providers. [*Id.* ¶ 90]. Indeed, eight other states permit the use of telemedicine for medication abortion, and one additional state permits telemedicine use in obtaining informed consent. [*Id.* ¶ 89]. Providers have found it feasible and effective to integrate telemedicine into their clinic operations and report that interactions with patients are essentially the same as in-person visits. [*Id.*]. As Dr. Grossman explains, "Screening women for contraindications and

eligibility, providing counseling, and dispensing medication is straightforward and can be done with equal safety regardless of whether the physician is physically present in the room with the patient." [*Id.*]. Because complications arising from medication abortion are likely to occur after a patient has left a clinic, it is immaterial whether she receives her initial medication-abortion care in person. [*Id.* ¶ 87].

The State disputes the appropriateness of telemedicine to secure a patient's informed consent for a decision as significant as whether to have an abortion. According to one cited expert, "in-person interactions" "lead[] to better eye contact, greater ability to read body language, and overall development of a real person-person relationship between doctor and patient." [Exp. Rep. Calhoun, ¶ 143]. Another expert agrees that the in-person provision is an essential component of the informed consent process. [Exp. Rep. Coleman, ¶¶ 191, 193].

The State maintains that a physical examination of the patient by a licensed physician is necessary in any event before a medication abortion can be safely conducted. A crucial component in determining whether a medication abortion is appropriate is identifying, with accuracy, gestational age. [Exp. Rep. Goodwine-Wozniak, ¶ 56]. A physical examination performed in conjunction with an ultrasound verifies this information. [*Id.* ¶¶ 53-54]. Additionally, a physical examination ensures that the provider secures a complete and accurate medical history to determine whether any contraindications exist that could increase the risk of complications. [*Id.*, ¶ at 52; Exp. Rep. Harrison, ¶ 25]. An ultrasound, in addition to ensuring an accurate determination of gestational age, is also necessary to rule out the possibility of an ectopic pregnancy,

which could cause further complications with a medication abortion. [Exp. Rep.

Goodwine-Wozniak, ¶¶ 53-54]. The State also notes that the In-Person Examination

Requirement lowers the risk of the diversion of abortion-inducing drugs, because Indiana

prohibits using telemedicine to prescribe particularly dangerous drugs, such as opioids

and abortion-inducing drugs, Ind. Code § 25-1-9.5-8(a)(3)–(4), to prevent their diversion

to individuals for whom they were not prescribed.

Dr. Glazer shares Dr. Grossman's view that an in-person examination is not always

necessary prior to a medication abortion; such an exam *may* be called for, however, if a

patient communicates an abnormality or personal health issue that mandates further

exploration. [Glazer Depo., 56:20-58-25].

By requiring that patients receive in-person counseling and examinations, clearly

the travel time and expenses for women seeking abortions are increased. These

expenditures are increased further by Indiana's requirement that women undergo a

waiting period of at least eighteen hours between their receipt of information related to

informed consent and proceeding with an abortion. Telemedicine would permit abortion

providers to administer abortion care more conveniently and at lower costs, thereby

reducing the burden on women seeking abortion. [*Id.* ¶¶ 91-98]. Statistics reveal that

sixty-six percent of Indiana women of reproductive age live in a county not providing an

abortion clinic, requiring them to travel a distance of some length to receive abortion

services. And the majority of women seeking abortions in Indiana are low-income

citizens with limited capacity to finance the travel necessary to receive abortion care. [*Id.*

¶ 92; *supra* at 23-25]. Telemedicine would provide a particularly effective means for improving access to abortion for these women especially. [*Id.*].

    C.  <u>Mandatory Disclosure and Delay Laws</u>

       Plaintiffs also challenge the State's "Mandatory Disclosure and Delay Laws." They highlight five statutory provisions in advancing these arguments: (1) the disclosure requirements; (2) the eighteen-hour delay requirement; (3) the in-person counseling requirement;[22] (4) the requirement that a physician or APC provide many of the required disclosures;[23] and (5) the ultrasound requirements. *See* Ind. Code § 16-34-2-1.1(a).

       Plaintiffs' claims in this category are premised on the following fact: the "decision of whether and when to remain pregnant and give birth has significant implications for a person. It affects, among other things, the person's bodily integrity, autonomy, financial and job security, workforce participation, educational attainment, ability to parent existing children, and health." [Comp. ¶ 28; Def. Br., p. 15]. For some women, this decision-making process may well be "stressful and complex." [Exp. Rep. Coleman, ¶ 183]. But not necessarily for all. By ensuring that all women "consider the risks, benefits, and potential short-term and long-term consequences" of their options regarding motherhood, Indiana has enacted specific safeguards as part of their providing "voluntary and informed" consent. Ind. Code § 16-34-2-1.1(a).

    *1.  The Disclosure Requirements*

---

[22] Our discussion of this requirement has previously been set out at pages 39-43.

[23] The State does not address this portion of Plaintiffs' Complaint; thus, we forego any discussion as well.

Indiana requires that at least eighteen hours prior to an abortion and "in the private, not group, presence of the pregnant woman," a physician or APC must provide orally and in writing certain information to the patient. This information includes the name of the physician performing the abortion; any potential danger to the patient's subsequent pregnancies or infertility; the fact that human physical life begins when a human ovum is fertilized by a human sperm; and that "objective scientific information" indicates that a fetus can feel pain at or before twenty weeks gestation. The patient must be informed, again orally and in writing, that she has a right to determine "the final disposition of the remains of the aborted fetus" and to receive information "concerning the available options for disposition of the aborted fetus." *Id.* § 16-34-2-1.1(a)(2)(H)-(I). Patients are required to certify in writing that they have received this information. *Id.* § 16-34-2-1.1(a)(3).

Eighteen hours prior to the abortion, patients must also be provided a color copy of Indiana's "Informed Consent Brochure," *id.* § 16-34-2-1.1(a)(4), which sets out much of the information referenced above.

A patient who has received a diagnosis of a lethal fetal anomaly (that is, a condition likely to be fatal before birth or shortly thereafter) must receive additional disclosures. Again, at least eighteen hours prior to an abortion, "the physician who will perform the abortion" must "orally and in person, inform the pregnant woman of the availability of perinatal hospice services" and provide her with copies of the State's "Perinatal Hospice Brochure" and "list of perinatal hospice providers and programs." *Id.*

§ 16-34-2-1.1(b). If the woman chooses to proceed with the abortion, she must certify in writing that she received these materials. *Id.* § 16-34-2-1.1(b).

These disclosure requirements, according to Plaintiffs, require distribution of materials that are "inaccurate, misleading, or ideologically charged" as well as often irrelevant to her personal circumstances. Forcing such information on a patient does not facilitate her decision or her involvement in the informed consent-process. It certainly does not lead to more thoughtful decision-making. In fact, it may cause her to "tune out or lose trust in the process," thereby undermining the entire purpose of informed consent. [Wocial Dec. ¶¶ 16-24; Dec. McKinney, ¶¶ 24-28; Dec. Grossman, ¶¶ 101-102; Dec Herr ¶¶ 47-48; Dec Hutson, ¶¶ 12-13].

Plaintiffs explain that mandating information related to the disposal of fetal tissue and requesting patients to select options for disposal using the provided form is confusing and unfairly upsetting for patients receiving medication abortion (who will typically pass the tissue at home over the toilet), leading them to believe they somehow must collect their fetal tissue and return it to the abortion clinic. [Dec. Hagstrom Miller, ¶ 303; Dec. McKinney, ¶ 24; Dec. Herr, ¶ 32]. The litany of required information required is also "overwhelming and difficulty to contextualize," requiring providers to go through a checklist of recitals which, at best, would inform patients of only *de minimis* risks, such as "the potential danger to a subsequent pregnancy" and "the potential danger of infertility." Ind. Code § 16-34-2-1.1(a)(1)(D)(ii)-(iii). [Dec. Dr. Wocial, ¶ 20].

Some of the mandated disclosures, say Plaintiffs, also appear in Indiana's informed consent brochure and are plainly false or misleading, for example, the statement that

"human physical life begins when a human ovum is fertilized by a human sperm." Ind. Code § 16-34-2-1.1(a)(1)(E). There is no medical consensus as to the moment in time or biology when "life" actually begins. [Dec. Dr. Grossman, ¶ 102]. This mandatory disclosure cloaks personal or religious beliefs regarding life's beginning as scientific, medical fact as to the formation of a developing embryo or fetus. Hence, it requires transmission of a "deeply ideological" opinion under the guise of medical fact. [*Id.*; Dec. Dr. Wocial, ¶ 18; Dec. McKinney, ¶ 23].

The State, of course, disagrees, arguing that this specific factual assertion is not "scientifically controversial." While agreeing that references to "human life" can be problematic, this requirement attempts to limit any offense or error by arguing that the disclosure's reference is simply to "human *physical* life" and, as such, is nothing more than a biological statement that makes no philosophical claim regarding the personhood of the embryo or fetus. [Exp. Rep. Kheriaty, ¶¶ 60-61].

Plaintiffs also object to the statutory requirement that abortion providers must tell their patients that "objective scientific information shows that a fetus can feel pain at or before twenty (20) weeks of postfertilization age," Ind. Code § 16-34-2-1.1(a)(1)(G). Plaintiffs contend that this alleged fact is actually a "minority view in the medical community" and that the ACOG and RCOG have determined that a human fetus does not have the capacity to experience pain until 24 weeks gestation. The State counters, with science, arguing that the "neural circuitry capable of detecting and responding to pain" is developed between 10-12 weeks lmp and that between 14-20 weeks lmp, "spinothalamic

circuitry develops that is capable of supporting a conscious awareness of pain." [Exp. Rep. Condic, ¶ 10].

Plaintiffs also challenge the scientific validity of assertions set out in the Perinatal Hospice Brochure. They regard as false and misleading, for example, the suggestion that continuing a pregnancy is medically safer than having an abortion. According to Plaintiffs, this information is simply untrue, asserting that there is no risk of death or complications associated with abortion in the circumstances described in the brochure. Similarly, they say, the brochure represents that abortion is associated with worse mental health outcomes than experienced in carrying a pregnancy to term; Plaintiffs firmly dispute this. [*See supra*, at 20-21].

## 2. *The Eighteen-Hour Requirement*

As we have noted, each of the above-mentioned required disclosures must be provided eighteen hours prior to an abortion. Plaintiffs contend that this period of delay does not enhance or facilitate patient decision-making. Many women are firm in their decisions to terminate their pregnancies when they first visit an abortion clinic. [Exp. Dec. Grossman, ¶¶ 109-110, 113-14; Dec. Herr, ¶¶ 46-48; Dec. Hutson, ¶ 12]. Those who are not so resolute are identified and screened pursuant to the informed consent process. In such circumstances, the healthcare provider, operating under Indiana's general standards governing informed consent, must refrain from proceeding with the abortion and advise the patient to take more time in reaching her decision. Thus, patients who arrive at the clinic firm in their decisions will receive prompt care, while patients who are

not certain receive the state prescribed support in making their decisions. [Exp. Dec. Grossman, ¶¶ 110-11].

As Dr. Grossman explains, research focused on Texas and Utah's delay requirements has shown that waiting periods do not dissuade women from obtaining abortions, given that most women have already deliberated on this decision prior to seeking services. [*Id.* ¶¶ 113-16]. This requirement, coupled with the In-Person Counseling Requirement and the Telemedicine Ban, thus needlessly requires many women either to make two trips to their abortion provider or stay overnight in the city where they are able in order to access these services.

Though many women may be confident in their decisions, many women are not, counters the State. Its data show that "44% of women have doubts about their decision to abort prior to an appointment for an abortion, with 30% continuing to express doubts on the date of the abortion." [Exp. Rep. Coleman, ¶ 74]. The State takes issue with Plaintiffs' research data based on studies out of Utah, citing contrary conclusions that 8% to 10% of women change their minds during Utah's 72-hour waiting period. [*Id.* ¶ 81]. The waiting period thus helps women "choose the best outcome[s] for their personal situations, seek counseling, and enhance the probability of preserving their mental health and general sense of well-being." [*Id.* ¶ 185].

One more factor, say Plaintiffs: if a woman is unable to travel on consecutive days, her abortion care may be delayed, sometimes up to two weeks, depending on the clinic. If the physician whose name was provided to the patient in compliance with Indiana law has become unavailable on the day the patient is able to return for abortion

care, the patient will likely be delayed even longer. [Hagstrom Miller, ¶¶ 57, 63, 103-104].

### 3. Ultrasound Requirement

Prior to an abortion, Indiana law stipulates that "the provider shall perform, and the pregnant woman shall view, the fetal ultrasound imaging and hear the auscultation of the fetal heart tone if the fetal heart tone is audible," unless the patient certifies in writing, before the abortion, that she declines to do so.  Ind. Code. § 16-34-2-1.1(a)(5) (the "Ultrasound Requirement").

The State asserts that the Ultrasound Requirement ensures adequate care to women seeking abortions by increasing the chances that a provider will notice a maternal or fetal abnormality and also verifying the gestational age of the fetus.  Plaintiffs do not challenge the importance of accurate determinations of gestational age via ultrasound. Indeed, the ACOG recommends ultrasound procedures to determine due dates and gestational age. [*See* Def. Exh. 27, American College of Obstetricians and Gynecologists, *Committee Opinion: Methods for Estimating the Due Date* (May 2017)]. Accurate gestational age is also necessary, for example, to inform providers on the proper from of abortion and to verify the viability of the fetus.

The parties' views diverge as to whether the Ultrasound Requirement enhances patients' decision-making.

The State maintains that an ultrasound—which allows a woman to see an image of as well as hear her fetus—is crucial to her decision of whether to terminate her pregnancy. Hearing the heartbeat or observing the fetus allows a woman to appreciate the

potential life of the fetus, further informing her consent to terminate her pregnancy. [Exp. Rep. Calhoun, ¶ 159; Exp. Rep. Stroud, ¶ 52]. The State buttresses its opinion with testimonials from women who reportedly and belatedly say the wish they had had the opportunity to observe their fetuses, claiming that they likely would have made different choices. [*See.* Def. Exh. 5]. Indeed, the State cites data to support this theory, to wit, that a woman who views an ultrasound is 1.86 times more likely to continue her pregnancy than a woman who does not. [Exp. Rep. Farr, ¶ 94]. The facts relating to the fetus's age, viability, and location must also be communicated to her in order to obtain her informed consent.

Plaintiffs argue that ultrasounds do not enhance decision-making, citing findings from two studies to that effect—one focused on a Los Angeles clinic and the other focused on abortions patients in Wisconsin. Plaintiffs further criticize the "requirement that the patient affirmatively opt out of viewing the ultrasound or listening to the heartbeat" as "cruel and insensitive." [Dec. Wocial, ¶¶ 21-22].

