UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WHOLE WOMAN'S HEALTH ALLIANCE, )
ALL-OPTIONS, INC., )
JEFFREY GLAZER M.D., )
                                           )
                Plaintiffs, )
                                           )
                 v. )           No. 1:18-cv-01904-SEB-MJD
                                           )
TODD ROKITA Attorney General of the State )
of Indiana, in his official capacity, )
KRISTINA BOX Commissioner of the Indiana )
State Department of Health, in her official )
capacity, )
JOHN STROBEL M.D., President of the )
Indiana Medical Licensing Board of Indiana, )
in his official capacity, )
KENNETH P. COTTER St. Joseph County )
Prosecutor, in his official capacity and as )
representative of a class of all Indiana )
prosecuting attorneys with authority to )
prosecute felony and misdemeanor offenses, )
                                           )
              Defendants. )
_____)
                                           )
INDIANA DEPARTMENT OF )
CORRECTION, )
Marion Superior Court, )
                                           )
             Interested Parties. )

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION TO EXCLUDE**

Plaintiffs Whole Woman's Health Alliance, All-Options, Inc., and Jeffrey Glazer,

M.D. (collectively, "Plaintiffs") have sued Defendants Todd Rokita, Attorney General of

Indiana; Kristina Box, M.D., Commissioner of the Indiana State Department of Health;

John Strobel, M.D., President of the Medical Licensing Board of Indiana; and Kenneth P. Cotter, St. Joseph County Prosecutor ("the State") under 42 U.S.C. § 1983, challenging as unconstitutional a wide array of Indiana's statutory and regulatory restrictions on providing and obtaining abortions.

Now before the Court is Plaintiffs' Motion to Exclude or Limit Expert Testimony at Trial.[1] For the reasons set forth herein, this motion is **granted in part and denied in part.**

### Standard of Review

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993)." *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014). Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Where the "testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the

---

[1] The State also filed a motion to exclude, which we address in a separate order.

testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire*, 526 U.S. at 149 (*quoting Daubert*, 509 U.S. at 592).

## Discussion

Pursuant to *Daubert* and Rule 702, Plaintiffs request an order excluding the State's experts from offering the following opinions at trial.

**I.      Ms. Stasia Roth's Testimony Relating to the Subjects Outlined in Her Expert Report Is Admissible, In Part**

Plaintiffs' first request is for an order excluding Stasia Roth, the founder and Executive Direct of A Mother's Hope ("AMH"), an organization serving homeless, pregnant women based in Fort Wayne, Indiana, from testifying as an expert in this case. Plaintiffs have interposed several objections to Ms. Roth's proposed testimony, each of which is addressed in detail below.

*A. The Proposed Testimony Contained Within Section II of Ms. Roth's Report Is Irrelevant*

Section II of Ms. Roth's expert report opines on the reasons women choose to pursue abortion services—for example, because they are experiencing housing crises or struggling with unmet mental health needs—as well as reasons women decide, alternatively, to carry their pregnancies to term.

Plaintiffs first contend that Ms. Roth's experiences at AMH do not provide a sufficient foundation for these opinions or for others that appear later in her report. According to Plaintiffs, "[Ms. Roth] does not interact with abortion patients on a regular basis" through her work at AMH, nor has she "spoken with anyone seeking an abortion in nearly twenty years." [Dkt. 273, at 2]. Plaintiffs thus categorize Ms. Roth's opinions as

merely speculative. *See Ammons v Aramark Unif. Servs.*, 368 F. 3d 809, 816 (7th Cir. 2004) ("A court is expected to reject any subjective belief or speculation.") (internal quotations omitted).

Plaintiffs' objection goes to the weight of her opinions, rather than their admissibility, and thus can be pursued by Plaintiffs on cross-examination. While it may be established that Ms. Roth has had limited interactions with women who ultimately chose to obtain abortions, her expert report and deposition testimony establish that she regularly interacts with women who have or are considering abortion as an option for their unplanned pregnancies. [Roth Depo., p. 65-66; Roth Expert Rep. ¶¶ 2, 8, 25]. We find that her proposed testimony is sufficiently supported by her own experiences. *See Walker v. Soo Line R. Co.*, 208 F.3d 581, 589 (7th Cir 2000) ("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.")

Plaintiffs also challenge the relevancy of Ms. Roth's proposed testimony presented in Section II of report, contending that it does not assist in the resolution of the due process challenges, which is the gravamen of this case. As the State has proffered, Ms. Roth's testimony will go to establish that "very few women, *if any*, actually want an abortion at all, but rather 'seek[] abortions when they believe they have no other choice." [Dkt. 277, at 3 (quoting Roth Expert Report, ¶ 8) (emphasis in original)]. Plaintiffs' objection to this testimony on relevancy grounds reflects their view that this evidence is primarily an attempt to litigate the desirability of abortion, a question not at issue here.

4

We share is Plaintiffs' assessment of the evidence. A woman's right to choose a pre-viability abortion is firmly rooted and well established. *See, e.g., Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309–10 (2016); *Lawrence v. Texas*, 539 U.S. 558, 565, 573–74 (2003); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851–53, 872 (1992); *Roe v. Wade*, 410 U.S. 113, 152–54 (1973). The ultimate issues in this case require us to determine whether the State has imposed undue burdens on this right. *Hellerstedt*, 136 S. Ct. at 2300. That the State contends that few women genuinely desire abortion, even if true, does not assist in the resolution of any issue before us. It offers no insight or clarity as to whether a woman's right to choose an abortion, if she so desires, is unlawfully burdened by the challenged statutes. The State further argues that Ms. Roth's testimony is relevant to the issue of whether women are firm in their decisions when they present at abortion clinics, as Plaintiffs' experts have theorized. However, Ms. Roth's proffered testimony provides no analysis or insight as to the issue of a woman's level of confidence in her decision to pursue an abortion once she elects to obtain those services and presents at a clinic.

For these reasons, we rule that Ms. Roth's opinions contained within paragraphs 8-9 of expert report may not be introduced into evidence at trial.

B. *Ms. Roth's Opinions on the Subjects Covered in <u>Section III</u> of Her Expert Report Are Admissible*

In Section III of her expert report, Ms. Roth describes resources available to pregnant women and young families in Indiana. Plaintiffs seek exclusion of these opinions on the grounds of relevancy.

The State maintains that Ms. Roth's testimony as to such resources will assist the Court in resolving certain issues before it. The fact that an expert's opinions does not go to the "ultimate issue" of a case is not necessarily a basis for its exclusion, as the State correctly asserts. Rather, expert testimony is relevant when "the testimony will assist the trier of fact with its analysis of any of the issues involved in the State." *Smith v. Ford Motor Co.*, 215 F.3d 713, 721 (7th Cir. 2000). Here, the State argues that Ms. Roth will rebut Plaintiffs' experts' testimony as to the availability of resources as well as bolster the State's defense of its informed consent requirements by establishing the value of providing these resources to women and "giving them the time to consider their decisions."[Dkt. 277, at 10].

Plaintiffs offer little by way of a response to this argument, advancing no specific rebuttal as to the relevancy of Ms. Roth's testimony. Without more from Plaintiffs, we will not order the exclusion of Ms. Roth's testimony in advance of trial.

Plaintiffs' claim that Ms. Roth has also failed to articulate a sufficient basis for her conclusion that "adequate resources" are available to women who carry their unintended pregnancies has not been sufficiently developed in Plaintiffs' briefing. The State's contention that Ms. Roth is well-versed in the operation and practices of the programs identified in her expert report by virtue of her personal experiences at AMH has gone unchallenged.[2] Lacking any substantive argument by Plaintiffs, Ms. Roth will be permitted to offer her opinions as contained within Section III of her report at trial.

---

[2] The deposition excerpts proffered by Plaintiffs do not establish a lack of personal experience, as Plaintiffs contend.

