```
                   UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF INDIANA
                      INDIANAPOLIS DIVISION


WHOLE WOMAN'S HEALTH ALLIANCE,   )
ET AL,                           )
                                 )
            Plaintiff,           ) CAUSE NO.:
                                 ) 1:18-cv-01904-SEB/MJD
                                 ) Indianapolis, Indiana
            -v-                  ) March 15, 2021
                                 ) VOLUME I
TODD ROKITA, ATTORNEY GENERAL    )
OF THE STATE OF INDIANA, IN HIS  )
OFFICIAL CAPACITY, ET AL,        )
                                 )
            Defendants.          )
```

```
                    Before the Honorable
                  SARAH EVANS BARKER, JUDGE
```

```
                OFFICIAL REPORTER'S TRANSCRIPT OF
                   ZOOM VIRTUAL BENCH TRIAL
```

```
Court Reporter:              Laura Howie-Walters, FCRR/RPR/CSR
                            Official Court Reporter
                            United States District Court
                            Room 217
                            46 East Ohio Street
                            Indianapolis, Indiana  46204
```

```
             PROCEEDINGS TAKEN BY MACHINE SHORTHAND
  TRANSCRIPT PRODUCED BY ECLIPSE NT COMPUTER-AIDED TRANSCRIPTION
```

A P P E A R A N C E S

For Plaintiffs:                    Dipti Singh, Esq.
                                   Stephanie Toti, Esq.
                                   Rupali Sharma
                                   Juanluis Rodriguez
                                   LAWYERING PROJECT
                                   3371 Glendale Blvd. #320
                                   Los Angeles, CA  90039-1825


For Defendants:                    Thomas M. Fisher, Esq.
                                   Robert Rowlett, Esq.
                                   Andrea Elizabeth Rahman, Esq.
                                   INDIANA ATTORNEY GENERAL
                                   302 West Washington Street
                                   Indiana Government Center South
                                   Fifth Floor
                                   Indianapolis, IN  46204

# I N D E X

**PLAINTIFFS' WITNESSES**                                   **PAGE**

LAURA MILLER
Direct Examination by Ms. Toti ..................23
Cross-Examination by Mr. Fisher ................57
Recross-Examination by Mr. Fisher ..............67


AMY HAGSTROM MILLER
Direct Examination by Ms. Singh ................72
Cross-examination by Ms. Rahman ...............113

CASSIE HERR
Direct Examination by Mr. Rodriguez  ..........129
Cross-examination by Mr. Rowlett ..............154

JEFFREY GLAZER, M.D.
Direct Examination by Ms. Toti ................163
Cross-examination by Mr. Fisher  ..............168
Redirect examination by Ms. Toti ..............180


WILLIAM MUDD MARTIN HASKELL, M.D.
Direct Examination by Ms. Sharma ..............182
Cross-examination by Ms. Rahman ...............205
Redirect examination by Ms. Sharma ............207
Recross-examination by Ms. Rahman .............208

**PLAINTIFF'S EXHIBITS**                              **PAGE**

SE1                                                    71
SE2                                                    71
SE3                                                    71
SE4                                                    71
PX4                                                    71
SE5                                                    71
SE6                                                    71
SE7                                                    71
SE8                                                    71
SE9                                                    71
SE10                                                   71
SE11                                                   71
SE12                                                   71
SE13                                                   71
SE14                                                   71
SE15                                                   71
SE16                                                   71
SE17                                                   71
SE18                                                   71
SE19                                                   71
SE20                                                   71
SE21                                                   71
SE22                                                   71
SE23                                                   71
SE24                                                   71
SE25                                                   71
SE26                                                   71
SE27                                                   71
SE28                                                   71
SE29                                                   71
SE30                                                   71
SE31                                                   71
SE32                                                   71

1            (Open court.)

2        THE COURT:  Good morning, all.

3        MR. FISHER:  Morning.

4        MS. SINGH:  Good morning.

5        THE COURT:  Everything is working so far.

6        MR. FISHER:  So far so good.

7        THE COURT:  We're getting a little echo, not sure

8    exactly why we're getting an echo.  We'll think about that

9    later.  We'll just tolerate the echo because I'm only hearing

10   it when I speak so I think it's reverberating in our courtroom

11   here.

12        I'm going to have Ms. Harves call the matter so we can

13   get officially underway, and then I'll speak to both of you.

14   But good morning again.

15            (Call to order of the Court.)

16        THE COURT:  All right.  This matter is on the Court's

17   calendar for a trial.

18            (Discussion held off the record.)

19        THE COURT:  This matter is set on the calendar today

20   for a trial.  We've labored mightily to get to this day.  I

21   know you all have done a lot of heavy lifting to tee it up so

22   that we can move through our witnesses and everything asked and

23   answered that you want to present to the Court.

24        We have excerpted four issues for this first trial

25   proceeding, as you lawyers know, and so I'll expect you to

1    direct your witnesses' testimony to those specific issues so

2    that we can try to resolve them before we go to a phase two, if

3    there is a phase two.

4          So I know you both asked for a brief opening statement

5    opportunity.  I remind you and assure you that I have --

6                      (Brief interruption)

7          So I'll allow you to do your opening statements, and

8    then we'll get right into the evidence.

9          Before that, is there anything preliminary that I need

10   to address, Ms. Singh?

11        MS. SINGH:  Yes, Your Honor.  We had a few

12   housekeeping items.  One was a request to move into evidence

13   the stipulated exhibits.

14        THE COURT:  Hold on just a minute.  Ms. Singh.  I'm

15   getting sound through the computer and the room so I'm hearing

16   it on -- too much of each other.

17        Ms. Singh, say the preamble to the Constitution.  I

18   just need to have you say something.

19        MS. SINGH:  Oh, I'm sorry.  I'm sorry.  I thought I

20   was -- yes.  Can you hear me okay now?

21        THE COURT:  Say it once more, Ms. Singh.

22        MS. SINGH:  Yes, absolutely.

23        We were hoping to move into evidence stipulated

24   Exhibits SE1 to ST32.

25        THE COURT:  Well, let's do your opening statement, and

1  then we'll get to the evidence; you start building your

2  evidence, okay?

3           MS. SINGH:  Yes, Your Honor.

4           THE COURT:  Is there anything -- I was actually

5  wondering if you had anything procedural I needed to address

6  before we get underway into the trial.

7           MS. SINGH:  No, Your Honor, nothing for plaintiffs.

8           THE COURT:  Mr. Fisher, good morning to you, sir.

9           MR. FISHER:  Good morning, Your Honor.

10          THE COURT:  Do you have anything of a preliminary

11  nature?

12          MR. FISHER:  Nothing of a preliminary nature, Your

13  Honor.  Thank you.

14          THE COURT:  Ms. Singh, I'll hear your opening

15  statement.

16          MS. SINGH:  Thank you, Your Honor.

17          May it please the Court.

18          This phase of the trial is about two categories of --

19          THE COURT:  Slow down because you're reading.  It's

20  all right to read, but you have to read slowly as if you're

21  speaking.

22          MS. SINGH:  Yes, Your Honor.

23          -- a pair of laws that preclude healthcare providers

24  from using telemedicine to prescribe abortion, which I will

25  refer to as the telemedicine ban --

1          THE COURT:  The telemedicine ban.

2          Slow it down, Ms. Singh, please.

3          MS. SINGH:  -- the telemedicine ban and the in-person

4     examination requirements and a pair of laws that require

5     patients to make two trips to obtain care, which I will refer

6     to as the in-person counseling requirement and the ultrasound

7     requirement.

8          First, I am going to discuss the telemedicine ban and

9     the in-person requirement.

10          With respect to plaintiffs' due process claim, the

11     evidence will show that these laws are not reasonably related

12     to any legitimate state interest.

13          You'll hear from Dr. Daniel Rosen, a board certified

14     obstetrician/gynecologist and public health researcher with

15     decades of experience providing and studying abortion care.  He

16     will give an overview of the scientific and medical literature

17     on the safety of abortion and the impact of the delayed access

18     to abortion care on patient health.  He will testify about

19     substantial research demonstrating the safety of telemedicine

20     abortion care, which has been safely provided in other states

21     for over a decade.

22          WWHA president, which is Amy Hagstrom Miller, has

23     overseen clinics in other states that have utilized

24     telemedicine to provide medication abortion.  You'll hear

25     evidence that, in the absence of the telemedicine ban and the

1   in-person examination requirement, Indiana abortion providers

2   would be willing and able to utilize the site-to-site model to

3   provide --

4          THE COURT:  I'm sorry.  You just have to slow it down.

5   The court reporter has to take it down.  I have to hear it.

6   And when you go that fast and you let your voice trail off at

7   the end of your phrases, you lose me and you lose words so it

8   sounds stilted.  I know to you it does not sound like anything

9   you've done in any other setting, but you have to do it that

10  way, Ms. Singh.

11         MS. SINGH:  Yes, Your Honor.

12         In this model, the patient visits the health center

13  for their medication abortion, for a consultation, and

14  screening with onsite staff.

15         THE COURT:  With onsite what?

16         MS. SINGH:  With onsite staff.

17         THE COURT:  Staff, okay.

18         MS. SINGH:  Yes, Your Honor.

19         The patient's medical records are electronically

20  transmitted to the treating physician at a remote location.

21  The physician reviews the patient's medical records and meets

22  with the patient via video conference.  Ultimately the

23  physician directs clinic staff members to dispense the abortion

24  medication to the patient.

25         Dr. Grossman will testify that providers using this

model in other states have found the interactions with patients
to be essentially the same in a telemedicine visit as during an
in-person visit.  He will explain that patients have a high
level of satisfaction with telemedicine abortion care, and he
will testify that telemedicine abortion improves access to
early abortion care, particularly in areas that lack abortion
providers.

THE COURT:  Abortion who?

MS. SINGH:  Providers.

Dr. Grossman will explain that an in-person
examination by a physician is not necessary prior to a
medication abortion and it does not enhance its safety or
effectiveness.  He'll tell you that, in the rare cases where a
physical examination may provide useful information, that exam
does not need to be done by a physician who prescribes a
medication abortion.

Dr. William Martin Haskell in Indianapolis will
explain that practitioners at his clinic rarely do physical
examinations.

THE COURT:  His last name is Haskell?  I have to
repeat it for the court reporter because you let your voice
trail.

MS. SINGH:  Sorry about that, Your Honor.

He will testify that practitioners at his clinic
rarely do physical examinations before prescribing medication

abortion.  In the rare cases where a physical examination would be helpful, he sees no medical reason for requiring physicians to do those exams.

You'll also hear evidence that the burden of the telemedicine ban and the in-person examination requirement substantially outweigh their benefits.

Representatives of Indiana abortion clinics, Ms. Laura Miller from Planned Parenthood, Ms. Hagstrom Miller --

THE COURT:  Who is he?  Who is he?  You've swallowed every one of those names.

Laura Miller.  Who's the other one?

MS. SINGH:  Ms. Hagstrom Miller from Whole Woman's Health Alliance and Dr. Haskell from Women's Med will testify that physician availability limits their ability to provide abortion care in Indiana.  They will testify that, in the absence of a telemedicine ban, an in-person examination requirement, their abortion clinics would use telemedicine to provide medication abortion.  You will hear testimony that this would allow abortion clinics to offer medication abortions much more frequently, allowing patients to obtain abortion earlier in pregnancy and at lower costs.

The plaintiffs here also challenge the telemedicine ban and the in-person examination requirement on equal protection grounds.  The evidence will establish that telemedicine is widely used in medicine, including for

reproductive care and other care that is riskier than
medication abortion.

In fact, one of the defendants' medical experts,
Dr. Stroud, treated infertility through telemedicine.

THE COURT:  Wait.  Wait.  Start that again.  Start
that sentence again, please.  Hang on just a minute.  Please
wait just one minute.

(Recess taken.)

(Open court.)

THE COURT:  Okay.  I believe we're back in business.
Thank you for your patience.

Ms. Singh, can you figure out where you left off and
pick up there?

MS. SINGH:  I can, Your Honor.  Thank you.  Returning
to plaintiffs' challenge to the telemedicine ban and in-person
examination requirement on equal protection grounds.

Planned Parenthood and Indiana Health Centers offered
birth control and testing for sexually-transmitted infection by
telemedicine.  Ms. Grace Hutson will testify about her
experience using telemedicine in Indiana for a variety of
treatments, including treatment with antibiotics.

Dr. Grossman will testify that antibiotics pose a
greater risk to patient health than the medication used to
induce a medication abortion.

In the end, plaintiffs' evidence will establish that

the State's differential treatment of abortion is not
reasonably related to any legitimate state interest.  The
evidence will also establish that the State's deferential
treatment imposes burdens on abortion access that substantially
outweigh its benefit.

Next, I'd like to discuss the in-person counseling
requirement and the ultrasound requirement.

Plaintiffs challenge the in-person counseling
requirement on both due process and equal protection grounds.
The evidence will show that the law is not reasonably related
to any legitimate state interest.  Dr. Grossman will testify
that telemedicine technology today permits face-to-face
communication between a provider and a patient that is
comparable to an in-person interaction.

The evidence will show that as a result, oral
State-mandated information can be provided just as effectively
via telemedicine as in person.  The evidence will also show
that printing out an electronic document and handing it to a
patient provides no benefit compared with sending the patient
an electronic version of the documents.

Ms. Herr is an advanced practice clinician who works
at an abortion clinic in Indiana.  She currently provides
State-mandated information to Indiana abortion patients.  She
will testify that she could do so just as effectively without
being in the same physical state with a patient.

1      Moreover, plaintiff will demonstrate that the

2  in-person counseling requirement is unconstitutional under the

3  Equal Protection Clause.

4      In Indiana, patients can receive information and

5  counseling concerning all other healthcare through

6  telemedicine.  Plaintiffs will establish that this differential

7  treatment of abortion patients fails to advance the State's

8  interest in informed consent.

9      Turning now to the ultrasound requirement.  There are

10  three components to that requirement:  That an ultrasound be

11  done; that it be done by an abortion provider; and that it be

12  done 18 hours in advance of an abortion.

13      Here, plaintiffs challenge on equal protection grounds

14  the requirement that the ultrasound be performed by the

15  abortion provider which, because of the requirement that it be

16  done 18 hours before the abortion, forces abortion patients to

17  make a separate trip to the abortion provider.

18      The evidence will show that the ultrasound requirement

19  treats abortion patients differently from all other medical

20  patients in Indiana.  Dr. Grossman will explain that there's no

21  medical basis for requiring the abortion provider to perform

22  the ultrasound.  Instead, any qualified practitioner can

23  competently perform a pre-abortion ultrasound exam, including

24  the patient's referring physician or another obstetrician,

25  gynecologist, or radiologist in the patient's local community.

Dr. Grossman will explain that outside of the abortion contact, clinicians commonly collaborate in the care of pregnant patients, and in Indiana no other pregnant patient is subject to a limitation on who may provide their ultrasound examination.

Further, the evidence will show that this differential treatment does not serve the State's interest in ensuring accurate gestational dating or --

THE COURT:  Say that again.

MS. SINGH:  Further, the evidence will show that this differential treatment does not serve the State's interest in ensuring accurate gestational dating or in enhancing patient's decision making.

With respect to gestational dating, another Indiana law, not challenged here, independently requires abortion providers to determine the gestational age of a pregnancy in accordance with accepted medical standards.  That law fully serves the State's interest while allowing abortion providers to choose the method of gestational dating that is most appropriate for a patient, so long as it is consistent with accepted medical standards.  Dr. Grossman will testify that ultrasound is not the only accepted method of dating a pregnancy.  Nevertheless, Indiana abortion providers would continue to use ultrasound for most of their patients even if the ultrasound requirement were struck down, but they would not

necessarily perform the ultrasound themselves.  Instead, they
would allow their patients to obtain ultrasound exams from
local obstetricians, gynecologists, and radiologists to save
them an unnecessary trip to the abortion provider.

With respect to patient decision making, although the
state has no credible evidence to support its claim that
viewing an ultrasound image enhances patient decision making,
another Indiana law, not challenged here, requires abortion
patients to be informed of the availability of ultrasound
imaging before consenting to an abortion.

In light of this other law, the ultrasound requirement
does little to advance the State's purported interest.  Thus,
neither the in-person counseling requirement nor the ultrasound
requirement are reasonably related to legitimate state
interest, however both impose substantial obstacles to abortion
access.  These requirements force abortion patients to make at
least two visits to an abortion provider.

Ms. Paulina Guerrero, an expert with years of
experience trying to help patients overcome barriers to
abortion care, will describe how making two separate trips
makes abortion more difficult to afford and logistically
burdensome for patients to arrange.  As a result, some patients
are forced to delay their care.

You will hear about the numerous reasons that delayed
access to abortion care is harmful, including the delay forces

1    a person to stay pregnant when they do not want to be and to

2    contend with the physical symptoms of pregnancy longer.

3            These are not hypothetical harms.  Ms. Hutson and

4    Ms. Herr will testify about how real these harms were for them.

5    They obtained abortions in Indiana.  Dr. Grossman will explain

6    that such experiences are well documented in research,

7    investigating the impact of travel and multiple trips on

8    abortion access in states across the country, especially with

9    respect to people who are lower income or living in poverty.

10           Dr. Diana Romero, a public health researcher, will

11   testify that for people already struggling to meet basic daily

12   needs, additional unexpected expenses are not just minor

13   inconveniences but substantial hardship.

14           For all of these reasons, plaintiffs respectfully ask

15   the Court to find that the challenged laws impose substantial

16   obstacles in the path of patients seeking abortion care in

17   Indiana.  Thank you, Your Honor.

18           THE COURT:  Thank you very much, Ms. Singh.  And you

19   did a good job, you slowed down, and I could catch it there.

20   Thank you.  We're all having to learn a new skill here, so

21   don't feel like I've criticized unduly.  I don't intend to do

22   that.

23           Mr. Fisher, an opening statement from the government

24   -- from the State.

25           MR. FISHER:  Thank you, Your Honor, and may it please

the Court.  Before I summarize the evidence that the defendants intend to provide, I thought I would take a moment to reframe the issues just a little bit.  We certainly agree with the plaintiffs that there are two sets of issues.  On the one hand, the ultrasound requirement with in-person counseling; and on the other hand, the physical examination requirement with the telemedicine ban.

But we think it's important to revisit where we find ourselves as we begin this trial.  With respect to the first pairing, that is the ultrasound and in-person counseling, the Court has already upheld the ultrasound requirement against a due process/undue burden challenge, and as we indicated in our colloquy at the final pretrial conference, there is no undue burden distinction between due process and equal protection.

Furthermore, the in-person counseling requirement adds no burden to the abortion process beyond what the ultrasound already requires, so its constitutionality would seem to follow from that of the ultrasound requirements.

With respect to the second pairing, the physical examination requirement and the telemedicine ban are really just two ways of stating the same requirement.  The abortion doctor must examine the woman in person before prescribing her Mifepristone.  Critically, plaintiffs do not assert that absent the telemedicine ban, women would obtain medication abortions from their homes.  They concede that in all events the abortion

patient must go to the abortion clinic the day of the abortion. So no matter what, the abortion patient will always have two trips to the abortion provider.

Accordingly, when they attack the physical examination requirement, what plaintiffs really demand is a constitutional right for abortion doctors to telecommute, to prescribe Mifepristone from some remote location, perhaps from home, perhaps without having to travel to the abortion clinic at all.

But the undue burden standard is not about the burdens on abortion doctors. It is about the burdens on abortion patients. And plaintiffs cannot show that permitting doctors to telecommute will lift burdens on abortion patients. In all events, the State will present evidence supporting the benefits of these four laws. First, Dr. Farr Curlin, a renowned medical ethicist will testify about the medical ethics of abortion and how disputed questions about due regard for the fetus justifies special regulatory attention to abortion, including with respect to informed consent.

He will also testify how the ultrasound requirement legitimately contributes to the informed consent process for women seeking abortion. Kristen Rinehart will testify about her abortion story, the negative effects of her medication abortion, and how an ultrasound might have altered her decision.

Dr. Donna Harrison will testify about the risk of

complications from a medication abortion and the importance of a physical examination for dispensing Mifepristone.  Drs. Nancy Goodwine-Wozniak and Christopher Stroud will each testify about the medical basis for in-person counseling, the importance of ultrasound for informed consent, and the importance of a physical exam in the abortion context.

Anastasia Roth will testify about resources available to pregnant women, especially vulnerable women, and her experiences with patients, experience in abortion, and coercion and intimate partner violence, as well as difficulties that low-income women have communicating their needs to medical providers, particularly when patient provider interactions are virtual over the telephone or otherwise not in person.

Professor Priscilla Coleman will testify about data showing the potential mental health risks of abortion. Dr. Anthony -- I'm sorry Dr. Aaron Kheriaty will testify about his experiences with patients who have suffered negative mental health impacts from abortion.  And if necessary, and if permitted by the Court, James Studnicki will testify to the lack of statistical support for the proposition that Indiana's abortion laws have caused a decline in abortion rates.

This evidence will demonstrate the utility of ultrasound, in-person counseling, and physical examinations for the sake of ensuring appropriate care, both mental and physical, for women seeking abortions, the benefits of which

1    outweigh any meager burdens they may impose.

2         Ultimately, on the in-person counseling and ultrasound

3    laws, there really is nothing left for the Court to decide as

4    their validity follows from the Court's summary judgment/due

5    process ruling in favor of ultrasound and the waiting period.

6         And for the physical examination requirement, the

7    question boils down to whether precluding abortion doctors from

8    telecommuting imposes an undue burden on women.  Again, this is

9    not an issue of lifting the two-trip requirement, which this

10   Court effectively upheld on summary judgment, because

11   plaintiffs concede that Mifepristone must be dispensed at the

12   clinic.  It is instead an issue of making things more

13   convenient for the abortion physicians.

14        And that, apparently, is why we are here this week, so

15   that abortion providers might have a chance to prove that the

16   14th Amendment entitles them to telecommute to abortions.

17   Plainly, it does not.  Thank you very much.

18        THE COURT:  Thank you, Mr. Fisher.

19        Ms. Singh, you may call your first witness, and you

20   may make your exhibit proffer.

21        MS. SINGH:  Yes, Your Honor.  Thank you.  Our first

22   witness will be Ms. Laura Miller.  And Ms. Stephanie Toti will

23   be conducting the direct examination.

24        THE COURT:  Miss Toti, hang on one second please.  Can

25   you hear me all right?

LAURA MILLER – DIRECT/TOTI                    22

1      MS. TOTI:  Yes, Your Honor.

2      THE COURT:  Miss Toti, will you call your witness,

3   please, officially, and I'll have her sworn.

4      MS. TOTI:  Yes, Your Honor.  The plaintiffs call Laura

5   Miller to the stand.

6      THE COURT:  Spell her last name.

7      MS. TOTI:  M-I-L-L-E-R.

8      THE COURT:  Good morning, Miss Miller.

9      THE WITNESS:  Good morning.

10      THE COURT:  The court reporter will now administer the

11   oath.  Would you raise your hand now and be sworn.  Can you do

12   that?

13              **LAURA MILLER, PLAINTIFFS' WITNESS, SWORN**

14                     **<u>DIRECT EXAMINATION</u>**

15      MS. TOTI:  Thank you.  Good morning, Miss Miller.  I

16   have a few questions for you this morning.

17   BY MS. TOTI:

18   Q.  Where do you work?

19   A.  I work for Planned Parenthood of Indiana and Kentucky.

20   Q.  Is it okay if I refer to Planned Parenthood of Indiana and

21   Kentucky as PPINK?

22   A.  Yes.

23      THE COURT:  What is it, Miss Toti?  Wait a minute,

24   what are you referring to it?

25      THE WITNESS:  PPINK, P-P-I-N-K.  Is that okay, Your

LAURA MILLER – DIRECT/TOTI                    23

Honor?

         THE COURT:  PPINK; is that it?

         MS. TOTI:  Yes, that's it.  That's the acronym.

         THE COURT:  Spell it again, though, so I make sure I
understand it.

         MS. TOTI:  Sure, P-P-I-N-K.

         THE COURT:  Okay.  Thank you.

         MS. TOTI:  You're welcome.

BY MS. TOTI:

Q.  Miss Miller, what's your current position at PPINK?

A.  I'm an area services director.

Q.  Can you tell us about your educational background,
beginning with college?

A.  Yes.  I have an undergraduate degree in human development
and family studies as well as religious studies.  I have a
master's degree in public health.  I also have a graduate
certificate in nonprofit and public affairs leadership from the
Ohio State University.

Q.  And can you give us an overview of your work experience
before joining PPINK?

A.  Yes.  When I was an undergrad at Ball State, I worked for
their career services department.  When I moved to Indiana
University for graduate school, in addition to being a graduate
assistant, I worked for an organization called Center Stone.  I
also worked for the Monroe County Youth Services Bureau.  I

1  went full time with them after I graduated; and then, I

2  transitioned to working for Planned Parenthood.

3  Q.  And when did you begin working at Planned Parenthood?

4  A.  In early 2016.

5  Q.  What position did you have when you first joined the

6  organization?

7  A.  I was the health center manager in the Bloomington

8  location.

9  Q.  What were your job responsibilities in that role?

10 A.  As the health center manager, I was responsible for the

11 operations of that specific health center.  So I was

12 responsible for making sure that access remained open.  I was

13 responsible for making sure that we were providing good access

14 to care and customer service.  I was responsible for hiring

15 folks as well as kind of the overall staffing of things.  I was

16 responsible for following up on audits and corrective action

17 plans, kind of everything that's needed to operationally keep

18 the health center going.

19 Q.  How long did you remain in that position?

20 A.  I was in that role for two years.

21 Q.  After that, did you transition to another position at

22 PPINK?

23 A.  Yes.  So after two years as the health center manager, I

24 transitioned to the regional manager role, which there's now

25 been a title change for that to area services director, but

1    it's the same job.

2    Q.  And is that the position that you currently hold?

3    A.  Yes.

4    Q.  What are your job responsibilities as area services

5    director?

6           THE COURT:  Excuse me.  When did you become the

7    regional manager?

8           THE WITNESS:  That was in early 2018.

9           THE COURT:  Thank you.

10   BY MS. TOTI:

11   Q.  And Miss Miller, what are your job responsibilities in that

12   role?

13   A.  As an area services director, I'm responsible for

14   overseeing the operations of the eight health centers that are

15   within my region.  So I'm responsible for kind of generally

16   knowing the kind of metrics of the health centers, how many

17   patients they are seeing, how much time patients are spending

18   at our health centers, the availability of appointments and the

19   access to our health centers.  I'm responsible for building out

20   budgets and looking at the finances of our health centers, kind

21   of generally providing operational support for those sites.

22   Q.  And where is the region that you oversee?

23   A.  My region is, if you draw a line east/west through

24   Indianapolis and go south from there, those are my sites.  They

25   include the Georgetown Road location in Indianapolis, the south

LAURA MILLER - DIRECT/TOTI          26

side Indianapolis location, the Bloomington location, Columbus,

Evansville, New Albany; and then, the two locations in

Kentucky, Louisville, and Lexington.

Q.  As area services director, what kinds of information

concerning health center operations do you routinely review?

A.  So I review information about how many patients are coming

into the health centers.  I'm reviewing information about how

long they are in the health center, what their visit time is.

I review information about how long it takes patients to get an

appointment with us.  I also review information about how

patients are paying for their visits with us.

Q.  To what extent does your job require you to understand and

analyze factors that lead to delay in abortion access?

A.  That's a pretty big part of what I do.

Q.  And why is that?

A.  So we want to make sure that patients have access to all of

our services within kind of certain periods of time.  The gold

standard is three days to get a patient in.  So we want -- any

time that a patient isn't able to get an appointment with us

within that three-day period, we want to understand why, what's

going on, and we want to take steps to fix that as much as we

can.

Q.  Do you have direct interactions with PPINK abortion

patients?

A.  Yes.

LAURA MILLER – DIRECT/TOTI                    27

1    Q.  In what circumstances?

2    A.  So I interact directly with abortion patients who have been

3    escalated to me from our frontline staff members.  Those

4    patients are the ones who need additional help accessing

5    services, whether that be from a logistical standpoint or a

6    financial standpoint.

7    Q.  How often do abortion patients get escalated to you?

8    A.  I speak with one to two patients a week who need that

9    additional support.

10   Q.  Are you familiar with the availability of services at PPINK

11   health centers that are outside the region that you oversee?

12   A.  Yes.  So I, in general, need to make sure that I'm aware of

13   availability at the sites that I don't directly -- that aren't

14   directly in my region because I regularly refer patients and

15   make appointments for patients at those locations.

16   Q.  Okay.  And just to be clear, Miss Miller, you're not a

17   medical practitioner; is that right?

18   A.  Correct.

19   Q.  Okay.  I'd like to ask you some questions about the PPINK

20   health centers that offer abortion services in Indiana.  How

21   many licensed abortion clinics does PPINK operate in Indiana?

22   A.  We have four.

23   Q.  Where are they located?

24   A.  They are located in Merrillville, in Lafayette, in

25   Indianapolis at the Georgetown Road location, and in

1    Bloomington.

2    Q.  Let's start with the Merrillville health center.  What

3    abortion services does the Merrillville health center currently

4    provide?

5    A.  Merrillville provides medication abortions up to ten weeks'

6    gestation and aspiration procedures up to 13 weeks and six

7    days' gestation.

8    Q.  And when you refer to "gestation," are you basing that on a

9    patient's last menstrual period?

10   A.  Yes.

11   Q.  How often does the Merrillville health center provide

12   abortion services?

13   A.  Merrillville provides services one day each week plus one

14   Saturday a month.  So five days total each month.

15   Q.  Does Merrillville health center provide medication

16   abortions and aspiration abortions on the same days, or are

17   some days reserved for one type of procedure?

18   A.  They are both scheduled on the same day.  They are both

19   available on the same day.

20   Q.  Thank you.

21       Now, let's talk about the Lafayette health center.  What

22   abortion services does the Lafayette health center currently

23   provide?

24   A.  Lafayette provides medication abortion services up to ten

25   weeks' gestation.

