UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


WHOLE WOMAN'S HEALTH ALLIANCE,    )
ET AL,                            )
                                  )
            Plaintiff,            ) CAUSE NO.:
                                  ) 1:18-cv-01904-SEB/MJD
                                  ) Indianapolis, Indiana
        -v-                       ) March 16 ,2021
                                  ) VOLUME II
TODD ROKITA, ATTORNEY GENERAL     )
OF THE STATE OF INDIANA, IN HIS   )
OFFICIAL CAPACITY, ET AL,         )
                                  )
            Defendants.           )


Before the Honorable
SARAH EVANS BARKER, JUDGE




OFFICIAL REPORTER'S TRANSCRIPT OF
ZOOM VIRTUAL BENCH TRIAL



Court Reporter:                Laura Howie-Walters, FCRR/RPR/CSR
                               Official Court Reporter
                               United States District Court
                               Room 217
                               46 East Ohio Street
                               Indianapolis, Indiana  46204


PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT PRODUCED BY ECLIPSE NT COMPUTER-AIDED TRANSCRIPTION

A P P E A R A N C E S

For Plaintiffs:                 Dipti Singh, Esq.
                                Sneha Shaw, Esq.
                                Rupali Sharma, Esq.
                                LAWYERING PROJECT
                                3371 Glendale Blvd. #320
                                Los Angeles, CA  90039-1825


For Defendants:                 Christopher Bartolomucci, Esq.
                                Joshua Prince, Esq.
                                Julie Payne, Esq.
                                INDIANA ATTORNEY GENERAL
                                302 West Washington Street
                                Indiana Government Center South
                                Fifth Floor
                                Indianapolis, IN  46204

# I N D E X

**PLAINTIFFS' WITNESSES**                                      **PAGE**


DR. DANIEL GROSSMAN
Direct Examination by Ms. Singh .................5
Cross-examination by Mr. Bartolomucci .........109
Redirect examination by Ms. Singh ............143
Recross-examination by Mr. Bartolomucci .......154


DIANA ROMERO, Ph.D.
Direct Examination by Ms. Shah ...............157
Cross-examination by Mr. Prince ...............178
Redirect examination by Ms. Shah  ............183


GRACE HUTSON
Direct Examination by Ms. Shah  ..............185

1                          (Open court.)

2              THE COURT:  Good morning, all.

3              MS. SINGH:  Good morning.

4              THE COURT:  Do I have pictures of who's going to be on

5    the broadcast?  I'm just seeing myself, which is not a place

6    for anybody to start.  Okay.  Hang on just a minute, everyone.

7    Now, good morning again.  Do you hear me?

8              MS. SINGH:  Good morning, Your Honor.  Yes.  Good

9    morning.

10             MR. BARTOLOMUCCI:  Good morning.

11             THE COURT:  Good morning to you.  We had to change

12   locations.  We had a collapse of the computer system overnight

13   in our other courtroom.  So that's why there's a little delay.

14   We had to transfer everything to another courtroom but we're up

15   and running, and this seems to be a more sophisticated system,

16   in any event.  So I hope you had a restful evening and you're

17   ready to go this morning.  Right?

18             MS. SINGH:  We are ready to go, Your Honor.

19             MR. BARTOLOMUCCI:  Yes.  Thank you, Your Honor.

20             COURT CLERK:  All right.  Miss Singh, will you please

21   call your next witness?

22             MS. SINGH:  Yes, Your Honor.  Plaintiffs call

23   Dr. Daniel Grossman.

24             THE COURT:  All right.

25             Good morning, Dr. Grossman.

1          THE WITNESS:  Good morning.

2          THE COURT:  I need to ask you to be sworn, please.

3    The clerk will administer the oath.  Would you raise your right

4    hand and be sworn?

5          DR. DANIEL GROSSMAN, PLAINTIFFS' WITNESS, SWORN

6                    **DIRECT EXAMINATION**

7          THE COURT:  Thank you.  You may begin your

8    questioning.

9          MS. SINGH:  Thank you, Your Honor.  Good morning,

10   Dr. Grossman.

11   A.  Good morning.

12   BY MS. SINGH:

13   Q.  I'd like to turn your attention first to the binder that's

14   marked stipulated exhibits, tab -- stipulated tab S as in Sam,

15   E as in Edward, 10.

16         THE COURT:  Okay.  Good.  You're going to put it on

17   the screen so I don't have to search for paper, right?

18         MS. SINGH:  Yes, Your Honor.  We'll put every document

19   on the screen.

20   BY MS. SINGH:

21   Q.  And I'll just ask, Dr. Grossman, that you take a look at

22   that document before I ask you questions.

23   A.  Yes, I see it.

24   BY MS. SINGH:

25   Q.  Do you recognize stipulated exhibit SE10?

1    A.  I do.

2    Q.  What is it?

3    A.  This is a copy of my recent CV.

4    Q.  Did you provide this CV as part of your supplemental expert

5    report in this case?

6    A.  I did.

7    Q.  Is this a true and accurate summary of your education,

8    professional credentials, and work experience?

9    A.  Yes.

10   Q.  Does it provide a complete and accurate list of your

11   publications?

12   A.  It was accurate and complete at the time I submitted it,

13   but I've had a few publications since then.

14   Q.  When was your CV last updated?  Approximately.

15   A.  I'm sorry.  In terms of the one that I submitted with my

16   report or --

17   Q.  Yes.  Yes, Dr. Grossman.

18   A.  In December.

19   Q.  Okay.  And please describe in detail your educational

20   background and medical training.

21   A.  I received an undergraduate bachelor's of science.

22           THE COURT:  If it's covered on the CV, won't that

23   speak for itself?

24           MS. SINGH:  Yes, Your Honor.  I can move on then.

25           THE COURT:  Not that I'm not impressed but I'll read

1  it off the CV.

2            MS. SINGH:  That sounds great.  I'm done with that

3  document then.

4  BY MS. SINGH:

5  Q.  Okay.  Just briefly, Dr. Grossman, what is your profession?

6  A.  I'm an obstetrician-gynecologist and a public health

7  researcher.

8  Q.  And how long have you been an obstetrician-gynecologist?

9  A.  I completed my residency in 1998.

10  Q.  Where are you licensed to practice medicine?

11  A.  In California.

12  Q.  Where are you currently practicing as an

13  obstetrician-gynecologist?

14  A.  I'm a professor at the University of California-San

15  Francisco and I provide clinical care at San Francisco General

16  Hospital.

17  Q.  Please describe your current clinical practice.

18  A.  My current practice is focused on outpatient obstetrics and

19  gynecology, primarily gynecology, including family planning,

20  and abortion care.

21  Q.  Can you describe the scope of your obstetrics practice

22  during the course of your career?

23  A.  I provided prenatal care.  I provided inpatient obstetrics

24  care, worked on labor and delivery, and deliveries.  I perform

25  surgeries.  I provide -- worked doing night call.  I stopped

1    doing inpatient OB/GYN in about 2012.

2    Q.   Do you provide miscarriage management care?

3    A.   I do.

4    Q.   What kind of miscarriage management care do you provide?

5    A.   Provide all options, including offering patients expected

6    management, treatment with medication, and vacuum aspiration.

7    Q.   Do you provide abortions?

8    A.   I do.

9    Q.   Where do you provide abortions?

10   A.   At San Francisco General Hospital.

11   Q.   Have you provided abortion care elsewhere in your career?

12   A.   Yes, I have.

13   Q.   Where?

14   A.   With Planned Parenthood.  When I was at -- worked at

15   St. Luke's Women's Center, I also provided abortion care.

16              THE COURT:  Where was St. Luke's?

17              THE WITNESS:  I'm sorry?  In San Francisco.

18              THE COURT:  Okay.

19   BY MS. SINGH:

20   Q.   And what kind of abortion care have you provided?

21   A.   Medication abortion, first trimester vacuum aspiration

22   abortion, and dilation and evacuation, as well as second

23   trimester induction termination.

24   Q.   How long have you provided abortions?

25   A.   It was an integral part of my training during residency

1   between 1994 to 1998; and then since then, I provided...

2   Q.   You also teach; is that right?

3   A.   Yes.

4   Q.   Please tell us about your teaching responsibilities.

5   A.   Currently as a professor at UCSF, I work with students,

6   residents, and fellows in the clinical settings where I work.

7   So I'm teaching.  I've been training them about the clinical

8   scenarios that we're seeing, and also give short didactic

9   lectures in the context of those clinical sessions.  I also do

10  guest lectures for various courses as well.

11  Q.   Do you teach about abortion care?

12  A.   I do.

13  Q.   Do you teach about other types of medical care, other than

14  abortion care?

15  A.   Yes.  I teach about miscarriage management, other aspects

16  of family planning, and other sort of basic obstetrics and

17  gynecologic conditions as well.

18  Q.   Do you teach informed consent?

19  A.   Informed consent is a critical component of so much of what

20  we do in medicine.  In almost every clinical session, in an

21  outpatient gynecology clinic working with medical students,

22  residents, fellows, we're doing something that requires

23  obtaining informed consent; and so part of that, of course, is

24  training those learners about how to obtain informed consent.

25  Q.   And just briefly, what is informed consent?

1          THE COURT:  I know what informed consent is.  Unless

2    you need it for the record, you don't have to educate me.

3          MS. SINGH:  Okay.  I will move on then, Your Honor.

4    BY MS. SINGH:

5    Q.  Are you board certified, Dr. Grossman?

6    A.  I am.

7    Q.  Do you have any other certifications?

8    A.  I'm not entirely sure what you mean by certifications.  I

9    mean, I'm licensed and I am in California and have a DEA

10   license.

11   Q.  Are you a fellow of the American Congress of Obstetricians

12   and Gynecologists and of the Society of Family Planning?

13   A.  I'm a fellow of the American College of Obstetricians and

14   Gynecologists, and -- but I'm also a fellow of the Society of

15   Family Planning.

16   Q.  And what is the American Congress of Obstetricians and

17   Gynecologists?

18   A.  Again, I apologize.  I believe that the current -- that the

19   correct name is College, not Congress.  It's the professional

20   society of practicing obstetrician-gynecologists.  About

21   90 percent of OB/GYNs in the United States are members of ACOG,

22   the American College of Obstetricians and Gynecologists.

23   Q.  Are you involved with ACOG in any other capacity?

24   A.  Yes.  I've been a member of several committees of ACOG.

25   Most recently I was the chair of the committee on healthcare

1   for underserved women.  After being a member of that committee

2   and vice chair for several years, I'm currently involved in the

3   diversity, equity and inclusive excellence working group.  I'm

4   involved in the telehealth working group.  In the past I was a

5   member of the committee on Practice Bulletins for gynecology.

6   Q.  Does that mean you've been involved in drafting ACOG

7   guidance?

8   A.  Yes, I have.

9   Q.  Are you familiar with the Planned Parenthood Federation of

10   American National Medical Committee?

11   A.  I am.

12   Q.  What is it?

13   A.  It is a committee of medical experts that convenes to

14   develop and approve the Planned Parenthood Federation of

15   America's standards and guidelines for the clinical care that

16   is provided at affiliates of Planned Parenthood.

17   Q.  Describe your involvement with the Planned Parenthood

18   Federation of America National Medical Committee.

19   A.  I have been a liaison member of the committee, which means

20   that I'm asked intermittently to present or give my opinion

21   about certain key topics.  I don't vote on the final guidance

22   that is accepted by the committee.

23   Q.  What involvement, if any, do you have with the National

24   Abortion Federation?

25   A.  I'm currently a board member of the National Abortion

1   Federation.

2   Q.  Do you regularly attend any medical conferences in the

3   field of obstetrics and gynecology?

4   A.  I do.

5   Q.  Which ones?

6   A.  I attend the ACOG annual meeting, the Society of Family

7   Planning annual meeting, also known as the forum; the annual

8   meeting of the National Abortion Federation, as well as other

9   meetings.

10  Q.  And do you regularly present at these meetings and

11  conferences?

12  A.  I do.

13  Q.  You mentioned that you're also a public health researcher;

14  is that right?

15  A.  Yes.

16  Q.  And are you also a director of Advancing New Standards in

17  Reproductive Health at UCSF?

18  A.  I am.

19  Q.  Is it okay if I refer to Advancing New Standards in --

20          THE COURT REPORTER:  I'm sorry.  Can you say that

21  again, please?

22          MS. SINGH:  Yes.  Advancing New Standard --

23          THE COURT REPORTER:  The whole question.

24  BY MS. SINGH:

25  Q.  You mentioned that you're also director of Advancing New

1   Standards in Reproductive Health at UCSF; is that right?

2   A.  Correct.

3   Q.  I'm going to refer to Advancing New Standards in

4   Reproductive Health as ANSIRH, A-N-S-I-R-H.  Is that okay?

5   A.  Yes.

6   Q.  What is ANSIRH?

7   A.  We are a research program within the Department of

8   Obstetrics-Gynecology and Reproductive Sciences at UCSF.

9   Q.  What does your role there involve?

10  A.  I'm the director of the program.  So I manage sort of the

11  administrative core team of the program and provide support to

12  the faculty and staff in the program, as well as perform my own

13  research.

14  Q.  Are you involved with any other research organizations?

15  A.  I'm currently a senior adviser with Ibis Reproductive

16  Health.  I previously worked at Ibis Reproductive Health.

17  Q.  Can you briefly describe the type of research that you

18  conduct?

19  A.  I conduct both clinical and social science research related

20  to reproductive healthcare.  Some of the research is exploring

21  the impact of various policies or changes in service delivery

22  practices, and some of the research is more clinically focused.

23  Q.  And you have conducted research on the provision of

24  abortion in the United States?

25  A.  Yes, I have.

1  Q.  Approximately how many articles do you have published in

2  peer review journals?

3  A.  Approximately 200.

4  Q.  Have you published research that is relevant to the

5  opinions you intend to offer today?

6  A.  I have.

7  Q.  Please describe that research, briefly.

8  A.  I have done research related do telemedicine provision of

9  medication abortion.  I have done research on safety of

10  abortion, generally.  I have done research on the impact of

11  certain policy restrictions, particularly in Texas.  I did

12  impact on providers, on provision of care and on patients.

13  Q.  Do you have any editorial responsibilities?

14  A.  I'm on the editorial board of the "Journal of

15  Contraception."

16  Q.  Have you been a reviewer for scientific journals?

17  A.  Yes.

18  Q.  And can you just describe, what does being a reviewer

19  entail?

20  A.  It involves reviewing a submitted manuscript to a journal

21  and evaluating it for, in terms of the regular -- of the

22  research, the quality of the writing, the applicability for the

23  journal, things like that.

24  Q.  Please give us a few examples of the journals that you've

25  been a reviewer on.

A.   "*The Journal of the American Medical Association*,"
"*Lancet*," "*New England Journal of Medicine*," "*Obstetrics &
Gynecology*," and, of course, "*Contraception*."

Q.   About how many times you have served as an expert in a case
involving abortion?

A.   In total?  Or --

Q.   Yes.  In total.  Approximately.

A.   Approximately --

          THE COURT:  How about if we just have expert
testimony?

          MS. SINGH:  All right.  I will move on, Your Honor.

          At this time I offer Dr. Grossman as --

          THE COURT:  No, wait.  No, no.  You misunderstood.
Just ask him about when he's testified before, rather than
asking how many times he's been an expert.  His life is a life
of expertise, obviously.

          So what I would like to know is have you testified
before?  Have you qualified as an expert in federal or state
court?

          THE WITNESS:  Yes, I have.  I believe about four or
five times.

          THE COURT:  Thank you.

          MS. SINGH:  Okay.  And, Your Honor, at this time, I
offer Dr. Grossman as an expert in the field of obstetrics and
gynecology, abortion care, and public health.

1    THE COURT:  Any objection?  Waiting to hear from you,

2  Mr. Bartolomucci.

3    MR. BARTOLOMUCCI:  I'm sorry, Your Honor.  No

4  objection.  I was fumbling with the technology, but no

5  objection.

6    THE COURT:  All right.  The proffer is accepted.  The

7  witness may testify as an expert.

8    MS. SINGH:  Thank you, Your Honor.

9  BY MS. SINGH:

10  Q.  Dr. Grossman, are you familiar with Whole Woman's Health

11  Alliance?

12  A.  I am.

13  Q.  Did you ever serve on the board of Whole Woman's Health

14  Alliance?

15  A.  I did.

16  Q.  Why did you join the board of Whole Woman's Health

17  Alliance?

18  A.  I was asked to join the board, and I believed that my

19  experience and expertise in the field of abortion would be

20  helpful to ensure that services and their advocacy efforts were

21  informed by the best available evidence.

22  Q.  Have you been a board member of NARAL Pro-Choice America?

23  A.  Yes.

24  Q.  Why did you decide to become a board member of NARAL

25  Pro-Choice America?

A.  Similarly, because they are very active in advocacy around policies related to reproductive health, and I thought my expertise would be helpful to ensure that those policies were based on solid evidence.

Q.  If you could now turn to the binder that's marked "Plaintiffs' Exhibits," please.

If you could turn to Plaintiffs' Exhibit P, as in Peter, X, as in xylophone, 5, PX5.

Do you recognize this document?

A.  Yes.

Q.  And what is it?

A.  This is my supplemental report that I submitted.

Q.  Does it accurately reflect your opinions in this case?

A.  Yes.

Q.  Okay.  Please feel free to refer to the report as you testify today, Dr. Grossman.

How common is abortion in the United States?

A.  Abortion is quite common.  About 25 percent of all women in the United States will have an abortion at some time in their lifetimes.

Q.  What are the most common methods of abortion in the United States?

A.  In the first trimester, the methods are -- that are most commonly used are medication abortion, and vacuum aspiration abortion.

1    In the second trimester, the most common procedure is

2  procedural abortion, known as dilation and evacuation, or D&E.

3  The other procedure that is used in second trimester is

4  induction termination.

5  Q.  Please describe for us how medication abortion works.

6  A.  Medication abortion involves the use of two medications.

7  The first is Mifepristone, which blocks the progesterone

8  receptor.  Progesterone is a hormone that's important in

9  early -- maintaining an early pregnancy.  By blocking that

10 hormone, it will cause the developing pregnancy to start to

11 separate from the lining of the uterine wall.

12   The second medication is Misoprostol, which is a

13 prostaglandin, and all prostaglandins cause the cervix to start

14 to soften and open, and cause the uterus to -- causes the

15 uterus to contract and that expels the pregnancy from the

16 uterus.

17 Q.  You also mentioned aspiration abortion, is that right?

18 A.  Yes.

19 Q.  Please tell us if there are any other names that aspiration

20 abortion is referred to by?

21 A.  There are many names which sometimes can be confusing.  It

22 can be called, sometimes, even a D&C or a suction procedure or

23 an in-clinic abortion, things like that.

24 Q.  Can you describe for the Court the aspiration abortion

25 method?

1  A.  So it may involve a step of gently opening or dilating the

2  cervix, either with medications or with instruments.  And then

3  inserting a tube, called a curette, that's attached to a vacuum

4  into the uterus and then removing the pregnancy using suction.

5  Q.  Typically, how long does an aspiration abortion procedure

6  take?

7  A.  The procedure itself generally takes less than five

8  minutes.

9  Q.  When in pregnancy is aspiration abortion used?

10  A.  It can be used up to 14 to 16 weeks.

11  Q.  Okay.  And just briefly, can you tell me about gestational

12  age measurements?

13  A.  So generally in obstetrics and gynecology when we're

14  referring to gestational, we are counting the number of weeks

15  from last menstrual period.

16  Q.  And please describe for the Court the D&E procedure that

17  you mentioned.

18  A.  D&E involves two steps.  First, preparing the cervix in

19  some way, either with medications or with something called

20  osmotic dilators which are inserted into the cervix and cause

21  the cervix to, again, soften and open slowly.

22     And then the second part of the procedure involves removing

23  the pregnancy, both with suction and with forceps, with

24  instruments.

25  Q.  How long does cervical dilation usually take?

A.  It depends on the gestational age and the method being used.  It may be done over a period of several hours on the same day before the evacuation procedure will be done.  Or sometimes it's done 24 or even 48 hours before.

Q.  How long does it typically take to empty the contents of the uterus with suction and forceps?

A.  Generally five to ten minutes.

Q.  Does D&E require incision into the patient's body?

A.  It does not.

Q.  Turning just briefly to induction, could you just describe for the Court what an induction abortion is?

A.  An induction procedure involves, essentially, inducing labor, and sometimes with the same medications that we talked about earlier, Mifepristone and Misoprostol, sometimes with other medications, to expel the fetus and placenta.

Q.  Thank you.

          THE COURT:  Hold on one minute.  We're not getting the running narrative here.

          Miss Howie-Walters, it stopped back with the document.

          One second.  Okay.  Good.  We'll have to call our court reporter Goldfinger.  All she had to do was push the right button.

          Her sense of humor is not as good as yours today, lawyers.

          Okay, Miss Singh, pick up right there.

1          MS. SINGH:  Yes, Your Honor.

2     BY MS. SINGH:

3     Q.  Dr. Grossman, I'd like to turn now to the overall safety of

4     abortion care in the United States.

5          Could you please turn to Plaintiffs' Exhibit 111.

6          Do you recognize this document?

7     A.  I do.

8     Q.  Could you please read for the record the author, title and

9     publication date?

10    A.  This was authored by the National Academies of Sciences

11    Engineering and Medicine.  The title is "The Safety and Quality

12    of Abortion Care in the United States," published in 2018.

13    Q.  What is the National Academies of Sciences, Engineering and

14    Medicine?

15    A.  It is a nongovernmental body that was established by

16    Congress.  It's a group of experts in the areas of science,

17    engineering and medicine.

18         It's highly respected, independent.  It's a great honor to

19    be asked to be a member of the National Academies.

20    Q.  Does the National Academies operate under a congressional

21    charter?

22    A.  Yes.

23    Q.  What role, if any, did you have with reviewing the National

24    Academies' report?

25    A.  I was asked to be one of the reviewers of the report, so I

GROSSMAN - DIRECT/SINGH                    22

1   was given a draft of the report -- the report was in its final

2   form -- and asked to review the entire thing and give comments

3   on the draft.

4   Q.  Is the National Academies' report recognized in your

5   profession as an authoritative source on the safety and quality

6   of abortion care in the United States?

7   A.  Yes, it is.

8   Q.  Did you rely on the National Academies' report in forming

9   your opinions today?

10  A.  Yes, I did.

11  Q.  Please turn to page 10 of the report.  And just under

12  Bullet 3, please read for the record what the report stated

13  about the safety of abortion care in the United States.

14          THE COURT:  Wait.  Do you want him to read it?

15  Because the document speaks for itself.  But if you want us to

16  review it, then you can ask him if he has a view about that or

17  something.  But the document itself speaks for itself, and I

18  don't think we need to read it into the record.

19          MS. SINGH:  Your Honor, I was trying to make the

20  finding of the report a part of the record.  I'm not going to

21  offer it into evidence, and so Dr. Grossman's reading of the

22  record would make it part of the evidentiary record.

23          THE COURT:  Okay.  Go ahead, Dr. Grossman.

24  A.  The part under safety?

25

BY MS. SINGH:

Q.  Yes, Dr. Grossman.

A.  "The clinical evidence clearly shows that legal abortions in the United States, whether by medication, aspiration, D&E, or induction, are safe and effective."

Q.  Turning now to the third sentence in the paragraph just below that, please read for the record what the National Academies' report concluded about the quality of abortion care in the United States.

A.  "Overall the committee concludes that the quality of abortion care depends to a great extent on where women live."

Q.  And could you keep reading those last two sentences.

A.  "In many parts of the country, State regulations have created barriers to optimizing each dimension of quality care. The quality of care is optimal when the care is based on current evidence and when trained clinicians are available to provide abortion services."

Q.  Thank you, I'm done with that document.

    I'd like to turn to the complications and risks associated with abortion care.  How commonly are major complications associated with abortion care?

A.  Major complications, by which I mean things like hospitalization, blood transfusion, surgery, are very rare, occurring less than a quarter of 1 percent.

Q.  And what is the basis for your opinion about that?

1    A.  There's a great deal of published literature on that.  My

2    opinion is also informed by my own clinical experience, as well

3    as talking to my colleagues in the field about their clinical

4    experience.

5    Q.  I would like you to now refer to what has been marked for

6    identification as Plaintiffs' Exhibit 112.  Is this one of the

7    studies that you relied on to conclude that major complications

8    from abortion are rare?

9    A.  Yes.

10   Q.  Please read for the record the lead author, title,

11   publication, and publication date.

12   A.  The lead author is Dr. Ushma Upadhyay, the title is

13   "Incidence of Emergency Department Visits and Complications

14   After Abortion," published in 2015.

15   Q.  Are you a co-author of this study?

16   A.  I am.

17   Q.  Are you familiar with the Journal of Obstetrics and

18   Gynecology?

19   A.  I am.

20   Q.  Who publishes the Journal of Obstetrics and Gynecology?

21   A.  This is the official journal of the American College of

22   Obstetricians and Gynecologists.

23   Q.  Is this official journal considered reliable in your field?

24   A.  Yes.

25   Q.  Was this study peer reviewed?

A.   Yes.

Q.   Please describe for the Court the study.

A.   So this study used data from the California Medicaid program, known as Medi-Cal, and it looked at data from 2009, 2010 among Medi-Cal beneficiaries, looking at patients who obtain an abortion as part of the Medi-Cal system and then looked at their subsequent visits to an emergency department for complications.  And the study ended up including about close to 55,000 abortions during this period.  It's a very rigorous study because patients who were Medi-Cal beneficiaries, that used Medi-Cal to essentially pay for their abortion care, are also very likely to use that same insurance then to pay for any care for complications, so it's a very complete data set for complications.

Q.   Do you believe this methodology used to conduct this study was reliable?

A.   I do.

Q.   Why?

A.   Again, because I think it's a very well-designed study, and this was peer reviewed in one of the top journals in Obstetrics and Gynecology.

Q.   What does the study report about the percentage of total major complications?

A.   Is it okay if I review?

Q.   Yes, absolutely.  And I am looking right now at page 181,

1    the bottom of the left−hand column.

2    A.   I was going to look at −− for major complications, in

3    Table 3, the proportion was .23 percent.

4              THE COURT:  Wait a minute.  Table 3 is on page 181?

5              THE WITNESS:  No.  I'm looking on page 179 actually,

6    but I believe it's also in the text there where Ms. Singh was

7    pointing.

8              THE COURT:  Okay.

9              MS. SINGH:  Thank you, Dr. Grossman.

10   BY MS. SINGH:

11   Q.   How did the study define major complications?

12   A.   As I said, it defined it, defined major complications as

13   those requiring hospitalization, blood transfusion, surgery.

14   Q.   Okay.  Great.  Thank you.  You can put that aside for now.

15        How common are abortion−related deaths?

16   A.   Abortion−related deaths are very uncommon.  They are much

17   less common than death associated with continuing a pregnancy

18   to term and going through childbirth.  Childbirth is about

19   14 times −− has a rate of death about 14 times higher than the

20   rate of death of abortion in the United States.

21   Q.   What is the basis for your opinion that abortion−related

22   deaths are very uncommon?

23   A.   It's based on published literature, my own experience in

24   talking with colleagues in the field.

25   Q.   Does the Centers for Disease Control have any role in

1  assessing abortion-related mortality?

2  A.  Yes, the Centers for Disease Control prevention has a very

3  robust system for performing surveillance on all maternal

4  deaths, including those related to abortion.

5  Q.  Could you please turn to what has been marked for

6  identification as Plaintiffs' Exhibit 113.  Do you recognize

7  this document?

8  A.  I do.

9  Q.  Please read for the record the lead author, title,

10  publication, and publication date.

11  A.  The author is Suzanne Zane, the title is "Abortion-Related

12  Mortality in the United States," 1998 to 2010, published in

13  2015.

14  Q.  Are the authors affiliated with the CDC?

15  A.  Yes.

16  Q.  Please briefly describe the study's objective.

17  A.  The study aims to examine the characteristics and causes of

18  deaths related to legal induced abortion in the United States

19  between the period of 1998 to 2010.

20  Q.  Please briefly describe the methodology used to conduct the

21  study.

22  A.  So they used the data that were obtained through the

23  national Pregnancy Mortality Surveillance System that also

24  involved active case finding for maternal deaths, and then they

25  -- the analysis, they looked at abortion mortality rate by

1    various factors, including race, age, gestational age.

