UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


WHOLE WOMAN'S HEALTH ALLIANCE,   )
ET AL,                           )
                                 )
            Plaintiff,           ) CAUSE NO.:
                                 ) 1:18-cv-01904-SEB/MJD
                                 ) Indianapolis, Indiana
        -v-                      ) March 17th, 2021
                                 ) VOLUME III
TODD ROKITA, ATTORNEY GENERAL    )
OF THE STATE OF INDIANA, IN HIS  )
OFFICIAL CAPACITY, ET AL,        )
                                 )
            Defendants.          )


Before the Honorable
SARAH EVANS BARKER, JUDGE


OFFICIAL REPORTER'S TRANSCRIPT OF
ZOOM VIRTUAL BENCH TRIAL


Court Reporter:              Laura Howie-Walters, FCRR/RPR/CSR
                             Official Court Reporter
                             United States District Court
                             Room 217
                             46 East Ohio Street
                             Indianapolis, Indiana  46204


PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT PRODUCED BY ECLIPSE NT COMPUTER-AIDED TRANSCRIPTION

```
1                          A P P E A R A N C E S

2

3    For Plaintiffs:              Rupali Sharma, Esq.
                                  Sneha Shah, Esq.
4                                 Michael Powell
                                  Stephanie Toti, Esq.
5                                 Melissa Shube, Esq.
                                  LAWYERING PROJECT
6                                 3371 Glendale Blvd. #320
                                  Los Angeles, CA  90039-1825
7

8    For Defendants:             Thomas M. Fisher, Esq.
                                  Robert Rowlett, Esq.
9                                 Andrea Elizabeth Rahman, Esq.
                                  Christopher Barolomucci, Esq.
10                                Robert Rowlett, Esq.
                                  INDIANA ATTORNEY GENERAL
11                                302 West Washington Street
                                  Indiana Government Center South
12                                Fifth Floor
                                  Indianapolis, IN  46204
13

14

15

16

17

18

19

20

21

22

23

24

25
```

# I N D E X

**PLAINTIFFS' WITNESSES**                                    **PAGE**

PAULINA GUERRERO
Direct Examination by Ms. Sharma ................5
Cross-examination by Mr. Hudson ................46
Redirect examination by Ms. Sharma ............49


**DEFENDANTS' WITNESSES**

FARR ANDREWS CURLIN
Direct Examination by Mr. Fisher ...............54
Cross-examination by Ms. Shube .................79

KRISTEN RINEHART
Direct Examination by Ms. Payne ...............95

DONNA JOAN HARRISON
Direct Examination by Mr. Bartolomucci ........107
Cross-examination by Ms. Powell ...............132
Redirect Examination by Mr. Bartolomucci ......157

NANCY GOODWINE-WOZNIAK
Direct Examination by Mr. Rowlett .............161
Cross-examination by Ms. Sharma ...............202

DR. CHRISTOPHER STROUD
Direct Examination by Ms. Rahman ..............204


PLAINTIFFS' EXHIBIT                          **PAGE**

ECF-350-1........................... 53

1                        (Open court.)

2              THE COURT:  Good morning.

3              MS. SHARMA:  Good morning, Your Honor.

4              MR. HUDSON:  Good morning, Your Honor.

5                    (Off-the-record discussion.)

6              THE COURT:  Okay.  I think we're in business now.

7    Good morning again.  Good to see you both.  You're well, I

8    hope, this morning.

9              MS. SHARMA:  I'm well, Your Honor.  Thank you.

10             THE COURT:  I bet you didn't get eight hours of sleep,

11   but maybe you got six.  That's about all you can expect in a

12   trial.  I'll tell you that from many years of experience.  Six

13   hours a night during a trial is about the usual allocation.

14             Ms. Sharma, do you have another witness for us, in

15   particular Ms. Guerrero?

16             MS. SHARMA:  Yes, Your Honor.  Plaintiffs would like

17   to call Ms. Guerrero.

18             THE COURT:  All right.

19                   (Off-the-record discussion.)

20             THE COURT:  Are you Ms. Guerrero?

21             THE WITNESS:  I -- yes, that's me, Ms. Guerrero.

22             THE COURT:  Okay.  Good.  Welcome this morning.  I

23   need to ask you to take the oath to tell the truth, the whole

24   truth, and so forth.  And so the clerk will administer the

25   oath.  Would you raise your right hand and take the oath,

 1  please.

 2          PAULINA GUERRERO, PLAINTIFFS' WITNESS, SWORN

 3                     **DIRECT EXAMINATION**

 4          THE COURT:  Thank you.  Call your witness and ask her

 5  to identify herself, please, Ms. Sharma.

 6          MS. SHARMA:  Sure.

 7  BY MS. SHARMA:

 8  Q.  Ms. Guerrero, could you please state and spell your full

 9  name for the record.

10  A.  Paulina Guerrero.  That's P-A-U-L-I-N-A; Guerrero, that's

11  G, as in George, U-E-R-R-E-R-O.

12  Q.  And what is your job, Ms. Guerrero?

13  A.  I'm the national programs manager at All-Options.

14  Q.  And what is All-Options?

15  A.  We're a nonprofit organization that holds three different

16  programs to provide unbiased judgment-free support to folks in

17  all of their pregnancy experiences.

18  Q.  And what is All-Options' role in this lawsuit?

19  A.  We're plaintiffs.

20  Q.  I'd like to begin with your professional background and

21  experience.  I'd like to direct your attention to Stipulated

22  Exhibit 9.  Are you familiar with this document?

23  A.  Yes, I am.

24  Q.  What is it?

25  A.  It's my CV.

Q.  Did you prepare it?

A.  Yes, I did.

Q.  Does this document provide a true and accurate

representation of your education and professional experience?

A.  Yes, it does.

        THE COURT:  That's a good undergraduate degree you

have there.

        THE WITNESS:  Oh, thank you.

        THE COURT:  In folklore at IU; right?

        THE WITNESS:  Yes, I did.

        THE COURT:  Yeah.  One of IU's best departments.

        THE WITNESS:  Yes, it is.

BY MS. SHARMA:

Q.  Ms. Guerrero, can you walk us through your job history,

beginning with your position at the National Abortion

Federation?

A.  Sure.  So in 2001, I started working as a hotline counselor

at the National Abortion Federation, where I provided options

counseling and case management for people seeking financial

assistance for their abortion procedures throughout the

country.  And then my last year there, I was a case manager

specifically for the state of Georgia.  That was the first one.

And I worked there for about, off and on, for about ten years.

Q.  And what is options counseling?

A.  So options counseling is basically walking people through

1    their various options when they are pregnant and just seeking

2    to figure out if they want to have an abortion, seek adoption,

3    or choose to parent.

4    Q.  I'm going to refer to the National Abortion Federation as

5    NAF, if that's okay.  You mentioned you also served as case

6    manager for the state of Georgia at NAF.  What did that

7    position involve?

8    A.  So the case management was basically receiving calls from

9    pregnant people seeking abortion services in Georgia.  Atlanta

10   really provided many clinics that were able to provide a wide

11   variety of abortion services.

12       So, actually, there was people coming from many different

13   states in the southeast area to Atlanta to seek services, and

14   we would determine eligibility based on federal poverty

15   guidelines, if they could receive financial assistance from us.

16   And if they did, then we coordinated with those clinics and

17   with the patients to try to help them be seen.

18       We also helped them navigate the legal and logistical

19   barriers, like practical support -- travel was always a huge

20   barrier for individuals -- and also connect them to any other

21   resources or referrals that they may need.  So it was really

22   walking somebody through the process of obtaining an abortion

23   because of the different barriers of access and the finances

24   involved, to make sure that they were able to access care and

25   get financial assistance.  And, yeah, that was basically the

1   role.

2   Q.   Thank you.  And you mentioned practical support.  Could you

3   please elaborate on what practical support entails?

4   A.   Sure.  So practical support, travel for people, especially

5   because of the different restrictions and requirements, was

6   always a big barrier, especially because there's not a lot of

7   abortion providers in rural areas.  They tend to be centralized

8   in metropolitan areas, so sometimes they would have to travel

9   anywhere from an hour, to six to sometimes eight hours.

10  Depending on the procedure, they would have to spend the night

11  in Atlanta.  So this really added up the cost for individuals,

12  especially low-income individuals, in terms of gas, lodging,

13  you know, finding a reliable car, which was a challenge for

14  many individuals.

15      And so we tried to connect them with local organizations

16  that could help, or volunteers, or also provide some extra

17  funding for their procedures so that they could keep some of

18  their own money for travel and lodging, and then try to connect

19  them with hotels that had special rates for people that were

20  going to clinics in Atlanta.

21      So it was really just walking people through, trying to

22  navigate all of these different things, because it can be a

23  really confusing and overwhelming process, especially if you're

24  traveling from out of state or just have a lot of different

25  things going on.

1    Q.  And what volunteer work you have done, Ms. Guerrero?

2    A.  I also volunteered at the D.C. Abortion Fund as an intake

3    case manager.  That was just basically focusing on individuals

4    who were in the Washington, D.C. area or traveling to the

5    Washington, D.C. area for abortion services.  I also was a

6    practical support volunteer for the Maryland-D.C.-Virginia

7    area.

8    Q.  And what is an abortion fund, Ms. Guerrero?

9    A.  So an abortion fund is typically a grassroots organization

10   that helps with financial assistance for people seeking

11   abortion procedures.  They are usually state based, local

12   based, or regionally based.  I believe there's an abortion fund

13   in every single state of the U.S. , and some states have

14   multiple abortion funds.  For example, I think Texas has about

15   four or five of them.

16       They are part of this larger network of the national

17   network of abortion funds, which is basically a membership

18   organization for all the abortion funds in the United States.

19   And so people call to see if they are eligible for funding.

20   And if they are eligible, the abortion fund is able to provide

21   that.  And a lot of abortion funds also provide practical

22   support, as well.  They typically are run by volunteers or

23   minimal staff.

24   Q.  Do the abortion funds have any other similarities, any

25   similar practices, or anything like that?

1    A.  For the most part, the way that most abortion funds are

2    run, as I said, are volunteer or minimal staff based.  So

3    individuals will call the abortion fund, leave a voice mail

4    with any pertinent information and contact information, and

5    then somebody will call them back and go through an intake

6    process with them to determine eligibility.

7         And then, if the individual is eligible, then, typically,

8    an abortion fund will send a promissory note or a pledge letter

9    via e-mail or secure fax over to the clinic that the individual

10   is going to.  And then the clinic invoices the abortion fund

11   and then the abortion fund pays them.

12        And while we are doing intakes, we also provide emotional

13   support, typically, just trying to check in with folks, making

14   sure that they need any other kind of counseling support.  So a

15   lot of abortion funds provide that, as well.

16             THE COURT:  You're talking pretty fast, Ms. Guerrero,

17   for our court reporter, so slow it down if you can.

18             THE WITNESS:  Okay.  Thank you.  I will.

19   BY MS. SHARMA:

20   Q.  Are there any groups or organizations that abortion funds

21   belong to?

22   A.  Yes.  For the most part, the abortion funds in the United

23   States belong to the National Network of Abortion Funds, which

24   provides professional development, continuing education, and

25   membership support.

1        THE COURT:  Are those 501(c)3 organizations?

2        THE WITNESS:  Typically, yes.

3   BY MS. SHARMA:

4   Q.  What other volunteer work have you done, Ms. Guerrero?

5   A.  I also was an outreach volunteer for the Indiana harm --

6   Indiana Recovery Alliance, which is a harm reduction

7   organization that does a needle exchange program for

8   individuals here in Monroe County, and so I was a volunteer for

9   that.  And then I also was an appointed member of the Monroe

10  County Opioid Commission, which addressed the opioid epidemic

11  in Monroe County, as well.

12  Q.  And have you worked with pregnant people as part of any

13  other volunteer work, other than the D.C. Abortion Fund?

14  A.  For volunteer work, you know, I've worked with pregnant

15  individuals who were struggling with substance-use issues

16  through the Indiana Recovery Alliance and also with the opioid

17  commission, as well.

18  Q.  And did you do any counseling as part of that work?

19  A.  I did do counseling as part of that work with the Indiana

20  Recovery Alliance.  As an outreach worker, we basically

21  distributed clean use supplies, naloxone, but also provided

22  counseling and support.

23  Q.  And, Ms. Guerrero, did you work at Centerstone, as well?

24  A.  Yes, I did.

25  Q.  And what were your responsibilities there?

1  A.  At Centerstone I was a recovery coach and also the recovery

2  engagement center coordinator.  So, as a recovery coach, I

3  provided recovery coaching and case management to individuals

4  who were struggling with substance-use disorder and mental

5  health issues.  I also worked with pregnant individuals that

6  were struggling with substance use issues.

7      As a coordinator, I managed and supervised a team of five

8  recovery coaches who had their own caseloads, overseeing, you

9  know, recovery coaching for clients, as well.  And I also

10 recruited other volunteers to help with the recovery engagement

11 center with different activities.

12 Q.  And did you receive any training as part of that role?

13 A.  Yes.  Centerstone provides continuous training throughout

14 the process.  There's an initial recovery coach training that

15 you have to take when you first get hired on, and then there's

16 continuing education that happens as you continue to work

17 there.

18      THE COURT:  Ms. Sharma, let me ask a question, if I

19 may.

20      Is Centerstone a place?  Is it a location in

21 Bloomington, is it?

22      THE WITNESS:  Nodded.

23      THE COURT:  Okay.

24      THE WITNESS:  Yes.  It's actually the largest

25 behavioral health and substance use organization in the

1    country.  And there's locations all over the Midwest and

2    Florida.

3           THE COURT:  Okay.  Good.  Thank you.

4    BY MS. SHARMA:

5    Q.  And did you do any counseling as part of that role?

6    A.  Yes.  Recovery coaching consisted of very heavy counseling

7    and also case management.  And sometimes we're offering

8    practical support to individuals that needed it, as well.

9    Q.  I'd like to move on to your work at All-Options.  What was

10   your first position with All-Options?

11   A.  My first position at All-Options was the community and

12   volunteer engagement coordinator.  And then I became the

13   national programs manager.

14   Q.  Okay.  So I'd like to begin with your role as community

15   engagement coordinator.  What did that role involve, what sort

16   of responsibilities?

17   A.  So I recruited, trained, and supervised volunteers, staff,

18   and interns in order to work the Hoosier Abortion Fund and also

19   the All-Options pregnancy resource center, as well as the

20   national talk line.

21       My primary role was really to ensure that volunteers and

22   interns got the training that they needed so that they could

23   work those programs.  And I also started and continue to do

24   direct service with All-Options.  So I do direct service at the

25   Hoosier Abortion Fund, at the pregnancy center, and at the talk

1   line as well as supervision and training.

2   Q.  And do you work with any other organizations as part of

3   that role?

4   A.  We -- as the Hoosier Abortion Fund, we are part of the

5   national network of abortion funds; and we also have a network

6   of coalitions and organizations in the state of Indiana.

7   Q.  And what were your responsibilities as national programs

8   manager?

9   A.  As national programs manager, the talk line was originally

10  a local volunteer program; but in order to expand our services

11  and the number of counselors we could get, we transferred it

12  over to remote volunteer opportunity, meaning that we wanted to

13  open up the ability to have counselors work from all over the

14  country instead of just in Bloomington.

15      So I created and taught and facilitated an online training

16  for counselors all over the country.  I also created the

17  program to basically manage the counselors all over the U.S.

18  and continue to supervise them and provide continuing education

19  opportunities and supervision.

20  Q.  And when you say "counseling," what type of counseling are

21  you talking about for the talk line?

22  A.  We do peer counseling.

23  Q.  What is peer counseling?

24  A.  So peer counseling means that we are on the same level as

25  our clients.  So peer counseling just means that we understand

1   and come from the same sort of the set of circumstances as our

2   clients and try to reflect that.  We're not therapists.  We're

3   not psychiatrists.  We are able to meet people where they're

4   at.

5   Q.  And what are some of the reasons why abortion patients may

6   reach out to you on the talk line?

7   A.  The talk line offers unbiased, judgment-free support for

8   people in all of their pregnancy experiences.  So a lot of

9   clients call with heavy ambivalence, indecision, and also just

10  struggle with a lot of the shame and stigma that comes with

11  abortion.

12      And they also are trying to figure out where they can be

13  seen.  It's difficult to figure out, you know, where the

14  clinics are, if it's a reputable clinic, and also financial

15  assistance as well.  So we act as a referral and recommendation

16  line to providers and also to abortion funds; and we also give

17  referrals and recommendations to other organizations in terms

18  of assistance with parenting issues, adoption, and even

19  miscarriage and infertility.

20  Q.  And what sort of issues do they want to explore during

21  counseling?

22  A.  During counseling, if it's an issue of indecision and

23  ambivalence, we just try to really validate and normalize their

24  feelings.  We provide a lot of active listening.  We try to

25  plant seeds of empowerment and healing.

1     They also voice a lot of concern over the different

2  barriers to access in terms of the different state

3  requirements.  Things like the 18-hour waiting period is a big

4  barrier and struggle for individuals, and just the travel can

5  be a huge barrier as well.

6     So the fact that it can be really difficult for someone to

7  access an abortion kind of reinforces the shame and stigma, so

8  clients oftentimes are just having a lot of feelings around

9  that and are trying to navigate those feelings and that stress

10  while also accessing care.

11  Q.  What approaches do you use to train and supervise talk-line

12  staff and volunteers?

13  A.  So we have a pretty rigorous 40-hour training for

14  counselors that they have to go through.  We do a mid-training

15  and final training evaluation.  We also have a secret caller

16  program or a secret shop program where we call the talk line

17  and then give evaluations on counselors' performances, and we

18  have ongoing professional development and training throughout

19  counselors' time with the talk line.

20  Q.  I'd like to ask you about the Pregnancy Resource Center as

21  well.  Where is the Pregnancy Resource Center located?

22  A.  In Bloomington, Indiana.

23  Q.  And you mentioned that you train and supervise the staff

24  and volunteers there as well?

25  A.  Yes.

1  Q.  Can you describe what that involves?

2  A.  So the Pregnancy Resource Center has a diaper bank.  We

3  offer diapers for eligible folks; and we also provide free

4  pregnancy tests, menstrual products, hygiene products, options

5  counseling; and the Hoosier Abortion Fund is also housed there

6  so people can access abortion funding there.

7      And we also connect individuals to other referrals and

8  resources like food pantries.  If people are looking for

9  government assistance programs, we connect them to that as well

10  in terms of WIC, SNAP, Medicaid, and Social Security, referrals

11  like that.

12          THE COURT:  Is that a specific location, too?  Is that

13  a place?

14          THE WITNESS:  Yes.  It's a center on South Walnut

15  Street in Bloomington, Indiana.  It's a house.

16          THE COURT:  Okay.  Thank you.

17  BY MS. SHARMA:

18  Q.  You mentioned a diaper program.  How does the diaper

19  program work, meaning how do people access free diapers?

20  A.  So right now -- typically, pre-COVID, people were able to

21  walk in or call; but now, people will call or text-message us.

22  We have an intake form via text message that people can access

23  or they can call us to do the intake form; and if they're

24  eligible, we're able to distribute a no-touch diaper service

25  right now, which just means that we schedule a pickup time with

1    them; and then we leave their diapers and any other requests in

2    terms of toiletries and menstrual products outside in a package

3    for them.  Yeah.

4    Q.  And is the Hoosier Abortion Fund an abortion fund as you

5    described that term earlier?

6    A.  Yes.

7    Q.  How do you publicize the Hoosier Abortion Fund?

8    A.  So a lot of our referrals for the Hoosier Abortion Fund

9    come from clinicians.  Clinicians will refer patients to us;

10   but also, a lot of people find out about us through the

11   Internet or social media.  A lot of people say, "I

12   Google-searched 'abortion fund Indiana' and you all came up."

13   Q.  And by clinicians, do you mean abortion providers?

14   A.  Yes, the abortion providers in Indiana and surrounding

15   states.

16   Q.  How do people contact the Hoosier Abortion Fund?

17   A.  People can call or text-message us, and sometimes they may

18   e-mail.

19   Q.  Do you provide financial assistance to every caller of the

20   Hoosier Abortion Fund?

21   A.  No, we do not.

22   Q.  And why is that?

23   A.  We have a very limited budget, and a very high need.  So we

24   have to prioritize certain folks for the financial assistance.

25   Our weekly budget is about $2,250; but we have to prioritize

1   people that are ten weeks or more because they are getting

2   close to the cutoff time of 13.5 weeks, which would mean if

3   they get past that, they have to travel out of state, which

4   will raise the cost.

5   Q.  Callers who you do fund, does your grant cover their entire

6   cost of abortion?

7   A.  No, it doesn't.  We're only able to pay for a portion of

8   the procedure price.  However, if they call us back and tell us

9   that they are still struggling to come up with the money, we

10  will raise the amount to try to help them meet that need.

11  Q.  Is there an average amount you give callers?

12  A.  So people that are about ten weeks, we will pledge $225.

13  People that are 13 weeks, we will pledge an average of $350;

14  but again, if people are struggling, we may raise that amount.

15      And we also prioritize folks that are less than ten weeks

16  if they are in particular situations, such as if they are

17  minors, if they are in a domestic violence situation, if they

18  have medical complications, or are experiencing homelessness.

19  Q.  And how do you determine if people fall into those

20  categories?

21  A.  So people will call or text us and leave the information

22  that we've requested, and then we call every single person back

23  and go through an intake process with them and generally have a

24  conversation about their current situation.

25      So the intake process will oftentimes -- you know, we take

1    down their basic contact information, their eligibility, how

2    many weeks they are, their clinic appointment time, which

3    clinic they are going to; and in that process, we constantly

4    try to open up the conversation to let them know, you know, if

5    anything else comes up, if there's anything you want to talk

6    about, please let us know.

7          Oftentimes if people are experiencing a medical

8    complication, they will mention that.  If they are experiencing

9    homelessness or, you know, are in a domestic violence

10   situation, they may not always disclose that; but we just try

11   to provide any kind of support -- emotional support we can.  So

12   those issues will come up, and we note that.

13         And then if they're minors, they typically will disclose

14   that because of the barriers that are in place.  So it just

15   sort of naturally comes up in the intake process.

16   Q.  Do you record this information?

17   A.  Yes, we record this in our intake form, which is in our

18   database.

19   Q.  How long do you typically spend speaking with each caller?

20   A.  So an average call, if it's relatively simple, then it can

21   be 10 to 15 minutes; but if it's -- if there's other

22   extenuating circumstances, such as the multiple trips causing

23   barriers or the categories that I mentioned before, it can take

24   20 to 30 minutes.

25         But really with the case management piece, we spend about

GUERRERO – DIRECT/SHARMA                    21

1   two to three, sometimes four hours for our client in terms of

2   e-mails and coordinating with the clinic and possibly other

3   abortion funds.

4   Q.  Do you provide funds directly to eligible callers?

5   A.  No.  The money -- the finances never really goes to the

6   callers.  We work directly with the clinics.  So once we

7   determine the intake, that they're eligible for funding and the

8   amount, we send the pledge letter to the clinic.  The clinic

9   invoices us, and then we pay them.

10  Q.  Do you have any reason to believe that callers are making

11  misrepresentations to you ever?

12  A.  No.  I don't know why they would.  It's not an easy

13  process.  It's not an enjoyable process.  It's a really

14  frustrating, confusing process; and there's really no way

15  that -- there's no reason why a caller would for any particular

16  reason.

17  Q.  And when you say "process," what are you referring to?

18  A.  Just in terms of, you know, if they're -- if they're

19  misrepresenting, I'm not sure why they would because the

20  process is pretty straightforward.

21  Q.  You mean the intake process?

22  A.  Yes.

23  Q.  Is that what you're referring to?

24  A.  Yes.

25  Q.  Okay.  And so you don't provide the funds directly to the

1    callers.  Who do you provide the funds to?

2    A.  It's directly to the clinics, to the providers.

3    Q.  For an eligible caller, once you provide the funds to the

4    clinic, is that the last step in the process for anyone

5    receiving funds or are their further steps?

6    A.  It's not the last step in the process.  We do a follow-up

7    call or text the day after their scheduled appointment to see

8    if they were able to access the abortion care; and if they

9    weren't, if they encountered barriers, then we try to work with

10   them to figure out if they are able to access -- still access

11   care.

12   Q.  What sort of questions do you ask as part of the follow-up

13   text or call?

14   A.  "Were you able to access your abortion?"  And if they say,

15   "No," we'll ask, you know, "Were there any circumstances or

16   tell us more about what was going on."  And usually, people

17   will just disclose right away why; and then if they say, you

18   know, "I encountered" -- you know, "It was just really

19   difficult for me to access this," usually because of travel and

20   the multiple trips, that kind of forces people to push and

21   delay their appointments a lot of time because it's just

22   difficult to get all the pieces together, for people.

23       Then we'll say, you know, "Do you want do reschedule?  What

24   can we do to try to get you seen, to try to access care?"

25       And then we'll just sort of come up with a game plan for

next steps.  You know, we'll say, you know, "Go ahead and

reschedule.  See if they can get you in."  We can repledge the

amount.  If we need to increase the amount, then we're happy to

do that; and we just try to work with them to make sure that

they're seen, if that's what they want to do.

Q.  In that situation, is there anything you can do other than

increase the pledge amount to help them?

A.  We can connect them to Practical Support.  Pre-COVID, we

had a Practical Support -- Practical Support Program housed

within the Hoosier Abortion Fund.  We also work with other

abortion funds outside of the state for practical support.

   So if they end up having to travel out of state, we work

with the Midwest Access Coalition, the Chicago Abortion Fund

and Kentucky Health Justice Network, and sometimes even other

organizations to just try to sort of cobble the pieces together

so that they are able to access care.

Q.  So after you pledge additional funds or work with other

organizations, are some clients then able to obtain an

abortion?

A.  I would say that a lot of the time, yes; but sometimes even

then it can prevent people from being able to access care; and

delayed care is a huge barrier.

Q.  And how do you know whether they are able or unable to

access an abortion at that point?

A.  We're always in communication with the client and with the

1    other organizations and with the providers to try to work

2    together to help this person be seen; and so just through that

3    work and -- you know, we're able to get an idea of what the

4    person is going through or experiencing that's causing these

5    delays.

6    Q.   What approaches do you use to train and supervise Hoosier

7    Abortion Fund staff and volunteers?

8    A.   So I would say for the Hoosier Abortion Fund, it takes

9    about two to four weeks to really train somebody on being able

10   to work in that program.  And then we also do weekly

11   supervision checks and meetings.  And we basically stay in

12   close contact all the time because we're always trying to work

13   together as a team.

14   Q.   And do you discuss clients as a team?

15   A.   Absolutely, yes.

16   Q.   What is the Practical Support Network?

17   A.   So the Practical Support Network is a volunteer program

18   housed under the Hoosier Abortion Fund that offered -- that was

19   trained volunteers that offered rides to people who needed

20   transportation support to a clinic.

21   Q.   Where were the drivers located?

22   A.   Most of the drivers were located in major metropolitan

23   areas.

24   Q.   And why is that?

25   A.   It just seemed like those were the folks that would sign up

1    for the volunteer opportunity, and so that's who we trained.

2    We didn't have a lot of volunteers in the further out, more

3    rural areas.

4    Q.   How often did the Practical Support Network provide rides

5    to abortion providers?

6    A.   Because we didn't have volunteers in sort of the more rural

7    areas, we were only -- we were unable to meet almost half of

8    the need or requests.

9    Q.   And when you were providing services, how often, whether it

10   was weekly or monthly, were you providing rides?

11   A.   I would say we would get a request one to two times a week.

12   Q.   And how often were you able to meet the request each week?

13   A.   We weren't able to meet half of the requests because we

14   didn't have volunteers in the areas that could do it.  Yeah.

15   Q.   What approaches did you use to train and supervise the

16   staff and volunteers at the Practical Support Network?

17   A.   So the staff, we go through a pretty rigorous on-boarding

18   and training process that can usually last 30 to 90 days.  For

19   the volunteers, we went through a day-long training with

20   volunteer drivers.

21   Q.   As All-Options' national program manager, do you ever work

22   with abortion providers to provide support to clients?

23   A.   Yes.

24   Q.   And how do you work with them?

25   A.   We are constantly working with them because of the

1  financial assistance component.  But also on the talk line,
2  we're providing referrals and recommendations to providers.
3  And we're also working with providers out of state regularly as
4  well because patients have to travel out of state, sometimes as
5  far as Washington, D.C. and Maryland, to access care from
6  Indiana.  So we're always in contact with providers.
7  Q.  And you said financial assistance component.  How do you
8  work with providers to address the financial assistance
9  components?
10 A.  We basically are -- you know, providers are always trying
11 to figure out a way to help clients access services.  So they
12 oftentimes provide discounts or reduced rates or a sliding
13 scale for patients, and then they'll reach out to us sometimes
14 to see if we're also able to provide financial assistance.  And
15 then we also do collaborative funding with other organizations
16 as well.

17     And we're also working with providers in the practical
18 support component as well.  You know, sometimes someone might
19 have a delay and we will try to work with providers to get them
20 rescheduled.  But also if they're experiencing, you know, an
21 unreliable car issue, like they can't make their first
22 appointment because their car broke down, which happens often,
23 we might reach out to a provider to see if they can push the
24 appointment back.  So it's always a constant collaboration.
25 Q.  As All-Options national program manager, do you ever work

1   with social service organizations to provide support to

2   abortion patients?

3   A.   Yes.  We are -- we refer and recommend people to various

4   social service organizations like WIC, SNAP, Medicaid, and

5   public housing.

6   Q.   And how often are you in contact with those organizations?

7   A.   We're doing referrals maybe several times a week.  But

8   sometimes we'll do a warm hand-off, if somebody is really

9   struggling and maybe the process seems overwhelming.  We've

10  called ahead to those organizations just to give them a heads

11  up and say, "Hey, we're working with this person and they're

12  seeking services.  What's the best way to do that?"

13  Q.   How often are you in contact with other abortion funds and

14  Practical Support Networks?

15  A.   Every week there is a case that comes up where we need

16  extra support around the assistance or -- the transportation

17  piece is a really big piece, and the multiple trips is a big

18  piece.

19  Q.   And those are organizations outside of Indiana and inside

20  of Indiana?

21  A.   Yes.

22       MS. SHARMA:  Okay.  Your Honor, at this time I'd like

23  to offer Miss Guerrero as an expert on the availability of

24  abortion care in Indiana and the burdens that Indiana residents

25  face in accessing abortion care.

1        THE COURT:  Any objections?

2        MR. HUDSON:  No objection, Your Honor.

3        THE COURT:  The proffer is accepted and the witness

4   may testify as an expert.

5        MS. SHARMA:  Thank you, Your Honor.

6   BY MS. SHARMA:

7   Q.  Miss Guerrero, did you prepare a disclosure report for this

8   case?

9   A.  Yes.

10       MS. SHARMA:  I'd like to mark the disclosure report

11  for identification purposes.

12       THE COURT:  As what?

13       MS. SHARMA:  As PX314.  Plaintiffs' Exhibit 314.

14       THE COURT:  Okay.  For identification?

15       MS. SHARMA:  Yes.

16  BY MS. SHARMA:

17  Q.  Is this document a copy of the disclosure report that you

18  prepared, Ms. Guerrero?

19  A.  Yes.

20  Q.  Please feel free to refer to the report as you testify.

21       I'd like to turn now to the experiences of Hoosier Abortion

22  Fund clients seeking abortion care in Indiana, and I'd like to

23  start with transportation.  Are you aware that Indiana law

24  currently requires abortion patients to make two separate trips

25  to a clinic or health center to obtain an abortion?

