UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


WHOLE WOMAN'S HEALTH ALLIANCE,  )
ET AL,   )
   )
      Plaintiff,   ) CAUSE NO.:
   ) 1:18-cv-01904-SEB/MJD
   ) Indianapolis, Indiana
    -v-   ) March 18th, 2021
   ) VOLUME IV
TODD ROKITA, ATTORNEY GENERAL  )
OF THE STATE OF INDIANA, IN HIS )
OFFICIAL CAPACITY, ET AL,  )
   )
     Defendants.  )




Before the Honorable
SARAH EVANS BARKER, JUDGE




OFFICIAL REPORTER'S TRANSCRIPT OF
ZOOM VIRTUAL BENCH TRIAL



Court Reporter:          Laura Howie-Walters, FCRR/RPR/CSR
                   Official Court Reporter
                   United States District Court
                   Room 217
                   46 East Ohio Street
                   Indianapolis, Indiana  46204


PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT PRODUCED BY ECLIPSE NT COMPUTER-AIDED TRANSCRIPTION

```
 1                        A P P E A R A N C E S

 2

 3   For Plaintiffs:              Juanluis Rodriguez, Esq.
                                  Stephanie Toti, Esq.
 4                                Melissa Shube, Esq.
                                  Dipti Singh, Esq.
 5                                LAWYERING PROJECT
                                  3371 Glendale Blvd. #320
 6                                Los Angeles, CA  90039-1825

 7

 8   For Defendants:             Thomas M. Fisher, Esq.
                                 Robert Rowlett, Esq.
                                 Andrea Elizabeth Rahman, Esq.
 9                               Christopher Barolomucci, Esq.
                                 Robert Rowlett, Esq.
10                               INDIANA ATTORNEY GENERAL
                                 302 West Washington Street
11                               Indiana Government Center South
                                 Fifth Floor
12                               Indianapolis, IN  46204

13                                     and

14                                Gene Schaerr
                                  Christopher Bartolomucci
15                                SCHAERR JAFFE LLP
                                  1717 K Street NW, Suite 900
16                                Washington, D.C.  20006

17

18

19

20

21

22

23

24

25
```

I N D E X

**PLAINTIFFS' WITNESSES**                                    **PAGE**

DR. CHRISTOPHER STROUD
Direct Examination Continued by Ms. Rahman ......6
Cross-examination by Ms. Toti .................32
Redirect Examination by Ms. Rahman ............48

DR. DANIEL GROSSMAN (Rebuttal)
Direct Examination by Ms. Singh ...............219

JULIA STEINBERG (Rebuttal)
Direct Examination by Ms. Shube ...............229
Cross-examination by Mr. Schaerr ..............237


DEFENDANTS' WITNESSES

ANASTASIA ROTH
Direct Examination by Mr. Rowlett .............49
Cross-examination by Mr. Rodriguez ............76
Redirect Examination by Mr. Rowlett ...........95

PRISCILLA COLEMAN
Direct Examination by Schaerr .................99
Cross-examination by Ms. Singh ...............162
Redirect Examination by Mr. Schaerr ..........167
Recross-examination by Ms. Singh  ............172
Further Redirect Examination by Mr. Schaerr ...173

AARON KHERIATY, M.D.
Direct Examination by Mr. Anderson ...........176
Cross-examination by Ms. Singh ...............212


**EXHIBITS**                              PAGE

1 ................................. 246
2 ................................. 246
3 ................................. 246
ECF347............................. 245
ECF367............................. 245

4

1           (Open court.)

2           THE COURT:  Morning, lawyers.

3           MS. TOTI:  Good morning.

4           MR. ROWLETT:  Good morning.

5           THE COURT:  I hear in your voice the fact that it's

6  the fourth day.  Here's how I heard your morning.  It goes

7  "morning."  That means somebody took me up on the time I gave

8  you last night to celebrate St. Patrick's Day maybe.

9           MS. RAHMAN:  To be honest, Your Honor, I have not had

10  my tea yet this morning.  So it's lack of caffeine but I will

11  try to compensate.

12           THE COURT:  I'm worried now.

13           Okay.  Miss Rahman, you were partway through the

14  testimony of Dr. Stroud, right?

15           MS. RAHMAN:  Yes, Your Honor.

16           THE COURT:  So do you want to recall Dr. Stroud?

17           MS. RAHMAN:  Yes, Your Honor.  I would like to call

18  Dr. Christopher Stroud.  He should be in the waiting room right

19  now.

20           THE COURT:  Recall him, right?

21           MS. RAHMAN:  Yes, recall Dr. Stroud.

22           THE COURT:  Good morning, Dr. Stroud.  Can you hear

23  me?

24           THE WITNESS:  Yes, ma'am.  Good morning.

25           THE COURT:  I can hear you fine now.  You had a

5

pleasant evening, I hope?

THE WITNESS:  Yes, I did, uneventful.

THE COURT:  A little bit of corned beef and cabbage?

THE WITNESS:  Not exactly.  No, ma'am.

THE COURT:  Okay.  Well, a good St. Patrick's Day any way, however you celebrate it.

We're going to resume your questioning because we had to interrupt it last night.  I remind you, sir, you're still under oath.

MS. RAHMAN:  Thank you, Your Honor.  To begin with, I just wanted to confirm that Dr. Stroud is being called as an expert witness with regards to informed consent.

Generally, I would also like to now tender him in addition as an expert in obstetrics and gynecology.

THE COURT:  Any objection to that, Miss Toti?

MS. TOTI:  No, Your Honor.

THE COURT:  All right.  The proffer has been made and not objected to, and so I'll permit him to testify as an expert in those areas.

MS. RAHMAN:  Thank you very much, Your Honor. Dr. Stroud, good morning.

THE WITNESS:  Good morning.

DR. CHRISTOPHER STROUD, PLAINTIFFS' WITNESS, RESUMES

**DIRECT EXAMINATION** CONTINUED

BY MS. RAHMAN:

Q.  To begin with, I wanted to first ask you if you are familiar with the different types of abortion?

A.  Yes.

Q.  Could you briefly describe the different types of abortion?

A.  Yes.  You could think of them as medical or surgical in two broad categories.  And then within the surgical category, you can think of two subtypes; one is often referred to as a suction D&C.

The other is usually referred to as a D&E.  Medically speaking, that involves taking the two medications that we've discussed, the Mifepristone and Misoprostol, to induce the termination.  Surgically it involves emptying the uterus mechanically.

A suction D&C is -- it requires the dilation of the cervix.  That's the D of the D&C.  And then a suction device is placed into the uterus connected to a suction machine and through suction, it pulls the material into the cannula, it's called, and that removes the tissue.

The D&E, the dilation and evacuation, generally people use that term to describe the situation where there is too much tissue for the suction device, and so then it involves a mechanical removal of tissue from the uterus with some similar

1   instrument.

2   Q.  Thank you very much for that summary.

3       Have you ever performed an abortion?

4   A.  Yes.

5   Q.  At what point in your career did you perform an abortion?

6   A.  In my residency at the University of Virginia between 1991

7   and 1995.

8   Q.  Approximately how many abortions did you perform during

9   your residency?

10  A.  I don't have a sense of it; but as I try to sort of

11  extrapolate, I would say at least a hundred.

12  Q.  Thank you.  What types of abortion did you perform?

13  A.  A suction D&C and D&E.

14  Q.  Thank you.  For these women, who provided these women with

15  information about their abortion to obtain their informed

16  consent?

17      THE COURT:  Wait.  Could I ask?  1991 to 1995 is quite

18  a long time ago, and so I need to make sure that the procedures

19  are the same, or if he knows they are the same, since he hasn't

20  been doing this.  Otherwise, if it's not the same, then it

21  won't be relevant.

22      THE WITNESS:  Yes, ma'am, if I may.

23      THE COURT:  Wait, wait.  We've got to give you a

24  question, Dr. Stroud.  I'm speaking to the lawyer to give the

25  lawyer instructions as to what questions to ask.  Miss Rahman.

1          MS. RAHMAN:  Yes, Your Honor.

2     BY MS. RAHMAN:

3     Q.  So Dr. Stroud, you just described a suction D&C and the D&E

4     procedure.  Have those procedures changed from how they have

5     been performed -- or how you performed them during --

6          THE COURT:  Actually, it's the informed consent

7     process.  Not the abortions themselves but the informed consent

8     is what you asked him about.

9          MS. RAHMAN:  Yes.  Okay.  I'm sorry.  I misunderstood

10    what you were getting at, Your Honor.

11    BY MS. RAHMAN:

12    Q.  Dr. Stroud, are you aware, has the informed consent process

13    changed for when you performed abortions to the present day?

14    A.  No.  Informed consent today, for any procedure, is the same

15    really that it's been in contemporary medicine.  Some of the

16    terminology has changed.  And when I say that, I'm referring to

17    the medical abortions.  That terminology didn't exist from '91

18    to '95.

19         But surgical abortions, the description of the instruments,

20    the description of the procedure, the description of the

21    potential complications and alternatives, that is to say the

22    fundamentals of informed consent, that has not changed.

23    Q.  Thank you, Dr. Stroud.

24         So just to go back to my question.  Who provided these

25    women with information about their abortion to obtain their

1  informed consent in your residency?

2  A.  I did.

3  Q.  You did?  Okay.  Thank you.

4      In the course of your discussions with these women, did you

5  converse with these patients about their reasons for having an

6  abortion?

7  A.  I did.

8  Q.  In general, were there common reasons given by these women

9  as to why they were having an abortion?

10  A.  I would have to say in general terms, if you think of it

11  across the spectrum, there are common themes.  Now, I was doing

12  this within the auspices of a teaching hospital, and so that's

13  sometimes a unique population of people that are seeking care

14  in a teaching center.

15      But in general, as I said, across the board, some of the

16  more common themes would be financial:  "I can't afford to be

17  pregnant."  "I have no way to support this pregnancy;

18  therefore, I'm terminating."  "I didn't intend to be pregnant."

19  "I didn't think I could get pregnant."  "I meant to start

20  contraception and never got around to it or I couldn't afford

21  it."

22      I would say economic despair was a common theme.  And

23  usually just a sense of loneliness and helplessness for a young

24  woman.  These are usually very young women with no -- in their

25  mind, no way to sustain and continue the pregnancy.

1   Q.  Did any of these women speak to funds or family members

2   having an impact on their decision to have an abortion?

3   A.  Oh yes.  I would say that's another common theme in an

4   unpleasant sort of way.  "I live with my boyfriend."  "If I

5   don't have this abortion, he'll kick me out."  "I have nowhere

6   to go."  Not an uncommon theme in that scenario, sadly.  But

7   being pushed by significant others and sometimes parents

8   pushing for the termination, that was not uncommon.

9   Q.  Thank you.  So based on your observation of these women for

10  whom you performed abortions, can you describe the emotional

11  state of these women?

12  A.  Again, in general terms, I would have to say most commonly

13  fragile.  I often say that women don't choose abortion, it

14  chooses them.  And you can see that when you're dealing with

15  this -- in this situation, that sort of despair, loneliness,

16  having a sense of no alternatives, that's a common feeling.

17  Q.  How often would you observe women crying before their

18  abortion?

19  A.  The majority of the time, I'd say.

20  Q.  So in your experience as an OB/GYN, are you familiar with

21  what drugs are used for medication abortion?

22  A.  I am.

23  Q.  Could you tell me what are the names of the abortion drugs

24  used for medication abortion?

25  A.  Yes, Mifepristone and Misoprostol.  It's difficult to

1   pronounce and easy to mix them up.  Most people refer to

2   Mifeprex as RU486 or just Mifeprex.

3       Misoprostol is also called Cytotec, which is a little

4   easier to say and is often used.  But those are the two

5   medications used.

6   Q.  Okay.  So do you usually refer to them as Mifeprex and

7   Cytotec?

8   A.  I typically do, just to make sure I'm being clear.

9            THE COURT:  But you don't use them, do you?

10           THE WITNESS:  I was just about to say -- I would

11  clarify.  I use Cytotec or Misoprostol commonly in my practice,

12  not Mifeprex.

13           MS. RAHMAN:  Yes.  Thank you.

14           THE COURT:  But you're not doing abortions, right?

15           THE WITNESS:  No.  I use Cytotec as a tool for

16  managing miscarriage and pregnancy loss.

17  BY MS. RAHMAN:

18  Q.  So while practicing as an OB/GYN over the years, have you

19  talked with patients who have had a medication abortion?

20  A.  Oh yes, certainly.

21  Q.  In what instance did you discuss a patient's prior

22  medication abortion?

23  A.  A variety of them.  I work pretty closely with a few crisis

24  pregnancy centers in our area and I will often see patients

25  from them in referral.  Sometimes the patient's had --

1            THE COURT:  Hang on.  We don't have pictures.  Hang

2    on.  We've lost you.  I have sound but not video.  There.  Now

3    you're back.  Okay.

4            Go ahead, Dr. Stroud.

5    A.  So I was describing the situations where I see them related

6    to medical abortion.  I was saying I work with a few pregnancy

7    crisis centers, pregnancy support centers, and I'll often see

8    patients from them in referral after.  Maybe they've undergone

9    a medication abortion, or commonly when they are considering it

10   and they'll see me as an alternative sometimes.

11           Probably the most common scenario that I encounter is in

12   treating women with infertility.  And in getting a detailed

13   obstetrical and reproductive health history, it will come out

14   that they've had one or more abortions, sometimes medical,

15   sometimes surgical in their past.

16   BY MS. RAHMAN:

17   Q.  With your prior positions, you have encountered --

18           THE COURT:  What prior position?

19           MS. RAHMAN:  I'm sorry.

20   BY MS. RAHMAN:

21   Q.  It sounded like you were describing your interactions with

22   patients currently.  In your prior clinical experience, have

23   you encountered patients who have previously had medication

24   abortions?

25           THE COURT:  Do you mean over the course of his

1  practice?

2       MS. RAHMAN:  Yes, over the course of his practice.

3  A.  Yes.  That's what I was describing.  I'm sorry if I was

4  unclear.  I meant throughout the continuum of my practice, I've

5  seen people in all of these different scenarios that I've

6  described.

7  BY MS. RAHMAN:

8  Q.  Okay.  Thank you.  So in discussing with your patients

9  their medication abortion, did your patients ever describe

10 their experience of taking Mifeprex?

11 A.  Oh certainly.  Very recently, yes.

12 Q.  Based on these conversations, what is your understanding of

13 a woman's experience of having a medication abortion?

14       MS. TOTI:  Objection, Your Honor.  Lack of foundation.

15 He's testifying based solely on hearsay what patients have told

16 him.

17       THE COURT:  You have to lay more of a foundation than

18 you have, Miss Rahman.  I'm sustain the objection.

19       MS. RAHMAN:  Yes.  Your Honor, just to clarify, the

20 questions I asked him were with regard to obtaining patient's

21 medical history, and including he testified that patients

22 describe their experience of taking --

23       THE COURT:  Lay the foundation, Miss Rahman.  That's

24 what I'm telling you to do.

25       MS. RAHMAN:  Okay.

1  BY MS. RAHMAN:

2  Q.  Dr. Stroud, could you tell me generally what did these

3  women --

4         THE COURT:  No, no.  You have to -- you have to

5  contextualize what you're asking him to tell you.  So you have

6  to find out how many times he's had these conversations.  Is it

7  every time?  Is this the ordinary information imparted.  You

8  have to contextualize it before you say what it was.  That's

9  how we have to know if he's qualified to say this.  When you

10  lay the foundation, you're qualifying him to offer testimony,

11  so that's what you're doing.  You're building the nest in which

12  you are going to place this egg.

13         MS. RAHMAN:  Yes.  My apologies, Your Honor.  I

14  thought I was specific enough, but I will drill down a little

15  more.

16  BY MS. RAHMAN:

17  Q.  Dr. Stroud, can you approximate how many times you had

18  conversations with your patients about their experience of

19  having a medication abortion?

20  A.  Yes, of course my recent memory is going to be the most

21  vivid, but last week I can remember four times that came up.

22  Maybe more.  I'm old.  My memory slips.  But at least four last

23  week.  I would have to say it's rather common in my

24  discussions.

25  Q.  Uh-huh.  Is there a ballpark estimate?  Could you say at

1  least a certain number of times that you have had conversations

2  with a patient about having a medication abortion?

3  A.  Since medication abortions became available through the

4  years, I would have to say well over 100.

5  Q.  Well over 100.  Okay.  So based on those 100 plus

6  conversations that you have had with women, have they described

7  their --

8       THE COURT:  What have they told you with respect to

9  what?  That's how you frame that.

10 BY MS. RAHMAN:

11 Q.  Okay.  Dr. Stroud, what have they told you with respect to

12 taking Mifeprex?

13       THE COURT:  In a generalized way, sir.

14 BY MS. RAHMAN:

15 Q.  In general.

16 A.  As I think about it in general terms through the years,

17 there are a few recurring themes I would offer.  One is

18 surprise at the degree of bleeding that the woman experiences.

19 If I'm seeing them maybe through the emergency room or in the

20 office afterwards and they are describing the bleeding, they,

21 and if they have a partner with them, are usually surprised at

22 just the amount of blood that they are actually going to

23 visualize.  They weren't expecting that much bleeding.

24      Another common theme is relative to pain, it's presented as

25 relatively painless or it's often compared to menstrual pain.

1   Of course none of us can describe pain and have the other

2   person actually understand it, but a recurring theme is, you

3   know, from the patient's perspective, "I had no idea it was

4   going to hurt this much."

5        And then I think a third common theme would be, in their

6   minds, they thought it was going to be much neater and tidier

7   in the sense of it will start and it will finish and I'll be

8   done and I'll move on, and in reality, it's not nearly that

9   succinct.  Often the spotting, the bleeding lingers for weeks,

10  and it isn't clear when the next menstrual period starts versus

11  "Is this just more bleeding from the termination, and "how do I

12  know when the clock is reset."

13       I'd have to say those are probably the most common themes.

14  If I could add, I would add a fourth, I suppose, and that would

15  be when very low percentages are quoted that a D&C will be

16  necessary after a medication abortion, in my experience that

17  number underestimates how often that happens.

18       That could be because the patient, for lack of a better

19  phrase, gives up, you might say.  So she's cramping and she's

20  bleeding, it may be that she doesn't "need" a suction D&C, but

21  she says, "I can't do this anymore," she goes to the ER and

22  asks for it.  Those would be really four very common emerging

23  themes.

24  Q.  So given that knowledge that you have gleaned from your

25  patients, do you consider a medication abortion comparable to

1   prescribing other medications?

2   A.  No, I would not.

3   Q.  Can you explain why you consider it to be different?

4   A.  Well, the implications and the ramifications.

5         MS. TOTI:  Objection, Your Honor.  This is really

6   outside the witness' scope of expertise.  He testified

7   yesterday that he has personally never prescribed medication

8   abortion and his entire knowledge about the experience seems to

9   be informed by a handful of patient antidotes.

10        THE COURT:  Well, first of all, more than a handful

11  because he says that he has these conversations regularly, and

12  he estimates more than 100 times, so handful probably is an

13  unfair characterization.

14        But it is true he hasn't ever prescribed this

15  medication.  He's told us that.  So if you ask him about the

16  impact of it, then that's within the scope of his testimony,

17  but not the decision to make the prescriptive judgment.

18        MS. RAHMAN:  Agreed, Your Honor, thank you.

19  BY MS. RAHMAN:

20  Q.  So if you could, Dr. Stroud, can you explain, based on your

21  understanding of how Mifeprex impacts a woman, why you consider

22  it different than prescribing other medications.

23  A.  Certainly.  If I prescribe someone an antibiotic for

24  bronchitis, their bronchitis will get better or it won't, but

25  it's pretty straight forward and pretty simple.

1    When medication abortion is used, the implications and the

2    ramifications are much more profound.  She's going to

3    experience, first, the loss of pregnancy.  That in and of

4    itself has significant ramifications on both her physical and

5    her emotional health.  She's going to experience intense

6    bleeding and cramping.  There's a very real probability she'll

7    need to have an emergency room visit and/or a procedure after

8    that.

9    That's not analogous to me prescribing a blood pressure

10   medicine or an antibiotic.  It's much more serious,

11   consequences are potentially much more, much more significant

12   and much more serious.

13   Q.  Thank you, Dr. Stroud.  So moving on to the topic of

14   informed consent and particularly in-person counseling, I

15   wanted to ask you a question.  Are you familiar with Indiana's

16   requirement that informed consent for an abortion must be

17   obtained in person?

18   A.  I am.

19   Q.  So just keeping that in mind, broadly speaking, in what

20   instances would a physician need to obtain a patient's informed

21   consent, generally?

22   A.  In a general sense, anytime you're going to do something to

23   a patient, there's a general consent to treat that, you know;

24   for instance, that's implied in some cases, but sometimes

25   that's a signature required just to come into the office and be

1  treated as a patient.  But whenever there's a procedure being

2  performed where there is material and significant risks to the

3  procedure, informed consent needs to be formally and carefully

4  documented.  Keeping in mind, informed consent is not a

5  document.  It represents a relationship.  The document merely

6  codifies, so to speak, that the relationship and the

7  interaction has taken place, but the actual informed consent

8  really describes an interaction that has occurred.  A patient

9  is saying "I understand what it is that you're proposing.

10  You've explained it to me properly and thoroughly, and now I'm

11  giving you my consent to do that thing to me."  She can't

12  consent if she's not properly informed.

13  Q.  Uh-huh, thank you.  Do you consider a surgical abortion to

14  be a medical procedure requiring informed consent?

15  A.  Certainly.

16  Q.  Uh-huh.  Do you consider a medication abortion to be a

17  medical procedure requiring informed consent?

18  A.  Yes.

19  Q.  Okay.  So you probably already touched on this, but I

20  wanted you to, if you could be a little more specific, in

21  general, what information must be provided to a patient for

22  obtaining their informed consent?

23  A.  They have to understand the condition that they have.  They

24  have to understand what it is that I'm proposing to do.  They

25  have to understand the risks of complications related to that

1  thing that I'm proposing that we do.

2      A patient has to then understand are there alternatives to

3  this thing that you're proposing, and what are the risks to

4  those alternatives.  And lastly, they have to understand what

5  if I elect to do nothing.  That has risks.  What are those

6  risks?  And then she has to, he or she, has to be in a position

7  to convince me, if you will, that she understands those issues,

8  and then she has to have a chance to ask meaningful questions

9  as a way to describe or display that she really does understand

10  what it is that we've gone over.

11  Q.  Thank you.  I appreciate that.

12      Given that description of how informed consent should be

13  carried out, do you consider informed consent to be an

14  important part of the doctor-patient relationship?

15  A.  Oh, absolutely.  It's critical.  I mean, it speaks to trust

16  and it speaks to, you know, this idea of first doing no harm.

17  You have to understand what it is that I'm proposing, or you

18  can't give your consent.  If I do something to you to which you

19  haven't consented, again that would be assault, so it's

20  critical in the doctor-patient relationship.

21  Q.  Uh-huh.  Thank you.  Do you think it matters whether you

22  obtain a patient's informed consent in person or virtually?

23  A.  I do.

24  Q.  Can you elaborate on why you think it matters.

25  A.  Well, as we've been discussing here, informed consent

1  requires really a relationship, an interaction, an exchange.

2  As we are all sort of feeling probably at this very moment,

3  telemedicine is not the same as being in person.

4      It's nice that I'm sitting in my office and not in

5  Indianapolis, but I would prefer the interaction for me to be

6  sitting there, because human interaction is complex, to say the

7  least, and it requires me to be able to see you and to pick up

8  on subtle queues and to see your expressions when we're talking

9  and for you to see mine.  When I'm giving informed consent, the

10  pandemic notwithstanding, I always remove my mask because I

11  want to make sure the patient sees me and gets any sort of

12  empathy or subtle hints from me that she might miss if my face

13  is covered, so informed consent needs to be in person, I need

14  to be able to pick up on those subtle queues, I need to know if

15  the person with her is coercing her consent.  Maybe I can't

16  even see them in a telemedicine environment.  But all of those

17  things need to be taken in, and a judgment needs to be made by

18  the provider:  Does this patient understand what I'm proposing?

19  Is she volunteering in her consent.  Is she really consenting?

20  And we're ready to go.

21  Q.  Thank you.  So how do you obtain a patient's informed

22  consent in your current practice?

23  A.  Face-to-face at the bedside, so to speak.  If there's

24  someone there with her, with everyone present, if that's

25  appropriate.  But we talk and I ask questions and then I ask

1  her to ask me questions and we exchange back and forth in a

2  human way.

3  Q.  So --

4         THE COURT:  I want to probe this a little bit, if you

5  don't mind, unless you had more questions on that topic.

6         MS. RAHMAN:  I do, Your Honor, but feel free.

7         THE COURT:  You go ahead, and then I'll ask mine.

8         MS. RAHMAN:  Okay.  And I don't know, Your Honor, if

9  this is getting off the topic of your question.  Let me know

10  and I'll stop.

11  BY MS. RAHMAN:

12  Q.  But I wanted to ask you, Dr. Stroud, it sounds like do you

13  believe that it is better to obtain informed consent in person?

14  A.  Oh most definitely.

15         THE COURT:  He just said that.

16         MS. RAHMAN:  Yes.

17         THE COURT:  He had said that before, which is why I

18  was going to ask the question.

19         MS. RAHMAN:  Okay.

20         THE COURT:  I am going to interrupt because I'm afraid

21  I will forget my question.  I'm not as well prepared on the

22  question end of this as you are, Ms. Rahman.

23         MS. RAHMAN:  I understand.

24         THE COURT:  So you said earlier in your testimony that

25  you used telecommunications extensively, right?

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  And so does that mean you've never

3     gotten a patient's consent through a virtual or telemedicine

4     format?  I know it's preferred face-to-face, I know it's

5     preferred bedside, but I'm wondering if there are some

6     exceptions.  We have even had some exceptions here at the court

7     when I sentence somebody remotely in the prison, I go through a

8     pretty complicated song and dance to make sure that -- and they

9     usually initiate it, by the way, by their ask, but we go

10    through a process such as informed consent with respect to

11    criminal procedures.  So I'm really probing your experience in

12    terms of never using it or never using it in the past but can

13    you foresee uses in the future?  Are there ways to get informed

14    consent through telemedicine that you just haven't devised yet?

15         THE WITNESS:  Interesting questions, all, Your Honor.

16    No, I do not get consent -- now maybe a little context about

17    the nature of, you know, my interactions in telemedicine.  So

18    I'm doing consultations generally about fertility and recurrent

19    loss for long-distance patients.

20         So it's a lot of reviewing history, it's a lot of

21    talking, it's a lot of describing approaches.  Sometimes that

22    approach would involve my suggestion that you need a procedure,

23    that you're going to travel to Fort Wayne, and I'm going to do

24    surgery on you.

25         Of course I'm not going to get the consent for the

1   surgery via telemedicine.  I'm going to see that person in

2   person to get her consent for surgery.

3          But I personally could never imagine me doing informed

4   consent via telemedicine and the next time that I see that

5   patient she's under general anesthesia and I operate on her.

6          THE COURT:  But when you get informed consent and

7   you're telling your patient at a remote location you're going

8   to do a procedure, come to Fort Wayne, then you get the consent

9   ordinarily just prior to the procedure, right?  You've shown

10  up for the procedure, here you are, do you consent, et cetera.

11         THE WITNESS:  We treat the telemedicine patients a

12  little differently because they have traveled to get there.

13  Often they come into town the day before for some preparation

14  for the surgery, some medical preparation.  And so I'll see

15  them in person at the office then.  The first time I see them

16  face-to-face could be at the hospital.  And when we are in that

17  situation, we have special time set aside before the surgery,

18  you might say, is imminent.

19         So before they feel like they're rolling down the

20  hallway, we'll sit down and have a visit, if you will, before

21  we ever move to those preliminary things like starting the IV

22  and getting dressed in the gown and all those things that are

23  done before the surgery as a way to try to substitute that we

24  haven't had that face-to-face before.

25         THE COURT:  Okay.  Now, Miss Rahman, I hope I didn't

1  throw you off your game plan here.

2       MS. RAHMAN:  No, Your Honor.  Thank you very much.

3  BY MS. RAHMAN:

4  Q.  Dr. Stroud, continuing with this discussion, what are some

5  reasons why you think it is better to obtain informed consent

6  in person?

7  A.  In many, you know, we've been discussing here, I think

8  because when a procedure is being performed and where there's

9  significant risks involved, it's critical that the patient

10 fully understands that.  It's critical that I understand her

11 understanding of that and that she doesn't in any way feel as

12 though she had no choice or she didn't understand her choice.

13      As a surgeon, one of the worst things that can happen to me

14 is there's a complication at surgery, and afterwards the

15 patient says, "I didn't understand that could have happened.

16 Why didn't you tell me about that?"

17      That would be horrible for me and for her.  So I want to

18 make certain that can never happen.  So one of the ways I can

19 do that is with a face-to-face interaction.  Are we hearing

20 each other?  Do we have a relationship?  Do you trust me?  Do

21 you understand what I'm proposing that we do?  Does it seem

22 like the right thing to do to you, given all that we've

23 discussed?

24 Q.  Thank you.  So continuing, when discussing a medical

25 procedure and obtaining informed consent, have you ever been

1   concerned that a patient may be dishonest about something

2   relevant to the procedure?

3   A.  Dishonest, yes; ill informed, yes; nervous to the point of

4   not communicating clearly.  You know, one of my favorite

5   stories when I'm teaching students is I'll say to a patient,

6   "Any past medical history?"  And she says, "No, no, I'm fine."

7   Then I go to listen to her lungs with my stethoscope, and she

8   has a thoracotomy scar on her chest.  And she says, "Oh, that

9   was when I was a kid.  I didn't think that was relevant."

10       Okay, that's relevant.  I would have wanted to know that.

11   So we're not all great communicators, but sometimes it is --

12              A VOICE:  Objection --

13              THE WITNESS:  -- shame.  I have had a patient who had

14   an IUD in place and she didn't tell me and I find it on exam.

15   She was ashamed to tell me that because she knows I don't use

16   IUDs in my practice.  That's pretty public so she thought, I

17   guess, maybe I just won't mention it.  People often just

18   forget.

19   BY MS. RAHMAN:

20   Q.  Thank you.  When discussing a medical procedure and

21   obtaining a patient's informed consent, have you ever been

22   concerned about whether a patient's consent is voluntary?

23   A.  Well, yes, that's not uncommon.  I have experienced cases

24   where spouses were pressuring spouses to have a hysterectomy or

25   to have a C-section.  I have had parents pushing their child to

1   have their tubes tied or to have, you know, suction D&C for a

2   loss instead of spontaneous management.  I've seen, sadly,

3   across the gamut of my years, spousal, parental, a significant

4   other attempted coercion at medical decisions.

5   Q.  Okay.  And in these instances, were you able to discern

6   that there was coercion going on for these medical procedures?

7   A.  I think so.  I hope so.  I believe so.

8   Q.  And what do you think enabled you to discover this

9   coercion?

10  A.  Well, frankly, part of it on the skill of the observer.  It

11  takes some skill to do that.  That's what training is about in

12  medicine, but being able to be in the room and sense the

13  dynamic, the unspoken things, reading between the lines, if you

14  will, and just having a sense of what is going on in the

15  relationship and in the room.

16      It is very clear, for example, in dealing with young women

17  who may come with their mother to a visit when you ask, for

18  example, "Are you sexually active?"  And she says, "No," and

19  immediately looks at her mother, it doesn't take a genius to

20  figure out there's something going on there that I need to

21  better understand.  Maybe I need to talk to her outside without

22  her mother listening, something like that.

23  Q.  Thank you.  So given your experiences with informed consent

24  and your knowledge of Indiana's requirement that informed

25  consent for an abortion must be obtained in person, can you

1  tell me, what is your professional opinion of Indiana's

2  requirement that informed consent for an abortion must be

3  obtained in person instead of remotely?

4          MS. TOTI:  Objection.

5          THE COURT:  Hold on.  Hold on a minute.  Miss Toti, I

6  can't hear you.

7          MS. TOTI:  Objection, Your Honor.  I would say this is

8  outside the witness's scope of expertise since he has no

9  experience obtaining informed consent using telemedicine.  He

10 has no basis for comparing that to obtaining informed consent

11 in person.

12         THE COURT:  Sustained.

13 BY MS. RAHMAN:

14 Q.  Dr. Stroud, in your opinion, do you think ultrasound should

15 play any role in obtaining informed consent for an abortion?

16 A.  I do.

17 Q.  Why do you think an ultrasound is relevant when obtaining

18 informed consent for an abortion?

19 A.  Because ultrasound takes what is a very abstract concept

20 and makes it very concrete.  Just like diagrams and

21 photographs, you know, understanding of medical terms and

22 medical things, not unlike in the law, is very difficult.  Our

23 vocabulary is complicated.  It's difficult.

24      An early pregnancy is very abstract.  An ultrasound allows

25 you to actually understand the anatomy involved.  It amazes me

1    the very limited understanding many adult professional women

2    have about their reproductive tract.  Photographs and videos

3    and things like that are very helpful for that.  Ultrasound is

4    ultimately excellent at that because it shows in real time

5    what's occurring.

6         Here's your uterus, here are your ovaries, here is what is

7    inside your uterus.  You can actually understand what's going

8    on in an early pregnancy with an ultrasound.  Without that, it

9    can be very difficult because it's very abstract.

10        For example, patients will often say to me when they are

11   referred from a pregnancy care center, "I had no idea that the

12   baby had a heartbeat.  I had no idea that the baby had limbs.

13   I had no idea that the baby was moving."  Well, the ultrasound,

14   you don't need words.  You can just look at the picture and

15   understand that.  It's very simple, and it takes the complex

16   and makes it very processible and manageable.

17   Q.  All right.  Thank you, Dr. Stroud.

18        Again, coming back to your practice, do you perform

19   physical exams as an OB/GYN?

20   A.  Certainly.

21   Q.  Have you, in the course of performing a physical exam, have

22   you ever discovered that a patient has experienced physical

23   abuse?

24   A.  Oh, yes.

25   Q.  Can you share some examples of how a physical exam helped

1  you to detect abuse of a patient?

2  A.  Visually, if I'm doing a pelvic examination, and maybe I'm

3  looking in the women's vagina, I may see evidence of trauma in

4  the past, of scarring that can't be explained maybe by her

5  obstetrical or gynecologic history that was given.

6       One of the more common hints that that may have occurred is

7  in women who experience severe vaginismus, it's called, and

8  that's a painful spasm of the vaginal muscles such that even a

9  single finger can't be gently inserted into the vagina without

10  the woman experiencing intense pain and anxiety.  With a little

11  bit of skillful discussion, it's very common to unveil sexual

12  abuse in that woman's past.

13       So I would say visually, on doing the exam and things that

14  you find on the exam and then probe further, it's very common

15  to pick up that history.

16  Q.  Okay, thank you.

17       MS. RAHMAN:  Your Honor, I would like to take a moment

18  to confer with my colleagues to see if there are any further

19  questions before I close my direct?

20       THE COURT:  You may.

21       Dr. Stroud, what was the weather in Fort Wayne this

22  morning?

23       THE WITNESS:  I think probably no better than

24  Indianapolis.  It's ugly and gray and rainy.

25       THE COURT:  Yep, same.

1      THE WITNESS:  But water exists in the liquid state

2  here this morning so that's good.

3      THE COURT:  Yes, yes, better than -- I just was saying

4  as I walked in with one of my clerks -- better than the snow

5  and ice of a few weeks ago.

6      THE WITNESS:  It's good to remind ourselves of that.

7      THE COURT:  Yeah.  Okay.

8      Dr. Stroud and I have handled the morning weather

9  while you've been conferring.  So what is your intention now?

10      MS. RAHMAN:  Just one final question, and then I'll

11  wrap up.

12  BY MS. RAHMAN:

13  Q.  Dr. Stroud, you previously mentioned discovering that a

14  patient had an IUD during a physical exam?

15  A.  Uh-huh.

16  Q.  Can you tell me, what's the best way to determine or

17  discover that a patient has an IUD?

18  A.  Well, most of the time it's possible to see the string in

19  the vagina when you look at the cervix, the IUD has a string

20  attached to the end of it.  That is supposed to come out of the

21  cervix and be present for removal.  So the string allows you to

22  know that it is present; and also, when you're ready to remove

23  it, you grasp the string and pull the IUD out.

24      Not uncommonly, though, that string isn't visible.  It

25  maybe migrates or breaks off or something; and so, you can't

tell that there's an IUD there.  All of the IUDs on the market have a very easy to recognize ultrasound appearance.  So the most foolproof way to assess for the presence of an IUD is with ultrasound.  If you see the string, you know that it's there.  If you don't see the string, you don't know that it's not there.  That requires an ultrasound.

Q.  Okay.  Thank you, Dr. Stroud.

MS. RAHMAN:  No further questions on direct, Your Honor?

THE COURT:  All right.  Miss Toti, cross?

*CROSS-EXAMINATION*

MS. TOTI:  Thank you, Your Honor, and good morning, Dr. Stroud.

THE WITNESS:  Good morning.

MS. TOTI:  I will note, for the record, that it's raining in Brooklyn as well.

THE COURT:  I'm happy to have the Brooklyn report because we have kids there.  So thank you, Miss Toti, for the Brooklyn report.

MS. TOTI:  You're welcome.

BY MS. TOTI:

Q.  Dr. Stroud, the opinions you're offering in this case --

THE COURT REPORTER:  I'm sorry, can you speak a little louder?

THE COURT:  Say it a little louder, please.

1      MS. TOTI:  Sure.

2   BY MS. TOTI:

3   Q.  The opinions that you're offering in this case are based on

4   your education and clinical experience; is that right?

5   A.  I believe that's correct, yes.

6   Q.  They are not based on research findings reported in the

7   medical literature; is that right?

8   A.  I would say my clinical experience in education is

9   consistent with the findings in the literature.

10  Q.  But the opinions, the specific opinions that you're

11  offering in this case weren't formulated based on your review

12  of the medical literature; is that right?

13  A.  I would disagree.  That's incorrect.

14  Q.  Dr. Stroud, you gave a deposition in this case; is that

15  right?

16  A.  That is correct.

17  Q.  As part of your deposition, you took an oath to tell the

18  truth similar to the one that you took in court yesterday; is

19  that right?

20  A.  That is correct.

21  Q.  Did you tell the truth at your deposition?

22  A.  I did, as sworn.

23  Q.  I'd like to call up Plaintiffs' Exhibit 609, which is the

24  transcript of your deposition, and turn to page 61.  I'd like

25  to direct your attention to lines 4 through 13.  I'm going to

*STROUD – CROSS/TOTI*                    34

1    read those for the record.

2            "QUESTION:  Would it be fair to say that" --

3            THE COURT REPORTER:  Sorry.  She cut out.

4            THE COURT:  Wait, you cut out.  Now, read it again,

5    starting line 4, please.

6            MS. TOTI:  Sure.

7            "QUESTION:  Would it be fair to say that most of your

8    opinions are based on your education and clinical experience?

9            "ANSWER:  Yes.

10           "QUESTION:  Did you review any articles or other

11   publications in connection with writing your expert report?

12           "ANSWER:  Not to my recollection.

13           "QUESTION:  And did you review any of the publications

14   cited in the Plaintiffs' experts reports?

15           "ANSWER:  Not specifically."

16           Did I read that correctly?

17           THE WITNESS:  You appear to have, yes.

18           MS. TOTI:  Thank you.  We're done with that exhibit

19   for now, thank you.

20   BY MS. TOTI:

21   Q.  Dr. Stroud, you're a member of the American Association of

22   Pro-Life Obstetricians and Gynecologists; is that right?

23   A.  That's correct.

24   Q.  You believe that abortion is never in a patient's best

25   interest; is that right?

