UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| WHOLE WOMAN'S HEALTH ALLIANCE, et al, | ) |
| Plaintiff, | ) CAUSE NO.: |
| | ) 1:18-C-0194-SEB/MJD |
| | ) Indianapolis, Indiana |
| -v- | ) June 23, 2021 |
| | ) VOLUME I |
| TODD ROKITA, ATTORNEY GENERAL OF THE STATE OF INDIANA, in his official capacity, et al, | ) |
| Defendants. | ) |

Before the Honorable
SARAH EVANS BARKER, JUDGE

OFFICIAL REPORTER'S TRANSCRIPT OF
BENCH TRIAL

Court Reporter: Laura Howie-Walters, FCRR/RPR/CSR
Official Court Reporter
United States District Court
Room 217
46 East Ohio Street
Indianapolis, Indiana 46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT PRODUCED BY ECLIPSE NT COMPUTER-AIDED TRANSCRIPTION

# APPEARANCES

For Plaintiffs:

Dipti Singh, Esq.
Stephanie Toti, Esq.
Rupali Sharma, Esq.
Melissa C. Shube, Esq.
Mollie M. Kornreich, Esq.
Athanasia Charmani, Esq.
Sneha Shah, Esq.
Juanluis Rodriguez, Esq.
LAWYERING PROJECT
3371 Glendale Blvd. #320
Los Angeles, CA 90039-1825

For Defendants:

Thomas M. Fisher, Esq.
Christopher M. Anderson, Esq.
Robert A. Rowlett
Kian J. Hudson
INDIANA ATTORNEY GENERAL
302 West Washington Street
Indiana Government Center South
Fifth Floor
Indianapolis, IN 46204

and

Gene C. Schaerr
H. Christopher Bartolomucci, Esq
James. A. Heilpern
Scott D. Goodwin
SCHAERR|JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006

# I N D E X

**PLAINTIFFS' WITNESSES** **PAGE**

LAURA MILLER
Direct Examination by Ms. Toti.................... 7
Cross-examination by Mr. Fisher..................24

CAITLIN BERNARD, MD, MS
Direct Examination by Ms. Toti.................. 27
Cross-examination by Mr. Hudson................. 38

WILLIAM MUDD MARTIN HASKELL, M.D.
Direct Examination by Ms. Sharma ...............43
Cross-examination by Ms. Payne..................53
Redirect examination by Ms. Sharma .............55

KELLY MCKINNEY
Direct Examination by Ms. Shube ................58
Cross-examination by Mr. Hudson.................69
Redirect examination by Ms. Shube ..............72

AMY HAGSTROM MILLER, MD
Direct Examination by Ms. Singh ................74
Cross-examination by Mr. Heilpern

ALLEN CLARK, MD
Direct Examination by Ms. Kornreich ...........103

PAULINA GUERRERO
Direct Examination by Ms. Charmani ............114

ALLISON COWETT, MD
Direct Examination by Ms. Sharma ..............122
Cross-examination by Mr. Goodwin ..............133
Redirect examination by Ms. Sharma ............148

DANIEL GROSSMAN, MD
Direct Examination by Ms. Singh ...............150
Cross-examination by Mr. Bartolomucci .........206
Redirect examination by Ms. Singh .............236

I N D E X (CONT.)


| **EXHIBITS** | **PAGE** |
|---|---|
| 1 | 241 |
| 3 | 241 |
| SE33 | 7 |
| SE34 | 7 |
| SE35 | 7 |
| SE36 | 7 |
| SE37 | 7 |
| SE38 | 7 |
| SE39 | 7 |
| SE40 | 7 |
| SE41 | 7 |
| SE42 | 7 |
| SE43 | 7 |
| SE44 | 7 |
| SE45 | 7 |
| SE46 | 7 |
| SE47 | 7 |
| SE48 | 7 |
| SE49 | 7 |
| SE50 | 7 |
| SE51 | 7 |
| SE52 | 7 |
| SE53 | 7 |
| SE54 | 7 |
| SE55 | 7 |
| SE56 | 7 |
| PE57 | 7 |
| PE58 | 7 |
| PE59 | 7 |
| PE60 | 7 |
| PE61 | 7 |
| PE62 | 7 |

(Open court.)

THE COURT: Morning all.

MR. FISHER: Morning.

COURT CLERK: Morning.

THE COURT: I feel hermetically sealed up here. That means you also are hermetically sealed. This has to be for a good purpose; so we'll just yield to it. But doesn't it seem strange to have all of this around us and between us and so forth?

It's good to see you, all of you. We'll get underway. You may be seated.

MR. FISHER: Thank you.

THE COURT: Miss Harves, will you call the matter before the Court, please.

COURT CLERK: This is the matter of Whole Woman's Health Alliance, et al. v. Todd Rokita, et al., Cause No. 1:18-cv-1904.

(Call to order of the Court)

THE COURT: Okay. I'm getting the lay of the land here. So I recognize Ms. Singh and Mr. Fisher, who are in their places with sunshiny faces, and their colleagues who have been placed at counsel's table as at least the initial round of questioning will go forward.

I asked the lawyers -- I ask you lawyers to condense your presentations if you can on opening statements since all

of us have more than a running start on the issues. But if you want to tee them up in some specific way, I'll give you permission to do that today.

So, Ms. Singh, is there anything that you need to raise on behalf of plaintiffs, or do you want to go ahead with your opening statement?

MS. SINGH: Plaintiffs will be forgoing on opening statement. I have just one housekeeping matter to raise.

THE COURT: Yes.

MS. SINGH: We wanted to move into evidence stipulated exhibits.

THE COURT: Okay.

MS. SINGH: They are SE --

THE COURT: Just a minute. There's more technology up here than I know what to do with. So I need to see what I'm using. I need to get it in a place where I can actually put pen to paper literally.

So okay. Your stipulated exhibits, Ms. Singh.

MS. SINGH: Yes, Your Honor. SE --

THE COURT: Well, that's a good start. SE --

MS. SINGH: 33.

THE COURT: Okay. SE what?

MS. SINGH: 33 to SE62.

THE COURT: All right.

MS. SINGH: And that is all for us, Your Honor.

THE COURT: Are these admissible pursuant to your stipulation, Mr. Fisher?

MR. FISHER: They are, Your Honor.

THE COURT: All right. Then I do admit them pursuant to the stipulation.

(Plaintiffs' Exhibit SE33-62 received in evidence.)

THE COURT: Do you have anything you want to say by way of an opening anything, Mr. Fisher?

MR. FISHER: No. Thank you, Your Honor. We'll waive the opening statement.

THE COURT: Okay. Very good.

You may call your first witness, Ms. Singh.

MS. SINGH: Plaintiffs call Laura Miller to the stand.

THE COURT: All right.

MS. TOTI: Good morning. And Stephanie Toti for the plaintiffs.

THE COURT: Morning, Ms. Toti. Nice to see you again.

MS. TOTI: Good morning, Judge Barker.

LAURA MILLER, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. TOTI:

Q. And good morning, Ms. Miller.

A. Good morning.

Q. Could you please state and spell your name for the record.

A. My name is Laura Miller, L-A-U-R-A, Miller, M-I-L-L-E-R.

Q. Thank you. Ms. Miller, you work at the local Planned Parenthood affiliate; is that right?
A. Correct.
Q. What's your current job title?
A. I'm an area services director.
Q. You testified during the first phase of trial in this case; is that right?
A. Correct.
Q. I'm not going to repeat the questions that I asked you last time; I'm just going to pick up where we left off.
Is that okay?
A. Yes.
THE COURT: Ms. Miller, by agreement of counsel, we're going to import into the hearing all of your background and vitae and bio information. So that would usually be the way we would start. But I say to you and the other witnesses that that will be part of the record, and we're just importing it from the prior hearing. Okay?
THE WITNESS: Okay. Thank you.
BY MS. TOTI:
Q. At the time of your prior testimony, the local Planned Parenthood affiliate was known as Planned Parenthood of Indiana and Kentucky; is that right?
A. Correct.
Q. Has that changed?

A. Yes. We are now Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana, and Kentucky.

THE COURT: Wow. That's not exactly a natural alliance. I'm trying to think of other times when we've been linked with Hawaii and Alaska. Not too often.

BY MS. TOTI:

Q. Is that the result of a merger between two affiliates?

A. Yes. That's correct.

Q. And in what states does the affiliate -- does the new affiliate operate health centers?

A. Yeah, we operate health centers in Indiana, Kentucky, Alaska, Hawaii, Washington, and Idaho.

Q. Have the scope of your responsibilities changed since the merger?

A. In addition to the health centers that I manage in Indiana and Kentucky, I now additionally oversee the management of two health centers in the Seattle area of Washington.

Q. Is there anything else that's changed with respect to the facts that you previously testified about?

A. No.

Q. I'd like to ask you a few questions about advanced practice clinicians. Are you familiar with the term "advanced practice clinician"?

A. Yes.

Q. What does it mean?

A. So for us at Planned Parenthood in Indiana, advanced practice clinicians are the midlevel providers that provide the vast majority of the care at our health centers.
Q. And does the term include nurse practitioners?
A. Yes.
Q. Do advanced practice clinicians -- I'm sorry. Strike that.
Approximately how many advanced practice clinicians currently provide healthcare services at Planned Parenthood's Indiana health centers?
A. We have about 20 nurse practitioners that work with us in Indiana.
Q. And what types of services do advanced practice clinicians currently provide at Planned Parenthood's Indiana health centers?
A. Our nurse practitioners provide services across the spectrum, everything from office visits for birth control, for STI testing. They do microscopy, looking at things under a microscope for different types of testing. They do wart treatment with trichloric acid, which is an acid that's kind of just blotted onto the area that needs treatment.
They also do Pap smears, which is a swab inside the vaginal canal. In addition to that, they do colposcopies, which is if a Pap smear comes back positive with issues, it's kind of the next step. And it's where the nurse practitioner looks at the cervix under a large microscope and also takes -- excuse me --

takes samples. So they reach in with tools and take samples for additional testing.

They also provide LEEP services. LEEP is a machine that has a little piece of wire with electricity running through it, and they use that to scrape cervical cells that are cancerous.

They can also do something similar with cryotherapy, which is a similar type of procedure but with cold instead of kind of heat and electricity.

Q. Got it. Thank you.

Are you aware that Indiana law currently prohibits advanced practice clinicians from providing abortion care?

A. Yes.

Q. Do advanced practice clinicians provide first trimester abortion care in any of the seats that are part of the newly merged Planned Parenthood affiliate?

A. Yes. Nurse practitioners provide first trimester abortion care both for medication and aspiration abortion in Hawaii and Washington.

Q. If Indiana law permitted it, would Planned Parenthood utilize advanced practice clinicians to provide abortion care at its Indiana abortion clinics?

MR. FISHER: Your Honor, I'm just going to object. I think we need a little more foundation before we get to that conclusion.

THE COURT: Overruled. It's within her expertise, her

knowledge. She's in charge of area services. So I assume she knows how she'd deploy her people.

Go ahead, Ms. Toti. Put the question to the witness again, please.

MS. TOTI: Yes, Your Honor.

BY MS. TOTI:

Q. Ms. Miller, if Indiana law permitted it, would Planned Parenthood utilize advanced practice clinicians to provide abortion care at its Indiana abortion clinics?

A. Yes, we would.

Q. And how would that affect abortion access?

MR. FISHER: Your Honor, object. I think, again, we have a foundational objection here. This is a question that seems to be designed to get into perhaps even abortion rates, which is not, I think, a part of the case that the plaintiffs have been trying to pursue. And --

THE COURT: Well, that would be your objection. You can make it if it comes up.

MR. FISHER: Okay.

THE COURT: I'll overrule this one.

BY MS. TOTI:

Q. So, Ms. Miller, how would utilizing APCs to provide abortion care affect abortion access at Planned Parenthood's Indiana abortion clinics?

A. Yeah, so at the very least, it would allow us to expand

abortion access to every day of the week our licensed health centers are open throughout the day as opposed to just the sites that our doctors can come in and provide there.

Q. Why can't Planned Parenthood hire more physicians now to increase access?

THE COURT: Physicians or physician assistants?

MS. TOTI: I'm sorry, Your Honor, physicians.

BY MS. TOTI:

Q. So I'm asking why would they need APCs to -- why would they need advanced practice clinicians to increase access? Why couldn't they simply hire more physicians?

THE COURT: There's your question.

So answer that question, Ms. Miller.

THE WITNESS: Okay.

Yeah, so historically it's just been much easier for us to recruit and retain nurse practitioners as opposed to medical doctors. It's a very hostile state for medical doctors to provide abortion services. Some of our doctors have been stalked or threatened, things like that and often, you know, just have other factors that go into that, whereas we have a base of nurse practitioners that could step into that space very easily.

BY MS. TOTI:

Q. Of the advanced practice clinicians that currently provide services at Planned Parenthood's Indiana health centers, do you

know how many would be willing to provide first-trimester abortions if the law permitted them to do so?

THE COURT: That's a yes or no because I need foundation on that.

Do you know?

THE WITNESS: Yes.

THE COURT: Now ask her how she knows, please.

BY MS. TOTI:

Q. What's the basis for your knowledge about that, Ms. Miller?

MR. FISHER: Ill object to the extent it calls for hearsay, Your Honor.

THE COURT: It's her knowledge. Overruled.

BY MS. TOTI:

Q. So the question is just what's the basis of your knowledge about this.

A. Yeah, so I am part of the interview teams that interview our nurse practitioners for our health centers in Indiana. And one kind of a piece of that interview is talking about what types of work that the position requires in respect to working in the area of the abortion care.

So we really dig into that and make sure the nurse practitioners know that working in abortion care is a part of the job. And as I said, in our other states where we're able to use nurse practitioners for abortion care, that's part of their position.

So in the same way, if we were able to do that in Indiana, that would be a part of that position. And in our interviews, when we talk to nurse practitioners about that, we make sure that they're comfortable with that type of care and that they are willing to work in abortion care in taking a job with us.

Q. Based on the job interviews that you've conducted with nurse practitioners who are ultimately hired to work at Planned Parenthood's Indiana health centers, what is your expectation about how many of the advanced practice clinicians that currently provide services for those Indiana centers, what is your expectation about how many of them would be willing to provide abortion care if the law permitted them to?

A. All of them.

Q. Thank you. I'm going to move on and ask you some questions about the provision of second trimester abortion care.

THE COURT: Ms. Toti, you called them by an acronym. Is it NP? What did you say? Nurse practitioner?

MS. TOTI: I apologize, Your Honor. NP is nurse practitioner. And if I used the term APC, I meant that to mean advanced practice clinician.

THE COURT: Okay. Thank you for that elaboration. I didn't know what that APC meant.

MS. TOTI: My apologies. I'll try to avoid the alphabet soup.

THE COURT: It's okay now that I know what they mean.

BY MS. TOTI:
Q. Ms. Miller, so with respect to second-trimester abortion care, does the newly merged Planned Parenthood -- does the newly merged Planned Parenthood affiliate provide second-trimester abortion care in states outside Indiana?
A. Yes. We provide second-trimester abortion care in Hawaii, Alaska, Idaho, and Washington.
Q. Approximately how much does Planned Parenthood charge for a second-trimester abortion in those states?
A. So there is a range depending on how far along the pregnancy is as well as other factors like additional medication the patient might need or if they decide to get a deeper form of sedation. But the range is about $900 to $1,500.
Q. Are you aware that Indiana law currently requires second-trimester abortions to be performed in a hospital or ambulatory surgical center?
A. Yes.
Q. None of Planned Parenthood's Indiana health centers are licensed ambulatory surgical centers; is that right?
A. Correct.
Q. Are you generally familiar with the licensing requirements for ambulatory surgical centers in Indiana?
A. In the sense that I'm aware of the areas that were deficient in order to become an ambulatory surgical site, yes.

Q. From an operations standpoint, could any of Planned Parenthood's Indiana health centers become licensed ambulatory surgical centers?

A. No. Unfortunately, that would be really cost prohibitive and would also reduce our current access. There's a couple of things that come up for me when I think about that.

The first is the requirement for the minimum square footage of the procedure spaces for an ambulatory surgical site. In order to create rooms that met those minimum square footage requirements, we would basically have to cut in half the number of exam rooms or procedure spaces we have in our buildings, which would then restrict access because we wouldn't have as many spaces to see patients in.

The other thing that really sticks out are the requirements around the HVAC systems, which require really specific things like air filters and positive and negative pressure areas. And our HVAC systems work fine now and are completely, you know, fine for the services that we provide. So that would just be really cost prohibitive.

Q. And when you say HVAC, do you mean heating, ventilation and air-conditioning?

A. Yes. I honestly have never really thought about what HVAC stands for. But yes.

THE COURT: I know about that because our criminal defendants do that in prison. So that's an acronym you didn't

need to explain.

MS. TOTI: Okay. Got it, Your Honor.

BY MS. TOTI:

Q. Ms. Miller, if the law requiring second-trimester abortions to be performed in -- if the law requiring second-trimester abortions to be performed in a hospital or ambulatory surgical center were struck down, would any of Planned Parenthood's Indiana health centers provide second-trimester abortions?

A. Yes.

Q. Which ones?

A. The three that are currently licensed with the state to provide aspiration abortion services: the site in Merrillville, Indiana; the site on Georgetown Road in Indianapolis; and the site in Bloomington.

Q. Do Planned Parenthood health centers in Indiana ever encounter patients seeking previability abortions after 13 weeks, 6 days of pregnancy?

A. Yes, we do.

Q. About how often does that happen?

A. So I personally work with three to four patients a month who are in that situation. Additionally, I certainly don't work with every patient who's in that position. So the range is likely even more.

Q. Right now, what happens to those patients?

A. Yeah, so when we are working with a patient whose estimated

gestational age is beyond the 13 weeks and 6 days that we're able to provide care for, we have to point them towards out-of-state providers where they can access second-trimester abortion services.

The patients that I particularly work with are the ones who really need a lot of logistical support to travel out of state, help with, you know, financial aid, help with the logistics of it, child care, all sorts of things like that.

Q. And what's your understanding about why a patient would travel out of state to access second-trimester abortion care rather than seek care at an Indiana hospital?

A. So there's only a few different hospitals that offer second-trimester abortion care in the state of Indiana. They're all centered in the Indianapolis region. And they only -- they all only provide second-trimester abortion services to patients who have some kind of medical indication. So the vast majority of our patients who are in that position are not able to seek care at those hospitals.

Q. What would happen to those patients if Planned Parenthood's Indiana health centers were allowed to provide second-trimester abortion care?

MR. FISHER: Objection, Your Honor. I think that calls for speculation.

THE COURT: Sustained.

BY MS. TOTI:
Q. Okay. Now, I'd like to ask you a few questions about Planned Parenthood's health center in Evansville.
A. Okay.
Q. Planned Parenthood operates a health center in Evansville; is that right?
A. Correct.
Q. Does that health center currently provide abortions?
A. No. That health center currently provides the preabortion counseling appointment as well as follow-up care and supportive care, but they're not able to provide the medication abortion itself.
Q. Is the Evansville health center able to comply with the physical plant requirements for medication abortion clinics in Indiana?
A. No.
Q. Which requirements in particular is the Evansville health centers unable to comply with?
A. So the only requirement that we are unable to comply with is the regulation that requires a housekeeping room with a service sink.
Q. How does the Evansville health center currently meet its housekeeping needs?
A. So we contract with a janitorial service who comes in every day and does all of the cleaning per our contract. It's all

set up, you know, to meet kind of medical space specifications in terms of the types of cleaners we use and how things are cleaned on a day-to-day basis.

Q. And if those -- if the folks doing the housekeeping need to utilize a sink, what do they do?

A. Yeah, so in our laboratory spaces we have separate sink areas for clean activities. That would be, like, washing your hands. And then we have a dirty sink. So that's where we're rinsing off medical instruments. That's where we are dumping samples after they have been used. And that's the sink that -- I apologize. That's the sink where any kind of cleaning washing could happen.

Additionally, though, I think it's important to point out that our janitorial services aren't using an old-fashioned mop with a mop bucket that they're wringing out. That's just not how medical spaces are cleaned anymore. So most of the things that they're using are single-use things that are discarded or, if they have anything that they do need to kind of wash and reuse, they take that with them for cleaning as a part of the contract.

THE COURT: Things like wipes? Is that what you're referring to?

THE WITNESS: Correct. So if -- most of that is going to be a single-use type of wipe. But if it's anything -- you know, towels or anything like that that might be reusable,

they're taking all of that stuff with them to clean and, you know, prepare for additional use.

BY MS. TOTI:

Q. And, Ms. Miller, you mentioned a "dirty sink" in the laboratory area. Just so the record is clear, I want to ask you is that sink distinct from the sink where people would wash their hands or healthcare providers or patients might wash their hands?

A. Yes. It's labeled as a dirty sink, and the clean sink is labeled as a clean sink. So it's very distinct and clear kind of what activities need to happen in each space.

Q. Thank you. Why doesn't Planned Parenthood build a housekeeping room with a service sink in the Evansville health center?

A. Yeah, so there's a couple of reasons. First of all, we simply don't need one. As I said, we have the housekeeping service that comes in and does everything per our contract and per protocols. There is just not a kind of functional reason that we would need one.

Additionally, in order to kind of create that space, we would either have to take over one of, like, the bathrooms that already has water in it to kind of retrofit it into a housekeeping room with that type of sink. Or we would have to take, you know, one of our exam rooms or one of our kind of offices and run water to a different place, which is really

expensive because you have to jackhammer up the floor and put in -- excuse me -- you know, run new water lines and run different drain lines. And that's just a lot of work for something that we functionally don't need.
Q. Does Planned Parenthood own the building that houses the Evansville health center?
A. No, we don't. So there is additionally the question of how the building's owner would respond to that request.
Q. If the housekeeping room and sink requirement were eliminated, would Planned Parenthood be willing and able to provide medication abortions at the Evansville health center?
A. Yes.
Q. Currently, how far do people who live in Evansville have to travel to reach a licensed Indiana abortion clinic?
A. The nearest licensed location is in Bloomington, which is a two-hour drive one way from Evansville.
Q. Thank you, Ms. Miller.
MS. TOTI: I have no further questions at this time.
THE COURT: Before I call on Mr. Fisher for cross-examination, let me just say, so the record is clear, that Ms. Miller, who testified previously in our initial trial, was placed under oath prior to her testimony.
That oath still binds you in your testimony. So whenever you testify, you're subject to the oath. So the testimony you've given today is -- would it be the same if I

had placed you under oath again, Ms. Miller?

THE WITNESS: Yes, yes.

THE COURT: Okay. Good. Now, Mr. Fisher, you may cross.

MR. FISHER: Thank you, Your Honor.

*CROSS-EXAMINATION*

BY MR. FISHER:

Q. Good morning, Ms. Miller.

A. Good morning.

Q. My name is Tom Fisher. I'm an attorney for the State of Indiana. We've met before. It's nice to see you again.

How long has the Planned Parenthood Evansville Health Center been open?

A. I don't know for sure. It's been open for a long time, but I don't know the exact length.

Q. Well, do you think it was before 2006?

A. I think so, but I honestly don't know. I wasn't working for the company at that time.

Q. Okay. And has the Planned Parenthood Evansville Health Center ever provided abortions?

A. Not to my knowledge. But, again, I'm not sure.

Q. Has Planned Parenthood ever challenged in court the validity of the housekeeping rule so that it would be -- perhaps be invalidated with respect to the Evansville Health Center, to your knowledge?

A. I don't know.

Q. You testified earlier that -- we're looking at the other clinics that Planned Parenthood has in Indiana -- that the Merrillville, Indianapolis, Georgetown Road, and Bloomington abortion clinics would provide second-trimester abortions if such abortions did not have to be performed in an ambulatory surgical center.

Do I have that right?

A. Correct.

Q. Okay. And I'm wondering, if that were to happen, would Planned Parenthood make any upgrades or sort of rehabs to any of those facilities in order to facilitate second-trimester abortions?

A. My understanding is that the facilities, as they are right now, are kind of operationally appropriate for providing second-trimester abortions services.

Q. Would Planned Parenthood, to your knowledge perform second-trimester abortions without providing general anesthesia?

A. That would be up to our medical leadership.

Q. So you don't have information about how Planned Parenthood would go about providing second-trimester abortions in those facilities?

A. Not from a medical standpoint. I just understand the operational side of it.

Q. I see. But you have no operational plan in place for doing so that would require any upgrades, as I understand it?
A. Correct.
MR. FISHER: I think that's it. I think I have no further questions. Thank you.
THE COURT: All right. Redirect, Ms. Toti.
MS. TOTI: No redirect, Your Honor.
THE COURT: Ms. Miller, thank you very much. Good to see you again, virtually.
THE WITNESS: Thank you.
Am I good to log off?
THE COURT: Ms. Toti.
MS. TOTI: Yes. You're excused for the day. Thank you so much.
THE COURT: Wait a minute. Is that excused for the day, or is she released from her witness summons?
MS. TOTI: Plaintiffs will not be calling her again, Your Honor.
MR. FISHER: Nor will the defense.
THE COURT: So you're released. You've done all you need to do. Thank you again, Ms. Miller.
THE WITNESS: Thank you.
THE COURT: Your next witness.
MS. TOTI: Plaintiffs call Dr. Caitlin Bernard to the witness stand. And she's here in person, Your Honor.

THE COURT: All right. Dr. Bernard? Come forward through the swinging doors there.

Yes. Would you remain standing and be sworn please by the clerk.

THE COURT: You may be seated.

**CAITLIN BERNARD, MD, MS, PLAINTIFF'S WITNESS, SWORN**

**DIRECT EXAMINATION**

BY MS. TOTI:

Q. Good morning, Dr. Bernard. Could you please state and spell your full name for the record?

THE COURT: Hold on, Ms. Howie-Walters, I'm not getting the transcript. Or -- oh, no, I'm sorry. I've got what I need from you. Thank you. Never mind. Okay.

Go ahead, Ms. Toti.

MS. TOTI: Thank you.

BY MS. TOTI:

Q. Could you please state and spell your full name for the record.

A. Caitlin Bernard, C-A-I-T-L-I-N, B-E-R-N-A-R-D.

Q. Thank you. What is your occupation?

THE COURT: Hold on a minute. Miss Harves, I can't see the witness. I'm getting lawyers. I'm getting courtroom. I'm getting Ms. Toti. I'm getting me. But I'm not getting a television pickup, a video pickup, from the witness stand.

COURT CLERK: The one of the general courtroom is all.

THE COURT: Really? A flaw in this highly electrified system.

Okay. So I do better when I can see you. So does that monitor swing a little bit there, Miss Bernard -- Dr. Bernard? But I want you to be able to see it. So swing it the other way.

No. That's it? Well, sit tall.

It's not all it's cracked up to be, is it?

MS. TOTI: It's good to be back, Your Honor.

THE COURT: You said the right thing.

THE WITNESS: I'd rather be taking care of patients, honestly.

BY MS. TOTI:

Q. Dr. Bernard, what is your occupation?

A. I'm an OB/GYN physician.

Q. Are you board-certified?

A. Yes.

Q. Where are you currently licensed to practice medicine?

A. Indiana and Kentucky.

Q. Do you hold any academic appointments?

A. Yes. I'm assistant professor at the Indiana University School of Medicine.

Q. Can you identify all the places where you currently provide medical care?

A. Yes. I provide medical care at IU Health. So that

includes Methodist Hospital and University Hospital, as well as Eskenazi Hospital and their associated clinics, as well as Planned Parenthood of Indiana and Kentucky in Indianapolis and in Louisville, as well as Whole Woman's Health in South Bend.
Q. Do you provide abortion care at each of those places?
A. Yes.
Q. I'm going to ask you about Planned Parenthood to start with. At what Planned Parenthood centers do you currently provide medical care?
A. Georgetown clinic in Indianapolis and Louisville clinic in Kentucky.
Q. Okay. I'm going to focus my questions on your work at the Planned Parenthood clinic in Indianapolis. Is that okay?
A. Yes.
Q. What type of medical services do you provide at Planned Parenthood of Indianapolis?
A. I provide abortion care as well as complex contraception care.
Q. What kind of abortion care do you provide there?
A. First-trimester, both in-clinic or surgical aspiration abortion, as well as medication abortion.
Q. How often do you provide abortions at Planned Parenthood's Indianapolis clinic?
A. About one day per week.
Q. Now I'm going to ask you about Whole Woman's Health of

South Bend. Is it okay if I refer to that clinic as the South Bend clinic?
A. Yes.
Q. What medical services do you provide at the South Bend clinic?
A. I provide first-trimester medication abortion.
Q. When did you start providing abortion care at the South Bend clinic?
A. In 2020.
Q. How often do you provide abortion care at the South Bend clinic?
A. About one day per month.
Q. How far is the South Bend clinic from where you live?
A. Two and a half hours each way.
Q. Did you recently stop providing abortion care at the South Bend clinic for a period of time?
A. Yes.
Q. How long was that period?
A. Several months.
Q. Why did you stop providing care?
A. I received a threat against my daughter. Somebody threatened to kidnap her. And I felt it would be best for me to limit my travel and exposure during that time.
Q. And do you have an understanding of who made the threat?
A. It was somebody who made the threat online in an attempt

to, you know, purportedly stop abortions from being performed.