Plaintiffs' challenges to Indiana's ultrasound requirement are raised in the context of informed consent. They also criticize the Ultrasound Requirement on the grounds that it requires some patients to receive duplicative ultrasounds because abortion providers must rely on an ultrasound performed only by an affiliated physician or technician.

D.  Parental Consent Law

Indiana's "Parental Consent Law" provides that, when a pregnant, unemancipated minor (that is, an adolescent girl under the age of eighteen) seeks an abortion, the physician who provides that abortion must obtain written consent from one of the minor's

parents or legal guardians. Ind. Code § 16-34-2-4. The statute creates an exception allowing a pregnant minor to petition a juvenile court for an exemption from the parental consent requirement ("Judicial Bypass"). Ind. Code § 16-34-2-4(b). The Judicial Bypass provision requires a judicial waiver of parental consent "if the court finds that the minor is mature enough to make the abortion decision independently," or "that an abortion would be in the minor's best interests." Ind. Code § 16-34-2-4(e). This statute requires that "[a]ll records of the juvenile court and of the supreme court or the court of appeals that are made as a result of proceedings conducted under this section are confidential," § 16-34-2-4(h) and that "[t]he juvenile court must rule on a petition filed by a pregnant minor . . . within forty-eight (48) hours of the filing of the petition." *id.* § 16-34-2-4(e). It also provides that the minor "is entitled to an expedited appeal," *id.* § 16-34-2-4(g).

In 2017, Indiana enacted a separate statute prohibiting "the state or an agency of the state" from consenting to an abortion for any pregnant minor in its custody "unless the abortion is necessary to avert the pregnant minor's death or a substantial and irreversible impairment of a major bodily function of the pregnant minor, as determined by a physician who certifies the determination in writing." Pub. L. No. 173-2017, § 3, 2017 Ind. Acts 1703-04 (codified at Ind. Code § 16-34-1-10). Accordingly, every minor, disadvantages already by being in state custody, who has an unwanted pregnancy must go through the Judicial Bypass process.

### E. Criminal Penalties

The majority of the abortion statutes under Indiana law are enforced through criminal penalties in addition to professional sanctions and civil liability. *See* Ind. Code

§§ 16-21-2-2.5(b), 16-34-2-1, 16-34-2-5(d), 16-34-2-7. For example, abortion providers are subject to criminal liability for non-compliance with administrative requirements, such as failing to "retain a copy of the signed patient agreement form, and the signed physician's agreement form required by the manufacturer [of Mifeprex], in the patient's file." Ind. Code § 16-34-2-1(a)(1); *see also id*. 16-34-2-7(a). In no other healthcare context are healthcare providers subject to criminal penalties for such failures; any sanctions are limited to disciplinary actions against them by their professional licensing boards. *See* Ind. Code § 25-1-9-4. The potential for criminal penalties likely deters qualified, pro-choice physicians from providing abortion care. [Dec. Hagstrom Miller, ¶¶ 110-11].

## Analysis

We proceed now to our review of the specific issues raised in the State's motion for summary judgment.

### I.   Standard of Review

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences

flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

In this lawsuit, Plaintiffs have waged a global challenge to no fewer than twenty-five sections and subsections of the Indiana Code, faulting each as facially violative of the Fourteenth Amendment's Due Process and Equal Protection Clauses. Plaintiffs also attack several of these statutes as violative of the First Amendment rights possessed by abortion providers. Plaintiffs challenge certain statutory and regulatory provisions as well as unconstitutionally vague. We have previously addressed the State's challenges to Plaintiffs' standing. [*Supra,* at 6-9]. We turn now to a consideration of the State's entitlement *seriatim* to summary judgment on Plaintiffs' Due Process (section II), Equal Protection (section III), First Amendment (section IV), and Vagueness (section V) claims.

## II.   Whether the Challenged Statutes Withstand Plaintiffs' "Undue Burden" Arguments Under the Due Process Clause, Thereby Entitling the State to Summary Judgment

The vast majority of Plaintiffs' claims in this lawsuit focus on the issue of whether Indiana's abortion regulations are facially violative of the Fourteenth Amendment's Substantive Due Process Clause. In conducting our analysis, we begin with a review of (A) the Supreme Court's recent decision in *June Medical*, followed by (B) an analysis of the merits of each of the due process claims presented here.

### A.   June Medical *Does Not Provide a New Controlling Rule*

Well-entrenched precedent recognizes that among the liberties protected by the Due Process Clause is a woman's freedom from state-required motherhood. *See, e.g.,*

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309–10 (2016); *Lawrence v. Texas*, 539 U.S. 558, 565, 573–74 (2003); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851–53, 872 (1992); *Roe v. Wade*, 410 U.S. 113, 152–54 (1973).

That liberty—first recognized by the Supreme Court's decision in *Roe v. Wade*, which declared unconstitutional Texas's criminalization of abortion—is protected from state deprivation without due process of law in part through guarantees of a pregnant woman's freedom to choose whether to terminate her pregnancy before fetal viability and, if so, to do so without undue state interference. *Casey*, 505 U.S. at 871 (joint op. of O'Connor, Kennedy, Souter, JJ.[24] [hereinafter joint op.]) (reaffirming *Roe*'s "most central principle," "[t]he woman's right to terminate her pregnancy before viability"). Without exception, "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Id.* at 879 (joint op.). *Accord id.* at 846 (maj. op.). Thus, any law  is deemed that imposes "an 'undue burden' on a woman's right to decide to have an abortion . . . is constitutionally invalid, if the 'purpose or effect' of the provision 'is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'" *Hellerstedt*, 136 S. Ct. at 2300 (emphasis omitted) (quoting *Casey*, 505 U.S. at 878 (joint op.)). "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877 (joint op.).

---

[24] The joint opinion constitutes the holding of the *Casey* Court in relevant part under *Marks v. United States*, 430 U.S. 188, 193–94 (1977).

The test for determining whether a law or regulation poses an undue burden has been disputed by the parties before us, each drawing support for its respective view from the Supreme Court's recent decision in *June Medical Services v. Russo*, 140 S. Ct. 2103 (2020). The impact, if any, of *June Medical* on the undue burden analysis requires us to carefully examination the Court's opinion in *Hellerstedt*, handed down four years prior, in 2016.

*Hellerstedt* involved a constitutional challenge to a Texas statute requiring all physicians performing abortions to have "active admitting privileges at a hospital . . . located not further than 30 miles from the location at which the abortion is performed." 136 S. Ct. at 2300. In *Hellerstedt*, the Court reiterated the core tenant of its 1992 decision in *Casey*: "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right" and are therefore "constitutionally invalid." *Id.* at 2300 (internal quotations omitted). The Supreme Court explained further that "the rule announced in *Casey*" "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* at 2309. The *Hellerstedt* Court held that the record adequately supported the district court's conclusion that, when considering the minimal benefits provided by the statute in comparison to its significant burdens, the statute placed a substantial obstacle in the way of a "large fraction" of women seeking abortion, thereby creating an unconstitutional undue burden. *Id.* at 2312 (*citing Casey*, 505 U.S. at 895 (maj op.) (finding burden to be "undue" when requirement places "substantial obstacle to a woman's choice" in "a large fraction of the cases in which" it "is relevant").

Four years after the ruling in *Hellerstedt* was handed down, the Supreme Court in *June Medical* confronted a facial challenge to a Louisiana statute it viewed as "nearly identical" to the Texas statute at issue in *Hellerstedt*. *June Med.* 140 S. Ct. at 2139 (Roberts, J., concurring). Five justices—Justice Breyer, Justice Ginsburg, Justice Sotomayor, Justice Kagan (plurality), and Chief Justice Roberts (concurring)—concluded that Louisiana's admitting privileges requirement imposed an unconstitutional substantial burden on women in Louisiana. The plurality reiterated that the undue burden standard, as articulated in *Casey* and *Hellerstedt*, requires courts to carefully review the evidentiary record before considering a statute's burdens together with its benefits. *Id.* at 2120 (plurality op.) (citing *Hellerstedt,*136 S.Ct. at 2310, 2324). The plurality concluded that the district court had "faithfully applied" these standards and, following the Supreme Court's own review of the burdens and benefits imposed by the statute as evidenced by the factual record, upheld the district court's findings that Louisiana's admitting privileges requirement imposed an "undue burden" on a woman's right to choose an abortion. *Id.*

Though Chief Justice Roberts had joined the dissent in *Hellerstedt* and thereafter maintained in *June Medical* that *Hellerstedt* was wrongly decided, he nonetheless concluded that the Louisiana statute could not survive under principles of *stare decisis.* *Id.* at 2133–34 ("The question today however is not whether *Whole Woman's Health* was right or wrong  but whether to adhere to it in deciding the present case . . . The legal doctrine of *stare decisis* requires us, absent special circumstances, to treat like cases alike."). Accordingly, he joined the plurality in holding the Louisiana statute

unconstitutional, stating that it "imposes a burden on access to abortion just as severe as that imposed by the Texas law, for the same reasons." *Id.* at 2133.

In reaching this conclusion, the Chief Justice rejected the argument that *Casey* mandated any sort of balancing test, or that the Court in either *Casey* or *Hellerstedt* conducted such a balancing test in reaching the respective constitutional conclusions. "[T]he only question," in cases such as these, is whether the statute places "a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus," wrote the Chief Justice. *Id.* at 2138. Because *Hellerstedt* concluded that the Texas statute imposing admitting privileges placed such a substantial obstacle, "independent of its discussion of benefits,"[25] the Chief Justice concluded that the virtually identical Louisiana statute, imposing identical burdens, must be ruled unconstitutional as well under the doctrine of *stare decisis. Id.* at 2141–42.

The question before us here, therefore, is whether, in light of the Chief Justice's concurring opinion with respect to his interpretation of the undue burden standard, his approach eschewing any balancing process operates as the Supreme Court's current governing rule.

---

[25] We note that the Chief Justice's interpretation of *Hellerstedt* in this regard was criticized by dissenting members of the Court. As Justice Gorsuch wrote, "At no point did the Court hold that the burdens imposed by the Texas law alone—divorced from any consideration of the law's benefits—could suffice to establish a substantial obstacle. To the contrary, *Whole Woman's Health* insisted that the substantial obstacle test 'requires that courts consider the burdens a law imposes on abortion access together with the benefits th[e] la[w] confer[s]' . . . And whatever else respect for *stare decisis* might suggest, it cannot demand allegiance to a nonexistent ruling inconsistent with the approach actually taken by the Court." 140 S. Ct. at 2181 (Gorsuch. J., dissenting) (internal citations omitted)

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal citations omitted). The *Marks* rule does not apply, however, when "a concurrence that provides the fifth vote necessary to reach a majority does not provide a 'common denominator' for the judgment.'" *Gibson v. Am. Cyanamid Co.*, 760 F.3d 600, 619 (7th Cir. 2014) (quoting *United States v. Heron*, 564 F.3d 879, 884 (7th Cir. 2009) (collecting cases)). "This means that *Marks* applies 'only when one opinion is a logical subset of other, broader opinions.'" *Id.* (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)). Without "a single standard that legitimately constitutes the narrowest ground for a decision on that issue," there is "no law of the land because no one standard commands the support of a majority of the Supreme Court." *Id.* (internal quotations and citation omitted). We interpret this guidance to mean that for the Chief Justice's opinion to provide a controlling rule, we must be able to say that his opinion reflects the narrowest grounds of a common denominator shared with the plurality.

The parties dispute whether any such "common denominator" exists here that operates to overrule the test previously announced by the Supreme Court. The State asserts that the plurality in *June Medical* along with the Chief Justice's opinion anchored their combined analyses to *Casey*'s standard mandating the enjoining of a state law if it creates a substantial obstacle to choosing an abortion. This unifying tie to *Casey* provides

the common denominator between the five Justices in *June Medical*, according to the State.

Plaintiffs disagree that there is common denominator between the plurality and the concurrence regarding *how* to determine whether a law violates the undue burden standard. They argue that though the plurality and the Chief Justice ultimately agreed that the Louisiana statute was unconstitutional, they diverged over the test employed in reaching this result. Because of this divergence, Plaintiffs contend, the opinions lack any common denominator with respect to the method that must be applied in analyzing the constitutionality of an abortion statute.

Of the two lower courts we have identified—the Fifth Circuit and the District of Maryland—who have addressed this "common denominator" question, both have agreed with Plaintiffs' interpretation.[26] *Whole Woman's Health v. Paxton*, 972 F.3d 649 (5th Cir. 2020); *Am. Coll. of Obstetricians & Gynecologists v. United States Food & Drug Admin.*, No. TDC-20-1320, 2020 WL 3960625, at *16, *appeal docketed*, (D. Md. July 13, 2020) (hereinafter, "*ACOG*"). We therefore adopt that approach as well, persuaded by its merit.

---

[26] The State directs us to the Eight Circuit's holding in *Hopkins v Jegley*, which held the Chief Justice's concurrence to be controlling. However, the Eighth Circuit did not address whether there was a "common denominator" or "common ground" between the opinions. This decision is thus inapt in our determination of whether a common denominator exists, since the Eight Circuit conducted no such analysis. *Hopkins v. Jegley*, 968 F.3d 912, 914 (8th Cir. 2020). Additionally, the Eighth Circuit relied on the dissents in tallying the "five Members of the Court reject[ing] the *Whole Woman's Health* cost-benefit standard," which, as we will discuss, the Seventh Circuit has instructed us not to do. *Id.* at 915. Accordingly, we hold that *Hopkins* does not support a finding of commonality between the *June Medical* plurality and the concurrence as it pertains to the undue burden standard.

Where the two views comprising *June Medical*'s majority opinion find common ground is in their conclusion that the Louisiana statute imposed an undue burden on a woman's right to access abortion. That conclusion, so far as we can determine, is the *only* commonality between the two opinions with respect to the merits of the dispute.[27] *Paxton*, 972 F.3d at 652; *ACOG,* 2020 WL 3960625, at *16. They obviously disagree on the proper way to reach those respective conclusions. The plurality's decision holds that the statute was unconstitutional based on a weighing of its benefits against its obstacles; in contrast, the concurrence anchored its result to principles of *stare decisis* and "expressly disavowed the plurality's test." *Paxton*, 972 F.3d at 653 (citing *June Med.*140 S. Ct. at 2136 (Roberts, J., conc. op)). The Chief Justice specifically ruled that neither *Hellerstedt* nor *Casey* required weighing a statute's benefits alongside its burdens, a view plainly not shared by the plurality who praised the district court's faithful weighing of the benefits and burdens in adherence to *Hellerstedt* and *Casey. Compare June Med.*, 140 S. Ct. at 2132, *with id.* at 2141-42; *see Heron*, 564 F.3d at 884 (quoting *King*, 950 F.2d at 781 ("[I]n essence, the narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices who support the judgment.")) [28]

---

[27] The plurality and the concurrence are in complete agreement as to the question of third-party standing.