*C.  Ms. Roth's Testimony Relating to the Subjects Presented in <u>Section IV</u> of Her Expert Report Is Admissible, In Part*

In Section IV of her expert report, Ms. Roth opines that pregnancy and childrearing give "pregnant, homeless women, including many facing the threat of violence . . . the motivation to pull their lives together." [Roth Expert Rep. ¶ 22]. Plaintiffs (again) challenge the relevancy of this testimony, given that the case at bar requires a determination of whether women seeking access to abortion care are unduly burdened by the requirements of the specific statutes. The State (again) responds that Ms. Roth's proposed testimony is relevant, given that is the testimony of Plaintiffs' experts that childbirth and childrearing (as opposed to abortion) can be harmful to women, particularly to poor women and women experiencing intimate partner violence. "The consequences of unintended pregnancy and childbirth . . . are thus at issue in this case at Plaintiffs' own behest," argues the State. [Dkt. 278, at 5].

Plaintiffs' rebut the State's characterization of its experts' proffered testimony, explaining that they are not expected to testify as to whether abortion is a better resolution for unintended pregnancies, rather that the unlawful restriction of access to abortion for those women who desire it results in negative health consequence for such women, particularly for those who are otherwise in some vulnerable condition. [*See e.g.*, Grossman Expert Rep. ¶¶ 185, 190; Gudeman Expert Rep. ¶ 29]. Such harms, say

Plaintiffs, defeat the State's theory that the challenged statutes advance the State's interest in women's health and safety.

Plaintiffs' experts are expected to focus on the harms and detrimental consequences that result from compelling a woman to carry her pregnancy to term by making abortion services either unnecessarily difficult to access or otherwise unavailable; for example, such inaccessibility might result in women turning to illegal and unsafe methods to terminate pregnancy. [Grossman Expert Rep. ¶ 190]. This testimony does not go to prove that abortion is the proper or less burdensome solution to unintended pregnancies; rather, it would illustrate the harms befalling women when their freedom to choose their own outcome is unlawfully restricted, according to Plaintiffs. We agree with Plaintiffs that evidence of such harms is relevant for the purpose of determining whether the challenged statutes serve the State's purported interests in patient health and safety, and thus it may be introduced for this purpose.

In contrast, Ms. Roth's opinions as to the benefits of carrying an unintended pregnancy to term, thereby supporting the State's implication that motherhood is the preferable alternative to abortion, does not advance the Court's resolution of issues before it. Whatever sense of fulfillment pregnancy and motherhood may provide to those who choose that option is not relevant to whether the harms inflicted upon women whose right to be free from state-required motherhood has allegedly been infringed. *See Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 837–38 (1992) ("[T]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom it is irrelevant.").

8

Plaintiffs also challenge Ms. Roth's second conclusion contained within Section IV of her report where she opines that, from her experience, perpetrators of intimate partner violence are more likely to coerce a pregnant woman into having an abortion than to continue her pregnancy to term. This opinion apparently contradicts that of Plaintiffs' experts.

Ms. Roth has not supported her conclusion with any studies, and Plaintiffs argue that her limited anecdotal experiences with pregnant victims of intimate partner violence do not satisfy Rule 702(b)'s requirement that expert testimony be based on sufficient facts and data.

The State defends Ms. Roth's opinion on this issue, arguing that it is adequately supported by her personal experiences working with pregnant victims of intimate partner violence. Ms. Roth's report details her work with a number of pregnant women who have been the victims of intimate partner violence, including several who reported feeling coerced by their partners into receiving abortions. In contrast, she recounts that she has never encountered a woman who has expressed the feeling of being coerced into carrying her pregnancy to term. Based on these personal experiences, Ms. Roth may proffer this testimony at trial, which we expressly limit to her own experiences at AMH. *See Walker*, 208 F.3d at 589.

### D. Ms. Roth's Testimony on the Subjects Presented in <u>Section V</u> of Her Expert Report Is Admissible

Plaintiffs next seek to exclude Ms. Roth's opinions relating to the alleged negative psychological effects of abortion, specifically, her experience that the women she has

worked with who have had abortions "suffer from depression, anxiety, PTSD, and suicidal thoughts that were not present before they had abortions."

We share in Plaintiffs' assessment that Ms. Roth's qualifications to offer testimony suggesting a link between abortion and mental health problems have not been established. In is undisputed that Ms. Roth has no training or education in psychology or psychiatry, nor do her professional duties as the Executive Director of AMH include providing counseling services. Ms. Roth, the State concedes, does not "make mental health diagnoses herself; rather she is referring to the self-reported mental health conditions of the women AMH supports." Such self-reporting she does attempt to corroborate, "when possible," with medical records or conversations with health care providers. [Dkt. 277, at 6]. However, whether AMH's clients are qualified to self-report or self-diagnose their mental health conditions or how frequently they do so is not in the record before us. The fact that Ms. Roth *sometimes* is successful in corroborating these self-reports through a comparison of medical records does not overcome these deficiencies, particularly because there is no evidence showing her qualifications to review or evaluate medical records.[3] *Berry v. McDermid Transp., Inc.*, 2005 WL 2147946, at *2 (S.D. Ind. Aug. 1, 2005) ("To testify as an expert on medical questions, [an expert] needs sufficient qualifications"); *see also Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 724, 1999 WL 551879 (7th Cir. 1999). Ms. Roth is thus not qualified as an expert to

---

[3] The State points to the Seventh Circuit's decision in *Walker* is support of its contention that Ms. Roth is permitted to rely on self-reported patient histories. This case held that medical professionals may rely on such self-reports. Because Ms. Roth is indisputably not a medical professional, *Walker* is inapposite. 208 F.3d at 586.

opine on the mental health diagnoses of women at AMH who have received abortions, nor is the State entitled to use such testimony to prove the purported mental health consequences of abortion.

### E. Ms. Roth's Testimony Regarding the Subjects Presented in Section VI of Her Expert Report Is Admissible

Plaintiffs' next objection concerns Ms. Roth's rebuttal opinion that, based on her experiences working at AMH with homeless pregnant women, Plaintiffs' experts have "overstated the burdens imposed by Indiana's regulations," particularly the stigma felt by women pursuing abortions. Plaintiffs' objection is narrow: Citing the fact that Ms. Roth does not work with women seeking abortion services, her opinions as to their feelings and experiences are unreliable. We have previously noted that Plaintiffs, in interposing these objections, misconstrue the nature and extent of Ms. Roth's experiences serving pregnant women; the evidence reveals that she works with women who are considering abortion, women who originally sought an abortion but thereafter changed their minds, and women who have previously had abortions. Plaintiffs' focus on the limitations of Ms. Roth's experiences is best addressed through vigorous cross-examination.  On this narrow point, Ms. Roth may offer her opinion(s).

### F. Ms. Roth's Testimony On The Subjects Presented in Section VII of Her Expert Report Is Admissible

Plaintiffs' final argument with respect to Ms. Roth's expert testimony is that she should not be permitted to offer opinions regarding whether telemedicine poses challenges for low-income women. Ms. Roth's opinions are reportedly based on her experiences serving low-income women, who, she says, often struggle with speaking up

11

or asking questions of individuals in authority positions, including in the medical field. These alleged difficulties are heightened when communications occur by phone. According to Ms. Roth, telemedicine would exacerbate existing communications barriers between low-income women and health professionals.

Because Ms. Roth has neither studied patients' experiences with telemedicine nor interacted with low-income women who have utilized telemedicine services in this setting, Plaintiffs object to her opinions as lacking a proper foundation.

The State rejoins that Ms. Roth is proffered only for a limited purpose that is based on her extensive communications with low-income patients to aid their navigation of health systems, which experience provides her with knowledge as to such challenges.

Ms. Roth's limited testimony regarding the potential challenges of telemedicine is admissible, based on her work with low-income pregnant women in Indiana. She may thus testify regarding their challenges she has observed when they engage in communications regarding health services. Other issues relating to telemedicine (for example, issues related to informed consent or the illicit distribution of abortion drugs) are beyond the scope of her personal experiences and would thus be inadmissible.