1    Q.  And how often does it provide those services?

2    A.  They provide services about every other week.  So two times

3    a month.

4    Q.  Now, let's talk about the Indianapolis health center at

5    Georgetown Road.  What abortion services does that health

6    center currently provide?

7    A.  Georgetown provides medication abortions up to ten weeks'

8    gestation and aspiration procedures up to 13 weeks and six

9    days' gestation.

10   Q.  How often does it provide those services?

11   A.  Georgetown offers services two times each week, plus one

12   Saturday a month.  So nine days total each month.

13   Q.  Does the Indianapolis health center provide medication

14   abortions and aspiration abortions on the same days?

15   A.  Yes.

16   Q.  Finally, let's talk about the Bloomington health center.

17   What abortion services does the Bloomington health center

18   currently provide?

19   A.  Bloomington provides medication abortion services up to ten

20   weeks and aspiration procedures up to 13 weeks and six days.

21   Q.  And how often does it provide those services?

22   A.  Bloomington offers procedures one day a week, so four times

23   each month.

24   Q.  And does the Bloomington health center provide medication

25   abortions and aspiration abortions on the same day?

A.  Yes.

Q.  What role does physician availability play in the frequency
with which the health centers you just testified about offer
abortion care?

A.  Physician availability is really the biggest factor in how
often we can schedule procedures at each health center.

Q.  Approximately what percentage of abortions performed by
PPINK Indiana health centers are medication abortions?

A.  Over the last couple of months, it's been about 50/50.

Q.  Okay.  So half medication abortions, half aspiration
abortions?

A.  Correct.

Q.  Okay.  Now, I'd like to ask you about PPINK health centers
that offer information sessions in ultrasound exams to Indiana
abortion patients.  Are you aware that Indiana law requires
abortion patients to participate in an in-person information
session and have an ultrasound exam at least 18 hours before
their abortion?

A.  Yes.

Q.  What PPINK health centers offer the required information
sessions and ultrasound exams to Indiana abortion patients?

A.  In addition to the four licensed sites that we just talked
about, patients can visit the Evansville health center, the
Columbus health center, the Midtown Indianapolis health center,
the Fort Wayne health center, or the Mishawaka health center to

LAURA MILLER – DIRECT/TOTI                    31

1  do that informational session and get the ultrasound that's

2  required.

3  Q.  What staffing and equipment does the PPINK Health Center

4  need in order to provide information sessions and ultrasound

5  exams to abortion patients?

6  A.  Yeah.  So we have to have an ultrasound machine at that

7  location.  We also have to have the equipment to appropriately

8  clean the ultrasound probe and pieces there, which is a

9  separate machine that is also very expensive.

10     We also have to train staff to perform early gestation

11 ultrasounds.  We also have to train the advanced practice nurse

12 at those locations to interpret the ultrasounds.

13 Q.  Who provides the state-mandated information?

14 A.  The advanced practice nurses.

15 Q.  Are you aware that PPINK filed a lawsuit to challenge the

16 requirement that the state-mandated ultrasound be performed at

17 the same time as the state-mandated information session?

18 A.  Yes.

19 Q.  And that lawsuit was ultimately dismissed, allowing the

20 requirement to take effect?

21 A.  That's my understanding --

22         THE COURT:  Wait.  Ms. Toti, say that again, please.

23         MS. TOTI:  Your Honor, I asked her if that lawsuit was

24 ultimately dismissed, allowing the requirement to take effect.

25         THE COURT:  To receive a fax?

1          MS. TOTI:  No, I'm sorry, Your Honor.

2          THE COURT:  I know about the dismissal, but I didn't

3     catch the end of your sentence.  You let your voice trail.

4          MS. TOTI:  I apologize, Your Honor.  Allowing the law

5     to take effect.  So in other words, the law went into effect

6     after the dismissal.

7          THE COURT:  Right.  Okay.  Thank you.  That is

8     consistent with my understanding, too.

9          MS. TOTI:  Okay.

10         THE COURT:  That was Judge Pratt's case, right?

11         MS. TOTI:  I believe so, yes.

12    BY MS. TOTI:

13    Q.  Miss Miller, do you know approximately when the requirement

14    that the ultrasound be performed at the same time as the

15    state-mandated information session -- when that requirement

16    took effect?

17    A.  That requirement went back into effect as of January 1st,

18    2021.

19    Q.  Prior to the change in the law, which PPINK health centers

20    had ultrasound capabilities?

21    A.  In addition to the four locations -- the four licensed

22    locations, just Evansville.

23    Q.  So the four abortion -- licensed abortion clinics, plus

24    Evansville?

25    A.  Correct.

1  Q.  Are there any additional health centers that have

2  ultrasound capabilities now?

3  A.  Yes.  So we were able to move some machines from the

4  licensed locations that had a couple of machines there so that

5  we could increase capacity.  We were able to move some of those

6  machines to get machines to the Columbus, the Fort Wayne and

7  the Mishawaka locations.

8      So we're no longer able to support as much capacity at the

9  licensed locations, but we wanted to be able to offer that

10  informational session with the new required ultrasound at more

11  sites.

12      And then we also were able to get a grant to put a new

13  ultrasound machine at the Midtown Indianapolis location.

14  Q.  Could PPINK transfer existing ultrasound machines to

15  additional health centers beyond the ones that you just

16  mentioned?

17  A.  No.

18          MR. FISHER:  Can I interject for just one second?

19          I just want to make sure that we understand what

20  Miss Toti's referring to.  Are we talking here about PPINK

21  health centers as opposed to some other company's health

22  centers?  I just want to make sure that's clear.

23          THE COURT:  Would you include that in your question,

24  Miss Toti?

25          MS. TOTI:  Yes, absolutely.  Thank you, Mr. Fisher.

BY MS. TOTI:

Q.  Miss Miller, does PPINK have the capacity to transfer existing ultrasound machines from its current facilities to other PPINK health centers that don't currently have ultrasound machines?

A.  No, we're spread as thin as we can get.

Q.  And are you aware of other grant opportunities for PPINK to acquire additional ultrasound machines?

A.  No, it certainly is something that we're always on the lookout for, but it's not an easy thing to get a grant for. It's a really expensive piece of equipment.

Q.  Could PPINK buy ultrasound machines for additional health centers that it operates?

A.  No, that's not financially an option.

Q.  In the foreseeable feature, do you expect there to be any changes in the number or location of PPINK health centers that provide pre-abortion ultrasounds and information sessions to Indiana abortion patients?

A.  No.

Q.  Now, I'd like to move on and ask you about the time it takes for a PPINK patient to obtain an abortion in Indiana.

How many times does that patient have to visit a PPINK health center to obtain abortion care in Indiana?

A.  Two.

Q.  What is the purpose of the first visit?

A.  So because of the state regulation that we have, that

there's a waiting period, we have that first visit to do all of

the things that we're required to do by law before that 18-hour

waiting period starts.

In addition to the state-mandated information and the

ultrasound, we also use that visit to get the patient's medical

history, to do our own internal counseling sessions, as well as

doing some labs that are relevant to the service.

Q.  And what's the purpose of the second visit?

A.  The second visit then after the waiting period is when the

patient either gets the medication for the medication abortion

or they have the aspiration procedure done.

Q.  And did you testify that lab work is typically done during

the first visit?

A.  Yes.

Q.  How long does it take to get the lab results?

A.  Those are available same day.  They are same day like in

clinic labs.

Q.  From an operation standpoint, would it be feasible to do

the lab work during the patient's second visit to the health

center?

A.  Yes.

Q.  How much time typically elapses between an abortion

patient's initial call to PPINK to make an appointment and the

patient's actual abortion?

A.  The typical time that elapses is one to two weeks.

Q.  How much time typically elapses between an abortion
patient's first visit to a PPINK health center and the
patient's second visit for the abortion?

A.  Anywhere from a couple of days to a week and a half.

Q.  Does it take some patients longer to obtain an abortion?

A.  Yes.

Q.  Why is that?

A.  Well, it can take longer for a patient to get in for that
second appointment based on factors like what their own
availability is like, how long of a drive it is to come back
for a second appointment, what their child-care situation is
like, what their financial situation is like, whether or not
they are applying to additional financial support
opportunities, whether or not the closest licensed location to
them has convenient appointment times for them.  Any and all of
those things can add up together to make their wait time even
longer.

Q.  How much does the first trimester abortion cost at PPINK's
Indiana health centers?

A.  The services that are required for a typical abortion visit
add up to $834.

Q.  Are there any additional costs for some patients?

A.  One of the lab tests is a test to see if the patient's
blood type is positive or negative; and for patients with a

negative blood type, they also require an additional shot after
either the medication abortion or the aspiration procedure; and
that shot costs an additional 100 to $200.  So there is the
potential for that cost on top of the 834.

Q.  What percentage of PPINK's Indiana abortion patients have
insurance coverage for abortion?

A.  Not very many at all.  Medicaid in Indiana doesn't cover
abortion services, except in very, very rare circumstances; and
most of our patients with commercial insurance, their plans
don't cover abortion services.

Q.  How do patients without insurance coverage pay for their
abortion care?

A.  So patients who aren't using insurance end up paying out of
pocket for their services.  So that means they're either
completely paying for it on their own or they are utilizing a
mixture of their own funding, as well as other financial
assistance to cover the cost.

Q.  Miss Miller, I believe you testified earlier that in your
role as area services director, abortion patients with a high
degree of financial need get escalated to you; is that right?

A.  Yes.

Q.  Do you screen those patients to determine eligibility for
financial assistance?

A.  We have a couple of funding sources that we have agreements
with where those sources let us screen patients internally to

see if they are eligible for funding assistance.  So we are able to ask the patients questions, like, "What is your income level?  How many other people are you supporting?  Are you experiencing homelessness," different things like that.

    And then using the eligibility requirements of those funding sources, we're able to tell the patient directly if they are eligible to receive funding assistance.

    Other organizations that we have relationships with in terms of abortion funding assistance, we actually have to refer the patient directly to that organization to talk to them.  So the patient reaches directly out to that organization; and then each individual organization has their own rules and processes for asking the patient about eligibility requirements as well as, you know, differences in how much they are able to provide the patients and how long the patient might have to wait to receive that funding.

        THE COURT:  Are those private organizations as opposed to governmental organizations?

        THE WITNESS:  Yes.

BY MS. TOTI:

Q.  Is the Hoosier Abortion Fund operated by All-Options one of those private organizations?

A.  Yes.

Q.  What does an eligible patient have to do to actually obtain financial assistance from a private external funder?

1          MR. FISHER:  I'm going to object on that, Your Honor.

2    Just -- it sounds like without foundation, there's a little bit

3    of speculation there.  I think that's better established

4    through All-Options if that's important to the case.

5          THE COURT:  Lay the foundation, Miss Toti.  Ask her if

6    she knows that and how she knows that.

7          MS. TOTI:  Thank you, Your Honor.

8    BY MS. TOTI:

9    Q.  Miss Miller, are you familiar with the steps that a PPINK

10   abortion patient has to take to obtain financial assistance

11   from an outside funder?  I'm just asking yes or no.

12   A.  Yes.

13   Q.  And how are you familiar with those steps?

14   A.  So for the organization, for the external organizations

15   that we have relationships with, that we can refer our patients

16   to them for funding assistance, we had conversations with them

17   and did trainings with them to understand what our patients

18   would need to do to get funding assistance from them, as well

19   as understanding how that funding assistance would come through

20   and what logistical support we needed to set up on our end to

21   make sure that all of that ran smoothly.

22         MS. TOTI:  Your Honor, may I ask about her

23   understanding of the steps that a patient has to take to obtain

24   funding?

25         THE COURT:  Yes, you've laid the foundation.

1      MS. TOTI:  Okay.

2   BY MS. TOTI:

3   Q.  So Miss Miller, what steps does an eligible patient have to

4   take in order to actually obtain financial assistance from a

5   private funding source?

6   A.  So once the patient reaches out to that funding source, the

7   individual funding organizations do their own screening and

8   kind of have their own questions that they go through.  If the

9   organization is able to provide funding to the patient, each

10  organization has their own process in terms of letting us know

11  that, either by sending an e-mail or sending a fax, letting us

12  know that they have pledged a certain amount of money towards

13  that patient's services.

14      And then when the patient comes in, we charge them whatever

15  they were going to owe, minus what the organization has pledged

16  to pay.  So then we collect payment from the patient, and we

17  bill that organization for the amount that they pledged.

18  Q.  Okay.  So when you have a patient obtain financial

19  assistance from an outside source, the funds are disbursed

20  directly to PPINK; is that right?

21  A.  Yes.

22  Q.  In your experience, approximately how long does the process

23  take for the patient to obtain that pledge?

24  A.  That can take up to an additional week.  Each organization

25  has their own availability in terms of when patients recall, as

LAURA MILLER – DIRECT/TOTI                    41

1    well as their own caps on how much funding they have available

2    to give out at any certain time, so depending on what day of

3    the week the patient initially gets that information from me to

4    give that outside organization a call, they may have to wait a

5    little bit until that organization is available to take the

6    phone call.  Depending on their eligibility requirements, they

7    may have to work with that organization a little bit to get to

8    a place where they have available funding to give the patient,

9    so it can add up to a week.

10   Q.  Does financial assistance typically cover 100 percent of

11   the costs necessary to obtain abortion care?

12   A.  No, financial assistance almost never covers 100 percent of

13   the cost.

14   Q.  With respect to patients who receive financial assistance,

15   in your experience, how much do they typically have to pay out

16   of pocket?

17   A.  Most of our patients who receive financial assistance are

18   still going to end up paying about $500 for their services.

19   Q.  Okay.  For abortion patients' information sessions and

20   ultrasound exams -- so for that first appointment -- do

21   patients always go to the PPINK health center that's closest to

22   their home?

23        MR. FISHER:  Objection.  I don't think we have a

24   foundation for that, Your Honor.

25        THE COURT:  Lay the foundation, Ms. Toti.

1          MS. TOTI:  Okay.

2     BY MS. TOTI:

3     Q.  Ms. Miller, as part of your job as area services director,

4     do you regularly review information about patient scheduling?

5     A.  Yes.

6     Q.  And do you regularly review information about health center

7     occupancy?

8     A.  Occupancy in terms of the availability that's there or

9     something else?

10    Q.  Do you have an understanding of which patients are going to

11    which health centers at any given time?

12    A.  In a general sense, yes.

13    Q.  And are you ever involved in assisting abortion patients in

14    making appointments for either their day one visit or their day

15    two visit?

16    A.  Yes.

17    Q.  Do you assist them with both visits?

18    A.  Yes.

19          MS. TOTI:  Your Honor, may I go ahead and inquire?

20          THE COURT:  In the process of assisting, do you gather

21    their address information?

22          THE WITNESS:  Yes.

23          THE COURT:  The foundation's been laid.  You may

24    proceed.

25          MS. TOTI:  Thank you, Your Honor.

LAURA MILLER – DIRECT/TOTI                43

BY MS. TOTI:

Q.  For abortion patient information sessions and ultrasound exams, do patients always go to the PPINK health center that's closest to their home?

A.  Not necessarily.  Patients are going to go to whatever health center has the most convenient access for them, whether that is something closer to their home or something further from their home, you know, but that health center has a more convenient appointment time available.

Q.  And so you mentioned appointment time.  What role, in your experience, does appointment time play in the patient's scheduling process?

MR. FISHER:  Your Honor, I'm going to object on lack of foundation grounds, and I'm concerned that this line of questioning may call for hearsay.

THE COURT:  She's testifying from her knowledge as an administrator of the region that covers these services.  So if the knowledge comes out of that background, and I assume it does, because that's her perspective, that's the foundation. So I'll overrule the objection.  I can't anticipate the hearsay objection.  I don't know what you're referring to.  You just have a general fear of hearsay.  I hear you.  So I'll --

MR. FISHER:  Thank you, Your Honor.

THE COURT:  I'll listen closely.

Go ahead, Ms. Toti.  I assume the foundation for all

1   of these questions is the same, basically.

2            MS. TOTI:  That's correct, Your Honor.

3            THE COURT:  Go ahead.

4   BY MS. TOTI:

5   Q.  So, Ms. Miller, in your experience, is the availability of

6   appointments a factor that patients consider, the availability

7   of appointments at a given health center a factor that patients

8   consider in determining which health center to visit?

9            MR. FISHER:  Your Honor, I'm sorry, I have to object.

10  I don't see how she can answer that question without referring

11  to conversations out of court, and that's hearsay.

12           THE COURT:  Overruled, counsel.  She's talking about

13  what she knows from running the systems and her interactions

14  with people.  It's an experience question, that was the

15  question, not conversations.

16  BY MS. TOTI:

17  Q.  Ms. Miller, do you recall the question, or would you like

18  me to repeat it?

19  A.  Could you repeat it, please?

20  Q.  Sure.  In your experience, is the availability of

21  appointments at a given health center a factor that patients

22  consider in deciding which health center to visit?

23  A.  It's one of the factors, yes.

24  Q.  What if a patient is unable to travel to a location where

25  the earliest appointment is available?

1  A.  I'm sorry, I don't understand the question.

2         THE COURT:  I don't understand it either.  Would you

3  rephrase it, please.

4         MS. TOTI:  Sure.  You know, Your Honor, I think I

5  might just move on.

6         THE COURT:  All right.

7  BY MS. TOTI:

8  Q.  Ms. Miller, have you ever encountered Indiana patients who

9  are less than ten weeks' gestation when they first contact

10  PPINK to schedule an abortion but past ten weeks' gestation

11  before they are able to have an abortion?

12  A.  Yes.

13  Q.  How does that affect those patients' options for care?

14  A.  So, unfortunately, once the patient is past ten weeks'

15  gestation, they are no longer eligible for a medication

16  abortion, so they don't have that as an option anymore.  And

17  even if they are under ten weeks at that initial appointment,

18  if they are going to be past ten weeks before they can get in

19  for the second appointment, they don't have that option

20  anymore.  That also means that they can't receive services at

21  our Lafayette location, so their kind of access is restricted

22  down to one of the other three locations.

23  Q.  And you have encountered patients who are less than

24  13 weeks gestation when they first contact PPINK to schedule an

25  abortion but past 13 weeks, six days gestation before they are

LAURA MILLER – DIRECT/TOTI                 46

1    able to have the abortion?

2    A.   Yes.

3    Q.   And how does that affect those patients options for care?

4    A.   So again, even if they are under 13 weeks and six days at

5    that first appointment, if we're not able –– if they are not

6    able to make an appointment for the second procedure

7    appointment before they're past that gestation, we're not able

8    to provide them services.  Unfortunately that means they have

9    to go out of state typically to receive services, which, I

10   mean, that just means that they have a much longer drive, and

11   also those services tend to cost more.

12   Q.   Okay.  I'd like to move on to the subject of telemedicine.

13           THE COURT:  I'm sorry, say that again.  I want to move

14   on to what?

15           MS. TOTI:  Telemedicine, Your Honor.

16           THE COURT:  Okay.

17           MS. TOTI:  The subject of telemedicine.

18           THE COURT:  Okay.

19   BY MS. TOTI:

20   Q.   Ms. Miller, does PPINK offer any telemedicine services in

21   Indiana?

22   A.   Yes.

23   Q.   What PPINK health centers offer telemedicine in Indiana?

24   A.   All of our health centers are set up to offer telemedicine

25   services.

1   Q.  And what telemedicine services do those health centers

2   offer?

3   A.  We're currently offering telemedicine services for things

4   like birth control, STI testing, emergency contraception, kind

5   of those types of things.

6   Q.  Did you play a role in implementing those telemedicine

7   services?

8   A.  Yes, I was on the team that implemented those services in

9   Indiana.  I was responsible for the operations side of that, so

10  all of the logistics about how patients were going to be able

11  to make an appointment, how we were going to connect them with

12  our teams and our advanced practice nurses, any support things

13  we needed to set up like sending in labs, as well as how

14  patients were going to be connected to pay for those

15  appointments.

16  Q.  Did you collaborate with Planned Parenthood medical team in

17  implementing those services?

18  A.  Yes.

19  Q.  And what role did the medical team play?

20  A.  So the medical team made the decisions about what types of

21  services were appropriate to basing the telehealth, as well as

22  like what types of medical history questions needed to be asked

23  for each of those visits, as well as training other clinicians

24  in how to support telehealth office visits.

25  Q.  Are you familiar with the term "direct-to-patient

1  telemedicine"?

2  A.  Yes.

3  Q.  What does that term mean?

4  A.  The direct-to-patient telemedicine means that the patient

5  is not physically located at any of our health centers, so they

6  can connect with us from wherever they are and do the

7  telemedicine visit in that way.

8  Q.  And are you familiar with the term "site-to-site

9  telemedicine"?

10  A.  Yes.

11  Q.  What does that term mean?

12  A.  Site-to-site telemedicine means that the patient is

13  physically located in one of our health centers, typically a

14  health center that we weren't able to cover with an advanced

15  practice nurse in person that day.  So patients are still able

16  to come in and be seen with an office visit by an advanced

17  practice nurse that's located at another location.

18  Q.  You testified that PPINK health centers offered birth

19  control by telemedicine, is that right?

20  A.  Yes.

21  Q.  Was that through direct-to-patient model or site-to-site

22  model?

23  A.  Both.

24  Q.  Can you describe the process that a PPINK patient would go

25  through to obtain birth control via direct-to-patient

1  telemedicine.

2  A.   Yeah, so after the patient makes an appointment, which they

3  can do either on line or by giving us a call, we're going to

4  give them a phone call, we're going to gather some of their

5  demographic information, as well as find out how they would

6  like to pay for their appointment.  We're also going to e-mail

7  them a secure link that they can use for the day of their

8  appointment to connect with us through our telehealth platform.

9  On the day of their appointment, when they follow that link,

10  they'll initially connect with a medical assistant who will ask

11  them questions about their medical history, kind of get an idea

12  of what kind of birth control they are interested in, and then

13  an advanced practice nurse will also connect with them via the

14  telehealth platform, answer any questions they have, kind of,

15  you know, do their clinical stuff on the birth control side,

16  and then arrange to send a prescription for birth control to

17  whatever pharmacy is most convenient for the patient.

18  Q.   Now can you describe the process that a PPINK patient would

19  go through to obtain birth control via site-to-site

20  telemedicine?

21  A.   It's a very similar process, except the patient is going to

22  physically come into a health center, so they'll be doing the

23  demographic collection, the payment conversation stuff, as well

24  as the medical history in person with a medical assistant, and

25  then they'll use that same telehealth platform to connect with

1    an advanced practice nurse that's at a different location.

2    That advanced practice nurse is going to basically do the same

3    thing, have the same types of conversations, prescribe whatever

4    birth control they want to prescribe, and then arrange to have

5    it sent to a pharmacy.

6    Q.   You mentioned a telehealth platform.  Can you explain what

7    that is.

8    A.   Yeah, so it's basically a program that allows us to connect

9    with a patient in a HIPAA-compliant way, so it's a very secure

10   program.  It allows us to send links to patients that allow us

11   to connect with them.  It also allows us to send documents to

12   the patient if we need to get written documents to them in a

13   secure way, and then it also allows them to sign those

14   documents digitally and send it back to us if it's a document

15   that we need to have signed and on file.

16   Q.   And what about video interactions?

17   A.   That's hosted through that same platform as well, and it's

18   very similar to using Zoom or Bluejeans or GoToMeeting, one of

19   those programs that allows video interfacing.  It's just all

20   done within that same program so that it's HIPAA compliant.

21   Q.   And how do patients access the telehealth platform?

22   A.   So it's a secure link that's sent to them either via the

23   e-mail of their choice.  We can also send it to them through

24   the patient portal, which is our version of kind of the online,

25   you know, review your chart and pay your bill and it's that

1   online kinda platform that all doctors' offices have now that

2   allow you to go back and forth with your doctor's office, so we

3   can send the link to them that way as well.  And then when

4   they're ready to join the appointment, they just click on the

5   link, and it puts them into the visit.

6   Q.  I believe that you testified earlier that PPINK uses

7   telemedicine for testing for sexually transmitted infections or

8   STIs; is that correct?

9   A.  Yes.

10  Q.  Is that using direct-to-patient model or site-to-site

11  model?

12  A.  That's primarily using a site-to-site model.

13  Q.  Can you describe how that process works?

14  A.  Yeah.  So very similar to the birth control visit, the

15  patient is going to come in to a health center, talk to a

16  medical assistant about what their concerns are.  The medical

17  assistant is going to help with collecting samples, whether

18  that be urine samples or swab samples, taking blood draws,

19  things like that.  And then the medical assistant will also

20  help use the telehealth platform to connect the patient with an

21  advanced practice nurse at another site.  The advanced practice

22  nurse is going to complete the office visit, talk to the

23  patient about their risk factors, as well as talk about what

24  might happen after the results of the test come back, and then

25  she'll sign off on the test so that they get sent off and

LAURA MILLER – DIRECT/TOTI                    52

1    tested.

2    Q.  From an operations standpoint, has implementation of

3    telemedicine services at PPINK been successful?

4    A.  Yes, very.

5    Q.  Have you encountered any major problems?

6    A.  No.

7    Q.  Outside of Indiana and Kentucky, do other Planned

8    Parenthood affiliates use telemedicine for pre-abortion

9    counseling and informed consent?

10   A.  Yes.

11   Q.  Suppose Indiana law changed so that the pre-abortion

12   information session didn't have to be conducted in person.

13   Would PPINK use telehealth to conduct those sessions?

14   A.  Yes.

15   Q.  And would that be through direct-to-patient model or a

16   site-to-site model?

17   A.  We would be able to do either.  It would actually fit

18   really well into the system that we've already set up for our

19   family planning services.

20   Q.  Outside of Indiana and Kentucky, do other Planned

21   Parenthood affiliates use telemedicine to deliver medication

22   abortion to patients?

23   A.  Yes.

24   Q.  Are you aware that Indiana abortion providers are currently

25   prohibited by law from utilizing telemedicine for medication

LAURA MILLER - DIRECT/TOTI                    53

1  abortions?

2  A.  Yes.

3  Q.  If the law changed, would PPINK's Indiana abortion clinics

4  begin using telemedicine to deliver medication abortion

5  services?

6  A.  We would definitely be interested in that, yes.

7  Q.  What role would you play in the implementation of

8  telemedicine for medication abortion at PPINK?

9  A.  Very similar to the role I played in bringing in family

10 planning services on telehealth.  I would focus on the aspects

11 like how to make an appointment, how to make sure that we have

12 the access that we need, and how to make sure that we can

13 connect patients effectively with providers.  As I said,

14 though, it would fit really well into the existing system that

15 we already have set up.

16 Q.  Would PPINK use a direct-to-patient model of telemedicine

17 for medication abortion or a site-to-site model?

18 A.  So patients would still have to come in to one of our

19 licensed sites to receive the medication so that it would

20 effectively be a site-to-site model, but they would be able --

21 we would be able to expand services to offer those appointments

22 on the days that we weren't able to get a physician directly

23 there on site.

24 Q.  How would the implementation of telemedicine for medication

25 abortion affect the amount of time that it takes for a PPINK

1    patient to obtain an abortion in Indiana?

2    A.  It would significantly reduce it.

3    Q.  Okay.  Finally, Ms. Miller, I have just a couple of

4    questions about your work in Kentucky.

5        Is PPINK's health center in Louisville one of the health

6    centers that you oversee?

7    A.  Yes.

8    Q.  Does it provide abortion services?

9    A.  Yes, it does.

10   Q.  All together, how many other clinics in Kentucky provide

11   abortion services, both Planned Parenthood and Non-Planned

12   Parenthood?

13   A.  Just one.

14   Q.  So there's the one Planned Parenthood clinic and there's

15   one other one?

16   A.  Correct.

17   Q.  And where is that other abortion clinic located?

18   A.  That one is also in Louisville.

19   Q.  When did PPINK's Louisville health center begin providing

20   abortion care?

21   A.  We received our license just last year in early 2020.

22   Q.  So in the year of 2018, how many clinics provided abortions

23   in Kentucky?

24   A.  Just one.

25   Q.  And in the year 2019, how many clinics provided abortions

LAURA MILLER - DIRECT/TOTI                    55

1  in Kentucky?

2          MR. FISHER:  I just -- I'm sorry.  I just want to make

3  sure we're talking here only about Planned Parenthood and no

4  other.

5          THE COURT:  That was the question.

6  BY MS. TOTI:

7  Q.  So maybe I should clarify.

8      In the year 2018, how many total clinics, both Planned

9  Parenthood and non-Planned Parenthood clinics, provided

10  abortions in Kentucky?

11  A.  Just one.

12  Q.  And in 2019, how many total clinics, including Planned

13  Parenthood clinics and non-Planned Parenthood clinics, provided

14  abortions in Kentucky?

15  A.  Just one.

16          MS. TOTI:  Okay.  Your Honor, may I just have a moment

17  to check my notes before I conclude?

18          THE COURT:  Yes.  Go quickly because I'd like to get

19  this witness finished before our lunch break.

20          MS. TOTI:  Thank you, Ms. Miller.  I have no further

21  questions at this time.

22          THE COURT:  Mr. Fisher, you may cross-examine.

23          MR. FISHER:  Thank you, Your Honor.

24          May I take just one moment to confer with colleagues?

25  I think we may be able to narrow the cross-examination based on

MILLER – CROSS/FISHER                    56

1   her testimony.  I just want to take a moment to compare notes.

2              THE COURT:  A moment.

3                   (Discussion held off the record.)

4              MR. FISHER:  Thank you, Your Honor.  We're ready now.

5              THE COURT:  All right.

6                    **CROSS-EXAMINATION**

7   BY MR. FISHER:

8   Q.  Ms. Miller, hi.  My name is Tom Fisher.  I work for the

9   Attorney General's Office and represent the defendants.

10      You and I met a little while ago.  I don't know if you

11  remember that meeting.  We had a deposition where we talked

12  about some of these issues.

13      Do you recall that?

14  A.  Yes.

15  Q.  Okay.  So I don't want to take too much time.  I just want

16  to make sure I understand a few things about what PPINK

17  provides and how it provides the services.