2           THE COURT:  Is that Pregnancy Mortality Surveillance

3    System maintained by the CDC?

4           THE WITNESS:  Yes.

5           THE COURT:  Thank you.

6    BY MS. SINGH:

7    Q.  Dr. Grossman, how does the CDC define abortion-related

8    deaths?

9    A.  I'd have to look at the exact definition in terms of the

10   period, but it's any death that is -- that occurs within a

11   certain period of time after the abortion.

12   Q.  I believe it's on page 260, the right-hand column.

13   A.  So it's any death resulting from a direct complication of

14   an induced abortion, an indirect complication caused by a chain

15   of events initiated by an abortion, or the aggravation or

16   preexisting condition by the physiologic or psychologic effect

17   of the abortion.

18   Q.  Okay.  Great.  Thank you, Dr. Grossman.

19          THE COURT:  Wait.  Hang on just a minute.  You were

20   referencing within a certain amount of time.  Was that the

21   eight weeks that's referenced down farther in the paragraph?

22          THE WITNESS:  Sorry.  I'm just looking for this still.

23          THE COURT:  Perhaps not.

24          THE WITNESS:  No, that's about an eight-week

25   gestation.

GROSSMAN – DIRECT/SINGH                    29

1          So they reviewed these pregnancy-associated deaths

2    occurring within one year of pregnancy.  That's noted on the

3    column on the left on page 260.

4          And then it says all deaths determined to be causally

5    related to the induced abortion or classified as abortion

6    related regardless of the time between the abortion and death.

7    BY MS. SINGH:

8    Q.  Great.  Thank you.  What did the study report about the

9    abortion mortality rate in the United States?

10   A.  The abortion, overall abortion mortality rate is very low,

11   with a total rate of 0.7 deaths per 100,000 procedures overall.

12   Q.  Do you believe the CDC is undercounting abortion-related

13   deaths?

14   A.  I do not believe that they are undercounting

15   abortion-related deaths.

16   Q.  Why not?

17   A.  Because they have a very active surveillance system, as I

18   mentioned, where they are not just relying on passive reporting

19   about these deaths, but they also actively investigate cases

20   that are noted in the press and other reports.  I think

21   particularly given the scrutiny that is applied to abortion

22   care in this country, I believe that there is an accurate

23   capture of all the abortion-related deaths.

24   Q.  Does the risk of death from abortion vary with gestational

25   age?

1    A.  It does.

2    Q.  How?

3    A.  The risk of death increases as gestational age increases.

4    So particularly for, as you've shown in this figure here, the

5    risk of death increases into the second trimester at 14 to

6    17 weeks.  It's 2.5 deaths per 100,000 cases.  That increases

7    up to 6.7 deaths per 100,000 legal induced abortions at a

8    gestational age of 18 weeks or greater.

9    Q.  Thank you, Dr. Grossman.  I'm done with that study now.

10       And you had mentioned the risk of carrying a pregnancy to

11   term and delivering the baby as 14 times riskier than abortion;

12   is that right?

13   A.  That's correct.

14   Q.  Could you now turn to what has been marked for

15   identification as Plaintiffs' Exhibit 115.

16       THE COURT:  Is it marked for identification, or is it

17   an exhibit in evidence?

18       MS. SINGH:  It's marked for identification.

19       THE COURT:  Okay.

20   BY MS. SINGH:

21   Q.  Is this one of the articles that you relied on to assess

22   the risk of carrying a pregnancy to term and delivering the

23   baby compared to the risk of abortion?

24   A.  It is.

25   Q.  Please read into the record the lead author, title,

1  publication, and publication date.

2  A.  The lead author is Elizabeth Raymond, the title is "The

3  Comparative Safety of Legal Induced Abortion and Childbirth in

4  the United States," published in 2012.

5  Q.  Did you review the methodology of this study and find it

6  reliable?

7  A.  Yes, I did.

8  Q.  In this study, how does the nationwide risk of maternal

9  mortality compare to induced abortion?

10  A.  So the risk of death associated with childbirth is

11  approximately 14 times higher than that of abortion.

12  Q.  And how do the rates of pregnancy-related complications

13  among patients who give birth compare to patients having

14  abortions?

15  A.  The risk of common maternal complications or morbidities is

16  also higher with live birth compared to abortion.

17  Q.  Thank you.  I'm done with that study.

18      What are some examples of serious maternal complications?

19  A.  Some examples include hypertensive disorder such as

20  preeclampsia, or eclampsia; urinary tract infections, including

21  infections of kidney or pyelonephritis; obstetric infections;

22  hemorrhage; things like amniotic fluid embolus.  These are a

23  few of the complications.

24  Q.  Turning back to Plaintiffs' Exhibit 115, why is continuing

25  the pregnancy to term associated with higher complications?

1   A.   Some of these complications only develop later in the third

2   trimester, later second trimester or third trimester.   Things

3   like high blood pressure pregnancy, preeclampsia, eclampsia

4   only occurs later in pregnancy.   Some of these things -- I mean

5   another example is amniotic fluid embolus, which, again, only

6   occurs generally with third trimester pregnancy.

7         Other things like the risk of thrombo- -- venous

8   thromboembolism or developing a blood clot, for example, on the

9   leg or lung can be related to the higher estrogen levels of

10  pregnancy; and simply because a pregnancy is continued over a

11  longer period of time exposes the pregnant person to those

12  higher levels of estrogen in that thromboembolic risk for a

13  longer period of time.

14  Q.   According to this study, what percentage of U.S. births

15  occur by Cesarean delivery?

16  A.   I think it's about a third.

17  Q.   And what is a Cesarean delivery?

18  A.   A Cesarean delivery is a major surgery to deliver an

19  infant.

20  Q.   Are there medical risks associated with Cesarean delivery?

21  A.   Yes.   Like any surgery, there is a risk of infection.

22  There's a risk of damaging surrounding organs.   There's a

23  higher risk of hemorrhage, possibly requiring blood

24  transfusion.   Once someone has a Cesarean delivery, they are at

25  higher risk for needing a Cesarean delivery in the future.   The

1  surgery can also cause scarring and make future surgeries,

2  including a future Cesarean delivery, more complicated and

3  riskier.

4  Q.  Thank you.  We can put that aside for now.

5     Approximately what percentage of people who give birth are

6  hospitalized for pregnancy-related complications?

7  A.  I believe it's about 10 percent.

8  Q.  Please tell us about any differences between racial groups

9  with respect to pregnancy-related outcomes.

10  A.  Black women, as well as indigenous women, in the United

11  States have a significantly higher risk of maternal mortality,

12  anywhere between two to three and a half times higher mortality

13  compared to white women.

14  Q.  Do you have an opinion about what contributes to those

15  heightened risks?

16  A.  I think there's growing evidence that racism plays an

17  important role in the increased poor outcomes, including

18  mortality, for black and indigenous women.

19  Q.  Thank you, Dr. Grossman.  I'd like to turn now to mental

20  health --

21        MR. BARTOLOMUCCI:  Your Honor, I would like to object

22  to lack of foundation for the last opinion about racial

23  discrimination.

24        THE COURT:  Can you lay the foundation?

25        MS. SINGH:  Yes, Your Honor.

BY MS. SINGH:

Q.  You mentioned that you have an opinion about what
contributes to those heightened risks, Dr. Grossman.  What is
the basis for that opinion?

A.  Umm, my review of the literature; my experience talking to
my patients and talking to my colleagues.  I think there is a
growing understanding that there are -- that genetic
differences do not explain the differences that we see in
outcomes -- see the differences in outcomes that we see
between -- among people of different races and ethnicities.
There are more genetic similarities than differences among
people that are of different races and ethnicity, and we have a
growing body of literature that's documenting that particularly
black women face discrimination in the care that they receive;
that sometimes their complaints are ignored in a way that is
different from the way that white patients may be treated; and
that ignoring of complaints sometimes leads to a delay in
diagnosis or misdiagnosis that negatively affects care.

Q.  Did your service on ACOG committee --

        THE COURT:  Let me say for the record the foundation
was laid.  The opinion can stand.

        MS. SINGH:  Thank you, Your Honor.

BY MS. SINGH:

Q.  I'll move on.

        I'd like to turn now to mental health.  Does abortion lead

1    to negative mental health issues?

2    A.   We do not have evidence that abortion leads to or causes

3    negative mental health outcomes.

4    Q.   What is the basis for your opinion about that?

5    A.   Published literature, my own experience talking to

6    colleagues.

7    Q.   Are you familiar with The Turnaway Study?

8    A.   I am.

9    Q.   What is The Turnaway Study?

10   A.   The Turnaway Study is a study that was led by my colleague

11   at UCSF, Dr. Diana Greene Foster, which recruited patients who

12   were seeking abortion care at clinics across the country; and

13   they presented just past the gestational age limit at that

14   particular facility; and there was no other near facility, I

15   believe, within 150 miles where they could go for care.  So

16   essentially --

17           THE COURT:  Hold on just a minute.  The court reporter

18   needs to have you say that again.

19           THE WITNESS:  I apologize.

20           THE COURT:  We're talking about -- you're talking

21   about The Turnaway Study.  Start that one again.

22   A.   The Turnaway Study was led by my colleague at UCSF,

23   Dr. Diana Greene Foster.  The study involved recruiting

24   patients who were seeking abortion at clinics across the United

25   States; and they presented for care just past the gestational

1    age limit of the clinic, and there was no nearby clinic where

2    they could obtain care.  I believe there was no clinic within

3    150 miles.

4        And then she also recruited at those same clinics patients

5    who presented just under the gestational age limit and were

6    able to obtain a wanted abortion, as well as a sample of

7    patients seeking care in the first trimester.

8        And then she followed those three groups of patients or

9    people -- there were about a thousand participants

10   altogether -- and followed them with interviews over a period

11   of five years and compared outcomes between the groups.

12   BY MS. SINGH:

13   Q.  Did this research produce any peer-reviewed articles?

14   A.  Yes.  I believe there are about 50 articles now published

15   in the peer-reviewed literature.

16   Q.  Briefly, please tell us about The Turnaway Study findings

17   with regard to mental health.

18   A.  With regard to mental health, I believe the findings were

19   that initially -- and so in the first six months or so --

20   patients who were turned away, were unable to get a wanted

21   abortion, had increased anxiety, but that returned to baseline

22   over time; and over the course of the study, there was really

23   no difference in mental health between the study groups.  There

24   is certainly no evidence that mental health outcomes were worse

25   for patients who obtained a wanted abortion.

Q.  Thank you.  What mental health outcomes occur when patients are continuing a pregnancy to term?

A.  Patients who are pregnant may have a range of mental health symptoms or diagnoses, including anxiety, depression, and of course, they may have post-partum depression as well.

Q.  What is the basis for your testimony about the mental health outcomes associated during pregnancy or with pregnancy?

A.  My review of literature, my clinical practice, and talking with colleagues.

Q.  Dr. Grossman, if I could now refer you to Plaintiffs' Exhibit 119.  Do you recognize this document?

A.  I do.

Q.  Is this one of the articles that you relied upon to make your -- to give your opinion today?

A.  Yes.

Q.  Please read for the record the lead author, title, publication, and publication date.

A.  The author is Shefaly Shorey.  The title is "Prevalence and Incidence of Post-Partum Depression Among Healthy Mothers:  A Systematic Review and Meta-Analysis," published in 2018.

Q.  Are you familiar with the *Journal of Psychiatric Research*?

A.  Yes.

Q.  Is it generally considered reliable in your field?

A.  Yes.

Q.  Was this study peer-reviewed?

1   A.  Yes.

2   Q.  Please describe the methodology for the Court.

3   A.  So this is a systematic review and meta-analysis where they

4   did a review of several different databases to try to identify

5   all of the studies looking at how common essentially

6   post-partum depression is around the world; and then where

7   possible, they did a meta-analysis where they tried to combine

8   similar studies to develop for pooled estimates.

9   Q.  What did the study report about the overall prevalence of

10  post-partum depression?

11  A.  I believe that the global prevalence overall was

12  17 percent.

13  Q.  In your opinion, is that conclusion reliable?

14  A.  Yes.

15  Q.  Why?

16  A.  The methodology that they used to identify studies was very

17  rigorous.  The study was peer-reviewed and published in a

18  reputable journal.

19  Q.  Thank you.  We can put that aside now.

20      I'd like to turn now more specifically to medication

21  abortion.  Have you reviewed the joint stipulations of fact in

22  this case?

23  A.  Yes.

24  Q.  Okay.  In the interest of time, I'm not going to ask you

25  questions about the facts that we already established through

1    those stipulations.

2        Is any anesthesia or sedation used to administer medication

3    abortion?

4    A.   No.

5    Q.   How is pain typically managed with medication abortion?

6    A.   It's managed with oral pain medication.

7    Q.   Can you give us some examples of oral medications that

8    might be used to manage pain with medication abortion?

9    A.   The most commonly used medication is ibuprofen.  Some

10   providers also use oral narcotics, such as Tylenol with

11   codeine, Vicodin, Norco, things like that.  Those are the most

12   commonly used medications.

13   Q.   Are you familiar with Tramadol?

14   A.   I am.

15   Q.   What is it?

16   A.   It's a centrally acting opioid.

17   Q.   Is it typically prescribed with medication abortion?

18   A.   It's not typically prescribed.  There are some published

19   studies about it, including a study that I recently

20   co-authored, but it is not a commonly used regimen currently.

21   Q.   If you could now turn to the big stipulated exhibits

22   binder.  Sorry about that.  There's a lot of documents.  If you

23   could turn to Stipulated Exhibit SE14.  Do you recognize this

24   document?

25   A.   I do.

Q.   What is it?

A.   This is the "Shared Risk Evaluation and Mitigation Strategy for Mifepristone 200 milligrams approved by the FDA."

Q.   How does this document impact how medication abortion is administered?

A.   This is an important regulatory document and has several restrictions on how medication abortion using Mifepristone can be provided, including restrictions on the type of provider, must be certified, the fact that patients need to sign a patient agreement form; and it also restricts the dispensing of Mifepristone, saying that the medication may only be dispensed in a medical office, clinic, or hospital.

          THE COURT:  Where does this document come from, Dr. Grossman?

          THE WITNESS:  This comes from the Food and Drug Administration.  So this −− these restrictions have been part of the approval for Mifepristone since it was approved in 2000. This REMS system, the Risk Evaluation and Mitigation Strategy system was created, I believe, in about 2011 or so.  They have been part of that since then.

          THE COURT:  Thank you.

BY MS. SINGH:

Q.  So you mentioned that the document restricts where Mifepristone may be obtained; is that right?

A.   Where Mifepristone may be dispensed to patients.

GROSSMAN – DIRECT/SINGH                41

Q.  Excuse me, may be dispensed.  Where can Misoprostol be
dispensed?  Are there any limitations?

A.  There -- I mean, this document applies to Mifepristone.
Misoprostol is a regular prescription medication that may be
dispensed at a pharmacy on prescription or in a clinical
setting as well.

Q.  Can you walk us through those steps that are involved in
obtaining medication abortion in person?

A.  So the patient -- I can tell you how it works at the
facility where I provide care.  The patient would come in who
says that they are interested in medication abortion.  They
undergo counseling first with a trained counselor to make sure
that they are certain of their decision, make sure all their
questions about abortion are answered in terms of what other
options there might be terms of continuing the pregnancy or
not.  They review options about having a medication abortion or
an aspiration procedure.

     If the patient is interested in medication abortion, they
undergo medical evaluation for their eligibility.  That
includes assessing the gestational age.  At my facility, we
routinely use ultrasound.  It's also reasonable and acceptable
to assess gestational age by physical examination as well.

     And then patients are screened for the other eligibility
criteria for medication abortion, which really are based on
medical history.  In some clinics, patients routinely have a

GROSSMAN – DIRECT/SINGH                42

1    hemoglobin measure to assess whether they have anemia.  That's

2    not required.

3         So that's the screening process; and then if patients are

4    eligible and still interested in having the medication

5    abortion, go through the informed consent process, they sign

6    the patient agreement form that's mandated by the FDA, as well

7    as any clinic-specific consent forms, and then patients are

8    dispensed medications as well as instructions for follow-up.

9    Q.  Thank you, Dr. Grossman.  I'm going to go through a number

10   of those steps in detail with you.

11        So you mentioned that clinicians commonly determine

12   gestational age prior to medication abortion?

13   A.  Yes.

14   Q.  How do clinicians commonly determine gestational age?

15   A.  So the assessment of gestational age is based on the

16   patient's history, so asking a patient about their menstrual

17   history, when their last period was, whether it was a normal

18   period, whether they had regular periods.  Also, ask patients

19   about when they think they got pregnant.  Some patients may not

20   be -- may not have a reliable last menstrual period but may be

21   very sure of when they actually got pregnant.

22        And in some settings, the assessment is made based on that

23   historical information combined with a physical examination,

24   which may involve abdominal palpation, may involve a pelvic

25   exam as well.  Alternatively -- and then for patients when

GROSSMAN – DIRECT/SINGH                    43

1    there's any question about whether the history is consistent

2    with the physical examination, ultrasound must be used to

3    confirm the gestational age.

4        In other facilities, ultrasound is routinely used, and so

5    we obtain history and then perform an ultrasound.

6    Q.  Okay.  Let's talk about ultrasound.  First just some

7    background.  What is an ultrasound?

8    A.  I mean ultrasound essentially uses sound waves to be able

9    to visualize a variety of anatomic structures, including the

10   uterus and developing pregnancy.

11   Q.  How is an ultrasound conducted during prenatal or abortion

12   care?

13   A.  An ultrasound is conducted by someone who has been trained

14   in performing ultrasound.  It may be done transabdominally or

15   transvaginally.

16   Q.  In what format are the results of the ultrasound

17   examination typically recorded?  For example, is it an image,

18   is it a report, is it both?

19   A.  It may be both.  But certainly it includes, at the very

20   least, a written report that reviews what was seen.  So was it

21   an intrauterine pregnancy or not, was it multiple gestation or

22   singleton, was the pregnancy living, what was actually

23   measured, so was it the size of the gestational sac, was it the

24   length of the developing embryo.  And then how those

25   measurements are translated or correlate with the estimated

1  gestational age.  And, of course, whether the pregnancy is

2  believed to be intrauterine or not.

3  Q.  Thank you.  If you could now please turn to Plaintiffs'

4  Exhibit PX120.

5  A.  Sorry, is that --

6  Q.  That's in the Plaintiffs' exhibit binder.  Thank you.

7      Do you recognize this document?

8  A.  I do.

9  Q.  And what is it?

10 A.  This is the ACOG practice bulletin on medication abortion

11 up to 70 days of gestation which was published last year in

12 2020.

13 Q.  What is a practice bulletin?

14 A.  A practice bulletin from ACOG is an official document

15 about -- it essentially includes recommendations for clinical

16 management guidelines.  The practice bulletins are issued by

17 the committees, the practice bulletin committees at ACOG.  The

18 committee is made up of experts, in this case, experts in

19 gynecology, who determine the focus of the practice bulletin.

20 They instruct the official librarians at ACOG to do a review of

21 the literature on the topic.  And then the committee works with

22 one or two experts to review that published information and to

23 develop the practice bulletin, to write the document, which is

24 then reviewed by the committee, or edited and finalized.  And

25 then it goes through a process of review by other committees at

1  ACOG, including the executive board, before it's issued as

2  official guidance of the college.

3  Q.  Were you involved in the drafting of this practice

4  bulletin?

5  A.  Yes.  So I, together with Dr. Mitchell Creinin, we were the

6  authors that were asked by the committee to write the practice

7  bulletin.

8  Q.  And generally, are ACOG practice bulletins considered

9  reliable authority in your field?

10 A.  Yes.

11 Q.  What did the practice bulletin have to say about how to

12 determine gestational age prior to medication abortion?

13 A.  It says that gestational age may be assessed clinically.

14 So based on a patient's history alone, up to -- if the patient

15 has a reliable last menstrual period within the prior 56 days

16 and no concerning signs or symptoms for an ectopic pregnancy,

17 in those cases clinical examination or ultrasound is not

18 required.  After 56 days, gestational age needs to be assessed

19 by one or both of those, either clinical examination or

20 ultrasound.

21 Q.  I assume you agree with this guidance, you were involved in

22 the creation of the document; is that right?

23 A.  I do agree, yes.

24 Q.  Okay.  We can put that practice bulletin aside for now.

25 We'll come back to it a little later.

1    A.  May I actually just clarify?

2    Q.  Yeah.

3    A.  I would say that, I mean, I do agree with that statement.

4    I believe that we have more evidence since this has been

5    published that, in fact, even later than 56 days it's

6    reasonable to base the assessment of gestational age on a

7    patient's history alone.

8    Q.  Thank you.

9    A.  Even -- perhaps even up to 70 days.

10   Q.  Oops.  Sorry about that.  Thank you.

11       Okay.  Earlier when we discussed your professional

12   background, you mentioned being a member of the National

13   Abortion Federation, right?

14   A.  Yes.

15   Q.  Does the National Abortion Federation recommend ultrasound

16   prior to abortion?

17   A.  The National Abortion Federation does not recommend routine

18   use of ultrasound before abortion.

19   Q.  So does that mean professional medical associations don't

20   always require routine ultrasound prior to medication abortion?

21   A.  That is correct.

22   Q.  In practice, though, is ultrasound commonly done prior to

23   medication abortion?

24   A.  Currently, yes, it is common that abortion is done, I mean,

25   that ultrasound is done to assess gestational age and confirm

1    intrauterine pregnancy prior to abortion.

2    Q.   When an ultrasound is done, does the person providing the

3    abortion need to be the one performing the ultrasound?

4    A.   No, even in my practice, as I mentioned, that ultrasound is

5    routinely done.  Sometimes patients come to our facility having

6    had an outside ultrasound done and they come with a report of

7    that ultrasound.  And we commonly rely on that report and don't

8    perform another ultrasound unless, of course, the patient has

9    had new symptoms since that last ultrasound was done.

10   Q.   And how would you determine those new symptoms?

11   A.   By talking to the patient.

12   Q.   And generally in medicine, are ultrasound examinations

13   common on pregnant patients?

14   A.   Yes.

15   Q.   And are ultrasound examinations performed on pregnant

16   patients to determine due dates?

17   A.   Yes.

18   Q.   What generally is the purpose of using ultrasound for

19   determining a pregnant patient's due date?

20   A.   Umm, the purpose in determining the due date for a patient

21   who's continuing a pregnancy is -- involves, also, the

22   consideration of the fetus and the conditions that may affect

23   the fetus.  So it's very important to have a precise assessment

24   of gestational age to know, for a patient who's continuing the

25   pregnancy to term, so that when a patient presents with signs

1   of labor, for example, to know whether the patient is in

2   preterm labor, in which case attempts may be made to stop labor

3   or to give a treatment to the fetus to make sure to help

4   improve the fetus' chances of survival, if it is born

5   premature.  It's important to be able to track growth during

6   the third trimester of pregnancy.  So if there's any evidence

7   that the uterine size is larger or smaller than expected

8   compared to that precise estimate of fetal age, then it's

9   important to do a follow-up ultrasound to check for growth

10  because if there's evidence of fetal growth restriction, it's

11  important to carefully monitor the fetus because the fetus may

12  be at risk for intrauterine fetal demise or fetal death.  If

13  the fetus has grown excessively, that may impact plans for how

14  the baby will be delivered.

15      Similarly, it's very important to know, precisely, the

16  gestational age when a pregnancy is continued to term, to know

17  when the due date has passed because once the due date has

18  passed, depending on a number of other risk factors, the fetus

19  is also at higher risk of intrauterine fetal demise and so it

20  would be important to make a determination whether labor needs

21  to be induced.

22  Q.  And just to be clear, outside of the abortion context, do

23  doctors taking care of pregnant patients rely on ultrasounds

24  performed by another qualified provider?

25  A.  Yes, we do.

1   Q.  And have you personally done that?

2   A.  Yes, quite often.

3   Q.  Can you tell us about some of those situations in which

4   you've relied on ultrasound done by somebody else?

5   A.  I mean it's very common that a patient will --

6           THE COURT:  Sorry for interrupting, but rather than

7   telling us about those situations, tell us why you think it's

8   an appropriate practice to do that.

9           THE WITNESS:  Sure, Your Honor.  I think it's

10  appropriate because, I mean provided that the report from the

11  other person is complete, and it's clear that the person has

12  had the, you know, requisite training in performing an

13  ultrasound, it's -- this is a common practice in medicine, to

14  receive that kind of information and to base clinical care on

15  that information.

16          Sometimes it's actually mandatory because a patient

17  may come, you know, transfer care to me, say, in the third

18  trimester of pregnancy, and I need to date the pregnancy based

19  on an early ultrasound that was done by the referring

20  clinician.  And so now if I, like, find a discrepancy in how

21  far along the pregnancy should be, I'm going to use that early

22  ultrasound to make my assessment that this fetus is either not

23  growing properly or may need further evaluation, things like

24  that.

25          THE COURT:  Thank you.

1          THE WITNESS:  So this is very common in medicine.

2          MS. SINGH:  Thank you, Dr. Grossman.

3   BY MS. SINGH:

4   Q.  Now, if you could bring back the stipulated exhibit binder.

5   I'm going to make you work today.

6          THE COURT:  Can we just do this, because your

7   technician can get them up on the screen very fast.  That will

8   spare him from having to go binder to binder.

9          MS. SINGH:  Yeah, that's fine with me.

10         It that okay with you, Dr. Grossman?  And if you want

11  the hard copy, you can pull it up.

12         THE WITNESS:  Okay.  Thank you.

13         MS. SINGH:  And I'll tell you where it is.

14  BY MS. SINGH:

15  Q.  So if we could now pull up Stipulated Exhibit 13.  And do

16  you recognize this document, Dr. Grossman?

17  A.  I do.

18  Q.  And what is it?

19  A.  This is the FDA-approved label for Mifepristone,

20  200 milligrams.

21  Q.  And if we could turn to page 2, there's a section labeled

22  2.1, do you see that?

23  A.  Yes.

24  Q.  Could you just read for the record that first paragraph?

25  A.  "For purposes of this treatment, pregnancy is dated from

1    the first day of the last menstrual period.  The duration of

2    pregnancy may be determined from menstrual history and clinical

3    examination.  Assess the pregnancy by ultrasonographic scan if

4    the duration of pregnancy is uncertain or if ectopic pregnancy

5    is suspected."

6    Q.  Does the dosing regimen for Mifepristone and Misoprostol

7    tested and approved by the FDA include routine use of

8    ultrasound to determine gestational age or screen for ectopic

9    pregnancy?

10          THE COURT:  Whoa, whoa.  You're going way, way too

11   fast on your question because you're reading it.  So slow it

12   down.  Slow it down.

13          MS. SINGH:  I will slow it down.

14   BY MS. SINGH:

15   Q.  Does the dosing regimen for Mifepristone and Misoprostol

16   tested and approved by the FDA include routine use of

17   ultrasound to determine gestational age or screen for ectopic

18   pregnancy?

19   A.  It does not.

20   Q.  Could you please turn to page 6 of Stipulated Exhibit 13.

21   And do you see on that page a section labeled "5.4 Ectopic

22   Pregnancy"?

23   A.  Yes.

24   Q.  And could you just read out loud that final sentence of the

25   first paragraph?

1   A.   "The presence of an ectopic pregnancy may have been missed

2   even if the patient underwent ultrasonography prior to being

3   prescribed Mifeprex."

4   Q.   In your medical judgment, is that statement accurate?

5   A.   Yes.

6   Q.   How do clinicians screen a medication abortion patient for

7   ectopic pregnancy?

8   A.   We screen patients for ectopic pregnancy based on their

9   history and symptoms.  So there's some aspects of their history

10  that may put them at higher risk for an ectopic, for example,

11  having had a prior ectopic pregnancy, having had a surgery on

12  their Fallopian tubes, as well as symptoms, things like unusual

13  pain or bleeding during the pregnancy.

14  Q.   What happens if during the screening process, a clinician

15  determines there is a possible risk of ectopic pregnancy?

16  A.   Those patients would undergo ultrasound.

17  Q.   And would you ever do a physical examination in that

18  situation?

19  A.   There may be times when a physical examination may be

20  warranted, but not routinely.