1    A.   Yes.

2    Q.   And how does that requirement impact your clients?

3    A.   Pretty significantly.

4    Q.   And could you describe how it impacts your clients?

5    A.   Of course.  Abortion providers are -- in the state of

6    Indiana are mostly centralized in metropolitan areas.  So for

7    individuals that live further out or in rural areas, the

8    multiple trips can be a huge barrier.  A lot of the folks that

9    we work with might not have a car or might not have access to a

10   reliable car.  You know, they may be able to ask a friend or

11   family member for a ride.

12        But we also have many patients that don't feel comfortable

13   disclosing that they are traveling for two trips, two days for

14   an abortion procedure because of the shame and stigma that's

15   attached to abortion.

16        The bus infrastructure is not really robust enough to

17   really meet the needs of our clients.  Even if there is a bus

18   that is traveling to a metropolitan area, it's usually, you

19   know, not every day and the time is pretty sporadic and doesn't

20   line up to when appointments are being scheduled.

21        Along with those barriers, you know, some individuals have

22   to miss two days' worth of work, which can be really difficult

23   to disclose to an employer.  Some employers are very

24   understanding and other employers, you know, that can be cause

25   for termination, which, you know, is a factor for folks.

1    There's some fear around that always.

2        We work with a lot of parents, and so they have to find

3    childcare for those two days because the appointments typically

4    take around half a day to a full day for both of the days.  So

5    if you're traveling and you also have to be at the clinic for

6    that amount of time, it's a significant amount of time that you

7    have to be gone and away.  So trying to find childcare for

8    those two days can be really difficult and challenging for

9    people, especially if, again, they are still trying to keep it

10   a private and confidential situation.

11       So when we work with folks who are seeking financial

12   assistance, the cost of travel can also be a barrier because,

13   you know, 20 bucks for gas and then 20 bucks for childcare, or

14   40 bucks for childcare, it tends to really add up for people.

15       And so all of this is -- just keeps kind of putting

16   together this cobbling of extra barriers for people and it

17   really increases -- we experience a lot of people who just have

18   a lot of anxiety and stress trying to obtain care, and this

19   actually reinforces the shame and stigma.  People just think to

20   themselves, "You know, it's so difficult to try to access this

21   care, you know, then maybe I'm bad."  So that's a lot of the

22   emotional support that we're giving to people as well.  So all

23   of those barriers, and the shame and stigma, impacts people

24   significantly.

25       Then a lot of times, you know, folks end up missing their

1  appointments because something just doesn't line up.  You know,

2  they say, like, "My car broke down.  I missed the bus.  My

3  childcare fell through."  These are all just common everyday

4  factors that happen.  But then they miss their appointment and

5  they actually have to push it back and reschedule, in their

6  attempt in trying to seek the care.

7  Q.  Thank you.  So you mentioned a number of things.  I'd like

8  to first ask you a little bit more about transportation.  So

9  how many clients was the Practical Support Network ultimately

10 able to serve?

11 A.  I believe we were --

12       THE COURT:  Over what period of time?  Can you tell us

13 the time period?

14       THE WITNESS:  Sure.  This was about a six-month period

15 of time.  I believe we launched it in August and then we closed

16 the practical support program because of COVID around March.

17       THE COURT:  Okay.

18 BY MS. SHARMA:

19 Q.  And in that time, approximately how many clients were you

20 able to serve?

21 A.  I think we were able to serve about 17 clients.

22 Q.  And what transportation support, if any, has the Hoosier

23 Abortion Fund provided since the pandemic began, since the

24 Practical Support Network suspended?

25 A.  If people say that they are having trouble with the gas

GUERRERO – DIRECT/SHARMA                    32

1  money or for childcare money, we will increase the pledge so

2  that they can keep more of their own money.  So if they say

3  "I'm having trouble with the babysitter money or gas money,"

4  we'll say, "Okay, we can increase the pledge another 40 or 50

5  bucks if that means that you can keep the 40 or $50 for those

6  practical support needs."

7  Q.  And you had mentioned people having to reschedule

8  appointments.  How does having to reschedule appointments

9  affect your clients?

10  A.  Well, the timing is always an issue.  You know, clients

11  want to be seen as soon as possible, which is completely

12  understandable.  And so when they miss that first appointment

13  or they miss the second appointment and they have to reschedule

14  and push back, there's always just -- they're getting closer to

15  the cut-off point of 13.5 weeks.  And then if they reach that

16  point, they'll have to travel out of state and the practical

17  support and financial aspect gets more complicated.

18      So it also means that people have to stay with an unwanted

19  pregnancy for a longer period of time.  Again, increasing the

20  stress and anxiety that clients face.

21  Q.  Are you aware that Indiana currently bans the use of

22  telemedicine to provide a medication abortion?

23  A.  Yes, I do.

24  Q.  In your opinion, could your clients use video technology

25  effectively for the purpose of obtaining an abortion?

A.  Yes.

        MR. HUDSON:  Objection, Your Honor.  This is outside
the scope of the witness's expertise.

        THE COURT:  How so?

        MR. HUDSON:  She was proffered as an expert on the
burdens that women in Indiana face in obtaining an abortion.
She's not an expert on the use of telemedicine.  She's not a
physician.

        THE COURT:  Overruled.  It's within her expertise.
It's a natural extension of the day-to-day work that she does,
and she's able to talk about things that might alleviate some
of the stresses and strains and anxieties and so forth.  The
objection's not well taken.  It's overruled.

        MS. SHARMA:  Thank you, Your Honor.  I'd now like to
turn to the experiences of Hoosier Abortion Fund clients --

        THE COURT:  I overruled the objection.  Do you want an
answer to the question?

        MS. SHARMA:  Oh.  I'm sorry.  Miss Guerrero, I'll ask
the question again, just to be clear.

BY MS. SHARMA:

Q.  So in your opinion, could your clients use video technology
for the purpose of obtaining an abortion?

A.  Yes, absolutely.

Q.  So I'd like to turn to the experiences of your clients with
the cost of obtaining abortion care in Indiana.  You testified

1   that the Hoosier Abortion Fund helps them pay for the cost of

2   abortion care.

3       Can you give us a sense of how much abortion care costs in

4   Indiana?

5   A.  Sure.  It can range -- for 13.5 weeks or less, it can range

6   between 500 and a thousand dollars, depending on the time of

7   abortion and just any other medical necessities that the client

8   may need.

9   Q.  And what other expenses do abortion patients incur to

10  obtain an abortion in Indiana?  So costs other than the

11  procedure or treatment itself.

12  A.  The travel cost can be a factor.  Whether it's a bus ticket

13  or gas or childcare, that can be an added expense; and then

14  there's also the after-care medications as well.

15  Q.  How do your clients pay for their abortion care?

16  A.  Clients try to piece together the finances for their

17  abortion care in many different ways.  Sometimes they will use

18  an entire paycheck.  They may borrow money from friends or

19  family, if they feel comfortable doing that.  They have also

20  pawned belongings and have taken payday loans.  And they have

21  also stalled on bills, such as rent, utilities.

22  Q.  Are your clients unable to use insurance to pay for

23  abortion care?

24  A.  Oftentimes they cannot use insurance.  Medicaid doesn't

25  cover it.  And most insurances don't cover abortion, unless

1  it's a life endangerment -- in the state of Indiana, a life

2  endangerment issue or rape or incest.

3  Q.  Okay.  So you had mentioned -- you had talked a little bit

4  about how the Hoosier Abortion Fund operates, how it provides

5  financial assistance.

6     Are there clients who are eligible for funds who are unable

7  to obtain the financial assistance they need from the Hoosier

8  Abortion Fund?

9  A.  I'm sorry.  Could you repeat the question?

10  Q.  Sure.

11     So for clients who are eligible for funds from the Hoosier

12  Abortion Fund, are there some who are unable to get the funds

13  they need to pay for their abortion?

14  A.  Yes, absolutely.

15  Q.  How does your clients' limited ability to pay for abortion

16  care in Indiana affect their abortion care?

17  A.  If -- well, they're unable to access abortion care, which

18  can have pretty significant impacts for clients.

19  Q.  Can you elaborate on what those effects are?

20  A.  I know that people are pretty devastated when they can't

21  access care.  I think that --

22          THE COURT:  Emotionally devastated?

23          THE WITNESS:  Yes, emotionally devastated.

24  A.  And then, of course, if there are medical complications,

25  you know, this really can increase the stress factor of it.  A

domestic violence situation can really -- you know, not being

able to access abortion care might mean that somebody ends up

having to stay in a domestic violence situation for longer than

they want to, and so their chances of trying to leave is really

impacted with having to carry an unwanted pregnancy to term.

And, of course, for people experiencing homelessness, this can

be really detrimental as well.

So, you know, I've -- through this work, I've worked with

people who are just -- yeah, they're emotionally devastated

when they can't access abortion care.  You know, I've spoken to

people who will do so many things to try to access care.

You know, I worked with someone once who was pushed out of

a car because they were with an abusive partner, and that

partner punched her in the face.

And she called me and said, you know, "I just got pushed

out of the car.  I got punched in the face.  But tell the

clinic that I am coming.  I'm going to hitchhike.  I'm going to

do whatever it takes to come," because sometimes this is a

matter of life and death for people.

BY MS. SHARMA:

Q.  Thank you, Miss Guerrero.

Do clients ever have people in their lives who are

supportive of their decision to obtain an abortion?

A.  Sometimes, yes.

Q.  And do they ever want that person to play a role in their

1   abortion care?

2   A.   Umm, sometimes, yes.   There are friends and family members

3   and partners that can be supportive and play a role in their

4   abortion care or they'll ask that person to come with them.

5   Q.   How does the requirement that a patient make two trips to

6   an abortion clinic affect the client's ability to have someone

7   with them?

8   A.   Sometimes it means that the person that's the most

9   supportive of them can't come, can't lend support, because then

10  now we're trying to configure two people's schedules and needs

11  for two days instead of just one person.   You know, then you

12  have two people that are trying to get off work or maybe two

13  people that are trying to get childcare.   So, yeah, sometimes

14  it means that the person that they want there to support them

15  can't be there.

16  Q.   I'd like to ask you a few questions about your clients'

17  employment arrangements.

18       What proportion of your Hoosier Abortion Fund clients are

19  employed?

20  A.   Umm, I would say maybe –– I would say that a little less

21  than half of our clients are unemployed or minimally employed.

22  Q.   Okay.   And for those clients who have jobs, what proportion

23  of them have salaried work as opposed to wage work?

24  A.   I don't think I've ever worked or known of somebody to work

25  with someone who has a salaried job.   Typically it's wage work

1  or hourly work.

2  Q.  Okay.  And for those who have jobs, what proportion have

3  paid time off that they can take?

4  A.  I don't think I've really worked with anybody that was able

5  to take paid time off.

6  Q.  And what proportion have unpaid time off that they could

7  take?

8  A.  They might have -- well, I'm just trying to think of the

9  definition of unpaid time off.

10  You know, we work with a lot of people in the service

11  industry, and so there's always just that pressure of getting

12  your shift coverage or your work covered by somebody else,

13  which doesn't always happen, so that's not really unpaid time

14  off.  I can't think of too many folks who have that option as

15  well.

16  Q.  Okay.  You mentioned -- so I think staying with unpaid time

17  off, you know, what proportion of clients have you worked with

18  who could take multiple days off even if it was unpaid?

19  A.  I think that, I would say, maybe like a quarter of our

20  clients were able to -- I would say that about a quarter of our

21  clients -- I'm thinking of percentages.  So about a quarter of

22  our clients who have a job who needed to go for the multiple

23  trips for the two days were able to sort of arrange the

24  schedule, and it didn't feel like it would impact them

25  negatively at work, so -- but there was still sort of the --

1    just a bit of a struggle in trying to manage that because, of

2    course, they have to coordinate that with the appointment

3    scheduling of the clinic.

4    Q.  You mentioned that some of your clients work in the service

5    industry.

6         Are there other industries or jobs that are common among

7    your clients?

8    A.  Some of our clients work in the -- in cleaning, cleaning

9    houses, in the cleaning industry; maintenance; and even some

10   construction jobs.

11   Q.  And what are your clients' job schedules like?

12   A.  It can range.  You know, some folks have a typical Monday

13   through Friday, nine to five, but a lot of folks, especially

14   with service or maintenance or -- any of them, can be second

15   and third shifts and weekend times.

16   Q.  And does All-Options currently offer any services that

17   address your clients' employment-related needs?

18   A.  No, we don't.

19   Q.  And are you aware of any organizations or do you work with

20   any organizations that do offer such services?

21   A.  If people express an interest in employment services, we

22   will refer folks to a place like Workforce One.

23   Q.  And what is Workforce One?

24   A.  Workforce One is essentially sort of a temporary

25   organization -- I'm sorry.  It's not a temp organization.  It's

an organization that tries to recruit and help people get
employed here in Bloomington, but -- yeah.

Q.  And you had mentioned that some clients are able to take
time off without feeling like it will negatively impact their
job.

A.  Uh-huh.

Q.  Do people -- when people are working with you, do they
share how they think taking time off will negatively impact
their job, taking time off to obtain an abortion?

A.  Yes.  Well, oftentimes, you know, they know that they can't
really disclose why they need to take the time off, and then
they express some stress about -- you know, it's one thing to
take one day off for a doctor's appointment, but it sounds a
little bit strange to take two days off for a doctor's
appointment, especially when sometimes it's not consecutive.
But that seems to kind of push people or potentially push
employers a little bit more with questions or just thinking
that the person's not dedicated or not taking things seriously.
So that's where things get a little bit complicated, because I
think one day off for a doctor's appointment is reasonable, but
the fact that it's two days off can seem like a lot to an
employer, and so people express some stress and anxiety around
that.

Q.  Okay.  And when you say it seems like a lot to an employer,
what is their concern?

1  A.  I think clients are concerned that the employer will fire

2  them or just -- yeah, just not think of them as a good worker

3  or a dedicated worker.

4  Q.  And so how do your clients deal with this problem?  If they

5  can't take unpaid time off, two days in a row, or they find it

6  difficult to do so, how do they go about obtaining an abortion?

7  A.  They sort of have to take their chances with the employer.

8  You know, they understand that it might mean that the employer

9  is upset with them, but they try to do that.  But if the

10  employer says, "No, you can't take that time off," then

11  sometimes that will cause people to miss their appointment and

12  just have to reschedule and delay and push it back.  And, you

13  know, sometimes if it means that you have to call out sick to

14  make your appointment, that can happen, too.  But, you know,

15  there's a lot of stress that goes around with just people

16  feeling like they are jeopardizing their relationship with

17  their employer, you know, as they're trying to ask for the

18  multiple days.

19  Q.  And in your experience, what has been the impact on your

20  clients of delaying the appointment due to the problems with

21  their employment?

22  A.  Well, along with the stress and anxiety, you know, I think

23  the longer they wait, the more there's just this sense of the

24  shame and the stigma.  And, you know, if they have to push it

25  back too long, past 13.5 weeks, then it means that they have to

 1    travel out of state to seek care.

 2              THE COURT:  I understand about employment.

 3              So would you go to the next topic, Miss Sharma?

 4              MS. SHARMA:  Yes.  I was just about to, Your Honor.

 5    BY MS. SHARMA:

 6    Q.  I'd like to ask you just a few questions about childcare,

 7    Miss Guerrero.

 8        What childcare needs do your clients have?

 9    A.  We work with parents who sometimes have very young

10    children, and so because the multiple days and the appointments

11    take, you know, the better part of the day, plus travel, it

12    might be a very long day.  Then they have to find childcare for

13    their children.

14    Q.  And what childcare services does All-Options currently

15    offer abortion patients?

16    A.  We are able to increase our pledge so that people can keep

17    some of their own money to pay for childcare services if the

18    clients say that that will be helpful for them.

19    Q.  Your clients have unmet childcare needs?

20    A.  Yes.

21    Q.  And how do those unmet childcare needs affect their ability

22    to obtain an abortion in Indiana?

23    A.  Well, as parents, they don't want to leave their children

24    without adequate childcare, so this can cause, again, for them

25    to miss their appointments and have to delay care.

1     You know, sometimes I've worked with people where they've

2  said, you know, "My babysitter's sick," or, "something fell

3  through and so I can't make the appointment because I have to

4  stay here with my kids."

5  Q.  Do you know what proportion of your clients are parents?

6  A.  I think that more than half are parents.

7  Q.  And do you know what proportion of those have small

8  children as opposed to older children?

9  A.  I would say the majority of them have younger children

10  instead of older children.

11  Q.  Okay.  Miss Guerrero, you had mentioned IPV or intimate

12  partner violence earlier.  I have just a few questions about

13  that.

14     Does All-Options currently provide any services regarding

15  intimate partner violence?

16  A.  We provide emotional support around intimate partner

17  violence, whether it's through the Hoosier Abortion Fund or the

18  talk line, and we also connect people to the National Domestic

19  Violence Hotline as well.

20  Q.  And how does having to make multiple trips to an abortion

21  provider affect clients living with IPV?

22  A.  It's -- if it's a situation where the person is trying not

23  to disclose the pregnancy to the partner, it can be really

24  difficult to try to justify a two-day trip to a metropolitan

25  area or to try to hide the two-day trip from the person, and so

1   there's a lot of risk involved with working with IPV clients.

2   A lot of times, that's when we end up having to communicate via

3   text message or e-mail because people just feel more

4   comfortable in those situations using that.  There's a little

5   bit more, I guess, ability to hide some of the interaction from

6   a violent partner.

7   Q.  Okay.  And does having to hide the situation from a partner

8   ever impact the client's abortion care?

9   A.  Yes.  It can cause them to have to delay care.  And, of

10  course, the continued stress and anxiety of something like this

11  can have some significant impacts as well.  And then just

12  having to stay with an unwanted pregnancy from a violent

13  partner is really difficult.

14  Q.  Just a couple more questions.

15      I wanted to return to one topic you brought up, which was

16  your work on the talk line learning about when your clients

17  reach out to you for emotional support.

18      From your work on the talk line, what do you know about the

19  emotional impact of having to make two trips to an abortion

20  provider on clients?

21  A.  I think the multiple trips can just serve as just another

22  shaming and stigmatizing factor for people.  And so along with

23  the stress and anxiety of trying to access care because of just

24  the lack of providers in more rural areas, the multiple trips

25  can just serve to have people feel, you know, like they are

1   stuck in a really tough situation.  And these are folks, you

2   know, when they reach out to us, are already in a pretty tough

3   situation, so it just kind of is a compounding set of factors

4   that block people from access and care.

5          MS. SHARMA:  Your Honor, may I have a moment to confer

6   with my co-counsel?

7          THE COURT:  Yes, you may.

8          MS. SHARMA:  Thank you.

9               (Off-the-record discussion.)

10  BY MS. SHARMA:

11  Q.  Ms. Guerrero, I just had one more question that I wanted to

12  clarify the answer to, and that is just how having to make two

13  trips to an abortion provider, exactly how it impacts the cost

14  of the abortion care.

15  A.  It ends up increasing the cost because of gas or a bus

16  ticket or childcare.  And if the -- if somebody has to continue

17  to delay care, it can push the appointment back to a number --

18  to -- it can push the appointment back where then people have

19  to seek care outside of the state, which then also

20  significantly increases cost in terms of the procedure and the

21  logistics.

22  Q.  Just one more follow-up question.

23      When a client -- when care is delayed for the reason that

24  you mentioned and the client doesn't have to travel out of the

25  state, does that increase the cost of care?

A.  It doesn't increase the cost of care, but it might increase
the cost of travel, actually.

    I know of people who, say, if they have a car that breaks
down in the middle of the road, and they have already spent the
money on the gas and the childcare, and then they delay care,
then that's just additional money that they have to try to find
to make a second attempt at trying to get to the clinic for
both trips.

Q.  Thank you, Miss Guerrero.

        MS. SHARMA:  No further questions on direct, Your
Honor.

        THE COURT:  All right.  Cross-examine.

        MR. HUDSON:  Thank you, Your Honor.  Just a couple of
questions this morning.

        THE COURT:  Okay, Mr. Hudson.

                      **CROSS EXAMINATION**

BY MR. HUDSON:

Q.  Good morning Ms. Guerrero.

A.  Good morning.

Q.  I'd just like to ask a couple of clarifying questions
regarding a couple of responses you gave to Ms. Sharma.

    So earlier this morning, you estimated the number of
clients that the Practical Support Network was able to assist
during the August to March period.  First, are you referring to
August 2019 to March 2020?

GUERRERO - CROSS/HUDSON                    47

1   A.  I'm referring to -- yes, August '19 to March 2020.

2   Q.  Understood.  And, specifically, the Practical Support

3   Network program that you were referring to in that answer, was

4   that the All-Options transportation assistance program, the

5   rides; is that correct?

6   A.  Yes.

7   Q.  Understood.  And so, just to make sure I'm understanding

8   your answers, then, so you were able to assist 17 clients with

9   transportation during that eight-month period from August 2019

10  to March 2020; is that right?

11  A.  Yes.

12  Q.  Okay.  Thank you.

13      I'd like to bring up impeachment Exhibit 6.  Just one

14  moment.

15          THE COURT:  Do you have a Plaintiffs' number for it?

16          MR. HUDSON:  No.

17          THE COURT:  It's a deposition?

18          MR. HUDSON:  Yes.

19          THE COURT:  Okay.

20          MR. HUDSON:  Yes.

21  BY MR. HUDSON:

22  Q.  Ms. Guerrero, this is a transcript of a deposition that you

23  took on April 10th, 2019.  Do you recall taking that

24  deposition?

25  A.  Yes.

1  Q.  Okay.  And can you see everything okay on the screen or

2  should I zoom in?

3  A.  I can see everything, yes.

4  Q.  Great.

5          THE COURT:  What page are we going to?

6          MR. HUDSON:  We are on page 40.  We are on page 40 of

7  the transcript, Your Honor.

8          THE COURT:  Okay.  Thank you Mr. Hudson.

9  BY MR. HUDSON:

10  Q.  Ms. Guerrero, could you read the transcript, beginning on

11  line 6?

12          THE COURT:  To yourself.

13          THE WITNESS:  Okay.

14  BY MR. HUDSON:

15  Q.  And then going down to line 23.

16  A.  Okay.

17  Q.  And so at this deposition, you were asked, "Roughly, what

18  percentage of clients requesting rides are able to secure one?"

19  And what was your answer for clients who are going to Chicago?

20  A.  I said, "Around 50 percent."

21  Q.  And -- thank you.  And when you were asked what percentage

22  of clients were able to secure rides to Indianapolis or

23  Bloomington, what was your answer?

24  A.  That it depends.  It depends what their needs are and which

25  clinics they are going to.  If they are going to Indianapolis

GUERRERO - REDIRECT/SHARMA                49

1  or Bloomington, it's a lot easier than trying to get someone

2  from northern Indiana to Chicago or Indianapolis.  So I can't

3  really say what percentage.

4        MR. HUDSON:  Perfect.  Thank you Ms. Guerrero.

5        If I could just have one quick moment to confer with

6  my colleagues, Your Honor?

7        THE COURT:  All right.

8              (Off-the-record discussion.)

9        MR. HUDSON:  That's all from the State, Your Honor.

10        THE COURT:  All right.  Redirect, Ms. Sharma?

11        MS. SHARMA:  Yes, Your Honor.  May I just have a

12  moment to confer with my counsel?

13        THE COURT:  Yes.

14        MS. SHARMA:  My co-counsel.  Thank you.

15                  **REDIRECT EXAMINATION**

16  BY MS. SHARMA:

17  Q.  Ms. Guerrero, I just wanted to clarify.  So the Practical

18  Support Network, could you just state again when exactly it

19  operated?

20  A.  It operated from about August 2019 to March 2020.

21  Q.  Okay.  And when --

22        MS. SHARMA:  Could we bring up the exhibit again,

23  please?  I think it was taken down.

24        MR. HUDSON:  Ms. Sharma, the deposition transcript?

25        MS. SHARMA:  Yes, please.

1        MR. HUDSON:  That's what you're referring to?

2        MS. SHARMA:  Yes, please.

3        MR. HUDSON:  Sure.

4        Page 40, is that what you were looking for?

5        MS. SHARMA:  The very first page, please.

6        MR. HUDSON:  The very first page.  Sure.

7        THE COURT:  The cover page, in other words?

8        MS. SHARMA:  Yes.

9   BY MS. SHARMA:

10  Q.  Ms. Guerrero when was your deposition taken?

11  A.  It was taken April 10th, 2019.

12       MS. SHARMA:  No further questions, Your Honor.

13       THE COURT:  Recross?

14       MR. HUDSON:  No questions, Your Honor.

15       THE COURT:  All right.  Have you asked all the

16  questions that you intend to ask of Ms. Guerrero?

17       MS. SHARMA:  We have, Your Honor.

18       THE COURT:  And you, too, Mr. Hudson?

19       MR. HUDSON:  Yes, Your Honor.

20       THE COURT:  Can the witness be excused?

21       MS. SHARMA:  Yes, Your Honor.

22       MR. HUDSON:  Yes, Your Honor.

23       THE COURT:  Thank you very much Ms. Guerrero.  Your

24  obligation was been fulfilled and so you're released from your

25  subpoena.  And I thank you very much.

1          THE WITNESS:  Thank you.

2          THE COURT:  Lawyers, it's about 20 till 11.  And since

3    this seems to be a natural point, you've called all your

4    witnesses, Ms. Sharma; is that right?

5          MS. SHARMA:  Your Honor, we reserve the right to call

6    rebuttal witnesses.

7          THE COURT:  Yeah, but I'm talking about your

8    case-in-chief.

9          MS. SHARMA:  Yes, Your Honor.

10         THE COURT:  So you rest on your case-in-chief?

11         MS. SHARMA:  Yes, Your Honor.

12         THE COURT:  Do you want to say it?

13         MS. SHARMA:  Oh.  We rest on our case-in-chief, Your

14   Honor.

15         THE COURT:  All right.  So what's the intention of the

16   defense?

17         MR. HUDSON:  Your Honor, I'll let my colleague answer

18   that question.

19         MR. FISHER:  Good morning, Your Honor.

20         THE COURT:  What's the intent of the defense?

21         MR. FISHER:  Our intention, Your Honor, is to call

22   one, two, three, four, five, six, seven, eight witnesses.  We

23   are not intending to call James Studnicki, who is on our

24   witness list.

25         THE COURT:  All right.

1    MR. FISHER:  But, otherwise --

2    THE COURT:  The eight you've disclosed previously?

3    MR. FISHER:  Yes.

4    THE COURT:  Okay.

5    MR. FISHER:  Exactly.

6    THE COURT:  And are you ready to go after our break?

7    MR. FISHER:  We are.

8    THE COURT:  All right.  Let's take a 20-minute recess

9  and then we'll reconvene and we'll hear the State's first

10  witness; okay?

11    MR. FISHER:  Thank you.

12    THE COURT:  Thank you.

13                    (Recess taken.)

14    THE COURT:  Okay, I believe I'm back.  Everybody, can

15  you hear?

16    MS. SINGH:  Yes.  Your Honor, this is Ms. Singh for

17  Plaintiffs.  I had just one item before we started with

18  Defendants' witnesses.  I'm sorry, I wasn't able to take myself

19  off of mute before we went on break.  Plaintiff had a --

20    THE COURT:  You have a slow mute, do you?

21    MS. SINGH:  Unfortunately for me.

22    THE COURT:  Okay.

23    MS. SINGH:  Maybe better for everybody else.  But I

24  had just a deposition designation that we wanted to move into

25  evidence.

1          THE COURT:  You want to reopen?

2          MS. SINGH:  Yes, please.

3          THE COURT:  Move to reopen.

4          MS. SINGH:  May I move to reopen Plaintiffs' case?

5          THE COURT:  I grant your request.

6          MS. SINGH:  Thank you, Your Honor.  Plaintiffs

7    respectfully submit that -- move to submit the deposition

8    transcript of Dr. Calhoun, which is ECF350-1, into evidence.

9          THE COURT:  I'm sorry.  I missed the number.  ECF

10   what?

11         MS. SINGH:  ECF-350-1.

12         THE COURT:  Okay.  Any objection, Mr. Fisher?

13         MR. FISHER:  No objection, Your Honor.

14         THE COURT:  All right.  I have granted your motion to

15   reopen for purposes of the court record receiving the

16   deposition of Dr. Calhoun.  So it's granted.

17         Do you want to rest on your case-in-chief again?

18         MS. SINGH:  Yes, Your Honor.  Plaintiffs rest.  Thank

19   you.

20      (Plaintiffs' Exhibit ECF-350-1 received in evidence.)

21         THE COURT:  Okay.  Mr. Fisher?

22         MR. FISHER:  Thank you, Your Honor.

23         THE COURT:  It's up to you now, sir.  Would you call

24   your witness and have her identify herself, please.

25         MR. FISHER:  We will.  The defense calls Farr Curlin,

1  M.D.

2          THE COURT:  All right.  Dr. Curlin, good morning.

3  Would you be sworn, please?  The clerk will administer the

4  oath.

5          MR. FISHER:  I think he's on mute.

6          THE WITNESS:  Good morning, Your Honor.  My apologies.

7          THE COURT:  There you are.  Okay, good.  Would you

8  take the oath, please, sir.

9          FARR ANDREWS CURLIN, DEFENDANTS' WITNESS, SWORN

10              **DIRECT EXAMINATION**

11          THE COURT:  Thank you, sir.  You may proceed,

12  Mr. Fisher.

13          MR. FISHER:  Thank you, Your Honor.

14  BY MR. FISHER:

15  Q.  Dr. Curlin, please identify yourself and spell your name

16  for the record.

17  A.  My name is Farr Andrews Curlin, F-A-R-R, the first name;

18  Andrews is A-N-D-R-E-W-S; and then Curlin is C-U-R-L-I-N.

19          THE COURT:  What's the derivation of the name Farr?

20          THE WITNESS:  That is a Scottish name.  It represents

21  a region in northern Scotland and also a small town in

22  Scotland.

23          THE COURT:  So if it were Irish, we could have used

24  that as our segue today to wish each other happy St. Patrick's

25  day.  Scotland is close, though.  Scotland is close.  Okay.

1   Sorry for the diversion.

2             MR. FISHER:  Not at all.

3             THE COURT:  It's a pretty name, Farr.  Your mother did

4   well by you.

5             THE WITNESS:  Thank you.

6   BY MR. FISHER:

7   Q.  Dr. Curlin, what is your occupation?

8   A.  I'm a physician and a professor at Duke University.

9   Q.  What are your duties at Duke?

10  A.  My primary appointment is in Duke's Trent Center for

11  Bioethics, Humanities & History of Medicine, which is the

12  ethics center in the School of Medicine at Duke; and in that

13  center, I do research and teach regarding medical ethics.

14     I have a second appointment in the Divinity School at Duke

15  where with colleagues I direct the Theology, Medicine and

16  Culture initiative.

17     I also have an appointment as a member of the Palliative

18  Medicine Group in the section of general internal medicine at

19  Duke, where I practice palliative and hospice medicine; and

20  then I have an appointment as a senior fellow in Duke's Kenan

21  Institute for Ethics, which is a cross-university ethics

22  institute.

23  Q.  As a senior fellow at the Kenan Center, were you involved

24  with something called the Arete Initiative?

25  A.  Yes, I was the founding faculty director for the Arete

1    Initiative.

2    Q.   Arete.  Thank you for correcting my pronunciation.

3         THE COURT:  How do you spell it?

4         THE WITNESS:  A-R-E-T-E.

5    BY MR. FISHER:

6    Q.   Okay.  Thank you.  Can you tell us about that initiative?

7    A.   Arete is the Greek word for virtue or excellence; and it

8    was an initiative seeking to promote opportunities for students

9    and faculty at Duke to consider the virtues and particularly

10   the virtues of the intellectual life in public life.