1   A.   That is correct.

2   Q.   I'd like to ask you a few questions about telemedicine.

3   The use of telemedicine services has dramatically increased in

4   recent years; is that correct?

5   A.   That's correct.

6   Q.   Telemedicine has improved access to many forms of

7   subspecialty care; is that correct?

8   A.   I believe that's generally correct, yes.

9   Q.   Telemedicine has been especially successful in improving

10  access to care in rural areas and for specialties in which

11  there is a shortage of providers; is that correct?

12  A.   I think that's generally thought of as correct.

13  Q.   Your medical practice uses telemedicine to provide

14  fertility services to patients who live outside a 90-minute

15  radius of your practice; is that right?

16  A.   That is correct.

17  Q.   And that's because it would be burdensome for those

18  patients to travel to your practice?

19  A.   We would have to ask them.  I mean, we offer them that as a

20  means to reduce the travel.  They are still going to have to

21  travel, but our telemedicine program allows them to perhaps

22  travel less than they would otherwise.

23  Q.   You personally treat infertility patients by telemedicine

24  approximately eight to ten times per week, is that right?

25  A.   That's correct.

1   Q.  At your practice, telemedicine patients interact with their

2   treating physicians via videoconference; is that right?

3   A.  That is correct.  That's not to say that all of our

4   telemedicine is done via video.  Some of it is done by

5   telephone, some of it is done by video.  Generally, patient

6   preference for that.

7   Q.  Thank you.

8        And your practice performs ultrasound examinations; is that

9   right?

10  A.  Yes.

11  Q.  Those ultrasound examinations are sometimes performed by

12  ultrasound technicians; is that correct?

13  A.  It is.

14  Q.  Typically, the treating practitioner is not in the room

15  when an ultrasound technician performs an ultrasound

16  examination at your practice; is that right?

17  A.  I would say it varies, depending on the nature of the exam.

18  But, in a general sense, it's not uncommon for the provider to

19  not be in the room.  It is very common to be in the room.  It

20  just varies.

21  Q.  Got it.  When an ultrasound technician in your practice

22  performs an ultrasound examination and the practitioner is not

23  in the room, the technician transmits the resulting image to

24  the treating practitioner electronically; is that correct?

25  A.  To a degree, that's correct.  We utilize an electronic

1  medical record so everything is transmitted, so to speak, but

2  her images and findings are in our record.  I open the record

3  and view the report and the images.

4  Q.  Do you do that electronically?  In other words, do you open

5  the electronic health record?

6  A.  That's correct.  We are a paperless office.

7  Q.  Got it.  And the treating practitioner is able to view and

8  interpret the ultrasound image after receiving it or viewing it

9  electronically; is that correct?

10 A.  That is correct.

11 Q.  You personally perform ultrasound examinations at times; is

12 that right?

13 A.  Yes, that is correct.

14 Q.  At early gestational ages, up to about 10 to 12 weeks'

15 gestation, you typically use a vaginal probe during an

16 ultrasound examination rather than an -- pardon me, rather than

17 an abdominal probe; is that right?

18 A.  I would disagree with that characterization.  It really

19 depends a lot on the patient's body style and habitus.  In some

20 cases it's very easy to get transabdominal images with the

21 newer equipment.  In some cases, though, based on the woman's

22 anatomy, the number of weeks she is, a transvaginal imaging may

23 be superior.

24     If anything has changed dramatically in ultrasound in the

25 last few years, it's the quality of the equipment, and so we

1  probably have to resort to transvaginal a lot less often than

2  we used to.

3  Q.  Got it.  But for at least some of your patients, you are

4  typically using transvaginal ultrasound?

5  A.  That's correct, it's not uncommon.

6        THE COURT:  Hang on.  My video is down again.

7        There you are.  Okay.

8        MS. TOTI:  Thank you.

9  BY MS. TOTI:

10  Q.  Just to make sure I understood the testimony, you use

11  transvaginal ultrasound in cases where you believe it will

12  produce a clearer image than transabdominal ultrasound, is that

13  right?

14  A.  Well, we begin with transabdominal.  If it's sufficient,

15  we're finished.  If it's insufficient and the patient's

16  agreeable, we'll move to transvaginal.  Our preference is

17  transabdominal for obvious reasons --

18        COURT REPORTER:  I'm sorry.  Can you say that again?

19        THE COURT:  Say that once more, please.  Your

20  preference is?

21  A.  Our preference is transabdominal because it's less invasive

22  and less frightening, for obvious reasons.  It doesn't involve

23  sticking anything in the woman's vagina.  But if the image

24  quality is inferior and we need a better image, with her

25  consent, then we'll use transvaginal.

BY MS. TOTI:

Q.  Thank you.

    And I believe you gave some testimony on direct about suction D&C; is that right?

A.  I believe so.

Q.  In your opinion, an aspiration abortion procedure is identical to a suction D&C procedure; is that right?

A.  That is correct.

Q.  Suction D&C may be used to treat an incomplete miscarriage; is that right?

A.  That is correct.

Q.  And suction D&C may also be used to remove or obtain placenta after childbirth; is that right?

A.  That's correct.

Q.  And, Doctor, on direct, you also testified about informed consent; is that right?

A.  Yes.

Q.  Informed consent requires educating a patient about the risks, benefits, and alternatives to a particular medical intervention; would you agree with that?

A.  Yes.

Q.  Today, one of the alternatives to aspiration abortion is medication abortion; is that right?

A.  Correct.

Q.  Medication abortion was not an alternative to aspiration

1    abortion during the period of 1991 to 1995; is that correct?

2    A.  I'm sorry.  Something happened with the audio.  I missed

3    part of that.

4            THE COURT:  Yeah, that's me.  I knocked the

5    microphone.  I'm sorry.

6            MS. TOTI:  No problem.

7            THE COURT:  You can say, "Judge, stop it."  I was just

8    moving my papers.

9    BY MS. TOTI:

10   Q.  I'll repeat the question, Dr. Stroud.

11       Medication abortion was not an alternative to aspiration

12   abortion during the period from 1991 to 1995; is that correct?

13   A.  That's correct.

14   Q.  Techniques for providing aspiration abortion have changed

15   since 1995; is that correct?

16   A.  Ask the question again, please.

17   Q.  Sure.  Have techniques for providing aspiration abortion

18   changed since 1995?

19   A.  No, they have not.  The procedure is identical.  It

20   involves dilating the cervix, inserting a plastic curette,

21   that's the suction curette, attaching that to a suction

22   machine.  Many of the suction machines in the hospitals are the

23   same as they were in 1980.  Nothing has changed about the

24   procedure.

25   Q.  Today, Misoprostol is routinely used to aid in cervical

1    dilation in connection with aspiration abortion; is that

2    correct?

3    A.  It's a tool that's always been available -- well, Cytotec,

4    or Misoprostol, has been around a long time.  It's been

5    available as a means to prepare the cervix for a procedure.

6    It's also used to treat hemorrhage related to childbirth.

7        Osmotic dilators, they're often called, or dehydrated

8    seaweed sticks, have been around a very long time.  They are

9    often used to pretreat the cervix, both for a diagnostic D&C or

10   for a D&C for retained products or for an aspiration abortion.

11   That hasn't changed.

12   Q.  Misoprostol wasn't routinely used to aid in cervical

13   dilation during the period from 1991 to 1995; would you agree?

14   A.  In my training facility, they had a preference for the

15   osmotic dilators the day before.  I'm not exactly certain when

16   Cytotec became widely available on the market.

17   Q.  Just to be clear, my question was about aspiration

18   abortion.  Is that how you understood it?

19   A.  Yes, I did, yeah.  I performed aspiration, as you know, and

20   where I learned at our facility, we used the osmotic sticks.  I

21   would have to check the literature to be certain, but I'm not

22   familiar with when Cytotec came on the market.

23   Q.  Okay.  And were you typically using osmotic dilators the

24   day before an aspiration abortion procedure?

25   A.  It varied based on the clinical specifics and, frankly, on

1  who the teaching physician was.  In a teaching environment, you

2  know, the resident physician is supervised by an attending

3  physician, and some attendings had a preference for osmotic

4  dilators the day before.  Some didn't like them used at all.

5  Some liked them put in the morning of.  So it was very variable

6  across the spectrum.

7  Q.  Got it.  The use of -- would you agree, Doctor, that the

8  use of manual vacuum aspiration is much more common today than

9  it was during the period from 1991 to 1995?

10 A.  I'm not sure I understand what you mean by "manual vacuum

11 aspiration."

12 Q.  Are you familiar with manual aspiration as an alternative

13 to an electric suction machine?

14 A.  Oh, yes, I am.  I would say those are two sides, really, of

15 the same coin.  The idea is to generate a negative pressure,

16 that is to say suction, that will be sufficient to remove the

17 contents of the uterus.  There are a few products on the market

18 that are often discussed for office-based suction D&Cs for

19 early losses, that are also sometimes used in termination

20 practices.

21     But the principle is the same, generate a vacuum, a

22 negative pressure.  The question is, how do you go about

23 generating that pressure?  But the principles are identical.

24 Q.  And would you agree that manual vacuum aspiration is much

25 more common today than it was in the 1990s?

*STROUD — CROSS/TOTI*                    43

A.  Some of the products that are marketed today didn't exist
in the early 90s.  The concept certainly existed then.  And I
think if we were to survey, we'd find that it's extremely
variable by market, by location in the country, and by the
background and training of the abortion provider.

Q.  The risk of mortality for patients carrying a pregnancy to
term has increased since 1995; is that right?

A.  I don't know that that's necessarily correct.  Maybe you
could ask that in a more specific way.

Q.  Maternal mortality in the U. S. has increased over the last
25 years; is that correct?

A.  Maternal mortality remains shockingly high.  The most
common causes are infection or hemorrhage or infection.
Worldwide, it's much higher in the U.S. than most of us believe
it ought to be.  But depending on the specific study and the
specific review period, I think there are plenty of people on
both sides of that data that would maybe disagree about the
actual answer.

        THE COURT:  Do you know if the mortality rates for
women carrying pregnancies to term have increased?

        THE WITNESS:  I'm not at all trying to be evasive,
Your Honor, it's just the statistics get confusing.

        THE COURT:  I know.  Well, I'm asking about what your
knowledge is of those confusing statistics.  Is it increasing
or decreasing or not changing?

*STROUD – CROSS/TOTI*                           44

1          THE WITNESS:  Yeah, there are reports that it has gone

2     up.  It of course depends on how you interpret those reports.

3     If a woman is 36-weeks' pregnant --

4          THE COURT:  Okay, wait just a minute.  We're just

5     asking about the statistics.  There's data showing they go up,

6     so I hear in your answer there's perhaps data showing they are

7     going down.

8          THE WITNESS:  There is conflicting, conflicting

9     reports, yes, Your Honor.

10          THE COURT:  His knowledge is there are conflicting

11     reports, Miss Toti.

12          MS. TOTI:  Yes, Thank you, Your Honor.  I think that's

13     all I have on that.  But thank you, Dr. Stroud, for clarifying.

14     Pardon me just one moment.

15     BY MS. TOTI:

16     Q.  Dr. Stroud, you testified on direct that you own a birthing

17     center in Fort Wayne called the Holy Family Birth Center; is

18     that right?

19     A.  That's correct.

20     Q.  You require all birthing center patients to obtain

21     screening for group B streptococcus bacteria; is that correct?

22     A.  That is correct.

23     Q.  And patients have to give their informed consent to that

24     screening; is that correct?

25     A.  Yes, they do.

*STROUD - CROSS/TOTI*                    45

1   Q.  And at Holy Family Birth Center, the first step of the

2   informed consent process for group B streptococcus screening is

3   that the patient is given a consent form to review; is that

4   correct?

5   A.  Technically, that is correct; but this happens at 36 weeks

6   of pregnancy.  So we've been caring for them for 36ish weeks.

7   So we discuss group beta strep and the approach to managing

8   group beta strep at the initial visit and at several visits

9   leading up to that point.  So I don't think it's really factual

10  to say that the discussion begins with that form.  The

11  discussion began early on in the pregnancy because GBS or group

12  beta strep is an important topic that's very important to a lot

13  of patients.  So we don't want to surprise them at the end of

14  pregnancy and realize that we have this position.  So we begin

15  talking about it early in the pregnancy and often.

16      The same would be true of screening for gestational

17  diabetes.  We talk about it early and often.

18  Q.  Okay.  I'm going to ask if we could pull up Plaintiffs' 609

19  once more.

20          THE COURT:  Is that the deposition?

21          MS. TOTI:  Yes.  That's the deposition transcript.

22  BY MS. TOTI:

23  Q.  And go to page 49.  I'd like to look at lines 18 through 25

24  on 49, and then we're going to carry over to the next page.

25      Okay.  So I'm going to begin reading at line 18.

1    "QUESTION:  At what point in the process is a patient

2    presented with the option of having a strep screening?

3          "ANSWER:  It's typically done at 36 weeks, no earlier

4    than 36, maybe a little later than 36 weeks; but in the

5    majority of cases, it's done at 36 weeks.

6          "QUESTION:  And what does the informed consent process

7    for that strep screening look like?  How does that process" --

8    And now we're carrying over to page 50 -- "How does that

9    process look?

10          "ANSWER:  The patient is given the form to review; and

11    then after the opportunity to review the form, a discussion

12    takes place between the provider and the patient.  And then if

13    there are any questions, those questions are addressed; and

14    then the patient completes the consent process."

15    Did I read that correctly, Doctor?

16    A.  Yes, you did.

17    Q.  Okay.  I think we're done with that for now.

18    Doctor, sometimes the screening test is performed within

19    minutes of when the patient completes the consent form; is that

20    right?

21    A.  That could be correct, yes.

22    Q.  And a patient who refuses to consent to the screening test

23    is not permitted to give birth at your birthing center; is that

24    right?

25    A.  Which is why we talk about it the whole pregnancy because

1  we don't want to surprise them at 36 weeks and then say, "Well

2  I didn't realize this wasn't an option."  So we start talking

3  about --

4       THE COURT:  Could you answer the lawyer's questions

5  please, sir?

6       THE WITNESS:  Yes, she knows --

7       THE COURT:  She didn't ask you a why question.  She

8  asked if that was true.

9       THE WITNESS:  Yes.  The patient realizes if she

10  declines the screening, she can't deliver at the birth center.

11       THE COURT:  No.  The question is what's your policy?

12  If she declines the screening, she doesn't give birth there?

13  Is that your policy?

14       THE WITNESS:  Yes, ma'am, that's correct.

15       THE COURT:  Thank you, sir.

16       MS. TOTI:  Thank you, Dr. Stroud.

17       Your Honor, may I have just a moment to consult with

18  the peanut gallery?

19       THE COURT:  Yes, you may.  So honestly said.  I love

20  the candor, Miss Toti.

21       MS. TOTI:  Thank you, Your Honor.

22       Okay.  I have no further questions for Dr. Stroud at

23  this time.

24       THE COURT:  And Miss Rahman, any redirect?

25       MS. RAHMAN:  Just one question, Your Honor.

1           THE COURT:  You may ask.

2                       REDIRECT EXAMINATION

3    BY MS. RAHMAN:

4    Q.  Dr. Stroud, when using telemedicine to provide fertility

5    services, do your patients still need to come in person to the

6    clinic?

7    A.  Yes.

8           MS. RAHMAN:  Okay.  Thank you.  That's all, Your

9    Honor.

10          THE COURT:  Recross, Miss Toti?

11          MS. TOTI:  No, Your Honor.

12          THE COURT:  All right.  Is Dr. Stroud relieved of his

13   obligation to appear in this trial?

14          MS. RAHMAN:  Yes, Your Honor.

15          MS. TOTI:  Yes, Your Honor.

16          THE COURT:  Thank you, Dr. Stroud.  Thank you

17   especially since we made you show up on two days; but I hope

18   it's out of the way now, and you can go do whatever you want to

19   do.  So thank you, sir.  You're excused from your subpoena.

20          THE WITNESS:  Thank you.

21          MS. RAHMAN:  Thank you, Dr. Stroud.

22                       (Witness excused.)

23          THE COURT:  All right.  Who's the State's next

24   witness?

25          MR. ROWLETT:  Good morning, Your Honor.

1       THE COURT:  Good morning to you sir, Mr. Rowlett.

2       MR. ROWLETT:  We are going to call Miss Anastasia

3  Roth, who I believe is in the Zoom waiting room.

4       Ms. Roth, is that you?  Your audio is not on.

5       THE WITNESS:  Yes.

6       THE COURT:  There you are.

7       Okay.  Miss Roth, I'm Judge Barker; and prior to

8  taking any questions and answering them, you must take the oath

9  of a witness to tell the truth, et cetera.  So the clerk will

10  administer the oath.

11       Would you raise your right hand and repeat it, please?

12                    *(Witness sworn.)*

13       THE COURT:  That's fine.  You may proceed,

14  Mr. Rowlett, with your questions.

15       MR. ROWLETT:  Thank you.

16       ANASTASIA ROTH, DEFENDANTS' WITNESS, SWORN

17                    DIRECT EXAMINATION

18  BY MR. ROWLETT:

19  Q.  Anastasia, could you state your full name for the record?

20  A.  Anastasia Marie Roth.

21  Q.  Thank you.  And Miss Roth, where do you work?

22  A.  A Mother's Hope.

23  Q.  What is A Mother's Hope?

24  A.  A Mother's Hope is a maternity home for pregnant homeless

25  women.

Q.  And what is your title there?

A.  I am the founder and executive director.

Q.  You mentioned you founded AMH.  Is it okay if I refer to it as AMH throughout our questions?

A.  Yes.

         THE COURT:  Where is it located?  If you could just tell me the city.

         THE WITNESS:  Sure.  It's in Fort Wayne.

         THE COURT:  Okay.

BY MR. ROWLETT:

Q.  And Miss Roth, when was AMH founded?

         THE COURT:  Oh, yes.  That was going to be my next question.  I didn't want you to go into the other things.

         So when was it founded?

         THE WITNESS:  A Mother's Hope was founded in 2015.

         THE COURT:  By you, right?

         THE WITNESS:  Yes.

         THE COURT:  Okay.  Now, go ahead, Mr. Rowlett.  I'll get out of your way.

         MR. ROWLETT:  It is perfectly fine, Your Honor.  Feel free to interrupt me at any time.

BY MR. ROWLETT:

Q.  What services does AMH offer?

A.  A Mother's Hope offers our housing program, and then we also focus on six different areas.  We focus on shelter, health

1  of mom and baby, support, life skills, education, and

2  employment.

3  Q.  Okay.  What are some of your duties personally at AMH?

4  What do you do there?

5  A.  Well, we have a small staff.  So although I do a lot of the

6  executive duties as far as supervising staff, representing A

7  Mother's Hope in the community, participating in a lot of

8  different community organizations and different community

9  groups, I also participate in our programming.  I teach one

10 class weekly, and also work with the women through their intake

11 into our program, and also have often daily interaction with

12 them.

13 Q.  So you personally work with the women that stay at AMH?

14 A.  Yes, often I do.

15 Q.  Okay.  And do women -- do the women that AMH provides

16 services to, do they stay there, as in do they take residency

17 there or do you just offer services to them?

18 A.  So some of the women that we serve here do stay here.

19 That's the focus of our housing program, the maternity home

20 itself.  However, we have become an expert in the community as

21 far as resources for pregnant women.  So we do often have women

22 call here, and we refer them to different services in the

23 community.

24 Q.  So you make referrals, and some of the women that you

25 treat -- or excuse me -- some of the women that you provide

1    services to you just provide services to, and some take

2    residency and stay in the maternity home?

3    A.   Correct.  We also have an after-care program so that women

4    who have lived at A Mother's Hope and then since have moved on

5    from A Mother's Hope, they also are able to participate in many

6    of the facets of our program.

7    Q.   Okay.  And we'll talk a little bit more about AMH, but I

8    want to move on to your work history.  Where did you work

9    before AMH?

10   A.   So I worked at several different places.  I worked at

11   Crossroad's Children's Home, where I worked with two different

12   groups of people.  I worked with teens and young women who were

13   considered a harm to themselves or run risks.  I did that for a

14   while, and I also worked with teens who were returning to their

15   home after being in a Department of Corrections placement --

16           THE COURT:  You need to slow down, Ms. Roth.  Our

17   court reporter can't keep up with your clickety-click pace.

18           THE WITNESS:  Thank you.

19   BY MR. ROWLETT:

20   Q.   I'll use this to interject with a question.  You said that

21   you treated teens and low-income women in your previous

22   position, and you said you did that for a while.  How long is a

23   while?  How long were you in that position?

24           THE COURT:  The Crossroad's position?  Are you asking

25   about that?

1    MR. ROWLETT:  Yes, the Crossroad's position.

2    MR. RODRIGUEZ:  Objection, Your Honor.  That misstates

3    the witness's prior testimony.  She never said that she treated

4    anyone.

5    THE COURT:  I think that's true, but just tell us how

6    long you were at Crossroad's, and then we can move on to the

7    next thing.  It's preliminary.

8    THE WITNESS:  I think it was two years.

9    THE COURT:  Okay.

10   BY MR. ROWLETT:

11   Q.  Okay.  Where did you work before Crossroad's?

12   A.  Before or after?

13   Q.  Before.

14   A.  Before Crossroad's, I was in college.

15   Q.  Okay.  And let's talk about that.  What degrees do you

16   possess?

17   A.  I have a bachelor of science in psychology.

18   Q.  Okay.  And are you a member of any professional

19   organizations?

20   A.  Yes.

21   Q.  And could you list them?

22   A.  Yes.  I am a member of the National Maternity Housing

23   Coalition, Fort Wayne Planning Council on Homelessness,

24   Footprints Fort Wayne.  I think that's it.

25   Q.  Okay.  Miss Roth, would you recognize -- well, let me back

1   up one question.

2       Miss Roth, do you have a resume?

3   A.  Yes, I do.

4   Q.  And would you recognize a copy of it if I showed it to you?

5   A.  Yes.

6   Q.  Okay.  I'm going to show for identification purposes what

7   is identified as Stipulated Exhibit 32.  Let me get the screen

8   share going here.

9           MR. ROWLETT:  Okay.  Miss Roth and the Court, can

10  everybody see this?

11          THE COURT:  I can see it.

12          THE WITNESS:  Yes.

13  BY MR. ROWLETT:

14  Q.  Okay.  Ms. Roth, does this appear to be a true and accurate

15  copy of your resume?

16  A.  Yes.

17  Q.  And does this resume accurately reproduce your work history

18  and your educational history?

19  A.  Yes.

20  Q.  And does it also reference the organizations and experience

21  that you're involved in?

22  A.  Yes.

23  Q.  Okay.  That's all we're going to do with that exhibit.

24      Now, Miss Roth, you mentioned you work at A Mother's Hope

25  and you mentioned that you work with low-income and homeless

1   women.

2       Do you keep up with current research on those issues?

3   A.   Yes.

4   Q.   And how do you do that?

5   A.   The main way that I do that is through participation in a

6   local group here in Fort Wayne called the Prenatal and Infant

7   Care Network.  It is a large network of individuals and

8   organizations, members, over 200 people and organizations, that

9   provide care and services to either women, families, or babies

10  in our community here in Fort Wayne.

11  Q.   And who facilitates that network?

12  A.   It is facilitated by the St. Joseph Community Health

13  Foundation and also Healthier Moms and Babies.

14  Q.   And could you describe each of those organizations?  Who

15  are they?  Are they specific to Fort Wayne?

16  A.   Yes, those two organizations are located here in Fort

17  Wayne.  St. Joseph Community Health Foundation is a local

18  foundation that is funded by the Poor Handmaids of Jesus

19  Christ, and they do a lot of work here in Fort Wayne with the

20  poor and under-served populations, and one of their focus areas

21  is prenatal and infant care.  And Healthier Moms and Babies is

22  an organization that provides in-home case management,

23  education, and support for pregnant women and also postpartum

24  women up to baby's three-month birthday.

25  Q.   Okay.  One last question about this network that you're a

part of.  I obviously don't need you to list all 200 people,

not that you would know all of them, but could you just give an

overview of what other kinds of prenatal-related or

pregnancy-related organizations are part of the network?

A.  Parkview Community Nursing Program is a program that's

there always.  Healthier Moms and Babies has a large presence

there at every meeting.  We also have a Woman's Care Center and

a Hope Center, and our local Christ Child Society often has

people there.  We also have representatives from Always Us, A

Mother's Hope.  Some of the other shelters often participate as

well.

Q.  Do any providers or employees of local hospitals attend

network meetings?

A.  Yes.  So Parkview is one of our local hospitals, and

there's often people there from Lutheran Hospital there as

well.

Q.  Okay.  Thank you.

    Miss Roth, I want to turn a little bit to your experience.

    Do you work with women who are considering a medication

abortion?

A.  I have not, that I know of.

Q.  Okay.  Do you work with women that are considering abortion

generally?

A.  Yes.

Q.  Okay.  And can you describe the general class of women that

1  you work with?  Do you work with a certain subspecialty in your

2  area or --

3  A.  So all the women that come to A Mother's Hope, one of our

4  requirements for entrance into our program is that they have an

5  income at or below 150 percent of the federal poverty

6  guideline, so all of the women that we work with are low

7  income.  They are all either homeless or at risk of

8  homelessness.  They all are pregnant when they come to us.

9  They also all commit to living drug and alcohol free while they

10  are here at A Mother's, but many of the women that we serve

11  here, when they come into the program, identify that they had a

12  past addiction or current addiction and also past issues with

13  smoking and things like that.

14  Q.  Okay.  Miss Roth, do you work with women who have

15  experienced intimate partner violence or domestic abuse or

16  sexual abuse?

17  A.  Yes.

18  Q.  And do you work with women who have experienced coercion to

19  receive an abortion by a significant other?

20  A.  Yes.

21  Q.  Do you or the people you oversee at AMH, do they assist the

22  women in your program with booking medical appointments?

23  A.  Yes.

24  Q.  And do they attend medical appointments with some of the

25  women that stay at your home?

1   A.   Sometimes.

2   Q.   Miss Roth, did you prepare an expert report in this case?

3   A.   Yes.

4   Q.   And could you describe the materials that you relied upon,

5   the written materials, to create that report?

6   A.   Yes.  I was provided some of the expert reports by the

7   plaintiffs, and I reviewed those documents and saw where those

8   opinions did not line up with my experience, and so my

9   experience was what I used to put the report together.

10  Q.   Okay.  Kind of already made it most of the way there, but

11  did you reach certain conclusions or opinions in your expert

12  report?

13  A.   Yes.

14  Q.   And are those based on your specialized knowledge in the

15  field you work in?

16  A.   Yes.

17  Q.   And that includes the current research that you mentioned

18  earlier through the Prenatal Care Network?

19  A.   Yes.

20  Q.   Do you believe that your testimony will be helpful to the

21  Court in assisting it in resolving the issues, the factual

22  issues, that the Judge has to resolve in this case?

23  A.   Yes.

24  Q.   And then finally, Miss Roth, have you testified previously

25  as an expert witness?

A.  No.

MR. ROWLETT:  Okay.  Your Honor, at this time, I would like to tender Miss Anastasia Roth as an expert in issues facing low-income women or homeless women and within that subset women who have considered abortion.

THE COURT:  Low-income women in the Fort Wayne area?

MR. ROWLETT:  Sure.

THE COURT:  Any objection?

MR. RODRIGUEZ:  No objections, Your Honor.

THE COURT:  All right.  There being no objection, the Court accepts the proffer and will allow you to inquire accordingly.

MR. ROWLETT:  Thank you, Your Honor.

BY MR. ROWLETT:

Q.  And, Miss Roth, just to clarify, all of the women that you treat at AMH, are they residents of Fort Wayne --

A.  No.

Q.  -- before they come to stay at your maternity home?

A.  No.

Q.  Okay.  Where do -- the women that you treat, where do they come from?

A.  Typically --

THE COURT:  You mean what's her catchment area?

MR. ROWLETT:  Yes.

A.  Typically, most of the women we serve --

1          MR. ROWLETT:  I think we lost the feed here for a

2     second.

3          THE COURT:  Hit the box again.

4     A.  -- and all the surrounding areas.

5          THE COURT:  Hold on just a minute.  We're out of

6     commission here.  There.  Now we're back.  Okay.

7          So the question is:  What is your catchment area for

8     your program?

9     A.  So we typically do serve women here from Fort Wayne.

10    However, there is no other home like ours in Allen County or

11    any of the surrounding counties so we serve all those counties

12    as well.

13         MR. ROWLETT:  Okay.  So, Your Honor, just at this

14    time, just as a little detail, I'd like to broaden the tender

15    to Allen County and the surrounding counties, not just Fort

16    Wayne.

17         THE COURT:  Well, I said Fort Wayne area, so doesn't

18    that include it?

19         MR. ROWLETT:  Fort Wayne is almost exclusively in

20    Allen County.  But if that's what you intended, then we can

21    move on.

22         THE COURT:  I considered it the Fort Wayne area, so

23    it's consistent with what she said.

24         MR. ROWLETT:  Okay.  That's fine.

25         THE COURT:  She's been accepted as an expert.

1          MR. ROWLETT:  Thank you, Your Honor.

2    BY MR. ROWLETT:

3    Q.  So, Miss Roth, now I want to get back into AMH a little

4    bit, learn a little bit more about your program.  We already

5    talked about when it was founded.

6          How many people are employed at AMH?

7    A.  We have 13 employees including myself.

8    Q.  Okay.  And what are the -- I think you answered this

9    earlier.  Did you identify the primary areas of care that you

10   offer to women?

11   A.  Yes.

12   Q.  And what were those areas?

13   A.  Shelter, health of mom and baby, education, employment,

14   support, and life skills.

15   Q.  Okay.  And how many women, every woman that AMH has served,

16   how many women has AMH collectively served since it was

17   founded?

18   A.  Over 200.

19   Q.  Okay.  And how many pregnant women have stayed at AMH's

20   maternity home?

21   A.  Thirty-one.

22   Q.  Okay.  And out of those 31, were any of those women

23   provided 24/7 care or participated in counseling services

24   offered by AMH?

25   A.  All 31 women participated in counseling services through

1    our program.

2    Q.  Okay.  And who provides those counseling services?

3    A.  We have a contract with an outside agency, that they --

4    prior to COVID, they came to A Mother's Hope to provide those

5    services here on site.

6    Q.  Okay.  So how long have you worked with your current

7    provider?

8    A.  With our current provider, we started working with her in

9    December.

10   Q.  Okay.  Did you have a provider before December?

11   A.  Yes, we did.

12   Q.  Okay.  And what was the reason for switching providers?

13   A.  We had some challenges with the therapist prior to COVID.

14   But because of COVID, we were forced to start having all of our

15   counseling through telehealth, and the issues that we had

16   previously with the therapist were made much worse and were

17   much more apparent when the women started attending counseling

18   through telehealth.

19   Q.  Okay.  And what were some of those problems?  What about

20   telehealth made that more difficult for your residents?

21   A.  The therapist struggled to connect with the residents prior

22   to using telehealth, and some of our residents had shared with

23   me that they felt like she was approaching them like you would

24   like what it says in a textbook.  They didn't feel a connection

25   with her.  And when we started using telehealth, it just got a

1    lot worse.

2    Q.  And these were not issues that you faced prior to COVID?

3    A.  No.  Not near as much, no.

4    Q.  Okay.  And so you mentioned that you were receiving

5    complaints.  So continue on with that.

6       Did the complaints become bad enough -- did AMH decide to

7    replace the therapist or did the residents request it or --

8    A.  So, I had had several residents tell me that they no longer

9    wanted to do counseling with her, but they were only doing it

10   as a requirement of the program.  And they were trying to avoid

11   appointments.  They would try to reschedule with her often to

12   try to make it so they didn't have to meet with her.  And

13   counseling is such a large part of our program and so

14   important, so we, after several conversations with the

15   therapist and her supervisor, decided do seek out another -- a

16   different therapist at a different counseling agency.

17        MR. RODRIGUEZ:  Your Honor, I'm going to object to

18   this entire line of questioning.  This is outside the scope of

19   the witness's report.

20        MR. ROWLETT:  Your Honor, may I briefly respond?

21        THE COURT:  Yes, especially since I've not read the

22   report.

23        MR. ROWLETT:  This is not outside the scope of her

24   report.  I mean, she discusses telemedicine challenges, which I

25   really shouldn't -- it's really in-person counseling, the

benefits of in-person counseling, and this is just a story from

within the scope of her employment that demonstrates the

challenges that her residents face when trying to use

telemedicine services.

THE COURT:  Was her experience with the bad provider

and the switch of the provider in the report?

MR. ROWLETT:  No, because it did not -- it hadn't

happened yet.

THE COURT:  Yeah, so that's why it's outside the

scope, so don't -- I'll sustain the objection with respect to

this vignette of the bad counselor being replaced with a new

counselor.

MR. ROWLETT:  Okay.  Your Honor, may I inquire?  Could

I return to this perhaps at the end from the perspective of

simply a fact witness, not in her capacity as an expert?

THE COURT:  Well, you've called her as a witness to

give expert testimony so I don't know.  I don't know what

you've given the other side notice of.  That was the gist of

Mr. Rodriguez's objection, that this is beyond what you have

told him you were going to ask, so he has to be able to

prepare.

MR. ROWLETT:  Okay.

THE COURT:  Accept the ruling and let's go on,

Mr. Rowlett.

MR. RODRIGUEZ:  Yeah, Your Honor.  I would move to

1    strike this testimony.  Defendants --

2            THE COURT:  I granted -- Mr. Rodriguez, I granted the

3    objection with respect to the vignette.  That's my ruling.

4    Let's move along.

5            MR. RODRIGUEZ:  Thank you, Your Honor.

6    BY MR. ROWLETT:

7    Q.  Okay.  Let's move on.  Miss Roth, does AMH serve all women

8    that require services, or are there certain criteria that they

9    have to meet?  You alluded to some of this, I believe, earlier.

10   A.  There are certain criteria they need to meet for the

11   housing program.

12   Q.  And what are some of those criteria?  And you don't need to

13   repeat ones that you mentioned earlier, such as whether they

14   meet a certain income level, et cetera.

15   A.  Okay.  They do need to be pregnant, homeless or at risk of

16   homelessness.  They have to be willing to follow the rules and

17   structure of the home.  They are required to pass a drug

18   screen.  And I think the other ones I already listed.

19   Q.  Okay.  Does AMH for -- you mentioned the in-house

20   counseling through the provided therapist.  Does AMH make

21   outside referral to outside providers as well?

22   A.  We have, however, we try to -- do you mean in regards to

23   counseling?

24   Q.  In regards to any services that AMH offers.

25   A.  Yes, we provide referrals for many services in our

1   community.

2   Q.  Okay.  And how many women through AMH have been referred

3   for services, either in-house or out?

4   A.  All of them.

5   Q.  Okay.  We're going to turn to another topic here in a

6   moment, but I have a couple other quick questions about AMH.

7   Have you worked with pregnant women who were considering an

8   abortion or who were conflicted about their decision whether to

9   abort?

10  A.  Yes.

11  Q.  Okay.  You have worked with women who have had an abortion

12  in the past?

13  A.  Yes.

14  Q.  And have you worked with pregnant women who originally were

15  going to receive an abortion, but then after receiving services

16  through AMH, changed their minds?

17  A.  Yes.

18  Q.  Okay.  How many women has AMH served that have previously

19  obtained an abortion?

20  A.  That I was aware of, I think four.

21  Q.  Okay.  Four out of 31, I believe that you mentioned

22  earlier?

23  A.  Yes.

24  Q.  Okay.  And how many women have you worked with who have

25  considered an abortion, not had a past one but have considered

1    it?  And just a ballpark estimate is fine.

2    A.  I would say almost all of them.

3    Q.  So, Miss Roth, I want to move on.  You mentioned earlier

4    that you work with women who have experienced intimate partner

5    violence, domestic abuse, sexual abuse; is that right?

6    A.  Yes.

7    Q.  Have you specifically observed or cared for women who have

8    been pressured into seeking an abortion?

9    A.  Yes.

10   Q.  And could you give us some examples of that, women that

11   you've worked with?

12   A.  Yes, in -- one woman in particular that I worked with

13   personally before A Mother's Hope opened, she was an African

14   woman who had moved here on a student Visa and she became

15   pregnant at one point and she, due to her African culture,

16   because she was pregnant by an African man, that was not

17   allowed to be pregnant out of, outside of marriage.  So he

18   pressured her to abort and when she refused, he locked her in a

19   closet and beat her and started bringing other women into the

20   home, having sex with them while she was forced to be in this

21   closet so that she could hear all that was happening.

22        And eventually, she chose to leave and she actually got in

23   her car and -- she was in Indianapolis at that point.  She got

24   in her car and drove towards Fort Wayne, came here to escape

25   him and the plans that he wanted her to abort and she didn't

1    want to.  And she actually saw a sign for Women's Care Center,

2    which is a local crisis pregnancy center.  She contacted them

3    and they contacted us and I started working with her then and

4    that's when she had shared this story with us.

5         THE COURT:  You know these things from what she told

6    you?

7         THE WITNESS:  Yes.

8         THE COURT:  No independent knowledge, right?

9         THE WITNESS:  What does that mean?

10        THE COURT:  That means you weren't with her.

11        THE WITNESS:  No, I was not with her.

12        THE COURT:  Mr. Rowlett, let's get to the points that

13   need to be made in this lawsuit, please.  We're into about

14   eight witnesses here.  Are we frozen here?

15        MR. ROWLETT:  You are frozen, Your Honor.

16        THE COURT:  Yeah, just a minute.  I'm not sure what

17   it's -- the screwdriver and the watch works here, but-- hang

18   on.  (Pause.)

19        THE COURT:  We're back.  Mr. Rowlett, we need to move

20   past story-telling and get to the central points that I have to

21   decide, please.

22        MR. ROWLETT:  Okay.  I only have one other question on

23   this topic, Your Honor, and then I'm ready to move on.

24        THE COURT:  I don't even want one more if it's

25   violative of what I just said.

1          MR. ROWLETT:  Okay.  It's not asking the witness to

2     tell a story.

3          THE COURT:  All right.

4     BY MR. ROWLETT:

5     Q.  So through AMH, Miss Roth, have you ever cared for and

6     encountered a woman who had been pressured or coerced into

7     carrying her pregnancy to term?

8     A.  No.

9     Q.  Okay.  Next I want to just briefly move onto the resources

10    that are available to pregnant women.  Some of plaintiffs'

11    witnesses and experts in this case have testified to a lack of

12    available resources to pregnant women, and I just want to

13    briefly cover that with you.

14         In your experience through AMH, what resources are

15    available to low income or homeless pregnant women?

16    A.  There are many resources available in our community.  Some

17    examples of those I've stated, Healthier Moms and Babies, that

18    provides prenatal education and in-home case management;

19    Healthy Families, which picks up where Healthier Moms and

20    Babies left off, working with mothers, fathers, families after

21    baby is born, to also provide help in finding additional

22    resources and also providing support and education.

23         We also have shelter available, either through here at A

24    Mother's Hope, if they don't have other children; but if they

25    do have other children, there's Vincent House; and there's also

1   the domestic violence shelter through the Y, which doesn't turn

2   anybody away.  Anyone who alleges that they are a victim of

3   domestic violence, they have to take them.

4   Q.  Okay.  Miss Roth, does AMH work with state and federal

5   healthcare providers, like Medicaid?

6   A.  Yes, so all of our residents are qualified to receive

7   Medicaid and we make sure they all have that.  We also work

8   with other state programs such as TANF and SNAP.  WIC is a

9   federal program that we utilize, and then most of our residents

10  also use the CCDF voucher for childcare.