Q. How did you learn about the threat?

A. Through the Planned Parenthood security, who received the threat through the FBI.

Q. Did you stop providing abortion care altogether during that time period, or did you just stop providing at the South Bend clinic?

A. Just at the South Bend clinic.

Q. Why was that?

A. First, it required significant travel from my home and I was concerned that there may be people who would be able to identify me during that travel, as well as it's a very small clinic without any privacy for the people who are driving in and out. And so, therefore, people could directly see me. There's a large group of protesters. They could directly see me, they could directly see my car, my license plate, and easily identify me.

Q. Thank you.

I'm going to move on now and ask you about the hospitals where you provide care. You mentioned three hospitals; is that right?

A. Yes.

Q. Are they all in Indianapolis?

A. Yes.

Q. Do all of the hospitals have a relationship with Indiana

University School of Medicine?
A. Yes. Faculty from Indiana University School of Medicine as well as residents provide patient care at each of those locations.
Q. Are there any differences in the services you provide at each hospital?
A. No.
Q. And what services do you provide at those hospitals?
A. So general OB/GYN care. That includes labor and delivery, emergency room care, outpatient OB/GYN care, as well as abortion care.
Q. Do the hospitals limit circumstances in which you can provide abortion care?
A. Yes.
Q. Can you describe those limitations?
A. So they have policies that state that abortions can only be performed in the hospital or the outpatient clinics that are medically indicated. And so that includes both maternal or fetal indications.
Q. Could you give some examples of the kinds of maternal or fetal indications that would qualify?
A. So maternal indications generally are those that make a pregnancy risky to the woman, both of her health and of her life. So that could include, for example, cardiac -- you know, heart problems that could cause her to have a cardiac event

during pregnancy and even die; conditions that develop in pregnancy, like preeclampsia, cancer that requires either surgical or chemotherapy that would not be able to be performed during a pregnancy, things like that.

Q. And what about fetal indications?

A. So fetal indications include fetal anomalies, you know, things like anencephaly, genetic abnormalities, or things like conjoined twins.

Q. Are you knowledgeable about how much the hospitals charge your patients for second-trimester abortion care?

A. Yes. My understanding is that it can range significantly, but you know, I've seen bills between 10 and $40,000.

Q. And are the charges comparable at each hospital where you work?

A. Yes.

Q. Are you aware --

THE COURT: Is that for the hospital care only, or is that the physician care as well?

THE WITNESS: Usually the physician care is included in that full bill.

THE COURT: Go ahead, Ms. Toti.

MS. TOTI: Thank you, Your Honor.

BY MS. TOTI:

Q. Are you aware of any hospitals in Indiana that will provide abortions in the absence of maternal or fetal indications?

A. No, I'm not.
Q. You have encountered patients in your hospital practice who want to have abortions but who don't have maternal or fetal indications?
A. Yes.
Q. What happens to those patients?
A. In the first trimester, they are referred to local abortion clinics such as Planned Parenthood. In the second trimester, they're referred out of state, primarily to Chicago, Kentucky, things like that.
Q. Do all of your hospital patients have insurance coverage for abortion?
A. No. Most of them do not.
Q. What happens when one of your patients can't afford the cost of abortion care at a hospital?
A. We discuss options for, again, referral out of state to somewhere that, you know, is less expensive for them, or they, you know, have the option to take on the medical debt of the thousands of dollars that's required.
Q. How often do you end up referring patients out of state for second-trimester abortion care?
A. About once a month.
Q. Do Indiana doctors ever refer their patients to you for abortion care?
A. Yes.

Q. Under what circumstances?
A. Again, if they see the patient in the office or hospital and diagnose them with any of those maternal or fetal indications that we discussed, then they refer them to me.
Q. What's your understanding about why those doctors refer their patients to you rather than providing abortions themselves?
A. My understanding is that most of them work in hospitals or hospital systems which have expressly prohibited them from performing abortions.
Q. From what regions of Indiana do patients travel to reach you for second-trimester abortion care?
A. I have had patients from all over the entire state of Indiana as well as out of state -- Michigan, Ohio, Kentucky, Tennessee.
Q. Thank you.
Okay. Now I'd like to ask you a few questions about advanced practice clinicians.
Are you familiar with that term, "advanced practice clinician"?
A. Yes.
Q. What does it mean?
A. Somebody who has received degrees and additional clinical training such that they can practice either with some supervision by a physician or independently.

Q. Does that term include nurse practitioners?
A. Yes.
Q. Does it include certified nurse midwives?
A. Yes.
Q. Does it include physician assistants?
A. Yes.
Q. You have worked with advanced practice clinicians in Indiana?
A. Yes.
Q. Have you observed Indiana advanced practice clinicians provide medical care that is comparable to a medication abortion?
A. Yes. We have advanced practice clinicians who provide miscarriage management. So the medical management of a miscarriage is exactly the same as a medication abortion.

MR. HUDSON: Objection, Your Honor. This calls for expert testimony --

THE COURT: Stand up when you address the bench, sir.

MR. HUDSON: Objection, Your Honor. This calls for expert testimony, and the witness hasn't been qualified as an expert.

THE COURT: Ms. Toti, do you want to respond?

MS. TOTI: Yes, Your Honor. She's talking about her personal observations as a physician and the kind of care that she has worked with advanced practice clinicians to provide.

THE COURT: I take it as such. Overruled.

BY MS. TOTI:

Q. Dr. Bernard, you have observed Indiana advanced practice clinicians provide medical care that's comparable to first-trimester aspiration abortion?

A. Yes. Advanced practice clinicians can, for example, insert and remove IUDs, which is a similar process for an early first-trimester aspiration abortion.

Q. Have you ever worked in a healthcare system that permitted -- have you ever worked in a healthcare system that permitted advanced practice clinicians to provide abortions?

A. Yes.

Q. And where was that?

A. When I worked at Planned Parenthood of the St. Louis Region, we had clinics that were in southern Illinois. And in that state, advanced practice clinicians are able to provide medication abortions.

Q. Would you be willing to refer patients to an advanced practice clinician for first-trimester abortion care?

A. Yes.

Q. Okay. And, finally, I'd like to ask you just a couple of questions about the climate towards abortion in Indiana.

How would you describe the climate towards abortion in Indiana?

A. It is incredibly hostile.

Q. Why do you provide abortions in Indiana despite the hostile climate?
A. I believe that every woman should be able to access comprehensive reproductive healthcare, including abortion care, know matter where they live. In addition, we have one of the highest maternal mortality rates in the country, and I don't believe somebody should be forced to risk their life for an unwanted pregnancy.
Q. Thank you.
MS. TOTI: Your Honor, may I just have a moment to confer?
THE COURT: Yes, you may.
MS. TOTI: Thank you, Dr. Bernard. No further questions.
THE COURT: Cross-examine.
Counsel, state your name because I don't have a roster for you vis a vis the witness, please.
MR. HUDSON: Understood, Your Honor. Kian Hudson for the State of Indiana.
THE COURT: Thank you.

*CROSS-EXAMINATION*

BY MR. HUDSON:
Q. Good morning, Dr. Bernard.
A. Good morning.
Q. I'm happy to say we'll keep this nice and brief and we'll

let you go quickly.

So just to clarify from earlier, in addition to performing abortions at the two clinics you mentioned earlier, you occasionally perform second-trimester abortions at hospitals in Indiana; is that correct?

A. Yes.

Q. Thank you.

And when women receive a second-trimester abortion at a hospital in Indiana, what anesthetic do they generally receive?

A. What we call deep sedation, which is IV anesthetic that -- the way I explain it is they're sleep, they don't feel any pain, but they're not so far asleep that they can't breathe their own.

Q. Thank you.

And you mentioned that some hospitals -- that hospitals in Indiana that permit second-trimester abortions limit the sort of circumstances under which they will provide second-trimester abortions; is that correct?

A. Yes.

Q. Then you mentioned that there are other hospitals that do not permit abortions at all; is that right?

A. Correct.

Q. And do you have any idea how long those policies have existed?

A. No, I do not.

Q. Would it be fair to say that they've existed for many years, as far as your understanding?
A. Yes.
Q. And do you have any idea why those hospitals have those policies? And you can address them in turn if there's a different answer for each.
A. Are you speaking about the hospitals that have policies that people can obtain abortions or including those in which there are no circumstances?
Q. Let's address them in turn. So the hospitals that don't permit abortions at all, do you have any idea why?
A. Sure. So the vast majority that I interact with are Catholic institutions. Right? So they have some rules. There's a term about the way that the diocese makes decisions about what is allowed, permitted to be performed at the hospital and what is not.
Q. I see. So for those hospitals, it's a religious objection?
A. That's my understanding.
Q. Then the hospitals that do perform second-trimester abortions but limit circumstances in which they perform them, do you have any idea why those limitations are in place?
A. To be honest, I think it's probably political. You know, most of the hospitals have some type of a public arm or, you know, governing board; and, therefore, they get significant pressure from other people to limit the amount of abortion care

that's provided.
Q. So is it fair to say that's a policy decision made by the governing body of the hospital? Is that a fair --
A. Correct. Administrators, not physicians.
Q. Understood.
And then have any of your patients ever experienced complications connected to their abortions?
A. Yes.
Q. And when that happens, what do you recommend that your patients do?
A. Depends on the situation, but essentially seek care. So usually that would require, you know, a higher level of care and attendance or care for those complications.
Q. And so, in general, would you say that you would recommend that your patients seek out a physician if they have a complication?
A. I would say that they should seek out, you know, appropriate level of care. So, for example, if I send a patient to the emergency room, they may, in fact, be seen by an advanced practice clinician, not necessarily a physician.
Q. Understood.
MR. HUDSON: Let's see. I think that's it.
Thank you very much, Dr. Bernard.
THE COURT: Redirect, Ms. Toti?
MS. TOTI: No, Your Honor.

THE COURT: Thank you very much, Dr. Bernard.

THE WITNESS: Thank you.

THE COURT: Is she released from her summons?

MS. TOTI: From plaintiff's perspective, yes, Your Honor.

MR. HUDSON: Nothing further from us, Your Honor.

THE COURT: Thank you. You are released. Thanks for the time this morning, Doctor.

Okay. Your third witness, plaintiffs.

MS. SHAH: Plaintiffs would like to call Dr. Haskell.

THE COURT: All right. Dr. Haskell is being recalled, right?

MS. SHAH: That's correct.

**WILLIAM MUDD MARTIN HASKELL, MD, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**

THE COURT: So good morning, Dr. Haskell. Can you see me?

THE WITNESS: Good morning, Your Honor. Nice to see you again.

THE COURT: Can you see me across the way?

THE WITNESS: I sure can.

THE COURT: Okay. Good. I just want to remind you that, prior to your testimony when you previously appeared in this cause, you were placed under oath. And so rather than repeat it today, I simply remind you of that because any

testimony you give must be subject to that promise.

Do you make that again?

THE WITNESS: I understand that completely. Thank you.

THE COURT: Thank you, Dr. Haskell.

You may resume your questioning.

MS. SHAH: Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MS. SHARMA:

Q. Good morning. Rupali Sharma for the plaintiffs. Dr. Haskell, could you please state and spell your name for the record.

A. Sure. William Mudd Martin Haskell, W-I-L-L-I-A-M, M-U-D-D, M-A-R-T-I-N, H-A-S-K-E-L-L.

Q. Dr. Haskell, could you please reintroduce yourself to the Court.

A. Sure. I'm a physician. I've been practicing medicine for approximately 45-plus years. I've been doing abortions for a little over 40 years. I'm the owner and the medical director of the Women's Med centers in Dayton, Ohio, and Indianapolis, Indiana.

Q. Thank you. During Phase I of this trial you -- during Phase I of this trial, you testified that two physicians provide abortions at Women's Med Indianapolis. Is that still true?

A. Currently, one of those two physicians is seriously ill, and we're not sure if he's returning. So currently only just one.

Q. How often does the other physician provide abortions at Women's Med Indianapolis?

A. We provide abortions two days a week. When both physicians were working, it was Wednesday and Friday. One physician who's currently working is working Wednesdays and Thursdays to make up for the loss of Dr. G's time.

Q. Do you expect that schedule to continue in the next couple of months?

A. No. The current physician, Dr. D, is -- schedule is going to change in July, and she'll only be able to give us one day a week.

Q. What is the impact of physician availability on your abortion patients?

A. The availability of physicians impacts directly our ability to provide abortion services to our patients. If we're restricted to one day a week, even if we extend that day to some extent, we're going to not be able to provide timely service to 40 to 50 percent of our -- of the patients requesting those services.

Q. And does physician availability impact the flexibility you can offer patients?

A. Yes, just in terms of the times that they're available.

You know, if a physician isn't available, a patient who may want services this week may have to wait a week or two.

Q. And you mentioned that you no longer provide on Fridays. What is the impact of that on patients?

A. Well, many patients prefer Friday appointments so they can recover over the weekend when they're not at work. Particularly if they're doing a medication abortion, they can take the second medication that induces the expulsion of the tissue. They can do that on Saturday instead of taking a day off from work.

Q. Thank you. Why don't you hire more physicians?

A. We try, and we are trying right now. We just haven't found that there are available physicians to provide these types of services.

Q. And how have you gone about trying to hire a physician currently?

A. Well, currently -- we have found in the past and currently that the most effective method is word of mouth with one of the physicians that are actively working with us. For instance, Dr. D is a physician in the community of Indianapolis, and she knows physicians who may be willing and will approach them and ask and try to recruit for us physicians to help us out.

Q. In your experience, why has it been difficult to hire a physician?

A. Well, a lot of physicians who may have the skills or the

inclination and are supportive of abortion rights have private practices. And they're concerned that their private practices would be picketed if they were working for us. This is something they have told us.

We've run into situations where the spouse of a physician is concerned for the physician's safety because of the previous assassinations and assassination attempts against physicians providing abortions.

You know, some physicians, they just have their own personal reasons. But, you know, there are a number of reasons why physicians who may be supportive of abortion rights simply aren't willing to kind of step into the fray, if you will.

Q. Why are the physicians who are currently providing abortions at Women's Med Indianapolis willing to do so?

A. For instance, Dr. G comes from out of town. So the picketers don't follow him. He actually comes from out of state, you know, don't follow him back to his residence or his place of employment.

In addition, his place of employment in that town is a large institution, a VA hospital; so he's somewhat -- his practice is sheltered from that activity.

The physician that lives in Indianapolis is -- similarly works for a large institution. And picketing out in front of Indiana University would have no impact on her practice and what she does.

Q. Do you have any experience with the picketing of abortion providers?
A. Yes. I personally have been picketed a lot. Our offices are picketed every day that we provide services. They yell and scream at our patients. They use bullhorns to try to intimidate them. They yell at our physicians and ask them why they're taking blood money and why are they killing babies.
I've been picketed at my house. A number of years ago, I was coming home with my children and our street was lined with skull-and-crossbone flags. You know, the picketers were yelling at us as we turned into our driveway. It's a little bit frightening for my children and, you know, it can be very disturbing for some people. Our families learn to manage it and adapt, but not everyone is willing to make that adjustment.
Q. You testified that you've provided abortions for over 40 years. Why have you been willing to do so?
A. When I first started doing them back in 1978, I recognized that there was a need for good, competent physicians to provide abortions. Women receiving abortions deserve good medical care just like any other medical service. And I quickly -- I don't know quickly -- but over time, I just became really committed to providing abortion services and left what I was doing, running and managing emergency rooms, to provide abortion care full-time.
Q. I'd now like to ask you a few questions about the Indiana

law that prohibits advanced practice clinicians from providing abortion care. Are you familiar with this law?
A. Yes, I am.
Q. Is it okay if I refer to it as the physician-only law?
A. Yes. That's fine.
Q. Are you familiar with the term "APC"?
A. Yes, advanced practice clinician.
Q. Do you currently employee any APCs?
A. Yes. We have two -- actually, three registered nurse practitioners.
Q. What services do those APCs provide?
A. Currently they do the 18-hour informed consenting process required by Indiana law. And they do follow-up examinations on postabortion patients. And they will occasionally interpret an ultrasound.

(Reporter clarification.)

BY MS. TOTI:
Q. Dr. Haskell, could you repeat the last thing you said?
A. They provide contraceptive prescriptions also.
Q. Do you know if any of your APCs would be willing to provide first-trimester abortions if the law permitted them to?
A. Yes, they would.
Q. And how do you know this?
A. I've had that discussion with them.
Q. Would you retain these APCs as abortion providers if the

law permitted it?
A. Yes, we would.
Q. How would retaining these APCs as abortion providers impact the provision of abortion care at Women's Med Indianapolis?
A. It would allow us to expand the days that we offer that service, especially when we have a physician shortage like we have now. The APCs are -- our APCs work five days a week. And that would allow us to offer abortions five days a week, which would be very favorable for many patients.
Q. Would retaining your APCs as abortion providers have any economic impact on patients?
A. Yes. We would be able to reduce the fee that we charge because the APC is -- we can employ an APC at a much lower rate than we can physicians --
Q. By approximately?
A. -- by 10 percent.
Q. I apologize. Can you repeat that?
A. I was about to say it would reduce the cost by about 10 percent.
Q. And by approximately how much -- approximately how many dollars is that?
A. So we currently charge $70 for a first-trimester abortion. So -- I mean, 700. So it would reduce the cost by about $70.
Q. Thank you. How would retaining APCs to provide -- sorry. I'll strike that.

Dr. Haskell, I'd like to move on to the second trimester -- to second-trimester abortion care. What is your experience with second-trimester abortions specifically?

A. I personally have been providing second-trimester abortions since about 1979. We perform them routinely at our offices in Ohio. We provide them up through currently 21 weeks, 6 days, which is the gestational limit in Ohio. Prior to the imposition of that limit, we would provide them through the 24th week.

Q. What is the cost of a second-trimester abortion at your facility in Ohio?

A. It varies depending upon gestational age, anywhere from $800 up to $2,400.

Q. Do you offer second-trimester abortions at Women's Med Indianapolis?

A. No, we do not.

Q. And why not?

A. Well, the Indiana law requires that a second-trimester abortion be provided either in a ambulatory surgical center or in a hospital setting.

Q. Would Women's Med Indianapolis offer second-trimester abortions if the law permitted it?

A. Yes, we would.

Q. If the clinic wants to offer second-trimester abortions in Indiana, why doesn't it become licensed as an ASC?

A. The physical plant standards for an ASC are very much higher than the current abortion facility standards. It requires --

THE COURT: Say it once more, Dr. Haskell, please.

THE WITNESS: Sure.

THE COURT: The question was, with respect to second-trimester abortions, would the clinic provide them if Indiana law permitted?

THE WITNESS: Right.

And the reason we don't become an ASC is because of the expense of building out an ASC. ASCs are built to a much higher standard. You have requirements with regards to airflow, positive-pressure ventilation in operating rooms, larger operating rooms, corridor widths, more expensive equipment.

The -- we've done some renovations in Ohio. We recently -- well, two years ago outfitted a building to a lower level of -- a lower standard that cost 1.4 million. So an ASC would cost over $2 million to build out.

Is my dog coming through?

MS. SHARMA: He is, Dr. Haskell.

THE COURT: Throw him a biscuit.

THE WITNESS: If it becomes a problem, let me know and I'll shoo her out downstairs.

BY MS. SHARMA:
Q. Does Women's Med Indianapolis encounter people seeking previability abortions at or after 13 weeks, 6 days?
A. Yes. We see them because they don't realize that they are that far in their pregnancy. And when we see those patients, we refer them to our center in Dayton, Ohio.
Q. How frequently do you encounter such patients?
A. We see two or three of those patients every week.
Q. And why don't you refer them to ASCs or hospitals in Indiana?
A. Well, I'm not aware of any ASCs that provide abortions in Indiana. I'm only aware of one hospital personally that does. The procedures there are very expensive. We don't do very many of them. We do them primarily for either women who have a severe health issue that requires hospitalization for the abortion or they have a severe fetal anomaly.
Q. How do you know this?
A. From talking with the physicians who provide those abortions.
Q. If Women's Med Indianapolis could offer second-trimester abortions, at what cost would the clinic do so?
A. That would be the same fee schedule that we have at our Ohio location.
MS. SHARMA: May I have a moment, Your Honor?
THE COURT: Yes, you may.

MS. SHARMA: No further questions on direct, Your Honor.

THE COURT: All right.

MS. SHARMA: No further questions, Dr. Haskell.

THE COURT: Cross?

MS. PAYNE: Yes, Your Honor.

THE COURT: Would you introduce yourself, please?

MS. PAYNE: My name is Julia Payne.

THE COURT: Okay. Ms. Payne, nice to see you again.

MS. PAYNE: You too, Your Honor.

**CROSS-EXAMINATION**

BY MS. PAYNE:

Q. Dr. Haskell, do you feel stigmatized and shamed for being an abortion provider?

A. I feel targeted; I don't feel stigmatized or shamed. I'm very proud to provide abortion. And it's -- it's a quality I'm somewhat uniquely qualified to perform.

Q. If the ambulatory surgical center requirement is enjoined and you begin providing second-trimester abortions at your Indianapolis clinic, will you do anything to upgrade that clinic?

A. There would need to be some minor modifications, but nothing of an extraordinary expense, no.

Q. What type of modifications?

A. We might enlarge one of our operating rooms. Typically --

THE COURT: Say that again, please, Dr. Haskell.

THE WITNESS: We would probably enlarge one of our operating rooms. As second -- generally with second-trimester abortions, we have an ultrasound machine in the room to guide the surgeon as he's doing the abortion.

BY MS. PAYNE:

Q. Anything else?

A. That's the only thing I can think of that would need to be modified.

Q. Dr. Haskell, have you ever adapted your practice in response to the statute?

A. Well, of course we have had to adapt procedures and policies. For instance, when the 18-hour consenting process was introduced in Indiana, we had to change how we did things and how we scheduled patients, have to bring them in for two days instead of one. Occasionally we've had to buy a piece of equipment because in Ohio we provide a general anesthesia. So we needed the equipment to do that.

We -- but in terms of extensive modifications, no.

Q. Does Women's Med comply with the physical plant requirements for aspiration abortion clinics?

A. Can you be more specific?

Q. Does the Women's Med clinic in Indianapolis comply with Indiana's physical plant requirements for clinics performing surgical abortions?

A. Not currently.
Q. Do you perform first-trimester surgical abortions?
A. Yes, we do.
Q. If Indiana lifted its laws governing the qualifications of abortion providers and clinics, would that eliminate the financial burdens on women?
A. What was the first part of your question?
Q. If Indiana lifted its laws governing the qualifications of abortion providers and clinics, would that eliminate the financial burdens on women seeking abortion?
A. It would reduce it, yes. I don't know that it would eliminate it entirely.
Q. Why not?
A. Well, we're not going to give them away for free.
Q. Do you remember at your deposition saying that you could perform an abortion in the conference room?
A. I'm saying that, in terms of the equipment that would be required and the space that's required, it doesn't require a lot of special modifications. I was using that as a metaphorical example, not as a reality.

MS. PAYNE: I have no further questions.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MS. SHARMA:

Q. Dr. Haskell, I had just a few questions on redirect.

You -- the state asked you about your provision of aspiration abortions at Women's Med Indianapolis.
A. Correct.
Q. And you testified that you're currently providing those abortions. Do you have a waiver from any of the aspiration abortion regulations currently?
A. I know we have requested a waiver in the past.
(Brief interruption.)
THE COURT: Somebody intruded on our Zoom. I think it was Ms. Miller's lawyer whom we allowed to appear by Zoom.
MS. SINGH: I believe that's actually one of plaintiff's witnesses, Ms. Hagstrom Miller. If she can hear us, put yourself on mute, please.
THE COURT: Is she subject to the separation order too?
MS. SINGH: She is not, Your Honor, because she's a party.
THE COURT: Okay.
MS. SINGH: Thank you. Sorry about that.
BY MS. SHARMA:
Q. Dr. Haskell, I had asked you whether you have any -- whether the clinic in Indianapolis has any waivers currently from any of the regulations.
A. Correct.
We had asked for one. And the response we got back from

the Indiana State Department of Health was that the requirements were under an injunction and that there was no need for us to request a waiver at that time.
Q. Understood. And have you been -- has the clinic in Indianapolis been inspected recently?
A. Yes. It's been inspected within the past year. We had no deficiencies on that inspection.
THE COURT: I assume you mean by the department of health?
MS. SHARMA: Yes, Your Honor, by the Indiana State Department of Health.
Can I have just a moment, Your Honor?
THE COURT: Yes.
MS. SHARMA: Thank you.
No further questions, Dr. Haskell.
THE COURT: Recross?
MS. PAYNE: No, Your Honor.
THE COURT: All right. Can the witness be excused?
MS. SHARMA: He may.
Thank you, Dr. Haskell.
MS. PAYNE: Yes, Your Honor.
THE COURT: Thank you, Dr. Haskell. You're excused now from any further testimony. Thank you, sir.
THE WITNESS: Thank you, Your Honor. Have a great day.

THE COURT: You too, sir.

All right. Who's your next witness, Ms. Shube?

Call your witness, please.

MS. McKINNEY: Kelly McKinney for the plaintiffs.

THE COURT: Ms. McKinney, good morning. Come to the witness stand. It's only halfway across the room. Save you the last lap of the journey.

Remain standing, please, and be sworn.

KELLY McKINNEY, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

THE COURT: You may be seated.

BY MS. SHUBE:

Q. Good morning, Ms. McKinney.

A. Good morning.

Q. Could you please spell your name for the record.

A. Kelly, K-E-L-L-Y, McKinney, M-C-K-I-N-N-E-Y.

Q. Thank you.

What is your occupation?

A. I'm a nurse practitioner, and I specialize in family medicine.

Q. And where do you currently work?

A. I work at Community Health Network and at Women's Med.

Q. Are those places both in Indiana?

A. Yes, they are.

Q. Could you briefly describe your educational background?

A. Yes. I have a bachelor's degree in biology, I have a bachelor's degree in nursing, and I have a master's degree in nursing.
Q. And could you briefly describe your professional background?
A. Sure. I've been a registered nurse for almost 20 years. I've been a nurse practitioner for almost six. And while I was an RN, I primarily worked in labor, delivery, recovery, and postpartum.
Q. And you mentioned that you previously worked as a registered nurse. For how many years did you work as a registered nurse?
A. Almost 15.
Q. And as a registered nurse, did you ever engage in patient education in connection with the informed consent process with patients?
A. Yes, I did.
Q. And what kind of patient education did you do?
A. I would answer questions, review the consent forms, and prepare the patient for signing consents with the doctor prior to a procedure like a C-section or a tubal ligation.
Q. And what is the difference in education and training between a registered nurse and a nurse practitioner, which is your current occupation?
A. A registered nurse can be prepared with an associate's

degree or a bachelor's degree. In order to sit for the national board certification to be a nurse practitioner, you have to pass the NCLEX, which is the RN exam, as well as pass a national board certification for a nurse practitioner and have a master's degree prior to that.
Q. And did you also do a clinical residency?
A. I did. I completed a residency while in my master's program.
Q. And is a nurse practitioner considered an advanced practice clinician?
A. Yes.
Q. Do you have national board certification?
A. I do with ANCC, the American Nurses Credentialing Center.
Q. And are you licensed as a nurse practitioner in Indiana?
A. I am.
Q. And which licenses do you have in Indiana?
A. I have an RN license, an APN license, which is an advanced practice nurse or a nurse practitioner. I have a CSR, which is a controlled substance registration. I have a DEA license. And I have a certificate for medication-assisted treatment, which is prescribing Suboxone.
Q. Thank you. And just to clarify for the record. For your Indiana APRN license, for how long have you had that license?
A. Almost six years.
Q. Thank you. As a nurse practitioner, what kind of care are

you able to provide?
A. I care for patients of all ages. I diagnose and manage chronic and acute illnesses and injuries. I prescribe medication and manage that. I do procedures. I do education, physical exam, and history-taking -- medical history-taking.
Q. Thank you. And what kind of physical exams can you perform?
A. I do a lot of physical exams including women's health exams, like a pelvic exam with a Pap smear, for instance.
Q. And what kind of procedures do you perform?
A. Suturing, incision and drainage, urinary catheterization. I can really perform any procedure that I'm trained in.
Q. As a nurse practitioner, are you required to have a collaboration agreement?
A. Yes.
Q. Can you describe the required collaboration agreement?
A. For any patient that I prescribe medication to, 5 percent of those charts have to be reviewed by my collaborating physician.
Q. And do you have collaboration agreements at Community Health Network in Women's Med center?
A. Yes.
Q. Ms. McKinney, I'd like to ask you a couple of questions about your work at Community Health Network. What is Community Health Network?