[28] The State also argues that Chief Justice Roberts' opinion shares common ground, and thus forms a controlling opinion, with the four dissenting justices, each agreeing that *Casey* should not be construed as requiring a balancing test. However, "under *Marks*, the positions of those Justices who *dissented* from the judgment are not counted in trying to discern a governing holding from divided opinions." *Gibson*, 760 F.3d at 620 (emphasis in original).

Because the plurality and concurring opinions applied differing undue burden tests and neither can be considered a logical subset of the other (indeed, the opinions are in direct controversy with one another on this point), we reject the State's argument that the plurality and the concurrence in *June Medical* encompassed a common holding regarding the proper application by the lower courts of the undue burden standard. [29]

Accordingly, we conclude that *June Medical* did not hand down a new controlling rule for applying the undue burden test in abortion cases. We thus shall apply the constitutional standards set forth in the Supreme Court's earlier abortion-related jurisprudence, in particular, *Casey* and *Hellerstedt.* At the risk of unnecessary repetition, we shall repeat these standards once more. In *Casey* and *Hellerstedt*, the Supreme Court explained that "a statute which, while furthering a valid state interest has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Hellerstedt*,  136 S.Ct., at 2309

---

[29] The State further argues that the Supreme Court's decision, in light of *June Medical*, to grant, vacate, and remand (GVR) two petitions for *certiorari*, both arising from cases challenging Seventh Circuit decisions enjoining Indiana laws based on the appellate court's weighing of benefits and burdens, demonstrates that a majority of the *June Medical* Justices believes that the Chief Justice's opinion is controlling Otherwise, they say, the Supreme Court could have denied *certiorari*. However, GVRs are simply "an efficient way for the Supreme Court to obtain the views of the lower courts on the effect of a new decision, whatever those views may be." *Klikno v. United States*, 928 F.3d 539, 544 (7th Cir. 2019) (rejecting argument that GVR "signaled that [] earlier decisions . . . were wrong"). Though a GVR mandates "further thought with the benefit of the pertinent Supreme Court opinion," it does not carry with it "some kind of presumption that the result should change." *Id.*; *see also File v. Kastner,* 2020 WL 3513530, at *4 (E.D. Wis. June 29, 2020) ("[T]he Court's entering a GVR order does not grant lower courts permission to overrule Supreme Court precedent. All a GVR order does is signal that the Supreme Court would like the lower court to reconsider its vacated decision in light of the new precedent.") *Tamas v. Family Video Movie Club, Inc.,* 2013 Wage & Hour Cas. 2d (BNA) 124604 (N.D. Ill. Aug. 13, 2013) (noting that GVRs do not "indicate, nor even suggest, that the lower court's decision was erroneous."). We therefore reject this argument by the State.

(internal quotations omitted) (quoting *Casey*, 505 U.S. at 877 (joint op.)). The *Hellerstedt* Court added that "[u]nnecessary health regulations" impose an unconstitutional "undue burden," if they have "the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion." 136 S.Ct., at 2309 (quoting *Casey*, 505 U.S. at 878 (joint op.)). In applying these standards, we "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Hellerstedt*, 136 S. Ct. at 2309.

*Hellerstedt* also directs lower courts to "review legislative 'factfinding' under a deferential standard," but not to "'place dispositive weight' on those 'findings'" because courts "retai[n] an independent constitutional duty to review factual findings where constitutional rights are at stake." 136 S. Ct. at 2310 (*quoting Gonzales*, 550 U.S. 124, 165 (2007) (noting that courts afford legislatures discretion in areas of medical and scientific uncertainty)). If evidence presented to the court contradicts legislative findings, "uncritical deference . . . is inappropriate." *Hellerstedt,* 136 S. Ct. at 2310 (*quoting Gonzales*, 550 U.S. at 165). Moreover, when, as here, the relevant statutes do not set forth legislative findings, courts should give "significant weight to evidence in the judicial record," including "expert evidence, presented in stipulations, depositions, and testimony." *Hellerstedt*, 136 S. Ct. at 2310; *see also Whole Woman's Health All. v. Hill*, 937 F.3d 864, 876, 2019 WL 3949690 (7th Cir. 2019), cert. denied, 2020 WL 3578684 (U.S. July 2, 2020) ("The [*Hellerstedt*] Court stated that the undue-burden inquiry requires a holistic, rigorous, and independent judicial examination of the facts of a case to determine whether the burdens are undue in light of the benefits the state is permitted to pursue.")

64

The benefits of a law are measured against the state's legitimate interests in this field. First, "[a]s with any medical procedure, the State may enact regulations to further the health and safety of a woman seeking an abortion." *Casey*, 505 U.S. at 878 (joint op.). Second, the state has a legitimate interest in preserving a life that may one day become a human being. *Id.* To promote that interest, the state may enact measures to ensure the woman's choice is philosophically and socially informed and to communicate its preference (if it has one) that the woman carry her pregnancy to term. *Id.* at 872 (joint op.). But such measures "must be calculated to inform the woman's free choice, not hinder it[,]" and even if so calculated may not present a substantial obstacle to its exercise. *Id.* at 877 (joint op.). Third, the state may choose to further the same interest by enacting measures "'protecting the integrity and ethics of the medical profession' . . . in order to promote respect for life," *Gonzales v. Carhart*, 550 U.S. 124, 158 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997)), but such measures equally may not impose undue burdens. *Id.*

The burdens of a law are measured by their impacts on women for whom they pose a relevant restriction on the choice to seek a previability abortion. *Hellerstedt*, 136 S. Ct. at 2313; *Casey*, 505 U.S. at 895 (maj. op.). "The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Casey*, 505 U.S. at 895. If the impacts amount to a substantial obstacle to the abortion decision for a "large fraction" of that group, the burdens imposed are undue. *Hellerstedt*, 136 S. Ct. at 2313; *Casey*, 505 U.S. at 895.

The court then turns to determining whether the burdens of the law's requirements

are "disproportionate, in their effect on the right to an abortion" compared "to the benefits that the restrictions are believed to confer." *Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 919 (7th Cir. 2015). To determine whether a burden is undue, the court "must weigh the burdens against the state's justification, asking whether and to what extent the challenged regulation actually advances the state's interests. If a burden significantly exceeds what is necessary to advance the state's interests, it is 'undue,'" and thus unconstitutional. *Id.* at 919–20.

Hellerstedt ratified *Schimel*'s conclusion that *Casey* balancing is not conducted under a simple preponderance standard. Rather, when striking down provisions of law as imposing undue burdens on the previability abortion right, the Supreme Court and the Seventh Circuit have found the state's asserted legitimate interests to be nil or their marginal advancement *de minimis*, and the burdens on the abortion right to be substantial. *Hellerstedt*, 136 S. Ct. at 2311–13; *id.* at 2318; *Casey*, 505 U.S. at 887–898 (joint op.); *Schimel*, 806 F.3d at 916. At the same time, the Seventh Circuit has cautioned that, when an abortion-restriction statute is sought to be justified on medical grounds, "the feebler the medical grounds . . . the likelier is the burden on the right to abortion to be disproportionate to the benefits and therefore excessive." *Schimel*, 806 F.3d at 920.

Before proceeding with our analysis of the Indiana abortion laws, we address one final dispute between the parties with relating to the proper scope of our undue burden analysis. Plaintiffs' Complaint asserts that Indiana's abortion laws "collectively[] impose an undue burden on access to previability abortion in Indiana." The State requests that we reject this "cumulative burdens theory" and instead evaluate "one statute or regulation at

a time." In response, Plaintiffs deny that they have framed a "cumulative burdens claim," confirming that they "simply ask the Court to evaluate the constitutionality of each challenged law[.]" That said, Plaintiffs do maintain that this evaluation requires consideration of "real-world context," which necessarily "includes constraints on abortion access imposed by other laws." We thus understand that Plaintiffs are not asking the Court to hold that the statutes are cumulatively unconstitutional. *See In re Gee* 941 F.3d 153 (5th Cir. 2019) (denying plaintiffs' argument that "the [challenged] provisions taken as a whole were unconstitutional, even if the individual provisions were not."). Accordingly, we will proceed with an independent evaluation of each statute independently. In so doing, we will not follow the State's admonition that we must refrain from considering the burdens of an individual statute against the backdrop of the "real-world context." *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786, 796 (7th Cir. 2013) ("When one abortion regulation compounds the effects of another, the aggregate effects on abortion rights must be considered.").

### B. The State Is Entitled to Summary Judgment on Some but Not All of Plaintiffs' Due Process Claims

As noted at the outset, Plaintiffs' Complaint challenges virtually the entire panoply of Indiana statutes regulating abortions, many of which, they say, are facially unconstitutional because they pose undue burdens on a woman's ability to access a previability abortion, as prohibited by the Due Process Clause of the Fourteenth Amendment. The State resists these challenges, asserting the appropriateness of summary judgment for those specific challenges of statutes, or some versions thereof, which have

previously been judicially upheld as facially constitutional. (The State's motion also addresses Plaintiffs' other claims).

The State asserts, and Plaintiffs do not dispute, that *Hellerstedt* did not change the applicable test for abortion statutes; it simply applied the undue burden test from *Casey. Hellerstedt,* 136 S. Ct. at 2309 ("We begin with the standard, as described in *Casey.*").[30] "Hellerstedt, therefore, does not wipe out the Supreme Court's prior abortion precedents applying the *Casey* standard," explains the State, in seeking to sidestep further judicial review of those decisions.

Indeed, the Seventh Circuit invoked various pre-*Hellerstedt* precedents in its decision affirming (with modifications) the preliminary injunction in this case. Specifically, when discussing the extent to which our original preliminary injunction—in which we determined that the Health Department had applied the state's licensure requirements to WWHA in an unconstitutional manner—was a judicial overreach by enjoining complete enforcement of Indiana's licensing scheme with respect to WWHA's South Bend Clinic, the Seventh Circuit relied on numerous cases spanning decades to hold that, "the Supreme Court has recognized that states may require licenses of abortion care providers." *Whole Woman's Health All. v. Hill*, 937 F.3d 864, 874, 2019 WL 3949690 (7th Cir. 2019), *cert. denied*, 2020 WL 3578684 (U.S. July 2, 2020). Because these cases remain good law, the State asserts, it is entitled to summary judgment on

---

[30] The State appears to assume that Plaintiffs reject the interpretation of *Hellerstedt* in this regard; however, no objection is discernable by us from Plaintiffs' briefing. Plaintiffs argue that the challenged laws must be reviewed within their current factual context, regardless of whether they were previously found to be constitutional.

Plaintiffs' challenges to any statutes similar to those previously upheld by the Supreme

Court or the Seventh Circuit, without further review by us here. [31]

Plaintiffs do not contest the State's general description of *Hellerstedt*'s holding: to

wit, that it did not overrule those abortion precedents that preceded it. However, they do

disagree with the State's position that the challenged statutes are foreclosed from further

judicial review, noting that "both *Whole Woman's Health* and *Casey* stress that the undue

burden test is context specific." [Dkt. 234, at 63 (quoting *Planned Parenthood of Indiana*

*& Kentucky, Inc. v. Comm'r of Indiana State Dep't of Health*, 896 F.3d 809, 817, 2018

WL 3567829 (7th Cir. 2018), *cert. granted, judgment vacated sub nom. Box v. Planned*

*Parenthood of Indiana & Kentucky, Inc*., 20 Cal. Daily Op. Serv. 6358 (U.S. July 2,

2020)].

We do not accept the State's broad reading of *Hill* that it requires *all* statutes (or

similar versions thereof) previously upheld as facially constitutional to continue to be

enforced without further review and regardless of any changes in the relevant, then-

existing circumstances. As Plaintiffs have argued, one judicial determination that a

specific abortion law poses no undue burdens to one group of women at a prior time and

place does not foreclose a subsequent finding that a similar abortion law does impose

such an undue burden on a group of women in another time and place. The burdens of an

---

[31] The State also broadly asserts that *Hellerstedt* applies only to challenges to newly enacted laws, none of which are at issue here. The State, however, does not direct us to any language in *Hellerstedt* that supports this construction, nor do we interpret *Hellerstedt* to require as much. We also disagree that the Seventh Circuit's decision in *Hill* supports a conclusion that we should not consider the benefits of the challenged statutes alongside their burdens, as the State seems to imply.

abortion law can change over time as medical technology and research evolve, as the population demographics of a state change, or as other abortion regulations are adopted or amended.

Whether a statute or regulation poses an undue burden on a woman's constitutional right to receive an abortion depends on the then-existing circumstances. *See Hellerstedt*, 136 S. Ct. at 2306; *Casey*, 505 U.S. at 887 (joint op.) ("[O]n the record before us, and in the context of this facial challenge, we are not convinced that the 24-hour waiting period constitutes an undue burden."). Nowhere in *Hill* does the Seventh Circuit direct that further review of challenged statutes previously upheld be suspended. We reject the State's assertion to this effect. The State's approach would insulate any statute previously found constitutional from subsequent judicial review, regardless of advancements in medicine, changes in population demographics, or other factors relating to women's access to abortion.

That said, for a Court to depart from precedential holdings with respect to any area of law, including but not limited to abortion laws, Plaintiffs bringing such actions must muster sufficient facts or evidence of changed circumstances to warrant renewed judicial review. Our review, therefore, shall address whether at this juncture the State is entitled to summary judgment on any of Plaintiffs' undue burden claims.

    1.   *The State is Entitled to Summary Judgment on Plaintiffs' Due Process Claims Related to Indiana's Clinic Licensure, Inspection, and Facility Requirements*

As noted above, the Seventh Circuit has previously ruled in this very case that Indiana is constitutionally permitted to require abortion clinics to be licensed. *Hill*, 937

F.3d at 874–75. Nonetheless, Plaintiffs renew their claim that Indiana's Licensure Requirement poses an undue burden to women's access to abortion in Indiana. A review of the Seventh Circuit's holding in *Hill* informs our analysis here.

The Seventh Circuit in *Hill* wrote: "State licensing regimes are ubiquitous . . . Generally speaking, those regimes fall comfortably within the state's police power; only rarely do they impinge on citizens' fundamental constitutional rights." *Id.* at 874. "[T]he state's power to license abortion care providers stretches back to *Roe v. Wade*'s companion case, *Doe v. Bolton*, 410 U.S. 179, 200–01 (1973)," and the Supreme Court has continued to "confirm the legitimacy" of licensure requirements. *Id.* (collecting cases). "It is therefore uncontroversial to say that a state may require an abortion to be performed in a licensed clinic[.]" *Id.*

Thus, the Seventh Circuit concluded that it was error for our Court to have ruled that Indiana's entire licensing scheme as unconstitutional. "Indeed, most of Indiana licensing statutes appear inoffensive," *id.* at 875, the Seventh Circuit continued, noting that Indiana's licensure requirements, on their face, "are well within the realm of accepted regulations of medical practices" and reflected "nothing unusual or suspect." "Consequently," wrote the Seventh Circuit, any conclusion that "Indiana licensing scheme [i]s unconstitutional because licensing provided insufficient benefits to the state as a general matter . . . cannot stand." *Id.*[32]

---

[32] Notwithstanding this conclusion regarding the facial constitutionality of Indiana's licensing provision, the Seventh Circuit did affirm our preliminary injunction on the grounds that Plaintiffs has shown a likelihood of success on the merits with respect to their as-applied challenges to Indiana's licensing scheme.