## II.    Dr. Coleman's Testimony Relating to the Opinions Contained Within Her Expert Report Is Admissible, In Part

Plaintiffs next set of challenges relates to the proffered testimony of Dr. Priscilla Coleman, Ph.D., a developmental psychologist and professor of Human Development and Family Studies at Bowling Green University. Dr. Coleman is designated as one of the State's experts on the mental health effects of abortion. As discussed in detail below,

Plaintiffs challenge Dr. Coleman's opinions as not being the product of reliable principles and methods, relying on her own studies "that are riddled with serious methodological errors." [Dkt. 274, at 7]. Accordingly, Plaintiffs have moved to exclude the entirety of Dr. Coleman's testimony as set out in Section V of her expert report, as well as in paragraphs 13-15, 28, 183-184, 187-191, 196, and 202 of that same report.

Plaintiffs' first challenge is based on their assertion that a reliable study concerning the impact of abortion on a patient's mental health must reflect data only from abortions preceding the evaluated mental health impact. Because several of the studies cited by Dr. Coleman fail to do so, they should be excluded from inclusion in the trial evidence.

One study,[4] for example, cited by Dr. Coleman, purportedly supports her conclusion that women who chose abortion face an increased risk of mental health problems as compared to women who carry their pregnancies to term. [Coleman Expert Rep. ¶ 105]. Plaintiffs cite the fact that because this study included women who had at any time experienced a mental health problem in their lives, without distinguishing between mental health problems occurring before the abortion and those occurring after, renders the conclusions irrelevant.

A 2009 study, co-authored by Dr. Coleman, and relied upon in her expert report, suffers from a similar methodological flaw,[5] according to Plaintiffs. Indeed, the editor of

---

[4] Natalie P. Mota, *Associations Between Abortion, Mental Health Disorders, & Suicidal Behaviors in a Nationally Representative Sample*, 55 Canadian J. of Psychiatry 239, 239-49 (2010).
[5] Priscilla K. Coleman et al., *Induced Abortion and Anxiety, Mood, & Substance Abuse Disorders: Isolating the Effects of Abortion in the National Comorbidity Survey, 43 J. of Psychiatric Res.* 770, 770-76 (2009)

the journal in which this study was published subsequently issued a letter criticizing the 2009 study because the "analysis [did] not support [the author's] assertions that abortions led to psychopathology[.]"[6]

The State argues that Plaintiffs are misconstruing Dr. Coleman's opinions, claiming she is attempting to show *causation* between abortion and mental health, when in fact she is attempting to demonstrate generally that abortion increases the risk of adverse mental health outcomes. The State concedes that a particular study may not satisfy the standards for proving causation; even so, it says inferences may nonetheless be drawn from such studies where there is a "careful collection and analysis of studies with relative strengths and weakness in different aspects of their experimental design." [*See* Coleman Expert Rep. ¶¶ 144-151].

The State's defense of Dr. Coleman's reliance on these arguably flawed studies stops short of addressing whether they do, in fact, contain the methodological flaws identified by Plaintiffs. Instead, the State attempts to establish that Dr. Coleman utilized a widely accepted methodology in reaching her conclusions as to the increased mental health risks resulting from abortion. The State's defense of Dr. Coleman's methodology, however, relates solely to the one she employed with respect to a meta-analysis she published in 2011 (which is the subject of a separate objection); the State does not address whether the other studies on which she has relied reflect the flaws identified by Plaintiffs. Rather, the State conclusively asserts that Plaintiffs have "cherry-pick[ed]

---

[6] Kessler, R.C. & Schatzberg, A.F. (2012), *Commentary on Abortion Studies of Steinberg and Finer and Coleman*, Journal of Psychiatric Research, 46, 410-411.

objections to the designs of particular studies," arguing that Dr. Coleman "approaches her selection of studies with great care" and should "have the opportunity to explain the strengths of th[e]se studies."

The State's championing of Dr. Coleman's careful intentions and methodology with respect to her meta-analysis does not overcome Plaintiffs' concerns about the cited studies nor establish that they are "beside the point." The entire purpose of the *Daubert* reliability inquiry is to focus on the purported expert's principles and methodology. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012).

We cannot ignore the methodological errors infecting the aforementioned studies, and the State's rejoinder that the studies cited by Dr. Coleman were all peer-reviewed does not overcome the fact that the journal in which one of these studies was published later disavowed the study's findings based on the authors' flawed methodology. *Daubert*, 509 U.S. 579 at 594 ("The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.")

Accordingly, Dr. Coleman's testimony regarding these particular studies is insufficiently reliable to become evidence at trial that will inform the Court's decision-making.[7]

---

[7] It does not follow, as Plaintiffs seem to suggest, that the unreliability of these two studies warrants the exclusion of Dr. Coleman's testimony in its entirety. The weaknesses of the cited studies and her conclusions tied thereto are inadmissible, but she apparently relied on several other studies, the integrity of which has not been specifically challenged by Plaintiffs. [*See* Coleman Expert Rep. ¶ 105 (listing sources)].

Plaintiffs assert that certain other studies relied upon by Dr. Coleman also contain methodological flaws rendering them and Dr. Coleman's resulting conclusions unreliable. In examining the relationship between abortion and subsequent mental health, assert Plaintiffs, researchers are required to control for common risk factors, known as covariates or confounding factors. Dr. Coleman's cited sources, however, fail to control for such factors. One 2006 study authored by Dr. Coleman,[8] for example, did not control for prior mental health outcomes. Another 2002 study co-authored by Dr. Coleman suffers from this same methodological flaw.[9]

The State's rebuttal posits that an alternative to controlling for a confounding variable is to restrict the study's population to individuals with equivalent risk with respect to the variable. The 2002 and 2006 studies applied such an approach, which the State maintains was an appropriate methodology. Moreover, Plaintiffs acknowledge that other studies cited by Dr. Coleman *do* include controls for mental health.

Plaintiffs did not specifically respond to the State's rebuttal. Accordingly, we accept their implicit concession and will analyze this issue no further in this setting.

Plaintiffs also contend that Dr. Coleman's report misapprehends the methodology of some of the studies on which she relies. One source,[10] for example, compares women

---

[8] Priscilla K. Coleman, *Resolution of Unwanted Pregnancy During Adolescence through Abortion Versus Childbirth: Individual & Family Predictors & Psychological Consequences*, 35 J. Youth & Adolescence 903, 903-11 (2006).

[9] Priscilla K. Coleman et al., *State-Funded Abortions Versus Deliveries: A Comparison of Outpatient Mental Health Claims Over 4 Years*, 72 Am. J. Orthopsychiatry 141 (2002).

[10] Anne Nordal Broen et al., *Predictors of Anxiety and Depression Following Pregnancy Termination: A Longitudinal Five-Year Follow-up Study*, 85 Acta Obstetricia et Gynecologica Scandinavica 317, 317-23 (2006); Anne Nordal Broen et al., *Psychological Impact on Women of*

who have had abortions to those who have had miscarriages rather than to women who have carried their pregnancies to term. Dr. Coleman's conclusion that abortions pose greater risks to mental health than carrying unintended pregnancies to term is flawed, argue Plaintiffs, "since women who experience a miscarriage . . . are not comparable to women who have an abortion[.]." [Dkt. 273, at p. 9].

The State denies any error by Dr. Coleman. It argues that determining the appropriate comparator group is a "hotly disputed factual issue." That Plaintiffs' experts and Dr. Coleman apparently disagree as to the appropriate or best comparison group, according to the State, is not grounds for exclusion.

Again, we lack any rebuttal from Plaintiffs. We thus adopt the State's contention that this objection embodies a sensitive factual issue on which both side's experts should testify at trial (and be subjected to cross-examination). *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 847 (7th Cir. 2017) ("[I]t is often the case that experts reach conflicting conclusions based on applying different but nevertheless reliable methodologies to a set of partially known facts."); *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 433 (7th Cir. 2013) ("Rule 702 did not require, or even permit, the district court to choose between [two 'competing'] studies at the gatekeeping stage. Both experts were entitled to present their views, and the merits and demerits of each study can be explored at trial.").

---

*Miscarriage Versus Induced Abortion: A 2-Year Follow-up Study*, 66 Psychosomatic Med. 265, 265-71 (2004).