18      So how many total PPINK clinics or health centers provide

19  the in-person counseling, the 18-hour in-person counseling

20  before the abortion?

21              THE COURT:  Now?  At this time?

22              MR. FISHER:  Yes, at this time.  At this time, yes.

23  A.  So in addition to the four licensed, abortion licensed

24  facilities where patients can also go to get the state-mandated

25  information and ultrasounds before the waiting period starts,

MILLER – CROSS/FISHER                57

1    patients can also visit five other sites.  So there are nine

2    total sites in Indiana where patients can visit for that.

3    BY MR. FISHER:

4    Q.  Okay.  And is ultrasound also available at those same nine

5    sites?

6    A.  Yes.

7    Q.  How many physicians work at the Bloomington abortion

8    clinic?

9    A.  Currently, we have three physicians that rotate through

10   there.

11   Q.  Can you provide their names, please, just so we're

12   familiar?

13   A.  Dr. ███████.

14          MS. TOTI:  Objection, Your Honor.

15          For the safety of the physicians, I'd ask if maybe

16   they could be identified by initials or by pseudonym.  We'd be

17   happy to provide the names, you know, in a sealed transcript,

18   the actual name.

19          THE COURT:  Sustained.

20          Can you give the initials, Ms. Miller?

21          THE WITNESS:  Yes.

22          THE COURT:  Okay.  Do it that way.

23          THE WITNESS:  So -- sorry.  I have to think about it

24   differently for initials.

25          THE COURT:  That's all right.  Can you write it down

MILLER - CROSS/FISHER                    58

1   there?  Do you have a piece of paper?

2           THE WITNESS:  Yeah.  Sorry.

3           THE COURT:  That's okay.

4   A.  So DN.

5           THE COURT:  C, CN.

6           THE WITNESS:  "D" as in dog.

7           THE COURT:  Wait.  I'm sorry.  Then was it DN?

8           THE WITNESS:  Correct.

9           THE COURT:  Okay.  Sorry.  I told the court reporter

10  wrong.  DN.

11          Go ahead.  Next one.

12  A.  EM.

13          THE COURT:  Okay.

14  A.  I'm realizing I can't recall the first name of our third

15  doctor because I typically refer to her as just her last name.

16  The last name is "B" as in boy.

17          MR. FISHER:  That will be sufficient.  That's fine.

18  Thank you.

19          THE COURT:  We lawyers use the initials FNU, first

20  name unknown.  So we'll go FNU B.

21          MR. FISHER:  FNU B.  Great.

22  BY MR. FISHER:

23  Q.  Okay.  So let's start with DN.

24      When does DN come to the abortion clinic in Bloomington to

25  do abortions?

A.  So we offer abortion services in Bloomington one day a
week, typically on Thursdays.  The doctors are scheduled by
someone else, so I'm actually not in charge of scheduling like
when each specific doctor is going to be there.  So she's part
of the rotation that comes down.  She's not there on like any
certain, specific days.

Q.  And I assume the same would be true then for EM and UB?

A.  Correct.

Q.  With respect to D -- well, all three, really, but we can
take them one by one if it's a different answer.  But I'm just
wondering.  Do they have other jobs as physicians besides what
they do for Planned Parenthood in Bloomington?

A.  Yes, all three of them do.

Q.  Let's start with DN.  What does DN do besides be a Planned
Parenthood abortion physician?

        THE COURT:  Could you tell me the relevance of this,
Mr. Fisher?

        MR. FISHER:  Oh, I'm just trying to establish, Your
Honor, the limits of capacity; in other words, if the
physicians have other jobs.

        THE COURT:  Well, why don't you go directly to that
issue instead of getting the incremental minutia.

        MR. FISHER:  Okay.

BY MR. FISHER:

Q.  Do you know the availability of these physicians to perform

1  abortions besides when they come in to Planned Parenthood in

2  Bloomington?

3  A.  No.

4  Q.  Are you familiar with the physicians at the other Planned

5  Parenthood clinics in Indiana?

6  A.  I'm familiar with who they are, yes.

7  Q.  Do you know about their availabilities to do abortions

8  besides when they already come in to do them for the other

9  clinics?

10  A.  No.

11     I mean, I know that, like, they are doing their other job,

12  so I know they send their availability to us, and then we fit

13  their availability into our schedules so that we can provide as

14  much access as we can.  I don't necessarily know, like, what

15  they are doing on those other days when they say they're not

16  available.

17  Q.  Have you quantified how many more days or how many more

18  abortion appointments you would be able to provide at the

19  Bloomington abortion clinic if there was no in-person physical

20  examination required?

21  A.  Certainly I haven't already, like, done the math.  I could,

22  I suppose, pretty quickly, if wanted.

23  Q.  I'm just asking if you've done it.

24  A.  No.

25  Q.  What about how many more days of abortions or abortion

MILLER - CROSS/FISHER                   61

1   appointments you could provide if the ban on telemedicine

2   abortions were lifted; have you quantified that?

3   A.   Yeah.  So if the ban on telemedicine for medication

4   abortions lifted, we would be able to expand access to five

5   days a week for medication abortion.

6   Q.   Who would staff those abortions?

7   A.   Support staff wise or provider?

8   Q.   Physicians.

9   A.   Physicians.

10      So physicians who are at one of the other three licensed

11   locations would provide telemedicine services for patients who

12   it was more convenient for them to come into, for example, the

13   Bloomington health center.

14   Q.   How do you know they would have availability to do that?

15   A.   Because of our current abortion schedule, I know that we

16   typically have abortions available pretty much each day of the

17   week somewhere in the state.  So using that same kind of --

18   where we're generally able to staff a physician somewhere in

19   the state, one day a week we would be able to use that same

20   physician availability to cover medication abortion via

21   telehealth.

22   Q.   I'm still trying to understand how you know that when you

23   testified that you don't know the schedules of your abortion

24   physicians either in Bloomington or at the other sites.

25   A.   I do know when we're typically able to provide abortion

1    services in person right now.  So assuming that that doesn't

2    change, I can say that we would be able to expand telemap

3    availability to that level.

4    Q.  So I'm still having trouble following the logic here.  So

5    you've got, let's take, okay let's take one day a week.

6    Mondays, where do you -- where does Planned Parenthood provide

7    abortions on Mondays?

8    A.  Typically Lafayette, like every other week.

9    Q.  Who staffs the Lafayette clinic that day?

10   A.  It varies.

11   Q.  And do you know who staffs, just by initials, do you know

12   who the physicians are?

13   A.  Lafayette isn't one of my sites so I'm not sure.

14   Q.  So what about Tuesdays?

15   A.  Tuesdays we typically have abortion services available in

16   Georgetown.

17   Q.  And who staffs those?  What physicians staff those?

18   A.  Again, it's a rotation.  The same physicians that I

19   mentioned earlier.  In addition to CB, "C" as in cat, "B" as in

20   boy.

21   Q.  Okay, CB, DN, EM and UB will staff the Georgetown clinic on

22   a Tuesday, but not necessarily the same physician every

23   Tuesday?

24   A.  Correct.

25   Q.  Okay.  Okay, let's -- so let's go with Wednesdays, then.

MILLER – CROSS/FISHER                    63

1    Where do you offer abortions on Wednesdays?

2    A.   In Merrillville.

3    Q.   And is that every Wednesday?

4    A.   Yes.

5    Q.   And which doctors?

6    A.   That's not one of my sites.  I'm not as familiar with the

7    doctors up there.

8    Q.   And going back to the Georgetown clinic, is that every

9    Tuesday?

10   A.   Uh-huh.  Yes.

11   Q.   What about Thursday?

12   A.   Thursdays we offer procedures in Bloomington.

13   Q.   And is it every Thursday?

14   A.   Yes.

15   Q.   All right.  Friday?

16   A.   Georgetown.

17   Q.   Same set of doctors rotating?

18   A.   Yes.

19   Q.   And is that every Friday?

20   A.   Yes.

21   Q.   Okay.  So you've already got your physicians dedicated,

22   except, I guess, on Monday.  Monday you do every other week,

23   right?

24   A.   Typically, yes.

25   Q.   And when you say "typically," what accounts for doing it on

1    a Monday or not?

2    A.   Physician availability.

3    Q.   Physician availability.  Okay.  And so -- great.  The

4    current days that you provide abortions, are you at capacity

5    for the appointments?

6    A.   Typically, yes.

7    Q.   Typically, but not always?

8    A.   Certainly not a hundred percent of the time are we

9    completely fully booked, but I would say 90 percent of our days

10   are fully booked.

11   Q.   So given what we've talked about on the schedule of when

12   you provide abortions, can you explain to me since you don't

13   know the schedules of the doctors, how you know they would be

14   available on other days, to provide abortions through

15   telemedicine?

16   A.   So I don't know each, like, individual doctor's schedule.

17   I do know that we have the coverage right now to cover

18   somewhere in Indiana five days a week.  So, for example, if we

19   have the physician who is physically in our Merrillville

20   location, we could use telehealth if they are in the

21   Merrillville location on a Wednesday to provide services there.

22   We could, by telehealth, offer services also in Lafayette, at

23   Georgetown Road, and in Bloomington.

24        So patients on Wednesday would be able to get a medication

25   abortion at any of those four sites even though we only may

1   have a doctor in Merrillville.

2   Q.  Oh, I see.  I see, but of course, your capacity those days

3   is already usually a hundred percent full, 90 percent of the

4   time.

5   A.  So if we were able to do telemedicine and we were able to

6   spread out and give patients more options on when they could

7   get their medication abortion appointment, that would probably

8   decrease the number of people physically going into the site

9   that the physician is at.

10      There would be some operational conversations about how we

11  would set up that schedule and different things like that.  But

12  the bottom line is we would be able to open up availability to

13  patients across the state at any of our other three locations

14  using a doctor at one of them.

15  Q.  Why would the amount of time that the physicians spend with

16  the patients be different?

17  A.  I'm sorry, it cut out right at the beginning of your

18  question.  Could you repeat that?

19  Q.  With the telehealth appointment, would the amount of time

20  that the physician spends with each patient be different?

21  A.  I don't think so, no.

22  Q.  So the amount of time it takes to see a given set of

23  patients in a given day would be the same, regardless whether

24  it was in person or on telehealth?

25  A.  Correct.  The patients just wouldn't always need to be

1  physically there with the doctor.

2  Q.  Okay.  Thank you.

3        MR. FISHER:  Okay, thank you, Ms. Miller.  I have no

4  further questions.

5        THE COURT:  Let me just see if I understand the last

6  line of questioning.

7        Ms. Miller, is it your testimony -- if it's not, you

8  should say so.  But is it your testimony that if telemedicine

9  were available, that you would be able to get greater

10  efficiencies out of your cadre of physician services by the way

11  in which you organize the flow of patients, is that what

12  you're -- is that your theory here?

13        THE WITNESS:  Yes, and we would be able to offer

14  better access to the patients because they wouldn't -- they

15  would be able to go to a location that is more convenient for

16  them and get an appointment date and time that is more

17  convenient for them.

18        THE COURT:  Does my question prompt any additional

19  questions from you, Mr. Fisher?

20        MR. FISHER:  Yes, Your Honor.

21                    **RECROSS-EXAMINATION**

22  BY MR. FISHER:

23  Q.  Ms. Miller, I'm a little bit confused.  You said that the

24  amount of time that the physician spends with the patient is no

25  different when it's in person versus telehealth.  So I'm

1  wondering, I'm left wondering what efficiencies you are talking

2  about whether you're trying to fit more patients into a

3  physician's day?

4  A.  It's not about fitting more patients into a physician's

5  day.  It's about more effectively using the physician's

6  availability to see patients across the state and offering

7  patients the opportunity to be seen at a location and at a time

8  that's more convenient for them.

9  Q.  Okay.  Thank you.

10        MR. FISHER:  I don't have anything further.

11        THE COURT:  Redirect, Ms. Toti?

12        MS. TOTI:  No redirect, Your Honor.

13        THE COURT:  Does that complete your questions for

14  Ms. Miller?

15        MS. TOTI:  Yes, Your Honor.  Thank you.

16        THE COURT:  Mr. Fisher, I assume we can release

17  Ms. Miller; is that right?  You don't have her on your list; is

18  that true?

19        MR. FISHER:  Yeah.  No, we can release her.  Thank

20  you.

21        THE COURT:  Thank you very much, Ms. Miller.  You may

22  step aside as a witness, and you're excused from further

23  requirements to appear in this trial.

24        THE WITNESS:  Thank you.

25        THE COURT:  We're at straight-up noon.  So since we're

1  doing this electronically, I'm thinking an hour will be enough

2  for lunch.  Is that agreeable to all of you?  Can we reconvene

3  at one?  Is that going to be a hardship for anyone?  Please

4  tell me if so.

5         MS. SINGH:  No, Your Honor.  That's great.

6         MR. FISHER:  That works for the defense too.

7         THE COURT:  All right.  Good.  We will take a one-hour

8  break and reconvene at 1:00 o'clock.  Ms. Singh, before we

9  leave, just tell me who the next witness will be and who will

10  be questioning.  Will it be Miss Toti again?

11         MS. SINGH:  No, Your Honor.  It will be me doing the

12  questioning, and it will be Ms. Amy Hagstrom Miller.

13         THE COURT:  Very good.  We will look forward to that,

14  thank you.  Have a nice break.  We're in recess.

15         MS. SINGH:  Thank you.

16                  (Recess taken.)

17         THE COURT:  Good afternoon.  I don't know who Joshua

18  Prince is, but he just sent a friendly greeting to all of us.

19         Hello, he's on.

20         Welcome, Joshua, whoever you are.

21         Ms. Rahman, are you doing the honors for the State

22  this afternoon?

23         MS. RAHMAN:  Good morning -- good afternoon, I should

24  say, Your Honor.  Yes, I will be cross-examining the witness

25  for the State.

1          THE COURT:  Okay.  You've got to talk real slowly, as

2     in real slowly.

3          MS. RAHMAN:  Will do, Your Honor.

4          THE COURT:  I'm having trouble with my microphone.

5     There.

6          Okay.  Ms. Singh, are you taking the next witness?

7          MS. SINGH:  Yes, Your Honor.  I also wondered before

8     we call Ms. Hagstrom Miller if we could move into evidence

9     stipulated exhibits?

10          THE COURT:  You may.

11          MS. SINGH:  So at this point, we'd like to move into

12     evidence stipulated Exhibits SE1.

13          THE COURT:  Now, wait.  You've got to give us words to

14     go with those initials because we can't otherwise understand

15     them.

16          MS. SINGH:  Yes.  Stipulated Exhibit S, as in Sam, E,

17     as in Edward, 1, to S, as in Sam, E, as in Edward, 32.

18          THE COURT:  All right.

19          MS. SINGH:  In addition --

20          THE WITNESS:  Any others?

21          MS. SINGH:  Yes, Your Honor.  Plaintiffs would also

22     like to move into evidence P, as in Peter -- Plaintiffs'

23     Exhibit, P, as in Peter, X, as in xylophone, 4, which is a

24     summary of five stipulated exhibits; and the foundation for

25     that exhibit has been laid through a second set of joint

1   stipulations of fact, and that is ECF No. 367.

2           THE COURT:  Wait.  See, you didn't give me letters to

3   go -- or words to go with those letters, so I didn't get it.

4   After you did SE as, in Sarah Evans, 32, then you said "P."

5           MS. SINGH:  Yes, Your Honor.  Plaintiffs' Exhibit P,

6   as in Peter, X, as a in xylophone, 4.

7           THE COURT:  X4.

8           MS. SINGH:  PX4.  P, as in Peter.  P, as in Peter, X

9   as in xylophone, 4.

10          THE COURT:  Okay.  Okay.  Those are stipulated, right?

11          MS. SINGH:  Yes, Your Honor.

12          THE COURT:  Okay.

13          Ms. Rahman, do you agree that those are stipulated

14  exhibits and they are admissible as such?

15          MS. RAHMAN:  Yes, Your Honor.

16          THE COURT:  All right those exhibits as previously

17  identified are all admitted pursuant to the stipulation.

18          (Plaintiffs' Exhibits SE1 through SE32 and PX4 were

19                      received in evidence.)

20          MS. SINGH:  Thank you, Your Honor.

21          Plaintiffs would like to call Ms. Amy Hagstrom Miller

22  please.

23          THE COURT:  All right.

24          Hello, Ms. Miller.

25          THE WITNESS:  Hello.

1        THE COURT:  Good.  You popped up there.  It's a little

2   pleasant surprise.  It's like having you arrive at the

3   courtroom door.  So good afternoon to you.

4        THE WITNESS:  Thank you.

5        THE COURT:  Where are you right now as we speak,

6   Ms. Miller?

7        THE WITNESS:  I am in Virginia.

8        THE COURT:  Virginia?  Okay.  All right.  I'm going to

9   ask the courtroom deputy clerk to administer the oath before

10   you testify so would you raise your right hand and be sworn

11   please.

12                    (Witness sworn.)

13        THE COURT:  All right.  Thank you.

14        AMY HAGSTROM MILLER, PLAINTIFFS' WITNESS, SWORN

15                    **DIRECT EXAMINATION**

16   BY MS. SINGH:

17   Q.  Good afternoon, Ms. Hagstrom Miller.

18   A.  Good afternoon.

19   Q.  I'd like to start this afternoon by discussing your

20   educational and professional background.  Tell us about your

21   educational background.

22   A.  I have a bachelor's degree in international studies, with a

23   focus on religion and women's studies from Macalester College

24   in St. Paul, Minnesota.

25   Q.  Tell us about your professional background.

A.   I have been working in women's reproductive healthcare,
specifically offering abortion care services, since my first
job out of college in 1989.  So I'm in my 32nd year working in
the field.

Q.   And what kind of work did you do over the course of that
career at various abortion clinics?

A.   I started out in my first job as a receptionist at a
Planned Parenthood in Minnesota; and since that time, I have
worked in every single position throughout the clinic setting.
So I was trained as a counselor.  I was trained to do lab work
and ultrasound, to assist the physician in the exam room, to
perform instrument sterilization, all of the positions that are
required in a reproductive health clinic, including management
and administration.

Q.   Tell us about the counseling work that you've done.

A.   Sure.  I have spent the majority of my career prior to
starting Whole Woman's Health as a reproductive health
counselor.  I worked in multiple clinics, providing healthcare
education, sort of medical information and counseling sessions
where I would describe a procedure or a contraceptive method or
an abortion method to the patient; make sure that they had
their questions answered, talk to them about their decision,
oftentimes encompassing, you know, their values and beliefs and
how they are determining what the best options are for them.

          THE COURT:  Slow down, slow down just a little bit,

1  Ms. Miller.  The technology mushes your words if you don't say

2  them more slowly.  So just -- you've said this a million times,

3  but we haven't ever heard it before.  So you've got to say it

4  so we can get it.

5           THE WITNESS:  Sure.

6           So going over their options for an unplanned

7  pregnancy, answering questions, also going over options for

8  contraception, discussing how methods work, discussing

9  after-care instructions, that kind of thing.

10  BY MS. SINGH:

11  Q.  And Miss Hagstrom Miller, how are you currently employed?

12  A.  I am the president and CEO of Whole Woman's Health.  I am

13  also the president and CEO of Whole Woman's Health Alliance.

14  Q.  Okay.  Let's talk first about Whole Woman's Health.  How

15  long have you been the president and CEO of Whole Woman's

16  Health?

17  A.  I founded Whole Woman's Health in 2003 in Austin, Texas.

18  So I am in my 18th year as the president and CEO of Whole

19  Woman's Health.

20  Q.  What is Whole Woman's Health?

21  A.  Whole Woman's Health is a group of women's reproductive

22  clinics.  We provide healthcare to people -- reproductive

23  healthcare, including abortion services.  Whole Woman's Health

24  has five clinics throughout the U.S. that operate healthcare

25  services.

HAGSTROM MILLER – DIRECT/SINGH                74

1   Q.  And what states are the Whole Woman's Health LLC group

2   clinics located in?

3   A.  Whole Woman's Health has clinics in Texas, Minnesota,

4   Maryland, and Virginia.

5   Q.  In your current position with Whole Woman's Health, what

6   are your responsibilities?

7   A.  I oversee all of the operations of the company, to include

8   things like human resources, hiring, training, doctor

9   recruitment, public relations, communications work, quality

10  assurance work, the training of staff, accounting, financial

11  operations, all of the things to make the clinics run.

12  Q.  And you mentioned that those clinics provide abortion

13  services; is that right?

14  A.  Correct.

15  Q.  What kind of abortion services do they provide?

16  A.  The clinics –– Whole Woman's Health clinics all provide

17  medication abortion services, and they also provide in-clinic

18  aspiration abortion services.  The gestational limits to which

19  we can provide those services are determined by different state

20  regulations.  So in some facilities, we're providing

21  first-trimester, and in others, we provide second-trimester

22  abortions.

23  Q.  Are you familiar with the National Abortion Federation?

24  A.  Yes, I am.

25  Q.  What is the National Abortion Federation?

A.   The National Abortion Federation is the credentialing body

for the professional aspects of abortion care provision in this

country.  They set the quality standards and the protocols and

clinical practice guidelines for the delivery of abortion

healthcare in the U.S. and in Canada.  Actually, they are in

North America.

Q.   Are the Whole Woman's Health LLC group clinics members of

the National Abortion Federation?

A.   Yes, every Whole Woman's Health clinic is a member.

Q.   Okay.  And you are also the president and CEO of Whole

Woman's Health Alliance; is that right?

A.   Correct.

Q.   Tell us, what is Whole Woman's Health Alliance?

A.   Whole Woman's Health Alliance is the 501(c)3 organization

that is governed by a board of directors.  Whole Woman's Health

Alliance operates three medical clinics that provide abortion

services.  Whole Woman's Health Alliance also conducts advocacy

and education services in the communities; and we do

communication work, all with the goal of eradicating the stigma

that surrounds abortion in this country.

Q.   And you mentioned three clinics.  Where are those clinics

located?

A.   In South Bend, Indiana; in Charlottesville, Virginia; and

in Austin, Texas.

Q.   What is the name of the clinic in South Bend, Indiana?

1    A.   Whole Woman's Health of South Bend.

2    Q.   I'm going to refer to that clinic today as the South Bend

3    Clinic.  Is that okay?

4    A.   Yes, of course.

5    Q.   So what are your responsibilities with respect to the South

6    Bend Clinic?

7    A.   I have ultimate oversight into the operations at the clinic

8    facilities.  So that would include the recruiting and the

9    hiring of physicians, of the leadership staff.  I secured the

10   statistical plans and supervised the construction and

11   remodeling of the physical plant facility.

12       I've also created the forms and the paperwork and the

13   system for care delivery that's operated in the clinic; the way

14   the patient flows through the system.  I have oversight over

15   quality assurance, regulatory compliance, those kinds of

16   things.

17   Q.   How do you exercise oversight over the South Bend Clinic?

18   A.   I am involved in oversight in a number of ways.  We have

19   systems of operation in Whole Woman's Health that require the

20   sites to turn in reports to me that I review.  There's a report

21   I review weekly.  There's a different report I review monthly

22   and then a quality assurance and program improvement system

23   that is conducted quarterly.

24       I also participate in management training and management

25   meetings that are a few days' time frame where we do training

1  and quality assurance and review of systems.  Those are done at
2  least quarterly, where the manager of the South Bend Clinic is
3  part of that process as well.
4  Q.  Okay.  So you mentioned being involved in staff meetings.
5  Tell us about the staff meetings that you're typically involved
6  in with respect to the South Bend Clinic.
7  A.  So like I said, I review a lot of the summaries and the
8  reports that are turned in; and then I'm involved in the clinic
9  managers' and administrators' staff meetings quarterly where we
10 are going over systems and training, and policies, protocols,
11 review of best practices, review of operations in the clinics.
12 I'm directly involved in those meetings.
13 Q.  You also mentioned being involved in the hiring and
14 onboarding of staff; is that right?
15 A.  Correct, yes.
16 Q.  So you were personally involved in recruiting staff for the
17 South Bend Clinic?
18 A.  Yes, I was involved in the job posting, the job
19 descriptions.  I've created all of the training protocols and
20 competency checklists for every position in the clinic setting.
21 I was also very involved in the recruiting of the leadership,
22 as well as the providing physicians and that whole process.
23 Q.  And how are you involved in designing the patient
24 experience at the South Bend Clinic?
25 A.  So I was involved in designing the patient experience at

1   Whole Woman's Health at large and very specifically in this
2   office, really a process of walking the patient through the
3   course of the visit, keeping in mind compliance with Indiana
4   laws and best practices according to clinical policy guidelines
5   and also my experience, understanding sort of all of the
6   processes that are needed for patients to go through, not only
7   the medical excellence but also some of the decision-making
8   tools and the compassion that patients need when they are
9   facing a difficult decision.
10  Q.  Tell us about the type of information that the South Bend
11  Clinic collects about its patients.
12  A.  So we collect general demographic information that's
13  similar to what you would share with most doctors' offices, so,
14  you know, the patient's information; their demographics; you
15  know, phone, address, that kind of thing; their pregnancy
16  history; their medical history.  We would be collecting any
17  insurance or financial information needed in order to conduct
18  the visit, that kind of thing.
19  Q.  Do you collect information about patients' social service
20  needs?
21  A.  Yes.  From time to time, patients may need referrals for
22  different services either that we don't provide or that they
23  have asked for information on, and the most common situation
24  that comes up is patients needing financial assistance where
25  we're connecting them with organizations that can help them

1   offset the cost of the abortion care.

2   Q.  Do you collect any patient feedback?

3   A.  Yes.  Whole Woman's Health has a very rigorous system for

4   collecting feedback from our patients.  We have a survey that

5   is given to every single patient who comes through the office,

6   and we have a benchmark of collecting at least 90 percent of

7   those surveys from our patients.  That feedback is reviewed by

8   the clinic manager, and it's also presented as part of the

9   weekly site report that is reviewed by myself and also the

10  larger leadership team to review what patients are satisfied

11  with, and the compliments they make of our staff, and also to

12  review any concerns or suggestions that patients might make in

13  the course of their care.

14  Q.  Do South Bend Clinic patients ever have financial

15  difficulty paying for the cost of their care?

16  A.  Yes, they do, very regularly.

17  Q.  Does the South Bend Clinic try to help those patients with

18  the cost of their care in any way?

19  A.  Yes, we do.  Unfortunately, patients who have Medicaid are

20  not allowed to use their Medicaid to cover abortion care in the

21  state of Indiana, and there are restrictions on people's

22  ability to use insurance coverage as well.  So the vast

23  majority of our patients are paying out of pocket, and nearly

24  50 percent of those patients are of such an income level that

25  would define them as in poverty, and they require assistance

1    from outside organizations, philanthropic abortion funds, and

2    assistants that step up to help people be able to afford the

3    cost of abortion care.

4    Q.   And who at the clinic helps them with these types of

5    activities, reaching out to external organizations?

6    A.   Sure.  We discuss the economics and the fees as early as,

7    you know, on our website.  And then when a patient calls,

8    oftentimes their concern for their ability to pay is part of

9    the conversation on the phone.  And I developed a position at

10   Whole Woman's Health that is called financial specialist or

11   funding specialist, and this position is a full-time position

12   that specifically is dedicated to triaging and assisting

13   patients' needs for help with abortion funds, so this person

14   can connect patients to local abortion funds in Indiana and

15   also national abortion funds that will assist patients in

16   helping pay for their care.

17   Q.   And what is an abortion fund?

18   A.   An abortion fund is a fund -- 501(c)3 organization that has

19   been set up specifically to help people either pay for the cost

20   of the abortion or pay for some of the surrounding costs that

21   people encounter when they seek abortion services, like

22   childcare, time off work, those kinds of things.

23   Q.   When you help a patient obtain financial assistance, are

24   the funds disbursed to the clinic or to the patient?

25   A.   The way it works is the patient comes in on the day of the

procedure, and she pays her part, and then Whole Woman's Health

will bill the abortion funds for the remaining part that they

have committed to, and those abortion funds will pay Whole

Woman's Health on behalf of that patient.

Q.  So you mentioned the patient still has some expense to pay

for themselves; is that right?

A.  Yes.

Q.  Does that mean that the financial assistance that you're

able to get doesn't cover the full cost of care?

A.  Yes.

       THE COURT:  Wait.  Wait.  Wait.  Repeat the question,

please.

       MS. SINGH:  Yes, Your Honor.

BY MS. SINGH:

Q.  Does that mean that the financial assistance you're able to

get doesn't cover the full cost of abortion care?

A.  Yes, you're correct.  The financial assistance usually

doesn't cover more than 50 percent.  The patient's usually

paying at least half, if not more than that, of the cost of the

abortion.

Q.  Let's talk now about the South Bend Clinic's provision of

care.

    First, is Whole Woman's Health Alliance also a member of

the National Abortion Federation?

A.  Yes, all three clinics operated by Whole Woman's Health

1    Alliance are members of NAF, including the South Bend Clinic.

2    Q.   Tell us about whether the South Bend Clinic has a

3    philosophy of care.

4    A.   Yes, we do.  We believe that a pregnant person is really at

5    the center of the decision making around what happens with an

6    unplanned pregnancy, and our role is to be the medical experts

7    who can provide that patient with exceptional medical care and

8    also scientifically-based information and compassionate

9    counseling services to support their decision making.  We

10   approach abortion care services from a human rights and justice

11   perspective, understanding that, for many people, access to

12   abortion services can be challenging, and our goal is to

13   provide a safe, calm environment for them to receive healthcare

14   services and be able to make a big decision with compassionate

15   support.

16   Q.   What services does the South Bend Clinic provide?

17   A.   Our South Bend Clinic provides medication abortion services

18   to ten weeks into the pregnancy, and we provide additional

19   services around that, such as pregnancy testing, ultrasound,

20   contraceptive counseling, that kind of thing.

21   Q.   What happens if a person is past ten weeks of pregnancy?

22   A.   Unfortunately, we are unable to provide abortion care for

23   that person, and we facilitate a referral for them, most often

24   to Indianapolis or to the Chicago area.