21  Q.   Okay.  Great.  Let's talk a little bit about an in-person

22  physical examination then.

23       How do clinicians screen medication abortion patients for

24  eligibility, other than gestational age, which we talked about,

25  in person?

1   A.   I'm sorry, can you please repeat the question?

2   Q.   Absolutely.  So putting aside gestational age, how do

3   clinicians screen medication abortion patients for eligibility

4   in person?

5   A.   As I mentioned, a complete medical history, including

6   medications, history of medications that are taken, is obtained

7   and that medical history is reviewed and specific questions are

8   asked of patients about their medical history to determine

9   whether they have any of the conditions that are considered

10  contraindications to the use of medication abortion.

11  Q.   You mentioned contraindications.  How common are

12  contraindications for medication abortion?

13  A.   Other than the contraindication related to gestational age,

14  the other contraindications are very rare.  I would say less

15  than 1 percent of patients.

16  Q.   What are the most common contraindications for medication

17  abortion?

18  A.   Again, probably the most common is the gestational age past

19  the limit.  I mean, the other things are things like having an

20  IUD in place that would need to be removed first, having an

21  ectopic pregnancy, using certain medications, including blood

22  thinners, having a bleeding disorder.  But again, these things

23  are all really quite rare among, you know, people of

24  reproductive age.

25  Q.   So before providing a patient medication abortion, is it

1  necessary for the practitioner to do an in-person physical

2  examination?

3  A.  It is not necessary.

4  Q.  And just to be clear, why not?

5  A.  Because there is no information that is gleaned from the

6  physical exam that impacts the decision to proceed with

7  medication abortion or not.

8      Certainly sometimes patients may have specific complaints

9  that may or may not be related to the pregnancy and abortion

10 that do merit a physical examination; for example, if they have

11 complaints or symptoms concerning a possible infection,

12 including a sexually-transmitted infection; if they have

13 symptoms related to a miscarriage.  There may be findings

14 sometimes on ultrasound that would prompt the need for a

15 physical examination, but these are really quite uncommon.

16 Q.  In your opinion, does an in-person examination enhance the

17 safety or effectiveness of medication abortion?

18 A.  It does not.

19 Q.  Is an in-person examination part of the standard of care?

20 A.  It is not.

21 Q.  In the rare situations that a physical examination should

22 be done, does it need to be the abortion provider that conducts

23 the physical examination?

24 A.  No.  I mean, it depends on what kind of complaint or

25 finding there is that merits the – or that requires an

examination.  But, for example, in the examples that I gave
that are for conditions that are not really related to the
abortion, like symptoms of a sexually transmitted infection or
things like that, a clinician who may not be the abortion
provider could do the examination and relay that information to
the physician.

Q.  And in other areas of medicine, outside of the abortion
context, do practitioners tend to collaborate in their care of
a patient like that?

A.  Yes, that's very common.

Q.  And is that also true specifically of pregnant patients?

A.  Yes, I would say that a coordinated care team is very
common in obstetricians.

Q.  Okay.  Thank you.  Now I'd like to talk about the safety of
medication abortion specifically.  How safe is medication
abortion?

A.  Medication abortion is very safe, with the risk of major
complications approximately 0.3 percent, so less than half a
percent.

Q.  What is the most common complication, major complication?

A.  All of the major complications are rare, but there is a
small risk of bleeding possibly so common to require a blood
transfusion.  Again, that's about -- the risk of that is about
one out of 1,000 patients.

     If you are talking about other, like, minor complications,

1    the most common complication with medication abortion is an

2    incomplete abortion where the medications don't completely work

3    to empty the uterus, and in some cases there's an ongoing

4    pregnancy, the pregnancy continues to develop, and in those

5    situations the patient needs to have an aspiration procedure to

6    complete the abortion.

7        We do classify those as minor complications.  They are also

8    kind of a known outcome of the treatment when patients are --

9    undergo the informed consent process for medication abortion,

10   they are told very clearly that there -- it's not 100 percent

11   effective.  Overall, when you step to about ten weeks of

12   pregnancy, it's about 97 percent effective.  That means about

13   3 percent of patients will need to have an aspiration

14   procedure, and patients accept that risk because they like the

15   fact that there's a 97 percent chance that they won't have to

16   have an aspiration.

17           THE COURT:  Better than the COVID vaccine.  Just

18   saying.

19           MR. BARTOLOMUCCI:  Exactly.

20           THE COURT:  Not an expert.  Just read the newspapers.

21   Go ahead.  I had to insert myself so that you know I'm still

22   alive here.

23           MS. SINGH:  I appreciate that, Your Honor.  Thank you.

24   BY MS. SINGH:

25   Q.  Is sepsis a complication of medication abortion,

1  Dr. Grossman?

2  A.  I mean, there have been a few case reports, some case

3  reports of sepsis.  It's a very rare complication of medication

4  abortion.

5  Q.  Okay.  And if we could turn back to Stipulated Exhibit 13,

6  which should be the FDA label for Mifeprex.  And we talked

7  about this document a little bit already.  Does the FDA's

8  Mifeprex label state what percentage of medication abortion

9  cases using the evidence-based regimen are successful?

10  A.  Yes, it does.

11  Q.  And what is that percentage?

12  A.  It's overall about 97 percent.  I believe it's not on this

13  page.

14  Q.  I think it's on page 13.

15  A.  So from the U.S. trials, it was 97.4 percent.

16  Q.  Okay.  And so that statistic is based on -- well, tell us,

17  what is that statistic based on?

18  A.  It's based on a number of published trials that were done

19  in the US.  Of the standard regimen that is described in the

20  FDA approved labeling, almost 17,000 patients, including a

21  clinical study that I led, these were reviewed by the FDA and

22  included in this, in the labeling.

23  Q.  And just to be clear, what does it mean if a medication

24  abortion is unsuccessful?

25  A.  Well, as they report in this table here, in 2.6 percent of

cases, patient required surgical intervention, meaning that they needed to have an aspiration procedure to complete the abortion.  Some of those were, as it says in the footnote there with the asterisk, that the reasons for surgical intervention include ongoing pregnancy, medical necessity, persistent or heavy bleeding, after-treatment, patient request, or incomplete expulsion.

Q.  When does this complication usually occur?

A.  This complication occurs once the patient is at home after taking the medications.

Q.  Does the risk of an incomplete medication abortion go up with gestational age?

A.  It does.

Q.  What are the treatment options if medication abortion is unsuccessful?

A.  Well, it depends what kind -- what the actual reason for lack of success is.  But, for example, in the case of incomplete abortion, it's reasonable sometimes to wait longer. It's also possible to give patients an additional dose of Misoprostol and see if that results in completion of the abortion, or it's possible to proceed with vacuum aspiration.

Q.  Thank you.

    And you have also done some studies investigating the safety of medication abortion?

A.  I have.

1    Q.  I thought that's what you would say.  If we could turn --

2              THE WITNESS:  Just asking if we might be taking a

3    break at some point.

4              THE COURT:  I was going to ask the same question,

5    Dr. Grossman.  So astute of you to ask.

6              How are you doing on time, Miss Singh?

7              MS. SINGH:  I've still got quite a ways to go with

8    Dr. Grossman.  I'm about halfway done through his testimony.

9              THE COURT:  Half?  No wonder he's weary.

10             MS. SINGH:  Yes, Your Honor.  We're making him work

11   today.

12             THE COURT:  Way back when I was in law school, I had

13   an evidence professor who used to call on the students to

14   recite -- we had to stand up in those days -- and all of us

15   came to quake when we would hear the words such as these,

16   "Miss Evans, he would say" -- I was Evans then -- "Miss Evans,

17   state the issues suck-int-ly (phonetic)."

18             So I always wonder if my court reporter can get that

19   pronunciation into the record since it's key to my story.  But

20   I'm asking you if you can please state these questions

21   succinctly so that we can move along and get through the rest

22   of the witnesses, please.  But we will honor the witness's

23   request, a very reasonable witness to make a reasonable

24   request, and we'll take a 20-minute recess.  I have about 22

25   after, so let's reconvene at 15 minutes till 12.  We'll go till

GROSSMAN – DIRECT/SINGH                    60

1   about 12:30 then.  That's my time.  I have no idea where the

2   rest of you in this trial are located, but that would be me on

3   our new Daylight Savings Time here in Indiana.

4           Okay.  So, see you in a few minutes.  We are in

5   recess.

6           MS. SINGH:  Thank you, Your Honor.

7           THE COURT:  We are in recess.

8           MR. BARTOLOMUCCI:  Thank you.

9       (Recess taken from 11:22 a.m. to 11:46 a.m.)

10                      (Open court.)

11          THE COURT:  There you are, Mr. Bartolomucci.  I

12  believe we're ready if you are ready.

13          Take up where you left off, Miss Singh.

14          MS. SINGH:  Thank you, Your Honor.

15          THE COURT:  I hope you got a decent break,

16  Dr. Grossman.

17          THE WITNESS:  Yes, thank you very much, Your Honor.

18  BY MS. SINGH:

19  Q.  So I think that we were just about to talk about one of

20  your studies, Dr. Grossman.  So if we could pull up, please,

21  Plaintiffs' Exhibit 121, and if you could read for the record

22  the lead author, title, publication, and publication date.

23  A.  I was the lead author, the title is "Safety of Medical

24  Abortion Provided Through Telemedicine Compared With in Person"

25  published in 2017.

1   Q.  What was the method used to investigate the safety of

2   medication abortion in this study?

3   A.  So the main source of data was the adverse event reports

4   that all clinicians everywhere in the United States are

5   required to submit or were at the time required to submit to

6   Danco, the manufacturer of Mifepristone, and to the FDA on

7   complications of patients who were taking Mifepristone, and we

8   looked at all the clinical significant adverse events that were

9   reported in a seven-year period between July of 2008 to June of

10  2015, among patients obtaining medication abortion at Planned

11  Parenthood of Heartland Clinics in Iowa and then compared the

12  prevalence of these clinically significant adverse events among

13  patients who had their medication abortion with telemedicine

14  compared to those who had an in-person visit with a physician.

15  Q.  And now I'm looking on page 3 under results.  How many

16  medication abortion patients were included in this study?

17  A.  So, in total, there were 19,170 medication abortions

18  performed during this period.  Almost 9,000 with telemedicine,

19  about 10,400 with an in-person visit.

20  Q.  And what is the main finding of this study?

21  A.  The main finding is that overall the prevalence of these

22  clinically significant adverse events was very low.  It was

23  0.26 percent of all medication abortions performed over the

24  seven-year period, which is comparable to some of the other

25  literature that we talked about before in other published

1   literature, and there was no significant difference in this

2   proportion between the patients who had a telemedicine visit

3   compared to those who had an in-person visit.

4   Q.  And now I'm looking on page 2, last paragraph of the

5   right-hand column.  What was considered a significant adverse

6   event for purposes of this study?

7   A.  So for this study we'd find -- we used the standard

8   definition for major adverse events or major complications,

9   including hospital admission, surgery -- which did not include

10  a vacuum aspiration of the uterus -- blood transfusion and

11  death, and then we also included cases where patients went to

12  the emergency department and were given treatment, including

13  intravenous fluids or oral medications.

14  Q.  And were there any surgeries required?

15  A.  There were not.

16  Q.  Were there any patient deaths?

17  A.  There were not.

18  Q.  Now, if we could turn to Plaintiffs' Exhibit 112.  This is

19  a study that we previously discussed.  Do you recall this

20  document?

21  A.  Yes.

22  Q.  In this study, what was the rate of major complications

23  among patients who had medication abortions?  And here I'm on

24  page 181 starting in the last paragraph.

25  A.  I believe major complications with medication abortion were

0.31 percent.

Q.   Great.  Thank you.

     And now if we could turn to Plaintiffs' Exhibit 122.  And do you recognize this document, Dr. Grossman?

A.   I do.

Q.   Could you please read for the record the lead author, title, publication, and publication date?

A.   The lead author is Kelly Cleland, title is "Significant Adverse Events and Outcomes After Medical Abortion," published in 2013.

Q.   Was this article peer reviewed?

A.   Yes.

Q.   Now turning to page 2 of this study, can you please describe for the Court the methodology of this study?

A.   This study used similar adverse event recording from the reports that were submitted to Danco and to the FDA for Planned Parenthood patients who had medication abortion for a two-year period from January of 2009 through December of 2010.

Q.   At the time, was it Planned Parenthood's practice to perform ultrasounds prior to medication abortion?

A.   It was.

Q.   And do you consider the methodology of this study to be reliable?

A.   I do.

Q.   Now I'm looking at page 168.  How many medication abortion

GROSSMAN – DIRECT/SINGH                64

1   cases were included in this study?  Second paragraph, first

2   sentence.

3   A.   So it's almost 234,000 medication abortions.

4   Q.   And turning to the first full paragraph of 168, how did the

5   study define a clinically significant complication?

6   A.   These included the adverse events such as hospitalization,

7   blood transfusion, emergency department treatment, intravenous

8   antibiotics, infection requiring treatment with intravenous

9   antibiotics or admission to the hospital --

10            COURT REPORTER:  I'm sorry.

11            THE COURT:  Just read it more slowly, Dr. Grossman.

12            THE WITNESS:  I apologize.

13   A.   These included hospital admission, blood transfusion,

14   emergency department treatment, intravenous antibiotics

15   administration, infection requiring treatment with intravenous

16   antibiotics or admission to the hospital, and death.

17   BY MS. SINGH:

18   Q.   Now I'm looking at page 168, second to the last paragraph.

19   What percentage of medication abortion patients experienced a

20   clinically significant adverse event, according to this study?

21   A.   It was 0.16 percent of all cases.

22   Q.   Page 169, table 2.  What percentage of complications

23   resulted in hospital admission, according to this study?

24   A.   It was 0.06 percent.

25   Q.   Thank you, Dr. Grossman.  We can put that study aside now.

1    When do complications related to medication abortion

2    typically occur?

3    A.  These occur at home after the patient has taken the

4    medications.

5    Q.  And why do they occur at home?

6    A.  The medication abortion involves a process that happens

7    outside of a clinical facility so the entire process is really

8    occurring at home, so it's not surprising then that the

9    complications, although they are rare, also occur at home.

10   Q.  And when do patients typically begin passing the pregnancy?

11   A.  So the standard -- the protocol described in the

12   FDA-approved labeling includes taking Mifepristone and then 24

13   to 48 hours later taking a dose of the Misoprostol, and

14   bleeding and expulsion of the pregnancy occurs after taking the

15   Misoprostol.  It can start to occur within about two hours or

16   so after taking the Misoprostol.

17   Q.  How does the overall rate of -- excuse me.  How does the

18   overall total complication rate for medical abortion compare to

19   the overall complication rate for first trimester aspiration

20   abortion?

21   A.  The total complication rate, which includes both minor and

22   major complications, is higher for medication abortion compared

23   to aspiration because of the increased risk of incomplete

24   abortion and ongoing pregnancy with medication abortion

25   compared to with aspiration.

1   Q.  How does the rate of serious complications following

2   medication abortion compare to the rate of serious

3   complications following aspiration abortion?

4   A.  Those are really quite similar.  They're very uncommon.

5   That prevalence is low for both.

6   Q.  I'd like to turn now to the risk of medication abortions

7   relative to other medical treatments.

8        How often do practitioners prescribe or dispense

9   medications that entail equal or greater risk than Mifepristone

10  and Misoprostol?

11  A.  There are many medications that are used that have higher

12  risks or higher probability of even death compared to

13  Mifepristone and Misoprostol, including things like medications

14  used for erectile dysfunction such as Viagra, antibiotics such

15  as penicillin.  There are many more deaths with acetaminophen

16  or Tylenol than there are with Mifepristone.

17  Q.  Is Mifepristone on its own used for any purpose?

18  A.  There's another Mifepristone product that's a different

19  dose, 300 milligrams -- the name is Korlym -- and it's approved

20  for treatment of Cushing's disease.  There are other unapproved

21  uses that are being investigated, including treatment for

22  uterine fibroids and other things.

23          THE COURT:  What is Cushing's disease?

24          THE WITNESS:  So it's a problem with excessive

25  cortisol production in the body.  So the medication also has an

1  effect to sort of block the other steroid receptors as well and

2  block the effect of that excessive cortisol.

3  BY MS. SINGH:

4  Q.  Is Misoprostol on its own used for any purpose?

5  A.  Yes.  Misoprostol is very commonly used in obstetrics and

6  gynecology.  It's used to -- for -- to induce labor with a term

7  pregnancy.  It's used to soften, open the cervix before a

8  vacuum aspiration abortion or a D&E.  It can be used to soften

9  and open the cervix before any procedure that's done inside the

10  uterus, including endometrial biopsy, hysteroscopy, placement

11  of an IUD.  Those are a few of the uses.

12  Q.  Are Misoprostol and Mifepristone combination used for any

13  other medical interventions?

14  A.  It's also the most effective treatment, medical treatment,

15  for miscarriage.

16  Q.  And how do you know that it's the most effective treatment

17  for miscarriage?

18  A.  There's a randomized controlled trial, a study that

19  compared use of Misoprostol by itself to Mifepristone plus

20  Misoprostol for first trimester incomplete miscarriage and

21  showed that patients had a faster resolution of the miscarriage

22  and were less likely to require intervention with aspiration

23  with the addition of Mifepristone.

24  Q.  We could now pull up Plaintiffs' Exhibit 123.  Do you

25  recognize this document?

1   A.   Yes.

2   Q.   Could you please read for the record the lead author,

3   title, publication, and publication date?

4   A.   The lead author is Courtney Schreiber, title is

5   "Mifepristone Pretreatment for the Medical Management of Early

6   Pregnancy Loss," published in 2018.

7   Q.   Was this study peer reviewed?

8   A.   Yes.

9   Q.   Now, staying on page 2161, please describe the methodology

10  used to conduct this study.

11  A.   So this is a randomized controlled trial of patients who

12  had an early pregnancy loss, which is another name for early

13  miscarriage, in the first trimester, and they were randomized

14  to either receive Mifepristone followed by Misoprostol or

15  Misoprostol alone, and then they followed these people up and

16  compared the outcomes in two groups.

17  Q.   Turning to page 2163, did the study use a dosage and

18  administration protocol that is consistent with the

19  evidence-based regimen for medication abortion?

20  A.   Yes, it is a dosage regimen that is certainly

21  evidence-based.  It's not the regimen that is described in the

22  FDA-approved labeling for Mifepristone.

23  Q.   And turning to page 2167, under "Discussion," the first

24  paragraph, what do the authors conclude about the use of

25  Mifepristone and Misoprostol to treat an incomplete

1   miscarriage?

2   A.   They found that pretreatment with Mifepristone, followed by

3   treatment with Misoprostol, resulted in a significantly higher

4   rate of complete gestational sac expulsion by approximately two

5   days after treatment compared to Misoprostol alone.

6   Q.   Is there any evidence that the medical risks associated

7   with Mifepristone and Misoprostol are any greater when used to

8   treat an incomplete miscarriage as opposed to inducing an

9   abortion?

10  A.   No, those risks are not greater.

11  Q.   Thank you.  I'm done with that study.

12       I'd like to now turn to aspiration abortion care.  How

13  often does aspiration abortion care result in complications?

14            COURT REPORTER:  Could you please slow down?

15            THE COURT:  Slow down, please.  Say that

16  question again.  Say the question again, please.

17            MS. SINGH:  Yes.

18  by MS. SINGH:

19  Q.   How often does aspiration abortion result in complications?

20  A.   I may not remember the exact number, off the top of my

21  head, but including both minor and major complications, it's on

22  the order of 1 or 2 percent.

23  Q.   I'm going to pull up a study for you, Plaintiffs' Exhibit

24  112.  And this is a study we previously discussed, correct?

25  A.   Yes.

Q.  Turning to page 178, table 3.  How many patients who obtained a first trimester aspiration abortion were found to experience a major complication from aspiration abortion?

A.  0.16 percent.

Q.  Are the study's findings about aspiration abortion complications consistent with other findings reported in the medical literature?

A.  Yes.

Q.  Okay.  We can take that down now.

    Dr. Grossman, are you familiar with vacuum aspiration?

A.  Yes.

Q.  What is it?

A.  The vacuum aspiration -- I'm sorry.  I think I described it earlier.  It's the technique that can be used in the first trimester to evacuate the uterus.  It's a technique used for abortion.  It's also used for miscarriage.

Q.  And is it also used for gynecological diagnosis?

A.  Yes, I mean, vacuum aspiration may be used to sample the endometrium, sometimes in combination with sharp curettage or scraping of the uterine lining.

Q.  And when vacuum aspiration is done for treatment of miscarriage, how does that procedure compare to an aspiration abortion procedure?

A.  They're essentially identical.

Q.  And what about in terms of risk, complexity, and duration;

1    how do the two procedures compare?

2    A.  Again, the procedures are really identical.

3    Q.  And are you familiar with diagnostic hysteroscopy?

4    A.  Yes.

5    Q.  And what is that?

6    A.  That's a procedure where a small instrument with a

7    television camera is introduced into the uterine cavity, along

8    with fluid to distend the uterine cavity, so the inside of the

9    uterine cavity may be examined.

10   Q.  In terms of risk, complexity, and duration, how does

11   aspiration abortion compare to diagnostic hysteroscopy?

12   A.  In some ways, the risk of first trimester aspiration -- I'm

13   sorry.  Was the question about aspiration abortion or --

14   Q.  Yes, Dr. Grossman.

15   A.  Aspiration abortion is less complex than hysteroscopy.

16   Q.  And what about in terms of risks; are they comparable?

17   A.  They're similar, but the risks may be even higher with

18   hysteroscopy because there's a risk of potential fluid overload

19   because that distention medium that is used to visualize the

20   inside of the uterus can also be absorbed through the uterus,

21   and that fluid overload can be dangerous for the patient.

22   Q.  And are you familiar with endometrial biopsy?

23   A.  Yes.

24   Q.  And what is that?

25   A.  That's a procedure that's done in the office to introduce a

1    very small sampling tube into the uterus to suction out a small

2    sample of the endometrial lining.

3    Q.  And in terms of risk, complexity, and duration, how does

4    endometrial biopsy compare to aspiration abortion?

5    A.  It's similar.

6    Q.  Okay.  Now, I'd like to turn to telemedicine care.  What is

7    telemedicine?

8    A.  Telemedicine is the provision of a healthcare service at a

9    distance using information and communication technology.

10   Q.  What is your personal experience with telemedicine?

11   A.  Up until about a year ago, my personal experience was

12   pretty much limited to the research that I had done and the

13   services that I had observed others providing.  But like all

14   medical providers over the past year, we've all gotten a lot of

15   quick learning and experience under our belt in terms of

16   telemedicine.  So I have provided quite a few telehealth visits

17   for obstetrics and gynecology over the past year.

18   Q.  In medicine, what generally are the benefits of

19   telemedicine care?

20   A.  Generally it can improve access, particularly to more

21   specialized care for patients who are in areas where they don't

22   have easy access to that specialty care.  So that's the main

23   benefit.  As we've seen during the COVID pandemic, the

24   additional benefits are that it can help to reduce the risk of

25   viral transmission.

GROSSMAN – DIRECT/SINGH                    73

Q.   In the US, is it common to prescribe medications that have

contraindication through telemedicine?

A.   Yes.

Q.   What are some examples?

A.   Almost all medications have some contraindications, and

medications are frequently prescribed using telemedicine.

Hormonal contraception is one example that has

contraindications, and we prescribe that using telemedicine.

Antibiotics, pain medications, all of these have some

contraindications and are prescribed using telemedicine.

Q.   You mentioned hormonal contraceptives.  What steps do

providers take when prescribing combined hormonal

contraceptives via telemedicine?

A.   We take a very detailed history, including history of their

prior use of contraceptives, and review the medical

contraindications to determine whether the patients -- patient

has any of them.  We also might review if the patient has been

seen at -- either within the health system, or if it's

electronic health record that we're using, it's in another

system where we can access those records to check, for example,

blood pressure.

Q.   So how do you check for blood pressure if you're providing

hormonal contraceptives through telemedicine?

A.   Again it would be screening for a history of hypertension

either based on what the patient reports, as well as reviewing

1   what the documented historical blood pressures had been

2   measured as.  It's also possible to, if there's a concern, ask

3   the patient to get a blood pressure measurement at a drug store

4   or grocery store --

5   Q.  Thank you.

6   A.  -- or to measure it at home if they have the equipment.

7   Q.  Thank you.

8       In your experience, how commonly are medications prescribed

9   to pregnant patients that have some unknown fetal risks?

10  A.  That's very common.  Most medications that we use during

11  pregnancy have not been very well studied during pregnancy, and

12  there is some potential risk.  That risk -- I mean, medications

13  that are commonly used in pregnancy, it's believed that that

14  risk is low.  But oftentimes there's not great data with

15  well-controlled trials that included pregnant patients.

16  Q.  What are some examples of medications offered to pregnant

17  patients that pose risks to a developing embryo or fetus?

18  A.  There are a variety of medications.  Things like

19  antidepressants may have some risks.  I'm trying to think of

20  others.

21  Q.  What about -- does -- has the COVID vaccine been tested on

22  pregnant patients?

23  A.  That's one that we're certainly dealing with a lot right

24  now.  And it involves a very long, and sometimes not very

25  satisfying for patients, discussion about the potential risks

1    and benefits.  And so we have to try to weigh the potential

2    risk to the patient of acquiring COVID versus the believed to

3    be low, but really unknown risks of the vaccine.  Hopefully,

4    we'll have more data soon about the safety in pregnancy.

5    Q.  And are medications prescribed through telemedicine to

6    pregnant patients, do they also have some unknown risks to the

7    developing embryo or fetus?

8    A.  Yes.  I mean, for example, the discussion about the COVID

9    vaccine right now is happening with all of our patients during

10   telehealth visits, where we're having this detailed discussion

11   with patients about the risks and benefits.  And if a patient

12   chooses to get the vaccine, they're often not seeing us in

13   person before they get the vaccine, but going straight to the

14   vaccination center to get it.

15   Q.  Can telemedicine be used to provide abortion care?

16   A.  Yes, it can.

17   Q.  And has it been used to provide abortion care?

18   A.  Yes, it has.

19   Q.  And can you tell us how telemedicine is commonly used to

20   provide abortion care?

21   A.  I mean, the most common way is to connect a clinician who

22   is not physically on site at the clinic where the patient is

23   being seen to essentially extend the reach of that clinician to

24   provide the care, to provide medication abortion care, to that

25   patient who is in a clinic.  That's the most commonly used way.

1    Telemedicine has also been used to provide state–mandated

2    informed consent visits prior to an abortion.  Telemedicine has

3    also been used to provide medication abortion directly to

4    patients in their home, outside of a clinic.

5    Q.  And the model that you described, that is most commonly

6    used to provide telemedicine abortion care, is that sometimes

7    referred to as "site to site"?

8    A.  Yes.

9    Q.  And in that model, why does a patient still have to visit a

10   healthcare facility to obtain medications?

11   A.  As we discussed earlier, the FDA has imposed the risk

12   evaluation and mitigation that runs for the Mifepristone that

13   says that the medication can only be dispensed in a clinic

14   medical office or hospital.  So a patient needs to come into

15   the facility to receive the medication.

16   Q.  I want to talk to you in a little bit more detail about the

17   steps that you described for us.  So you had mentioned

18   screening.  How do –– how are practitioners able to screen

19   patients for contradictions when prescribing medication

20   abortion via telemedicine?

21   A.  So, again, in this most commonly used model, the patients

22   come into an outlying facility where the physician is not

23   located on site, and undergo an ultrasound by a trained staff

24   person, who then uploads those images and the report for the

25   physician to remotely review to assess gestational age and to

1    confirm an intrauterine pregnancy.

2        The remaining contraindications, as we talked about, are

3    really based just on the patient's medical history and involve

4    essentially a series of questions and reviewing the patient's

5    history and the medications that they're taking.  So all of

6    that can be done remotely.

7    Q.  And does the ultrasound, again, need to be done at the

8    abortion clinic?  Could it be done by an unaffiliated provider?

9    A.  It could be done by an unaffiliated provider.  As I talked

10   about earlier, it's common to rely on outside ultrasounds, and

11   the clinician could review the report, and the images if they

12   are there, to determine whether that ultrasound would make the

13   patient eligible for medication abortion or not.