11   Q.   Do you maintain a clinical practice?

12   A.   Yes.  I practice in our inpatient hospice unit, taking care

13   of patients there, as well as doing palliative medicine

14   consultations at Duke Regional Hospital.

15   Q.   Tell us a little bit about those ethics consultations and

16   how they operate.

17   A.   So I was speaking there of palliative medicine

18   consultations.

19   Q.   Do you engage in ethics consultations in your clinical

20   practice?

21   A.   At the University of Chicago, where I was before I came to

22   Duke, I was a part of the clinical ethics faculty and did

23   clinical ethics consultations.

24        At Duke, I am not a part of our clinical ethics committee,

25   but I provide consultations to that committee on an ad-hoc

1   basis when they ask me for those.

2   Q.  So -- and before -- I think you mentioned before you were

3   at Duke, you were at the University of Chicago?

4   A.  Correct.

5   Q.  What were your duties at the University of Chicago?

6   A.  I went to the University of Chicago in 1998 for a

7   three-year residency in internal medicine.  I then completed a

8   two-year fellowship in health services research; and then I

9   joined the faculty.

10       During my first year there, I completed a one-year clinical

11   ethics fellowship at the MaClean Center for Clinical Medical

12   Ethics.

13       During my years on faculty --

14           THE COURT:  Dr. Curlin, you need to slow down just a

15   little bit so the court reporter can get down what you're

16   saying.

17           THE WITNESS:  Yes, Your Honor.

18   A.  As a member of the faculty, my primary obligations were --

19   responsibilities were, one, to serve as an attending physician

20   on the general medicine inpatient wards one to two months per

21   year; to see patients in an outpatient primary care medical

22   clinic; and then later, to do palliative medicine consultations

23   in the hospital, as well as to serve as a hospice physician for

24   Horizon Hospice through our relationship with the university.

25       I also did research.  I had developed my own research

program regarding particularly the intersection of religion and

medicine; and as part of the ethics faculty, I taught ethics

fellows, as well as medical students about clinical medical

ethics.

BY MR. FISHER:

Q.  I think you mentioned then that you were involved in ethics

consultations at the University of Chicago.

A.  Yes.  At the University of Chicago, we had a two-hour

weekly clinical ethics case conference; and I was one of the

faculty that was a regular participant in that in which we

considered clinical cases that had emerged at the University of

Chicago about which there was some kind of ethical dispute or

disagreement.

    I also provided ethical consultations generally one month

per year, going to the bedside to interview people involved in

a dispute, and then bring that back to my colleagues for the

further discussion.

Q.  Did any of your ethics consultations at the University of

Chicago involve abortion?

A.  They did.  I don't recall that the ones I personally saw at

the bedside involved abortion, but a number of the ethics cases

that we considered as a faculty involved abortion.

Q.  What is your educational background before University of

Chicago?

A.  I completed a BA degree in biology at the University of

1    North Carolina; and then I completed a medical doctorate at the

2    University of North Carolina Chapel Hill.

3    Q.  Are you a licensed physician?

4    A.  I am.  I first secured a license early in my residency

5    training -- I don't recall if it was the first or second

6    year -- and I have been licensed since then.

7    Q.  Do you have a CV?

8    A.  I do.

9    Q.  Dr. Curlin, do you recognize this document?

10         THE COURT:  Wait.  I need an exhibit.

11         MR. FISHER:  Excuse me, Your Honor.  Stipulated

12   Exhibit 2.

13         THE COURT:  All right.

14   A.  Yes, I recognize it.

15   BY MR. FISHER:

16   Q.  I'm sorry.  Go ahead.

17   A.  Yes, I recognize it.

18   Q.  Can you tell me what this document is?

19   A.  This is my curriculum vitae as of February 18th, 2021.

20   Q.  What specializations do you have?

21   A.  Can you repeat that?

22   Q.  Yes.  What specializations do you have?

23   A.  Clinically, I am a -- board certified in internal medicine,

24   and then in the subspecialty of hospice and palliative

25   medicine.

Q.  What year -- just remind us.  I think we have it on the

screen, but what years were you board certified then?

A.  I was board certified first in internal medicine in 2001

and then recertified in 2011; and I was board certified in

hospice and palliative medicine in 2010.

Q.  Are you a member of any professional associations?

A.  I'm a member of the American Medical Association and also

the American Society for Bioethics --

          THE COURT:  Can't the CV speak for itself, Mr. Fisher?

          MR. FISHER:  Very good, Your Honor.  We'll move on.

          THE COURT:  All right.  Thank you.

          MR. FISHER:  I would like, Your Honor, to draw

attention to one thing on the CV?

          THE COURT:  You may do that.  I just didn't want you

to track it all.

          MR. FISHER:  Very good.  Very good, Your Honor.

BY MR. FISHER:

Q.  Dr. Curlin, have you received any awards in bioethics,

specifically as it might relate to abortion?

A.  Not specifically as it relates to abortion; but in 2006, I

was selected as a Greenwall Foundation Faculty Scholar in

Bioethics.  That was a nationally competitive program.  I was

one of three scholars selected.

     And I in 2018 received the Paul Ramsey Award for Excellence

in Bioethics from the Paul Ramsey Institute; and in 2019, the

1  Pellegrino Medal for Healthcare Ethics from Samford University.

2  Q.  Let's talk about that 2006 Greenwall award.  And what

3  happened with that that relates to abortion?

4  A.  Well, the award seeks to support promising young faculty in

5  bioethics and their research for it.  I proposed a research

6  project that would track how physicians' religious

7  characteristics, including being not religious, account for,

8  empirically, differences in their clinical practices and in

9  their self-reported opinions about an array of clinical

10 practices; and I specifically proposed to do a study of U.S.

11 obstetricians-gynecologists to examine those issues in the area

12 of sexual and reproductive healthcare.

13 Q.  And did you carry out that study that you proposed?

14 A.  Yes, I did.

15 Q.  And tell us what -- about that study.  Was it a

16 peer-reviewed study?

17 A.  It was.  It -- we ended up studying a representative sample

18 of more than a thousand U.S. obstetrician/gynecologists; and

19 the results of the study were published in a number of

20 peer-reviewed papers, which are listed on my CV, including two

21 papers that focus on abortion.

22 Q.  So can you give us a couple of highlights from that

23 peer-reviewed study that you conducted?

24 A.  Sure.  With respect to abortion, we found that 14 percent

25 of U.S. obstetrician/gynecologists ever provide abortion; and

1    then we found that OB/GYNs' willingness to accommodate

2    patients' requests or help them to obtain an abortion varied

3    significantly based on the reasons women had for seeking the

4    abortion.

5         In the most common case of failed contraception at six

6    weeks, in an item we asked that 41 percent of U.S. OB/GYNs

7    reported they had moral objections to abortion in that case.

8    Q.  On your CV, do you list other scholarly research and

9    publications in bioethics --

10             THE COURT:  Would you repeat the question, please?

11             MR. FISHER:  Yes.

12   BY MR. FISHER:

13   Q.  On your CV, do you list other scholarly research and

14   publications in bioethics, particularly as it relates to

15   abortion?

16   A.  I have a number of other both empirical studies and

17   analytical papers that are published in the peer-reviewed

18   literature that to varying extents touch on abortion.  I

19   mentioned the two, 53 and 54, that are the most focused there.

20        Number 55 also is a study of OB/GYNs' beliefs about when

21   pregnancy begins, which is often a part of discussions of

22   abortion.

23        And then manuscript 22, I believe is the right number, is a

24   study of OB/GYNs and their differing approaches to morally

25   controversial practices in sexual and reproductive healthcare.

1  Q.  Each of those papers that you just mentioned, was each peer

2  reviewed?

3  A.  Yes.

4  Q.  Do you have any books in print?

5  A.  I just recently had my first book co-authored with

6  Christopher Tollefsen of the University of South Carolina go in

7  press.  It will be published this summer, and the title is *The*

8  *Way of Medicine:  A Profession To Heal*.

9  Q.  Can you tell us about that book and what it covers?

10  A.  Yes.  It's a book on medical ethics and on the ethical

11  foundations of the practice of medicine published in a series

12  at Notre Dame on medical ethics.  In it, we talk about a lot of

13  things; but centrally, we talk about the tension between

14  understanding medicine as a moral art that is oriented to the

15  patient's health where health is an objective norm of the body.

16  That is, we argue the traditional idea that's at work in the

17  practice of medicine for most of the history and a newer idea

18  that has been growing in popularity, which is that medicine is

19  better understood as the provision of healthcare services to be

20  used to satisfy patients' desires regarding the states of

21  affairs that physicians can help to bring about using their

22  technology.

23  Q.  Among the subjects that the book discusses, is informed

24  consent included?

25  A.  It is.  There's a chapter focused on clinical decision

1    making and the doctor-patient relationship, and we speak

2    significantly about informed consent.

3    Q.  And how do you -- what do you say about informed consent in

4    the book?

5    A.  Well, we -- in the book, we argue that informed consent

6    under this provider-of-services model, as we call it, has come

7    to be misconstrued as if the goal of the physician-patient

8    communication is just to give -- for the physician to give

9    information and to otherwise carefully avoid influencing the

10   patient in any way.

11        We see this as not either descriptive of what physicians

12   actually do or as morally adequate to account for what they

13   ought to do, as those to whom patients intrust their health.

14        And so we seek to clarify how informed consent has been

15   more historically understood, and particularly, to note that it

16   is a principle that requires -- or that puts into practice a

17   proper respect for the patient as an other and a respect for

18   the authority to decline any proposal that a physician may

19   make.

20   Q.  Do you participate in peer-reviewing for academic

21   publications?

22   A.  I do.  I have done peer reviews for more than 40 different

23   peer-reviewed publications and still peer-review regularly.

24             THE COURT:  In the medical ethics field?

25             THE WITNESS:  Yes, Your Honor.

1  BY MR. FISHER:

2  Q.  Medical ethics and any other fields?

3  A.  Well, the clinical medicine fields often -- it's about

4  medical ethics topics but journals like the *New England Journal*

5  *of Medicine* and *Journal of The American Medical Association*,

6  *Annals of Internal Medicine* often --

7           THE COURT:  You're talking too fast, please.

8           THE WITNESS:  My apologies.

9           THE COURT:  You can't see the court reporter, but I

10  can; and she's wilting.  So slow it down.

11          THE WITNESS:  Yes, Your Honor.

12          THE COURT:  And I have a strong interest in keeping

13  her where she is right now, as opposed to walking out.

14          THE WITNESS:  Yes, Your Honor.  I will.

15          THE COURT:  And actually, Dr. Curlin, you share that

16  interest as well.

17          THE WITNESS:  Yes, I do.

18  A.  Many clinical medical journals, for which I do peer

19  reviews, publish among their papers, papers that consider

20  ethically controversial or contested issues in the practice of

21  medicine.

22  BY MR. FISHER:

23  Q.  What is your role in this case?

24  A.  I understand my role to be to consider arguments made by

25  the plaintiffs and the experts that they called on and who have

1    submitted reports, arguments that the regulations of abortion

2    in Indiana as a whole and individually are ethically

3    problematic.  That they violate important norms of medical

4    ethics and that they particularly require practitioners of

5    abortion to act in ways that contradict their obligations to

6    their patients.

7    Q.  So on what topics would you propose to offer opinions

8    today?

9    A.  I propose to offer opinions on the norms of medical ethics,

10   how they bear on the practice of abortion and the regulation of

11   abortion, and including questions about what the principle of

12   informed consent requires in these cases.

13   Q.  And how did you come to your opinions in this case?

14   A.  I began with attending carefully to the arguments made,

15   seeking to understand them, to understand the ethical questions

16   raised or the ethical claims made.

17       I tried to understand the facts.  So I paid attention to

18   what the plaintiffs said, what they reported and what their

19   experts reported, and looked up a number of the studies that

20   were relied upon by those experts to have a look at the

21   empirical facts myself.

22       I then considered, based on my training and experience

23   within the field of medical ethics, considered what ethical

24   goods are at stake in these disputes and what ethical norms are

25   relevant to them.  And I considered arguments made as to their

CURLIN – DIRECT/FISHER                67

internal coherence, as well as to -- how well they apply or do

not apply to the particular disputes at stake here, and

considered relevant legal -- legal cases in the past, similar

cases that have -- or clinical cases that have similar ethical

concerns and taking all of this into consideration, rendered an

expert opinion.

Q.  That methodology that you described, is that a typical

methodology from your field?

A.  Yes, I think so.  Medical ethics is not an empirical

science but that is consistent with good practice in

philosophical analysis.

Q.  Did you prepare a report in this case after thinking

through all of the materials that you described?

A.  I did, yes.

Q.  All right.  We're going to bring up recollection

document -- or Exhibit 23.  Dr. Curlin, do you recognize this

document?

A.  Yes, I do.

Q.  What is it?

A.  It is my expert report.

Q.  Is this where you memorialized the opinions that you came

up with after reviewing the materials and exercising the

methods you earlier described?

A.  Yes, it is.

Q.  Now, Dr. Curlin, how do you think that your opinion on

1   matters of bioethics, on abortion, and informed consent will

2   assist the Court in this case?

3   A.  I think it will help the Court understand what is ethically

4   at stake in the practice of abortion and in the regulation of

5   abortion, and will help the Court understand how the principle

6   of informed consent has been understood within the field of

7   medical ethics and how it applies to these cases.

8            MR. FISHER:  Your Honor, the defense tenders this

9   witness, Dr. Farr Curlin, as an expert in the field of

10  bioethics, including but not limited to the bioethics of

11  abortion and informed consent.

12           THE COURT:  Any objection?

13           MS. SHUBE:  No objection from the plaintiff, Your

14  Honor.

15           THE COURT:  The proffer is accepted and the witness

16  may testify according to his expertise.

17           MR. FISHER:  Thank you.

18  BY MR. FISHER:

19  Q.  Dr. Curlin, does abortion represent a grave decision?

20  A.  It does.

21  Q.  Could you explain how you come to that assessment?

22           THE COURT:  A grave decision to whom?

23  A.  Your Honor, abortion presents a grave decision both for the

24  one who's offering the abortion, the practitioner, as well as

25  for the woman who's considering undergoing an abortion.  It

1    is -- abortion has been enduringly ethically controversial

2    among the public, among practitioners of medicine, and among

3    medical ethicists because it appears to involve actions that

4    intentionally kill an innocent human.  And the ethical norm of

5    "do not kill the innocent" has seemed what philosophers call

6    basic.  It's a starting point for ethical reasoning.  It's not

7    something you find people arguing to contradict.  So in that

8    respect, abortion has continued to be deeply and gravely

9    ethically problematic.

10   BY MR. FISHER:

11   Q.  Well, as the issue plays out, the ethical dilemma over

12   abortion, what is the crux of that controversy?

13   A.  The crux of the controversy is, it's not a question of

14   whether abortion kills.  It's pretty self-evident that's what

15   the procedure does.  It's not been a controversy about whether

16   the fetus is a human being.  That's been an uncontroversial

17   fact scientifically; but rather the crux of the controversy has

18   been whether this category of human beings are persons whose

19   rights we must respect.

20       The language of personhood has been used to identify those

21   humans that do not have sufficient moral status, another term

22   that's often raised, to require of us the kind of obligations

23   that we owe to all other human beings.  And this is -- this

24   justification has been and continues to be deeply controversial

25   and ethically fraught because the language of personhood is not

1    a scientific norm.  It's not even a descriptive concept but

2    rather an evaluative one, the language of person who's used by

3    those who seek to justify a treatment of some category of human

4    beings that they know would not be permissible with any other

5    human beings.

6           THE COURT:  Mr. Fisher, I'm having trouble figuring

7    out how this testimony, if it proceeds along these lines of

8    Dr. Curlin's initial statements, is relevant to our lawsuit.  A

9    decision has been made by many others that abortion's legal.

10   And in that sense, if Dr. Curlin's views were applied, it might

11   not be because of these moral -- the moral violation of that

12   decision.

13          So it is legal and the Court's obligated to determine

14   a rather narrow range of issues with respect to undue burden on

15   the patient.  Not the practitioner.  Not society.  Not anybody

16   else but on the patient.

17          So you better rein it in here a little bit for me so

18   that I can see the relevance of this testimony to the issues

19   that I have to decide.

20          MR. FISHER:  Yes, Your Honor.  And just to cut to the

21   chase, Dr. Curlin is going to be responding to the plaintiffs'

22   claim that -- essentially their equal protection claim that

23   abortion is improperly treated differently from other medical

24   procedures.

25          So I'll ask Dr. Curlin --

1    THE COURT:  That's a legal issue.  And so you bring

2    him in on that being -- by the question you ask so that it

3    doesn't just sort of go back and forth, back and forth on

4    broader ethical, moral concerns that I'm not going to have

5    to -- happily I'm not going to have to resolve those.

6         MR. FISHER:  Very well, Your Honor.  Happy to do that.

7    BY MR. FISHER:

8    Q.  Dr. Curlin, how, if at all, does the dispute over the moral

9    status of the fetus distinguish abortion from other medical

10   interventions?

11   A.  It makes elective abortion unique with respect to medical

12   ethics insofar as there is no other intervention, to my

13   knowledge, that physicians offer or participate in that --

14        THE COURT:  That is -- that question, Mr. Fisher, does

15   not reflect what I just was trying to ask you.  I think you

16   just went down to your next question.

17        MR. FISHER:  Oh.

18        THE COURT:  I don't -- I need to have this witness, if

19   he's going to testify to issues that are relevant to my lawsuit

20   and my decision making, talk about the fact of abortion in an

21   equal protection context.

22        The law's already recognized this as a permissible

23   procedure.  It's legal.  So I'm really confused by what the

24   witness is being asked to testify to when he talks about moral

25   status.  That bridge has been crossed.

1    MR. FISHER:  Well, Your Honor, the distinction that

2  Dr. Curlin is testifying about goes to the rationale or some

3  state regulations of abortion, including regulations that the

4  plaintiffs have challenged.  So with your permission, I'd like

5  to ask Dr. Curlin just to connect those dots for us.

6    THE COURT:  That's what I'm hoping you'll do and start

7  with those, instead of having him take us on a long journey

8  here.

9  BY MR. FISHER:

10  Q.  Dr. Curlin, the dispute, the debate over the moral status

11  of the fetus, how does that justify state regulation of

12  abortion?

13  A.  To me it justifies those insofar as because of the ethical

14  gravity of the practice, albeit legal, because of what's at

15  stake ethically here in a way that's not at stake in any other

16  thing that physicians do, it is reasonable for extra

17  precautions to be taken to be certain that the woman who will

18  or will not give consent to an elective abortion understands

19  fully what's at stake there and has every opportunity to

20  consider other less ethically grave options.

21    MR. FISHER:  And now, Your Honor, I think I'm ready to

22  move onto informed consent.

23  BY MR. FISHER:

24  Q.  Dr. Curlin, please define informed consent.

25  A.  Informed consent is an ethical principle and a kind of

1    practice that holds that physicians should not act on patients

2    without at least their implicit consent.  And that for a

3    patient to validly give consent, he or she must have sufficient

4    understanding to know what it is he or she is giving consent

5    to.

6        This principle is based on the deeper ethical principle of

7    respect for persons, which includes a proper respect for their

8    authority.

9              THE COURT:  It runs through medicine, doesn't it?

10             THE WITNESS:  It does.  This is arguably the most

11   commonly applied and widely accepted, least controversial

12   practical ethical principle in the practice of medicine.

13             THE COURT:  Go ahead.

14   BY MR. FISHER:

15   Q.  What is your familiarity with the use of ultrasound to

16   further informed consent?

17   A.  Well, on a broad level I'm familiar with ultrasound as an

18   imaging modality that is used to make visible through digital

19   images that which otherwise cannot be seen inside of the body.

20       I'm aware, with respect to ultrasound in the case of

21   pregnancy, that ultrasound is used to date pregnancy, is used

22   to determine whether the pregnancy is, in fact, located within

23   the uterus.

24             MS. SHUBE:  Objection, Your Honor.

25             THE COURT:  What's the objection, Miss Shube?

1          MS. SHUBE:  The objection is that Dr. Curlin isn't

2     qualified to testify as a medical ethicist.  He's not been

3     qualified to testify about the clinical practice of abortion,

4     about the use of ultrasound for ruling an ectopic pregnancy and

5     gestational -- yeah, whether the -- whether the ultrasound is

6     located within the uterus.  He does not -- he's not an OB/GYN.

7     He does not treat pregnant patients.  He lacks relevant

8     expertise for this testimony.

9          THE COURT:  The question that was put to the witness

10    is, what does ultrasound have to do with or how is it connected

11    to informed consent.  So I understood his responses to be based

12    on his understanding of ultrasound so he can say what

13    connection it has with informed consent.

14          I recognize he's not an expert in this area.  He's not

15    an OB/GYN.  He's not going to be testifying to how that

16    happens.  He's just talking about his understanding that that's

17    what ultrasound does.

18          If he's wrong, then it doesn't have a very good tie to

19    informed consent, does it?  So the objection's overruled.

20    BY MR. FISHER:

21    Q.  Dr. Curlin, does performing and offering ultrasound during

22    the in-person consultation process 18 hours before --

23          THE COURT:  Mr. Fisher, I overruled the objection.

24          Do you want the witness to answer?

25          MR. FISHER:  Oh, thank you, Your Honor.  I wasn't

1    sure.

2    BY MR. FISHER:

3    Q.  Dr. Curlin, I was asking about your familiarity with

4    ultrasounds, and you were mentioning the context of pregnancy,

5    so let's just make sure we have covered that ground fully.

6    A.  Just what -- I am not an expert in the provision of

7    ultrasound, but I understand that ultrasound is used, again, to

8    make visible what otherwise is not visible, including in the

9    case of pregnancy what is going on inside the uterus.

10   Q.  What is your understanding of Indiana law as it relates to

11   ultrasounds and abortion?

12   A.  My understanding is that it requires an abortion provider

13   to perform an ultrasound and to offer the pregnant woman the

14   opportunity to see the ultrasound or hear a recording of the

15   ultrasound.

16   Q.  Does performing and offering an ultrasound during the

17   in-person consultation process 18 hours before an abortion

18   further informed consent?

19   A.  I believe it does.

20   Q.  And what's your basis for that opinion?

21   A.  Well, it -- the ultrasound, again, makes visible that which

22   remains invisible.  It makes more definite and concrete that

23   which can be indefinite and abstract.  It allows the woman to

24   see the fetus for what it is, at least insofar as that can be

25   depicted through that imaging.

1          THE COURT:  Well, how does that relate to consent?  I

2    mean, those things are true, but how does that relate to

3    consent.

4          THE WITNESS:  The way it relates to consent, Your

5    Honor, is it helps the woman have an understanding of what it

6    is that is going to be removed from the uterus.

7          Consent requires not just abstract information being

8    given, but taking pains to make sure that the one who's going

9    to undergo a procedure understands what's at stake in that

10   procedure.

11         THE COURT:  So you mean having the understanding could

12   result in either strengthening the patient's decision or

13   weakening it, right?

14         THE WITNESS:  I do, Your Honor, and evidence that I'm

15   aware of suggests it can do both of those in different women.

16         THE COURT:  So having the knowledge as it relates to

17   informed consent basically clarifies the decision that's being

18   made, right?

19         THE WITNESS:  Yes, Your Honor.

20         THE COURT:  Okay.  Go ahead, Mr. Fisher.

21         MR. FISHER:  Thank you, Your Honor.

22   BY MR. FISHER:

23   Q.  Dr. Curlin, you just mentioned that you are aware of

24   evidence about how ultrasound may have an impact.

25       Is this something that you've covered in your report?

A.  Yes, it is.

Q.  Okay.  Let's go to Paragraph 94.  This is still the same

exhibit.  Refresh or recollect Exhibit 23.

        THE COURT:  Does he have a failure of recollection,

Mr. Fisher?

        MR. FISHER:  No.  I was just going to allow him to

review it, but we can hang on to that if you'd rather.

        THE COURT:  Well, why don't you ask him the question,

see if he knows what he's going to say.

        MR. FISHER:  Very good.

BY MR. FISHER:

Q.  Dr. Curlin, what is your -- the evidence you're talking

about in terms of the impact of ultrasound and the informed

consent process for abortion?

A.  I'm thinking particularly of a study that was cited in

Dr. Grossman's expert report that I initially reviewed, a study

whose lead author was Dr.Upadhyay, and it was a study of women

who presented seeking an abortion both before and after the

implementation of, I believe it was, a 2013 law in Wisconsin

that newly required that the screen for the abortion image be

put in the line of sight of women who were considering

abortion, and that study found that the proportion of women who

continued their pregnancy, who did not follow through with an

abortion, went up significantly after the implementation of

that law.  The study also found that that difference, that rise

in the proportion of women that continued their pregnancy, was
accounted for, was mediated by is the language statisticians
would use, looking at the image itself.  Another way to put
that is, among women who did not look at the image because they
are were not required to look at the image, you did not see
that change.  And interestingly, the rise was found primarily
and significantly among women who said they were certain they
wanted to have an abortion when they came to the clinic.

Q.  Dr. Curlin, does your opinion about the significance or the
relevance of ultrasound for informed consent depend on the
earlier discussion about the debate over the moral status of
the fetus?

A.  I don't think it does.  It -- and, in fact, that study
found in follow-up interviews with women that a number of the
women had said that seeing the ultrasound had helped them have
a firmer decision to follow through and have the abortion.  So
that evidence suggests that seeing the ultrasound helped women
understand more fully what was going to happen and come to a
more considered decision.

Q.  Thank you, Dr. Curlin.

          MR. FISHER:  No further questions on direct, Your
Honor.

          THE COURT:  All right, sir.

          Cross-examine?

## **CROSS–EXAMINATION**

BY MS. SHUBE:

Q.  Good morning, Dr. Curlin.  My name is Melissa Shube, and I represent the plaintiff.

A.  Good morning.

Q.  I'd like to pull up that same study that we were just discussing.  That would be Plaintiffs' Exhibit -- Plaintiffs' Exhibit for Impeachment 629.

THE COURT:  Is that the Grossman Padre study?

MS. SHUBE:  Yes.

No.  It's the -- I think the name of the author is Upadhyay.

THE COURT:  I just was making a stab at it because I was listening.  Oh, I see it is.  I was way off.

But it was cited by Dr. Grossman; is that right?

MS. SHUBE:  I believe so.

THE COURT:  Okay.  So is this how it came into evidence to begin with, Plaintiffs' Exhibit 629?  Is that where I'm going to find it in the record, in other words?

MS. SHUBE:  I believe that plaintiffs used -- had a different number for the nonimpeachment document so there may be another plaintiffs' exhibit but it's the same document.

THE COURT:  Well, have one of your team look that up so I can find it in the record and not be confused by these multiple numbers, please.

1          But you can go ahead.

2          MS. SHUBE:  Okay.

3  BY MS. SHUBE:

4  Q.  Dr. Curlin, is this the article that you were referring to

5  just a moment ago with Mr. Fisher?

6  A.  Yes.

7  Q.  Didn't this article find that the strongest association

8  with continuing a pregnancy was decision certainty in having to

9  pay for the procedure out of pocket?

10  A.  I can't remember which was the, as you put it, strongest

11  finding.

12          MS. SHUBE:  Could we please turn to page 1 of this

13  article and if you could highlight right under "results."

14  Thank you.

15  BY MS. SHUBE:

16  Q.  And I'll read.  "Decision certainty and having to pay" --

17          THE COURT:  Wait just a minute, Miss Shube.  Where are

18  you?

19          MS. SHUBE:  Sure.

20          THE COURT:  Are you reading from the document?

21          MS. SHUBE:  Right on the third sentence.

22          THE COURT:  Okay.

23  BY MS. SHUBE:

24  Q.  "Decision certainty and having to pay fully out of

25  pocket" --

1    THE COURT:  Slowly, slowly, slowly, slowly, slowly.

2    MS. SHUBE:  My apologies.

3    THE COURT:  When you read, you go to the races, so

4    slow it down.

5    MS. SHUBE:  Okay.  I'm going to read so slow right

6    now.

7    THE COURT:  That's good.

8    BY MS. SHUBE:

9    Q.  "Decision certainty" –– and I'm going to skip over the

10   numbers –– "and having to pay fully out of pocket were most

11   strongly associated with continuing pregnancy."

12   Did I read that correctly?

13   A.  Yes, you did.

14   Q.  The article identified other factors that may have

15   contributed to the increase in the percentage of women

16   continuing their pregnancy.

17   Is that correct?

18   A.  I don't recall, but I would not be surprised if that was

19   the case.

20   Q.  Do you recall that the other factors included the drop in

21   abortion funds available to help patients pay for abortions?

22   A.  I do not.

23   MS. SHUBE:  Let's please turn to page 19, I believe,

24   and the paragraph should be "other factors."  Yes.  Thank you

25   so much.

CURLIN – CROSS/SHUBE                    82

BY MS. SHUBE:

Q.  I'll read starting at the second sentence, "That the proportion of women who qualified for assistance from an abortion fund dropped between pre-law and post-law periods, together with the finding that women who qualified for assistance from an abortion fund were more likely to proceed to abortion than those who would have to pay fully out of pocket, suggests that the drop in abortion funds available may have contributed to the increase in the percentage of women continuing pregnancy between the pre- and post-law periods."

Did I read that correctly?

A.  I do -- you did read that correctly, but I will say that that -- that could not explain why the -- it was viewing the ultrasound that mediated the difference statistically speaking.

Q.  Thank you.

A.  You would have expected the numbers to be consistent, whether they viewed the ultrasound or not, if viewing the ultrasound did not have an effect.

Q.  And why do you say that you would have expected the numbers to be consistent?

A.  So what they did in this study was, of course, looked at the proportion of women who continued pregnancy, but then they also throughout the study measured whether women looked at the ultrasound.  They recorded that.  And then when they went back and evaluated, they saw that the increase in the proportion of

1    women that continued their pregnancy was found among those

2    women who viewed the ultrasound.  It was not found among those

3    who didn't.  That's a kind of lay person's way of saying that

4    looking at the ultrasound mediated that association.

5    Q.  Is it your testimony that the other circumstances impacting

6    women from the pre-law -- between the pre-law and post-law

7    period could not have impacted the increase in the percentage

8    of women continuing pregnancy?

9    A.  No, that's not my -- that's not my testimony.  My testimony

10   is it could not explain the primary study finding, the finding

11   for which the study was designed, which was to look at the

12   impact of the ultrasound law and viewing the ultrasound.  Those

13   other things can't explain that finding.

14   Q.  And is it your testimony that the drop in abortion funds

15   could not have contributed to the increase in the percentage of

16   women continuing pregnancy between the pre and post law

17   periods?

18   A.  The same thing, unless -- actually, unless there's some

19   kind of confounding association between funds to provide an

20   abortion and whether one sees the abortion or not.  But without

21   that association, it could not explain the primary finding of

22   the study.

23   Q.  I'm going to move on.

24       Dr. Curlin, do you believe that many women have trouble

25   accessing abortion services?

A.  I'm aware that some women do.  And since there's lots of women, I would say, yes, that many women do.

Q.  And do you believe that access has become more limited over the past three decades?

A.  That is my understanding, yes.

Q.  And do you believe that one cause of limited access is a decline over the past three decades in the number of providers that perform abortions?

A.  That is my understanding as well, yes.

        MR. FISHER:  Your Honor, I'm just going to object here.  This line of questioning is outside the scope of the direct examination.

        THE COURT:  It seems to be, Miss Shube.

        What's the point of the questioning?

        MS. SHUBE:  Umm, the point of the questioning is this is -- these are part of -- it's referencing -- these are beliefs and arguments from a study that Mr. Fisher pulled up right when we started the questioning.  It's --

        THE COURT:  I've not read the article so let me ask.