11  Q.  And there were a lot of acronyms there.  Do you know what

12  those acronyms stand for?  And if you do, could you state them?

13  A.  Yes, so TANF stands for Temporary Assistance for Needy

14  Families.  So that's cash that they receive to support them.

15  SNAP is food stamps virtually -- basically, and it's -- gosh, I

16  can't think of what that stands for.  Supplemental Nutrition

17  Assistance Program.  And the CCDF is childcare Development

18  Fund.  And WIC is Women, Infant, and Children's program.

19  Q.  Okay.  Miss Roth, what about education, do you have

20  educational services that you can refer for some of your women?

21  A.  Yes, we do.  We have the literacy alliance, which helps

22  anyone get their GED or HSE.  We also have safe sleep programs

23  through our local hospitals, which is actually an Indiana State

24  Department of Health funded program.  That provides safe sleep,

25  education, and training, also providing a free bed to all

1    people who go through that program.

2    Q.   Then briefly you mentioned outside counseling, that

3    sometimes you refer for outside counseling.  Could you name

4    just a couple providers that you provide outside counseling

5    for.

6    A.   Sure.  We have Park Center.  Park Center provides

7    counseling, addiction counseling, and psychiatric services that

8    are free for Medicaid patients or a sliding fee scale for

9    non-Medicaid patients.

10        We also have Bowen Center, which also provides very similar

11   services to Park Center.  We also have the two crisis pregnancy

12   centers here in town as well.

13   Q.   Okay.  And the last area I wanted to ask about is housing

14   resources available to pregnant women.

15   A.   So we have Vincent House, which is for families, so men and

16   women can go there together with their children.

17        We also have, like I said here, A Mother's Hope, and --

18   umm, do you want another one?

19   Q.   Oh, no, that is fine if you're finished.

20        So out of all these services that you've identified, does

21   AMH connect their residents to these directly?

22   A.   Yes.

23   Q.   Okay.  So in your opinion, at least limited to your

24   experience in the Fort Wayne area, are there a lot of resources

25   available for pregnant women, low income pregnant women?

A.  Yes, here there are a lot of resources for low income
pregnant women.

Q.  Have you ever had a circumstance where you couldn't refer a
woman for services of some kind?

A.  No.

Q.  Okay.  Now, Miss Roth, I think we're moving on just to the
last topic here.  I want to ask you a little bit about, you
mentioned earlier that AMH staff, or sometimes you personally,
I believe, attend medical appointments with some of your
residents; is that the case?

A.  Yes.

Q.  Okay.  Why does AMH attend some medical appointments for
its residents?

A.  Many of our residents struggle to communicate their needs,
especially during medical appointments.  They often will not
ask questions.  They will not talk about what is going on with
their health and try to get help for what their needs are, so
oftentimes our staff will -- or myself, will go with them to
encourage them to ask their questions and help them get good
feedback so that they understand what's actually happening with
their bodies.

Q.  Okay.  And so in speaking to a medical provider, do your
residents, do they have issues with people in authority?

A.  Yes.  I have had residents tell me before they just get
very nervous, and they don't know how to speak to somebody in

1  authority.

2  Q.  And do you -- is this something that you've observed from

3  appointments that you've gone to?

4  A.  Yes, I've also had it where they wait till the medical

5  provider leaves the room and then tells me their question so

6  that I'll ask it for them.

7  Q.  Okay.  Switching gears slightly.  So you talked about

8  medical appointments that you attend with your residents.  Has

9  AMH, or you personally, ever attended a telehealth appointment

10  with a resident?

11  A.  Yes.

12  Q.  And does that patient-provider interaction -- is that

13  different?

14  A.  Yes.

15  Q.  And is it a better or a worse interaction compared to in

16  person?

17  A.  Worse.

18  Q.  And why is that?  Or explain why that is.

19  A.  Our residents struggle to connect or to understand what is

20  happening and the information when they are in person, but when

21  it's coming through a screen, I think they find -- from what

22  they have told me, it's even harder to make that connection and

23  feel that their needs are being met and feel cared for.

24  Q.  And you have also observed -- have you personally attended

25   a telehealth appointment with a resident?

1   A.  I have spoken with them after they happened.

2   Q.  Okay.  Miss Roth, I think my last question for you and

3   then, Your Honor, I might want to take a brief moment to confer

4   with my colleagues if there's any final direct questions.

5   Miss Roth, could you give me some examples of where telehealth

6   has caused a problem for one of your residents?

7          THE COURT:  Wait, she said she's never accompanied

8   anybody on a telehealth appointment.  So you have to rephrase

9   that one since she has not laid the foundation for that.

10  BY MR. ROWLETT:

11  Q.  Okay.  Miss Roth, have you had any patients who have

12  reported problems with their telehealth appointments to you

13  after the fact?

14  A.  Yes.

15  Q.  And what complaints were common?

16         THE COURT:  Well, isn't that hearsay, Counsel?

17         MR. ROWLETT:  I don't believe so, Your Honor.  I think

18  it would be --

19         THE COURT:  Well, then, phrase the question so you're

20  not eliciting hearsay.  Do you have an opinion with respect to

21  telehealth medicine based on the things you've learned in your

22  administrative capacity?  Isn't that your question?

23         MR. ROWLETT:  Sure, and Miss Roth, feel free to

24  answer.

25  A.  Yes.  In my opinion, telehealth is not effective for the

women that I work with because they get frustrated.  They don't

understand, often, what is being communicated to them, but they

don't say that they don't understand.  They state that they

understand; and then, what they reported to me afterwards is

that they were frustrated, didn't understand what was

happening, and just walked away.

BY MR. ROWLETT:

Q.  So some of these communications issues that you've

identified for low income women, is it your opinion they are

exacerbated when the interaction is by telehealth instead of in

person?

A.  Yes, absolutely.

Q.  Okay.

        MR. ROWLETT:  At this time, Your Honor, I would just

like a brief moment to confer with my colleagues, see if

there's anything else on direct.

        THE COURT:  As Miss Toti said, your "peanut gallery"?

        MR. ROWLETT:  Yes.

        THE COURT:  Okay.

        Where did you go to college, Miss Roth?  Where did you

get your bachelor's degree?

        THE WITNESS:  IU in Bloomington.

        THE COURT:  Great.  Did you live on campus?

        THE WITNESS:  For the first couple of years, yes.

        THE COURT:  Where did you live?

1          THE WITNESS:  I lived in Forest.

2          THE COURT:  I know exactly where it is.

3          THE WITNESS:  They had just remodeled it when I was

4     there.  So it was nice.

5          THE COURT:  Good.

6          MR. ROWLETT:  Your Honor, we have no additional

7     questions at this time.  Thank you.

8          THE COURT:  Okay.

9          MR. RODRIGUEZ:  Good morning, Miss Roth.  How are you

10    doing today?

11         THE COURT:  Hold on, Mr. Rodriguez.  We've got another

12    snafu here.  Would you call the techies and ask them to come

13    check this, please, because this is a nuisance.

14         Okay.  Cross-examine, Mr. Rodriguez?

15         MR. RODRIGUEZ:  Thank you, Your Honor.

16                   *CROSS-EXAMINATION*

17    BY MR. RODRIGUEZ:

18    Q.  Good morning, Miss Roth.  How are you doing today?

19    A.  (Inaudible.)

20         THE COURT REPORTER:  I'm sorry, I did not hear her.

21         THE COURT:  Did you answer, Miss Roth?

22    A.  I said, "Good."

23    BY MR. RODRIGUEZ:

24    Q.  My name is Juanluis Rodriguez, and I'm an attorney for the

25    Plaintiffs, and I just have a few questions for you, Miss Roth.

1      You are not a licensed medical practitioner, correct?

2  A.  No.

3  Q.  You do not hold any medical degrees?

4  A.  No.

5  Q.  You have not received any formal medical training?

6  A.  No.

7  Q.  You are not a licensed clinical social worker?

8  A.  No, I am not.

9  Q.  You do not have any experience as a clinical social worker?

10  A.  Not with that degree, no.

11  Q.  And you are not a clinical psychologist?

12  A.  No.

13  Q.  You do not have any experience caring for patients in a

14  clinical setting?

15  A.  No.

16  Q.  You are not a public health professional?

17  A.  No.

18  Q.  You have not received any formal public health training?

19  A.  No.

20  Q.  You do not hold any degree in public health?

21  A.  No.

22  Q.  You are not a mental health professional?

23  A.  Not with a degree.

24  Q.  You do not hold any licenses or certifications concerning

25  the diagnosis or treatment of mental illness?

A.  No.

          MR. ROWLETT:  Miss Roth, I don't think it picked up
your answer.

          THE COURT:  Yes.

A.  No.

BY MR. RODRIGUEZ:

Q.  Your highest level of education is a bachelor's degree,
correct?

A.  That's correct.

Q.  You do not hold any advanced degrees?

A.  No.

Q.  And you do not hold any professional licenses or
certifications?

A.  I do have certifications.

Q.  Okay.  I'd like to call up Plaintiffs' Exhibit 606.  This
has also been previously identified as stipulated Exhibit 32.

     I'm sorry, yes.  This is a separate document, but
Plaintiffs' 606 works, and could we turn, please, to page 14.

     Okay.  Ms. Roth, you recognize this document?

A.  Yes.

Q.  And starting here is your CV which you have previously
identified?

A.  Yes.

Q.  Okay.  And is this a true and accurate representation of
that CV?

A.   Yes.

Q.   Okay.  Could you please point us where you have your professional licenses or certifications listed?

THE COURT:  Is it a one-page document, Counsel?

THE WITNESS:  No.

MR. RODRIGUEZ:  You also should have access to this.  I believe you received both physical and electronic copies, Miss Roth.

A.   I am looking at it.  Are you saying I have access to this?

BY MR. RODRIGUEZ:

Q.   You should.

A.   I don't think -- we did not put my, any certifications that I had on this.  They are just not listed.

Q.   So this is not a complete CV of yours?

A.   It's just not something that I listed on there.

Q.   So it is not a complete CV?

A.   Well, I think it's complete.

Q.   So it lists all of your educational and professional background?

A.   Yes.  The certifications that I have received through various trainings are not listed.

Q.   So this is not a complete CV?

A.   (No response.)

MR. ROWLETT:  Your Honor, I'm going to object.  This has been asked and answered.

1          THE COURT:  Well, it's been asked, but it hasn't been

2     answered.  The certifications are not on there.  So to that

3     extent, is it incomplete, Miss Roth?

4          THE WITNESS:  Yes.

5          MR. RODRIGUEZ:  Okay.  Thank you.  That's all we'll

6     need of that document for now.

7     BY MR. RODRIGUEZ:

8     Q.  Miss Roth, your testimony today is based on your experience

9     working at A Mother's Hope; is that correct?

10    A.  Yes.

11    Q.  And if I refer to A Mother's Hope as AMH, you'll understand

12    what I'm referring to?

13    A.  Yes.

14    Q.  Okay.  AMH is located in Fort Wayne, Indiana?

15    A.  Yes.

16    Q.  And it serves pregnant woman in the Fort Wayne community?

17    A.  And the surrounding areas, yes.

18    Q.  So your experience through AMH is with women in Fort Wayne?

19          THE COURT:  Fort Wayne area, Mr. Rodriguez.  We've

20    gone down this road before.

21          MR. RODRIGUEZ:  Okay.

22    BY MR. RODRIGUEZ:

23    Q.  You have never worked at a maternity home outside of the

24    Fort Wayne?

25          THE COURT:  Area.

A.  I have not.

THE COURT:  We're going to call it "the Fort Wayne area," Mr. Rodriguez.  Now, do that or you're just going to invite objections.

MR. RODRIGUEZ:  Yes, Your Honor.

BY MR. RODRIGUEZ:

Q.  Miss Roth, I'll repeat the question.  You have never worked at a maternity home outside the Fort Wayne area?

A.  No.

Q.  And all of your clients at AMH, to the extent they are gainfully employed, work in the Fort Wayne area?

A.  We have had some that went outside of the Fort Wayne area for work.

Q.  Okay.  Ms. Roth, you've not reviewed the academic and professional literature on reproductive coercion; is that right?

A.  No.

Q.  You are not familiar with the American College of Obstetricians and Gynecologists or ACOG for short?

A.  Yes, I have heard of that.

Q.  You're not familiar with ACOG's guidelines for screening patients for possible reproductive coercion?

A.  No.

Q.  You're not aware of the overall incidents of reproductive coercion in Indiana?

1  A.  No.

2  Q.  You're not aware of the overall incidents of reproductive

3  coercion in Fort Wayne?

4  A.  No.

5  Q.  You have not done any systematic research concerning

6  whether homeless women's experiences of reproductive coercion

7  are unique or different from other women's experiences of

8  reproductive coercion?

9         THE COURT:  Is that true?

10  A.  No, I have not.

11  BY MR. RODRIGUEZ:

12  Q.  And your personal experience, which is the basis of your

13  testimony today, is limited to working with homeless women?

14         MR. ROWLETT:  I'm going to object.  That

15  mischaracterizes testimony.  She said "low income" or

16  "homeless," not exclusively homeless.

17         THE COURT:  She can clarify.  If that's not true, you

18  should say "that's not true."

19  A.  Yes, it's homeless and low income women.

20  BY MR. RODRIGUEZ:

21  Q.  Okay.  You don't know how many AMH participants are

22  survivors of intimate partner violence?

23  A.  I don't know that number.

24  Q.  And that's information that you've never collected from AMH

25  participants?

83

A.  We have not tracked that data, no.

Q.  Based on your experience, Miss Roth, women who have had an

abortion eventually come to regret their decision?

A.  Yes.

MR. ROWLETT:  Objection, Your Honor.  This is outside

the scope of my direct.  I didn't ask her about why women seek

abortions or whether they regret them.  I only asked if she had

worked with people who had received an abortion.

THE COURT:  I sustain the objection to the question in

the way it was framed.

BY MR. RODRIGUEZ:

Q.  Miss Roth, it's your testimony that you have interacted

with women who have obtained abortions; is that correct?

A.  Yes.

Q.  The only time in your professional life in which you have

interacted with people who want abortion care is during your

work at Crossroad's; isn't that right?

A.  No.

Q.  Okay.  Ms. Roth, you gave a deposition in this case; is

that right?

THE COURT:  Say it louder so it picks up on your

machine, please.

A.  Yes.

BY MR. RODRIGUEZ:

Q.  And as part of your deposition, you took an oath to tell

1  the truth just as you did in court this morning; is that right?

2  A.  Yes.

3  Q.  Did you tell the truth at your deposition?

4  A.  Yes.

5  Q.  I'd like to call Plaintiffs' Exhibit 607, which is the

6  transcript of your deposition.

7      Okay.  And if we could turn that to page 65, and I'd like

8  to turn your attention to lines 8 through 16.

9          THE COURT:  You better go a little above that.

10          MR. RODRIGUEZ:  Yeah.  Sorry.  If we can go a little

11  above that.

12          THE COURT:  Are we going to start with line 5?

13          MR. RODRIGUEZ:  Yes.  Okay.

14          "Question:  Start with during your time at A Mother's

15  Hope.

16          "Answer:  I have had women who were considering

17  aborting but said that they did not want to.

18          "Question:  How about in your professional experience

19  prior to A Mother's Hope?

20          "Answer:  Yes.

21          "Question:  How many, do you recall?

22          "Answer:  No.

23          "Question:  When would that have been?

24          "Answer:  In the work when I was at Crossroads.

25          "Question:  So 2002 or something?

1        "Answer:  1998 through 2000."

2        Ms. Roth, did I read that correctly?

3   A.  Yes.

4        MR. RODRIGUEZ:  And we can put that document aside for

5   now.

6   BY MR. RODRIGUEZ:

7   Q.  In your personal life, you similarly have not known anyone

8   who, to your knowledge, affirmatively wanted abortion care, is

9   that right?

10        MR. ROWLETT:  Objection.  That -- again that's outside

11   the scope of direct.  I didn't ask Ms. Roth anything about her

12   personal life or people she may be friends with.  I only asked

13   questions about in her professional capacity.

14        THE COURT:  It's a credibility question.  The

15   objection is overruled.

16        Can you answer the question?

17   A.  Could you please ask it again?

18   BY MR. RODRIGUEZ:

19   Q.  Sure thing, Ms. Roth.

20        In your personal life, you have not known anyone who, to

21   your knowledge, has affirmatively wanted abortion care; is that

22   right?

23   A.  Yes, I have known people who wanted abortion care, but I

24   did not know them when they wanted it.

25   Q.  Okay.  I'm going to direct your attention to Plaintiffs'

1   Exhibit 607.

2       Okay, and I'll direct you to lines 2 through 5.

3           THE COURT:  Page?

4           MR. RODRIGUEZ:  On page 67.

5   BY MR. RODRIGUEZ:

6   Q.  "Question:  So, other than your work at Crossroads, you

7   haven't known anyone who has affirmatively wanted an abortion?

8       "Answer:  No."

9       Did I read that correctly, Ms. Roth?

10  A.  You did.

11  Q.  Okay.  Thank you.  We can put that document aside.

12      Ms. Roth, you would not know how to seek out a person who

13  had an abortion and did not regret her decision; is that

14  correct?

15  A.  Can you repeat that, please?

16  Q.  You would not know how to seek out a person who had an

17  abortion and did not regret her decision?

18  A.  I don't know.

19  Q.  You don't know how to seek out such a person?

20  A.  I don't know the answer to that.

21          MR. RODRIGUEZ:  Okay.  All right.  Can we pull up

22  document 607 again, please.  And if we can go to page 93.  And

23  I'd like to highlight, please, lines 4 through 9.

24  BY MR. RODRIGUEZ:

25  Q.  Okay.  I'm going to read this out loud for you, Ms. Roth.

1   "Question:  Have you ever been interested in talking to a

2   woman who had an abortion that doesn't regret her decision?

3       "Answer:  Absolutely.

4       "Question:  Ever tried to find such a person?

5       "Answer:  I'm not sure how you would seek that out."

6       Did I read that correctly, Ms. Roth?

7   A.  Yes.

8   Q.  Okay.  You testified on your direct about the number of AMH

9   residents who had previously sought out abortion care; is that

10  right?

11  A.  Yes.

12  Q.  And you said that four out of the 31 residents at AMH had,

13  in fact, obtained an abortion; is that right?

14  A.  That I know of.

15  Q.  That you know of.

16      MR. RODRIGUEZ:  Okay.  I'm going to call up, again,

17  Plaintiffs' Exhibit 607.  And if I can -- we can go to page 95.

18  And we're going to go to lines 20 through 24.

19  BY MR. RODRIGUEZ:

20  Q.  "Question:  Of the 30 women with whom you've worked, how

21  many have had abortions before?

22      "Answer:  By self-report?

23      "Question:  Yeah.

24      "Answer:  I don't know.  I don't know that number."

25      Did I read that correctly, Ms. Roth?

1   A.  Yes.

2   Q.  Okay.  Thank you.  We can put that document aside.

3      AMH serves pregnant women; is that correct?

4   A.  Yes.

5   Q.  And if an AMH resident terminated her pregnancy, she would

6   no longer be eligible for any of the resources provided by AMH;

7   is that correct?

8   A.  No.

9   Q.  Being pregnant is not a requirement for seeking services at

10   AMH?

11   A.  It is a requirement for entrance into the program, but if a

12   woman chose to terminate her pregnancy or if she placed her

13   baby for adoption, we would allow her to remain in the program

14   to support her until she was able to complete the necessary

15   things so she could be on her own, just like somebody who

16   carried their baby to term.

17   Q.  And does that include shelter?

18   A.  Yes.

19   Q.  You think it is never in a woman's best interest to obtain

20   abortion care; is that right?

21   A.  Yes.

22   Q.  And you think abortion care should be illegal in all

23   circumstances?

24   A.  Yes.

25   Q.  Ms. Roth, you testified about Medicaid earlier; is that

1   right?

2   A.   Yes.

3   Q.   And your testimony about Medicaid is based on your

4   experiences at AMH?

5   A.   Yes.

6   Q.   You testified about the benefits that Medicaid provides to

7   pregnant women in Indiana?

8   A.   Yes.

9   Q.   And you are aware that Medicaid does not cover abortion

10   care in Indiana?

11   A.   Yes.

12   Q.   You are aware that in Indiana, some individuals who are

13   eligible for Medicaid while pregnant are no longer eligible for

14   Medicaid after they give birth?

15   A.   Yes.

16   Q.   You are aware that in Indiana, some children whose mothers

17   were eligible for Medicaid while pregnant are not themselves

18   eligible for Medicaid?

19   A.   Yes.

20   Q.   And you are aware that Indiana imposes an

21   80-hour-per-week -- or, excuse me, an 80-hour-per-month work

22   requirement for Medicaid eligibility?

23   A.   I'm not sure about the number, but, yes, there is a work

24   requirement.

25   Q.   You are aware that unpaid work, such as caregiving duties,

90

1  does not satisfy that work requirement?

2  A.  No, I'm not aware of that.

3  Q.  You have never personally shown an AMH participant where to

4  find a Medicaid application?

5  A.  I have done that.

6       MR. RODRIGUEZ:  Okay.  Let's call up Plaintiffs'

7  Exhibit 607.  And if we can go to page 110, please.  And if we

8  can highlight, please, lines 13 through 21.  And can we

9  actually go a little above that just so I can show that it's

10  the question, 10 through 21.

11  BY MR. RODRIGUEZ:

12  Q.  Okay.  I'm only going to start reading from line 13, but,

13  as you can see, that's part of the question.

14     "Question:  Flip to page 3 of your report, please.  Are all

15  of your residents participants in Medicaid?

16     "Answer:  Yes.  If they are not when they come to us, we

17  help them get that coverage.

18     "Question:  How do you help them get that coverage?

19     "Answer:  We show them where the application is and help

20  them fill it out if they need help.

21     "Question:  Have you done that personally?

22     "Answer:  No."

23     Did I read that correctly, Ms. Roth?

24  A.  Yes, you did.

25  Q.  Okay.  We can put that document aside.

1      You also testified about the benefits that TANF provides to

2  pregnant and postpartum women in Indiana; is that correct?

3  A.  Yes.

4  Q.  And your testimony on TANF is based on your experiences at

5  AMH?

6  A.  Yes.

7  Q.  Are you aware that Indiana imposes a family cap on TANF

8  benefits, such that poor and low-income women who welcome a new

9  child cannot receive additional cash assistance to support that

10 child?

11 A.  No.  They do receive an increase when they have a new

12 child.

13 Q.  So you are not aware that Indiana imposes a family cap on

14 TANF benefits?

15 A.  No.

16 Q.  You are aware that TANF can only serve five out of every

17 100 poor or low-income families in Indiana?

18 A.  No.

19 Q.  At AMH, you meet with your staff to ensure that they have

20 reviewed every AMH resident with regard to TANF; is that right?

21 A.  Yes.

22 Q.  But you are not personally involved with anything related

23 to TANF for AMH residents; is that correct?

24 A.  No.

25 Q.  That's not correct?

1  A.  No.  That is correct.

2  Q.  That is correct, okay.

3     All right.  You also testified about the benefits that SNAP

4  provides to pregnant and postpartum women in Indiana.  And your

5  testimony on SNAP is based on your experiences at AMH?

6  A.  Yes.

7  Q.  You are aware that the federal government allows states to

8  offer SNAP to individuals with an income of up to 200 percent

9  of the federal poverty line?

10 A.  Yes.

11 Q.  You are aware that Indiana does not permit SNAP eligibility

12 for individuals with an income beyond 130 percent of the

13 federal poverty line?

14 A.  No, I didn't know that.

15 Q.  Okay.

16          COURT REPORTER:  She did not?

17          THE COURT:  She did not know that.

18 BY MR. RODRIGUEZ:

19 Q.  AMH requires that residents have an income at or below

20 150 percent of the poverty guideline; is that right?

21 A.  Yes.

22 Q.  So there are some AMH residents who would not be eligible

23 for SNAP?

24 A.  We have only had that happen in one case that I recall.

25 Q.  So there are some AMH residents who would not be eligible

1    for SNAP?

2    A.  Not when they come into the program, but potentially when

3    they leave.

4    Q.  Ms. Roth, if you had an AMH resident with an income of

5    140 percent of the federal poverty guideline, would they be

6    eligible for SNAP in Indiana, which imposes a 130 percent cap

7    of the federal poverty line?

8    A.  No.

9    Q.  You are aware that Indiana also imposes an assets cap of

10   $2,250 on SNAP eligibility?

11   A.  No.

12   Q.  Okay.  At the time you formulated your opinions in this

13   case, you were not aware of whether any AMH participants had

14   ever had a telemedicine appointment; is that correct?

15   A.  Correct.

16   Q.  And you said that AMH staff members sometimes accompany

17   clients to in-person medical appointments?

18   A.  Yes.

19   Q.  And that occasionally staff members also accompany clients

20   to telemedicine medical appointments?

21   A.  Yes.

22   Q.  At the time you formulated your opinions in this case, you

23   had never reviewed any studies about telemedicine; is that

24   correct?

25   A.  That's correct.

Q.  And at the time you formulated your opinions in this case, you had no other education or knowledge about telemedicine?

A.  That's correct.

MR. RODRIGUEZ:  Okay.  Your Honor, if I could have just a moment to confer with my colleagues?

THE COURT:  You may.

MR. RODRIGUEZ:  Okay.  Thank you, Your Honor.  No further questions on cross.

THE COURT:  Redirect, Mr. Rowlett?

MR. ROWLETT:  Your Honor, can I consult with the peanut gallery momentarily?

THE COURT:  Yes, you may.

Mr. Rodriguez, where are you this morning?

MR. RODRIGUEZ:  I am in my apartment in Brooklyn, Your Honor.

THE COURT:  Oh, you're in Brooklyn, too.

MR. RODRIGUEZ:  I am.  I'm in our east Brooklyn office.

THE COURT:  Do you live close to the botanic garden?

MR. RODRIGUEZ:  I do actually.  I'm a ten-minute walk.

THE COURT:  That was a stab in the dark by me because we go to Brooklyn to see our kids, but I don't know Brooklyn that well.  When we go, we often go to the botanic garden and the zoo, Mr. Rodriguez.

MR. RODRIGUEZ:  I haven't been to the zoo yet, but the

1   gardens make for a lovely walk.

2        THE COURT:  I was in Fort Wayne last summer -- no,

3   before the COVID stuff -- and was surprised at how wonderfully

4   developed the downtown is; and I love the summer market that

5   they have -- the farmer's market.

6        They have a nice farmer's market in Brooklyn, too, at

7   the end of Prospect Park.  Do you go to that, Mr. Rodriguez?

8        MR. RODRIGUEZ:  I haven't actually stopped, but I walk

9   by it all the time.

10        THE COURT:  Go to the cheese vendor, Mr. Rodriguez.

11        MR. RODRIGUEZ:  I'm taking notes.

12        MR. ROWLETT:  I have returned from the peanut gallery.

13   Just a couple questions, Your Honor.

14        THE COURT:  You may ask.

15        MR. ROWLETT:  Thank you.

16                    REDIRECT EXAMINATION

17   BY MR ROWLETT:

18   Q.  Miss Roth, opposing counsel asked you a couple questions

19   about the women that you see, whether you serve primarily women

20   in the Fort Wayne area; but just to clarify, has AMH ever

21   worked with women from outside the Fort Wayne area?

22   A.  Yes, we have.

23   Q.  And would that include the story of the woman you told

24   earlier that drove up from Indianapolis?

25   A.  Yes.

Q.  Moving on, opposing counsel asked you briefly about
intimate partner violence and whether you knew the statistics,
so to speak, of how many AMH residents experience intimate
partner violence.  Are all of the residents or women that you
serve through AMH -- do they always truthfully report whether
they have experienced intimate partner violence?

A.  No.

Q.  Okay.  Opposing counsel asked you a number of questions
about your deposition and answers you'd given as part of your
deposition.  I'm not going to go through those individually;
but suffice it to ask, do you recall how long ago your
deposition was taken?

A.  I think it was August 2019 or something like that.

Q.  Okay.  Thank you.

    Opposing counsel also asked you some questions about state
and federal assistance programs, particularly TANF and
Medicaid.  So first question, again, have you had any residents
at AMH for whom you have not been able to secure services?

A.  No.

Q.  And are there services available to your residents that you
utilize other than TANF and Medicaid?

A.  Yes.

Q.  Would those be the services that you listed earlier on
direct?

A.  Yes.

1  Q.  And through those services, do you find that you've been

2  able to achieve high-quality care for your residents?

3       I think she's frozen.  I'm going to wait just a second.

4            THE COURT:  Okay.

5  A.  You're back.  Sorry.  I froze.

6  BY MR. ROWLETT:

7  Q.  Do you find that through the resources that you are aware

8  of, both state, federal, and not state or federal provided,

9  that you're able to provide high-quality care for your

10 residents?

11 A.  Yes.

12          MR. ROWLETT:  Your Honor, I have no further questions.

13 Thank you.

14          THE COURT:  Recross, Mr. Rodriguez.

15          MR. RODRIGUEZ:  Nothing further, Your Honor.

16          THE COURT:  All right.  Have the parties asked all the

17 questions of Miss Roth that you intend to ask, Mr. Rowlett?

18          MR. ROWLETT:  Yes, Your Honor.  Thank you.

19          THE COURT:  And Mr. Rodriguez?

20          MR. RODRIGUEZ:  Yes, Your Honor.

21          THE COURT:  Can Miss Roth be excused and released from

22 her subpoena?

23          MR. ROWLETT:  Yes.

24          MR. RODRIGUEZ:  Nothing further, Your Honor.

25          THE COURT:  Miss Roth, thank you very much for your

1    participation in our trial this morning.  Good luck on your

2    important work.

3                 THE WITNESS:  Thank you.

4                      (Witness excused.)

5                 THE COURT:  I brought you right up till noon, lawyers,

6    without a morning break.  So let's use this as lunch and

7    morning break.  I appreciate your pushing through so that we

8    can, as we say in Indiana, make hay while the sun shines,

9    Mr. Rodriguez, although there's no sun shining today.

10                So we'll reconvene at 1:15, which is about an hour and

11   20 minutes.  I hope you have a nice break.  We'll see you then.

12                MR. RODRIGUEZ:  Thank you.

13                MR. ROWLETT:  Thank you, Your Honor.

14                      (Lunch recess taken.)

15                      AFTERNOON SESSION

16                      (Open court.)

17                THE COURT:  Okay.  We're all set.  The court reporter

18   is in gear.

19                So please call your witness, Mr. Schaerr, and then

20   I'll have her sworn.

21                MR. SCHAERR:  Thank you, Your Honor.  The defense

22   calls Dr. Priscilla Coleman as an expert.

23                THE COURT:  All right.  Dr. Coleman, prior to giving

24   your testimony, you must take the oath, so I'll ask the clerk

25   to administer it.

1          Would you raise your right hand, please.

2          PRISCILLA COLEMAN, DEFENDANTS' WITNESS, SWORN

3                     DIRECT EXAMINATION

4          THE COURT:  Thank you very much.

5          Mr. Schaerr, you may ask your questions.

6          MR. SCHAERR:  Thank you.

7    BY MR. SCHAERR:

8    Q.  Professor Coleman, tell us your full name, please.

9    A.  Priscilla Kerry Coleman.

10   Q.  And did you prepare a CV for this case?

11   A.  Yes, I did.

12   Q.  And let me show you Stipulated Exhibit No. 1.

13       Does this appear to be your CV?

14   A.  Yes.  If you could enlarge it a little bit, that would be

15   great.

16   Q.  Okay.  And that is in fact the CV you prepared for this

17   case?

18   A.  Yes, it is.

19   Q.  And what is your current place of employment?

20   A.  Bowling Green State University.

21   Q.  And how long have you worked there?

22   A.  I assumed my position in July 2002.  So this is my

23   nineteenth year.

24   Q.  Okay.  And are you a full professor?

25   A.  Yes.  I was granted full professorship in 2010.

1   Q.   Okay.  And before that, you were an associate professor?

2   A.   Correct.  I brought in a few years from the --

3                THE COURT:  Hold on.

4                Okay.  Go ahead.

5                I don't know what's causing the in and out of our

6   video, but we just have to stop every once in a while and deal

7   with it.

8                THE WITNESS:  Okay.

9                THE COURT:  But I can hear you.  We were talking about

10  your professorship.

11               THE WITNESS:  Correct.

12  A.   And so I arrived in 2002, and I was granted tenure in 2005

13  because I brought in a couple years from the University of the

14  South where I taught prior, and then I became a full professor

15  in 2010.

16  BY MR. SCHAERR:

17  Q.   And what responsibilities do you have at Bowling Green now?

18  A.   Too much at the moment.  I'm teaching four courses.

19  Normally my load is three/three.  But because of COVID, we let

20  go of part-time people.  So it's typically a three/three course

21  load, and I have responsibilities for advising up to 50

22  undergraduate students in our human development and family

23  studies major.  I also serve on committees at various levels of

24  the university.  I'm always the person doing the assessment

25  report for our program.

Q.  Which courses do you teach?

A.  Well, I teach a research methods course.  I look forward to a break from that when I'm on sabbatical next year.  It's the dreaded course in our curriculum.  So I teach research methods to our seniors.  And I teach parenting processes.  It used to be a senior course.  It's now at a junior level.  And I teach a sophomore-level course in child development and a life span development course for our freshmen.

Q.  Okay.  And what degrees do you have?

A.  Well, I have a bachelor's degree in general psychology from Southern Connecticut State University, and then my master's is from James Madison University also in general psych.  My Ph.D. is from West Virginia University in life span developmental psychology.

Q.  And tell us what life was like for you in getting your Ph.D.

A.  The first word that comes to mind is a blur, but challenging because I had three young children.  My youngest was still nursing at two.  It was kind of hard to get him off, so he was -- they ranged in age from two to 12.  And so it was challenging to balance the coursework and parenting.  So all in all, I think it was a positive for the kids.  They saw me studying frequently and now they have all done very well academically.  My oldest just finished a Ph.D. from Princeton in biology, so ...

1    Q.   During your Ph.D. --

2    A.   What was that?

3    Q.   Sorry.  I interrupted you.  Go ahead.

4    A.   So in retrospect, it was a good thing for children to get

5    exposed to mom working on a doctorate.

6    Q.   As a Ph.D. student, did you specialize in any particular

7    field or fields?

8    A.   Well, my focus in my master's program was on women's

9    adjustment to parenting, so I was interested in sort of the

10   thought processes that go on, the cognitions associated with,

11   you know, a pretty dramatic change in lifestyle from not being

12   a parent to being a parent, so that was my initial entrance

13   research-wise.

14        And then when I arrived in '95 at West Virginia University,

15   I was parenting and the transition to parenting, so I continued

16   with that line of research.  And my doctoral program was

17   particularly interested in self efficacy beliefs, which

18   incorporate -- it's relevant to different domains of

19   functioning.  But in the parenting domain, it relates to your

20   knowledge of appropriate parenting behaviors and your

21   confidence and --

22             COURT REPORTER:  I'm sorry.

23             THE COURT:  Wait just a minute.

24             COURT REPORTER:  "And your confidence," and I couldn't

25   understand.

1          THE WITNESS:  Okay.

2          THE COURT:  We didn't get after "confidence."

3    A.   Okay.  Self efficacy involves confidence in your parenting

4    if we're applying it to the parenting domain.  Self efficacy

5    can be applied to different areas of functioning.  But as

6    related to parenting, it involves confidence in engaging in

7    behaviors that you know are appropriate to the needs of the

8    child, so there's a knowledge component and a confidence

9    component.

10        It appealed to me because it's something that has been

11   shown to be altered, so when we can't alter the circumstances

12   of children's lives in terms of finances and, you know, where

13   homes are located, so there's a lot of factors that may make

14   development challenging and parenting challenging, but we do

15   know that --

16         THE COURT:  Wait.  Wait.

17         Is that the topic of your Ph.D.?

18         THE WITNESS:  Yes.

19         THE COURT:  Okay.  Next question, please.

20   BY MR. SCHAERR:

21   Q.   And is it fair to say that a substantial part of your

22   studies have been in the general field of developmental

23   psychology?

24   A.   Yes, and some have -- you know, some are also in -- more in

25   the clinical and the medical field now that I've been studying

1    the psychological associations between abortion and mental

2    health.

3    Q.   And what is developmental psychology?

4    A.   It's the study of human behavior, normative human

5    behavioral processes from conception to death.

6    Q.   Does it include issues of human decision-making?

7    A.   Yes.

8    Q.   Okay.  Besides developmental psychology, were you trained

9    in the usual and customary practices in the field of

10   psychology?

11   A.   Well, psychology is a very diverse, broad discipline, so my

12   Ph.D. focused primarily on the typical milestones in the

13   different domains of development across the lifespan.

14   Q.   Okay.  And when you perform work in psychology, do you

15   apply the skills that you learned while earning your degrees?

16   A.   Yes.

17   Q.   Are you a clinical psychologist?

18   A.   No, I'm not.

19   Q.   Is it fair to say that you're a research psychologist?

20   A.   Yes.

21   Q.   And what role, if any, do clinical data play in your

22   research?

23   A.   Well, the research -- the bulk of the research that I have

24   conducted over the years has dealt with large-scale nationally

25   representative data sets that are -- that contain data that was

gathered by professionals, some clinicians.  You know, it just

depends.  But so I -- because I'm interested in mental health,

I have extensively studied various diagnoses and, you know, and

risk factors for suffering from various mental health

conditions, you know, so I've been immersed in the empirical

data related to mental health for 25 years.

Q.  Okay.  And how many scientific or technical articles or

studies have you published?

A.  I believe it's 57.

Q.  Okay.  And what general topics have those publications

addressed?

A.  Well, if we -- the best way to characterize my research

through the years has been I have been interested in

reproductive outcomes, reproductive choice and outcomes, so

I've studied parenting, I've studied adoption, and most of my

research has been on the psychology of abortion.  So

approximately 75 percent of those publications relate to

abortion decision making and predictors of mental health

outcomes and comparisons between women who undergo an abortion

to women who decide to carry to term, so that's kind of been

the gamut.

Q.  So have the number of your studies and publications then

dealt with associations between abortion and psychological

outcomes or decision-making about abortion?

A.  Yes.

1   Q.  And how long have you been publishing in that field?

2   A.  I believe the first publication was around 1995.  It could

3   have been earlier.  It might have been.  I know -- I started

4   publishing --

5            THE COURT:  Do you have list of your publications?

6            THE WITNESS:  Yes.  It's in my CV.

7            THE COURT:  Do you have a CV?

8            Why don't we just put them in evidence, Mr. Schaerr?

9            MR. SCHAERR:  Okay.

10                    (Cross talking.)

11            COURT REPORTER:  I'm sorry.  One at a time.

12            THE COURT:  Can't talk at the same time.

13            I'm talking to Mr. Schaerr.

14            Why don't we just put the document in evidence?

15            MR. SCHAERR:  That's fine, Your Honor.  I believe it's

16   already in evidence.

17            THE COURT:  Okay, then.  We'll roll.

18   BY MR. SCHAERR:

19   Q.  Okay.  And do you typically perform or oversee your own

20   research?

21   A.  Yes.

22   Q.  And has your work been peer reviewed?

23   A.  Yes.

24   Q.  And how is its followers' influence typically measured or

25   assessed in your field?

1    A.   Probably one of the most straight forward ways is what we

2    refer to as the H Index.  That's for Hirsch.  The Hirsch Index

3    is a measure of the impact of a particular scholar, and it's

4    based on numbers of publications, as well as citations to those

5    publications.

6    Q.   And what is a typical H Index for someone of your

7    experience in the field of psychology?

8    A.   Around an index of 20 is considered a decent scholarship

9    activity for a full professor who's been in the field for about

10   20 years.