A. Community is a large health network here in Indiana that includes multiple hospitals and a lot of outpatient locations.
Q. What is your role at Community Health Network?
A. I'm an internal medicine hospitalist.
Q. What are your responsibilities in that role?
A. I see patients that are admitted to behavioral health and manage their inpatient stay. So I manage all of their medications, any chronic illnesses, anything that comes up during their stay. I perform procedures, anything that's really required, physicals and history-taking as well, to clear them for admission to the hospital.
Q. What are some of the conditions that you typically diagnose and treat?
A. Diabetes mellitus, hypertension, hyperlipidemia.
Q. And what are some -- and you mentioned that you prescribe some medications in this role?
A. Right.
Q. What are some types of medications that you prescribe in this role?
A. With my license, I can prescribe all regimen drugs as well as Controlled Substances II through V. I prescribe antihyperglycemics, antihypertensives, a lot of antibiotics.
Q. Are NSAIDs a type of medication that you prescribe in this role?
A. Yes.

Q. And could you describe the acronym, what NSAID stands for?
A. Yes. It's nonsteroidal anti-inflammatory drug.
Q. And what kinds of medications are classified as NSAIDs?
A. The most common ones are ibuprofen or naproxen.
Q. How often do you prescribe ibuprofen and naproxen?
A. Almost every day.
Q. I believe you mentioned that you occasionally provide controlled substances?
A. I do, yes.
Q. What kinds of controlled substances do you provide?
A. Primarily pain medication and Suboxone for those in heroin recovery.
Q. Do any of the medications that you prescribe have contraindications?
A. Yes.
Q. How do you ensure that patients are eligible for these medications?
A. I start with a complete history from the patient to rule out allergies or any bad outcomes from taking it prior. I review labs and any other information that I can find in their chart typically.
Q. Does that include vitals?
A. And their vital signs, yes.
Q. You mentioned that one of the drugs you prescribe frequently is naproxen.

A. Yes.
Q. Is this a drug that you screen patients before prescribing?
A. Yes.
Q. And what contraindications do you look for?
A. Things like hypertension, liver disease, kidney disease.
Q. Have you ever had a patient with a contraindication for naproxen?
A. Yes.
Q. What did you do?
A. I found an alternative treatment.
Q. Do any of the medications you prescribe carry risks of complications?
A. Yes.
Q. Have you ever been in a situation where one of your patients experienced a complication that you weren't qualified to treat?
A. I have not.
Q. If you were in such a situation, what would you do?
A. Seek a higher level of care for the patient.
Q. How often do you work at Community Health Network?
A. 32 to 40 hours per week.
Q. And you mentioned that you would seek a higher level of care. If necessary, would that include transferring --
A. Hospitalization.
Q. And I want to clarify that. And Community Health Network

is already a hospital; is that correct?

A. Correct.

COURT REPORTER: I'm sorry, could you repeat that slower, please.

THE COURT: "Community Health Network is already a hospital, right?" Answer, yes.

You're talking so fast that the court reporter can't get it.

MS. SHUBE: I'm sorry. I will try. I'll slow down. I'm sorry, Your Honor.

THE COURT: When you read it, you go too fast. So look at the witness. It's different when you look at the witness and you engage the witness. You naturally slow down because you're actually communicating; you're not just reading to the witness. There's a hot tip for the day.

MS. SHUBE: Thank you. I appreciate it.

BY MS. SHUBE:

Q. Okay. Ms. McKinney, I'd like to ask you a few questions about your work at Women's Med.

What are your responsibilities as a family nurse practitioner at Women's Med?

A. I see the patients after they come in. I review their labs, their vital signs, their medical history. And then I sit with them and answer questions and review all of the state-mandated materials and sign their consent forms. And I

review their ultrasound.
Q. And do you ever prescribe medication?
A. I do. I prescribe contraception, and I prescribe a lot of Zofran, which is an antinausea medication.
Q. Do you ever treat patients for complications from abortions?
A. I do.
Q. And what kind of treatment do you provide?
A. If a patient comes in with an incomplete medical abortion, I prescribe Cytotec to complete the procedure.
Q. And you mentioned that you provide contraception. What kinds of contraception do you prescribe?
A. I prescribe the pill, the patch, the ring, and Depo-Provera.
Q. Do any of the contraceptions that you provide have contraindications?
A. Yes.
Q. Do you screen patients for these contraindications?
A. Yes.
Q. Do you have an interest in performing first-trimester abortions?
A. Yes, definitely.
Q. Are you able to perform them now?
A. No, I'm not.
Q. And why not?

A. Because it's illegal in the state of Indiana.
Q. If permitted to do so by Indiana law, would you want to perform first-trimester abortions at Women's Med?
A. Yes.
Q. And how often do you currently work at Women's Med?
A. Approximately one day per week.
Q. If you were able to perform first-trimester abortions, would you be interested in increasing the hours that you work at Women's Med?
A. Yes. I would decrease the hours at Community in order to perform abortions at Women's Med more frequently, yes.
Q. Turning briefly to the state-mandated disclosures that you mentioned you provide at Women's Med, for how many years have you provided state-mandated disclosures at Women's Med?
A. Four.
Q. And based on your experience, are there other staff members at the clinic capable of providing the state-mandated information?
A. Yes, definitely. I believe any of the staff members -- RNs or medical assistants -- could provide the materials if they were educated and prepared.
Q. As part of the mandatory disclosure process, do you have to tell patients that human physical life begins when a human ovum is fertilized by a human sperm?
A. I do.

Q. Based on your personal observations, how do your patients typically react?

A. Most are angry and confused and they disagree. Most state that they don't believe that life begins at conception.

MS. SHAH: May I have a moment to confer with my colleague, please?

THE COURT: Yes. I'll ask a question, and then you can think about whether you have additional questions of Ms. McKinney.

Based on your expertise -- I'm over here.

THE WITNESS: Yes.

THE COURT: This is not optimal, but I can see you. Can you hear me all right?

THE WITNESS: Sure.

THE COURT: Okay. So based on your experience and your education, your work, and so forth, can you think of any reasons that you would feel that you're not qualified or medically prepared to provide first-trimester abortions if permission were granted? Would there be anything about that practice that would exceed your confidence levels or your experience and so forth?

THE WITNESS: No. As long as I received adequate training, I feel like I would be perfectly capable of providing a first-trimester abortion.

THE COURT: So insofar as your own practice is

concerned, it would come within the sphere of activities and experience that you have already worked to achieve; is that right?

THE WITNESS: Yes.

THE COURT: Go ahead. Ask whatever other questions you have, Ms. Shube.

MS. SHUBE: Just one more clarification.

BY MS. SHUBE:

Q. You mentioned a medication called Cytotec; is that right?

A. Uh-hum.

Q. Is Cytotec also known as misoprostol?

A. Yes, it is.

MS. SHAH: No further questions.

THE COURT: Cross-examine, Mr. Hudson.

*CROSS-EXAMINATION*

BY MR. HUDSON:

Q. Good morning, Ms. McKinney.

A. Good morning.

Q. I'm Kian Hudson for the state, and I will be very brief this morning.

So first you mentioned advanced practice clinicians in your testimony. Could you briefly summarize the categories of practitioners who, in your view, fall into that category.

A. That would include nurse practitioners, physician assistants, nurse anesthetists.

Q. And you mentioned briefly some of the medical care that you provide as an advanced practice clinician.

Do you currently perform any surgeries in your current role?

A. No, I do not.

Q. And, in your view, do you think APCs should be allowed to perform surgeries?

A. Are you talking about a D&C?

Q. Just in general, do you think that as a matter of policy --

A. Not surgery but procedures, yes.

Q. Thank you.

MR. HUDSON: No further questions, Your Honor.

THE COURT: All right, Mr. Hudson.

Redirect?

MS. SHUBE: No redirect, Your Honor.

THE COURT: Okay. Let me ask a question before you step down there. Based on the last questioning.

You're distinguishing between surgeries and procedures.

THE WITNESS: Yes.

THE COURT: So if we extended it to the ridiculous level, of course, you'd say you shouldn't do brain surgery; is that right?

THE WITNESS: Correct.

THE COURT: So the procedures you feel qualified to

perform, what would those include within the area of practice that you already have established?

THE WITNESS: Well, typically I meant anything that doesn't require anesthesia, general anesthesia. So a procedure like placing an IUD or an implant -- contraceptive implant.

THE COURT: Okay. So all of those, you feel qualified to provide and you do provide; is that right?

THE WITNESS: I don't provide those in my current role, no, but I do feel qualified.

THE COURT: And you don't because of Indiana law.

THE WITNESS: No. I don't because I work in behavioral health right now, not women's health.

THE COURT: Okay. So if you were in women's health, it would be within your scope of expertise --

THE WITNESS: Definitely.

THE COURT: -- and experiences; is that right?

THE WITNESS: Yes.

THE COURT: Do my questions prompt any additional ones from you, Mr. Hudson?

MR. HUDSON: No, Your Honor.

THE COURT: Or you, Ms. Shube? You have any redirect?

MS. SHUBE: Yes. Maybe just one or two.

May I have just one moment, Your Honor.

THE COURT: Sure.

**REDIRECT EXAMINATION**

BY MS. SHUBE:

Q. Ms. McKinney, just a few questions.

So when the Court asks you what procedures you felt qualified to perform --

A. Yes.

Q. -- would that include an aspiration abortion?

A. I do not feel qualified at this point. I haven't been trained in it. But I feel that I could perform an aspiration abortion if I had the training.

Q. What kind of training would you need to obtain to perform an aspiration abortion?

A. I would have to follow a curriculum to learn how to do the procedure and then be paired with a physician in order to be observed and then signed off on, just like every other procedure that I've learned to do.

Q. And when you mentioned that you work in behavioral health, is that in your role at Community Health Network?

A. Yes.

Q. And in your role, how would you describe your work at Women's Med currently?

A. What? I'm sorry. Can you --

Q. Would you say that your work at Women's Med is work in women's health?

A. It's in health, yes. We just do not provide those kind of

contraceptions at Women's Med.

MS. SHUBE: I think I may have no further. I'll just confirm.

No further questions.

THE COURT: Ms. McKinney, having spent the morning here with all these lawyers, you should feel like we've honed your behavioral health skills.

You may step down.

May the witness be excused?

MR. HUDSON: Yes, Your Honor.

MS. SHUBE: Yes from the plaintiff.

THE COURT: Thank you very much. You're excused.

I'm anticipating, Ms. Singh, that your next witness may take a few minutes, more than 20 minutes. Is that right?

MS. SINGH: I believe she might. I don't think she will be more than 30 minutes, however.

THE COURT: Okay. Let's go ahead and do that before we take a morning break.

Would you call your witness, please.

MS. SINGH: Yes, Your Honor. Plaintiffs call Ms. Amy Hagstrom Miller.

**AMY HAGSTROM MILLER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**

THE COURT: Hello, Ms. Miller. Can you see me?

THE WITNESS: I can see you.

THE COURT: Okay. Good. Ms. Miller, I remember you

from your prior testimony. So I remind you you're still under oath for all the testimony you give in our cause, even when there's a disruption in the schedule so that you are appearing a few weeks and months after the first testimony.

Do you agree to that?

THE WITNESS: Yes, I do, ma'am.

THE COURT: You may proceed with your questioning, Ms. Singh.

MS. SINGH: Thank you, Your Honor. Dipti Singh for the plaintiffs.

AMY HAGSTROM MILLER, MD, PLAINTIFFS' WITNESS, SWORN

DIRECT EXAMINATION

BY MS. SINGH:

Q. Ms. Hagstrom Miller, please state and spell your name for the record.

A. Amy Hagstrom Miller, A-M-Y, H-A-G-S-T-R-O-M, new word Miller, M-I-L-L-E-R.

Q. I'd like to ask you a few questions about Indiana's law that prohibits anyone other than a physician from providing abortion care.

Are you familiar with that law?

A. Yes, I am.

Q. Is it okay if I refer to it as the physician-only law?

A. Yes.

Q. Are you also familiar with the term "advanced practice

clinician" or APC?

A. Yes, I am.

Q. How does the physician-only law impact the availability of abortion care at the South Bend clinic?

A. It -- this law impacts it greatly. It requires us to only schedule a physician to dispense or administer the medication abortion procedure or the visit. And so it restricts the ability of us to have more days on the schedule, and we have to pay for physicians to travel in to South Bend at this point.

Q. And how does the physician-only law impact the cost of care at the South Bend clinic?

A. It increases the cost of care at Whole Woman's Health in South Bend for a couple of reasons. One, physicians are generally compensated at a higher level than advanced practice clinicians; and, two, we at this point bring all of the physicians that work at Whole Woman's Health in South Bend from outside communities. So either they're traveling in from other places in Indiana or outside the state. So we're incurring additional costs in travel.

Q. During Phase I of the trial, you testified about the steps that patients must go through over the course of two days to access care at the South Bend clinic.

Have those steps changed since we last spoke?

A. No, they have not.

Q. I won't ask you to go over them again. But, instead, can

you tell the Court about the role that a physician plays at the South Bend clinic on a patient's Day 1 and Day 2 visits?
A. Sure. So I'll start with Day 2. Day 2 absolutely has to be provided by a physician. The physician is there in person and needs to be the one who goes over the medication and dispenses and administers that medication to the patient.
On Day 1 the state-mandated information counseling session and ultrasound is required by law to be delivered either by a physician or an advanced practice clinician. And we have an advanced practice clinician twice a month, and we have a physician the other two times a month.
Q. Why don't you always have the APC that you have working at the South Bend clinic provide the state-mandated information?
A. Because she actually needs full-time work, and so we are her second job. And so she needs to fit us into her primary work schedule and is only able to do that for two Fridays a month.
Q. If not for the physician-only law, would you be able to offer more hours to an APC that was working for you?
A. Yes. We would be able to offer more hours to the APC currently working for us, and she would be very interested in that.
Q. Do you recall testifying during Phase I of the trial that one of the factors impacting Whole Woman's Health Alliance's ability to recoup are the protesters at the South Bend clinic?

A. Yes, I do recall that.
Q. Has the situation with protesters changed at all since Phase I of the trial?
A. Our situation with protesters has always been a big challenge in South Bend, and it has gotten worse since the first phase of our trial. We have seen increasing animosity, aggression. We've actually had protesters trespassing, coming all the way up to the front door of the clinic and banging on the door when we have staff and patients inside. The tension has increased greatly.
Q. What are the other factors that impact the South Bend clinic's ability to recruit physicians to work there?
A. In general there is physicians that we have attempted to recruit and physicians we've already recruited describe an environment of hostility, of surveillance, of fear that they're going to be targeted, fear that their work in other communities could be impacted, their work in their home community could be impacted, whether they are an OB/GYN or a family medicine doctor. There's worry about being followed and being targeted. Some of our physicians have actually had that experience in their work with us, and others are deterred by that environment.
Q. Do you work at abortion clinics outside of Indiana?
A. Yes, I do.
Q. At those clinics do APCs provide healthcare services?

A. Yes, they do. We have -- Whole Woman's Health manages a clinic in Virginia that is a full family practice clinic, a primary care clinic, that integrates abortion into full primary care services. And we have an advanced practice clinician who performs primary care --

THE COURT: Slow down, Ms. Miller.

THE WITNESS: Sure.

We've have a nurse practitioner in that clinic who performs primary care visits for men and women. She provides gynecology care, and she also provides abortion care.

BY MS. SINGH:

Q. She provides first-trimester abortion care there?

A. Yes, she provides first-trimester medication abortion care. And Virginia recently got rid of the restriction preventing her from providing aspiration abortion. So now she is legally allowed to add aspiration abortion into her practice and is seeking training to do so.

Q. If not permitted by law, would Whole Woman's Health Alliance utilize APCs to provide first-trimester abortion care at the South Bend clinic?

A. Yes, we would.

Q. Would being able to utilize APCs to provide first-trimester abortion care impact how often care is provided at the South Bend clinic?

A. Yes, it would. Right now, the nurse practitioner is really

limited in the scope of practice that she can provide in the clinic. And so she would be able to add medication abortion visits, and we would be able to expand the hours that she works.

Q. Would being able to utilize APCs to provide first-trimester abortion care at South Bend clinic impact the cost of care for patients?

A. Yes, it would. We would -- like I said before, compensation for a nurse practitioner is a different rate than for physicians, generally, and also we would be able to save on the expense of supporting physician travel. And we would pass those cost savings on to the patients.

Q. So you mentioned that during Day 1, either a physician or APC provides the state-mandated information; is that right?

A. Correct.

Q. Why do you have APCs and physicians only providing that information?

A. Because that is what we are required to do by law in Indiana.

Q. Do any of the clinics that you work at outside of Indiana provide preabortion counseling to abortion patients?

A. Yes. They all do.

Q. At those clinics, who provides the preabortion counseling?

A. Trained staff such as nurses, counselors, medical assistants provide that visit and that information.

Q. And the individuals that you just described are not APCs; is that right?
A. Correct.
Q. If Indiana permitted Whole Woman's Health Alliance to utilize other trained staff, other than APCs and physicians, to provide the preabortion counseling at the South Bend clinic, would you?
A. Yes, we would.
Q. And how would doing so impact the South Bend clinic's provision of abortion care?
A. This would be a great improvement. We have staff that are qualified to deliver that information and do that counseling already in the clinic five days a week. So this would give our patients multiple options of days and times that they could come in for that information that may work better for their work schedule or their parenting schedule.
Q. Would it increase the number of days that you're able to provide care to patients?
A. Yes. We would expand that counseling and consenting visit to be offered on all the days that we're open. So it would be five days a week.
Q. Thank you.
Now I'd like to turn to the criminal penalties that are associated with provision of abortion care.
Outside of Indiana, do any of the states in which you work

single out abortion providers for criminal penalties?
A. Yes.
Q. In those experiences -- again, outside of Indiana -- have the criminal penalties impacted the provision of abortion care?
A. Yes, they have, in multiple states. I can think of two specific examples. One recently in Minnesota, there was clarification and confusion about the second-trimester abortion law in Minnesota that attached criminal penalties for any physician who performed a second-trimester abortion outside of the hospital.

And this basically resulted in all the physicians in the state suspending second-trimester abortion care for quite some time until the clarification about the interpretation and enforcement could be reached.

So it greatly impacted our patients in Minnesota and even patients from surrounding states who come into Minnesota for those -- for that care.

Secondly, recently, this last year, in Texas Governor Abbott issued an executive order related to the pandemic and COVID-19 and restricting all nonessential medical care. And while he didn't mention abortion specifically, he -- the attorney general made it very clear that it was extended to abortion care providers. And their intention was to deem abortion as nonessential medical care, and there were criminal penalties for physicians connected to providing abortion care

and the use of PPE -- so personal protective equipment -- for nonessential medical care.

And this created a -- chilling effect is a little mild. This basically stopped abortion care in the entire state of Texas for upwards of three weeks because physicians were so concerned about being prosecuted and the criminal penalties associated with that EO.

Q. Are you familiar with Indiana's laws that impose criminal penalties on abortion providers?

A. Yes.

Q. In your experience, do the criminal penalties associated with abortion care in Indiana impact the provision of that care?

A. Yes, they do. This is one of the issues that is raised oftentimes by physicians in our course of recruiting physicians to provide care in Indiana. It contributes to the hostile climate physicians often describe about providing abortion care in Indiana.

Q. Thank you.

Now I'd like to ask you questions about the provision of aspiration abortion care at South Bend clinic.

Does the South Bend clinic provide first-trimester aspiration abortion care?

A. No, we do not.

Q. Why not?

A. Because the physical plant requirements connected to the aspiration abortion care regulations in Indiana are cost-prohibitive for us in the building that we have in South Bend. It would require significant construction for us to come into compliance to add that service.

Q. We'll go into more detail. But just to start, could you identify the specific physical plan requirements that prevent the South Bend clinic from offering first-trimester aspiration abortion care?

A. Yes. There are at least three that come to mind. There is a requirement for the exam room to migrate to what they define as a procedure room, and that increases the square footage requirement for that room to 120 square feet.

The second is to maintain a 44-inch corridor, hallway.

And the third would be to have what is described as scrub facilities outside each procedure room.

Q. Why can't Whole Woman's Health Alliance expand the size of the procedure room in the South Bend clinic?

A. The building that Whole Woman's Health Alliance leases in South Bend is a small building. It's about 3,000 square feet. And the two current exam rooms have outside walls, so load-bearing outside walls, on one or two sides of each of those rooms, which would be a big undertaking to renovate. You'd have to do an addition.

The interior walls are shared with a corridor, and we

already underwent construction to meet the requirements of the corridor width. So if we expanded the exam room, it would make us out of compliance with the corridor width.

Additionally, one of the exam rooms shares a wall with the hallway that leads to one of our exits. So if we expanded that wall, it would block one of the exits to the building, which is another requirement, to have two entrances and exits to the building.

So there's kind of multiple reasons why complying with that restriction would be difficult and cost prohibitive.

Q. Why can't Whole Woman's Health Alliance add scrub facilities in the South Bend clinic?

A. Well, again, the scrub facilities would need to be outside of those procedure rooms. And it would go into the corridor that I just described. And so we would have to knock down a wall and renovate the space on the other side of that wall so that we could maintain the corridor width in order to add a scrub facility in that corridor. It would be a big undertaking that would involve plumbing as well as moving walls and losing a different room that's used for other purposes at this point as part of the care visit.

Q. Is it financially feasible for Whole Woman's Health Alliance to do renovations you just described?

A. No --

MR. HEILPERN: Objection, Your Honor. Lack of

foundation. She hasn't established that she has knowledge about how much any of these renovations would cost.

THE COURT: Well, she's the director of the clinic, the owner of it. So wouldn't she know that, Mr. Heilpern?

MR. HEILPERN: I was not aware that she was a general contractor or an architect.

THE COURT: Well, she has to pay the bill, right, if she owns it? She doesn't have to be an architect, right, Mr. Heilpern?

MR. HEILPERN: Well, no, I was simply suggesting that a foundation should be laid that she has solicited quotes.

THE COURT: All right.

Are you able to give financial extrapolations as to the costs of these things?

MS. SINGH: I can lay a foundation for her knowledge about the cost of renovations like the ones she's just described, Your Honor, if you'd like.

THE COURT: Go ahead, Ms. Singh.

MS. SINGH: Yes, Your Honor.

BY MS. SINGH:

Q. Ms. Hagstrom Miller, do you have experience renovating healthcare facilities?

A. Yes, I do. I have overseen at least 15 clinic renovations in my career.

Q. Can you tell us briefly about those experiences?

A. Yes. In multiple states, including Indiana in our South Bend facility, I've overseen the renovation of facilities including building exam rooms, hallway widths, adding janitors closets, housekeeping rooms, et cetera, in multiple facilities.

Q. And during that experience, did you come to learn about the cost of renovating healthcare facilities?

A. Absolutely. We always work with contractors. We solicit multiple bids. I have a lot of experience with what it would cost to do the renovations that we just described. In fact, I have done those kinds of renovations in the past in other states.

Q. And do you have any experience renovating the South Bend clinic?

A. Yes. We had to undertake significant renovations to come into compliance even to provide medication abortion services. We had to move all of the walls in the exam rooms in order to maintain the 44-inch corridor width requirement. We had to add a medication room.

We had to do multiple, multiple things in order to come into compliance initially. And it was quite challenging in South Bend to get a contractor in the first place. That was part of the delay of us being able to even apply for a license initially, was soliciting a contractor because of the antiabortion protests that we were already receiving at -- on-site.

THE COURT: You withdraw your objection, Mr. Heilpern?
MR. HEILPERN: Yes, Your Honor.
THE COURT: So in addition to all of her other expertise, she is an expert in this area, Mr. Heilpern. Think about that the next time you object to foundation because it may be better for you to do it on cross-examination than as an objection. Another little practice tip from your friendly neighborhood judge.
MR. HEILPERN: Thank you, Your Honor.
THE COURT: You're welcome.
Go ahead, Ms. Singh.
MS. SINGH: Thank you, Your Honor.
BY MS. SINGH:
Q. Ms. Hagstrom Miller, would it be financially feasible for the South Bend clinic to do the renovations you described would be necessary to provide aspiration abortion care there?
A. No, it would not. Already our patients are primarily people who come with economic hardship. And it would be very difficult to pass the cost of that renovation on to the people we serve.
Q. If the physical plant requirements we just discussed were struck down, would the South Bend clinic offer first-trimester aspiration abortion care?
A. Yes, we would.
Q. Does the South Bend clinic ever refer patients for

first-trimester aspiration abortion care?
A. Yes, we do, very regularly.
Q. In what circumstances?
A. We refer all patients who are over ten weeks into the pregnancy, where they are no longer eligible for medication abortion, to other places for an aspiration abortion.
We also refer patients who prefer an in-clinic procedure to medication abortion, and we refer people who are in their second trimester.
Q. Where do you refer those patients?
A. The first two groups -- the patients who are in their first trimester needing or seeking an aspiration abortion -- are most commonly referred to Indianapolis or Merrillville or Chicago.
Q. Where do the patients that come to the South Bend clinic typically live?
A. The majority of our patients live within the South Bend area or surrounding communities. But a significant percent, almost 20 percent, come from places as far away as Fort Wayne or Gary or other communities that are well over 50 or more miles from South Bend.
Q. Do any of the outpatient facilities you work at outside of Indiana provide first-trimester aspiration abortion care?
A. Yes. Most of them do.
Q. Tell the Court about whether those facilities have to comply with the physical plant requirements we just discussed.

A. We do not have any physical plant requirements in any other state connected to first-trimester abortion.

Q. Thank you. Next I'd like to turn to Indiana's law prohibiting abortions from being performed outside of a hospital or ambulatory surgical center.

THE COURT: May I ask a question before you move on to the next subject?

MS. SINGH: Of course, Your Honor.

THE COURT: So I'm confident, Ms. Miller, that your interests are in providing high-level patient care experiences for the patients who come to the South Bend clinic. So we'll start with that premise.

So if Indiana law did not require a 44-inch corridor, and you could afford it, would that be a renovation that you would provide because it's consistent with high-level care to your patients?

THE WITNESS: No, Your Honor. We're able to provide safe and high-quality abortion care services without undertaking renovation.

THE COURT: Do you see a correlation between a 44-inch corridor and the standard of care provided to patients? Is there a medical reason for that that you have perceived in your practice and in your management of the clinics?

THE WITNESS: No, I do not. Usually a corridor width is connected to a stretcher or anesthesia or something like

that in an ambulatory surgical center setting. And in a doctors office setting, where we're providing a procedure -- so it's not surgery and there's not anesthesia -- the requirements here are out of line with the sort of complexity -- or I would say the simplicity of the procedure.

THE COURT: How about the procedure rooms being 120 square feet, I guess it is?

THE WITNESS: We would be able to provide safe abortion care in our current exam rooms, which are actually -- one of them is 109 square feet and the other is 112.

THE COURT: How about the scrub facilities outside each procedure room? Does that have a medical correlation? Is there, not even a necessity, but just a desirability of that? Does it enhance the patient care you can provide?

THE WITNESS: No, Your Honor, because we are already required and compliant with having a sink for handwashing facilities inside each of the exam rooms. So that's already in place. And so the scrub facilities outside the exam room would be additional and not necessary to maintain high-quality infection control standards.

THE COURT: Ms. Singh, back to you.

MS. SINGH: Thank you, Your Honor.

BY MS. SINGH:

Q. Just to follow up, you mentioned the housekeeping room with the sink. Does the requirement to have a housekeeping room

with a sink impede your ability to utilize the space in the South Bend clinic in any way?

A. Yes, it does. It requires us to maintain that room and we can't sort of move the wall from that room in order to accommodate a hallway with expansion because we have to maintain that housekeeping room as is.

Q. Thank you.

Now I'd like to turn to Indiana's law prohibiting abortions from being performed outside of a hospital or ambulatory surgical center after the first trimester of pregnancy.

Are you familiar with that law?

A. Yes, I am.

Q. Is it okay if I refer to it as the second-trimester hospitalization requirement?

A. Yes.

Q. How does the second-trimester hospitalization requirement impact Whole Woman's Health Alliance's ability to provide second-trimester abortion care in Indiana?

A. It prevents us from doing so.

Q. Can the South Bend clinic become licensed as an ambulatory surgical center?

A. No, not without significant physical plant renovations.

Q. And why can't you do the renovations to become a licensed ambulatory surgical center?

A. Similar to what I just described for first-trimester

aspiration abortions, the ambulatory surgical center requirements for second trimester are even more onerous.