Thus, the State argues here: "the Seventh Circuit's opinion in this case unmistakably reaffirmed the power of the State to require that abortion clinics have a license." We also accept that as true.

Plaintiffs offer little by way of squaring their arguments with the Seventh Circuit's holding in this case. Indeed, Plaintiffs have completely sidestepped the Seventh Circuit's prior factual and legal conclusions on this issue. While reiterating their position that "[w]hether Indiana's Licensure Requirement is unconstitutional . . . depends on application of the undue burden standard to the facts in the record," they fail to apply this standard to those facts. Plaintiffs' contentions that the Licensure Requirement provides "little if any marginal benefits" has already by rejected by the Seventh Circuit. *Id.* at 874–75.

Plaintiffs focus their challenge to the Licensure Requirement on the burdens it imposes, but that approach is similarly unavailing. Plaintiffs recount the details of WWHA's previous difficulties in obtaining a license to operate its South Bend Clinic, citing those circumstances as illustrative of the burden to abortion access resulting from the Licensure Requirement. However, these arguments are based on Indiana's Licensure Requirement *as applied* to WWHA; they do not provide a basis for their *facial* challenge to the Licensure Requirement.  Plaintiffs' assertion that "several Planned Parenthood health centers in communities that do not currently have an abortion provider would begin offering abortion care but for the licensure requirement" is not borne out by their cited evidence, which merely references difficulties one specific Planned Parenthood

encountered in complying with Indiana's Facility Requirements—a separate issue in this litigation.

Plaintiffs have failed to raise any factual or legal issues that warrant a departure from the well-established principle that states may impose licensure requirements on abortion clinics without violating the Due Process Clause of the Fourteenth Amendment. On this claim, the State is entitled to summary judgment.

However, "to say that a state may require a license does not mean that every licensing regime, no matter how burdensome or arbitrary, passes constitutional muster." *Hill*, 937 F.3d at 874–75. Plaintiffs' specific challenges to various provisions within Indiana's licensing regime must thus be reviewed in this light.

Plaintiffs' Complaint specifically targets Indiana's "Inspection Requirement," which mandates an inspection by the Health Department of every abortion clinic in Indiana at least once annually and more frequently if needed. Ind. Code § 16-21-2-2.6. Plaintiffs level a simple attack, objecting merely to the mandatory inspections of abortion clinics, which in and of itself creates an undue burden on women seeking abortions.

The State defends the Inspection Requirement as a means of ensuring that abortion providers are "qualified, competent, law-abiding and trustworthy to perform abortions safely and consistent with Indiana's informed-consent and reporting requirements." Its inspection protocols help to guarantee compliance with abortions statutes and preempts and/or resolves certain health and safety issues at clinics. The State maintains that no burdens are imposed by inspections and that none of Indiana's six licensed abortion clinics (which excludes WWHA's South Bend Clinic, who operates under a provisional

73

license) have reported any hardships in submitting to or complying with Indiana's Inspection Requirements.

Plaintiffs' challenges to these inspections includes their dispute over whether inspections meaningfully advance Indiana's patient health and safety, as the State asserts that they do. Noting that medical practices that provide miscarriage management treatments and are often medically identical to abortion procedures, are not subject to Health Department inspections, Plaintiffs attempt to buttress their claim.

Plaintiffs' arguments that the Inspection Requirement provides few, if any, benefits, falls short of the kind of specific evidentiary support necessary to prevail on this claim. There is nothing before us that proves this requirement actually "disrupt[s] abortion clinics operations, divert[s] resources away from patient care, and drive[s] up costs." Their continued reliance on the South Bend Clinic's challenges to Indiana's Inspection Requirement in its pursuit of a license does not carry the weight placed on it by Plaintiffs in their effort to challenge the constitutionality of the Inspection Requirement. Similarly, the testimony of the director of a single abortion clinic located in Indianapolis reporting that inspections can "divert[] time away from patient care" lacks any persuasive details. An isolated opinion as to the generalized impact of inspections on clinic operations falls well short of showing that these inspections place a burden on a "large fraction" of women. *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004) (noting the Rule 56 demands something more specific than "bald assertions of the general

truth of a particular matter[.]"). There simply is no indication from Plaintiffs that this inspection requirement has affected *any* woman in her pursuit of any abortion.[33]

Having failed to overcome the State's claim that the Inspection Requirement, on its face, does not create a substantial obstacle for women seeking abortion in Indiana, Plaintiffs' challenge cannot succeed. Accordingly, the State is entitled to summary judgment on this issue.

We turn next to Plaintiffs' final challenge to Indiana's licensure scheme: its Facility Requirements. Specifically, Plaintiffs' Complaint challenges Indiana's physical plant requirements, which arguably "impose medically unnecessary facility requirements."

As the State describes, Indiana law requires abortion clinics providing surgical abortions to meet certain minimum safety requirements. Ind. Code § 16-21-2-2.5(a)(2) (ISDH's authority to promulgate rules), § 16-18-2-1.5(a)(2) (definition of abortion clinic); 410 Ind. Admin. Code, art. 26, including 410 Ind. Admin. Code §§ 26-10-1(b)(5) (observance of patient during recovery), 26-11-2(a) (sterilization of equipment), 26-11-3 (laundry), 26-13-1 (anesthesia), 26-13-3(b)–(c) (equipment), 26-17-2(c)(3)–(4) (access to certain facilities or equipment), 26-17-2(d)(1)–(4) (clinical facilities requirements), (d)(6) (drug distribution station), 26-17-2(e)(1) (housekeeping), (8) (antiscalding requirements). These facilities requirements advance the health and safety of pregnant women seeking

---

[33] Plaintiffs also note that the inspection process is subject to being abused by anti-abortion groups, who file complaints and prompt investigations by the Health Department. However, Plaintiffs' arguments do not bridge the gap between these potential actions and the facial validity of the Inspection Requirement.

surgical abortions and are consistent with facility recommendations made by the ACOG.[34]

We agree that the benefits provided by Indiana's Facility Requirements are important. Indeed, Plaintiffs offer almost no rebuttal on this point; indeed, it is even unclear from Plaintiffs' Complaint whether they have included in their challenges this regulatory portion of Indiana's Facility Requirements. Plaintiffs do argue that Indiana's facility requirements are not aligned with ACOG recommendations, but this argument has been framed entirely in conclusory terms, without any explanation of the differences. Aside from the general assertion that the Facility Requirements do not yield increased patient safety, Plaintiffs otherwise do not dispute the identified health and safety benefits of Indiana's Facility Requirements as identified by the State. Based on the insufficiency of the evidence before us, we cannot conclude, as Plaintiffs request, that the benefits of Indiana's abortion facilities requirements are negligible.

Plaintiffs' arguments further falter in the absence of any evidence that these requirements create any obstacles to care, let alone for a "large fraction" of women, which is the necessary showing to sustain a facial challenge. Plaintiffs speculate that women in Lafayette and South Bend are burdened by these requirements because, but for the costs required to retrofit their facilities to become compliant with these regulations,

---

[34] Plaintiffs again counter challenging the State's defense of these regulations on the grounds that medical practices providing miscarriage treatments are medically identical to abortion and are not subject to the physical plant requirements imposed on surgical abortion facilities. However, Plaintiffs have stopped short of detailing these differences.

these facilities would provide first-trimester aspiration abortions.[35] That these facilities are unable to perform first-trimester aspiration abortions requires women seeking such services in those areas to travel elsewhere. Plaintiffs argue that retrofitting facilities would be cost prohibitive without explaining why this would be necessary or the nature or amount of these changes and costs. Plaintiffs have also stopped short of producing any evidence to show that women residing in regions of unmet needs are, in fact, traveling elsewhere and, if so, to where and at what cost. Plaintiffs' failure to identify any persons impacted by the Facility Requirements or to define who precisely comes within the "large fraction" of Hoosier women that are being burdened,[36] never mind their failure to explain how these speculative burdens outweigh the actual benefits identified by the State, dooms their claim.

For these reasons, summary judgment shall enter in the State's favor on Plaintiffs' claims that Indiana's licensure, inspection, and surgical facility requirements are facially violative of the Fourteenth Amendment's Substantive Due Process Clause.

> 2. *Questions of Material Fact Preclude Summary Judgment on Plaintiffs' Allegations that Indiana's Physician-Only Law Creates an Undue Burden*

---

[35] Plaintiffs note that Planned Parenthoods in Evansville, Columbus, and New Albany would provide "medication and/or surgical abortion" but for the Facility Requirements; however, the Facility Requirements cited in Plaintiffs' Complaint do not pertain to facilities providing medication abortions. That said, these facilities *could* provide medication abortions without complying with the disputed Facility Requirements.

[36] We note, as well, that the number of women impacted by this provision is presumptively few since medication abortion is the most common form of abortion up to ten weeks and, after twelve weeks, an aspiration abortion must occur in a hospital or ASC under the current law. Accordingly, women receiving aspiration abortions in clinics  are either those contraindicated for medication abortion or those whose pregnancies are in the last two weeks of their first trimester.

Plaintiffs next constitutional target is Indiana's Physician-Only Law, Ind. Code §
16-34-2-1(a)(1), which limits the performance of a first-trimester abortion or the
prescription of an abortion-inducing pill only to a physician.

The State seeks summary judgment in its favor on this claim based on the holding
in *Mazurek v. Armstrong*, which upheld a Montana law prohibiting abortions except for
those provided by licensed physicians. 520 U.S. 968 (1997). Licensed physicians along
with a physician assistant had sought to enjoin the Montana statute, asserting that it had
had an "invalid purpose."  The Supreme Court, however, ruled that:

> [T]his line of argument is squarely foreclosed by *Casey* itself. In the course of
> upholding the physician-only requirement at issue in that case, we emphasized that
> "[o]ur cases reflect the fact that the Constitution gives the States broad latitude to
> decide that particular functions may be performed only by licensed professionals,
> even if an objective assessment might suggest that those same tasks could be
> performed by others.

*Mazurek*, 520 U.S. at 973. Citing its "repeated statements in past cases," the Court
held that there was "no doubt" that the performance of abortions could be restricted to
physicians. *Id.* at 975.

Plaintiffs distinguish *Mazurek* from the case at bar by describing the question in
*Mazurek* as whether the law had been enacted for an improper purpose, not whether it
created a substantial obstacle to abortion access. In fact, it was uncontested in *Mazurek*
that there was "insufficient evidence of a substantial obstacle." *Id.* at 972. Here, in
contrast, Plaintiffs assert that they have advanced substantial evidence of the burdens and
obstacles imposed by this requirement. Plaintiffs also assert that the medical landscape
regarding abortions has evolved since the decision in *Mazurek* and that this interpretation

of *Mazurek* is supported by a recent ruling from the District of Idaho. *Planned Parenthood of the Great Nw. & the Hawaiian Islands v. Wasden*, 406 F. Supp. 3d 922, 928 (D. Idaho), *motion to certify appeal denied sub nom. Planned Parenthood of Great Nw. & Hawaiian Islands v. Wasden*, 410 F. Supp. 3d 1108 (D. Idaho 2019).

We agree with Plaintiffs' argument that *Mazurek* does not automatically foreclose further judicial review of this issue. Though the Seventh Circuit has not yet addressed *Mazurek*'s precise scope, we read *Mazurek*'s conclusion as limited to challenges to the legislature's purpose, where it has been determined that the challenged statute does not, in effect, create burdens for women accessing abortion services. *See Karlin v. Foust*, 188 F.3d 446, 493 (7th Cir. 1999) ("While a plaintiff can challenge an abortion regulation on the ground that the regulation was enacted with an impermissible purpose, the joint opinion in *Casey* and the Court's later decision in *Mazurek v. Armstrong* . . . suggest that such a challenge will rarely be successful[.]"). The Court in *Mazurek* did not address whether a physician-only requirement could pose substantial obstacles to those seeking abortions. *See Planned Parenthood of Wisconsin v. Doyle*, 162 F.3d 463, 467 (7th Cir. 1998) (noting that states "may adopt paternalistic measures for the protection of the mother's health, as by requiring that only physicians be allowed to perform abortions . . . Although such a requirement might in principle pose a substantial obstacle to abortion, the record in *Mazurek* showed that it did not in fact.").

The record before us establishes that Indiana's statute has a broader reach than did Montana's statute in *Mazurek*. In *Mazurek*, the record identified only one non-physician impacted by the new Montana statute. Here, Plaintiffs have identified numerous APCs,

some of whom already work in licensed abortion facilities, who would provide abortion care but for the prohibitions imposed by Indiana's Physician-Only Law. *A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 688, 2002 WL 31050945 (7th Cir. 2002) ("Findings based on new evidence could produce a new understanding, and thus a different legal outcome[.]") Our review of Plaintiffs' claim reflects this context, and is not foreclosed by *Mazurek.*

The benefits conferred by the Physician-Only law reflect the state's interest in promoting the health and safety of a woman seeking an abortion. The limitation of care by a physician only ensures a person with extensive professional education and specialized training perform abortions, thereby reducing the risk of procedure-related complications and enhancing care if complications do occur. Because physicians have broader experience and more specialized training than APCs, they are better qualified and able than APCs to respond to complications (such as hemorrhaging or bloodclotting). "In these circumstances, the patient is better served if a qualified physician has already been involved in her care," says the State. [*Supra*, at 25-28].

Plaintiffs counter that APCs are equally capable of performing these tasks. APCs are permitted to provide care for women in other settings where medical risks are comparable to those arising from or associated with medication or aspiration abortions. An APC is authorized to prescribe controlled substances, to suture torn vaginal tissue after childbirth, and to insert or remove an intrauterine device. They are also qualified to perform miscarriage management, which, in practice, often closely resembles abortion care. That said, APCs are prohibited from prescribing a combination of medications or

80

performing a procedure which pose risks equal to or less than the risks inherit in their authorized duties. And, when an APC performs their duties, they must do so under the supervision of or in collaboration with a licensed physician, further minimizing any benefits arising from the Physician-Only Law. [*Supra*, at 25-28].

The State does not counter Plaintiffs' evidence showing that APCs are trusted to perform similar procedures of comparable risk. This undercuts the State's contention that physicians are critical to ensuring that abortions are conducted safely. Viewing the evidence in the light most favorable to Plaintiffs, we agree that the benefits identified by the State are significantly undermined by the authority given elsewhere to APCs. Consequently, for summary judgment purposes, we view the purported benefits of this restriction to be minimal.