Plaintiffs' final critique of Dr. Coleman's report relates to its reliance on a meta-analysis she published in 2011,[11] which they claim has been "widely rejected by the scientific community." [Dkt. 274, at 10]. Plaintiffs maintain that the "significant errors in the methods, analyses, and reasoning of Dr. Coleman's meta-analysis render it unreliable[.]" [*Id.*]. Such errors include "violating guidelines for conducting a meta-analysis; treating effect sizes that were from the same data as independent; not adhering to the inclusion and exclusion criteria for studies; misclassifying the comparison groups of the studies identified in the meta-analysis; and wrongfully inferring the percentage of births in the United States that are unintended[.]" [*Id.* at 11].

Critics of this meta-analysis are not to be minimized or ignored; they include, for example, the Academy of Royal Colleges/National Collaborating Centre for Mental Health, the leading scientific and professional organization in the United Kingdom. This group concluded that the "methodological problems" with the meta-analysis "bring[] into question both the results and the conclusions."[12] Additionally, commentary published in 2011 by "some of the authors of the National Collaborating Centre," [Dkt. 274, at 11], concluded that the meta-analysis "cannot be regarded as a formal systematic review."[13]

---

[11] "A meta-analysis is a specific form of systematic literature review wherein quantitative data from multiple published studies are converted to a common metric and combined statistically to derive an overall measure of the effect of an exposure such as abortion." [Coleman Exp. Report ¶ 108].

[12] National Collaborating Centre for Mental Health (2011). *Induced Abortion and Mental Health: A Systematic Review of the Mental Health Outcomes of Induced Abortion, Including their Prevalence and Associated Factors.* London, UK: National Collaborating Centre for Mental Health.

[13] Kendall, T. et al. (2012). *To Meta-Analyze or Not to Meta-Analyze: Abortion, Birth, and Mental Health.* Brit. J. Psychiatry, 200(1), 12-14.

Plaintiffs' critiques of Dr. Coleman's methodology sweep broadly without the benefit of any substantive analysis. Aside from a list of purported "flaws" in her meta-analysis, they offer *no* explanation of how her meta-analysis supposedly committed the identified errors, nor how such errors are violative of the relevant standards within the scientific community. Vague assertions including that she "violated guidelines for conducting a meta-analysis" or that she failed to "adhere[] to the inclusion and exclusion criteria for studies" say nothing about the substance of such guidelines and criteria, nor the manner in which she violated them. Based on such sparce information and arguments, we cannot conclude that Dr. Coleman's methodology was unreliable.

Plaintiffs rely on the apparent fact that Dr. Coleman's analysis has been "rejected" by the scientific community, such rejections coming in the form of critiques from a widely-respected professional organization and a set of commentators. That said, Plaintiffs have not disputed the State's defense of the meta-analysis, specifically that it was published in the British Journal of Psychiatry, another highly respected journal in the field of psychiatry, and has never been retracted. Suffice to say, scientific opinion as to the validity and reliability of the meta-analysis is mixed. [*See* Coleman Expert Rep. ¶¶ 137-153].

Based on these differing views and Plaintiffs' weak rebuttal, we are not persuaded that Dr. Coleman's testimony must omit opinions based on her meta-analysis. *See Baugh*, 845 F.3d 838, 847 (7th Cir. 2017); *Schultz*, 721 F.3d at 433.[14]

---

[14] Our research has disclosed two cases addressing the reliability and admissibility of Dr. Coleman's allegedly controversial opinions on mental health and abortion. In *Planned*

In summary, Dr. Coleman's proffered testimony must be tailored to delete any opinions reflecting a methodology that renders them unreliable.

### III.    Dr. Calhoun's Testimony Relating to the Opinions Outlined in His Expert Report Is Admissible, In Part

Plaintiffs next challenge the testimony of Dr. Byron C. Calhoun, an ob-gyn associated with West Virginia University-Charleston, whom the State has designated as an expert on abortion morbidity and medical standards of care, among other related topics. Dr. Calhoun's qualifications have not been challenged; rather, Plaintiffs' objections are premised on reliability issues regarding Dr. Calhoun's opinions.

### A.   The Opinions Contained Within Section II(C) of Dr. Calhoun's Expert Report Are Unreliable and Must Be Excluded

Plaintiffs request that we exclude Dr. Calhoun from testifying as to his opinions set forth in Section II(C) of his report, entitled "Special risks for women obtaining abortions." Plaintiffs specifically challenge Dr. Calhoun's conclusion that abortion is "disproportionately harmful" to Black women as well as to older women. [Calhoun Expert Rep. ¶¶ 57-62]. Dr. Calhoun opines that because "[a]bortion has led many women to delay the birth of their first child (rather than marry the child's father or put the child up for adoption[,]" "the average woman is . . . older, and potentially in poorer health,

---

*Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds,* the Eighth Circuit, sitting *en banc*, relied on Dr. Coleman's testimony in upholding South Dakota's mandatory disclosure requirement on the connection between abortion and mental health risks, though the majority's reliance on her testimony was heavily criticized by the dissent. 686 F.3d 889, 910 (8th Cir. 2012). The Middle District of Tennessee denied Plaintiffs' request to exclude Dr. Coleman's testimony at trial, though the Court ultimately determined that Plaintiffs' cross-examination of Dr. Coleman effectively established that her "testimony [was] not credible and not worthy of serious consideration." *Adams & Boyle, P.C. v. Slatery,* 2020 WL 6063778, at *40 (M.D. Tenn. Oct. 14, 2020).

when she becomes a mother." [Calhoun Exp. Rep. ¶ 61]. Dr. Calhoun also concludes that the higher rates of abortion among Black women compared to women of other races is responsible for the higher rates of maternal mortality among Black women. [*Id.* ¶¶ 58-60].

Plaintiffs fault Dr. Calhoun's opinions for not having been reached based on any review by him of any causal relationship evidence, nor were they formed based on any other reliable scientific methodology. Instead, Dr. Calhoun's opinions reflect his personal speculation and subjective beliefs, say Plaintiffs.

Dr. Calhoun's conclusions, argues the State, have been adequately explained as the product of his review of relevant, valid data.

This defense, however, rings hollow. The critical inquiry under a Rule 702 analysis is whether a link exists between the data or facts presented and the expert's conclusion. *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003); *see also Gen. Elec.,* 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Such a link is entirely missing here.

For example, in rendering his conclusion that abortion is disproportionately harmful to Black women, Dr. Calhoun merely spouts various statistics regarding 1) the increased abortion rate among Black women, and 2) the increased risk of maternal morality and pregnancy complications among Black women. Missing is any data or other evidence that bridges the gap as to how the former contributes to the latter. Dr. Calhoun's conclusion that "the much greater abortion rate for black women . . . may account for

most of the racial disparity noticed in pregnancy morbidity and mortality"[15] is entirely unsubstantiated by any data or analysis to support the conclusion that abortion is the predominate factor or cause for this racial disparity. His uncorroborated conclusions on this issue render them patently unreliable.

In addition, Dr. Calhoun's conclusions regarding the disproportionate harms that abortion poses to older women suffer from these same analytical flaws. Again, they are based on nothing beyond his personal speculation.

We hold that the opinions of Dr. Calhoun which reflect merely his "subjective beliefs and speculations" and are inadmissible. *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (directing the district court to "rul[e] out any subjective belief or unsupported speculation.").

### B. Dr. Calhoun's Proposed Opinions Regarding Telemedicine Are Admissible

Plaintiffs also seek the exclusion of Dr. Calhoun's opinions relating to the appropriateness of telemedicine in the delivery of abortion services, arguing that his personal experiences as a physician do not suffice to qualify him to opine as an expert on this issue.

---

[15] Dr. Calhoun offers only a single example regarding morbidity rates among Black women, explaining: "Black women have a cervical insufficiency rate 2.45 higher than Caucasian women . . . Cervical insufficiency is a known risk factor for preterm delivery, and is related to the number of surgical procedures performed on the cervix including elective surgical abortions." However, Dr. Calhoun says nothing about the rate at which Black women have *surgical* abortions compared to women of other races, nor does he offer anything regarding other factors that may increase the risk of cervical insufficiency. Moreover, he offers no explanation for how this single example yields his conclusion that *most* of the racial disparity in morbidity *and* mortality rates is attributable to abortion.