25   Q.   In 2019, how often was the South Bend Clinic open?

A.  So we were able to open the South Bend Clinic, thanks to a
court order from the Court that allowed us to be licensed,
about halfway through 2019.  So for the second six months of
2019, we were open about twice a month.

Q.  In 2020, how often was the South Bend Clinic open?

A.  By 2020, we were able to secure a couple more physicians to
join our staff team, and we were able to open usually three
weeks, sometimes four weeks out of the month.

Q.  Okay.  So in 2019, what factors contributed to the
availability of care at the South Bend Clinic?

A.  The primary factor that made it challenging for us to
provide care was the recruitment of physicians; very difficult
to recruit physicians to work in South Bend, Indiana.

Q.  In 2020, what factors contributed to the availability of
care at the South Bend Clinic?

A.  Here again, it was challenging for us to recruit physicians
to provide care.  And then when we finally reached stability of
having five physicians that had been recruited and our schedule
was covered such that we could be open every week throughout
the month, we encountered a pandemic, and we've encountered
multiple other factors that have now reduced our ability to be
open every week.

    The first is that one of our primary physicians can no
longer travel to Indiana during the pandemic because she comes
from a state that would require her to quarantine for 14 days

1    upon her return because the state where she lives and Indiana

2    have differing compliance to COVID-19 restrictions.

3         We have another physician who just went out on parental

4    leave, and that has limited her ability to cover the schedule.

5         We have another physician who, unfortunately, has

6    encountered really scary antiabortion protests specifically

7    targeting her and threatening to kidnap her children, and so

8    this physician has made the choice not to travel to South Bend

9    for some time to protect the safety of her family and

10   specifically one of her children.

11        Our fourth physician is uncomfortable driving in Indiana.

12   This physician has a few hours' commute to be able to provide

13   with us and is uncomfortable driving in Indiana snowstorms in

14   the winter, and so his ability to cover our schedule is often

15   interrupted.

16        Unfortunately, that's four out of five of our current

17   physicians that have very unique, different situations they are

18   encountering that's challenging our ability to cover the

19   schedule.

20   Q.  You mentioned protestors.  How have protestors impacted

21   your ability to recruit physicians for the South Bend Clinic?

22   A.  Protestors have impacted our ability greatly.

23   Unfortunately, our South Bend office is a site of extreme

24   antiabortion protesting.  We regularly have 30 or 40 protestors

25   in front of the clinic.  This is a small, 3,000 square foot

1    building.  And we have had upwards of 70 to 80 protestors from

2    time to time, but there are always at least 30 or 40 protestors

3    out front on the days that we offer services to patients.

4    Q.  Have you taken any action to mitigate the impact of

5    protestors on the South Bend Clinic?

6    A.  Yes, we have.  We have done a number of things.  We've

7    installed cameras, security systems in the clinic, things like

8    motion detectors, door bell locks, cameras, motion detector

9    lights.  We've had to go back and install more of those cameras

10   and equipment.  As the protests have increased and the

11   protestors have gained access to the sides of the building, we

12   had to go back and add more equipment.

13       We have also had to make arrangements with physicians that

14   we're recruiting who have expressed fear of driving their own

15   personal vehicle to the clinic, very concerned that they will

16   be followed, that their license plate will be searched, that

17   they will be followed home, that their family may be impacted,

18   and protestors may show up at their house or other place of

19   work, and so we have had to make arrangements to rent people a

20   separate car, rent physicians a separate car, in order for them

21   to feel safe enough to come to the clinic.

22   Q.  How many physicians are currently on staff at the South

23   Bend Clinic?

24   A.  With the caveat that we have one on parental leave and one

25   who can't travel because of COVID, there are five current

1  physicians under contract to work with us at the clinic.

2  Q.  Do any of them live in the South Bend area?

3  A.  No.

4  Q.  Do any of them live out of state?

5  A.  We have –– yes.  We have two physicians who come from out

6  of state and three physicians who live in Indiana but far from

7  South Bend.

8  Q.  How does relying on physicians who are not local to the

9  area impact the provision of care at the clinic?

10  A.  Thankfully, it allows us to provide care in the first

11  place, but it greatly impacts the cost of care.  It's much more

12  expensive to fly a physician in, to pay for the physician to

13  travel by car.  Because of the two–visit requirement, all of

14  those physicians need to spend at least one night in South

15  Bend, and that's an additional cost as well.  And,

16  unfortunately, these costs are passed on to the patient.

17  Q.  What percentage of your expenses are spent on physician

18  travel?

19  A.  In the South Bend office, it's about 10 percent.

20  Q.  Okay.  I'd like to now talk about the patient visit to the

21  clinic.

22  A.  Sure.

23  Q.  How many visits to the South Bend Clinic must a patient

24  make before they can get medication abortion pills?

25  A.  Each patient must come at least twice.

1    Q.  And why is that?

2    A.  Because the state of Indiana has a two-visit requirement

3    that requires each patient to come in person at least 18 hours

4    before the pills are dispensed in order for them to have an

5    ultrasound and to receive state-mandated information from the

6    provider.

7    Q.  What days does the South Bend Clinic currently provide

8    care?

9    A.  We provide the first day, the consultation service on

10   Fridays, and we provide the dispensing of the pills on

11   Saturdays.

12   Q.  What factors affect the clinic's ability to schedule

13   patients for their initial appointment at the South Bend

14   Clinic?

15   A.  The primary factor is our limited doctor availability, and

16   then from there we encounter patients who talk about their own

17   barriers that they encounter in order to come.  So arranging

18   for childcare, arranging for time off work, they have to figure

19   out those things for Fridays, and so sometimes patients have

20   challenges with traveling to the clinic and arranging that

21   coverage.

22   Q.  What factors impact the clinic's ability to schedule

23   patients for the second appointment at the South Bend Clinic?

24   A.  Here again, doctor availability is a very limiting factor.

25   And we only have doctors on schedule to dispense medication on

Saturdays, and here again, many patients have child-care

obligations, if they have trouble finding somebody else to take

care of their children, this has especially become more of an

issue in COVID because people are quarantining.  People have

trouble getting time off work and arranging travel, whether

they have a car, or arranging a ride or support from -- to make

it to the clinic.

Q.  Have some patients been unable to come in on the next

Saturday for their medications?

A.  Yes, that happens regularly.

Q.  What happens if a patient is unable to come in that next

day on Saturday for their medication?

A.  Oftentimes they will need to wait until the following

Saturday to come in.

Q.  How often does that happen?

A.  It happens every week.

Q.  What happens if a patient is unable to come in on any

Saturday?

A.  Sometimes we've been able to make an accommodation for that

patient to come in on the Friday of the following week.

However, if we have a different physician on that subsequent

weekend, that patient will need to receive the state-mandated

information again from a different physician so as to be

compliant with Indiana law, but the only option that we really

have for them is the Fridays or the Saturdays.

1    Q.   In that situation, when you have to repeat the

2    state-mandated information, how many trips must the patient

3    make to the clinic to access medication abortion care?

4    A.   Three.

5    Q.   Has that happened before?

6    A.   Yes, it happens regularly.

7    Q.   How long do patients have to wait for their first

8    appointment?

9    A.   Most patients will wait a week.  Sometimes if we don't have

10   a physician every week, as I described we're encountering now

11   in 2021, they may wait as much as two weeks.

12   Q.   Typically how much time elapses between the first visit and

13   the second appointment to get medication abortion pills?

14   A.   Most patients come on two subsequent days, two days in a

15   row, but there is a significant percent of patients who need to

16   wait an additional week or two to be able to make the second

17   visit.

18   Q.   Does your staff do anything to try to reduce that time,

19   that delay between the first and second appointment?

20   A.   Yes, we do track the reason for patients rescheduling, and

21   part of our quality assurance review is to try to see if

22   there's anything we can do to support patients, whether it's

23   they're rescheduling for financial reasons or they're

24   rescheduling for transportation reasons or other obstacles, we

25   try to look is there anything we can do to be supportive of

1  that patient's specific situation.

2  Q.  How often do you refer out a patient who is less than ten

3  weeks pregnant when they first contact the clinic because they

4  would be past ten weeks pregnant by their second appointment at

5  the clinic?

6  A.  That also happens regularly every week.

7  Q.  Okay.  Let's talk about what happens during these various

8  visits to the South Bend Clinic.

9  A.  Sure.

10  Q.  How do patients typically first contact the South Bend

11  Clinic?

12  A.  Most patients contact us by phone after having visited our

13  website.  They call to make an appointment, and at that time is

14  the -- for most people the first time they learn about the

15  regulations that affect the way an appointment needs to be made

16  in Indiana, so our staff walks them through the two-visit

17  requirement, the mandatory ultrasound, and explains to them

18  what needs to happen in order for them to complete the

19  abortion.

20  Q.  Focusing now on the first day that the patient comes to the

21  clinic.  Tell us what happens during a patient's check-in at

22  the clinic.

23  A.  So unfortunately the first thing that happens with our

24  patients is that they go through a line of very aggressive

25  protestors who are yelling and screaming at them, oftentimes

1    trying to block their access to drive into the driveway and

2    park the car.

3        So when patients first come in the door, many of them are

4    shaken, quite shaken up, pretty emotional having gone through

5    that harassment.  We operate our clinic to be an oasis, a

6    quiet, calm, compassionate environment, so that's a big piece

7    of what we try to greet the patient with, having gone through

8    that on her way in.  And then the first steps are very similar

9    to just any doctor's office anybody might have gone through,

10   medical history information, demographic information, we

11   collect, you know, paperwork that the patient fills out, we

12   have a form that's unique to Whole Woman's Health, we call it

13   an emotional triage form.  It's a form that really assesses the

14   patient's decision making where she can sort of indicate any

15   concerns or questions she might have about abortion

16   specifically or about her decision around her unplanned

17   pregnancy.  That helps to guide our counseling session, allows

18   us to address the issues specific to that patient.  Medical

19   entry forms, financial forms, that kind of thing, and she turns

20   that paperwork in at the front desk.

21   Q.  So that's the check-in process, right?

22   A.  Correct.

23   Q.  What happens after the check-in process?

24   A.  So we have included the lab work and the counseling to be

25   on the first day to make it the most efficient for the patient

HAGSTROM MILLER - DIRECT/SINGH              92

1    if they need to come twice, so the patient will have lab work

2    screening, you know, similar to other offices, blood pressure,

3    temperature, pulse, we screen her hematocrit for her iron and

4    Rh typing, and then she will have counseling with one of our

5    counselors who will go over how the method works, how the

6    medications work, we'll go over her decision making process

7    with her, answer any questions she may have, discuss the risks

8    and the benefits of abortion, make sure she's considered all of

9    her options with the unplanned pregnancy, then walk her through

10   the after-care instructions and discuss if she has a need for

11   contraceptive care, any birth control prescriptions, and then

12   the next step would be for her to have the ultrasound and the

13   state-mandated information script from the doctor or the

14   advanced practice clinician.

15   Q.  Why do you provide the state-mandated information in

16   person?

17   A.  We are required to by the state of Indiana.

18   Q.  Would the South Bend Clinic require staff to provide the

19   state-mandated disclosures in person if it wasn't required to

20   by Indiana law?

21   A.  No, we would not.  We would be able to provide that via

22   telemedicine.

23   Q.  You mentioned ultrasound.  Do South Bend Clinic providers

24   typically provide an ultrasound on day one?

25   A.  We are required to perform the ultrasound on day one per

1    Indiana law and so, yes, we do that for every patient.

2    Q.  Does the clinic ever refer patients to other providers for

3    their ultrasound?

4    A.  Unfortunately we don't because we are required to perform

5    that ultrasound ourselves at the clinic.

6    Q.  How does the ultrasound requirement that you perform

7    yourself at the clinic impact the number of trips a patient

8    must make to access care at the clinic?

9    A.  That ultrasound requirement means that every patient has to

10   come at least twice.

11   Q.  If you were allowed to, would you refer patients to an

12   unaffiliated provider for their ultrasound?

13   A.  Yes.

14   Q.  Why?

15   A.  Specifically, if the patient lived far from South Bend and

16   it added a lot of travel requirements or the burdens I

17   described, like she has to get childcare and get time off work,

18   oftentimes being able to get that ultrasound locally in the

19   community that she lives in from either a radiologist or an

20   OB/GYN or her family physician would allow her to avoid that

21   extra trip.

22   Q.  What proportion of patients come to the South Bend Clinic

23   already having had an ultrasound?

24   A.  At least 10 percent.  It's not a question we normally ask

25   patients, but oftentimes they offer it up when you tell them

HAGSTROM MILLER – DIRECT/SINGH                94

1  about the requirement and --

2          THE COURT:  Just a second.  Back up.  I missed the

3  whole question, so give it to me again, and then I'll

4  understand the answer.

5          MS. SINGH:  Yes, absolutely.

6  Q.  What proportion of patients --

7          MS. RAHMAN:  Objection, Your Honor.  Can we first lay

8  a foundation for this question?

9          THE COURT:  Well, let me hear the question first.

10          MS. SINGH:  What proportion of patients come to the

11  South Bend Clinic already having had an abortion?

12          THE COURT:  Wait.  Is this information you gather in

13  the course of your intake procedure, Ms. Miller?

14          THE WITNESS:  Well, I think the question is how many

15  people have an ultrasound before they come in.

16          THE COURT:  No, that wasn't the question.  Was it?  I

17  thought it was -- well, see, this is why we --

18          MS. SINGH:  Yes, Your Honor.

19          THE COURT:  Wait a minute, Ms. Singh.  We're not

20  getting the question, so slow it down.

21          MS. SINGH:  Yes, Your Honor.

22  BY MS. SINGH:

23  Q.  Ms. Hagstrom Miller, do some patients -- do some patients

24  already have an ultrasound exam done before they get to the

25  clinic?

A.  Yes, they tell us they have had an ultrasound already, yes.

        THE COURT:  Hold on.  Hold on.  Is that information
you get in the course of your intake processing and counseling
with them?

        THE WITNESS:  Yes, patients tell us they have already
had an ultrasound.  When we tell them we have to do an
ultrasound on day one, many patients will tell us, "I have
already had an ultrasound at my OB/GYN's office."

        THE COURT:  All right.  Ms. Rahman, do you have an
objection to the foundation?

        MS. RAHMAN:  Well, I also wanted to clarify where --
is she gathering this information secondhand?  Because there's
a potential hearsay objection as well.

        THE COURT:  Lay the foundation, Ms. Singh.

        MS. SINGH:  Yes, Your Honor.

BY MS. SINGH:

Q.  Ms. Hagstrom Miller, do you have meetings with your staff
at the South Bend Clinic?

A.  Yes.

Q.  Do they tell you about the experiences of the patients at
the South Bend Clinic?

A.  Yes.

Q.  Do they talk to you about the impacts of the ultrasound
requirement on patients at the South Bend Clinic?

A.  Yes.

HAGSTROM MILLER – DIRECT/SINGH                96

1   Q.  Did you learn that information in the course of your

2   responsibilities as the president and CEO of Whole Woman's

3   Health Alliance?

4   A.  Yes, we did.

5   Q.  Has your staff told you that patients have already had an

6   ultrasound done before getting to the South Bend Clinic?

7   A.  Yes, they tell me that at least 10 percent of our patients

8   say they have already had an ultrasound, and they don't

9   understand why they have to come for a repeat ultrasound with

10  us.

11  Q.  Where do those patients get their ultrasound?

12  A.  Most of them get them from their OB/GYN.  Many patients

13  have already had a prenatal visit.

14       MS. RAHMAN:  Objection, Your Honor.  Just to go back,

15  I want to -- before we get too far along, I just want to

16  reiterate that the foundation she laid is really double

17  hearsay.  This sounds like it is from the patient to the local

18  provider, from the local provider to Ms. Hagstrom Miller.  This

19  is not necessarily based on documentation or some other grounds

20  for Ms. Hagstrom Miller's experience as president and CEO.

21       THE COURT:  Overruled.  That is not hearsay.  She is

22  talking on the basis of information that's come to her in the

23  course of her duties and her administration of the clinic and

24  out of her experience that she's gathered this information.

25  That is not hearsay.  The objection was overruled.

BY MS. SINGH:

Q.  Has the South Bend Clinic provided care to sexual assault
providers?

A.  Yes.

Q.  How do you know that?

A.  Because it's part of the data that we collect in the weekly
site report that I described.  It's also part of what we talk
over in our quality assurance meetings just to be sure that our
care is as compassionate as possible.

Q.  What impact does the ultrasound requirement have on sexual
assault survivors that you care for at the South Bend Clinic?

A.  Ultrasound can oftentimes be triggering for somebody who
has had a sexual assault, especially an early ultrasound, early
in the pregnancy where the ultrasound needs to be done
transvaginally.  Repeated ultrasounds or undressing for any
reason for a sexual assault survivor can oftentimes be --

        THE COURT:  Wait, wait, wait.  You let your voice
trail off.  Say that answer again, Ms. Miller.

        THE WITNESS:  Repeated ultrasounds, especially an
ultrasound that's done transvaginally, can be very emotionally
challenging for somebody who's a sexual assault survivor.

        THE COURT:  Thank you.

BY MS. SINGH:

Q.  Does having to make two trips have an impact on sexual
assault survivors trying to get to the South Bend Clinic?

1   A.  Yes, just because of what I just described, repeat times

2   undressing can be really traumatic for someone who has survived

3   sexual assault.

4   Q.  At the clinics you work at --

5          MS. RAHMAN:  Objection, Your Honor, what is this based

6   on, this testimony that she's --

7          THE COURT:  Do you want to ask a preliminary question,

8   or do you have an objection, Miss Rahman?

9          MS. RAHMAN:  I'm trying to understand.  My

10  understanding is that --

11         THE COURT:  Wait a minute.  Miss Rahman, you can

12  either ask permission to ask a preliminary question, or you can

13  object to the testimony.  You can't just insert yourself.  So

14  what do you want to do?

15         MS. RAHMAN:  My apologies.  I want to clarify.  I'm

16  objecting on the lack of the foundation for where she's getting

17  this understanding.

18         THE COURT:  Wait.  The understanding with respect to

19  the impact of the sexual -- of the ultrasound on sexual assault

20  survivors?

21         MS. RAHMAN:  Yes, yes, her understanding of that and

22  their experience.  Like, how does she know that this is what

23  the sexual assault survivors are going through and

24  experiencing.

25         THE COURT:  That sounds like a preliminary question or

1    cross-examination.  So you may ask your preliminary question.

2         MS. RAHMAN:  I'm confused, Your Honor.  I'm just

3    objecting on lack of foundation for that answer.

4         THE COURT:  Establish the foundation, Miss Singh.

5         MS. SINGH:  Yes, Your Honor.

6    BY MS. SINGH:

7    Q.  Does your staff collect information from patients when they

8    get to the South Bend Clinic?

9    A.  Yes.

10   Q.  What kind of information do they collect?

11   A.  They collect information about the patient's medical

12   history, about the reasons for, you know, choosing an abortion.

13   We discuss their decision making process.  We oftentimes in

14   that counseling discussion, we learn about, you know, what's

15   going on with the patient.

16   Q.  And does what's going on with the patient include a past

17   history of sexual assaults, ever?

18   A.  Yes, it does.

19   Q.  And when you talk to those patients about their history of

20   sexual assault, do they talk to you about barriers to accessing

21   care at the South Bend Clinic?

22   A.  Yes.  Patients who have had a history of sexual assault

23   talk about the ultrasound and the repeat visits as being

24   traumatic, as being, you know, they express frustration with

25   having to come twice.

1    Q.  Thank you, Miss Hagstrom Miller.

2           MS. RAHMAN:  I would object again on grounds of

3    hearsay.  It's my understanding, are these patients providing

4    information to a local providor or Miss Hagstrom Miller

5    directly?  Even then, it's hearsay or double hearsay, how they

6    gather this information.

7           THE COURT:  Overruled for the same reasons I've said

8    before, Miss Rahman.

9           MS. RAHMAN:  Okay.

10          MS. SINGH:  Thank you.

11   BY MS. SINGH:

12   Q.  At the clinics you work at outside of Indiana, do you ever

13   refer patients to other providers for an ultrasound?

14   A.  Yes, regularly.

15   Q.  In those situations, what types of providers do you refer

16   abortion patients to?

17   A.  We will refer abortion patients for ultrasounds to a

18   radiologist, to an OB/GYN, sometimes to a maternal fetal

19   medicine doctor.

20   Q.  The clinics you work at outside of Indiana, do you ever

21   rely on ultrasounds performed by a clinician which referred the

22   patients to you?

23   A.  Yes, we do.

24   Q.  In those situations, what type of providers refer patients

25   to the clinics that you work at?

1    A.  Most often, it would be a OB/GYN who's been providing care

2    to a patient who makes a referral to us for termination.

3    Oftentimes it is fetal indication, so the patient may have also

4    seen a maternal fetal medicine physician to get a diagnosis

5    that we sort of make the choice of the termination.

6    Q.  Thank you.  Okay, now let's talk about Day 2.

7            THE COURT:  Let's talk about what?  What are we

8    talking about?

9            MS. SINGH:  Day 2, the second visit to the clinic.

10   BY MS. SINGH:

11   Q.  What happens on Day 2 of a patient's visit?

12   A.  Unfortunately, the patient has to go through the line of

13   protestors again in order to come back to the clinic site.

14   Similarly, she presents at the front desk.  We will repeat the

15   vital signs for the patient because it's a different date of

16   service, so she will have her blood pressure, temperature,

17   pulse repeated.  Then, she will meet with the physician who

18   will give her the abortion medication.

19   Q.  Now, I'd like to turn to telemedicine.

20   A.  Sure.

21   Q.  Do you have any personal experience with a provision of

22   medication abortion care via telemedicine?

23   A.  Yes, I do.

24   Q.  How?

25   A.  I developed a telemedicine protocol at Whole Woman's Health

1    as early as 2009.  We started providing telemedicine abortion

2    care in our clinics in Texas in order to maintain access to

3    abortion services in at least two of our clinics that were in

4    smaller towns or rural communities so that patients would be

5    able to receive abortion care services on days when the doctor

6    didn't travel to that community.

7        We offered abortion services via telemedicine in Texas

8    starting in 2009 all the way through 2011.  We had to stop that

9    program because Texas passed a law that requires every patient

10   to come in for two in-person visits with the same physician in

11   order to obtain abortion care.  So that stopped our

12   telemedicine program in Texas.

13       I have also become somebody who has presented our

14   telemedicine model at national conferences such as the National

15   Abortion Federation, the Society for Family Planning, other

16   conferences to share the way we developed the model and how it

17   benefited access to early abortion more affordably for our

18   patient.

19   Q.  You mentioned the Texas clinics.  Tell us about how the

20   Texas clinics provided telemedicine abortion care.

21   A.  Sure.  So, when we started telemedicine abortion care in

22   2009, it was very new.  It's not, it was not as common as

23   telemedicine is now.  And when we started then, we had a

24   pretty, what I would call low-tech approach.  We faxed the

25   ultrasound results to the physician.  We were faxing the

1    medical history forms and the lab results to the physician for

2    the physician to talk over with the patient and discuss with

3    the patient.

4        Now, we're able to do all of those things via video

5    conference, and we're able to send the ultrasound directly from

6    the ultrasound machine and the live image directly to the

7    physician.  But when we started, it was a little lower tech.

8    Q.  Did telemedicine impact the cost of abortion care at the

9    Texas clinics?

10   A.  Yes, it did, in a couple of different ways.  The first for

11   the clinic side, it reduced our expenses for physician travel.

12   We were able to provide abortion services where the physician

13   would meet with the patient virtually but did not have to

14   travel often hundreds of miles to the clinic site.  It would

15   also benefit the patients in a few ways.

16       One, those savings were passed on to the patient.  The

17   patient could get their abortion earlier in the pregnancy,

18   thereby saving money because sometimes as a pregnancy advances,

19   the abortion becomes more expensive.  The patient could also

20   schedule more flexibly around their life.  So they could

21   schedule the telemedicine visit on a day they had off work or a

22   day that they were able to arrange childcare.  So, it allowed

23   for them to avoid additional expenses like that.

24   Q.  Over the course of your career, have you had experience in

25   other states with telemedicine abortion care?

1    A.  Yes.  We had a telemedicine program in Illinois, and we

2    have currently a telemedicine program in Virginia, and in

3    Maryland and in Minnesota.

4    Q.  Did any of the clinics that provided telemedicine abortion

5    care get their patients' written information or patient forms

6    through telemedicine?

7    A.  Yes.  Initially, we would e-mail patients the forms that

8    they needed to fill out and the things they needed to read.

9    Now, we have what's called a patient portal so the patient can

10   receive a link that's encrypted and HIPAA compliant where that

11   patient can fill out the paperwork ahead of time and also

12   receive information about the medication, information about

13   after care, how the medications work, et cetera.  They can

14   receive all of that information, either through e-mail or

15   through text, whatever the patient prefers.

16         THE COURT:  Hold up a minute.  We have a little

17   technical snafu here.  We've lost video.

18         MS. SINGH:  Sure.

19         THE COURT:  We don't have it on our monitor, so I

20   don't know if anybody else does.  Hang on.  We'll see if we can

21   fix it.

22         Can all of you see me?

23         MS. SINGH:  Yes, Your Honor.

24         THE COURT:  I know that brightens your afternoon.  So

25   that's why I ask.  Hang on.  We're just trying to see who's

1    been excluded here.

2          Miss Miller, does anybody play basketball in Virginia?

3          THE WITNESS:  Yes.

4          THE COURT:  Well, they'll be coming to Indiana pretty

5    soon.

6          THE WITNESS:  Yes.  I actually live in Charlottesville

7    where the UVA team is very successful.

8          THE COURT:  They take it seriously there, I know.

9          THE WITNESS:  Yeah, they do.

10              (Off-the-record discussion.)

11         THE COURT:  We need to wait.  Okay.  She's going to

12   try to get the visual part back, but we can continue.  So your

13   next question, please, Miss Singh.

14         MS. SINGH:  Yes, Your Honor.

15   BY MS. SINGH:

16   Q.  Miss Hagstrom Miller, have you received feedback from

17   patients about their telemedicine experiences at any of the

18   clinics at which you work?

19   A.  Yes.  We collect patient feedback for telemedicine visits

20   in the same rigorous manner.  We collect them for in-person

21   visits.  So at the very beginning when we first launched

22   telemedicine services, patients were very satisfied with the

23   care.  They were thankful to get care in their own local

24   community and get it earlier in their pregnancy.

25         They also went out of their way to say how they were

1   impressed with the high-tech care delivery.  This was early,

2   like I said, in 2009, 2010, and they, it gave them confidence

3   in the care that Whole Woman's Health was, you know,

4   technologically advanced and able to bring that care to their

5   small communities.

6              THE COURT:  Now, Ms. Miller --

7              THE WITNESS:  Yes.

8              THE COURT:  The specific statements of people you

9   can't put in the record.  That is hearsay.  So you need to talk

10  about your findings and conclusions and your knowledge and so

11  forth without recounting specific comments or words spoken to

12  you, okay?

13             THE WITNESS:  Okay.  The information I was sharing is

14  from the patient feedback forms that get summarized and sent to

15  me on a weekly basis.

16             THE COURT:  All right.  That's acceptable.

17             THE WITNESS:  Okay.  So patients would talk about

18  their experience and talk about that they were grateful to be

19  able to get the abortion earlier in the pregnancy and in their

20  own community.

21        Every once in a while since that time, we've

22  gotten feedback that patients want to understand that they have

23  the option of either a telemedicine visit or an in-person

24  visit, and so we have made sure our telephone staff are

25  explaining to the patients, for example, if you want an

1  appointment on Tuesday, it will be via telemedicine.  If you

2  would like an appointment in person, you can come on Thursday.

3      And for the most part, I think upwards of 90 percent of the

4  patients have been extremely satisfied with the telemedicine

5  services.

6  BY MS. SINGH:

7  Q.  Tell us about your experience integrating the technology

8  for telemedicine into the clinic operations for those clinics.

9  A.  Sure.  The vast majority of our patients find out about us

10  and speak with us via either the Internet or the website or on

11  a smartphone.  So our patients are very used to technology, but

12  when we set up an appointment for a telemedicine visit, part of

13  what we discuss with the patient is their access to video

14  conferencing and prepare them for that requirement.

15      So we will discuss with them, you know, do you have a

16  smartphone?  Do you have a tablet?  Do you have access to a

17  computer?  We'll discuss with them their bandwidth, the access

18  for video, because some of our patients are coming from small

19  towns, small communities that don't have high speed Internet

20  access.  And so, we've -- a couple of times we've helped

21  patients come up with solutions.  Like, they will drive to the

22  library and park their car outside the library so they can get

23  the access to the library WiFi from their car and still have a

24  private visit, or they will park at the Starbucks' parking lot,

25  et cetera, to try to help patients in small rural communities

1  to figure out the best way for them to be able to access the

2  video.

3  Q.  What happens if there are technology difficulties during

4  the telemedicine visit?

5  A.  The telemedicine visit now needs to be via video.  And so

6  sometimes we will, you know, wait out a glitch, like we're

7  having to do here, right?  Like I think people are more and

8  more comfortable with a Zoom glitch or an audio hiccup.  But if

9  there is not video, we will have to reschedule the appointment.

10  So either the physician or the patient can be in a place where

11  the video visit can be conducted adequately.

12  Q.  What happens if, during the telemedicine visit, the patient

13  seems uncertain about the decision to get an abortion?

14  A.  The exact same thing that would happen if the patient was

15  in person.  We would not continue delivering abortion services

16  if the patient was not sure that that was the best decision for

17  them.  So they would be given more time to consider their

18  options.  They would be given some resources that we use to

19  help people with decision-making, people they can call for

20  counseling services and options counseling, but we would not

21  proceed with an abortion unless we were sure that the patient

22  was making that choice herself.

23  Q.  How has telemedicine impacted access to abortion care at

24  those clinics that provide telemedicine abortion care?

25  A.  It has allowed us to be able to offer appointments more

1  often.  For patients, it's allowed more patient flexibility for

2  the days and the times that they come for their appointment.

3  It has allowed us to pass some of those cost savings, reducing

4  the doctor travel, on to the patient.