14   Q.  Let's talk about informed consent.  How does the process

15   for informed consent differ when it's done through telemedicine

16   as opposed to in person?

17   A.  It's really identical.  I mean, there's no aspect of an

18   informed consent that requires being physically present in the

19   same room.  I mean, I can go through the process of informed

20   consent if you'd like, but it's really exactly the same when

21   it's done over a videoconference call as when in you're right

22   next to the patient.

23   Q.  How do you get a patient to sign forms through

24   telemedicine?

25   A.  I mean, it's done a variety of different ways in different

1  clinic systems.  In some cases, the form is printed out on

2  paper where the patient is, and the patient signs on the paper

3  form.  And then the physician or clinician may sign either

4  electronically or the form is faxed to the physician/clinician

5  to sign.  Sometimes they are done electronically using DocuSign

6  or some other similar technology.

7  Q.  And you mention that there are states in which telemedicine

8  has been used to provide state-mandated preabortion consent; is

9  that right?

10 A.  Yes.

11 Q.  And has there been research done on the provision of

12 state-mandated information through telemedicine?

13 A.  Yes, there has.

14 Q.  Can we turn to Plaintiffs' Exhibit 124, please.

15     Do you recognize this document?

16 A.  I do.

17 Q.  Can you please read the lead author, title, publication,

18 and publication date?

19 A.  The author is Katherine Ehrenreich.  The title is "Women's

20 Experiences Using Telemedicine to Attend Abortion Information

21 Visits in Utah:  A Qualitative Study."  The publication date is

22 2019.

23 Q.  Did you co-author this study?

24 A.  I did.

25 Q.  Now, turning to page 2, under "Methods," how did you

1    conduct this study?

2    A.   This study was based on in-depth interviews that we

3    performed with patients who were seeking abortion care at

4    clinics that were part of the Planned Parenthood affiliates of

5    Utah and who used the telemedicine platform to go through the

6    state-mandated informed consent process.

7    Q.   Was this a qualitative study?

8    A.   It was.

9    Q.   Can you tell us about the established methods for

10   conducting qualitative studies?

11   A.   Sure.  The study, as I mentioned, was based on in-depth

12   interviews.  There -- you know, the purpose of this kind of

13   research, particularly in the context of the health services

14   research, is to gain more in-depth information from patients

15   about their experiences with given health services and sort of

16   the meaning that they attach to that experience.

17        There are established guidelines for the conduct of this

18   research, for the design of the study, for ways in which the

19   data are collected, the ways the data are coded and analyzed,

20   the way the results are presented.  And the study conforms with

21   those guidelines.

22   Q.   Was this study peer reviewed?

23   A.   Yes.

24   Q.   Can you describe the logistics of how state-mandated

25   information was provided to patients who participated in this

1  study?

2  A.  So the way this Planned Parenthood affiliate operates the

3  telemedicine system, when patients call to schedule their

4  appointment, they get an option to do it by telemedicine.

5  Patients are e-mailed the written information.  And then they

6  use this platform to access a video visit with a nurse, who

7  provides the state-mandated information, essentially reads

8  aloud the state-mandated script, and then answers patients'

9  questions.

10 Q.  What did the study find about patients' experiences with

11 receiving state-mandated information through telemedicine?

12 A.  Patients, in general, were very satisfied with the service.

13 They -- some of them were concerned about using the technology,

14 and they didn't have much experience using telemedicine and

15 thought it might be weird.  But, in general, once they actually

16 did it, they found that it worked fine, and most people felt

17 like they -- the interaction with the nurse was good.

18     I mean, in general, people felt like the visit wasn't

19 useful and that the state-mandated information wasn't that

20 helpful.  But, given that they had to do it, they -- the vast

21 majority of the participants in this study, as well as in other

22 quantitative research that we've done with this model, the vast

23 majority were very happy that they were able to do it by

24 telemedicine to avoid having to make an extra visit to the

25 clinic to have this visit.

1   Q.  Returning to page 4 of the article, did the study find that
2   telemedicine had any impact on the ability of patients to
3   maintain their privacy.
4   A.  Yes.  Some people, some patients, said -- you know, they --
5   it allowed them to, you know, have the telemedicine, have this
6   informed consent visit outside of the clinic so they didn't
7   have to be seen at the clinic.  They were worried about being
8   seen and going to the group visit for the in-person visit, and
9   doing it by telemedicine allowed them to have it on their own,
10  alone, with a nurse, and preserve their confidentiality.
11  Q.  Did patients raise concerns about having difficulty
12  understanding the information provided to them through
13  telemedicine?
14  A.  No.  People talked about that they were able to get the
15  information that they needed through the telemedicine visit.
16  Q.  Did the study find that telemedicine had any impact on
17  patients' ability to ask questions during their informational
18  visits?
19  A.  No.  Patients were still able to ask questions.  I will say
20  we've done additional research since then that has now been
21  accepted for publication, that's based on surveys with
22  patients, that also confirms, using larger quantitative
23  surveys, that patients are actually significantly more likely
24  to feel comfortable asking questions with a telemedicine visit
25  as compared to an in-person visit.

1    Q.  We can put that study aside now.  Thank you, Dr. Grossman.

2         Do you have an opinion about providers' experiences

3    providing abortion care through telemedicine?

4    A.  I do.

5    Q.  And what's the basis for that opinion?

6    A.  It's based on the research that we've conducted,

7    particularly in Iowa and Alaska, as well as other discussions

8    that I've had with providers in other states, as well.

9    Q.  And we'll talk about some specific studies, but can you

10   give us an overview of how, from the provider's perspective,

11   interactions with patients through telemedicine compare to

12   their in-person interactions?

13   A.  I mean, in general, our findings –- my impression is that

14   the providers see those interactions with patients really to be

15   identical, that they have the same kind of interaction with

16   patients when in a telemedicine visit as they do with an

17   in-person visit.

18   Q.  How can providers assess whether a patient is giving

19   voluntary and informed consent through telemedicine?

20   A.  The same way that they do when they are meeting with them

21   in person.  Part of that relies on the assessment that the

22   patient goes through with the abortion counseling, which is

23   generally another person, certainly in my clinic it's another

24   person who is trained to provide counseling around abortion,

25   who spends much more time with the patient than I do and gets a

1    great deal of information.  But then in that interaction

2    directly with the patient, whether it's by telemedicine or in

3    person, we go through a process that involves a teach-back

4    session at the end where we ask the patient to say in their own

5    words what they are going do and that they voice an

6    understanding of what they are going to do, and they understand

7    the risks, benefits and alternatives and that they want to

8    proceed.  So that all can be done by telemedicine as easily as

9    in person.

10   Q.  And generally, in medicine, how do providers screen for

11   intimate partner violence?

12   A.  We do that by asking patients questions about partner

13   violence.  And we also ask them to -- we ask them these

14   questions both verbally when we meet with them, but we also ask

15   them to complete a history form that includes questions about

16   intimate partner violence.  And I think that the research shows

17   that using those kinds of written forms or questionnaires or

18   checklists are just as effective as asking the questions in

19   person.  So it's often a combination of those kinds of

20   screenings.

21   Q.  And is screening for intimate partner violence common in

22   obstetrics?

23   A.  Yes, it's recommended to be done routinely during prenatal

24   care and multiple times during prenatal care.

25   Q.  And have you personally screened for intimate partner

1    violence?

2    A.   Yes.

3    Q.   And during telehealth visits for obstetrics services, can

4    providers screen for intimate partner violence?

5    A.   Yes, and it's a little bit different for a telehealth visit

6    for obstetric care because I think unlike the kind of

7    telemedicine that we're talking about here, the site-to-site

8    model, abortion care patients are in kind of a confidential

9    setting in a clinic, and so we know there isn't an issue that

10   there's someone else in the room with them who -- that may be

11   actually perpetuating the violence.

12       When we are doing this kind of screening during an

13   obstetric visit, obstetric telehealth visit, we need to --

14   again, we are also going to rely on the written history that

15   patients complete, those patient questionnaires that they

16   complete ahead of time.  But before we ask these kinds of

17   questions, we first want to make sure that they are in a safe

18   place at home that they can answer these questions safely.

19   Q.   And in your opinion, is it possible to screen for intimate

20   partner violence through telemedicine before medication

21   abortion is dispensed?

22   A.   Yes, I mean as I said, we need to do the screening for

23   intimate partner violence now with telehealth for all kinds of

24   visits when we're using telehealth and patients are at home.

25   That's harder but still needs to be done.  It certainly can be

1   done in the context of a telehealth visit with a patient in a

2   clinic.

3          THE COURT:  Can you finish up with your telemedicine

4   questions and then we'll take our noon break, please.

5          MS. SINGH:  Yes, Your Honor.  I have a couple more

6   questions left on telemedicine.  Do you want me to get them --

7          THE COURT:  Ask the couple more questions so we wrap

8   that subject and then we'll know where we are when we start up.

9          MS. SINGH:  Yes, Your Honor.

10  BY MS. SINGH:

11  Q.  So now I'd like to turn to Plaintiffs' Exhibit PX111.  And

12  this is the National Academies Report we previously talked

13  about.  Turning to page 79 of the report, and I'm looking here

14  at the first sentence under "Medication Abortion."  What do the

15  National Academies conclude about whether medication abortion

16  needs to be taken in the presence of a clinician?

17  A.  They determined that there is no evidence that the

18  dispensing or taking of Mifepristone tablets requires the

19  physical presence of a clinician or a facility with the

20  attributes of an ASC, which is ambulatory surgical center, or

21  hospital to ensure safety or quality.

22  Q.  When providing medication abortion care, do providers look

23  for signs that a person is intending to divert Mifepristone for

24  other uses?

25  A.  Umm, I mean I have to say I have never heard of that.  It

1   has never come up in the 20 years of providing medication

2   abortion in my personal experience, in the research that I've

3   done and the other published research.  I've just, I've never

4   seen that happen.  You know, it's no longer required by the FDA

5   that patients take the medication in the clinic so patients can

6   take the medications at home, if they prefer, and then take it

7   at a time that's convenient for them.

8        Certainly there are some patients that I have had in my own

9   practice, in published research and in my own research that I'm

10  doing and have done in the past, there are some patients that

11  take the -- that take the medication home and then decide not

12  to proceed with the medication abortion.  And then they either

13  destroy the medication or they bring it back to the clinic.  I

14  have never seen a case of diversion.

15  Q.  Could we please turn to Plaintiffs' Exhibit 125.  Do you

16  recognize this document, Dr. Grossman?

17  A.  Yes.

18  Q.  Please read for the record the lead author, title,

19  publication and publication date.

20  A.  Kate Grindlay "Telemedicine Provision of Medical Abortion

21  in Alaska:  Through the Provider's Lens," published in 2017.

22  Q.  And were you a co-author for this study?

23  A.  Yes.

24  Q.  Was this article peer reviewed?

25  A.  Yes.

GROSSMAN – DIRECT/SINGH                    87

Q.  And turning to page 681 under the methods discussion, how
was this study conducted?

A.  This was a qualitative study based on in-depth interviews
with clinic providers, including both clinician and staff, at
the affiliate that provided care, Planned Parenthood affiliate
that provided care in Alaska.

Q.  And can the findings of a qualitative study like this be
generalizable to other studies where similar telemedicine model
is being used.

A.  Yes, I mean it's important to take into consideration what
the context is, including what the service delivery model is,
and the other context of the setting.  For example, in Alaska,
providers were having to fly in to Fairbanks in order to
provide care.  So some of those things might be unique to
Alaska, but certainly the findings about the model of care
could be generalized to other settings where the model of care
is similar.

Q.  And what did the study find about providers experiences
with telemedicine?

A.  Again, it found that in general providers thought that
essentially what they did in their interaction with patients
was really the same as it was with an in-person visit.  And
that it allowed them to kind of provide a more patient-centered
care, allowing patients to be seen sooner so they didn't have
to wait a couple of weeks until the physician next flew up to

GROSSMAN – DIRECT/SINGH                88

1   Fairbanks to provide care.

2        So it facilitated earlier access to medication abortion.

3   It also -- I think it also mentioned it had some ripple effects

4   to aspiration abortion care as well because since they were

5   able to provide the medication abortions by telemedicine, then

6   they could get patients in for vacuum aspiration during the

7   short amount of time that the physician was on site in

8   Fairbanks.

9   Q.  And could you just read into the record the first sentence

10  starting with "As one provider said"?

11  A.  "As one provider said, 'I do the same thing that I would do

12  if I was in front of the patient.  I do the counseling,

13  computer paperwork, and discuss risks and benefits and follow

14  up with the patient, and then I watch the patient take the

15  medication instead of physically handing it to them.'"

16  Q.  Thank you, Dr. Grossman.  We can put that study aside for

17  now.

18        MS. SINGH:  Your Honor, would this be a good time to

19  break for lunch?

20        THE COURT:  Have you finished telemedicine?

21        MS. SINGH:  I have not completely finished

22  telemedicine.  But I am getting close.  I have a couple more

23  questions for him.

24        THE COURT:  Well, a couple more questions or a couple

25  more pages?  I see you shuffling pages.

1      MS. SINGH:  I have more questions for him on

2  telemedicine and then I have a couple of other categories of

3  questions for Dr. Grossman.

4      He is our longest witness today.  We do expect still

5  to get through our other witnesses and conclude today.  They

6  are much shorter in duration than Dr. Grossman's testimony.

7      MR. BARTOLOMUCCI:  Can we get an estimate of the

8  number of additional telemedicine questions that will be

9  forthcoming after lunch?

10      THE COURT:  Well, no.  I don't care so much about that

11  as how much more time with this witness?

12      MS. SINGH:  I think I have probably about an hour,

13  maybe an hour and a half left with Dr. Grossman.

14      THE COURT:  No.  You use the lunch hour to condense it

15  to an hour.  Okay?  Because we need to -- I'm getting it.

16  You're making your record.  I understand it.  So shovel it in a

17  little faster.

18      MS. SINGH:  I will do my best.  And like I said, Your

19  Honor, we do intend to get through our other witnesses today.

20  They are much shorter.

21      THE COURT:  Dr. Grossman is giving me a subliminal

22  sign that he wants you to do it in an hour too, and I'm reading

23  that, I'm reading that through his eyes.  So you'll make us all

24  happy.

25      Mr. Bartolomucci will not care if you go on for a

1    while because he gets paid by the hour.  But I know he'd like

2    it to wrap up too.  So do your best.

3           MR. BARTOLOMUCCI:  I would, Your Honor.

4           THE COURT:  Yes.  Thank you.

5           MS. SINGH:  I will try, Your Honor.

6           THE COURT:  Okay.  So it's 20 minutes till, just about

7    20 minutes till one.  So let's aim to reconvene at a quarter of

8    two and hope our technology allows us to do that.

9           Have a nice lunch break.

10          THE WITNESS:  Thank you.

11          MS. SINGH:  Thank you, Your Honor.

12             (Lunch recess was taken at 12:38 p.m.)

13                       (Open court.)

14          THE COURT:  That hour went fast, didn't it?

15          MS. SINGH:  It did, Your Honor.

16          THE COURT:  Well, I hope you got something to eat, had

17   something to do, maybe walked around the block.

18          Okay.  Here we go again.  Are you ready with your next

19   questions, Miss Singh?

20          MS. SINGH:  I am, Your Honor.  Thank you.

21          THE COURT:  You may resume your questioning.

22          MS. SINGH:  Thank you.

23   BY MS. SINGH:

24   Q.  Dr. Grossman, I'd like to talk to you now about the safety

25   of abortion care via telemedicine.  In your opinion, is

1    telemedicine for medication abortions safe?

2    A.  Yes, it is safe.

3    Q.  What is the basis for your opinion about the safety of

4    medication abortion via telemedicine?

5    A.  Published research on this topic as well as talking with

6    providers who are providing the service.

7    Q.  I'd like to pull up Plaintiffs' Exhibit 126.  Please read

8    for the record the lead author, title, publication, and

9    publication date.

10   A.  I was the lead author.  Title is, "Effectiveness and

11   Acceptability of Medical Abortion Provided Through

12   Telemedicine," published in 2011.

13   Q.  Does the study look at the safety and effectiveness of

14   medication abortion via telemedicine?

15   A.  Yes.

16   Q.  Please tell us about the findings with respect to those

17   issues.

18        THE COURT:  You need to slow down a little bit.  I

19   know I've pushed you to go fast, so it's on me a little bit;

20   but the court reporter has to make a record.

21        MS. SINGH:  Yes, Your Honor.  I'll slow it down.

22   BY MS. SINGH:

23   Q.  Could you tell us about the --

24        THE COURT:  One second.  Just one second.

25        All right.  Go ahead now.

1        MS. SINGH:  Let me try that again.

2   BY MS. SINGH:

3   Q.  Tell us about the findings of this study with respect to

4   the safety of medication abortion care via telemedicine.

5   A.  So this study only started shortly after the service was

6   started in Iowa -- in the Planned Parenthood affiliate in Iowa.

7   This is the site-to-site telemedicine model.

8        THE COURT:  Was this published in 2011?  I'm trying to

9   see the small print there.

10       THE WITNESS:  That's correct.

11       THE COURT:  Okay.

12  A.  And we looked at -- we performed what's called a

13  prospective cohort study where we recruited about 220 patients

14  who were having a medication abortion in the affiliate clinics

15  and chose to have a telemedicine visit, and a similar number of

16  patients who chose to have an in-person visit; and then we

17  followed them through their clinical course and collected

18  clinical outcome data with those patients.

19       And then at the end of the abortion process, we also

20  surveyed them about their experience.  So we have data about

21  acceptability and satisfaction.

22       So the main finding with regard to this cohort study was

23  looking at the effectiveness of the abortion method; and not

24  surprisingly, we found that the proportion with the successful

25  abortion was very high.  Ninety-nine percent were telemedicine

GROSSMAN – DIRECT/SINGH                                     93

1   patients, and 97 percent were those who had an in-person visit;

2   and that was not statistically significantly different.

3        We also looked at safety outcomes; and safety outcomes

4   were -- let's say the data was very reassuring based on this

5   small cohort study.

6        We also looked at all of the patients who received

7   medication abortion in the affiliate for the first -- I think

8   it was about 17 or 18 months of the service, looking at those

9   adverse events that were reported to FDA; but those data are

10  also included in the larger paper that I think we already

11  discussed that looked at the first seven years of data.  So I'm

12  not sure that it's so useful to go in depth into the safety

13  data that we found in this study.  It was also -- showed no

14  difference in adverse events.

15  BY MS. SINGH:

16  Q.  Have there been systematic reviews of the literature on

17  telemedicine for abortion care?

18  A.  There have.

19       If I might just add one other thing to my last answer.  I

20  was focused mostly on the effectiveness and safety outcomes in

21  that other -- in that study that I just referred to, the 2011

22  study.  We also surveyed the patients and asked questions about

23  satisfaction and acceptability; and some measures of

24  satisfaction were significantly higher among patients who had a

25  telemedicine medication abortion.  In particular, they were --

1    controlling for other factors, they were significantly more

2    likely to say that they would recommend the service to someone

3    else.

4    Q.   Thank you, Dr. Grossman.

5    A.   Regarding the question about systematic reviews, yes, there

6    is a –– one systematic review of the literature on telemedicine

7    provision of medication abortion published by Endler,

8    E–N–D–L–E–R, et al.

9    Q.   And can you tell us about what the Endler study found?

10   A.   It reported on a variety of different models of

11   telemedicine, including –– included data from our published

12   work in Iowa and also included from several other models that

13   are used in other countries that don't involve the patient

14   going to a clinic.

15        I think the main finding of the review overall is showing

16   that the complications for all of these models is very low, and

17   the prevalence of complications is similar across all these

18   studies and showing that all of these models are provided

19   safely.  There are some details about how the models are

20   provided that show some differences in some of the other

21   outcomes, but I think that's the important finding.

22   Q.   And has ACOG taken a position on the provision of

23   medication abortion care via telemedicine?

24   A.   Yes.  ACOG has noted in the Practice Bulletin on medication

25   abortion that telemedicine may be used to safely and

GROSSMAN - DIRECT/SINGH                  95

effectively provide medication abortion and that it may help to
improve access to early abortion and reduce the need for second
trimester abortion.

Q.  Do some patients prefer medication abortion to aspiration
abortion?

A.  Yes.  I'd say in my -- there are published studies and in
my own clinical experience, many patients have a strong
preference of one versus the other, including many who have a
strong preference for medication abortion.

Q.  And has there been research into whether telemedicine has
an impact on the gestational age at which abortion is accessed?

A.  Yes.  One of our findings from the research in Iowa from
another study where we looked at four years of data across the
Planned Parenthood affiliate there, we found that after the
introduction of telemedicine, controlling for other factors,
the patients were significantly more likely to obtain a first
trimester abortion after telemedicine was tried.  There was a
small but significant reduction in the proportion of abortions
that were done in the second trimester.

Q.  Thank you.

    Okay.  Now, I would like to turn to obstacles to abortion
care.  Just to start, do you have an opinion about why people
seek abortion care?

A.  Yes, I think people seek abortion care for a variety of
reasons, including because it's not the right time in their

1    life to have a child or another child.  Because of their

2    education or because of their work, they don't have financial

3    resources to support a child or another child.  They want to

4    focus their resources that they have possibly on their other

5    children, given that about 60 percent of abortion patients

6    already have other children, have given birth previously.

7        Some patients have medical reasons why they're concerned

8    about their health status if they continue a pregnancy.  So

9    those are some of the reasons.

10   Q.  And what is the basis for your testimony about the reasons

11   that people seek abortion care?

12   A.  It's based on published literature, my experience with my

13   own patients, talking with other colleagues in the field.

14   Q.  Nationally, what percentage of abortion patients are low

15   income?

16   A.  About 75 percent of patients are living at or below

17   200 percent of poverty level, which is considered low income.

18   Q.  Okay.  Now, if I could pull up Plaintiffs' Exhibit 128.

19   And do you recognize this document?

20   A.  I do.

21   Q.  Could you please read for the record the lead author,

22   organization title and publication date?

23   A.  Lead author is Jenna Jerman from the Guttmacher Institute.

24   The title is "Characteristics of U.S. Abortion Patients in 2014

25   and Changes Since 2008"; and it was published in 2016.

1    Q.  Is this report widely relied upon in your field?

2    A.  Yes.

3    Q.  Turning to page 6, Table 1, according to the report, in

4    2014, how many abortion patients live in households that are

5    below the poverty level?

6    A.  In 2014, there was 49 percent.

7    Q.  In 2014, how many abortion patients live in households that

8    are at 100 to 200 percent of the federal poverty level?

9    A.  25.7 percent.

10   Q.  In your expert opinion, as a doctor, researcher, and prior

11   member of ACOG's Committee on Healthcare for Underserved Women,

12   how does poverty impact access to abortion?

13   A.   It plays an important role, obviously, given that the

14   majority of patients seeking abortion care are living on low

15   incomes.  In most states, Medicaid does not cover abortion

16   care.  So even though these patients may be eligible for

17   Medicaid, particularly during pregnancy, based on their income

18   level, they are not eligible for financial support for Medicaid

19   to pay for abortion care.  So often, they need to pay for

20   abortion care out of pocket.

21       In addition, to overcome barriers to accessing abortion

22   care, such as traveling long distances to get to a provider

23   involves costs associated with transportation.  There are costs

24   associated with getting time off from work, arranging for and

25   paying for childcare, if the patient has other children.

1        Patients often want someone to accompany them to the

2    abortion, so that involves someone else taking off time from

3    work.  There are obviously costs associated with all of these

4    things that are particularly burdensome for patients who are

5    living on low incomes.

6    Q.  In your expert opinion, how does telemedicine impact access

7    to abortion care for people who are low income or living in

8    poverty?

9    A.  It may help some patients overcome some of these barriers

10   if they are able to access care closer to home so they don't

11   have to travel as far.  It may not take as much time off from

12   work, may not have to create as much childcare time.  So all of

13   this helps to reduce some of those costs.

14   Q.  Is there evidence in the medical literature that the need

15   to travel farther or make multiple trips to an abortion

16   provider delays access to care?

17   A.  Yes, there now are published studies from a number of

18   settings in the U.S., from a number of different states,

19   including data research from Mississippi, Texas, Alabama, Utah,

20   Arizona, a variety of different settings, showing how this --

21   the need to make multiple visits impacts patients.

22   Q.  Can you describe the types of studies that have been

23   conducted, qualitative or quantitative, on the impact of travel

24   on multiple trips on access to care?

25   A.  I mean, there are both quantitative studies, some that are

GROSSMAN - DIRECT/SINGH                99

based on surveys with patients, some that are based on clinic
records, some that are based on vital statistic data from
state.  There are also qualitative studies that are based on
in-depth interviews with patients.

Q.  Is the qualitative study just a collection of anecdotal
information?

A.  No.  As we discussed earlier, I think, there are, you know,
established standards and real guidelines about how qualitative
research is designed, conducted, analyzed, and written up and
published; and so qualitative studies need to adhere to that
guidance in order to be published in peer-reviewed journals.

Q.  What does the research demonstrate about the impact of
travel distance on access to care?

A.  The impact of travel distance can be very burdensome for
some patients.  It can force patients to delay care while they
figure out how they are going to make that longer trip or the
additional trip.  Sometimes their care gets delayed into the
second trimester, so it puts them at increased risk of having a
second trimester procedure.

It may require them -- there may be emotional burdens or
confidentiality burdens and that they might have to tell
someone else that they otherwise wouldn't tell about the
abortion in order to arrange transportation.

Sometimes the barriers may be so great that it prevents
some people from getting a wanted abortion, and they are forced

GROSSMAN – DIRECT/SINGH                    100

1  to continue an unwanted pregnancy to term; and it may also

2  cause some to explore options to self-manage or self-induce an

3  abortion outside of a clinical facility on their own.

4  Q.  Have you done research on the impact of travel distance on

5  access to abortion care?

6  A.  Yes.

7  Q.  If we could now pull up Plaintiffs' Exhibit 129, please.

8  Please read for the record the lead author, title, publication

9  and publication date.

10  A.  The author is Liza Fuentes, the title is "Women's

11  Experiences Seeking Abortion Care Shortly After the Closure of

12  Clinics Due to a Restrictive Law in Texas," published in 2016.

13  Q.  Did you co-author this study?

14  A.  I did.

15  Q.  How was this study conducted?

16  A.  So this study is based on in-depth interviews with patients

17  who tried to access care from clinics in Texas that were closed

18  or not providing services shortly after House Bill 2 went into

19  effect in Texas; and so we worked with those clinics to contact

20  the patients and invite them to participate in an interview and

21  then we interviewed them some weeks later about their

22  experience seeking care.

23  Q.  And what did the study find with respect to how increased

24  cost and travel time impacted abortion patients?

25  A.  Similar to what I said before, it was burdensome and the

1   fact that patients had to travel farther was -- made it hard

2   for them to access care.  Some patients were delayed in the

3   process.  Getting additional funds together to be able to make

4   the trip to arrange transportation, some were pushed into the

5   second trimester; some were unable to obtain a wanted abortion

6   at all.

7   Q.  If we could turn to page four of this study.  And now

8   looking just above Section 3.4.  If you could read into the

9   record that second to last black quote and the two sentences

10  that follow?

11  A.  It starts "I wanted to get"?

12  Q.  Yes, please?

13  A.  "I wanted to get the medication procedure but they said I

14  couldn't because it requires at least two visits to go back to

15  the doctor, and I wouldn't be able to travel back to San

16  Antonio because I work and I wouldn't be able to have so many

17  days off to go.  I just kind of, you know, forgot about having

18  that done.  Like I really wanted to get it done, but it was

19  real expensive and then I would have to travel a long time, for

20  like, I think, it's like a four-hour drive or a six-hour

21  drive."

22     "She expressed that she felt unable to manage the added

23  cost of child chair, more time off work and traveling farther

24  to obtain an abortion after her local clinic closed."

25  Q.  Thank you, Dr. Grossman.  Tell us about whether delayed

1   access to abortion has any medical risks.

2   A.   Yes.   If patients are delayed later in pregnancy,

3   particularly into the second trimester as we saw in one of the

4   previous articles that we referred to by Zane, Z–A–N–E, et al.,

5   the risk of complications and death increases in second

6   trimester when abortion is performed in the second trimester

7   compared to the first trimester.   It is still a safe procedure

8   and safer than continuing a pregnancy to term, but it does

9   increase the medical risks of the procedure.