        So are you representing that the article covers many factors that may result in the reduction in abortions and that one of them is viewing the ultrasound but there were others?  Is that your point?

        MS. SHUBE:  Actually, Your Honor, I was referring to -- I had moved on.  And at the beginning --

1    THE COURT:  Then you have to tell us what you're

2  referring to if there's a study in particular.

3    MS. SHUBE:  Sure.

4    So at the beginning of the testimony, Mr. Fisher

5  referenced several articles by Dr. Curlin.

6    THE COURT:  Okay.  So tell me which one.  Tell me

7  which one you're talking about.

8    MS. SHUBE:  And I am specifically referring to what I

9  have as PX633, but it's the -- it is the abortion provision

10  among practicing obstetrician-gynecologists.

11    THE COURT:  Is that -- wait a minute.  Is that PX633?

12  Is that what it is?

13    MS. SHUBE:  Yes, and I believe -- I'm sure it was

14  introduced with -- I'm not sure it was introduced.  It was just

15  referenced by Mr. Fisher.  Yes, this is the article.  And this

16  is the article that Mr. Fisher and Dr. Curlin referenced for

17  the percentage of obstetrician-gynecologists who perform

18  abortions.

19    THE COURT:  Okay.

20    MS. SHUBE:  And so I was just seeking to ask

21  Dr. Curlin additional questions about this article.

22    THE COURT:  You may, now that I know what it is

23  grounded in.

24    MS. SHUBE:  My apologies if that was unclear.

25    THE COURT:  It was unclear.  I accept your apology.

CURLIN – CROSS/SHUBE                    86

1          MS. SHUBE:  Thank you.

2    BY MS. SHUBE:

3    Q.  So my next question is whether you -- whether this article

4    states that access to abortion -- I'm sorry.  Let me just -- if

5    you don't mind, I'm going to just confirm what I already asked

6    you, so I don't repeat it.

7          Does this article state that access to abortion might be

8    particularly limited in rural areas, and especially in the

9    south and Midwest, where physicians are less likely to perform

10   abortions?

11   A.  Yes, it does.

12   Q.  And that abortion providers often face opposition from the

13   surrounding community?

14   A.  I don't remember if we said that, but I know that to be the

15   case.

16   Q.  And that research indicates that harassment of abortion

17   providers is especially common in the south and Midwest?

18   A.  I don't remember if we wrote that in this paper.

19          MS. SHUBE:  Could we please turn to page 5 of this

20   article.

21          THE COURT:  When was this article written, Dr. Curlin?

22          THE WITNESS:  It is published in 2011.

23          THE COURT:  Thank you.  The published date is what I

24   should have asked.  So thank you.

25

1   BY MS. SHUBE:

2   Q.  And could you scroll down a little bit.  Yes.  Thank you.

3       And I'll just read the last sentence --

4              THE COURT:  Wait.  Wait.  Show us where you are.

5              MS. SHUBE:  Right at, "Recent research," yes.  Thank

6   you.

7   BY MS. SHUBE:

8   Q.  The last sentence of this paragraph.  "Recent research

9   indicates that harassment of abortion providers is especially

10  common in the south and in the Midwest."  Did I read that

11  correctly?

12  A.  Yes, you did.

13  Q.  Thank you.  I'm finished with this article.

14      Dr. Curlin, a federal court in Illinois has discredited

15  your expert conclusions; is that right?

16  A.  Well, it depends on what you mean.

17  Q.  You were an expert in a case called Ford-Sholebo v. the

18  United States; is that correct?

19  A.  I was.  Sholebo, I believe it's pronounced.

20  Q.  Sholebo?

21  A.  Yes.

22  Q.  Thank you.  And the court held that your medical

23  conclusions could not be --

24             THE COURT:  You have to slow down, Ms. Shube.  You go

25  awful fast.  You're reading it, which is why you're going so

1    fast.  Pretend like you're standing on your feet in the well of

2    the court.

3              MS. SHUBE:  Okay.

4              THE COURT:  All right.  The Illinois court said what?

5    BY MS. SHUBE:

6    Q.  That your medical conclusions could not be credited because

7    of overall inconsistencies in your testimony; is that right?

8    A.  That is something that the judge said.

9              MS. SHUBE:  May I have a moment?

10             THE COURT:  Who was that?

11             THE WITNESS:  May I clarify, Your Honor?

12             THE COURT:  Just a minute.  Who was the judge?  That's

13   what I want to know.  Then I'll know whether to discredit the

14   judge's view.  I'm just kidding.  I'm just kidding.  I'm just

15   saying that out there for you guys.  It's not for the Seventh

16   Circuit.  Who was the judge?  Do you know, Dr. Curlin?

17             THE WITNESS:  Your Honor, I can see the judge's face,

18   but I do not recall the judge's name.

19             THE COURT:  Dr. –– or, Ms. Shube, do you know?

20             MS. SHUBE:  Yes.  The judge was Judge Rubén Castillo.

21             THE COURT:  Oh, yeah.  He's one of our finest judges.

22   I just have to say that.

23             THE WITNESS:  If I may, Your Honor, the judge agreed

24   with me about my ethical judgments, which was the primary

25   reason I was called.  The counsel that called me also asked me

1  to give my expertise in empirical research --

2          MS. SHUBE:  Objection, Your Honor.

3          THE COURT:  No.  Wait a minute.  You called his

4  credibility into question, and he's entitled to tell me his

5  side of it.

6          MS. SHUBE:  Okay.

7          THE WITNESS:  I was also asked by the attorneys that

8  called me, given my expertise in health services research and

9  applying evidence to a case to estimate the probability,

10  clinically, that an inmate who died had died of the condition

11  that the plaintiffs alleged he died of, which was a seizure

12  disorder.  And I did a statistical analysis and presented that,

13  and the judge did not find that analysis persuasive.  I

14  evidently did not explain it as well as I should have.

15          THE COURT:  Okay.  Fine.  Now we can go to the next

16  matter.

17          MS. SHUBE:  Your Honor, may I pull up the opinion?

18          THE COURT:  Yes.

19          MS. SHUBE:  Can we please pull up Plaintiffs' Exhibit

20  for Impeachment 637?

21          Could you please turn to page 40?

22          Could you please pull up paragraph 217.

23  BY MS. SHUBE:

24  Q.  I'll read it.  "Given the overall inconsistencies in

25  Dr. Curlin's testimony regarding Sholebo's cause of death, this

1    Court cannot credit his medical conclusions, as they are

2    primarily based on general statistical studies that have been

3    used to reach broad unfounded speculative conclusions about

4    Sholebo's cause of death."

5         Did I read that correctly?

6    A.  Is that a question for me?

7    Q.  It's a question for you.

8    A.  Yes, you did.

9    Q.  And the Court also discredited your testimony on the

10   applicable standard of care; is that correct?

11        COURT REPORTER:  Would you say that one more time, a

12   little slower.

13        THE COURT:  Say it again.

14   BY MS. SHUBE:

15   Q.  The Court also discredited your testimony on the applicable

16   standard of care; is that correct?

17   A.  Not with respect to the ethical obligations of the

18   physician, no.

19   Q.  Could we please turn to page 41.  And would you please

20   highlight starting at 226 -- actually it goes between 41 and

21   42.  I don't know if that's possible.  I'll read this first.

22        "In light of Dr. Curlin's inconsistent testimony on whether

23   medication may reduce a person's risk of death from seizure

24   disorder, this Court discredited --

25        THE COURT:  Whoa, whoa, whoa.  Stop.  Stop.  Listen to

1      yourself.

2              I'll read it:

3              "In light of Dr. Curlin's inconsistent testimony on

4      whether medication may reduce a person's risk of death from

5      seizure disorder, this Court discredits his testimony that the

6      standard of care did not require the MCC physicians to inform

7      Sholebo that he could die from a seizure disorder.  For the

8      same reasons, this Court discredits his testimony that although

9      taking medication reduces a patient's risk of dying from a

10     seizure disorder, it does not reduce the risk of dying from"

11     something –– "S-U-D-E-P" in capital letters.

12             Miss Shube ––

13             MR. FISHER:  Your Honor ––

14             THE COURT:  Just a minute.

15             Miss Shube, this testimony doesn't relate to this

16     witness's testimony.  This seems to be one of those tough,

17     knotty questions about a prison death that goes in an entirely

18     different direction than the litigation before me.  So I'm not

19     sure what your point is; but if the Court in –– if Judge

20     Castillo in rejecting the analysis and the logic of this

21     witness with respect to cause of death and other statistical

22     extrapolations was the issue at hand, it doesn't have anything

23     to do with what I have to do.  So let's go on to the next

24     thing.  How about that?

25             MS. SHUBE:  I'll move on Your Honor.  Thank you.

BY MS. SHUBE:

Q.  Dr. Curlin, in your opinion, is it ethical to delay
abortion patients further into pregnancy, including into the
second trimester?

A.  It's not ethical to intentionally delay pregnancy, but it
may be ethical to do other things that have, as a side effect,
the delay.

THE COURT:  Really?  Okay.

Miss Shube, go on.

BY MS. SHUBE:

Q.  In your opinion --

MS. SHUBE:  Actually, Your Honor, may I have a moment
to confer with my colleagues?

THE COURT:  Yes.

(Off-the-record discussion.)

MS. SHUBE:  Nothing further from the plaintiff.

THE COURT:  Redirect?

MR. FISHER:  Your Honor, may I have a moment to
confer?

THE COURT:  You may.

MR. FISHER:  Your Honor, we have nothing further for
Dr. Curlin.

THE COURT:  Does that complete all the questioning of
Dr. Curlin then so he can be excused from his subpoena?  Are
you done, Mr. Fisher?

1          MR. FISHER:  I am done, Your Honor.

2          THE COURT:  And Miss Shube?

3          MS. SHUBE:  Yes, thank you.

4          THE COURT:  Do you have any objection to his being

5     excused?

6          MS. SHUBE:  No, Your Honor.

7          THE COURT:  Dr. Farr Curlin -- I say it that way for a

8     reason, so I can smile at your nice name again.  Thank you very

9     much, sir.  You've completed your testimony and so you're

10    excused now.

11         THE WITNESS:  Thank you, Your Honor.

12         THE COURT:  Let's take a lunch break, lawyers.  It's a

13    little after 12.  We'll reconvene at 1:20.

14         MR. FISHER:  Thank you, Your Honor.

15         THE COURT:  Have a nice break.

16         MS. SHUBE:  Thank you.

17                         (Recess taken.)

18                         (Open court.)

19         THE COURT:  Good afternoon, Counsel.

20         MS. PAYNE:  Good afternoon.

21         MS. SHAH:  Good afternoon, Your Honor.

22         THE COURT:  Ms. Payne, how good of you to wear green

23    today.

24         Did you get up and think of the fact that it's

25    St. Patrick's Day when you were getting ready?

1          MS. PAYNE:  I did, Your Honor.

2          THE COURT:  Good job.

3          I'm going to schedule the afternoon in such a way that

4   we can end at an appropriate time so that, no matter where you

5   are, each of you can go get a green beer someplace, so I won't

6   wear you out completely.  I want you to be able to do that.

7          MS. SHAH:  We appreciate that.

8          THE COURT:  Miss Payne, have you got a witness for us

9   this afternoon to start us out?

10         MS. PAYNE:  Yes, Your Honor.  We'd like to call

11  Kristen Rinehart to the stand.

12         THE COURT:  All right.  Miss Rinehart, we'll watch for

13  your arrival.

14         Miss Rinehart, good afternoon.  You're on mute.

15         THE WITNESS:  Good afternoon.

16         THE COURT:  There you are.  Okay.

17         Can you hear me all right?

18         THE WITNESS:  Yes, I can.

19         THE COURT:  Okay, good.

20         You've been called to testify.  And before you

21  testify, you have to take the oath, so I'll ask the clerk to

22  administer the oath.

23         Would you raise your right hand and take the oath,

24  please.

25                    (Witness sworn.)

1          THE COURT:  Very good.

2          Miss Payne.

3              RINEHART, DEFENDANTS' WITNESS, SWORN

4                   **DIRECT EXAMINATION**

5    BY MS. PAYNE:

6    Q.  Kristen, thank you for being here today.

7        Could you please state and spell your name for the Court?

8    A.  Yes.  My name is Kristen Rinehart.  K-R-I-S-T-E-N,

9    R-I-N-E-H-A-R-T.

10   Q.  Have you ever had an abortion before?

11   A.  Yes, I have.

12   Q.  And how old were you when you had your abortion?

13   A.  I was 24.

14   Q.  Why did you decide to have an abortion?

15   A.  I decided to have an abortion for a few different reasons.

16       I had just started teaching, I had just finished my third

17   year of teaching, and I was living at home at the time with my

18   parents, and I was trying to save up money to move out

19   eventually, but I didn't feel like I was financially able to

20   care for a child on my own.

21       Also, the father and I were not together.  We were not a

22   couple.  So I decided to have an abortion.

23       And also since I was a teacher in the south -- I lived in

24   North Carolina at the time -- I didn't want the stigma of being

25   an unwed pregnant teacher in the south.

1  Q.  And where did you obtain your abortion?

2  A.  It was Carolina Center For Women, and that was in

3  Charlotte, North Carolina.

4  Q.  And is that an abortion clinic?

5  A.  Yes.

6  Q.  Do you know how far along you were in your pregnancy when

7  you had your abortion?

8  A.  Yes.  They told me I was about six-and-a-half weeks.

9  Q.  And what happened when you arrived at the abortion clinic?

10  A.  When I arrived, they had me fill out some paperwork, just

11  like medical history and that sort of thing, and then they took

12  me back to a room to do --

13         THE COURT:  What year would this have been,

14  Miss Rinehart?

15         THE WITNESS:  This was 2008.

16         THE COURT:  Thank you.

17  A.  So they -- after filling out the paperwork, they took me to

18  do a urine sample so that they could do a pregnancy test to

19  confirm the pregnancy.  Then they took me to another room to

20  test the RH factor to see if I was positive or negative, so

21  they did a blood test for that.  Then they took me to a third

22  room that was an examination room where they did a vaginal

23  ultrasound.  Following that, they took me to a fourth room, a

24  counseling room, where the physician talked to me about the

25  medical abortion.

BY MS. PAYNE:

Q.  I want to go back for just a moment to the ultrasound.

    Can you describe the set-up of the room where you had the ultrasound?

A.  Yes.  So I went in this room.  There was an exam bed to my right.  There was -- in front of me, there was a wall of cabinets and cupboards and things.  And then there was a big, bulky ultrasound machine, and it was -- the screen was facing the other direction.  And then there was a stool for the physician to sit on.

Q.  So could you see the screen?

A.  No, I could not.  From where I was laying on the bed, no.

Q.  Did the clinic personnel performing the ultrasound offer to show you the screen?

A.  No, she did not.

Q.  Could you hear the fetal heart beat?

A.  No, I could not.

Q.  What happened when she finished performing the ultrasound?

A.  After she finished the ultrasound, she told me to get dressed and then she would come back to get me in a few minutes.  After I put on my clothes, I turned to look at a still image of the ultrasound.

Q.  Can you describe what you saw?

A.  It was really hard to make out.  I had never been pregnant before or had an ultrasound before.  But it was

1  black-and-white.  I saw like a lot of white around the outside.
2  And then in the center, there was a big, black space.  And then
3  there was a smaller white figure in the middle, but I really
4  couldn't tell what it was.  Nothing was labeled or anything.
5  Q.  Did the clinic personnel offer you any explanation of the
6  image?
7  A.  No, they did not.
8  Q.  Have you had any ultrasounds since the time of your
9  abortion?
10  A.  Yes, I have had two ultrasounds.
11  Q.  Was that experience similar or different to your experience
12  at the abortion clinic?
13  A.  It was very different.
14      I have two daughters that I've had since my abortion.  And,
15  at the first, you know, appointments when, you know, you go to
16  have your first ultrasounds with your babies, I was about eight
17  to ten weeks with both of them, and it was a very different
18  experience because the ultrasound machine was turned.  It was a
19  much bigger machine, too, a much bigger screen, and it was
20  turned where the doctor and I were having a conversation and
21  she was letting me know about how big the baby was.  I actually
22  got to see the baby moving around, both my daughters moving,
23  and got to hear the heart beat, along with seeing their
24  movements, and so it was drastically different than the
25  abortion experience.

1   Q.  Going back to the abortion, what type of abortion procedure

2   did you have?

3   A.  I had a medication abortion or a chemical abortion.

4   Q.  And what was your understanding at the time of how

5   medication abortion works?

6   A.  The physician told me that it would be like a really heavy

7   period.  She said there would be a lot of bleeding, that there

8   could be some blood clots, that I would experience possibly

9   nausea and cramping.  So that was my understanding at the time.

10  Q.  Did you decide to take the pill?

11  A.  Yes, I did.

12  Q.  And what happened after you took the pill?

13  A.  After I took the pill --

14          THE COURT:  Where did you take the pill?

15          THE WITNESS:  I took the pill in the abortion clinic's

16  office in the fourth counseling room that I spoke of.

17          THE COURT:  Okay.

18  A.  So she gave me the pill, along with something to drink, and

19  she said that she could not be in the room at the time that I

20  took the pills, and she told me to make sure that this is

21  really what I wanted to do.  She left the room.

22      I did choose to take the pill.  Then after that, I went to

23  the check-out desk to schedule an appointment to -- I had to

24  have a follow-up appointment to make sure the abortion was

25  successful and completed.  So I made that appointment, and then

1   they gave me some birth control, and I called my friend to come

2   pick me up.

3   BY MS. PAYNE:

4   Q.  What happened after you left the clinic?

5   A.  After I left the clinic, I went to a friend's house to wait

6   for the next few days, because I had to insert the vaginal --

7   the pills vaginally two days after that first pill that I had

8   taken, so I went to his house to wait for the next few days,

9   like I said, until I had to insert those pills.

10  Q.  And what happened when you inserted those pills?

11  A.  Within the first 15, 20 minutes, I just experienced the

12  worst pain I had ever felt in my life up to that point.  It

13  was -- it felt like someone was stabbing me in the knives -- in

14  the abdomen with knives.  It felt just very, very horrible

15  pain.  And then I started bleeding after that.

16      I did spend the majority of the time in the bathroom

17  because it was just easier.  They did tell me, too, that I

18  would have to wear pads, which I did.  So I spent some of the

19  time laying on the floor, some of the time sitting on the

20  toilet waiting for the bleeding to stop.

21  Q.  Did you seek medical treatment at any point?

22  A.  I did not.

23  Q.  Why not?

24  A.  I did not want any other record of my abortion.  I didn't

25  want to have to go to the hospital and explain what was

1  happening.  Even though the pain was bad and there was a lot of

2  bleeding, I was hopeful that it would end soon, and I didn't

3  want to go to the hospital.

4  Q.  Were you aware when you passed the fetus?

5  A.  Yes.  I was actually sitting on the toilet at the time.  I

6  kind of felt something different that felt like I hadn't felt

7  before.  And I turned around and looked, and the fetus was in

8  the toilet.

9  Q.  How could you tell that it was the fetus?

10  A.  It was a really huge blood clot, and I just knew when I

11  looked.  I knew that was it.  It was different than anything

12  before.

13  Q.  And what was your reaction to seeing that?

14  A.  It was really hard to see that, like I said, because I knew

15  that's what it was, disbelief, and I just knew that what I had

16  done was wrong and that there was no going back from that

17  point, no reversing that, that it was just a moment of -- kind

18  of like an out-of-body experience I guess.

19  Q.  Once the abortion was over, how did you feel emotionally?

20  A.  Right after the abortion, I honestly felt relieved.  I felt

21  relieved I didn't have to be pregnant any more and worry about

22  how to raise a child, but that didn't last long.  I started

23  having lots of feelings of regret, lots of sadness.  I withdrew

24  from my friends because I just didn't want to -- I didn't want

25  anyone to know.  Very few people knew at that time.  I didn't

1    want anybody else to know.  So if I didn't have to go

2    somewhere, I really didn't.  I withdrew from almost everything

3    except for work.

4    Q.  And how long did these emotions last?

5    A.  They lasted about -- I mean, I've experienced them in

6    waves, you know, from that moment till now, but those intense

7    emotions lasted about two years.

8    Q.  And what changed at the end of those two years?

9    A.  So my friends and I, we -- I was working at a gym, and I

10   found a flyer about like a march for life put on by a local

11   pregnancy support center, and I kind of thought maybe that was

12   something that I could do, maybe I could, you know, go and walk

13   and maybe that would help me feel bleater.  So we went there,

14   and there were a lot of different booths set up about different

15   resources that the pregnancy center offered, and one of them

16   was about post-abortive counseling.  And I picked up a brochure

17   and kind of, you know, just held on to it and kind of thought

18   about it.  And then we participated in the walk.  We just

19   walked a couple of laps.  But I held on to that brochure.  And,

20   like I said, it kind of -- I wanted to talk to someone, but at

21   the same time I didn't because it was really hard to talk

22   about.  And part of me thought if I didn't talk about it that

23   it would just go away with time and get better.  So I didn't

24   want to drudge up those feelings.  But ultimately I did decide

25   to contact the pregnancy support center that was in my home

RINEHART - DIRECT/PAYNE                    103

1    town, and then I started going to a post-abortive support group

2    after that.

3    Q.  And did those feelings subside after the support group?

4    A.  It helped for a while.  You know, it made me feel a lot

5    better than before.  But I feel like when I -- it was still

6    always in the back of my mind.  I still -- no one else knew

7    outside of, like I said, a few people, and then my counselor

8    that I talked with every week at the -- for the support group.

9    So no one really knew.  I still felt like I -- even though I

10   felt a little better, there was still a lot of anxiousness on

11   my part because I didn't want to -- I didn't want anyone else

12   to find out.

13   Q.  And how long did those emotions last after that?

14   A.  I -- actually after that, I finished in, I think, spring of

15   2011.  My husband got a job offer.  He's originally from

16   Michigan.  We were living in North Carolina at the time.  He

17   got a job offer in Michigan.  So I was, you know, not wanting

18   to leave my family, but at the same time, very excited about

19   the idea of moving away.  I felt like if I moved away from the

20   state and the area where I had the abortion and kind of had,

21   like, a new life where, like, no one had to know about my

22   abortion, that you know, that that would help me feel better.

23   We moved in February of 2013 to Michigan.

24   Q.  So did the move help?

25   A.  It did help at first.  My husband and I did get pregnant

1  with our first daughter in summer of '13, so a couple months

2  after we had moved.  Being pregnant, you know -- and like I

3  said before, seeing the ultrasound with my daughter and

4  realizing, you know, what I did, and really thinking about

5  that, I mean, it weighed heavily on my mind.  Just every time I

6  would have an ultrasound, you know, like, thinking about the

7  child that I would have had.

8  Q.  Do you think that you made the right decision with respect

9  to your abortion?

10  A.  I do not think I made the right decision.  I regret it.  I

11  really thought that it would be -- I never thought abortion was

12  right, but I felt trapped.  I felt like that was the only

13  choice I felt like I had at the time.

14      So while I knew it wasn't right, I chose it any way.  I do

15  regret it because I do -- like I said, I have two daughters

16  since the abortion; and you know, they have a sibling that, you

17  know, they'll never get to meet.  And I often, you know, think

18  about that child, how old it would be and like, you know, what

19  it would be like, and you know just having a third child.

20      So I do regret my abortion.  I regret, you know, everything

21  that comes along with that abortion decision; and I, you

22  know -- like I said, I thought it would be -- I knew it would

23  be hard to go through with the abortion, but I didn't know that

24  there would be this much sadness and regret and still thinking

25  about it 12 and a half years later.

1    I thought as soon as I got over, like, the physical, you

2    know, act of abortion, and after some time had passed, I

3    thought it would be a lot easier; and I thought I could kind of

4    go back to life the way it was before the abortion, but I know

5    now that that's not possible.

6    Q.  Is there anything that you think could have changed your

7    abortion decision?

8    A.  Yes.  I do think a couple things could have changed that.

9    I think if I -- looking back now, if I would have seen the

10   ultrasound image, if I would have heard the physician explain,

11   you know, the size of my baby, and milestones at that time, if

12   I would have been able to hear the heartbeat, coupled with the

13   ultrasound and actually been able to see, like I said, my child

14   moving around and not just the still image, I would like to

15   think that would have made a difference in my decision.

16       Also, in North Carolina, there wasn't a waiting period at

17   the time.  So I felt like -- and also at the time, you could

18   only have the medication abortion if you were seven weeks or

19   before.  So when she told me I was six and a half weeks and she

20   told me I was just in time for the medication abortion, I think

21   if there would have been a waiting period where I would have

22   had an appointment the next day already set up but then I had

23   time to go home and think about it and really reflect on that

24   and the gravity of that choice before I did it, I think that

25   would have made a difference.

1    MS. PAYNE:  I have no further questions, Your Honor.

2    THE COURT:  Cross-examine.

3    MS. SHAH:  Your Honor, no questions from the

4    plaintiffs.  Thank you.

5    THE COURT:  Can the witness be excused, Miss Payne?

6    Put your audio on.

7    MS. PAYNE:  Oh, I'm sorry, Your Honor.  Yes, the

8    witness may be excused.

9    THE COURT:  Thank you, Miss Rhinehart.  You've

10   satisfied your subpoena, and you've finished your testimony; so

11   I send you on your way with good wishes.

12   THE WITNESS:  Okay.  Thank you, Your Honor.

13                 (Witness excused.)

14   THE COURT:  Now the next witness, Miss Payne.

15   Mr. Bartolomucci, I practiced all night saying your

16   name.

17   MR. BARTOLOMUCCI:  Spot on Your Honor.  Our next

18   witness is Dr. Donna Harrison.

19   THE COURT:  All right.  You don't get any

20   St. Patrick's Day celebration, Mr. Bartolomucci.  There's no

21   way you could pretend to be Irish.

22   MR. BARTOLOMUCCI:  Your Honor, I'm in Indiana on a

23   limited wardrobe.

24   THE COURT:  All right.  Let's see, Dr. Harrison,

25   right?  Your audio needs to be on.  You're muted.  Are you

1    there?

2             THE WITNESS:  I am there, sorry.  I un-muted.

3             THE COURT:  It gives me great personal pleasure to be

4    able to prompt somebody else on technology.  No apologies

5    needed, Dr. Harrison.

6             Dr. Harrison, you've been called as a witness; and so

7    you need to take the witness oath to tell the truth.  So I'll

8    ask the clerk to administer the oath.  Would you raise your

9    right hand and be sworn, please.

10                         (Witness sworn.)

11            THE COURT:  All right.

12        DONNA JOAN HARRISON, DEFENDANTS' WITNESS, SWORN

13                     **DIRECT EXAMINATION**

14   BY MR. BARTOLOMUCCI:

15   Q.  Good afternoon, Dr. Harrison.  Would you please state your

16   full name for the record?

17   A.  I am Donna Joan Harrison.

18   Q.  Thank you.  I'd like to call up a document at this time.

19   This is Stipulated Exhibit No. 6, which should be coming up

20   momentarily.  There it is.

21        Dr. Harrison, do you recognize this document?

22   A.  Yes, I do.

23   Q.  Is this the resumé that you supplied, along with your

24   expert report in this case?

25   A.  Yes, it is.

Q.  Is the information in this resumé correct or at least was it correct at the time when you provided it?

A.  Yes, it is.

Q.  Are you a doctor?

A.  Yes, I am.  I'm a board-certified obstetrician/gynecologist.

Q.  Where did you get your medical degree?

A.  My medical degree was at University of Michigan; and at the time, it was one of the top ten medical schools in the world; and I graduated at the top 10 percent of my class.

Q.  Do you today have a medical license?

A.  Yes, I do.  I'm licensed to practice in the state of Michigan.  I have had an unrestricted license to practice since residency.

Q.  Okay.  I think we can take down Stipulated Exhibit 6.

    Doctor, have you ever been a practicing OB/GYN?

A.  Yes, I was a practicing OB/GYN from 2000 -- I'm sorry. From 1990 to 2000, I had my office practice.

Q.  And could you briefly describe for us your former OB/GYN practice?

A.  Yes.  Well, I was in two OB/GYN practices when I -- right after I finished residency in Ann Arbor, I was an associate clinical professor at University of Michigan, while having a private practice with three other OB/GYNs in the Ann Arbor area.

1     After three years, I then went to the west side of the

2     state and practiced in a multi-specialty group, which included

3     four other OB/GYNs and a number of doctors of different

4     specialties.  In fact, all primary care doctors.

5         And I left that practice in 2000 for -- to fulfill a

6     obligation that I had to do two years of public policy work

7     because of a Truman Scholarship, which I had for part of my

8     undergrad and part of my medical school.

9     Q.  I think you mentioned that you were once a clinical

10    professor of obstetrics and gynecology at the University of

11    Michigan Medical Center.  Have you ever held any other

12    professorial positions?

13    A.  I'm currently teaching -- intermittently teaching classes

14    at Trinity International University in Chicago.

15    Q.  Okay.  Doctor, what is your current position?

16    A.  My current position is as CEO -- it was executive director

17    until about two months ago -- CEO of the American Association

18    of Pro-Life Obstetricians and Gynecologists.

19    Q.  And can we call that organization AAPLOG for short?

20    A.  Yes, or AAPLOG.

21    Q.  AAPLOG, thank you.

22        And what are your duties as the CEO of AAPLOG?

23    A.  As the CEO of AAPLOG, I'm responsible for the day-to-day

24    running of the organization.  I also am responsible for

25    oversight of the research aspects, which include composition of

practice bulletins and committee opinions.

Q.   And how long you have worked at AAPLOG?

A.   So I've been involved in the leadership of AAPLOG since
2000, but I have been an executive director since 2013.

Q.   And apart from your duties as director or CEO, which we've
discussed, could you describe your other work at AAPLOG over
the years?

A.   In 1996, as a representative of AAPLOG, I attended the
first -- the Reproductive Health Advisory Committee meeting
where the issue of approval of RU486, Mifepristone/Mifeprex was
being discussed by the FDA.  So I closely followed the approval
process since then.  I was actually chairman of the
subcommittee on Mifeprex for AAPLOG and then eventually
chairman of the Committee on Research and Public Policy.

Q.   Now, you mentioned both Mifeprex and Mifepristone.  Can you
tell me what the difference is between the two?

A.   Well, they are the same drug.  Mifeprex is the brand name
or the trade name.  The Mifepristone is the generic name.

Q.   Now, since joining AAPLOG, have you performed any research
regarding Mifeprex or Mifepristone?

A.   Yes, I have.

Q.   Can you tell me a little bit about that?

A.   Sure.  I have, along with a team of other physicians, been
responsible for looking at all of the adverse event reports
submitted to Food and Drug Administration after the use of

1  Mifepristone in the United States from 2000 to 2019.

2  Q.  Have you done any other studies relating to the safety or

3  efficacy of Mifepristone?

4  A.  I have done a couple of other studies looking at the FDA

5  approval process and concerns raised about the side effects of

6  Mifepristone.

7  Q.  Have you offered published articles in the field of

8  obstetrics and gynecology?

9  A.  Yes.

10  Q.  Approximately how many, Doctor?

11  A.  Half a dozen.

12  Q.  And would those articles be listed in your resumé?

13  A.  I think most of them are.

14  Q.  Okay.  I don't think we need to go over all of those.  The

15  resumé will speak for itself.

16      Have you authored/published articles relating to your

17  studies of Mifepristone?

18  A.  Yes, two.

19  Q.  Two, thank you.  I want to call up a document.  This is

20  Recollection Document No. 8.  Can you see that, Dr. Harrison?

21  A.  Yes.

22  Q.  Do you recognize this document?

23  A.  Yes.

24  Q.  Now, could you read into the record the authors and the

25  title of this article?