11   Q.   Okay.  And what is your H Index?

12   A.   It's 32, according to Google Scholar.

13          COURT REPORTER:  According to what?

14          THE WITNESS:  Google Scholar.

15          COURT REPORTER:  I still didn't get it.

16          THE COURT:  Google Scholar.

17          COURT REPORTER:  Thank you.

18          THE COURT:  According to Google Scholar.

19          THE WITHESS:  Correct.

20          THE COURT:  The court reporter has to get it down, so

21   we have to talk one at a time, not on top of each other, and as

22   clearly and slowly as possible.

23          THE WITNESS:  Okay.  I'm sorry.

24   BY MR. SCHAERR:

25   Q.   And is 32 considered a high H factor for someone of your

1  level of experience?

2  A.  Yes.

3  Q.  And are scholars in your field also judged by the number of

4  times their articles have been read?

5  A.  That is one index that is available through a research

6  community that is known at ResearchGate.  It pulls scholars

7  from all -- virtually every discipline, and it provides

8  information of several different scores if you're a member of

9  ResearchGate, so there is an indication of how many times

10  articles have been read or at least downloaded.  I don't know

11  that they can really determine how thoroughly one has read it.

12  But I have almost 50,000 reads on ResearchGate.  And I also

13  have a research interest score that is in the 97th percentile,

14  ranked at the 97th percentile across all disciplines.

15  Q.  And is that also considered high for somebody in your field

16  at your level?

17  A.  Yes.  I think we consider it high in any discipline when

18  you're in the 97th percentile.

19       My general ResearchGate score, which is based on number of

20  publications and a variety of factors, and that is -- 31 is the

21  number, and that corresponds to being at the 90th percentile

22  across all disciplines.

23  Q.  Thank you.

24       Have you personally peer reviewed the work of other

25  scholars in your field?

1   A.  Yes, I've done that a great deal over the course of my

2   life.

3   Q.  How many presentations in the field of abortion and mental

4   health or abortion decision-making have you personally given?

5   A.  I have not counted them but they are in the CV.

6   Q.  And have you testified before legislative bodies on those

7   issues?

8   A.  Yes.

9   Q.  Do you want to tell us about that?

10  A.  Well, I testified in Ohio when they were considering a ban

11  on later-term procedures.  I testified for a committee -- a

12  U.S. committee that dealt primarily with postpartum depression.

13  They opened it up to psychological outcomes related to abortion

14  as well, and I testified in that case.

15  Q.  You said that was a U.S. body.  Was that the U.S. House of

16  Representatives?

17  A.  Yes, I believe so.  It's been quite some time.  It's also

18  in my CV.

19  Q.  Are there other legislative bodies?

20  A.  Well, do you -- does this type of work fall into that

21  category?

22          THE COURT:  No.  We're judicial.

23          THE WITNESS:  Okay.  Sorry.

24          THE COURT:  Three branches, Dr. Coleman.  Three

25  branches.

1      THE WITNESS:  I think that would be -- well, I did

2  testify by phone to Alaska at one point but that dealt with

3  funding.

4  BY MR. SCHAERR:

5  Q.  Have you testified before Houses of Parliament in the U.K.?

6  A.  Yes, I have, a couple times.

7  Q.  And how many times you have been qualified as an expert in

8  a lawsuit or other legal proceedings?

9  A.  Twice, with prior trial testimony.

10  Q.  Okay.  And have your expert opinions been relied upon in

11  published court opinions?

12  A.  Yes, they have.

13  Q.  And where have they been relied upon?

14  A.  In the Eighth Circuit Court of Appeals related to my

15  testimony for the 1166 House Bill in South Dakota, and then

16  they have -- also in a case in Florida involving a 24-hour

17  waiting period.

18  Q.  Okay.  Well, let's turn to your work in this case.  Did you

19  prepare a report in this case?

20  A.  Yes.

21  Q.  And you understand that this phase of the trial deals with

22  a very small set of Indiana abortion related laws, correct?

23  A.  Correct.

24  Q.  And one of those laws requires in-person counseling before

25  an abortion?

1   A.  Yes.

2   Q.  And so as relevant to this particular stage of the

3   proceeding, what specific topics were you retained to address?

4   A.  I was asked to look at, from the volume of information and

5   studies that are presented in my report, to focus on women who

6   may be from particularly sensitive groups or high risk

7   populations in terms of psychological adjustment after an

8   abortion.

9      It's a very strong literature.  We do know which women are

10  at risk and there's consensus around --

11      THE COURT:  Okay.  Wait.  Just a minute.  We're just

12  talking about the topics.  You'll be asked the substantive

13  questions in a minute but we're just trying to figure out the

14  topics that you were engaged to opine on.

15      THE WITNESS:  Okay.  Well --

16  BY MR. SCHAERR:

17  Q.  Dr. Coleman, let me ask the question this way.  Is it fair

18  to say that you were retained to address the psychological

19  implications of Indiana's in-person informed consent counseling

20  requirement?

21  A.  Yes.

22  Q.  Okay.  So please describe for us generally the materials

23  you reviewed in creating your report.

24  A.  I primarily rely on peer-reviewed academic journals, and

25  there is a fairly vast literature on risk factors for adverse

1    psychological problems.  So I use methodological criteria when

2    selecting studies to include because I obviously want to

3    identify the most reliable and valid findings.

4        So the bulk of what I discuss in my report is based on as

5    an exhaustive as possible review of available literature, often

6    across disciplines.  But I don't typically include studies that

7    I feel are not methodologically sound.

8    Q.  Thank you.  Without specifying your opinions at this point,

9    after you're completed your analysis, did you arrive at any

10   conclusions on the psychological implications of the in-person

11   counseling requirement?

12   A.  Yes.

13   Q.  And what are some research topics within psychology that

14   are relevant to assessing the relationship between mental

15   health and abortion?

16   A.  Well, topics that relate to women who are at risk, women

17   who are subjected to domestic violence or are victims of sexual

18   abuse, when we're talking about minors, sex traffic

19   individuals, individuals who are feeling some level of pressure

20   or coercion to abort.  Uncertainty has relevance, decisional

21   uncertainty.

22   Q.  As a research psychologist, are you an expert in each of

23   those topics insofar as they relate to abortion?

24   A.  Yes.

25   Q.  And do you believe your testimony will be helpful in

1   assisting the Court to understand the facts and the issues in

2   this case?

3   A.  Yes.

4          MR. SCHAERR:  Your Honor, I tender Professor Coleman

5   as an expert in the field of psychology and abortion.

6          THE COURT:  In particular --

7          We're having trouble with the video here.  Just a

8   minute.  Can you hear me?  No.

9          COURT CLERK:  He would have lost the video feed in the

10  courtroom.  So I'm going to have to dial back in.  Hang on just

11  one second.

12                 (Off-the-record discussion.)

13         THE COURT:  Good.  We're back.

14         MR. SCHAERR:  I'm sorry, Your Honor.  Dr. Coleman just

15  indicated she needed to take a very short restroom break.  Is

16  that all right?

17         THE COURT:  I guess it is.  Do I have an option on

18  that one, Mr. Schaerr?

19         MR. SCHAERR:  Yes, you do, Your Honor.

20         THE COURT:  Not really.  I'll tell you where we

21  dropped out, and it was when you proffered her as an expert.

22  So just hold up right there until she gets back.

23         MR. SCHAERR:  Okay.

24         THE COURT:  Actually, she doesn't have to be present

25  for this, so I'll just bring it up because it's a lawyer issue.

1    Your proffer was that she be received and allowed to testify as

2    an expert in the psychology of abortion.  But that wasn't quite

3    the foundation you laid in your questions because as I

4    understood it, you were asking her about in-person counseling

5    and abortion.

6         So is that the reference that is going to put the

7    boundaries on her testimony?

8         MR. SCHAERR:  That was what she's going to be talking

9    about.  That's a field within the general -- more general field

10   of psychology and abortion.

11        THE COURT:  Right, because you proffered her as an

12   expert and I don't want to shoot wide of the mark here.  And if

13   it's an expert in the area of in-person counseling in abortion,

14   that's a different issue.  So is that what you intend?

15        MR. SCHAERR:  That is what we intend.  That's a

16   subfield within her area of expertise, Your Honor.

17        THE COURT:  I understand that, Mr. Schaerr, but I'm

18   asking what you're doing when you proffer her.  Is it the

19   limited proffer that I just mentioned?

20        MR. SCHAERR:  Yes.  We intend to have her address the

21   psychological implications of Indiana's in-person informed

22   consent counseling requirement.

23        THE COURT:  Any objection, Miss Singh?

24        MS. SINGH:  Yes, Your Honor.  We object to her being

25   offered as an expert on in-person counseling.  I do not object

1   to her being offered as an expert on the psychology of the

2   abortion, however.

3           THE COURT:  What's the basis for your objection to the

4   in-person counseling aspect of her testimony?

5           MS. SINGH:  Except for one article, Dr. Coleman has

6   not written any studies on the benefits of in-person

7   counseling, except she has not cited --

8           THE COURT:  Hold on, Ms. Singh.  Wait just a minute.

9   You're going too fast, in your usual fashion.

10          MS. SINGH:  Yes, Your Honor.

11          THE COURT:  So do you want to do this as preliminary

12  questions or are these things that --

13          MS. SINGH:  Yes, Your Honor.

14          THE COURT:  -- Mr. Schaerr will stipulate to?

15          MS. SINGH:  I can do them as preliminary questions,

16  Your Honor.

17          THE COURT:  You may ask.

18          MS. SINGH:  Thank you, Your Honor.

19          Dr. Coleman, other than one article about the type of

20  information that patients would like to receive before

21  obtaining an abortion, you have not published any articles on

22  informed consent, correct?

23          THE WITNESS:  I published an article in 2006, I

24  believe.  It was on elected procedures generally, and it

25  pertained to the amount of information and the forms of

1    information that women would like to receive for a variety of

2    elective procedures, and abortion was in the list.  So I did

3    publish that.

4            And I have studied risk factors.  And so the informed

5    consent process, which requires that women are fully informed,

6    they're aware of the risks, and that they are freely choosing

7    one option or the other, those elements of the informed consent

8    process relate to the research and the risk factors because the

9    need for that is likely to vary according to the level of risk

10   that a woman kind of falls under based on experience and

11   demographics and so forth.

12           MS. SINGH:  So the answer to my question, however,

13   would be:  Yes, that except for one article about the type of

14   information that patients would like to receive before

15   obtaining abortion, you have not published any article on

16   informed consent, correct?

17           THE WITNESS:  Specifically on informed consent?  I

18   have published on women's desire for -- or perceptions of the

19   adequacy of information received when they have gone to an

20   abortion facility.

21           THE COURT:  That's not quite the lawyer's question,

22   Dr. Coleman.  So listen to the question she's asking because it

23   matters, and she'll take you step-by-step, if you'll just

24   answer her questions.

25           THE WITNESS:  Okay.  Thank you.

1          MS. SINGH:  So except for that one article about the

2     type of information that patients would like to receive before

3     obtaining an abortion, you have not published any articles on

4     informed consent, correct?

5          THE WITNESS:  Correct.

6          MS. SINGH:  Your opinion in this case is not based on

7     research demonstrating that abortion provided in person is

8     associated with better mental health outcomes, correct?

9          THE WITNESS:  Correct.

10          MS. SINGH:  You mentioned that you were not a clinical

11     psychologist, correct?

12          THE WITNESS:  Correct.

13          MS. SINGH:  That means that you have never obtained

14     informed consent from a patient, correct?

15          THE WITNESS:  Correct.

16          MS. SINGH:  That means you have never counseled a

17     patient in connection with any healthcare service, correct?

18          THE WITNESS:  Correct.

19          MS. SINGH:  Your Honor, I stand on my objection to the

20     proffer.

21          THE COURT:  Do you want to respond, Mr. Schaerr?

22          MR. SCHAERR:  Yes.  Can I ask a couple followup

23     questions, Your Honor?

24          THE COURT:  You may.

25

BY MR. SCHAERR:

Q.   Dr. Coleman, is the psychological impact of informed consent requirement, is that part of the general field of abortion and psychology?

A.   Yes.

Q.   And in preparing your testimony for this case, what kind of information did you review specifically about informed consent or information that's relevant to informed consent?

A.   Well, the purpose of informed consent is to --

       THE COURT:  No.  The question was what literature did you review, Dr. Coleman?

       THE WITNESS:  Please state it again.

       THE COURT:  What literature did you -- or materials did you review with respect to informed consent to form your judgment?

       MR. SCHAERR:  You're welcome to look at your report, if you like.

       THE WITNESS:  Yeah, that might be a good idea, if that's okay.

       THE COURT:  Do you have it with you?

       THE WITNESS:  Yes.

       MR. SCHAERR:  Your Honor, perhaps one way to do this is if I could ask her about the references in her report and perhaps just go through page by page and let her identify the articles that are pertinent --

1          THE COURT:  Well, do you want to reframe your

2     question?  It's your question, Mr. Schaerr.  She's struggling

3     to answer.

4          THE WITNESS:  I can answer if you'd like, Your Honor.

5          MR. SCHAERR:  Okay.  Go ahead.

6          THE WITNESS:  On page 17 of my report, under

7     Section B, I talk about the nature of abortion decision-making

8     and informed consent; but I don't actually address studies that

9     specifically look at the psychological consequences of the

10    informed consent process.

11    BY MR. SCHAERR:

12    Q.  Is it fair to say that a number of the articles that you do

13    discuss in your report have a bearing on the psychological

14    implications of informed consent?

15    A.  I believe they do, and that's why I wrote about the

16    decisional process.

17    Q.  So everything that you cite in your report about abortion

18    decision-making, is it fair to say that all or virtually all of

19    that is relevant to the psychological implications of informed

20    consent?

21    A.  Yes.

22         MR. SCHAERR:  Okay.  Your Honor, we can go through her

23    list of -- her extensive list of references.  She's got 226

24    articles.

25         THE COURT:  No.  We're not going to do that.

1          Do you distinguish, Dr. Coleman, between the

2    decisional process, as you used that phrase, and informed

3    consent?

4          THE WITNESS:  Yeah.  In general, the decisional

5    process --

6          THE COURT:  Yes, you do?  Yes, you distinguish between

7    those?  See, I need to have you answer my question.  Do you

8    distinguish between those two things, the decisional process

9    and informed consent?

10         THE WITNESS:  The decisional process is part of

11   informed consent is the way I view it.

12         THE COURT:  So they are two different things.  They're

13   related but two different things.  Is that your point?

14         THE WITNESS:  My point is that informed consent -- the

15   purpose of informed consent is to help people make good

16   decisions.

17         THE COURT:  How do you know that?

18         THE WITNESS:  Just from what I've read about informed

19   consent, that, you know, the purpose is to provide the

20   knowledge that's needed to make an informed decision.  And

21   there needs to be an assessment of the competence of the

22   individual, and there needs to be freedom from any pressure.

23   It needs to be voluntary.  So those components all relate back

24   to decision processes.

25         THE COURT:  Miss Singh, anything further?

1          MS. SINGH:  No, Your Honor, my objection stands.

2          THE COURT:  All right.  Your objection's well taken

3    with respect to the expertise in the specific area of informed

4    consent.  The witness has not demonstrated a familiarity with,

5    in a practical sense, the practice of informed consent.  She's

6    not a clinician.  She's hasn't asked for it.  She hasn't done

7    that, gone through those steps with patients.

8          To the extent that she alludes to it generally as part

9    of a decisional process, that testimony can come in, but not

10   with respect to the particulars or the impact of the informed

11   consent process as such, which is distinguishable from just a

12   general decisional process.

13         So the plaintiffs have no objection to her being

14   received and allowed to testify as an expert in the area of

15   psychology and abortion, so I'll allow that to go forward.

16         Mr. Schaerr.

17         MR. SCHAERR:  Well, I'm not sure I exactly understand

18   the implications of the Court's ruling.

19         THE COURT:  Do you want to talk to your colleagues?

20   That's what everybody else has done when they're stuck.

21         MR. SCHAERR:  I'd like talk to confer with counsel.

22              (Off-the-record discussion.)

23         If it's all right, Your Honor, let me ask her some

24   questions; and if you believe that her questions are outside

25   the scope of what you're allowing, then let me ask it by way of

1    an offer of proof.

2         THE COURT:  Well, make every effort to follow my

3    ruling.

4         MR. SCHAERR:  I certainly will, Your Honor.

5         THE COURT:  And we'll take it from there.

6         MR. SCHAERR:  She was retained specifically to address

7    Indiana's in-person informed consent law.

8         THE COURT:  Well, I can't control why she was

9    retained.  I just hear the evidence, and I make a decision

10   based on the answers that she's given as to whether that's

11   within her expertise.

12   BY MR. SCHAERR:

13   Q.  Dr. Coleman, have you reviewed Indiana's in-person informed

14   consent law?

15   A.  Yes.

16   Q.  And could you briefly explain what you understand that law

17   to require?

18   A.  Well, it requires that a woman who presents for an abortion

19   have in-person counseling with a trained professional, the

20   doctor who will be performing, a referring physician, a nurse

21   midwife, an advanced nurse practitioner.

22        So the counseling must take place with a very advanced and

23   well-trained professional.  Information needs to be provided

24   regarding the risks of abortion and the risks associated with

25   childbirth.

1      Women are provided with information on fetal development at

2  the approximate gestational age that she's presenting with a

3  pregnancy.  There's also information related to the fetal pain.

4  She's told that at 20 weeks, evidence –– scientific evidence

5  suggests that a fetus will feel pain.

6      So she's given a lot of information about how the procedure

7  is conducted, what are –– whether it's medication or surgical.

8  She's given information on alternatives to –– you know, to ––

9  adoption would also be an alternative.

10      So she's given information on the risks of each

11  reproductive choice and specific information regarding the

12  abortion procedure.

13      She's also given information related to the name of the

14  physician and contact information and so forth.  She's handed a

15  brochure, so this information is provided both in writing and

16  orally.

17  Q.  Thank you.  From a psychological standpoint and as someone

18  who studied the field of abortion and psychology extensively,

19  why, in your opinion, is informed consent important?

20      MS. SINGH:  Your Honor, I'm sorry.  Objection to

21  relevance.  This phase of the case doesn't have a challenge to

22  the informed consent requirements.  The challenge here is to

23  the in-person requirement and specifically to the requirement

24  that state-mandated information be provided in person.

25      THE COURT:  So tailor your question, Mr. Schaerr.

BY MR. SCHAERR:

Q.  Dr. Coleman, do you have an opinion as to why providing informed consent in person might or might not be important from a psychological standpoint.

A.  Well, in my -- it could very well be quite important if it's being conducted with women who are at risk for post-abortion psychological problems and for women who are uncertain about which way to go.

Research suggests that 30 percent of women who arrive at an abortion clinic are unsure, and so to be in person with a human being and being able -- in a private situation and able to ask the questions from somebody who's objective, not a family member or a partner -- to be able to be in that environment with a human being who is well versed on all of the information is bound to lead to a better decision, whether the woman decides to go through with the abortion or decides not to.

Q.  Okay.  And in that regard, let's look at one of your studies.  It's Recollect Exhibit No. 79, if we could put that up.

And when it comes up, could you give us the title of this study and the authors?

A.  My eyes are getting bad at this age.  If you could just make it a little bigger.  It's cut off.  "Women's preferences for information and complication seriousness ratings relative to elective medical procedures."

Q.  Who are the authors?

A.  Myself, David Reardon, and Mr. Lee.

Q.  Where was this study published?

A.  It was published in a premier medical ethics journal.  It was at the time the *Journal of Medical Ethics*.

Q.  Okay.  And what year?

A.  I believe it was 2006.

Q.  Okay.  And let's --

A.  It says '5 here, but I think when it went actually into print, it was '6.  Sometimes these articles are available prior to the actual print.

Q.  Okay.  And then if we could, let's look at Table 1.

MS. SINGH:  Your Honor, objection again to this line of questioning.  This article, as I indicated in my initial objection, is about the type of information that women would like to receive before obtaining an abortion.  It is not about the benefits or harm from telemedicine or the in-person provision of information.

THE COURT:  Sustained.

BY MR. SCHAERR:

Q.  Okay.  Well, let's look at Recollect Exhibit No. 65.  And you recognize this article?

A.  Yes.  That's the Vandamme article, "Pre-abortion Counseling From Women's Point of View."

Q.  Okay.  And when and where was that published?

1    A.   It was published in the *European Journal of Contraception*

2    *and Reproductive Health Care*, and that was in 2013.

3    Q.   Does this article, in your opinion, have implications for

4    the question of the circumstances under which informed consent

5    counseling could appropriately be provided?

6    A.   It addresses the percentages of women who want

7    information -- more information.  There's a table in this study

8    where there are different topics that the researchers

9    investigated with a thousand or so women they sampled

10   addressing the forms of information or the type of counseling

11   that they desire prior to.

12   Q.   Okay.  Let's look at that --

13        MS. SINGH:  Objection, Your Honor.  Same objection to

14   this article.  This has nothing to do with in-person

15   counseling.  It has to do with the type of information that

16   women are provided prior to making an abortion decision.

17        THE COURT:  So ask the next question, Mr. Schaerr.

18        MR. SCHAERR:  Well, with respect, Your Honor, the

19   information in this article does have implications for the

20   in-person counseling requirement.

21        THE COURT:  Direct our attention to that.  That's what

22   I can't tell -- you're not deep enough into it for me to tell.

23        MR. SCHAERR:  Understood.  If we could see the table

24   on page 313.

25        THE COURT:  Is it page 313 or Table 313?

1          MR. SCHAERR:  It's Table 1.

2          THE COURT:  Table 1 on page 313, sir?

3          MR. SCHAERR:  Yes.

4          THE COURT:  Okay.

5    BY MR. SCHAERR:

6    Q.  And Dr. Coleman, if we look at this table, what does this

7    tell us that's of relevance to the question of whether it would

8    be useful to provide counseling in person?

9    A.  Well, we have information that indicates that 82 percent

10   wanted information.  We also have information here that

11   40 percent wanted information on the decision and possible

12   doubts related to the decision.  Thirty-one percent wanted to

13   discuss their emotions.  Thirty-six percent wanted to --

14          THE COURT:  Wait.  I can read the table; but

15   Mr. Schaerr, you haven't asked the question that was raised by

16   the objection.  This column that Dr. Coleman's referencing is

17   that they wanted information.

18          Ms. Singh's objection is yeah, but it doesn't --

19   there's no data, there's no basis for Dr. Coleman's opinion, if

20   she has one, as to how that information is delivered.

21          So where does that link come in her expertise?  That's

22   what's missing here.

23          MR. SCHAERR:  That's where I'm getting, Your Honor.

24          THE COURT:  Well, get to it then, please.

25          MR. SCHAERR:  Let me ask that question.

BY MR. SCHAERR:

Q. Dr. Coleman, if a woman presents for an abortion and has doubts about it or has emotions that are strong emotions about the decision, would there be a psychological value in having her discuss those doubts and emotions with someone in person rather than remotely?

MS. SINGH:  Objection.  Your Honor, this is outside the scope of her expertise.

MR. SCHAERR:  Your Honor, it's certainly within the scope of her expertise.

THE COURT:  We qualified her as an expert in psychology and abortion, so that's a broader topic than the informed consent issue.  So I suppose it does sort of connect, but it doesn't connect to my issues that I have to decide, Mr. Schaerr.

MR. SCHAERR:  Well, okay.  If I could just get an answer to this question, and then, we will move more directly to those issues.

THE COURT:  Well, why don't you rephrase your question in light of this colloquy, sir?

MR. SCHAERR:  Okay.

BY MR. SCHAERR:

Q. Dr. Coleman, if a woman presents for abortion and has doubts or strong emotions with regard to her decision --

THE COURT:  Well, look.  Try it this way, Mr. Schaerr.

1    Dr. Coleman, we have before us Table 1 in which is recorded

2    information and an article that you've authored.  It's the

3    information that women want with respect to making an abortion

4    decision; isn't that true?  Isn't that what this shows?

5              THE WITNESS:  Well, I didn't author this study, but I

6    did cite to the study.

7              THE COURT:  Is that how you understand the study that

8    you relied upon?

9              THE WITNESS:  Right, that was data on the percentage

10   that wanted these forms of information and when they looked at

11   what was actually discussed.

12             THE COURT:  Okay.

13             THE WITNESS:  But we --

14             THE COURT:  Okay.  Wait, wait, wait, wait.  Just

15   answer my question, please.

16             THE WITNESS:  Okay.

17             THE COURT:  Limit your answer to my question.  So this

18   table that you've cited and relied upon simply shows topics and

19   the percentage of people who would want this information, true?

20             THE WITNESS:  True.

21             THE COURT:  So did you do any studies, or did this

22   study, in particular, reflect the means by which this

23   information should be conveyed to the patient or the woman who

24   wants it?  Does it have to do with an in-person disclosure?

25   We'll just end it there.

1    THE WITNESS:  No, it does not involve a comparison of

2    different modes of presentation of the information or

3    telehealth versus in person, if that's what you're asking.

4    THE COURT:  Yes.  So I'll sustain the objection.

5    BY MR. SCHAERR:

6    Q.  Dr. Coleman, in your opinion, are there discreet classes of

7    women who are particularly vulnerable and who can benefit

8    psychologically from in-person counseling with regard to their

9    abortion decisions?

10   A.  Yes, there are.

11   Q.  And is one of those categories victims of domestic violence

12   and threats of violence?

13   A.  Yes.

14   Q.  Now, Paragraph 19 of your report talks about a specific

15   woman discussed in the Moore study, if we could bring that up.

16   That's Recollection Exhibit 76, and it's page 1741 of that

17   study.

18   Could you read the title and the authors of the study,

19   Dr. Coleman?

20   A.  Sure.  "Male reproductive control of women who have

21   experienced intimate partner violence in the United States,"

22   Ann Moore, Lori Frohwirth and Elizabeth Miller, and it was

23   published in social science and medicine --

24   Q.  Okay, thank you.

25   A.  2010, I believe.

1   Q.  And if we could, let's go to page 1741 of that document,

2   and let me invite you to read the story that begins here on the

3   screen.

4        THE COURT:  No, I'm not going to let you read it

5   because what I want to know is why this is relevant and why

6   it's something other than just a vignette.

7        MR. SCHAERR:  Okay.  Dr. Coleman, why is the story of

8   this woman that's told here, why is it relevant, in your view,

9   to in-person counseling?

10        THE COURT:  What impact did this article have or this

11   vignette have on you in your judgment?

12        THE WITNESS:  Okay.  Well, the article generally

13   covers reproductive control.  So that's circumstances where an

14   abusive partner is coercing to either carry to term, which

15   happens often, or coercing to abort.  Both phenomena have been

16   well documented.

17        This particular case deals with a woman who is being

18   pressured to abort and threatened.  She's told that if she

19   won't get an abortion, he will make it happen by throwing her

20   down the stairs or punching her in the stomach, and she also

21   cites in this excerpt the fact that she believes him because he

22   has previously hit her.  And he --

23        THE COURT:  There are no doubt, sadly, millions of

24   such stories, right?

25        THE WITNESS:  Right, right.

1      THE COURT:  And so since you know this happens and

2   there are these accounts, how have they informed your decision

3   making as an expert in this field?

4      THE WITNESS:  Because she's not exercising autonomy in

5   decision-making.  She's being actively coerced.  So she goes

6   into the clinic and meets with a professional who can --

7   hopefully, she can feel free to say, you know, "I really want

8   this abortion, but he doesn't want me to."  Or "I really want

9   to have this baby, but he doesn't want me to."

10     There's a chance to get away from him.  Abusive men

11  are very controlling.  So she has an opportunity to be removed

12  from his presence and to be with someone who not only can help

13  ensure autonomous decision-making, which is part of informed

14  consent, but also get her to safety, maybe.

15     I mean, there's a lot of documentation in these

16  studies.  For example, Hall, 2014, they strongly recommend that

17  abortion providers have a protocol for assessing for domestic

18  violence because up to 30 percent of women -- and that was

19  based on a metanalysis -- up to 30 percent of women present

20  with having been in a physically or psychologically sexually

21  abusive relationship within the last year.

22     THE COURT:  So two ways in which these accounts inform

23  your judgment --

24     THE WITNESS:  Right.

25     THE COURT:  -- is that one is that it underscores the

1  importance of creating a setting in which the woman has

2  autonomy and is not -- to assure that she's not being coerced,

3  and the other is to make sure she's safe, right?

4  THE WITNESS:  Yes.  Ideally, get her to safety, yes.

5  THE COURT:  Okay.  Next question.

6  MR. SCHAERR:  Thank you.

7  BY MR. SCHAERR:

8  Q.  And Dr. Coleman, specifically, of what value is in-person

9  counseling in -- of what value is in-person counseling in

10  achieving those objectives that the Judge just mentioned?

11  A.  I don't have data specifically on how many abortion

12  providers refer victims to law authorities or resources such as

13  a shelter for IPV women.  I don't have that data, but my belief

14  is if there's hope, that by being in that in-person setting,

15  that these women will feel free to share what they want to do

16  away from him; and then, be led out if there's -- even if it

17  results in only 5 or 10 percent.  We're talking about a large

18  population of women who seek abortion.  Up to 30 percent are

19  actively being abused.

20  So I don't know the percentage that will decide after they

21  have talked to the professionals that, you know, they feel

22  confident enough to go with what's in their heart to make a

23  choice that's free of pressure or coercion.  Ideally, they all

24  do.  Hopefully, a significant percentage would, and there is

25  data to suggest that --

1          THE COURT:  Hold on.  Now, you're getting far afield.

2    Mr. Schaerr, give her the next question.

3    BY MR. SCHAERR:

4    Q.  Why don't we, Dr. Coleman, have you reviewed Dr. Grossman's

5    trial testimony in this case?

6    A.  I did skim it.  I received it yesterday.

7    Q.  Well, let me show you a statement from Dr. Grossman's

8    testimony about the prevalence of intimate partner violence

9    among women.

10          THE WITNESS:  Okay.

11          MR. SCHAERR:  If we can have that -- it's pages 106 to

12   107 of his testimony.  Let's go right to the page.

13   BY MR. SCHAERR:

14   Q.  Do you recall Dr. Grossman talking about a study on the

15   subject of intimate partner violence?

16   A.  Yes, it's -- if you could make it a little larger.  I can't

17   --

18          THE COURT:  What's the line, Mr. Schaerr?

19          MR. SCHAERR:  It's line 20, Your Honor.

20          THE COURT:  Okay.

21   BY MR. SCHAERR:

22   Q.  He was asked about --

23          THE COURT:  This is on page 106?

24          MR. SCHAERR:  Yes, Your Honor.

25          THE COURT:  Okay.

1   BY MR. SCHAERR:

2   Q.  So he was asked about Plaintiffs' Exhibit 134.  Do you see

3   that, Dr. Coleman?

4   A.  Yes.

5   Q.  And then, he was asked, "What does this study find with

6   respect to the proportion of abortion patients who have

7   experienced intimate partner violence?"  And can you read his

8   answer for us?

9   A.  "Six to 22 percent reported abuse and violence from an

10  intimate."

11  Q.  Okay.  And did Dr. Grossman cite that study in Exhibit 134

12  in support of that statement?

13  A.  Yes, I believe so.

14  Q.  And do you agree with Dr. Grossman and this study that a

15  significant percentage of women who present for abortion are,

16  in fact, victims of intimate partner violence?

17  A.  Yes.

18  Q.  And did you review any metanalyses on the prevalence of

19  intimate partner violence among women seeking abortions?

20  A.  Yes, I reviewed the Hall study that I mentioned a few

21  minutes ago.

22  Q.  Why don't we pull that up.  We'll pull that up,

23  Dr. Coleman.

24  A.  Okay.

25  Q.  Recollect Exhibit 55.  Is this the study to which you

1   referred, Dr. Coleman?

2   A.   Yes.

3   Q.   Do you want to just read the title?

4   A.   *"Associations between Intimate Partner Violence and*

5   *Termination of Pregnancy: A Systematic Review and*

6   *Meta-Analysis."*

7   Q.   Okay.  And the lead author is Megan Hall, correct?

8   A.   Correct.

9   Q.   And where was this study published?

10   A.   PLoS ONE, I believe, which is one of the premiere journals.

11   Q.   To your knowledge, was it peer reviewed?

12   A.   Yes.

13   Q.   Okay.

14          THE COURT:  When was it published?

15          THE WITNESS:  It was 2014.

16          THE COURT:  Thank you.

17   BY MR. SCHAERR:

18   Q.   And Dr. Coleman, what is a metanalysis?

19   A.   Metanalysis is a type of review article where the focus is

20   not to collect new data and report on it like the study that

21   Dr. Grossman referred to, but instead, that the focus is more

22   on synthesizing data or information from multiple studies in

23   order to ideally guide practice.  It's more informative.  In

24   this case, 74 studies, individual studies were combined,

25   statistically.

1    And a metanalysis differs from a narrative or traditional

2    review in that it results in a numerical summary of the impact

3    of whatever question you happen to be asking.  In this case,

4    the basic question is what percentage of women who present at

5    an abortion clinic have experienced or are experiencing

6    intimate partner violence.

7    Q.  And do you recall what this study establishes on that

8    subject?

9    A.  Up to 30 percent of women seeking abortion are -- have been

10   victimized within the last year.

11   Q.  Okay.  And we can see there on the front page that it says

12   women undergoing a TOP, a termination of pregnancy, range from

13   two and a half percent to 30 percent, correct?

14   A.  Yes.

15   Q.  Okay.

16        THE COURT:  So is that consistent with Exhibit 134

17   cited by Dr. Grossman, that it was 6 to 22 percent?  Do you

18   accept that as consistent?

19        THE WITNESS:  It's in the range.  The problem is there

20   are just so many studies on this topic.  So you're going to get

21   a fairly broad range.

22        THE COURT:  Right.  I'm saying, is it consistent?

23   It's not identical, obviously, but is it consistent?

24        THE WITNESS:  Yeah.  I'd say it's consistent, yes.

25        THE COURT:  Is 6 to 22 percent comparable to up to

1    30 percent?

2         THE WITNESS:  No, but it fits within the range, and

3    it's consistent --

4         THE COURT:  I said, they are not identical.

5         THE WITNESS:  Okay, sorry.

6         THE COURT:  Mr. Schaerr, what's the next question?

7    I'm not understanding why we're going through this if she

8    agrees with that range of women who have experienced intimate

9    violence, intimate partner violence prior to seeking an

10   abortion.  What's your point, Mr. Schaerr?

11        MR. SCHAERR:  Let me try to bring that out more

12   clearly, Your Honor.

13   BY MR. SCHAERR:

14   Q.  So the point of both of these studies, is it fair to say,

15   Dr. Coleman, that they both show that a substantial percentage

16   of women who present for an abortion are victims of intimate

17   partner violence, right?

18   A.  Correct, yes.

19   Q.  It does show that.

20        And is it fair to say, then, that that means, in your

21   opinion, that a substantial number of women would benefit from

22   receiving the in-person counseling in person?

23        MS. SINGH:  Objection, Your Honor.  Again, I don't

24   think --

25        THE COURT:  Sustained.  Sustained.

1  BY MR. SCHAERR:

2  Q.  Do you have an opinion, Dr. Coleman, on the rough number or

3  percentage of women presenting for an abortion who would be

4  benefited from in-person counseling based on their intimate

5  partner violence status?

6  A.  Yes.

7  Q.  And what is that opinion?

8       MS. SINGH:  Objection, Your Honor.  Calls for

9  speculation, lacks foundation, and it's outside of her

10  expertise.

11       THE COURT:  I'll sustain on the first two grounds.

12  BY MR. SCHAERR:

13  Q.  So, Dr. Coleman, we have seen from both of these studies

14  that a significant number of women who present for an abortion

15  have been the victims of intimate partner violence, correct?

16  A.  Yes.

17  Q.  And in your opinion, what does that -- what does that imply

18  for the benefit of in-person counseling for those women?

19       MS. SINGH:  Objection.  Calls for speculation.  Lacks

20  foundation.

21       THE COURT:  Overruled.  That she may answer.

22  A.  I believe I've answered that previously, but it offers an

23  opportunity for autonomous decision-making and safety that are

24  not -- those are two -- those are two important reasons that

25  are not as available in home with an abusive partner possibly

nearby, highly likely nearby, during remote counseling.  So the

physical distance from the abuser ideally enables autonomous

decision-making, one aspect of informed consent, and also

ideally may help her to safety.

THE COURT:  Mr. Schaerr, Dr. Coleman's right.  She's

answered that previously several times now so maybe you should

go to your next topic.

MR. SCHAERR:  Thank you.

BY MR. SCHAERR:

Q.  Dr. Coleman, your report talks about another category of

vulnerable women, that is, those who face pressure from

partners or family members short of violence.

Is that fair?

A.  Yes.

Q.  Okay.  And have you had personal experience with a case

involving significant partner pressure?

A.  Yes.

Q.  Could you, mindful of the Judge's reluctance to entertain

scenarios or vignettes, can you briefly just describe what

happened --

THE COURT:  Well, wait.  The reason I'm reluctant is

she's not a clinician, she's not talking about her own

practice, and so -- and also there are a thousand stories.  And

she's here as an expert witness and so she's supposed to give

the Court the value of her distilled judgment, so I don't need

endless vignettes.  I mean, they're high impact.  I get that.
I know why you want to put them in.  But I'm telling you I
don't need those.  They're not valuable to me.  So I don't want
stories.

         If she wants to talk about the correlation between
partner pressure and decision-making to get an abortion, that's
relevant.  Why don't you ask her that?

         MR. SCHAERR:  Sure.

BY MR. SCHAERR:

Q.  Well, just as a preliminary question, Dr. Coleman, do you
believe that it's coercive simply to provide factual
information to somebody about abortion?

A.  No.  Not in an abstract sense, no.

Q.  Okay.  And in your opinion, are there significant numbers
of women in Indiana who might find themselves in a situation
where they are under significant pressure from a partner who
isn't violent with regard to the abortion decision?

A.  My opinions are based on data from a number of studies,
U.S. and international, regarding the prevalence of pressure of
various forms.

    One study in particular by Anne Broen identified 39 out of
80, so almost 50 percent, of the women in that sample
experienced some pressure.  The pressure from the partner was
the highest.  That was 25 percent.

         THE COURT:  Do you remember the question?  The

question was:  Are there significant -- in your opinion, are

there significant numbers of women in Indiana -- I don't know

how you know about Indiana but maybe you do -- who might find

themselves in a situation where they are under significant

pressure, partner pressure, who isn't violent with regard to

the abortion decision, who is violent with respect to that?

That's your question.

Do you have an opinion?  Do you have an opinion?

THE WITNESS:  Yes.

THE COURT:  Okay.  What is your opinion?

THE WITNESS:  That Indiana women are not necessarily

different from women anywhere else in the U.S., and so I would

imagine the data reviewed would apply there as well.  There's

nothing distinguishing about Indiana that I know of that would

make them more or less inclined as to any pressure or coercion.

BY MR. SCHAERR:

Q.  And if we can, Dr. Coleman, why don't we look for just a

moment at the Broen study that you just mentioned.  That's

Exhibit Recollect 34.

Could you tell us the name of the study and the lead

author?

A.  Yes.  "*Reasons for Induced Abortion and Their Relation to*

*Women's Emotional Distress:  A Prospective, Two-year Follow-up*

*Study,*" published in the "*General Hospital Psychiatry Journal*"

in 2005.

Q.  And if we could turn to page 39, Table 2.

A.  It can be a little bigger for me.  I could put the computer

right in my face, but --

Q.  We'll try to get it bigger, Dr. Coleman.

A.  Okay.  There we go.

THE COURT:  I couldn't read it either, Dr. Coleman.