For example, the procedure room needs to be 250 square feet. And like I described before, that kind of renovation would be very expensive and would really require, actually, an addition onto the current building.

Q. Outside of Indiana, have you worked in outpatient settings that provided second-trimester abortion care?

A. Yes.

Q. Where?

A. Most of our clinics provide second-trimester abortion care in a doctor's office setting similar to the building that we have in South Bend, Indiana.

So we are able to provide care to 18 weeks in our clinics in Texas. We are able to provide care to 24 weeks in both Maryland and Minnesota, if we choose to, in a similar physical plant setting. And Virginia allows us to provide care to 24 weeks in a doctor's office setting as well.

Q. How much does a second-trimester abortion cost at those outpatient facilities?

A. It is much more affordable than in a hospital or an ambulatory surgical center. It's more expensive than a first-trimester abortion, but usually in the range of anywhere from 800 to $1,500 depending upon anesthesia, length of pregnancy, et cetera.

Q. If this court enjoined the second-trimester hospitalization requirement, would the South Bend clinic provide second-trimester abortion care there?
A. Yes, we would.
MS. SINGH: Your Honor, may I have a moment to confer?
THE COURT: Yes, you may.
BY MS. SINGH:
Q. Ms. Hagstrom Miller, just one more question. If the physician-only law were struck down, would you be able to offer your APC that currently works there enough hours that she could leave her current job?
A. Yes, that's possible, and she has expressed interest.
Q. Thank you.
MS. SINGH: No further questions.
THE COURT: Cross-examine, Mr. Heilpern?

**CROSS-EXAMINATION**

BY MR. HEILPERN:
Q. Hello, Ms. Miller.
A. Hello.
Q. My name is James Heilpern. I'm an attorney for the state of Indiana. I appreciate your testimony this morning, and I promise to keep this quick.
I want to ask a couple of questions about the South Bend clinic. Dr. Glazer is one of the physicians that provides abortion at the South Bend clinic; is that correct?

A. Yes.
Q. And you trust him, right?
A. Yes.
Q. And he's had a lot of training, correct?
A. He is a board-certified obstetrician/gynecologist, yes.
Q. That's right. And so he went to medical school and residency, et cetera; is that right?
A. Yes.
Q. And because of that training, it must be nice that you don't have to micromanage him, correct?
A. I'm not sure I understand your question.
Q. Sure. So, for example, if, heaven forbid, something went wrong with one of the abortions that he was administering to one of the physicians [sic], you would trust him to use his training and his knowledge and his expertise to handle that emergency and make medical-level decisions?
A. Yes, I would. He's the medical director, and he's a board-certified OB/GYN.
Q. All right. Thank you very much.
Let's shift to a related subject, the requirement that physicians or APCs provide mandatory disclosures. Now, you mentioned that you have a part-time APC at the South Bend clinic; is that correct?
A. Yes.
Q. And now the law already allows that APCs provide those

state-mandated disclosures, correct?
A. Yes, either an APC or a physician.
Q. That's right. But you testified that the APC does not always provide those disclosures, correct?
A. Yes. She works two times a month.
Q. Okay. And just out of curiosity, why haven't you hired another APC to help provide those disclosures?
THE COURT: Do you mean at the South Bend clinic?
MR. HEILPERN: Yes. I'm sorry, Your Honor.
BY MR. HEILPERN:
Q. At the South Bend clinic, why haven't you hired another APC to help provide the disclosures?
A. Unfortunately, because of the limits in their ability to provide care in the -- under current Indiana law, we haven't been able to offer enough hours to attract an APC to come just for those consenting visits.
Q. Okay. I'd like to move on and talk about the physical plant requirements for aspiration abortions. Now, you testified just a moment ago that you face kind of a Hobson's choice there. You can't expand the surgical room without shrinking the hallway below the legal limitations, right?
A. That's one of the reasons, yes.
Q. Okay. Now, could you remind us what year you founded the South Bend clinic?
A. We began work on building a clinic or growing a clinic in

2015. And we were finally able to open in 2019 thanks to a judge's order who told the State of Indiana to issue us a license.
Q. Okay. But was 2015 the year that you began searching for facility space, or was that 2019?
A. We began in 2015 working with people in the community and search for facility space and grant writing, et cetera.
Q. Now, you're aware that the physical plant requirements have been on the books since 2006, correct?
A. Yes.
Q. Okay. And that's nine years before you opened the South Bend clinic?
A. Yes.
Q. Okay. And when you were looking for facility space in 2015, did you look for a space large enough to meet the physical plant requirements in order to provide aspiration abortions?
A. Yes, we did. We actually spent well over a year looking at spaces. And multiple landlords -- upwards of 50 different spaces -- that all declined to lease to us because of the services we provide, specifically abortion.
Q. Okay. And some of those 50 spaces were large enough that you could have done aspiration abortions?
A. They were various spaces all over the city of South Bend.
Q. Thank you.

Now -- okay. Now, you've mentioned that you have done renovations at the South Bend clinic before, correct?
A. Yes.
Q. And during those renovations, you did not attempt to comply with the aspiration abortion physical plant requirements; is that right?
A. Those renovations were specifically geared toward us coming into compliance to be able to provide medication abortion specifically.
Q. Okay. And you've never spoken to a general contractor about the costs it would require specifically to convert the South Bend clinic into -- to meet the physical plant requirements, have you?
A. I actually have. I spoke to general contractors in soliciting contractors for the initial renovation of the building. The fees for the work that we did at that time were exorbitant. And we also under -- endured a lot of hostility from antiabortion picketers such that we lost our first contractor. Because the subcontractors were targeted by antiabortion people, our construction process was delayed and we had to find a second contractor. So I spent a lot of time actually speaking with contractors and --
Q. All right. And so you specifically asked for a bid about what it would take to meet the physical plant requirements for aspiration abortions?

A. I don't have a bid. I spoke about how much it cost to move the hallways, add sinks, add scrub facilities. Oftentimes in clinic construction, plumbing, moving walls, that kind of thing is quite common to be part of a discussion.

Q. Thank you. Let's move on to the second-trimester hospitalization and ASC requirement. A different set of the physical plant requirements but pretty much the same dilemma, right, the tradeoff between the procedure room and the hallway?

A. It's even more onerous. There's ceiling height requirements more than twice the size for the procedure rooms. But there's a similar theme in physical plant construction.

Q. And you're aware that those physical plant requirements for ASCs date back to at least 2004, correct?

A. Yes.

Q. And you're aware that there are other ASCs in South Bend, right?

A. I am sure there are other ASCs in South Bend. I haven't reached out to them or done research in that.

Q. And so when you were looking for facility space in 2015, did you also look for a space large enough to potentially open an ambulatory surgical center?

A. No, I did not, because I have experience running an ambulatory surgical center and the overhead is very significant and I knew we couldn't pass those charges on to the patients in South Bend.

Q. Okay. And if the second-trimester hospitalization requirement were enjoined today, you testified that you would begin offering second-trimester abortions, correct?
A. Yes.
Q. But you wouldn't perform second-trimester abortions without offering deep sedation or general anesthesia, would you?
A. Yes, I would.
Q. One final question. Would you consider providing abortions to be a -- particularly lucrative for physicians?
A. I'm not really sure what the nature of your question is, but abortion is a very normal part of an OB/GYN's training and a very normal part of their practice, including D&Cs, deliveries, other gynecological procedures.
Q. Sure. And I'm not questioning that. I'm just asking you, you've mentioned concern about passing expenses on to patients a number of times.
So I'm just asking as far as in comparison to other services that, say, an OB/GYN might perform, is performing an abortion comparatively a real moneymaker?
THE COURT: For whom?
BY MR. HEILPERN:
Q. For the physician.
A. No, it is not. One of the unique things about abortion in the state of Indiana is that people can't use their health insurance and they can't use their Medicaid to pay for their

abortion.

So the majority of people we're serving are actually paying out of pocket for those services, which actually makes the cost of the procedure very different than other parts of medicine. It's extremely uncommon in other medical specialities, but unfortunately it's a burden that our patients endure.

Q. Okay. Well, thank you, Miss Miller. You've been quite helpful.

THE COURT: Redirect?

MS. SINGH: No, Your Honor.

THE COURT: All right. Good. Thank you.

Is Ms. Miller excused?

MS. SINGH: Yes, on behalf of plaintiffs.

MR. HEILPERN: Yes.

THE COURT: Thank you, Ms. Miller, very much. You have fulfilled your obligation here.

THE WITNESS: Thank you.

THE COURT: Well, I've brought us up to close to noon because it's -- that witness went a little bit longer. So I think maybe we should break for lunch. I don't know the time involved in the next one, Dr. Clark.

MS. SINGH: I think it would take about 15 minutes. So it might be preferable to break for lunch.

THE COURT: Okay. Let's do that.

It's -- we'll regard it as noon. By the time you

gather up your papers, it will be noon. So we'll reconvene at 1:20. See you then.

MS. SINGH: Thank you, Your Honor.

THE COURT: Have a good break.

COURT CLERK: All rise.

Court is in recess.

(Recess taken.)

(Open court.)

THE COURT: Good afternoon, all.

MR. FISHER: Good afternoon.

THE COURT: I hope you had a nice break. Anybody go outside?

MR. FISHER: Oh, yes.

THE COURT: How is it, Mr. Fisher? Muggy?

MR. FISHER: A little muggy. There were a few raindrops on the way over; but coming back, just fine.

THE COURT: Okay. Good. So what do you think about my gardening tonight? Will I be able to do it?

MR. FISHER: I think that there's a pretty good chance. It is still shortly past the solstice; I think you may be able to do it.

THE COURT: Well, if it's rained a little, that helps on the weeding.

Do you garden?

MR. FISHER: I do, in fact.

THE COURT: Good. So we're talking about subjects of mutual interest.

MR. FISHER: I love gardening. We've had some beautiful roses this season.

THE COURT: Oh, yeah. Good.

Do you garden?

MS. SINGH: No, I do not. I buy a lot of plants, but I tend to kill them.

THE COURT: I know you're in LA. You have to do hydroponic things in LA. It's still worthwhile.

MS. SINGH: Yes. Absolutely.

THE COURT: You may be seated. It's good to see you all again.

There was a nice article recently -- and I think it was in the Business Journal, IBJ -- about a young guy who learned how to use some apartment sort of building, maybe warehousing space -- did you see it? -- where he's growing greens in long columns like this in hydroponic sorts of arrangements. And they're wonderfully productive and prolific. So it may be the thing of the future, you know. So getting your hands in real dirt is going to be regarded as old-fashioned.

Have you got another witness for us?

MS. SINGH: We do, Your Honor.

THE COURT: Who are you going to call this time?

MS. SINGH: We will be calling Dr. Allen Clark.

THE COURT: Okay. And is Dr. Clark present?

MS. SINGH: He is, Your Honor.

THE COURT: Okay.

Oh, Dr. Clark, hello. Come forward, please, and sit in our witness stand over there. And before you sit down, would you turn this way and be sworn by the clerk, please.

THE COURT: You may be seated.

Go ahead.

MS. KORNREICH: Thank you, Your Honor.

ALLEN CLARK, MD, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. KORNREICH:

Q. My name is Mollie Kornreich for the plaintiffs.

Dr. Clark, can you please spell your full name for the record.

A. A-L-L-E-N, C-L-A-R-K, Allen Clark.

Q. Thank you. And what is your profession?

A. I'm an obstetrics/gynecologist.

Q. Are you licensed to practice medicine?

A. Yes.

Q. Where?

A. In Indiana.

Q. What is your educational background?

A. I did my undergraduate at University of Illinois in

Champaign and my medical school at University of Illinois in Chicago. And then did a four-year residency at Illinois Masonic, which is on the north side of Chicago, in OB/GYN.
Q. Do you have any professional certifications?
A. I'm a fellow of the American College of Obstetrics and Gynecology.
Q. Do you currently practice as an obstetrician-gynecologist?
A. Yes.
Q. Where?
A. South Bend, Indiana.
Q. Who is your current employer?
A. I'm employed by The South Bend Clinic.
Q. And what is The South Bend Clinic?
A. The South Bend Clinic is a private practice, multispecialty organization. I have seven partners. We're in our own private practice, and then we're part of a multispecialty larger group that works together.
Q. Is that office affiliated in any way with the Whole Woman's Health Alliance South Bend clinic?
A. No, I do not believe so.
Q. What type of care do you provide as part of your practice?
A. We do full-range obstetrics and gynecology. So for obstetrics, that would be prenatal care --
So we do prenatal care. So that's low- and high-risk obstetrics, delivery, which is vaginal and C-sections, do

miscarriage management. We do also full-range gynecology. I do annual exams, Pap smears, in-office procedures, contraception, IUDs. I do colposcopies, LEEPs, endometrial biopsies. Just kind of all generalist OB/GYN.
Q. What types of miscarriage management care do you provide?
A. I provide medical management and D&Cs.
Q. And when you prescribe medication for miscarriage management, what medication is that?
A. Cytotec or -- yeah, misoprostol.
Q. Other than in the miscarriage management context, do you provide abortion care?
A. No, I do not.
Q. Do you refer patients for abortion care?
A. Yes.
Q. Where do you refer patients for medication abortions?
A. Preferably the Whole Woman's Health Alliance in town.
Q. Where do you refer patients for aspiration abortions during the first trimester?
A. Typically to Indianapolis or Chicago.
Q. Where do you refer patients for abortion care after the first trimester?
A. Chicago.
Q. What care do you provide in your doctor's office?
A. So in our office itself, we do prenatal visits, ultrasounds; we do annual exams, Pap smears; we do in-office

procedures, such as IUD, endometrial biopsies, colposcopies, LEEPs, simple skin procedures, things we did do under local anesthesia.

Q. When you perform a colposcopy in your office, in your practice what does that entail?

A. Typically, the patients had an abnormal Pap smear, and they've come back for a colposcopy. We'll place them in an exam to visualize the cervix. We use acidic acid on the cervix and something called a colposcope. It allows us to visualize the cervix. Think of it as a mobile microscope almost. Lets you visualize the cervix. And then I can see where the abnormal cells are and do a biopsy in the office to make a diagnosis.

THE COURT: What is that procedure you're referring to? It didn't show up on our transcript, and I missed it.

THE WITNESS: It's called a colposcopy.

THE COURT: That's fine. I know what that is. Thank you.

BY MS. KORNREICH:

Q. Does the colposcopy involve the removal of tissue?

A. If we see abnormal cells, I would do something called an endometrial biopsy. That's where you take a piece of tissue to send to pathology. You can also do something called an endocervical curettage where you take tissue past what you can see on the cervix. The goal of the procedure is to identify

abnormal cells. And so I want to send that tissue to the pathologist.

Q. You mentioned that you perform LEEPs in your office. What does that stand for?

A. Loop electrocautery excisional procedure.

Q. And in your practice, what does that entail?

A. So a LEEP is typically done on someone who has found an abnormal biopsy on the colposcopy exam. They normally would have a precancerous lesion that I need to remove.

And so, again, that patient would come back. I would perform an exam, which typically includes another colposcopy to make sure I'm seeing where the pathologist said the abnormal cells were. I then typically would perform what's called a paracervical block to numb the cervix. And then I actually will cut approximately 5 millimeters in depth in about a 1-centimeter circumference portion of the cervix off and remove a larger piece of tissue to send to the pathologist.

Q. And when you perform endometrial biopsies in your office, what does that entail?

A. So an endometrial biopsy is performed to assess intrauterine tissue. Often this will be a patient I'll be worried about a uterine cancer. So I've identified they need this; bring them in.

Again, perform an exam. I'll typically at that point apply Betadine to the cervix, grasp the cervix with something called

a single-tooth tenaculum.

THE COURT: Spell it.

THE WITNESS: T-E-N-A-C -- it's been -- C-U-L-U-M, I believe.

THE COURT: Oh, you mean ordinary spelling?

THE WITNESS: I dictate it. So I haven't spelled it in a long time.

So I grasp the cervix with a tenaculum. It's a long kind of pinching device. It gives the cervix some stability; otherwise, it will just move when I try to then pass what's called is a biopsy pipelle. It's a long hollow cylindrical tube that you pass to the top of the uterus and then pull to apply suction. And you tap the top of the uterus with that to obtain tissue, intrauterine tissue to send to the pathologist to get a diagnosis.

BY MS. KORNREICH:

Q. When you insert IUDs in your office, what does that entail?

A. IUD insertion, we also take to an exam room, place an exam. Also Betadine to the cervix, grasp the cervix with the same instrument. And then I pass two things. First I pass a measuring stick, which actually I often use a pipelle. They're then marked so I can measure how big the uterus is and then set the IUD appropriately and then pass the IUD through the cervix into the body of the uterus and then remove everything else.

Q. Do you provide care to pregnant patients in your medical

office?
A. Yes, I do.
Q. Do you perform colposcopies on pregnant women in your office?
A. Yes.
Q. Do you prescribe misoprostol for miscarriage management in your office?
A. Yes.
Q. What does that entail?
A. Typically, we've diagnosed a patient with a miscarriage and I'm discussing her options. That would include medical management or a D&C.
If they prefer medical management, I would prescribe misoprostol; it's 800 micrograms. They place -- they would go home and place that vaginally and repeat it 12 hours later if they've not passed tissue. The medicine is to make them cramp, contract, and push anything inside the uterus out.
Q. Do you prescribe other medications to pregnant women from your office?
A. Yes.
Q. Which medications?
A. It's a full-range medical office. So antibiotics, antiemetics, antidepressants, pain medicines. Whatever's indicated.
Q. Are there scrub facilities in your office?

THE COURT: Are there what?

BY MS. KORNREICH:

Q. Are there scrub facilities in your office?

A. No.

Q. How many rooms are there in your office that are used for providing patient care?

A. Fourteen patient exam rooms.

Q. And what is the size of those rooms?

A. Slight variety, but 13 of them are about 7 by 12, give or take, and one of them is a little bit larger. It's about 11 by 12. They're all a little different.

Q. What, if any, procedures do you perform in the smaller rooms?

A. I will perform all -- everything except we don't typically do colposcopies or LEEPs in the smaller rooms. But everything else.

Q. And where do you perform the LEEPs and colposcopies?

A. Typically the larger room.

Q. Why do you perform those procedures in the larger room?

A. It's where we keep the colposcope.

Q. If you wanted to, could you move the colposcope into one of the smaller rooms and perform colposcopies or LEEPs there?

A. Yes.

Q. Do patients have discretion to determine whether they're treated in a hospital or ambulatory surgical center as opposed

to your office?
A. Yes. Typically, I will talk with the patient about whatever the procedure is I feel like needs to be done. I discuss with them pros and cons, risks and benefits, why they may want to go one or the other. There's often financial reasons patient will pick one or the other. Procedures in the office tend to be much cheaper for patients.
That's normally what goes into figuring out where we do a procedure.
Q. Are you familiar with the process of obtaining informed consent from patients?
A. Yes.
Q. In your practice, what does that involve?
A. Typically, if we're going to do a procedure, my MA or RN, whoever is working with me that day, will room the patient, discuss the procedure. They'll often obtain the signature on the consent form. And they'll prepare the room.
Then typically I'll come in; discuss the procedure again; make sure we've answered any questions; gone over pros, cons, risk benefits; answer questions. And then I'll sign the consent as well and then typically perform the procedure.
Q. When others on your staff provide information, is that always an advanced practice clinician?
A. No.
Q. Do you work with advanced practice clinicians in your

clinical practice?
A. We had a nurse practitioner in our office from when I started until spring of 2021. And then we work at another clinic and provide some prenatal care with an advanced -- with a nurse practitioner.
Q. When did you have an advanced practice clinician in your office?
A. I believe I started in '14, and we had one who then retired. But we transitioned a new one, and then she left in spring of '16 -- sorry -- spring of last year. Spring of '21. Excuse me.
Q. What care did those individuals provide?
A. So the nurse practitioners typically did well woman exams, annual exams, Pap smears. They did endometrial biopsies. They did IUD insertions. They did a little bit of prenatal care.
Q. When they performed exams, what were they typically looking for?
A. At your annual exam, you'll typically history, physical, ask them if there are any problem. You'll then perform a physical exam. You know, kind of include our normal physical -- breast exam, pelvic exam, assessing uterus, cervix, making sure there's no abnormalities.
Q. Thank you.
MS. KORNREICH: No further questions, Your Honor.
THE COURT: Cross-examine?

MR. ANDERSON: No questions from defendants, Your Honor.

THE COURT: Dr. Clark, have you run across a Dr. Robert Oppman up there in South Bend?

THE WITNESS: What kind of doctor is he?

THE COURT: He's a family practice doctor.

THE WITNESS: I believe I know his name.

THE COURT: I'm not going to think any more of you or less of you for how you answered that question. Just checking.

THE WITNESS: I am lucky to get many refers from many primary care doctors. I appreciate them.

THE COURT: Thank you, sir, for coming in.

Can Dr. Clark be excused?

MS. KORNREICH: From plaintiff's perspective, yes, Your Honor.

MR. ANDERSON: For defendants, yes. Thank you.

THE COURT: Thank you, sir. You've done all we need you to do in this trial. Thank you.

All right. Your next witness, please.

MS. CHARMANI: Plaintiffs call Ms. Guerrero, Your Honor.

THE COURT: I have somebody else as Number 7. Are you moving the order around? I don't care if you do that. Just tell me.

MS. SINGH: Your Honor, apologies. Would that be okay

if we call Ms. Guerrero instead?

THE COURT: However you want to do it. I'm working off your list.

MS. SINGH: Thank you.

Ms. Guerrero, hold on just one second and be sworn by the clerk please.

PAULINA GUERRERO, PLAINTIFFS' WITNESS, SWORN

DIRECT EXAMINATION

THE COURT: You may be seated.

MS. CHARMANI: Athanasia Charmani for plaintiffs, Your Honor.

Good afternoon, Ms. Guerrero.

THE COURT: Just one second here. I don't know how to turn off this microphone; so I have to turn away. So excuse me.

All right. Now proceed.

BY MS. CHARMANI:

Q. Ms. Guerrero, could you please state and spell your name for the record.

A. Paulina Guerrero. P-A-U-L-I-N-A. Guerrero, G, as in George, U-E-R-R-E-R-O.

Q. Did you testify during Phase I of this trial?

A. Yes.

Q. And were you admitted as an expert on the availability of abortion care in Indiana and the burdens that the Indiana

residents face in obtaining abortion care?
A. Yes.
Q. Can you remind the Court what your occupation is?
A. I'm the national programs manager at All-Options, and I work in the Hoosier Abortion Fund, the Diaper Bank, and I supervise and manage the National Talkline.
Q. Are you aware that currently Indiana law requires that, after the first trimester of pregnancy, an abortion may only be obtained in a hospital setting or ambulatory outpatient surgical center?
A. Yes.
Q. What percentage of your clients seek a second-trimester abortion?
A. About a quarter of our clients.
Q. What percentage of those clients are able to obtain the care they seek in Indiana?
A. None. And that's because the price of accessing second-trimester abortion care at those hospitals is way beyond what our clients are able to afford. We generally work with low-income clients, clients that live in more rural areas. And so the cost is completely prohibitive for them.
Along with this, most of the hospitals that I know of that offer those services have restrictions on who can access those services. The pregnancy has to present for maternal or fetal indications.

So all the time we have to refer patients out of state to seek services, and most of the time we refer them to the Chicago area.

And along with this, even in situations where perhaps they -- we have a client that is presenting for maternal or fetal indications -- for example, I worked with a client who was having health complications with their pregnancy. I tried to contact Indiana Medicaid and got the runaround for about a week. And because time is of the essence in this situation, the client and I decided to just go ahead and try to access services in Chicago anyway.

Q. So every client that seeks a second-trimester abortion is referred to Chicago, correct?

A. Yes. Chicago or perhaps a couple of other places out of state, like Granite City.

THE COURT: I'm sorry. Like where?

THE WITNESS: Granite City.

BY MS. CHARMANI:

Q. And why is that an issue?

A. It's an issue because having to seek care outside of the state for second-trimester procedures creates emotional and financial barriers for and burdens for the clients that we work with.

Q. Can you tell me a little bit more about the financial burdens first.

A. Yes. Overall, Chicago has a much higher cost of living than Indiana. And so the clients that we work with, since they are low-income, since many of them are from rural areas, you know, really struggle to try to scrape together the money for the procedure price in the first place, and then there's also added expenses for travel and logistics.

And so this includes money for gas to get to Chicago. There are tolls from many places to get into Chicago. The price of parking is exorbitant compared to Indiana. You know, many towns in Indiana, it's a dollar 50 for a meter or the parking's free. So it's a bit of a shock for our clients to have to pay for tolls and then find out that downtown Chicago parking is easily 20, 40, 50 dollars for overnight. The price of food is more expensive, and because it is a two-day process, they have to figure out a way to pay to spend the night.

Along with this, because it is two days, if they're working, they're missing two days of work. And if they have children, they have to figure out a way to find childcare for those two days, including an overnight stay.

So the combination of that means that they're scraping together every penny that they have to not only pay for the remaining price of the procedure but also these travel expenses as well, which is a significant burden for them.

Q. And you mentioned emotional burdens as well. Can you tell me a little bit more about that?

A. Yes. The clients that we work with are experiencing significant stress, anxiety, overwhelming feelings in trying to navigate all of these different burdens and financial barriers, along with dealing with the situation of being -- trying to deal with an unplanned pregnancy.

So this really just gets compounded when you have other factors built into it as well. Confidentiality becomes a huge issue.

And the sad reality is -- and it's hard to think about this, but we talk to clients all the time that are experiencing this -- is there's many clients that don't have anybody they can tell that they're going through this experience, and they have to keep everything completely secret.

This gets even more complicated when you are working with clients who are in a domestic violence situation, where the cloud of secrecy is really meant to protect the client and it's almost virtually impossible for them to try to figure out how to be gone for two days in those situations.

So that places an incredible amount of emotional strain on the clients. And even if somebody is not experiencing an extenuating circumstance, like a domestic violence situation, you know, it's an overwhelming process for some of our clients.

I recently worked with a young woman who was 19 years old from Seymour, Indiana, who had never really been outside of Seymour except for Indianapolis and Bloomington, and she had to

board a bus and go up to Chicago by herself in order to access care.

So along with this, if they don't have anybody that they can go with, a lot of the clinics in Chicago do ask clients to leave with someone once the procedure is finished. And we do have some partner organizations that are able to find volunteers to do that. But the volunteers are strangers. They're not somebody that the client is familiar with.

Q. And based on your observations and what your clients tell you, how do they feel about having to leave the state to obtain abortion care?

A. Along with the fact that they are experiencing this intense stress and anxiety, especially because time is of the essence, they all want to be seen as soon as possible, of course. And sometimes that just can't happen because, you know, things happen when you're -- especially for low-income people. You know, a car wreck or car troubles, that money is gone. So you have to wait to try to accrue that money again in order to be seen.

But it also reinforces this idea that they're doing something bad or wrong when, in fact, they're just trying to access healthcare.

Q. What part of the cost of a second-trimester abortion do you cover?

A. We cover on average about 200 to $275 for second-trimester

procedures. We always let clients know that, if they are having trouble coming up with the rest of the money, to please call us and we can increase the amount of money that we pledge towards their procedure.

And then if the client lets us know that, you know, the travel cost is part of the issue -- you know, I recently worked with someone in Indianapolis who had a reliable car but was having trouble coming up with the gas money and somebody to watch her kids. So we said, you know, if we kick in an extra $75 towards the procedure price, that means that you can keep more of your own money to put towards the travel cost.

And that was -- that was fine with her, and that's something that we try to do with other clients as well.

Q. Is there a cap to the amount of funds that you can provide for a second trimester abortion?

A. Generally speaking, we have a cap of about $350 for second-trimester procedures. But, you know, it really depends on a case-by-case basis. Once it get to more of the extenuating circumstances, we might go past the 350 if somebody needs it. And then once it's starting to be a situation where -- we have a weekly budget that's pretty small, and if it's really starting to push against our weekly budget, we'll start to reach out to other organizations to see if they can help towards the procedure price so that it's a collaborative funding, sort of piecing together of the price.

Q. And what other services do you offer to assist your clients with the burdens of having to travel to Chicago?
A. We were running a Practical Support Network program, which is a program of volunteer drivers that would drive clients to their appointments, but we had to suspend that with COVID. And we're just now trying to figure out how to possibly reopen that.
But even when -- before COVID, even when we had the program running, we really only had one or two volunteers that were able to drive someone to Chicago, and then not all the time because those volunteers had their own scheduling conflicts for appointment times. So it was difficult to find drivers to help take people up to Chicago.
MS. CHARMANI: Thank you, Ms. Guerrero.
No further questions on direct, Your Honor.
THE COURT: Ms. Guerrero, would you remind me where you are located physically.
THE WITNESS: I'm physically located in Bloomington, Indiana.
THE COURT: Bloomington. Okay. Good. Thank you.
Cross-examine.
MR. HUDSON: Nothing from the defendants, Your Honor.
THE COURT: Ms. Guerrero, thank you very much. You may step down.
THE WITNESS: Thank you.