We turn next to an analysis of burdens imposed by the Physician-Only Law.

Plaintiffs' evidence establishes, *supra* at 20-21, that the limited pool of physicians available to provide abortions directly reduces the number of clinics in operation along with their capacity to treat patients and their long wait times (potentially up to weeks). No one could seriously dispute that delaying an abortion, even by a few weeks, for whatever reason, leads to increased risks for maternal health. Important to our analysis is that Plaintiffs have identified multiple APCs who are being directly impacted by this physician-only restriction and who would provide abortion services, if permitted. Their ability to provide these services would reduce wait times that burden potential patients by placing them at increased risk for abortion-related complications.

81

The State challenges the sufficiency of this evidence, claiming it does not create an issue of fact regarding whether a "large fraction" of women are affected by the Physician-Only law. We disagree with the State's argument. Plaintiffs have presented evidence showing that the Physician-Only Law directly results in the limited capacity and extended wait times at Indiana's existing abortion clinics. The lack of any contrary evidence from the State defeats its arguments and its entitlement to summary judgment. Given the minimal nature of the benefits, these burdens outlined and described by Plaintiffs are not justifiable. Summary Judgment will not enter on this issue.

   3.  *The State is Entitled to Summary Judgment on Indiana's First Trimester Admitting Privileges Requirement*

Indiana's Admitting Privileges Requirement requires any physician performing an abortion either to have "admitting privileges in writing at a hospital located in the county where abortions are provided or in a contiguous county" or be a party to a "written agreement with a physician," who has such privileges. Ind. Code. § 16-34-2-4.5(a). Written agreements made pursuant to this Section must be annually renewed with copies submitted to the Health Department. *Id.* § 16-34-2-4.5(a)(2), (c)(2).

We note at the outset that Indiana's admitting privileges statute is facially distinguishable from the laws invalidated in *Hellerstedt* and *June Medical* in at least two ways: (1) Indiana permits privileges at hospitals at a distance of greater than 30 miles from an abortion clinic; and, more significantly, (2) Indiana, unlike Texas or Louisiana, permits compliance with this requirement through a backup physician agreement. Plaintiffs' attempt to analogize Indiana statutes to the unconstitutional statutes by

emphasizing the difficulties for abortion providers in obtaining admitting privileges does not address the critical issue here, namely, whether Indiana's "backup physician" provision saves the statute from the same fate as those in *Hellerstedt* and *June Medical*. The State does not dispute the extent of the burdens that would be imposed if abortion providers were, themselves, required to hold admitting privileges. Thus, we focus our analysis on the "backup physician" provision.

The dispute between the parties as to the medical benefits arising from this provision (the State relies on continuity of care; Plaintiffs deny any such need, *see supra* at 28-31) does not require our resolution. Even construing these facts favorably to Plaintiffs, we remain unpersuaded that they would preclude summary judgment on the primary issue of whether this statute places a substantial obstacle in the path of a large fraction of women seeking abortions in Indiana.

Plaintiffs have provided no evidence to establish that Indiana's Admitting Privileges statute, which has been in effect since 2011, has imposed burdens on Indiana women seeking abortions. Plaintiffs identify no clinic that has been unable to comply with, at a minimum, the backup physician provision. None of the six licensed clinics operating at the time this lawsuit was filed report that compliance with this requirement was unduly difficult or problematic or places them at risk of closure. Unlike in *Hellerstedt* and *June Medical*, Plaintiffs also have not identified any clinics that were, in fact, confronted with closure following enactment of the statute. Nor have Plaintiffs identified any clinics or providers that would provide services if not for the onerous task of enlisting a backup physician.

The only potential burden referenced by Plaintiffs relates to the South Bend Clinic's challenges in enlisting a backup physician apparently due to hostility against abortion in the South Bend community. But even this clinic, despite any alleged hostility, was able to locate and enter into a written agreement with a qualified backup physician. Plaintiffs' reference to the South Bend Clinic's difficulties in finding a backup physician in the "South Bend region" makes no mention of whether the clinic confined its search solely to St. Joseph County (in which South Bend is locate)d, or if it included the "contiguous" counties (LaPorte, Starke, Marshall, and Elkhart) as the statute permits.[37]

Plaintiffs have failed to present any evidence establishing that Indiana's Admitting Privileges statute has or will burden any women seeking abortion services in Indiana. No issues of material fact preclude summary judgment in favor of the State on this issue.

> 4. *Questions of Material Fact Preclude Summary Judgment on Plaintiffs'*
>    *Allegations that Indiana's Second-Trimester Hospital Requirement Creates*
>    *an Undue Burden*

We move next to address Indiana's requirement that all second-trimester abortions be performed in a hospital or ACS. Ind. Code § 16-34-2-1(2).

We begin with a review of the two cases the State has cited as conclusive in resolving its constitutionality: *Gary-Northwest Indiana Women's Services, Inc. v. Bowen*, 496 F. Supp. 894 (N.D. Ind. 1980), *aff'd*, 451 U.S. 934 (1981) and *Simopoulos v. Virginia*, 462 U.S. 506, 516–17 (1983), both of which upheld this requirement.

---

[37] We concede Plaintiffs' point that this statute is likely futile when a woman is faced with an emergency. since she would no doubt travel to the closest hospital, not one in a neighboring county. Nonetheless, this poses no burden on women, and thus the statute stands.

Plaintiffs quickly and correctly rejoin that *Bowen*'s holding that Indiana's second-trimester hospitalization requirement was *per se* constitutional under *Roe*'s trimester framework was abrogated by *Simopoulus* and its companion cases, *City of Akron*, 462 U.S. 416, and *Planned Parenthood Association of Kansas City, Missouri, Inc. v. Ashcroft*, 462 U.S. 476 (1983). In *Simopoulos*, the Court upheld the challenged second-trimester law requiring second-trimester abortions be performed in outpatient surgical hospitals (similar to ACSs) in part because the plaintiff there did "not attack[] [it] as being insufficiently related to the State's interest in protecting health." 462 U.S. at 517; *see Whole Woman's Health*, 136 S. Ct. at 2320 ("[T]he Court in *Simopoulos* found that the petitioner in that case . . . had waived any argument that the regulation did not significantly help protect women's health.").  In *City of Akron*, the Court recognized that recent medical advancements had made second-trimester abortions safer over time such that they could be performed in outpatient settings. The Court thus struck down the state's requirement that second-trimester abortions be performed in hospitals. *See City of Akron*, 462 U.S. at 435–36. The Court in *Ashcroft* reached the same conclusion.. 462 U.S. at 481–82.

The State argues that *Simopoulos* is binding here. Unlike the statutes determined to be unconstitutional in *Akron* and *Ashcroft*, Indiana does not limit its second-trimester abortions to hospital facilities. Instead, its statute permits such abortions to be performed in ACSs, much like the statute found to be constitutional in *Simopoulos.* Accordingly, the State would have us look no further.

Plaintiffs' interpretation of *Simopoulos* is much more apt, however. In *Simopoulos*, no issue was raised as to whether the challenged statute served the state's interest in protecting health. *Simopoulos*, 462 U.S. at 517. In our case, these facts are very much in dispute between the parties. Moreover, the decision in *Simopoulus* was handed down more than thirty-five years ago. As the *Akron* Court recognized, medical advancements in administering second-trimester abortions had developed substantially since the Court's prior decision was handed down, counseling that we should not ignore the likelihood that second-trimester abortions may no longer be performed in the ways they were in the mid-80s.

With respect to the benefits of this statutory requirement, the key facts and assumptions are strenuously in dispute. [*Supra*, at 34-37]. The State's expert cites complications associated with second-trimester abortions that are best managed at a hospital or ACS. Plaintiffs counter with statistical evidence showing that second-trimester abortions performed at clinics are comparable in safety to those performed at hospitals or ASCs. The State's expert recommends general anesthesia in conjunction with a D&E, illustrating the need to perform this procedure in a hospital setting. But Plaintiffs counter with expert testimony attesting to the fact that deep sedation, not general anesthesia, is sufficient to manage patients' pain during D&Es. Viewing these facts in the light most favorable to Plaintiffs, we hold that this requirement does not provide sufficient benefits with respect to Indiana's interest in promoting the health and safety of women.

The burdens imposed by this requirement are not in dispute.[38] Plaintiffs have presented statements from numerous witnesses reporting difficulties they have encountered in obtaining second-trimester abortions in Indiana. [*Supra*, at 37]. No ASC in Indiana provides abortion services. Only four Indiana hospitals, all located in Marion County, perform second-trimester abortions. For those women who do not face geographical disadvantages in seeking second-trimester abortions at one of these locations, the costs of a second-trimester abortion provided by a hospital are indisputably onerous—upwards of $20,000, according to the estimates. *If* a woman's health needs generally are covered by insurance, policy coverage for abortion care is still unlikely. The combination of these costs, given the sparse supply of facilities, often forces Indiana women to travel out of state to receive second-trimester abortions. The burdens of travel are onerous for many women seeking abortion in Indiana, the majority of whom are low-income. [*supra*, at 23-25, 37]. We are informed by Plaintiffs' proffers that without this

---

[38] The State, relying on its expert, asserts that "there was no change in the percentage of women seeking second trimester abortions" following Indiana's passage of its "hospital law." Their expert mistakenly posits, however, that this law was enacted in 1993 when in fact it was initially enacted in 1973. [Exp. Rep. Studnicki, ¶ 45]; *see* Pub. L. No. 322-1973, § 2, 1973 Ind. Acts 1741-46. On October 2, 2020, the State filed a Motion to Amend, [Dkt. 296], this expert report on the grounds that the State had furnished to its expert inaccurate information with respect to the date of the statute's enactment. Plaintiffs are expected to oppose this motion. To the extent the State wishes to amend its evidence for our consideration in conjunction with its summary judgment motion, that request is denied. We are informed that this error was first brought to the State's attention in Plaintiffs' surreply, filed on January 16, 2020. We will not grant the State's dilatory request, however, which would clearly be prejudicial to Plaintiffs who, like the Court, have committed substantial time and resources addressing the specific evidence proffered by the State in their motion for summary judgment. We refrain at this time from deciding whether the State may introduce an amended expert report at trial.

law, abortion clinics in Bloomington, South Bend, Indianapolis, and Merrillville would offer second-trimester abortion services.

The disputed facts underlying the issue of the benefits of the Second-Trimester Abortion requirement preclude a resolution of this dispute and prevent summary judgment on this claim.

5. *The State is Entitled to Summary Judgment on Plaintiffs' Due Process Claims Relating to Indiana's Reporting Requirements*

Indiana requires healthcare providers performing surgical abortions or prescribing abortion-inducing drugs to file a terminated pregnancy report which includes specific information relating to each abortion and additional information relating to minor patients. *See* Ind. Code §§ 16-34-2-5(a), 16-34-2-5.1, 16-34-2-5(b). The form must be transmitted to the Health Department, and, if the woman on whom the abortion was performed is younger than sixteen years old, to the Department of Child Services. *Id.* § 16-34-2-5(b). Failure to submit the form subjects the provider to misdemeanor penalties. *Id.* § 16-34-2-5(d). The Health Department summarizes the aggregate data and submits it to the Center for Disease Control for inclusion in the annual Vital Statistics Report. *Id.* § 16-34-2-5(f).

The State again analogizes Indiana's reporting requirement to those upheld by the Supreme Court in other cases, arguing that an undue burden analysis is unnecessary here.

The parties agree that *Planned Parenthood of Central Missouri v. Danforth* sets forth the proper standard for evaluating the benefits of reporting requirements: "[r]ecordkeeping and reporting requirements that are reasonably directed to the

preservation of maternal health and that properly respect a patient's confidentiality and privacy are permissible." 428 U.S. 52, 80 (1976) (quoted in *Casey*, 505 U.S. at 900) (joint op.).

Several of Indiana's reporting requirements are virtually identical to requirements upheld in *Casey*, *Danforth*, and *Planned Parenthood Ass'n of Kan. City, Mo., Inc. v Ashcroft*, 462 U.S. 833, 900-01 (1992). In *Casey*, for example, the Supreme Court upheld Pennsylvania's requirement that physicians report the date of the abortion; the physician and facility; the referring physician or agency; the type of procedure, the woman's age and her number of prior pregnancies and abortions; gestational age; any pre-existing medical conditions that would complicate pregnancy; medical complications with the abortion; the basis for any determination of medically necessity; and the weight of the aborted fetus. 505 U.S. at 900 (joint op.). In *Ashcroft*, the Supreme Court also upheld the requirement that a pathology report be submitted regarding fetal tissue. 462 U.S. at 489–90. Plaintiffs do not disagree that Indiana's requirements mirror those imposed by the Pennsylvania statute upheld in *Casey. Compare* Ind. Code § 16-34-2-5(a)(1),(4)–(6), (8), (13)–(18), (20)(A)–(B), (20)(E), (21)–(22), (24)–(26), (29) with 505 U.S. at 909–11.

Plaintiffs do claim, however, that the requirements imposed on Indiana-based abortion providers to report thirty-nine pieces of information for each patient are distinguishable from those in *Casey*, where providers were required to report only twelve items of information on each patient. This argument fails to address the relevant question of whether the requirement to collect and report this information is "reasonably directed to the preservation of maternal health," especially in light of Plaintiffs' apparent inability

to identify even one reporting request that they believe to be substantially unreasonable.
*Danforth*, 428 U.S. at 80.

The State maintains that its reporting requirements are entirely reasonable.
Regarding requirements not explicitly addressed in *Casey, Ashcroft*, and *Danforth*, the
State defends the need to gather such statistical information to assist in its enforcement of
other abortion regulations, including its parental consent statute, Ind. Code § 16-34-2-
5(a)(2); prohibitions against abuse, harassment, coercion, and trafficking, *id.* § 16-34-2-
5(a)(19); and informed consent, *id.* § 16-34-2-5(a)(23).

Plaintiffs half-heartedly object, stating that the information required to be reported
goes "beyond the information that the CDC solicits, and it is not used by the Health
Department to develop programs." Whether the information is used to "develop
programs" or is consistent with the CDC's reporting requests is not addressed in
*Danforth.* Plaintiffs present here no meaningful objection to the rationale behind the
reporting requirements—that they are reasonably related to the preservation of maternal
health, given that the information enables the enforcement of Indiana's health and safety
regulations governing abortion. Even if Plaintiffs had succeeded in showing that these
identified benefits are illusory or unsubstantiated, their argument with regard to the
burdens of the reporting requirements would not succeed. Describing the requirements as
"serving as a trap for the unwary and a deterrent to providing abortion care in Indiana,"
Plaintiffs fall short in mustering evidence to show that any health care provider has been
deterred from providing abortion care or any woman deterred from receiving an abortion
because of these reporting  requirements. As to whether there has been a generalized

increase in costs and reallocation of resources due to the reporting requirements, no concrete evidence has been introduced on these claims. Providers can and do delegate reporting duties to administrative staff, in any event, we are informed. Consequently, Plaintiffs' arguments, unsupported as they are by evidence, do not establish that Indiana's reporting requirements create barriers for women seeking abortions.