Plaintiffs' first argument reflects their apparent belief that Dr. Calhoun does not possess a sufficient understanding of the technology involved in contemporary telemedicine practices. [Dkt. 273, at 13]. Dr. Calhoun concedes that he does not utilize telemedicine in his practice. In his deposition testimony, he analogized telemedicine technology to "Facetime," which consists of real-time video interaction. While he appears to lack any real sophistication with the technology of telemedicine, he has sufficient knowledge and experience to testify to those things that he knows personally.

Plaintiffs do contend that Dr. Calhoun lacks any "knowledge of the process by which telemedicine is used to provide medication abortion." Plaintiffs' primary criticism of Dr. Calhoun relates to his unfamiliarity with the FDA's Risk Evaluation Mitigation Strategies ("REMS"), a program which prohibits mifepristone, the drug used to induce a medication abortion, from being dispensed in pharmacies. Instead, this drug may be dispensed only at abortion clinics. Accordingly, even if state law permitted certain aspects of abortion care (such as providing informed consent) to be provided remotely via telemedicine, a patient will still be required to obtain mifepristone at an abortion clinic. Because of Dr. Calhoun's apparent unfamiliarity with this FDA requirement, Plaintiffs argue that he has anchored his opinions to an incorrect assumption that abortion patients would never visit a healthcare facility if telemedicine were implemented.

For example, Plaintiffs contend that Dr. Calhoun is incorrect in his conclusion that incorporating telemedicine in Indiana would interfere with women receiving physical examinations and ultrasounds prior to receiving abortions, which he believes are necessary. Plaintiffs also argue that Dr. Calhoun's conclusion that telemedicine could

23

create a risk of drug diversion is erroneous given that the FDA requires mifepristone to be secured at an abortion clinic.

The State characterizes Plaintiffs' assertion that "Dr Calhoun has no knowledge of the process by which telemedicine is used" as "highly misleading," given that Plaintiffs had not identified, at the time of Dr. Calhoun's report and testimony, what specific telemedicine protocols they believed should be implemented in Indiana.[16] For example, though patients could receive physical examinations and ultrasounds prior to abortions even if telemedicine were utilized for other aspects of abortion care, Plaintiffs' telemedicine proposal for Indiana did not illustrate the inclusion of such procedures. Plaintiffs' expert's opinion is, in any event, that ultrasounds and physical examinations are unnecessary prior to abortion. Dr. Calhoun's opinions regarding the need for these procedures thus remain "a separate and important concern," insists the State. The State also maintains that Dr. Calhoun *does* have sufficient knowledge regarding the FDA's regulations governing mifepristone. That the REMS program requires the distribution of mifepristone to occur at abortion clinics does not resolve Dr. Calhoun's concerns on the issue of diversion.

Plaintiffs provide little by way of a substantive response to these specific contentions from the State. We are thus unpersuaded that anything regarding Dr.

---

[16] Plaintiffs argue that Dr. Calhoun *could* have known of the protocols by which Indiana abortion providers would likely incorporate telemedicine, either through additional discovery or by reviewing the "vast literature" cited by Plaintiffs' expert, Dr. Grossman. However, neither Dr. Grossman nor any other expert had outlined standards for which telemedicine should work in Indiana prior to Dr. Calhoun's testimony.

Calhoun's opinions on these issues requires exclusion; Plaintiffs' objections can be fully explored through cross-examination.

Regarding Dr. Calhoun's concerns about obtaining informed consent via telemedicine, Plaintiffs object that this testimony is conclusory, lacking any explanation as to methodology or principles underlying his opinions. We do not share this concern. Much like Dr. Grossman's, Dr. Calhoun's opinions on the appropriate use of telemedicine in obtaining informed consent reflect his years of practicing medicine as an ob-gyn, and he sufficiently links these personal experiences to his conclusions. [Calhoun Expert Rep. ¶¶ 143, 158].

In Section X of Dr. Calhoun's report, he opines that "abortion does not solve problems for vulnerable women." [Calhoun Expert Rep. ¶¶ 207-213]. "[A]bortion is not a real solution for the challenges faced by [his] vulnerable patients" nor is it "the best solution for an unplanned pregnancy." Plaintiffs regard these assertions as irrelevant: whether abortion is a "good choice for women sheds no light" on the legal issues presented in this case, to wit, the burdens imposed by the challenged statutes. The State characterizes Dr. Calhoun's opinion on this issue as similar to Ms. Roth's opinion on the benefits of pregnancy and motherhood, but we have excluded Ms. Roth's opinions on that issue as being unhelpful to the resolution of the relevant factual or legal questions. Dr. Calhoun's opinions must be excluded for the same reasons.

Plaintiffs challenge the admissibility of Dr. Calhoun's opinions regarding the impact of abortion on patients' mental health on the grounds that they "suffer from the same methodological flaws as the opinions expressed by Dr. Coleman." Specifically, Dr.

25

Calhoun has relied on some of the same studies cited by Dr. Coleman. However, Dr. Calhoun's conclusions are not dependent on the studies we found unreliable. Accordingly, there is no basis on which to limit his testimony.

### IV.   Dr. Studnicki's Testimony Related to the Opinions Presented in His Expert Review Is Admissible, In Part

The State offers the testimony of Dr. James Studnicki, an expert in data analytics, on a wide range of topics. Plaintiffs object. We address each objection below.[17]

#### A.   *Dr. Studnicki's Opinions on Indiana's Abortion Rate Are Admissible*

Plaintiffs first seek to exclude Dr. Studnicki from presenting any testimony relating to his opinion that "Indiana's position as a low-volume, low-rate abortion state has been consistent for over 40 year, beginning with the *Roe v. Wade* legalization of abortion and the passage of the first of any of the contested laws." [Studnicki Am. Expert Rep. ¶ 83(a)]. According to Plaintiffs, the connection between abortion rates and the enactment of the challenged statutes has no relevancy to the ultimate questions before the

---

[17] On December 3, 2020, the Magistrate Judge granted in part the State's motion to supplement Dr. Studnicki's expert report. The Magistrate Judge stated that Plaintiffs were "entitled to . . . supplement their motion to exclude[.]" Plaintiffs were directed to file a "supplemental motion" no later than January 15, 2021. Plaintiffs timely filed their supplemental briefing on Dr. Studnicki's amended report. Plaintiffs' objections contained within their supplemental briefing should be denied in their entirety, says the State, on the grounds that Plaintiffs did not file a motion, in contravention of the Magistrate Judge's directive and Local Rule 7-1. We hold that Plaintiffs sufficiently complied with the Magistrate Judge's order, and, given that the issues requiring supplementation comprise a subset of the issues raised in their original motion, the filing of the supplemental memorandum rather than a separate motion promotes judicial economy and minimizes confusion.

Court in this litigation, that is, whether any of the challenged statutes create undue burdens for women seeking abortion services in Indiana.

We disagree that this testimony bears *no* relevance to the factual and legal questions pending before us, an assertion made by Plaintiffs without any authoritative support. Though we have rejected the State's position that abortion rates are dispositive of the due process challenges posed here,[18] whether there is an association between the enactment of the challenged statutes and any variations in Indiana's abortion rate may be relevant to our understanding of the impact of those statutes. As explained, such an association is not outcome determinative in our assessments of the undue burdens, as the State suggests it should be, but it is relevant to our overall analysis of the evidence. Accordingly, Dr. Studnicki's opinions related to abortion rate data need not be excluded from evidence on relevancy grounds.