5  Q.  Do the clinics that provide telemedicine abortion care also

6  provide in-person care?

7  A.  Yes.

8  Q.  Thank you.  I'd like to talk now about how the ability to

9  provide telemedicine care would impact the South Bend Clinic.

10  A.  Sure.

11  Q.  If Whole Woman's Health Alliance prevailed in this lawsuit,

12  would the South Bend Clinic use telemedicine to provide

13  medication abortion care?

14  A.  Yes, we would.

15  Q.  How would the ability to use telemedicine impact how often

16  abortion care was provided at the South Bend Clinic?

17  A.  We would add more days per week that we would be open and

18  available if the physician via telemedicine could provide

19  abortion care services for the patient.

20  Q.  Would telemedicine impact the hours that care was

21  available?

22  A.  Yes, we would be open more hours.  We'd be able to be open

23  at different times of the day, so perhaps in the evening or

24  over lunch break, or we would just be better able to

25  accommodate the patients's schedule restrictions.  And we would

1  be open, like I said, more days of the week.

2  Q.  Would you also be open more weeks of the month?

3  A.  Yes.

4  Q.  How would telemedicine impact how promptly you could see

5  patients for care at the South Bend Clinic?

6  A.  That would be a great improvement.  We would be able to

7  offer patients an appointment within a day or two of their

8  phone call.  So that, one, they wouldn't be pushed further into

9  the pregnancy by waiting for doctor availability.  And two,

10  they would be able to choose medication abortion without doing

11  what we call "timing out."  You know, without waiting such that

12  they were now over ten weeks and no longer eligible for the

13  abortion pill.

14  Q.  How many more patients could the South Bend Clinic see on a

15  weekly basis if it could utilize telemedicine abortion care?

16  A.  We would be able to increase our patient volume by at least

17  50 percent.  We don't have a huge patient volume already, and

18  we're a small town clinic, but we turn patients away every week

19  who either have to travel outside of the city because we don't

20  have a way to accommodate them before they are over ten weeks.

21  So from that information that is gathered by my staff, we've

22  estimated that we would be able to book probably half again as

23  many patients as we see now.

24  Q.  If the South Bend Clinic could provide the required

25  state-mandated disclosures via telemedicine, how many trips

1  would a patient have to make to the clinic to obtain care?

2  A.  If we were able to do the state-mandated information via

3  video conference with the physician, the patient could have the

4  rest of her visit all in one day in person at the clinic.

5  Q.  Would the ability to use telemedicine have any impact on

6  the cost of medication abortion care at the South Bend Clinic?

7  A.  Yes, I believe it would allow us to reduce that 10 percent

8  of our budget that is going towards physician travel.  We would

9  be able to reduce that and pass some of those savings on to the

10 patient.

11        MS. SINGH:  Okay.  Could I have just a moment, Your

12 Honor?  I think I'm just about done.

13        THE COURT:  Yes.

14        MS. SINGH:  Thank you.  Okay, I have no further

15 questions, Your Honor.  Thank you.

16        THE COURT:  Very good.

17        Miss Rahman, oh, there you are.  I thought you'd left

18 me.

19        MS. RAHMAN:  My apologies, Your Honor.  I was just

20 speaking with colleagues.  If I could have a moment to confer

21 with my colleagues, I might be able to reduce the number of my

22 questions on cross, if I could.

23        THE COURT:  Very good.  Of course.

24        MS. RAHMAN:  Thank you, Your Honor.

25        THE COURT:  I've never heard of Haskell College.  Is

1    that what you said, in Minnesota?

2             THE WITNESS:  Macalester?

3             THE COURT:  Oh, Macalester, okay.  I was reading it

4    off -- I didn't catch it when you said it, but of course I've

5    heard of Macalester, but I was reading it off the monitor.

6             THE WITNESS:  No, Macalester.

7             THE COURT:  Well, yeah, that's a good school.

8             Okay, Miss Rahman, cross.

9             MS. RAHMAN:  Thank you, Your Honor.

10                        CROSS EXAMINATION

11   BY MS. RAHMAN:

12   Q.  Hi, Ms. Hagstrom Miller.  My name is Andrea Rahman.  I'm

13   representing the defendants in this case.  I just wanted to

14   follow up on some questions --

15            THE COURT:  Whoa, whoa, whoa, you're going way too

16   fast.

17            MS. RAHMAN:  My apologies.

18   BY MS. RAHMAN:

19   Q.  I just wanted to follow up on --

20            THE COURT:  Don't be nervous, just slow it down.

21   We're going to be here.

22            MS. RAHMAN:  Yes, Your Honor.

23   BY MS. RAHMAN:

24   Q.  I just wanted to follow up with some of what you had

25   testified on.  To begin with, I just wanted to confirm that

1  it's your contention that if abortion doctors would be allowed

2  to telecommute, then your clinic would be open for more

3  abortion appointments on additional days, correct?

4  A.  Correct.

5  Q.  And I was wondering if we could go through, I just wanted

6  to clarify, because you went through some --

7          THE COURT:  Whoa, whoa, whoa, wait, Miss Rahman.  You

8  did really nicely on that first question.  Then you went back

9  into road gear.  Now slow it down.

10         MS. RAHMAN:  Yes, Your Honor, my apologies.

11 BY MS. RAHMAN:

12 Q.  You mentioned you have five doctors that work for Whole

13 Woman's Health South Bend, correct?

14 A.  Correct.

15 Q.  You said the first doctor cannot come to Indiana I believe

16 because of COVID, correct?

17 A.  Correct.  She can't travel, fly into Indiana because of

18 COVID restrictions upon her return to the state she comes from.

19 Q.  Okay, just to make sure I'm able to clarify the difference

20 between these doctors, could you provide me with the first and

21 last initial of this doctor's name?

22 A.  Sure.  Her -- let's call her Dr. S, if that works.

23 Q.  As long as there's not another doctor with a last name that

24 starts with S, I think we should be good.

25         And then you mentioned there is another doctor who is

1   contracted but is not currently providing abortion services

2   because this doctor is on parental leave; is that correct?

3   A.   Correct.

4   Q.   Could you provide me with the initials of this doctor?

5   A.   Dr. O.

6   Q.   Dr. O, thank you.

7   A.   Uh-huh.

8   Q.   Next you mentioned a third doctor who has, I guess, since

9   refused to travel to South Bend because of various concerns

10  about health and well-being?

11  A.   She has been advised by security professionals in the U.S.

12  government to restrict travel until -- because of threats, yes.

13  She would be Dr. B, as in boy.

14  Q.   And so she is not currently traveling to the South Bend

15  Clinic; is that correct?

16  A.   I believe she is resuming time on the schedule coming up

17  here in 2021, but there's been a few months' time period where

18  she has been advised to reduce her travel for safety.

19  Q.   Thank you.

20  A.   You're welcome.

21  Q.   Next you mentioned another doctor who had concerns about

22  distance traveling particularly because of snowstorms in

23  Indiana?

24  A.   Correct.

25  Q.   What's this doctor's initials?

1   A.  Dr. G.

2   Q.  Okay.  And this doctor, is he traveling to the South Bend

3   Clinic?

4   A.  He is, and he's traveling by car.

5   Q.  He's traveling by car, okay.

6   A.  Yes.

7   Q.  And then you mentioned a fifth doctor, that so far is still

8   regularly traveling to the South Bend Clinic?

9   A.  Yes.

10  Q.  What is this doctor's initial?

11  A.  Dr. C.

12  Q.  Dr. C.  Okay.  And this doctor, are they providing -- all

13  five of these doctors, are they providing abortions at the

14  South Bend Clinic?

15  A.  We provide medication abortion pills at the South Bend

16  Clinic, and all of them dispense pills, yes.

17  Q.  Okay, great.  Thank you.

18  A.  Uh-huh.

19  Q.  I just wanted to clarify, and if need be, you can go down

20  through and clarify for each doctor, but do any of these five

21  doctors work at other locations or have other jobs outside of

22  their work with the South Bend Clinic?

23  A.  Yes, all of them do.

24  Q.  All of them do, okay.  Starting with Dr. S, could you tell

25  me what other work or job responsibilities they have besides

1  the South Bend Clinic?

2  A.  Yes.  That physician is a medical director for a Planned

3  Parenthood affiliate and oversees, I believe, 14 clinics in a

4  Planned Parenthood facility.

5  Q.  Is that in another state, multiple states?

6  A.  Yes, in another state.

7  Q.  In another state, okay.

8  A.  Yes.

9  Q.  Dr. O, does this doctor have jobs beyond their work at the

10 South Bend Clinic?

11 A.  Yes, they do.

12 Q.  Can you tell me what other jobs they hold?

13 A.  I don't know who their other employer is, but they are in

14 full-time practice, medical practice.

15 Q.  Okay.  And then Dr. B, what other jobs do they hold beyond

16 their work at the South Bend Clinic?

17 A.  Dr. B works for other reproductive healthcare providers and

18 is also a faculty physician at a university hospital.

19 Q.  And then Dr. G, do they have additional jobs?

20 A.  Yes, Dr. G also works at multiple clinics.

21 Q.  Could you clarify what you mean by "multiple clinics"?  Can

22 you give me a number?

23 A.  At least three that I know of that provide reproductive

24 healthcare services.

25 Q.  Okay.  So three in addition to their work at South Bend?

1    A.  So four total including South Bend.

2    Q.  Okay.  And then Dr. C, do they have additional jobs beyond

3    their work at South Bend?

4    A.  Yes, they also have full-time employment outside of working

5    for Whole Woman's Health in South Bend.

6    Q.  So could you -- again, just going through, thinking through

7    these doctors, given their other jobs, how many days per

8    week -- so do -- is Dr. S able to work at the South Bend

9    Clinic, how many times per week?

10   A.  Dr. S is the physician who's unable to fly because of

11   COVID-19 but could provide abortion care via telemedicine very

12   easily and reduce not only the travel but the travel time and

13   be more available to the patients in South Bend via

14   telemedicine.

15   Q.  Okay.  Just to clarify, COVID aside, prior to that, how

16   often was the doctor able to come to the clinic in light of

17   their other job responsibilities?

18   A.  They came to the clinic at least once a month, and it was a

19   three-day commitment because of travel on either end and

20   because of the two-visit requirement.

21   Q.  Okay.  Thank you.

22   A.  Uh-huh.

23   Q.  And to confirm, Dr. S, their other job responsibilities are

24   full-time at the other location?

25   A.  Correct.

1  Q.  And now Dr. O, again they are on parental leave I

2  understand --

3          THE COURT:  Miss Rahman, what's the purpose of this

4  line of questioning?

5          MS. RAHMAN:  Yes, Your Honor.  Their theory is that

6  telecommuting would allow doctors to come more often.  We are

7  wanting to confirm doctor availability to see if the doctors

8  are truly available more often to provide services, given their

9  other job responsibilities.

10          THE COURT:  So what -- you're --

11          MS. RAHMAN:  I just have a few more questions on this

12  line of questioning.

13          THE COURT:  Well, I know; but I'm trying to figure out

14  the relevance of it.  Even if you had one more question, I need

15  to know the relevance of it.  So this was a line of questioning

16  that Mr. Fisher asked of the first witness as well; and I asked

17  him to just get to the point because I'm not quite sure I'm

18  capturing the importance or the relevance of the specific

19  schedules of individual doctors when it's been influenced by

20  factors that may or may not be unique.  I can't tell yet.

21          So what is your overall point?  Why don't you just ask

22  that question?

23          MS. RAHMAN:  I don't know if it's necessarily a

24  specific question.

25          THE COURT:  Well, then tell me what your point is

HAGSTROM MILLER - CROSS/RAHMAN                    119

1    then.  That's what I'm trying to get you to tell me.

2              MS. RAHMAN:  Yes.  To answer your question, the

3    relevance is that we are trying to establish whether the

4    doctors would, given their other job -- would truly be

5    available to continue providing additional time, even if

6    telecommuting was available to them.  My understanding is

7    that --

8              THE COURT:  So ask the witness to answer that

9    question, in light of what she said about these five

10   physicians.  Does she have a view or does her experience in

11   running the clinics cause her to think that those doctors would

12   have more time to spend.  Isn't that your point?

13             MS. RAHMAN:  Yes.

14   BY MS. RAHMAN:

15   Q.  If we could elaborate then, Miss Hagstrom Miller.

16   Given the fact that each of these doctors, you know, have other

17   full-time job responsibilities, how many more days per week

18   would they be able to work at the South Bend Clinic more than

19   what they already are doing?

20   A.  Yes, thank you.  So each of these physicians, when they do

21   come to work at the South Bend Clinic, is making about a

22   72-hour commitment, with travel and the two-day requirement,

23   and the two-day requirement and the overnight stay.  So if the

24   physician were able to provide that care without that travel,

25   the physician would have more than adequate time to have more

1   than one day of the week where they could provide telemedicine

2   visits for a few hours each day, and they would actually still

3   be making even less of a time commitment to Whole Woman's

4   Health and increasing the availability of appointments to our

5   patient.

6   Q.  Okay.  So just to clarify, you are saying that currently,

7   all of your doctors approximately spend about 72 hours or three

8   days working at Whole Woman's Health.  So they will travel

9   there, spend three days, and then travel back?

10  A.  The travel can be anywhere from 48 hours to 72 hours.  The

11  ones that are flying from out of state may have more than one

12  flight to get to South Bend.  The ones that are driving usually

13  have three or four hours each way, and then have an overnight

14  stay because of the two-visit requirement.  So they have been

15  able to make that time commitment already for the in-person

16  care; and if they were able to provide the visits via

17  telemedicine without that travel, they would be able to make

18  that time commitment and availability to our patients.

19  Q.  Okay.  So just to clarify, how many days per week do these

20  doctors currently work at Whole Woman's Health South Bend?

21  A.  So I am thinking about it as hours on the schedule that

22  they are available and days they are available now coming --

23  we've gone over this, but they come on Fridays and Saturdays

24  and we rotate physicians.  On any given weekend, it may be one

25  of these five providers.

1   So we have spoken about telemedicine visits, if we're able

2   to do that in the future; and many of these physicians have

3   experience with telemedicine and would be available for

4   telemedicine visits from their -- either other office or home

5   location to provide those visits for our patients in South

6   Bend.

7   Q.  Okay.  So Friday and Saturday is your answer.  If

8   telecommuting was allowed, how many more days per week besides

9   Friday and Saturday would the doctors be able to work for Whole

10  Woman's Health?

11  A.  Our plan would be to offer patient visits four to five days

12  a week for a telemedicine visit.

13  Q.  Okay.  So given the doctors' other job responsibilities,

14  you believe -- it is your understanding that these same doctors

15  would be able to expand their schedules to provide services

16  from two days a week, increasing up to four to five days per

17  week; is that correct?

18  A.  Yes.  I would not plan to schedule full eight-hour days.

19  We would hope to have clinic for two to three hours each of

20  those days and add weekdays in addition to the weekend times.

21  Q.  Okay.  And can you tell me now what are the number of

22  patients that you see each week with your current schedule?

23          THE COURT:  At the South Bend Clinic?  Wait.  At the

24  South Bend Clinic?

25          MS. RAHMAN:  Yes, at the South Bend Clinic.

HAGSTROM MILLER - CROSS/RAHMAN                122

A.  I will -- in 2020, we saw a total of 366 patients for the

whole year.  So I would have to do some quick math to give you

an average of how many patients per week that would be.

BY MS. RAHMAN:

Q.  That's fine.  You said 366 patients a year in 2020?

A.  Correct.

Q.  Okay.  We can do the math ourselves, but I appreciate that.

A.  About seven patients a week, and keep in mind we're not

open every week, so --

Q.  Okay.  So are these patients or number of abortions

provided?

A.  This is the number of abortions that we provided via the

medication abortion pill.  The total number of visits would be

at least double that because each of those patients came twice;

and then we have additional visits for pregnancy testings,

ultrasound, et cetera.  So this was just the number of

abortions completed.

Q.  Okay.  Three hundred sixty-six the number of abortions

completed?

A.  Uh-huh.

Q.  Thank you.  And then you also mentioned something about the

physicians doing in-person counseling; is that correct?

A.  The physicians are required to provide the state-mandated

information script to the patients in person, and our

physicians oftentimes are the ones who provide the ultrasound

1   as well.

2   Q.  Do any -- do you have other staff at the South Bend Clinic

3   besides physicians that are medical personnel, such as advanced

4   practice nurses, nurse practitioners and so forth?

5   A.  We have one advanced practice clinician who works

6   part-time; and if she is available on Fridays, she can provide

7   that state-mandated information; and sometimes we also need to

8   use the physician.

9       It has been our experience that it sometimes is more

10  difficult to recruit an advanced practice clinician than a

11  physician for abortion services in South Bend.

12  Q.  So you have -- just to clarify, you have one advanced

13  practice clinician and then five doctors, correct?

14  A.  Correct.

15  Q.  Do you have any other medical personnel at work at the

16  South Bend Clinic?

17  A.  We have clinic staff like medical assistants and clinic,

18  you know, patient advocates; but they don't meet the

19  requirements for delivering the state-mandated information

20  according to Indiana law.

21  Q.  Okay.  Thank you.  So just to clarify, of some of the

22  services that you provided -- you listed several -- do you also

23  carry out any kind of follow-up appointments?

24  A.  Yes.  Every patient who comes in for a medication abortion

25  is offered a follow-up appointment.

1    Q.   So are these in-person appointments?

2    A.   Yes.

3    Q.   And about how often do you provide follow-up appointments?

4    How often do patients come in?

5    A.   About half of the patients come in in person for follow up.

6    Q.   Do you consider follow-up appointments to be beneficial for

7    your patients?

8    A.   Yes.  We also call the patients that don't come for their

9    follow-up to check in with them over the phone; and the sort of

10   clinical standard from the National Abortion Federation is that

11   the follow-up visit is recommended; and I think there are other

12   ways to ascertain whether the patient had a positive outcome

13   and is doing okay.  In person is one of those ways.

14   Q.   Okay.  And then just to clarify from earlier, could you

15   explain the schedule for -- sorry.  I'll clarify.

16        What days of the week do you provide any kind of services

17   for your patients?  What days of the week are you open?

18   A.   We are -- we answer the phone Monday through Saturday, and

19   we have patient advocacy staff on site; but as far as advanced

20   practice clinician or physician, they are only on site on

21   Fridays and Saturdays; but the other days of the week we have

22   people available to do pregnancy testing and options counseling

23   and to get information.

24   Q.   And what services do you usually provide on Fridays?

25   A.   Fridays are the day that we do what we refer to as day one,

HAGSTROM MILLER - CROSS/RAHMAN                    125

1    the consultation visit.  That would include, as I described,

2    the lab work, the counseling, the ultrasound, and the

3    state-mandated information.

4    Q.  And then it's my understanding from your prior testimony

5    that Saturday is when you usually prescribe medication

6    abortion; is that correct?

7    A.  That's when the patient would come back and receive her

8    pill, yes.

9    Q.  Okay.  Thank you.

10        I'd like to confer with colleagues one more time, Your

11   Honor, before I wrap up my cross, Your Honor, if that's okay?

12             THE COURT:  Yes.  I have a question for Miss Hagstrom

13   Miller.  So before you confer with your colleagues, let me ask

14   my question.

15             You've spoken of the five physicians that are

16   affiliated with the South Bend Clinic to one degree or another

17   and for some period of time or another.  I'm wondering if you

18   have had the experience of attempting to recruit additional

19   physicians who have been deterred because of the time

20   commitment that's required?

21             THE WITNESS:  Yes, Your Honor.  Thank you for that

22   question.

23             We have a database.  We've recruited -- attempted to

24   recruit at least 20 physicians to work in the South Bend

25   Clinic, and the challenges have been related to the security

1   and the protestors and the time commitment.  So currently, of

2   those 20 that we've tried to recruit and had conversations

3   with, we successfully have five that are on staff right now;

4   but there have been many more that we have talked with about

5   working in South Bend.

6            THE COURT:  Is it your judgment based on those

7   conversations that if telemedicine were an option and,

8   therefore, the time commitment for the physicians was reduced,

9   that some or all of them would make themselves available to

10  practice in your clinic.

11           THE WITNESS:  Yes, Your Honor.

12           THE COURT:  Now, confer with your clients –– or your

13  colleagues, Miss Rahman; and tell me if you've got any more

14  questions.

15           MS. RAHMAN:  Thank you, Your Honor.

16           Thank you.

17  BY MS. RAHMAN:

18  Q.  One final question.  Miss Hagstrom Miller, you previously

19  mentioned that the clinic pays for the travel time for the

20  physicians.  Could you tell me if they were able to

21  telecommute, what the dollar amount would be reduced by if

22  telecommuting were allowed?

23  A.  Sure.  I'll give you just from 2020, the annual expense

24  related to doctor travel –– so it would include mileage

25  reimbursement, hotels, flights, was $20,000 just for 2020; and

HAGSTROM MILLER – CROSS/RAHMAN                    127

1    travel was a little limited in 2020 because of the pandemic,

2    but that's the hard number.

3    Q.  Okay and can you tell me what percentage would that amount

4    be reduced by -- one moment.

5                    (Off-the-record discussion.)

6    BY MS. RAHMAN:

7    Q.  And just to clarify, that's 10 percent of your overall

8    budget; correct?

9    A.  For 2020, yes.

10   Q.  Okay.  Thank you.

11           MS. RAHMAN:  No further questions on cross, Your

12   Honor.

13           THE COURT:  All right.  Redirect, Ms. Singh?

14           MS. SINGH:  I have no further questions.  Thank you.

15           THE COURT:  Can Ms. Miller be excused?

16           MS. SINGH:  Yes, Your Honor.

17           THE COURT:  And you have no intention of calling her,

18   is that right, Ms. Rahman?

19           MS. RAHMAN:  Correct, Your Honor.

20           THE COURT:  You are excused from your jury summons, so

21   thank you -- I mean your witness summons, so thank you very

22   much, and your responsibilities have been discharged.

23           THE WITNESS:  Thank you, ma'am.

24           THE COURT:  Thank you, Ms. Miller.

25                    (Witness excused.)

1          THE COURT:  Ms. Singh, do you have another witness up

2     your sleeve?

3          MS. SINGH:  I do, indeed.  We have Ms. Cassie Herr,

4     and Mr. Juanluis Rodriguez will be conducting her examination.

5          THE COURT:  Okay.  Hello, Mr. Rodriguez.

6          MR. RODRIGUEZ:  Good afternoon, Your Honor.

7          THE COURT:  Just a minute.  I've got Mr. Rowlett on my

8     line here.

9          MR. ROWLETT:  Good afternoon, Your Honor.  I'll be

10    doing the cross-examination of Ms. Herr.

11         THE COURT:  All right.  We don't have your name on our

12    list, Mr. Rowlett; so let me get it down.

13         Ms. Herr, good afternoon to you.  I need to ask you to

14    take your oath to testify truthfully, so would you raise your

15    right hand and be sworn by the clerk.

16              CASSIE HERR, PLAINTIFFS' WITNESS, SWORN

17                      **DIRECT EXAMINATION**

18         THE COURT:  Thank you.  Mr. Rodriguez, you may ask

19    your questions.

20         MR. RODRIGUEZ:  Thank you, Your Honor.

21    BY MR. RODRIGUEZ:

22    Q.  Good afternoon, Ms. Herr.  Could you tell us, please, what

23    is your profession?

24    A.  I'm a family nurse practitioner.

25         THE COURT:  Say that again.  A family what?

1          THE WITNESS:  I'm a family nurse practitioner.

2          THE COURT:  Thank you.  You said it just at the right

3   speed there, family nurse practitioner.

4          All right.  Go ahead.

5          MR. RODRIGUEZ:  Thank you, Your Honor.

6   BY MR. RODRIGUEZ:

7   Q.  Ms. Herr, are you licensed as a family nurse practitioner

8   in Indiana?

9   A.  Yes, I am.

10  Q.  Where do you work?

11  A.  I work at Women's Med.

12  Q.  And is that an abortion clinic?

13  A.  It is.

14  Q.  And where is Women's Med located?

15  A.  It's located in Indianapolis, Indiana.

16  Q.  Ms. Herr, have you ever had an abortion in Indiana?

17  A.  Yes.

18  Q.  I'm going to come back and ask you more about your work in

19  a few minutes, but I'd like to ask you first about your

20  experience obtaining abortion care.

21      When did you have your abortion?

22  A.  I had my abortion in January of 2019.

23  Q.  And where did you have your abortion?

24  A.  I had it at Women's Med.

25  Q.  This is the Women's Med where you work?

HERR – DIRECT/RODRIGUEZ                    130

1   A.  That's correct.

2   Q.  Were you an employee of Women's Med when you obtained an

3   abortion there.

4   A.  No, not at the time.

5   Q.  Okay.  Now, was this your first pregnancy when you got your

6   abortion?

7   A.  No.

8   Q.  What led you to seek abortion care?

9   A.  My husband and I got pregnant while was on a medication

10  that was teratogenic to a developing embryo, meaning that it

11  could have significant harm on the developing embryo, and so we

12  made the decision to obtain an abortion.

13  Q.  Ms. Herr, can you tell us about the process you went

14  through to obtain your abortion care.

15  A.  Yes, I Googled abortions in Indiana, and I found the

16  closest to me, which was Women's Med, so I called and

17  scheduled.

18  Q.  And did you learn anything on that call?

19  A.  Yeah, on that call I learned that it was a two-step process

20  in Indiana, that there was going to be an 18-hour waiting

21  period before I came and got consented for my abortion and when

22  it was actually performed.

23  Q.  So you had to come in and get consented and then wait 18

24  hours and then get your abortion; is that what you're saying?

25  A.  That's correct.

Q.  Now, did you know about this two-trip requirement before you called to make your appointment?

A.  I did not.  I had not researched that much into it.

Q.  And how did learning about the two-trip requirement on this call make you feel?

A.  It made me feel very frustrated that I would have to go to the clinic twice.

Q.  And on this one call, did you, in fact, make an appointment at Women's Med?

A.  I did.

Q.  Okay.  I want to ask you now about your first appointment at Women's Med.  How were you feeling on the day of your first appointment at Women's Med?

A.  The day of my first appointment I was physically ill.  I -- in subsequent pregnancies I had pretty bad morning sickness with nausea and vomiting, and I was feeling this way on the morning that I went in and emotionally I was pretty upset to be there.  I didn't want to be there.

Q.  And why did you go forward with the abortion if you felt like you didn't want to be there?

A.  Sure.  I felt like it was the best option for us.  I wanted to set a pregnancy up to be a healthy one, and I felt like I had not done that because of medication I was on, and I felt that that was the best choice for me to make at the time, but I wanted to keep the pregnancy otherwise had I not been on that

1   medication.  So that's why I say, you know, I didn't want to be

2   there.

3   Q.  Thank you, Ms. Herr.  So thinking back to that first day of

4   your appointment, can you describe the environment when you

5   arrived at Women's Med on that day of your first appointment.

6   A.  So driving up to the Clinic, when I pulled in, there was a

7   line of protestors that were on the side of the building on the

8   street by the Clinic, and I had to drive in between them.  When

9   I got out of my vehicle, they began yelling things at me, most

10  notably "murderer" and "Jezebel," and that was repeated.  When

11  I went around to the front of the building, there were some

12  women that were also protesting that told me that they could

13  help me and that they would help me but then proceeded, as I

14  got closer to the door, to tell me that I was going to hell,

15  and so it was -- to me I just didn't see how that would help,

16  how that help that they are saying they had, that it looked

17  like that, if you will.  It looked like calling names.  And so

18  then I entered the building.

19  Q.  How did you feel having to walk through all those

20  protestors?

21  A.  I felt extremely anxious and very angry, and I felt they

22  didn't know what my situation was.  They didn't know that I too

23  didn't want to be there.  And those were my main emotions.

24  Q.  Okay.  Now, what happened once you went into Women's Med on

25  the day of your first appointment?

1  A.  When I went into Women's Med, I got my vitals taken, I got

2  an ultrasound performed, and then I sat and met with the nurse

3  practitioner who went over the consent forms with me.  After

4  that, I went and scheduled my follow-up appointment.

5  Q.  Okay.  So you did, in fact, schedule an appointment to come

6  back?

7  A.  I did.

8  Q.  Did you see the protestors again after you left Women's

9  Med?

10  A.  Yeah, they were out there, and, you know, it was such a

11  stark contrast from being in the building and then being

12  outside the building.  Inside the building it was a normal

13  medical treatment where I was treated with respect, and then I

14  walked back outside into what felt very much like harassment

15  and hate speech to me, and I remember being filled with a sense

16  of dread that I was going to have to come back again.

17  Q.  Ms. Herr, have you had the opportunity to reflect on how

18  your experience would have been different if your first

19  appointment at Women's Med had been over videoconference?

20  A.  Yes.  I would not have experienced what I just spoke to you

21  about.  I would not have had to take off work.  I would not

22  have had to leave my home feeling so sick.  I would not have

23  had to obtain childcare.  Those are all I can think of right

24  now.

25  Q.  If you had been given the option of doing that first

1    appointment by videoconference, would you have chosen that

2    option?

3    A.   Absolutely.

4    Q.   And if you had been given the option of receiving that

5    state-mandated information electronically, would you have

6    chosen that option?

7    A.   Yes.

8    Q.   Okay.  I want to ask you now about your second appointment

9    at Women's Med.  How were you feeling on that day of your

10   second appointment?

11   A.   Umm, I was extremely anxious and upset to go back.

12   Extremely.

13        Umm, I pulled -- it was a bad car ride.  I was afraid I'd

14   be recognized.  I pulled into the appointment and, as I know

15   now because I work there, but I didn't know at the time, the

16   protestors know the dates that abortions take place.  So this

17   time I met -- I was met with more megaphone, with posters,

18   large posters of fetuses, there were women that were -- had

19   these plastic doll things, "This is the size of your baby," and

20   I knew mine was less than a centimeter in length.  So

21   misleading.

22        And women yelling that, "I want your baby.  I'll take your

23   baby," which was also really disturbing to me.  So that was

24   going into my second appointment.

25   Q.   How did you feel having to walk through all those

HERR – DIRECT/RODRIGUEZ                          135

1    protestors for now the third time?