10      If a patient is delayed to the point where they are unable

11  to obtain a wanted abortion at all, and is forced to continue

12  an unwanted pregnancy to term, again, as we saw earlier, one of

13  the other references by Raymond and Grimes, they are subjected

14  to the risks associated with childbirth, which are

15  significantly higher compared to abortion.

16  Q.   And does delay have any impact on the methods of abortion

17  available do a patient?

18  A.   Yes, so if a patient is delayed past the gestational age

19  limit for medication abortion, which currently is 10 weeks,

20  according to the FDA approval for Mifepristone, but some

21  clinics are using it in states off label to 11 weeks, so if a

22  patient is pushed past that gestational limit for medication

23  abortion then medication abortion is no longer available.

24      Once they get past 11 or 12 weeks, many clinics will start

25  using cervical priming before performing a vacuum aspiration

1  procedure which means the patient has to spend often more time

2  in the clinic and receive medication that may have additional

3  side effects in order to undergo a vacuum aspiration.  And

4  then, of course, if they are delayed later, they might have to

5  under gone a D&E which would involve a multi-day procedure.

6  Q.  If we could now pull up Plaintiffs' Exhibit 131.  Please

7  read for the record the lead title -- the lead author, title,

8  publication and published date, please.

9  A.  The lead author is Kari White, title is "Travel for

10  Abortion Services in Alabama and Delays Obtaining Care."

11  Published in "Women's Health Issues" in 2017.

12  Q.  Are you a co-author of this study?

13  A.  I am.

14  Q.  And was this study peer reviewed?

15  A.  Yes.

16  Q.  What did the study find was the impact of multiple trips on

17  access to abortion care for people who are living at or below

18  the poverty level, and here I'm on page 527?

19  A.  Well, I think one -- it's also in Table 2 perhaps, but they

20  found -- or we found -- that people who are living below a

21  hundred percent poverty level were significantly more likely to

22  not return for the abortion procedure visit.

23  Q.  If we could now pull up Plaintiffs' Exhibit 132, please.

24  If you could please read for the record the lead author, title,

25  publication and publication date.

1  A.  The lead author is Deborah Karasek, the title is "Abortion

2  Patients' Experience and Perceptions of Waiting

3  Periods:  Survey Evidence before Arizona's Two-visit 24-hour

4  Mandatory Waiting Period Law," published in "Women's Health

5  Issues" in 2016.

6  Q.  How was this study conducted?

7  A.  So this was a survey of patients seeking abortion care at a

8  facility in Arizona before that state's 24-hour waiting period

9  and two-visit requirement went into effect.

10 Q.  What did the study report were the most common reasons for

11 patients being delayed from obtaining an earlier procedure?

12 A.  I think more than two-thirds reported difficulty paying for

13 the appointment -- for the expenses related to the appointment.

14 They talked about having to pay for other expenses such as

15 rent, bills and food, and particularly patients on lower

16 incomes were more affected.

17 Q.  Previously you mentioned that about 60 percent of abortion

18 patients are already parents; is that right?

19 A.  Yes.

20 Q.  How does having other children impact a person's ability to

21 access care?

22 A.  Often patients will need to arrange for childcare during

23 the time that they have a clinic visit for their abortion.

24 Q.  And what is the basis for your opinion about that?

25 A.  Published literature, my own experience, both as a care

1  provider and as a parent.

2  Q.  Now if we could please turn to Plaintiffs' Exhibit 133.

3  Please read for the record the author, title, journal and

4  publication date.

5  A.  The lead author is Lawrence Finer, the title is "Timing of

6  Steps and Reasons for Delays in Obtaining Abortions in the

7  United States," published in 2006 in "Contraception."

8  Q.  Was this study peer reviewed?

9  A.  Yes.

10  Q.  How was this study conducted?

11  A.  This was a survey that was completed by a little over 1200

12  abortion patients at 11 facilities, and they asked them about

13  sort of the timing and the steps to obtain an abortion as well

14  as asked them questions about some of the reasons for the

15  delay.

16  Q.  Now I'm looking at page 341.  How did cost impact access to

17  care, according to this study?

18  A.  In this study, I think at the part you're referring to, is

19  that poor women were more likely to say that they would have

20  preferred to have the abortion earlier.  People often talked

21  about, in the study, that the time that it took to put together

22  resources to pay for the abortion care was an important reason

23  for delay.

24  Q.  And what was the most common reason for delay?  It's Table

25  1.

1    A.   Yeah.  So the most common reason was that they needed to

2    raise money to have the abortion, which was cited by -- that's

3    one of the reasons, sub-reasons that it took a long time to

4    make arrangements.  But, yeah, needing time to raise money to

5    have the abortion was cited by 26 percent of all women.

6    Q.   Okay.  And staying on page 341, if you could please read

7    into the record that last block quote that begins with "I

8    mean."

9    A.   "I mean, when I first found out that I was pregnant, I had

10   it in my head anyway to have the abortion, but I did not have

11   the money.  It was the money; I did not have no money to come

12   down here and the money to do it.  It is hard to take off work,

13   you know, but it was really the money, because if I were to

14   have it sooner, I would have come sooner, but I did not have

15   it.  And everybody was against me having the abortion so, there

16   was nobody to help me, you know."

17   Q.   Thank you, Dr. Grossman.  What proportion of abortion

18   patients have experienced intimate partner violence?

19   A.   A significant proportion.  I'm sorry, I don't remember off

20   the top of my head.

21   Q.   If we could bring up Plaintiffs' Exhibit 134.  And taking a

22   look at this study, under "Background," what does this study

23   find with respect to the proportion of abortion patients with

24   experienced intimated partner violence?

25   A.   Six to 22 percent reported recent violence from an

1    intimate.

2    Q.  Great.  And if you could just read into the record, again,

3    the author, title publication and publication date.

4    A.  First author is Sarah Roberts, the title is "Risk of

5    Violence From the Man Involved in the Pregnancy After Receiving

6    or Being Denied an Abortion," published in "BMC Medicine" in

7    2014.

8    Q.  Thank you.  If we could pull up Stipulated Exhibit SE31.

9    And what is this document, Dr. Grossman?

10   A.  It's a report from The National Intimate Partner and Sexual

11   Violence Survey, the 2010 to 2012 state report.

12   Q.  If we could turn to page 134, Table 5.9.  I think that's

13   the wrong page.  Page -- actually Table 5.9.  I think I have

14   the wrong page.  I see.  134 of the article, which is page 148

15   of the exhibit.  There we go.  Okay.  Thank you.

16       And according to this table, what information does this

17   report provide about the percentage of the Indiana women who

18   experience psychological aggression from intimate partner

19   violence?

20   A.  51.8 percent reported any psychological aggression.

21   Q.  Turning to page 14 of the article, how does the publication

22   define psychological aggression?

23   A.  Sorry, I don't actually have it in front of me.  I can pull

24   it up.

25   Q.  You know what, it's actually on page 13, right-hand column.

GROSSMAN – DIRECT/SINGH                              108

1   And just beginning in that first sentence.

2   A.  "Intimate partner violence was assessed through several

3   questions that included physical violence, sexual violence and

4   psychological aggression, which includes expressive aggression,

5   e.g., insulting, name calling and coercive control, behaviors

6   that reflect monitoring, controlling or threatening the victim,

7   by an intimate, i.e., romantic or sexual partner."

8   Q.  Thank you.  We can put that study aside now.

9       Dr. Grossman, how does pregnancy impact intimate partner

10  violence?

11  A.  It may increase.

12  Q.  And in your expert opinion as a doctor and as a researcher,

13  how do restrictions on telemedicine impact people experiencing

14  intimate partner violence?

15  A.  Those burdens may be particularly challenging for patients

16  who are experiencing intimate partner violence, particularly if

17  the patient needs to hide the fact that they are having the

18  abortion from the perpetrator.  If they need to make multiple

19  visits, if they need to arrange transportation, extra

20  transportation to a facility, all those things may be

21  particularly challenging for patients who are victims of

22  intimate partner violence.

23  Q.  Thank you, Dr. Grossman.

24          MS. SINGH:  I think I'm just about done, Your Honor.

25  May I just have a moment?

1          THE COURT:  Yes, one moment.

2          MS. SINGH:  Thank you.

3          THE COURT:  It's hard to imagine you left anything

4    out, Miss Singh.

5          MS. SINGH:  I hope I didn't.  Okay.  I think I have

6    just one.

7    BY MS. SINGH:

8    Q.  And, Dr. Grossman, we previously talked about the National

9    Abortion Federation; is that right?

10   A.  Yes.

11   Q.  And can you just tell us, what is the National Abortion

12   Federation?

13   A.  It's a professional organization that represents abortion

14   providers, and provides clinical guidance to abortion

15   facilities; it provides training, education for

16   abortion-providing facilities; it essentially provides

17   accreditation to members by ensuring that facilities that are

18   NAF members are providing high standards of care.

19   Q.  Thank you, Dr. Grossman.

20         MS. SINGH:  I have no further questions, Your Honor.

21         THE COURT:  All right.  Finally, finally,

22   Mr. Bartolomucci.  You get to cross-examine.

23                    **CROSS EXAMINATION**

24         MR. BARTOLOMUCCI:  Thank you, Your Honor.

25

1  BY MR. BARTOLOMUCCI:

2  Q.  Dr. Grossman, my name is Chris Bartolomucci.  I'm one of

3  the attorneys representing the defendants in this case.

4     Are you able to hear me okay?

5  A.  Yes.

6  Q.  Okay.  Great.  I'd like to start by asking you some

7  questions about use of ultrasound technology.

8     You testified that in your practice, you routinely use

9  ultrasound to determine gestational age when providing abortion

10 care; is that right?

11 A.  That is correct.

12 Q.  And your practice is located in California; is that true?

13 A.  Yes.

14 Q.  Does California state law require your practice to use

15 ultrasound?

16 A.  No.

17 Q.  Doctor, is ultrasound the most accurate way to determine

18 the gestational age of a fetus?

19 A.  Um, not necessarily.  I think actually the most accurate

20 way is when a patient has been -- has undergone assisted

21 reproductive technology and we know the precise date of when

22 the pregnancy began.  That's the most precise measurement.

23 Ultrasound also has some error in the measurement.  In the

24 first trimester that error of measurement is about plus or

25 minus five days.  Often patients are very accurate in their own

1    self assessment of gestational age based on their last

2    menstrual period from the -- based on the date that they

3    believe they got pregnant.

4    Q.  Well, if it's not the most accurate method, would you agree

5    with me that it is a highly accurate method of determining

6    gestational age?

7    A.  Yes.

8    Q.  And it is important to determine accurately the gestational

9    age of a fetus before an abortion, isn't it?

10   A.  It is important to know whether the patient is eligible for

11   medication abortion, meaning it's important to know whether

12   they are within that window.  So if the clinic cut-off is ten

13   weeks, it's important to know that they are less than ten weeks

14   pregnant.  It really doesn't matter for clinical care whether

15   they are nine weeks and six days or if they are six weeks and

16   three days.

17   Q.  Isn't it true that the risk of abortion increases as

18   gestational age increases?

19   A.  It is true as we get into the second trimester that the

20   risks start to increase, but it's really not clear that those

21   risks are much different between, as I said, six weeks and nine

22   weeks.

23   Q.  But it would be important to determine gestational age

24   accurately in order to provide the woman with accurate

25   information about her risks of undergoing an abortion, true?

1   A.  Um, again, I don't think that those risks are materially

2   different between six weeks and nine weeks, so I don't know

3   that that information is so critical.  But I will stipulate

4   that it's important to know that gestational age.  I don't know

5   that it has to be precisely pinpointed to the exact day and, in

6   fact, we can't do that.  There is an error with any of the

7   tools that we use to measure gestational duration.

8   Q.  Fair enough.  Let me ask you a question about ACOG Practice

9   Bulletin 225 concerning medication abortion.  You previously

10  testified that you were a co-author of that publication; am I

11  correct?

12          THE COURT:  Do you have a number for the exhibit?

13  That's how we're carrying them in the record, sir.

14          MR. BARTOLOMUCCI:  I do, Your Honor.  It's Impeachment

15  Document 35 and also Plaintiffs' Exhibit 120.

16          THE COURT:  Okay.  I think it's been referred to as

17  Plaintiffs' Exhibit 120, so we'll carry it as that.

18          MR. BARTOLOMUCCI:  Very good.

19  BY MR. BARTOLOMUCCI:

20  Q.  Dr. Grossman, you testified that you were a co-author of

21  that practice bulletin, true?

22  A.  Yes.

23  Q.  And do you agree with ACOG's recommendation that

24  gestational age be determined either by ultrasound or with an

25  in-person physical examination?

GROSSMAN – CROSS/BARTOLOMUCCI                   113

1   A.  After 56 days, as we talked about earlier.

2   Q.  Thank you.  Now, in your practice, doctor, what percentage

3   of your patients seeking a medication abortion show up in your

4   office already having had an ultrasound?

5   A.  It's a small proportion, I would say probably fewer than

6   10 percent.

7   Q.  And do you know what percentage of women in Indiana already

8   have had an ultrasound before they go to an abortion clinic?

9   A.  I do not know.

10  Q.  Does the use of an ultrasound reveal ectopic pregnancy?

11  A.  Not definitively, but it may provide additional information

12  that's useful in assessing the location of the pregnancy.

13  Q.  Thank you.  Let's shift and talk now about telemedicine.

14  At first let's talk about telemedicine from the vantage of a

15  woman seeking a medication abortion in Indiana.  Now, am I

16  right that telemedicine does not mean that a woman seeking a

17  medication abortion never has to leave her home?

18  A.  I'm sorry, there were several negatives in there.

19  Q.  Okay, let me try to rephrase that.  A woman in Indiana who

20  is -- who would be using telemedicine would still have to leave

21  her home to obtain a medication abortion, correct?

22  A.  Yes.

23  Q.  It doesn't permit you, telemedicine doesn't permit you to

24  stay at home and obtain your abortion?

25  A.  This model of care that we're talking about, that is

1   site-to-site telemedicine for medication abortion, still

2   requires patients to go into a facility.

3   Q.  And one reason a woman would have to go to the facility is

4   to obtain an ultrasound, in Indiana, correct?

5   A.  I mean, are you asking me about the current law, or are you

6   asking me about clinician, ideal clinician practice?

7   Q.  I'm asking you about what a woman would have to do in

8   Indiana under current law even if there were telemedicine?

9           MS. SINGH:  Objection, Your Honor.  That calls for a

10  legal conclusion.

11          THE COURT:  Sustained.

12  BY MR. BARTOLOMUCCI:

13  Q.  The FDA requires abortion-inducing drugs to be dispensed at

14  a doctor's office, clinic, or hospital, correct?

15  A.  That is incorrect.

16  Q.  What does the FDA require?

17  A.  The FDA only has specific dispensing requirements for

18  Mifepristone and say that Mifepristone must be dispensed in a

19  clinic medical office or hospital.

20  Q.  Okay.  Thank you.  I believe you testified that you started

21  using telemedicine yourself in the last year or two; is that

22  correct?

23  A.  Since the COVID 19 pandemic, yes.

24  Q.  And you have personally performed an abortion using

25  telemedicine?

GROSSMAN - CROSS/BARTOLOMUCCI                 115

1   A.  I've not performed an abortion using telemedicine.  I have

2   provided follow-up care using telemedicine.

3   Q.  Let's talk about your 2011 Iowa study regarding

4   telemedicine.  If we could call that up.

5          MR. BARTOLOMUCCI:  This is, Your Honor, Impeachment

6   Document 39, although I believe plaintiffs have previously

7   identified it as Plaintiffs' Exhibit 126.

8          THE COURT:  Okay.

9   BY MR. BARTOLOMUCCI:

10  Q.  Do you recognize this study, Doctor?

11  A.  I do.

12  Q.  And this is your 2011 Iowa study?  Can I call it that?

13  A.  Sure.

14  Q.  Now you studied follow-up data obtained from women who had

15  medication abortions at Planned Parenthood clinics in Iowa,

16  right?

17  A.  I'm sorry, I didn't really understand your wording, what

18  you meant by "follow-up data."

19  Q.  Data obtained from follow-up visits.

20  A.  So this study includes several different types of data

21  collection.  We, as I said, performed a prospective cohort

22  study where we prospectively enrolled participants and then

23  followed them prospectively to collect their clinical

24  information.  So we weren't just reviewing charts.  We were

25  prospectively following them.  Those that didn't return for a

1    follow-up visit, we tried to contact them by telephone to get

2    that follow-up information, and then we also surveyed them.

3        And then in addition, we, during this time period of the

4    study, we examined all of the adverse event reports that were

5    reported to Danco and to the FDA on the adverse events.

6    Q.  I'd like to draw your attention to a finding you made on

7    page 302 of your Iowa study, the 2012 Iowa study.

8        I believe we're going to highlight it to make it easier to

9    read.

10            THE COURT:  That would be a good idea.  There it is.

11   BY MR. BARTOLOMUCCI:

12   Q.  Now, doctor, you found "25 percent of telemedicine patients

13   would have preferred a face-to-face visit with the physician,

14   and this was more common among younger, less educated, and

15   nulliparous women."

16       Is that what you found?

17   A.  Correct.

18   Q.  And can you tell me, for the record, what nulliparous women

19   refers to?

20   A.  Nulliparous means patients who have not had a birth.

21   Q.  Thank you.  Now, if we could go to page 296 of the same

22   study.  I think we're in the process of doing that.

23   A.  I do have the page in front of me.

24   Q.  Oh, you do.  I want to read a quotation from page 296, and

25   that's "younger age, less education, and nulliparity were

1  significantly associated with preferring face-to-face

2  communication."  Was that one of your findings?

3  A.  Yes.

4  Q.  And if I could draw your attention to page 301 to Table 3,

5  near the bottom of the table, I believe you found that

6  11 percent of women reported that they were not "comfortable

7  asking questions during a telemedicine encounter."  Was that

8  one of your findings?

9  A.  Yes.

10  Q.  Now, by the way, at the Planned Parenthood clinic in Iowa,

11  and in your study, neither of the telemedicine patients, nor

12  the face-to-face patients, received routine physical

13  examinations; is that true?

14  A.  That is true, consistent with the standard of care for

15  medication abortion nationwide.

16  Q.  And just to save time, is that also true of your other Iowa

17  studies of telemedicine that physical examinations were not

18  routinely performed?

19  A.  Patients did not undergo a physical examination in any of

20  those studies consistent with the standards of care.

21  Q.  Okay.  Let's now move to your 2013 Iowa study, and we can

22  identify this as Impeachment Document 42.

23  A.  Is that also a plaintiff --

24          THE COURT:  Does it have a Plaintiffs' number?

25          MR. BARTOLOMUCCI:  It does, Your Honor.  It's also

1    PX130.

2              THE COURT:  Okay, thank you.

3    BY MR. BARTOLOMUCCI:

4    Q.  Now, do you recognize this document, Doctor?  We can blow

5    it up if we need to.

6    A.  Yes, I recognize it.

7    Q.  Okay.  And can we call this your 2013 Iowa study?

8    A.  Yes.

9    Q.  Now, tell me if I'm wrong, but I think you studied data

10   from the two years before the Planned Parenthood clinics in

11   Iowa began to offer medication abortion through telemedicine

12   and the two years after the clinics started offering such

13   abortions; is that right?

14   A.  Yes.

15   Q.  And one of the things you studied was data relating to the

16   distance women traveled from their home to the clinic before

17   telemedicine and after the introduction of telemedicine, right?

18   A.  Yes.

19   Q.  Now, on page 77, page 77 -- we're nearly up.  There we are.

20        You wrote on page 77, Doctor, I believe, "We observed a

21   relatively small reduction in the distance women traveled from

22   their home to the clinic."  Is that one of your findings?

23   A.  That is one -- that's what that sentence says.  There are

24   other data in this paper, which perhaps we'll go through,

25   either now or later with Miss Singh, related to some of the

1  geographical findings.  But, yes, that sentence is correct.

2  Q.  I read that correctly, and it's in the study, true?

3  A.  Correct.  Yes.

4  Q.  Now, if we could go to page 75, we'll talk about another

5  finding.  So on page 75, you found "the average distance that

6  women traveled from their home to the clinic decreased slightly

7  from 33.2 miles before telemedicine introduction to 30.7 miles

8  after.  P is less than .001."  Was that one of your findings?

9  A.  Yes.

10  Q.  So the average distance that women traveled decreased by

11  only 2.5 miles; is that correct?

12  A.  On average, yes.

13  Q.  Now, Doctor, you did not include this information in your

14  expert report in this case, did you?

15  A.  I don't recall if I had that specific finding in there or

16  not.

17  Q.  Now, also on page 75, you found, "The median distance

18  traveled did not change."  Is that one of your findings?

19  A.  Yes.

20  Q.  And just for the record, what is the difference between

21  average distance traveled and median distance traveled?

22  A.  The average is the mean, which was taken by summing up all

23  of the distances and dividing by the number of observations,

24  whereas the median is the observation, the value that is in the

25  middle, and there are an equal number above and below that

1  number.

2  Q.  Okay.  Thank you.  Now let's talk about whether

3  telemedicine in Iowa was associated with increased or decreased

4  rates of abortion.  If we could go to page 74.

5           MS. SINGH:  Objection, Your Honor.  This is outside

6  the scope of the direct.  Dr. Grossman didn't testify about the

7  rates of abortion care in Iowa or anywhere else.

8           MR. BARTOLOMUCCI:  Your Honor, these are the data that

9  underlie his studies and his conclusions.

10          THE COURT:  Well, if he didn't testify to rates of

11  abortion, I was trying to think after Miss Singh listed that,

12  if I remembered otherwise; but I think she's right.  He didn't

13  testify about that.  I don't know if it's in his report,

14  though.

15          Did he include anything in his report about that,

16  Miss Singh, rates of abortion in Iowa or anyplace else?

17          MS. SINGH:  Your Honor, I do not believe there's a

18  focus in his expert report about rates; but the testimony that

19  we presented today does not rely on the rates of abortion in

20  Iowa or in any other state, including Indiana.

21          THE COURT:  I'll sustain the objection on that basis.

22  BY MR. BARTOLOMUCCI:

23  Q.  Dr. Grossman, are you offering any opinions in this case on

24  your findings with respect to rates of abortion in Iowa after

25  the introduction of telemedicine?

1   A.  I am not.

2   Q.  Just one last question about this study, Doctor.

3        On page 78 -- and this will not be a question about rates

4   of abortions; but on page 78, Doctor, you wrote, "Our study had

5   several limitations.  Because it was an observational study, we

6   cannot infer causality from our results, and factors other than

7   telemedicine and the variables we were able to control for may

8   have contributed to our findings."  Is that something you said

9   in your study?

10  A.  Yes.

11  Q.  Okay.  Let's put up your -- another Iowa study that you

12  wrote on, and this is Impeachment Document 34.

13           THE COURT:  Plaintiffs' Exhibit what?

14           MR. BARTOLOMUCCI:  I don't believe this one has a

15  Plaintiffs' Exhibit number, Your Honor.

16           THE COURT:  Is it a stipulated exhibit?

17           MR. BARTOLOMUCCI:  No, it's a document that we

18  previously provided as impeachment material.

19           THE COURT:  So you're going to get it into evidence,

20  right?

21           MR. BARTOLOMUCCI:  Your Honor, it wasn't my

22  understanding that that would be necessary but --

23           THE COURT:  It may not.  I can't tell from what you've

24  asked so far what you're going to do with the article.  So --

25           THE WITNESS:  May I just ask am I being provided with

GROSSMAN – CROSS/BARTOLOMUCCI                122

1   this article?

2          MR. BARTOLOMUCCI:  It's been sent to your counsel

3   previously, Dr. Grossman.

4          THE COURT:  Impeachment Document -- what is

5   Impeachment Document 34?  Give us a title.  Is it on the

6   screen?

7          MR. BARTOLOMUCCI:  Yes, it is.

8          THE COURT:  All right.

9          Now, do you recognize that, Dr. Grossman?

10         THE WITNESS:  I do.

11         MS. SINGH:  I'm sorry, Your Honor.  I believe

12  Dr. Grossman should have gotten an e-mail with an attachment

13  with the article in it.

14         THE WITNESS:  I just didn't realize I was supposed to

15  check this.

16         MS. SINGH:  It should be there now.

17         THE WITNESS:  Yes.

18  BY MR. BARTOLOMUCCI:

19  Q.  So, Doctor, did you say you recognized this article?

20  A.  I do.

21  Q.  And, in fact, you are one of the co-authors; are you not?

22  A.  Yes.

23  Q.  And is this a study that you conducted from looking at data

24  from Iowa from 2009 to 2010?

25  A.  It wasn't really looking at data.  It was based on in-depth

1  interviews that we conducted at clinics with both patients and

2  providers in those clinics related to telemedicine.

3  Q.  And am I right that one of the topics you asked the women

4  about was whether telemedicine factored into their decision

5  about whether to have an abortion?

6  A.  Maybe you can point me to the part of the paper that you're

7  referring to?

8  Q.  Sure.  If we would go to page E, E like Eric, 119.  Now,

9  Doctor, the quotation here I want to draw your attention to is,

10  "No women in our study cited telemedicine or the greater access

11  to abortion services that it facilitated as a factor in their

12  decision about whether to have an abortion."

13      Was that one of your findings?

14  A.  Yes.

15  Q.  And if we could go to page E121, here you wrote, "Although

16  women were generally positive about the increased convenience

17  of having the option of telemedicine services, none of the

18  participants said that the ease of access influenced their

19  decision to have the abortion."  Was that one of your findings?

20  A.  Yes.  And the next sentence says, "Instead, it allowed them

21  to obtain the service they needed sooner or closer to home."

22  Q.  Thank you.  And the next sentence actually says, "Our

23  finding that telemedicine did not influence women's decisions

24  to abort is consistent with Iowa vital statistics data, which

25  showed that the abortion rate has not increased in Iowa since

1    Planned Parenthood of the Heartland launched the telemedicine

2    service."

3              MS. SINGH:  Again, we're talking about abortion rates;

4    and Dr. Grossman didn't testify about abortion rates during his

5    direct.

6              MR. BARTOLOMUCCI:  Your Honor, I believe he did.  I

7    believe there was testimony about telemedicine making it easier

8    or likely for women to obtain abortions.

9              THE COURT:  I don't hear this line of questioning to

10   go to rates of abortion.  It does pertain to other things he's

11   testified to on direct.  So the objection's overruled.

12   BY MR. BARTOLOMUCCI:

13   Q.  Doctor, do you have your supplemental expert report handy?

14   A.  If someone can remind me --

15             THE COURT:  "Handy" may be the key word there.

16             MR. BARTOLOMUCCI:  Yes.  I used that deliberately.

17   And I think your supplement report is PX5, if memory serves.

18             Am I right, Miss Singh?

19             MS. SINGH:  Yes, that is right.  It should be in the

20   Plaintiffs' exhibit binder, Dr. Grossman.

21             THE WITNESS:  Yes.

22   BY MR. BARTOLOMUCCI:

23   Q.  Okay.  If I could ask you to take a look at paragraphs 129

24   and 130 of your supplemental expert report.

25             MS. SINGH:  What were those paragraph numbers?

1          MR. BARTOLOMUCCI:  129 to 130.

2          MS. SINGH:  Thank you.

3    BY MR. BARTOLOMUCCI:

4    Q.  Are you there, Dr. Grossman?  I mean at those pages or

5    paragraphs?

6    A.  Yes.

7          THE COURT:  Can you put those up?  Can your technical

8    assistant put those up?

9          MR. BARTOLOMUCCI:  Yes, absolutely.

10   BY MR. BARTOLOMUCCI:

11   Q.  129 is at the bottom of this page.  Now, Dr. Grossman, am I

12   right that in paragraph 129, you're talking about the effect of

13   travel distance on abortion rates?

14         MS. SINGH:  Your Honor, I'm sorry.  I'm not

15   understanding the relevance of this testimony.  Dr. Grossman

16   didn't testify about this on his direct; and we're pulling up

17   his expert report, which is not inconsistent with anything he's

18   testified about today.

19         MR. BARTOLOMUCCI:  I'll withdraw the question.

20         THE COURT:  All right.  I will show the question

21   withdrawn.