A.   Yes.   The title of the article is, "*Analysis of Severe Adverse Events Related to the Use of Mifepristone as an Abortifacient*."   The authors are Margaret M. Gary and myself, Donna J. Harrison.

Q.   Thank you.   Now, we're going to highlight another portion.

            THE COURT:   When was this published, Doctor?

            THE WITNESS:   2006.

            THE COURT:   Thank you.

BY MR. BARTOLOMUCCI:

Q.   And what is the name of the journal this was published in, Dr. Harrison?

A.   The *Annals of Pharmacotherapy*.

Q.   Was this study peer-reviewed?

A.   Yes.

Q.   Now, would you mind briefly describing the study for us?

A.   Sure.   The -- this study arose from a FOIA request, Freedom of Information Act, request to the FDA to release the adverse events which had been submitted to the FDA between 2000 and 2004.   We obtained many more than 607, but we then sorted through the adverse events until we found 607 unique adverse events.   So there were some duplicates, which we eliminated. We coded these adverse events using the National Cancer Institute's common terminology criteria --

            THE COURT:   You have to slow it down a little bit. The court reporter can't get it that fast.   We coded what?

1          THE WITNESS:  We coded the severity of these adverse

2     events based on the National Cancer Institute's common

3     terminology criteria for adverse events.  Myself and Dr. Peggy

4     Gary coded these.  We are both board-certified

5     obstetricians/gynecologists, and we compared them and agreed on

6     the final coding.

7     BY MR. BARTOLOMUCCI:

8     Q.   Thank you.

9          MR. BARTOLOMUCCI:  We can take down that document.

10    BY MR. BARTOLOMUCCI:

11    Q.   Now, Dr. Harrison, have you ever testified as an expert

12    witness in state or federal court in any case other than this

13    one?

14    A.   Yes.

15    Q.   And approximately how many times have you testified as an

16    expert witness?

17    A.   Probably around half a dozen, but I would have to go back

18    and look at my records to give you an exact number.

19    Q.   And when you have testified as an expert, have you ever

20    testified about the risks and complications of Mifepristone?

21    A.   Yes.

22         MR. BARTOLOMUCCI:  Your Honor, at this time, the

23    defendants would like to offer Dr. Harrison as an expert in the

24    field of obstetrics and gynecology and as an expert regarding

25    Mifepristone and Mifeprex.

1          THE COURT:  Any objection, Miss Powell?

2          MS. PAYNE:  No objection, Your Honor.

3          THE COURT:  The expert has been -- the witness has

4    been proffered as an expert.  There is no objection.  She may

5    proceed, and you may ask questions of an expert.

6          MR. BARTOLOMUCCI:  Thank you, Your Honor.

7    BY MR. BARTOLOMUCCI:

8    Q.  Dr. Harrison, I'd like to ask you a few questions about any

9    contraindications or any risks regarding Mifepristone.

10         First question:  Is Mifepristone contraindicated for

11   certain patients or in certain circumstances?

12   A.  Yes.

13   Q.  Okay.  Could you please tell us when Mifepristone is

14   contraindicated?

15   A.  To give you the complete list, I would ask that you would

16   put up my declaration.  But I can tell you for sure that the --

17   that Mifepristone is contraindicated when the pregnancy is not

18   in the uterus, when the pregnancy is ectopic, so that is

19   probably the most severe contraindication, the most serious

20   contraindication, because if a woman takes Mifepristone, and

21   the pregnancy is in her tube, then the pregnancy will not be

22   terminated by the Mifepristone, and the pregnancy will continue

23   to grow, rupture the tube, and she can die.

24   Q.  Are there any other contraindications for Mifepristone?

25   A.  There are.

The -- the presence of an IUD -- that's an intrauterine device, which is a contraceptive device -- in uterus is also a contraindication, probably because of the strong contractions induced by the second drug, misoprostol, but possibly also because both misoprostol and Mifepristone have an effect on the immune system to suppress infection, and the presence of an IUD may increase that.

Q.  Could you give us maybe one more example of a contraindication?

A.  If you have a presence of an undiagnosed adnexal mass, okay, that is where there's something beside the uterus that's called the adnexa, okay, so it's next to the uterus.  If you have -- if you have a ruptured ovarian cyst, if you have an ectopic pregnancy, another reason for an adnexal mass, which may not show a fetus but may show up as a large clot, that's a contraindication, again.

Q.  Well, thank you.

A.  Also --

Q.  Please continue.

A.  Go ahead.

Q.  Okay.  Are there risks of complications associated with Mifepristone?

A.  Yes, there are.

Q.  What are some of those risks?

A.  Those risks include hemorrhage, for a number of different

1    reasons.  One, the Mifepristone abortion, the Mifeprex

2    abortion, may not be complete, and tissue can be left inside.

3    As the gestational age of the pregnancy increases, the risk of

4    incomplete abortion increases as well.  If there's tissue left

5    inside the uterus, then the uterus cannot contract down and

6    stop bleeding.  That's why tissue left inside is so dangerous.

7        But in addition to that, Mifepristone itself has a direct

8    effect on the blood vessels inside the lining of the uterus and

9    causes those blood vessels not to be able to contract.  So some

10   of the major hemorrhages that I've seen in the adverse event

11   reports were in situations where there actually wasn't tissue

12   left inside, but the uterus itself simply could not contract to

13   stop the bleeding.  So both of those factors contribute to

14   hemorrhage being a major issue.

15       The second major complication is infection with tissue left

16   inside.  So if you have tissue left inside, you can get an

17   infection from the dead tissue that's left.

18       There have also been cases where tissue wasn't left inside

19   but the woman had a fatal infection from a bacteria called

20   clostridium sordellii.  There have been a number of women,

21   probably about seven or eight now at this point, who have died

22   from clostridium sordellii infections, and that's a normal soil

23   bacteria that most women can fight off with no problem.  But in

24   the presence of Mifepristone and misoprostol, the local immune

25   system is not capable of fighting off that infection in some

1  women, so they went from perfectly healthy to dead in two

2  weeks.

3  Q.  Thank you, Doctor.

4  A.  The third complication --

5  Q.  Yes, please.

6      Is there another complication?

7  A.  The third major complication is ongoing pregnancy.  And

8  when you have exposure to the second drug, misoprostol, that

9  ongoing pregnancy is now exposed to a drug, misoprostol, which

10  is known to cause birth defects.

11      So those are the three major complications, or four if you

12  count tissue left inside as itself a major complication.

13  Q.  Let's take a look at the FDA's label for Mifeprex.  So

14  we're going to call up Stipulated Exhibit 13.

15      Dr. Harrison, do you recognize this?

16  A.  Yes.

17  Q.  What are we looking at?

18  A.  This is the Mifeprex label, which is the document which

19  summarizes the information that the FDA thinks that a

20  practitioner should have prior to prescribing Mifeprex.

21  Q.  Have you ever heard of a black box warning?

22  A.  Yes.

23  Q.  What is a black box warning?

24  A.  So a black box warning is the mechanism that FDA uses for

25  those drugs which have serious or sometimes fatal side effects,

1 and the black box is used to call attention for the

2 practitioner about these side effects so that the practitioner

3 will then be able to appropriately counsel the patient on

4 serious side effects.

5 Q.  Does the Mifeprex label have a black box warning?

6 A.  Yes.

7 Q.  I'd like to zoom in to part of this document.

8     Is this part of the black box warning for Mifeprex?

9 A.  Yes.

10 Q.  Could I get you to read into the record what you see

11 highlighted on the screen?

12 A.  Yes.

13     "Warning:  Serious and sometimes fatal infections or

14 bleeding."

15 Q.  Thank you.

16     And that is part of the black box warning regarding taking

17 Mifeprex, true?

18 A.  That's correct.

19 Q.  Now, let's take a look at the next --

20     THE COURT:  Excuse me.  Let me ask a question, please.

21     Doctor, is this label still in effect?  I noticed at

22 the bottom of the page it said 2016, but I wondered if it was

23 still current.

24     THE WITNESS:  It is current.  2016 is the last time

25 that the FDA updated the label.

1          THE COURT:  Okay.

2          THE WITNESS:  The label prior to that was from 2000.

3          THE COURT:  Thank you.

4    BY MR. BARTOLOMUCCI:

5    Q.  We've moved on now to the second page of the label.

6         And is this another black box warning for Mifeprex?

7    A.  Well, the black box warning is usually the one in bold in

8    front at the very beginning, but this does contain information

9    that is contained in the black box warning, yes.

10   Q.  I see.

11        This appears to be a longer narrative?

12   A.  Yes.

13   Q.  I'd like to zoom in on part of this.

14        Could you read into the record the words that we've zoomed

15   in on?

16   A.  Yes.

17        "Because of the risks of serious complications described

18   above, Mifeprex is available only through a restricted program

19   under a Risk Evaluation and Mitigation Strategy (REMS) called

20   the Mifeprex REMS Program."

21   Q.  So, Doctor, what is a Risk Evaluation and Mitigation

22   Strategy or REMS?

23   A.  A REMS is a program that the FDA uses to apply

24   post-marketing restrictions to drugs or devices which they

25   think cannot be safely used without such restrictions.  So in

1    drugs that are approved but are -- have a risk profile that

2    varies based on how it's used, FDA applies the REMS to say,

3    "This is the way the drug can be used to minimize serious

4    risks."

5    Q.  Is it common for the FDA to impose a REMS program on a

6    prescription drug?

7    A.  No.

8    Q.  Can you elaborate on that?

9    A.  I think, of the hundreds of thousands of drugs available, I

10   think there are 70 or so with a REMS.  I would have to look up

11   that exact number, but I think it's around 70.  It's not

12   common.

13   Q.  Let's now go to another page of this document.  This is

14   going to be page 13, and we're going to be looking at Table 4.

15       Are you able to see Table 4, Doctor?

16   A.  Yes.

17   Q.  We can zoom in on that.

18   A.  Thank you for zooming in.

19   Q.  Okay.  We're going to try to do that.

20   A.  It's good.  I can see it.

21   Q.  We're going to try to zoom in.  My technology wizards are

22   on the job.  There we go.

23   A.  Thank you.

24   Q.  Now there is a row labeled "complete medical abortion."

25       Do you see that?

A.  I do.

Q.  And under the heading "less than 49 days," it says "98.1."

Do you see that number?

A.  I do.

Q.  Does this mean that, in 1.9 percent of cases, at less than 49 days of gestational age, Mifeprex does not result in a complete abortion?

A.  That is correct, so that's about one out of 50 women.

Q.  And in that same row, over on the right, under the heading "64 to 70 days," it says "92.7."

Do you see that?

A.  Yes.

Q.  Does this mean that, in 7.3 percent of cases, at 64 to 70 days of gestational age, Mifeprex does not result in a complete abortion?

A.  That's correct, so that's about one out of 15, roughly, women.

Q.  When Mifeprex fails to achieve complete abortion, what happens to the woman?

A.  She needs to have a surgical completion, so she needs to have a D&C.

Q.  And by "completion," you mean -- do you mean to complete the abortion?

A.  Correct, to remove the retained tissue that is not completely passed after the Mifeprex and misoprostol.

1   Q.  Does the FDA consider it to be a complication when Mifeprex

2   fails to achieve complete abortion?

3   A.  Yes.

4        MR. BARTOLOMUCCI:  Okay.  I think we can take down

5   this document.

6        We're going to put up another document which is

7   Recollection Document Number 7.

8   BY MR. BARTOLOMUCCI:

9   Q.  Now, I will represent to you that this is the first page of

10  the document.

11       Oh.  No.  I'm sorry.  It's not the first page of the

12  document.  This is the first page of the document,

13  Dr. Harrison.

14       Can you see that?

15  A.  Yes.

16  Q.  Are you able to recognize this document?

17  A.  Yes.

18  Q.  And could you tell us what we're looking at?

19  A.  We're looking at a training PowerPoint that was produced

20  apparently by the World Health Organization and the CIOMS,

21  Committee on International Organizations of Medical Sciences, I

22  believe, is what CIOMS stands for.  So this represents a

23  consensus document of researchers around the world as to how to

24  describe adverse events.

25  Q.  Now, you said that CIOMS stands for Committee on

1   International Organization of Medical Science.

2       Is it possible --

3   A.  I believe.

4   Q.  Is it possible that the first word is "Council" instead of

5   "Committee"?

6   A.  Oh, yes, it could be "Council."  Sorry about that.

7   Q.  So CIOMS stands for Council of International Organization

8   of Medical Science; do I have that right?

9   A.  Yes, that's my understanding.

10  Q.  Now, if we would go to page 10 of this document, what, if

11  anything, does this page of the document tell us, Dr. Harrison?

12  A.  This page of the document is the understanding of -- it's

13  sort of a numerical description of what words mean.  So when

14  researchers use the term "very common" in terms of adverse drug

15  reactions, they mean an event that happens to more than one out

16  of ten people.

17      When they say "common," they mean an event that happens

18  from one in a hundred to one out of ten people.

19      When they say "uncommon" or "infrequent," it's an event

20  that occurs in one out of a thousand up to less than one in a

21  hundred.

22      When they say "rare," it's one in a thousand to one in

23  10,000.

24      And "very rare" is less than one in 10,000.

25      So the words "common" -- excuse me -- "very common,"

1  "common," "uncommon," "rare" and "very rare" actually have a

2  numerical meaning that is accepted.

3  Q.  So according to this document, an adverse drug reaction in

4  2 percent or 7 percent of patients should be characterized as

5  what?

6  A.  Common, by definition.

7  Q.  According to this document, the complication rate for

8  Mifepristone should be characterized as what?

9  A.  Common, because according to the table that we looked at --

10  the FDA table, which is a summary of studies, which the FDA

11  reviewed, the rate of need for surgical intervention is

12  somewhere between 2 and 7 percent.  That puts it in the common

13  category.

14  Q.  According to this document, is it correct to characterize

15  the complication rate of Mifepristone as rare or very rare?

16  A.  No.

17  Q.  Thank you.  I have nothing further on that document, so we

18  can take it down.

19      Let's shift gears a bit now, Doctor, and talk about

20  ultrasounds and physical exams, okay?

21  A.  Okay.

22  Q.  Are you aware if Indiana law requires before an abortion an

23  ultrasound and an in-person physical examination of the woman?

24  A.  That is my understanding.

25  Q.  When you were a practicing OB/GYN, did you perform

1  ultrasounds on pregnant women?

2  A.  Yes, I did.  I was actually certified by the American --

3  AIUM, American Institute for Ultrasound in Medicine.

4  Q.  Are you able to tell me roughly how many times you've

5  performed an ultrasound on pregnant women?

6  A.  Well, I'm a -- in my ten years of practice, I would

7  routinely scan patients at the first visit because that is the

8  best time to date the pregnancy; and according to ACOG, a

9  pregnancy that does not have an ultrasound before 20 weeks is

10  considered an inadequately dated pregnancy.

11      So it's very important that for dating purposes --

12          THE COURT:  The question, Doctor, is how many times

13  have you done this?  Ballpark it.

14          THE WITNESS:  Three to 5,000.

15          MR. BARTOLOMUCCI:  Thank you.  I think that will

16  suffice.

17  BY MR. BARTOLOMUCCI:

18  Q.  Now, are ultrasounds sometimes performed before providing

19  an abortion?

20  A.  Yes, that's my understanding.

21  Q.  Now, what is the medical benefit, if any, of performing an

22  ultrasound before performing an abortion?

23  A.  Well, there are a number of benefits in general, the most

24  important benefit being accurate dating of the gestational age

25  of the pregnancy, because the risks, whether it's surgical or

1    medical, increase as the gestational age of the pregnancy

2    increases.

3         Further, you can document where the pregnancy is at.  Is it

4    in the uterus or is it in the tubes?  Even though you can't see

5    a pregnancy oftentimes in the tubes, in that oftentimes you

6    can't -- oftentimes there isn't a fetus present to make a

7    dating when the pregnancy is in the tubes.  Still, if you have

8    a patient that you expect to be eight weeks pregnant and

9    there's nothing in the uterus, you have a very high suspicion

10   that this is an ectopic pregnancy, if the dates are accurate.

11   So it gives you that information.

12        If you're doing a surgical abortion, it gives you the

13   information about where the uterus is located.  Is it tilted

14   forward?  Is it tilted backwards?  Is it midposition?  And

15   that's important because that determines the direction of your

16   instruments.  If you think a uterus is tilted forward and it's

17   tilted backward and you insert instruments, assuming the uterus

18   is tilted forward, you have a higher risk of perforation of the

19   uterus.  So it gives you that kind of information.

20   Q.  Now, thinking specifically about prescribing Mifepristone

21   to end a pregnancy, are there any other benefits of performing

22   an ultrasound beyond what you've already testified to?

23   A.  Well, the most important is the gestational age of the

24   pregnancy because the risks increase as the gestational age of

25   the pregnancy increases.

1      So if you have a patient at six weeks, you know, according

2  to the table that we just looked at, she has about a one out of

3  50 chance that she will end up needing surgery.

4      If you have a pregnancy that she thinks is six weeks but is

5  actually 14 weeks, then she has a 30 percent chance, a one out

6  of three chance, of needing surgery; and that information is

7  important when you are doing informed consent for a patient

8  because informed consent should involve patient-specific risks

9  for that patient for that procedure.  So that's important.

10      In addition, sometimes an ultrasound can pick up an IUD,

11  which is a contraindication to using Mifeprex; and if the

12  ultrasonographer is paying attention to the adnexa, that is,

13  the area next to the uterus, sometimes you can pick up an

14  ectopic pregnancy or some other --

15          THE COURT REPORTER:  Can she repeat --

16          THE COURT:  Wait, wait.  You can pick up an ectopic

17  pregnancy.  Slow it down a little bit, Doctor.

18          THE WITNESS:  Sorry.  I'll try to do better here.

19          You can pick up an ectopic pregnancy or an ovarian

20  mass that can be, you know, a rupture and ectopic pregnancy or

21  some other problem, which is again a contraindication to the

22  use of Mifeprex.

23  BY MR. BARTOLOMUCCI:

24  Q.  I'm going to put up one more document, which is

25  Recollection Document No. 4.  Are you able to see that,

1  Dr. Harrison?

2  A.  Yes.

3  Q.  We're going to zoom in a bit on the top of the document.

4  Now, do you recognize this document?

5  A.  Yes.

6  Q.  Can you tell us what this is?

7  A.  This is an ACOG Practice Bulletin, and it's Medical

8  Management of First Trimester Abortion.

9  Q.  What is the date of this publication?

10  A.  March of 2014.

11  Q.  Just for the record, do you want to tell us what ACOG is?

12  A.  ACOG is the American College of Obstetrics and

13  Gynecology -- American College of Obstetricians and

14  Gynecologists.  Excuse me.

15  Q.  So thank you.  We're going to go to page 8 of this

16  document.  We're going to zoom in on part of the second column.

17  Are you able to see that, Dr. Harrison?

18  A.  Yes.

19  Q.  Could you please read into the record the heading in bold

20  next to the triangle?

21  A.  Yes.  It says, "Is ultrasonography useful in the medical

22  management of abortion before treatment?"  And then it says,

23  "Before medical abortion is performed, gestational age should

24  be confirmed by clinical evaluation or ultrasound examination."

25  Q.  Do you agree with what ACOG wrote there?

A.   Yes.

Q.   Now, to your knowledge, did ACOG ever change the advice that we're looking at now?

A.   No, to my knowledge they did not, although this practice bulletin has been updated.

Q.   Okay.  Thank you.

     Thank you.  We can take that down.

     Let's talk about in-person physical exams.  And I assume you've performed plenty of those, so I won't ask you to estimate the number.

     What is the medical benefit, if any, of performing an in-person physical examination of a woman before prescribing Mifepristone to terminate a pregnancy?

A.   Well, there are several benefits.  One is to find out whether or not she has an IUD, because oftentimes, the IUD string is in place; and in some women, because it's a long-term contraceptive, some women forget.  I had a couple of patients that forgot they had an IUD in place; and on pelvic exam, I discovered the string.  So it is possible, and that is a contraindication to Mifeprex.

     Another reason is it allows you some ability to screen for sexually transmitted infections.  Now, sexually transmitted infections can be screened in a number of different ways --

               THE COURT REPORTER:  Could she please slow down?

               THE COURT:  Slow down.  Slow down, Dr. Harrison.

1              THE COURT REPORTER:  Please start over.

2              THE COURT:  Start over with that answer.  You screen

3    for sexually transmitted disease, right?

4    A.  Which allows to you an opportunity to screen for sexually

5    transmitted diseases, which can be screened for by a blood

6    test; but if you see pus, purulent discharge coming from the

7    cervix, it will increase your suspicion.  It also allows you to

8    do an exam on the woman to see how much -- how big the uterus

9    is, is it consistent with the dates that she has, and to screen

10   for any other physical problems which would make emergency

11   surgery difficult.

12        So since we know that there are some percent of women who

13   will have to have emergency surgery to complete the abortion,

14   it is wise for a practitioner to know ahead of time whether

15   this is a woman who has a severely anteflexed uterus that is

16   tilted way forward, whether she has fibroids that would

17   interfere, whether she has any other problems.

18        And sometimes, you can pick up an ectopic pregnancy when

19   you're doing an exam.  I have picked up ectopic pregnancies on

20   physical exam that were missed on the ultrasound.  So it gives

21   you more information and the combination of physical

22   examination and ultrasound is really the most efficient way to

23   screen a woman for contraindications.

24             THE COURT REPORTER:  Can we hold on?

25             THE COURT:  Hold on.  The court reporter needs a

1   minute.

2                    (Off-the-record discussion.)

3           THE COURT:  Okay.  We're back in business.

4   BY MR. BARTOLOMUCCI:

5   Q.  Okay.  Doctor, I think with your last answer, you predicted

6   my next question, which is what is the medical benefit, if any,

7   of performing both an ultrasound and a physical exam before

8   prescribing Mifepristone to terminate the pregnancy?

9   A.  Well, ultrasound gives you different information than a

10  physical exam does; but the combination of both allows you to

11  screen physically and also intrauterine.  So the ultrasound

12  looks inside the uterus and can sometimes look and find things

13  beside the uterus.

14      The physical exam allows you to physically feel what the --

15  the shape and the position of the uterus, as well as allows you

16  to judge the amount of pain that a woman has when you go beside

17  the uterus, which is important for diagnosing an ectopic

18  pregnancy.

19  Q.  Thank you, Dr. Harrison.

20          MR. BARTOLOMUCCI:  Your Honor, I have no further

21  questions for this witness at this time.

22          THE COURT:  Okay.  Cross-examine, Miss Powell.

23          MS. POWELL:  Thank you, Your Honor.

24

25

1        **CROSS-EXAMINATION**

2    BY MS. POWELL:

3    Q.  Dr. Harrison, my name is Michael Powell.  I'm going to be

4    asking you some questions on behalf of plaintiffs this

5    afternoon.

6         To begin, I'd like to return to your employment history.

7    You worked at AAPLOG, the American Association of Pro-Life

8    Obstetricians and Gynecologists, for the past 20-plus years.

9    Is that what you testified to?

10   A.  Yes, I have been involved in the leadership there.  I was

11   formerly employed as executive director.  Prior to that, I was

12   on the board and in -- and chairman and president.

13   Q.  Were those full-time positions?

14   A.  Yes, yes, they were more than full-time positions.

15   Q.  AAPLOG is an antiabortion organization; is that right?

16   A.  No.  AAPLOG is a Hippocratic medical organization.  We do

17   not think that killing human beings is a therapeutic option.

18   Q.  And by "killing humans beings," you're referring to

19   abortion; is that right?

20   A.  Well, we're referring to killing humans beings, whether

21   they are inside the woman or outside the woman.

22           THE COURT:  Does it include abortion, Doctor?

23           THE WITNESS:  The term -- the reason it's difficult to

24   answer that question is the term "abortion" has about 16

25   different medical definitions.

1        THE COURT:  Well, given those definitions -- wait just

2    a minute.  Given those definitions, does it include that, any

3    of them?

4        THE WITNESS:  It includes -- it includes elective

5    abortion, yes.  It includes elective abortion.

6        THE COURT:  Not trying to be cute; just get the

7    answers.

8        THE WITNESS:  Yes.

9    BY MS. POWELL:

10   Q.  It's AAPLOG's position that elective abortion has no place

11   in the practice of medicine; isn't that right?

12   A.  That's correct.

13   Q.  Is that your personal belief as well?

14   A.  Yes.

15   Q.  Now, Dr. Harrison, because of your work with AAPLOG, it's

16   been over 20 years since you maintained a regular clinical

17   practice; isn't that right?

18   A.  That's correct.

19   Q.  During the years that you were practicing from 1990 to

20   2000, you only performed a single abortion during that time; is

21   that right?

22   A.  That is correct.

23   Q.  Was that a medical abortion?

24   A.  No.

25   Q.  It was a surgical abortion?

1  A.  Yes.

2  Q.  During your time that you were practicing, did you ever

3  review ultrasounds that were performed by another practitioner?

4  A.  Yes.

5  Q.  Did you do so frequently?

6  A.  Yes.

7  Q.  Dr. Harrison, you've also previously offered expert

8  testimony on the subject of safety -- of the safety of medical

9  abortions as you testified on direct, is that right?

10  A.  Yes.

11  Q.  And your testimony relating to the safety of medical

12  abortions has previously been excluded, hasn't it?

13  A.  Well, I know "excluded" is a legal term.  I know there was

14  a problem in one case.

15  Q.  You only recall a problem in one case?

16  A.  That is my -- that is my recall for my testimony on safety.

17  Q.  What case was that?

18  A.  That was a case in North Dakota.

19  Q.  Do you recall testifying on behalf of the State in the case

20  of *Oklahoma Coalition for Reproductive Justice v. Cline* in

21  Oklahoma state court?

22  A.  Yes, I do.

23        THE COURT:  Wait a minute.  When was that,

24  Miss Powell?

25

BY MS. POWELL:

Q.  Dr. Harrison, do you recall when that was?

A.  I don't.  I would have to look back.

Q.  Do you recall that the case involved challenges to Oklahoma's restrictions on medical abortion?

A.  Yes, I think that's correct.

Q.  Do you recall that your testimony was excluded on grounds that included the fact that you lacked the appropriate qualifications to offer an opinion?

A.  I think actually that portion of my testimony was regarding FDA approval process.  So because -- my recall, as a -- I'm not a legal scholar but my recall is that because I did not hold office at the FDA, that I was not qualified to comment on the FDA approval process.

Q.  And with regard to the FDA approval process, was the opinion that you offered, did it pertain to the approval of Mifeprex?

A.  I believe that was part of my testimony.

Q.  And part of your testimony that was excluded, just to clarify?

A.  That -- that is my understanding but I don't -- I never got follow-up from the lawyers about what actually happened.

Q.  You mentioned a North Dakota case, when I asked you about issues with your previous testimony relating to the safety of medical abortion.  Was that the case of *MKB Management*

1  *Corporation v. Burdick*?

2  A.  Yes.

3  Q.  The case of *MKB Management Corporation v. Burdick* was

4  litigation involving challenges to restrictions placed by the

5  state of North Dakota on physicians performing abortions, is

6  that right?

7  A.  That's my recall.

8  Q.  And the court concluded that you were not a very credible

9  witness; is that right?

10 A.  Yes.  The judge who was -- later lost his position because

11 he was sexually harassing his clerk and who opened the case

12 stating that -- at the very beginning saying that he would --

13 he was there to ensure that women's reproductive rights were

14 followed, that is the judge who found my testimony not

15 credible.

16       MS. POWELL:  Your Honor, I'd like to move to strike

17 significant portions of that answer as nonresponsive.

18       THE COURT:  I won't grant the motion to strike.  But

19 I'm not sure I'll weigh it into any decision that I make.  I

20 don't even know who the judge is.

21 BY MS. POWELL:

22 Q.  And Dr. Harrison, in the case of *Burdick*, you were serving

23 as a State's primary expert regarding the safety and efficacy

24 of medical abortions; is that right?

25 A.  That's correct.

1  Q.  If you turn to the opinions regarding the State's

2  medical --

3          THE COURT:  You're reading, so your head is down like

4  this, and you're going too fast, Miss Powell.  I'm over here.

5          MS. POWELL:  I apologize, Your Honor.

6          THE COURT:  Put your monitor up or your paper up or

7  something.

8          MS. POWELL:  I'll do my best, Your Honor.

9          THE COURT:  Thank you.

10 BY MS. POWELL:

11 Q.  Dr. Harrison, I'd like to turn to the opinions regarding

12 the safety of medical abortions that you've offered today in

13 this case.

14     Do you recall testifying on direct examination that it is

15 not correct to characterize the complications from medical

16 abortion as rare or very rare?

17 A.  Yes.

18 Q.  Do you have an understanding that scholars in this field

19 differentiate between "complications" and "major

20 complications?"

21 A.  Which scholars?

22 Q.  Scholars generally in this field.

23 A.  Well, there are a lot of scholars in this field.

24         THE COURT:  Are you aware of any scholars in the field

25 who make that distinction?

1          THE WITNESS:  Yes.

2     BY MS. POWELL:

3     Q.  The opinion you've offered previously in this case

4     pertained in part to the opinion of Dr. Grossman; is that

5     right?

6     A.  That's correct.

7     Q.  Dr. Grossman is one such scholar in this field?

8     A.  He is one such scholar.

9     Q.  And he has opined, hasn't he, that complications from -- or

10    excuse me, that major complications from abortion are very

11    rare?  Isn't that right?

12    A.  He has --

13          THE COURT:  Are you aware of that?

14          THE WITNESS:  Yes, he has written that.

15    BY MS. POWELL:

16    Q.  One of the reasons that your -- or excuse me.  Taking a

17    step back.

18        Do you have an understanding of what Dr. Grossman

19    classified as major complications in offering that opinion?

20    A.  Yes.

21    Q.  What is that understanding?

22    A.  I would have to pull up his paper to quote it.  So if you

23    want to pull up the paper, I'm happy to find the spot in the

24    paper where he defines major complications.

25    Q.  Sure.  Can we pull up what's been marked as Plaintiffs'

139

1   Impeachment Exhibit 838?  And then can I direct -- can we pull

2   that up?

3        And then can I direct you, Dr. Harrison, to start with

4   page 7, paragraph 22.  Do you see the term "a major

5   complication" used in paragraph 22?

6   A.   Yes.

7   Q.   Would you agree --

8   A.   Excuse me.  I'm sorry.  I spoke too fast.  He said "serious

9   complications requiring urgent care."

10  Q.   That's the first sentence; is that right?

11  A.   Correct.

12  Q.   And then in the next sentence, he makes reference to

13  "clinically significant adverse events," fourth line down.  Do

14  you see that?

15  A.   I see that.

16  Q.   And did you understand he was defining that as treatment

17  given in an emergency department, hospital admission, surgery,

18  blood transfusion or death?

19  A.   Yes.

20  Q.   And then two lines down from that, he references "major

21  complications;" is that right?

22  A.   Yes.

23  Q.   And do you see the definition of major complications as

24  "serious, unexpected adverse events requiring hospital

25  admission, surgery, or blood transfusion"?

1   A.  I see that.

2   Q.  So with that understanding of how Dr. Grossman used the

3   terms --

4           THE COURT:  Wait just a minute.  Your paper went over

5   your microphone.  So we didn't catch those words.

6           MS. POWELL:  I apologize, Your Honor.

7   BY MS. POWELL:

8   Q.  Dr. Harrison, with that understanding of how Dr. Grossman

9   has used the terms "serious complications requiring urgent

10  care," "clinically significant adverse events" or "major

11  complications," is it your position that it's incorrect to

12  characterize major complications as rare or very rare?

13  A.  Yes, for two reasons.  One, because that .31 percent does

14  not meet the definition of very rare as we talked about before.