THE WITNESS:  That's one of the negatives of getting

older, I guess.

BY MR. SCHAERR:

Q.  Okay.  Can you read that now, both Your Honor and

Dr. Coleman?

A.  Yes, I can.

It's reasons for choosing to have an induced abortion.  N

is 80.

Q.  Okay.  And just in general, Dr. Coleman, what does this --

what does this table tell you about the extent of pressure that

women often face with regard to the abortion decision from

people who are not violent with them?

A.  That a very good proportion of women are being pressured

or -- and pressure can be rather subtle where a woman just gets

a sense that a man would prefer, and that's indicated in the

table.  I'm not considering that really as pressure, but that's

one of them.

I think -- I can't quite see.

"Male partner does not favor having a child at this

1   moment."  That's not pressure in the sense that I'm talking

2   about.

3       Any of the items that have actual -- the word "pressure" in

4   them, if you add --

5   Q.  So that would be perhaps Item No. 11?

6   A.  Yes.

7       So that's 25 percent.  As I indicated earlier, 25 percent

8   are going to identify from a male partner as a reason for the

9   abortion.

10      And then if you go down a little lower in the table, you

11  can see there's pressure from a variety of other individuals in

12  the woman's life, from friends, mother, father, siblings,

13  others.

14      And so you add up all those numbers, and it's 39 out of 80,

15  so almost 50 percent are under some pressure, and that is going

16  to detract from fully autonomous decision-making.  Anyone who

17  feels pressure to make a big decision like this, you know, it's

18  a deterrent, in my view, to really freely chosen decisions.

19  Q.  And, Dr. Coleman, does this inability to make a truly

20  autonomous decision, in your opinion, have an impact on the

21  woman's ability to make a fully informed consent?

22  A.  Yes.

23  Q.  Okay.  Then, in your opinion, what would be the effect on

24  this group of women, that is, women who are subject to pressure

25  short of violence, what would be the effect on that group of

1    women if the informed consent counseling were performed in

2    person face-to-face rather than remotely?

3    A.   They are likely to be physically away from whoever is

4    exerting the pressure.

5    Q.   And what impact will that have?

6    A.   What is that?

7    Q.   What impact will that have on the woman's autonomous

8    decision-making?

9    A.   Ideally, it will be enhanced that she will more freely

10   choose that abortion if she wants it or she'll more freely

11   choose to give birth.

12   Q.   Okay.  Let's move on to the next category.  Paragraph 44 of

13   your report talks about another group of especially vulnerable

14   women and that is abused minors.

15       Do you recall discussing that in your report?

16   A.   Yes.

17   Q.   And without going into them, is it fair to say that you've

18   actually been involved in some cases in which an abused

19   adolescent could have benefited from in-person counseling about

20   an abortion decision?

21   A.   Yes, *Well versus Planned Parenthood*.

22   Q.   Okay.  And in situations where a child or an adolescent is

23   pregnant, why could an in-person discussion be beneficial and

24   even more beneficial than a remote discussion regarding

25   informed consent?

1    A.  Well, often these cases involve -- the case I was involved

2    in involved statutory rape, a 13-year-old with a 21-year-old

3    soccer coach.  And so if she's in person, then she has an

4    opportunity to reveal a crime that's being committed and the

5    opportunity ideally to be brought away from and into a safe

6    environment, away from whoever the abuser happens to be.  And

7    as in the other scenarios, it enhances the probability that her

8    decision will be her own and it will be voluntary and the steps

9    that are necessary for informed consent.

10   Q.  And in your opinion, why is that setting, that is, an

11   in-person face-to-face discussion, superior to a remote

12   discussion over a TV screen?

13   A.  It's similar to the domestic violence situation.  It's

14   likely that she will not be around whomever is victimizing her.

15   Q.  Okay.  Anything else?

16   A.  That's going to enhance the probability that she will be

17   brought out of an illegal situation.  It's often statutory

18   rape.  Also that she will be -- if she's being sexually abused,

19   she has a right to not have to live that way.  And abortion

20   providers are aware that pregnant teens are often victims of

21   abuse.  The stats run -- I say, in my report -- run from like

22   50 to 66 percent, so -- that are -- of women who present -- who

23   are pregnant, generally, have abuse in their history.

24       So this is a particularly sensitive population.  They're

25   young.  You know, again, they're living -- their home

environments, their circle of friends, whomever they are with,

they have a right to be safe from those individuals, and --

THE COURT:  Okay.  Next question, please.

BY MR. SCHAERR:

Q.  Okay.  You mentioned that substantial -- that there are

substantial numbers of young girls who are pregnant who are the

subject of sexual abuse nationwide and worldwide.

Do you have any reason to believe that that pattern would

be any different in Indiana?

A.  Not particularly, no.

Q.  Okay.  Are pregnant, abused, adolescent girls typically

more or less psychologically vulnerable than the average

pregnant adult?

A.  Yes, adolescents are -- in general are more -- it's well

established that adolescents are more likely to experience

psychological -- adverse psychological consequences following

an abortion, and there's evidence that abused youth are more

likely to experience psychological problems generally.

Q.  Okay.  And are there other factors that make them more

vulnerable than a typical adult?

A.  Developmentally they don't have the decisional processes

that adults have.  There's considerable data indicating that

adolescents are more prone to risky decision-making, impulsive

decision-making, that their decision-making skills are

generally inferior to those of adults.

1    Q.  And how, if at all, does an in-person interview help in

2    addressing those additional factors?

3    A.  Well, there's evidence that when adolescents are helped

4    through a decision process, where they sort out the pros and

5    cons of the choices, that then they can make more adaptive

6    decisions that will benefit them in the future; so having

7    somebody, an adult who's not somebody who is involved in their

8    lives directly, help them arrive at the point where they are

9    able to know for themselves and articulate what they would like

10   to do and where they're likely to receive help if they decide

11   to carry to term.  Many parents, I would imagine, are invested

12   in a child not carrying to term because then the responsibility

13   of childcare is likely to fall on them since the adolescent is

14   not developmentally -- it's a rare adolescent who is

15   developmentally ready to have a child.  So they're natural

16   recipients of more pressure.  And pressure, as we've already

17   discussed, is a significant risk factor for post-abortion

18   traumatic reactions and mental illness.

19   Q.  Okay.  Thank you.

20       Well, let's move on to the next category of vulnerable

21   women discussed in your report, and that is victims of sex

22   trafficking.  Do you recall discussing that in your report?

23   A.  Yes.

24   Q.  And we won't have you go into a vignette on that topic.

25   But are you aware that sex trafficking has been the subject of

1  a book that you've reviewed on that subject?

2  A.  Yes --

3      (Zoom platform cut out.)

4          THE COURT:  Hold on.  Hold on.  The answer is -- did

5  you review a book about that?  Yes or no.

6          THE WITNESS:  Chapter, yes.

7          THE COURT:  A book chapter, okay.

8  BY MR. SCHAERR:

9  Q.  Tell us about that book.

10         THE COURT:  No.  You ask her substantive questions.  I

11 don't need a book review.

12         THE WITNESS:  Thank you, Judge.

13         THE COURT:  I'm saving you.  I'm saving you,

14 Dr. Coleman.

15 BY MR. SCHAERR:

16 Q.  All right.  Have you formed an opinion on whether an

17 in-person informed consent discussion could have a

18 psychological impact one way or another on women who are the

19 subject of technologies, sex trafficking?

20 A.  Yes, and my opinion is similar to my opinion with the other

21 exploited groups.  Sexually abused minors and domestic violence

22 victims, sex traffic victims, experience horrific lives.  My

23 sabbatical work is on this population.

24     So they are an extremely vulnerable population of young

25 people.  The majority are recruited between ages 12 and 14 and

1     they are --

2           THE COURT:  Are they easily manipulated, Dr. Coleman?

3     Would you say that?

4           THE WITNESS:  Yes, they are.  That's done with

5     physical violence and all kinds of ways, yes.

6           THE COURT:  Okay.

7     BY MR. SCHAERR:

8     Q.  Dr. Coleman, do you have any data about the number of

9     women --

10          THE COURT:  I'd like the opinion on that first.

11          MR. SCHAERR:  I'm sorry.  Go ahead.

12          THE WITNESS:  Could you restate the question?  Sorry.

13          THE COURT:  What's the connection-- do you make a

14    connection in saying that there's value in an in-person

15    counseling process, in particular for sex trafficking victims?

16          THE WITNESS:  Yes, because they are very -- every

17    aspect of their lives is coerced and pressured typically, and

18    they experience -- the average sex traffic victim experiences

19    multiple abortions.  And so, yes, they definitely have very

20    little choice in any aspect of their lives; so it would -- and

21    this particular choice relates to their ability to continue to

22    make money for the trafficker.  So if they are not -- if they

23    don't obtain an abortion and they carry to term, they are going

24    to be less lucrative as a -- you know, someone providing that

25    form of service, so --

BY MR. SCHAERR:

Q.  Dr. Coleman, of what value is in-person counseling to those people, in your opinion?

A.  It's absolutely invaluable.  It's maybe a woman's only chance to be freed from a trafficking situation because often these women don't receive general medical care, but they do go to abortion clinics frequently.  So this may be the only chance that she feels free to share with a counselor what the status of her life is.  She may be able to be rescued, and also make that voluntary decision if she so chooses.

Q.  And is she more likely to be able to do that in an in-person setting than if she's talking with somebody through a TV screen?

A.  Absolutely.  Similar to my answer related to minors who are sexually abused and domestic violence victims because the perpetrators are --

          THE COURT:  Okay.  Okay.  Same as before, right?

          THE WITNESS:  Right.

          THE COURT:  Let's go, Mr. Schaerr.  Go on through your list so we can get Dr. Coleman's testimony.

          MR. SCHAERR:  We're getting close, Your Honor.

BY MR. SCHAERR:

Q.  Do you have any data about the number of women who may be victims of sex trafficking?

A.  Well, --

1    Q.   Have you reviewed any data?

2    A.   -- yes, I reported in my expert report that the data is not

3    very good data for obvious reasons, that this is a crime that

4    goes on underneath the surface but the numbers are 300 to

5    400,000 per year, and then I cited other authors who have

6    indicated that estimates are more likely in the millions, but

7    we're just now getting to the point where there are more

8    centralized reporting agencies.  The State of Indiana does not

9    have --

10         THE COURT:  Hold on.  Hold on.  You're going way far

11   afield here.  Just answer the question.  Okay?

12         THE WITNESS:  Okay I'm sorry.

13   BY MR. SCHAERR:

14   Q.   Why don't we quickly look at one of those studies.  That's

15   Recollection Exhibit 82.

16         THE COURT:  The question is pretty simple.  Based on

17   your expertise, Dr. Coleman, in a generalized ballpark sort of

18   way, what's the level of incidents of sex trafficking victims?

19   How are they being measured, and at what level?  You don't have

20   to give me a whole lot of studies and so forth.  You're here as

21   an expert.  Just tell me, is this a big problem or not?  And if

22   so, how many?

23         THE WITNESS:  It's a big problem, and it's, at a very

24   minimum, 3 to 400,000.  Most likely --

25         THE COURT:  That's good.

1          Now let's go to the next thing, Mr. Schaerr.

2          MR. SCHAERR:  All right.  Good.

3     BY MR. SCHAERR:

4     Q.  Our follow-up category, Dr. Coleman, is women who are

5     experiencing decisional uncertainty about the abortion.  Do you

6     recall discussing that category of women in your report?

7     A.  Yes, I cited many studies.  This is another variable we

8     know a lot about in terms of predictors for psychological

9     problems.

10    Q.  Okay.  Let's begin our discussion of this topic just by

11    reviewing briefly another statement from Dr. Grossman's trial

12    testimony.  If we could pull up Pages 126 and 27 of his

13    testimony.

14        Do you recall Dr. Grossman testifying about Plaintiffs'

15    Exhibit 125 and making a conclusion about that?

16    A.  Yes.

17    Q.  If we could highlight --

18          THE COURT:  What is this category, Mr. Schaerr?  I'm

19    looking at the transcript.  I can't figure out what category

20    you're talking about.

21          MR. SCHAERR:  Yes, we're talking about women who are

22    experiencing decisional uncertainty about their abortion.

23    BY MR. SCHAERR:

24    Q.  So this is Page 126, beginning at Line 17.  Dr. Grossman is

25    quoting his own study here in which he says "In this study,

providers felt that some women may be better served by an
in-person visit based on patient prevalence as well as for
patients for whom English is not their primary language, deaf
patients, and people who may be emotional about their decision
or" -- I can't see it -- "but may be unsure or emotional about
their decision."  Is that -- do you recall reading that in
Dr. Grossman's testimony?

A.  Yes, and to me I'm sure means there's decisional
difficulty.

Q.  And do you agree with Dr. Grossman's view that a remote
counseling session may not be appropriate for people in those
categories?

A.  Yes, and I appreciate his recognition of that.  Yes.

Q.  Okay.  And for women in those categories, especially those
who are unsure about a decision, how, in your opinion, would an
in-person interview improve their ability to make a fully
informed decision?

A.  Well, the reasons for uncertainty vary dramatically, but a
significant percentage of those that are uncertain because of
pressure.  So there is overlap among these risk factors.

So women who are uncertain, it would be helpful for them to
be in a setting where they are comfortable, with a trained
counselor, to be able to sort out, you know, the reasons why am
I not sure, and are these reasons that are -- are there more
reasons that fall on the side of terminating or are there more

reasons that make sense to carry it to term.  So just having

somebody objective who can help tease out the source of the

ambivalence, and so I would imagine that it would be helpful to

do that.  These are trained -- in Indiana they are highly

trained professionals that the women will be working with, and,

you know, it's likely to feel more comfortable, more secure

with an actual person in the room rather than remotely.

Q.  Okay.  And in that regard, let's look again at a portion of

Dr. Grossman's testimony.  This is Page 144.

        THE COURT:  Why don't you just ask her for the view

and we don't have to -- she is agreeing with Dr. Grossman on

these things.  I mean, this doesn't sound like rebuttal.  Do

you want to take her through everything that she agrees with?

I mean, she is giving you her opinion, but I don't understand

why you're doing a vis a vis Dr. Grossman's testimony when it's

not contrary or rebuttal of that.

        MR. SCHAERR:  Okay.

BY MR. SCHAERR:

Q.  Dr. Coleman, is it fair to say, as Dr. Grossman did, that

some percentage of women are not comfortable asking questions

during telemedicine?

        THE COURT:  I can take judicial notice of that,

Mr. Schaerr.  I can take judicial notice.  Some people are not

comfortable asking questions.  This is not rocket science.  So

bring me something I don't know.

BY MR. SCHAERR:

Q.  And is that especially true of telemedicine, Dr. Coleman?

MS. SINGH:  Objection, Your Honor.  Lacks foundation.

THE COURT:  Sustained.  There's no foundation with respect to her knowledge of telemedicine.  She wasn't proffered as a telemedicine expert, in any event.

BY MR. SCHAERR:

Q.  But do you recall reading a statement from Dr. Grossman that 11 percent of the women in a study that he did were not comfortable asking questions during telemedicine?

A.  Yes, I remember that specific.

Q.  And as an expert on psychology, is that the sort of information that you can take into account in forming your own opinions about telemedicine?

A.  Yes, that's -- yes.  I would -- a caveat here.  I'd like to have a chance to look at the methodological strengths of the study prior to saying, you know, I definitely agree it's 11 percent.  I would want to know how the data were collected and all kinds of things, but...

Q.  But in general would you agree with him that a substantial portion of women are not comfortable asking questions during telemedicine specifically?

A.  My sense is that, yes, that's correct.  I agree with that.

Q.  Okay.

THE COURT:  Is that it?

1          MR. SCHAERR:  Not quite, Your Honor.  One more exhibit

2    to look at.  That is Recollect Exhibit No. 83.

3    BY MR. SCHAERR:

4    Q.  Dr. Coleman, could you read for us the title.

5          THE COURT:  Wait, why are you presenting this?  What

6    -- why are you pulling this forward?  What's the issue that you

7    want to address?

8          MR. SCHAERR:  It has to do with the extent of

9    decisional uncertainty with regard to abortion, Your Honor,

10   which is in the heartland of her opinion.

11         THE COURT:  Then you have to ask her if this pertains

12   to that.

13         MR. SCHAERR:  Okay.

14   BY MR. SCHAERR:

15   Q.  Dr. Coleman, do you recognize this study?

16   A.  Yes, I do.

17   Q.  And does this study pertain to your opinion about the

18   extent of decisional uncertainty with regard to abortion?

19   A.  Yes.

20   Q.  Okay.  Do you want to read the name of the study and tell

21   us the principal investigator.

22   A.  "*Ambivalence Among Women Applying for Abortion*."  Husfeldt

23   is the lead author.

24   Q.  Where was that published?

25   A.  The journal is Acta Obstetrics and Gynecology, Scandinavia,

1    and it's 1995.

2    Q.  And is that a well respected peer review journal?

3    A.  Yes.

4    Q.  Okay.  Let's turn to Page 816, second paragraph.

5        Dr. Coleman, can you read that paragraph for us and tell us

6    how it informs your opinion about the extent of decisional

7    uncertainty on abortion.

8            THE COURT:  Read it to yourself.  Read it to yourself.

9            THE WITNESS:  Okay.  Well, I'll read it, but the first

10   line is my opinion.  But should I still read it all to myself?

11   BY MR. SCHAERR:

12   Q.  Why don't you tell us what is -- how does the first line

13   inform your opinion about the extent of decisional uncertainty?

14   A.  Well, they studied a fairly significant number of women.  I

15   believe it was -- I'd have to look back -- 44 percent when they

16   found out that they were pregnant had doubts about the decision

17   to terminate.  By the time they arrived at the clinic, the

18   abortion is due, it had dropped some, so some had become

19   certain.  But 30 percent retained uncertain when they arrived

20   at the clinic.  And to me that's almost a third of women.

21       So you know, that's why counseling is so important.  That

22   they understand the risks of each alternative and they really

23   fully understand, you know, what's about to take place.  I

24   think women deserve that.  They deserve information and

25   assistance if they are uncertain.

1  Q.  And if they are already at the clinic and they're still

2  uncertain about their decision, are they going to be able to

3  receive counseling via telemedicine?

4          MS. SINGH:  Objection, Your Honor, calls for

5  speculation.

6          THE COURT:  It does.  Sustained.

7  BY MR. SCHAERR:

8  Q.  What does that statistic -- Dr. Coleman, in your opinion,

9  what does that tell us about value of in-person counseling?

10          THE COURT:  She just answered that question, Counsel.

11  She just answered.  I just wrote it down in my notes.

12          MR. SCHAERR:  Okay.

13  BY MR. SCHAERR:

14  Q.  Just to conclude, Dr. Coleman, how many distinct categories

15  of women have we now identified who could be benefited by the

16  in-person informed consent counseling that Indiana law

17  contemplates?

18  A.  I think we identified five different groups.

19  Q.  Are you claiming today that every woman who falls into one

20  of these categories will benefit from that in-person

21  counseling?

22  A.  I'm testifying that there's a high probability that they

23  will benefit by being able to make a choice that's freely

24  chosen, that they will be able to (indecipherable) that

25  increase the probability of an autonomous decision away from

1    coercive people and exploitative people.  And if it brings, you

2    know, a few of them to safety, it's worth it in my opinion.

3    Q.  But you're not suggesting that every single woman -- every

4    single woman who falls into one of those categories needs

5    in-person counseling, are you?

6    A.  Not necessarily.  But there's a high probability that it

7    would lead to a better outcome for more women than otherwise.

8    Q.  Okay.  And in your opinion, what psychological outcomes --

9    for someone who needs in-person counseling, what psychological

10   outcomes might these women face without the in-person

11   counseling?

12          MS. SINGH:  Objection.  Calls for speculation.

13          THE COURT:  Overruled.  That's within her expertise.

14   She's a psychologist.

15          MR. SCHAERR:  Thank you.

16   A.  The primary psychological or mental health outcomes that we

17   see in women who have risk factors for abortion, like pressure,

18   coercion, experience of abuse and so forth, is we see a gamut

19   of various anxiety disorders, particularly PTSD.  We see

20   depression.  We see substance abuse.  We see suicidal ideation.

21   We see suicide completed.  So there's a wide range of

22   psychological problems that could reasonably be averted in

23   women who make choices that are consummate with their heart and

24   minds and life situations.

25          So I believe in-person counseling is likely to be a safer

place for them to make the decision and to ideally transition

away from abuse.

BY MR. SCHAERR:

Q.   Thank you, Dr. Coleman.  Now, as a social science

researcher, do you have an opinion on whether a legislature

could reasonably use an in-person counseling requirement to

help women in these categories make genuinely informed choices

about abortion?

A.   Yes, I do.

Q.   And could a legislature reasonably impose such a

requirement, even if it creates some inconvenience for other

women or their doctors?

A.   My opinion is it's worth inconveniencing some people if --

            THE COURT:  The answer is yes?  The answer is yes?

            THE WITNESS:  Yes.

BY MR. SCHAERR:

Q.   Would you like to explain, Dr. Coleman?

A.   What I believe is if a few people are inconvenienced or

even a significant percentage are inconvenienced, if 50 or

60 percent are a little inconvenienced by having to go in

person, if that in-person contact effectively saves lives and

rescues women from abusive situations, youth -- developing

teenagers from horrific abuse, then yes, it's worth it.

It's -- the State should do that, protect everybody.

Q.  Dr. Coleman, just my final question.  Do you hold each of the opinions you've expressed today to a reasonable degree of scientific certainty?

A.  Yes.

MR. SCHAERR:  Thank you.  Your Honor, I'll pass the witness.

THE COURT:  Cross-examine, Miss Singh?

MS. SINGH:  Thank you, Your Honor.

*CROSS-EXAMINATION*

THE WITNESS:  Your Honor, would it be okay to take a another very quick break?

THE COURT:  You've had the most recent break of all of us.

THE WITNESS:  I always have to use the bathroom.  I'm sorry.

THE COURT:  I'm teasing you on that.  Do you need a break?

THE WITNESS:  I just --

MR. SCHAERR:  I do, Your Honor.

THE WITNESS:  Two minutes.  I promise.

THE COURT:  Let's do ten minutes.  We'll be back in ten minutes.

THE WITNESS:  Okay.  Thank you.

(Recess taken.)

(Open court.)

1          THE COURT:  We're ready.  Miss Singh, you may

2    cross-examine.

3          MS. SINGH:  Thank you, Your Honor.  I will be brief.

4    BY MS. SINGH:

5    Q.  Dr. Coleman, you believe that abortion should be

6    prohibited, correct?

7    A.  Can you explain what you mean by prohibited?  Against the

8    law?  I mean, that's kind of general.

9    Q.  You believe that abortion should not be allowed, correct?

10   A.  Allowed, legally available?

11   Q.  You have previously stated that you believe abortion should

12   be prohibited, correct?

13   A.  I don't know if those were the words I've used previously

14   but I do believe that abortion is detrimental to women's mental

15   health, to a significant number of women.

16   Q.  Could we pull up, please, PX696?  Turn to page 41, please.

17   If you could just read that to yourself, Dr. Coleman.  To

18   yourself.

19          THE COURT:  Starting on what line?

20          MS. SINGH:  Line 41/25.

21          THE COURT:  Wait just a minute.

22          MS. SINGH:  Yes, Your Honor.

23          THE COURT:  Line 21?

24          MS. SINGH:  Forty-one.  Page 41, line 25.

25          THE COURT:  Line 25.  That's what I was trying to get

1   you to tell me, the line number.

2           MS. SINGH:  Yes, Your Honor.  I believe we're on the

3   wrong -- we're on the wrong -- one second, Your Honor.  I'm

4   sorry, Your Honor.  I think we have an issue.  I'm sorry.  My

5   apologies.

6           THE COURT:  Hold on.  There's not a question,

7   Dr. Coleman.

8           THE WITNESS:  Okay.  Sorry.

9   BY MS. SINGH:

10  Q.  Do you recall taking a deposition in this matter,

11  Dr. Coleman?

12  A.  Yes.

13  Q.  And I asked you this question --

14          THE COURT:  Now, wait, wait, wait.  What line are we

15  on?  That's what we've been trying to get you to tell us.

16          MS. SINGH:  Yes, Your Honor.  I'm sorry.  It's line

17  41 --

18          THE COURT:  No.  That's page 41.

19          MS. SINGH:  Page 41, line 18.

20          THE COURT:  Line 18.  Okay.

21  BY MS. SINGH:

22  Q.  Do you believe that abortion should be prohibited based on

23  what you know about it?

24  A.  And I answered, do you --

25          THE COURT:  Wait, wait.  Read the answer into the

1   record and then ask her your question.

2          MS. SINGH:  Sorry, Your Honor.  I think we're having

3   some issues with the page numbers.  I'm going to move on from

4   this particular question.  I apologize.

5          THE COURT:  All right.

6   BY MS. SINGH:

7   Q.  I will fix that.  I'm not sure what happened here.  Okay.

8       Dr. Coleman, you testified previously that you have

9   given prior testimony in federal court cases, correct?

10  A.  Yes.

11  Q.  Your testimony concerning abortion and mental health has

12  been previously rejected by federal courts, correct?

13         MR. SCHAERR:  Your Honor, I object.  This is beyond

14  the scope of her direct testimony.

15         THE COURT:  It's impeachment, sir.  Permissible

16  impeachment.  Objection's overruled.

17  BY MS. SINGH:

18  Q.  For example --

19  A.  Okay.

20  Q.  For example, Judge Pratt in this district noted in 2018

21  that the science behind your studies has been uniformly

22  rejected by experts in the field, correct?

23  A.  I was not on that case.  My research was used by another

24  expert.

25  Q.  And Judge Pratt concluded that the science behind your

1   studies had been uniformly rejected by experts in the field,

2   correct?

3   A.  If you're telling me he concluded that, I believe you.  I

4   was not on that case.

5   Q.  And in October 2020, a federal court in Tennessee found

6   your testimony not credible and not worthy of serious

7   consideration, correct?

8   A.  Judge Friedman, I believe, did state that in his opinion.

9   Q.  That court also found that your views, as a social

10  scientist, are heavily influenced, if not entirely overridden,

11  by your personal views, correct?

12  A.  That was the opinion.

13  Q.  Okay.  And the reference to personal views is the view that

14  abortion should be prohibited, correct?

15  A.  Yeah.  Back to the previous question, prohibited is a very

16  general term.  My position -- most typically when I testify, my

17  position on the legality of abortion is that -- all that I have

18  learned over 30 years is that there are significant mental

19  health risks with abortion.

20      And so are you asking me my expert opinion, my personal

21  opinion?  And what law?  Entirely prohibited?  I'm sorry but

22  it's so vague.

23  Q.  Your personal opinion is that abortion should be

24  prohibited, correct?

25  A.  That's -- my opinion is not that it should be --

1    MR. SCHAERR:  Your Honor, I object.  This question has

2  been asked and answered.

3    THE COURT:  It's not been answered.  That's the

4  problem, Mr. Schaerr.

5  A.  I believe that abortion should not be legal except in

6  very -- I think this is what you're after.  So I personally

7  believe that abortion should be illegal from -- you know,

8  throughout pregnancy except for in cases where the woman's life

9  is in danger.

10  BY MS. SINGH:

11  Q.  Thank you, Dr. Coleman.

12  A.  Uh-huh.

13  Q.  You understand that in the model of telemedicine abortion

14  care proposed in this case, a patient visits the abortion

15  clinic to obtain medication abortion, correct?

16  A.  Correct.

17    MS. SINGH:  I have no further questions, Your Honor.

18    THE COURT:  Redirect, Mr. Schaerr?

19    MR. SCHAERR:  Give me just a moment, Your Honor.

20              REDIRECT EXAMINATION

21    MR. SCHAERR:  Okay, Your Honor.  I'm ready.

22    THE COURT:  Go ahead.

23  BY MR. SCHAERR:

24  Q.  All right.  Are there situations, Dr. Coleman, when you

25  think abortion can and should be allowed?

1       THE COURT:  She said one.

2   A.  Yes; the life of the mother.

3   Q.  So certainly if the life of the mother is at stake, then

4   you would acknowledge that abortion should be allowed then,

5   right?

6   A.  Right.  I would probably characterize it more as

7   healthcare; that it's just necessary healthcare.

8   Q.  Okay.  Do other scientists and researchers have views on

9   abortion that differ from yours?

10  A.  I would say the majority of researchers, academics have a

11  different -- individual personal view, yes.

12  Q.  And have you worked with other scientists who considered

13  themselves pro-choice or pro-abortion?

14  A.  Yes, I have.  The first two articles I published, my

15  adviser from my master's program definitely was pro-choice.

16  Q.  You have felt -- go ahead.

17  A.  I have also -- the outside reviewers for my promotion, I

18  think (indiscernible) university for promotion.  To be tenured

19  and promoted to full professor, I had outside examiner David

20  Ferguson, who has extensively published on many topics.  He

21  recently passed away, but he was my external reviewer.  He was

22  very pro-choice.  He was an outspoken atheist -- described

23  himself as an atheist, rationalist, pro-choice; and he wrote

24  great reviews for me as I was promoted for promotion.

25  Q.  Have you felt that those scientists who consider themselves

1  pro-choice could not honestly evaluate abortion-related issues

2  in light of their personal views?

3  A.  I don't really believe that's for me to judge, but I have

4  seen evidence of bias in terms of studies that are selected in

5  reviews.  I've seen evidence of bias in the methodologies that

6  are incorporated.

7      You know, I'm not really prepared to say anyone who is

8  pro-choice can't be objective, but I -- hopefully, we are all

9  objective.  We are trained to separate our personal views from

10  our scholarly activities.  So ideally, we are all objective,

11  and then we get to the truth and we know what realistically are

12  the harms associated with abortion so that women can be

13  informed.  I mean --

14  Q.  Have you -- Dr. Coleman, have you worked with scientists

15  who were pro-abortion that you felt were objective, as you put

16  it?

17  A.  Yes.  Dr. Eileen Nelson, my master's thesis adviser, the

18  first two studies I published on this topic were with her; and

19  my adviser in my doctoral program, Katherine Karriker, had

20  published on -- with Brenda Major, the head of the EPA task

21  force; and Katherine was a wonderful adviser to me, and we

22  worked together on several projects; not on the abortion topic.

23  She had kind of moved on, and I was junior --

24      THE COURT:  Okay.  Okay.  We don't need to keep

25  talking about it.

1  BY MR. SCHAERR:

2  Q.  What, if any, effect do your personal views on abortion

3  have on your professional analysis of abortion-related issues?

4  A.  Well, the origin of my interest in this topic came from

5  having a roommate in college who suffered a psychotic episode

6  that was clearly linked to the abortion.  So that piqued --

7  that was the beginning of my interest in this topic.

8      My personal views have evolved over time, where after, you

9  know, reading stories in the literature, the qualitative

10  studies, looking at all these large-scale studies and the

11  analyses, I've come to the conclusion that it's not a healthy

12  choice for a significant number of women; but it doesn't

13  interfere with my ability to conduct good science.

14      You know, I analyze data that was collected by other

15  people, and it's open to public scrutiny; and boy, is it

16  scrutinized.  So I don't -- I believe I'm able to keep my

17  personal beliefs out of research, and the research community is

18  going to make sure that I do.

19  Q.  And have you evaluated and analyzed the issues in this case

20  honestly and objectively?

21  A.  Absolutely, yes.

22  Q.  Do your opinions in this case reflect honest scientific

23  inquiry, unshaded by bias?

24          THE COURT:  Is that a question or is that your closing

25  argument?

1          MR. SCHAERR:  That's a question, Your Honor.

2     A.  Yes, I believe so.

3     BY MR. SCHAERR:

4     Q.  Okay.  Now, counsel mentioned the Tennessee case in which a

5     district judge found that your -- decided to exclude or not

6     give credit to your opinions.  Do you recall that?

7     A.  Yes, I do.

8     Q.  And what exactly was the nature of the testimony that you

9     presented in that case?

10    A.  I covered quite a bit in the Tennessee case.  I covered

11    decision-making.  I addressed risk factors for adjustment

12    afterwards.  I looked at the literature comparing psych

13    outcomes with abortion versus childbirth.

14        I also considered -- I had done two population-based

15    studies with data from a whole country, from Denmark, that

16    dealt with reproductive history patterns and death.  So I also

17    had opinions related to that, and I published a third study

18    related to mortality as well.

19        And then so -- but within the decision-making area, I

20    covered the psychology of decision making generally and -- but

21    mostly specific to the abortion decision because it was most

22    relevant.  And --

23          THE COURT:  All right.  Okay.

24    BY MR. SCHAERR:

25    Q.  Is it fair to say, Dr. Coleman, that your opinion in the

1  Tennessee case focused principally on the general impact of

2  abortion on mental health?

3  A.  I would say it was pretty equal in terms of abortion

4  decision making, risk factors for mental health, and the

5  outcomes.

6  Q.  Is that decision by the judge in Tennessee -- is that case

7  on appeal?

8  A.  I haven't followed it closely enough.  I think it was

9  headed to the appeals court, but I don't know if the decision

10 was rendered.  I'm not sure.

11 Q.  Okay.  Just a final question, Dr. Coleman.  Do you continue

12 to believe that your -- the opinions you've expressed here

13 today are true and correct to a reasonable degree of scientific

14 certainty?

15 A.  I do.  And I wish I could defend those remarks by Bernard

16 Friedman because I felt like they were entirely off base.

17         MR. SCHAERR:  Thank you, Dr. Coleman.

18         THE COURT:  Thank you.  Recross.

19         MS. SINGH:  One question, Your Honor; just one

20 question.

21                  RECROSS-EXAMINATION

22 BY MS. SINGH:

23 Q.  Dr. Coleman, you believe that a significant percentage of

24 women would be better off psychologically if abortion was

25 prohibited, correct?

A.  A significant percentage, I believe, would be benefited if abortion were not legal, except for in cases of the life of the mother.

MS. SINGH:  Thank you.  No further questions.

THE COURT:  Re-redirect?

MR. SCHAERR:  Just one follow-up question.

### FURTHER REDIRECT EXAMINATION

BY MR. SCHAERR:

Q.  Dr. Coleman, in the personal view that you've just expressed, do you mean to suggest that if abortion were completely illegal in all circumstances, that women would be better off, or do you still -- do you continue to recognize an exception for the life of the mother?

A.  The life of the mother, yes.  My opinion hasn't changed in the last five minutes.

Q.  Would you consider yourself a pro-life extremist?

A.  Not at all.  No.

MR. SCHAERR:  Okay.  Thank you.

THE COURT:  Is that enough, Miss Singh?  Have we beat that horse dead now?

MS. SINGH:  Yes, Your Honor.  I'm done.  Thank you.

THE COURT:  Okay.  Thank you, Dr. Coleman.  You've fulfilled your obligation by virtue of your subpoena.  So thank you very much.  Good luck to you.

THE WITNESS:  Thank you.  Thank you.  I'll celebrate

1    my son's birthday now.  He just turned 28.

2           THE COURT:  That's a good one to celebrate, and I hope

3    you've had COVID shots so you can go celebrate and not worry

4    about the virus.

5           THE WITNESS:  I've only had one, but I'm looking

6    forward to my second one and freedom.  That's for sure.

7           THE COURT:  I've had both, and it does give you a

8    measure of freedom, so keep going.

9           THE WITNESS:  The second one is a little scarier from

10   what I've heard; but I had Pfizer, and I didn't have any real

11   reactions.  So I'm not too worried.

12          THE COURT:  My husband and I both had it, and we had

13   no reaction, so go in brave.  Thank you, Dr. Coleman.

14                        (Witness excused.)

15          THE COURT:  Thank you, Mr. Schaerr.

16          MR. SCHAERR:  Thank you, Your Honor.

17          THE COURT:  Can we get our next witness up and going?

18   That's Aaron Kheriaty.

19          Where are you, Miss Singh?  What city are you in?

20          MS. SINGH:  I'm in Los Angeles.

21          THE COURT:  Okay.  Well, you guys need to get your

22   shots out there, too.

23          MS. SINGH:  We do.  It's coming hopefully.  Soon they

24   say.

25          THE COURT:  Yeah, it's such a huge public health issue

1    to deliver that amount of vaccine to everybody.  So I hope that

2    they figure out the magic way to do it.

3                MS. SINGH:  So do I.

4                THE WITNESS:  Hello.

5                MR. ANDERSON:  Good afternoon.

6                THE COURT:  Good afternoon, Mr. Anderson.  Are you the

7    designated hitter here?

8                MR. ANDERSON:  That is me, Your Honor.

9                THE COURT:  Do you intend to call Aaron Kheriaty?

10               MR. ANDERSON:  Yes.

11               THE COURT:  Okay.  Would you, please?  And as soon as

12   that person arrives, you can do the official calling.

13               MR. ANDERSON:  I believe he should be in the waiting

14   room.

15               THE COURT:  Hello, sir.  Are you Aaron Kheriaty?

16               THE WITNESS:  Yes.

17               THE COURT:  Did I say it right?

18               THE WITNESS:  You did.  Most people don't get it

19   right.

20               THE COURT:  Mr. Anderson, is this the witness you

21   intend to call?

22               MR. ANDERSON:  Yes, it is.  And, Your Honor, as a

23   preliminary matter, I think the witness wanted to address

24   something with the Court briefly, just as far as his chronic

25   pain condition.

1      THE COURT:  Okay.  Let me get you installed, ensconced

2   as a witness, and then you can tell me whatever you wish.

3      THE WITNESS:  Very good.  Thank you.

4      THE COURT:  Would you take your oath?  The clerk will

5   administer the oath for the witness.

6                      *(Witness sworn.)*

7      THE COURT:  Go ahead and get him named and called, the

8   spelled name and so forth, and then we'll talk.

9      MR. ANDERSON:  Great.

10      AARON KHERIATY, M.D., DEFENDANTS' WITNESS, SWORN

11                     DIRECT EXAMINATION

12   BY MR. ANDERSON:

13   Q.  Dr. Kheriaty, good afternoon.  Could you please state and

14   spell your name for the record?

15   A.  Aaron Kheriaty, A-A-R-O-N, K-H, as in Henry, E-R-I-A-T-Y.

16      THE COURT:  What did you want to say to me,

17   Dr. Kheriaty?

18      THE WITNESS:  Yes, Your Honor.  I just wanted to

19   address -- probably most of your witnesses are not reclining in

20   a zero gravity chair like this, and I have a chronic pain

21   condition that doesn't permit me to sit for long periods of

22   time.  So that's why I've assumed perhaps this more casual or

23   relaxed attitude but meant no disrespect to the Court.  It's

24   just due to my medical condition.

25      THE COURT:  Thank you for the explanation.  I would

1    not have drawn a negative inference from that.  You need to do

2    whatever you need do.  I can hear you fine, see you well.

3                THE WITNESS:  Very good.

4                THE COURT:  If you need a break because of your need

5    to move around, give us an indication and we'll do that.

6                THE WITNESS:  Thank you.  I appreciate that.

7                THE COURT:  Mr. Anderson, you may ask your questions.

8                MR. ANDERSON:  Okay.  Thank you.

9    BY MR. ANDERSON:

10   Q.  Dr. Kheriaty, could you give just a brief summary of your

11   educational background?

12   A.  Yes, I did my undergraduate training in philosophy and

13   premedical sciences at the University of Notre Dame.  I earned

14   my M.D., my medical degree, from Georgetown University School

15   of Medicine.  I completed my residency training in psychology

16   at the University of California Irvine; and after residency

17   training, I joined the clinical faculty at UCI.

18               THE COURT:  I want you to know, Dr. Kheriaty, that I

19   grew up in Mishawaka.