THE COURT: Your next witness.

MS. SHARMA: Plaintiffs would like to call Dr. Allison Cowett.

THE COURT: All right.

Good afternoon, Dr. Cowett.

THE WITNESS: Yes, ma'am.

THE COURT: Can you hear me?

THE WITNESS: Yes, I can.

THE COURT: Okay. I'm going to ask you to be sworn by the clerk.

THE WITNESS: Okay.

THE COURT: Will you do that.

THE WITNESS: Yes.

THE COURT: Thank you.

ALLISON COWETT, MD, PLAINTIFFS' WITNESS, SWORN

DIRECT EXAMINATION

MS. SHARMA: Good afternoon. Rupali Sharma for the plaintiffs again.

THE COURT: Go ahead, Ms. Sharma.

MS. SHARMA: Thank you.

BY MS. SHARMA:

Q. Dr. Cowett, could you please state and spell your full name for the record.

A. Yes. My first name is Allison, A-L-L-I-S-O-N. And my last name is Cowett, C-O-W-E-T-T.

Q. What is your occupation?
A. I am an obstetrician/gynecologist specializing in abortion and contraception.
Q. Are you board-certified?
A. I am. I am board-certified in obstetrics and gynecology.
Q. I'd like to show you Stipulated Exhibit No. SE33.
Do you recognize this document, Dr. Cowett?
A. Yes. This is my curriculum vitae.
Q. Is it a true and accurate summary of your education, work history, and professional credentials?
A. Yes, it is.
Q. What is your current job, Dr. Cowett?
A. I'm currently the medical director of Family Planning Associates Medical Group in Chicago.
Q. And do you hold any other positions currently?
A. I am also on staff at the Northwestern University Feinberg School of Medicine.
Q. And what are your duties in these positions?
A. So as the medical director at Family Planning Associates Medical Group, I am responsible for, as the primary surgeon, doing both aspiration abortion and dilation-and-evacuation abortion; so the first and second trimester.
I'm also responsible for the medical abortions that take place in the facility. We work with multiple physician assistants and nurse practitioners, but I am responsible for

the oversight of all the medical -- everything that happens in the clinic as well as administrative duties.

As the -- as a member of the Northwestern medical staff, I am also responsible for teaching fellows who are training in family planning.

Q. Do you provide general OB/GYN care as well?

A. I do not currently provide general obstetrics and gynecology care, although I did for ten years in my prior position at the University of Illinois.

Q. And where are you licensed to practice medicine?

A. I am licensed in Illinois.

Q. Have you ever been licensed to practice medicine in any other state?

A. No, I have not.

Q. And what professional societies, if any, do you belong to?

A. I belong to the American College of Obstetricians and Gynecologists; the Society of Family Planning, which is the professional organization for OB/GYNs who specialize in this area; as well as the National Abortion Federation.

Q. Is Family Planning Associates a National Abortion Federation member as well?

A. Yes, we are.

MS. SHARMA: Your Honor, at this time I'd like to offer Dr. Cowett as an expert in the field of obstetrics and gynecology as well as abortion care.

THE COURT: Any objection?

MR. GOODWIN: No objection, Your Honor.

THE COURT: All right. The witness has been proffered and the Court accepts her without objection as an expert. She may testify accordingly.

MS. SHARMA: Thank you.

BY MS. SHARMA:

Q. Dr. Cowett, I'd like to ask you a few questions about Family Planning Associates. Does Family Planning Associates collect information about its patients?

A. Yes, we do. We collect both health history information from the patients that come to receive care here as well as demographic information that we collect.

Q. And what sort of demographic information do you collect?

A. We collect information about patient age, race, ethnicity, address -- so what county and state they reside in -- as well as information about highest level of education obtained and those sorts of things.

Q. And do you ever use this data?

A. I do. I frequently use it. In some cases, I will use it for my clinical work in caring for patients. I will also use it as the medical director of the clinic and in advocacy efforts to advocate for our patients as a whole.

Q. And approximately how many people obtain abortion care at Family Planning Associates each year?

MR. GOODWIN: Your Honor, I'm going to object to the relevance of this data.

THE COURT: Well, what's your name, sir?

MR. GOODWIN: I'm sorry. Scott Goodwin for the defendants.

THE COURT: And, Mr. Goodwin, on your feet so I can hear you.

MR. GOODWIN: All right.

I have an objection just as to the relevance of this data to the plaintiff's theory of the case.

THE COURT: Ms. Sharma, you want to answer?

MS. SHARMA: Yes, Your Honor. We will establish the relevance. It's information about her patients that will -- that informs her understanding of what they need and how she cares for them. So I can establish the relevance as I go on, but --

THE COURT: Are her patients emblematic of all other abortion patients, for example, those in Indiana?

MS. SHARMA: Yes, Your Honor. I'll be asking her specifically about Indiana residents obtaining abortion care with her.

THE COURT: Okay. Lay the foundation.

MS. SHARMA: Okay.

BY MS. SHARMA:

Q. So my next question is are any -- so are any of the people

who obtain abortion care at Family Planning Associates residents of Indiana?

A. We do see patients from Indiana on a regular basis. So I'm located in Chicago. And we perform and provide about 12,000 abortions annually for women who present for care. And about 1 in 12 of our patients presenting for care or for abortion are from Indiana.

MR. GOODWIN: Your Honor, at this point we're going to object as to the foundation for her knowledge. Unless she's had personal observations of all these women's addresses, we need a foundation.

THE COURT: Your objection is overruled.

You may proceed.

BY MS. SHARMA:

Q. What proportion of the second-trimester abortion patients at Family Planning Associates are residents of Indiana?

A. So while 1 in 12 of our patients overall are from Indiana, about 1 in 9 come from -- coming from Indiana are coming to Indiana [sic] for a second-trimester abortion.

Q. And how do these patients pay for their abortion care?

A. So the majority of women that we see from Indiana for a second-trimester abortion are paying out of pocket for their procedure. And by that, I mean they are self-pay. So they are required to have a certain amount of money to pay for their abortion.

Many of these self-pay individuals will receive financial assistance from a number of different abortion funds that help low-income women pay for their abortion procedures. And then a much smaller percentage of patients presenting from Indiana will use private insurance.

Q. Where in Indiana do your second-trimester abortion patients come from?

A. So I see patients, really, from all over the state. I -- well, you might assume -- and it's true -- that most -- the majority of our patients coming for a second-trimester abortion from Indiana are coming from counties in northwest Indiana that are closer to Chicago, such as Lake County, Porter County, and LaPorte.

However, we do see a significant number each year from counties much further away from Chicago. Between one and two times a month I will see patients from Allen County, Fort Wayne, and South Bend, Indiana, and other counties as well.

Q. Do you see patients from the Indianapolis area?

A. I do. Of patients seeking second-trimester abortion with us, 1 in 5 -- or actually 22 percent, so slightly more than 1 in 5 -- will seek care -- seeking care for a second-trimester abortion are from Indianapolis. So Marion County or the surrounding counties such as Boone, Shelby, and Hendricks County.

Q. And do you see patients from the Evansville area in

Indiana?
A. I do. And our -- based on the demographic data that we collect, 28 percent of our patients come from greater than three hours away from Chicago; so Indianapolis area or further south such as Terre Haute and Evansville.
Q. Why do Indiana residents travel to Chicago for second-trimester abortions?
A. These patients travel to Chicago because they are unable to access second-trimester abortion in Indiana because of the hospital- and ASC-only requirement for abortion provision in the second trimester.
Q. And why can't your Indiana patients who are obtaining abortions in the second trimester go to an ASC or hospital in Indiana for care?
A. So my understanding is that there are no ASCs in Indiana that provide second-trimester abortion. And they are unable to access second-trimester abortion in a hospital because, while there are some hospitals in the Indianapolis area that provide second-trimester abortion, these hospitals do not provide abortion in cases -- a second-trimester abortion in cases other than maternal health indications or a fetal indication for having an abortion.
And patients I see have -- sometimes have those indications but often have different reasons for seeking abortion.
Q. And how do you know what you just testified about with

respect to hospitals, why they can't obtain care at hospitals? How do you know that?
A. Well, I know that from two main sources, one being the patients that I see. When I meet patients and I interview them, I -- for the majority of patients seeking care from far away, I'll ask them and understand from them why are they not seeking care closer to home. And they tell me, you know, abortion is not accessible to them in the hospital setting.
I also know that because I have colleagues in Indiana who refer me patients on a regular basis. These are obstetricians, gynecologists, or other individuals who are taking care of women seeking abortion and that cannot access an abortion in a hospital setting.
Q. What is the practical impact on your second-trimester abortion patients from Indiana of having to obtain an abortion in Chicago?
A. So this is -- there's certainly a big impact on them from the standpoint of financial burden. The women I see for second-trimester abortion, as I stated, are coming from -- often from quite far away. They many times are coming from small towns or smaller cities and are not aware or prepared for the financial burden that they will face in Chicago.
The cost of living is significantly different than their residence, you know, where they live, their counties of origin as opposed to Chicago. And they will often come here

unanticipating -- or not anticipating the high cost of things such as hotels, parking, food.

Many of the patients that we see -- I would say most of the patients that we see seeking care in the second trimester will be in Chicago for multiple days. So they will be required to see us in clinic, stay overnight either one or two days, and return to clinic for their procedure.

I have many patients who are unprepared for that -- those finances. I recently took care of a woman whose mother had accompanied her to Chicago in their private vehicle. They had money for a hotel and stayed in a hotel overnight. However, they didn't anticipate the high cost of parking, which is extreme in Chicago.

The patient's mother, for two nights, had to stay in her car and drive around the city because she was not able to pay the cost of parking. This is obviously a significant burden and meant that the patient did not have, you know, her emotional or social support with her overnight in the hotel.

Q. Does Family Planning Associates ever provide services to Indiana residents seeking a second-trimester abortion with the clinic?

A. We do. We -- if we find out from patients about these financial difficulties, we certainly can reach out to funds that we work with, the funds I mentioned before, that will often help low-income women pay for the cost of their abortion.

We could reach out to these funds, and they can often help with food and lodging.

We also -- if the funds are -- you know, do not have money at that time, we also have a fund here within the clinic that we can use for low-income patients, although I will say that the financial burden is not really -- is not the only burden. There's also, you know, a significant psychological and emotional burden that patients will encounter by coming from so far away.

They will have the stress of coming to a different state for their procedure. They feel often that they're doing something secretive or, you know, doing something wrong because they know that if they had another type of medical problem, they could seek care within Indiana and in Indianapolis, but -- you know, if they were coming for cancer treatment or something like that, but because they're seeking abortion in the second trimester, they're forced to cross state lines for that procedure.

There's also of concern for -- I've had many patients from Indiana tell me that they were planning to sleep in their car or, if they came by public transportation, that they were planning to sleep in the bus station. And when I find these things out, obviously, I help patients make different arrangements. But I do worry there are patients who -- there's a significant threat to their safety because they are

vulnerable, you know, in a situation like sleeping in their car or in a bus station.

MS. SHARMA: May I have a moment, Your Honor?

THE COURT: Yes, you may.

MS. SHARMA: Thank you, Dr. Cowett.

No further questions on direct, Your Honor.

THE COURT: Okay. Thank you, Ms. Sharma.

Cross-examine?

CROSS EXAMINATION

BY MR. GOODWIN:

Q. Good afternoon, Dr. Cowett.

THE COURT: Mr. Goodwin.

THE WITNESS: Good afternoon.

MR. GOODWIN: Scott Goodwin for the State of Illinois -- Indiana.

THE COURT: You have a multistate practice?

MR. GOODWIN: I teleported there for a minute. All right.

BY MR. GOODWIN:

Q. All right. Dr. Cowett, is it accurate to call Family Planning Associates a clinic or a facility? What's the correct term there?

A. Either of those are appropriate. We are a clinical facility.

Q. Okay. So if I say clinic then, you know, nobody will be

confused?
A. Correct.
Q. Okay. And your clinic has a website and portal for scheduling appointments; is that correct?
A. Yes, it does.
Q. And that's, if I have this right, FPAChicago.com? Does that sound right?
A. Yes.
Q. And you would agree that all of the information on -- that your clinic posts on its website is true; is that right?
A. To the best of my knowledge, yes.
Q. Okay. Great. So is it true that all of the abortions at your clinic are provided by physicians?
A. Yes.
Q. Okay. And that's true for both first and second trimester?
A. It is true to the extent that abortions are either performed or supervised by physicians.
Q. Okay. So which are performed by physicians and which are supervised by physicians?
A. So the performance of the first-trimester suction aspiration abortion and the second-trimester dilation and evacuation are performed solely by physicians.
The medical abortions that we provide are performed under the supervision of myself, the medical director.
Q. I see. All right. Would you agree that patients consider

a number of factors in choosing where to obtain an abortion?
A. In my experience, that is true.
Q. Could the reputation of the facility be one of those factors?
A. Yes.
Q. Sure. And, in fact, don't you tout your clinic's reputation on your website?
A. Yes, we do.
Q. Could the reputation of the certain physicians at the facility be a factor that patients might consider?
A. I would say that may be a factor, but that's not my experience of what patients tell me when they're coming from far away. That's not one of the reasons they stay.
Q. Okay. Sure. Could the recommendation of a friend or confidant be another factor that a patient might consider?
A. Yes.
Q. Okay. Is it possible that some abortion patients might pick a facility further from their home community for the sake of privacy and anonymity?
A. Yes.
Q. Okay. Do you have any idea how many -- approximately how many abortion facilities there are throughout the Chicagoland area?
A. I would not be able to tell you an exact number, but there are multiple clinics, and they -- providing different services.

Q. To your knowledge, are all those facilities downtown or are they scattered throughout the area?
A. They are not all downtown, no.
Q. Okay. In an op-ed that you wrote in February of this year, didn't you describe your clinic as "one of the largest independent abortion facilities in the country"?
A. I did.
Q. Can you explain what you mean by largest?
A. By largest, I mean we serve one of the largest number of patients seeking abortion per year in the country.
Q. All right. Thank you.
So if I missed the number, forgive me, but you said that over the past year your facility treated what I remember to be an approximate number of Indiana residents. Did I miss the number?
A. I testified that we see 1 in 12 -- approximately 1 in 12 of our 12,000 patients seeking abortion per year are from Indiana.
Q. So that wasn't an exact number, just an approximation?
A. It is an approximation from my -- based on the last year's data.
Q. Okay. Do you have a number for how many of those patients were coming for a second-trimester abortion?
A. Yes. 271.
Q. Okay. Out of approximately?
A. Well, I can't tell you off the top of my head the exact

number of second-trimester abortions we did, but I know that my calculation within -- recent calculation noted that that was 1 in 9 of our second-trimester abortion patients. So multiply that and you get the answer.
Q. Okay. And your report doesn't attempt to measure the number of Indiana patients going to other Chicagoland abortion facilities; is that right?
A. It does not. However, I am aware from other sources that many patients are coming to see us. That is because we do provide some services that other clinics in the Chicagoland area do not provide.
Q. Okay. So, you know, the proportion that might be coming to your facility would not necessarily be replicated at other facilities? Fair to say?
A. Could you clarify that? I don't think I understand the question.
Q. I was just trying to understand your statement. It sounded like you had said that sort of colloquially you understood that more patients were coming to see you. So, you know, just sort of given the approximate figure that you'd given for the proportion of patients that were -- well, what did I mean by that?
THE COURT: Go to the next question.
MR. GOODWIN: Yes. Scratch that.

BY MR. GOODWIN:

Q. Do you know how many Illinois residents travel out of state for abortions?

A. I do not.

Q. Okay.

A. Given the fact that all the states around us have far more restrictive abortion laws, based on my expertise in this area, I would assume that very few travel out of state.

Q. Okay. But you don't know the number?

THE COURT: What are those other states, just -- when you say all the other states around you, Iowa? Wisconsin?

THE WITNESS: Iowa, Wisconsin, Missouri, Indiana, Kentucky, Ohio. We receive patients from all of these states on a regular basis.

THE COURT: Okay. Thank you.

BY MR. GOODWIN:

Q. Okay. But just to clarify, you don't know what number would be going from Illinois to another state?

A. I do not know the exact number, no.

Q. Okay. You provide, as you said before, second-trimester abortions at your clinic, correct?

A. Yes.

Q. Does your clinic use deep sedation for second-trimester abortions?

A. We use deep sedation, yes.

Q. When do you use deep sedation?
A. We use deep sedation when patients -- at any gestational age when we perform abortions if that's the patient's request.
Q. So is it only on request?
A. Well, it is only on request, but the majority of our patients do receive deep sedation.
Q. Okay. All right. Switching gears for a minute, Dr. Cowett, since you joined Family Planning Associates, how many times has your clinic made emergency calls for an ambulance?
A. I would have to say an approximate number. This is probably two to three times a year.
Q. Okay. And you are the medical director, correct?
A. Yes.
Q. So if there were a call for an ambulance, you would know about it?
A. Absolutely.
Q. Okay. To your knowledge, since you've joined Family Planning Associates --
THE COURT: I assume you mean for patients; is that right?
MR. GOODWIN: Yes, for patients.
BY MR. GOODWIN:
Q. Isn't it true that, since you've -- since the time that you've been with Family Planning Associates, at least four of

those emergency calls were for postoperative uterine or vaginal bleeding?
A. I would have to look back at the records, but that would be a common reason that a patient would be transported to the hospital, yes.
Q. And to your knowledge, were any of those because of uterine perforation or cervical laceration?
A. Yes. Those are known complications of abortion.
Q. Okay. And just briefly, what might have caused that?
MS. SHARMA: Your Honor, objection. Calls for speculation.
THE COURT: She's your expert. Let her testify.
THE WITNESS: I'm sorry. Can you repeat the question?
BY MR. GOODWIN:
Q. Yeah. Of those cases of -- of uterine or vaginal bleeding, what might have caused the uterine perforation or cervical laceration?
A. The performing -- are you asking about dilation and evacuation or first-trimester suction evacuation -- suction aspiration?
Q. Either. I'm just trying to get to the bottom of it.
A. Okay. So cervical abortion.
THE COURT: Let me back you up because I want to know your answer. You said that two to three times per year you have to resort to emergency calls to an ambulance?

THE WITNESS: Correct.

THE COURT: And of those two or three times a year, it's usually for bleeding or uterine laceration or a perforation; is that right?

THE WITNESS: It could be for -- the most common reasons we would transfer a patient would be for bleeding. Sometimes the bleeding is caused by an injury to the uterus, like a uterine perforation. The other reason we would transport a patient would be for an infection.

THE COURT: Okay.

Now ask your question, Mr. Goodwin.

MR. GOODWIN: Okay. I think I got what I need there.

BY MR. GOODWIN:

Q. You said that that type of bleeding or injury, that would be serious enough to make an emergency call for an ambulance; is that correct?

A. On occasion -- sometimes it is and sometimes it's not. But yes, we've transferred -- we do transfer people -- not often, but we do have occasion to transfer people to the hospital.

Q. Okay. And isn't it true that, since the time that you've been with Family Planning Associates, at least two emergency calls for an ambulance were for patients who aspirated while they were under anesthesia?

A. I recall one call to an ambulance for an aspiration from anesthesia -- at the time of anesthesia. This particular

patient had a -- had a condition -- medical -- preexisting medical condition which was a problem within her GI tract, her esophagus, which caused her to aspirate and was certainly not our usual young, healthy patient.

This was also a patient that did not disclose to us that she had this problem. And had she disclosed it, we would have referred her to an inpatient facility for her abortion.

Q. I see. And just for clarification on the record, what does aspiration mean?

A. Aspiration -- I think the aspiration that you're referring to refers to, while a patient is under sedation, they will breathe in some stomach contents into their lungs.

Q. Okay. And if you know, during your time at Family Planning Associates, isn't it true that at least a couple of those emergency calls for an ambulance were for tachycardia and/or hypertension?

A. I don't believe I've transferred anybody for hypertension.

Q. Okay. But tachycardia, yes?

A. Tachycardia, yes.

Q. What does tachycardia mean?

A. Tachycardia is a high pulse rate over the rate of a hundred beats per minute.

Q. In your medical experience, what can tachycardia be symptomatic of?

A. That is an extremely broad question. Tachycardia has many

etiologies. In our postoperative patients tachycardia could be due to a number of things.
Q. But if a patient has tachycardia, what would be the reason then to call for an ambulance?
A. Tachycardia, if we thought that a patient was having bleeding and had bled enough that it was dangerous and she needed to go to the hospital, tachycardia could be a symptom.
Q. I see. All right. Thank you.
Isn't it true that, at least in one of the calls for an ambulance that occurred since your time at Family Planning Associates, the patient had a fever of 106?
A. I don't recall that specific incident. We do, as I mentioned, occasionally transfer people to the hospital because of infection. And that is a rare event, but a fever of 106 would not be a common finding.
Q. That would be sort of an emergency level of temperature?
A. Well, it's a sign of infection which needs treatment that is beyond our scope of care here at the facility.
Q. Okay. Isn't it true that running a fever of 106 or higher, if not lowered, can result in organ damage or death?
A. From my medical knowledge, yes, that's true, if untreated. But we wouldn't sit here and not treat the patient. We, you know, get the various treatments, IV fluids, ice bath, those types of things.
Q. Right. Or potentially transport them to the hospital?

A. Yes.

Q. Okay. Let's see. Can you tell me, as medical director, for these cases that we've described, why did your patients need to be transferred from your clinic to a hospital?

If you want to divide those up into types of cases, that's fine.

A. Well, I'll say generally that we provide a certain level of care here at the -- at our clinic. The vast majority of patients that we see --

THE COURT: Priscilla Coleman is on the line. Wait. That's your witness, Ms. Shah.

MR. GOODWIN: I believe that's our witness, Your Honor.

THE COURT: Okay. I had it on my list -- oh, defendant's witness. Sorry.

MR. GOODWIN: We're working on it, I think.

THE COURT: She sent word that Coleman is not supposed to be on.

Sorry, Dr. Cowett.

THE WITNESS: No problem. Could you repeat the question?

BY MR. GOODWIN:

Q. Let me see if I remember my own question here. So of the cases that we just described and the various types of symptoms that the patient was displaying, why did your patients need to

be transferred to a hospital from your clinic?
A. Oh, yes. I started to say that the -- for the types of abortion that we provide, the vast majority of patients will be able to be treated here for any issues, any perioperative issues.
On extremely rare occasion, we do need to transport patients to the hospital for bleeding. That would be one. Infection. That would be the second reason. Those really are the two reasons. In bleeding -- the third sort of overall category would be bleeding from a uterine injury.
Q. Just as a follow-up to that, those are the conditions why you would transfer them, but why to a hospital and why not just treat them in your clinic?
A. So because these conditions are extremely rare, it does not make sense for us to have the -- be required to have the ability to treat these conditions here in the clinic. We do not -- the risk of hemorrhage requiring transfusion for a second-trimester abortion is extremely rare. Therefore, we do not keep blood transfusion products here in the clinic.
Q. So there's just certain equipment and other supplies that you don't have on-site?
A. Yes, because we don't need them. Every doctor's office doesn't have an emergency room or a blood blank and a patient might walk into the room and have a problem. So you don't need all of these things in your midst if you have a place to send a

patient in an extremely rare situation where they might have a problem.
Q. Sure. But also you testified that these issues do occur on a regular basis every year, correct?
A. I would not agree with this -- depends on what you mean by "regular."
Q. I think -- I'm just repeating your testimony. You said you need to make these transfers to the hospital at least two to three times a year on average?
A. Yes. But that's not regular to me.
Q. Okay. I just meant as a recurring issue.
All right. Is it true -- or I'm sorry. To your knowledge, how often, when you have to transport a patient to the hospital, does one of the physicians at your clinic ride along with the patient to the hospital?
A. 100 percent of the time.
Q. And why is that?
A. Because these are patients that we are caring for and we want to have a continuity of care with the treating physicians in the hospital and be able to speak directly with them and help them understand what is our understanding of the reason for transport.
Q. All right. Thank you. Just a couple of more questions, Dr. Cowett.
Over the course of your medical career, how many times have

you been sued for medical malpractice?
A. I have never been sued for medical malpractice as it relates to an abortion procedure.
Q. That wasn't my question. How many times over the course of your medical career?
THE COURT: What's the relevance beyond that question?
MR. GOODWIN: So, Your Honor, we just were looking for information about sort of the frequency of issues that might lead to a medical malpractice suit.
THE COURT: I understood the question. I'm asking the relevance of that question. She was going to answer as it pertains to abortion, which is relevant. I'll let the answer she gave about abortion.
MR. GOODWIN: But not as to an OB/GYN in general?
THE COURT: No. I don't see any relevance of that. You haven't told me any either.
MR. GOODWIN: Okay. So I'm sorry. I wasn't quite sure where we left this, then.
THE COURT: We left it that she said she's never been sued as to any abortion-related procedure for medical malpractice.
BY MR. GOODWIN:
Q. Okay. To your knowledge, Dr. Cowett, is it common for an OB/GYN to be sued multiple times?
THE COURT: Now, how would she know that, Counsel?

You better establish that with some foundational testimony if you want her to testify.

BY MR. GOODWIN:

Q. Okay. Dr. Cowett -- how should I put this?

As someone who's been trained as an OB/GYN and as someone who has colleagues that are OB/GYNs, are you aware of OB/GYNs being sued multiple times throughout the course of their career?

A. I do know --

THE COURT: Wait. I can take judicial notice of the fact that those are lawsuits that get filed. I'll do that.

MR. GOODWIN: Then no further questions. Thank you, Dr. Cowett.

THE COURT: Redirect.

MS. SHARMA: I have just a few questions, Your Honor.

THE COURT: You may ask them.

Ms. Sharma.

MS. SHARMA: Thank you.

REDIRECT EXAMINATION

BY MS. SHARMA:

Q. Dr. Cowett, in your experience and medical expertise, is it safe to provide second-trimester abortion care in an office-based setting?

A. Yes, it is. That's my -- whole practice occurs in an outpatient setting.

Q. And when patients do have, I think you testified, extremely rare complications in which it may be necessary to transfer them to a hospital, are they safely transferred?
A. Yes. In every instance.
MS. SHARMA: No further questions, Your Honor. Thank you.
THE COURT: Recross, Mr. Goodwin?
MR. GOODWIN: Nothing further, Your Honor.
THE COURT: Okay. Thank you, Dr. Cowett.
THE WITNESS: Thank you.
THE COURT: I would say you can step down, but it means really just turn off your computer.
THE WITNESS: Okay. Thank you.
THE COURT: Thank you.
All right. And your next witness.
MR. FISHER: Your Honor, may I request a short recess? We have agreed with the plaintiff's lawyers to provide hard copies of cross-examination exhibits for Dr. Grossman, and I just want to make sure we have those ready to go.
THE COURT: I don't want to do a recess. So have your conference. We'll just sit here and wait.
MR. FISHER: Okay. Thank you.
(Off-the-record discussion.)
THE COURT: Turn off your microphone, though, or I'll hear you.

MR. FISHER: Okay. Your Honor, I think we've sorted it out the best we can for the moment. I think by the time we're ready for the cross, we'll have the exhibit situation figured out. So we're ready to proceed.

THE COURT: Ms. Singh, do you want to call your witness?

MS. SINGH: Yes, Your Honor. Plaintiffs call Dr. Daniel Grossman.

DANIEL GROSSMAN, MD, PLAINTIFFS' WITNESS,

PREVIOUSLY SWORN

DIRECT EXAMINATION

THE COURT: Hello, Dr. Grossman.

THE WITNESS: Hello.

THE COURT: I remember you from your prior appearance. So I'll remind you, sir, that you are under oath for that testimony, as you must be under oath for all testimony, and that will bind you for this particular presentation as well. Do you agree to that?

THE WITNESS: I do.

THE COURT: Thank you.

Ms. Singh, you may ask your questions of Dr. Grossman.

MS. SINGH: Thank you, Your Honor. Dipti Singh for plaintiffs.

BY MS. SINGH:

Q. Dr. Grossman, could you please turn to Plaintiff's

Exhibit PX923.

A. I'm sorry 9 --

Q. 923. It's your supplemental expert report. I think we can move through these quickly.

Do you recall submitting a supplemental expert report in this case?

A. I do.

Q. And does that expert report accurately reflect your opinions in this case?

A. It does.

Q. Okay. If you need to refer to it, please do so.

So now I'd like to ask you some questions about Indiana's law that prohibits anyone other than a physician from providing first trimester abortion care.

Are you familiar with that law?