For these reasons, we hold that the Reporting Requirements do not violate the Fourteenth Amendment's Due Process Clause and grant summary judgment in favor of the State on this claim.

### 6. The State is Entitled to Summary Judgment on Plaintiffs' Due Process Claims Relating to the Eighteen-Hour Delay Requirement

Indiana law mandates that patients delay their abortions for at least eighteen hours following receipt of Indiana's mandatory disclosures.[39] [*Supra,* at 49].

We examine the Supreme Court's decision in *Casey* in reviewing Indiana's eighteen-hour delay requirement. 505 U.S. at 886 (joint op.).

In *Casey*, the Supreme Court ruled Pennsylvania's 24-hour waiting period requirement was constitutional. 505 U.S. at 883 (joint op.). After overruling its prior decision in *Akron*, 462 U.S. at 450, holding that a state's interest in ensuring that a woman be reasonably informed was not served by such a delay, the *Casey* Court ruled that "[t]he idea that important decisions will be more informed and deliberate if they

---

[39] The burdens of this requirement intertwine with Indiana's in-person requirements. However, our conclusion with respect the waiting period is the same irrespective of any separate determination as to the constitutionality of the various in-person requirements; despite the in-person requirements, the eighteen-hour delay requirement passes constitutional muster, in accordance with *Casey*.

follow some period of reflection does not strike us as unreasonable, particularly where the statute directs that important information become part of the background of the decision." *Id.* at 887. The Supreme Court then turned to a review of the burdens imposed by the delay requirement. It recognized the requirement's practical effect, specifically, that many women would be required to travel to receive abortions, who would also experience greater delays than a day between the time they received the state's disclosures and proceeded with the abortion. Such delays could be particularly difficult on women with low financial resources or facing other logistical challenges. Though the *Casey* court acknowledged these findings as "troubling," and harbored no doubts that the waiting period could "increase[e] the cost and risk of delay of abortions," it nonetheless upheld the waiting period on the grounds that it did not amount to a substantial obstacle. *Id.* at 874.

Here, the facial challenge to the Indiana statute reveals a law virtually identical to the one reviewed in *Casey*, albeit with a shorter waiting period. *Newman*, 305 F.3d at 684 (noting that the text of Ind. Code § 16–34–2–1.1 was "materially identical" to the one held constitutional in *Casey*). As the State urges, and we agree, we are obliged to follow *Casey*'s holding in this regard.

Plaintiffs correctly remind us, however, that *Casey*  was decided on its unique factual record, which spares us from simply applying it automatically; we are obliged to exam the distinguishable factual record before us. Plaintiffs also note that the burdens imposed by the Pennsylvania statute were at that point speculative because *Casey* involved a pre-enforcement challenge. Here, Plaintiffs stress, our record is replete with

92

evidence that these burdens are actually occurring. While true, the burdens that Plaintiffs highlight—increased delays and costs and risks—are the very same burdens that the *Casey* Court anticipated in its ruling. *Casey*'s holding recognized the benefits of the waiting period to allow for "informed and deliberate" decision-making. *Casey* controls here. Accordingly, we hold that Indiana's waiting period requirement does not pose a substantial obstacle for women attempting to access abortion care, and the State is entitled to summary judgment on this issue.

### 7. *Indiana's Informed Consent Provisions*

Plaintiffs' next challenges to the Indiana abortion code require a review of the informed consent statutes.

### a. The State is Entitled to Summary Judgment on Indiana's Ultrasound Requirement

Prior to obtaining an abortion in Indiana, "the provider shall perform, and the pregnant woman shall view, the fetal ultrasound imaging and hear the auscultation of the fetal heart tone if the fetal heart tone is audible," unless the patient certifies in writing, before the abortion, that she declines to do so.  Ind. Code § 16-34-2-1.1(a)(5) (the "Ultrasound Requirement").

The State maintains, and Plaintiffs do not dispute, that an ultrasound is vital to an accurate determination of the gestational age of a fetus, which is, in turn, critical to providing proper abortion care. What Plaintiffs do dispute is whether and to what extent an ultrasound also is intended to influence the patient's decision-making and whether

there is any medical basis for Indiana's requirement that the abortion provider be the person to conduct the ultrasound.

With respect to the benefits of this ultrasound requirement, the State has mustered both anecdotal and statistical evidence to show that Indiana's ultrasound requirement enhances patients' decision-making and ensures that providers obtain informed consent. [*Supra*, at 50-52]. Plaintiffs make little effort to rebut either the theory or the evidence proffered by the State, relying on two studies, both of which discuss small samplings of women whose abortion decision-making was impacted by their having first viewed their ultrasounds. Indiana's ultrasound requirement thus clearly provides more than *de minimis* benefits in furtherance of its interest in enacting regulations to further the State's legitimate interest in preserving potential life.

Plaintiffs do not specify what burden, if any, this requirement imposes on women in the context of informed consent. They proffer a conclusory statement that it is "cruel and insensitive," but that bald assertion does not explain how that is so, particularly in light of the legitimate benefits identified above. There simply is no evidence that the Ultrasound Requirement presents an obstacle to any Indiana woman seeking an abortion.

Plaintiffs also challenge this ultrasound requirement as problematic on the grounds that it would require some women to submit to duplicative ultrasounds. Plaintiffs take issue with the statute's requirement that the abortion provider, rather than an unaffiliated provider or technician, be the only person authorized to conduct the ultrasound. Despite these objections, Plaintiffs have not articulated any specific, significant burdens arising from this requirement. There is no evidence of the number of women who have faced this

need for multiple ultrasounds, nor has there been any constructive analysis provided as to the way(s) in which potentially duplicative ultrasounds create a substantial obstacle. The state clearly has a legitimate interest in ensuring that a woman seeking an abortion submit to a preabortion ultrasound and that the results be reviewed by a qualified healthcare provider, given the undisputed safety and health benefits connected to such a procedure.

Weighing the benefits of the statute identified by the State against the dearth of any burdens, we shall grant the State's request for summary judgment on this claim.

> **b.    The State is Entitled to Summary Judgment, in Part, on Plaintiffs' allegations that Indiana's Mandatory Disclosures Create Undue Burdens**

Plaintiffs also challenge the "Mandatory Disclosures" that the treating physician or the physician's designee must provide to a woman prior to her abortion. *Id.* § 16-34-2-1.1(a)(1)–(2), (b). Additionally, where there has been a diagnosis of a lethal fetal anomaly, the physician must inform the woman "of the availability of perinatal hospice services" and provide her with the "Perinatal Hospice Brochure." Id. § 16-34-2-1.1(b). All women must be provided the informed consent brochure.[40] Id. § 16-34-2-1.5(b).

Much of the information required to be disclosed to women prior to an abortion is uncontroverted here.[41] Plaintiffs specifically challenge the Mandatory Disclosures which include: 1) when life begins, 2) fetal pain, 3) fetal tissue disposal as well as 4) the

---

[40] Plaintiffs' only developed objection to the mandatory distribution of the informational brochure is that it contains false or misleading information.
[41] That is, information related to the gestational age of the fetus, the availability of services, and the nature of the procedure.

information contained in the Perinatal Brochure.[42]

In reviewing the constitutionality of Indiana's mandatory disclosures aimed at obtaining informed consent, we begin with the *Casey* standard, where the Court explained that "as with any medical procedure, the State may require a woman to give her written informed consent to an abortion." 505 U.S. at 881 (joint op). Further, states may "require doctors to inform a woman seeking an abortion of the availability of materials relating to the consequences to the fetus, even when those consequences have no direct relation to her health." *Id.* at 882. In other words, Indiana's Mandatory Disclosures further the state's interests in the health of the patient seeking the abortion as well as its interest in potential fetal life.

To promote the latter interest, the state may enact measures aimed at ensuring that the woman's choice is philosophically and socially informed and to communicate its preference (if it has one) that the woman carry her pregnancy to term. *Id.* at 872.  But such measures "must be calculated to inform the woman's free choice, not hinder it[,]" and even if so calculated may not present a substantial obstacle to its exercise. *Id.* at 877. The information provided must be "truthful and not misleading." *Id.* at 882.

The parties first address the state-mandated specific disclosure that "human

---

[42] Plaintiffs also challenge Indiana's mandatory disclosures in terms of their burden on women by requiring providers to review information about purportedly *de minimis* risks, such as "the potential danger to a subsequent pregnancy" and "the potential danger of infertility." Ind. Code § 16-34-2-1.1(a)(1)(D)(ii)-(iii). However, the parties have not briefed this issue. The State merely asserts that it is accurate to assert that such risks exist. But neither party addresses whether imposing this obligation "hinders" rather than "informs" decision-making, as *Casey* instructs.

physical life begins when a human ovum is fertilized by a human sperm." Plaintiffs contend that this statement is at best misleading, conflating a religious or ideological view of when "life" begins with one sounding in science. As they argue, there is no established medical consensus as to when human life begins; thus to advance that position is not "truthful." Additionally, as Plaintiffs note, the Supreme Court has long-recognized the complicated nature of the tasks of determining precisely when "life" begins, and thus it has refrained from making guesses. *See, e.g., Roe*, 410 U.S. at 93 ("When those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus, the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer.").

The State maintains that its statement as to when life begins is not "scientifically controversial," while acknowledging that references to "human life" can be problematic. Even so, it argues that the statute's reference is to "human *physical* life" and as such it is nothing more than a "biological statement" advancing no philosophical or religious claim regarding the personhood of the embryo or fetus.

The State's efforts to neutralize this statement declaring it to be "medically accurate, scientifically uncontroversial, and not ideologically charged" is superficial. Simply parroting this phrase does not make it true. The State has offered nothing in the way of a biological explanation or justification for this provision. The State's expert's view distills into this: "human physical life" begins when Indiana says it does; Plaintiffs'

expert disagrees that this definition reflects medically established knowledge.[43] We resolve this dispute in Plaintiffs' favor at this time and, accordingly, withhold summary judgment on the issue in the State's favor.

As to whether Indiana's mandatory disclosure to a woman contemplating an abortion that a fetus feels pain as early as 20 weeks gestation, Ind. § 16-34-2-1.1(a)(1)(G), we also conclude that material facts in dispute foreclose summary judgment.

The State buttresses its claim of the scientific accuracy of this statement about fetal pain, citing the opinion of Dr. Condic, the State's neurobiology expert, who explains: "[N]eural circuitry capable of detecting and responding to pain" is developed between 10-12 weeks lmp. [Exp. Rep. Condic, ¶ 10]. Between 14-20 weeks of gestation as measured by a woman's lmp, "spinothalamic circuitry develops that is capable of supporting a conscious awareness of pain." [*Id.*]. Plaintiffs argue that this statement is misleading because it presents as settled science a statement that has been rejected by leading medical associations, who have concluded that a fetus's capacity to experience pain is not developed until 24 weeks gestation. The State characterizes this dispute as more about "how pain is experienced" rather than "whether" a fetus has the physical capacity to detect pain. In other words, the State explains, the research cited by Plaintiffs begs the question of whether a fetus is "capable of suffering."

---

[43] The State also invokes the testimony of Plaintiffs' witnesses to bolster the alleged uncontroversial nature of this statement. However, this cited evidence does not save the State from its failure to proffer any evidence explaining the medical accuracy of its statement.

We discern from this distinction being advanced here by the State that the dispute between the parties poses the question of whether and to what extent a fetus is aware of pain at a certain gestational age, not whether the fetus's neural circuitry development is capable of detecting pain at that stage. According to the State, the information provided to women relating to fetal pain is consistent with its expert's findings on the fetal detection of pain.

These conflicting contentions suffice to raise questions of fact regarding whether the mandatory disclosure is "misleading." Even accepting the State's summary of the dispute, we reject its argument that communicating to a pregnant woman, as Indiana requires, that a fetus "can *feel* pain"[44] at a certain stage in gestational development would not lead her to reasonably believe that the fetus "suffers" at this stage. As the State concedes, Plaintiffs' evidence calls such claims of "suffering" into question. This evidence thus creates a dispute of fact as to whether it is misleading to inform a woman that her fetus feels pain.

Regarding mandatory disclosures dealing with the disposal of fetal tissue, Indiana law requires that providers inform their patients of certain options for tissue disposition following an abortion, Ind. Code § 16-34-2-1.1(a)(2)(H)-(I). Plaintiffs' challenge to this disclosure comes in the context of medication abortion, arguing that mandating information related to the disposal of tissue and requesting patients to select an option for such disposal, *supra* at 45-49, is confusing and upsetting for patients who receive

---

[44] Though the State, in its briefing, speaks of what a fetus can "detect," the language communicated to a woman is what a fetus can "feel."

medication abortions because it leads them to believe they must collect their fetal tissue and return it to the abortion clinic. Plaintiffs omit in their argument any mention of the fact that providers are permitted to inform women having medication abortions that they are not required to return the fetal remains to the clinic for disposition. Plaintiffs are silent in the face of this proffered clarification. Accordingly, summary judgment shall be granted in the State's favor with respect to Plaintiffs' Due Process challenges to this specific portion of Indiana's Mandatory Disclosures.

Finally, we turn to Plaintiffs' allegations that Indiana's Perinatal Hospice Brochure, which is provided to women when a fetal anomaly has been identified, contains false or misleading information. [*Supra*, at 45-49].

Plaintiffs note that this brochure "erroneously suggests" that continuing the pregnancy is safer than having an abortion, which is scientifically not true. There is no risk of death or complication associated with abortion in the circumstances described in the brochure; indeed, as Plaintiffs have argued, abortion is medically safer than carrying a pregnancy to term. The State seeks to rebut this argument on the grounds that Plaintiffs misstate what the Perinatal Hospice Brochure actually discloses, namely, that the risks associated with abortion increase after 21 weeks gestation. The brochure contains no comparison of health outcomes between continuing a pregnancy to term and having an abortion (though it notes that women can safely carry pregnancies to term when a fetal anomaly has been diagnosed). With this clarification as to the text of the Brochure, we agree with the State that Plaintiffs' objection is without merit.

Plaintiffs also contend that the Brochure inaccurately suggests that, when a fetal

anomaly has been identified, abortion is associated with worse mental health outcomes than are experienced in carrying a pregnancy to term. Research demonstrates that women who have an abortion due to fetal anomaly do not have worse mental health outcomes than women who experience a miscarriage, still birth, or neonatal death because of the fetal anomaly. [*Supra,* at 20-21, 45-49]. The State's faint-hearted response attempts to defend the accuracy of its statement in the Perinatal Brochure, noting that the "brochure expressly cites studies supporting its assertion[.]" Because the State has not submitted those studies for our review, we are unable to establish the accuracy of the above-referenced statement. Plaintiffs' evidence thus creates questions of fact as to whether the assertions about mental health impacts are true. Accordingly, we shall withhold summary judgment on this issue.