Relevancy, however, is not the sole objection by Plaintiffs for excluding Dr. Studnicki's testimony on abortion rates. They argue that his opinions are not the product of an application of reliable principles and methods, in particular his conclusion that "[n]o variations in Indiana's abortion rate over the past 40 years suggests any association with any of the challenged laws." [Studnicki Am. Expert Rep., ¶ 83(b)]. As Plaintiffs contend, abortion rates are not a reliable measure of the burdens (including increased delays, costs, or travels) that women confront in accessing abortion. Additionally, Plaintiffs argue Dr. Studnicki's analysis of abortion rate data fails to account for

---

[18] A discussion of this issue is set out in our Order on the State's motion to exclude at pages 5-7.

confounding variables, such as the rate of unintended pregnancy or economic insecurity, that could increase the demand for abortion and thus mask a decline in the abortion rate.[19]

With respect to Plaintiffs' assertion that abortion rates are an unreliable metric by which to measure burdens on women otherwise seeking abortions, Plaintiffs focus their attack on the relevancy of this opinion, rather than attacking the reliability of Dr. Studnicki's analysis of these rates.

Moreover, Plaintiffs have responded only in minimal fashion to the State's argument that they have misconstrued Dr. Studnicki's opinions by assuming that he has sought to prove that the challenged statutes do *not* impose burdens on abortion access. Such an assumption by Plaintiffs is inaccurate, says the State, given that the State bears no such burden of proof in this litigation. In addition, Dr. Studnicki's analysis of Indiana's abortion rates has been proffered by the State to rebut the opinions of Plaintiffs' experts, including Dr. Heidi Moseson, whose data regarding these dates does not support her conclusions, according to Dr. Studnicki. In his rebuttal, he hypothesized that multiple factors could affect the abortion rate and surveyed the evidence in light of these factors. His intention was to test the hypotheses of Plaintiffs' experts and to illustrate the shortcomings of their conclusions.

---

[19] Plaintiffs have also challenged the reliability of Dr. Studnicki's opinions for failing to consider the abortion rates for specific subpopulations. The State responds that Dr. Studnicki did, in fact, review abortion rates for subpopulations, including minors and racial minorities, and, in any event, none of Plaintiffs' experts provided an independent analysis of the challenged laws on specific subgroups. Plaintiffs do not address this issue in their Reply brief, which silence we accept as a concession. Likewise, Plaintiffs' reply brief omits any rebuttal to the State's assertion that Plaintiffs have misunderstand a portion of Dr. Studnicki's opinions related to the challenged laws that were enacted immediately following *Roe v. Wade*. Again, we infer Plaintiffs' silence to be a concession.

Plaintiffs' response consists of their reiteration of the irrelevancy of Dr. Studnicki's testimony and a defense of Dr. Moseson's analysis. They argue that Dr. Studnicki's testimony is inadmissible based on the State's "concession" that Dr. Studnicki's analysis "fails to prove that the challenged laws do not pose substantial obstacles." This contention, however, mischaracterizes Dr. Studnicki's conclusion regarding the association between abortion rates and the challenged laws. Plaintiffs offer no other support for their claim that Dr. Studnicki's testimony is unreliable.

In response to Plaintiffs' objection that Dr. Studnicki's analysis of abortion rates fails to account for confounding variables, the State emphasizes that Dr. Studnicki's analysis was never intended to be exhaustive; indeed, no statistical analysis ever is. In lodging this objection, says the State, Plaintiffs are demanding a more rigorous scientific analysis by Dr. Studnicki than any performed by Dr. Moseson. Plaintiffs lack of response signals their acquiescence, so the Court will address this challenge no further.

The referenced testimony from Dr. Studnicki is sufficiently reliable to be admitted for the purposes for which it is proffered. Plaintiffs' challenges (with exception for the ensuing specific objections) do not challenge the data upon which he relied, nor do they dispute the link between the data and his conclusions. Plaintiffs' objections that Dr. Studnicki's conclusions provide an insufficient basis on which the State can prove that the challenged statutes do not create undue burdens shifts the burden of proof that is on *Plaintiffs* to prove that the challenged statutes *do* create undue burdens. At best, Plaintiffs arguments go the weight attributable to Dr. Studnicki's opinion (compared to those of

their experts), rather than its admissibility. Exclusion of this evidence is not appropriate. *Lees v. Carthage Coll.*, 714 F.3d 516, 525 (7th Cir. 2013).

B. *Dr. Studnicki's Opinions Relating to Indiana's Second Trimester Hospitalization Requirement Are Admissible*

Plaintiffs also seek the exclusion of Dr. Studnicki's opinions relating to Indiana's requirement that second-trimester abortions be performed in a hospital or surgical ambulatory center. His analysis is set out in Paragraph 83(h) of his amended expert report: "Plaintiffs' experts argue without evidence that the challenged laws, specifically the requirement that second trimester abortions be performed only in hospitals or ambulatory surgery centers, are reducing the percentage of abortions performed in Indiana in the second-trimester. Again, the evidence does not support these experts' conclusions."

According to Plaintiffs, Dr. Studnicki has failed to apply reliable principles or methods in reaching this conclusion. Dr. Studnicki's conclusion was the product of his comparison of Indiana's second-trimester abortion rate with four other states' statutes that are similar to Indiana. Plaintiffs assert that Dr. Studnicki should have "analyzed[d] or account[ed] for differences in demand for second-trimester abortion among residents of each state" or "determine[d] what the abortion rates in those states would have been in the absence of those requirements." [Dkt. 326, at 6; Dkt. 334, at 4].

That Plaintiffs can think of an alternative analytical approach (one that not even their own experts employed, apparently), says the State, is not reason enough to establish that Dr. Studnicki's approach was unreliable. We agree. Dr. Studnicki has conceded that

his review is not exhaustive; rather, his approach was to respond to and rebut the analyses and conclusions of Plaintiffs' experts. Despite Plaintiffs' criticisms and suggestions that Dr. Studnicki could have employed other methods, they themselves have offered little to justify contrary approaches. Again, their challenges to Dr. Studnicki's conclusions will be best pursued in cross-examination.[20]

### C. Dr. Studnicki's Opinions Regarding the Hostility Index Are Admissible

Plaintiffs next object to Dr. Studnicki's consideration of the "hostility index," a methodology we are told that was developed by the Guttmacher Institute, a reproductive health think tank, as a reference point when analyzing the burdens of abortion regulations. This hostility index "characterize[s] each state's policy environment on a scale from hostile to protective" based on the number of abortion regulations in the state. Applying this methodology, Dr. Studnicki "measured the association of each state's policy environment to its rate of change in abortion rates for the period 2000-2015" to conclude that "[n]o variations in Indiana's abortion rate history over the past 25 years suggest any association with any of the challenged laws." [Studnicki Am. Expert Rep., ¶ 83(d)].

Plaintiffs reject Dr. Studnicki's application of the hostility index, asserting that this analytical device was "created as a qualitative tool to convey the complexity of a state's abortion policy environment in a simplified way." Plaintiffs argue that it was not intended

---

[20] Plaintiffs also challenge Dr. Studnicki's remarks regarding the general safety of second-trimester abortions. The State has confirmed that Dr. Studnicki does not intend to proffer such testimony at trial. We accept this stipulation by the State.

for rigorous quantitative analyses, nor has it been validated, that is, tested to ensure that it produces reliable accurate, results. According to Plaintiffs, it is not a reliable method by which to establish that the challenged laws have no impact on access to abortion care.

The State responds that Plaintiffs "misunderstand the significance of the hostility index in Dr. Studnicki's analysis." He did not, as Plaintiffs imply, "assume that the hostility index was peer reviewed, validated, or capable of illuminating practical effects." [Dkt. 277, at 24]. Rather, "he merely . . . *hypothesiz[ed]* (and disproved) that the combination of laws in effect, as measured by the hostility index, bears on abortion rate." [*Id.* (emphasis in original)]. This approach provided support for Dr. Studnicki's over-arching conclusion that there is no connection between the challenged statutes and Indiana's abortion rates. His reference to the hostility index does not impeach the reliability of his primary conclusion, argues the State.