2    A.  I was –– to be honest, I was really angry.  I was angry

3    because I did feel misunderstood, but I also felt that –– I

4    didn't feel I needed to be understood to do this by anyone but

5    myself and, for me personally, my husband.

6    Q.  You mentioned a fear of being recognized at this

7    appointment.  Did you have any specific fear about who might

8    recognize you?

9    A.  So at the time I was a primary care provider at an

10   outpatient clinic less than ten miles from Women's Med, and I

11   treated a population of people that lived within that area, so,

12   you know, I was concerned I'd be recognized not only by other

13   patients but by the protestors again.  Somewhere in my mind I

14   felt like what if they remember me?  Even if that didn't matter

15   to me, it was upsetting.  They also threatened to take

16   pictures, and so that, to me, kicked up another level of

17   anxiety.  So my confidentiality is what I was concerned about.

18   Q.  Did you have any specific fear about what might happen with

19   those pictures?

20   A.  I felt they could get back to my job or in some way hurt my

21   employment.

22   Q.  And, Ms. Herr, how were you feeling physically on that day

23   of your second appointment at Women's Med?

24   A.  I continued to be very sick.  I don't mean to be graphic,

25   but I vomited multiple times before I got there.  So the nausea

1  progressed and got worse, which was typical for me.  I expected

2  it to.

3  Q.  Okay.  Ms. Herr, did you, in fact, get your abortion that

4  day?

5  A.  I did.

6  Q.  And what happened after you got your abortion?

7  A.  After I got my abortion, I had to go back out for the final

8  time through the protestors, and this time it was just sad.  I

9  was just sad.  I felt defeated.  I was really -- I was

10 relieved, but I felt so sad to be called those names because,

11 you know, I wouldn't even know my son right now had I not had

12 that abortion, so there are good things that came from it.

13     And I just felt like I deserved better.  I felt the irony

14 of, you know, the protestors and their freedom of speech, which

15 I respected, but if they were allowed to use their brain and

16 their mouth to use this language, I didn't understand why I

17 couldn't use my pregnancy, my embryo, my uterus to do what I

18 wanted to do with it.  The freedom that I felt that I had that

19 I was being told not to exercise, but I could not stop them

20 from doing the right that they had to speak, if that makes

21 sense.

22     So, yeah, that's my answer.

23 Q.  Thank you, Ms. Herr.  Approximately how much time passed

24 from the day you first called Women's Med to make that first

25 appointment and the day that you were actually able to obtain

1    your abortion?

2    A.  About a week and a half.  About two weeks.  About a week

3    and a half from when I went to the first appointment and then I

4    had to wait I believe three or four days before I got my

5    second -- when I went to actually obtain the abortion.

6    Q.  Okay.  And can you describe what you experienced during

7    those two weeks?

8    A.  During the two weeks I was, as I had mentioned, very sick.

9    I had to still care for my young twins.  I still had to work

10   full-time.  So I was in a state of constantly trying to hide

11   that illness from both my children and not to worry them but

12   also at work.  I was, in between patients, constantly in the

13   bathroom.  So it was a tough two weeks.  It was frustrating, to

14   be sick and also the anxiety of also the buildup, the waiting.

15   Q.  Did you have to take any time off work?

16   A.  I did.  I had to take two days off work.

17   Q.  And what were the consequences of having to take those two

18   days off work?

19   A.  Almost 40 patients had to be rescheduled.  So the ripple

20   effect on my own patients was extremely upsetting to me as well

21   because I do work in an underserved community, and that is a

22   big deal for patients to get appointments.  And they make a lot

23   of arrangements to get to those appointments because they have

24   a lot of barriers.

25   Q.  Okay.  And other than -- sorry, go ahead.

A.  I just felt I was disappointing and letting them down even
though they didn't know the reason.

Q.  Other than having to take restroom breaks in between
patients at work, during those two weeks, did the physical
symptoms affect your work in any other way?

A.  I was extremely tired.  I mean, I couldn't see as many
patients.  I couldn't -- I just physically couldn't.  There are
patients that had to be, you know, rebooked towards the end of
my shift because I was having trouble getting through them.
So --

Q.  And aside from work, did those physical symptoms affect
your daily life in any way?

A.  Yeah, it was my children.  I had to hide that from them.  I
didn't want them to worry, and they wouldn't have understood
why I was feeling and throwing up.  So --

Q.  Okay.  And how were you feeling emotionally throughout
those two weeks?

A.  Yes, so emotionally more and more anxious, and I kept --
you keep going -- not "you," I kept going back to having to
walk back into this clinic with what was going on outside.  And
so it just -- it created a lot of angst and then anger and then
sadness and so it was emotional.  It was an emotional time for
me.

Q.  Okay.  Thank you for sharing that with us, Ms. Herr.
     I'd like to switch gears here now and ask you about your

1  professional practice.

2  A.  Okay.

3  Q.  You mentioned that you're a family nurse practitioner at

4  Women's Med.  When did you begin working there?

5  A.  In June of 2019.

6  Q.  And what is a family nurse practitioner?

7  A.  A family nurse practitioner is an advanced practice nurse

8  who has a master's level who can diagnose and treat patients,

9  prescribe medication, order and interpret tests, some minor

10 procedures we can do.  And as a family nurse practitioner, I am

11 able to practice across the life span.

12 Q.  What are your responsibilities as a family nurse

13 practitioner at Women's Med?

14 A.  So at Women's Med, I serve as the healthcare provider that

15 the state mandates, consents a woman 18 hours before she's

16 going to, at least 18 hours before she's going to obtain her

17 abortion.  So I am consenting the patient as well as providing

18 counseling and reviewing their medical history.

19 Q.  So you consent patients, you counsel patients, and you

20 review their medical history?

21 A.  Yes, and their ultrasound.

22 Q.  Okay.  So these are all interactions with your patients

23 that occur on their first appointment?

24 A.  On their first appointments, yes.

25 Q.  Okay.  So when a patient comes to Women's Med for that

1    first appointment, what is the first thing that you do to

2    provide care?

3    A.  The first thing that I do is review their medical history,

4    and I do that before the patient enters the room.  I also

5    review the ultrasound to make sure there is a pregnancy in the

6    uterus, or at least the gestational sack in the uterus and the

7    measurements, and that's before the patient -- before I call

8    them into the room to get consented.

9    Q.  And you said, you also said you review the medical history.

10   A.  Yes.

11   Q.  What does that entail?

12   A.  Their medical history?

13   Q.  Yes.

14   A.  Yes.  That and any past medical conditions, surgeries they

15   may have had, allergies.  In general, what I'm looking for is

16   any contraindications of them having a safe abortion.

17   Q.  Okay.  And so this review of both the medical history and

18   of the ultrasound, are these physical copies that you are

19   reviewing?

20   A.  These are electronic.

21   Q.  Okay.  And so going back to the patient's first

22   appointment, what do you do after you have reviewed the

23   patient's medical history and their ultrasound?

24   A.  Then, I call the patient into the room to sit with them.

25   Q.  And is that when you do the counseling and the consenting

1  that you mentioned earlier?

2  A.  Right, that's correct.  So when I pulled them in, anything,

3  any discrepancy or any questions that I have about medical

4  history, we can review, but then I start to counsel the patient

5  and do the consenting.  And the counseling is -- entails, you

6  know, both explaining the medication abortion pill and -- or

7  the surgical abortion, if they have questions.  But I also have

8  to be very sure that they are not being coerced into making a

9  decision.  So I'm assessing for that.

10     I am assessing for safety, if they have a good support

11  system, if there's any abuse going on; and then, there are

12  demographic information that I'm required to collect such as

13  marital status and education level.

14  Q.  Okay.  And that's all the counseling part?

15  A.  That's correct.

16  Q.  Okay.  Do you believe you would be able to counsel your

17  patients by videoconference?

18  A.  Oh yes, uh-huh.

19  Q.  And as you sit here today, can you think of anything you

20  would have to do differently if you counseled your patients by

21  videoconference instead of in person?

22  A.  No.  The counseling would be the same.

23  Q.  As you sit here today, can you think of any reason why you

24  would be unable to provide the counseling by videoconference as

25  effectively as you do in person?

1    A.  I can't think of any reason I would not be able to.

2    Q.  Do you have any reservations about counseling your patients

3    by videoconference?

4    A.  No.

5    Q.  And if the law permitted you to counsel your patients by

6    videoconference, would you be willing to do so?

7    A.  Yes.

8    Q.  Okay.  Turning back, now, to your patients and their first

9    appointment, after you've done this counseling, you said you do

10   the consenting?

11   A.  Yes.

12   Q.  What does that entail?

13   A.  So the consenting entails going over their state-mandated

14   form that patients are required to sign, and when I say

15   "consenting," I mean that we are going through those forms

16   together, and I am making sure the patient understands them and

17   then witnessing them initial and sign the form.  And then, I

18   put the time that they signed the form.

19   Q.  Okay.  What do patients generally do with those forms after

20   you've given them -- after you've given the form to your

21   patients?

22   A.  The consenting forms?

23   Q.  Yes.

24   A.  They -- the consenting forms are then provided to the

25   patient, and they are either able to take them with them, or

1    some patients choose to have them shredded.

2    Q.  And why does the patient choose to have them shredded?

3    A.  They don't appreciate the documents for some reason, and/or

4    another reason typically I hear is they don't want evidence to

5    go out of the building that they had an abortion.

6    Q.  And do you believe that you would be able to review the

7    state-mandated forms with your patient by videoconference?

8    A.  Yes, I do.  And if you reviewed the state-mandated forms

9    with your patient by videoconference, how would you give the

10   patient the state-mandated forms themselves?

11   A.  Umm, well, we could get them to them electronically in some

12   way or perhaps use -- there's a lot of telehealth software we

13   can use now.  Two ways, potentially.

14   Q.  Ms. Herr, as we sit here today, can you think of anything

15   other than sending those forms electronically that you would

16   have to do differently if you reviewed those state-mandated

17   forms with your patients by videoconference rather than in

18   person?

19   A.  No.

20   Q.  As you sit here today, can you think of any reason why you

21   would be unable to review the state-mandated forms with your

22   patients by videoconference just as effectively as you do in

23   person?

24   A.  No.  I can't think of any reason why not.

25   Q.  Do you have any reservations about reviewing the

HERR - DIRECT/RODRIGUEZ                                          144

1    state-mandated forms with your patients by videoconference

2    rather than in person?

3    A.   No.

4    Q.   If the law permitted you to review the state-mandated forms

5    with your patients by videoconference, would you be willing to

6    do so?

7    A.   Yes.

8    Q.   Okay.  Turning back now to your patients and their first

9    appointment, what do you do after you finish reviewing those

10   state-mandated forms with your patients?

11   A.   They are put on the chart.  They are put on their clipboard

12   chart, handed to the patient, who takes them up front.  I first

13   give birth control script if the patient wanted it, and then

14   they take that and their paper chart up front.  And that's

15   where they schedule for their follow-up for the actual

16   abortion.

17   Q.   And then, at that point, are you done with the patient?

18   A.   Yes, I am done after the consenting.

19   Q.   Okay.  I want to ask you, now, about the patients you treat

20   at Women's Med.

21   A.   Okay.

22   Q.   Do any of your patients present with any pregnancy-related

23   complications?

24   A.   Yes.  The most common that I see is nausea.  They

25   also have --

1            THE COURT:  Say that again, the most frequent is what?

2            THE WITNESS:  I'm sorry, Your Honor.  Nausea.

3            THE COURT:  Nausea, got it.  Thank you.

4            THE WITNESS:  Yeah, yes.

5    BY MR. RODRIGUEZ:

6    Q.  And nausea, like what you experienced during your

7    pregnancy?

8    A.  Yes, that's correct.  Some are also vomiting occasionally,

9    but nausea is one of the main issues we deal with, and then,

10   low blood pressure, which is called hypotension.  And I see

11   that often as well.

12   Q.  Okay.  Any other conditions?  Any other pregnancy-related

13   complications?

14   A.  There's a severe form of nausea/vomiting that's called

15   hyperemesis gravidarum.  There can also be anemia in early

16   pregnancy.

17   Q.  Thank you, Ms. Herr.  I want to ask you first about your

18   patients with hyperemesis gravidarum.  You said that is an

19   extreme form of nausea?

20   A.  Yes, that is an extreme form of nausea and vomiting.  It

21   includes vomiting because the patient can very quickly

22   deteriorate and become dehydrated, requiring -- most of these

23   patients require hospitalization to get rehydration,

24   electrolyte, their electrolytes checked.  It can be a very

25   severe condition.

1  Q.  How often do you see patients with this condition?

2  A.  So it's a pretty rare condition, but it's also a clinical

3  judgment diagnosis, meaning, there is not a formal consensus on

4  the diagnosis.  It's made clinically by a clinician.  So I

5  would say I probably see one to two a month.

6  Q.  And for patients with this condition, how long will it

7  persist in them?

8  A.  The majority of these patients, it will persist throughout

9  the pregnancy or until the pregnancy is over.  So until the

10  abortion or until an infant is delivered.

11  Q.  And how many of your patients present with nausea?

12  A.  Almost -- a lot, so I mean, maybe six or seven out of ten

13  patients will have nausea.

14  Q.  And for those patients, how long will the nausea persist?

15  A.  Usually nausea will lift after the first trimester, you

16  know, if it's going to.  But in the first trimester, it would

17  not go away until the patient had an abortion.

18  Q.  Now, you said it would lift after the first trimester if

19  it's going to.  Can you tell us what you mean by that?

20  A.  Sure.  So some patients are nauseous throughout their

21  entire pregnancy.  Some are even nauseous with vomiting

22  throughout their pregnancy and still may not get them the

23  diagnosis of hyperemesis, but it is still extremely unpleasant,

24  and I'm just saying that based on my experience with it.

25  That's my experience with it.

1   Q.  So for the patients for whom the nausea continues after the

2   first trimester, how long will the nausea persist for them?

3   A.  There's no way to know for sure because every patient is

4   different, but if it's lingering, you know, there's a chance it

5   could linger throughout the pregnancy as well.

6   Q.  Okay.  And how long will -- excuse me, how often do you see

7   patients with pregnancy-related hypotension?

8   A.  That's -- I see that more commonly, two or three times a

9   week.

10  Q.  And for those patients, how long will the pregnancy-related

11  hypotension persist?

12  A.  So it's -- the circulatory system, the pregnant mother

13  changes throughout pregnancy.  In early pregnancy, it expands.

14  So in the first trimester is when we see low blood pressure the

15  most.  I can't say how long it will persist throughout, you

16  know, a pregnancy that continues, but the symptoms can resolve

17  again with abortion.  And if it persists throughout the

18  pregnancy, then with delivery.

19  Q.  Okay.  Ms. Herr, do you ever have to provide additional

20  care to help patients keep their pregnancy or their abortion

21  care confidential?

22  A.  I do.  I -- are you going to ask me a question?

23  Q.  Yeah.  Well, other than shredding the state-mandated forms.

24  A.  Oh, so I provide a written document on spontaneous

25  miscarriage, so just a miscarriage that would happen normally.

HERR - DIRECT/RODRIGUEZ                                148

1   I provide that to patients, and it also has counseling

2   resources.  It does not say directly the patient has had a

3   spontaneous miscarriage, but they often will present this to

4   family members or partners who are upset that -- and it can

5   help to -- it can help these patients to be able to tell a

6   mistruth about whether or not their abortion was spontaneous or

7   induced.

8   Q.  Are there any other patients for whom you have to provide

9   some additional care?

10  A.  Do you mean physical or do you mean --

11  Q.  Anything at all.

12  A.  So I provide nausea medication for patients that are

13  physically sick.  And for patients that are having any kind of

14  intimate partner violence or are in unsafe situations, I create

15  safety plans for them, or we create them together and provide

16  resources.

17  Q.  Do any of your patients have to travel long distances to

18  reach Women's Med?

19  A.  Yes, I have patients that come from all over Indiana.

20          MR. ROWLETT:  Your Honor, at this point I'd like to

21  object to lay a foundation for how the witness knows that

22  certain patients have to travel a long distance.

23          THE COURT:  Ask the question, Mr. Rodriguez.

24          MR. RODRIGUEZ:  I'll lay some foundation, Your Honor.

25

1   BY MR. RODRIGUEZ:

2   Q.  Ms. Herr, when your patients come to see you on their first

3   appointment and you're working through --

4         THE COURT:  Why don't you ask it in direct examination

5   form.  How do you know where they are coming from?

6   BY MR. RODRIGUEZ:

7   Q.  Ms. Herr, how do you know where your patients are coming

8   from?

9   A.  I know because I have a paper chart in front of me as well

10  as electronic, and on that is their demographics, their

11  address, and the ID is actually put on there as well.  So if I

12  did not believe them, I could certainly check those forms.

13  However, I do believe them.

14        THE COURT:  That's a sufficient foundation.  You may

15  proceed.

16        MR. ROWLETT:  Your Honor, could I ask one preliminary

17  question before she proceeds?

18        THE COURT:  What does it have to do with, Mr. Rowlett?

19        MR. ROWLETT:  So she just said she -- oh, sorry.

20        THE COURT:  Go ahead.  Answer my question.

21        MR. ROWLETT:  So she said that she looks at a paper

22  chart, and I'm just curious if patients tell her that

23  information and she puts it on a chart.

24        THE COURT:  That is not hearsay.  I don't know where

25  you lawyers from the state are getting this idea that this is

HERR - DIRECT/RODRIGUEZ                    150

1    hearsay.  She's attesting to distilled information that she's

2    acquired in the course of her practice.  She's not giving me

3    statements.  She's not saying what somebody else said.  It's

4    her distilled knowledge from the work that she does.

5           So go back and review Rule 800 series before you

6    interpose that objection again.

7           MR. ROWLETT:  Okay.  I just would like to register an

8    objection on hearsay nonetheless for the record.

9           THE COURT:  The record so notes, but the objection's

10   overruled for the reasons I've said three times now.

11   BY MR. RODRIGUEZ:

12   Q.  Ms. Herr, how often do you have patients who have to travel

13   long distances to get to Women's Med?

14          THE COURT:  In your practice, Ms. Herr.

15   A.  In my -- are you asking for a number?  An estimate?

16          THE COURT:  However you can answer the question.

17          THE WITNESS:  Okay, Your Honor.  I see -- every single

18   day I see patients that have traveled to get to our clinic.  I

19   would -- I don't know exactly every patient where from, I don't

20   ask them, but there has been said at least every day I have

21   been at Women's Med by someone that they have traveled long

22   distance.  And I can list some of the counties if you'd like me

23   to that I hear most often?

24   BY MR. RODRIGUEZ:

25   Q.  That's okay, Ms. Herr.

1          But they are coming from all over the state?

2     A.   Yes, they are.

3     Q.   Okay.  Do you ever have to refer patients to another

4     abortion clinic?

5     A.   I do.

6     Q.   How often do you have to refer patients to another abortion

7     clinic?

8     A.   Umm, probably anywhere from one to three times a week.

9     Q.   Why do you have to refer those patients to another abortion

10    clinic?

11    A.   The reason is because they are past the gestational age to

12    have an abortion in Indiana, which is 13 weeks and six days.

13    Q.   So you're referring those patients out of the state?

14    A.   Yes, out of the state.  I have never referred to another

15    clinic in the state.

16    Q.   Okay.  And thinking now about all of your patients and

17    their specific factors of their pregnancies, what are the

18    consequences of delaying abortion care for those patients?

19    A.   I think one of the most -- more serious ones is that they

20    then are too far along to have this done in Indiana.  And we

21    know that the further along a patient goes, you know, the more

22    at risk they are.  So we want to be able to provide abortion

23    services in a timely fashion so that the patients don't have to

24    continue the pregnancy.

25         Not just for that, but if patients are sick, these patients

HERR – DIRECT/RODRIGUEZ                    152

1    have children, sometimes multiple children.  These patients

2    have jobs.  I have had patients that have lost jobs for coming,

3    having to make two trips.  I have had patients sleeping in

4    their car overnight because of where they come from because of

5    the two trips.

6        And then for our rape and incest victims, it is -- I can

7    imagine it would be excruciating to have to make two trips

8    through those protestors in our women that have a pregnancy

9    that they would otherwise keep but the embryo is not viable any

10   longer.

11       So those are some of the -- did I answer your question?

12   Q.  Yes, ma'am.  You did.  Thank you, Ms. Herr.

13           MR. RODRIGUEZ:  No further questions on direct, Your

14   Honor.

15           THE COURT:  All right.  Cross-examine, please.

16           MR. ROWLETT:  Your Honor, if I could take just a

17   moment to confer, I might be able to keep my questions pretty

18   short.

19           THE COURT:  All right.  Please do.

20           THE WITNESS:  What does that mean that I do?

21           THE COURT:  You just wait a second.  We're going to

22   see if Mr. Rowlett has any questions for you.

23           THE WITNESS:  Oh, okay.  Thank you, Your Honor.

24           THE COURT:  Mr. Rowlett.

25           MR. ROWLETT:  Okay, thank you, Your Honor.  I am ready

*HERR — CROSS/ROWLETT*                    153

to proceed.

      THE COURT:  All right, sir.

### CROSS—EXAMINATION

BY MR. ROWLETT:

Q.  All right.  Well, good afternoon, Ms. Herr.  My name is Robert Rowlett.  I'm with the Indiana Attorney General's Office.  I just have a few brief questions.  It should not take a lot of time here.

A.  Sir, good afternoon.  And my last name is pronounced Herr.

Q.  Oh, Herr, I apologize.

A.  It's okay.  I get that all the time.

Q.  I will make sure not to mispronounce it.

      Now, I kind of want to walk through.  My questions are sort of in the order of the topics that Mr. Rodriguez walked through.  So they might appear somewhat out of order or disconnected, but I kind of want to walk through beginning to end.

      So you mentioned that you have patients that experience coercion, experience intimate partner violence and things of those sorts, and that you screen them specifically for that.  And I'm just curious why exactly you do that.  Why do you screen for those things?  How does that help you treat them?

A.  Well, in any setting, when I have an opportunity to be alone with a woman or a man, it has been my practice as a family nurse practitioner to always assess for that.  I think

*HERR – CROSS/ROWLETT*                                      154

1    that is something that can also -- well, let me stop there.

2    Q.  Okay.  So maybe expand on that a little bit more.  So what

3    particularly about -- what is it you're screening for if you

4    know that someone has been subjected to intimate partner

5    violence, for example, or coercion, what do you then do with

6    that information?

7    A.  That information is something that we put into their

8    medical record, and then I am providing resources to those

9    patients.

10   Q.  Okay.  And do you also do that to support their mental

11   health or is it related to that or not?

12   A.  Well, patients can -- will tell us if they have any -- I

13   mean it is self-report obviously, if they have any mental

14   health diagnoses prior to coming to our clinic.  And again, no,

15   I do that standard across the board whether I have a sense or

16   an idea that a patient might be suffering from mental illness

17   or if it was written or if they noted it on their history or if

18   it was not noted.

19   Q.  Gotcha.  That makes sense.

20   A.  Thank you.

21   Q.  Yeah, thank you.  So say that you're conducting an

22   appointment and say, for example, that it's by telemedicine,

23   would you be able to effectively ask questions about intimate

24   partner violence or screen for that if the person's partner was

25   in the room with them?

A.  Sure, that's a great question, and actually the answer is
you would not want to do that if you sense that a partner was
in the room.  In fact, you would just want to open-endedly
say -- we have a lot of patients sometimes that, especially
during COVID, and this doesn't have to be during COVID, but
that can be a sentence used presently, that are having some
tough times.  There might be some relationship issues going on,
and so we are providing everyone with resources.  May I please
provide them to you, so you can pass them on to any friends
that might need them as well.  That's what I would do if I
suspected someone was in the room.

Q.  Okay.  Thank you.

A.  Thank you.

Q.  Now, give me just a moment here.  I apologize.  So I have a
question.

    You talked a little bit briefly about the ultrasounds that
you perform.  Mr. Rodriguez also asked you whether you had any
reservations about telemedicine.  But do you believe that the
ultrasound is important for purposes of gestational dating?

A.  I think it gives you a useful tool, but it's also, if the
woman has an idea about the start of her last menstrual period
date, then I'm able to also get a good understanding or a good
idea rather of the gestational age.  That would then be
confirmed later.

Q.  Now, when you mentioned that you have Mr. Rodriguez ask you

*HERR – CROSS/ROWLETT*                                        156

1   a series of questions about women that present with certain

2   symptoms, and if you had a woman that presented to your clinic

3   with certain symptoms, would you examine her in response to

4   those complaints?

5   A.  Could you be more specific, please?

6   Q.  Like would you perform, say, a physical?

7   A.  I don't generally perform physical exams on patients at

8   Women's Med.

9   Q.  Okay.  Not even if they didn't present with -- or even if

10  they did present with symptoms?

11  A.  So I would triage them, meaning I would ask followup

12  questions and -- but I'm not going through a full physical

13  exam.  And then, like I said, I could manage symptoms with

14  medication, like nausea medication, for example.  Does that

15  make sense, sir?

16  Q.  Yes.

17  A.  Okay.

18  Q.  So okay.  And in -- and this isn't specifically related to

19  symptoms, but so a woman comes in, you mentioned sometimes you

20  do an ultrasound at least currently, for certain purposes, but

21  if you were allowed via telemedicine, you're saying you could

22  go off essentially a patient's history, what the patient

23  relates to you about her last menstrual period?

24  A.  Well, yes, but that's just based on the patient's

25  recollection, which, as we know, can be off.  So we would get a

1   general idea of that date, and then that would have to be on a

2   followup appointment confirmed via the ultrasound.

3   Q.  Right.  And then I have one other question, and then we're

4   going to move on to something else.

5       And that is, you mentioned that you make referrals to

6   out-of-state clinics.  And I'm just curious, are those all

7   referrals due to the fact that the woman has passed gestational

8   age to be indicated for a medication abortion?

9   A.  No, sir, that's only for if they are past the gestational

10  age for a surgical abortion.

11  Q.  Okay.  Thank you.

12      Now, Ms. Herr, I want to ask you a couple of questions

13  about Women's Med.  Could you tell me what physicians perform

14  medication abortions there?

15  A.  Dr. Glazer and ███████████.

16  Q.  Okay.

17  A.  And I believe ███████████ will if he has to, but I have not

18  been on site with him.

19          MR. RODRIGUEZ:  Your Honor, I'm going to object here.

20  If we could have physician names sealed or stricken from the

21  record and to have initials only.

22          THE COURT:  Okay, please use initials.

23          MR. ROWLETT:  Your Honor, I believe you're muted.  I

24  apologize.

25          THE COURT:  Please use initials, Mr. Rowlett.

 1          MR. RODRIGUEZ:  Your Honor, I believe you were muted.

 2          THE COURT:  Now, I'm not.  Please use initials for the

 3   doctors' names.

 4          MR. ROWLETT:  Will do.

 5   BY MR. ROWLETT:

 6   Q.  Okay.  So Ms. Herr, we'll go with Dr. G, Dr. D, and Dr. H.

 7          THE COURT:  Wait, wait.  You said it too fast,

 8   Mr. Rowlett.

 9          MR. ROWLETT:  Dr. G, Dr. D, as in dog, and Dr. H.

10          THE COURT:  Thank you, sir.

11   BY MR. ROWLETT:

12   Q.  Okay.  Now, for each of these physicians, do you know how

13   many appointments they participate in or have per week, how

14   many patients they see?

15   A.  No, I don't handle the scheduling.

16   Q.  So you don't know how many patients Dr. G, D, or H see per

17   week?

18   A.  I mean, I don't -- I don't have any way of knowing an exact

19   amount.  I could give you an estimate.  I don't want to do that

20   because I don't know if it would be accurate, to be honest.

21   Q.  Okay.  That's fine.

22          MR. ROWLETT:  Your Honor, I may not have any

23   additional questions at this point based on that answer.  If

24   you could just give me a moment to confirm, and then we might

25   be done.

1          THE COURT:  Yes, sir.  Take the time you need.

2                    (Off-the-record discussion.)

3          MR. ROWLETT:  Thank you, Your Honor.  We have no

4    further questions at this time.  Thank you so much, Ms. Herr.

5          THE WITNESS:  Thank you.  You got it right.  Thanks.

6          THE COURT:  Any redirect, Mr. Rodriguez?

7          MR. RODRIGUEZ:  No redirect, Your Honor.

8          THE COURT:  Thank you very much, Ms. Herr.

9          Is Ms. Herr excused now from her witness subpoena?

10         MR. RODRIGUEZ:  Yes, Your Honor.

11         THE COURT:  And the State doesn't intend to call her;

12   is that right, Mr. Rowlett?

13         MR. ROWLETT:  No, we do not, Your Honor.  Thank you.

14         THE COURT:  So you have discharged your

15   responsibilities.  I thank you very much, Ms. Herr.  You may

16   step aside.

17         THE WITNESS:  Thank you.

18                    (Witness excused.)

19         THE COURT:  We'll be in recess for about 20 minutes.

20   It's just about 20 minutes till four, so we'll reconvene at

21   4:00 o'clock.

22         MR. RODRIGUEZ:  Thank you, Your Honor.

23                    (Recess taken.)

24                    (Open court.)

25         THE COURT:  Okay, I think I'm ready.  Oh, Mr. Fisher,

1    I'm glad to see you.

2              MR. FISHER:  Oh, thank you.

3              THE COURT:  I was hoping it would be you so I could

4    ask you this question.

5              MR. FISHER:  Okay.

6              THE COURT:  What's the definition of hearsay?

7              MR. FISHER:  Out-of-court statement used to prove the

8    truth of the matter asserted.

9              THE COURT:  Exactly, an out-of-court statement offered

10   for the truth of the matter asserted.  So we have memorized it

11   exactly the same way.

12             So all those hearsay objections were not for

13   statements out of court offered for the truth of the matter.

14   So that's why I kept saying that's not hearsay.  They were

15   talking about other things but not hearsay.

16             So I've made my ruling.  You don't have to argue with

17   me; but I just wanted to make sure you knew the definition of

18   hearsay.  I'm not a bit surprised that you know that.