22   BY MR. BARTOLOMUCCI:

23   Q.  Okay.  Dr. Grossman, let's talk about your Alaska study,

24   which is Plaintiffs' Exhibit 125, and also Impeachment

25   Document 33.

1         Now, do you recognize this article, Dr. Grossman?

2    A.   I do.

3    Q.   And is this your study of telemedicine in Alaska?

4    A.   Yes.

5    Q.   And am I right that this study was based on in-depth

6    interviews with abortion providers in Alaska?

7    A.   Yes, and staff.

8    Q.   And staff.  Now, on page 5 of this study, I want to draw

9    your attention to the quotation that starts, "Telemedicine may

10   not be the best service delivery modality for all women."  I'd

11   like to bring that up so you can see it and the Court can see

12   it.

13        Now, the sentence goes on -- I don't want to mislead you;

14   but the sentence begins, "Telemedicine may not be the best

15   service delivery modality for all women"; is that right?

16   A.   Yes.

17   Q.   That was one of your findings in the Alaska study?

18   A.   Umm, yes.

19   Q.   Okay.  So staying on that page, there's another quotation

20   that's of interest.  And you wrote, "In this study, providers

21   felt that some women may be better served by an in-person

22   visit, based on patient preference, as well as for patients for

23   whom English is not their primary language, deaf patients, and

24   people who may be unsure or emotional about their decision."

25   Did I read that correctly?

1    A.  Yes.

2    Q.  And that was one of your findings in this Alaska study?

3    A.  Yes.

4    Q.  Now, I was going to ask you some questions about the Alaska

5    study as it bears upon abortion rates; but just to confirm,

6    you're not offering any opinion in this case on the

7    relationship between telemedicine and abortion rates; is that

8    right?

9    A.  That is correct.

10   Q.  Okay.  The next study I'd like to bring up has previously

11   been identified as Plaintiffs' Exhibit 127.  Doctor, this is

12   the Endler study.

13       Do you remember this study, Dr. Grossman?

14   A.  I do.

15   Q.  Now, just so I'm clear, was this study published by the

16   World Health Organization?

17   A.  It wasn't published by them.  It was published in the

18   "*British Journal of Obstetrics and Gynecology*."  Several of the

19   people are affiliated with the World Health Organization.

20   Q.  I saw a reference to the organization in the small print at

21   the bottom.  That's why I was asking.

22   A.  As far as I know, I don't believe that this was -- yeah, I

23   don't know why it has the copyright of the World Health

24   Organization there.

25   Q.  Now, if we could focus in on the portion that discusses

1   main results.  Now, am I correct, Dr. Grossman, that the Endler

2   study concluded that, "Surgical evacuation rates are higher for

3   medical abortion through telemedicine compared to in-person

4   medical abortion"?

5              THE COURT:  Where is that, Counsel?

6              MR. BARTOLOMUCCI:  I'm looking, Your Honor.

7              THE COURT:  Top right paragraph?

8              MR. BARTOLOMUCCI:  I may have the wrong paragraph,

9   Your Honor.  Oh, I'm sorry, Your Honor.  I should have been

10  talking about the conclusion paragraph and the last six words

11  of that paragraph, "and surgical evacuation rates are higher."

12  BY MR. BARTOLOMUCCI:

13  Q.  Dr. Grossman, do you see those words?

14  A.  I do.

15  Q.  And that's a reference to medical abortion through

16  telemedicine, correct?

17  A.  Well, it's specifically a reference to the studies that

18  were included in this review that came from other countries,

19  not the U.S. data, where patients were undergoing a model of

20  telemedicine that did not involve them going to a clinic; and

21  where they were, if they had a complication, or a concern, they

22  went to a hospital and were cared for by providers who didn't

23  have experience with abortion.

24       And in those studies, the surgical evacuation rates are

25  higher; and we can look at that in Table 1 of the study; but

GROSSMAN - CROSS/BARTOLOMUCCI                    129

1   the U.S. studies, including the studies from Iowa, show a very

2   low rate of surgical intervention.

3   Q.  But this article did -- this study did include U.S. data

4   along with non-U.S. data; did it not?

5   A.  Yes.  And if you look at those data broken own by the

6   different studies in Table 1, you can see how there's a big

7   difference for the U.S. data compared to the other countries.

8   Q.  Well, let's look at their overall conclusion for now.

9   Perhaps Miss Singh will want to slice and dice the data with

10  you later.

11      But if we go to page 1099.  Drawing your attention, Doctor,

12  towards the middle of this passage, the study authors wrote

13  "the mean rate of surgical evacuation after in-person abortion

14  care at ten or fewer gestation weeks is estimated at below

15  5 percent, 1.8 to 4.2 percent, whereas surgical evacuation

16  rates in our view ranged from 0.9 to 19.3 percent."  Was that

17  what the study found?

18  A.  That's what that sentence says, yes.

19  Q.  So I read that correctly?

20  A.  You did read that correctly.

21  Q.  And when Dr. Endler is writing about surgical evacuation

22  rates ranging from 0.9 to 19.3 percent, she was talking about

23  abortion -- rates in abortion through telemedicine, correct?

24  A.  Um, yes.

25  Q.  Okay, that's -- did you finish your answer?

1   A.   Yes, that's correct.

2   Q.   Okay.  Let's turn now to a document we have mentioned

3   previously, ACOG Bulletin 225, and this is Plaintiffs'

4   Exhibit 120.  Now, you've briefly testified today about this

5   document, correct, Dr. Grossman?

6   A.   Yes.

7   Q.   Now, near the end of the bulletin, it includes a summary of

8   its recommendations, correct?

9   A.   Yes.

10  Q.   And if we could go to page E39.  Here we are.  Now, am I

11  right, doctor, that this ACOG practice bulletin includes both

12  what it calls Level A recommendations and Level B

13  recommendations.

14  A.   And Level C recommendations.

15  Q.   Okay.  So there's Level A, B, and C recommendations,

16  correct?

17  A.   Yes.

18  Q.   And according to ACOG, Level A recommendations are "based

19  on good and consistent scientific evidence."  Is that true?

20  A.   Yes.

21  Q.   And, in contrast, Level B recommendations, if we can blow

22  up that part, Level B recommendations are "based on limited or

23  inconsistent scientific evidence."  Is that true?

24  A.   Yes.

25  Q.   Now, under the Level B recommendations is the

1    recommendation that "medication abortion can be provided safely

2    and effectively by telemedicine with a high level of patient

3    satisfaction."  Is that right?

4    A.   Yes.

5    Q.   So that's not a Level A recommendation, that's a Level B

6    recommendation in the ACOG framework?

7    A.   Correct, as is the recommendation that medication abortion

8    not be used with suspected ectopic pregnancy.

9    Q.   And as a Level B recommendation, the recommendation

10   concerning telemedicine is therefore "based on limited or

11   inconsistent scientific evidence."  Is that right?

12   A.   At the time that this was being prepared, the only

13   published data about medication abortion being provided by

14   telemedicine was from Iowa.  There is since additional

15   publications published from other states and other contacts as

16   well.  So the fact that it was from a single service delivery

17   provider meant that it was limited information at that time.

18           THE COURT:  Was it 2011?

19           THE WITNESS:  No, this was -- the review for this

20   practice bulletin was started in, actually in 2018 and

21   continued through 2019.  This thing came out in 2020.  So all

22   of the papers that had been published from Iowa were available

23   for this review, but the more recent publications from other

24   states, including Nevada, the quantitative study from Alaska,

25   which aren't even part of my expert opinion but have been

1    published -- my expert report, but have been published since

2    then have all been consistent with the published data from

3    Iowa.

4    BY MR. BARTOLOMUCCI:

5    Q.   Doctor, this ACOG practice bulletin was published in

6    October of 2020, correct?

7    A.   Yes, but it's -- as I mentioned before, for the process for

8    the practice bulletin, it involves a review by the librarians,

9    and the data are not -- the review is not constantly updated as

10   the review is being prepared, but -- so anything that was

11   really published after 2019, the middle of 2019, did not get

12   considered into this review.

13   Q.   Has ACOG updated or supplemented this practice bulletin

14   since October of 2020?

15   A.   Not the practice bulletin but they have issued other

16   guidance related to abortion care in the context of the COVID

17   pandemic, which was slightly different from this, including

18   saying that ultrasound was not required for the provision of

19   medication abortion and that it shouldn't be -- neither

20   ultrasound nor the requirement to check Rh status and provide

21   anti-D immunoglobulin should be barriers to provision of care

22   and they made an even stronger recommendation about the use of

23   telemedicine during the pandemic.  And, in fact, ACOG has sued

24   the FDA to try to get rid of the in-person dispensing

25   requirement for Mifepristone during the pandemic.

Q.  Thank you for that, doctor.  Within the four corners of
this practice bulletin, however, the recommendation that the
clinical examination or ultrasound examination is not
necessary, that's offered as a Level B recommendation, true?

          MS. SINGH:  Objection, Your Honor.  Asked and answered
a couple of times now.

          THE COURT:  Sustained.

          MR. BARTOLOMUCCI:  Your Honor, I did not ask
previously about the clinical examination or ultrasound
examination recommendation.  I previously discussed only the
telemedicine recommendation.  So may I rephrase my question?

          THE COURT:  Yes, you may rephrase.

BY MR. BARTOLOMUCCI:

Q.  Doctor, in ACOG Practice Bulletin 225, the recommendation
that "a clinical examination where ultrasound examination is
not necessary," that's a Level B recommendation, true?

A.  Again, if you want to point to that -- where it is, and
maybe your technical person could highlight --

Q.  Sure.

A.  Yes, that's in the B section.  As I mentioned, in addition,
during the pandemic, ACOG issued additional guidance about
that.

Q.  Okay.  Let's bring up the next study, which is Impeachment
Document 146.

          MR. BARTOLOMUCCI:  I don't believe it has a PX number,

1    Your Honor.

2    BY MR. BARTOLOMUCCI:

3    Q.   Do you recognize this document, Dr. Grossman?

4    A.   Yes.

5    Q.   And is this a study that you co-authored?

6    A.   Yes.

7    Q.   This is called "Medication Abortion Provided Through

8    Telemedicine in Four U.S. States"; is that right?

9    A.   Yes.

10   Q.   Published in August of 2019?

11   A.   Yes.

12   Q.   Now, am I right that this was a retrospective cohort study

13   of nearly 6,000 patients in Alaska, Idaho, Nevada, and

14   Washington state who underwent medication abortion either

15   through telemedicine or standard means?

16   A.   Yes.

17   Q.   Now, turning your attention to page 346.  Okay.  I think

18   we're moving to page 346.  We're going to highlight the

19   sentence of interest.  It's near the bottommost first

20   paragraph.

21       I believe you wrote, Doctor, "gestational age at time of

22   abortion" -- and I'm going to omit the dashed phrase -- "was

23   slightly different between groups, 50.4 days for telemedicine

24   patients versus 48.9 days for standard patients."  Was that the

25   finding?

1  A.  Yes.

2  Q.  Am I right that telemedicine patients had their abortions

3  slightly later in their pregnancies than the standard patients?

4  A.  I mean, it's of no clinical significance.  We're talking

5  about a day and a half.

6  Q.  Now, if we could go to -- actually if we could go back to

7  the first page, down to the bottom to the financial disclosure.

8  Here it states "Dr. Grossman has received consulting payments

9  from Planned Parenthood Federation of America for work related

10 to telemedicine for medication abortion.  The other authors did

11 not report any potential conflicts of interest."  Is that what

12 that study says?

13 A.  That was the financial disclosure, yes.

14 Q.  Now, your payments from Planned Parenthood were disclosed

15 because they were a potential conflict of interest that readers

16 needed to know about, correct?

17 A.  The -- I mean it's a requirement that if there is any

18 potential for there to be a conflict of interest or a potential

19 for people to see a conflict of interest, that that should be

20 declared, and so that's why I declared that.

21 Q.  And just to be clear, the potential conflict of interest

22 was that you had a financial interest in telemedicine for

23 medication abortion, true?

24      MS. SINGH:  Objection.  Mischaracterizes the

25 disclosure on that document.

1          THE COURT:  He may answer the question.  Overruled.

2     A.  I provided consulting to Planned Parenthood as they were

3     implementing telemedicine services, given the extensive

4     research that I did.  My work I did with them -- I mean, I

5     wasn't getting paid if they expanded telemedicine or not.  They

6     had questions about how to implement the telemedicine service,

7     and I provided that through -- I provided input based on my

8     expertise given the research findings that I had.  I had no

9     interest in whether they provided X number of telemedicine

10    abortions.  I received no financial benefit depending on --

11    based on what services they provided.  I was just being asked

12    to provide input based on my research, and I provided that and

13    they paid for my time.

14    Q.  Thank you.  Are you still receiving payments from Planned

15    Parenthood for work related to telemedicine for medication

16    abortion?

17    A.  I have continued to provide some consulting to Planned

18    Parenthood related to their work on telemedicine, yes.

19    Q.  That's as of today?

20    A.  I'm not -- I had received payments.  I think the last

21    payment I received was in 2020.

22    Q.  Thank you.

23          MR. BARTOLOMUCCI:  Your Honor, if I may briefly

24    consult with my colleagues, I may be finished with my

25    cross-examination.

1      THE COURT:  It depends on what you want to ask?  I'm

2  just kidding.  You may ask.

3      MR. BARTOLOMUCCI:  Thank you, Your Honor.

4                (Off-the-record discussion.)

5      THE COURT:  Where do we stand?

6      MR. BARTOLOMUCCI:  Thank you, Your Honor.  I think I

7  have at most one or two more questions.

8      THE COURT:  All right.  You may ask.  Bring it home,

9  Mr. Bartolomucci.  I have to practice saying your name.

10  Bartolomucci.

11      MR. BARTOLOMUCCI:  Bartolomucci.

12      THE COURT:  You say it better than this Anglicized

13  Hoosier here.

14      MR. BARTOLOMUCCI:  I have had a lot of practice, Your

15  Honor.

16  BY MR. BARTOLOMUCCI:

17  Q.  So I have been advised by my colleagues I need to return to

18  Impeachment Document 34, so let's do that.

19  A.  Sorry.  Can you remind me if that's one I received in

20  e-mail or in my plaintiffs' exhibit book.

21  Q.  Okay.  So this was Impeachment Document 34.  I suspect you

22  got that by e-mail.  Okay.  If we can go to page E121, and

23  we'll blow up the sentence of interest.

24      Doctor, do you see the sentence that begins "our finding"?

25  A.  Yes.

GROSSMAN – CROSS/BARTOLOMUCCI                    138

1  Q.  Now, I'm advised that I read this sentence, and there was

2  an objection which was overruled by the Court, but I failed to

3  obtain an answer to my question.

4      So with the Court's permission, I'll ask it again.  Now,

5  Doctor, this study, this is your Iowa study from 2009 to 2010,

6  the statement is "our finding that telemedicine did not

7  influence women's decisions to abort is consistent with Iowa

8  vital statistics data which show that the abortion rate has not

9  increased in Iowa since Planned Parenthood of the Heartland

10  launched the telemedicine service."

11      Now, is that the finding?

12  A.  That's what that sentence says, yes.

13         MR. BARTOLOMUCCI:  Now, Your Honor, when I said a

14  question or two, I think I may have short-changed my position.

15  Would the Court indulge me to ask perhaps ten questions?

16         THE COURT:  Holy smokes.

17         MR. BARTOLOMUCCI:  I know.  I know I'm asking a lot,

18  Your Honor.

19         THE COURT:  What made you think you were done and

20  you're not, talking to those people in the room with you there?

21         MR. BARTOLOMUCCI:  You may infer that, Your Honor.

22         THE COURT:  Well, tell them to mind their own

23  business.

24         MR. BARTOLOMUCCI:  All of you stop giving me questions

25  to ask.

1        THE COURT:  All right.  Combine a couple of them and

2   ask five.

3   BY MR. BARTOLOMUCCI:

4   Q.  Dr. Grossman, you are the director of an organization

5   called ANSIRH; is that right?

6   A.  It's not an organization.  As I said earlier, it's a

7   research program within the Department of Obstetrics,

8   Gynecology, and Reproductive Services at the University of

9   California San Francisco.

10  Q.  And am I correct that ANSIRH either does or has received

11  funding from the Packard Foundation?

12       MS. SINGH:  Objection, Your Honor, the relevance.

13       THE COURT:  What is the relevance?

14       MR. BARTOLOMUCCI:  Your Honor, this line of

15  questioning is going to go to potential bias that the funding

16  of his research program comes from organizations which, in

17  turn, invest in the Mifeprex drug.

18       MS. SINGH:  Your Honor, I would ask that a foundation

19  be laid for this line of questioning.  If these funders have no

20  impact on his studies or the findings, which is what he's

21  testified about, I don't see the relevance for who funds ANSIRH

22  or any other study that he's participated in.

23       THE COURT:  Wait.  Take the document off the screen,

24  please, so I can see you better.

25            And now lay the foundation for this.

1    MR. BARTOLOMUCCI:  Yes, Your Honor.

2    BY MR. BARTOLOMUCCI:

3    Q.  Dr. Grossman, are you aware that the Packard Foundation

4    provided a $14 million loan to help the manufacture of Mifeprex

5    get that drug to market?

6    A.  I didn't know the exact amount.  I will say that, just to

7    clarify the question that you asked previously, the Packard

8    Foundation has not funded any of the research that I've

9    presented today.

10   Q.  Well, the question, Doctor, was:  Has the Packard

11   Foundation provided funding to the ANSIRH research program?

12              THE COURT:  To your knowledge.

13              MS. SINGH:  Objection.

14              THE COURT:  To your knowledge.  To your knowledge.

15              MR. BARTOLOMUCCI:  To your knowledge.

16              MS. SINGH:  Objection, Your Honor.  I don't think a

17   foundation has been laid for why this testimony is relevant.

18              THE COURT:  I can't tell yet.  He may answer the

19   question that's asked.

20   A.  Yes, as I said before, they have provided support to our

21   program.

22              THE COURT:  This is the university program?  This is

23   your academic association?

24              THE WITNESS:  Yes.

25              THE COURT:  Okay.

GROSSMAN - CROSS/BARTOLOMUCCI                     141

A.  And I should clarify that the grantee for all of these, for all of our -- the funding, the direct grantee is the university.  The Regents of the University of California receive this funding, not me.

BY MR. BARTOLOMUCCI:

Q.  But just to recap and make sure I have the record clear, we're agreed that the Packard Foundation is an investor in the company that manufactures Mifeprex, true?

THE COURT:  Now I found that to be irrelevant based on the answers that have been given.  It does not tie over to his testimony and therefore reveal any conflict.

MR. BARTOLOMUCCI:  But, Your Honor, the testimony was that the Packard Foundation invests -- or provides funding for the research program of which he is the director and from which he draws a salary.

THE COURT:  So he's not the grantee.

MR. BARTOLOMUCCI:  No.

THE COURT:  So in order to have that line of questioning be relevant, you have to tie it to what he's done.  It can't just be two circumstances.  That's where you are right now.  You have two circumstances.  But unless you can tie it to something that he's done or some decisions he's made or whatever, it's not relevant.

MR. BARTOLOMUCCI:  Well, Your Honor --

THE COURT:  Sir, sir, sir, ask your questions, and

GROSSMAN - CROSS/BARTOLOMUCCI                    142

1    then I'll rule on the questions.  I've ruled on the one so far.

2            MR. BARTOLOMUCCI:  Thank you.  Thank you.

3    BY MR. BARTOLOMUCCI:

4    Q.  Dr. Grossman, you draw a salary from ANSIRH; is that right?

5    A.  I'm paid by University of California, San Francisco.

6    Q.  Is none of your compensation tied to funding provided to

7    the research program specifically?

8            MS. SINGH:  Objection, Your Honor.  I'm not sure -- I

9    don't know what that means.  If the question could be

10   rephrased.

11           THE COURT:  Can you answer the question, Dr. Grossman?

12   A.  I'm responsible for raising a significant proportion of my

13   salary through grants.  Those grants come from a variety of

14   funders, including the federal government, private foundations,

15   individual donors, but that funding goes to the University of

16   California.  The University of California pays me my salary.

17   BY MR. BARTOLOMUCCI:

18   Q.  But your testimony is that the funding provided by entities

19   like the Packard Foundation goes to the university which in

20   turn provides the payments to you?

21           THE COURT:  Wait.  The university can get money from a

22   million directions.  That is not a sufficient tie to this

23   witness or his testimony or any of his opinions, so I repeat:

24   It's not relevant, Mr. Bartolomucci.

25           MR. BARTOLOMUCCI:  Thank you, Your Honor.  I'll move

1   on.

2           THE COURT:  Tell the person in your gallery that was

3   not relevant.

4           MR. BARTOLOMUCCI:  I believe they heard you.

5           THE COURT:  Okay.

6           MR. BARTOLOMUCCI:  Your Honor, I am finished.

7   However, we would ask that Dr. Grossman be retained as a

8   witness for our direct examination.

9           THE COURT:  Well, we're not done with him yet because

10  I have to see if Miss Singh has redirect.

11          MR. BARTOLOMUCCI:  Of course.

12          THE COURT:  Okay.  Very good.

13          That ends your questions?

14          MR. BARTOLOMUCCI:  Yes, ma'am.

15          THE COURT:  Okay.  You did it in fewer than ten.

16          MR. BARTOLOMUCCI:  Thank you.

17          THE COURT:  Okay.

18          Miss Singh, redirect?

19          MS. SINGH:  Yes, Your Honor.  Thank you.

20          If I could please have Plaintiffs' Exhibit 126 pulled

21  up.  Great.

22                    **REDIRECT EXAMINATION**

23  by MS. SINGH:

24  Q.  Dr. Grossman, you were asked on cross about this study.  Do

25  you recall that?

1   A.  Yes.

2   Q.  And in particular, you were asked about some statements

3   that patients had made that they preferred having a

4   face-to-face visit; is that right?

5   A.  Yes.

6   Q.  What did those findings indicate to you?

7   A.  So as you said earlier, about 25 percent of telemedicine

8   patients said that they would have preferred to be in the same

9   room with the doctor.

10     And we asked a follow-up question on the survey for

11  patients to give more detail about their responses, and people

12  wrote in those responses things like, "Well, generally, I'm a

13  more face-to-face person, but, you know, considering

14  everything, it was fine."

15     They kind of expressed that, in an ideal world, if they

16  could have been in the same room with the physician, that would

17  have been better.  But given everything, given the fact that

18  they were able to obtain the abortion closer to home sooner,

19  for some patients it meant the difference between getting a

20  medication abortion or not because if they waited for the next

21  available in-person visit, they would have been past the

22  gestational age limit.  Considering all of those things, it was

23  better for them in the end to have the telemedicine visit.

24  Q.  Thank you.

25     Now, if I could please get Plaintiffs' Exhibit 127.

1      This is the Endler study that you were also asked about on

2  cross-examination.  And in particular, you were asked about the

3  rates of non-U.S. data as they compare to U.S. data.  Do you

4  recall that?

5  A.  Yes.

6  Q.  What do you attribute the difference to those rates in?

7  A.  Again, as I mentioned before, so this review included a

8  range of the different types of telemedicine, which is good

9  because it gives an overall picture showing, first of all, just

10 that there are a variety of different kinds of telemedicine

11 models that can be used to provide medication abortion, and, as

12 we see in Table 1, they are all very safe with a very, very low

13 rate of serious complications like blood transfusion or

14 hospital admission.

15     But the models are very different and particularly the

16 models in other countries where abortion is legally restricted

17 and patients have no option to go to a facility and have the

18 abortion there.  By obtaining the service through telemedicine,

19 they're able to get a safe abortion.  But if they have a

20 question or a complaint or any concerning symptom, they go to a

21 hospital to get evaluated.  And because the providers there

22 aren't experienced abortion providers -- and it's also true

23 that patients may be at legal risk if they say that they have

24 taken anything on their own to initiate the abortion.  Patients

25 may just say that this was a spontaneous miscarriage.  For all

those reasons, it's more likely that the patients will have an

intervention done such as a surgical intervention to stop the

bleeding instead of potentially using additional doses of

medication or just watching the patient for a longer period of

time.  So that's why the findings are so very different for the

models in other countries as compared to the US.

Q.  Thank you, Dr. Grossman.

Now, if we could pull up Plaintiffs' Exhibit 130, please.

You were also asked about this study that you co-authored,

correct?

A.  Yes.

Q.  What do you think the utility of this study is?

A.  Well, I think there are a lot of important findings in this

study, including the fact that we saw a reduction in second

trimester abortion after telemedicine was introduced and the

fact that this really seemed to improve access to early

abortion particularly for people living farther away.

So Mr. Bartolomucci asked me about some of the geographic

findings.  With regard to distance traveled, I think -- you

know, I talked to some patients who were obtaining the service

in Iowa during this time who talked about how they actually

traveled farther to access a telemedicine abortion because it

might mean -- might have meant that they were able to get the

care sooner.  Again, maybe it meant that they could get a

medication abortion.  And if they waited for the next

GROSSMAN – REDIRECT/SINGH                    147

appointment that was close to home, they would have been past the gestational age cut off.

I even talked to some patients who, you know, might have lived in a small town where there was a telemedicine-providing clinic there, but they didn't wouldn't to go there because they were worried about being seen in their small town and so they went to another town further away to retain their anonymity and confidentiality.

So I think the bottom line is that telemedicine offers up more options to patients and that's good for patients.  And for some of them, that means driving less.  But in some cases, it might mean driving more.

I think one of the other important findings related to distance is included in Table 2 where we found that patients who lived -- particularly the last finding in that table where it says, "the distance between the residential zip code of patient to the nearest clinic providing surgical abortion," so we found that particularly patients who lived greater than 25 miles or greater than 50 miles were significantly more likely to obtain an abortion after telemedicine was introduced in that post period.

Q.  Thank you, Dr. Grossman.

Now, if we could please pull up Plaintiffs' Exhibit 120.

And you were asked about this ACOG bulletin and in particular about the Level B recommendation.

GROSSMAN – REDIRECT/SINGH                                    148

1       What is the significance of a Level B recommendation?

2   A.  It is important to differentiate the things, you know, the

3   recommendations that are based on the largest body of evidence

4   versus things that are based on less published evidence versus

5   things that are more based on expert opinion.  All of these,

6   though, are recommendations that ACOG makes.

7       Some of the things in the B category just haven't been well

8   studied but make good sense like the one I mentioned when

9   Mr. Bartolomucci was asking me questions.

10      The first one in the Level B list is that medication

11  abortion is not recommended for patients with any of the

12  following, including a confirmed or suspected ectopic

13  pregnancy, intrauterine device in place, and all of the

14  contraindications to medication abortion, which are established

15  and kind of accepted as dogma by clinicians, but actually

16  there's not a lot of evidence about those things.

17  Q.  And you mentioned that there's been data since this

18  bulletin was published; is that right?

19  A.  Correct.

20      So as I mentioned, the reason why the telemedicine

21  recommendation is in Category B is because at the time when the

22  review was done that informed this practice bulletin, the only

23  published data were from Iowa.  And since then, there have been

24  studies from other states.  There's a large study that was just

25  published last week or a week before from United Kingdom on

GROSSMAN - REDIRECT/SINGH                    149

1   about 50,000 patients undergoing telemedicine.  So we have

2   considerably more data.

3   Q.  And what do you think the significance of that more recent

4   data is?

5   A.  Again, all the data are consistent showing that

6   telemedicine is safe, effective, and well liked by patients.

7       So I have a feeling that when this is next updated, that

8   recommendation will be in the Level A category.

9   Q.  Thank you, Dr. Grossman.

10      You were asked a few times about a finding that

11  telemedicine didn't affect women's decisions to get an

12  abortion.  Do you recall that?

13  A.  Yes.

14  Q.  Are you surprised by that?

15  A.  Surprised by what was asked or surprised by --

16  Q.  Surprised that the availability of telemedicine didn't

17  change someone's opinion about whether or not to get an

18  abortion.

19          THE COURT:  He'd make a good lawyer, wouldn't he,

20  Miss Singh?

21          MS. SINGH:  Better than I am, unfortunately for me.

22          THE COURT:  No, no.  You're doing fine.  I just

23  thought it was a lawyerly response.