15  And for the second reason, that in his Upadhyay study, they did

16  not actually screen for all the codes that could have been used

17  for complications.  So for example, in the Upadhyay study, they

18  only looked at emergency room visits that were coded by the

19  emergency room physicians as being from legal induced abortion.

20  But they didn't look at codes from spontaneous abortion and

21  that's an issue because many women who have medical abortions

22  are told to tell the ER doc they are having a spontaneous

23  abortion and not a medical work.

24          They also didn't use any of the codes.  They didn't collect

25  any of the information on codes from undetermined, whether it

1    was legal or illegal.  So there were actually three sets of

2    codes that they did not look at.  They only used one small

3    coding group which was only for those complications recognized

4    as legal induced abortion.

5        The second thing is in that Upadhyay paper, they didn't --

6    they took things like convulsions, you know, seizures, and

7    didn't define that as a serious event.  I think a woman having

8    a seizure after a medical abortion would consider that a

9    serious event.

10       They also did not, in the Upadhyay study, have any way of

11   tracking deaths.  So there's some serious methodological

12   problems with the Upadhyay study.

13       In the safety of medical abortion provided through

14   telemedicine study, there is a significant concern because they

15   did not actually -- it's unclear --

16       Let's put it this way.  It's unclear how they screened for

17   treatment in the emergency department.  My understanding was

18   they looked at the records of patients that came back, but

19   there's a significant loss to follow-up rate in the abortion

20   industry.  And what that means is often women who have

21   abortions and have complications do not have that complication

22   taken care of by the abortionist.

23       And in my review of the adverse events submitted to the

24   FDA, there were cases where even a woman's death was not

25   recognized until the abortionist saw it in the newspaper

1    report.

2        So I think the funnel, the sorting that the acquisition of

3    data on complications from medical abortions is fraught with

4    problems.  And I think these papers represent an absolute

5    minimum number but not the actual number of women who have

6    complications after abortion.

7    Q.  So Dr. Harrison, let's discuss some other papers then.

8        In forming your opinion regarding the safety of medical

9    abortions that you've offered here today, did you rely on

10   the -- actually taking a step back.

11       One of the reasons that your opinion was excluded in the

12   *Burdick* case was that your opinion lacked scientific support;

13   is that right?

14   A.  I actually don't know what the judge was talking about.

15   Q.  You recall the judge commenting that your opinions lacked

16   scientific support?

17   A.  I quoted the scientific literature as I'm quoting today.

18   So I don't know what the judge was taking about.

19   Q.  My question is whether you recall that that was a comment

20   the judge had made in deeming your testimony not very credible?

21   A.  I didn't actually read the judge's comments.  So all I know

22   is what I've heard.

23   Q.  And what you've heard -- or excuse me.  Withdrawn.

24             THE COURT:  When was the *Burdick* case?

25             MS. POWELL:  Your Honor, we can introduce it, if

necessary.  The opinion to which I referred --

THE COURT:  Just need the date.

MS. POWELL:  One of -- one of them was in 2013.

THE COURT:  And was it a state court judge?

MS. POWELL:  Yes, Your Honor.  It was the East Central
Judicial District for the County of Cass in the state of North
Dakota.  Please don't ask me where any of those are.

THE COURT:  That may be part of Dr. Harrison's point.

BY MS. POWELL:

Q.  Dr. Harrison, turning to the scientific support for the
opinions you've offered here today, you relied on a bulletin
from the American College of Obstetricians and Gynecologists in
coming to your opinion on the safety of medical abortion, is
that right?

A.  That's correct.

Q.  And that bulletin provided a -- excuse me, provided a
comparison of issues pertaining to surgical and medical
abortion?

A.  Yes.

Q.  And the figures from that bulletin upon which you rely were
related to the fact that medical abortion takes longer to
complete than surgical abortion?

A.  Well, when you say "the figures," I quoted from that --
from that practice bulletin.

Q.  So Dr. Harrison, your quotation from the practice bulletin

included the practice bulletin's mention that medical abortion

takes longer to complete; is that right?

A.  Correct.

Q.  The fact that medical abortion takes longer to complete,

that's not a major complication, is it?

A.  Well, it depends on what's involved in the completion

process.  If you have a major hemorrhage in the completion

process, if you have to have surgery to complete the process,

both of those are -- those are complications.

Q.  Standing alone, is the fact that the procedure takes longer

to complete a major complication?

A.  Well, if the procedure takes weeks and weeks and she's

bleeding for weeks and weeks, that would be considered a major

complication.  Anything longer than about ten minutes, a

surgical abortion takes ten minutes.  A medical abortion

obviously doesn't take ten minutes.  So I'm not exactly sure

how to answer your question.

Q.  From your testimony just now, don't -- then, 100 percent of

the women that undergo medical abortions take a longer time to

complete.  Is it your testimony that a hundred percent of women

who undergo medical abortion suffer from major complications?

A.  No, that has never been my testimony.

Q.  All right.  You also quoted the bulletin from the American

College of Obstetricians and Gynecologists, with respect to the

finding that medical abortion requires more active patient

1  participation; is that right?

2  A.  That's correct.

3  Q.  The requirement for more active patient participation is

4  not a major complication, is it?

5  A.  No.

6  Q.  You've also relied upon the bulletin from the American

7  College of Obstetricians and Gynecologists for its finding

8  regarding medical abortions' association with higher reported

9  rates of bleeding and cramping; is that right?

10  A.  Yes.

11  Q.  Are higher reported rates of bleeding and cramping alone a

12  major complication?

13  A.  Depends on how high the rate of bleeding and cramping is.

14  Q.  You have also cited the bulletin for its finding that

15  medical abortion has lower success rates than surgical

16  abortion; is that right?

17  A.  That's correct.

18  Q.  Is it your testimony that the abortion procedure failing to

19  terminate the pregnancy, standing alone, is a complication of

20  medical abortion?

21  A.  Yes.

22  Q.  Is it your testimony that that's a major complication?

23  A.  It's a severe complication.  It's a severe adverse event,

24  by definition.

25  Q.  Using the definition of major complication from

1   Dr. Grossman's report that we looked at earlier, the fact that

2   --

3   A.  Dr. Grossman?

4   Q.  I'm sorry?

5   A.  Dr. Grossman's definitions are idiosyncratic.

6   Q.  That's your testimony?

7   A.  That is my testimony.

8   Q.  All right.  You've also relied on a -- in forming your

9   opinions that you have offered today, you have relied on a

10   Finnish study comparing adverse events for surgical and medical

11   abortions; is that right?

12   A.  That's correct.

13   Q.  Can it -- excuse me, can I call this the Niinimaki study?

14   A.  Yeah, I don't speak Finnish either.  So that works for me.

15   Q.  You particularly relied on Niinimaki for its findings

16   concerning rates of hemorrhage, incompletion, and the

17   requirement of surgery to complete the abortion; is that right?

18   A.  That's correct.

19   Q.  None of those are major complications using the opinion

20   from Dr. Grossman that we looked at; is that right?

21   A.  Dr. Grossman has an idiosyncratic definition of major.  For

22   a woman who hemorrhages, that, for that woman, is a major

23   complication.  If she needs surgical intervention, hemorrhage,

24   surgical intervention, those are all, by definition, severe

25   adverse events.

1   Q.  In Niinimaki itself, didn't the study authors note that a

2   problem with the study was that the adverse events measured

3   could vary substantially in their severity?

4   A.  They could, but all those adverse events are what are

5   entered into the medical record by a physician.  So there was a

6   physician who made the judgment that the bleeding merited a

7   coding of hemorrhage.

8   Q.  Well, in -- again, in Niinimaki itself, didn't the study

9   authors note that hemorrhage was particularly susceptible to an

10  issue or to the issue I've just described where variable rates

11  of severity could be distinguished between?

12  A.  What I can tell you is that the diagnosis of hemorrhage was

13  coded by a physician into the woman's medical record.  That's

14  what I can tell you.  So some physician made the judgment, as a

15  physician, that the woman was hemorrhaging.

16  Q.  Can we pull up the Niinimaki study, which is Plaintiffs'

17  Impeachment Exhibit 839?  Particularly, I'd like to look at

18  page 803 in the left-hand column in the middle of the first

19  paragraph.

20      Dr. Harrison, do you see the sentence starting, "For

21  unknown reasons, the risk of hemorrhage after medical abortion

22  diminished with advancing duration of gestation"?

23  A.  I am finding it.  Hold on.

24          THE COURT:  I don't see it either.

25          MS. POWELL:  Forgive me, Your Honor.  It's page 803.

1    The -- in the left-hand column.

2    A.  If you could blow it up a little bit, that would be

3    helpful.

4    BY MS. POWELL:

5    A.  Yes, I see that.

6    Q.  Do you see the sentence after reading, "Tolerance of

7    bleeding, a natural part of medical abortion, varies from one

8    woman and physician to another and also depends on preabortion

9    counseling"?

10   A.  Yes.

11   Q.  Do you agree that that's an explanation that the study

12   authors were offering -- excuse me, potential explanation that

13   the study authors were offering for the hemorrhage rate?

14          THE COURT:  What?  Say that question again.  I don't

15   understand what you're saying there.

16   BY MS. POWELL:

17   Q.  Dr. Harrison, would you agree that the study authors'

18   notation that, "The tolerance of bleeding, a natural part of

19   medical abortion, varies from one woman and physician to

20   another and also depends on preabortion counseling"?  Would you

21   agree that that is an explanation that the study authors

22   offered to give context to the hemorrhage rate reported in the

23   study?

24   A.  That's not what they said.  They didn't say as an

25   explanation of the hemorrhage rate, we offer tolerance of

1  bleeding.  They just put in the sentence.

2  Q.  Well, the study authors noted elsewhere that the --

3  actually -- excuse me, withdrawn.

4      I'll move on, Your Honor.

5      Can we look at Defendant's Recollection Exhibit 4, I

6  believe, the 2014 ACOG practice bulletin?

7          THE COURT:  What are we looking at?

8          MS. POWELL:  Nothing at the moment, Your Honor, but I

9  can actually -- I'll ask my questions without the exhibit.

10  BY MS. POWELL:

11  Q.  Dr. Harrison, do you recall testifying on direct

12  examination about a practice bulletin from the American College

13  of Obstetricians and Gynecologists relating to medication

14  abortion?

15  A.  Yes.

16  Q.  And that was a practice bulletin dated from 2014?

17  A.  Yes.

18  Q.  That bulletin was updated by -- or excuse me, the American

19  College of Obstetricians and Gynecologists updated its guidance

20  on medication abortion in October of 2020; is that right?

21  A.  That's correct.  The same sentence that I quoted appears in

22  the 2020 practice bulletin.

23  Q.  But other sentences also appear; isn't that right?

24          THE COURT:  What?

25          MS. POWELL:  Your Honor, I'll rephrase.

BY MS. POWELL:

Q.  Dr. Harrison, that 2020 bulletin also contains other information and recommendations; is that right?

THE COURT:  Other than what?  Wait a minute, other than what, Ms. Powell?  Come on, nail the question.  What do you want her to tell you?

MS. POWELL:  I'd like Dr. Harrison to confirm that the October 2020 bulletin updated the 2014 bulletin upon which she relied during her direct examination.

THE COURT:  Is that true, Dr. Harrison?

A.  Yes, I think I mentioned that during direct.

BY MS. POWELL:

Q.  Dr. Harrison, I'd also like to discuss the 2006 study of FDA adverse events that you discussed during direct examination.  Do you recall that testimony?

A.  Yes.

Q.  By its nature, that study only took into account data from 2006 or earlier; is that right?

A.  I believe it was 2000 to 2004.  That was the FOIA information that we were given, Freedom of Information Act information that we were given.

Q.  So 12 years after the latest data to which you had access, the FDA updated the --

THE COURT REPORTER:  Excuse me?

THE WITNESS:  Yes.

1        THE COURT:  Wait.  We didn't catch your question

2   because you were looking down, Miss Powell.

3        MS. POWELL:  I apologize, Your Honor.

4   BY MS. POWELL:

5   Q   Twelve years after the latest data that you had access to

6   for that paper, the FDA updated the label for Mifeprex, didn't

7   it?

8   A.  They updated the label in 2016.

9   Q.  And with the label update, the accepted regimen for

10  Mifepristone and misoprostol combination changed; isn't that

11  right?

12  A.  The FDA allowed for a different administration than what it

13  had originally allowed for in 2000.  However, I will tell you,

14  that most of the complications -- in fact, probably 90 percent

15  or more of the complications that we analyzed in our original

16  data used an off-label protocol, despite the fact that they

17  were not supposed to be using an off-label protocol.  So most

18  of the complications, over 90 percent, used the combination of

19  Mifepristone and the vaginal use of misoprostol.

20  Q.  I'm sorry, could you repeat that last sentence again?

21  A.  In our 2006 paper, we analyzed the adverse event reports

22  that were submitted to the FDA from 2000 to 2004.  Over

23  90 percent of those adverse events used an off-label regimen,

24  which included Mifepristone by mouth and misoprostol per

25  vagina.  They did not use the FDA regimen, which had been

1  approved.

2  Q.  And the 2016 approved FDA regimen, that does not involve

3  the vagina or the use of misoprostol vaginally, does it?

4  A.  It talks about buccal use, which is using misoprostol in

5  the cheek and sublingual use, which is using misoprostol under

6  the tongue.

7  Q.  And not the off-label vaginal use you just described that

8  was covered in your 2006 study?

9  A.  It does not describe a vaginal use, that is correct.

10 Q.  Let's return to the FDA approval of medication abortion.

11           THE COURT:  Ms. Powell?  Ms. Powell?

12           MS. POWELL:  Yes.  I'm sorry.

13           THE COURT:  Put your paper up here so you can talk to

14 me, because honestly, I am looking not just at the top of your

15 head but the back of your head.  Now, come on.  We're all

16 operating under these unusual circumstances, but you have got

17 to cooperate.  I can't get it.  Pick up your paper.

18           MS. POWELL:  I apologize, Your Honor.

19           THE COURT:  Prop it up in front of your computer.

20 Yes, that's right.  Good.

21 BY MS. POWELL:

22 Q.  Dr. Harrison, do you recall testifying during your direct

23 examination that the issuance of a REMS --

24           THE COURT:  Apparently you didn't understand,

25 Miss Powell.  Apparently you didn't understand.  You keep doing

1   what I've asked you not to do.  Look, I've got my paper on a

2   board.  Just hold it up like this.  Even if you have to go to

3   the side, we'll understand you better.

4           Come on, now, you're making me old and cranky because

5   you're not trying.  That's it.

6           MS. POWELL:  Apologize, Your Honor.

7   BY MS. POWELL:

8   Q.  Dr. Harrison, do you recall testifying on direct

9   examination that the issuance of a REMS is how the FDA

10  minimizes risk for medication?

11  A.  No.  What I said was, the FDA uses the REMS in those cases

12  where there is a need for the FDA to say this is how the drug

13  can be administered with the least amount of complications.

14  It's a little different than what you just said.

15  BY MS. POWELL:

16  Q.  The REMS supports the safe use of a medication; isn't that

17  right?

18  A.  The REMS allows the FDA to apply post-marketing

19  restrictions.  Without the REMS, the FDA has no authority to

20  apply post-marketing restrictions.

21      So the REMS is the mechanism by which the FDA can say to

22  use this drug, you must abide by these restrictions; otherwise,

23  the drug is not safe for use.  That's what the REMS does.

24  Q.  You previously authored a citizen petition asking the FDA

25  to pull approval for Mifeprex; isn't that right?

1   A.  Yes.

2   Q.  That citizen petition was rejected?

3           MR. BARTOLOMUCCI:  Objection, Your Honor.  This is

4   outside the scope of direct.

5           THE COURT:  What causes you to believe it's not

6   outside the scope of direct, Ms. Powell?

7           MS. POWELL:  Your Honor, Dr. Harrison testified as to

8   the FDA's position on Mifeprex, whether -- whether the FDA

9   considers it to be safe.  I think the fact that she's

10  previously approached the FDA with these concerns and had them

11  rejected goes to the credibility of her testimony.

12          THE COURT:  Objection is overruled.  You may ask.

13  BY MS. POWELL:

14  Q.  Dr. Harrison, your citizen petition asking the FDA to pull

15  approval for Mifeprex based on safety concerns --

16          THE COURT:  Wait, wait, wait.  You're going too fast.

17  The court reporter didn't get it.

18  BY MS. POWELL:

19  Q.  Dr. Harrison, your citizen petition asking the FDA to pull

20  approval for Mifeprex because of safety concerns was rejected,

21  was it not?

22  A.  Well, the citizen petition was filed in 2002.

23          THE COURT:  Was it rejected?

24  A.  The --

25          THE COURT:  Was it rejected?

1          THE WITNESS:  In 2016.

2          THE COURT:  All right.

3     BY MS. POWELL:

4     Q.  Now, Dr. Harrison, I would like to ask you about the

5     ultrasound requirement in this action.  You've taken the

6     position that the ultrasound requirement and the physical

7     examination requirements are necessary because of

8     contraindications for Mifeprex?

9     A.  I'm sorry.  I missed the question.

10    Q.  I'm sorry.  Is it your opinion that the physical

11    examination requirement and the ultrasound requirement that are

12    being challenged in this case, those requirements are necessary

13    because there are instances in which Mifeprex is

14    contraindicated?

15    A.  Yes.

16    Q.  Do you -- what are the contraindications implicated by the

17    physical examination requirement and the ultrasound

18    requirement?

19    A.  As I mentioned in my direct testimony, the practitioner who

20    provides Mifeprex is responsible for making sure that the

21    gestational age is within the FDA limit and also responsible

22    for making sure she does not have an ectopic pregnancy.  So you

23    can't rely on a patient's history to know whether or not she

24    has an ectopic pregnancy.

25         And in order to know what the gestational age of the

1  pregnancy is, the gold standard, even attested to by ACOG, is

2  ultrasound, because in several studies looking at patients'

3  ability to date the pregnancy by last menstrual period, about

4  half of the women are accurate to within three to four days of

5  their last menstrual period.  You just -- you find that you

6  have to change the date of a pregnancy about half the time from

7  what the woman thinks she is based on the last menstrual

8  period.

9      So, for those two reasons, the gestational age and ruling

10  out ectopic pregnancy, you need to do -- I think, in my

11  clinical judgment, you need to do both an ultrasound and a

12  physical exam, that you at least need to do one of them.

13  Q.  Thank you, Dr. Harrison.

14      Do you recall testifying, during your direct examination,

15  that an in-person exam is necessary for -- to screen for

16  sexually transmitted infections?

17  A.  That's one of the things that you can find on an in-person

18  exam.

19  Q.  The FDA does not consider sexually transmitted infections

20  to be a contraindication for Mifeprex use, does it?

21  A.  I don't think they listed sexually transmitted infections

22  in their list of contraindications.  However, it's wise not to

23  start a procedure in the midst of an infected organ.

24  Q.  The FDA does not require a physical examination prior to

25  the administration of Mifeprex; is that right?

1   A.   There were some -- as I read the FDA 2016 label, there was

2   an assumption that if the woman is coming to the office to get

3   Mifeprex, and if part of the responsibility of the physician

4   was to rule out ectopic pregnancy, which is a contraindication,

5   there was the assumption that a physician would do a physical

6   exam.

7         Now, it is not explicitly spelled out, but there is that

8   assumption, because there really isn't another way to rule out

9   an ectopic pregnancy if you don't do an ultrasound or a

10  physical exam.   And I would argue that the combination is the

11  safest.   It gives you the most information to rule out an

12  ectopic pregnancy.

13  Q.   But the FDA, as you acknowledge, does not explicitly

14  require that; is that right?

15  A.   The FDA does explicitly require that the practitioner who

16  is administering Mifeprex be capable of ruling out an ectopic

17  pregnancy, which is a contraindication.   And ruling out

18  contraindications is the responsibility of the prescribing

19  practitioner.

20         MS. POWELL:  All right.  Thank you, Dr. Harrison.   I

21  have no further questions at this time.

22         THE COURT:  Redirect?

23                      **REDIRECT EXAMINATION**

24  BY MR. BARTOLOMUCCI:

25  Q.   Dr. Harrison, do you recall being asked in

1  cross-examination about whether you've ever made use of an

2  ultrasound performed by someone other than yourself --

3  A.  Yes.

4  Q.  -- during your clinical practice, during your medical

5  practice?

6  A.  Yes.

7  Q.  Here's my question.  Have you ever used someone else's

8  ultrasound in order to perform an abortion?

9  A.  No.

10  Q.  In what circumstances outside of the abortion context would

11  you make use of an --

12      THE COURT:  Well, wait.  She's only done one abortion,

13  she testified.  So do you mean in that instance?

14      MR. BARTOLOMUCCI:  That or any other.  I'm aware of

15  her prior testimony.

16      THE COURT:  Well, I don't understand the answer, then.

17  In the instance when you committed -- when you performed the

18  abortion, did you use an ultrasound?

19      THE WITNESS:  No.  I was a resident, and --

20      THE COURT:  No is your answer.  If the lawyer wants to

21  go into it further, I'll let him do it, but you answered the

22  question.

23      THE WITNESS:  Okay.

24  BY MR. BARTOLOMUCCI:

25  Q.  And then I was going to ask you, and will ask you, a more

general question, Dr. Harrison.  Outside of that abortion
context, in what circumstances during your days of practice
would you use an ultrasound that was performed by someone other
than yourself?
A.   If I were seeing a patient in the emergency room and, by
the time I got to see the patient, they had been through the
emergency room physician and he or she had ordered an
ultrasound on the patient, I would look at the physical
ultrasound pictures, because I like ultrasound and it's a
particular interest of mine, but I would look at the ultrasound
pictures and get the reading.  So in that case, I wouldn't
perform the ultrasound myself.  But in my patients, I perform
the ultrasound myself.
Q.   Would you say it was common -- strike that.
     During your days of practice, were there ever circumstances
in which you received an ultrasound performed by someone other
than yourself, but you decided to do another ultrasound
yourself?
A.   Oh, there may have been.  I had a very busy practice.
There were a lot of patients, so it's possible.  I may have
repeated the ultrasound.
          MR. BARTOLOMUCCI:  Nothing further, Your Honor.
          THE COURT:  Recross?  Recross, Ms. Powell?
          MS. POWELL:  No recross, Your Honor.
          THE COURT:  All right.  Have you finished your

questions of this witness and may she be dismissed?

MR. BARTOLOMUCCI:  Yes, Your Honor.

THE COURT:  Ms. Powell?

THE WITNESS:  Thank you.

MS. POWELL:  Plaintiffs have, Your Honor.

THE COURT:  Okay.  Thank you, Doctor, very much.
You've fulfilled your obligation.  Thank you kindly.  Good
luck.

THE WITNESS:  You're welcome.  Thank you.

THE COURT:  Farewell.

Let's take an afternoon recess.  What do you say?

Is your next witness Nancy Goodwine-Wozniak?

MR. ROWLETT:  Yes, Your Honor.  I will be conducting
her direct.

THE COURT:  Okay.  Mr. Rowlett, we're going to start
up in about 20 minutes.

MR. ROWLETT:  Okay.  Could we briefly -- she is
actually testifying from the Attorney General's office, and in
a separate conference room we have set up by agreement with the
plaintiffs.  Could we get her -- we've been trying to get her
admitted to the Zoom room.  Could we maybe test that over the
break just to ensure we have no technical problems?

THE COURT:  Well, you're asking the wrong person.  If
you're asking permission, yes, I give permission, but I have no
idea what I'm giving permission for.  I don't know how to do

1    that.  So you work it out.

2              COURT CLERK:  Tell him to e-mail me.

3              THE COURT:  E-mail Ms. Harves.

4              MR. ROWLETT:  Ms. Harves.  I will e-mail her right

5    now.  Thank you, Your Honor.

6              THE COURT:  All right.  We'll take a break.

7                        (Recess taken.)

8              THE COURT:  Okay, Mr. Rowlett, it's your witness.

9              Hello, Ms. Sharma.

10             MS. SHARMA:  Hello.

11             MR. ROWLETT:  Hi.  If we're ready to get started, I'd

12   like to call Dr. Goodwine-Wozniak.

13             THE COURT:  All right.  Come in out of your secret

14   room, Dr. Goodwine-Wozniak.

15             There you are.

16             THE WITNESS:  Thank you.

17             THE COURT:  I'm Judge Barker.  Dr. Goodwine-Wozniak,

18   is that who you are?

19             THE WITNESS:  It is.

20             THE COURT:  All right.  Before you can testify, you

21   need to take the oath.  And I will ask the clerk to administer

22   the oath, please.  Would you raise your hand and swear.

23        NANCY GOODWINE-WOZNIAK, DEFENDANTS' WITNESS, SWORN

24                    **DIRECT EXAMINATION**

25             THE COURT:  Thank you.  You may testify.

1          MR. ROWLETT:  Thank you, Your Honor.

2   BY MR. ROWLETT:

3   Q.  Dr. Wozniak, I just want to ask a couple of introductory

4   questions.  Where do you currently work?

5   A.  I am currently at Indiana University Health and practice at

6   IU North and at IU West.

7   Q.  Okay.  And what is your title at those places?

8   A.  I am an attending physician.  I work as an obstetric

9   hospitalist.

10  Q.  Okay.  Do you specialize in any particular fields?

11  A.  My practice is generally limited to obstetrics, although on

12  a given shift, I may see some emergent GYN or early obstetrics

13  in the emergency department.

14  Q.  Okay.  And are emergency department cases -- are those most

15  of the patients that you treat, or do you have an office

16  practice?

17  A.  I no longer have an office practice.  And I do treat a

18  number of patients who come through the emergency department.

19  Q.  Okay.  Where did you work previously to IU Health?

20  A.  St. Vincent, which is a part of the Ascension Health

21  Network.

22  Q.  And what was your position and what were your

23  responsibilities in that position there?

24  A.  I was an attending physician practicing general obstetrics

25  and gynecology.

Q.  Okay.  And did you have an office practice in that position?

A.  I did.

Q.  Okay.  Dr. Wozniak, where did you attend medical school?

A.  University of Illinois.

Q.  Okay.  And what degrees do you possess?

A.  I have a Bachelor of Science in business and marketing and an M.D. degree from the University of Illinois.

Q.  Okay.  Are you a member of any professional associations?

A.  I'm a member of the American College of Obstetrics and Gynecology.

Q.  Okay.  Have you given any lectures or presentations in the course of your work?

A.  I've given a number of lectures throughout my career.

Q.  And on what topics?

A.  Anything ranging from -- actually, I did two years of internal medicine residency prior to obstetrics and gynecology, so my lectures covered issues in internal medicine.  I've done resident lectures in obstetrics and gynecology.  I was also assistant clerkship director for the University of Illinois, so I did a number of lectures for the medical students.

Q.  Okay.  And have you received any honors or awards in your career?

A.  Yes, I received a teaching award in obstetrics and gynecology.

1   Q.  And where did you receive that award?

2   A.  At the University of Illinois.

3   Q.  Okay.  Dr. Wozniak, do you have a resume?

4   A.  I do.

5   Q.  And would you recognize a copy of that resume if I showed

6   it to you?

7          THE COURT:  You better say yes to that.

8   A.  Yes.  I just haven't seen it.  So just waiting for it.

9   Q.  There we go.  Can you see that?

10  A.  Yes.

11         THE COURT:  What's the exhibit number before you show

12  it?

13         MR. ROWLETT:  This is Stipulated Exhibit 3.  And is

14  that large enough for everyone to see?

15         THE COURT:  If everyone is me, I say yes.

16         THE WITNESS:  Yes.

17         MR. ROWLETT:  Thank you, Your Honor.

18  BY MR. ROWLETT:

19  Q.  Dr. Wozniak, is this your current resume?

20  A.  It is.

21  Q.  And does this contain an accurate listing of your education

22  and your professional background and the various jobs that you

23  have held?

24  A.  Yes, from what I can see of it, but I'm familiar with my

25  CV, and that looks like mine.

1   Q.  Okay.  And is this a true and accurate copy of your work

2   history?

3   A.  It is.

4   Q.  Thank you.  That's all I have on that.

5       Now, Dr. Wozniak, I want to ask you a couple of specific

6   questions.  You mentioned your area of specialty, that you work

7   in obstetrics and gynecology.  Have you had occasion to treat

8   patients that have received a medication abortion?

9   A.  I have.

10  Q.  Okay.  As part of that, have you treated patients that have

11  had complications from their medication abortion?

12  A.  I have.

13  Q.  Are you familiar with the medication abortion procedure

14  itself?

15  A.  I am.

16  Q.  And what are the two drugs that are used or medications

17  that are used in that practice?

18  A.  Misoprostol and Mifepristone.

19              THE COURT:  Wait, wait, wait.  Say it again.

20              THE WITNESS:  Mifepristone is the medication used

21  first.  It's then followed by misoprostol 24 to 24 hours later.

22  BY MR. ROWLETT:

23  Q.  And, Dr. Wozniak, have you also had occasion in treating

24  those patients to work with abortion providers, interface with

25  them?

A.  Work with them?  I have worked with abortion providers, but not in the capacity of performing an abortion.

Q.  Okay.  But you have worked, in the sense of interacted with an abortion provider, in the course of treating a patient that presents to you with complications from a medication abortion?

A.  Yes.

THE COURT:  Why don't you explain how you interact with them when you do.

THE WITNESS:  Well, when I was practicing in Illinois, there was an abortion provider.  And on occasion, her patients would come through the ED sometimes when she was out of town, and so I would take care of her patients.  And on occasion, you'd have to let her know or at least a message that this patient has come in and what the situation was and what was done for her and how things were left, what the status of the patient was.  I've also had reason to work with and interact with this particular abortion provider for a surgical complication of a suction D&C where there was a uterine perforation.

BY MR. ROWLETT:

Q.  And, Dr. Wozniak, did you prepare an expert report in this case?

A.  I did.

Q.  And can you explain the materials that you relied upon in preparing that report?

A.  Well, my education, history, my experience, my ongoing continuing medical education, and lectures in the past.

Q.  Okay.  Did your expert report reach certain opinions and conclusions?

A.  It did.

Q.  And were those based on your expertise as an OB/GYN?

A.  Yes.

Q.  Do you believe that your testimony will be helpful to the Court today in assisting and resolving this case?

A.  I do.

Q.  And last question on this topic, Dr. Wozniak, have you previously testified before as an expert witness?

A.  No, I have not.

MR. ROWLETT:  Okay.  Your Honor, at this time I'd like to tender Dr. Goodwine-Wozniak as an expert witness on obstetrics and gynecology.

THE COURT:  And what specific purpose do you expect her to address in her testimony?  Nobody has told me what she was engaged to do, so I can't tell if she's an expert in the engaged area.

MR. ROWLETT:  Okay.  Would you like me to lay a foundation or just tell you now?

THE COURT:  Well, you can put it into your question, were you engaged to study and opine on such and so.

1   BY MR. ROWLETT:

2   Q.  Dr. Wozniak, were you retained by the defendants to study

3   the medical benefits of in-person examinations prior to a

4   medication abortion?

5   A.  Yes.

6   Q.  And were you also retained to opine on the medical benefits

7   of in-person counseling before a medication abortion?

8   A.  Yes.

9   Q.  And on the benefits, medical benefits that is, of

10  performing an ultrasound before medication abortion?

11  A.  Yes.

12  Q.  And then finally, also on the affect of Indiana's

13  telemedicine ban, on the provision of medication abortion?

14  A.  Yes.

15          MR. ROWLETT:  Okay.  Your Honor, at this point I would

16  reoffer the tender.

17          THE COURT:  Have you been involved in all of these

18  areas?

19          THE WITNESS:  I have been involved in taking care of

20  patients who I believe have had complications of abortion.

21  I've certainly taken care of patients who were contemplating

22  abortion.