20               THE WITNESS:  Oh, no kidding?  Right down the street.

21               THE COURT:  Anybody from Notre Dame would know about

22   Mishawaka.

23               THE WITNESS:  Of course, of course.  I'm not going to

24   ask --

25               THE COURT:  I will go on to say, Dr. Kheriaty, that

this is an age-related remark; but we had movie theaters that the Notre Dame students disrupted almost every weekend, and especially if there was anything mushy in the movie.

THE WITNESS:  Yeah, well we were known to do that sort of thing.  I'm not going to ask, Your Honor, if you're a Notre Dame football fan.

THE COURT:  I actually am a Notre Dame football fan.

Okay.  We've gotten you into your clinical group in California.  So --

BY MR. ANDERSON:

Q.  Doctor, when did you graduate medical school?

A.  I graduated medical school in 2003.

Q.  And when did you complete your residency?

A.  I completed residency in 2007.

Q.  Okay.  I'd like to put up Stipulated Exhibit 7.  Do you recognize this document?

A.  Yes.

Q.  And what is it?

A.  That's my CV.

Q.  Does it appear to be a true and accurate representation of your education and professional background?

A.  Yes.

Q.  Okay.  We're done with that for now.

So, Doctor, you hinted at this; but what's your profession?

A.  I am a professor of psychology, and I direct the medical

1   ethics program at UCI Health.

2   Q.   Okay.  And how long have you been a psychiatrist?

3   A.   Fourteen years.  And if you count my psychiatry residency

4   training, that would be 18 years.

5   Q.   Okay.  And where are you licensed to practice?

6   A.   The State of California.

7   Q.   And you mentioned that you currently work at UCI; is that

8   correct?

9   A.   Correct.

10  Q.   Okay.  So what positions do you currently hold at UCI?

11  A.   So I'm a professor of psychiatry, which is what I spend

12  roughly half of my time doing, psychiatry-related work, and

13  I'm -- so that's in the School of Medicine at the University of

14  California-Irvine, specifically in the Department of

15  Psychiatry.  And the other half of what I do is I'm the

16  director of the medical ethics program at UCI Health, which

17  involves directing the ethics consultation service or clinical

18  service in the hospital and in the outpatient clinics at UCI

19  and also doing teaching, research, education, and community

20  outreach work in bioethics.

21  Q.   Now, approximately -- could you give an estimate of

22  approximately how many hours you spend teaching per week.

23  A.   Sure.  It can vary from month to month.  I have some

24  courses that I teach that run certain months of the year and

25  not others, but on average I would say somewhere in the

neighborhood of 30 percent of my time is devoted to teaching.
And that's a combination of clinical supervision for medical
students and psychiatry residents, clinical supervision and
teaching in the context of ethics consultations for trainees on
our ethics committee, seminar-based teaching and also
lecture-based teaching in the School of Medicine for residents
and for medical students, and also continuing education
teaching for other attending physicians or other healthcare
professionals.

Q.  And you mentioned serving on an ethics committee.  How many
ethics committees do you serve on?

A.  Well, currently I serve on UCI's ethics committee as the
chair.  I've been on that committee 15 years as a member and 13
years as the chair of the committee.

I also, for the last four years, have chaired the ethics
committee at the California Department of State hospitals.  So
that's the department that runs the state psychiatric hospitals
in California.  There are five of them.  Each of those
hospitals has its own local hospital ethics committee, but
there's a statewide committee that oversees those and that
deals with particularly complicated cases in the system, cases
which may have policy or legal implications for the system as a
whole, and I've chaired that committee for the last four years.

I've served also as a member and a consultant on some other
bioethics policy committees, particularly during COVID.  So the

1    University of California has six different hospitals, six

2    different medical centers, UCI, UCLA, UC-San Diego, and so

3    forth, and there's a statewide committee that was formed about

4    a year and a half ago to deal with some of the issues that were

5    coming up during COVID.

6         So we developed the crisis standards of care, which are

7    basically -- the first thing we looked at was ventilator

8    allocation, ventilator triage.  If we exceeded our search

9    capacity, how would we allocate a scarce supply of ventilators.

10   Since then that committee has also looked at issues related to

11   allocation of the medication Remdesivir, which was in short

12   supply for a period of time when it was first released, and now

13   we've been looking at vaccine allocation.

14        Also, for about the last -- about six months, I've served

15   on the Orange County healthcare agency's vaccine allocation

16   task force, and I've done some consulting for the California

17   Department of Public Health on their crisis standards of care

18   as well during COVID.

19   Q.  Okay.  And could you describe your training in bioethics.

20   A.  Sure.  So my training in bioethics, well, really began as

21   an undergraduate, I guess, with my training in philosophy.  I

22   had a particular focus on history of ethics and ethical theory

23   and maintained that interest and that research through medical

24   school, so I did additional training in bioethics beyond just

25   what every medical student gets.  I was fortunate to do some

1   research while I was at Georgetown with -- my mentor there was

2   a man named Edmond Pellegrino, a very well known kind of major

3   figure in American bioethics.  He chaired the U.S. President's

4   Council on Bioethics for a period of time.  He passed away a

5   few years ago, so I did additional bioethics training and

6   research and work as a medical student, particularly in my time

7   as a fourth year student, and then continued doing some

8   research, got involved in the ethics committee as a trainee

9   during my residency training.

10      And in addition to that, various continuing education and

11  other opportunities that I've kept up on over the years.  So a

12  lot of the training in healthcare ethics consultation and

13  clinical bioethics occurs in this kind of apprenticeship-based

14  model.  It's a relatively new field compared to the rest of

15  medicine, and so there's different avenues to gaining expertise

16  and experience.  There are more research based kind of academic

17  avenues for people that are just doing research and writing in

18  bioethics, but my focus includes also healthcare ethics

19  consultation.  And that training really needs to be done hands

20  on by gaining an adequate number of experiences under

21  supervision and mentorship with healthcare ethics consultation.

22  And I was fortunate to get that both in medical school

23  residency training and my early career as well.

24  Q.  And you also mentioned that you perform ethics

25  consultations; is that correct?

A.   Correct.

Q.   And what are ethics consultations?

A.   So ethics consultations are similar to other clinic consulting services in the hospital in some respects but different in other respects.  I'll explain a little bit about the process.

We are a committee, actually the ethics consult service is a subset of our larger ethics committee of doctors, nurses; we have a social worker; we have the head of spiritual care to the chaplaincy program at the hospital; we have some legal expertise.

So we're a group of people that are available 24/7 so we can be called by any member of the treatment team, by the patients, by a patient's family member, really by anyone in the hospital from the chief of staff on down to the custodial services, for example.  And this is how we differ in some respects from other consultation services in the hospital.  So if you consult psychiatry, for example, when we have a patient on another service, say the obstetrics service wants a psychiatric consultation, that consult has to come from the attending physician.

THE COURT:  I'm familiar with how these consults work, Mr. Anderson.  Unless you just need to round out the record. You could go on to the next topic.

MR. ANDERSON:  Okay.  Very good, Your Honor.

BY MR. ANDERSON:

Q.  Doctor, you mentioned that you provide a wide variety of ethics consultations.  What kind of patients do you deal with?

A.  Well, on the ethics consultation service we deal with really anything and everything in the hospital or in the outpatient clinic.  So over the years we've been consulted by virtually every department, every division within every department, perhaps with the exception of pathology, you know, the folks looking at slides.

We have had radiology consults, although those are rare, but they have occurred.  So we get exposed to a wide variety of patients in the hospital and in the clinic setting.

THE COURT:  So bring this into under the umbrella of our case, would you please, Mr. Anderson.

MR. ANDERSON:  Certainly, Your Honor.

BY MR. ANDERSON:

Q.  So, doctor, do you perform ethics consultations in situations involving abortion?

A.  Yes.

Q.  And how frequently is that?

A.  They are fairly common.  I would say on average probably anywhere between one and three cases per month that would be from our maternal fetal medicine service, which is a very active division within obstetrics at our hospital that deals with complicated pregnancies, and that very often will have

1  patients referred to them that have a fetal anomaly, or a

2  patient may be seeking an abortion fairly late in gestation,

3  and there may be either medical -- a complicated medical issues

4  surrounding that request, or there may be ethical and legal

5  issues regarding whether the abortion can legally be permitted

6  under California state law given the circumstances.

7      So those consultations are fairly frequent.  We also get

8  consultations of pregnant individuals with complicated

9  pregnancies who are considering abortion but make the decision

10  to carry the child to term.

11  Q.  And do any of your situations in ethics consultations

12  involve informed consent?

13  A.  Yes.  I would say virtually, with very few exceptions,

14  probably nine cases out of ten that we get consulted on, there

15  is some question related to informed consent, either who is the

16  appropriate surrogate decision maker, or does the patient have

17  decisional capacity, or what information or disclosure elements

18  are necessary for the informed consent process in this case, or

19  issues related to communication.  So informed consent is very

20  central to -- it's a key theme and certainly a recurrent theme

21  in our ethics consults.

22  Q.  Okay.  And you also have a clinical practice as a

23  psychiatrist; is that correct?

24  A.  Correct.

25  Q.  And how long have you had that?

1    A.  Well, started building it up in my last two years of

2    residency training and have maintained it since then, so I

3    guess 16 years total.

4    Q.  Okay.  And how many patients are you currently treating?

5    A.  Well, I do about eight hours, eight to ten hours per week

6    of direct patient care with my own outpatients.  I supervise a

7    resident clinic for four hours a week that has five residents

8    in it, so I'm ultimately responsible for all of those patients,

9    as well as a case supervisor.

10        I do about three hours a week of supervision on resident

11   psychotherapy cases.  Every other week I'm on call on Tuesday

12   evenings, so I'm staffing cases with the residents in the

13   emergency department, in the main hospital, on our inpatient

14   psych units, and then about every eight weeks I'm covering our

15   in-patient psych units and psychiatry patients in the emergency

16   room when I cover the on-call duties.

17        So I'm not sure I could tally up the total number of all of

18   those patients, but that's kinda a sense of I guess hours per

19   week or per month that I'm doing clinical work.

20   Q.  Okay.  Now, do you routinely obtain a patient history of

21   each new patient that you see?

22   A.  Yes.

23   Q.  Okay.  And so just briefly, what's that entail?

24   A.  So, I mean, the history involves of course the history of

25   present illness.  For psychiatry especially, a very

comprehensive what we call social and developmental history
that has to do with, you know, the patient's early life
experiences, sources of social support, drug and alcohol use
history, behavioral history, pregnancy history, you know, their
family, their family history of mental illness but also family
relationships.  Of course we do a very thorough what we call
review of systems in psychiatry to look at not just what their
presenting complaints are but any other psychiatric symptoms
that they may have or any co-occurring psychiatric disorders.
We take a medical history as well, even if they are just
presenting with a purely sort of mental health complaint.

     So a very comprehensive history on all new patients, with a
special focus I think in psychiatry, even more detailed when it
comes to social and developmental and familial factors, which
are really important for us as psychiatrists.

Q.  Okay.  And would you know if a patient had previously had
an abortion?

A.  I would generally, because part of the routine history
would be asking about the number of pregnancies, asking about
the number of children that the woman has given birth to.  And
if there's a discrepancy between those two numbers, we try to
ask sensitively, you know, what happened with the other
pregnancies.  And so you get a history of miscarriage and a
history of abortion in the context of the pregnancy and birth
history.

188

1   Q.  Okay.  So, doctor, do you treat patients who have

2   previously had abortions?

3   A.  I do.

4   Q.  And could you give an estimate of how frequently that is.

5   A.  Well, based upon my own clinical experience, I would say

6   women of childbearing age, probably somewhere in the

7   neighborhood of 20 to 30 percent of the women that we evaluate

8   have a history of abortion.

9       And that seems fairly congruent, I think, with incidents

10  and prevalence that we see in national surveys.

11  Q.  And is that woman's abortion ever a subject of conversation

12  when you're meeting with them?

13  A.  It is at times.  I recall a patient -- in fact, I just saw

14  her last week -- who presented very distressed to our clinic a

15  couple of weeks ago because of an unwanted pregnancy.  She was

16  considering an abortion.  We discussed the decision with her.

17  We discussed some sources of mental health support for her.

18  Her husband was there.  He was part of that conversation at her

19  request.

20      She came back last week, after having gone through with the

21  abortion.  So we asked her about her experiences with that.  So

22  we get cases like that where it's sort of a here-and-now issue

23  for women that they are dealing with or they are presenting,

24  wanting to talk about it.

25      There's other cases as well where women had a distant

1   history of abortion, but in the course of the pregnancy

2   history, it comes up, and I typically will ask, what was your

3   experience with that like?  And for some women, they want to

4   talk about it; and for others, they don't.  I try to respect

5   where they are at at that point.

6       For those who do, very often it's something that no one's

7   asked them about before, and they are, in fact, eager to talk

8   about it or eager to process some of their thoughts and

9   feelings about that experience.

10  Q.  Doctor, have you ever published any books on the topic of

11  informed consent?

12  A.  I have not published books on informed consent

13  specifically.  I do have a book chapter in press, from

14  Georgetown University Press.  The chapter I contributed was

15  typically on informed consent.

16  Q.  Okay.  Could you just give a very, very high level overview

17  of what you're writing about, then?

18      MS. SINGH:  I'm sorry.  Objection, Your Honor.  I'm

19  not sure that this has been disclosed in his expert report.

20  Could you just indicate the book chapter, that's something

21  that's in press?

22      THE WITNESS:  Yes.  I think I would need to pull up my

23  most recent CV in order to get that.  Is it all right if I have

24  that document on hand?

25      THE COURT:  Are you asking me?

1        Are you asking the lawyer who asked you?

2        THE WITNESS:  I guess I'm asking -- well, I guess I'm

3   asking either of you who can give me an answer to that

4   question.

5        THE COURT:  I've not read your report.  So the lawyer

6   will have to answer the question about whether it's --

7        THE WITNESS:  Okay.

8        THE COURT:  -- in there.  Do you remember if it's in

9   there?  Did you put it in there?

10       THE WITNESS:  I don't think I cited -- I don't think I

11  cited that book chapter in my report, though, some of the

12  concepts that I discuss about informed consent would be found

13  in that book chapter as well.  But I don't cite it directly

14  because it hasn't been published yet.

15       THE COURT:  So Mr. --

16       THE WITNESS:  It's been submitted to publication.

17       THE COURT:  -- Mr. Anderson, talk about the concepts,

18  not the book chapter.

19       MR. ANDERSON:  Certainly, Your Honor.

20  BY MR. ANDERSON:

21  Q.  Doctor, do you have any training on how to interpret

22  medical studies?

23  A.  I do.  That's a routine part of medical school training,

24  residency training, ongoing continuing medical education.  One

25  of the things that we do both in our department and with the

1    ethics program, is we have a monthly psychiatry journal club,

2    a monthly bioethics journal club where we present and dissect a

3    study in detail and, you know, go back and forth on the merits

4    and demerits, strengths and limitations of the study.  We talk

5    about the findings.  We try to place that study in the context

6    of broader research and go over the statistics and so forth.

7        So very important for physicians to be able to understand

8    the medical and scientific research literature, and it's a

9    routine part of our training and an ongoing clinical practice.

10   Q.  And did you prepare an expert report in this case?

11   A.  I did.

12   Q.  Could you please explain the materials that you used in

13   preparing your report?

14   A.  Yes.  I reviewed the Plaintiffs' complaint.  I reviewed the

15   reports of several of their expert witnesses.

16       I spent extra time reviewing the report of Dr. Grossman.

17   Because of the reports I read, his was the most detailed and I

18   felt the most substantive.

19       I reviewed the Indiana laws that were at question in this

20   case; and then, I reviewed some of the research literature that

21   was relevant to my report and that I was citing in my report.

22   Q.  Okay.  And did you develop any opinions on informed consent

23   as it relates to abortion?

24   A.  I did.

25   Q.  Okay.  And did you develop any opinions on the

1   psychological effects of abortion on women?

2   A.   I did.

3   Q.   And in developing those opinions, did you rely on any

4   specific scientific or technical principles or methods that are

5   widely used in your field?

6   A.   So I relied on general methods of trying to understand and

7   interpret scientific studies, you know, looking at statistical

8   methods, looking at the quality of the sample size and

9   methodology, and I relied on knowledge gained in my medical

10  training and knowledge gained from my clinical experience as

11  well.

12  Q.   Now, Doctor, in your clinical practice, do you deal with

13  informed consent?

14  A.   Yes.

15  Q.   And do you obtain informed consent from your patients?

16  A.   I do.  It's -- any time that we, that we make a medical

17  intervention, anything from recommending a procedure to

18  prescribing a medication, we're required to get informed

19  consent from the patient.

20       MR. ANDERSON:  Your Honor, at this time I'd like to

21  tender Dr. Kheriaty as an expert in the field of bioethics and

22  psychiatry, specifically as to the topics of informed consent

23  and the psychological effects of abortion.

24       THE COURT:  Any objection?

25       MS. SINGH:  Your Honor, I don't believe a foundation

1    has been laid for his expertise on the psychological effects of

2    abortion.

3            THE COURT:  Yes.  Would you lay a better foundation

4    for that?

5            MR. ANDERSON:  Certainly.

6    BY MR. ANDERSON:

7    Q.  Doctor, how many patients did you see -- sorry, did you say

8    that you treat that have had an abortion?

9    A.  Well, again, I don't know the exact number.  But I would

10   have to estimate anywhere between 20 and 30 percent of the

11   women of childbearing age, and I do mostly adult psychiatry.

12   So that would include, roughly, half of the patients that I see

13   and evaluate, either as the primary attending on the case or

14   the direct supervisor on the case, are women that have had

15   abortions.

16   Q.  Could you give just a bottom threshold number, just a

17   guess?

18   A.  Oh, well, I have seen, certainly, more than 10,000 patients

19   in the course of my career.  Particularly, if you count all the

20   cases that I have supervised that have been treated by

21   residents.  So it would have to be at least a few thousand

22   women that have had abortions.

23   Q.  Okay.  And in some of those instances, is abortion one of

24   the -- is abortion a common topic with those women, in your

25   meetings with them?

A.  It's not an uncommon topic.  It doesn't always come up as something that we dig into clinically, but very often it does. And very often for the women, it's something that they want to talk about.  It's something that they may be struggling to deal with, sometimes even many years later.  So it's not uncommon for abortion to be part of or one of the things that we address.

THE COURT:  So the issue, sir, is did you treat these patients based on the psychological effects of the abortion, or was that a secondary sort of coincidental factor?

THE WITNESS:  So in some cases, it was the primary factor; and in other cases, it was one factor among many that they were dealing with.

THE COURT:  So even when it was one factor, were you treating the psychological effects of abortion?

THE WITNESS:  Yes.

THE COURT:  All right.  So with respect to all of those people that you've treated, who have disclosed that they have had an abortion, you treated them as a psychiatrist for whatever the facts were of their case; is that true?

THE WITNESS:  That's right.

THE COURT:  All right.  He qualifies as an expert.  He may testify.

MR. ANDERSON:  Thank you, Your Honor.

BY MR. ANDERSON:

Q.   So Doctor, when treating patients and your work as a psychiatrist, do you attempt to identify the contributing factors that led to the patient seeking your help in the first place?

A.   Yes, of course.

Q.   How do you go about determining what those contributing factors are?

A.   Well, the thorough history is the first step; and then, what we call the mental status examination, which is a systematic way of evaluating cognitive, emotional, and behavioral symptoms.  We often, in psychiatry, because of the nature of mental illness, sometimes it can cause various forms of cognitive impairment.  Or the person, if their illness is not well treated, can't always give a coherent and clear history because they are manic or they are psychotic or they are profoundly depressed.  So it's common for us, with the patient's permission, to get history from collateral sources as well.

     So very often the evaluation in psychiatry, especially in in-patient and emergency settings, involves talking to other individuals that know the patient very well, perhaps family members or friends that live with the person to get information.  So our evaluation is focused mostly on the patient's history that they disclose, but other collateral

1    sources of history are important.

2        Diagnostic studies and imaging is used in psychiatry as

3    well, though not as frequently, perhaps, as some other

4    specialties of medicine, like orthopaedics.  So there's other

5    tools that physicians routinely use, are important for us as

6    well.

7    Q.  Now, in treating women who have had an abortion, do you

8    ever come to the conclusion that their abortion was a

9    contributing factor to their current mental health status?

10   A.  Yes.

11   Q.  Okay.  How frequently does that occur?

12   A.  Well, I would say, certainly in cases where women bring up

13   their abortion on their own, which is fairly common to -- for

14   some women, it's a weight that they are carrying.  It's

15   something that they are ambivalent about or struggling

16   emotionally with in some way.

17       It's pretty clear to them that this is the factor that's

18   contributing to their anxiety or their depression or their

19   other form of -- other forms of emotional distress or

20   behavioral issues.

21       In other cases, as we explore all of the different factors

22   of the history and patients begin to think about their prior

23   experiences, it becomes more apparent to the patient that maybe

24   their experience of abortion is something that they haven't

25   fully processed.  There can often be grief and loss, for

example, related to abortion that, you know, because it's something hard for many women to talk about, they haven't had the opportunity to process that grief and loss.

And unprocessed grief can oftentimes lead to mental health symptoms.  Unresolved issues that a person is carrying that they haven't dealt with is sort of a common theme in psychology that we help patients work through.

Q.  Okay.  And in your experience, is it common for women who have had an abortion who come to see you to feel emotional distress about their abortion?

A.  It's certainly not uncommon.  I wouldn't say that every woman that has had an abortion presents with emotional distress because of the abortion, but for most people, the abortion was something difficult to go through.  And for many of those women, there are still complicated emotional feelings, sometimes rising to the level of very severe distress, as with the patient that I mentioned that presented to our clinic a couple of times in the last month with an unwanted pregnancy and then shortly after her abortion.  Those kinds of cases are fairly common.

Q.  Okay.  Now, do the women who have obtained an abortion, do they ever express mixed feelings about their abortion?

A.  Yes, that's a fairly common response to abortion, is to have mixed or conflicted feelings about the event itself or the experience itself and sometimes about the decision.

Q.  Do you know why that might be?

A.  Well, it seems to me that it's, understandably, it's a decision that's very difficult for some women, an unwanted or unintended pregnancy or a wanted pregnancy, where at some point during the pregnancy the fetus is diagnosed with a medical problem or a genetic or developmental problem, a fetal anomaly, as we say.  These are difficult circumstances for any person to be in, and the decision of whether or not to carry a pregnancy to term or to terminate a pregnancy is, it seems to me, very obvious, a significant decision for a woman's future, for her health, for her life, for whether or not -- you know, for her identity, whether or not she will be a mother raising a child or raising, perhaps, another child if she already has a child. It can bring up difficult issues in terms of relationships.

Oftentimes these patients are what we would describe as ambivalent.  They have more than one conflicting thought, feeling, emotion, towards the same thing or toward the same decision.  So part of them wants to continue the pregnancy, perhaps, but another part of them is afraid that they will not be able to be a good mother or to -- they will not be able to provide for a child if they were to give birth to a child.

Maybe part of them wants to continue a pregnancy or part of them wants to terminate a pregnancy, but they feel pressure from a partner or from other family members to make a decision in one direction or another, and that can create strain in

1    their relationships.  It can sometimes make them feel alone or

2    isolated in making this decision.  So the kinds of situations

3    that women find themselves in when they are contemplating or

4    considering abortion are highly variable, obviously, and really

5    depend on the individual circumstances.

6        But, certainly, in many cases, this is a difficult

7    decision, it's a difficult time, or a period in a woman's life,

8    and there can often be distress, both I think both before,

9    during, and after that decision is made.

10        THE COURT:  Mr. Anderson, would you take my

11    suggestion, please?  If not, just argue with me about it a

12    little bit, but would you elicit from the witness his expert

13    opinions and then get the justification from him so that I can

14    tell the relevance of his disclosures?  It's hard for me to

15    know exactly what to do.  I mean, it's interesting, it's

16    insightful, et cetera, but I don't know what to do with it,

17    because I don't know what opinions you're going to ask him.  So

18    start with the opinions and then build the justification for

19    those, please.

20        MR. ANDERSON:  Certainly, Your Honor.

21    BY MR. ANDERSON:

22    Q.  So, Doctor, based on your experience treating women who

23    have had an abortion, and their psychological effects, how does

24    that inform your view of the importance of informed consent?

25    A.  Well --

1          THE COURT:  Wait.  Is that the opinion, the importance

2    of informed consent?  What is the opinion?  That's what I want

3    you to start with, Mr. Anderson.

4          MR. ANDERSON:  Yes, Your Honor.

5          THE COURT:  Okay.  Get his expert opinion before the

6    Court, and then you can talk about what informs it.

7    BY MR. ANDERSON:

8    Q.  Doctor, so how does your experience inform your view of the

9    importance of informed consent?

10         THE COURT:  No, Mr. Anderson, you didn't understand.

11   You're asking him a how question.  I'm asking him a what

12   question.  What is your opinion with respect to the importance

13   of informed consent in the field of abortion?  What is your

14   opinion?

15         MR. ANDERSON:  Certainly.

16   BY MR. ANDERSON:

17   Q.  Doctor, what is your opinion on the importance of informed

18   consent based on your experience?

19         THE COURT:  In the field of abortion.

20   BY MR. ANDERSON:

21   Q.  In the field of abortion.

22   A.  So, as with anything in medicine, informed consent is very

23   important.  It's important that it be adequately informed, that

24   the person making the decision have adequate information,

25   adequate time to consider her options, including the option of

1    not intervening, adequate time and opportunity to seek a second

2    opinion, and that she be able to make and communicate a free

3    decision, that is a decision that is not subjected to undue or

4    excessive pressure or certainly coercion from external

5    influences.

6         So informed consent is important for any medical decision,

7    but with abortion, the decision has, you know, irreversible

8    consequences, one way or another.  And so the informed consent

9    process needs to be carefully done, carefully documented.  And

10   because it's a sensitive subject for so many people, it needs

11   to be done with a lot of tact and nuance.

12        THE COURT:  And what's your opinion with respect to

13   the psychological effects of abortion?

14        THE WITNESS:  I believe that, based on my clinical

15   experience, my read of the research literature, that some

16   women -- I wouldn't make the stronger claim that it would be

17   all women, but some women -- are adversely impacted

18   psychologically by their experience of abortion.

19   BY MR. ANDERSON:

20   Q.  And, Doctor, is that psychological impact always

21   measurable?

22   A.  Sometimes it is.  It would contribute to a diagnosable

23   psychiatric condition, like depression, anxiety, substance use,

24   suicidality.  By "contribute," I don't mean it's the only

25   factor that plays a role in influencing those things.  These

1    are all complex illnesses and complex behaviors.  Usually,

2    there's more than one contributing factor or cause, but

3    abortion could be a significant contributing factor to those

4    diagnoseable conditions.

5       But there may be forms of distress that don't necessarily

6    rise to the level of meeting diagnostic criteria for a

7    psychiatric disorder that are nonetheless distressing to an

8    individual or impactful on an individual.

9       And so I think my opinion, I've seen cases where the

10   experience of abortion has impacted women, both in terms of

11   diagnoseable conditions that are quantifiable and measurable,

12   but in other ways that are perhaps more subtle and not

13   necessarily diagnosed mental health disorders, but are

14   nonetheless important for their lives.

15   Q.  Doctor, can you explain the importance of informed consent

16   specifically within the context of abortion?

17   A.  Well, so abortion is a medical decision that, once you go

18   through with the procedure, the effects of that can't be sort

19   of walked back or reversed.  So you can contrast it, for

20   example, with me getting informed consent to change the dose of

21   a patient's antidepressant medication or start a new

22   antidepressant medication.  You know, this is a medication that

23   doesn't have an adverse effect.

24      If a person experiences side effects two weeks after

25   starting the medication, I can discontinue the medication or

change the dose or switch to a different medication to try to
mitigate some of the negative effects of that decision, whereas
a woman who carries a child to term and delivers it is
obviously going to be living with the lifelong consequences of
raising a child and being a mother, or if she makes that
decision of giving a child up for adoption.  Or if a woman
makes a decision to terminate a pregnancy and goes through with
an abortion, she's going to live with the decision not to bring
that child into the world, and the various ways in which that
influences her life and her future, as well.

So, because it's a decision where you can't sort of go back
and change it once it's done or do much to mitigate some of
those effects later on, it's important that the informed
consent process be more thorough, certainly, than it would be
for something else, where the effects could be reversed if
there's a problem, or if there's a complication, or if the
patient later changes their mind about wanting to continue with
the treatment.

Q.   Okay.  Earlier you mentioned that in your practice, you
frequently used images; is that accurate?

A.   Yes.  That's common in medicine as a whole, and we do use
brain imaging, particularly, in psychiatry.

Q.   Okay.  So -- and in your opinion, how does the use of
imaging relate to the informed consent process?

A.   Well, the use of imaging is very important for informed

consent.  In medicine as a whole, it's become quite routine.  I can give an example from my own experience.  I broke my clavicle last year.  And, you know, I did gross anatomy in medical school.  I know what a collarbone looks like.  I've assisted on surgeries.  My knowledge of anatomy is pretty good compared to the general population.

But, nonetheless, I naturally wanted to see the x-rays of not just what a clavicle, or a broken clavicle generically looks like, but what does my broken collarbone look like.  You tell me that it was broken in four places, but, you know, the picture's going to be worth a thousand words.  In this case, I want to see exactly what it looks like.  You know, I can see the bone poking out through my skin, but I still want to know what's going on under the skin.

Same thing with my two previous spine surgeries.  I have a pretty good sense of what a laminectomy and a spinal fusion surgery involves, and you have can show me what the hardware looks like, but I also want to see that MRI of my spine and I want you to explain, you know, not just using some generic model, but actually using the image of my body:  What's wrong?  What the condition is?  What does it look like?  What are you going to do when you go in there and intervene?  And what can I expect?

So this sort of thing, I think, is pretty familiar to many of us who have gotten medical care.  The imaging is useful, not

just for the physician to figure out, you know, what's going on

and how the physician may want to propose, you know, options to

the patient, but also for educating the patient about what's

going on in their body.  It's a way of respecting patient

autonomy and enhancing and improving the informed consent

process, because it's a form of, you know, useful information

that the patient, you know, should have access to if it's

available.

Q.  Now, are you aware of any studies that support your opinion

that images can be useful for informed consent purposes?

A.  Yeah.  There are some studies suggesting the utility of

both, general images, but also more personalized images, for

helping patients understand the nature of different medical

diagnoses and the nature of different interventions.  So it's

well supported in the research literature and in the literature

on informed consent.

Q.  Doctor, are you familiar with the Indiana ultrasound law

being challenged in this lawsuit?

A.  Yes, I am.

Q.  Okay.  And what's your understanding of what that law

requires?

A.  My understanding is that the law requires that an

ultrasound be performed for a woman seeking an abortion and

that the woman be given the opportunity, if she chooses, to

view the ultrasound or to listen to the fetal heart tones from

1    the ultrasound.  She has the right to decline that option if

2    she chooses, but it at least needs to be offered do her.

3    Q.  Okay.  And what's your opinion as to the ethics of that

4    ultrasound law as to --

5            MS. SINGH:  Objection, Your Honor.

6    BY MR. ANDERSON:

7    Q.  -- as to informed consent?

8            THE COURT:  Hold on --

9            MS. SINGH:  Objection, Your Honor, relevance to this.

10   This phase of the trial does not involve a challenge to the

11   offer to view the image or to listen to the fetal heart tone if

12   one is audible.

13           THE COURT:  Sustained.  That's true.  Sustained.  This

14   lawsuit does not pertain to that.  Go to the next topic

15   Mr. Anderson.

16   BY MR. ANDERSON:

17   Q.  Doctor, are you familiar with the Indiana requirement that

18   informed consent for an abortion be given in person?

19   A.  Yes.

20   Q.  Okay.  And what's your understanding of that requirement?

21   A.  My understanding of that requirement is that during the

22   visit in which the informed consent conversation occurs with

23   the physician, the individual who's considering -- the patient

24   who's considering whether or not to have an abortion needs to

25   be present at the clinic, and that conversation needs to occur

1    face-to-face.

2    Q.  Okay.  And have you formed an opinion on that requirement?

3    A.  Yes.

4    Q.  And what is that opinion?

5    A.  It seems to me that that requirement would enhance the

6    informed consent process, especially on a difficult decision

7    like this, a decision where it's important to assess for

8    factors that may diminish or impair the patient's capacity or

9    that may suggest that the patient is being pressured to make

10   one decision or another by family members or other individuals

11   in the person's life.

12       The assessment of the patient's psychological and social

13   circumstances, their ability to process information and make a

14   decision that is free of undue external influences seems to me

15   that that requirement can help to enhance the possibility that

16   that will be done adequately and that, you know, the quality of

17   that conversation will not be diminished by having to be done

18   over the phone or by video chat.

19   Q.  Doctor, do you ever meet with your clients through remote

20   means like Zoom?

21           MS. SINGH:  Objection, Your Honor.  This was the

22   subject of the Daubert motion.  Dr. Kheriaty has said he was

23   not going to testify about telemedicine care.

24           THE COURT:  If that's true, then you shouldn't go into

25   it.

1      MR. ANDERSON:  Your Honor, I believe that the Court's

2  order said that he was allowed to testify as to in-person

3  counseling, but not telemedicine.  So he's simply going to be

4  talking about the in-person counseling.

5      THE COURT:  Well, then ask that question, because that

6  was not your question, Mr. Anderson.  You asked about Zoom.

7  BY MR. ANDERSON:

8  Q.  Doctor, do you ever obtain informed consent via Zoom or

9  other remote means?

10  A.  I do.

11  Q.  And, based on your experiences, what challenges are posed

12  by obtaining informed consent in that remote format?

13      MS. SINGH:  Objection, Your Honor.

14      THE COURT:  This sounds like telemedicine to me, sir.

15  This doesn't sound like his informed consent experience.  Do

16  you want me to go back and read the order or do you have a

17  different view?

18      MR. ANDERSON:  Your Honor, my understanding is he's

19  testifying as to the importance of doing informed consents in

20  person as opposed to through a remote means.

21      THE COURT:  Well, you asked him about the remote

22  means, though.  That's what you just asked him about.

23      You asked him if he did.  He said, "Yes."  And then

24  you said, "How'd it go?"

25      So that sounds like you're overstepping the line,

1   Mr. Anderson.

2           MR. ANDERSON:  Certainly, Your Honor.

3   BY MR. ANDERSON:

4   Q.  Doctor, in your experiences obtaining informed consent, are

5   you -- strike that.

6           MR. ANDERSON:  Your Honor, if I may have one moment to

7   confer with my colleagues?

8           THE COURT:  Okay.  Let me read to you, because my

9   clerk is so good, my previous order with respect to the

10  limiting request that the plaintiffs asked.  This is on Page 41

11  of my order, my long order, pretrial order, I think, on summary

12  judgment.

13          LAW CLERK:  Daubert motion.

14          THE COURT:  The Daubert motion.

15          Plaintiffs next argue that Dr. Kheriaty should be

16  excluded from offering testimony regarding the medical benefits

17  of Indiana's prohibitions on the use of telemedicine in

18  abortion care.  I'm paraphrasing a little bit.  Plaintiffs

19  challenge his qualifications to opine.  And the State didn't

20  dispute those challenges to the qualifications.  The State

21  clarified that Dr. Kheriaty has not been designated to testify

22  on this topic, nor does his expert report offer any opinion

23  regarding the appropriateness of telemedicine.  So we accepted

24  the State's stipulation and found the objection to be moot.

25          There's a Footnote 23, which goes on a little bit

1    further, but I need not read it in to record.

2         So you have to abide by that order, Mr. Anderson, and

3    the State's acquiescence, their stipulation.

4    BY MR. ANDERSON:

5    Q.  Doctor, I believe that you mentioned earlier that some of

6    the patients that you've treated have expressed that they may

7    have been coerced in their decision to obtain an abortion --

8    A.  Yes.

9    Q.  -- is that correct?

10   A.  Yes, that's correct.

11   Q.  Okay.  So what special concerns do you have as far as

12   obtaining consent from a patient when you believe there may be

13   coercion?

14        THE COURT:  You mean what impact does that fact have

15   on informed consent?

16        MR. ANDERSON:  Yes, Your Honor.

17   A.  Yeah.  So when we're talking about informed consent, it's

18   important to think about what information needs to be conveyed

19   to the patient, but it's also important -- so that's the

20   informed part of informed consent -- but it's also important to

21   consider the patient's circumstances with regards to being able

22   to process that information and also make a decision that is

23   free of undue influences that may impair their autonomy, impair

24   their ability to make a decision according to what they want to

25   do versus what someone else is pressuring them to do.

1        So one of the factors is making sure that the person has

2   the conversation in a setting that is private, which is

3   certainly easier to do in person.  If it's not done in person,

4   it's hard to tell who else sort of might be there in the room,

5   maybe outside of view or outside of the physician's awareness,

6   who might overhear something.  So, certainly, in my own

7   experience, individuals are sometimes less likely to talk about

8   sensitive issues or disclose sensitive things, patients

9   specifically, when they are not meeting with me in person but

10  when, you know, we're having a conversation by some other

11  remote means.

12       The in-person experience also allows me to see subtleties

13  of body language, voice, the various things certainly that I

14  think all physicians, but particularly mental health

15  professionals, pay close attention to, to give us a sense of

16  the patient's state of mind and what kind of emotional state

17  they are in.  They may be in a state where it's difficult to

18  process a lot of information.  They may be in a state in which

19  they feel pressure to decide something quickly.  And to be able

20  to sensitively spot that and assess that certainly is enhanced

21  by a face-to-face, in-person conversation and evaluation with a

22  patient.

23  BY MR. ANDERSON:

24  Q.  Okay.  Doctor, are you aware if intimate partner violence

25  or domestic abuse has increased during this COVID pandemic?

A.  Yes.  There's several studies that have been published in

the last year suggesting, unfortunately, increased rates of

intimate partner violence as people have been living under the

stay-at-home orders in many states.

Q.  And are you aware if your patients have -- if you have seen

an increase in your patients of domestic abuse victims?

A.  Yes.

        THE COURT:  Are you talking about during COVID?

        MR. ANDERSON:  During COVID.

A.  Yes, anecdotally, I have.  I haven't done a rigorous sort

of study of the cases that we've seen, but I can certainly say

most of us have the impression that we're seeing more of those

cases in emergency settings, emergency psychiatry and so forth.

        MR. ANDERSON:  Okay.  No further questions.

        THE COURT:  Okay.  Cross-examine?

        MS. SINGH:  Yes, Your Honor.

        May I have a moment?

        THE COURT:  You may.

        MS. SINGH:  Okay.  I think I just have a few

questions, Your Honor.

        THE COURT:  All right.

                    *CROSS-EXAMINATION*

BY MS. SINGH:

Q.  Dr. Kheriaty, is your testimony today that you determined

20 to 30 percent of your patients have had an abortion based on

1  your clinical experience?

2  A.  Yes, and that's -- I want to emphasize; that's an estimate.

3  I would have to actually go back and do a systematic chart

4  review to come up with an exact number, so that's my -- that's

5  my off-the-cuff impression of a ballpark number based on just

6  thinking through, you know, the cases that I have evaluated.

7  Q.  Is that number also based on your extrapolation from the

8  number of people in the general U.S. population who have had

9  abortions?

10  A.  Not necessarily, no.  I'm thinking through the cases that I

11  evaluate or that I supervise in outpatient, inpatient, and

12  emergency settings.  And, in fact, in some of those settings,

13  women who have had abortions, probably the rates would be a bit

14  higher than that.  They may be overrepresented among some of

15  the populations that we treat.  So that's my attempt to

16  estimate based upon clinical experience.  But it also seems

17  congruent with some of the studies I've seen of, you know,

18  population-based studies of incidents of abortion in the United

19  States.

20      MS. SINGH:  If you could, pull up PX644.  I'll try to

21  get it right this time.  Page 120, please.