A. I am.

Q. Is it okay if I refer to that law as physician-only law?

A. Yes.

Q. In the United States, what kind of medical professionals typically provide abortion care?

A. In the US, abortion care is typically provided by physicians from a variety of specialities, as well as nurse practitioners, certified nurse midwives, and physician assistants.

Q. Are the group of clinicians you identified as nurse

practitioners, certified nurse midwives, and physician assistants commonly referred to as advanced practice clinicians, or APCs?

A. Yes, they are.

Q. Do APCs require a license to practice?

A. They do.

Q. In your opinion, is the physician-only law consistent with accepted medical practice today?

A. It's my opinion that it is not consistent with accepted medical practice.

Q. What is the basis for that opinion?

A. The basis for that opinion is my review of the published medical evidence on this topic, my personal experience working closely with advanced practice clinicians, and my discussions with other physicians who work with APCs in other settings.

Q. Have any major professional organizations taken a position on the provision of first-trimester abortion care by APCs?

A. Yes. The American College of Obstetricians and Gynecologists has taken that position in support of APC provision of abortion care, as well as the American Public Health Association, World Health Organization, the Association of Certified Nurse Midwives. So several professional organizations have taken statement -- have made statements in support of that.

Q. You mentioned the World Health Organization.

What is the World Health Organization?
A. The World Health Organization is an international body made up of UN -- United Nations member states that provides guidance on a variety of global health issues.
Q. You also mentioned the American Public Health Association.
What is the American Public Health Association?
A. The American Public Health Association is the largest US professional organization for public health practitioners and researchers.
Q. If you could please turn to PX408, which we will also display on your screen.
Do you recognize this document?
A. I do.
Q. And what is it?
A. This is a policy statement that has been issued by the American Public Health Association.
Q. And what is a policy statement issued by the American Public Health Association?
A. Policy statement is an evidence-based statement that is endorsed by the organization. There's a process through which the American Public Health Association's governing counsel, which is made up of members of the organization, introduces these statements. They need to be made based on the best available published evidence. They are then debated in the governing counsel. They're voted on and then approved by the

APHA leadership before they become official policy statements.

And then they are -- after that, they are intermittently reviewed to ensure that they are still up to date and reflect the latest evidence.

Q. Are American Public Health Association policy statements relied upon by members of your profession?

A. Yes, they are.

Q. Turning to page 2 of PX408, under "Advanced Practice Nurses and Physician Assistants Improve Access to Reproductive Health Services, Including Abortion Care," could you tell us what the American Public Health Association statement says about physician-only requirements?

A. The policy statement reads, "There is evidence that with appropriate education and training, NPs, CNMs, and PAs can competently provide all components of medication abortion care (pregnancy testing, counseling, estimating gestational age by exam and ultrasound, medical screening, administering medications, and postabortion follow-up care) and can perform the added components of aspiration abortion (administering the paracervical block, dilating the cervix, and evacuating or aspirating the contents of the uterus)."

Q. Thank you. We can put that exhibit aside now.

Approximately what percentage of states permit APCs to provide medication abortion care?

A. I believe it's about one-third of all states allow APCs to

provide medication abortion care.
Q. Approximately what percentage of states permit APCs to perform first-trimester aspiration abortion care?
A. I believe it's about one-quarter of all states allow APCs to provide first-trimester aspiration care.
Q. Does California permit APCs to provide first-trimester abortion care?
A. Yes, they do.
Q. Which methods of abortion care are APCs allowed to provide in California?
A. They are allowed to provide medication abortion, and they are allowed to provide first-trimester vacuum aspiration procedures.
Q. And you practice in California; is that right?
A. Yes.
Q. In your clinical practice have you worked with APCs?
A. Yes, I've worked closely with APCs pretty much in every setting that I've worked since and even during residency and after. And I worked with them as they provided medication abortion and vacuum aspiration abortion. And I was also involved in training them to provide those services.
Q. You mentioned training APCs. Does the abortion training provided to APCs differ from the training provided to physicians?
A. No, it does not. It's really essentially the same.

Q. In your expert opinion, do APCs provide first-trimester abortion care as safely and effectively as physicians?
A. Yes, it is my opinion that APCs provide medication abortion and first-trimester vacuum aspiration as safely and effectively as physicians.
Q. What is the basis for that opinion?
A. The basis for that opinion is my review of the published medical evidence, my personal experience practicing alongside APCs providing abortion care, my experience training them, and my discussions with other physicians who work with APCs.
Q. You mentioned published medical literature. If we could turn to PX111, please. And this will also come up on your screen, Dr. Grossman.
This is the National Academies of Sciences, Engineering, and Medicine consensus study report, which we discussed in Phase I of the trial.
Do you recall that?
A. Yes, I do.
Q. Turning to page 118, the last paragraph on that page, what do the National Academies conclude about the provision of first-trimester abortion care by APCs?
A. The report reads, "Both physicians (typically OB/GYNs and family medicine physicians, but other physicians can be trained) and APCs can provide medication and aspiration abortions safely and effectively. Many states, however,

prohibit nonphysicians from performing abortions regardless of the method."

I don't know if you want me to keep going.

Q. No. That's okay, Dr. Grossman. Thank you.

We discussed the FDA label from the Mifeprex in Phase I. Do you recall that?

A. Yes.

Q. Does the current FDA label include language specifying that the proscriber needs to be a physician?

A. It does not.

Q. Did a prior label ever include that specification?

A. Yes. The original label did specifically refer to physician providers; but as part of the update to the label that was approved by the FDA in 2016, that physician-specific language was removed, and I believe now it simply says "any certified healthcare provider" or "any certified prescriber."

Q. Do you attribute any significance to the fact that the revised label does not include such language?

A. Yes. I think it's very significant. It's -- I believe it's an implicit endorsement of APC provision of medication abortion. Based on the evidence that was available at the time that the label was approved, it was already widespread in many states for APCs to provide medication abortion.

Q. Please turn to PX406. And again this will show up on your screen as well.

Is this one of the studies you relied on to conclude that APCs provide first-trimester aspiration abortion care as safely and effectively as physicians?
A. Yes, it is.
Q. Please read for the record the lead author, title, publication, and publication date.
A. The lead author is Tracy A. Weitz, W-E-I-T-Z. The title is "Safety of Aspiration Abortion Performed by Nurse Practitioners, Certified Nurse Midwives, and Physician Assistants Under a California Legal Waiver." And it was published in 2013.
Q. And what is the publication in which it was published?
A. It's the American Journal of Public Health.
Q. Was this study peer-reviewed?
A. Yes, it was.
Q. Please describe for the Court the study's methodology.
A. So in this study they trained APCs to perform first-trimester aspiration abortion and then recruited patients who were seeking abortion care at certain clinics. And patients either obtained their abortion with a physician or with an APC as they were prospectively enrolled into the study. And then they collected information on clinical outcomes, which they report on here.
They specifically designed this study as a noninferiority study. So they were really trying to ask the question is

aspiration abortion performed by APCs inferior in terms of safety outcomes to provision by physicians.

And to do that kind of study, they needed to determine ahead of time what difference in complications would be considered, essentially, too big of a difference and would deem APC provision to be inferior.

And so they worked -- please stop me if I'm saying too much, but --

Q. Could you keep describing the methodology.

A. They worked with an outside group of experts to review the literature on first-trimester aspiration abortion complications. We found that studies reported about 1 to 4 percent of patients experienced a complication from first-trimester vacuum aspiration. And so they determined ahead of time that a difference of 2 percent would be considered inferior.

So if the complication rate with APCs were 2 percent or more higher, then that associated with physician assisted abortion, they would deem APC provision to be inferior.

Q. Thank you.

A. So that's briefly an overview.

Q. Thank you. And how many first-trimester abortions were evaluated in this study?

A. Close to 11,500.

Q. What did the study conclude about the provision of

first-trimester abortion care by APCs?
A. They concluded that complications were clinically equivalent between newly trained APCs and physicians. So they -- they did not observe that the difference exceeded the threshold that they had set ahead of time.
Q. Did the study find any difference in major complications between the two groups?
A. No, major complications were very rare. I believe they were about 0.05 percent, and there was no difference between the two groups.
Q. Did the study find any difference in the provision of first-trimester abortion care between physicians and APCs?
A. They -- I mean, looking at the absolute difference, I mean, there were more minor complications in the APC group. I think looking at Table 2, there were 97 minor complications in the APC group compared to 49 in the physician group.
They -- when they looked at the sort of relative risk of complications, it was about twofold higher in the physician group compared to the APC group.
Q. And what do you attribute that difference to?
A. Well, I mean, I think -- you know, as I mentioned, the study was set up as a noninferiority study. So they determined ahead of time what absolute difference was going to be considered too big of a difference and would be considered a clinically significant difference.

The thing about abortion complications is that they're very rare. So, essentially, doubling of a small number is still a very small number.

So my interpretation of this study, according to the way it was designed and analyzed, is that the -- there's not a clinically significant difference in the risk of APC complications compared to physicians.

I think the fact that there were more minor complications in the APC group is likely because these were newly trained advanced practice clinicians. And I think that over time, certainly in my experience working with new physicians as well as new APCs, as a clinician gains experience, their complications become fewer.

And, again, I think it's also important to reiterate that the only difference was seen in minor complications and there was no difference in major complications. For me, I think that indicates also that the minor complications that they identified were then appropriately managed and didn't escalate to a major complication.

So, for example, in the case of hemorrhage, appropriate medications or treatment was given and it didn't escalate to the point where a patient required a blood transfusion.

Q. Thank you. We can put that study aside.

THE COURT: Wait. I wanted to ask one question, if you don't mind.

In the title, Dr. Grossman -- it's not before me, but I remember -- it referenced a California waiver, that there -- was that because California law wouldn't have permitted APCs to do this but for the waiver at that time?

THE WITNESS: Exactly. At that time, yes. And then the information from this study as well as other research informed the introduction and eventual passage of a law in California that allowed this.

THE COURT: So now California law permits APCs to do these procedures?

THE WITNESS: Correct.

THE COURT: In part because based on this study; is that right?

THE WITNESS: Correct.

THE COURT: Okay. Thank you.

Go ahead, Ms. Singh.

BY MS. SINGH:

Q. Dr. Grossman, have there been other studies since the one we just discussed evaluating the provision of first-trimester abortion care by APCs?

A. Yes.

Q. Now, if you could turn to PX405.

Is this another one of the studies you relied upon for your opinion today?

A. Yes, it is.

Q. Please read into the record the author, title, publication, and publication date.
A. The title is "Doctors or mid-level providers for abortion." The lead author is S. Barnard. The publication date is 2015. And this was published in the Cochrane Library.
Q. Please describe the methodology for this study.
A. So this is a meta-analysis where they did a systematic review of all of the literature on comparative studies between APCs or what they refer to here as mid-level providers compared to physicians for the provision of both medication abortion and first-trimester aspiration abortion.
They then, where possible, were able to pool the results to get some summary estimates of some of the results where similar data were collected across studies.
Q. Please describe the findings from this study.
A. So they found several published studies related to both medication abortion and first-trimester aspiration abortion.
For the medication abortion studies, they found that there was no significant difference between provision by an advanced practice clinician compared to a physician in terms of safety or effectiveness.
With regard to first-trimester aspiration abortion, they found that, when they looked at all complications, which included incomplete abortion as well as any other complication, again, there was no significant difference between the two

groups.

And they looked specifically at the risk of incomplete abortion, or effectiveness. For the one randomized controlled study, they found no difference. But I believe there were three observational studies, and in those studies, they did observe a significant difference in incomplete abortion.

However, that absolute difference was very, very small. I think incomplete abortions in the physician group was, like, 0.3 percent, and in the APC group it was 0.7 percent. I don't think that's a clinically significant difference, but they note that it was a statistically significant difference.

Q. What did the study find was the implication of that difference?

A. I mean, I think overall, they, you know, still were cautiously supportive of expanding mid-level provider provision of aspiration abortion, but I think that there is a statement saying that additional data should be collected.

Q. And has additional data been collected since this 2014 study?

A. I believe this was published in 2015. I'm not aware of an additional publication. However, I am aware of a great deal of, you know, experience that has been accumulated in California and the other -- approximately 15 other states where APCs provide medication abortion quite commonly. In fact, in many clinic systems they are the main providers of medication

abortion.

And that widespread clinical experience that I have had and my colleagues have had working alongside APCs who provide both -- I was talking about medication abortion, but in this case specifically for aspiration abortion, that clinical experience has really, I think, added to this published literature and confirmed that they can safely and effectively provide that service.

Q. Some of the studies took place outside of the U.S.; is that right?

A. That is true.

Q. In your opinion, are the findings from those studies generalizable to the United States?

A. I believe that they are. And they're from a variety of different countries, including India, South Africa, Vietnam, as well as one study from the U.S. There's a study from Sweden among the medication abortion studies. I think, you know, some of those countries have very similar healthcare systems to the U.S. And, importantly, the findings are really consistent across the studies. So I think these results are very applicable to the U.S. context.

Q. Thank you. And we can put that exhibit aside now.

I'd like to ask you some questions about the types of healthcare services that APCs typically provide. What medications do APCs typically provide -- prescribe that are

comparable to or riskier than medication abortion?

A. I mean, there are many. Some that come to mind include opioids. APCs can provide misoprostol for miscarriage management. They can provide combined hormonal contraception. All these are riskier medications.

Q. Do APCs typically prescribe antibiotics?

A. They do.

Q. Do APCs typically prescribe nonsteroidal anti-inflammatory drugs or NSAIDS?

A. They do.

Q. Do these medications that we've just talked about have contraindications that an APC would want to screen for?

A. Yes, they do.

Q. What are the contraindications for combined hormonal contraceptives?

A. I mean, it's a very long list, a much longer list than compared to medication abortion. But it includes things like hypertension, history of venous thromboembolism, history of myocardial infarction, stroke, migraine headache with aura. I mean, the list is quite long.

Q. What are the contraindications for misoprostol when used to treat an incomplete miscarriage?

A. Some of the contraindications include things like if the patient is at high risk of bleeding, for example, because they have a bleeding disorder or because they are on anticoagulants.

If they have an intrauterine device in place, that needs to be removed first before treatment. An allergy to the medication, things like that.
Q. What are the contraindications for opioids?
A. In addition to screening for history of allergy, the main concern is about the potential risk of abuse or possibly developing a dependency. So it's important to screen for that and to monitor use of opioids over time.
Q. Do these medications have complications that might require follow-up care?
A. Yes, they do.
Q. What are the complications associated with using misoprostol to treat an incomplete miscarriage?
A. The complications really are quite similar to the complications that can happen with medication abortion or aspiration abortion, including hemorrhage, incomplete evacuation of the uterus requiring aspiration, possible infection, things like that.
Q. And what is some of the follow-up care that might be required if there was a complication following misoprostol use to treat an incomplete miscarriage?
A. It might be necessary to perform a vacuum aspiration. I mean, it might be necessary to provide other medications to treat the hemorrhage. Those are a few examples.
Q. What is the follow-up care that might be required for

combined hormonal contraceptives if there's a complication?
A. If a patient has a concerning side effect or symptom, it would be important to evaluate the patient to determine whether they might be having a venous thromboembolism or potentially things like a blood clot in the leg or the lung. If they might be having, you know, worsening hypertension, that would all need to be managed appropriately.
Q. And what is the follow-up care that might be required after narcotics are prescribed?
A. Again, as I mentioned, primarily monitoring for potential dependency or abuse and ensuring that, if a patient needs opioids beyond a short course, that they are getting a sort of comprehensive approach to their pain management and that other medications or modalities are being used as needed.
Q. Please tell the Court whether APCs typically perform medical procedures that are comparable to or riskier than first-trimester aspiration abortion.
A. They do.
Q. And what are some of those procedures?
A. Things like inserting an intrauterine device or IUD, performing an endometrial biopsy, performing an aspiration in the case of miscarriage. Some APCs perform colposcopy to evaluate for cervical dysplasia or cervical cancer. Some APCs also provide -- or perform loop electrocautery excision procedure, or LEEP procedure, of the cervix.

Q. What are some of the complications associated with LEEP?
A. So this is, like, a minor cervical procedure that involves excising part of the cervical tissue. And some of the complications that can arise include bleeding, infection, possible damage to surrounding organs. There are potential longer-term risks that can lead to possible infertility or difficulty getting pregnant in the future as well as potential risk of increased preterm delivery if the patient did become pregnant.
Q. What are some of the complications associated with colposcopy?
A. So colposcopy by itself involves just looking at the cervix carefully, but generally APCs who do that also perform biopsies if they identify an abnormality. And with those biopsies, there is a risk of bleeding.
Q. Do APCs perform well-woman examinations?
A. They do.
Q. During a well-woman examination, is it necessary to assess for any abnormalities?
A. Yes. As part of a sort of a healthy patient examination in the gynecology office, it's important to, obviously, evaluate any complaint the patient has, but also generally involves a speculum exam to look at the vagina and the cervix and evaluate the cervix and uterus for any abnormality.
Q. Are you familiar with the process for inserting and

removing an intrauterine device, or an IUD?
A. I am.
Q. And how are you familiar with that process?
A. I do it a lot.
Q. And can you please describe that procedure?
A. So depending on the patient, we may provide local anesthesia using a paracervical block where local anesthetic is injected into the area around the cervix. This is essentially identical to what we do with a first-trimester aspiration abortion.

Then we insert the IUD inserter into the uterus. Sometimes the cervix can be stenotic or very tight, and it's necessary to manually dilate the cervix in order to insert the introducer. This manual dilation process is really identical to what we do during a first-trimester vacuum aspiration abortion.

And then the inserter is introduced into the uterus and the IUD is inserted and the introducer is removed.
Q. How do the risks associated with inserting an IUD compare to the risks associated with a first-trimester aspiration abortion?
A. Some of the risks are similar. In particular, the risks of -- are associated with the local anesthetic, if we use that, and potential toxicity reactions to the local anesthetic.

The risk with -- if we have to do manual dilation of the cervix, there's a risk of forming a false passageway in the

cervix or possibly perforating the uterus during the process of dilating the cervix. Again, these are all rare but possible.

And then in the process of inserting the IUD, it is possible to perforate the uterus and essentially the IUD is inserted into the abdominal cavity. That overall risk of uterine perforation is about one in a thousand.

If that happens in the case of an IUD insertion, the patient needs to undergo surgery of some sort, either laparoscopy or a laparotomy, to remove the IUD. That risk of uterine perforation is also similar to the published risk of perforation associated with first-trimester aspiration abortion.

Q. And would surgery require referral to another provider if an APC was involved?

A. Yes.

Q. Do APCs provide care during labor and delivery without a physician present?

A. Yes, they do.

Q. Just briefly, what are some of the serious complications associated with labor and delivery?

A. There's a risk of bleeding, hemorrhage possibly requiring blood transfusion. There is risk of damage to organs, including the vagina and perineum during birth. There's a risk of obstructed labor that could require a cesarean section, a risk of fetal intolerance of labor that could require an

emergency cesarean section, risk of infection, and then serious things like developing a blood clot or amniotic fluid embolism that could result in death.
Q. During Phase I of the trial, you discussed the specific contraindications for medication abortion. I won't go over those again. But can you tell us whether APCs can assess for contraindications for medication abortion?
A. Yes, they can assess them.
Q. During Phase I of the trial, you also discussed complications for medication abortion. And I won't go over those again. But can you explain whether APCs can effectively counsel patients about complications after medication abortion?
A. Yes, I believe that they can adequately counsel about those risks. They're very similar to the above risks that we talked about. For example, if they were counseling a patient around miscarriage care, essentially those risks are very similar. And they can adequately counsel about those risks.
Q. And can APCs effectively provide follow-up care to patients after medication abortion?
A. Yes, they can.
Q. Turning to aspiration abortion care, can APCs assess for contraindications for first-trimester aspiration abortion care?
A. Yes, they can.
Q. And can they effectively counsel patients about complications after first-trimester aspiration abortion care?

A. Yes, they can.
Q. And can they provide follow-up care to patients after first-trimester aspiration abortion care?
A. Yes, they can.
Q. In your opinion, does a physician's education and training make them better able to identify and respond to potential complications from first-trimester aspiration abortion care?
A. No, I don't believe that the physician's training makes them more qualified in order to perform the initial assessment and initial management of complications compared to an APC.
It is certainly possible that, for either -- you know, a treating physician or for an APC to have to refer a patient with a complication to another physician. But, again, that happens sometimes in my practice as well. But I don't believe that -- generally that a physician is more qualified to provide this care.
Q. Thank you.
Now I'd like to ask you some questions about the facility standards needed to provide safe first-trimester abortion care.
Just to start, what kinds of facilities have you provided abortion care in?
A. I have provided abortion care in freestanding clinics. I have provided abortion care in hospitals. And where I currently provide abortion care is essentially in a clinic setting adjacent to a hospital that is physically connected to

the hospital.
Q. In your expert opinion, what facility standards are needed to provide medication abortion care?
A. I don't believe that there are any facility standards that are required to provide medication abortion care safely and effectively.
Q. In your opinion, what facility standards are needed to provide first-trimester aspiration abortion care?
A. For first-trimester aspiration abortion care, I believe there are some facility standards that would depend upon the type of anesthesia that is being provided. But beyond that, I don't believe that there are any facility standards that improve the safety or effectiveness of first-trimester aspiration abortion care.
Q. And what is the basis for your opinion about the facility standards needed to provide first-trimester aspiration abortion care?
A. It's based on my review of the literature and on my experience and talking with colleagues in the field.
Q. And is that also true for the standards needed to provide medication abortion care?
A. Yes.
Q. Please turn to PX111. And this is the --
THE COURT: I thought he said there were no standards for medication abortions --

MS. SINGH: Yes.

THE COURT: -- in terms of facilities but with respect to first-trimester aspiration abortions only with respect to anesthesia. That's how I heard him to testify. Did I miss it?

MS. SINGH: No, Your Honor. I was just affirming that the basis for his opinion is the same with respect to both aspiration abortion care and medication abortion care.

THE COURT: The literature and his practice?

MS. SINGH: And his training and conversations with colleagues.

THE COURT: That would be true for anything, right?

MS. SINGH: Yes, Your Honor.

THE COURT: Okay.

BY MS. SINGH:

Q. Please turn to PX111. This is the National Academies consensus report that we've talked about a few times in this case. We'll pull up page 162 on the screen right under the No. 4.

Could you please read into the record what the National Academies concluded about the evidence of the minimum characteristics of clinical facilities necessary to effectively and safely provide the different types of abortion methods?

THE COURT: Could you give me the date of this conclusion or this report?

MS. SINGH: Yes.

THE WITNESS: I believe it's 2018.

BY MS. SINGH:

Q. Sorry, Dr. Grossman. Could you just read into the record that first paragraph under No. 4.

THE COURT: Wait. He said he thought it was 2018. Is that -- do you want that answer to stand? because he was saying he thought so, but I thought we were searching.

THE WITNESS: I thought so too.

MS. SINGH: Yes. That's correct.

THE COURT: So is it the same today, three years later, as far as you know, sir?

THE WITNESS: Yes. And I believe we will be referring to some more recent published literature as well which is consistent with this as well.

THE COURT: All right.

THE WITNESS: So it says here they concluded that "Most abortions can be provided safely in office-based settings. No special equipment or emergency arrangements are required for medication abortions. For other abortion methods, the minimum facility characteristics depend on the level of sedation that is used. Aspiration abortions are performed safely in office and clinic settings. If moderate sedation is used, the facility should have emergency resuscitation equipment and an emergency transfer plan as well as equipment to monitor oxygen saturation, heart rate, and blood pressure."

BY MS. SINGH:
Q. Could you read that last sentence in as well?
A. Sorry.
"For D&Es that involve deep sedation or general anesthesia, the facility should be similarly equipped and also have equipment to provide general anesthesia and monitor ventilation."
Q. Thank you. We can put that aside now.
If we could now turn to PX410. Is this another one of the studies that you relied upon for your opinion today?
A. Yes, it is.
Q. Please read into the record the author, title, publication, and publication date.
A. The lead author is Barbara Levy. The title is "Consensus Guidelines for Facilities Performing Outpatient Procedures." The publication is Obstetrics & Gynecology, published in 2019.
Q. Could you tell us about the process for developing these consensus guidelines.
A. So these consensus guidelines were developed by first performing a comprehensive review of the published medical literature as well as obtaining information about some studies that were in progress at the time of this consensus process that were then subsequently published.
There were summaries made of the existing evidence. And then there was a consensus meeting that was convened with

experts in a variety of areas of medicine and nursing to review that published evidence and to come up with these consensus guidelines.

Q. And did those groups include ACOG?

A. Yes.

Q. And did it also include the American College of Physicians?

A. Yes.

Q. What did the working group conclude about facility standards for abortion?

A. Looking at the conclusions, they say, "requiring facilities that perform office space procedures, including abortion, to meet standards beyond those currently in effect for all general medical offices and clinics is unjustified based on this thorough review and analysis of available evidence. Safety concerns were not identified in any area of study."

Q. You have personally conducted research on whether the prevalence of complications differs based on the setting in which an abortion is performed?

A. I have.

Q. If we could please turn to PX412.

Is this one of those studies?

A. Yes, it is.

Q. Please read into the record the author, title, publication, and publication date.

A. The lead author is Kari White. The title is "Complications

from first-trimester aspiration abortion: a systematic review of the literature." It was published in the journal Contraception in 2015.

Q. Please describe the methodology for this study.

A. So this was a systematic review of the published literature on first-trimester aspiration abortion where we looked at the complications that were reported and the overall prevalence of these complications and then looked at the studies according to where the abortion was performed.

And overall we found that these complications were uncommon and that the prevalence of complications did not differ according to whether they were performed in a clinic, in an ambulatory surgical center, or a hospital.

Q. Thank you. We can put that aside now.

THE COURT: May I ask a question before you do?

Dr. Grossman, with respect to facility review studies such as these that you've not only read but participated in, is that unique to the provision of abortion care? Are there other areas of medical care that are submitted to facility reviews?

THE WITNESS: Other than the facility requirements related to the provision of anesthesia which I mentioned, I am not aware of any other specific, you know, outpatient medical service that is subject to these kinds of facility requirements and reviews.

THE COURT: So we can imagine why they've become an

issue here, because restrictions on facilities have become a tool for the advancement of some restrictive views with respect to abortion, right?

THE WITNESS: That is correct.

THE COURT: So it comes up in the literature and in your expertise because it has become a legislative vehicle for abortion access limitations. True?

THE WITNESS: That is true.

THE COURT: So the same question just from a slightly different direction. If you wanted to have an outpatient clinic that provided foot care, let's say, all the different kinds of care -- I think there might be these kinds of things. I see signs for them anyway.

So are other medical specialties required to have size requirements for examining rooms and -- even if you apply anesthesia to do whatever it is you're going to do to people's feet?

THE WITNESS: As far as I know, I am not aware of similar kinds of restrictions on the facility for any other type of medical service.

THE COURT: So we know that -- in hospital construction, that there are best practices. And we know that the architects and the contractors and the medical administrators of those facilities will infuse the judgments as to the design of these places with research and so forth, but

it's generally not legislated. Is that your experience?

THE WITNESS: That is my experience. I mean, I don't want to say that I'm completely familiar with all of the regulations that might go along -- might be associated with hospital construction requirements, but I think it's really important to recognize that, you know, for example, for an operating room, those requirements serve a purpose.

They serve a purpose to maintain sterility when a patient is undergoing an operation that is cutting into the body. They need to be of a certain size to, you know, allow a number of personnel to be able to perform their various duties and to include -- to have enough space for various equipment, including for the provision of general anesthesia.

None of these things apply to the provision of abortion care.

THE COURT: So you anticipated my last question. And that is can you -- even if you disagree with them, can you formulate rationales for the facility structural regulations and limitations that appear in Indiana statutes?

THE WITNESS: I think it depends on which ones in particular. We could go through them all. You know, there may be a few of them that I could imagine that they are extrapolating from, for example, a situation where patients are undergoing a surgery with general anesthesia and are potentially being moved back and forth on gurneys because they

are unable to move and therefore you need to have a hallway of a certain width so that two gurneys could pass. But that's not the case in outpatient abortion care.

Patients aren't receiving that kind of anesthesia. It's exceedingly rare that a patient needs to be transported out of an exam room in a wheelchair or a gurney. And it never happens that there would need to be two that pass each other in the hallway.

So that's an example of a standard that has been extrapolated, I believe, from a setting where -- it might have made sense where there's an operating room or ambulatory surgery center, but it makes absolutely no sense in an outpatient clinic where abortion care is being provided.

THE COURT: So if there were structural facilities-based limitations, in your judgment, based on your practice and expertise, to justify them, they should be tied to some medical goal or some desirable medical purpose. Is that true?