### 8. *Indiana's In-Person Requirements*

#### *a.* **Questions of Material Fact Preclude Summary Judgment on Plaintiffs' Claims that the In-Person Counseling Requirement Creates an Undue Burden**

As discussed in detail, *supra* at 39-44, Plaintiffs have challenged Indiana's Telemedicine Ban as well as other statutes that create a *de facto* restriction on the use of telemedicine in the provision of abortion care, including the In-Person Examination Requirement and the In-Person Counseling Requirement. We review each of these individual requirements prior to turning to an analysis of the Telemedicine Ban.

Regarding Indiana's In-Person Counseling Requirement, the State directs us to *A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 688, 2002 WL

31050945 (7th Cir. 2002), in which the Seventh Circuit, in reliance on *Casey*, upheld this very statute as facially constitutional. The State requests that we defer to that ruling.

In *Newman*, the Seventh Circuit reversed the district court's permanent injunction blocking enforcement of Indiana's requirement that its mandatory disclosures be provided "in the presence of the pregnant woman." The Seventh Circuit,  consistent with the Supreme Court in *Casey*, recognized that this requirement obligates a woman seeking an abortion to make two trips to the clinic, imposing "both financial and mental" costs on the procedure that could otherwise be lessened or avoided. *Id.* at 685. Consequently, some women choose to travel to other states to secure an abortion, while others might forego entirely the procedure or at least delay it. *Id.*  691–92. Because this statute was substantially identical to the informed-consent statute upheld in *Casey*, the Seventh Circuit reversed the lower court's injunction, prohibiting its enforcement despite these burdens. *Id.* 692–93.

The Seventh Circuit stressed that *Casey* had held that "an informed-consent law is valid even when compliance entails two visits to the medical provider." *Id.* at 692. However, *Casey* acknowledged that "for those women who have the fewest financial resources, those who must travel long distances, and those who have difficulty explaining their whereabout to husbands, employers, or others," a statute creating a two-visit requirement would be "particularly burdensome." *Id.* The Court nonetheless ruled "these considerations insufficient to condemn" an informed-consent statute. The Seventh Circuit in *Newman* followed this command, upholding Indiana's In-Person Counseling

Requirement as facially constitutional, despite the acknowledged possibility that it would pose additional burdens on women.

We agree with Plaintiffs that *Newman* nonetheless left the door open for challenges to informed consent provisions that entail two visits by the patient. *See id* at 691 ("This is not to say that a two-visit requirement *could not* create a burden comparable to a spousal-notice requirement[.]"). We also agree that the record before us is significantly different than that one presented in *Newman*. Of particular significance is the widespread advancement in and reliance on telemedicine throughout Indiana, especially over the past five years. Neither the *Newman* nor the *Casey* Court had the opportunity to consider the onset and prevalence of telemedicine as it exists in 2020; the alternative to in-person counseling discussed in *Newman*, which was decided nearly twenty years ago, was to provide the disclosure information on paper or over the phone. *Id.* at 690. Face-to-face videoconferencing was not an option. Accordingly, we shall consider the extent to which advancements in telemedicine impact the State's benefits that come from requiring healthcare providers to obtain informed consent "in the presence" of their patients.

In non-abortion contexts, Indiana broadly encourages the use of telemedicine. As of 2015, the state has required health insurance policies to provide coverage for telemedicine services on the same terms as they provide coverage for healthcare services administered in person. And in 2016, Indiana enacted a law broadly authorizing healthcare providers to use telemedicine to treat patients in Indiana. As the nation

currently battles the COVID-19 pandemic, Indiana physicians have extensively relied on telemedicine to ensure ongoing care for their patients.[45]

With specific respect to its In-Person Counseling Requirement, the State maintains that in-person counseling inspires better engagement between provider and patient.  In-person interactions lead to better eye contact, a greater ability to read body language, and the development of a person-to-person relationship. Plaintiffs counter with evidence from states that have effectively incorporated telemedicine into their abortion services. Both patients and providers report positive results from interacting with one another in this setting. Telemedicine allows face-to-face, direct communications without requiring the women to travel. Providers have also found it easy to integrate telemedicine into their clinic operations and report that interactions with patients are essentially the same during the in-person visits.

The parties' evidence clearly conflicts with respect to the assessments of the benefits of the person-to-person direct communications. Viewing these disputed facts in the light most favorable to Plaintiffs, we find the benefits of in-person counseling to be significantly reduced, given Indiana's broad-based encouragement and use of telemedicine in other settings as well the success of other states who have incorporated this technology into their informed consent processes.

In light of such minimal benefits, the weight of this requirement's burdens are borne heavily by Indiana women in ways that the *Newman* court could not and did not

---

[45] Associated Press, *Indiana Doctors Use Telemedicine for Patient Visits* (June 22, 2020), https://www.wfyi.org/news/articles/indiana-doctors-use-telemedicine-for-patient-visits.

envision. If this requirement does not advance the efforts to ensure that providers effectively obtain informed consent, why should women—especially low-income women with limited resources and ability to travel—be subjected to the additional expense and effort and time to secure an abortion simply because she was required to come to the clinic in person? We need not elaborate further on the onerous burdens this places on women seeking abortions. [*Supra* at 23-25, 44].

Given these unresolved disputes, we cannot conclude as a matter of law that Indiana's In-Person Counseling Requirement does not create a substantial obstacle for women seeking previability abortions in Indiana.  The State's motion for summary judgment must be denied.

> b.      *Questions of Material Fact Preclude Summary Judgment On Plaintiffs' Claims that Indiana's In-Person Examination Requirements & Telemedicine Ban Create an Undue Burden*

Indiana requires that, prior to receiving an abortion, a woman must receive a physical examination by a licensed physician and that the dispensing or prescribing of abortion-inducing drugs not occur via telemedicine. The State defends these requirements as beneficial on several grounds. [*Supra* at 39-44].

First, the State argues that a physical examination, alongside the required ultrasound, are essential steps in identifying the gestational age of the fetus. Plaintiffs have not disputed that an ultrasound is vital to verifying gestational age (though, as discussed herein, they dispute Indiana regulations governing the administration of an ultrasound). However, it is not at all clear as a factual certainty that a physical examination provides any greater reliability or accuracy as to gestational age than an

ultrasound. Even the State acknowledges, for example, that "for medication abortions, an ultrasound is the best method for ensuring that the unborn child is the correct gestational age[.]" [Def. Br., p. 21]. And if an ultrasound is adequate in this regard, then the required physical examination provides no additional established benefits. Because we lack confidence that the State has established this fact beyond dispute, we will not credit the benefits of a physical examination in identifying gestational age.

The State also maintains that an in-person examination fosters the compilation of a complete medical history, enhancing the discovery of any contraindications. Plaintiffs rejoin that research has shown that the risks associated with a medication abortion are no greater when a women is screened for contraindications through telemedicine. Even when telemedicine is incorporated into abortion care, a patent still visits a clinic, where qualified personnel conduct an intake interview to compile her medical history and to perform an ultrasound. This information is then transmitted to the remote provider, presumably via technology. The prevalence of telemedicine throughout Indiana once again influences our analysis.

Accordingly, we find the facts underlying the benefits purportedly provided by the In-Person Examination Requirement to be at best unsettled. Plaintiffs have provided ample evidence to show that this examination poses minimal benefits for women seeking medication abortions. And the burdens that we have discussed throughout  this opinion are all imposed when women are required to receive in-person examinations. Viewing the purported benefits of this law for summary judgment purposes, in light of Plaintiffs' evidence, any benefits lose significance and increase the burdens.

106

We turn finally to Indiana's general Telemedicine Ban, which, as discussed, forbids providers from using telemedicine to prescribe or dispense abortion-inducing drugs. The only argument not previously discussed is the State's claim that the Telemedicine Ban is necessary to prevent the diversion of the medications used in an abortion procedure, mifepristone and misoprostol.[46] Plaintiffs focus their objections on the use of telemedicine in conjunction with a medication abortion. In that situation, a remote practitioner prescribes the medication, but the dispensing of the medications to the patient occurs at a clinic, where the patient ingests the mifepristone in the presence of clinic staff, and the patient takes home the misoprostol for later use.

The State offers no rebuttal to Plaintiffs' objection, which failure redounds, therefore, to Plaintiffs' favor. Plaintiffs' evidences creates a genuine issue of material fact as to whether the telemedicine ban provides any actual medical benefits. Without any benefits, the myriad of burdens identified throughout this Order foreclose the State's entitlement to summary judgment on this claim.

### 9. *Parental Consent and Judicial Bypass*

Indiana, like many other states, generally requires that minors secure either parental consent or a judicial waiver in order to receive an abortion. Ind. Code §§ 16-34-2-1(a)(1)(C), 16-34-2-4(a). Plaintiffs' Complaint appears to attack Indiana's Parental

---

[46] The State also notes that some providers prescribe opioids following a medication abortion, bolstering Indiana's need for a telemedicine ban to prevent diversion so the provider can "be sure" who takes the prescription. However, the statute at issue only applies to abortion-inducing drugs, so we do not find this additional fact to be relevant. Additionally, the State's evidence suggests that providers ordinarily write such prescriptions to "fill as needed," which undermines their assertion that the opioids are administered and consumed in the presence of the provider.

Consent Law in its entirety as facially unconstitutional. However, beyond including it within their Complaint, Plaintiffs have left this claim largely undeveloped in their summary judgment briefing.

Plaintiffs' objections to Indiana's enactment of a parental consent law, [*see* Pl. Br. 40-41 (arguing that parental consent laws are not advantageous to minors)], leave unaddressed the fact that states operate well within the bounds of due process in restricting minors access to abortion by requiring that they receive parental consent to proceed, so long as the states provide a "judicial bypass" exception. *Bellotti v. Baird*, 443 U.S. 622, 640, 647 (1979) (concluding that  "a State reasonably may determine . . . as a general proposition, that [parental consultation] is particularly desirable with respect to the abortion decision"  but "every minor must have the opportunity—if she so desires—to go directly to a court without first consulting or notifying her parents."). The opinion in *Bellotti* guides our analysis of the relevant standards for determining the facial constitutionality of Indiana's Parental Consent Law and Judicial Bypass provision, Ind. Code §§ 16-34-2-1(a)(1)(C), 16-34-2-4(a).

Under *Bellotti*, a parental consent statute must provide a judicial bypass procedure that (1) allows the minor to have an abortion without parental consent if she is sufficiently mature to make the decision on her own; (2) allows the minor to have an abortion without parental consent if it is in her best interests; (3) ensures the anonymity of the minor throughout the judicial proceeding; and (4) may be conducted expeditiously. *Id.* at 643–44.

The State stands by the constitutionality of Indiana's statute and its compliance with *Bellotti*. We agree with this assessment. Consistent with *Bellotti*, Indiana's parental consent statute requires a judicial waiver of parental consent "if the court finds that the minor is mature enough to make the abortion decision independently," or "that an abortion would be in the minor's best interests." Ind. Code § 16-34-2-4(e). The statute also requires that "[a]ll records of the juvenile court and of the supreme court or the court of appeals that are made as a result of proceedings conducted under this section are confidential," § 16-34-2-4(h) and that "[t]he juvenile court must rule on a petition filed by a pregnant minor . . . within forty-eight (48) hours of the filing of the petition." *id.* § 16-34-2-4(e). It also provides that the minor "is entitled to an expedited appeal," *id.* § 16-34-2-4(g). Indiana's abortion ban for minors who are wards of the State, Ind. Code § 16-34-1-10, permits these minors to avail themselves of the judicial bypass process. *Id.* § 16-34-2-4(b)(2). Accordingly, "[w]ards are in precisely the same situation as minors whose parents refuse consent." [Def. Br. p. 67].

Plaintiffs advance no specific challenges to the facial compliance of Indiana's Parental Consent and Judicial Bypass provisions with the *Bellotti* standard.[47] Though they do not contend that the statute fails to require for the expeditious adjudication of minors' judicial bypass petitions, they do allege that these bypass petitions are not always ruled on within 48 hours, as the statute also requires. This claim is not relevant to the facial validity of Indiana's Judicial Bypass provision under *Bellotti*, which is the issue

---

[47] Plaintiffs present evidence relating to the ability of adolescents to make informed decision-making, but they never extrapolate from these facts in their legal analysis.

pending before us. Plaintiffs concede that the statute provides for "expeditious" proceedings, which is the extent of the requirement imposed on the state; whether courts are in practice adhering to the 48-hour rule imposed by this statute is not a matter for us to resolve.

Plaintiffs also broadly challenge the effectiveness of these provisions, arguing, for example, that "Indiana's Parental Consent Law does not promote adolescent health" and criticizing Indiana for its failure to establish a "network of attorneys to help pregnant adolescents . . . prepare and file Judicial Bypass petitions." [Pl. Opp. Br., at 66]. Nice as such a cadre of available attorneys may be, Plaintiffs direct us to no law imposing that obligation on the State, especially as a precondition to a finding of facial validity of the underlying statute.[48]

Plaintiffs' arguments, such as they are, seem to concede that Indiana's Parental Consent Law, accompanied by the Judicial Bypass provision, is, on its face, constitutionally valid. Accordingly, we grant the State's motion for summary judgment on this claim.[49]

_____

[48] Instead, Plaintiffs focus on issues outside of the statute, for example, "the fact that adolescents generally take two weeks longer than adults to seek abortion care[.]"

[49] This holding is limited to Plaintiffs' challenges to Indiana's Parental Consent Law. Plaintiffs' Complaint does present challenges to specific portions of Indiana's Judicial Bypass provision that have not been addressed by the State in its summary judgment briefing. They include Plaintiffs' challenges to Indiana's requirement that a pregnant minor's application must be filed in the
minor's county of residence or county in which the abortion is to be performed, Ind. Code § 16-34-2-4(b); the prohibition against an abortion provider serving as the minor's next friend, Ind. Code § 16-34-2-4(b); and the requirement that a physician who believes compliance with the parental consent requirement would have an adverse effect on the pregnant minor file a petition seeking waiver of the requirement within twenty-four hours of the minor requesting the abortion,

10. *The State is Not Entitled to Summary Judgment on the Criminal Penalties*

The next Due Process issue raised in the parties' summary judgment briefing is Plaintiffs' challenge to the criminal penalties imposed for violations of Indiana's substantive abortion regulations.