Apparently both sides agree that the hostility index is not a valid scientific methodology by which to prove the practical effects of abortion statutes on access to abortion services. Indeed, the State represents that Dr. Studnicki's analysis of the hostility index will not be offered for this purpose; rather, in performing this test of the hostility index, he achieved an element of support for his conclusion regarding the lack of connection between the challenged statutes and abortion rates. Plaintiffs have not objected to Dr. Studnicki's testimony for this limited purpose. Accordingly, it may be introduced at trial.

D. *Dr. Studnicki's Opinions Regarding Indiana's Adoption Rate Are Unreliable and Must Be Excluded*

32

Plaintiffs attack Dr. Studnicki's analysis and discussion of Indiana's adoption rates. He specifically has opined that:

> Indiana is a leader in non-marital infant adoptions, an important alternative to abortion for unwanted pregnancies. In a 2014 Adoption Index computed by the National Council for Adoption, Indiana ranked 5th in the nation compared to Ohio and Illinois' rankings of 25th and 38th, respectively. A high adoption rate is clearly a likely contributing factor in Indiana's low abortion rate.

Plaintiffs contend that this conclusion rests on unreliable principles or methods; Dr. Studnicki has assumed, without evidentiary support, that Indiana's high adoption rate is a contributing factor in its low abortion rate. Further, Indiana's "culture of life," as reflected by the fact that it leads the nation in adoption rates, "explains a low abortion rate far more persuasively than unsupported assertions of lack of access to clinics, or Indiana's legal regime." [Studnicki Am. Expert Rep. ¶¶ 47-49]. Dr. Studnicki has testified that his conclusion was based on "common sense," thus conceding that he lacks data to support it. He also acknowledges the possibility that a woman who desires an abortion but is unable to obtain one may instead place her child up for adoption. [Studnicki Depo., at p. 108-109].

The State supports Dr. Studnicki's opinion as appropriate given his lack of any attempt to use it to show causation. The high adoption rates, the State argues, suggest "a potential alternative causality for Indiana's low abortion rates." [Dkt. 277, at 25].

This defense by the State leaves us unpersuaded. It clearly misstates the proffered opinion of Dr. Studnicki, who has *not* opined that Indiana's high adoption rate may be a "potential" factor in Indiana's low abortion rates, but instead that Indiana's high adoption rate is "clearly" a contributing factor to Indiana's low abortion rate. His conclusion is, by

his own admission, based on merely his own "common sense," unsupported by any data or other reliable authoritative source. For these reasons, we hold that Dr. Studnicki's opinion regarding adoption rates must be excluded from evidence because it is not the product of reliable principles or methods, and instead is simply his personal speculation.

### E. Dr. Studnicki's Testimony Concerning Minors Is Admissible

Plaintiffs' next challenge concerns the following assertion by Dr. Studnicki: "Indiana minors have no less access to abortion than minors across the nation, and plaintiffs have offered no evidence of any association of declines in minor abortion rates with any challenged laws." [Studnicki Am. Expert Rep. ¶ 83(j)].

Plaintiffs challenge this conclusion as not being the product of reliable principles or methods in that fails to consider only the impact of the parental consent law enacted in 1984 and not the impact of related laws enacted in 2011 and 2017. The State rejoins that Dr. Studnicki was relieved of performing such an analysis since his report was directed only at Dr. Moseson's, who did conduct such a comparison of rates at these intervals. Plaintiffs have not rebutted this explanation, so we accept it as well.

Plaintiffs' remaining arguments are repetitive of challenges we have already resolved, to wit, that Dr. Studnicki's analysis incorporates only abortion rates without consideration of confounding factors or other burdens that the laws may impose. We need not review these issues further.

### F. Dr. Studnicki Is Entitled to Testify to His Opinions Relating to the Travel Burdens (or Lack Thereof) Imposed By the Challenged Laws

Plaintiffs next objection targets the following opinion by Dr. Studnicki:

34

> Travel times for abortion in the United States and Indiana specifically, [*sic*] *remained* largely constant over the period 2000-2014 according to the Guttmacher Institute. The Institute's study concluded that travel distance in Indiana remained constant and that spatial disparities were unchanged "despite several abortion restrictions enacted during the period."

[Studnicki Am. Expert Rep. ¶ 83(i)]. Plaintiffs challenge this opinion as irrelevant, arguing that the time period analyzed (2000-2014) is arbitrary and lacks any significance given the context of Plaintiffs' claims, and the fact that several of the laws at issue were enacted outside of this time period. The State agrees that not all of the challenged laws were enacted during this time period, but points out them some undisputedly were and others were already in effect. Dr. Studnicki's opinion is being offered to bolster the State's theory that there is no evidence that any of the challenged laws have created a travel burden for women.

We conclude that Dr. Studnicki's testimony is relevant for this purpose. Plaintiffs clearly have theorized that travel is one of the burdens imposed by the challenged laws, and at least some of these laws were enacted during the timeframe identified and analyzed by Dr. Studnicki. Though Plaintiffs may question the utility of Dr. Studnicki's testimony on this issue, their best recourse is through cross-examination.

### G. Dr. Studnicki's Opinions Relating to the Disproportionate Impact of the Challenged Laws on Black Women Are Admissible

Plaintiffs' final objection concerns the following opinion by Dr. Studnicki's proffered in his expert report.

> CDC race specific data for Indiana show that the over representation of black women in abortion statistics has increased over time, consistent with trends in the national data. Accordingly, the plaintiffs cannot establish that the alleged burden

created by Indiana's legal regime for abortions falls disproportionately on women of color.

[Studnicki Am. Expert Rep. ¶ 83(k)].

According to Plaintiffs, Dr. Studnicki's conclusion that none of the challenged laws disproportionately burden Black women is not based on sufficient facts and data. As they explain, Dr. Studnicki's conclusion is premised solely on the fact that the abortion rate among Black women is higher than the abortion rate among women of other races as well as the fact that this rate has increased over time. However, say Plaintiffs, the abortion rate alone does not reflect the burden Black women may face in obtaining abortions, including delays in access to care or the frequency with which Black women in Indiana must travel to other states to obtain abortions. Thus, the data on which Dr. Studnicki relies does not support his conclusion.

The State disagrees with Plaintiffs' characterization of Dr. Studnicki's opinion, explaining that he has not opined that the challenged laws do not disproportionately affect Black women; rather, he holds the view that Plaintiffs are unable to prove their theory, that is, that the challenged laws *do*, in fact, disproportionately harm Black women. The State's rejoinder is that Plaintiffs are faulting Dr. Studnicki for failing to support an opinion he does not hold.

The State's explanation more accurately tracks Dr. Studnicki's proffered opinion. Dr. Studnicki has not opined that the challenged laws do not disproportionately burden Black women. Thus, there is no basis on which to rule that his conclusion is insufficiently supported. We expect Dr. Studnicki to testify that Black women have obtained abortions

at rates higher than white women but consistent with national trends, which fact he contends undermines Plaintiffs' theory that Black women are disproportionately burdened. We will not issue an order excluding Dr. Studnicki from proffering a conclusion that he does not intend to offer.

### V.     Dr. Goodwine-Wozniak's Expert Opinions Are Admissible

The State expects to introduce into evidence at trial the testimony of Dr. Nancy Goodwine-Wozniak, an ob-gyn practicing in Indiana, as an expert on several topics, including Indiana's "Reporting Requirements," which require health care providers performing abortions in Indiana to file a terminated pregnancy report with the State's Department of Health, including specific information relating to each abortion as well as additional information relating to minor patients. Plaintiffs' objection to Dr. Goodwine-Wozniak's testimony reflects statements she made during her deposition, where she apparently could not recall the substance of the Reporting Requirements and that her expert report offered an opinion on this subject. On the basis of her lack of sufficient knowledge about the Reporting Requirements, Plaintiffs seek to exclude her from offering expert testimony on the topic.

The State describes Dr. Goodwine-Wozniak's deposition testimony as nothing more than a mere "memory lapse, which did not contradict the opinions presented in her expert report. In any event, says the State, Plaintiffs have not questioned the foundation for her views, nor did they attempt to refresh her faltering memory at her deposition by referring her to the appropriate section of her expert report.