19             MR. FISHER:  Thanks.

20             THE COURT:  Miss Toti, welcome back.

21             MS. TOTI:  Good afternoon, Your Honor.

22             THE COURT:  Do you have another witness for us?

23             MS. TOTI:  Yes.  Plaintiffs call Dr. Jeffrey Glazer to

24   the stand, G-L-A-Z-E-R.

25             THE COURT:  Okay.  Thank you.

1          MS. TOTI:  And I'll note for the record, Your Honor,

2     that Dr. Glazer is a plaintiff; and he doesn't object to his

3     name appearing in the record, even though he's an abortion

4     provider.

5          THE COURT:  Okay.  Very good.

6          Good afternoon Dr. Glazer.

7          You're muted, sir.

8          THE WITNESS:  I'm not muted now.

9          THE COURT:  I'm going to ask the clerk to administer

10    the oath.  Would you be sworn, please, and raise your right

11    hand.

12                         (Witness sworn.)

13         THE COURT:  All right, sir.

14         MS. TOTI:  Good afternoon, Dr. Glazer.

15         THE COURT:  Just one second.  I have a question from

16    Miss Harves.

17                    (Off-the-record discussion.)

18         THE COURT:  Amy Hagstrom Miller wants back in.

19    She's -- she was a witness but is also a party, and she's been

20    relieved of her obligation to testify.  Does anybody have any

21    objection to her coming back into the broadcast basically?

22         Do you object to that, Mr. Fisher?

23         MR. FISHER:  I do not, Your Honor.

24         THE COURT:  Okay.  We have a separation of witnesses

25    order.  So I'm inquiring.

1    I assume, Ms. Toti, you don't have any objection; is
2    that right?
3        MS. TOTI:  No objection, Your Honor.
4        THE COURT:  All right.  So yes, she may, Miss Harves.
5    If you can click her back, we will welcome her back.
6        Okay.  You may resume -- you may undertake your
7    questioning now of Dr. Glazer.
8        MS. TOTI:  Thank you, Your Honor.
9        JEFFREY GLAZER, M.D., PLAINTIFFS' WITNESS, SWORN
10                   **DIRECT EXAMINATION**
11   BY MS. TOTI:
12   Q.  Good afternoon, Dr. Glazer.  I have a few questions for
13   you.  What's your occupation?
14   A.  I'm a physician.
15   Q.  Do you have an area of specialty?
16   A.  Obstetrics and gynecology.
17   Q.  I'd like to show you what's been marked as Stipulated
18   Exhibit 8.  Do you recognize this document, Dr. Glazer?
19   A.  Yes, ma'am, I do.
20   Q.  What is it?
21   A.  It's a copy of my CV.
22   Q.  Did you provide this CV as part of your expert report dated
23   June 26, 2019?
24   A.  Yes, I did.
25   Q.  Does it provide a true and accurate summary of your

1    education, professional credentials, and work history as of

2    that date?

3    A.  Yes, ma'am, it does.

4           THE COURT:  Dr. Glazer, can you turn the volume up on

5    your computer a little bit, please?

6           THE WITNESS:  Is that better?

7           THE COURT:  Yes, I think so, or sit close to it, one

8    or the other.

9    BY MS. TOTI:

10   Q.  I'd like to direct your attention to page two of the

11   exhibit.  Towards the middle of the page where it says

12   "Certification," it indicates that your board certification was

13   set to expire in December 2019; is that correct?

14   A.  That is correct.

15   Q.  Did you subsequently renew it?

16   A.  Yes, ma'am, I have.  It is renewed through December 2022.

17   Q.  Okay.  Apart from renewing your board certification, have

18   there been any material changes to your education, professional

19   credentials, or work history since June 26th, 2019?

20   A.  No, ma'am, there has not.

21   Q.  Okay.  I'm done with that exhibit.  Thank you.

22        Dr. Glazer, do you currently provide abortion care in

23   Indiana?

24   A.  Yes, ma'am, I do.

25   Q.  When did you first start providing abortion care in

GLAZER, M.D. – DIRECT/TOTI                    164

1   Indiana?

2   A.  Approximately 2014.

3            THE COURT:  What was it?  I'm sorry.  2015?

4            THE WITNESS:  '14, ma'am.

5            THE COURT:  2014.  Okay.

6   BY MS. TOTI:

7   Q.  And where do you currently provide abortion care in

8   Indiana?

9   A.  In two clinics.  One is the South Bend Clinic run by the

10  Whole Woman's Health Alliance, and the other is as Women's Med

11  in Indianapolis.

12  Q.  Let's talk about the South Bend Clinic.  How often do you

13  provide abortions there?

14  A.  Approximately one every two to three months.

15  Q.  How do you get to the South Bend Clinic from your home?

16  A.  I drive my car.

17  Q.  And how long a drive is that?

18  A.  Anywhere from four and a half to five and a half or more

19  hours, depending on traffic.

20  Q.  How does the weather affect your ability to travel to the

21  South Bend Clinic?

22  A.  If the weather is going to be bad, as in a snowstorm, since

23  they are unpredictable, sometimes we have to cancel the clinic.

24  Q.  So have there been times when you've been unable to provide

25  abortions at the South Bend Clinic because of snow?

1  A.  Yes, ma'am.

2  Q.  And when was the most recent time that that happened?

3  A.  It was in January of this year.

4  Q.  And what happened to the patients that were scheduled to

5  have abortions on that day?

6  A.  They had to be rescheduled.

7  Q.  What percentage of the abortions that you provide at the

8  South Bend Clinic are medication abortions?

9  A.  The South Bend Clinic, a hundred percent.

10  Q.  If the law permitted you to provide medication abortions

11  using telemedicine, would you be willing to do so?

12  A.  Yes, I would.

13  Q.  And if you're able to provide medication abortions using

14  telemedicine, how often would you be willing and able to

15  provide medication abortions at the South Bend Clinic?

16  A.  Almost on a daily basis, including evenings and weekends.

17  Q.  If you could use -- pardon me.  Strike that.

18      Let me move on and ask you about the Women's Med Clinic in

19  Indianapolis.  How often do you provide abortions there?

20  A.  Most Fridays and occasional Thursdays.

21  Q.  So typically, one day per week but occasionally, two days

22  per week; is that right?

23  A.  Yes, ma'am.

24  Q.  How do you get to Women's Med from your home?

25  A.  I drive in my car.

1    Q.   And how long a drive is that?

2    A.   Approximately two hours and 15 minutes.

3    Q.   Roughly, what percentage of the abortions that you provide

4    at Women's Med are medication abortions?

5    A.   Approximately 40 percent.

6    Q.   If the law permitted you to use telemedicine for medication

7    abortions, how often would you be willing and able to provide

8    medication abortions at Women's Med?

9    A.   Again, my answer would be almost on a daily basis,

10   including evenings and weekends.

11   Q.   Okay.  I'd like you to focus on the year 2019 for a moment.

12   Approximately how many abortions did you provide at Women's Med

13   in 2019?

14   A.   Approximately 1,500.

15   Q.   And approximately how many abortions did you provide at the

16   South Bend Clinic in 2019?

17   A.   Per year, it ranges from 40 to 60.

18   Q.   Okay.  And that was true in 2019?

19   A.   That's 2019, yes, ma'am.

20   Q.   And now, I'm going to ask you about 2020.  Approximately

21   how many abortions did you provide?

22            THE COURT:  I'm sorry.  I'm sorry, Miss Toti.  I

23   missed the number.  Go back to 2019 and get the numbers.

24            I'm having great difficulty hearing you, Doctor.

25   Could you just speak up a little bit please?

GLAZER — CROSS/FISHER                    167

 1            THE WITNESS:  Yes.

 2            THE COURT:  Okay.  Start again.  2019 how many did you

 3  perform?  Did you say 15 to 20?

 4            THE WITNESS:  No, ma'am, 40 to 60.

 5            THE COURT:  Okay.  And then did you ask about 2020,

 6  Miss Toti?

 7            MS. TOTI:  I was just getting to that, Your Honor.

 8            THE COURT:  Okay.  Go ahead.  Then you pick it up.

 9            MS. TOTI:  Okay.  Thank you.

10  BY MS. TOTI:

11  Q.  So, Dr. Glazer, for 2020, approximately how many abortions

12  did you provide at Women's Med?

13  A.  Again, approximately 1,500.

14  Q.  And approximately how many abortions did you provide at the

15  South Bend Clinic in 2020?

16  A.  Again, my numbers are approximately the same, between 40

17  and 60.

18            MS. TOTI:  Thank you very much.  I have no further

19  questions for you, Dr. Glazer, at this time.

20            THE COURT:  Okay.  Mr. Fisher, cross-examine.

21                      **CROSS EXAMINATION**

22            MR. FISHER:  Thank you, Your Honor.

23  BY MR. FISHER:

24  Q.  Hello, Dr. Glazer, my name is Tom Fisher.  I'm with the

25  Attorney General's Office.  We represent the defendants in this

1    case.

2        I think you and I have met once before at a deposition.  Do

3    you recall that?

4    A.  Yes, sir, I do.

5    Q.  Okay.  Do you perform an ultrasound before an abortion?

6    A.  An ultrasound is performed before we perform an abortion.

7    Sometimes I will do it, but sometimes I don't have to do it.

8    Q.  Would you perform an ultrasound even if state law did not

9    require it?

10   A.  Well, it's important to adequately date the pregnancy in

11   order to provide the proper service to the patient if she

12   wishes to proceed, so an ultrasound happens to be a very good

13   method for my patients to adequately date their pregnancy.

14   Q.  Well, can I just have a yes or no answer to the question?

15   A.  Then you'd have to repeat the question, I'm sorry.

16   Q.  Even if state law did not require it, would you perform an

17   ultrasound before an abortion?

18   A.  I'm not sure I could answer that with a yes or no question.

19   There might be circumstances where I did not necessarily need

20   to have an ultrasound.  I do feel it's a very accurate way to

21   date a pregnancy.

22   Q.  Is the decision to have an abortion a serious decision?

23   A.  Yes, it is.

24   Q.  Are some women nervous and anxious about making that

25   decision?

1    A.  No.  Most patients I see, most women I see in that

2    circumstance, are nervous about the circumstances of having to

3    have the procedure or take the medication, but they are -- many

4    people can be nervous about the whole process.

5    Q.  Okay.  Well, so do you meet with patients who, for whatever

6    reason, are nervous about the process or anxious, do you do

7    anything to help calm them, to make them calm, make them feel

8    calm?

9    A.  Well, yes.  I, unfortunately for Judge Barker, I talk in a

10   very soft voice to many of these patients, in a calm way.  I

11   try to make eye contact with them.  I try to make sure that

12   they are appropriate for a procedure such as a pregnancy

13   termination.

14   Q.  Do you shake hands?

15   A.  Well, recently with the COVID I do not because we've tried

16   to do away with hand-shaking, but before the COVID pandemic, I

17   frequently shook hands with patients.

18   Q.  Do you think it's possible that negative mental health

19   consequences could be associated with abortion?

20   A.  I have not seen that in my patient population.  I'm sure

21   that that has happened, but I have not seen that.

22   Q.  Have you ever encountered abortion patients who are victims

23   of sex trafficking?

24   A.  Yes, I have seen a few.

25   Q.  How did you learn of that victimization?

1   A.  May I correct you?  I have seen a few, but not just in the

2   abortion clinic, also in my OB/GYN practice.  Sorry.

3   Q.  Thank you.

4   A.  Would you repeat the last question?

5   Q.  Sure.  I just wondered how you learned of that

6   victimization.

7   A.  Well, frequently they will just tell us.  Sometimes

8   patients will be reluctant to discuss answers with us, they

9   will be evasive in the questions they answer.  Sometimes their

10  partner will come in and not leave them alone, and that usually

11  makes us aware.

12  Q.  What did you do in the situations where you learned or

13  discerned in one way or another that your patient was a victim

14  of sex trafficking?

15  A.  We offered them help, and we offered them reassurance,

16  tried to find them a safe place to call and certainly advised

17  them to notify the police.  And if they wished to proceed with

18  the procedure, we proceeded.  If they did not, we did not

19  proceed.

20  Q.  Is an in-person examination sometimes necessary before even

21  a medication abortion?

22  A.  Sometimes it might be if the patient had a significant

23  medical problem.  I would want to pursue that and examine the

24  patient.

25  Q.  What is your understanding of what the Indiana physical

1  examination law requires?

2  A.  My understanding is that in those patients who --

3                    (Interruption.)

4      Sorry.  Those patients who might have medical issues, that

5  it should be pursued.

6  Q.  Well, but you're aware that we have a statute that --

7  you're a plaintiff in this case and that you've challenged

8  regarding physical examinations, correct?

9  A.  Yes, in-person physical examinations.

10  Q.  Right.  So my question is what is your understanding of

11  what that law requires?

12  A.  That law, my understanding is that law requires we have to

13  have an in-person face-to-face meeting with the patient.

14  Q.  Could you just clarify "we" in that sentence.

15  A.  Us, the abortion providers.

16  Q.  Well, and I'm asking here about not simply the staff but

17  about the physicians.  Do you understand the law to require the

18  abortion physician to provide a physical exam before the

19  abortion?

20              MS. TOTI:  Objection.  Calls for a legal conclusion.

21              MR. FISHER:  I'm simply asking for his understanding.

22              THE COURT:  Okay.  He may give his understanding

23  because it is about the legal requirements.  He may or may not

24  be right.

25  A.  My understanding is that those people who might have health

1    issues that have been uncovered or we are made aware of might

2    need a further physical exam by the abortion provider.

3    Q.  Do you concede that even if the telemedicine ban were

4    enjoined, a woman seeking an abortion would still need to go to

5    the abortion clinic the day of her abortion to have her

6    telemedicine appointment?

7    A.  I am sorry, I don't understand all the words in your

8    question.

9    Q.  And, I'm sorry, I'm speaking slower than normal because I

10   want to make sure that I don't trip over myself, so I'll try it

11   again.  Do you concede that if the telemedicine ban at issue in

12   this case were enjoined, that is the Judge said that it can't

13   be enforced, that a woman seeking an abortion would still need

14   to go to the abortion clinic anyway on the day of her

15   appointment, abortion appointment?

16   A.  Because I want to understand your question, I'm writing it

17   down, if you don't mind.

18   Q.  Absolutely.  That's fine.

19   A.  Okay.  Umm, well, as it stands now, those protocols require

20   us to give the patient the pill in the clinic.  With the recent

21   COVID testing -- COVID pandemic, excuse me, we were -- we never

22   did, but we would be allowed to give the pill to the patient in

23   the parking lot so as not to cause an infection.

24   Q.  In the parking lot of the clinic?

25   A.  Yes, sir.

GLAZER – CROSS/FISHER                     173

1  Q.  So is it fair to say that you wish to enjoin the

2  telemedicine ban so that you can telecommute to the South Bend

3  Clinic?

4  A.  I don't know the meaning of "enjoin."

5  Q.  I'm sorry.

6  A.  You're tripping me up.

7  Q.  I apologize.  I used that word before, and I'll try to

8  rephrase it.

9      So is it fair to say that you wish to take away the

10  telemedicine ban, make it unenforceable, so that you may

11  telecommute to the South Bend Clinic?

12          THE COURT:  Why don't you say -- instead of the

13  negative, say would you prefer to use telemedicine to treat the

14  abortion patients.  Isn't that the point?

15          MR. FISHER:  Well, that is a point.  I'm trying to

16  make a slightly different point, but maybe I can rephrase one

17  more time or multiple times.

18  BY MR. FISHER:

19  Q.  If the telemedicine ban were not in place, you could then

20  telecommute to the South Bend Clinic; is that correct?

21  A.  That is correct.

22  Q.  And that is what you're seeking to -- that's your objective

23  by challenging the telemedicine ban?

24  A.  No, I'm trying to make it easier for patients and more

25  convenient for the patients to have telemedicine.

GLAZER — CROSS/FISHER                            174

1  Q.  Sure.  Where would you be in that circumstance?

2  A.  Wherever I would be at that moment.

3  Q.  Well, let's maybe think of some of the places you might

4  likely be.  Would you be at home?

5  A.  I could be at home.  I could be at work.

6  Q.  At work.  Tell us what that means, "at work."

7  A.  I'm sorry, my other job as an obstetrician-gynecologist.

8  Q.  And --

9  A.  In Louisville.

10  Q.  In Louisville?

11  A.  Yes, sir.

12  Q.  So tell us about that job.  Is that a full-time job?

13  A.  That's three days a week.

14  Q.  Three days a week.  Okay.

15  A.  That is considered full time.

16  Q.  Okay.  Now, earlier you mentioned that you go to the South

17  Bend Clinic once every two to three months?

18  A.  Yes, sir.

19  Q.  You have always maintained that schedule, or has it varied

20  over time since the South Bend Clinic opened?

21  A.  It has varied over time since the South Bend Clinic opened.

22  Q.  And what accounts for that variation?

23  A.  Depending on the number of providers we have had.  So at

24  the beginning I think we had two or three providers, so I was

25  going more frequently.  As time went on, we found more

1   providers, and therefore my need to travel up to the South Bend

2   Clinic became less and less.

3   Q.  Have you ever been concerned when you've been with a

4   patient for whom you're about to prescribe Mifeprex that she

5   might palm it and try to steal away with it, divert it?  Has

6   that ever been a concern of yours?

7   A.  That is not a concern of mine.

8   Q.  Bear with me one second.  I'm going to check something,

9   please.

10  A.  Yes, sir.

11  Q.  Do you remember, Dr. Glazer, having your deposition taken

12  in this case?  I mentioned that earlier, I just wanted to

13  confirm your memory on that.

14  A.  I took two depositions.

15  Q.  Two depositions, okay.  Now I'm going to share -- hopefully

16  this will work.  I'm going to attempt to share my screen with

17  you so that we can take a look at a page from one of your

18  depositions.  If I've got the right one -- can you see that

19  page that I've just brought up?

20  A.  Yes, I do see that page.  Yes, sir.

21  Q.  Now, we're on -- you can see it says page 91, and I want to

22  take you --

23            THE COURT:  Which deposition is this?

24            MR. FISHER:  That's what I was just going to identify.

25  I'm going to go to page 1, and we'll identify it.

1  BY MR. FISHER:

2  Q.  This is a deposition from September 29th, 2019.

3  Dr. Glazer, do you remember giving that deposition?

4  A.  I remember giving both depositions.  I'm not sure which one

5  is different from the other.

6  Q.  Okay.  This one I believe was taken by my colleague

7  Ms. Payne, and I was there with her.

8  A.  I think she gave me both depositions.

9  Q.  Oh, did she?  Okay.  This would have been the one where I

10  attended as well.

11  A.  Okay.

12  Q.  Okay.  Now, I'm going to attempt to highlight some text.

13  If you can see where I drew a square around some text.

14  A.  Yes, sir, I see that.

15  Q.  And could you read that text, please, into the record.

16  A.  "You mentioned before that you watch the patient when she

17  takes the Mifeprex pill; is that correct?"  "Yes, ma'am."  "How

18  do you confirm she swallowed the pill?"  "I see them put it in

19  their -- in her mouth and swallow it.  Sometimes I'll ask if

20  they swallowed the pill, and they'll open their mouth and show

21  me it's not in their mouth."  "Why do you ask sometimes?"  "If

22  I would have thought they palmed it or something like that."

23  Q.  Doctor, does this deposition transcript refresh your

24  recollection about your suspicions about abortion patients

25  palming Mifepristone?

GLAZER – CROSS/FISHER                                    177

1   A.  Well, in the seven, eight years I've been doing it, I have

2   never seen anyone palm it.

3   Q.  But you've suggested that you would watch them swallow it

4   if you had a concern.  So you've had a concern?

5   A.  Well, I have concerns also that they are not -- I am --

6   yes, I have never seen anyone palm the pill or be deceptive

7   about taking the pill.

8   Q.  How much are you compensated for your work at the South

9   Bend Clinic?

10  A.  South Bend Clinic, $1,500 per day plus expenses.

11  Q.  How much are you compensated for your work at Women's Med

12  in Indianapolis?

13  A.  I am paid $75 per procedure.  If the procedure is more

14  advanced, I get more.  If it is to get a preop for a patient

15  for Ohio or Indiana, I am paid 25.

16  Q.  Does Women's Med reimburse your mileage to Indianapolis?

17  A.  I'm sorry, I forgot, they do not reimburse for expenses.

18  Q.  So if you could telecommute to Women's Med, that would save

19  you the out-of-pocket for the mileage?

20  A.  It would be more convenient for the patients.

21  Q.  Well, but my question is, if you could telecommute, that

22  would save you the out-of-pocket expense of driving your car to

23  Indianapolis, correct?

24  A.  Yes, it would.  That is one reason.  That is one thing that

25  would be beneficial, but mostly it would make the availability

1   of patients to have procedures days during the week and even

2   weekends.

3   Q.  Are you compensated by any other abortion providers besides

4   Women's Med and the South Bend Clinic?

5   A.  No, sir, those are the only two places I work at.

6   Q.  Are you compensated to promote the use of telemedicine

7   generally?

8   A.  No, sir.

9   Q.  Are you --

10  A.  I'm sorry.  If I may answer?

11  Q.  I apologize.

12  A.  I use telemedicine in my other practice of obstetrics and

13  gynecology in Louisville.  We use it frequently.

14  Q.  Are you compensated by the manufacturer of Mifepristone for

15  any reason?

16  A.  No, sir.

17          MR. FISHER:  Your Honor, may I take a moment?  We may

18  be just about finished here.

19          THE COURT:  Yes, you may.

20          MR. FISHER:  Thank you, Dr. Glazer.  I have no further

21  questions.

22          THE COURT:  Redirect, Miss Toti?

23          MS. TOTI:  Briefly, Your Honor.

24

25

**REDIRECT EXAMINATION**

BY MS. TOTI:

Q.  Dr. Glazer, was it your testimony on cross-examination that a patient is required to come to the clinic in order to obtain Mifepristone?

A.  At this point, the protocols of both clinics require the patient to come here to get the pills, to get the medication.

Q.  And would you change that protocol if you were providing care by telemedicine?

A.  If it could be worked out, the answer is absolutely, to make it easier for the patient to get the Mifepristone and the other medications and instructions.

Q.  And if the law continued to require a patient to go in person to pick up the medications, would you comply with that legal requirement?

A.  Of course I would.

          MS. TOTI:  Nothing further, Your Honor.

          THE COURT:  Recross?

          MR. FISHER:  Nothing further, Your Honor.  Thank you.

          THE COURT:  All right.  Dr. Glazer, thank you very much.

          Does anybody need to have him remain, subject to his subpoena, or is he free to go?  Free to go, apparently.

          MR. FISHER:  Nothing from the defense, Your Honor.

          THE COURT:  Okay.  Thank you, then.  You've discharged

1    your responsibility.  Thank you.

2              THE WITNESS:  My pleasure.  Thank you.

3              THE COURT:  Since you are a party, if you want to

4    monitor the trial, you're permitted to do that.  You don't have

5    to have any other special permission.

6              THE WITNESS:  Oh, I'm fine.  I have other -- I've got

7    other things to do.

8              THE COURT:  I know the feeling.  I know the feeling,

9    Dr. Glazer.  Your choice.

10             THE WITNESS:  My pleasure.  Thank you.

11             THE COURT:  Thank you, sir.

12             THE WITNESS:  Thank you, Your Honor.

13             THE COURT:  Okay.

14             THE WITNESS:  Bye, bye.

15             THE COURT:  Miss Toti, do we have one more quick

16   witness we can wrap up the day with?

17             MS. TOTI:  I believe Miss Sharma has the next witness,

18   Your Honor, and I think she estimated her direct would be about

19   30 minutes.

20             THE COURT:  Okay.  That's good.  Let's do that.

21             MS. SHARMA:  Your Honor, plaintiffs would like to call

22   Dr. William Mudd Martin Haskell to the stand.

23             THE COURT:  Okay.  Good afternoon to you, Miss Sharma.

24             MS. SHARMA:  Good afternoon, Judge.

25             MR. FISHER:  Your Honor, I think Miss Rahman is going

HASKELL – DIRECT/SHARMA                              181

1   to do the cross-examination.  I just want to make sure she's

2   available.  There she is.  Okay.  Then I'll sign off.  Thank

3   you.

4           THE COURT:  Okay, good.

5           Dr. Haskell, good afternoon to you, sir.  Can you hear

6   me?  I think you're muted, sir.  I think you're muted.  There

7   you are.

8           THE WITNESS:  Yes, ma'am, I can.

9           THE COURT:  All right.  Good.  Good afternoon to you.

10          THE WITNESS:  Good afternoon.

11          THE COURT:  The clerk is going to administer the oath

12  prior to your testimony, so would you raise your right hand and

13  be sworn, please.

14   WILLIAM MUDD MARTIN HASKELL, M.D., PLAINTIFFS' WITNESS, SWORN

**<u>DIRECT EXAMINATION</u>**

16          THE COURT:  All right.  Thank you very much.

17          Miss Sharma, you may ask your questions of the

18  witness.

19          MS. SHARMA:  Thank you, Your Honor.

20  BY MS. SHARMA:

21  Q.  Good afternoon, Dr. Haskell.

22      What is your current job?

23  A.  I'm the medical director in the honor of Women's Med Group

24  Professional Corporation, which operates Indianapolis --

25          THE COURT:  Wait, wait.  We didn't catch that.  You've

1    got to slow it way down because the technology garbles the

2    language, the words.

3              So you're the medical director of what?

4              THE WITNESS:  Of Women's Med Professional Corporation,

5    which operates Indianapolis Women's Center.

6              THE COURT:  All right.

7              THE WITNESS:  I'm also the owner of the corporation.

8    BY MS. SHARMA:

9    Q.  Thank you, Dr. Haskell.

10             THE COURT:  I'm sorry.  Wait.  You're the owner of it?

11             THE WITNESS:  Yes, I am.

12             THE COURT:  Okay.  Medical director and owner.  Okay.

13             Next question.

14   BY MS. SHARMA:

15   Q.  And, Dr. Haskell, you mentioned that Women's Med Group

16   Professional Corporation, which I'm going to refer to as

17   "Women's Med," operates a facility in Indianapolis.

18        Does it operate any other facilities?

19   A.  Yes, we operate a facility in Dayton, Ohio, which also

20   provides abortions.

21   Q.  And is the facility in Indianapolis a licensed abortion

22   clinic?

23   A.  Yes, it is.

24   Q.  Dr. Haskell, I'd like to begin with your professional

25   background and qualifications.  Could you please describe your

HASKELL – DIRECT/SHARMA                 183

1  education, beginning with --

2  A.  Yes.  I received my medical degree from the University of

3  Alabama in Birmingham in 1972.  I did an anesthesia internship

4  there.  I took a year off and worked in rural south Alabama,

5  the (inaudible) area, as a general practitioner.  I then came

6  to Cincinnati where I did 18 months of job surgery residency.

7  I took six months off and ran emergency rooms for six months,

8  and then I entered a family practice residency also at the

9  University of Cincinnati and completed that in about 1978, I

10 believe, and took and passed my boards in family practice at

11 that time.

12 Q.  Thank you, Dr. Haskell.

13     And where are you currently licensed to practice medicine?

14 A.  Currently in Ohio and in Indiana.

15 Q.  Have you previously held a license to practice medicine

16 anywhere else?

17 A.  Yes, in Alabama, New York, Maryland, District of Columbia,

18 Illinois, and I believe Kentucky at one point also.

19 Q.  Thank you.

20     And what professional societies do you belong to?

21 A.  Currently just the National Abortion Federation.

22 Q.  I'm going to refer to the National Abortion Federation as

23 "NAF."

24     Can you please describe what NAF is?

25 A.  Yes.  NAF is a professional organization for abortion

1   providers, individual providers like myself and also for

2   organizational providers like Women's Med Center in

3   Indianapolis.

4   Q.   And are the Women's Med clinics NAF members as well?

5   A.   Yes, they are.

6   Q.   And, Dr. Haskell, can you please describe your professional

7   experience in abortion care for me?

8   A.   Sure.  I began providing abortions in around 1978.  I've

9   been providing them ever since then.  I've written a couple of

10  papers on −− and presented papers at NAF meetings on second

11  trimester abortions.  I have performed over a hundred thousand

12  abortions personally in the course of my career and now

13  supervise the clinic in overseeing the delivery of more than

14  250,000 abortions.

15  Q.   Thank you.

16       And when you say "abortions," you're referring to both

17  medication and what is referred to as surgical abortions?

18  A.   That's correct or aspiration abortions.

19  Q.   Thank you.

20       I'd like to move on to your experience at Women's Med

21  Indianapolis, including the availability of physicians there to

22  provide abortion care.

23       How long have you operated Women's Med Indianapolis for?

24  A.   In excess of 20 years.  I don't recall the exact date.

25  Q.   And you mentioned that you're medical director.  What are

1    your responsibilities as medical director of that clinic?

2    A.  By far, the physician providers and also the nurse

3    practitioners that work there, I develop and maintain the

4    medical policies and procedures that we use, and I have overall

5    oversight of delivery of all medical services, including the

6    nursing staff.  The quality assurance comes under my purview

7    also, and peer review.

8    Q.  And, Dr. Haskell, you mentioned policies and procedures.

9    Is it your responsibility to ensure that the clinic complies

10   with law, including Indiana law?

11   A.  Yes, it is.

12   Q.  And are you responsible for ensuring that there is

13   sufficient staffing to meet patient needs?

14   A.  Yes, I am, through oversight of others that directly hire

15   the ancillary staff.

16   Q.  What services does Women's Med Indianapolis offer patients?

17   A.  Primarily abortions, surgical or aspiration abortions

18   through 13 weeks, and then medication or drug-induced abortions

19   through 70 days.  We also provide contraceptives for the women

20   who receive abortions so that they may protect themselves from

21   future pregnancy.