24  A.  I -- it isn't surprising.  I mean, patients don't decide to

25  have an abortion just because the service is available and they

1    can get it.  We talked about the reason why patients get an

2    abortion.  It's because of a very serious need that they have

3    considered carefully.  Sometimes there are barriers that

4    prevent them from acting on that need to get an abortion and

5    that prevents them from getting an abortion.  But it doesn't

6    surprise me that patients -- particularly when asking a

7    patient, "What is the reason why you're getting the abortion?"

8    it would be very surprising to hear that a patient decided to

9    do that because the service was available.

10   BY MS. SINGH:

11   Q.  Thank you, Dr. Grossman.

12        MS. SINGH:  I believe that I'm done, Your Honor.  May

13   I have just a moment to check my notes?

14        THE COURT:  Yes.  Before you do that, I mean, maybe I

15   should do it.  I want to ask a question myself, and it might

16   prompt further questions from the lawyers.

17        You have alluded to this, Dr. Grossman, and I want to

18   go more specifically to it.  And that is, the experience that

19   has been acquired during this pandemic where there is greatly

20   expanded use of telemedicine capabilities in every area of

21   care.  This has been basically the prudent practice method, as

22   far as I have been able to determine, for much care that would

23   be otherwise either withheld or made more risky because the

24   patient would have to come into a clinical setting.

25        So you said in your own practice in this last year

1    plus, because of the pandemic, you have used telemedicine

2    resources more than you did before.  Is that true; did I hear

3    you correctly?

4              THE WITNESS:  That is correct.

5              THE COURT:  So my question goes to not just the more

6    use, but the broadened use or the more resourceful and

7    innovative, creative uses of telemedicine.  Have you found that

8    your practice has sharpened your expertise and broadened your

9    knowledge about how to use these techniques; and if so, can you

10   explain your answer to me, please?

11             THE WITNESS:  That's a very interesting question.  I

12   mean, there has definitely been a lot of learning around

13   telemedicine.  I will say, you know, one piece of learning --

14   so as I mentioned, I work primarily at San Francisco General

15   Hospital and care for largely uninsured, low-income population.

16   I think there was a lot of bias among providers initially that

17   our patients would be able to or be willing to use

18   telemedicine.

19             So much so that actually one of my colleagues had to

20   do a study about it, where they called patients to show that

21   patients were actually interested in having a telemedicine

22   visit, that they could download the software and successfully

23   use it.  So that's one piece.

24             I mean, you know, other ways that we have skillfully

25   used it, I'm not sure that it's always been so skillful, but

GROSSMAN — REDIRECT/SINGH                    152

1    doing lots of workarounds, that we -- you know, for example,

2    even with like sterilization consent, there's a requirement for

3    Medicaid patients that you have to sign this informed consent

4    document for sterilization 30 days in advance.

5           And sometimes that timing doesn't line up with when

6    the patient is going to have an in-person visit for their

7    prenatal care.  So what people are doing is going through the

8    informed consent for the procedure on a certain date that's

9    more than 30 days before the patient's due date and documenting

10   all of that in the electronic health record.  And then when

11   patients come in and actually sign the form, it may be

12   sometimes later, but they are using the date of when the

13   consenting took place, because that really is when the patient

14   went through the informed consent process.

15          That's one example.  I mean, we've also used --

16          THE COURT:  Let me -- I want to hear your answer, of

17   course.  I asked the question, and I'm interested in your

18   answer, but let me guide you a little bit.

19          So I think we've discovered as a society in the last

20   year or so, that education, our schools can be operated on the

21   basis of remote learning with all the video teleearning that's

22   had to go on.

23          We've discovered, even in our court, that our court IS

24   operating virtually in ways we never imagined before, because

25   we always thought everybody had to come to court.  We do sign

GROSSMAN – REDIRECT/SINGH                    153

1   documents.  We do find that there's a greater familiarity with

2   technology, a greater willingness to use it.

3         So I'm trying to contextualize the telemedicine issue

4   in this lawsuit in terms of these new learnings.  And I'm

5   wondering if you think that what we've learned in the last year

6   casts a different light on what you knew even before the

7   pandemic.  If you were to write a research paper on it today,

8   would you go a different direction?

9         THE WITNESS:  Yeah.  Well, honestly I think that what

10  we have learned during the pandemic is about a model of care

11  that I don't think is really at issue in this specific case,

12  but it is the expanded use of telemedicine to provide

13  medication abortion that is not based on -- that does not

14  include routines of ultrasound or other laboratory testing.

15        So reaching patients directly in their home with

16  telemedicine services for medication abortion, I, along with

17  other experts in our field, have reviewed the medical

18  literature and came up with a protocol for providing medication

19  abortion with limited testing that would allow most patients to

20  essentially stay at home and have the medications either mailed

21  to them when that was possible or allow patients to come in for

22  a very brief visit to the facility to pick up the medications.

23        And I mentioned the study that recently came out from

24  the United Kingdom with about 50,000 patients that included a

25  large number that had received care in that way, and we're

GROSSMAN – RECROSS/BARTOLOMUCCI          154

1    learning that that care can be provided safely and effectively

2    and in a manner that is well liked by patients.

3            So that is probably the biggest learning that has

4    happened around COVID and the provision of medication abortion

5    using telemedicine.

6            I'd defer to the lawyers.  I don't think that's a

7    model of care that is being proposed in this context.

8            THE COURT:  Right, I understand that, too.  I wanted

9    to ask you to explore those other thoughts, though.  And you

10   have.

11           So now let me see.  Miss Singh, do you have any

12   additional questions based on mine?

13           MS. SINGH:  No, Your Honor.  I have no further

14   questions.  Thank you.

15           THE COURT:  How about you, Mr. Bartolomucci?

16           MR. BARTOLOMUCCI:  Just a few questions, Your Honor.

17           THE COURT:  You may ask.

18           MR. BARTOLOMUCCI:  Thank you.

19                    **RECROSS–EXAMINATION**

20   BY MR. BARTOLOMUCCI:

21   Q.  Dr. Grossman, I believe you just told Miss Singh that you

22   expected that in the next go-around, ACOG would move the

23   telemedicine recommendation into the Level A category.  Is that

24   essentially what you said?

25   A.  I was saying that I believed that already the published

GROSSMAN - RECROSS/BARTOLOMUCCI                155

1   evidence is coming from multiple settings.  It's consistent and

2   good quality evidence that I think would justify putting it in

3   the A category.

4   Q.  So I may have misunderstood.  So you're not making a

5   prediction that ACOG is soon to move it into the Level A

6   category?

7   A.  I was not making a prediction.  I was making an assessment

8   about the quality and consistency of the scientific evidence on

9   telemedicine provision of medication abortion.

10         MR. BARTOLOMUCCI:  Your Honor, those are the only

11   questions I have at this time.  Although, I want to reiterate

12   that defendants would like to have Dr. Grossman retained so

13   that he may be examined as a witness as part of our direct

14   examinations.

15         THE COURT:  So keep yourself available, please,

16   Dr. Grossman, because you may be subject to recall.  Okay?

17         THE WITNESS:  Understood.

18         THE COURT:  All right.  Very good.  That completes the

19   questioning at this time of Dr. Grossman.  Thank you very much,

20   sir.

21         THE WITNESS:  Thank you.

22         THE COURT:  How about taking an afternoon recess

23   before your next witness, Miss Singh?  Is that a good time?

24         MS. SINGH:  That sounds great.  Thank you, Your Honor.

25         THE COURT:  It's ten till 4.  We'll aim for ten after

1    4, but we won't chide anybody if it's 4:15.

2              MS. SINGH:  Thank you.

3                        (Recess taken.)

4                        (Open court.)

5              THE COURT:  Two new lawyers here.

6              MS. PAYNE:  Good afternoon, Your Honor.

7              THE COURT:  Ready to go?

8              MS. SHAH:  We are ready.

9              THE COURT:  Miss Shah, do you have a witness for us?

10             MS. SHAH:  Yes, Your Honor, plaintiffs would like to

11   call Dr. Diana Romero.

12             THE COURT:  Let's see if she pops up on our screen

13   here.

14             Dr. Romero, is that you?

15             MS. SHAH:  I believe her audio is still connecting.

16             THE COURT:  Can you hear me, Dr. Romero?

17             THE WITNESS:  Yes.  Can you hear me?

18             THE COURT:  Yes, but I'm going to suggest you -- yeah,

19   that's better -- that you tipped your monitor so that we could

20   see you a little bit better.

21             Good afternoon.

22             THE WITNESS:  Good afternoon.

23             THE COURT:  Are you someplace where it's afternoon?

24             THE WITNESS:  It is.  I'm in New York.

25             THE COURT:  Okay.  Good.

ROMERO – DIRECT/SHAH                    157

1        I'm going to ask the clerk to administer the oath, so

2   would you take the oath to testify truthfully, et cetera,

3   please.  Raise your right hand.

4           DIANA ROMERO, Ph.D., PLAINTIFFS' WITNESS, SWORN

5                       **DIRECT EXAMINATION**

6           THE COURT:  Good.  Now we're where we can all three

7   see each other.  Can you see all three of us?

8           THE WITNESS:  Yes, I can.

9           THE COURT:  All right.  Very good.

10          Miss Shah, you may ask your questions of this witness.

11          MS. SHAH:  Thank you, Your Honor.

12  BY MS. SHAH:

13  Q.  Hi, Dr. Romero.  Before we begin, I'd like to turn your

14  attention to the screen where you'll see stipulated Exhibit 11.

15          THE COURT:  Miss Shah, you have to give it a little

16  running start.  Have her identify herself, spell her name,

17  et cetera.

18          MS. SHAH:  Sure.

19  BY MS. SHAH:

20  Q.  Dr. Romero, can you please state and spell your full name

21  for the record?

22  A.  My name is Diana Romero.  It is D-I-A-N-A, R-O-M-E-R-O.

23  Q.  Thank you.  I'd like to turn your attention to stipulated

24  Exhibit 11.  Do you recognize this exhibit?

25  A.  Yes.

ROMERO - DIRECT/SHAH                                          158

1    Q.  What is --

2    A.  It is my curriculum vitae or resume.

3    Q.  Is it a true and accurate summary of your education,

4    professional credentials and work experience?

5    A.  Yes, it is.

6    Q.  And does it provide a complete and accurate list of your

7    publications?

8    A.  It does.  If anything, maybe there are some more recent

9    ones.

10   Q.  And when did you last provide an updated CV for this case?

11   A.  I think that was maybe about two weeks ago.

12   Q.  Okay, thank you.  I'm done with this exhibit.

13       Dr. Romero, what is your professional discipline?

14   A.  Public health.

15   Q.  Can you please describe the discipline of public health?

16   A.  Sure.  Public health is a field that is fairly

17   interdisciplinary.  It includes researchers and scholars in

18   various social sciences and health-related fields.  It focuses

19   on factors related to the promotion of health and prevention of

20   disease, and takes a large sort of community or

21   population-based focus as compared to, say, medicine or the

22   clinical sciences that are more disease oriented and focused at

23   the individual level.

24   Q.  You're currently a professor at the City University of New

25   York, correct?

1    A.   Correct.

2    Q.   I'm going to refer to the university as CUNY, if that's

3    okay?

4    A.   Yes.

5    Q.   What is the main focus of your research at CUNY?

6    A.   My research focus is in a few different areas.  It has

7    focused on poverty policies and the relationship between

8    poverty and maternal and child health.  It is also focused on

9    access to reproductive healthcare.  And also overall access to

10   healthcare, particularly among vulnerable populations like poor

11   and low-income populations, racial ethnic minorities.

12   Q.   And you teach doctoral students at CUNY, correct?

13   A.   Yes, I do.

14   Q.   How long have you been working in the field of public

15   health?

16   A.   Over 20 years.

17   Q.   I'd like to discuss your research a little bit, Dr. Romero.

18   Have you authored any chapters and books on the impact of

19   poverty and race on access to healthcare?

20   A.   Yes, I have.

21   Q.   Can you name some of those chapters?

22   A.   Sure.  I've authored or co-authored about four chapters in

23   four different books.  They had to do with welfare policy and

24   the health of families; the impact of policies related to

25   reproductive behaviors; and the health of poor and low-income

1    women.  And also, one was particularly focused on the

2    experience of low income and poverty among Latino families.

3    Q.  And have you authored any articles on low-wage workers?

4    A.  Yes, I have research specifically focusing on hospitality

5    workers in a range of very low-wage occupations.

6    Q.  And, Dr. Romero, have you done any research on women in

7    poverty?

8    A.  I have.  I've done a fairly large amount of research on the

9    experience of poor and low income.  Well, the health of poor

10   and low-income women.

11   Q.  Where has your work been published?

12   A.  I have published across a fairly wide range of scientific

13   journals.  Certainly the *American Journal of Public Health*,

14   *Contraception*, *Perspectives in Sexual Reproductive Health*, the

15   *Journal of Community*, the *Journal of Family Medicine*, and the

16   *Journal of Healthcare for The Poor and Underserved*.  Those are

17   just some.

18   Q.  Are these peer-reviewed journals?

19   A.  Yes, they all are.

20   Q.  How long have you been conducting research on poverty,

21   gender, and healthcare?

22   A.  Since the late 1990s.

23   Q.  And how long have you been a professor at CUNY?

24   A.  Since 2007.

25          MS. SHAH:  Your Honor, at this time, I'd like to offer

1    Dr. Romero as an expert in public health as it pertains to

2    poverty and racial and ethnic disparities in healthcare.

3              THE COURT:  Making a note.  Any objection, Mr. Prince?

4              MR. PRINCE:  No, Your Honor.

5              THE COURT:  Okay.  The proffer's accepted.  The

6    witness may testify as an expert.

7              MS. SHAH:  Thank you, Your Honor.

8    BY MS. SHAH:

9    Q.  Dr. Romero, did you prepare an expert report for this case?

10   A.  Yes, I did.

11   Q.  I'd like to show you Plaintiffs' Exhibit No. 7, which is

12   going to show up on the screen.

13        Is this a copy of the expert report that you prepared?

14   A.  Yes, it is.

15   Q.  And do you have a copy in front of you?

16   A.  To the side of me, but yes.

17   Q.  Near by you?

18   A.  Exactly.

19   Q.  Please feel free to refer to the expert report as you

20   testify if you need to refresh your recollection.

21   A.  Okay.

22   Q.  I'd first like to talk to you about poverty in Indiana.

23   Can you explain to us how the poverty rate is measured?

24   A.  Sure.  The poverty rate is measured with a federal

25   indicator, if you will, called the federal poverty line.

ROMERO − DIRECT/SHAH                    162

1  Q.  Where does the federal poverty line come from?

2  A.  It was derived many decades ago, I want to say in the early

3  50s or early 60s, from the work of a lead economist who was

4  using estimates from −− produced by the United States

5  Department of Agriculture, estimates in what they call sort of

6  the market basket of food that might be required for families

7  of different sort of levels of nutrition, if you will, or

8  dietary value.

9      And they −− she pretty much focused on sort of the lower

10  estimate, called the economy food plan, because USDA had −− was

11  the only agency that actually developed some kind of a standard

12  for a necessity of sort of life, a basic necessity of living,

13  which was food.

14      So it was −− there weren't other established indicators,

15  like for other necessities of life, such as housing and

16  clothing, for example, so she used these USDA indicators for a

17  fairly low level of, you know, food that would be needed to −−

18  for an individual to subsist on, and then, using a multiplier

19  on that indicator, came up with what would be needed for sort

20  of basic subsistence, or meeting basic needs, depending on

21  different family sizes.

22  Q.  So, to clarify, food was the only necessity taken into

23  consideration when calculating the federal poverty line?

24  A.  It was the only necessity that there were some standard

25  indicators for.  And then it was multiplied assuming that the

1    other necessities would be sort of -- of equal weight, like a

2    third for food, a third for housing, and a third for clothing,

3    for example.  It was fairly crude despite involving a lot of

4    economic calculations, but that was the basis of it.

5    Q.  Has the way the federal poverty line is calculated changed

6    since the 1950s?

7    A.  Not very much.  It's still considered a fairly crude

8    measure.

9    Q.  Dr. Romero, you used the term "basic necessities."  Can you

10   define that term?

11   A.  Yeah.  It's generally -- you know, I would say maybe

12   there's some variation in it, but it's generally understood to

13   be the minimum that an individual family would need to subsist,

14   or survive.  And, generally, you know, historically, that's

15   been like food, housing and -- or food, shelter, and clothing,

16   but there has been some since that probably people require more

17   than that.

18   Q.  And amongst public health researchers -- or, excuse me.  In

19   your opinion, what is the accuracy of the federal poverty line?

20   A.  Generally speaking, there's wide consensus that the federal

21   poverty line is a very low bar for what is needed to meet basic

22   needs, that indeed it underestimates what is needed for, you

23   know, any individual or family to actually meet its needs.

24   Q.  Using the federal poverty line, what is the overall poverty

25   rate in Indiana?

ROMERO - DIRECT/SHAH                    164

1  A.  Yeah, at the time of my report, it was about 20,400 for a

2  family of three, I believe.

3  Q.  And what is the overall poverty rate in Indiana?

4  A.  Well, so, yeah, at the time, again, about 14 and a half,

5  maybe 14.6 percent, I believe.

6  Q.  And where does that data come from?

7  A.  That comes from Census Bureau data.  It's generated by data

8  from Census Bureau, Department of Health and Human Services.

9  Q.  And what is the poverty rate for women in Indiana compared

10  to men?

11  A.  There's certainly a disparate experience in poverty -- a

12  gendered experience in poverty.  In Indiana, it's about

13  16 percent among women compared to about 13 percent among men.

14  Q.  How much money do women in Indiana earn compared to men?

15  A.  Yeah, so there's quite a gender wage disparity, as well.

16  For every dollar that a male earns, a woman earns approximately

17  73 cents.  That is almost the lowest in the country.

18  Q.  What is the rate of poverty for --

19       MR. PRINCE:  Objection to that last answer, Your

20  Honor.

21       Could you lay some foundation just for the --

22       THE COURT:  Mr. Prince, first of all, we can't hear

23  you.  Your voice is too low.  And --

24       MR. PRINCE:  I apologize, Your Honor.  I can speak

25  louder.

1            THE COURT:  I'm assuming that these are figures you're

2    familiar with from your research; is that right?

3            THE WITNESS:  These are data -- these are actually

4    publicly available data, national data, comparing, you know,

5    all the states in the country.  If I'm not mistaken, I think

6    Indiana was 49 out of 51, which I believe may have included the

7    District of Columbia in terms of the gender wage disparity.

8            THE COURT:  The foundation is her research and her

9    knowledge in this field, Mr. Prince.  Are you concerned about

10   something else?

11           MR. PRINCE:  No.  Withdrawn.

12           THE COURT:  Okay.  Go ahead, then, Ms. Shah, please.

13           MS. SHAH:  Thank you.

14   BY MS. SHAH:

15   Q.  Dr. Romero, what is the rate of poverty for single mothers

16   in Indiana?

17   A.  The rate of poverty for single mothers was at 39 percent.

18   Q.  And what does this higher rate of poverty among single

19   mothers compared to the general population in Indiana mean?

20   A.  Can you say that again?

21           THE COURT:  Say that again, please, Ms. Shah.

22           MS. SHAH:  Sure.

23   BY MS. SHAH:

24   Q.  What does this higher rate of poverty amongst single

25   mothers in Indiana compared to the general population of the

1  state mean?

2  A.  Well, for certain, it means that they suffer a

3  disproportionate experience with poverty.  And if we understand

4  poverty to be not being able to meet all basic needs, then

5  there would -- one would presume that there would be a greater

6  struggle among single mothers in terms of meeting basic needs

7  for themselves and their dependents, their families.

8  Q.  Based on this 39 percent, is it fair to say about four out

9  of ten single mothers struggle to meet their basic needs?

10  A.  Yeah, that would be the -- that would be the conclusion.

11  Q.  Dr. Romero, you testified that the federal poverty line is

12  not an accurate measure of poverty.  Are there other measures

13  used to determine poverty levels?

14  A.  Yes, some alternative measures of poverty have been

15  proposed.

16  Q.  Do you have any examples of those measures?

17  A.  Yes.  So, for example, there's a measure called a

18  self-sufficiency standard.  That was developed several decades

19  ago and has been used in the majority of the states around the

20  country.

21     What the SSS tries to do is actually take into account

22  other -- other necessities of life that individuals or families

23  would need to meet in order to, I guess, meet those needs.  So,

24  for example, the self-sufficiency standard includes taxes which

25  we're all expected to pay at some level.  Also, expenses like

childcare, transportation, healthcare.  And after incorporating

all of those, in general, this self-sufficiency standard tends

to estimate a relatively higher level of poverty than the

federal poverty line estimates.

Q.  And who developed the self-sufficiency standard?

A.  It was developed by social scientists and public policy

researchers.

Q.  Are economists included in that group?

A.  In the social scientists, yes.  I'm sorry.

Q.  And according to the self-sufficiency standard, what is the

rate of poverty in Indiana?

A.  Yeah, when they use the SSS to calculate it, it comes out

to over a third of the Indiana population.

Q.  Dr. Romero, how has the median household income changed in

Indiana in recent years?

A.  The median household income has gone up slightly.  When

looking, I think -- I believe at the change from 2009 to 2016,

I believe the median income went up about six and a half or

maybe 6.7 percent.

Q.  And how has the cost of basic necessities changed in

Indiana in recent years?

A.  Yeah, so during the same time period, the cost of basic

necessities, or what they call cost of living, has gone up by

almost 32 percent.

Q.  And what proportion of a median-earning household income

ROMERO — DIRECT/SHAH                    168

1    does basic necessities take up in Indiana?

2    A.  So recent estimates have shown that a median income-earning

3    family requires about 82 percent of that income to meet its

4    basic needs.

5    Q.  What's your opinion of the proportion that the cost of

6    basic needs takes up for a low-income family in Indiana?

7    A.  Right.  So a family earning less than a median income,

8    which would be a low-income family, would then, in turn, have a

9    greater proportion of their income required to meet basic

10   needs.

11       So if we only have -- you know, for example, for a

12   median-income earning family, 82 cents on the dollar is needed

13   for basic necessities.  Then, if we look at families that earn

14   below that, they may not even earn enough, those 82 cents on

15   the dollar, if their income is below it.  They may not even

16   earn enough to meet basic necessities.  But we can certainly

17   say that a greater proportion of their income would be

18   required.

19   Q.  And -- okay.  I'd like to turn your attention to the

20   document marked Stipulated Exhibit 28.

21   A.  Okay.

22       THE COURT:  We're going to put them on the screen so

23   you can look at them up there, which may be quicker than

24   looking for them in your manual.

25       THE WITNESS:  Okay.

1         THE COURT:  But if you need to refer to the manual,

2   feel free to do that.

3         THE WITNESS:  Okay.  Thank you.

4   BY MS. SHAH:

5   Q.  Dr. Romero, do you recognize this document?

6   A.  Yes.

7   Q.  Can you read the title of the document?

8   A.  Report on "The Economic Wellbeing of U.S. Households in

9   2019, Featuring Supplemental Data from April 2020."

10  Q.  And who published this document?

11  A.  The Federal Reserve or the Board of Governors of the fed.

12  Q.  And what is the Federal Reserve System?

13        THE COURT:  I know that.  You don't need to --

14  A.  So --

15        THE COURT:  You don't need to put that in the record.

16        MS. SHAH:  Okay.

17  A.  Okay.

18  BY MS. SHAH:

19  Q.  And Dr. Romero, what is the report on economic -- on the

20  economic well-being of U.S. households in 2019, briefly?

21  A.  So the fed conducts a wide range of economic research; and

22  in this report, they essentially were trying to take a pulse --

23  or took a pulse of where we stood as a country in terms of our

24  ability to -- you know, I guess across a wide range of economic

25  behaviors.  But in particular, well-being meaning how able as a

1   country we were to meet our economic needs.

2   Q.   Is the Federal Reserve Board report a reliable authority?

3   A.   Yes, it is considered so.

4   Q.   I'd like to turn your attention to page 9 of the report,

5   the bottom paragraph of the first column.

6   A.   Okay.

7   Q.   Sorry.  It's page 9 of the exhibit numbering.

8   A.   I have it.

9   Q.   Okay.  Can you read the sentence that starts with "yet" and

10  ends with "400," please?

11  A.   Sure.  "Yet while most adults were fairing reasonably well

12  financially, results also show that a substantial minority of

13  adults were financially vulnerable at the time of the survey

14  and either could not pay their current month's bills in full or

15  would have struggled to do so if faced with an emergency

16  expense as small as $400."

17  Q.   Thank you.  Dr. Romero, how does the increased cost of

18  basic necessities impact a low-income family's ability to

19  access healthcare?

20  A.   So in general, when a poor or low-income family is facing

21  increased costs in anything, they're going to have to make some

22  difficult decisions about prioritizing what are the expenses

23  that they can pay and which ones they have to forego or delay.

24       And we have seen that oftentimes less urgent needs, such as

25  healthcare deemed less urgent because it's not keeping a roof

1   over someone's head or providing food to the family, that,

2   unfortunately, those needs oftentimes will be delayed or

3   forgone indefinitely.

4       So poor and low-income families at a wide range of public

5   health research have been shown to oftentimes have to delay or

6   forego healthcare.

7   Q.  I'd next like to talk to you about employment in Indiana.

8   How many people do Indiana's largest 20 occupations employ?

9   A.  They employ over three-quarters, about 78 percent of the

10  population.

11  Q.  And can you describe the median wage for Indiana's largest

12  20 occupations?

13  A.  Yeah.  So it turns out that for over three-quarters of

14  these jobs -- or rather over three-quarters of individuals in

15  these jobs who earn this median income, the median income is

16  below what's needed for a family of three to subsist.  So I

17  apologize if that was a little -- a little, you know, sort of

18  awkward in the way I said it.  But essentially, a large

19  proportion, that is, more than three-quarters of these workers,

20  earn a median income that cannot meet the basic needs of a

21  family of three, if that was clear.

22  Q.  Yes, thank you.

23      What challenges does a person in the low-wage labor force

24  face in accessing healthcare?

25  A.  So the low wage labor force happens to have a set of

ROMERO - DIRECT/SHAH                                    172

1    characteristics that are fairly common across occupations.

2    They tend to be inflexible schedules such that there might not

3    be benefits, such as paid time off or even unpaid time off,

4    personal days, you know, sick days, vacation time.

5        The schedules many times are very changing but not within

6    the control of the employees.  So that from week-to-week,

7    oftentimes workers are not sure what their schedules or the

8    number of hours for that matter are going to be that they're

9    working.

10       And if individuals are trying to access healthcare or make

11   appointments for healthcare, this -- this constantly changing

12   dynamic of this precarious -- largely precarious workforce

13   oftentimes makes it incredibly difficult to access healthcare

14   without risking loss of wages, loss of work hours, and

15   sometimes might even jeopardize their jobs.

16   Q.  I'd like to next ask you a few questions about the racial

17   and ethnic makeup of Indiana.  What is the racial makeup of

18   Indiana residents?

19   A.  So Indiana is a largely white population.  It's just under

20   80 percent white.  About 7 percent Latino or Hispanic and just

21   under 10 percent black or African-American.

22   Q.  And what are the comparative rates of poverty amongst these

23   three groups?

24   A.  So that distribution is almost reversed in that the white

25   population has a relatively smaller representation in terms of

ROMERO – DIRECT/SHAH                173

1    poverty.  About 11 and a half percent of the white population

2    experience poverty.  Whereas, over 25 percent of the Hispanic

3    or Latino population are in poverty, and just about 30 percent

4    of the black or African-American population are in poverty.

5    Q.  So what do these higher rates of poverty within the black

6    and/or Latino population mean?

7    A.  So as a group, these racial ethnic minorities are

8    disproportionally experiencing the burden of difficulty meeting

9    basic needs.  So by definition, you know, as we discussed

10   already, living at or near poverty means that one's income is

11   not adequate to meet basic needs.  And so Latino and black

12   individuals in Indiana are going to have a disproportionally

13   higher rate or experience with being able to meet basic

14   necessities of life.

15   Q.  I'd like to next talk to you about Indiana social safety

16   net programs.  Dr. Romero, what are social safety net programs?

17   A.  So these tend to be government programs that try in various

18   ways to provide additional support to individuals or families

19   who are experiencing low income or living at or below poverty

20   in order to meet some of -- you know, some of their needs.