23          THE COURT:  Wait, wait.  My question is more specific

24  than that.  So you've listed four areas that you were engaged

25  to opine on.  So have you been involved in all of these area?

1   Are they part of your practice?  Is it part of what you know

2   from your practice or your study or what?

3          THE WITNESS:  Both.

4          THE COURT:  Yes to all four?

5          THE WITNESS:  Yes, I have counseled patients, I have

6   done ultrasounds, I've treated complications of abortion.  I

7   have not performed any abortions.

8          THE COURT:  Okay.  So, now, are you tendering her as

9   an expert to speak from her acquired knowledge in practice of

10  these areas, Mr. Rowlett?

11         MR. ROWLETT:  Yes, I do, Your Honor.

12         THE COURT:  Any objection, Miss Sharma?

13         MS. SHARMA:  No objection, Your Honor.

14         THE COURT:  The witness has been proffered as an

15  expert and qualifies and she may testify as such.

16         So in the future now you can say you were called one

17  time to testify as an expert.

18         THE WITNESS:  Yes.

19         MR. ROWLETT:  Thank you, Your Honor.

20  BY MR. ROWLETT:

21  Q.  Dr. Wozniak, tell me a little bit about your practice as an

22  OB/GYN, specifically in your most recent position.  Generally

23  speaking, what kind of patients do you see and treat?

24  A.  Currently I function as an obstetric hospitalist, and that

25  position is commonly known as a laborist.  So I am taking care

1    of patients with more late second, third trimester pregnancies.

2    However -- so that would, that would encompass preterm labor,

3    complications of late pregnancy, deliveries, but also I do go

4    down to the emergency department and take care of complicated

5    early pregnancies, miscarriages, and some GYN.

6    Q.   Okay.  And for first trimester patients that you see, that

7    includes patients that are coming in from a complication or

8    even a failed, potentially, medication abortion?

9    A.   Yes.

10   Q.   Now, Dr. Wozniak, one of the examples you mentioned was a

11   miscarriage that you might see in the emergency department.

12   Just very briefly walk us through, a woman comes in with a

13   complication from a miscarriage or comes in with a miscarriage

14   as a complication.  What steps do you follow?

15   A.   So most often the patient will come through the emergency

16   department, and I will typically be called down by the

17   emergency department physician to see the patient.  She may or

18   may not have had an ultrasound done.  She may or may not have

19   had labs done, but my role is to evaluate that patient,

20   determine where she is as far as a miscarriage and essentially

21   whether or not this is a viable pregnancy or whether this is a

22   pregnancy that has spontaneously ended and is in need of a D&C,

23   which is a dilation and curettage, a surgical procedure to

24   empty the uterus because of ongoing bleeding, pain, or both.

25   Q.   Okay.  And in treating patients generally that you deal

1   with in the emergency department, do you conduct physical exams

2   as a regular part of your practice?

3   A.  Yes.

4   Q.  And do you do in-person counseling as a regular part of

5   your practice?

6   A.  Yes.

7   Q.  And the same question for performing ultrasounds, do you

8   commonly perform ultrasounds in your practice?

9   A.  Yes.

10  Q.  Okay.  And specifically with your patients that deal with

11  miscarriage that are coming in for that medical condition, do

12  you do those three things with those patients as well?

13  A.  Typically I do.  Sometimes the ultrasound will have already

14  been done by an ultrasound tech.  But in answer to your

15  question, an ultrasound is routinely performed either by me or

16  an ultrasound tech for a patient who comes in with that

17  complaint.

18  Q.  Okay.  And that would be an ultrasound tech that works at

19  your place of employment?

20  A.  Yes.

21  Q.  Okay.  Dr. Wozniak, how many patients have you treated that

22  you know for certain are presenting to you because of a

23  complication from a medication abortion?

24  A.  In my career, I would estimate probably 15 that was known

25  to me because the patient admitted as much.  I have no way of

1    knowing the exact number though.

2    Q.  And why would you not know the exact number?

3    A.  Because oftentimes patients will come in having started a

4    medical abortion, either for pain, bleeding or both, and

5    they'll simply say that they are having a miscarriage.

6    Q.  Okay.  Now, Dr. Wozniak, I want to move to talking about

7    in-person physicals.  Are you familiar with Indiana statutes

8    that require an in-person physical before a medication abortion

9    may be prescribed?

10   A.  Yes.

11   Q.  And you're also familiar with Indiana's laws that prohibit

12   the use of telemedicine without an in-person exam being

13   conducted?

14   A.  Yes.

15   Q.  And I want to just start general here.  Are physicals and

16   exams, are those common to gynecology and obstetrics?

17   A.  Yes.

18   Q.  Okay.  And why do OB/GYNs, people in your field,

19   physicians, perform physical exams?  What does that tell them?

20   A.  Well, it's -- broadly it does a number of things.  It

21   establishes some rapport with the patient, it helps either

22   confirm or come up with a diagnosis, so those are the main

23   reasons to perform a physical exam.

24   Q.  Okay.  And what are some of the medical benefits of

25   performing an in-person physical?

A.  Medical benefits would be, again, you have an opportunity

to get to know the patient by her history, past surgeries, past

complications.  And an exam can be either confirmatory of your

impression or you may find something that is completely

different than what you expected.

Q.  Okay.  So I want to touch a little bit on that last point.

You said that an in-person exam essentially might change the

direction of treatment or change your thoughts as to what might

be ailing a patient.  Do you have any examples of that?

A.  I do.  So recently I had a patient who was approximately

29.  Her last birth was five years prior to her coming to the

emergency department and she had been on Depo-Provera.  It's an

injectionable form of contraception that's designed to last

three months.  A number of women when they have taken that

medication over time often experience amenorrhea, which means

she's not having bleeding or periods.  So this lady had

discontinued her Depo-Provera and she presented to the

emergency department with pain and some irregular bleeding.  So

because of her age, the fact that she'd had children before,

the fact that she had discontinued her Depo-Provera, my mind

was I'm probably going down to the emergency department to

evaluate a patient for either a miscarriage, an ectopic

pregnancy, or even a normal pregnancy that just has first

trimester bleeding.

       So I went down there and I did an exam, and the patient had

1    an obvious advanced cervical cancer.  Had I not done the exam,

2    there is no way that I would have recognized that.

3    Q.  Okay.  So the physical exam is what allowed you to make

4    that diagnosis?

5    A.  That's right.

6    Q.  And, Dr. Wozniak, do you find that conducting a physical

7    allows you to screen for complications that might arise during

8    the first trimester of pregnancy?

9    A.  Many times.

10   Q.  And what kind of complications would a physical exam reveal

11   for a first trimester pregnancy?

12   A.  So it can be anything from infections to risk factors for

13   preterm labor, just to name a couple.

14   Q.  Okay.  I'm assuming these would be especially true if a

15   patient presents with any sort of pain or any kind of symptoms?

16   A.  Yes.

17   Q.  Now, I want to talk a little bit specifically about

18   medication abortion.  Are you aware, you know, that plaintiffs

19   in this lawsuit challenge that they should be permitted to

20   perform medication abortions without conducting an in-person

21   physical exam?

22   A.  I am.

23   Q.  And what's your opinion on that?

24   A.  I disagree with their assertion that this can be done

25   without an exam.

1    Q.  And why is that?

2    A.  Because the criteria for a medication abortion are rather

3    specific.  It should be done at ten weeks or less.  Without a

4    physical exam, you really can't determine the gestational age

5    of a pregnancy with any real accuracy.

6    Q.  Okay.  Are there certain contraindications for medication

7    abortion?

8    A.  Yes.

9    Q.  And perhaps I should also use the term complications.  Are

10   there any complications that you could use a physical to screen

11   for before medication abortion?

12   A.  Well, if not absolutely, at least potentially.  So

13   certainly one would be an ectopic pregnancy, the presence of an

14   IUD, just for starts, and again, establishing a gestational age

15   would be important.

16   Q.  Okay.  Let's talk a little bit about gestational age.  Why

17   is it -- I know you already spoke to the indication for

18   medication abortion that it can't be done after a certain

19   period of time, but why else is gestational age important for

20   purposes of prescribing a medication abortion?

21   A.  One is simply the likelihood of success, the successful

22   completion of the medical abortion.  If it's not successful,

23   and the patient's gestational age is greater than ten weeks,

24   there is higher risk for bleeding and her need to come into the

25   emergency room or an incomplete abortion, which would require a

1    surgical procedure to empty the uterus, just as a few.

2    Q.   Okay.   And is a medication abortion indicated when a

3    pregnancy is ectopic?

4    A.   Never.

5    Q.   Okay.   Now, staying a little bit on gestational age, can

6    you use a physical exam to determine gestational age?

7    A.   You can use a physical exam as an adjunct.   If the patient

8    is thin and there's only one pregnant -- one fetus inside the

9    uterus, your physical exam may match that of an ultrasound, but

10   if your patient is obese, there's more than one fetus, in other

11   words there is multiples or twins or if she has fibroids or any

12   other anatomical distortion of the uterus, that can certainly

13   make your exam misleading without an ultrasound.

14   Q.   Okay.   And how would you gestationally date a pregnancy

15   using a physical exam?

16   A.   For a first trimester, it's generally done as a bimanual

17   exam, so that means the exam is both vaginal and abdominal to

18   assess the size and mobility of the uterus, but I nearly always

19   have that accompanied by an ultrasound for dating.

20   Q.   Okay.   Dr. Wozniak, I'm assuming when patients -- when you

21   see a patient, you receive their patient history?

22   A.   Not always.   Sometimes the patient is unknown to anybody or

23   it's a first visit, and so that history may or may not be

24   available to me, but I always take a history.

25   Q.   Right.   So that's what I was going to ask.   If there's a

1   situation where you don't have a patient history, then you

2   would take a patient history?

3   A.   Yes.

4   Q.   And why -- is there any reason to doubt the gestational age

5   just by relying on a patient's history that they have provided?

6   A.   Of course.  So --

7   Q.   Why?

8   A.   -- the reasons for that are sometimes patients have

9   irregular bleeding or irregular menses; they may not have

10  thought they were pregnant; they may have had first trimester

11  bleeding and they think that that was actually a period and so

12  their gestational age may be further along than what she may

13  have thought herself.

14  Q.   And if a patient is aware of her history, does she always

15  know what is the most important information to relate to you?

16  A.   No, not always.  I mean --

17  Q.   And why is that, in your experience?

18  A.   I think part of it is, for example, if it's a first

19  pregnancy, this is completely new to her.  I have had patients

20  who have had complications with previous pregnancies that they

21  were under such stress with everything that was going on in the

22  labor room at the time, that they really couldn't appreciate

23  exactly what the complication was, so in getting a history you

24  can elicit some of these details and ask appropriate questions

25  of the patient and come up with, you know, at least a strong

possibility of a previous diagnosis that the patient may not

have recognized before.  Not that she's trying to withhold

information.  There's just different factors that under the

stress of her previous circumstances she may not have

appreciated.

Q.  So in all the patients that you treat, both medication

abortion patients and not, you find that you routinely receive

or take patient history and then also perform a physical?

A.  Yes.

Q.  Now, Dr. Wozniak, I want to shift gears a little bit here.

Have you treated patients that have been subjected to intimate

partner violence or domestic abuse or sexual abuse?

A.  Many times.

Q.  Will a physical of that patient reveal evidence of such

abuse?

A.  Sometimes, but not always.

Q.  And why is that?

A.  Well, sometimes they -- the abuse may have been in the

recent past but not enough that there's physical evidence at

the time of exam.  It may not be something that she's

forthcoming about or immediately shares until she has some

sense of rapport, so you can't always tell.  I always ask, but

that doesn't mean that the patient is going to tell me for

certain whether or not that is the case.

Sometimes, sometimes it actually takes a few visits with

1  the patient to elicit that kind of history after she's

2  developed some sense of trust with you.

3  Q.  And the physical contributes to this trust that you build

4  with the patient?

5  A.  I think it does, particularly --

6  Q.  Go ahead.

7  A.  I said particularly over time.

8  Q.  Okay.  And in a situation involving domestic abuse, sexual

9  abuse, intimate partner violence, if there is physical evidence

10  to be discovered, will a physical reveal that evidence?

11  A.  Sometimes it will, and sometimes it won't, depending on how

12  recent it is.  So I may see, you know, fresher fading bruises,

13  I've seen patients where I have seen them in the past and now

14  she's got some teeth missing.  Well, how did that happen?  That

15  sort of thing.

16  Q.  Okay.  And what about, particularly, sexual abuse, does a

17  physical exam in your field reveal signs of sexual abuse,

18  assuming that there is physical evidence to be found?

19  A.  If there's evidence to be found, it often will.

20  Q.  Okay.  And I'm assuming a patient's physical, unless they

21  voluntarily disclose that to you, would not reveal that

22  information?

23  A.  That's kind of the interesting part of it.  Many times

24  patients who've suffered abuse, that's not the reason they have

25  come in to see you, and that's why I say sometimes it takes a

1  couple of visits to establish that kind of rapport or trust.

2      And patients who suffer abuse live in real fear of the

3  abuser, so they may -- they're smart enough, they'll time their

4  visit so maybe there isn't quite so much evidence.  So all of

5  these things are factors that contribute to whether or not you

6  recognize abuse.  Because, like I said, I'll ask the question,

7  I'll screen for it, but I'm not going to just dismiss it as not

8  a possibility even if she says no.

9  Q.  Okay.  Do you think that intimate partner violence, sexual

10  abuse, domestic abuse, can that be as effectively screened for

11  if the patient/physician interaction is by telemedicine, it's

12  virtual or remote?

13  A.  I certainly think it's much more difficult and less

14  reliable.

15  Q.  Why is that?

16  A.  Again, because I think there really is something to

17  physical presence, human connection, eye contact, being able to

18  actually just look at the patient's skin surface to see if

19  there's bruising or not.

20      I think that is really very relevant in being able to

21  examine a patient and getting a thorough history.

22  Q.  Thank you.  Now I want to return just briefly to

23  gestational age.  Excuse me, not gestational age.  I want to

24  talk a little bit -- continue with what we were talking about

25  with telemedicine.  So, say, a patient calls up your hospital,

1    you know, calls on some kind of call-in line and complains of

2    abdominal pain.  Would a doctor be able to adequately make a

3    diagnosis by telemedicine?

4    A.  In my opinion, no.

5    Q.  And why is that?

6    A.  Because you're not able to examine the patient.  Abdominal

7    pain always has the question attached to it what is it that can

8    be hurting down there, and abdominal pain is very broad.  All

9    the organs down there have very similar innervation.  They all

10   contract.  They all cramp.  And so it can be anything from

11   appendicitis to gastroenteritis to an ectopic pregnancy.  You

12   really, really can't connect the dots without seeing the

13   patients, doing labs, and sorting it out in person, in my

14   opinion.

15   Q.  You kind of anticipated where I was going a little bit.  So

16   if you have a pregnant woman that is complaining of any kind of

17   pain or anything like that, would you want to conduct a

18   physical of that patient?

19   A.  Yes.

20   Q.  Okay.  And what kind of -- for a pregnant woman that's

21   presenting with symptoms, why would you want to conduct a

22   physical exam, and specifically, what would you be checking

23   for?

24   A.  Well, some of it depends on gestational age.  But if it's

25   in the first trimester, I would need to know where the

pregnancy is located, whether it's an ectopic, whether it's a

miscarriage, whether it's she happens to be pregnant and

actually the pain is unrelated to her pregnancy.  Things that

you can't know without evaluating her.  If it's a second

trimester or beyond, there's other concerns, such as preterm

labor, placental issues that can be or become serious, and the

viability of the pregnancy.

Q.  Thank you.  Now I want to move on a little bit to a topic

that is related to the in-person physical.

Do you -- have you ever had a concern, working in your

field, about patients diverting medications?

A.  Anytime that you send a patient home with an opioid

prescription, you know, you want -- you screen as best you can,

but there is no guarantee somebody won't divert that medicine.

Q.  And in the medication abortion context, specifically the

in-person --

THE COURT:  Really, let me get you to answer the

specific question because I'm interested.  You spoke of a

concern, a general concern, but have you ever had that problem

presented where a patient has diverted drugs that they were

given or authorized to take outside your view?  Did you ever

have that specific problem?

THE WITNESS:  Yes, I have previously.

THE COURT:  With one of these drugs?

THE WITNESS:  With the Mifepristone or misoprostol,

1   there's no way to -- unlike opioids, where somebody can be

2   tested with a urine test, they have either taken the medication

3   or they have not.  You can't do that with misoprostol or

4   Mifepristone.

5           THE COURT:  Wait.  I'm sorry, I just don't quite

6   understand that.  The question is about those two drugs are

7   susceptible to diversion.

8           THE WITNESS:  Your Honor, I think any drug is

9   susceptible to diversion.

10          THE COURT:  Okay.  So your concern is a generalized

11  concern because you haven't had that specific issue presented

12  that you know of; is that right?

13          THE WITNESS:  I would not -- I want to be very clear.

14  With opioids, there is always a concern.  I have had patients

15  who have had substance abuse problems in the past that would

16  continue to be an ongoing concern, and some of those patients

17  actually had to leave the hospital without an opioid.  Some of

18  those patients who are recovering --

19          THE COURT:  I'm asking you about these two drugs.

20          THE WITNESS:  I'm putting these in context.

21          THE COURT:  Well, I'm only asking about the specific

22  drugs.

23          THE WITNESS:  Okay.  In answer to your question, those

24  drugs, like any drug, can be potentially diverted.  Unlike

25  opioids, you cannot test a person who comes into the ED as to

1    whether or not they have taken that medication.

2         THE COURT:  Right.  I get that.  Apparently my

3    question is not clear, but we can go on.

4         THE WITNESS:  The drugs can be diverted.

5         MR. ROWLETT:  So, Dr. Wozniak, let me ask this --

6         THE COURT:  Yes, they can be diverted.  But have you

7    had the situation in your practice where these particular drugs

8    have been susceptible to diversion?  We've heard testimony in

9    this trial, Doctor, that nobody -- no doctors, no doctors who

10   have been asked this question have had a problem with the

11   diversion.  I'm trying to find out if you've had a problem with

12   the diversion of these particular drugs because they are -- one

13   of them at least, is taken at home.  The other one has to be

14   taken at the clinic.

15        THE WITNESS:  So the only medication of the two that I

16   would have ever prescribed would have been the misoprostol for

17   somebody who has a miscarriage.  I don't prescribe

18   Mifepristone, so I can never say it was ever diverted on my

19   account.  If somebody has come into the ED, I have no way of

20   knowing if she has received that medication by diversion.

21   That's all I'm really trying to say.

22        THE COURT:  Right.  Okay.  You've answered my

23   question.  Round about, you answered it.

24        THE WITNESS:  Sorry about that.

25        THE COURT:  Go ahead, Mr. Rowlett.

1    MR. ROWLETT:  No, you're good.  I am skipping ahead.

2    THE COURT:  Thank you, Mr. Rowlett.  I try to be.

3    Hanging in there with you.

4    BY MR. ROWLETT:

5    Q.  So some of the plaintiffs' experts in this case have

6    testified that they would like their abortion physicians to be

7    able to provide medication or book medication abortion

8    appointments via telemedicine.  What's your reaction to that,

9    Dr. Wozniak?

10   A.  I don't think that's good medicine.

11   Q.  And why not?

12   A.  Because I do think there's a potential for abuse and

13   diversion of medications that are prescribed by telemedicine,

14   and telemedicine may limit their ability to do an exam.  So for

15   those -- those are the two big reasons that I don't think it's

16   good practice.

17   Q.  Okay.  So in your opinion, an in-person exam before

18   prescribing Mifepristone would be required by the standard of

19   care in obstetrics and gynecology?

20   A.  Yes.

21   THE COURT:  Do you practice telemedicine now?

22   THE WITNESS:  No, ma'am, I do not.

23   THE COURT:  Does your hospital?

24   THE WITNESS:  The hospital does not.

25   THE COURT:  During COVID, they didn't do telemedicine?

1          THE WITNESS:  Physicians who have an office practice

2    would have telemedicine but I do not have an office practice.

3    I'm practicing in a hospital.

4          THE COURT:  Okay.  So the physicians, as you said,

5    with office practices do use telemedicine but not the hospital?

6          THE WITNESS:  Correct.

7          THE COURT:  And is that IU North and IU West?

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.  Go ahead, Mr. Rowlett.

10         MR. ROWLETT:  Dr. Wozniak, we can --

11         I was planning to actually get to that, Your Honor.

12   So I'll just jump to those questions.

13   BY MR. ROWLETT:

14   Q.  Obviously in the age of COVID, there has been increased use

15   of telemedicine in the medical world generally.  To your

16   knowledge, has that worked well?  Have there been any problems

17   in the OB/GYN field specifically?

18   A.  My understanding is there is.  Many that --

19         THE COURT:  Wait.  You don't practice in this area.

20   So you would only know that from what other people have told

21   you?

22         THE WITNESS:  Yes, with my conversations with other

23   physicians.

24         THE COURT:  I don't want her to testify to that,

25   Mr. Rowlett.  She doesn't practice in this area.

1           Now, if you want to establish some expertise by which

2     she studied it and done surveys and so forth, it might be

3     relevant.  But you should go on to the next question.

4           MR. ROWLETT:  Okay.  We will leave that alone.

5     BY MR. ROWLETT:

6     Q.  So Dr. Wozniak, I want to move on to in-person counseling.

7     Are you familiar with Indiana's requirement that counseling

8     before a medication abortion be done in person?

9     A.  Yes.

10    Q.  And is it your opinion -- or what is your opinion on

11    in-person interactions?  Do you think those are superior to

12    telemedicine interactions?

13    A.  I do think they're superior, again, for reasons I've

14    mentioned before.  I think there's a question of rapport,

15    there's a question of trust.  There's also an ability to --

16          THE COURT:  Hold on.  Mr. Stroud, we need to have you

17    log off.  I mean, we're going to do that to you.  Just stand

18    by.  It won't hurt.  You were accidentally admitted.  We're

19    back to the original cadre here.  Okay.  Sorry for the

20    interruption, Mr. Rowlett.

21          MR. ROWLETT:  No problem, Your Honor.

22    BY MR. ROWLETT:

23    Q.  So Dr. Wozniak, you were speaking, I believe, of the

24    benefits of conducting counseling in person instead of

25    virtually.

1  A.  Yes.

2  Q.  And you can continue.  What are some of those benefits?

3  A.  So yes, I think there is a benefit to having been

4  face-to-face with a person regarding counseling risks,

5  benefits, expected outcomes, complications.  In my experience,

6  prior to doing surgery, patients often have a number of

7  questions.  Sometimes they didn't fully understand their

8  condition.  Sometimes I drew pictures for them.  So I do think

9  that an in-person counseling is superior.

10  Q.  And based on all those things that you just identified, do

11  you believe that in-person interactions enhance your obtaining

12  informed consent from your patients?

13  A.  I do.

14  Q.  And what kind of things do you do in your in-person

15  counseling sessions with your patients to facilitate obtaining

16  their informed consent?

17  A.  So the first thing is I want to make sure the patient

18  understands her condition, where she is with that.  And then if

19  there's a procedure involved, I want to make sure that she

20  understands the reasoning behind it, what the risks are, what

21  the potential complications are, what the potential benefits

22  are.  So that's -- that would be the second part of that.

23      The third part is going through the consent itself.  And I

24  literally go through it; this is what is says, this is what it

25  means.  And I go on through it right down the list.  And then

1  the patient signs it; and she's never under any pressure to

2  sign it because I want to make sure she has all her questions

3  answered.

4       And where I was practicing with St. Vincent's, two things:

5  One, I would have her sign the consent in advance when she was

6  in the office and explained it, because I felt like the

7  patient's more receptive and better able to process that

8  information, even though the hospital actually required a

9  consent to be signed the day of surgery; and my issue with that

10  was I feel like patients who sign a consent on the day of

11  surgery are distracted, they're nervous, and I just don't feel

12  like that's a true informed consent.  So I would spend the time

13  in the office to literally walk them through the counseling

14  part as well as signing the consent portion of it.

15  Q.  Okay.  When you meet with patients, do you ever find that

16  patients try to mislead you about their condition?  And I don't

17  mean necessarily intentionally.  But do you find that you

18  always don't get accurate information out of your patients?

19  A.  There have been a number of times that patients haven't

20  given me the full and complete history, and I have to say most

21  of the time it's unintentional.  Time has gone by, they forget

22  about a surgery they have had in the past.  But I'm doing an

23  exam, and so I see a scar where a colesectomy was done, and

24  I'll ask them about it and that will jog their memory.  It's

25  mostly along those lines but it is a part of connecting the

1    history to the physical.

2    Q.   Okay.   And now talking about a circumstance where it may be

3    somewhat intentional.   Going back to kind of the intimate

4    partner violence context.   How does in-person counseling, not

5    the physical but the counseling, how does that assist you in

6    screening for intimate partner violence, domestic abuse, sexual

7    abuse, et cetera?

8    A.   Some of it is body language, eye contact.   Some of it is,

9    quite frankly, gestalt.   Who's with the patient in the room?

10   Who's basically dominating the conversation?   That's always a

11   red flag if it's -- the partner is in the room and they are

12   directing everything.   So there's been some instances of that.

13   Q.   If that interaction were happening by telemedicine, would

14   you be able to as easily detect who was in the room?

15   A.   Just like you can't tell me if there's somebody else in

16   this room.   There's nobody else in this room but we know where

17   I am.   There's no one in this room but if this were my home,

18   there's no way somebody would know that for certain that I was

19   the only person in the room.

20   Q.   And so if I'm hearing you correctly, you find it important

21   not only to see the patient but to see who comes with the

22   patient?

23   A.   Absolutely.

24   Q.   Now, specifically in the context of medication abortion, do

25   you think an in-person interaction would be superior for

discussing the moral or ethical implication of the abortion?

A.   I do.

Q.   And I'm speaking in kind of an informed consent context here.  And why is that?  Why do you think that better facilitates that conversation?

A.   I just think that what she's contemplating doing is not a trivial matter, and I feel that having an in-person conversation again provides some human connection.  But I have always found it important that patients understand even if they go through with the termination, I'm still their doctor.  And I think that part of that connectedness is really very valuable and I think it's very important to the patient, whether or not she feels it at the time.

     But many times, in my experience, patients have come back, I think, because of that connection and because of the way they were counseled.

Q.   And so kind of going off of that, you know, could you give -- not looking for an overwhelming amount here but just some examples from your years of practice where an in-person counseling session, you know, allowed you to make a diagnosis or to catch something that you otherwise would not have.

A.   With regard to pregnancy?

Q.   Yes.

A.   So -- well, one case that comes to mind is in a sense I did have the diagnosis.  She had an ultrasound and the fetus had --

1  basically had absence of kidneys, which was not survivable.

2  And so she came and we discussed the options, and she elected

3  to terminate the pregnancy, but did have a complication and

4  came back a few days later.  And I happened to be on call and

5  her comment to the ED physicians was "Thank God Wozniak was on

6  call."

7  Q.  I want to talk specifically also about your miscarriage

8  patients.  Do you find that in-person counseling allows you to

9  sort of counsel them about what's ahead, about what's going to

10 happen as a result of their diagnosis with a miscarriage?

11 A.  Yes.  And with a miscarriage -- and quite frankly, even

12 with an elective termination -- there's an element of grief

13 with this.  It's still a pregnancy loss.  Even if she elects to

14 terminate her pregnancy, it's still a loss.  So again, I feel

15 that in-person counseling does help with that.  But it also

16 helps to discuss with them:  "Okay, here's the plan of care

17 going forward."  And for my patients if it was regarding a

18 miscarriage, "These are your options in taking care of you for

19 this miscarriage."

20     You can expect family management.  You can do Mifepristone.

21 You can have a D&E, and go over the benefits.  And one of the

22 more important things in both cases of an elective termination

23 and a miscarriage, she's not actively bleeding with a

24 miscarriage.  She doesn't have to make an instantaneous

25 decision about what she's going to do.

1    And I think that rapport helps her feel like she has some

2    space and can think about it and come to, you know, the

3    decision that she feels is best, based on what we discussed and

4    what I feel her risks are.

5    Q.  Okay.  And so specifically for a patient that may be

6    considering a medication abortion, do you think in-person

7    counseling would better facilitate that provider and that

8    patient discussing whether they should proceed with that

9    treatment?

10   A.  I do.

11        THE COURT:  So let me ask a question that sort of gets

12   to the chase here.  So what you describe in terms of your own

13   practice and your own judgments, Dr. Goodwine-Wozniak, reflects

14   best practices or you are setting your own practice standards

15   at a level that conforms to your own best judgment as to how to

16   meet the challenges of practice.

17        So do you agree that there's probably a gap between

18   the very best highest standards that you maintain and standards

19   that others may maintain that would still be adequate, if not

20   best practices?  Is there a range of discretion with respect to

21   how to treat patients with respect to these issues that you've

22   been asked about by Mr. Rowlett?

23        THE WITNESS:  In all honesty, Your Honor, I do.  I

24   think there's, you know, the minimum and then there is taking

25   care of a patient.  And I remember in residency, you know,

1   something that really resonated with me is you can't always

2   treat patients, but you can always take care of patients, and

3   that's how I practice.

4        THE COURT:  So if the law prescribes various standards

5   of practice and says in certain circumstances, particularly

6   with abortion, various procedures have to be undertaken.  So

7   you would agree, I assume, that they could be undertaken with

8   variations in quality.  That people would do those tasks more

9   or less good, some really good, some middle, some not so good.

10        But the law has set out a range of practice behaviors

11  below which, because the law says that, you can't go.  You

12  can't forego the standards that the law imposes, right?  Is

13  that how you understand it, too?

14        THE WITNESS:  That's how I understand it.  I don't

15  think sometimes what's legal is always the best care for a

16  patient, but I'm only responsible for how I take care of

17  patients.

18        THE COURT:  Sure.  That's sort of what I'm getting at

19  because I admire your level of practice, and I admire the care

20  and the diligence and the training and the expertise that you

21  bring to bear on it.  But those things are not entirely

22  relevant to what I have to decide because I have to decide if

23  these requirements create barriers or undue burdens, that

24  because of the conditions, certain patients don't get access to

25  the care.

1          So I wish, Mr. Rowlett, instead of asking of this good

2     witness, whom I repeat I do admire and respect, if you would

3     ask her the questions that go to the issues before the Court,

4     because I don't need to know best practices.  I need to know

5     whether these practices create obstacles, if they create an

6     undue burden -- undue burden on the patient.  Not the

7     practitioner but the patient.

8          So there seems to be -- we're sort of surrounding

9     these issues from a great distance and I wish you'd get right

10    to the core issues, if I could give you that guidance,

11    Mr. Rowlett.

12          MR. ROWLETT:  Sure.

13    BY MR. ROWLETT:

14    Q.  Dr. Wozniak, this dovetails nicely into the next area we

15    were going to go into.  You testified previously about

16    gestational dating and the importance of gestational dating for

17    whether a medication abortion is indicated.

18          Now, what is -- and I understand the Court's intention with

19    its previous comments.  What is the best way to date a first

20    trimester pregnancy?

21    A.  Without question, the best way to date a first trimester

22    pregnancy is by ultrasound.

23    Q.  Okay.  And in your field, is there any other commonly

24    relied on way to date a first trimester pregnancy?

25    A.  Not with any real degree of accuracy.  A first trimester

1  ultrasound is going to be accurate between one and three days.

2  Q.  So it would, then, be the case that if a physician who

3  needed to determine gestational age as part of making a

4  recommendation didn't perform an ultrasound, they would be

5  below the minimum standard of care; is that correct?

6  A.  In my opinion, they would.

7  Q.  Okay.

8          THE COURT:  So the ultrasound -- having an ultrasound

9  and the benefit of that is the standard of care but not

10  necessarily by the physician who's going to be using that to

11  inform judgments, right?  It can be done by a technician or

12  somebody else?