22  BY MS. SINGH:

23  Q.  You gave a deposition in this matter, correct,

24  Dr. Kheriaty?

25  A.  That's right.

Q.  Page 120, Line 21.

    "Question:  So part of that number is derived from general population statistics about who has abortion, the percentage of women who have abortion?

    "Answer:  Yeah."

    Did I read that correctly, Dr. Kheriaty?

A.  Yes.

Q.  Thank you.

    You're familiar with the site-to-site model of telemedicine via abortion care, correct?

A.  Yes.

Q.  You understand that the plaintiffs in this case would be using a site-to-site model of telemedicine care where a patient visits an abortion clinic to obtain medication abortions, correct?

        COURT REPORTER:  I'm sorry.  Can she say that one more time slowly?

        THE COURT:  Say it one more time.  Wait just a minute. The court reporter has to get it.

        Are you aware or do you understand -- go ahead.

BY MS. SINGH:

Q.  Do you understand that the plaintiffs in this case would use a model of telemedicine in which patients visit the abortion clinic to obtain their medication abortion pills?

A.  I was not aware specifically of which model was going to be

1    proposed by the plaintiffs.

2              MS. SINGH:  Thank you, Dr. Kheriaty.

3              No further questions, Your Honor.

4              THE COURT:  Redirect?

5              MR. ANDERSON:  If I could just consult with my

6    colleagues, Your Honor?

7              THE COURT:  Yes, you may.

8              MR. ANDERSON:  Thank you.

9              THE COURT:  While he's consulting, Dr. Kheriaty, I'll

10   ask if you are an acquaintance of the renowned law school dean

11   Erwin Chemerinsky at UC-Irvine.

12             THE WITNESS:  Yes, I am.  Erwin -- Erwin is a friend.

13             THE COURT:  He's a friend of all federal judges, too.

14             THE WITNESS:  Yeah.  Yeah.  Mr. Constitutional Law.

15             We had -- Erwin and I had a lot -- we had a lot of fun

16   with this.  We had a public debate in 2015 at UCI, and so I did

17   some back and forth on the stage with Erwin.

18             He's no longer here actually.  He -- so he was the

19   founding dean of our law school.

20             THE COURT:  I remember that.  Where did he go, though?

21   I knew he moved, but I forgot where.

22             THE WITNESS:  You know, I want to say Berkeley.  I

23   want to say he's back up in Northern California now.

24             THE COURT:  Miss Singh is nodding her head.  She

25   knows.

1              THE WITNESS:  Yeah.  Yeah.

2              MS. SINGH:  He is, indeed.

3              THE COURT:  Okay.  Good.

4         Okay.  We were filling the time, Mr. Anderson, talking

5    about mutual acquaintances at UC-Irvine.

6              MR. ANDERSON:  Thank you.  Your Honor, I have no

7    further questions.

8              THE COURT:  All right.  Very good.

9         Does that complete the questioning of Dr. Kheriaty?

10             MR. ANDERSON:  Yes, it does, Your Honor.

11             THE COURT:  Okay.  You're excused from your subpoena

12   to testify, and I thank you very much.  I hope your physical

13   situations prove manageable.

14             THE WITNESS:  Thank you, Your Honor.  I appreciate

15   that.

16             THE COURT:  All right.  Thank you now.

17        Mr. Anderson?

18             MR. ANDERSON:  Your Honor, the State rests its case.

19             THE COURT:  Will there be rebuttal?

20             MS. SINGH:  Yes, Your Honor.

21        May I just confer with my colleagues for one moment?

22             THE COURT:  You may.

23                  (Discussion held off the record.)

24             MS. SINGH:  Thank you, Your Honor.

25             We have two rebuttal witnesses.  We expect them to be

1  fairly short, Your Honor.

2  THE COURT:  Okay.  I need to protect the court

3  reporter, so let's take a 15-minute recess, and you have your

4  witnesses ready to go, and then we'll be able to finish it up

5  tonight.

6  MS. SINGH:  Thank you, Your Honor.

7  (Recess taken.)

8  (Open court.)

9  THE COURT:  Okay.  We're ready for your rebuttal

10  witnesses, Miss Singh.  Who's the first one?

11  MS. SINGH:  Dr. Daniel Grossman, Your Honor.

12  THE COURT:  Oh, there's a name we recognize.

13  MR. SCHAERR:  Your Honor, if I may, I don't believe

14  Dr. Grossman was disclosed as a potential rebuttal witness.  So

15  if they are going to lead with him, we'd like to request a

16  five-minute short recess for us to confer with one another and

17  decide what position we want to take on that.

18  THE COURT:  Is this your first knowledge that

19  Dr. Grossman might be recalled because I've known for quite a

20  while?

21  MR. SCHAERR:  This is the first knowledge we have of

22  it, Your Honor, looking around at counsel here in the room.

23  THE COURT:  We'll take five -- not five minutes.  Step

24  aside and confer because we're getting on to the end of the

25  day.

1    MR. SCHAERR:  Thank you.  Will do.

2    THE COURT:  Hi, Dr. Grossman.

3    THE WITNESS:  Hello.

4    How are you?

5    THE COURT:  Very good.

6    Did you survive your prior ordeal?

7    THE WITNESS:  I did.

8    THE COURT:  Without requiring any social drugs or

9    anything?

10    THE WITNESS:  No.

11    THE COURT:  That would include alcohol.

12    THE WITNESS:  I might have had a glass of wine, yes.

13    THE COURT:  Okay.  You said on direct that you're a

14    parent.  So how many children do you have, Dr. Grossman?

15    A.  Two, two daughters; one who's a second year at University

16    of California, Berkeley, and one is a senior in high school

17    who's going to be hopefully going to NYU in the fall.  She's

18    gotten accepted, and hopefully there will be on-site classes.

19    THE COURT:  You're going to have to keep working for a

20    while to pay for that higher education stuff.  How blessed you

21    are to have two daughters.

22    THE WITNESS:  Very lucky.

23    THE COURT:  They'll teach you things, too, Dr. Daniel.

24    THE WITNESS:  Oh, yes.

25    THE COURT:  Oh, well.  There's been a transformation.

1    We started out with Schaerr and now we've got Mr. Bartolomucci.

2    Are you sent in for a particular level of duty?  When it gets

3    to fisticuffs, do you have to come in?

4         MR. BARTOLOMUCCI:  No.  Just only when requested.

5         THE COURT:  Okay.  What do you say about the recall of

6    Dr. Grossman?

7         MR. BARTOLOMUCCI:  Well, Your Honor, my understanding

8    is that this is the first we've learned that he was to be

9    called as rebuttal witness.  Nevertheless, we're prepared to

10   proceed.

11        THE COURT:  Okay.  Very good.  Thank you for your

12   flexibility.

13        Now, Ms. Singh, you may ask your questions.  And I

14   remind you, Dr. Grossman, you're still under oath.

15        THE WITNESS:  Yes.  Thank you.

16     DR. JONATHAN GROSSMAN, PLAINTIFFS' WITNESS, SWORN

17                    DIRECT EXAMINATION

18        MS. SINGH:  Thank you, Your Honor.

19   BY MS. SINGH:

20   Q.  Dr. Grossman, did you hear Dr. Stroud's testimony today

21   that the best way to determine whether a patient has an IUD is

22   to look at her cervix?

23   A.  I did hear that.

24   Q.  Do you agree?

25   A.  I do not.  In my experience, the best way to find out if a

1    patient has an UUD, or intrauterine device, is to ask her.  I

2    have to say, I've never been in a situation with a patient

3    where they withheld information from me because they were

4    concerned that I might be judgmental of something that they did

5    or a medical device that they're using.  So I was really quite

6    surprised by that testimony.

7    Q.  Has the technique for aspiration abortion changed in the

8    last 25 years?

9    A.  Yes.  I also started my residency in 1994 and was trained

10   to provide abortions in the mid 1990s, and the practice has

11   changed considerably.  We now use manual vacuum aspiration

12   quite commonly.  This is a hand-held device to perform an

13   aspiration abortion, and it's really quite different from an

14   electrical vacuum aspiration.  And the way we perform the

15   procedures is different and the way we describe it to patients

16   is very different.

17       So the process of informed consent, as we described what

18   the various options are for treatment, is different because the

19   experience of using the manual vacuum aspiration is very

20   different.

21       We also commonly use Misoprostol now for cervical

22   preparation before performing an aspiration abortion after

23   about ten or eleven weeks, instead of using rigid manual

24   dilation of the cervix.  So the way we have to explain the

25   whole procedure to a patient is very different.  What she'll

GROSSMAN - DIRECT/SINGH                221

1    experience in terms of side effects with the medications,

2    things like that, it's very different.

3    Q.  Have the risks for abortion changed over the past 25 years?

4    A.  Yes.  I think we have a much more detailed understanding of

5    what the risks are and really, quite honestly, what the safety

6    of abortion is.  There are, you know, I think I can safely say,

7    hundreds of articles now really published about abortion

8    safety.  And so we have a much more precise understanding of

9    what those risks are.

10       Since 2004, there have been two comprehensive reports

11   published by the U.S. Centers for Disease Control and

12   Prevention published on the complications and mortality

13   associated with abortion.  So that has given us a much more

14   detailed sort of accounting of the risks that we can go through

15   with patients.

16   Q.  Over the course of your career, has informed consent

17   process for abortion changed?

18   A.  Yes, because -- I mean, as I think all the experts that

19   have talked about this, and I agree, that informed consent

20   requires discussing the detail of the procedure or the

21   treatment that the patient may be given, the risks, the

22   benefits, and the alternatives, as well as, you know, what

23   would happen if the patient decides to do nothing.

24       Over the past 20 years, we now have a new abortion method,

25   medication abortion.  So that's a new alternative that we have

1    to explain to patients and make sure they understand.

2         And then in terms of doing nothing, the alternative, when a

3    patient is pregnant, is that they will continue to childbirth.

4    And if they have questions about the risks associated with

5    continuing to pregnancy -- a pregnancy to term, it's important

6    that we give accurate information about what those risks are.

7         And it's really quite clear that maternal mortality has

8    increased in this country over the past 20 years.  I was quite

9    disturbed to hear a practicing obstetrician-gynecologist say

10   that there were differing opinions about this.  The Centers for

11   Disease Control and Prevention have very clear data showing how

12   maternal mortality as increased.  I think from 1987, it was

13   about seven deaths per 100,000 live births; and in 2017, it's

14   about -- it's a little over 17.  And of course, those rates are

15   much higher for black woman and indigenous women in particular.

16   Q.  Dr. Grossman, did you also listen to the testimony of

17   Dr. Harrison and Dr. Goodwine-Wozniak?

18   A.  I did.

19   Q.  And in the abortion context, does an in-person examination

20   involve a pelvic examination?

21   A.  It does not.

22   Q.  And Dr. Grossman, is a pelvic examination needed to

23   determine whether a person has been the victim of sexual

24   assault?

25   A.  No.  I was also very disturbed to hear that.  The best way

GROSSMAN - DIRECT/SINGH                223

1   to -- as I talked about in my direct testimony, to assess

2   whether a patient is a victim of intimate partner violence,

3   including sexual assault, is to talk to the patient, also give

4   the patient an opportunity to give confidential information

5   using a written form.

6        As I think has been made clear, the model of telemedicine

7   that the plaintiffs are considering using involves as a

8   site-to-site model where the patient would be in the clinic or

9   in a facility; and so it would be possible to know whether the

10  patient is alone or accompanied by someone.

11       And if there's concern about the person that the patient is

12  with, arrangements can be made for the patient to be alone

13  while they would be having a video consultation with the

14  physician, who would be assessing them for their risk of

15  intimate partner violence or history of sexual assault.

16       We'd never say that a patient who does not disclose a

17  history of sexual assault, it would be -- it's very odd to

18  suggest that they needed to have a vaginal exam, whether with a

19  speculum or a digital exam, to determine they have been

20  sexually assaulted.

21  Q.  Do you believe that it is necessary to conduct both a

22  physical examination and an ultrasound examination prior to

23  medication abortion?

24  A.  I do not.  I don't believe that there is additive benefit

25  of doing both of those things for the vast majority of

1    patients.

2         The guidance is also very clear.  The guidance that is in

3    the FDA approved labeling for Mifepristone, as well in the

4    guidance for the American College of Obstetricians and

5    Gynecologists, say that either a physical examination or an

6    ultrasound may be performed to determine gestational age and to

7    confirm the pregnancy is intrauterine.

8         And of course, the ACOG guidance went even further in 2020

9    to say that patients who have a sure last menstrual period

10   within the past 56 days and no signs or symptoms of an ectopic

11   pregnancy don't need to have either an ultrasound or a physical

12   examination.

13   Q.   So you mentioned the ACOG guidance from 2020.  Did you also

14   hear Dr. Harrison testify about ACOG's 2014 guidance on

15   medication abortion?

16   A.   I did.

17   Q.   Has ACOG's recommendation concerning the performance of a

18   clinical evaluation ultrasound changed between 2014 and 2020?

19   A.   Yes, it has.

20   Q.   How?

21   A.   In the 2014 guidance, it said that all patients needed to

22   have an assessment by either ultrasound or physical examination

23   to assess gestational age and to rule out ectopic pregnancy.

24   And in the 2020 guidance, it said that patients with a sure

25   last menstrual period within the past 56 days and no signs or

GROSSMAN – DIRECT/SINGH                    225

1   symptoms of ectopic pregnancy, did not need to have either of

2   those things.

3   Q.  And did you also hear Dr. Harrison's testimony about your

4   2017 study entitled Safety of Medical Abortion Provided Through

5   Telemedicine Compared with In-person, which is Plaintiffs'

6   Exhibit 121?

7   A.  I did.

8   Q.  Did you understand her to criticize what she referred to as

9   the study's loss to followup rate?

10  A.  I did hear her say that, and I was a little confused

11  because she seemed to think that the data that we used for that

12  study involved -- was dependent on patients coming back to the

13  abortion clinic and that is not the case.

14      The data that we used for that study is essentially the

15  same data that she used in her 2006 article that she talked

16  about in her direct testimony.  We used the adverse event

17  reports that all clinicians are required to -- at that time

18  were required to report to the FDA and to the manufacturer, and

19  we reviewed all of those adverse event reports to -- in order

20  to assess the prevalence of these clinically significant

21  adverse events.

22      So it was not dependent on the patients coming back to the

23  clinic for follow-up to have their data included.  We looked at

24  all of the adverse events, regardless who identified them and

25  reported them.

1   Q.  And did you also hear Dr. Harrison testify about her
2   interpretation of the FDA's Mifeprex label?
3   A.  I did.
4   Q.  Do you agree with her opinion that the label has an
5   implicit assumption that a person will go to a healthcare
6   facility to receive Mifepristone?
7   A.  I do not share that view.  I have read the label many
8   times, and no where does it say that a patient needs to be in
9   the same room with the clinician who is providing the
10  medication abortion.  So there's nothing in there about that.
11  It is completely silent.

12      I do know that the FDA was aware that telemedicine was
13  being used to provide medication abortion when they updated the
14  label in 2016.  One of the papers that they reviewed was our
15  2011 Iowa study, and the data are included in the summary table
16  of overall outcomes for medication abortion.  So they were
17  aware of telemedicine and did not say anything about it in the
18  label.
19  Q.  And just one final question.  In a site-to-site model of
20  telemedicine for medication abortion care, what happens when a
21  patient complains of symptoms when arriving at the clinic for
22  their medication abortion pills?
23  A.  So if a patient has symptoms that are unusual, such as pain
24  or concerns for an infection or unusual bleeding, it may be
25  necessary for the patient to have further evaluation.

1    Sometimes in some settings, if there's a nurse practitioner on

2    site, maybe they could do a pelvic exam to evaluate, say, a

3    patient might have a signs of a sexually transmitted infection.

4         Sometimes though, it's urgent that the patient be evaluated

5    because of a potential risk of ectopic pregnancy in which case

6    the patient would be referred to a place, generally an

7    emergency department, where they could be evaluated

8    appropriately for an ectopic pregnancy.

9         And I would argue that in those cases, you know, patients

10   are being facilitated to have an evaluation more quickly

11   because they were evaluated at least initially by telemedicine

12   and a concern was identified, and then they were promptly

13   referred to get the additional care that they need, they needed

14   as opposed to if they had potentially waited another week or

15   two to have a visit, the next possible visit where they would

16   see the physician in person, their care might have been

17   delayed.

18        And just in relation to some of the other testimony we

19   heard, I would say that kind of assessment is also true for

20   patients that might have concerning social situations.  So

21   patients may be evaluated in the course of a telemedicine visit

22   for intimate partner violence, and if it's concerning that the

23   patient is in a dangerous situation, they can be then promptly

24   referred to social services, for example, and get the help they

25   need.  More quickly than if they again had to wait a week or

STEINBERG - DIRECT/SHUBE                    228

1    two for the next available in person appointment with a

2    physician.

3    Q.  Thank you, Dr. Grossman.  No further questions.

4            THE COURT:  Cross-examine?

5            MR. BARTOLOMUCCI:  Your Honor, we have no questions

6    for Dr. Grossman.

7            THE COURT:  All right.  Very good.  Dr. Grossman,

8    thank you very much for your added testimony.  Best wishes to

9    you.

10           THE WITNESS:  Thank you very much, Your Honor.

11           THE COURT:  And your next rebuttal witness.

12           MS. SINGH:  Yes, Your Honor.  Plaintiffs call

13   Dr. Julia Steinberg.

14           THE COURT:  Is it Steinberg?  Did I get it?

15           THE WITNESS:  You did, Your Honor.

16           THE COURT:  Okay, good.  Hi, Dr. Steinberg.

17           THE WITNESS:  Well, hello, Your Honor.

18           THE COURT:  I'm Judge Barker, and the clerk will

19   administer the oath prior to your testimony.  So would you

20   raise your right hand and be sworn, please?

21                    *(Witness sworn.)*

22        JULIA STEINBERG, PLAINTIFFS' WITNESS, SWORN

23                  DIRECT EXAMINATION

24           THE COURT:  Thank you.  All set?

25           THE WITNESS:  Yes.

1    MS. SHUBE:  May I begin, Your Honor?

2    THE COURT:  Yes, Miss Shube.

3  BY MS. SHUBE:

4  Q.  Would you please state and spell your full name for the

5  record?

6  A.  My name is Julia Renee Steinberg, J-U-L-I-A, R-E-N-E-E,

7  S-T-E-I-N-B-E-R-G.

8  Q.  Thank you, Dr. Steinberg.  What is your professional

9  discipline?

10  A.  I'm trained as a social psychologist.

11  Q.  And do you have a specialty within social psychology?

12  A.  My research specializes -- is at the intersection of

13  psychology and reproductive health.

14    MS. SHUBE:  I would like to call up Stipulated

15  Exhibit 12, please.

16  BY MS. SHUBE:

17  Q.  Dr. Steinberg, is this your CV?

18  A.  It is.

19  Q.  And does Stipulated Exhibit 12 provide an accurate

20  representation of your educational background and professional

21  experience?

22  A.  It does.

23  Q.  Does it provide a complete and accurate list of your

24  publications?

25  A.  Yes.

STEINBERG – DIRECT/SHUBE                    230

1   Q.  Have there been any material changes to the information

2   contained in the CV since it was last updated?

3   A.  No, no material changes.

4   Q.  I'm done with that exhibit.  Thank you.

5       I'm going to try to keep this not too long.  So if you

6   wouldn't mind, we won't go over your full educational

7   background; but could you please list your advanced degrees?

8   A.  Sure.  So I have a doctoral degree and a master's degree in

9   social psychology from Arizona State University.

10  Q.  And Dr. Steinberg, where do you currently work?

11  A.  I am in the Department of Family Science in the School of

12  Public Health at the University of Maryland, College Park.

13  Q.  And does your work consist of doing research?

14  A.  It does.

15  Q.  And please describe the kinds of research that you do.

16  A.  So broadly speaking, my research is at the intersection of

17  psychology and reproductive health; and one of my lines of work

18  has focused around understanding the association between

19  abortion and mental health.

20  Q.  Do you have any publications in peer-reviewed journals?

21  A.  I do.

22  Q.  Roughly, how many peer-reviewed publications do you have?

23  A.  Over 30.

24  Q.  And have you received any awards for such publications?

25  A.  Yes, I have.

Q.  Do you recall what those awards were?

A.  So in 2013, I believe, for a 2012 article, I received an award from the *Journal of Contraception* --

THE COURT REPORTER:  Please slow down.

THE COURT:  Wait.  I know we're trying to go fast; but the court reporter has to get it.  So don't go that fast, Dr. Steinberg.

THE WITNESS:  All right.  So I received an award for an outstanding article, the outstanding article of the year published in *Contraception* in 2012.

For the last two years in 2019 and 2020, I have been one of the ten -- I have had one of the ten most-cited articles in abortion research.

BY MS. SHUBE:

Q.  Do you hold any positions in professional organizations?

A.  I am the chair of the Reproductive Issues Committee in the -- Division 35 of the American Psychological Association.

Q.  Have you served on any editorial boards?

A.  Yes, I currently serve on two.

Q.  And for which journals?

A.  For *Contraception* and *Social Science and Medicine*.

Q.  Have you served as a peer reviewer of any journals?

A.  Yes, I serve as the peer reviewer for a variety of journals.

Q.  And without -- there's a lot of them.  Without naming all

1  of them, what are the kinds of journals for which you've served

2  as a peer reviewer?

3           THE COURT:  Are they listed on the CV?

4           MS. SHUBE:  I believe so.

5           THE COURT:  Let's just rely on that.  So we can go --

6  since this is a rebuttal witness, we can go to the heart of the

7  matter.

8           MS. SHUBE:  The heart of the matter.  Okay.

9  BY MS. SHUBE:

10 Q.  Have you provided testimony as an expert on abortion and

11 mental health before?

12 A.  I have done expert reports on this topic, yes.

13 Q.  And have you provided testimony in a deposition as an

14 expert on abortion mental health before?

15 A.  Yes, I have.

16          MS. SHUBE:  Your Honor, I'd like to offer Dr. Julia

17 Steinberg as an expert in social psychology and the

18 relationship between abortion and mental health.

19          THE COURT:  Any objection?

20          MR. SCHAERR:  Not to that, Your Honor.

21          THE COURT:  All right.  The proffer is not opposed,

22 and so I accept it as well; and she may testify according to

23 that expertise.

24 BY MS. SHUBE:

25 Q.  Dr. Steinberg, are you offering opinions in this case today

1   in response to the testimony provided by Dr. Priscilla Coleman

2   and Dr. Aaron Kheriaty --

3           THE COURT:  Whoa, whoa, whoa.  You're going too fast

4   again.  Say that again but at a normal pace.

5   BY MS. SHUBE:

6   Q.  Dr. Steinberg, are you offering opinions in this case today

7   in response to the testimony provided by Dr. Priscilla Coleman

8   and Dr. Aaron Kheriaty?

9   A.  Yes.

10  Q.  Did you observe the testimony of Dr. Priscilla Coleman and

11  Dr. Aaron Kheriaty?

12  A.  Yes.

13  Q.  In your expert opinion, does abortion increase the risk of

14  mental health problems?

15          MR. SCHAERR:  Objection, Your Honor.  That's beyond

16  the scope.  That is not proper rebuttal because I don't believe

17  there's any testimony to the contrary.

18          THE COURT:  Well, I think that's what she's eliciting.

19  So the objection is overruled.

20  A.  No.

21  BY MS. SHUBE:

22  Q.  Why not?

23  A.  Because the overwhelming majority of evidence shows that

24  abortion does not cause or increase risk of women's mental

25  health problems.

STEINBERG – DIRECT/SHUBE                    234

1   Q.  And what is the basis for your opinion in this matter?

2   A.  So the basis for my opinion is various reviews, such as

3   those put out by the American Psychological Association, the

4   National Collaborating Center for Mental Health in the U.K.,

5   the National Academies of Science and Engineering and Medicine,

6   as well as my own research using various data, and The Turnaway

7   Study.

8   Q.  Thank you.  So you mentioned the Academy --

9           THE COURT:  Hang on a minute.  I'm not getting

10  rolling.

11                  (Off-the-record discussion.)

12          THE COURT:  We're looking at the simultaneous transfer

13  from the court reporter, and it's not quite keeping up.  So I

14  was inquiring about that.

15          Would you go back to your last question?  You were

16  responding to the Coleman-Kheriaty testimony about a connection

17  between abortion and mental health.  So would you pick up

18  there, please.

19          MS. SHUBE:  Sure, Your Honor.

20          THE COURT:  She said there is no mental health

21  detriment that comes from abortion.

22          Was that your testimony, Dr. Steinberg?

23          THE WITNESS:  Yes, it was.

24          THE COURT:  Okay.

25

1   BY MS. SHUBE:

2   Q.  Dr. Steinberg, you mentioned a few sources that you relied

3   on to form the basis of your opinion, and one that you

4   mentioned was the National Academies of Science and Engineering

5   in Medicine report; is that correct?

6   A.  Yes.

7   Q.  Do you consider the report to be authoritative and

8   reliable?

9   A.  Yes, I do.

10  Q.  Please turn to the document marked --

11              (Off-the-record discussion.)

12          THE COURT:  Go ahead.  Sorry for the fits and starts.

13  BY MS. SHUBE:

14  Q.  Could you please turn to the document marked PX111 for

15  identification.  And Dr. Steinberg, can you briefly describe

16  what this report examined with respect to abortion and mental

17  health?

18      I'm sorry, Dr. Steinberg.  First, would you please -- could

19  you please describe what this report is.

20  A.  Sure.  It's a report on the safety and quality of abortion

21  care in the United States.

22          THE COURT:  What's the date on it?

23          THE WITNESS:  2018.

24          THE COURT:  Okay.

25

BY MS. SHUBE:

Q.   And where did the report -- who put out the report,

Dr. Steinberg?

A.   The National Academies of Science and Engineering and

Medicine.

Q.   Thank you.  Can you briefly describe what the report

examined with respect to abortion and mental health?

A.   Sure.  It examined whether there was evidence regarding

whether abortion increased risk of various mental health

disorders.

Q.   Can we please turn to page 25 of the exhibit?

          MR. SCHAERR:  Your Honor, I object to this line of

questioning.  This is not responsive to any testimony that was

given today by Dr. Kheriaty or Dr. Coleman.

          MS. SHUBE:  Your Honor --

          THE COURT:  Yes, Miss Shube.

          MS. SHUBE:  If I may, Dr. Kheriaty testified just a

few moments ago that abortion was causing negative health

outcomes to his patients, and that he had many conversations

with them about it, and he provided testimony on this exact

precise issue.  And Dr. Steinberg is here to rebut that

testimony with evidence from respected organizations.

          THE COURT:  That's my recollection with respect to

Dr. Kheriaty's testimony and Dr. Coleman's testimony.  So our

recollections are not the same, on that, sir.  So I'll overrule

1    the objection.

2            MR. SCHAERR:  Okay, Your Honor.

3    BY MS. SHUBE:

4    Q.  Dr. Steinberg, could you please read on page 25 where it

5    starts with, "Mental health effects"?

6    A.  Sure.  "The committee identified a wide array of research

7    on whether abortion increases women's risk of depression,

8    anxiety, and/or posttraumatic stress disorder, and concludes

9    that having an abortion does not increase a woman's risk of

10   these mental health disorders."

11           MS. SHUBE:  Your Honor, may I have a moment to confer

12   with my colleagues?

13           THE COURT:  Yes, you may.

14           MS. SHUBE:  No further questions.

15           THE COURT:  Mr. Schaerr, cross?

16           MR. SCHAERR:  Yes.

17                    CROSS EXAMINATION

18   BY MR. SCHAERR:

19   Q.  Dr. Steinberg, how are you?

20   A.  Hello.  Good, thanks.

21   Q.  Now, Dr. Steinberg, today you are not offering any opinion

22   on whether the laws challenged in this case or in this phase of

23   the case impose a burden on women; isn't that correct?

24   A.  I am here as an expert on the science of abortion mental

25   health.

STEINBERG – CROSS/SCHAERR                238

1   Q.  But you have not offered any opinion on whether the laws at

2   issue here impose a burden on women; isn't that correct?

3              MS. SHUBE:  Asked and answered, objection.

4              MR. SCHAERR:  It has not been answered, Your Honor.

5              THE COURT:  Mr. Schaerr, she's talking to me when she

6   makes an objection.

7              MR. SCHAERR:  I'm sorry.

8              THE COURT:  She's not asking what you think.  I'll ask

9   you.

10             The scope of the witness' testimony did not include

11  those things, and so she said what she is testifying to.  So go

12  to your next point.  The question has been answered.

13  BY MR. SCHAERR:

14  Q.  Okay.  And conversely, Dr. Steinberg, you have not offered

15  any opinion on whether the laws at issue in this proceeding

16  benefit women; isn't that right?

17             MS. SHUBE:  Objection, Your Honor.

18             THE COURT:  She wasn't asked that question.  Is that

19  what you want to ask her?  She was not asked those questions.

20  That's what she keeps saying, "I wasn't asked those things."

21  If you want her to testify to those things, I bet you don't,

22  Mr. Schaerr, you had better cut it off right there.

23  BY MR. SCHAERR:

24  Q.  And, Dr. Steinberg, you have not been asked any questions

25  about whether the laws at issue here benefit women; is that

1    correct?

2         THE COURT:  I'll sustain the objection for the reasons

3    I just stated.  Did you not hear me?

4         MR. SCHAERR:  I'm sorry, Your Honor.

5    BY MR. SCHAERR:

6    Q.  Now, Dr. Steinberg, you did a post-doctoral fellowship at

7    the Bixby Center for Global Reproductive Health; isn't that

8    right?

9    A.  Yes, that's correct.

10   Q.  And people at the Bixby Center generally support a woman's

11   right to terminate a pregnancy; isn't that correct?

12        MS. SHUBE:  Objection.

13        THE COURT:  Wait a minute.  What's the objection,

14   Miss Shube?

15        MS. SHUBE:  Relevance, lack of foundation.

16        THE COURT:  He may ask if she knows anything about

17   that.

18        So you do have to lay the foundation.

19   BY MR. SCHAERR:

20   Q.  Do you know anything about the views of people at the Bixby

21   Center about a woman's right to terminate a pregnancy?

22        THE COURT:  Today or --

23        MS. SHUBE:  Objection.

24        THE COURT:  Wait a minute.  Wait just a minute,

25   Miss Shube.  Are you asking that question as to the Bixby,

1   whatever it is, today or when she was affiliated with it?

2              MR. SCHAERR:  I'm sorry, when you were affiliated with

3   them, Dr. Steinberg.

4              THE COURT:  Were you familiar with their views on a

5   woman's right to choose?

6              THE WITNESS:  I mean, I was not -- I did not discuss

7   with the center the views on a woman's right to choose.

8   BY MR. SCHAERR:

9   Q.  In the past you have worked with researchers who support a

10  woman's right to terminate a pregnancy?

11  A.  I have not asked everyone's views on whether they support

12  the right to terminate a pregnancy.

13  Q.  Have you worked with any researcher who expressed to you a

14  belief in the right of a woman to choose to terminate a

15  pregnancy?

16  A.  Yes, I have.

17  Q.  And did you believe that those researchers were capable of

18  approaching scientific issues fairly and objectively,

19  notwithstanding their views on abortion?

20  A.  Yes.

21  Q.  And, in fact, you organized a symposium on abortion stigma

22  for the National Abortion Federation in 2010, didn't you?

23  A.  I would have to look at my CV to look at what year that

24  was.

25  Q.  But you recall organizing that symposium?

1  A.  Yes, I do.

2  Q.  Okay.  And you've given talks to the North American Forum

3  on Family Planning; correct?

4  A.  Yes, that's a professional organization.

5  Q.  Okay.  And the Guttmacher Institute; is that correct?

6          THE COURT:  What about it, sir?

7  BY MR. SCHAERR:

8  Q.  You've given presentations to that group, correct?

9  A.  I have given presentations at the Guttmacher Institute,

10 yes.

11 Q.  And you've given presentations to the Catholics for Choice;

12 is that correct?

13 A.  I have been part of, I guess, a conference where people

14 were -- from there may have been attending, yes.

15 Q.  Okay.  And is it true that you have spoken to that group?

16 A.  If by spoken you mean people from that group were at a

17 conference that I was at, yes.

18 Q.  My question is did you speak at that conference?

19 A.  At what conference?

20 Q.  The conference organized by Catholics for Choice.

21 A.  I would have to look at my CV to see if it was organized by

22 Catholics for Choice.

23         THE COURT:  What's your point, Mr. Schaerr?  What's

24 your point?

25         MR. SCHAERR:  I'm just trying to find out whether she

1    spoke at a conference involving that group.

2           THE COURT:  I know, but you've gone through a whole

3    list of them.  And if you are reading from her CV, then the CV

4    speaks for itself.  But what makes this relevant on rebuttal

5    here?  What's the point you're trying to make?

6    BY MR. SCHAERR:

7    A.  Is it fair to say, Dr. Steinberg --

8           THE COURT:  No, answer my question, Mr. Schaerr.

9    What's the point you're trying to make by asking about those

10   appearances?

11          MR. SCHAERR:  It's impeachment testimony, Your Honor.

12   It goes to bias.

13          THE COURT:  Is it your contention that all those

14   organizations are alike, they are all of one stripe?  What's

15   the bias?

16          MR. SCHAERR:  Well, they all do have one thing in

17   common, and that is that they are publicly pro-choice.

18          THE COURT:  Well, ask her if that's the kind of

19   organization she presents to.  Just get to it.

20          MR. SCHAERR:  Okay.

21   BY MR. SCHAERR:

22   Q.  Is it true that the organizations we've mentioned are

23   generally pro-choice in the views that they expressed to the

24   public on abortion?

25          THE COURT:  If you know.

STEINBERG - CROSS/SCHAERR                243

1   A.  I mean, I don't know that I've discussed all the views of

2   all with the heads of those organizations.

3   Q.  But the people that you've met in those organizations, is

4   it true, is it fair to say that they are generally pro-choice?

5   A.  I have not asked people of those organizations what their

6   views are on abortion.

7            MR. SCHAERR:  Okay.  I don't have any further

8   questions, Your Honor.

9            THE COURT:  Redirect, Ms. Shube?

10           MS. SHUBE:  May I have a moment --

11           THE COURT:  Yes, Your Honor.

12           MS. SHUBE:  -- to confer?

13           THE COURT:  Yes.

14           MS. SHUBE:  No redirect, Your Honor.

15           THE COURT:  Have you finished your questions of

16  Dr. Steinberg on rebuttal?

17           MS. SHUBE:  Yes, Your Honor.

18           THE COURT:  And so can she be excused from her

19  subpoena?

20           MS. SHUBE:  Yes.  Thank you, Your Honor.

21           THE COURT:  Do you have any objection to her being

22  excused, Mr. Schaerr?

23           MR. SCHAERR:  No, Your Honor.

24           THE COURT:  Okay.  So thank you very much,

25  Dr. Steinberg.  You've done the work we needed you to do, and I

1    appreciate it, as the parties do as well.  So we wish you good

2    luck.

3         THE WITNESS:  Thank you, Your Honor.

4                   (Witness excused.)

5         THE COURT:  Miss Shube, any further rebuttal evidence?

6         MS. SHUBE:  Your Honor, I may wait for my colleague to

7    appear.  And there we go.

8         THE COURT:  You mean the commander in chief of the

9    plaintiffs' team?

10        MS. SHUBE:  Yes.  Thank you, Your Honor.

11        THE COURT:  Miss Singh, is there any further rebuttal?

12        MS. SINGH:  No, Your Honor.

13        THE COURT:  The plaintiffs rest on rebuttal?

14        MS. SINGH:  Yes, Your Honor, plaintiffs rest.

15        THE COURT:  Is there any surrebuttal, Mr. Fisher?

16        MR. FISHER:  There is none, Your Honor.  Thank you.

17        THE COURT:  Have the parties placed before the Court

18   all of the evidence that you intend to present in this trial?

19   Have you, Miss Singh.

20        MS. SINGH:  Yes, Your Honor.  And I had just a couple

21   of questions that might be relevant to the answer, if I could

22   run those by you, they are housekeeping items.

23        THE COURT:  Yes.

24        MS. SINGH:  One, we wanted to inquire about the joint

25   stipulations of fact and ask if they are automatically in

1    evidence or if we need to move them into evidence.

2            THE COURT:  Well, you need to move them into evidence,

3    and they come in expeditiously because they are joint

4    stipulations.  But they have to nonetheless be ushered into

5    evidence.

6            MS. SINGH:  At this time, then, plaintiffs would like

7    to move the joint stipulations of fact, which are ECF numbers

8    347 and 367 into evidence, please.

9            THE COURT:  All right.  Any objection to those,

10   Mr. Fisher?

11           MR. FISHER:  No objection, Your Honor.

12           THE COURT:  Pursuant to stipulation, those exhibits

13   are admitted.

14       (Plaintiffs' Exhibits 347 and 367 received in evidence.)

15           MS. SINGH:  In addition, plaintiffs would like to move

16   PX1 to PX3 into evidence.  Those are official versions of the

17   laws that plaintiffs challenge, and they aren't available on

18   Westlaw or Lexis.  And we wanted to provide them for the

19   Court's convenience because we cited to them in our pretrial

20   brief.

21           THE COURT:  Any objection to that, Mr. Fisher?

22           MR. FISHER:  No objection.

23           THE COURT:  Those exhibits are admitted.

24       (Plaintiffs' Exhibits PX1, PX2, PX3 received in evidence.)

25           MS. SINGH:  And lastly, Your Honor, one of the Planned

1   Parenthood doctor's names ended up on the record and we would
2   like to ask that it be either redacted or stricken from the
3   transcript.

4        THE COURT:  I'll order the redaction.

5        MS. SINGH:  And that's at Page 57, Line 14 of the
6   Day 1 transcript.

7        THE COURT:  Okay.  The court reporter has that.  She's
8   nodding.

9        MS. SINGH:  I have no other items, Your Honor.  Thank
10  you.

11       THE COURT:  Okay.  So have the parties placed before
12  the Court all of the evidence you intend to present in this
13  trial?  Have you, Miss Singh?

14       MS. SINGH:  Yes, Your Honor.

15       THE COURT:  And you, Mr. Fisher?

16       MR. FISHER:  Yes, Your Honor.

17       THE COURT:  As to these issues that were, of course,
18  just part of the overall issues to be tried, the evidence is
19  closed.

20       So it's 5:30.  As I told you yesterday, I very much
21  want to avoid your filing any more paper.  We have a ton of
22  paper.  But I do want you to have a chance to do a bit of a
23  closing argument, although I have been paying close attention,
24  and I don't think I need to be brought along like you might
25  feel you should with a jury.

1          So do you want that opportunity for a closing
2     argument, Miss Singh?
3          MS. SINGH:  Yes, Your Honor, please.
4          THE COURT:  And do you, Mr. Fisher?
5          MR. FISHER:  Yes, please, Your Honor.
6          THE COURT:  All right.  So are you ready to go now?
7          MS. SINGH:  Could I just have a few moments?
8          THE COURT:  What does that mean, five minutes?
9          MS. SINGH:  Five minutes, Your Honor.
10         THE COURT:  Is that agreeable to you Mr. Fisher?  Are
11    you ready to go?
12         MR. FISHER:  I am, Your Honor.  That's perfectly fine.
13         THE COURT:  Okay.  We'll take a five minute recess.
14         MS. SINGH:  Thank you.
15                    (Recess taken.)
16                    (Open court.)
17         THE COURT:  All right.  I believe we're back for the
18    closing arguments.  So I'll recognize you Miss Singh.  Could
19    you give me an idea --
20         MS. SINGH:  It's about 30 minutes, Your Honor.
21         THE COURT:  Whew, that's a lot.  Do it as quickly as
22    you can.  This was only two days.  It's not like I've had a
23    failure of recall here.
24         But that doesn't mean you should talk so fast, because
25    the court reporter will -- she's been here all day, too.