THE WITNESS: Exactly. And I would say, you know, I know from my own personal experience, I have practiced here in California in settings where we don't have any of those kinds of restrictions or requirements. And we provide abortion care very safely and effectively to the patients here.

THE COURT: One of the worries, I guess we could say out loud, is that, if there were no restrictions or no

limitations, then -- and there were no abortions, that it would be wherever a person chose to access that service without regard to the medical establishment. Right?

THE WITNESS: I just want to make sure that I'm understanding your question. Do you mind just restating that for me?

THE COURT: Oh, you know how we do. We hate to restate our own questions.

I'm just saying that if there were no abortions because nobody could comply with facility requirements or other purposes that are imposed by legislation so as to curtail abortions, that it wouldn't stop abortions; it would just put them in some other place beyond medical facilities to be provided.

Is that your sense of it?

THE WITNESS: I believe that that is certainly a concern. We have a great deal of evidence showing that, you know, severe restrictions on access to abortion care does not make abortion go away; it simply moves into other settings. And some of that could be unsafe providers. Some of that could be patients who choose to self-manage their abortion on their own using medications, for example.

THE COURT: Well, I have worn myself out doing the lawyering up here, Ms. Singh. So I think we need to take a recess. Actually, I've been looking for a time to do it. So

maybe this is as good a point as any. So it's just coming on to 20 of 4:00. Let's reconvene at 4:00. Okay?

Okay with you, Mr. Fisher?

MR. FISHER: Yes, Your Honor. Thank you.

THE COURT: Dr. Grossman, can you be still in ready status when we come back in 20 minutes?

THE WITNESS: Yes.

THE COURT: Thank you kindly. We'll be in recess.

COURT CLERK: All rise.

Court is in recess.

(Recess taken.)

(Open court.)

COURT CLERK: Court is in session.

THE COURT: You may be seated. It's almost impossible to come in here without wrapping yourself in the flag, but I didn't want to mislead you and think I had an issue about that.

Okay. Ms. Singh, we're ready to resume the questioning of Dr. Grossman.

MS. SINGH: Thank you, Your Honor.

BY MS. SINGH:

Q. Dr. Grossman, before the break, we talked more broadly about facility standards for abortion care. Now I'd like to turn to the specific medication abortion facilities standards at issue during this phase of the trial.

In your opinion, is a housekeeping room with a sink

necessary to provide medication abortion care?
A. I do. In my opinion, that is not necessary.
Q. Why not?
A. Because it's possible to provide medication abortion care completely without -- essentially without touching the patient. And so there's no instruments to process or clean, and you just simply have to disinfect the room and surfaces as you would in any office.
It's also possible, if you do need to use instruments, to have those processed off-site. So I don't think it is absolutely necessary that you have a housekeeping sink on-site in a facility that's providing medication abortion.
Q. Thank you.
Let's turn to aspiration abortion care now. During Phase I of the trial, you provided background information about aspiration abortion care.
Can you tell us how often aspiration abortion care results in complications?
A. I think it's about 1.3 percent.
Q. I'd like to -- okay. Great.
And now let's talk about pain management. Is it possible to provide aspiration abortion using oral medication for pain management?
A. Yes, it is possible to provide first-trimester aspirations using oral pain medication, generally in combination with a

local anesthetic, or what's known as a paracervical block.
Q. And what size of room is necessary to provide aspiration abortion care?
A. Really, a room that's big enough to hold the personnel and equipment, and a standard exam room is sufficiently sized to be able to provide first-trimester vacuum aspiration.
Q. Does performing a first-trimester aspiration abortion in a 120-square-foot room enhance the safety of that procedure?
A. No. There's no evidence to indicate that that's the case, and I don't believe that a room of that size improves the safety.
Q. I'd like it turn back to PX410. These are the ACOG Consensus Guidelines for Facilities Performing Outpatient Procedures that we discussed before the break.
What did the working group conclude about the sizes of rooms that are necessary for abortion procedures?
A. They said something along the same lines of what I just said, but I can find it exactly where they say it.
Q. If you turn to page 259, and I'm looking at the second bullet under "Physical Plant Specifications."
A. "Facilities should perform procedures in examination rooms or procedure rooms adequate to accommodate the equipment and personnel involved in the procedure. Typical examination rooms are an adequate size for most procedures. A room larger than needed to accommodate the equipment and personnel involved in

the procedure is neither necessary nor desirable."

Q. Thank you. And we can put that aside now.

What is a scrub facility?

A. A scrub facility is a large sink that has automated soap dispensers and a way to turn on and off the water that doesn't involve the use of someone's hands. These are typically used or situated outside of operating rooms where sterile procedure is going to be performed that involves cutting into a person's body.

Yeah, that's what it is.

Q. Is a scrub facility needed to provide first-trimester aspiration abortion care?

A. It is not.

Q. Why not?

A. A scrub facility is not needed to provide first-trimester abortion care because this is not a sterile procedure in that same way that involves cutting into the body, that requires --

THE COURT: There's somebody -- Schaerr. Who is Schaerr?

COURT CLERK: No. It's Dr. Condic.

MR. FISHER: That's our witness and one of our counsel. We're communicating right now to let them know.

THE COURT: Tell your witnesses to --

COURT CLERK: Gotta mute on entry.

MR. FISHER: Okay.

THE COURT: Wait. There was still somebody speaking through there. Maybe it was just your cocounsel. Okay.

BY MS. SINGH:

Q. Do you remember the question, Dr. Grossman?

A. I think we were talking about a scrub facility.

So it's not needed for providing first-trimester abortion care. We don't -- it's -- the standards of practice is to just wash one's hands with regular soap and water. In some sites, it's not even customary to use sterile gloves. Of course, any instrument that is introduced into the patient is kept sterile. Introduced. But there's no need to perform that kind of, like, deep cleaning of the hands and trying to maintain sterility.

Q. Does having a scrub facility enhance the care that's provided?

A. It does not.

Q. Does having a 44-inch corridor enhance the safety of first-trimester aspiration abortion care?

A. It does not.

Q. Why not?

A. As I think I mentioned earlier -- I mean, that size, I believe, comes from, you know, because we're thinking about the possibility that two gurneys would need to pass each other in the hallway, and again that never happens in the setting of outpatient abortion care.

It's exceedingly unlikely and rare that a patient is

ever -- ever needs to be transported out of a procedure room by a wheelchair or gurney, and -- it never, ever happens and it would never happen to two patients at the same time and need to pass at the same time.

Q. And can you tell us whether you have ever safely provided aspiration abortion care in facilities that did not meet the three physical plant requirements we just discussed?

A. Yes, I have.

Q. I'd now like to turn to second-trimester abortion care.

Has the provision of second-trimester abortion care changed in the last 40 years?

A. Yes. I would say this is an area of abortion care that perhaps has changed the most. Around the time when abortions first legalized across the US, the standard of care for second-trimester abortion was a procedure called an installation procedure, where medications were essentially injected through amniocentesis into the uterine cavity to induce labor. There was a very high rate of complications with that. It had to occur in a hospital, and patients were carefully monitored.

Later in the later 1970s and 1980s, the surgical technique of dilation and evacuation, or D&E, was developed, which was much safer with a much lower risk of complications. And that began to be performed in outpatient settings.

And then even since then, the provision of D&E has changed

even since when I did my training as a resident in the 1990s. Now commonly use medications to prepare the cervix as well as different types of osmotic dilators to prepare the cervix that were not available in the 1990s. So all of these have made the procedures simpler and safer for patients.

Q. Can you identify the methods of abortion used during the second trimester today in the US?

A. So they are primarily dilation and evacuation, or D&E, which is probably over 90 percent of all second-trimester procedures.

And then also medication abortion, or induction termination, which is most effectively done using the combined regimen of mifepristone together with misoprostol.

And also, just to mention, the other procedural type of abortion is vacuum aspiration, which can be used early in the second trimester, up to about 15 or 16 weeks.

Q. And vacuum aspiration is sometimes referred to as aspiration abortion?

A. Correct.

Q. During what gestational ages is the aspiration abortion procedure used?

A. It can be used up to about 15 or 16 weeks gestation from last menstrual period.

Q. How does the aspiration abortion procedure used at 13 weeks, 6 days, compare to the procedure used at 14 to 15 weeks

LMP?
A. The procedure is really exactly the same.
Q. You described how D&E is performed during Phase I; so I won't go into that today. But how is pain typically managed with D&E?
A. Pain is managed, again, by using a local anesthetic that's injected as a paracervical block. And patients may be given oral medications. They may be given intravenous sedation, which could be moderate sedation or deep sedation. And then there's also the possibility of using general anesthesia.
Q. How effective is D&E?
A. D&E is very effective, about 99 percent effective.
Q. Is D&E safe?
A. Yes.
Q. Turning back to PX111, which is the National Academies Consensus Study Report. And now I'm looking at page 63 of that document.
What did the National Academies conclude about the rate at which complications occur in D&E?
A. They note that complications occur in about 0.05 to 4 percent of cases.
Q. And what did the National Academies base that conclusion on?
A. It's based on their systematic review of the literature.

Q. Thank you. We can put that aside.
What type of facility setting is needed to provide D&E abortion care up to 22 weeks LMP?
A. Again, I don't believe that there is any -- there are any minimum facility requirements beyond those that would be needed, depending on the type of anesthesia that's used.
Q. Does providing D&E in a hospital or ASC enhance its safety and effectiveness?
A. No, it does not.
Q. Why wouldn't, for example, the heightened construction requirements or personnel requirements enhance the safety of D&E?
A. I mean, as we discussed a little bit earlier, those requirements for a hospital operating room are designed to ensure the sterility of the room, to make sure that the air flow is appropriate, to maintain sterility in the context of performing a sterile surgery where surgeons are cutting into the human body.
The rooms are also of a sufficient size to allow for an anesthetist and general anesthesia equipment and other monitoring equipment and more surgical supplies. So those rooms need to be larger to accommodate the needs of performing major surgery, but those characteristics don't improve the safety of providing D&E.
Q. With D&E, is a hospital or ASC better able to handle

complications on the rare occasions in which they might occur?
A. I mean, they might be better equipped to handle some kinds of complications. But, in general, I don't think that it's necessarily the case that they would be better equipped to handle all complications. In some cases it's not the facility that is sort of a rate-limiting step of treating a complication, but it's the type of specialist -- a surgeon, for example -- who might be needed to manage a complication.
And that kind of specialist may not be on-site at an ASC. So, similarly, in the case of a very, very rare complication, it would be necessary to transport the patient from the ASC to the hospital. And the same thing that would occur in the case if that very, very rare complication had occurred at an outpatient clinic.
Q. Thank you.
Now, if we could turn to PX413. Do you recognize this document?
A. I do.
Q. And is this one of the studies that you relied on for your opinions today?
A. Yes.
Q. Please read for the record the author, title, publication, and publication date.
A. The author is Rachel Jones. The title is "Differences in Abortion Service Delivery in Hostile, Middle-ground, and

Supportive States in 2014." It was published in 2018 in Woman's Health Issues.
Q. Was this article peer-reviewed?
A. It was.
Q. Turning to Table 2 on page 4, nationally what percentages of abortions are performed in a hospital-based setting?
A. 4 percent.
Q. Thank you. And we can put that aside and now turn to PX411.
Do you recognize this document?
A. I do.
Q. It's one of the studies that you also relied upon for your opinion today?
A. Yes.
Q. Please read for the record the author, title, publication, and publication date.
A. The lead author is Sarah Roberts. The title is "Association of Facility Type With Procedural-Related Morbidities and Adverse Events Among Patients Undergoing Induced Abortions." It was published in JAMA in 2018.
Q. Was this article peer-reviewed?
A. Yes.
Q. Please describe for the Court this study's methodology.
A. So this study relied on insurance claims data for a period of four years, from 2011 through 2014, and looked at

complications and adverse events related to abortion and compared those complications or adverse events at abortion -- among abortions that were performed at ambulatory surgical centers, or ASCs, compared to office-based settings.
Q. And turning to Table 2, according to this study, what was the rate of total abortion-related adverse events for second-trimester abortion?
A. For second-trimester abortion, it was 2.6 percent.
Q. What did this study indicate to you about whether second-trimester D&E abortion is safer if performed in an ASC?
A. I think this study demonstrates that there is no evidence indicating that abortion is safer -- second-trimester abortion, D&E -- when it's performed at ambulatory surgical center as compared to an office-based setting.
Q. Now if we could please turn to PX112.
This is the Upadhyay study that we talked about in Phase I and also earlier today. What did this study indicate to you about the safety of D&E abortion?
A. I mean, this study indicates that second-trimester abortion, again, the majority of which -- the majority of these procedures are performed using D&E -- has a very low risk of complications. They found that, overall, about 1.5 percent of all second-trimester abortions had a complication.
Q. Thank you. We can put that aside.
Outside of Indiana, is D&E safely provided in office-based

settings?
A. Yes, it is.
Q. You have safely performed D&E in an office-based setting?
A. I have.
Q. Okay. Thank you.
Now I'd like to switch gears and talk to you about informed consent.
Just to begin, what is the purpose of informed consent?
THE COURT: I know that. We covered it a lot in the first trial. So let's go on to the next question.
BY MS. SINGH:
Q. Are you familiar with Indiana's law that requires a physician or APC to tell an abortion patient that human physical life begins when a human ovum is fertilized by a human sperm?
A. I am.
Q. Does that statement convey objective medical information?
A. It does not. Quite honestly, I don't know what it means.
Q. Is "human physical life" a term that major professional organizations define?
A. It is not a term that's -- that I know of that is defined by major professional medical or nursing organizations.
Q. Do you believe that it is consistent with the standards of informed consent to provide patients this disclosure that we just talked about?

A. I do not believe that it is consistent with the standards of care because it's confusing and it's not based on a medical definition.
Q. Do you believe there's any harm to giving patients this information?
A. I believe that it can be confusing and that it is certainly stigmatizing to patients to be told this information, especially when it's not based on a medical definition or a medical concept.
Q. Is there medical consensus about when human life begins?
A. There is not.
Q. Is there medical consensus about when pregnancy begins?
A. Yes. There is a medical definition of pregnancy, which is when a fertilized egg implants into the uterine wall.
Q. How did you determine that was the medical definition of pregnancy?
A. That's the definition according to the American College of Obstetricians and Gynecologists, which is major professional organization of board-certified obstetricians and gynecologists representing about 90 percent of all OB/GYNs in the United States.
Q. For embryos created in vitro, can pregnancy be delayed?
A. Yes.
Q. For how long?
A. For years, even for decades.

Q. Thank you.

And now I want to ask you if you're familiar with Indiana's requirement that a physician or APC tell an abortion patient that objective scientific information shows that a fetus can feel pain at or before 20 weeks of postfertilization age.

A. I am aware of this.

Q. Do leading medical associations agree with that statement?

A. They do not.

Q. In your opinion, does the assertion that a fetus can feel pain at or before 20 weeks of postfertilization age reflect a mainstream view within the medical community?

A. No. I believe this is a fringe view in the medical community.

Q. What has ACOG concluded about whether a fetus can feel pain?

A. ACOG has concluded that there is no evidence indicating that the fetus can perceive or experience pain before the third trimester.

Q. Please turn to PX421.

A. I'm not sure that I have -- I see 420 and 423.

Q. It's going to pull up on your screen, Dr. Grossman.

A. Okay.

Q. Could you just read into the record the author, the title, and the publication date?

A. The author is the Royal College of Obstetricians and

Gynecologists. The title is "Fetal Awareness Review of Research and Recommendations for Practice," published in March 2010.
Q. And are you familiar with this document?
A. Yes.
Q. What is the Royal College of Obstetricians and Gynecologists?
A. This is the major professional organization of obstetricians and gynecologists in the United Kingdom.
Q. What did they conclude about whether a fetus can feel pain?
A. They similarly concluded that there is no evidence indicating that the fetus can perceive or experience pain before the third trimester.
Q. And how do they come to that conclusion?
A. Based on a thorough review of the medical evidence.
Q. If we could now please pull up PX422.
Do you recognize this document?
A. I do.
Q. What is it?
A. Do you want me to read the title and all that?
Q. Sure.
A. So the lead author is Susan Lee. The title is "Fetal Pain, A Systematic Multidisciplinary Review of the Evidence." I believe it was -- I'm sorry. I don't have the printed version, but it was published in JAMA, I believe, in 2005, but perhaps

we can scroll down just to confirm that.
Q. That is correct. And it should be just on the bottom of that first page.
A. Yes.
Q. Okay. Was this article peer-reviewed?
A. It was.
Q. And how is the analysis here conducted?
A. So they performed a systematic review of the literature related to fetal pain and then synthesized that evidence into number of conclusions.
Q. And what did the article conclude?
A. They concluded that there's no evidence that the fetus can perceive or experience pain prior to the third trimester.
Q. And is this one of the sources that ACOG relied upon to make its conclusion about whether a fetus can experience pain?
A. It is.
Q. Since the Royal College and JAMA sources that we discussed were published, has ACOG or the Royal Colleges changed their position on whether a fetus can feel pain at or before 20 weeks?
A. They have not.
Q. Thank you. Now if we could pull up Stipulated Exhibit SE17.
THE COURT: May I ask a question about the scholarship underlying the two reports that were just referenced.

Dr. Grossman, is this an area of controversy within the discipline? Is this a raging debate, or is this opinion that you've cited two grounds of, that you've cited two exemplars of, sort of settled view? Where is the scholarship on this?

THE WITNESS: I mean, I think that both of the reviews acknowledged that there was a limited evidence about some of these issues related to fetal pain and that it's -- you know, that more research could be done in this area.

I believe -- so I won't say it's settled in that it's possible that there could be new information that could change these views. However, it is my understanding that, you know, there's certainly discussion of this issue, and neither the Royal College of Obstetricians and Gynaecologists nor ACOG have changed their assessment of the medical evidence.

THE COURT: So on the grounds that anything's possible, they could change their view. But it doesn't seem to be an area of active research and debate; is that right?

THE WITNESS: I don't know that I can speak to what research may be ongoing, but I would not say that this is an area of very active debate in the medical community currently. But as I said and as you said, it's certainly possible that the view could change in the future if there were more or different evidence.

THE COURT: Thank you.

Ms. Singh.

MS. SINGH: Thank you.

BY MS. SINGH:

Q. Now if we could turn to Stipulated Exhibit SE17 and turning to page 2 of this document. If you could turn to the paragraph under the section entitled "Is perinatal hospice psychologically safer for the mother?" Is the following statement accurate: "Studies show that mothers who choose to carry their baby to term recover to baseline mental health more quickly than those who aborted due to fetal anomaly"?

THE COURT: Wait. That's not the area that was highlighted.

MS. SINGH: Just underneath that. That paragraph right there. Right above it (indicating). There we go. Thank you.

BY MS. SINGH:

Q. Is this statement accurate: "However, studies show that mothers who choose to carry their baby to term recover to baseline mental health more quickly than those who aborted due to fetal anomaly. Terminating the pregnancy does not shorten the grieving process or allow parents to put it behind them. On the contrary, abortion is a complicating factor in healing"?

A. That is not medically accurate.

Q. And we can put that exhibit aside.

Why not?

A. There's no medical evidence indicating that pregnant people with fetal anomaly who choose to continue the pregnancy to term fare any better in terms of their mental health and return to baseline faster than those who choose to have a termination.
Q. What is baseline mental health?
A. That's the mental health that the person had really before their pregnancy. And, you know, it includes that some patients have preexisting mental health conditions before they even get pregnant.
Q. And what is the basis for your opinion about the medical accuracy of this statement?
A. My review of the literature and my personal experience providing care.
Q. If we could now pull up PX158.
Is this one of the studies you relied upon for your opinion about the perinatal hospice brochure statement?
A. Yes.
Q. Please read into the record the lead author, title, publication, and publication date.
A. The lead author is Julia Steinberg. The title is "Later Abortions and Mental Health: Psychological Experiences of Women Having Later Abortions -- A Critical Review of Research." And it was published in 2011 in Women's Health Issues.
Q. Was this study peer-reviewed?
A. Yes.

Q. And how was this study conducted?
A. So for this study, the author, Dr. Steinberg, performed a review of the literature on looking for studies that reported on mental health outcomes of patients who underwent an abortion later in pregnancy due to a fetal anomaly and reported on mental health and then specifically looked for certain methodologically -- methodological criteria in these studies to determine whether they were high-quality studies or not.
In particular, she looked at whether there was a comparison group, whether the comparison group was appropriate, how prior mental health or baseline mental health was assessed, and whether common risk factors were controlled for the analyses.
Q. And what did she conclude?
A. That, really, this literature is of very poor quality. And I believe none of the studies met all of these criteria. And, in particular, I believe that none of them appropriately controlled for prior mental health.
Q. Have any studies published since this 2011 article changed this finding?
A. I'm not aware of any article that changes this finding.
Q. Thank you. We can put that document aside.
Finally, Dr. Grossman, is there any reason that preabortion counseling has to be done by licensed practitioners?
A. No.
Q. Is it consistent with the standard of care to delegate the

provision of preabortion counseling to properly trained counselors or medical assistants?

A. Yes. I mean, for example, where I practice currently, patients undergo a very in-depth and thorough counseling session with a trained counselor who generally is not a licensed practitioner. And then they meet with me afterwards, and I review that information with them and ask if they have any additional questions. But, really, the in-depth counseling is occurring with an unlicensed person.

Q. Are you familiar with Indiana's requirement that only a physician performing an abortion for a person who has been given a lethal fetal anomaly diagnosis can give the information about the availability of perinatal hospice services and the state's perinatal hospice brochure?

A. I am aware of that.

Q. In your opinion, is there any medical basis for requiring the physician providing the abortion to provide a patient with the state's mandated disclosures?

A. I don't believe there's any benefit to that requirement.

Q. Why not?

A. I believe that the referring physician could just as easily do that and in some ways might even be more aware of various options available to the patient, specifically near where the patient lives, as well as, you know, an advanced practice clinician could also give that information.

Q. Thank you, Dr. Grossman.

MS. SINGH: I have no further questions, Your Honor.

THE COURT: All right.

Cross-examine.

Does someone else have a microphone on besides asking counsel? I'm hearing comments. Ms. Harves, are you making comments?

COURT CLERK: I am not.

CROSS EXAMINATION

BY MR. BARTOLOMUCCI:

Q. Good afternoon, Dr. Grossman. You may remember me from March. It's good to see you again.

THE COURT: State your name, Counsel.

MR. BARTOLOMUCCI: My name is Christopher Bartolomucci, counsel for the state.

THE COURT: All right, sir.

BY MR. BARTOLOMUCCI:

Q. Now, Dr. Grossman, why don't we start with Indiana's requirement that only physicians may perform abortions. You criticize that requirement, correct?

A. Yes.

Q. Now, in your report did you cite any evidence that some women in Indiana were unable to obtain an abortion because of the physician-only requirement?

A. I did not perform any research in Indiana. So I did not.

Q. In your report, did you offer any opinion that the physician-only requirement will prevent some number of women in Indiana from obtaining an abortion?

MS. SINGH: Objection, Your Honor. This is outside the scope of his direct testimony.

THE COURT: You asked about the physician-only requirement. So he's able to ask about the nature of the research that led to his opinions. I don't quite understand why you say it's outside the scope.

MS. SINGH: He didn't testify about whether the requirement prevents people from accessing care; he talked about the medical basis for the requirement and the scientific and medical literature that doesn't support the requirement.

THE COURT: I understand.

The objection's overruled.

MS. SINGH: Thank you, Your Honor.

THE COURT: Cross-examination, he's got more latitude than that, Counsel.

BY MR. BARTOLOMUCCI:

Q. Do you need me to restate the question, Dr. Grossman?

THE COURT: No. He's already answered it.

BY MR. BARTOLOMUCCI:

Q. Did he answer the second question? I know he answered the first question.

THE COURT: No research in Indiana, he said.

BY MR. BARTOLOMUCCI:
Q. Then I asked a follow-up question. And I think then the objection came.
THE COURT: Yes, it was about Indiana.
MR. BARTOLOMUCCI: It was about Indiana, yes.
THE COURT: And he said no research in Indiana.
MR. BARTOLOMUCCI: Okay.
THE COURT: That's what I understood him to say.
BY MR. BARTOLOMUCCI:
Q. Is that your answer to both questions, Dr. Grossman, no research?
A. That is correct.
Q. Okay. Could we put up on the screen the Weitz study?
THE COURT: Need an exhibit number.
MR. BARTOLOMUCCI: It is PX406, Your Honor.
THE COURT: Thank you.
BY MR. BARTOLOMUCCI:
Q. Can you see that, Dr. Grossman?
A. Yes. And I have a printed version in front of me too.
Q. Okay. Great. And you talked about this study in your direct testimony, correct?
A. Yes.
Q. Now, am I correct that the Weitz study found that the rate of complications for aspiration abortions performed by nurse practitioners, certified nurse midwives, and physician

assistants was double the complication rate for such abortions performed by physicians?
A. Yes.
Q. Am I also correct that the study noted that low-income and minority women are more likely to be served by nurse practitioners and physician assistants?
A. Can you point to that in the study -- in the paper?
Q. Sure. I believe that's on page -- there. It's been highlighted.
A. Yes.
Q. Okay. Thank you.
Now, on page 456 of the study, am I right that the study authors admitted that "follow-up data were available for 69.5 percent of patients"?
A. Yes.
Q. So that means, does it not, that 30 percent of study participants did not complete the follow-up survey?
A. Correct. And that was not different between the two groups.
Q. And is this phenomena known as loss to follow-up?
A. Yes.
Q. Could you give me a definition of loss to follow-up?
A. It's when patients who are recruited into a study and receive their allotted treatment but are not available for follow-up.

Q. And am I also correct that the way this study was conducted, the study authors assumed that the women who didn't complete the survey had no complications?
A. Can you point to where you see that?
Q. I think that appears on page 456. Actually, it's right below the yellow highlighting that we were looking at. Do you see where it says, "Patients who did not return the follow-up survey were retained in the analytic sample because we found that they contacted the facility when they did experience a complication"?
MS. SINGH: Sorry, Your Honor, is it possible to state the page number. I'm having a hard time finding that.
THE COURT: Yes. What page is that?
MR. BARTOLOMUCCI: I thought I said that was page 456, but that's where it will be found.
MS. SINGH: In the Weitz article?
MR. BARTOLOMUCCI: We are still in the Weitz article. It's 456 in the third column.
THE WITNESS: Yes, I have a different page numbering on the article I have printed. But I see it here.
And yes, it does say that.
BY MR. BARTOLOMUCCI:
Q. Okay. I didn't know there was a pagination issue. All right.
But thank you. We have your answer.

Now, you also discussed in your report and in your direct testimony that the Barnard study -- the literature review; is that right?

A. Yes. I believe you're referring to the Cochrane review.

THE COURT: Is this an exhibit? If so, refer to it by the number, please.

MR. BARTOLOMUCCI: Yes, Your Honor. It's PX405.

Can we call that up?

BY MR. BARTOLOMUCCI:

Q. Were you looking for that, Barnard? Here it comes.

Now, the authors of this study considered the problem of loss to follow-up, didn't they?

A. I do believe that they discussed that, yes.

Q. And so on page 13 of this study in the second sentence we have on the screen there, the "We considered loss to follow-up," do you see that, Dr. Grossman?

So am I right that these authors considered a loss-to-follow-up rate of greater than 20 percent to threaten the study validity?

A. Correct. And then they also talk about how they had looked at other studies in this review that did not have significant loss to follow-up.

Q. Now, one of the studies reviewed by Barnard was the Weitz 2013 study, correct?

A. Yes.

Q. And they noted that the Weitz study, as we've discussed, had a loss-to-follow-up rate of 30 percent, correct?
A. Yes.
Q. And am I also right that Barnard found that, in the Weitz study, the risk of "allocation concealment bias was high"?
A. Yes. It was not a randomized study.
Q. Now, if we could turn to page 20 of Barnard. In the first column, there's a heading "Implications for practice." It says "Authors' Conclusions and Implications for practice."
Do you see that?
A. Yes.
Q. Now, the authors stated, did they not, that "there may be some difference in the effectiveness of the surgical abortion procedures performed by midlevel providers compared with physicians, however, we cannot be sure" --
THE COURT: Wait. Where is that, sir? I'm having trouble finding that.
MR. BARTOLOMUCCI: I'm sorry, Your Honor.
It's now highlighted on the page.
THE COURT: Okay. So you're starting partway through a sentence?
MR. BARTOLOMUCCI: Correct.
BY MR. BARTOLOMUCCI:
Q. The sentence starts, "Based on a small number of studies, there may be some difference in the effectiveness of surgical

abortion procedures performed by midlevel providers compared with physicians; however, we cannot be sure."

Have I read that correct, Dr. Grossman?