The parties diverge in their views as to whether the Court should conduct a separate undue-burden analysis of Indiana's criminal penalties provisions, Ind. Code §§ 16-34-2-7(a)–(b), 16-21-2-2.5(b), 16-34-2-5(d)). The State maintains that "these challenges do not constitute a unique constitutional issue; the criminal prohibitions are valid if the substantive restrictions they enforce are valid." The State relies on the Supreme Court's decisions in *Gonzales v. Carhart* and *Casey* as support for its view. In *Gonzales*, the Supreme Court held that the federal partial-birth abortion ban, 18 U.S.C. § 1531, which criminalizes performance of partial-birth abortions, was not void for vagueness nor was it facially unconstitutional based on its overbreadth. 550 U.S. at 124. In *Casey*, the Court upheld Pennsylvania's informed-consent requirements, which were enforced with the threat of criminal liabilities. 505 U.S. at 844 (maj. op.). Plaintiffs respond that neither of these cases independently addressed the constitutionality of the challenged laws' criminal enforcement mechanisms apart from the laws' substantive requirements because the parties in those cases did not challenge the constitutionality of these criminal sanctions.

---

Ind. Code § 16-34-2-4(c). [Comp. ¶ 148]. In addition, this ruling does not encompass Plaintiffs challenges to the reporting requirements for minor patients, Ind. Code § 16-34-2-5(b). [*Id.*].

Regardless of whether the criminal penalties provisions are subject to independent judicial review, we conclude that the State is not entitled to summary judgment on this claim. Even if we were to adopt the State's reasoning that the "constitutionality of the criminal penalties . . . follows the constitutionality of the substantive abortion provisions they enforce," we are unable to enter summary judgment given our inability at this time to determine the constitutionality of all of the challenged statutes. And, if we were to conclude that Plaintiffs' theory is correct, then the State is not entitled to summary judgment due to its failure to conduct any undue burden analysis on this claim.

We therefore deny summary judgment for this criminal penalties claim.

### 11.  The State is Entitled to Summary Judgment on Claims Related to Indiana's "Dosage and Administration Requirements"

We address one final due process issue raised in Plaintiffs' Complaint. The Complaint challenges as unconstitutional a portion of Indiana Code § 16-34-2-1(a)(1), which Plaintiffs label as Indiana's "Dosage and Administration Requirements." This provision provides that "an abortion inducing drug may not be dispensed, prescribed, administered, or otherwise given to a pregnant woman after nine (9) weeks of postfertilization age unless the Food and Drug Administration has approved the abortion inducing drug to be used for abortions later than nine (9) weeks of postfertilization age." Plaintiffs' specific objection to this statute, however, remains unclear both from the text of the Complaint and the summary judgment briefing. The State contends, and Plaintiffs do not dispute, that this statute accords with the FDA guidelines for the administration of

Mifeprex. Plaintiffs leave this specific argument entirely unaddressed.[50] The State requests summary judgment establishing that this provision is facially valid, which request we shall grant.

### III.   The State is Entitled to Summary Judgment, In Part, on Plaintiffs' Equal Protection Claims

The Fourteenth Amendment provides that no state may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1, cl. 4. This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude" to draw appropriate lines: their "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* But a heightened standard of judicial review applies to state laws predicated on certain "suspect" classifications such as race, as well as to those which "impinge on personal rights protected by the Constitution[,]" *id.*, such as the right to obtain a previability abortion. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 n.3 (1976).

Here, Plaintiffs have alleged that the challenged statutes violate "patients' equal protection rights" by "impos[ing] unique burdens on abortion patients, but not on patients seeking similarly situated medical interventions, that make it harder, and sometimes impossible, to obtain abortions in Indiana." [Pl. Br., 69]. Plaintiffs further claim that the

---

[50] Following the filing of the State's Motion for Summary Judgment, Plaintiffs moved to voluntarily dismiss this claim, citing their own misunderstanding of what the statute required. We denied Plaintiffs' request on September 11, 2020.

challenged statutes discriminate between abortion providers as compared to non-abortion medical providers. Plaintiffs also assert that the challenged laws enforce unconstitutional sex stereotypes, constituting impermissible sex discrimination. [*Id.* p. 70].

Regarding Plaintiffs' final challenge above with regard to sex discrimination, we agree with the State that it cannot survive. We know of no precedent that supports applying the Equal Protection Clause in this manner. Though, as Plaintiffs have argued, the Supreme Court has not expressly rejected the theory that abortion regulations may impermissibly discriminate on the basis of sex, Plaintiffs identify not even a single case from any court which has embraced or sustained such a claim. Rather, as the State notes, the undue burden standard has consistently been applied in determining whether a statute constitutionally advances the state's interests.

From our extensive review, the few federal courts addressing this specific issue have foregone a traditional Equal Protection analysis in favor of applying *Casey*'s undue burden analysis. *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 549 (9th Cir. 2004) ("[E]ven if laws singling out abortion can be judicially recognized as not gender-neutral . . . *Casey* replaces the intermediate scrutiny such a law would normally receive under the equal protection clause with the undue burden standard. In fact, elements of intermediate scrutiny review particular to sex-based classifications . . . are evident in the *Casey* opinion."); *Am. Civil Liberties Union of Kansas & W. Missouri v. Praeger*, 863 F. Supp. 2d 1125, 1135 (D. Kan. 2012) ("The Court concludes it is neither rational basis nor intermediate scrutiny that applies; the *Casey* undue burden standard must be applied to

determine Plaintiff's [gender discrimination] equal protection claim.").[51] We shall follow this precedent here to hold that Plaintiffs' gender discrimination claims are not judicially cognizable apart from the undue burden analysis.

This rational, however, does not carry over to Plaintiffs' claims that the challenged statutes violate the Equal Protection Clause in drawing impermissible distinctions between women seeking abortion care and women seeking other, comparable medical care (such as miscarriage management). Though the parties dispute the applicable standard of scrutiny by the Court (rational basis or intermediate scrutiny) in this context, we draw on our previous explication to respond to the State's continued arguments based on the Equal Protection Clause:

> We think the standard under the Equal Protection Clause is the same as that under the Due Process Clause, that is, the undue-burden standard. Defendants agree at least that the Equal Protection Clause cannot be more protective of the abortion right than is the Due Process Clause.
>
> As the [Supreme] Court [has] explained, "The guarantee of equal protection . . . is not a source of substantive rights or liberties, but rather a right to be free from invidious discrimination in statutory classifications and other governmental activity." [Harris v. McRae, 448 U.S. 297, 322 (1980)]. Thus no heightened review applies where the law "does not itself impinge on a right or liberty protected by the Constitution," or, in other words, where the law "violates no constitutionally protected substantive rights." Id.
>
> Whether [a law] impinges on the abortion right is defined by the Due Process Clause. And because the Equal Protection Clause is not itself "a source of substantive rights," *id.*, Plaintiffs cannot expand the substantive scope of the abortion right by resort to the Equal Protection Clause. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33 (1973) ("It is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws.").

---

[51] We agree with the State that the dearth of case law on this issue reflects the unavailability of the Equal Protection Clause as a basis of relief for Plaintiffs.

> Accordingly, under the Equal Protection Clause, we review whether the [law's] classifications impinge on the exercise of the fundamental abortion right, *Plyler*, 457 U.S. at 216–17, as defined by the Due Process Clause. *Casey*, 505 U.S. at 846 (maj. op.).

[Dkt. 116, 52-53]. Thus, in reviewing Plaintiffs' Equal Protection claims, we analyze the benefits and burdens that flow from these classifications to determine whether any disparate treatment between non-abortion patients and abortion patients receiving similar medical services imposes a substantial obstacle to a woman's abortion decision.  The State's cursory discussion of this topic in the sex discrimination section of their Reply brief disadvantages their advocacy as well as the thoroughness our analysis.

To the extent Plaintiffs maintain that the challenged laws treat abortion providers differently than non-abortion providers (as opposed to the women seeking abortions) in violation of the Equal Protection Clause, the parties agree that the rational basis test applies. But because these challenges have not received the kind of thorough discussion and fulsome briefing required, they are not amenable to summary judgment. Despite its well-developed arguments against the Equal Protection Clause as a basis for Plaintiffs' relief, the State glosses over the rational-basis discussion relating to the challenged statutes. Plaintiff's response is correspondingly meager. The State's belated criticism of Plaintiffs' failure to comprehensively address the allegations in the Complaint is also unavailing. Plaintiffs are not to be faulted nor ruled against on an issue for which the State bears the burden and has failed to entirely address it.

**IV.   The State is Entitled to Partial Summary Judgment on Plaintiffs' First Amendment Claims**

Plaintiffs challenge Indiana's Mandatory Disclosures as violative of a woman's substantive due process rights. Plaintiffs also assert that these requirements violate the First Amendment Freedom of Speech rights of healthcare providers. We incorporate here our prior analysis of the constitutionality of Indiana's Mandatory Disclosures in the due process context. *See Casey*, 505 U.S. at 884–85 (joint op.) (finding that mandatory disclosures did not violate physician's First Amendment rights where such disclosures did not create substantial obstacles for women seeking abortions). Accordingly, the State's request for summary judgment on the First Amendment claim is granted in part and denied in part, consistent with our findings in Section III(B)(7)(b): Summary judgment is granted with respect to Plaintiffs' challenges to the Indiana Code provisions regulating the disclosure of fetal tissue disposal as well as the physical health risks contained in the Perinatal Hospice Brochure. The State's request for summary judgment on the First Amendment claim is denied in all other respects.

## V.     The State is Entitled to Summary Judgment on Plaintiffs' Vagueness Claims[52]

Plaintiffs' Complaint challenges parts of three statutes on the grounds that they render the laws void for vagueness:  (1) the requirement that an abortion provider must be of "reputable and responsible character" (Ind. Code § 16-21-2-11(a)(1); 410 Ind. Admin. Code 26-2-5(1)); (2) the requirement that an applicant disclose whether an abortion clinic closed "as a direct result of patient health and safety concerns" (Ind. Code § 16-21-2-

---

[52] Rather than responding to the State's motion with respect to these vagueness claims, Plaintiffs moved to voluntary dismiss them. As stated, we denied this request.

117

11(d)(1)) or if a principal or clinic staff member was ever "employed by a facility owned or operated by the applicant that closed as a result of administrative or legal action" (Ind. Code § 16-21-2-11(d)(3)); and (3) the restrictions on dosage and administration of the medications utilized to induce abortions (Ind. Code § 16-34-2-1(a)(1)).

The Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1, cl. 3. "It is a fundamental tenet of due process that 'no one may be required at peril of life, liberty or property to speculate as to the meaning of . . . statutes.'" *United States v. Batchelder*, 442 U.S. 114, 123 (1979) (alteration omitted) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)). Thus, a state violates the constitutional guarantee of due process "by taking away someone's life, liberty, or property under a . . . law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015) (citing *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983)). These statutes satisfy due process standards only if they "define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Bell v. Keating*, 697 F.3d 445, 461 (7th Cir. 2012).[53]

This Court has previously addressed, and the Seventh Circuit affirmed, Indiana's "reputable and responsible character" standard. [Dkt. 116, at 47]. Plaintiffs present no

---

[53] For a full discussion of the vagueness doctrine, *see* docket at 116 at 40-42.

arguments in opposition to the State's request for summary judgment on this claim. Accordingly, consistent with our earlier determinations, we hold that the State is entitled to summary judgment on this issue.

The State is also entitled to summary judgment with respect to Indiana's requirement that any person or entity applying to operate an abortion facility must disclose if the applicant, the applicant's owner, or the applicant's affiliates previously operated an abortion clinic that was closed under specified circumstances. As the State wryly notes, "What [Plaintiffs] find[] vague about these requirements is not clear." In its preliminary injunction briefing, Plaintiffs challenged the term "affiliate" as vague, but this issue has been addressed and resolved against Plaintiffs. [Dkt. 116, at 60 ("There is no longer any room for confusion on the meaning 'affiliate.'")]. Plaintiffs do not rebut the finding that these provisions "provide fair warning about what is expected, in clearly ascertainable terms, and leave no room for interpretation by the licensing agency such that the provision could be applied arbitrarily." We thus shall grant summary judgment in favor of the State on this claim.

Plaintiffs' final vagueness challenge attacks Indiana's restrictions on administering mifepristone. This statute provides, in relevant part: "[A]n abortion inducing drug may not be dispensed, prescribed, administered or otherwise given to a pregnant woman after nine weeks of postfertilization age unless the Food and Drug Administration has approved the abortion inducing drug to be used for abortions later than nine (9) weeks of postfertilization age." Indiana Code §16-34-2-1(a)(1). We hold that every portion of this provision is understandable by a reasonable person and provides clearly ascertainable

standards. Plaintiffs appear to have acceded to that assessment. Accordingly, the State is entitled to summary judgment on this claim as well.

## **CONCLUSION**

For the reasons explicated above, the State's Motion for Summary Judgment [Dkt. 213] is **granted in part and denied in part**, as follows:

- Summary Judgment is **granted** in favor of the State with respect to Plaintiffs' Fourteenth Amendment Substantive Due Process challenges outlined in Count I as they relate to:

  - The Licensure Requirement;
  - The Reporting Requirements;
  - The Admitting Privileges Requirement;
  - The Dosage and Administration Requirements;
  - The Facility Requirements;
  - The Mandatory Disclosures regarding the disposal of fetal tissue and the physical health risks stated in the Perinatal Hospice Brochure;
  - The Ultrasound Requirement;
  - The Eighteen-Hour Delay Requirement; and
  - The Parental Consent Law.

- The State's Motion for Summary Judgment is **denied** with respect to Plaintiffs' due process challenges in Count I relating to the following requirements and provisions:

  - The Physician-Only Law;
  - The Second-Trimester Hospitalization Requirement;
  - The In-Person Examination Requirement;
  - The Telemedicine Ban;
  - The In-Person Counseling Requirement;
  - The Mandatory Disclosures related to fetal pain, the beginning of life, the physical health risks of abortion, and the mental health risks contained in the Perinatal Hospice Brochure;
  - the Criminal Penalties provision; and

- o Any and all provisions that were left unaddressed by the parties, including the specific portions of the Judicial Bypass provision, Ind. Code § 16-34-2-4(b)-(e), regulating minors seeking abortion care as well as reporting requirements tailored to minors.

- Summary Judgment is **granted** in favor of the State with respect to Plaintiffs' claim that the Indiana abortion code constitutes impermissible gender discrimination in violation of the Fourteenth Amendment's Equal Protection Clause, as set out in Count II of the Complaint. Summary judgment on Count II is **denied** in all other respects.

- Summary judgment is **granted** in favor of the State with respect to Plaintiffs' claims in Count III that the Indiana Code provisions relating to the disclosure of fetal tissue disposal as well as the physical health risks contained in the Perinatal Hospice Brochure violate the First Amendment. Summary judgment is **denied** as to Court III in all other respects.

- Summary judgment in favor of the State on Plaintiffs' Vagueness Claims (Count IV) is **granted.**

IT IS SO ORDERED.

Date:   10/9/2020

_SARAH EVANS BARKER, JUDGE_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution to all parties of record via CM/ECF.