We share the views expressed by the State. That Dr. Goodwine-Wozniak's lack of recall of one aspect of her report at her deposition does not invalidate the sufficiency of her conclusions in their entirety. We will not exclude her testimony on this basis.[21]

### VI.   Dr. Aaron Kheriaty's Testimony Relating to the Opinions Contained Within His Expert Report Are Admissible, In Part

Plaintiffs' final challenge is to the opinions of Dr. Aaron Kheriaty, a psychiatrist and the Director of Medical Education in the Department of Psychiatry at the University of California Irvine School of Medicine. No dispute exists between the parties as to Dr. Kheriaty's qualifications to testify on issues relating to medical ethics and bioethics. Plaintiffs nonetheless assert that Dr. Kheriaty should be excluded from testifying to the following statements contained in his expert report.

#### A.  Dr. Kheriaty's Testimony Relating to the Medical Accuracy of Indiana's Mandatory Disclosures and Informed Consent Brochure Is Not Admissible

Plaintiffs first move for the exclusion of Dr. Kheriaty's opinions that the mandatory disclosures required by Indiana law are "supported by medical evidence and reasonable." They object to Dr. Kheriaty's contention that "the information regarding fetal development, abortion, and other available options and resources as required by statute and/or contained in [Indiana's Abortion Informed Consent Brochure] are . . . medically and ethically appropriate and justified," [Kheriaty Expert Rep. ¶ 9], and his

---

[21] We note, as well, that summary judgment has been granted in favor of the State with respect to Plaintiffs' claim that the Reporting Requirements violate the Fourteenth Amendment's Substantive Due Process Clause, with the exception of those requirements tailored to minors, which were unaddressed at summary judgment. Accordingly, this dispute may very well be moot.

opinion that Indiana's Informed Consent Brochure "contains factual and unbiased medical information about fetal development, medical and surgical abortion procedures and their potential risks and complications, information on other available options (such as adoption), and other relevant support services." [*Id.* ¶ 54].

At his deposition, Dr. Kheriaty confirmed that he is not qualified to opine on issues related fetal development or abortion risks or complications, nor is he qualified to opine on the specific resources offered in Indiana. As he explained, these issues are beyond his expertise; such questions should instead be posed to other experts, including "experts in the field of obstetrics." [Kheriaty Depo., at p. 173-74, 245-47]. These concessions prompt Plaintiffs to argue that Dr. Kheriaty should be precluded from presenting testimony reflecting the opinions set forth in paragraphs 9(3), 10, and 53-54 of his expert report, that is, his defense of the medical and scientific accuracy of Indiana's mandatory disclosures and the information contained within the Informed Consent Brochure.

The State contends that Dr. Kheriaty's expert report is carefully tailored to topics within his expert knowledge, that is, medical ethics. This limitation is borne out by statements such as, based on his examination of the Informed Consent Brochure, "no inaccuracies from *within [his] area of expertise*" were revealed. [Dkt. 277, at p. 28 (quoting Kheriaty Rep. ¶ 58) (emphasis in original). Dr. Kheriaty's opinions regarding the "medical and ethical reasonableness" of Indiana's disclosures related to "fetal development, abortion, and other available resources" are thus acceptable, given that he has tethered his opinions to his expertise as a medical ethicist. As to the substantive

medical content of these disclosures, says the State, Dr. Kheriaty was "careful to identify and respect the limits of his expertise." [*Id.* at 29].

Given the boundaries on Dr. Kheriaty's expertise, he will not, as he has stipulated, provide any medical opinions regarding "fetal development" nor "medical and surgical procedures and their potential risks and complications."

We are unclear from the State's briefing whether Dr. Kheriaty will be called to testify at trial as to his opinion that, as a medical ethicist, he believes Indiana's mandatory disclosures and Informed Consent Brochure contain medically accurate and truthful information. The State appears to defend Dr. Kheriaty's capacity to testify to the medical accuracy and truthfulness of its informed consent materials as a medical ethicist.

We have our doubts about this kind of boot strapping; if Dr. Kheriaty is not qualified to opine on issues of medicine, he may not testify to matters or issues of this nature. Thus, Dr. Kheriaty's testimony related to the accuracy or truthfulness of Indiana's mandatory disclosures and its Informed Consent Brochure must be excluded because he is not qualified to offer such opinions, which entail analysis of underlying substantive medical content. For these reasons, his opinions set out in paragraphs 9(3) and 54 of his expert report, to the extent they relate to the accuracy or truthfulness of the medical information provided in Indiana's mandatory disclosures and its Informed Consent Brochure, are not admissible.[22]

---

[22] We disagree with Plaintiffs' characterization of the statements in paragraphs 10 and 53 to include opinions as to the medical accuracy of Indiana's mandatory disclosures. Additionally, Plaintiffs have not challenged Dr. Kheriaty's statement in paragraph 54 of his expert report that the Informed Consent Brochure contains information from a reliable and unbiased scientific

**B.** *Dr. Kheriaty Has Not Provided Opinions Regarding the Appropriateness of Telemedicine; Thus There Are No Grounds for an Exclusionary Order*

Plaintiffs next argue that Dr. Kheriaty should be excluded from offering testimony regarding the medical benefits of Indiana's prohibitions on the use of telemedicine in abortion care. Again, Plaintiffs assert that Dr. Kheriaty is not qualified to opine on this topic. The State does not dispute that Dr. Kheriaty is not so qualified, clarifying that he has not been designated to testify on this topic, nor does his expert report offer *any* opinion regarding the appropriateness of telemedicine. Accepting the State's stipulation, we find this objection to be moot.[23]

**C.** *Dr. Kheriaty's Opinions Regarding Mental Health Are Admissible, In Part*

Finally, Plaintiffs seek to exclude Dr. Kheriaty's opinion that "a significant number of women suffer negative psychological effects of abortions." [Kheriaty Expert Rep. ¶¶ 67-101]. According to Plaintiffs, the studies upon which Dr. Kheriaty relies are the same flawed studies relied upon by Dr. Coleman. However, based on our review, we have determined only one study to be unreliable as referenced in Dr. Kheriaty's expert report. Like Dr. Coleman, Dr. Kheriaty may not include the findings of this study in his testimony. Otherwise, he is permitted to testify as to his opinions.

---

source. Nor have Plaintiffs challenged Dr. Kheriaty's qualifications to review this source. Accordingly, he will be permitted to offer this opinion at trial so long as he does not offer his own conclusion regarding the accuracy of the medical information.

[23] In their Reply brief, Plaintiffs assert that if Dr. Kheriaty is not opining on the appropriateness of telemedicine, he should not permitted to discuss his opinion that "informed consent conservations require face-to-face" communications, which, as he clarified at his deposition, could mean "face-to-face through a screen." Plaintiffs assert that this statement will not aid the Court in "understand[ing] the evidence or [] determin[ing] a fact in issue." We disagree. Dr. Kheriaty's limited opinion on the value of face-to-face informed consent may be useful to our resolution of the issues before us, as provided in the limited context described above.

## CONCLUSION

Plaintiffs' Motion to Exclude [Dkt. 273] is **granted in part and denied in part.**

As explicated fully herein, the proposed testimony of the State's experts is limited as follows:

- Ms. Roth's opinions relating to women's motivations in obtaining abortions; the benefits of pregnancy and motherhood; and the mental health impacts of abortion are all excluded.

- Dr. Coleman's testimony relating to those studies that we have determined to reflect unreliable methodologies is excluded.

- Dr. Calhoun's testimony relating to his conclusions that abortion is disproportionately harmful to Black and older women as well as his opinion regarding the value of pregnancy and motherhood to vulnerable women is excluded.

- Dr. Studnicki's testimony relating to the correlation between Indiana's adoption rate and its abortion rate is excluded.

- Dr. Kheriaty's testimony relating to the medical accuracy or truthfulness of Indiana's mandatory disclosures and its Informed Consent Brochure is excluded. Any further testimony relating to those studies on mental health that we have determined to be unreliable is also excluded.

IT IS SO ORDERED.

Date:      2/19/2021

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution to counsel of record via CM/ECF

42