22   Q.  And what proportion of the abortion care offered at Women's

23   Med Indianapolis is medication abortion care?

24   A.  Approximately 40 percent, 40 to 45 percent.

25   Q.  Have you yourself provided abortion care at Women's Med

HASKELL − DIRECT/SHARMA                    186

1    Indianapolis?

2    A.  Yes, I have.

3    Q.  And when did you provide that care, what years?

4    A.  Well, starting when we acquired the facility, you know, up

5    through up until about two years ago when I had a severe

6    rotator cuff injury, and I retired from performing surgery at

7    all.

8          THE COURT:  Wait.  The court reporter did not get that

9    answer, so would you repeat it, please?

10         THE WITNESS:  Sure.

11   A.  I began providing services there when we acquired the

12   facility up until about two years ago when I had a severe

13   rotator cuff injury, and I stopped performing surgery

14   altogether.

15       Typically −− go ahead.

16   BY MS. SHARMA:

17   Q.  I'm sorry, Dr. Haskell.  Go ahead.

18   A.  I was just going to say, typically, I would travel to

19   Indianapolis one day a week, and we had other physicians that

20   worked there also.  So sometimes it would be every other week.

21   Sometimes it would be once a month.  But pretty much

22   continuously I had a presence there over the time that we owned

23   and operated that facility.

24   Q.  And when you retired a couple of years ago, was anyone

25   providing abortion care at Women's Med Indianapolis?

1  A.  Yes.

2  Q.  And how frequently were they providing abortion care there?

3  A.  Two days a week, Thursday afternoon and all day on Friday.

4  Q.  Okay.  And who was providing that abortion care at that

5  time?

6  A.  That's Dr. Jeffrey Glazer.

7  Q.  Okay.  And how frequently did Dr. Glazer provide abortion

8  care at Women's Med Indianapolis from 2018 to 2020?

9  A.  On the schedule that I just described, he would go there

10  weekly for a Thursday afternoon session and a Friday session

11  when he had vacations.

12  Q.  And how frequently does he provide at that clinic

13  currently?

14  A.  Currently, he's working just Fridays.  He has asked to slow

15  down, and we found another physician to fill that gap.

16  Q.  And Dr. Glazer isn't a local physician, is he?

17  A.  No, he is not.

18  Q.  Okay.  And Women's Med Indianapolis isn't the only place he

19  works?

20  A.  My understanding is that he works up in South Bend maybe

21  once a month.  He also has other -- another job in Louisville.

22  Q.  And, Dr. Haskell, you mentioned that the clinic hired

23  another physician.  I'm going to ask that we refer to that

24  physician just with the first letter of her last name.

25  A.  Okay.

HASKELL - DIRECT/SHARMA                    188

1    Q.  So just using that, can you describe how frequently that

2    physician provides abortion care at Women's Med currently?

3            THE COURT:  Well, what's the initial we're using?

4            Wait just a minute, Dr. Haskell.

5            What's the initial?  You said we're going to refer to

6    her by an initial.  What is it?

7    by MS. SHARMA:

8    Q.  What is it, Dr. Haskell?

9    A.  D.

10           THE COURT:  D, all right.

11           THE WITNESS:  D as in David.

12           THE COURT:  Now tell us about Dr. D, Dr. Haskell.

13           THE WITNESS:  Okay.

14   A.  Well, Dr. D works on Wednesdays providing abortion

15   services, you know, through what I previously described.

16   BY MS. SHARMA:

17   Q.  And is Women's Med Indianapolis the only place she works?

18   A.  No.  She has employment elsewhere not providing abortions.

19   Q.  Has Women's Med Indianapolis considered hiring another

20   local physician?

21   A.  We have been looking into it, yes.

22   Q.  And why hasn't it hired anyone yet other than Dr. D?

23   A.  In part, because it's taken some time to find someone

24   that's available and willing, and, in part, it's, you know,

25   having the need to add additional time on our schedule.

1  Q.  Why has it been difficult to find someone willing to

2  provide at Women's Med Indianapolis?

3  A.  Well, physicians in private practice are concerned about

4  the picketing that we have, which is very intense, and whether

5  they would follow them to their office and then picket at the

6  private offices and disrupt their private practice, where Dr. D

7  works at a large institution where her practice is hidden

8  within the walls of that institution and which is why she's

9  willing.

10  Q.  Understood.  I have a few general questions for you about

11  your patients.  Does Women's Med track information about its

12  patients?

13  A.  Yes, we do.

14  Q.  And what kind of information do you track?

15  A.  Well, of course, the medical record, and that medical

16  record contains demographic information.  We track on a

17  statistical basis, you know, the number of patients that we

18  see, the type of service that they receive and, you know,

19  whether or not there are any complications.

20  Q.  And do you track where your patients are coming from,

21  meaning --

22  A.  Yes.

23  Q.  -- you know, where they reside?

24  A.  Yes, we have their zip codes.  So we're on electronic

25  medical records.  So this is all computerized.  So we have the

HASKELL – DIRECT/SHARMA                    190

1   ability to sort on zip codes and see where our patients are

2   coming from by zip code.

3   Q.  And do you do this in the normal course of business?

4   A.  We have.  We're not doing it as much currently, but we have

5   in the past.

6   Q.  And how often do you treat patients who live outside of the

7   Indianapolis area?

8   A.  Regularly, every week.

9   Q.  And how far have patients traveled to reach Women's Med

10  Indianapolis?

11  A.  Well, virtually practically from all over the state of

12  Indiana.  We've got patients from southern Indiana, either

13  coming to us in Indianapolis or eastern Indiana, depends on

14  whether Indianapolis is closer or Dayton is closer, patients

15  from South Bend.  We don't get as many from Fort Wayne.  I

16  think -- yeah, we don't get as many from Fort Wayne.  But we've

17  basically come from all over the state and points in between

18  the corners that I've laid out.

19  Q.  And what proportion of your patients have insurance

20  coverage for abortion?

21  A.  None of them do.

22  Q.  How often does Women's Med Indianapolis treat patients who

23  are low income?

24  A.  Regularly.

25  Q.  And, Dr. Haskell, do you use a particular definition for

1  low income patients, or is there a way that you measure that?

2  A.  Yes.  We use criteria of 110 percent federal poverty level

3  per household, and the reason for that is that the National

4  Abortion Federation has funds to assist patients that are in

5  households below that threshold.

6  Q.  And how often does Women's Med Indianapolis treat patients

7  who have small children?

8  A.  Regularly.

9  Q.  Are patients allowed to bring their children with them to

10  their abortion appointments?

11  A.  No, and particularly, we don't allow any guests.

12  Q.  And even before COVID, what instructions do staff give

13  patients about small children?

14  A.  That they have to leave them at home or in the care of

15  someone, that we don't have the facility or the staff to

16  monitor and watch out after small children.

17  Q.  I'd like to turn to the process of obtaining a medication

18  abortion from Women's Med Indianapolis in telemedicine.

19      Currently how many visits must a medication abortion

20  patient make to Women's Med Indianapolis to complete her

21  abortion?

22  A.  Two visits, one for the abortion -- or informed consent

23  visit, and then she has to return to receive the medication.

24  Q.  Can you walk us through what Women's Med Indianapolis

25  requires during the first visit for a medication abortion?

HASKELL - DIRECT/SHARMA                    192

A.   Sure.  We perform some lab work, the hemoglobin and Rh, Rh

factor.  We perform an ultrasound to determine the length of

the gestation, and the patient is required by Indiana law to

view that ultrasound and also take fetal heart tone sounds.

We, then, put them with a nurse practitioner who reviews their

medical history with them, who provides the state-mandated

booklet to the patient and goes over the consent forms that the

state of Indiana requires us to use, as well as our own consent

form, and then she provides her the information required by

state law, and that's to be provided both verbally and wrote.

We provide them with a picture or a drawing of the fetus at the

stage of development that that women is in her pregnancy.

Q.   And, Dr. Haskell, you mentioned an ultrasound.  What types

of ultrasounds do you perform on your patient?

A.   Well, there's a vaginal probe and abdominal --

          THE COURT:  Wait, wait, hold on.  Wait, Mr. Haskell --

Dr. Haskell, sorry.  Hold on a minute.  The court reporter

needs to have you say that more slowly.  I heard you say a

vaginal ultrasound.  So start your --

          THE WITNESS:  Vaginal --

          THE COURT:  Start your -- wait just a minute, wait

just a minute.  You're testifying as to the kinds of

ultrasounds, so start there, and just slow it down a little

bit.

          THE WITNESS:  The types of ultrasounds that we perform

HASKELL – DIRECT/SHARMA                193

are vaginal probes and abdominal.  Most of them are vaginal

probe because of the patients being early in their pregnancy.

We only use abdominal probes starting at about 12 weeks and up.

BY MS. SHARMA:

Q.  Does Women's Med Indianapolis screen for external pressure

to terminate a pregnancy?

A.  Yes, we do.

Q.  And on what visit does that happen?

A.  That happens on the first visit.  That's part of the nurse

practitioner's duty, is to verify that she's making her

decision of her own free well, and we've also had training and

signs to look for of human trafficking.  So we screen for human

trafficking.

Q.  And how do the nurse practitioners screen for external

pressure to terminate a pregnancy?  What does that involve?

A.  Well, basically ask.  It involves asking the patient in a

calm and nondirected manner whether she feels as if she's being

pressured, and is anybody, you know, forcing her to make the

decision.  We'll look for signs that the patient is, is

hesitant about answering or in some way indicates that she

finds the question uncomfortable, and then, she'll probe

further.

Q.  And what does Women's Med Indianapolis require the nurse

practitioner to do if an abortion patient seems uncertain of

her decision?

HASKELL - DIRECT/SHARMA                    194

A.  Well, she will counsel her about some options, including an

option just to go home and think about it.  If she's concerned

about abuse or trafficking, she can refer her to a shelter.  If

she confirms trafficking, we'll call the Indianapolis Police

Department to come and talk with her.  So what we try to do is

remove as much of the -- given what the patients face, to be

able to assert herself, encourage her to do so.

Q.  And Dr. Haskell, you mentioned state-mandated disclosures.

Are you aware that Indiana law requires those disclosures to

happen in person?

A.  Yes, I am.

Q.  Okay.  As a matter of clinical policy, would you require

the nurse practitioner to provide the disclosures in person

even if Indiana law didn't require that?

A.  Not necessarily, or they could be done on the day of the

procedure.  They wouldn't have to be done 18 hours in advance.

Q.  So assuming they did need to be done 18 hours in advance,

if Indiana law didn't require the disclosures to happen in

person, would you still require them to happen in person at

your clinic?

A.  No.  We had that situation in Ohio, and we did it over the

phone.

Q.  And why wouldn't you require the disclosures to happen in

person if the law didn't require them to happen in person?

A.  Because there is really no need for the patient to come in

HASKELL - DIRECT/SHARMA                    195

1    for a second visit.  You know, they can be provided just as

2    easily, you know, over the phone or by videoconference as we're

3    doing now.

4    Q.  And in that case, how would the nurse practitioner provide

5    abortion patients state-mandated materials?  You mentioned

6    forms, I think?

7    A.  Correct, the state-mandated booklet and the various consent

8    forms.  They can be provided to the patient by e-mail.  They

9    can be provided by fax.  You know, they could even be provided

10   to their cell phone where they could, you know, later be

11   printed out.  So there's a number of ways of delivering them

12   quickly and expeditiously.

13   Q.  And you mentioned that currently lab work occurs on Day 1

14   of a medication abortion patient's visit.  How long does it

15   take to get the lab results?

16   A.  Those are instantaneous, and there's some tests right now

17   we send out, but we get those in 24 hours, or we're getting to

18   revert back to doing them in-house.

19   Q.  Could the lab work happen on Day 2 of a medication abortion

20   patient's visit?

21   A.  Absolutely.

22   Q.  And what would Women's Med Indianapolis require a nurse

23   practitioner to do if the patient seemed uncertain of her

24   decision but the counseling was happening over video

25   technology?

1    A.  The same sort of, you know, direction or suggestion about

2    patient having options, and not feel pressured and to assert

3    herself.

4    Q.  Could you walk us through what currently happens on Day 2

5    of a medication abortion patient's visit?

6    A.  Yes.  The patient, you know, comes to our office, she's put

7    into a physician's office.  The physician sits down with her,

8    takes the medications out of the packet, reviews the

9    medications with them, the purpose of each one, when to take

10   each one, provides her with the FDA-approved brochure for the

11   medication abortion, and provides her with our own quick list,

12   if you will, of the sequence to take the medications, ask her

13   if she has some questions, responds to any questions that she

14   has.  He hands her the Mifeprex, M-I-F-E-P-R-E-X to take.  He

15   hands it to her, watches her take it; and then, the patient

16   leaves with her medications to complete taking them at home in

17   24 to 48 hours.

18   Q.  And does the physician abortion provider receive the

19   patient's medical history?

20   A.  Yes.  As I mentioned earlier, we are on electronic medical

21   record, so when he sits down with a patient, he opens that

22   patient's medical record and would use the history and any

23   notes that the nurse practitioner may have made.

24   Q.  And does the physician -- is the physician the one to

25   determine whether a patient is eligible for a medication

1 abortion?

2 A.  Ultimately, but the nurse practitioners also do that

3 screening initially.  So the physician's role is just double

4 checking that he feels it is still appropriate for the patient

5 to take the medication abortion.  I can't recall if we have

6 ever denied a patient a medication abortion since we've been

7 doing them.

8 Q.  And is the clinic concerned about contraindications to

9 medication abortion for patients?

10 A.  We are because contraindications are few and very rare.  I

11 don't believe we've ever refused a medication abortion to any

12 patient.

13        MS. RAHMAN:  Your Honor, I'm going to object to this

14 line of testimony as improper expert testimony.

15        Right now, Dr. Haskell is testifying about

16 contraindications, medical necessity.  These are things that

17 aren't necessarily aligned with the medical profession –– a

18 medical doctor's expertise, and Dr. Haskell is not called as an

19 expert witness.  He was not disclosed as an expert witness.  He

20 is solely testifying as a lay witness.

21        THE COURT:  Do you want to respond, Miss Sharma?

22        MS. SHARMA:  Yes, Your Honor.  Dr. Haskell is not an

23 expert witness.  What I'm trying to elicit is just the practice

24 and policy at Women's Med Indianapolis concerning these things,

25 not the medical basis of contraindications or medical

1    knowledge, just what the clinic requires of its staff with

2    respect to the procedure around medication abortion; and

3    Dr. Haskell is the one who determines that at his clinic.

4          THE COURT:  That's how I understand his testimony, and

5    that's the way I'll treat it.  So I overrule the objection.

6          MS. SHARMA:  Thank you, Your Honor.

7    BY MS. SHARMA:

8    Q.  So Dr. Haskell, could you please clarify how the -- what

9    Women's Med Indianapolis requires to screen for

10   contraindications?

11   A.  Well -- go ahead.

12   Q.  I mean what your staff are required to do to screen for

13   contraindications.

14   A.  Well, the main ones are, are they allergic to any of the

15   medications that are being provided.

16      We want to be sure that the pregnancy is in the uterus and

17   not somewhere outside the uterus.  That would be confirmed by

18   the ultrasound.

19      Those are the primary contraindications.  Those are the

20   ones I can recall off the top of my head.

21   Q.  How do they determine -- go ahead.

22   A.  Well, the allergy question would be answered by the medical

23   history.  The ultrasound, like I said, would determine that the

24   pregnancy is in the uterus.  Mifeprex is contraindicated in an

25   ectopic pregnancy, for instance.

1  Q.  Would you require the physician to treat the medication

2  abortion patient in person even if Indiana law permitted

3  telemedicine abortion?

4  A.  Required to do it in person, no.

5  Q.  And what if a patient has an abnormality or personal fault

6  issue?

7  A.  Well, that would be revealed from their medical records.

8  Q.  And so would you require the physician to treat the patient

9  in person in that situation or could the patient still obtain

10  medication abortion without the physician being in person at

11  the clinic?

12       MS. RAHMAN:  Your Honor, respectfully, I'm going to

13  object again.  I believe we are still going into the way of

14  expert testimony about medical necessity.  Before, personal

15  medical history was brought up, contraindications and so forth.

16  I believe this goes do expert testimony, and Dr. Haskell is a

17  lay witness.

18       THE COURT:  I hear it as testimony with respect to

19  Women's Med, his role as the medical director, what he tells

20  his staff, and what he does there.  I'm not going to

21  extrapolate from that in the area that you're concerned about.

22  The objection's overruled.

23       MS. RAHMAN:  Okay.

24       MS. SHARMA:  Thank you, Your Honor.

25

BY MS. SHARMA:

Q.  So Dr. Haskell, just to be clear, I was asking you if Indiana law permitted the dispensation of medication abortion by telemedicine, would you as director of the clinic ever require physicians to provide it in person at the clinic?

A.  There wouldn't be a need to, so no.  All the information that we would need to make that determination would be contained in the electronic record that can be accessed remotely through videoconference and some other means.  The physician would have the opportunity to query the patient further if that were needed.  So there's really no advantage to being present in person with the patient.

Q.  If Indiana law permitted it, would Women's Med Indianapolis be willing to provide the state-mandated counseling through video technology?

A.  Yes, we would.

Q.  And why is that?

A.  Well, because it's a very effective way of communicating. It uses fewer resources than having the patients come into the facility.  It's more convenient for the patient to not have to make two trips.  So there are a number of advantages for us and for the patient and being able to do some parts of the provision of that service remotely.

Q.  And if Indiana law permitted it, would Women's Med Indianapolis be willing to have physicians counsel and dispense

1   medication abortion to eligible patients using video

2   technology?

3   A.   Yes.

4   Q.   And why is that?

5   A.   Well, again, because it's going to be -- it will give us

6   the opportunity to provide the service more frequently, which

7   would be a convenience for the patient.  Right now, we're only

8   available to provide services two days a week because one of

9   our physicians has to travel a great distance, and the other

10  physician has limited in-person availability; but by

11  videoconference, we could dispense the medication by remote

12  conference like we are doing now and instruct the nurse to hand

13  the patient the medication.

14  Q.   If Women's Med Indianapolis were legally able to provide

15  telemedicine abortion, how would you have staff respond to a

16  medication abortion patient who is unable or unwilling to use

17  video technology?

18  A.   Well, we'd have to look at each individual circumstance

19  because certainly, to do it by phone, we used to do that, like

20  I said, in Ohio, at one point; and it was very effective then.

21  I see no reason why it wouldn't be as effective now.

22  Q.   Would you permit patients who wanted to come in to come in

23  for both -- for any visits regarding a medication abortion?

24  A.   Absolutely.

25  Q.   If Women's Med Indianapolis were legally able to provide

1    telemedicine abortion, how would you have staff respond to any

2    major technical difficulties during a telemedicine appointment?

3    A.  Well, if the appointment could be deferred or reestablished

4    at a later time, whether that's minutes or hours or even a day,

5    it's -- you know, technology sometimes gives us problems; but

6    we always seem to find solutions to those problems and move

7    forward.

8    Q.  And what if the technical difficulties couldn't be resolved

9    promptly?

10   A.  Well, we would reschedule with the patient over the phone

11   for another day and complete the visit over the phone.

12   Q.  And would patients be able to come into the clinic in that

13   situation if the video technology wasn't working?

14   A.  Absolutely, yes.

15   Q.  Dr. Haskell, I just had a few more questions for you about

16   ultrasounds.

17       If Indiana law permitted it, would Women's Med Indianapolis

18   rely on an ultrasound exam performed by a referring physician

19   to determine the gestational age of an abortion patient's

20   pregnancy?

21   A.  Yes.

22   Q.  And why is that?  Why would you be willing to rely on

23   another provider's ultrasound exam?

24   A.  Well, that physician is using the same ultrasound

25   examinations in his own practice.  So he -- he's relying on

1    that to the same extent that we would be relying on it.

2    His professional credentials are dependent upon him performing

3    the reliable ultrasounds.

4    Q.  And what impact would the clinic's ability to rely on

5    another provider's ultrasound exam have on your patients?

6    A.  It could make it easier for them in terms of not having to

7    travel as much, not having to undergo a second vaginal probe

8    ultrasound.

9    Q.  And if a patient lived outside of Indianapolis, as you

10   testified that many of your patients do, would Women's Med

11   refer her to a local provider to have an ultrasound?

12   A.  We certainly could, and it could be her own OB/GYN or

13   family practice physician; or we could develop a directory of

14   physicians who would perform that service.

15   Q.  Just one more question for you.  Could Women's Med open

16   satellite locations that would provide information sessions and

17   ultrasounds to pregnant women?

18   A.  We could, but it's not economically feasible to do so.

19   Q.  Can you explain that?  Can you elaborate on that, please?

20   A.  Sure.  So we would have to have a facility where we could

21   perform the service.  We would have to staff that facility.

22   We're able to see the patients for a screening now with the

23   facility that we have.  So there would be a lot of duplication

24   without commensurate increase in the number of patients, at

25   least not enough to offset those additional expenses.

1      MS. SHARMA:  Thank you, Dr. Haskell.

2      No further questions on direct, Your Honor.

3      THE COURT:  All right.  Thank you.

4      Miss Rahman, cross-examine.

5                    **CROSS EXAMINATION**

6  BY MS. SHARMA:

7  Q.  Dr. Haskell, you mentioned it's not worth opening a second

8  clinic; and you said because there wouldn't be enough patients

9  to make it worthwhile; is that correct?

10 A.  Well, she's talking about there being multiple satellites.

11 She didn't say a clinic.  She said to perform ultrasounds, and

12 so what would be happening is you would be -- we would be

13 spreading ourselves thin trying to operate in numerous

14 locations.  Let's say if we opened a second location, we would

15 want to see double the number of patients we're seeing now to

16 make that second location worthwhile.  Otherwise, it wouldn't

17 be possible.  It would be losing money all the time.  We are a

18 private office.  We don't have donors that support us when

19 things aren't going well.

20 BY MS. RAHMAN:

21 Q.  Okay.  Thank you.  Just so I can understand from your

22 testimony about telecommuting, is it your contention that if

23 abortion doctors at Women's Med Clinic were allowed to use

24 telehealth appointments, then your clinic would be able to

25 provide more abortion appointments?

HASKELL, M.D. - CROSS/RAHMAN                    205

A.  Potentially, we could because it would make it easier for

them to access our services without making two trips.  So if we

can do part of that remotely, that would reduce the burden on

the patient; and I think it would increase the number of

patients that we could serve.

Q.  Can you quantify how many more appointments for abortion

would Women's Med be able to offer if there wasn't this

in-person requirement?

A.  There's no way of quantifying that without actually doing

an experiment to find out.

Q.  Okay.  So you have not done any kind of analysis on this?

A.  Well, we can't because we can't do telehealth to see if it

works or not in terms of increasing, you know, the access for

patients.

Q.  Okay.

        MS. RAHMAN:  Let me -- if I could for a moment, Your

Honor, I'd like to confer with my colleague to see if I have

any more questions.

        THE COURT:  You may.

            (Off-the-record discussion was held.)

        MS. RAHMAN:  I think that's all the questions I have,

Your Honor.

        THE COURT:  Okay.  Thank you very much.

        Any redirect, Miss Sharma?

        MS. SHARMA:  Yes, Your Honor.  I have just a couple of

*HASKELL, M.D. - RECROSS/RAHMAN*                    206

1    questions.

## **REDIRECT EXAMINATION**

3    BY MS. SHARMA:

4    Q.  Dr. Haskell, would you just clarify for the record what you

5    meant by "satellite offices," what services those would provide

6    when you were talking about locations being economically

7    unfeasible?

8    A.  Sure, the scenario that you presented to me, as I

9    understood it, was opening a small satellite solely for the

10   purpose of providing the preoperative ultrasound and maybe

11   preabortion ultrasound, and possibly informed concept.  So

12   staffing those offices or satellites and equipping them is

13   added overhead, much more overhead than what we would normally

14   expect to get in terms of increase in patients.

15   Q.  And just one more question.  If Indiana allowed physicians

16   to provide medication abortion remotely, what impact would that

17   have on your patients?

18   A.  Gives them a lot more options when they can come to us for

19   the actual service.  We would be able to provide that service

20   five days a week instead of two days a week.

21          MS. SHARMA:  Thank you.  Your Honor, nothing further.

22          THE COURT:  Recross, Miss Rahman?

23          MS. RAHMAN:  Yes.

24          THE COURT:  You may ask.

25

1                        **RECROSS-EXAMINATION**

2    BY MS. RAHMAN:

3    Q.  So Dr. Haskell, before I asked you about an increase in

4    abortion appointments; and you said you didn't really have an

5    answer; and now what I'm understanding from Miss Sharma is that

6    you said you would be able to increase the number of days you

7    could provide a medication abortion up to five days a week; is

8    that correct?

9    A.  That's correct.

10   Q.  Can you explain how you reached that number of additional

11   days that appointments could being provided?

12   A.  Oh, sure.  That's easy.  The office is open five days a

13   week.  We only have physicians present in that office two days

14   a week.  If -- for instance, if I could call in remotely on a

15   videoconference for a secure -- we have what's called a VPN or

16   virtual private network between our various locations,

17   including the business office where I work or where I am now,

18   I'm at my winter home in Florida.  I could just as easily call

19   into the office over the same video link that we're using on a

20   private secure network and interview the patient, just as

21   you're interviewing me right now, and instruct the nurse to

22   provide the medication to the patient.

23   Q.  Okay.  So just to understand, are you suggesting that just

24   yourself would then provide these additional appointments other

25   days of the week or would there be other physicians that would

1  do this as well?

2  A.  Well, we could do it with any physician with whom we would

3  set up this virtual private network and provide them with the

4  terminal at their location, whether it's at an office or at

5  their home on a day off.  I think Dr. D doesn't work full time

6  at her other job, so I think she has days that she could be

7  available for several hours a day.  We're not talking about

8  needing to be there full time, but if we would be able to offer

9  medical services for a couple of hours a day on the days that

10  we don't have a physician present, we could have the capacity

11  to assist a number of patients in that way.

12  Q.  Okay.  So just to clarify, you're suggesting that at least

13  Dr. D would be available for providing additional appointments

14  additional days?

15  A.  At least Dr. D and myself and possibly Dr. Glazer.  It

16  depends on their availability and other commitments and where

17  we can set up the video links and provide them access to a

18  medical record.

19  Q.  And you have confirmed with these other doctors that they

20  would be available so that you can truly provide abortion

21  appointments five days a week?

22  A.  No, I haven't because it's a moot point as long as the laws

23  are in place.

24  Q.  So is it technically possible that Dr. Glazer or Dr. D may

25  not be able to provide appointments five days a week like you

1    suggested?

2    A.  You said "technically."  What do you mean by technically?

3              THE COURT:  And what does the word "possible" mean,

4    Counsel?  Anything's possible.  Let's get to something more

5    specific.  I heard him just saying that with a change in the

6    systems, there could be an increase in services provided, so I

7    don't think we need to speculate about whether Dr. Glazer would

8    do them or he would do them or whatever.  He's talking -- I

9    understand the testimony to be systemic.

10             MS. RAHMAN:  That's fine, Your Honor.  I was just

11   wanting to clarify, but I don't need to press it any further.

12             THE COURT:  Is that all then?

13             MS. RAHMAN:  Yes, that's the last of my questions.

14   Thank you.

15             THE COURT:  Any re-redirect, Ms. Sharma?

16             MS. SHARMA:  No, Your Honor.  Thank you.

17             THE COURT:  All right.  And can Dr. Haskell be

18   excused?

19             MS. SHARMA:  Yes, Your Honor.

20             THE COURT:  Okay.  Thank you, Doctor.  You performed

21   your anticipated and expected service here, and so you're

22   excused from your -- anything further.  Thank you very much.

23                        (Witness excused.)

24             THE WITNESS:  Thank you very much, Your Honor.  It's

25   been a pleasure being in your court.

1      THE COURT:  Come see it in real life sometime.  It is

2  a pretty special place.  I don't know if you've seen it,

3  Dr. Haskell.

4      THE WITNESS:  I have not.  Not in Indianapolis.  And

5  I'm curious about the picture behind you.  All I can see is the

6  lower edge of the robe and the feet.

7      THE COURT:  While I still have you and we're just

8  bantering, I want to know if you're part of the famous American

9  history Mudd Klan.

10      THE WITNESS:  Distantly.  Not a direct descendent but

11  a collateral descendent.  You know, I don't want to get into

12  the politics of it.  Some think he was, you know, falsely

13  accused, but when he was (indiscernible), he provided a great

14  service there.

15      THE COURT:  Right.  Well, it's a name we all recognize

16  in American history, so don't be shy about it or defensive.

17      THE WITNESS:  Thank you, Your Honor.

18      THE COURT:  All right.  I think we'll wrap it up.

19  It's 5:33 approximately.  We'll start again in the morning at

20  9:30.  Is Dr. Grossman going to be your first witness,

21  Ms. Sharma?

22      MS. SHARMA:  I believe so, Your Honor.  But I would

23  just like to confer.  Yes, he will be our first witness.

24      THE COURT:  He's the next on your list.  I bet

25  Ms. Singh knows.  Is that right?  Is Dr. Grossman next up?

1          MS. SINGH:  Yes, Your Honor, he is.

2          THE COURT:  And are you still intending to call four

3    witnesses tomorrow?

4          MS. SINGH:  Yes, Your Honor, we are.

5          THE COURT:  Okay.  We'll go clip, clip, clip through

6    them.  You've done well.  You have had them right ready to go

7    and marched through your questions, all of you, including the

8    AG lawyers as well.  So that's good.  We're making good

9    progress.  Okay.  Rest up tonight.  We'll see you all at

10   9:30 in the morning.  We'll be testing the systems a little

11   before that, so you might want to click in somehow to make sure

12   that we can hear you and you can hear us.  That will be prudent

13   I think.  Okay?  Good night for now.

14         MS. SHARMA:  Thank you, Your Honor.

15              (Court adjourned at 5:35 p.m.)

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF COURT REPORTER


        I, Laura Howie-Walters, hereby certify that the foregoing is a true and correct transcript from reported proceedings in the above-entitled matter.



/S/LAURA HOWIE-WALTERS   March 15th 2021

LAURA HOWIE-WALTERS, FCRR, RPR, CSR
Official Court Reporter
Southern District of Indiana
Indianapolis Division