21   Q.  And what is the purpose of social safety net programs?

22   A.  So the sensible goal is to make it easier for them to meet

23   basic needs, whether it's, you know, cash assistance for a wide

24   range of expenses, food specific assistance, assistance with

25   health, accessing healthcare like through health insurance

ROMERO - DIRECT/SHAH                               174

1   programs, assistance for people with disabilities who may not

2   be able to work.  These sort of categorical programs attempt to

3   bridge some of that gap for poor and low income families to be

4   able to access these basic necessities.

5   Q.  Does Indiana have social safety net programs?

6   A.  Yes.  Indiana participates in several of them, sure.

7   Q.  Can you list Indiana's main social safety net programs?

8   A.  Yes.  So there's temporary assistance for needy families,

9   which is otherwise known as welfare, and that's cash

10  assistance.  There's the SNAP Program, or Supplemental

11  Nutrition Assistance Program, also referred to as food stamps.

12  There's Medicaid, which is a health insurance program.  There's

13  also partition in unemployment, you know, benefits but I would

14  say that, you know, the cash assistance, the food assistance,

15  and the health insurance assistance are probably the main ones.

16  Q.  I'd like to discuss a few of these programs with you.  What

17  is the Supplemental Nutrition Assistance Program?

18  A.  So that's what used to be called food stamps or now it's

19  SNAP.  And in -- you know, it's federal monies that can flow to

20  states and states can use to provide food related assistance to

21  poor and low income families.

22      There's, I guess, variability in how states may choose to

23  offer sort of in terms of eligibility.  The federal government

24  allows states to offer SNAP to individuals up to 200 percent of

25  the federal poverty line.  Indiana actually does not permit

1  eligibility beyond 130 percent.  One's income has to be below

2  the 130 percent of the federal poverty line.

3       And they also have an assets cap, so that a family cannot

4  have assets totaling more than $2,250.  So that means, you

5  know, a family can be poor below the 130 percent of the poverty

6  line; but if, for example, they own an old car, a used car

7  that's worth more than $2,250, they would be ineligible for

8  food assistance.

9  Q.  What is temporary assistance for needy families?

10 A.  So that is the -- you know, again, the sort of common term

11 is the welfare program.  It's cash assistance.  And the states

12 have wide purview, I guess, in terms of what the benefits are

13 that they offer.

14      In Indiana, they cap eligibility at -- for a family of

15 three, at just under $600 a month income, which is about $7,000

16 a year annual income.  So that's dramatically below the federal

17 poverty line cutoff for a family of three.  So a family that's

18 at a very, very, very low income might be eligible for TANF

19 assistance which for family of three in Indiana would be no

20 more than $288.

21      The benefit that Indiana gives puts it at No. 6 in the

22 entire country, sort of lowest, where it's only able at that

23 benefit amount -- or rather that income cutoff, they are only

24 able to serve five out of every 100 poor families.

25 Q.  Does the temporary assistance for needy family program that

1    Indiana has support women with newborns?

2    A.   No.   Indiana is one of only 12 states that currently has in

3    place what it calls a family cap policy.  So if a woman is

4    receiving TANF assistance, and let's say she has one child, if

5    she has a newborn, she does not receive any additional cash

6    assistance despite the fact that the size of her family is

7    now -- you know, went from two to three.

8    Q.   What is Medicaid?

9    A.   Medicaid is a government funded safety net program that

10   provides access to healthcare.  It's a public health insurance

11   program.  It is federal and state match program.  And it

12   also -- wait.  Where was I going with this?  I guess at this

13   point, I'll put it that there's Medicaid and then there's

14   expansions of Medicaid, such as for family planning, but I

15   don't know if that's what you wanted to know.

16   Q.   Thank you.  What criteria does Indiana have for someone to

17   be eligible for Medicaid?

18   A.   Right.  So Medicaid doesn't have to, but some states have

19   elected to add work requirements as a condition of receiving

20   health insurance in addition to, you know, income-related

21   eligibility.

22        So in Indiana, as of last summer, work requirements of 80

23   hours per month were required in order for a poor family that's

24   eligible for Medicaid to actually receive it.  So individuals

25   would have to work 80 hours a month in addition to income

ROMERO – DIRECT/SHAH                        177

1    eligibility to be eligible for health insurance for the poor.

2    Q.  And can you describe what kind of work does or does not

3    qualify for Indiana's Medicaid work requirements?

4    A.  So unpaid work does not qualify and work that may not be

5    part of the sort of official labor markets.  So it turns out

6    that over 50 percent of women who receive Medicaid are already

7    working, so may meet that work requirement.  Working in sort of

8    the formal labor force.

9         But if somebody is, let's say, providing care for a family

10   member, dependent, a sick family member that's unpaid, that

11   would not be recognized as work and so would not qualify.

12   Q.  Overall, how well do Indiana social safety net programs

13   support low-income people in the state?

14   A.  Unfortunately, not well at all.  By almost all indicators,

15   Indiana is fairly close to the bottom when compared to other

16   states around the country in terms of providing assistance to

17   poor low-income families.  It consistently seems to apply more

18   stringent and restrictive requirements than are actually

19   required of it from these federal programs.

20   Q.  Dr. Romero, have you researched the impact of travel on

21   low-income people's access to healthcare?

22   A.  Yes; a couple of my studies have included factors related

23   to travel.

24   Q.  Can you describe the impact of multiple trips to a

25   healthcare provider on a low-income person?

A.  Sure.  In one study that we conducted in New York City

after the closure of a long-standing, 160-year-old hospital

that was a social safety net healthcare provider, we conducted

a survey of over 1500 people who used that hospital system and

found that there was a significant impact on their accessing

healthcare when they had to travel further for healthcare

services.

And this involved the cost associated with the travel, as

well as the time required for travel, and also delays in being

able to get -- make appointments as well.  That additional

effort that they had to make to access healthcare further away

had multiple, you know, impacts on them in terms of delays for

healthcare.

MS. SHAH:  Thank you.  No further questions, Your

Honor.

THE COURT:  Okay.  Mr. Prince, cross-examine, sir?

**CROSS EXAMINATION**

MR. PRINCE:  Yes, Your Honor.  And I will try to speak

up as you indicated that my voice doesn't carry too well with

the microphone.

THE COURT:  And my court reporter says you're going

awfully fast.

MR. PRINCE:  Of course.

BY MR. PRINCE:

Q.  Dr. Romero, good afternoon.  My name is Joshua Prince.  I

ROMERO - CROSS/PRINCE                                    179

1    am one of the attorneys that represents the defendants in this

2    matter.  Very nice to meet you.  I do not have too many

3    questions for you today and I will do my best to keep it as

4    painless as possible, as I know that testimony can be a

5    different experience for a lot of people.

6          Certainly --

7    A.  Sure.  Nice to meet you, too.

8    Q.  Thank you.  My first question is that -- I just wanted to

9    talk with you briefly about your educational background.  You

10   obtained your Ph.D. from Columbia; is that correct?

11   A.  Correct.

12   Q.  And in your time at Columbia, you studied sociomedical

13   sciences?

14   A.  I did.

15   Q.  Would it be a fair assumption that at some point in your

16   training you took classes on statistics?

17   A.  Yes.

18   Q.  Probably quite a few, based on your degree?

19   A.  Yes.

20   Q.  And is it also fair to assume that you likely used the

21   information and the skills that you learned in those statistic

22   courses in preparing your report?

23   A.  I did.

24   Q.  Now, would the process of determining causation have been

25   something that would have arisen in your statistic studies?

ROMERO – CROSS/PRINCE                    180

1  A.  Yes.

2  Q.  And is it fair to say that from a scientific standpoint,

3  determining causation is a difficult thing to do?

4  A.  Yes.

5  Q.  So whereas, a layperson would look at two simultaneously

6  occurring variables and say that one causes the other, it would

7  be impossible to do that scientifically without going through

8  some sort of deep analysis, correct?

9  A.  Umm, I'm -- I guess causation does require analysis.  I'm

10 just not sure if you were trying to make a -- trying to have me

11 make a different -- a more nuanced response based on -- you

12 said a typical person.  I guess I'm not following that.

13 Q.  Sure, a layperson that lacks statistical training might

14 attempt to draw some causal inferences that a person with

15 scientific training would know would be improper.

16          MS. SHAH:  Objection, Your Honor.

17          THE COURT:  What's the objection?

18          MS. SHAH:  Vague and speculative.

19          THE COURT:  Well, I'm not sure the relevance of an

20 ordinary person making this sort of analysis.  If you want to

21 ask her what she does to make an analysis since she's trained

22 in both.

23          MR. PRINCE:  Certainly.

24          THE COURT:  Go ahead.  I'm just taking it as

25 preliminary questions, so you've got a little latitude to get

where you want to go here.

MR. PRINCE:  Thank you, Your Honor.

BY MR. PRINCE:

Q.  I can rephrase the question.  To say scientifically that one variable causes another variable requires analysis, as we've determined, correct?

A.  Yes.

Q.  Now, in your report, one of the conclusions that you drew was that the Indiana laws exacerbate the difficulties women face in receiving healthcare; is that accurate?

A.  Yes.

Q.  Is it also fair, though, to say that your report did not -- that in preparing your report, you did not do a causal analysis?

A.  Correct.

Q.  And you didn't personally compare Indiana's abortion rate before or after the introduction of any of the challenged laws?

A.  Correct.  My report includes a lot of data from other researchers' work.

Q.  You didn't personally speak with any Indiana women about their attempts to have an abortion in the state of Indiana?

A.  Correct.

MS. SHAH:  Objection, Your Honor, this is beyond the scope of the direct.  Dr. Romero did not opine on abortion. She simply stated her opinions on access to healthcare as it

ROMERO – CROSS/PRINCE                                    182

1    relates to poverty.

2            THE COURT:  Do you want to ask that as a preliminary

3    question, Mr. Prince, did her conclusions include abortion?

4            MR. PRINCE:  Certainly.

5            Dr. Romero, did any of the conclusions you drew in

6    your report address abortion specifically?

7            THE WITNESS:  No.

8            MR. PRINCE:  Your Honor, if I could have just a second

9    to confer with my colleagues?

10           THE COURT:  You may.

11           MR. PRINCE:  Thank you, Your Honor.

12           THE COURT:  Phone a friend.  Phone a friend,

13   Mr. Prince.

14           MR. PRINCE:  Phoning more than one, Your Honor.

15           THE COURT:  Oh, do you do it by vote?  Is it majority

16   rules?

17           MR. PRINCE:  Uh, work product privilege, Your Honor.

18           THE COURT:  Okay.  I'll recognize the privilege, but I

19   am curious.

20           MR. PRINCE:  I have no further questions, Your Honor.

21           THE COURT:  Okay.  Mr. Prince, thanks for taking my

22   late afternoon tease.

23           So, Miss Shah, do you have any redirect?

24           MS. SHAH:  No, Your Honor, no redirect -- or one

25   moment, Your Honor.

 1          THE COURT:  You have to consult your panel of experts.

 2          MS. SHAH:  Oh, okay, yes, I also have to consult --

 3          THE COURT:  I feel so alone over here.

 4          MS. SHAH:  I'm sorry about that.

 5          THE COURT:  My law clerk --

 6          MS. SHAH:  Just two questions, Your Honor.

 7                        **REDIRECT EXAMINATION**

 8          THE COURT:  You may ask.

 9   BY MS. SHAH:

10   Q.  Dr. Romero, your testimony today concerns healthcare,

11   right?

12   A.  Accessing healthcare, yes.

13   Q.  Is abortion a healthcare service?

14   A.  Indeed it is.

15          MS. SHAH:  No further questions, Your Honor.

16          THE COURT:  Re-recross, Mr. Prince?

17          MR. PRINCE:  I do not believe so, Your Honor.

18          THE COURT:  All right.  Very good.  Then does that

19   complete all the questions for Dr. Romero?

20          MS. SHAH:  Yes, thank you, Your Honor.

21          And thank you, Dr. Romero.

22          THE COURT:  Can we excuse her from her subpoena?

23          MS. SHAH:  Yes.

24          THE COURT:  All right.  Very good.  Thank you.  You've

25   done the work we needed to have you do and requested, so thank

ROMERO - REDIRECT/SHAH                    184

1    you very much.  I would say it's nice to have you in court, but

2    I'll say it's nice to you have on our monitor, how's that.

3              THE WITNESS:  Thank you very much.  It was nice to be

4    here.  Bye-bye now.

5              THE COURT:  Thank you.

6                        (Witness excused.)

7              THE COURT:  Let me ask, you've got two more witnesses.

8    Are there any expeditious witnesses here?

9              MS. SHAH:  Yes, Your Honor.  One of our witnesses will

10   take about 40 minutes or 45 minutes, and another witness will

11   take about 20.

12             THE COURT:  Let's do the 20-minute witness.

13             MS. SHAH:  Sure, Your Honor.  Plaintiffs would like to

14   call Grace Hutson.

15             THE COURT:  Okay.  Are you Grace Hutson?

16             THE WITNESS:  There we go.  Got it.  Yes, I'm Grace

17   Hutson.

18             THE COURT:  Okay good.  And I need an Indiana lawyer.

19   Who's replacing Mr. Prince?  Oh, there, Ms. Payne.

20             MS. PAYNE:  That would be me, Your Honor; yes, Your

21   Honor.

22             THE COURT:  Good, good.  We've got our full complement

23   here.

24             Ms. Hutson, good afternoon to you.

25             THE WITNESS:  Good afternoon.

1   THE COURT:  I'm going to ask if you would please take

2   your witness oath to tell the truth, and I'll ask the clerk to

3   administer it.

4            GRACE HUTSON, PLAINTIFFS' WITNESS, SWORN

5                      **DIRECT EXAMINATION**

6            THE COURT:  Okay, Miss Shah, you may ask your

7   questions.

8            MS. SHAH:  Thank you, Your Honor.

9   BY MS. SHAH:

10  Q.  Good afternoon -- or good evening, Ms. Hutson.  Can you

11  tell us your full name and how you spell it.

12  A.  My name is Grace Hutson, it's spelled G-R-A-C-E,

13  H-U-T-S-O-N.

14  Q.  How old are you, Miss Hutson?

15  A.  I am 27 years old.

16  Q.  And what state do you live in?

17  A.  Indiana.

18  Q.  How long have you lived in Indiana?

19  A.  My whole life.

20  Q.  Miss Hutson, have you got an abortion before?

21  A.  Yes.

22  Q.  And you received State-mandated counseling as a part of

23  that abortion?

24  A.  I did.

25  Q.  When did you get an abortion?

HUTSON — DIRECT/SHAH                    186

A.   In the summer of 2014.

Q.   How old were you then?

A.   I was 20 years old.

Q.   And where did you get an abortion?

A.   At a clinic in Indianapolis.  I'm sorry, a Planned
Parenthood clinic in Indianapolis.

Q.   Where did you live when you got your abortion in 2014?

A.   I lived in the Broad Ripple area of Indianapolis.

Q.   And who did you live with at the time?

A.   I lived at my family's home with my parents and three of my
four siblings.

Q.   Can you tell me a little bit about your life circumstances
at the time you got your abortion.

A.   Yes, I was in college full-time at IUPUI, or Indiana
University-Purdue University Indianapolis.  I was working
part-time as a lifeguard as a local swim club, and I had just
finished treatment, like an outpatient treatment center called
the St. Vincent Stress Center.  I was diagnosed previously with
anxiety and depression, and I was just kind of having a
depressive episode at the time.

Q.   I'd like to talk to you a little bit about your abortion in
2014.  Can you please describe your experience learning you
were pregnant.

A.   Sure.  I didn't —— you know, I kind of just woke up one
morning and felt off, so I got a pregnancy test at like a

1    pharmacy and just took the test, and it came back positive.

2    And I was pretty calm.  I knew what I wanted to do and so I

3    started researching and I called Planned Parenthood to figure

4    out how I could terminate my pregnancy.

5    Q.  Why did you decide to get an abortion?

6    A.  I was not in a place in my life that I wanted to carry to

7    term.  The financially, emotionally and, really just physically

8    living with my parents and everything, it just wasn't the right

9    time in my life.

10   Q.  You mentioned you received state-mandated counseling before

11   your abortion.  What information did you receive?

12   A.  I received brochures about -- about carrying to term,

13   adoption and abortion.  And, yeah, it was like paper copies.

14   Q.  How did you feel about the brochures being given to you at

15   your appointment had to be delivered to you in person?

16   A.  It added a layer of stress for me because I was not sharing

17   that I was pregnant with anyone, so, you know, it was another

18   thing that I had to, you know, hide and make sure no one else

19   saw because I didn't want anyone else to know at the time.

20   Q.  And when you said that you weren't sharing that information

21   with anyone, that includes the family that you were living

22   with?

23   A.  Yes.

24   Q.  Your family?

25   A.  Yes.  Only one of my sisters knew because I needed, like, a

1    ride to the clinic, so that was the only reason I told anyone.

2    Q.  And so what did you do with the brochures?

3    A.  I ended up throwing them away.  I didn't take them into my

4    parents' house.  I just didn't want to risk it.

5    Q.  And when you say "risk it," can you explain what you mean?

6    A.  I just didn't want my family to know that I was pregnant

7    and that I was choosing to terminate it, so I -- yeah, it just

8    wasn't -- it wouldn't have made sense for me to bring it

9    inside.

10   Q.  When was your first counseling appointment -- when was your

11   counseling appointment first scheduled for?

12   A.  I don't remember the exact date, but it was probably within

13   a week or two of when I first called the clinic, and -- yeah,

14   so it was late July I would say.

15   Q.  And was that, in fact, when you had your first counseling

16   appointment?

17   A.  Umm, so I had -- oh, I'm sorry, I misunderstood you.  I had

18   a -- I had it scheduled for early August and then the -- like,

19   Planned Parenthood called me and had to reschedule because the

20   doctor was not in my area at the time, so I did not end up

21   having, like, the counseling appointment until late July.  I'm

22   sorry, August.

23   Q.  Thank you.  And approximately how long was the delay

24   between your original appointment and the rescheduled

25   appointment?

1    A.  It was about two weeks.  So, yeah, two more weeks of

2    waiting and going through the symptoms and everything.

3    Q.  Can you tell us a little bit about what the impact of this

4    delay was on your life at the time?

5    A.  I, so I had originally scheduled off for those two, the

6    counseling and then the actual procedure.  And then when it was

7    rescheduled, I had to take off more days from work.  And I was

8    only working part-time.  I didn't have access to paid time off,

9    so it financially affected me.  And like physically, I was

10   experiencing morning sickness and nausea, so I was experiencing

11   those symptoms longer and just, you know, being pregnant for

12   longer when I didn't want to be.

13   Q.  I'd like to talk to you a little bit about the financial

14   impact you just described.  What job were you doing at the

15   time?

16   A.  I was a lifeguard just part time, about 20 hours a week.

17   Q.  And how much money were you making as a lifeguard?

18   A.  About $8 an hour.

19   Q.  Did you have any other income?

20   A.  I would babysit occasionally on the weekends, but I didn't

21   have anything that was, like, routine, as the same way my

22   part-time job was.

23   Q.  And at the time, what were you paying for?

24   A.  I did live with my parents, so I didn't have to pay rent,

25   but I was responsible for pretty much everything else.  I paid

1    for school, I paid for gas, car maintenance, food, clothes,

2    hair cuts, you know, everything else.

3    Q.  And how many days total did you have to take off from work

4    for your abortion?

5    A.  I had to take off four days total because of the two -- I

6    originally had it for early August, and then I didn't end up

7    having my procedure until late August.

8    Q.  And that's because the procedure was rescheduled because

9    the doctor was unavailable?

10   A.  Yes.

11   Q.  And the four days that you had to take off, were you paid?

12   A.  I was not.

13   Q.  How did the delay impact your well being at the time?

14   A.  It was stressful.  You know, things were kind of -- it was

15   like a line of dominoes.  I had everything lined up, had to

16   make sure everything happened the way it should so that I

17   could, you know, end up having this done.  So it was stressful.

18   And like I mentioned earlier, I was diagnosed with anxiety and

19   depression before, and it kind of exacerbated those symptoms of

20   just waiting and just -- you know, it just -- it made me

21   nervous and I was stressed.

22   Q.  How did you get to your appointments?

23   A.  I drove myself to the counseling appointment, and then my

24   sister drove me to the procedure.  And I was sharing a car with

25   my siblings at the time so I did have to do a little

1   coordination regarding, you know, setting a time, making sure

2   that I had the car that day, while maintaining some secrecy

3   about what I was going to do.

4   Q.  And how did it make you feel to have to coordinate with

5   your family to use the car?

6   A.  It was another domino in the line that had to work for this

7   whole -- for -- you know, for me to -- for this to happen, so,

8   yeah, it was another layer of stress.

9   Q.  How did you pay for your abortion?

10  A.  I paid out of pocket.  And, you know, looking at my

11  finances and everything, I had decided that that fall semester

12  I would take one less class to make sure I could afford

13  everything.

14      I was on my mom's health insurance at the time, but she

15  worked for a Catholic school, and they wouldn't cover abortion

16  or birth control or anything like that, so I didn't have any

17  help from my insurance.

18  Q.  How did you feel after receiving your abortion?

19  A.  I felt, like, a big sense of relief and I was really

20  grateful to Planned Parenthood.

21  Q.  Have you received any medical care using telemedicine?

22  A.  I have.

23  Q.  What medical care?

24  A.  I've had appointments with my primary care doctor for

25  things like a UTI or an ear infection, and I have also done

HUTSON — DIRECT/SHAH                    192

1   about two years of virtual therapy.

2   Q.  And what was the process of signing documents to receive

3   that care?

4   A.  It was pretty seamless.  I believe the software I used was

5   called DocuSign so it's just like an electronic signature.

6   Q.  And what treatment -- can you tell me about how receiving

7   that information electronically was for you?

8   A.  I liked the ability for me to go back and access them any

9   time.  It wasn't like a piece of paper I could lose easily.  I

10  just had to log in, I think, with my e-mail address and I could

11  access, you know, whatever I had signed.  I could look back if

12  I needed to.  And, yeah, it was just -- it was easy.  I liked

13  that it was -- you know, I could just always have it right

14  there.  It was simple.

15  Q.  And what treatment did you receive using telemedicine for

16  your UTI?

17  A.  I just described my symptoms to my primary care doctor, and

18  I was prescribed an antibiotic that he sent to my local

19  pharmacy.

20  Q.  And what impact did receiving those treatments using

21  telemedicine have on your life at the time?

22  A.  It made my life a little bit easier.  I mean, I didn't have

23  to drive across town to the doctor, didn't have to take off

24  work.  I have done a telemedicine appointment in my car on my

25  lunch break at work before, so it really -- it makes the care

HUTSON - DIRECT/SHAH                    193

1    more accessible.

2    Q.  I would just like to go back really quickly to the impact

3    of having to pay for your abortion out of pocket on your life.

4        Just to clarify, did you say you had to take one less class

5    that fall semester to pay for your abortion?

6    A.  Yes.

7    Q.  And what was the impact on you?  How did you feel having to

8    pay for the abortion and take time off of work and take one

9    less class that semester?

10   A.  I -- you know, it was -- I -- I was stressed.  I mean, it

11   did push my graduation back a little bit, and it was -- you

12   know, it just -- kind of all the little pieces like that kind

13   of added up to me feeling like I was rushed in having to figure

14   everything out within like a very small time line.

15   Q.  Okay.  I think --

16           MS. SHAH:  One moment, Your Honor.  I just want to

17   make sure I don't have any other questions.

18           Okay.  I think that's all the questions on direct,

19   Your Honor.

20           THE COURT:  Okay, Miss Shah.

21           Miss Payne, cross-examine?

22           MS. PAYNE:  Your Honor, do you mind if I take a moment

23   to confer with my counsel?

24           THE COURT:  No.

25                   (Off-the-record discussion.)

1      MS. PAYNE:  Your Honor, I have no questions on cross.

2      THE COURT:  All right.  I have a couple of questions.

3      Miss Hutson, so did you graduate from IUPUI?

4      THE WITNESS:  I ended up transferring, but I did -- so

5  I completed my associate's at Ivy Tech, but it did push me back

6  because I had to take, like -- kind of like the classes

7  scheduled later.

8      THE COURT:  Yeah.

9      And so what was your degree in?

10      THE WITNESS:  It's a general science degree.  I was a

11  couple of classes of short of my early childhood education

12  degree.

13      THE COURT:  And are you working now?

14      THE WITNESS:  I'm currently unemployed.  I got laid

15  off in January due to COVID.

16      THE COURT:  Uh-huh.

17      And what would you say, when you work, that your line

18  of work is?  Are you -- do you have a specific direction you're

19  going with respect to job applications and that sort of thing?

20      THE WITNESS:  I'm keeping it fairly open.

21      THE COURT:  Okay.

22      THE WITNESS:  I'm sorry.  I didn't mean to cut you

23  off.

24      THE COURT:  No, no.  That's fine.  The technology sort

25  of makes us go in fits and starts here.

1        So you were laid off.

2        So are you getting unemployment now?  Is that the

3   situation?

4        THE WITNESS:  Yes.

5        THE COURT:  Yeah.  It's happened to a lot of people

6   during this COVID year.

7        Okay.  My questions don't matter really very much --

8        THE WITNESS:  Yes, I know.

9        THE COURT:  -- but I just wanted to ask you.  So good

10  luck to you.

11       THE WITNESS:  Thank you.

12       THE COURT:  All right.  That completes the

13  questioning, right, lawyers?

14       MS. SHAH:  Yes.

15       MS. PAYNE:  Yes, Your Honor.

16       THE COURT:  And can the witness be excused?

17       MS. SHAH:  Yes.

18       MS. PAYNE:  Yes, Your Honor.

19       THE COURT:  So thank you, again, Miss Hutson.  You

20  complied with your subpoena, and you've done all we needed to

21  have you do, so thank you very much.  As I said before, good

22  luck.

23       THE WITNESS:  Okay.  Thank you.

24       THE COURT:  Well, it's 15 after five so we won't push

25  through that last witness on your list.

1          Do you still intend to call the witness, Miss Shah?

2          MS. SHAH:  Yes, Your Honor.  Miss Paulina Guerrero

3     will be our first witness tomorrow, and she's the last witness

4     on our list.

5          THE COURT:  All right.  Very good.  Then we'll start

6     with her at 9:30, and then we'll move to the State of Indiana's

7     witnesses.

8          So have them lined up, Miss Payne, tell your

9     colleagues, however you're going to --

10          MS. PAYNE:  Yes, Your Honor.

11          THE COURT:  -- organize it.

12          MS. PAYNE:  Your Honor, we wanted to let you know that

13     we will no longer be calling Dr. Grossman in our part of the

14     case.

15          THE COURT:  So we can convey that to Dr. Grossman,

16     that he is not subject to being recalled?

17          MS. PAYNE:  Yes.  Yes, Your Honor.

18          THE COURT:  Okay.  Miss Shah, you can tell him that.

19          MS. SHAH:  Will do, Your Honor.

20          THE COURT:  All right.  And if your witness list has

21     changed any, Miss Payne, would you make that decision so that

22     we can sort of decide what the time allocations will be.  We

23     have a whole lot of people who are focused on this litigation,

24     including all the court reporters and so forth who are

25     generating this simultaneous and daily copy, so it will help us

1    to know if you're going to pare down that witness list any.

2           So would you look at that with your colleagues and

3    give us some indication when you can, please?

4           MS. PAYNE:  Yes, Your Honor.

5           THE COURT:  Okay.  Very good.

6           Anything else tonight that I need to address with you?

7           MS. SHAH:  Nothing from plaintiffs, Your Honor.

8           THE COURT:  Miss Payne?

9           MS. PAYNE:  Nothing from defense.

10          THE COURT:  Okay.  Have a nice evening, both of you.

11   We'll see you again at 9:30 in the morning.  Good night.

12          MS. SHAH:  Thank you.  Good night.

13                 (Court adjourned at 5:20 p.m.)

14

15   ***************************************************************

16                 CERTIFICATE OF COURT REPORTER

17

18          I, Laura Howie-Walters, hereby certify that the

19   foregoing is a true and correct transcript from reported

20   proceedings in the above-entitled matter.

21

22

23   /S/LAURA HOWIE-WALTERS   March 16th, 2021

24   LAURA HOWIE-WALTERS, FCRR, RPR, CSR
     Official Court Reporter
25   Southern District of Indiana
     Indianapolis Division\