13          THE WITNESS:  Yes, it can be done by a technician or

14  somebody else.  But I would say -- I want to be really clear on

15  this.  It really depends on the trimester in which the

16  ultrasound is done.  So if it's a first trimester ultrasound,

17  so many offices have ultrasounds, Your Honor, that it's

18  routinely done in the first trimester for two reasons.

19          One, we want to know the location of the pregnancy and

20  its gestational age.  Two, so many women are getting not

21  invasive prenatal testing but is very contingent on having an

22  accurate gestational age.  That's the other reason that early

23  pregnancy ultrasounds are performed.

24          So in my mind, I really have a hard time finding a

25  reason not to have an accurate ultrasound in determining what

1   becomes of a pregnancy.

2       THE COURT:  Well, you missed my point, because I'm not

3   talking about an accurate ultrasound.  I'm assuming that if

4   somebody else did it, it would be accurate.  I don't want

5   somebody to give you bad information, but is there any reason

6   somebody else can't do it besides the attending physician?

7       THE WITNESS:  An attending physician should be able to

8   do it.  A second trimester ultrasound, to be honest with you, a

9   first trimester ultrasound I tend to do myself.

10      THE COURT:  I know you're not hearing my question.  I

11  know you do best practice.  I'm asking, is there room in the

12  system to use an ultrasound that's correct, reliable, accurate,

13  that's been performed by somebody besides the attending

14  physician?

15      THE WITNESS:  I would want that.

16      THE COURT:  Can you look at the x-ray and see what you

17  would need to see even though you didn't perform it?

18      THE WITNESS:  That is a really important distinction.

19  There's a big distinction between looking at an image that may

20  have been printed somewhere else and looking at their

21  measurements versus looking at a report.

22      THE COURT:  So you would never rely on somebody else's

23  ultrasound; is that right?

24      THE WITNESS:  The only time I would rely on another

25  person's ultrasound is if it's second trimester and performed

1   by maternal fetal medicine; otherwise, I want the image.  I

2   want the measurements.

3            THE COURT:  Go ahead, Counsel.  I'm sorry, I sort of

4   highjacked your questioning here.

5            MR. ROWLETT:  No, Your Honor, no problem at all.

6   BY MR. ROWLETT:

7   Q.  Now, Dr. Wozniak, I want to -- so we talked about

8   ultrasound a little bit, and I'm kind of still focusing on the

9   Court's focus here about sort of that divide between minimal

10  and best practices.  So going back to the physical exam, you

11  know, what benefits of the -- what benefits does the physical

12  exam provide you, performing a physical on a patient in order

13  to treat that patient, which I, you know, understanding that

14  being able to get enough information to treat the patient

15  would, I'm assuming, be the minimum.

16       Correct me if I'm wrong there, but if that's so, how does

17  the in-person examination facilitate your ability to choose a

18  treatment?

19  A.  Well, as we discussed before, the physical exam does marry

20  the history and supports the history that was taken.  You get a

21  better sense of what surgical procedures they have done.  If

22  you do a pelvic exam, you get a better look at the cervix.  You

23  know what procedures have been done there, at least potentially

24  you know if there's problem from an infectious standpoint.  So

25  I think it's an important part of getting somebody ready for a

1    procedure.

2    Q.  And so, to go off that, have you had any circumstances with

3    your patients where an in-person physical was vital to making

4    the proper diagnosis, a/k/a, it would have fallen below that

5    minimum standard of care.  Somebody would have been making a,

6    you know, committing a violation of the standard of care or

7    even committing perhaps malpractice if they didn't do

8    something.  Any examples of where the physical was what created

9    the right treatment and the right result for that patient?

10   A.  Well, the most basic example would be a size, date

11   discrepancy, which happens not infrequently.  So the uterus

12   feels bigger on exam.  You do an ultrasound, and low and behold

13   --

14          THE COURT REPORTER:  Could you slow down and repeat

15   that?

16          THE COURT:  You have to slow down but also repeat that

17   answer.

18          THE WITNESS:  I say --

19          THE COURT:  You said, "The most basic example would be

20   a size, state --

21          THE WITNESS:  Size and date --

22          THE COURT:  Size and date --

23          THE WITNESS:  -- discrepancy.

24          THE COURT:  -- discrepancy, okay.

25          THE WITNESS:  That would be a very commonplace example

where the uterus feels bigger than what you would expect for her last menstrual period.  So you do an ultrasound and there's not one baby but two in there, or perhaps you see some fibroids within the uterus.  Fibroids are benign tumors that could certainly make a uterus feel larger than it was.

So those would be some very basic ones.  One would not want to miss a twin gestation.

BY MR. ROWLETT:

Q.  And so going off that to kind of dig a little deeper.  Have you ever had a circumstance where you're receiving a patient from another doctor and the diagnosis is a certain thing; and then, after you perform the physical exam, you realize that that diagnosis was incorrect?  It was the physical exam that resolved the issue?

A.  Well, one classic example, again, would be an undiagnosed twin gestation that transferred, you know, late first trimester and was far enough along in the pregnancy that she was measuring larger.

Sometimes -- it can be really variable.  Things progress over time.  I've certainly had patients come in from other physicians, and I just need to get them up to date on things, or they have a complaint, and I'm looking and I find they have an infection.  So whether it was missed, whether it progressed, a physical exam made a difference for that patient.

Q.  Okay.  And did you -- have you ever had any circumstances

with particular patients you've treated where a previous physician not performing a physical, you know, resulted to more either negative health repercussions to the patient or an incorrect diagnosis and when you performed a physical, that resolved it?

A.   So I can think of an instance where a patient started her pregnancy off with one physician and for whatever reason didn't have a pelvic exam.  She'd had previous procedures on her cervix; and when she saw me at 18 weeks, I looked, and her cervix was giving way.  She had cervical insufficiency, so she was painlessly dilating, and that was an instance where she immediately became a high risk pregnancy and needed to be evaluated for procedures that could potentially salvage that pregnancy.

Q.   Thank you.

     MR. ROWLETT:  Your Honor, can I just confer very briefly because we've jumped around a little bit on the order I was intending to go through, so I just would like to confer briefly, and we may be ready for cross.

     THE COURT:  Yes, you may, and you don't have to explain to me why you need to do that because I was the one that got you off track.  So take the time you need, Mr. Rowlett.

     MR. ROWLETT:  Thank you, Your Honor.

               (Off-the-record discussion.)

1          THE COURT:  Now, we're back on the record.  Mr.

2    Rowlett?

3          MR. ROWLETT:  Yes.  So Your Honor, just a quick point

4    of clarification.  Obviously, the purpose of Dr. Wozniak was to

5    put on affirmative evidence of the benefits of the four laws

6    that are at issue in this trial.  I can revisit some of those

7    and go a little bit further, but is the Court going to be

8    amenable to that or --

9          THE COURT:  Well, if you did that, you'd be repeating

10   yourself.  So I'm not very amenable to repeating.

11         MR. ROWLETT:  Okay.  Well then, in that case, Your

12   Honor, we have no additional questions at this time.

13         THE COURT:  Okay.  Then, Miss Sharma, you may

14   cross-examine.

15                        CROSS-EXAMINATION

16         MS. SHARMA:  Good afternoon, Dr. Goodwine-Wozniak.  I

17   have just a few questions for you.

18   BY MS. SHARMA:

19   Q.  First, I believe that on direct examination, you testified

20   that you've never provided a medication abortion.  I just

21   wanted to clarify that you've never provided an aspiration

22   abortion either?

23   A.  I have never provided a medication abortion.  I have never

24   provided an aspiration abortion.  I have done suction D&Cs for

25   miscarriages.

1   Q.  You haven't published any peer-reviewed articles on

2   abortion either?

3   A.  No.

4   Q.  Your research doesn't address abortion either?

5   A.  No.

6   Q.  And Doctor, you're a member of ACOG?

7   A.  Yes.

8   Q.  And you look to ACOG for educational materials?

9   A.  Yes.

10  Q.  You look --

11          MS. SHARMA:  No further questions, Your Honor.

12          THE COURT:  Okay.  Redirect?

13          MR. ROWLETT:  No, Your Honor.  Thank you.

14          THE COURT:  Okay.  Thank you, Doctor, very much.  I

15  take it she is released from her subpoena; is that right?  So

16  you have finished with her questioning?  True, Mr. Rowlett?

17          MR. ROWLETT:  Yes, Your Honor.

18          THE COURT:  Miss Sharma?

19          MS. SHARMA:  Yes, Your Honor.

20          THE COURT:  So thank you very much, and I appreciate

21  your making the time available.

22          THE WITNESS:  Have a good day.

23          THE COURT:  Yes, you too.  Good luck.

24          Let's see, we might be able to get another witness

25  started here, or is your last name Bartolomucci too?  Wait just

1    a minute.  You're muting.  Whatever your last name is, I don't

2    know what it is.

3         MS. RAHMAN:  Andrea Rahman, Your Honor.

4         THE COURT:  Okay, Miss Rahman.  I didn't think you

5    were -- I had another Bartolomucci.

6         MS. RAHMAN:  Yes.

7         THE COURT:  Do you have a witness for us, Ms. Rahman?

8         MS. RAHMAN:  Yes, Your Honor.  We wanted to get

9    started.  I have Dr. Christopher Stroud.

10        THE COURT:  All right.  Hello, Dr. Stroud.  Is that

11   you?  You don't have your audio on.

12        MR. ROWLETT:  Do you want to un-mute yourself?

13        THE WITNESS:  How does that sound?

14        THE COURT:  That's better, that's better.

15        Dr. Stroud, you've been called as a witness in our

16   trial, so would you be sworn to give truthful testimony,

17   please?  I'll ask the clerk to administer the oath.

18        DR. CHRISTOPHER STROUD, DEFENDANTS' WITNESS, SWORN

19                     **DIRECT EXAMINATION**

20        THE COURT:  You may proceed, Ms. Rahman.

21        MS. RAHMAN:  Thank you, Your Honor.  Hello,

22   Dr. Stroud.

23        THE WITNESS:  Hello.

24   BY MS. RAHMAN:

25   Q.  We have a little bit of time left today so I doubt we'll be

205

1    able to complete your testimony, but we at least wanted to get

2    the ball rolling today, if that's all right with you.

3    A.   Certainly.

4    Q.   First, could you please state your name and spell it for

5    the record?

6    A.   Christopher Stroud, S-T-R-O-U-D.

7    Q.   Thank you.  And first, I would like to pull up the

8    stipulated Exhibit 4.  I'll do that here momentarily.  Can you

9    see what's on my screen, Dr. Stroud?

10   A.   Yes, I do.  I see my CV.

11   Q.   Excellent.  Is this the copy of the CV that was provided

12   with your expert report?

13   A.   Yes, it appears to be.

14   Q.   Thank you.  And is this the most up-to-date version of your

15   CV as far as you're aware?

16   A.   Yes, I believe it is.

17   Q.   Great.  To start with, can you tell me where you currently

18   work?

19   A.   I work at the Fertility & Midwifery Care Center in Fort

20   Wayne, Indiana.

21   Q.   What is your current job title?

22   A.   I'm an obstetrician/gynecologist, and I'm the owner of the

23   practice.

24   Q.   Thank you.  Could you tell me, where are you licensed to

25   practice medicine?

A.   Indiana, Wisconsin, Ohio, and Michigan.

Q.   Thank you.  Now, are you board certified?

A.   I am.

       THE COURT:  Sounds like an electoral college slate, Doctor.  Go ahead.  Just a little aside for Dr. -- Chris's benefit here.

       MS. RAHMAN:  Thank you, Your Honor.

BY MS. RAHMAN:

Q.   So Dr. Stroud, are you board certified?

A.   I am.

Q.   In what specialty?

A.   Obstetrics and gynecology.

Q.   Thank you.  Could you take a moment and summarize what education you obtained to become a doctor?

A.   I went to undergraduate University of Florida and have a BS in biology.  I then went to -- excuse me, Florida State University, and then went to medical school at the University of Florida.  And then, I attended residency in obstetrics and gynecology at the University of Virginia.

Q.   Thank you.  At some point during that mix, did you also obtain a master's in business administration?

A.   I did.  Later on in those years, I went to Auburn University and have an MBA there.

Q.   Thank you.  If you could, could you take a few minutes and discuss some of your prior places of employment and what

1  positions you held, beginning after your residency at the

2  University of Virginia?

3  A.   Sure.  I was in private practice a few years in Beloit,

4  Wisconsin.  Then, I was in private practice for about ten years

5  in Albany, Georgia, southwest Georgia.  I then left clinical

6  practice and began work as a hospital administrator, which is

7  what first brought me to Fort Wayne.

8      I then did that for a large health system in Wisconsin, the

9  Aurora health system where I was a vice president and then,

10  chief medical officer for their health system.

11     And then I did the unusual thing and returned to private

12  practice after administrative practice.  And that brought me

13  back to Fort Wayne.

14  Q.   Thank you.

15     So you testified that you work at the Fertility & Midwifery

16  Care Center; is that correct?

17  A.   That's correct.

18  Q.   And do you also work for the Holy Family Birth Center?

19  A.   I own the Holy Family Birth Center.  It's a freestanding

20  licensed birth center in -- here in Fort Wayne.  It's a

21  completely separate entity, but I do own that, as well.

22  Q.   Okay.  Gotcha.  So would you -- would it be fair to say

23  that most of your clinical practice is at the Fertility &

24  Midwifery Care Center?

25  A.   Yes, that would be correct.

1   Q.   Okay.   So focusing on your work with the Fertility &

2   Midwifery Care Center, what are your current responsibilities

3   there?

4   A.   Well, I'm a full-time practicing OB/GYN.   And then, in

5   addition to that, I've got the business and administrative

6   responsibility for the practice.   And the same is true, I'm the

7   medical director for the birth center, as required by state

8   regulations.   But I'm also the owner, and so I'm responsible

9   for the business and the administration of the birth center, as

10  well.

11  Q.   And could you tell me, what are some of the medical care

12  and medical services that you provide there in your practice?

13  A.   Sure.   In the practice, really, full-scope obstetrics and

14  gynecology.   So women's health throughout the continuum of a

15  woman's life, from preadolescence, adolescence, perimenopause,

16  and menopause.   Our practice is heavily weighted in really two

17  areas, obstetrical care, pregnancy, and infertility and

18  recurrent pregnancy loss.

19  Q.   Okay.   I appreciate that.   Thank you.

20       Now, during your time -- looking at the breadth of your

21  career, during your time practicing as an OB/GYN, have you ever

22  had patients who had an abortion?

23  A.   Certainly.

24  Q.   In what kind of situations have you discussed a patient's

25  prior abortion throughout your years of experience?

A.  A variety of situations and circumstances.  You know, I've

certainly seen them after their initial followup care and now

maybe they have one concern or another, maybe about their

menstrual bleeding pattern, maybe about their future fertility,

but I've certainly seen them in routine followup or

post-abortion care, you might say.

I've also seen them on call through the emergency room if

they were suffering from complications of a pregnancy

termination.  Certainly, and more recently, in these years, it

comes up a lot when I'm talking with couples that I'm

evaluating for infertility.  And as we pursue a detailed

medical history, often that comes up, that maybe it is a part

of the woman's past.

Q.  Thank you.

So in your current practice --

THE COURT:  Could you remove the CV so that we can see

everybody better, please?

MS. RAHMAN:  Yes.

BY MS. RAHMAN:

Q.  So do you use telemedicine in your current practice?

A.  I do, extensively.

Q.  Okay.  Thank you.

Can you give me some examples in which you use

telemedicine?

A.  It's -- the only situation I use it in is for

consultations, usually for infertility or recurrent pregnancy loss.  And we offer that if someone lives more than an hour and a half away, we'll offer that in lieu of an in-person consultation.

Q.  Okay.  Thank you.

Along with that, in followup, as your -- in your practice as an OB -- board certified OB/GYN, do you regularly read and review contemporary medical literature in obstetrics and gynecology?

A.  Oh, certainly.

Q.  Were you asked do provide an expert opinion in this case?

A.  I was.

Q.  Okay.  Did you prepare an expert report for this case?

A.  I did.

MS. RAHMAN:  Okay.  Briefly, Your Honor, I want to just pull up a report.  This is marked as Recollect 22.

BY MS. RAHMAN:

Q.  Do you recognize this document, Dr. Stroud?

A.  Yes, I do.

Q.  Okay.  Can you tell me what we're looking at here?

A.  This is my entire expert report.

MS. RAHMAN:  Okay.  I just wanted to bring this to the Court's attention in case we reference it later.  I can go ahead and stop sharing that now.

All right.  Thank you.

BY MS. RAHMAN:

Q.  Dr. Stroud, given -- looking back on your experience, can

you give a brief explanation as to how your opinion and

expertise as an obstetrician/gynecologist would benefit this

Court with regards to the issues in this case?

        THE COURT:  Well, wait.  You're using a formula that

I'm recognizing.  When you're bringing your experts in, you ask

that question next, but I need to know what you're proffering

him as an expert in before I know if it's going to be helpful

to the Court.  So it's not just the field of OB/GYN, I assume.

        MS. RAHMAN:  Correct, Your Honor.  We would proffer

him as an expert on informed consent.

        THE COURT:  Now ask your questions about informed

consent.  You didn't even ask him if he's ever done that.

        MS. RAHMAN:  Okay.  Yes, Your Honor.

BY MR. ROWLETT:

Q.  Dr. Stroud, in your practice as an OB/GYN over the years,

do you engage in the process of informed consents?

A.  Oh, yes.

Q.  Can you give me some examples in which you would use

informed consent or obtain informed consent?

A.  Sure.  I do a lot of surgery, and always before a surgical

procedure an informed consent is required.  So it's a very

common part of my practice, and has been, you know, for all of

my 25 years now.

Q.  Are there any other examples of medical care procedures

that you would obtain someone's informed -- a patient's

informed consent?

A.  I mean, there's certainly a general consent just to be

treated, but anything that involves me touching or doing

something to a patient, you might say, requires consent.  If I

didn't have her consent, that would be assault.

     So -- but, typically, in medicine, when we say informed

consent, we usually mean a procedure of sorts.

Q.  Okay.  Thank you.

     Would it -- how extensively do you view -- engage in the

process of informed consent as part of your practice?

A.  I would say somewhere around 10 to 15 times per week.

Q.  Okay.  Thank you.

     MS. RAHMAN:  Your Honor, was that sufficient to get

back to my initial question about his expertise?

     THE COURT:  Yes.

     MS. RAHMAN:  Okay.  Thank you.

BY MS. RAHMAN:

Q.  Dr. Stroud, if you could, especially keeping in mind that

we would like you to discuss informed consent, can you give a

brief explanation as to how your opinion as an

obstetrician/gynecologist would benefit this Court with regard

to the issue of informed consent?

A.  Certainly.  I've been practicing medicine now well over two

1   decades, and particularly in obstetrics and gynecology, which

2   is a more procedural-based specialty than some.  I've been

3   doing informed consent and I've been involved with the informed

4   consent process extensively in a vast array of circumstances.

5   Q.  Have you also engaged in informed consent in the context or

6   related to abortions or post-abortion care?

7   A.  I have.

8   Q.  Okay.  Thank you.

9           MS. RAHMAN:  Your Honor, at this time I'd like to

10   tender Dr. Stroud as an expert witness to the Court.

11           THE COURT:  You proffer him as an expert?

12           MS. RAHMAN:  Yes, Your Honor.

13           THE COURT:  All right.  Any objection?

14           MS. TOTI:  Your Honor, may I inquire as to what

15   subject matter?

16           MS. RAHMAN:  The nature of --

17           THE COURT:  Wait, wait, wait.  She's asking me.  All

18   the dialogue goes through me, Miss Rahman.  If you were in

19   court, you'd sense it more acutely than you do on the

20   technology.  He's been proffered as an expert in informed

21   consent procedures with respect to OB/GYN practice.  That's the

22   proffer.

23           MS. RAHMAN:  And my apologies to clarify.  It's OB/GYN

24   practice including abortion care.

25           THE COURT:  Including abortion care.

MS. TOTI:  Your Honor, I would object to his
qualification as an expert in abortion care.  I think a
foundation hasn't been adequately laid for that.

THE COURT:  Do you want to ask preliminary questions
or stand on your objection?

MS. TOTI:  If I may ask a few preliminary questions,
Your Honor?

THE COURT:  You may ask.

MS. TOTI:  Okay.  Good afternoon, Dr. Stroud.  My name
is Stephanie Toti.  I think we previously met at your
deposition.

THE WITNESS:  I recall.  Yes.  Good afternoon.

MS. TOTI:  Nice to see you again.

Dr. Stroud, at your practice at the Fertility &
Midwifery Care Center, that practice doesn't provide abortion
services; is that correct?

THE WITNESS:  That is correct.

MS. TOTI:  And you've never personally provided a
medication abortion; is that correct?

THE WITNESS:  That is correct.

MS. TOTI:  And you've never sought or obtained a
patient's informed consent for medication abortion; is that
correct?

THE WITNESS:  That is correct.

MS. TOTI:  You haven't performed a surgical abortion

1    since your residency training; is that correct?

2                THE WITNESS:  That is correct.

3                MS. TOTI:  You completed your residency in 1995?

4                THE WITNESS:  Correct.

5                MS. TOTI:  Since completing your residency, you've

6    never been part of a medical practice where other providers

7    offer abortion services; is that correct?

8                THE WITNESS:  That is correct.

9                MS. TOTI:  You've never been inside an abortion

10   clinic; is that correct?

11               THE WITNESS:  That is correct.

12               MS. TOTI:  Your Honor, those are my preliminary

13   questions, and I do renew the objection.

14               THE COURT:  All right.  Do you want to respond,

15   Ms. Rahman?

16               MS. RAHMAN:  Yes, Your Honor.  I can ask additional

17   questions to better lay a foundation, but at least

18   preliminarily, Dr. Stroud has testified that he has provided

19   abortion care.  I can go into more detail about that and his

20   experience.

21               THE COURT:  Well, the objection goes to his lack of

22   involvement in providing abortion-related care during which he

23   would have to or did secure informed consent.

24               MS. RAHMAN:  Yes.

25               THE COURT:  So if you can rehabilitate on those areas,

that's what you should ask about.

       MS. RAHMAN:  Yes.  I will.  Thank you.

BY MS. RAHMAN:

Q.  Dr. Stroud, have you ever performed an abortion?

A.  Yes, I have.

Q.  When did you -- at what point in your career did you perform an abortion?

       THE COURT:  How many times you have performed abortions?

       THE WITNESS:  I don't recall an exact number, Your Honor.  I would have to estimate over a hundred.

       MS. RAHMAN:  Thank you.

BY MS. RAHMAN:

Q.  And did you perform abortions during your residency at the University of Virginia?

A.  Yes, I did.

Q.  What type of abortions did you perform?

A.  Suction, dilatation and curettage, as well as dilatation and evacuations.

Q.  Thank you.  And did you -- with these abortions that you performed, did you provide these women with information and obtain their informed consent for the abortion?

A.  I did.

       MS. RAHMAN:  Thank you.

       Your Honor, I can also address his experience with

1  regards to engaging with patients on medication abortion.

2         THE COURT:  You ask whatever questions you want.

3         MS. RAHMAN:  Okay.

4         THE COURT:  Then, I'll rule.

5         MS. RAHMAN:  All right.  Thank you.

6  BY MS. RAHMAN:

7  Q.  Dr. Stroud, have you ever had patients who have had a

8  medication abortion in your practice?

9  A.  Oh, certainly.

10  Q.  With these patients, have they described their experience

11  of taking Mifeprex?

12  A.  Yes.

13  Q.  Based on these conversations, what is your understanding of

14  a woman's experience in having a medication abortion?

15         THE COURT:  Wait.  That doesn't have anything do with

16  his expertise.  We're talking about informed consent for an

17  abortion-related process or procedure.  So that question

18  glosses over unasked questions.

19         Do you have any other that bear on the objection?

20         MS. RAHMAN:  My apologies.  To explain, I was wanting

21  to get to the point that he understands what is involved in

22  getting a medication abortion, and would be able to speak to a

23  woman's experience in informed consent that would be necessary

24  for a medication abortion.

25         THE COURT:  Well, your questions are oblique to that

1  purpose.  So you need to ask him if his familiarity with

2  treating patients who have had medical abortions has made him

3  familiar with the informed consent process for the abortion.

4          MS. RAHMAN:  Yes.  Will do.  Thank you, Your Honor.

5  BY MS. RAHMAN:

6  Q.  So Dr. Stroud, in speaking with your patients who have

7  obtained a medication abortion, are you familiar with the

8  process for obtaining informed consent for a medication

9  abortion?

10 A.  Yes, most certainly.  And --

11         THE COURT:  Yes, okay.  Hold on.  The lawyer has to

12 take you step-by-step, doctor.  So you answered "yes."  Okay.

13         MS. RAHMAN:  Yes.

14 BY MS. RAHMAN:

15 Q.  And Dr. Stroud, given that experience, conversing with

16 these patients about that, can you elaborate on your

17 understanding about the informed consent process for a

18 medication abortion?

19 A.  Yes.  Because it is standard, whether it's an orthopedic

20 surgery, or whether it's a gallbladder removal, or whether it's

21 a medication or aspiration abortion, informed consent is a --

22 it's a principle.  It's an intellectual endeavor, you might

23 say, that is not unique or specific to the procedure at hand,

24 other than the person getting -- or giving the informed consent

25 has to be very familiar and be able to answer all of the

1   patient's questions.  But the fundamentals of informed consent

2   are not procedure specific.

3          MS. RAHMAN:  Thank you, Dr. Stroud.

4          Your Honor, given Dr. Stroud's experience as an OB/GYN

5   and his experience in providing abortions, and his experience

6   in talking and conversing with patients who have had medication

7   abortions, I would proffer him as an expert witness on informed

8   consent, both in OB/GYN care and on abortion care.

9          THE COURT:  Any objection to that, Miss Toti?

10         MS. TOTI:  Your Honor, plaintiffs don't object to

11  Dr. Stroud being qualified as an expert in the provision of

12  informed consent generally; but given that he last performed an

13  abortion 26 years ago and that both the abortion techniques

14  have changed considerably since then and the risks of abortion

15  have changed considerably since then, we do object to him being

16  qualified as an expert specifically with respect to informed

17  consent in the context of abortion care.

18         THE COURT:  I hear his answers and the proffer to be,

19  but mostly his answers, that it's sort of a generic process,

20  this informed consent.  That it extends across many fields of

21  medicine.

22         So to the extent that's relevant, we've already heard

23  a lot of testimony about that already, he can testify to that.

24  But I don't hear an expertise with respect to the specific

25  delivery of abortion related care and the securing of an

1    informed consent.  That's what is missing here in the proffer.

2         MS. RAHMAN:  Respectfully, Your Honor, he testified

3    that he has provided abortions and he provided informed consent

4    for those abortions during his residency.

5         THE COURT:  Miss Toti put an age -- I mean a year on

6    that.  Twenty-six years ago she said.  Is that when the last

7    time was?

8         MS. TOTI:  Dr. Stroud?

9         THE WITNESS:  Well, my last informed consent was

10   yesterday, but the last abortion informed consent was in

11   residency training, probably 1995.

12        THE COURT:  So 26 years ago, whatever the math was.

13   Is that right?

14        THE WITNESS:  Yes, ma'am.

15        THE COURT:  And when you provided the abortions, was

16   it a standard informed consent or was there something specific

17   or unique about it?

18        THE WITNESS:  Well, it was specific and unique to the

19   abortion care.  Abortion -- surgical abortions --

20        THE COURT:  Wait.  I'm asking -- sorry, sir.  I'm

21   asking whether the informed consent process that you undertook

22   with respect to those patients seeking that care was any

23   different than the informed consent process you follow in all

24   other respects in your practice?

25        THE WITNESS:  They are identical.

1    THE COURT:  That was what I heard you just say.  So I

2    don't think that there's an area of expertise with respect to

3    abortion procedures as such.  Only as to consent -- informed

4    consent, about which we have a lot of testimony, by the way.

5    MS. RAHMAN:  Yes, Your Honor.  And I would like to

6    know, I think it's relevant that -- I think we can all agree

7    that Dr. Stroud is an expert on informed consent and an

8    informed consent applies to all areas.

9    It seems that Miss Toti's objections seem to go more

10   to the weight of his testimony as it applies to abortion care

11   but not necessarily to his admissibility or his testimony as an

12   expert.

13   THE COURT:  Actually, the objection went to your

14   proffer because you were proffering -- you made it a dual

15   proffer.  You said he's an expert in informed consent and in

16   informed consent with respect to abortion care.  It's the

17   second part that's missing.

18   MS. RAHMAN:  Okay, Your Honor.  I mean, I maintain

19   that his experience -- he has previously provided informed

20   consent for abortion care, and Dr. Stroud has testified that

21   informed consent applies regardless of the procedure.  I just

22   think it's important to bring to light that he has experience

23   providing abortions.

24   So I didn't want to cabin him to only discussing

25   informed consent as an OB/GYN.  I also want to bring to light

1   his experience providing abortions.  So if we were to agree --

2        THE COURT:  You're creating a bit of a moving target

3   here, Miss Rahman, because you've changed the terms on which

4   you're calling him.  And therefore, you're misconstruing the

5   objection.  I will allow you to call him and have him testify

6   as an expert as to informed consent.

7        MS. RAHMAN:  That's what I was going to ask, Your

8   Honor.  I agree.  Thank you very much.

9        THE COURT:  All right.  So how about if we use that as

10  a break point.  Can we get you back tomorrow by video here,

11  Dr. Stroud?

12       THE WITNESS:  Yes, ma'am.

13       THE COURT:  9:30 in the morning, does that satisfy

14  your schedule all right?

15       THE WITNESS:  That would be perfect.

16       THE COURT:  Looks like you've been in the Florida sun,

17  Dr. Stroud.

18       THE WITNESS:  I think it's just the magic of the

19  camera.

20       THE COURT:  Okay.  I wish the camera worked as well on

21  me, then.  I still have library pallor no matter what.

22       So okay.  I'm sorry to inconvenience you in this way

23  but I have to be respectful of the court personnel as well.  So

24  to all of you, we'll reconvene at 9:30 in the morning.

25       Ms. Singh has a question or something?

1          MS. SINGH:  Your Honor, yes, just briefly, I was

2    wondering if the Court would like closing statements tomorrow,

3    if we wrap up tomorrow.

4          THE COURT:  I'll hear closing statements, yes, but I

5    don't want post-trial briefs.  So put in your closing statement

6    whatever you would otherwise put in a post-trial brief.  I have

7    pretrial briefs.  I have tendered findings and conclusions.

8    And I'll hear your closing arguments but I don't want any more

9    paper filed after that, please.

10         MS. SINGH:  I see.  I understand, Your Honor.  Okay.

11   Thank you.

12         THE COURT:  Okay.  Good.  We'll see you in the

13   morning.  Have a nice evening.  Oh, Happy St. Patrick's day.

14   Don't do anything that will prevent you from being on your best

15   in the morning.

16         THE WITNESS:  Certainly.

17         MS. SINGH:  Absolutely not.  Thank you.

18         MS. RAHMAN:  Thank you, Your Honor.

19              (Court adjourned at 5:10 p.m.)

20

21

22

23

24

25

CERTIFICATE OF COURT REPORTER


        I, Laura Howie-Walters, hereby certify that the
foregoing is a true and correct transcript prepared from
reported proceedings in the above-entitled matter to the best
of my ability.



/S/LAURA HOWIE-WALTERS   March 17th, 2021

LAURA HOWIE-WALTERS, FCRR, RPR, CSR
Official Court Reporter
Southern District of Indiana
Indianapolis Division