248

1      MS. SINGH:  I understand.

2      THE COURT:  So distill it as best you can.

3      MS. SINGH:  I will do my best, Your Honor.

4      May it please the Court.

5      THE COURT:  Miss Singh.

6      MS. SINGH:  Thank you, Your Honor.  May it please the

7  Court.  Plaintiffs' claims in this case are governed by the

8  undue burden standard.  Last Friday, March 12, the Seventh

9  Circuit issued a decision interpreting the undue burden

10  standard in light of the Supreme Court's decision in June

11  Medical Services v. Russo.

12      THE COURT:  I believe I know something about that

13  case.

14      MS. SINGH:  I believe you do, Your Honor.  My point

15  was just that that decision, of course with this Court's

16  application of the undue burden standard in its summary

17  judgment decision in this case --

18      THE COURT:  I know you are reading, so you just need

19  to do it little slower.  It does comport with the undue burden

20  statement or position that we tried to take in the summary

21  judgment order.  Yes, I agree.

22      MS. SINGH:  As well as the discussion of the undue

23  burden standard in plaintiffs' pretrial brief.

24      In many ways, my closing argument may sound similar to

25  what we said at the beginning of this trial, and that is

1   because the evidence presented shows that plaintiffs have, in

2   fact, done what we said we would do.  The evidence presented

3   demonstrates that each of the laws at issue in this phase of

4   the trial, namely the telemedicine ban, the in-person

5   examination requirement, the in-person counseling requirement,

6   and the ultrasound requirement, is unconstitutional.

7        The telemedicine ban and the in-person examination

8   requirement work in tandem to prevent healthcare providers from

9   offering medication abortion through site-to-site telemedicine.

10  Plaintiffs have challenged both laws on due process and equal

11  protection grounds and respectfully submit that we are entitled

12  to relief on each claim.

13       An initial matter, the telemedicine ban and the

14  in-person examination requirement single out abortion patients

15  for disfavored treatment.  It is undisputed that outside the

16  abortion context, Indiana has authorized a dramatic expansion

17  of the use of telemedicine in recent years.  This is likely no

18  surprise.  Just as science and medicine continue to advance, so

19  does technology.

20       Apart from abortion medications and certainly highly

21  addictive opioids, all other drugs may be prescribed to Indiana

22  patients by telemedicine without an in-person examination by

23  the prescriber.  The uncontested evidence shows that healthcare

24  providers throughout Indiana utilize telemedicine to deliver

25  healthcare services to patients, including services --

1    THE COURT:  Stop.  Now start.

2    MS. SINGH:  -- including services that are far more

3    complex than medication abortion.  For example, stipulated

4    facts establish that the St. Joseph health system, whose

5    hospitals are licensed by the health department, has a

6    telemedicine program for acute stroke patients.  The Beacon

7    Health system, whose hospitals are licensed by the health

8    department, operates a telemedicine program to serve patients

9    with urgent care needs.

10    Indiana University Health, whose hospitals are

11    licensed by the health department, uses telemedicine to deliver

12    a variety of services to patients, including follow-up care to

13    kidney transplant patients.

14    Indiana practitioners also provide a broad range of

15    reproductive healthcare services via telemedicine.  For

16    example, even Defendants' own expert, Dr. Stroud, treats

17    infertility patients via telemedicine.  Laura Miller testified

18    that Planned Parenthood provides contraceptive services and STI

19    testing through telemedicine.

20    And Dr. Grossman testified that OB/GYNs across the

21    country provide routine obstetrics care by telemedicine and

22    also use it to prescribe medications that are riskier than

23    Mifepristone and Misoprostol, have known contraindications, or

24    pose unknown fetal risk.  Such medications include antibiotics

25    and pain medications.

1          Grace Hutson, a lifelong Indiana resident, testified

2     that her physician prescribed her antibiotics after seeing her

3     in a telemedicine visit.  The record shows that the use of

4     telemedicine has accelerated over the past year during the

5     COVID 19 pandemic.  The telemedicine ban and the in-person

6     examination requirement fail the undue burden test for two

7     independent reasons:  First, Defendants have not met their

8     burden of showing that these laws or the specifications that

9     they embody are reasonably related to a valid State interest.

10         To the contrary, the weight of the evidence

11    demonstrates that these laws fail to meaningfully advance the

12    State's interest in patient's health.  Dr. Grossman, a board

13    certified OB/GYN and public health researcher with decades of

14    experience providing and studying abortion care, testified

15    about the substantial body of medical literature demonstrating

16    that medication abortion is just as safe and effective when

17    provided by telemedicine as when provided in person.

18         For example, Dr. Grossman is the lead author of a 2017

19    study that included over 19,000 medication abortions provided

20    in a seven-year period.  The study's main finding was that the

21    prevalence of significant adverse events was low overall and

22    that there was no significant difference in adverse clinical

23    events between telemedicine abortions and in-person abortions.

24         Moreover, the most recent practice bulletin on

25    medication abortion published by the American College of

Obstetricians and Gynecologists, or ACOG, declared that
"Medication abortion can be provided safely and effectively by
telemedicine with a high level of patient satisfaction."

Likewise, after reviewing the relevant medical
literature, the National Academies of Sciences, Engineering,
and Medicine concluded that, "There's no evidence that the
dispensing or taking of Mifepristone tablets requires the
physical presence of a clinician to ensure safety or quality."

Given this evidence, it is not surprising that
telemedicine is commonly used to provide medication abortion in
other states.  Laura Miller testified that Planned Parenthood
clinics outside Indiana use telemedicine to provide medication
abortion.  And Amy Hagstrom Miller testified that many of the
clinics she manages in other states have used telemedicine for
abortion care.

Dr. Grossman testified that abortion providers using
site-to-site telemedicine to provide medication abortion in
other states have found their interactions with patients to be
essentially the same as during an in-person visit.  The State
presented no evidence whatsoever concerning the safety of
telemedicine as compared to an in-person abortion.

Although Dr. Harrison offered opinions about the
safety of medication abortion generally, based on 15-year-old
data, she did not testify that medication abortion is safer
when provided in person than when provided by telemedicine, nor

could she, given the clear findings in the medical literature.

The opinions of Dr. Goodwine-Wozniak concerning the benefits of an in-person abortion are based solely on her personal experience as a clinician, but she has never provided an abortion nor attempted to use telemedicine for any type of care.  Accordingly, her opinions deserve little, if any, weight.

Notably, although Dr. Goodwine-Wozniak's testimony focused on the benefits of a pelvic examination prior to medication abortion, the in-person examination requirement does not require a pelvic examination or a physical examination of any kind.  It simply states that a physician shall examine a pregnant woman, in person, before prescribing or dispensing an abortion drug.  The requirement could be satisfied by taking her vital signs.

The law's failure to meaningfully advance a State's interest in patient health is sufficient in and of itself to render them unconstitutional, but the telemedicine ban and the in-person examination requirement failed the undue burden test for a second reason.  The burdens that the laws impose on abortion access substantially outweigh their benefits.

There are only seven clinics in Indiana that provide abortion care.  Collectively, Laura Miller of Planned Parenthood; Amy Hagstrom Miller of Whole Woman's Health Alliance; and Dr. Haskell of Women's Med represent six of those

1    clinics -- excuse me, six of those providers.

2         They testified that their respective clinics are each

3    open only a handful of days each month, and the biggest factor

4    affecting the frequency with which they provide care is

5    physician availability.

6         If the telemedicine ban and the in-person examination

7    requirement were struck down, they would be able to offer

8    medication abortion care nearly every day each week.

9         Dr. Glazer testified that he currently has to drive

10   for hours to reach Women's Med in the South Bend Clinic, which

11   limits the frequency with which he can provide care at those

12   clinics.  If he could use telemedicine, he would be willing and

13   able to provide medication abortions nearly every day of the

14   week, including evenings and weekends.

15        Amy Hagstrom Miller testified that one of the

16   physicians providing abortion care at the South Bend Clinic had

17   to stop traveling to the clinic for a period of time for

18   security reasons after an antiabortion extremist threatened her

19   family.  If that physician could use telemedicine, security

20   concerns would not interfere with her ability to provide

21   medication abortions.

22        All of the clinic witnesses testified that

23   implementing telemedicine would significantly reduce the amount

24   of time that it takes a patient to obtain an abortion.  Right

25   now, many patients are having to wait two weeks or more.

1      Delayed access to abortion burdens patients in several

2 ways:  First, it is undisputed that the medical risk of both

3 pregnancy and abortion increase significantly with gestational

4 age.  Consequently, delayed access to abortion poses risks to

5 patient health.

6      Second, delayed access to abortion means that patients

7 must cope with the physical symptoms of pregnancy for longer

8 and will have a harder time concealing their pregnancies.

9 This, in turn, increases patient's levels of stress and

10 anxiety.

11     Cassie Herr, a nurse practitioner, testified that a

12 substantial number of patients she sees at Women's Med

13 experience pregnancy-related complications or nausea.  Both

14 Cassie Herr and Grace Hutson testified that while they were

15 waiting for an abortion in Indiana, they experienced severe

16 nausea, which caused them significant anxiety and emotional

17 distress.

18     Third, patients were delayed ten weeks LMP, will no

19 longer have the option of medication abortion, and they will

20 not be able to obtain care at the abortion clinics in South

21 Bend or Lafayette.  Patients delayed past the first trimester

22 will not be able to obtain an abortion at any Indiana abortion

23 clinic.

24     Amy Hagstrom Miller testified that the telemedicine

25 ban and the in-person examination requirement also increased

1    the cost of abortion care at the South Bend clinic because the

2    clinic has to fly many of its physicians in from out of state

3    and pass those costs on to its patients.

4           The State's attempts to minimize these burdens falls

5    flat.  The record plainly shows that the impact of invalidating

6    the telemedicine ban and the in-person examination requirement

7    would not merely permit telecommuting for abortion providers;

8    rather, invalidating those laws would eliminate substantial

9    obstacles to abortion access for numerous abortion patients.

10   Because of substantial obstacles to abortion access caused by

11   the telemedicine ban and in-person examination requirement are

12   not offset by proportionate benefits, the laws violate the

13   undue burden standard.

14          With respect to the in-person counseling and

15   ultrasound requirements, these laws work in tandem to require

16   that abortion patients make two trips to an abortion provider

17   to obtain abortion care.

18          If these laws were struck down, abortion patients

19   would still have to make an in-person trip to obtain an

20   abortion, but only -- excuse me.  If these laws were struck

21   down, abortion patients would still have to make an in-person

22   trip to obtain an abortion, which is one rather than two.

23          Plaintiffs challenge the in-person counseling

24   requirement on due process grounds and both the in-person

25   counseling and ultrasound requirements on equal protection

1    grounds.  The evidence shows that we are entitled to relief on

2    each of these claims.

3            As an initial matter, the in-person counseling and

4    ultrasound requirements single out abortion patients for

5    disfavored treatment.  Indiana law does not require patients

6    seeking any other medical care to obtain counseling or provide

7    informed consent in person, nor does Indiana law micromanage

8    the provision of ultrasound examinations to other kinds of

9    patients.

10           Notably, outside the abortion context, a pregnant

11   patient needing an ultrasound exam can go to any qualified

12   provider to get one.  Defendants have not met their burden of

13   showing that the in-person counseling requirements or the

14   classifications that they draw are reasonably related to a

15   valid state interest.  To the contrary, the weight of the

16   evidence demonstrates that this law fails to meaningfully

17   advance the state's interest in informed consent to abortion.

18           The evidence shows that today's telemedicine

19   technology permits face-to-face communication between a

20   provider and a patient that is comparable to an in-person

21   interaction.  As a result, oral state-mandated information can

22   be provided just as effectively via telemedicine as in person.

23           Likewise, written state-mandated information can be

24   securely and effectively transmitted by electronic means.

25   Cassie Herr, who currently leads state-mandated information

sessions at Women's Med, testified that she could do so just as effectively without being in the same room as the patient.

Laura Miller testified that practitioners at Planned Parenthood already use telemedicine technology to counsel patients about birth control and sexually transmitted infections.

Grace Hutson testified that she has been receiving mental health counseling using telemedicine in Indiana and receiving healthcare information electronically for over two years, which has made it easier for her to access care without struggling and dealing with the stressors of taking off time of work or getting to and from her appointments.

Additionally, Dr. Grossman testified that a qualitative study of patients' experiences using telemedicine for state-mandated preabortion information sessions in Utah found that patients' experiences were positive.

Sorry about that, Your Honor.

THE COURT:  Court reporter is glad.

MS. SINGH:  I'm glad to give her a break.  I'm almost done.  Sorry about that.

Patients reported that telemedicine was easy to use and that the person providing the information was attentive to their emotions over video.

Defendants' expert, Dr. Stroud, has no basis to compare the effectiveness of preabortion counseling and

obtaining a patient's informed consent to abortion in person as
compared to by telemedicine because he has no experience using
telemedicine for these purposes and has not provided abortion
care in more than 25 years.

Similarly, Dr. Coleman is not a clinician and
therefore has no experience obtaining informed consent to
medical intervention.  Her opinions about in-person abortion
counseling are not grounded in reliable research findings.
Instead, they are merely ipsa dixit and tainted by her
ideological opposition to abortion.

Dr. Kheriaty's opinions about the relative benefits of
in-person abortion counseling compared to telemedicine abortion
counseling similarly lack a reliable basis in the witness's
expertise or personal experience.

As with the in-person counseling requirements, the
State has not demonstrated the ultrasound requirement's
differential treatment of abortion patients is reasonably
related to a valid state interest.

Dr. Grossman explained that there's no medical basis
for requiring the abortion provider to perform the ultrasound.
It is a common practice in medicine to rely on ultrasounds
performed by unaffiliated providers, including the patient's
referring physician, or another obstetrician-gynecologist or
radiologist in the patient's local community.

In fact, as the Court heard, abortion clinics managed

by Amy Hagstrom Miller, the president of Whole Woman's Health

Alliance, routinely rely on ultrasounds performed by competent

but unaffiliated providers in other states.  The State has

presented no evidence to explain why barring ultrasound

referrals provides a medical benefit for abortion patients but

not other pregnant patients.

Likewise, it is common for a treating physician to

review ultrasound images as part of an electronic health record

rather than in paper format.

THE COURT:  Now you have to slow down.

MS. SINGH:  Sorry about that.

Further, the evidence shows that the differential

treatment of abortion providers with respect to ultrasound does

not serve the State's interest in ensuring accurate gestational

dating or enhancing patient decision-making.

With respect to gestational dating.  As plaintiffs

noted in our opening statement, another Indiana law not

challenged here independently requires abortion providers to

determine the gestational age of a pregnancy in accordance with

accepted medical standards.  That law is codified at Indiana

Code Section 16-34-2-2A1.  That law fully serves the State's

interest while allowing abortion providers to choose the method

of gestational dating that is most appropriate for a

given patient, so long as it is consistent with accepted

medical standards.

1      Dr. Grossman testified that ultrasound isn't the only

2  accepted method of dating a pregnancy.  Nevertheless, Indiana

3  abortion providers continue to use ultrasound for most of their

4  patients, even if the ultrasound requirement were struck down,

5  but they would not necessarily perform the ultrasound

6  themselves.  Instead, they would permit their patients to

7  obtain ultrasound exams from local OB/GYNs and radiologists, to

8  save them an unnecessary trip to the abortion provider.

9      The State presented --

10     THE COURT:  Let me ask you a question.  In your view,

11  do the ultrasounds perform an important medical -- do they

12  perform an important medical purpose?  Do they satisfy such a

13  purpose, outside the abortion context?

14     MS. SINGH:  Your Honor, they can, depending on the

15  healthcare service.  And providers outside of the abortion

16  context are given discretion to determine both when to perform

17  ultrasounds but also by whom to have ultrasounds performed.

18     THE COURT:  Right.  Well, you've sort of anticipated

19  my question.  If an ultrasound is the sine qua non for

20  determining gestational age and the determination of

21  gestational age is the sine qua non of a safe, healthy

22  pregnancy because it controls many other factors of care, it

23  does seem to me that the importance of that one procedure ought

24  to be reflected in other aspects of medical practice by law, if

25  it does hold that sort of importance.

1          Go ahead.  You can respond.

2          MS. SINGH:  Yes, Your Honor.  Dr. Grossman testified

3     that, in fact, pinpointing a due date is much more important to

4     do so accurately than determining gestational age for purposes

5     of abortion.

6          And yet the State does not have any similar ultrasound

7     requirement for patients that are continuing their pregnancy,

8     as it does in the abortion context.  And it has presented no

9     evidence explaining that differential treatment or any evidence

10    about the benefits that are conferred by that classification.

11         THE COURT:  Okay.  Thank you.  I maybe got you off

12    course here.

13         MS. SINGH:  Thank you, Your Honor.  The State

14    presented no evidence that the ultrasound requirement at issue

15    here would serve its interest in accurate gestational dating to

16    a greater extent than Indiana Code Section 1634-2-2A1.

17         With respect to patient decision-making, although the

18    State presented no credible evidence to support its claim that

19    viewing an ultrasound image enhances patient decision-making,

20    another Indiana law not challenged here requires abortion

21    patients to be informed of the availability of ultrasound

22    imaging before consenting to an abortion.  That law is codified

23    at Indiana Code Section 16-34-2-1.1A1I.

24         The State presented no evidence that the ultrasound

25    requirement at issue here would serve its interest in patient

decision-making to a greater extent than this other law.
Notably, the ultrasound requirement at issue here does not
require abortion patients to view their ultrasound images.
Instead, it requires abortion providers to inform patients of
the option, just like the other statutory provision.

Not only do the in-person counseling and ultrasound
requirements fail the undue burden standard's threshold inquiry
concerning the relationship to a valid state interest but both
laws impose burdens on abortion access that substantially
outweigh their benefits.  These requirements force abortion
patients to make at least two visits to an abortion provider.

Miss Paulina Guerrero, an expert with years of
experience trying to help patients overcome barriers to
abortion care, testified about the substantial burdens imposed
by multiple trips to an abortion clinic, especially on
low-income patients in Indiana.  The cost of logistics,
including transportation, forces women in Indiana to make
impossible decisions, such as choosing between their livelihood
or obtaining on abortion.

Women in Indiana have had to pawn their belongings,
take payday loans, and forego paying their utility bills and
rent to afford their care.  Those patients who cannot overcome
the financial and logistical barriers are forced to delay their
care.  These are not hypothetical harms.  Miss Hutson and
Ms. Herr testified about how real these harms were for them and

they both obtained abortions in Indiana.

Miss Hutson, who is a college student at the time of her abortion, testified that as a result of the delay in her care, she had to take multiple days off from work.  The cost of abortion care, combined with the loss of income, made her unable to pay for all the credits she planned to take the next semester.  Instead, she had to take one less class and delay her graduation.

Dr. Grossman explained that such experiences are well documented in research investigating the impact of travel and multiple trips on abortion patients, 75 percent of whom are low income.

Dr. Diana Romero, a public health researcher, testified that in Indiana, low-income families spend nearly 100 percent of their income on basic necessities, leaving little to no disposable income for unexpected expenses like a healthcare emergency.

Similarly, Stipulated Exhibit 28, a report prepared by the Federal Reserve on the economic well-being of U.S. households in 2019 and 2020, found that more than one-third of U.S. adults would not be able to cope with an unexpected expense of $400 or more.

Laura Miller testified that Planned Parenthood abortion patients, including those receiving financial assistance, typically have to pay at least $500 out of pocket

for abortion care alone, not including the cost of
transportation, lodging, childcare or lost wages.

Notably, the fed report concluded that out-of-pocket
spending for healthcare is a common unexpected expense that can
be a substantial hardship for those without a financial
cushion.

Thus, the evidence shows that for low-income
individuals, and those without a financial cushion, having to
make multiple trips to an abortion provider is not merely an
incidental inconvenience. Rather, it is an obstacle to
abortion access that is substantial and economically
devastating.

Critically, plaintiffs' evidence concerning the
burdens imposed by the in-person counseling and ultrasound
requirement are wholly uncontested. The State presented no
evidence whatsoever concerning this issue.

Because the in-person counseling and ultrasound
requirements and the classifications they draw impose burdens
on abortion access that substantially outweigh their benefits,
the laws violate the undue burden standard. If all four laws
were struck down, abortion patients would still have to make
two appointments with an abortion provider, but they would only
have to make one trip to an abortion clinic.

Patients would still have an initial appointment for a
state-mandated information session. Those who prefer the

1  in-person consultation would be able to have one, but all

2  patients would have the option of using telemedicine to

3  participate in the information session from home.

4      Patients choosing to receive the state-mandated

5  information by telemedicine would connect with the provider

6  using a secure HIPAA-compliant video platform and receive the

7  documents and consent forms through an online patient portal or

8  other electronic means.

9      All patients would be informed pursuant to Indiana

10 Code Section 1634-2-1.1A1I of the availability of fetal

11 ultrasound imaging and auscultation of fetal heart (inaudible)

12 services to enable the pregnant woman to view the image and

13 hear the heartbeat of the fetus and how to obtain access to

14 these services.

15     Abortion providers would still utilize ultrasound for

16 gestational dating but they would not necessarily perform the

17 ultrasounds themselves.  Instead, they would rely on ultrasound

18 exams performed by referring physicians or allow physician's

19 patients to get an ultrasound at a local OB/GYN or radiology

20 office if that would be less burdensome for the patient than

21 making an extra trip to the abortion clinic.  At least 18 hours

22 after the patient's information session, the patient would

23 travel to the abortion clinic.

24     Patients who prefer an in-person interaction with the

25 physician and those having aspiration procedures would do so on

1    a date that the physician is present at the clinic.

2         But medication abortion patients would have the option

3    of going to the clinic on the day a physician can't be

4    physically present.  Those patients would arrive at the clinic,

5    provide a medical history to clinic staff, have their vital

6    signs taken, have blood and urine testing done by an on-site

7    lab, and then meet with the physician via a secure

8    HIPAA-compliant video platform to discuss the medication

9    abortion in further detail.

10        If, after talking to the patient and reviewing their

11   medical records, the physician determined that the patient was

12   eligible for medication abortion and had provided the informed

13   consent, the physician would authorize clinic staff to dispense

14   Misoprostol and Misoprostol to the patient.  The patient would

15   then self-administer Mifepristone in the presence of clinic

16   staff and take the Misoprostol home to complete the abortion in

17   accordance with the physician's instructions.

18        The ability to use direct-to-patient telemedicine for

19   the first appointment, and site-to-site telemedicine for the

20   second appointment, would eliminate substantial obstacles to

21   abortion access for relevant Indiana residents, namely, those

22   who prefer telemedicine over the alternative.

23        In conclusion, the evidence presented at trial shows

24   that the four challenged laws single out abortion patients for

25   disfavored treatment and impose undue burdens on abortion

access.  For those reasons, the Court should declare them

unconstitutional and permanently enjoin their enforcement.

Low income patients, those who have difficulty

securing transportation, childcare, or time off from work,

those who are experiencing pregnancy-related complications or

nausea, those who are approaching the gestational limits for

medication or aspiration abortion in Indiana, and those who are

victims of intimate partner violence would experience the

greatest reduction in burden.

Thank you, Your Honor.

THE COURT:  Thank you, Ms. Singh.

Mr. Fisher?

Your volume is not on, sir.

MR. FISHER:  My apologies.  Thank you, Your Honor.

May it please the Court.

THE COURT:  Mr. Fisher.

MR. FISHER:  Ms. Singh and I actually start at the

same point with last Friday's ruling in the parental notice

case from the Seventh Circuit.  And, certainly, the Seventh

Circuit said that the Hellerstedt balancing test applies; but

what's critical to bear in mind from that case is Footnote 7,

which makes it clear that in undertaking that analysis, the

Court must first discern that there's a substantial obstacle to

abortion before undertaking the Hellerstedt balancing.  That I

think is an analytical tool for -- of special relevance in this

1   case, given the gaps in the proof supplied by the plaintiffs.

2       So let's start with the ultrasound law, for example.

3   Ample evidence has shown the importance of the ultrasound both

4   for gestational dating and for other aspects of informed

5   consent, including the ability of the woman to view the moving

6   fetus, to hear the heartbeat, have a sense of what's going on

7   inside her body.

8       Now, the plaintiffs' claim has been that a woman ought

9   to be able to bring the -- an ultrasound from another provider

10   to the abortion provider and have that be sufficient.

11       But of course, the question, as this Court

12   acknowledged in the summary judgment ruling, is how does the

13   inability to do that constitute an undue burden?  And we still

14   don't have really any answer to that question, and that's, I

15   think, why the Court has already rejected the argument.

16       Here, we have only the testimony from Dr. Grossman

17   suggesting that less than 10 percent of women in his studies

18   that present themselves for abortion have already obtained an

19   ultrasound from another provider.  Of course, he's not even

20   studying Indiana abortions.  He's studying abortions in other

21   states.

22       So I think we're left without the substantial obstacle

23   evidence necessary to go to the next step, which is to evaluate

24   the benefits and burdens of the study -- or of the requirement.

25   Excuse me.

1          With respect to in-person counseling, plaintiffs here

2     again have failed to identify any burden associated with the

3     implementation of the law.  Their only theory is that the law

4     forces women to go two trips to the clinic, one for an

5     in-person counseling and the other for the abortion to get the

6     pills.

7          But the in-person counseling, of course, takes place

8     at the same time as the ultrasound, which means that it imposes

9     no additional burden.  Even if the in-person counseling

10    requirement did not exist, the ultrasound requirement would

11    still require the two trips to the abortion provider.  And

12    let's be clear.  It's the provider, not the clinic; and that is

13    important in part because Planned Parenthood, of course,

14    provides nine facilities around the state where women can go to

15    obtain both the in-person counseling and the ultrasound 18

16    hours before an abortion.  So there are several avenues for

17    women to take to satisfy that obligation with Indiana abortion

18    providers.

19         The in-person counseling requirement is also

20    constitutional even standing alone because the benefits -- even

21    if the Court were to proceed to the balancing, the benefits of

22    the counseling and informed consent simply cannot be obtained

23    any other way.

24         As Doctors Curlin, Stroud, Wozniak, and Coleman

25    explained, performing this process in person helps women to

1    understand the medical and ethical stakes of the abortion

2    procedure and helps the physician detect subtle cues that

3    necessitate further explanation or questioning.

4         Perhaps most important, performing this process in

5    person ensures the patient is not being coerced into making

6    this decision, a danger that is particularly acute for women in

7    this vulnerable population, as Anastasia Roth and Dr. Wozniak

8    testified, and as plaintiffs themselves recognize.

9         Indeed, Dr. Grossman responded to the concern of

10   coercion by rejecting the direct-to-patient model plaintiffs

11   propose.  Instead, in response to a requested -- I'm sorry -- a

12   question asked by plaintiffs' counsel on direct examination, he

13   explained that the kind of telemedicine that we're talking

14   about here, a site-to-site model, in that model, abortion care

15   patients are in kind of a confidential setting in a clinic; and

16   so we know there isn't an issue that there's someone else in

17   the room with them who may actually be perpetrating or

18   perpetuating the violence.

19        Again, the site-to-site model, which requires the two

20   trips for the in-person counseling and for the abortion,

21   facilitates the kinds of conversations and detections available

22   to physicians to help women who are the victims of violence and

23   sex trafficking to get help and to overcome that situation.

24        That brings us to the physical examination

25   requirement, the so-called telemedicine ban.  Really, it needs

1   to focus not so much on the telemedicine side of it as it does

2   on the in-person examination side of it, because, of course, as

3   long as the woman has undergone an in-person exam by the

4   physician who's prescribing the Mifeprex, any further contact

5   with the doctor can be by telephone or video, Zoom, however you

6   want to do it.

7          The key here is the in-person examination; and that

8   is, I think, very important with respect to Whole Woman's

9   Health Alliance, where Amy Hagstrom Miller testified that she

10  has her doctors provide the 18-hour in-person counseling before

11  the abortion.  In other words, in their model, in Whole Woman's

12  Health model, the physicians are already available 18 hours

13  before the abortion to see the patient in person.

14         If they would merely undertake the examination at that

15  point, there would be no need for the physician to be in

16  attendance when the patient returns after 18 hours to pick up

17  the prescription of Mifepristone.  Why Whole Woman's Health

18  does not avail itself of that model, we don't know.  We don't

19  hear about that, but they seem especially well positioned to

20  carry out the requirements of the statute without any

21  additional commitment of resources in that regard.

22         THE COURT:  Could the in-person counseling and the

23  exam and so forth be delegated to another provider and that

24  report sent to the abortion provider?  I mean, could you get

25  another physician colleague to do those tasks and send it in,

1   in the same way that they might be able to get the ultrasound

2   exam done by somebody else?

3           MR. FISHER:  No.  The statute requires for purposes of

4   the in-person examination -- it requires that the physician

5   who's the prescribing physician to undertake the in-person

6   examination.

7           THE COURT:  So I understood that, but could the

8   in-person examination be supplemental or happen with another

9   doctor closer to home?

10          MR. FISHER:  Well --

11          THE COURT:  In that sense, couldn't it be more

12  perfunctory?

13          MR. FISHER:  Well, certainly I think the definition of

14  the examination, that it has to be in person, would be up to

15  the standard of care.  I think that's the way we understand it.

16          Now, certainly the communications that a woman might

17  have either with the abortion doctor or with other doctors or

18  other healthcare providers, those are all perfectly fine; and

19  they would not in any way negate the efficacy of the in-person

20  examination.  All the statute requires is one in-person

21  examination with the prescribing physician, and that can be at

22  the same time that the informed consent information is conveyed

23  18 hours before the abortion.

24          So Whole Woman's Health is in a position to carry that

25  out with its physicians that it already has, whose physicians

1  carry out the information conveyance 18 hours before the

2  abortion.

3          So beyond that, for the plaintiffs to prevail, they

4  must show that preventing physicians from telecommuting somehow

5  places a substantial obstacle in the way of women making that

6  choice; and they simply have not done so.  Let's look at their

7  theories.

8          First, they argue that requiring a physical

9  examination somehow artificially inflates the price of an

10 abortion.  But by how much?  Amy Hagstrom Miller testified that

11 in 2020, the South Bend Clinic spent $20,000 reimbursing

12 doctors for travel expenses.

13         She also testified that in that same year, the clinic

14 performed a total of 366 abortions.  That works out to a total

15 cost of $54.64 per abortion.  Yet, Miss Hagstrom Miller also

16 testified that she would pass on only some of those savings to

17 the patient.  How much would it be?  Would it be the entire

18 $54.64?  Would it be $30?  Would it be $5.  We don't know.  But

19 what we do know is that all in, the greatest cost savings to be

20 realized by eliminating the physical examination requirement is

21 less than $55.  Yet, the plurality in *Casey* held that a slight

22 increase in the cost of an abortion does not constitute a

23 substantial obstacle, which leads to burden theory No. 2.

24         Plaintiffs argue that by eliminating the physical

25 examination requirement, that could yield more abortion

1    appointments, essentially, during the time that the Whole

2    Woman's Health physicians or the other clinic physicians

3    currently spend traveling.

4           But how many more?  The only specific answer came

5    from, again, Miss Hagstrom Miller, who testified that if her

6    physicians did not need to travel, the South Bend Clinic would

7    be able to book probably half again as many patients each week.

8           But Miss Hagstrom Miller also said that Whole Woman's

9    Health sees about seven patients a week.  Half of seven being

10   3.5 means that the ceiling for additional appointments is three

11   and a half each week.

12          But we're not done yet, because plaintiffs have not

13   provided any evidence of how those additional three and a half

14   appointments a week would actually lift a substantial obstacle

15   to abortion.

16          Let's think of some options.  We might speculate that

17   having three and a half fewer slots each week prevents some

18   women from obtaining an abortion altogether.  If so, you'd

19   expect to see some impact on the state's abortion rate.  Yet,

20   plaintiffs expressly disavow any such theory of this case; and

21   they have not presented evidence of even one woman who was

22   prevented from having an abortion because of the ostensible

23   suppression of appointment slots occasioned by the personal and

24   physical examination requirement.  Now, the State believes that

25   we should win on that fact alone, but let's keep going.

1          Maybe having three and a half fewer slots each week

2    increases the average travel distance for a woman seeking an

3    abortion.  Well, but that really can't be right, at least not

4    for the patients of Whole Woman's Health.  Remember, under

5    plaintiffs' own theory, the patient has to travel to a clinic

6    regardless whether the prescribing doctor is at the clinic or

7    is on the road or is at home.  Because the South Bend Clinic is

8    the only Whole Woman's Health facility in the state of Indiana,

9    its patients must travel the exact same distance, regardless

10   whether the appointment is on Friday, Saturday or Tuesday.

11         And even if we swapped out this plaintiff, this clinic

12   for, let's say, Planned Parenthood, which has several

13   facilities around the state, Dr. Grossman, plaintiffs' only

14   testimony on this point, testified that when telemedicine was

15   introduced in Iowa, the average travel distance decreased only

16   2.5 miles; and the median travel distance didn't change at all.

17         Finally, we might speculate that having three and a

18   half fewer appointments each week might increase the average

19   gestational age at which women obtain an abortion; but this

20   theory rests on a single table in a single paper authored by

21   Dr. Grossman that showed that after the introduction of

22   telemedicine, the percentage of second trimester abortions

23   decreased by only 4 percent.  Yet another study authored by

24   Dr. Grossman found that the gestational age at the time of the

25   abortion was slightly higher for women who obtained a

1    medication abortion using telemedicine.

2            Even if we credit Dr. Grossman's testimony that the

3    second difference is of no clinical significance, that cuts

4    both ways.  We really don't have clinically significant

5    information suggesting that gestational age would vary if only

6    Indiana did not require a physical exam.

7            So after nine witnesses and more than two days of

8    testimony, plaintiffs were able to identify just two possible

9    obstacles by the physical examination requirement and the

10   telemedicine law:  Some unspecified monetary amount, less than

11   $55, and a miniscule decrease of just .4 percent in second

12   trimester abortions with no increase in the average gestational

13   age overall.

14           And even if all of that is true, that cannot be a

15   substantial obstacle even in light of *Casey*.  *Casey* said that

16   the fact that a law, which serves a valid purpose when not

17   designed to strike at the right itself, has the incidental

18   effect of making it more difficult or expensive to procure an

19   abortion cannot be enough to invalidate.

20           But of course, even if this Court disagrees on the

21   substantial obstacle point, it must still weigh these small

22   burdens that the plaintiffs have identified against the law's

23   benefits and the asserted interests of the State, and the

24   evidence shows that the in-person examination requirement has

25   weighty benefits.

Dr. Wozniak testified that in-person physical examinations are helpful for identifying signs of intimate partner violence, including physical and sexual abuse. She also testified that screening for intimate partner violence is much more difficult and less reliable via telemedicine because of the lack of human presence, human connection, eye contact, not to mention the ability to see bruises on the patient's skin. Dr. Stroud said the same thing. The same is true for the process of screening patients for victims of human trafficking, another benefit of the physical exam identified by Dr. Coleman.

The State's need to detect abuse of pregnant women seeking abortion isn't hypothetical. Dr. Grossman testified that between 6 and 22 percent of abortion patients have experienced intimate partner violence, and Dr. Coleman opined that the number might be as high as 30 percent. Cassie Herr even testified that when her clinic identifies patients that have been victimized, they provide resources to those patients. That is an important service that clinics provide, and the State has a clear interest in ensuring that this help is extended to as many women in need as possible.

This week the Court asked Dr. Grossman what we had learned the last year with COVID. Well, one of the things that we have learned, as Dr. Kheriaty testified, is that as people have become more physically isolated, rates of domestic

violence have gone up.  And that makes the physical examination

requirement even more important to help get the victims of

violence who present themselves for abortion to a safe place

with a medical professional to help screen for abuse.

The physical examination also provides substantial

health benefits.  Both Dr. Wozniak and Dr. Harrison testified

that a physician can use a physical examination to help

identify an ectopic pregnancy, which the FDA requires to be

ruled out as a contraindication for Mifepristone.

Drs. Harrison and Wozniak also testified that a

physical examination can help detect the presence of an IUD,

another contraindication for medication abortions.  They also

testified that physical exams are necessary to rule out other

complications and to address any patient complaints of

discomfort or pain, not to mention screening for sexually

transmitted diseases that the woman might not know she has.

All of this helps to safeguard a woman's life and health.

Finally, many abortion patients come form

underprivileged backgrounds.  Dr. Grossman testified that

telemedicine might not be the best option for all woman.  He

found that 25 percent of patients who received abortions via

telemedicine wished it had been face to face, and that those

women were more likely to be uneducated younger women with

first-time pregnancies.

The State has an interest in making sure that its most

1    vulnerable citizens receive adequate care regardless of the

2    preferences of their doctors to telecommute.  So that's the

3    principal question for the Court, whether the possibility of

4    saving a woman from a life of intimate partner violence or sex

5    trafficking, and the possibility of identifying

6    contraindications that could jeopardize a woman's health, is

7    worth at least $55 a week or perhaps three and a half more

8    abortion appointments.  Thank you very much.

9              THE COURT:  Thank you, Mr. Fisher.

10             Rebuttal, four minutes.

11             MS. SINGH:  Your Honor, I don't have much to add to my

12   closing statement.  The plaintiffs have focused the burdens of

13   the ultrasound requirement and the in-person counseling

14   requirement primarily on the trips that those requirements

15   currently require of abortion patients.  Currently, abortion

16   patients have to make two trips to obtain care.  If those

17   restrictions were struck, patients would only have to make one

18   trip if they chose the option of telemedicine care.  And,

19   again, no one is suggesting that patients be forced to use

20   telemedicine abortion care.  In-person care would still be

21   available.

22             What defendants call minor inconveniences, for some

23   patients are substantial hardships.  We've had testimony that

24   these hardships mean that people are not able to pay for their

25   utilities; they are not able to pay for groceries; they are

having to delay their education; they are jeopardizing their employment.  And these may seem like inconveniences to the State, but they are not for the patients that are impacted by these requirements that have no offsetting benefits.

And for that reason, Your Honor, there has been substantial evidence presented, not only that there are no benefits advanced by these laws, but certainly that there are substantial hardships imposed by them.  And, therefore, under prevailing law, these requirements are unconstitutional and we ask that the Court enjoin them.

THE COURT:  Very good.

Thank you, lawyers, very much.  You've teed it up so I have all the hard work to do now, which I will do.  You've got to give me a little time.

We have some questions, and I'm going to leave those to Ms. Harves to specifically nail down with respect to all the exhibits that you sent in, only a few of which were used.  So we don't know what to do with all the notebook binders, but we don't need to resolve that tonight.

The case is submitted; it is under advisement, and I'll rule as soon as I possibly can.  Thank you again, both, very much.  Good night.

MR. FISHER:  Thank you, Your Honor.

MS. SINGH:  Thank you, Your Honor.

1                    (Court adjourned at 6:30 p.m.)

2

3

4

5

6

7    ****************************************************************

8                    CERTIFICATE OF COURT REPORTER

9

10

11          I, Laura Howie-Walters, hereby certify that the

12   foregoing is a true and correct transcript from reported

13   proceedings in the above-entitled matter.

14

15

16   /S/LAURA HOWIE-WALTERS    March 18th, 2021

17   LAURA HOWIE-WALTERS, FCRR, RPR, CSR
     Official Court Reporter
18   Southern District of Indiana
     Indianapolis Division
19

20

21

22

23

24

25