A. Yes.

Q. And then the next sentence continues, "Observational data indicates that there may be a higher risk of abortion failure for surgical abortion procedures administered by high-level providers" --

THE COURT: Midlevel providers.

MR. BARTOLOMUCCI: You're right, Your Honor, midlevel. Thank you.

BY MR. BARTOLOMUCCI:

Q. -- "but the number of studies is small and more robust data from controlled trials are needed."

Did I read that correctly, Dr. Grossman?

A. You did.

Q. So is it fair to say that the conclusions of the Barnard study was that more information is needed but the data that they have suggests a higher risk of abortion failure by midlevel providers versus physicians?

A. Yes. They found a difference that was 0.3 percent for physicians and 0.7 percent for midlevel providers. And that was a statistically significant difference. And so they suggested that this should be studied further.

Q. Okay. Why don't we talk now about the second-trimester

hospitalization requirement.

You stated in your report, did you not, that you were not aware of any evidence that second-trimester abortions are safer when performed in ASCs or hospitals as compared to office-based settings; is that right?

A. That is correct.

Q. And then you immediately went on to discuss the Roberts 2018 study.

MR. BARTOLOMUCCI: Which, Your Honor, is Exhibit PX411.

THE COURT: Is that a question to the witness?

MR. BARTOLOMUCCI: It started as a question, and then I think I finished it as more of a comment. But -- so let me try this again.

BY MR. BARTOLOMUCCI:

Q. So, Dr. Grossman, you discussed the Roberts study in your report and your direct examination, correct?

A. Yes.

Q. Now, in your report, this is the only study you cited to support the claim that there was no medical benefit to performing a second-trimester abortion in an ASC or a hospital, right?

A. Well, I mean, the consensus statement from ACOG and the National Academies of Sciences report, I think, are also applicable to this.

Q. Would you consider those to be studies?
A. Well, they're reviews of the available literature.
Q. Did they review Roberts?
A. Preliminary data from the Roberts study were presented at the consensus meeting that informed the Levy consensus guidelines from -- that's led by ACOG. But it was not yet published at that time.
Q. Okay. So the Roberts study came later? Is that what I gathered, the publication of it?
A. Yes, the publication came later.
Q. Now, am I right that this study compared adverse events occurring after abortions performed in office settings versus such adverse events performed in ambulatory surgical centers?
A. Correct.
Q. In other words, the study did not look at the rate of complications occurring in abortions performed in hospitals; is that right?
A. That is correct.
Q. Now, if we could go to Table 2, which is on page 2503. And we'll want to look at the top of that table.
Okay. So this table is giving unadjusted rates of abortion-related morbidities and adverse events by facility type, right?
A. Yes.
Q. And am I reading this right that it says, in ambulatory

surgery centers, the rate was 2.6 percent for any morbidity or adverse event?
A. Yes.
Q. And the equivalent rate in office space settings was 3.42 percent?
A. Yes.
Q. Okay. So the risk of bad things was greater in office-based settings, right?
A. I mean, there was a significant difference in those proportions.
Q. Okay. Let's go to the next page. It's Table 3, page 2504. Once again, we'll want to look at the top of the table.
Now, this is a table reporting on what they called adjusted rates, right?
A. Correct.
Q. Do you know what the difference is between unadjusted and adjusted rates in the context of this study?
A. I mean, this study involved a multivariable analysis that essentially controlled for other risk factors that may be different in these different groups.
Q. Okay. So looking at the data toward the left, am I right to read this as the adjusted incidence for ASCs was 3.25 percent and the adjusted incidence for office-based settings was 3.33?
A. Yes. I just wanted to highlight that I believe I only

referred to this article as it pertains to second-trimester abortion, but you seem to be pointing out the findings related to any abortion. So I just want to highlight that difference in how I used this source in my report and my testimony.
Q. Okay. So you're saying that this table reflects data relating to first- and second-trimester abortions?
A. Yes, and medication abortions.
Q. And medication abortions. Okay.
Well, once again, however, the data shows that the risk of bad things in office-based settings is higher than in ASCs, right?
A. No, that's incorrect. The 8-point estimate has some error associated with that estimate, and the adjusted difference, as you can see there, is .08 percent, and that 95 percent conference interval crosses 0. So this is not a significant difference. The P-value of 0.77 indicates that this is not a significant difference.
Q. It's -- okay. If it's not a significant difference, nevertheless it's a difference?
A. No, it's not a difference.
Q. I'm sorry. Number -- 3.25 is no different than 3.33?
A. In this analysis, there is no difference in those adjusted incidences.
Q. Okay. Well, I'm not going to go to war with you over statistics because I know I'll lose. So why don't we leave it

there.

Let's go to page 2505. In the first column, there's a paragraph labeled "Limitations." Do you see that?

A. I do.

Q. And it says, "This study has several limitations," right?

A. Yes.

Q. Okay. I'm not going to go through all of these, but down towards the bottom -- I guess it's three lines from the bottom of the column.

It says, "Third, by virtue of the data included in the database used in this study, the study only included abortions paid for by private insurance. Only about 15 percent of the almost 1 million abortions provided each year in the United States are paid for by private insurance. Thus, findings may not be generalizable to all abortions in the United States."

Is that right, Dr. Grossman?

A. That is what it says.

Q. Okay. I think that's enough of Roberts.

Let's talk now about informed consent and, in particular, the mandatory disclosure regarding the beginning of life. Now, this disclosure requires an abortion provider to tell patients that "human physical life begins when a human ovum is fertilized by a human sperm," right?

A. Yes. That is my understanding.

Q. And you stated in your report that there is no medical

consensus about when life begins, right?
A. That is correct.
Q. And you yourself did not offer a view in your report on when life begins, right?
A. That is correct.
Q. Is it fair to say that you don't even view yourself as qualified to express a view on that question?
A. I don't believe it's a medical question; I believe it's more of a philosophical question.
Q. But one view on the question of when life begins is the view expressed in the Indiana disclosure, right?
A. That is a view, yes.
Q. Okay. There's no consensus about it, but that's one of the views that people hold?
A. People may hold that view, but it is not a medical concept. And it's not something about which there is medical consensus. And, therefore, I don't think it should be part of medical -- the medical informed consent process.
Q. Do your abortion patients ever ask you questions about the morality of abortion?
A. I mean, my patients are going through -- I mean, they have different experiences. And some patients have their, you know, moral struggles that they're going through while they're making their decision. And yes, we talk about that.
Q. Okay. So I'm assuming your patients are interested in

topics that go beyond strictly medical questions, right?
A. My -- I see my role in, you know, helping to support patients with whatever moral questions or dilemmas they may be facing are to help them think through all aspects of the decision or choice that they're facing and to refer them to experts who can help them with some of these moral challenges they may be facing if that's needed, including a chaplain. We're very lucky to have a chaplain available on-site where I work who sometimes comes and meets with patients who are going through abortion.
Q. Now, forgive me for jumping around, but this discussion reminded me of a question I wanted to ask you back on the physician-only topic. So with your indulgence, we'll pop back to that for a minute.
    Now, am I right that you provide abortion services through the Women's Options Center in San Francisco?
A. At Zuckerberg San Francisco General Hospital.
Q. Okay. So what is the name of the -- is it a clinic? What's the name of it?
A. It's the name you said, the Women's Options Center in Zuckerberg San Francisco General Hospital. But there are several Women's Options Centers; so I wanted to clarify the location.
Q. Okay. So you work at a particular Women's Options Center or you perform services at a particular Women's Options Center,

right?
A. Yes.
Q. And I'm led to believe that, at this particular Women's Options Center, all of the abortions are performed by physicians. Am I right about that?
A. That is not true. There are -- it's a training site. And there are medical students as well as advanced practice clinicians who are -- may be trained at that site and who sometimes provide care there.
Q. Outside of the context of training, do nonphysicians perform abortion services at this Women's Options Center?
A. I mean, we are generally a training site. I mean, almost all the abortions at the site are performed by trainees because we are part of the health sciences university at University of California San Francisco.
So there is not a regular attending clinician who is an APC who consistently provides care there, but there are sometimes attending advanced practice clinicians who do provide care there.
Q. Thank you for clarifying that. And of course in California, unlike Indiana, it is lawful for nonphysicians to provide these services, right?
A. Yes.
Q. Okay. So why don't we go on to the topic of fetal pain and the informed consent disclosure about fetal pain.

Now, Dr. Grossman, do you consider yourself to be an expert in neuroscience?

MS. SINGH: Objection, Your Honor. Calls for a legal conclusion.

THE COURT: Overruled. He can say what his expertise is. It doesn't have to be legal. It could be medical, scientific.

THE WITNESS: I am not a neuroscientist.

BY MR. BARTOLOMUCCI:

Q. Do you consider yourself to be an expert in the field of embryology?

A. I am not an embryologist.

Q. In your report, did you cite any paper or study in which you were an author or a coauthor relating to fetal pain?

A. No.

Q. So, in other words, the testimony that you've given regarding fetal pain is essentially based upon your review of literature. Is that fair?

A. Well, it's -- I think, really, what my testimony about fetal pain is is that I have read and am aware of the statements that have been made by the leading professional organizations that represent obstetrician/gynecologists in the United States and in the United Kingdom who have worked with experts to review all of the evidence and make evidence-based conclusions about that literature.

I am very much aware of the process that the American College of Obstetricians and Gynecologists goes through to review literature and to come up with these conclusions, and I have confidence in these two organizations and the statements that they've made. So that's really the, I think, the basis of my testimony.

Q. Now, at some point in the fetus's development, there's no question but that it can feel pain, correct?

A. Can you be more specific?

Q. Well, what is your understanding of the number of weeks of fetal development as the point at which a fetus can feel pain?

A. I mean, I think that in both of the reviews, they talk about how -- in both the JAMA article and in the Royal College of Obstetricians and Gynaecologists, they talk about how, in particular, the anatomic connections between the thalamus and the cortex are present in the third trimester. And they talk about how those are necessary but not necessarily sufficient for the experience of pain. So that would be the earliest point at which, according to those reviews, the fetus could experience pain.

I think the Royal College review also talks about how there is some effect at the intrauterine environment that is almost like a kind of anesthetic-like effect in which kind of the fetus is almost in, like, a sleep-like state, and so that its perceptions of all sorts of stimuli are muted.

So I don't know that I would say there's a consensus at X number of weeks for sure a fetus can experience pain. I think there is consensus in these reviews that a fetus cannot feel pain prior to 25, 26 weeks.
Q. Okay. So your testimony was that there's a consensus that a fetus cannot feel pain prior to 25.6 weeks? Is that what you said?
A. I said prior to -- around 25 or 26 weeks according to the reviews.
Q. And this -- that view is based upon a view about when the cortex is connected to the thalamus; is that right?
A. I think that's a big part of the evidence that has been referred to in those reviews, yes.
Q. What is the other evidence?
A. I mean, for example, the -- in the Royal College document, I mean, they talk about the timing at which nerve receptors are present in the skin. They talk about the earliest connections through to the spinal cord and to the lower levels of the brain and then the point at which there's connection between the thalamus and the cortex. But, yes, I think the anatomic structure that they refer to that happens latest is that connection between the thalamus and the cortex.
Q. Would you agree that there are doctors who believe that a fetus can feel pain earlier than 25 or 26 weeks?
A. Can you be precise about what you mean by "earlier"?

THE COURT: And what you mean by "believe."

BY MR. BARTOLOMUCCI:

Q. Would you agree that there are doctors who have expressed the view that, in their judgment, a fetus can experience pain prior to -- before -- 25 or 26 weeks?

A. Again I really wish you would -- I would like you to be precise about what you mean by "prior to." I mean, do you mean 23 weeks? Or do you mean --

Q. How about 20 weeks? I didn't mean to interrupt. How about 20 weeks?

A. There are doctors who have stated that view, yes.

Q. Okay. So your opinion offered today doesn't represent the judgment of all doctors?

A. It represents the judgment of, again, the professional body that represents 90 percent of OB/GYNs in the United States and the vast majority of practicing obstetricians in the United Kingdom.

THE COURT: I'm trying to think of a topic on which I could get all doctors to agree.

MR. BARTOLOMUCCI: Or --

THE COURT: We'll save that for another day, Mr. Bartolomucci.

MR. BARTOLOMUCCI: Or a topic on which all lawyers could agree?

THE COURT: That's even bigger problem.

MR. BARTOLOMUCCI: Well, one person's problem is another person's living.

THE COURT: Litigation. Right.

BY MR. BARTOLOMUCCI:

Q. Okay. So why don't we move to the topic of the mandatory disclosure relating to mental health risks in the context of fetal anomalies, in other words, the Indiana brochure.

MR. BARTOLOMUCCI: Could we put that brochure back on the screen?

I'm sorry, Your Honor. I don't have the PX number for it.

THE COURT: Well, you won't know if it's the right one or the wrong one.

MR. BARTOLOMUCCI: When I see it, I'll know whether it's right or wrong.

THE COURT: There's a dodge. I've read that one before.

MR. BARTOLOMUCCI: I'll take that as a compliment, Your Honor.

THE COURT: Okay. Just go ahead with your question. The Indiana brochure.

BY MR. BARTOLOMUCCI:

Q. Indiana brochure. So in the paragraph that we looked at earlier on your direct -- there we go. We're getting it highlighted.

THE COURT: Now, wait. So what is this number? PX what?

MR. FISHER: This is Stipulated Exhibit 17, Your Honor.

THE COURT: Oh, SE what? SE what?

MR. FISHER: 17.

THE COURT: And what page are we on here?

MR. BARTOLOMUCCI: You know, it's a brochure. I think it's a foldable brochure. So I'm not sure exactly how it's paginated.

THE COURT: It says page 2 of something? Okay. Page 2 of SE17. Go ahead.

BY MR. BARTOLOMUCCI:

Q. Okay. So, Dr. Grossman, this paragraph starts off with a question: "Is perinatal hospice psychologically safe for the mother?" And it says, "Again, the answer is resoundingly yes."

Do you have a problem with that question and answer?

THE COURT: Counsel, even I don't know what that question means. Do you have a problem with it?

MR. BARTOLOMUCCI: I think I can improve it.

BY MR. BARTOLOMUCCI:

Q. So, Dr. Grossman, do you agree or disagree with the answer to that question?

MS. SINGH: Objection, Your Honor, to the relevance.

THE COURT: It's hard to know what even the question

means. So I'll sustain the objection and let you try again.
BY MR. BARTOLOMUCCI:
Q. Well, Dr. Grossman, I believe you testified on direct that you disagreed with the last two sentences of this brochure. Is that right?
A. Well, I disagree with the explicit statement that, I believe, it has to accompany handing over this brochure. And specifically we looked at the statement -- the sentence that's further down in this paragraph.
Q. Right. And in particular, the ones that start "however" and "terminating the pregnancy," right? Those are the two sentences you disagreed with?
A. Yes.
Q. Okay. Do you disagree with the material that precedes it, starting with the question through the next two sentences?
MS. SINGH: Objection. Relevance.
THE COURT: Overruled.
THE WITNESS: I definitely agree with the sentence that says, "Grief is a natural response experienced by all parents who have lost a baby due to a medical condition."
The question of "Is perinatal hospice psychologically safe for the mother?" I mean, you're asking me -- like, it's completely out of context.
I think that, if someone were to choose to have perinatal hospice and has been adequately counseled about the

risks, benefits, and alternatives and made that decision as the best decision for themselves, I think that that would be a psychologically safe decision.

Based on what I see here alone, it's a little hard to make that assessment.

BY MR. BARTOLOMUCCI:

Q. Now, if we could move to the portion of the brochure dealing -- captioned "References," do you see the reference to the 2015 Cope paper?

A. I do.

Q. Now, you didn't cite that in your report, did you?

A. I did not because it's a poor-quality study.

Q. You read that study in connection with the preparation of your report?

A. Yes.

Q. Okay. So you believe it's of poor quality, but you didn't explain that opinion in your report, correct?

A. I cite the Steinberg review which, although it was done prior to this, the Cope paper, the Steinberg review essentially applies to this Cope paper because the Steinberg review talks about the methodological weaknesses of all of the studies that have looked at this question, and they are all plagued with the problem that they don't account for baseline mental health. And that, along with several other problems, makes the Cope study a poor-quality study and doesn't contribute any relevant

information.

Q. Well, let's talk about the Steinberg study. In fact, why don't we put that on the screen.

THE COURT: Wait, wait. I want you to read that sentence. Put it back, please. Put back the brochure, please, whoever's doing it. Hello. Who's doing it?

The reference to the Cope study. Mr. Bartolomucci, read to me, as written there, the italics portion.

MR. BARTOLOMUCCI: Your Honor, it says, "Pregnancy continuation and organizational religious activity following prenatal diagnosis of a lethal fetal defect are association with improved psychological outcome."

THE COURT: Does that make sense to you?

MR. BARTOLOMUCCI: The word "are" in there, I wonder if that may have been a typographical error.

THE COURT: How what about "association"? The whole thing seems sort of junky, doesn't it, because we've got two words combined, and then we have something down there about "are association."

It's a great brochure that we've authored, the State of Indiana.

You need not response. I just want to point that out.

MR. BARTOLOMUCCI: I would like to say that --

THE COURT: You wouldn't write that, Mr. Bartolomucci.

MR. BARTOLOMUCCI: I would try not to. But I would

not characterize the study as junky because of what might have been a typesetting error.

THE COURT: I'm not saying the study is. I'm saying that description of the study is an embarrassment.

MR. BARTOLOMUCCI: The typesetting leaves something to be desired, Your Honor.

THE COURT: How about the grammar? It's not the use of italics; it's the use of the language.

Move along, Mr. Bartolomucci. It's 5:30. You have to give me a little license to complain about stuff.

MR. BARTOLOMUCCI: Fair enough, Your Honor. And I think we're almost finished.

Why don't we go to the Steinberg study. This is the 2011.

THE COURT: One more thing about that.

THE WITNESS: Can you tell me about the number?

THE COURT: One more thing about that provision. If it somehow makes it into my decision, I'm putting "sic" by it.

MR. BARTOLOMUCCI: That's your prerogative, Your Honor.

THE COURT: It is. I'm not going to claim that language.

MR. BARTOLOMUCCI: We might put in "sic" if we cite it.

THE COURT: Yes, you should. Save your reputation,

Mr. Bartolomucci.

MR. BARTOLOMUCCI: I hope the associates in the courtroom have taken note.

Okay. So here we have Steinberg. And if the peanut gallery could give me a PX number, that would be helpful. No?

MR. PRINCE: This peanut does not have that information.

MR. BARTOLOMUCCI: Your Honor, may we proceed.

MS. SINGH: If you could give me the PX number so I could find it in my binder.

MR. BARTOLOMUCCI: That's what we're looking for, is the PX number.

THE COURT: How many lawyers do we have working on this? I see five at each table, and I know there are four more on each side because you told me that. Nine lawyers per side can't give me a PX number?

COURT CLERK: PX158.

THE COURT: Not even left to a lawyer. PX158.

MR. BARTOLOMUCCI: PX158.

THE COURT: All right. We're there.

BY MR. BARTOLOMUCCI:

Q. So, Dr. Grossman, this is the only study you cited in your report that specifically addressed the mental health effects of women terminating a pregnancy due to fetal anomaly; is that right?

A. Yes. It's a review of the literature and evaluated all the published literature at that point.
Q. And isn't it true that, of the 11 studies reviewed by Dr. Steinberg, several found higher levels of posttraumatic stress disorder following a later abortion for reasons of fetal anomaly?
A. Can you point to that, please?
Q. Well, for example, isn't it true that several of the Kersting studies found that, compared to women who gave birth to healthy babies, women in the later abortion group had higher levels of PTSD, depression, and anxiety on validated psychological measures?
A. You mean, as we just read in that poorly prepared brochure from Indiana, it talked about how the diagnosis of a fetal anomaly is traumatic for everybody.
So it makes no sense, then, to compare those patients who receive that traumatic diagnosis and then have to end the pregnancy some way compared to people who gave birth to a healthy infant. That makes no sense.
Q. Another study reported on by Steinberg, the Korenromp, found that, compared to men whose partners had later abortions, women in the later abortion group had higher levels of PTSD, depression, and anxiety on validated psychological measures, right?
A. Again, as Dr. Steinberg points out, that's an inappropriate

comparison group.

Q. And the next study below, Davies, found that, compared to women who had first-trimester abortions because of fetal anomaly, women who had later abortions reported higher levels of posttraumatic stress, right?

A. But equal levels of depression, grief, and --

(Reporter clarification.)

THE WITNESS: Just that the sentence continues to say "but equal levels of depression, grief, and general psychological health on validated psychological measures." That is everything that it says in that part of the table.

BY MR. BARTOLOMUCCI:

Q. Didn't Dr. Steinberg concede that this comparison group is appropriate?

A. Yes.

Q. Now, the Steinberg article also says, does it not, that the evidence supports the claim that late-term abortion is associated with poor mental health outcomes?

A. Can you point to that?

Q. Do you know what she means by the evidence does and does not support the claim?

A. That there were mixed findings, that one -- for one measure of mental health, there was a worse outcome, and for other outcomes, including, I believe it was, general psychological health, there was no difference.

Q. So, in other words, the evidence was mixed?
A. Correct.
Q. Finally, compared to women who gave birth to preterm infants, didn't Kersting find that women in the later abortion group had higher levels of posttraumatic stress?
A. And continuing to read that section of the table, "but equal levels of depression on validated psychological measures." So one of the measures there was a difference, and one of the measures there was not.
Q. Right. So looking at the column on the right, she once again wrote that the evidence does and does not support the claim, right?
A. Correct.
Q. So, once again, the evidence was mixed?
A. Correct. And I think we're skipping over quite a few of the studies where she says it's an inappropriate comparison group and the evidence does not support the claim.
THE COURT: So, Dr. Grossman, is the comparison group in that one category the men whose partners had later abortions?
THE WITNESS: Yes.
THE COURT: I'm not going to say anything further. My question stands for itself.
MR. BARTOLOMUCCI: And, Your Honor, I have no further questions for this witness.

THE COURT: That's a really good response to what I just said, Mr. Bartolomucci.

Okay. Redirect, quickly.

MS. SINGH: Yes, Your Honor. Thank you.

May I start, Your Honor?

THE COURT: Yes.

MS. SINGH: Thank you.

REDIRECT EXAMINATION

BY MS. SINGH:

Q. Dr. Grossman, let's start with the perinatal hospice brochure. Just as a reminder, that disclosure says studies show that people with fetal anomaly diagnoses who carry to term return to baseline faster than people who obtain abortion.

Do any of the studies that you were asked about during your cross support that assertion?

A. No. As the -- as Dr. Steinberg noted in her review, I believe that all of the studies -- not all of them, almost all of them were plagued by the problem that they did not control for baseline mental health. They didn't account for what the patient's baseline mental health was.

So, in fact, they weren't even able to answer the question about whether patients returned to their baseline mental health. And that's also the problem with the Cope study. They don't report what the patient's baseline mental health was.

Q. If we could just pull up PX158, which is the Steinberg

study, going to Table 1.

Did the Kersting study you were asked about compare people with fetal anomaly diagnoses who carried to term with people who obtained an abortion?

A. Are you talking about the 2009 one that gave birth to preterm infants, the last part?

Q. Right.

A. Yes.

Q. Did that study look at whether -- did that study compare who returned to baseline mental health faster?

A. No. I don't believe they looked at baseline mental health.

Q. Thank you. I have no further questions about that document.

Dr. Grossman, you were asked about the Roberts study, which is PX411. And, specifically, you were asked about the fact that the study involved women with private health insurance.

Does the fact that it involved private health insurance data give you any concerns about whether it would be generalizable to the abortion population -- abortion patient population?

A. I mean, looking at that study alone, I mean, I think it's appropriate that the authors highlight that as a limitation.

However, we have other data in addition to that study, including the Upadhyay study, which specifically looked at a Medicaid population in California. And so that is a low-income

population. And they report on complications of second-trimester abortion. If anything, the complications are overall that they report a little bit lower in the Upadhyay study compared to the Roberts study.

So the concern about generalizability in particular might be that the Roberts study looked at a healthier population that might have a lower risk of complications. But looking at it in the totality of all of the literature on second-trimester abortion, I don't think that's the case, and I think that the findings are generalizable.

Q. And looking at page 2503 of PX411, which is the Roberts study, did they find that there was an association between performing an abortion in an ASC compared with performing an abortion in office-based setting during the second trimester?

A. They did not.

Q. And did they, in fact, conclude that there was no association?

A. That is correct.

Q. And if we could now turn to PX406, which is the Weitz study.

You were asked -- and now turning specifically to page e3, under "Results." You were asked about the loss to follow-up data. Did the authors address the loss to follow-up rate in that study?

A. I mean, they do provide a justification as to why they

included them, specifically saying that they found that patients did end up later contacting the facility when they experienced a complication.

Q. Then if we could go back now to the Barnard Cochrane review study, which is PX405.

Now, you were asked on your cross whether the Barnard study concluded that more information is needed to know whether the provision of first-trimester aspiration abortion care by APCs is effective -- as effective as when physician-provided.

Do you recall that?

A. Yes.

Q. And do we have more information since the Cochrane review was published?

A. Yes. I'm not aware of an additional peer-reviewed publication, but we do have the experience, you know, in 25 percent or so of states where advanced practice clinicians can provide aspiration abortion, which continues to indicate that they can safely and effectively provide the service.

Q. Thank you.

MS. SINGH: No further questions, Your Honor.

THE COURT: Recross.

MR. BARTOLOMUCCI: Nothing, Your Honor.

THE COURT: All right. That completes the questioning of Dr. Grossman. Can he be excused?

MS. SINGH: Yes, Your Honor.

THE COURT: And by the State as well?

MR. BARTOLOMUCCI: Yes, Your Honor.

THE COURT: Okay. So, Dr. Grossman, thank you very much. Thank you for your afternoon. It's our afternoon. I suppose out in California, you've still got some afternoon left. So thank you.

THE WITNESS: Thank you very much.

THE COURT: Okay. This is a good break point for our proceedings today. One more witness for the plaintiffs according to my list. That true?

MS. SINGH: We may have potential rebuttal witnesses, Your Honor, but we do not have any more witness in our case-in-chief.

THE COURT: How about Ms. Steinberg -- Dr. Steinberg?

MS. SINGH: She may testify as a possible rebuttal witness.

THE COURT: But not -- so you're ready to rest?

MS. SINGH: Yes, Your Honor. But before I do, I'd like to move in plaintiff's deposition designations into evidence.

THE COURT: Are they straightforward, as in to say no objections? Or do you need to disclose to the other side?

MS. SINGH: They were submitted previously. So we would like to move into evidence -- our understanding is Dr. Stroud will be testifying; is that right?

MR. FISHER: That's right. That's right.

MS. SINGH: We'd like to move into evidence Exhibit 1, which is Mr. Covington's testimony, and Exhibit 3, which is Mr. Foster's testimony, but only insofar for a couple of pages that are relevant to this phase about the perinatal hospice brochure.

MR. FISHER: Oh, yes. Okay. There is no objection on those.

THE COURT: Is that it?

MS. SINGH: Yes, Your Honor.

THE COURT: So you're moving the admission of Exhibit 1 and Exhibit 3 as to two pages; is that right?

MS. SINGH: Yes, Your Honor.

THE COURT: And there's no objection. So those will come into evidence.

(Plaintiff's Exhibits 1 and 3 received in evidence.)

THE COURT: Are you ready to rest?

MS. SINGH: Yes, Your Honor. Plaintiffs rest.

THE COURT: All right. We will then turn to the defense evidence in the morning. Good for you, lawyers. Moving it right along. We're making good progress.

We'll start at 9:30 in the morning, as we started today. Have a nice evening.

Oh, yeah. I need to tell you that you can't leave the building. I'm going to ask Miss Harves to tell you what she

knows about how you leave the building. I don't want you to have to spend the night here. The thought of it makes me smile, but --

Go ahead and tell them what they should do.

COURT CLERK: The doors are locked. So you have to wait for one of us to let you out. So hold tight and don't head to the exit right now.

THE COURT: Which exit do you want them to use? Do you know?

COURT CLERK: We have to go out the handicap exit.

THE COURT: So that's the northeast corner basement. If you go that way, you have to wait still for somebody to let you out.

That's true in the gallery too, please. Don't try to burst through the doors. You'll get more action than you want.

Good night.

MR. FISHER: Good night.

COURT CLERK: Court is in recess.

(Court adjourned at 5:45 p.m.)

CERTIFICATE OF COURT REPORTER

I, Laura Howie-Walters, hereby certify that the foregoing is a true and correct transcript from reported proceedings in the above-entitled matter.

/S/LAURA HOWIE-WALTERS June 23rd, 2021

LAURA HOWIE-WALTERS, FCRR, RPR, CSR
Official Court Reporter
Southern District of Indiana
Indianapolis Division