UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WHOLE WOMAN'S HEALTH ALLIANCE, et al, Plaintiff,

-v-

TODD ROKITA, ATTORNEY GENERAL OF THE STATE OF INDIANA, in his official capacity, et al, Defendants.

CAUSE NO.: 1:18-C-0194-SEB/MJD
Indianapolis, Indiana
June 24th, 2021
VOLUME II

Before the Honorable
SARAH EVANS BARKER, JUDGE

OFFICIAL REPORTER'S TRANSCRIPT OF
BENCH TRIAL

Court Reporter: Laura Howie-Walters, FCRR/RPR/CSR
Official Court Reporter
United States District Court
Room 217
46 East Ohio Street
Indianapolis, Indiana 46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT PRODUCED BY ECLIPSE NT COMPUTER-AIDED TRANSCRIPTION

**A P P E A R A N C E S**

For Plaintiffs:

Dipti Singh, Esq.
Stephanie Toti, Esq.
Rupali Sharma, Esq.
Melissa C. Shube, Esq.
Mollie M. Kornreich, Esq.
Athanasia Charmani, Esq.
Sneha Shah, Esq.
Juanluis Rodriguez, Esq.
LAWYERING PROJECT
3371 Glendale Blvd. #320
Los Angeles, CA 90039-1825

For Defendants:

Thomas M. Fisher, Esq.
Christopher M. Anderson, Esq.
Robert A. Rowlett
Kian J. Hudson
INDIANA ATTORNEY GENERAL
302 West Washington Street
Indiana Government Center South
Fifth Floor
Indianapolis, IN 46204

and

Gene C. Schaerr
H. Christopher Bartolomucci, Esq
James. A. Heilpern
Scott D. Goodwin
SCHAERR|JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006

# I N D E X

FARR CURLIN
Direct Examination by Mr. Fisher ................5
Cross-examination by Ms. Shube .................10
Redirect Examination by Mr. Fisher .............15
Recross-examination by Ms. Shube ..............18

PRISCILLA K. COLEMAN, PHD
Direct Examination by Mr. Schaerr ..............19
Cross-examination by Ms. Shah ..................70

BYRON C. CALHOUN
Direct Examination by Mr. Fisher ...............90
Cross-examination by Ms. Toti .................109
Redirect Examination by Mr. Fisher ............130
Recross-examination by Ms. Toti ..............133

NANCY GOODWINE-WOZNIAK, MD
Direct Examination by Mr. Rowlett .............137
Cross-examination by Mr. Rodriguez ............159

MAUREEN L. CONDIC, PHD
Direct Examination by Mr. Schaerr .............170
Cross-examination by Ms. Charmani .............228
Redirect Examination by Mr. Schaerr ...........239

Defendants' Exhibit: PAGE

851................................. 113

Plaintiffs' Exhibit:

7 .................................. 180
8................................... 213

(Open court)

THE COURT: Good morning, all. As I said before, I always am curious about day two to see if you found the groove back to the courthouse. And you have. That's good. Nice to see you all.

MR. FISHER: You too.

THE COURT: I did a little bit of gardening last night. Not much, but a little bit. It hadn't rained enough to really make me want to go for the weed patch. So that will wait for the weekend. I expect you were working on pulling weeds this -- overnight too, weren't you? Of a different sort?

All right. Good to see you. We'll get started.

Ms. Singh, who do you have in the chute ready for us this morning?

MS. SINGH: Plaintiffs have rested their case-in-chief. So I believe it's defendants that will be calling.

THE COURT: Correct you are.

MS. SINGH: I did have one housekeeping.

THE COURT: I knew you would have something if I called on you.

MS. SINGH: If given the chance.

THE COURT: It was fortuitous.

MS. SINGH: Yesterday I moved some deposition designations into the record.

THE COURT: Yes, you did.

MS. SINGH: I failed to indicate the two pages of one of the exhibits. And I just wanted to -- it was page 240.

THE COURT: Of which? Exhibit 1?

MS. SINGH: Exhibit 3.

THE COURT: Page what?

MS. SINGH: 240 and 241.

THE COURT: Thank you for rounding that out.

And, Mr. Fisher, what's your plan today?

MR. FISHER: We are ready to call our first witness. And I wasn't sure if the court wanted to address the situation with Dr. Calhoun right now or wait to see how that developed.

THE COURT: Nope. We're in the chute. We're ready to go. Call your first witness.

MR. FISHER: The defense calls Dr. Farr Curlin.

THE COURT: All right. Dr. Curlin, good morning. Come to the witness stand, please.

Would you remain standing. And as soon as I'm done with the clerk, she'll administer the oath.

**FARR A. CURLIN, MD, DEFENDANTS' WITNESS, SWORN**

THE COURT: **Nice to see you, sir.**

THE WITNESS: **Thank you, Your Honor.**

THE COURT: You may be seated.

**DIRECT EXAMINATION**

BY MR. FISHER:
Q. Good morning, Dr. Curlin.
A. Good morning.
Q. You recall, of course, back in March we had an earlier phase of this trial where you testified?
A. Yes.
Q. And in that trial you testified as an expert in the field of bioethicists, including the bioethics of abortion and informed consent; is that correct?
A. Yes.
Q. What is the role of science in bioethics?
A. There's a saying in the field of bioethics that good ethics depends on good facts. And any ethical analysis must begin with a careful consideration of what the facts are, including those facts we know scientifically. So any scientific error that's informing one's ethical judgment will -- could lead to an erroneous ethical judgment.
Q. Well, there's a dispute in this case about a statement in Indiana's informed consent -- abortion informed consent brochure. And I'm going to read that statement to you.
The statement is "Human physical life begins when a human ovum is fertilized by a human sperm."
Are you familiar with that statement?
A. Yes, I am.
Q. Is that -- is that an accurate statement?

A. Yes.
Q. Is that a medically significant statement?
A. It is insofar as medicine treats living beings, living human beings, and part of having a sound scientific understanding as a medical practitioner is knowing about when human beings come into existence.
Q. Is there a scientific debate about that statement?
A. There is not.
Q. To put it another way, is there a scientific consensus about that statement?
A. There is, to my knowledge, a 100 percent scientific consensus about that. In my declaration I cited Miller & Levine's biology textbook. I could have cited any biology textbook which makes clear that each organism, living organism, begins with a fertilized egg.
I cited the embryology textbook by Moore and Persaud. Again, I could have cited any human embryology textbook. But in that one, they make clear that each of us, as an individual human being, begins with -- as a zygote, as a fertilized egg. That's when we come into existence. That's when our physical life begins.
Q. Are you aware that Dr. Daniel Grossman has testified in this proceeding?
A. I am.
Q. Have you reviewed that testimony insofar as it relates to

this human physical life definition?
A. Yes, I have.
Q. Have you reviewed his expert report on that matter?
A. Yes.
Q. What is your reaction to what Dr. Grossman says on this point?
A. Dr. Grossman seems to allege that the idea that human life, human physical life, particularly begins with fertilization is somehow obscure or a matter of philosophical speculation or not an area of consensus among medical practitioners.
But that is clearly not the case. I'm not aware of a single biologist, a single embryologist, a single practitioner of medicine who in public is arguing that -- against the idea that that's when human life begins.
Q. So I'm wondering in that statement about human physical life, why do you suppose the word "physical" is in that definition?
A. I suppose the word "physical" is in that definition because the state is seeking to avoid the claim that we're talking about the way that the term "life" can be used analogically to talk about the immaterial soul or some theological speculation about ensoulment.
But the statement would be equally true if it said "human life begins with fertilization of the ovum." By adding the term "physical" -- which the state could have added

"biological," "bodily," "natural" -- it just makes it that much more clear that we're talking about a simple fact on which medicine depends and which is not disputed at all in the scientific community.

Q. Taking the discussion back to the bioethics and the bioethics of abortion and another subject on which you testified earlier, informed consent, is the information that human physical life begins when a human ovum is fertilized by a human sperm, is that statement, is that information relevant to decisions regarding pregnancy and abortion?

A. It seems to me obviously relevant. Insofar as I said before, good ethics depends on good facts. Knowing that the human embryo or human fetus is a living human being, a living human organism, is important knowledge in deciding whether one is going to take actions that would kill that human being.

Q. And let's just revisit very briefly the concept of informed consent and how we think about informed consent.

How does a physician, an ethical physician, come about a decision about whether information is useful, relevant, or necessary for informed consent? What's the standard?

A. Well, the basic idea behind informed consent in brief is that, as a matter of respect for persons and specifically respect for patients as persons, we are not going to act on them without their consent and that they can't give valid consent unless they understand what it is they're giving

consent to, unless they have sufficient information to understand what is being proposed, what the action will do, what its potential side effects are, what's at stake even ethically in that action.

And the people have asked the question, well, when do you know you've given sufficient information for the consent to be adequately informed? And the standard that is most often referred to within the field of bioethics is the standard of the reasonable person, which, in my understanding, that's also the standard in the law.

And that just holds that if a reasonable person similarly situated would want to know this information or be relevant to them, then that's information you should give. And we know that many reasonable persons consider very serious the fact that the human fetus and the human embryo is a human organism.

Q. Let's just say it directly as we can. The statement "human physical life begins when a human ovum is fertilized by a human sperm," is that statement information that a reasonable person may want to consider before deciding to have an abortion?

A. Yes.

MR. FISHER: No further questions. Thank you.

THE COURT: All right. Cross-examine? Ms. Shube.

**CROSS-EXAMINATION**

BY MS. SHUBE:

Q. Good morning, Dr. Curlin.

A. Good morning.
Q. My name is Melissa Shube, and I represent the plaintiffs. We met before in Phase I but not in person.
I'd like to start by asking you if you believe a fertilized egg is a human being.
A. A human fertilized egg, a human zygote, is a human being, yes.
Q. Dr. Curlin, you described abortion as the intentional killing of a human being, correct?
A. Correct.
Q. You also believe that performing an elective abortion contradicts the physician's ethical obligations because it involves killing, correct?
A. It involves specifically intentionally killing an innocent human being, yes.
Q. Thank you.
And you favor a ban on all abortions except those necessary to preserve the health of the woman getting the abortion, correct?
A. Specifically, I believe that it is not reasonable to abort in any case except in those cases in which one is doing so to preserve the health and life of the woman. I don't know that I've said I favor a ban on all such abortions, but I think a ban would have a reasonable basis insofar as it's protecting the innocent.

Q. You think a ban on all abortions would benefit the public, including women who might otherwise have sought an abortion; is that right?
A. I do think laws that forbid killing the innocent do benefit the public. And so a law that forbids elective abortion would, I think, benefit the public, yes.
Q. And you believe that elective abortion is not medicine, correct?
A. That's correct, insofar as elective abortion does not have any plausible rationale as oriented towards the ends of medicine, namely the health of the patient.
Q. I'd like to briefly discuss one of the challenge disclosures with you. You just testified about the disclosure that human physical life begins when a human ovum is fertilized by human sperm, correct?
A. Yes.
Q. You testified that the disclosure is another way of saying that life begins at conception, correct?
A. The human life, the life of any human organism, begins at conception.
Q. And you believe that it is ethically relevant for women considering abortion to be told during the informed consent process that human life has begun?
A. Yes, I do. They need to know that what the abortion will do is kill a living human being.

Q. And you believe that the specific ethical question facing women considering abortion is when, if ever, is it reasonable to intentionally kill a human being at the fetus stage of development?
A. That is a central ethical question.
Q. Dr. Curlin, you've described personhood as when a human organism obtains moral status to have a claim against being killed; is that correct?
A. So personhood is a concept used to identify those human beings that we owe the respect of, among other things, not intentionally killing them. It's not a scientific concept, but that is how the term is used.
Q. And you believe that a human organism obtains the moral status of personhood at conception.
A. I believe that's the most reasonable place to draw that line, is when a human being becomes essentially what we all are.
Q. So, in your opinion, a human organism is a person from conception, correct?
A. So, in my opinion, the term "personhood" should be applied to all human beings.
Q. Including a human organism from conception?
A. Yes. Meaning all human beings deserve the respect of not being intentionally killed.
Q. And you believe there must be an objective standard for

establishing personhood?
A. Yes. I believe that to draw the line about personhood subjectively or arbitrarily is characteristic of unjust decisions and that it is not fully reasonable to draw it in any place other than when a human being begins.
Q. And that's because the least discriminatory standard for personhood is simply being a human being because that does not separate out any group for killing; is that correct?
A. More or less, yes.
Q. And you believe there is a scientific and medical consensus about when human life begins, correct?
A. Yes.
Q. And, specifically, you believe there's a scientific and medical consensus that human life begins with fertilization, correct?
A. Yes, with fertilization of the human egg.
Q. Dr. Curlin, you've described the American College of Obstetricians and Gynecologists, or ACOG, as a prominent medical organization; is that correct?
A. Yes.
Q. And ACOG defines pregnancy as beginning with implementation of the embryo, correct?
A. Yes. An entirely different question, but yes.
Q. And, Dr. Curlin, you believe that the informed consent process should provide patients with accurate information,

correct?

A. Yes.

Q. And you also believe policies that require a physician to see something that he or she believes is not true is unethical if it facilitates deception; is that correct?

A. That's correct, if it requires them to say it as if they believed it were true. I think it's reasonable to require them to give them information that they may not believe if there's a strong reason to do so.

MS. SHUBE: May I take a minute to confer, Your Honor?

THE COURT: Yes, you may.

MS. SHUBE: No further questions.

THE COURT: Redirect?

MR. FISHER: Thank you, Your Honor. Just a few questions.

**REDIRECT EXAMINATION**

BY MR. FISHER:

Q. Dr. Curlin, the statement we've been discussing about human physical life beginning at fertilization, is that a statement about personhood?

A. No.

Q. Do physicians disagree about when personhood begins?

A. Yes.

Q. The same physicians who have a consensus, in your view, over the meaning of human physical life or the definition of

human physical life and when it begins, they disagree about when personhood attaches?
A. Yes. And, in fact, as I believe I testified in the earlier hearing, the idea of personhood, as bioethicists -- multiple bioethicists have noted, has developed to identify those human organisms that do not deserve the respect that we owe to all other human organisms by calling them not yet persons.
And as is there's the dispute about abortion, that's built on a dispute about when we owe that kind of respect.
Q. Is the information about when human physical life begins relevant to one's inquiry for whatever one's purposes are about personhood?
A. Yes, it seems to me, absolutely.
Q. But it's not -- sorry.
A. Well, no. Insofar as it involves asking, well, what is this -- what is a human being essentially? And when did it come into existence as the thing it is? You have to start with a human being to have a question of whether that human being is a person.
Q. Now, you were asked a question, I think, about what ACOG has said about pregnancy, and I think you suggested that's a different question. And I would like you to elaborate, if you could, please.
A. Sure. So ACOG doesn't challenge because there would be absolutely no scientific reason to challenge the reality that

human life begins with fertilization of the ovum. But the question of pregnancy is basically regards the woman in whom any -- all of us begin our development. And there's actually dispute about when we should say someone is pregnant.

I can't remember if I testified about this, but although ACOG defines pregnancy as beginning with implantation, the majority of obstetrician-gynecologists, which make up ACOG, disagree. According to a representative national study that we did years ago, the majority of obstetrician-gynecologists, when given the choice, say they believe pregnancy begins at conception, not at implantation of the embryo.

Q. Well, regardless, is the statement about when human physical life begins a statement about pregnancy?

A. No.

Q. Is there any restriction on -- to your understanding, in the Indiana law that requires this disclosure that says that a physician may not comment on the statement that human physical life begins when a human ovum is fertilized by a human sperm in the context of abortion?

A. No, there is not.

Q. So a physician could give the physician's own viewpoint related to that?

A. That is my understanding, yes.

MR. FISHER: Nothing further. Thank you.

THE COURT: Recross?

MS. SHUBE: Just briefly.

**RECROSS-EXAMINATION**

BY MS. SHUBE:

Q. Dr. Curlin, you mentioned a study that you authored entitled "Obstetrician-Gynecologists' Beliefs About When Pregnancy Begins," correct?

A. Correct.

Q. And that study did not ask obstetrician-gynecologists to identify a medical definition for when pregnancy begins, did it?

A. I don't know what you mean by a medical definition. It just asked physicians when pregnancy begins.

Q. And it asked them to choose the statements that come closest to their beliefs about when pregnancy begins; is that correct?

A. That's correct.

Q. And that study found that opposition to abortion was associated with obstetrician-gynecologists being less likely to believe that pregnancy begins with implantation; is that correct?

A. That's correct.

MS. SHUBE: No further questions.

THE COURT: Reredirect?

MR. FISHER: Nothing further, Your Honor. Thank you.

THE COURT: Dr. Curlin, thank you very much, sir. You

may step down.

Is he excused?

MR. FISHER: He's excused.

THE COURT: Thank you again.

Okay. Your next witness.

MR. FISHER: The defense calls Dr. Priscilla Coleman.

THE COURT: All right. Morning, Dr. Coleman. Come to the witness stand, please.

Remain standing, be sworn by the clerk.

**PRISCILLA K. COLEMAN PHD, DEFENDANT'S WITNESS, SWORN**

**DIRECT EXAMINATION**

THE COURT: You can't put it there. I have to be able to see the gallery, Counsel. I have to see the gallery, Counsel. Find another location, please. Put it over by Judge Hamilton's picture. And don't tell him I said so. He still passes on my decisions, so...

MR. SCHAERR: May we put it right here in front of the --

THE COURT: Anyplace I can still see the gallery.

MR. SCHAERR: Let's try it there and see if the judge can still see the gallery.

If I put it there, can you still see the gallery, Your Honor?

THE COURT: Yes.

MR. SCHAERR: But don't put it on the stand. Let's

just leave it on the floor.

Dr. Coleman, can you see it too? Sorta?

THE WITNESS: Sorta, yeah.

MR. SCHAERR: Good morning, Your Honor. Gene Schaerr for the defendants.

THE COURT: Yes, Mr. Schaerr. Nice to have you in court today.

MR. SCHAERR: When I stand at full height, we have this bar that blocks my view of you and your view of me. So I apologize for that in advance.

THE COURT: It may be to your advantage.

BY MR. SCHAERR:

Q. And good morning, Dr. Coleman.

A. Good morning.

Q. Could you please state and spell your name for the record.

A. Priscilla K. Coleman, P-R-I-S-C-I-L-L-A, K., C-O-L-E-M-A-N.

Q. And, Dr. Coleman, do you recall being admitted as an expert on abortion and psychology during the last trial?

A. Yes.

Q. So rather than go through the usual preliminaries like we did last time, is it all right with you if we just pick up where we left off?

A. Sure.

THE COURT: She'll follow your lead. You just ask her the questions you want to.

MR. SCHAERR: Thank you.
BY MR. SCHAERR:
Q. So let's refer for a moment to this demonstrative that we have here.
Do you recognize that paragraph?
A. Yes, I do.
Q. And what is it?
A. It's a paragraph related to the safety of perinatal hospice that's provided in the brochure by the State of Indiana to women who are considering an abortion in cases of fetal anomaly.
THE COURT: Mr. Schaerr, you better get it into the record somehow because we won't have a picture of it unless you have a copy of it or something.
MR. SCHAERR: I believe it's Stipulated Exhibit 17, Your Honor.
THE COURT: That helps.
BY MR. SCHAERR:
Q. Dr. Coleman, let's talk first about the pamphlet's claim, which is the second sentence here which says that "Grief is a natural response to a diagnosis of fetal anomaly," and then there's some other information there. Well, it says "experienced by all parents who have lost a baby due to a medical condition."
Okay? Now, you were watching Dr. Grossman's testimony,

yesterday, correct?
A. Yes, I was.
Q. Do you recall that Dr. Grossman said yesterday that he fully agreed with that statement?
A. I do recall that, yes.
Q. And in your opinion, is that statement true or false?
A. Yes, it is. It's true.
Q. It's true. Is it misleading in any way?
A. No, it's not.
Q. Okay. And without going into detail at this point, what's the basis for your opinion that it's true and nonmisleading?
A. My extensive review of the literature that relates to various forms of perinatal loss, particularly loss when a woman undergoes a termination for -- in the cases of a fetal anomaly. Many studies indicate that that is a normative response.
Q. Okay. Thank you.
And how often, according to the literature, are fetuses diagnosed with fetal anomalies?
A. Approximately 3.8 percent of pregnancies entail some form of anomaly. It may be a minor or a major anomaly that's likely to lead to death of the fetus.
In a second study actually from the CDC, it was revealed that there are approximately 120,000 births each year in the United States where there is an anomaly present; among those, 8,000 of the babies die within a year.

Q. So is it fair to say that fetal anomaly, even serious fetal anomaly, is not a trivial issue?
A. Agreed. I would say it's not trivial, correct.
Q. Now, again without telling me at this point what your opinion is, have you formed an opinion on whether the other information in this paragraph is truthful and nonmisleading?
A. Yes, I have.
Q. And similarly without telling me at this point what your opinion is, have you formed an opinion on whether the provision of this information would be helpful or harmful to women seeking an abortion?
A. I believe it would be helpful.
Q. Okay. Well, let's now talk about the ultimate question that's asked in this brochure, beginning with the question is perinatal hospice psychologically safe for the mother. And the answer -- again, the answer is resoundingly yes. We'll call that Block 1.
A. Okay.
Q. And we'll call the grief sentence Block 2, just for ease of reference.
A. Okay.
Q. Now, what is your opinion on the truthfulness of Block 1 here, the question and the answer?
A. Regarding the safety of perinatal hospice, I don't know of any study that has indicated it is not safe for women. And

there is emerging literature -- several studies that have indicated that it's therapeutic, that women interpret it as very helpful in their healing from the grief.

Q. So are you saying that your opinion is that that entire block is truthful and nonmisleading?

A. Yes.

MS. SHAH: Objection, Your Honor. This line of questioning is not relevant. The only statement in this brochure -- or in this paragraph that is relevant and at issue today is the one starting with "however."

THE COURT: Is that true, Mr. Schaerr? Is the other information beside the point?

MR. SCHAERR: No. We're talking about that first block, Your Honor.

THE COURT: I understand what we're talking about. I'm asking about relevance.

MR. SCHAERR: Because yesterday Dr. Grossman took issue with it. Now, if the plaintiffs are now saying that they are willing to stipulate to the truthfulness and nonmisleading character of that first block, then --

THE COURT: Well, if it was irrelevant for Dr. Grossman and you didn't object, then of course the Court couldn't rule. But you must refrain from irrelevancies if you've previously been advised that no other part is in controversy here.

MR. SCHAERR: I don't believe that we've been so advised, Your Honor, except now. So --

THE COURT: Well, plaintiffs, defend yourselves.

MS. SHAH: Your Honor, our briefing has been clear that the statement at issue is the one that starts with "however."

THE COURT: All right. Then that's what the Court's analysis will begin with as well, no matter what Dr. Grossman said.

MR. SCHAERR: Okay. So we'll take that as a stipulation that there's nothing false or misleading about the first block.

THE COURT: No, you may not do that because the relevant part, the plaintiffs have told you, starts with "however." So it's not a stipulation to some other part.

MR. SCHAERR: Okay. But they're saying that that's the only part that they're contesting here. Am I understanding that correct?

THE COURT: They're -- as I understand it, you can correct me -- you must correct me if I'm wrong. They say the issue they've raised has to do with the phrase after the word "however" -- beginning with the word "however."

MR. SCHAERR: Okay.

THE COURT: That's what's before the Court. So stick within the issues --

MR. SCHAERR: If they are taking Block 1 off the table, then we'll proceed.

THE COURT: Mr. Schaerr, they say they didn't put it on the table. So they're not taking it off the table. That's an argumentative response. Now, stop it.

So start with "however" and put your questions to the witness.

MR. SCHAERR: Okay.

All right. My understanding, Your Honor, is that they are -- that the plaintiffs are contesting the final two sentences, then?

THE COURT: Well, it starts with "however." I didn't count how many sentences. So just start with "however" -- however many sentences there are, please, Mr. Schaerr, don't make it any more confusing.

MR. SCHAERR: I apologize.

THE COURT: Start at "however" and ask your questions.

MR. SCHAERR: Okay, Your Honor.

BY MR. SCHAERR:

Q. Well, let's -- Dr. Coleman, let's turn to the sentence, then, that begins with "however" and let's bracket that as Block 3.

Dr. Coleman, do you believe this sentence is perfectly written?

THE COURT: Okay. Wait a minute. Read the sentence

into the record. I will not be able to tell what you're referring to when I read the record later.

BY MR. SCHAERR:

Q. Dr. Coleman, could you read the sentence for us.

A. Yes. I'm not sure if I can read it and stay on the microphone. Can you raise it?

Oh, thank you.

"However, studies show that mothers who chose to carry their baby to term recovered a baseline mental health more quickly than those who aborted due to fetal anomaly."

Q. Thank you.

Now, Dr. Coleman, do you think that sentence is perfectly written?

A. No, I do not.

Q. Okay. And we'll discuss the reasons for that later, but do you think the sentence is affirmatively false or misleading?

A. No, I do not.

Q. Okay. Do you believe that the gist of the sentence is true?

A. Yes -- yes, the substance of it.

Q. And what do you take to be the gist of that sentence?

A. Well, Josh, would you mind holding it up again.

I just think it could be reworded.

THE COURT: Well, the question, Dr. Coleman, is is the gist true? And what is the gist?

THE WITNESS: All right. Well, the gist of it is that mothers who choose to carry their baby to term are more likely to experience a trajectory of positive mental health. They're likely to experience a more swift decline in any grief response compared to women who choose to terminate.

BY MR. SCHAERR:

Q. And so would it be -- if that sentence were recast slightly to say "women are more likely to experience positive outcomes more quickly than those who abort," would you think that sentence were exactly correct?

A. Yes, and I'd be much more satisfied with it.

Q. Okay.

So, Josh, why don't we replace the words "recover to baseline mental health." Okay? Just -- "recover to baseline mental health" with the words "experience positive mental health outcomes."

And, Dr. Coleman, so as Josh has rewritten that sentence, is it truthful?

A. Yes.

Q. And nonmisleading?

A. Yes.

Q. Okay. So are you saying that the "recover to baseline mental health" portion of that statement is false?

A. I'm not saying it's false; I'm saying that we don't have sufficient empirical evidence where baseline data had been

collected.

And I also feel that women reading that may not really understand it. I'm not sure what my baseline mental health is. So I think that it is -- it's just clearer. It's more user-friendly. Women can -- anyone can understand more readily that they're more likely to experience positive mental health with that option to carry to term versus termination.

Q. Okay. And if you clarify the sentence to refer to "experience positive mental health outcomes" rather than "recover to baseline mental health," what impact is that likely to have on the average woman in deciding whether to get an abortion?

A. Well, it will introduce clarity so they can make a decision based on their own situation, their life, their morals, and so forth. But just knowing that there's an option available that hasn't been, you know, associated with any morbidity is useful.

Q. Okay. And do the words "recover to baseline mental health," in your view, does the use of those words make it more likely that women would forego an abortion if they were thinking about getting an abortion?

A. I don't know that definitively.

Q. Okay. Can you say that it would make it more likely that a woman would get an abortion?

A. I don't -- I can't answer that without data. I'm sorry.

Q. Okay.

A. It will be clearer so that they're able to make their own choice, and it will align more precisely with the literature. And that's what would be my concern.

Q. And what is -- for a woman making a decision about getting an abortion in this very heart-wrenching situation, what, in your view, is the value of clarity?

A. Well, it's -- when women receive the news that they're carrying a child with a lethal or severe fetal anomaly, that's typically a shock to -- I would imagine it's always a shock to women, particularly those in the second trimester with wanted pregnancies, women who assume that they're carrying to term a baby who is healthy. And that's one of the fears that most women have during pregnancy, that there may be something wrong with the baby.

So to receive that kind of shocking news is likely to compromise their decisional processes. There are studies that I reviewed wherein it's clear that, when women receive this kind of information, they don't even process what the doctor is saying half the time. It's just such a shock. So clarity is vital in terms of this decision that has long-term repercussions.

Q. Now, you mentioned earlier that there -- that there are a wealth of studies that support the idea that women who choose to carry their fetuses to term in the face of a diagnosis of fetal abnormality produce positive mental health outcomes; is

that correct?

A. Yes. The literature I've reviewed definitely shows that there are benefits to the woman to carry to term. There are reports of embracing memories, photographs, mementos, even though the child's life is often very brief, might be a few hours, could be a few months up to a year or more. But typically it's very brief, and it provides women with a way to process that grief and a healthy way to have closure.

There's evidence that it's beneficial to the families, that it enriches the families. One study indicated that 82 percent reported that the siblings were benefited by having a baby in the family for a brief period.

Q. And which study was that?

A. I believe it was the -- the Janvier study.

Q. Let's take a minute and look at the Janvier study. Let's Recollect Document Number 106.

I've asked Josh to do the job of two attorneys here.

THE COURT: It's because the others are so busy, Mr. Schaerr?

MR. SCHAERR: They are, Your Honor.

THE COURT: Yes. It's hard to tell.

BY MR. SCHAERR:

Q. Do you have the Janvier study in front of you, Dr. Coleman?

A. No, I don't.

Q. You don't have a hard copy of it?

A. No, I don't.

MS. SHAH: Your Honor, I also believe that defendants need to provide us a hard copy with the study as well that they're referring to.

THE COURT: Somebody has risen in the gallery holding papers. The bad part is that Dr. Coleman nor I has this study. So what are we going to do about that, Mr. Schaerr?

MR. SCHAERR: I believe we're going to have it in front of us in just a moment, Your Honor.

MR. PRINCE: I apologize, Your Honor. When we ran through this before on Tuesday, plugging it in worked just fine, but it doesn't seem to be now.

THE COURT: If you're speaking to me, I can't hear you.

MR. PRINCE: I just apologized to the Court that my attempts to connect it to the screen don't seem to be working adequately. It was working on Tuesday.

THE COURT: Well, give Dr. Coleman a copy of the hard copy.

MR. SCHAERR: Do we have extra copies?

THE COURT: Why don't you go to the next topic and let them work out the paper, Mr. Schaerr? Just come back to this, why don't you?

MR. SCHAERR: Okay.

BY MR. SCHAERR:

Q. All right. Dr. Coleman, do we have it now?

Okay. We now have the Janvier study. Can you give a copy to the judge?

MR. PRINCE: Permission to approach?

THE COURT: I'm wrapped in cellophane up here. So I can't get it directly. Okay.

MR. SCHAERR: We apologize for the trouble, Your Honor.

BY MR. SCHAERR:

Q. So, Dr. Coleman, you now have the Janvier study in front of you, correct?

A. Correct.

Q. And do you recognize this study?

A. Yes, I do.

Q. And could you read the author, title, and publication date for the record.

A. The title of the article is "The Experience of Families with Children with Trisomy 13 and 18 in Social Networks," published in Pediatrics. And the author -- the lead author is Annie Janvier.

Q. Is trisomy 13 and 18 a serious fetal abnormality?

A. They're both serious chromosomal abnormalities, yes.

Q. Is this journal respected in the field?

A. It's highly respected. The impact factor exceeds 5, which

reflects a very strong journal.

Q. And was this study peer-reviewed?

A. Yes.

Q. So what did the parents interviewed in this study report about what their providers told them after a diagnosis of fetal abnormality?

THE COURT: Mr. Schaerr, may I ask a question, please, sir?

MR. SCHAERR: Sure.

THE COURT: This line of questioning has to do with the statement in the brochure as part of the informed consent, right?

MR. SCHAERR: It does.

THE COURT: The statement does not go to the children or the families of the mother, right?

MR. SCHAERR: Well, the statement goes to the women's mental health, which will often be bound up in the benefits or cost to her family.

THE COURT: Well, that's not established. If that's your theory, you have to get some evidence before the Court.

But, otherwise, what anybody else thinks -- let's say a church congregation may have a view or some service club may have a view. But they don't get the brochure. They're not the ones who are targeted by the state's mandate by law that information be dispensed.

So this is pretty much on the fringe of things.

MR. SCHAERR: Let me ask about another aspect of the Janvier study. Okay?

BY MR. SCHAERR:

Q. What does the Janvier study tell us about the mental health effects on women of deciding to carry a fetus to term rather than aborting it?

A. Well, the women felt that their families were enriched, that they were -- that it was health-promoting for them psychologically in that way in that, you know, they had support during this time of loss. And they viewed it as a -- an opportunity for growth and, you know, a lot of the questioning does reflect the impact on the rest of the family. But the woman is part of that family and --

THE COURT: So this would be women who already have children who might otherwise seek an abortion for a new --

THE WITNESS: I believe the majority did already have children.

THE COURT: Yeah. So women who didn't have children before wouldn't be included in this study; is that right?

THE WITNESS: I believe there's also questioning of the participants about their relationships with their partners. I'd have to look to get exact data on that.

BY MR. SCHAERR:

Q. Let's turn, if we could, to page 295 of this study, under

the heading called "Parental Experiences."
A. Okay.
Q. And if you go down about three sentences to the sentence that begins "yet 98 percent"?
A. Correct. What -- would you like me to read that?
Q. Just read that sentence and the next sentence.
A. Okay. "Yet 98 percent reported that this child enriched their life. Of the families in this cohort who had other children" -- and this was 160 -- "82 percent felt that this child had a positive effect on siblings. Of all parents, 3 percent report that their marriage dissolved since the diagnosis of T13 or 18, and 68 percent stated this child had a positive effect on their relationships."
Q. Okay. And when the study refers to "this child," what does that mean?
A. The child who was born with trisomy 13 or 18.
Q. Okay. And is that after the woman had made a decision not to terminate?
A. Correct.
Q. Okay. And let's look at the Wool study. That's -- Recollect -- Document No. 102.
MR. PRINCE: May I approach?
THE COURT: Go ahead, Mr. Schaerr.
BY MR. SCHAERR:
Q. Dr. Coleman, do you --

A. I don't have the Wool study.
Q. Can you give us the name and the author of that study and where it was published and when?
A. Yes, the title of the article is "Systematic Review of the Literature: Parental Outcomes After a Diagnosis of Fetal Anomaly." It's a single-author publication, Charlotte Wool, published in Ethical Issues in Newborn Care.
THE COURT: What's the year?
THE WITNESS: Oh, excuse me. I believe it was '11, but let me see. 2011.
BY MR. SCHAERR:
Q. Thank you. And let's turn to page 191. And let's go to the paragraph -- the right bottom paragraph. The paragraph begins "Of the 16 articles."
Do you see that paragraph?
A. Yes.
Q. Can you just read that paragraph up to the end of the sentence that ends with "overwhelmingly positive."
A. "Parental response to this model of care" and the author is referring to perinatal palliative care --
THE COURT: Are you starting with the paragraph "Of the 16 articles"?
THE WITNESS: I thought I was supposed to begin with "parental response." Excuse me.
Where was I supposed to start?

BY MR. SCHAERR:
Q. Well, actually, why don't we begin with the first paragraph of that section, "A limited body of research."
A. Okay.
"A limited body of research exists to inform clinicians of outcomes for women who choose to continue their pregnancy in light of a lethal anomaly. Although nonaggressive obstetric management is a legitimate option for families, clinicians' expertise in managing the medical and psychological aspects of such cases may be limited. There is little published data for reference, resulting in a lack of guidance to inform practice decisions. Only since 1997 has the literature presented a PPC model that involves a coordinated, multidisciplinary approach for families who wish to continue their pregnancy in the face of life-limiting diagnoses."
Would you like me to continue?
Q. Yes.
A. "Of the 16 articles presented of PPC model, three exploratory descriptive studies were found. One group of researchers developed a PPC program and presented 33 patients with this option. They found that parents to whom comprehensive, multi-disciplinary, individualized, and informed counsel was given -- was given, chose PPC 85 percent of the time. Of these, 61 percent delivered a live-born infant and 39 percent experienced intrauterine fetal death. No maternal

morbidity was noted. Parental response to this model of care was reported as overwhelmingly positive."

Shall I continue?

Q. No, I think that's enough.

So what does all of that tell us about the mental health effects of choosing to carry a fetus to term after a diagnosis of fetal abnormality?

A. Well, what it tells us is that this model of care was very well received. There wasn't any psychological morbidity, and that relates to mental health. So it's really -- they didn't identify anything negative with this model of care.

Q. Okay. And what other studies, Dr. Coleman, do you think would help the Court understand the mental health benefits to women of choosing to carry a fetus to term in this situation?

A. Well, the Lathrop and VandeVusse study is one.

Q. Thank you. Why don't we turn to that one. That's Recollection Exhibit 105.

A. Thank you.

Q. Well, Dr. Coleman, let's look at page 263.

A. Did you want me to read the title of the article?

Q. I'm sorry. Yes, please do.

A. "Affirming Motherhood Validation and Invalidation in Woman's Perinatal Hospice Narratives" published in Birth Issues in Perinatal Care, 2011. Authors are Lathrop, L-A-T-H-R-O-P, and VandeVusse, V-A-N-D-E-V-U-S-S-E. And it's in a

peer-reviewed journal article -- or journal.
Q. Okay. And is this journal a reputable journal in your field of mental health?
A. Yes, it's a reputable journal based on the impact factor.
Q. Thank you.
Let's turn to page 263 of this study. Why don't you generally describe what this study did, first.
A. Okay. There were 15 women. It was -- it's in the realm of being a qualitative study, which has strengths in that it allows the researcher to examine the deeper, more substantive subjective experiences of women who go through any given life event.
And in this particular study, they reflected back over the experience. And they were just -- they were asked rather generalized questions about their experience.
Q. Okay. And what did the study conclude?
A. Well, the authors concluded that women responded very well to perinatal hospice. In particular, they felt affirmed for their identities as mothers. And that historically has been an experience that women often don't have prior to the decision with doctors and other healthcare professionals encouraging rapid termination to -- under the guise that that is healthier and more humane to spare suffering and so forth.
So the experiences of these women really brought home the idea that this is a healthy choice for them, that they felt

they grew as human beings. They grew as mothers. The authors talk about the fact that the mother-child bond may mitigate any negative impact of the whole experience of carrying a child with a significant anomaly and giving birth. So essentially, a very horrible, negative life situation resulted in positive outcomes.

What was particularly important to these women were the photographs, the mementos. So they had closure on the whole ordeal.

Q. And this paragraph on page 263 under "Implications," the second paragraph of that -- on -- of that section, can you see that, Dr. Coleman?

A. Yes.

Q. What does that paragraph tell us about what the women did in this situation to -- that improved their mental health and their dealing with this difficult situation?

A. Well, some of the things that I just spoke about, but I'll read the paragraph.

"These mothers' stories provided support for the established perinatal bereavement practices of creating mementos and photographs. Understanding how these items can provide validation may help care professionals to suggest those that affirm mothers' perceptions of themselves and their babies. Planning for photographs and mementos before birth can provide an opportunity to explore these perceptions. The

tangible quality of hand and foot molds seem to have -- seem to make them especially validating."

Q. Okay. So this is talking about women who elected to go through with their pregnancy and then their baby passed away shortly after birth; is that correct?

A. Yeah. I believe for the majority, yes.

Q. Okay. Well, let's read -- or let me ask you to read the first paragraph under "Discussion" on page 263. And tell me if you agree with the conclusion of the study.

A. Okay.

"Analysis of these women's stories revealed that they identified themselves as mothers and expressed love for their babies. The importance they ascribed to affirmation of their motherhood and attachment to their babies was also evident. Words and actions that validated their status as mothers, the value of their babies, and the significance of their losses were perceived as supportive. Invalidating words and actions caused anger and emotional pain."

And they're referring to invalidating remarks provided by the medical community before the decision was made.

Q. And those invalidating remarks would have been remarks that would encourage them to get an abortion instead of carrying the baby to term?

A. Right. And my view is it was probably perfectly well intended, but the view in the medical literature just tends to

veer in the direction of always recommending termination in these cases.

But the women were feeling some attachment and bonding likely to their babies and had no desire to terminate. So they felt invalidated when they receive information indicating that the child's life is meaningless or, you know, the humane option is to terminate when they didn't feel that in their hearts.

Q. And just to sum up, in your opinion, what are the implications of this study for the mental health of women who choose to carry a fetus to term in this situation?

A. Well, the brochure, and this paragraph in particular, provides women assurance that -- or affirmation that this is a valid choice. And they're not getting that elsewhere.

You know, I don't think that this -- you know, this information is going to deter somebody who is set on terminating. But for a good number of women in the Wool study -- I believe the percentages were 75 to 85 percent -- when they hear about this option, they decide to carry to term.

And I just believe people should have options with a crisis like this, particularly one that where the data, all that we have, suggests positive health for the woman and her family.

Q. And in your view, is it important to know about the options?

A. Absolutely.

Q. And what role does this brochure play in that process?

A. It provides the information. There's detail about the services that are offered through the perinatal hospice organization.
Q. Is there another study or paper that, in your view, helps us understand better the mental health consequences to women of choosing to carry a baby to term rather than aborting it in this situation?
A. Well, the Wool study is a review that looks at -- you know, we've got it here. I believe we have it, but the Wool study looks at both -- looks at the decisional process, then reviewed in 2011 all the studies that exist related -- that related specifically to -- at least all the studies the author could identify; I'm not sure if it was an exhaustive list. But she lists 11 studies that relate to termination for fetal anomaly, and then she also summarizes three studies that look at carrying to term, and summarizes basically the findings, the sample information, and strengths and weaknesses of the various studies.
So the Wool is another source.
Q. I think your expert report talks a bit about the Davies study as well. Is that correct?
A. The Davies study specifically looked at women who chose to terminate. But the comparison group was women who that -- basically, they all had terminations for fetal anomaly. But the groups were divided based on first trimester versus second

trimester, and this is a comparison group that Dr. Steinberg, who I also read her rebuttal report, she identified it as a valid comparison group as well in her 2011 review.

So basically what Davies found looked at women right at -- a little after the diagnosis, then down the road six months and a year, saw very high rates of posttraumatic stress, 67 percent, that went down to 41 percent a year later. That is not much of a drop. 41 percent still experiencing PTSD after a termination is alarming to me.

Q. Let me stop you there for just a minute.

MR. SCHAERR: Do we have copies of the Davies report?

MR. PRINCE: Yes, we do.

THE WITNESS: Thank you.

MR. PRINCE: May I approach?

THE COURT: What exhibit is this counsel?

MR. SCHAERR: This is, I believe, Plaintiff's Exhibit 237.

BY MR. SCHAERR:

Q. Dr. Coleman, do you recognize this document?

A. Yes, I do.

Q. Can you read the author and title and publication date for the record?

A. The author, the lead author, is V. Davies. The title is "Psychological Outcome in Women Undergoing Termination of Pregnancy for Ultrasound-Detected Fetal Anomaly in the First

and Second Trimesters: A Pilot Study." And it was published in Ultrasound Obstetrics & Gynecology in 2005.
Q. Is that a peer-reviewed journal?
A. Yes.
Q. Is it well respected in the field?
A. Yes, I believe so.
Q. Does this study use comparative groups?
A. Yes. As I indicated a few minutes ago, they compared first-trimester termination to second-trimester termination.
Q. Is that an appropriate comparison group for trying to determine the mental health effects of abortion versus carrying a baby to term after a diagnosis of abnormality?
A. This study did not include a group of women who carried to term, but it allows us to see if there is any substantive difference between women who terminate in the first trimester versus the second trimester.
Q. Well, let's turn to page 390, and let's look specifically at the section there that begins "Overall level of psychological distress."
A. Excuse me. I'm not sure where you are. 390?
Q. Page 390.
A. Which column?
Q. The second column. Under the heading "Overall levels" --
A. Okay. I was looking for a paragraph. Okay. Got it.
Q. I'm sorry. All right. Now, would you go through this

paragraph and read it and explain it to the Court.
A. Sure.
THE COURT: Well, wait. We can read it. You summarize it. What do you think this means?
THE WITNESS: Okay. Well, one of the findings -- basically, the data in this paragraph is looking really at both of the groups combined. They found very little difference between the first and second trimester other than PTSD being elevated for the second trimester group. But that difference dissipated over the year period.
So when we look at the combined results, a 67 percent screened -- this is what I indicated earlier -- 67 percent screened positive for posttraumatic stress. That dropped down to 41 percent. You see that several lines down.
So at the 12-month period we only saw a drop of, you know, 26 points. And 67 percent is extremely high, and it went down to 41 percent at a year.
There are other outcomes. There's also emotional distress. And they looked at depression, and they looked at grief. Grief, which we all have unanimously agreed, is symptomatic of this type of a diagnosis.
So 47 percent experienced grief at six weeks.
BY MR. SCHAERR:
Q. Just to be clear, are these women who chose an abortion or chose a termination after a diagnosis of abnormality?

A. Yes. So the grief rate was 47 percent at six weeks, and that dropped to 27 percent one year later. So we're still -- we see a decline, but 27 percent still experiencing grief at the loss of a baby a year later is alarming, in my view.

And then the emotional distress was 53 percent at six weeks. That -- at a year later, it only dropped down to, I believe, 43 percent. So they are still experiencing major psychological indicators of mental health issues.

And the depression was an interesting one because it was 30 percent at six weeks, and then a year later it was 32 percent. So the depression didn't even decline; it went up a little bit. That was likely not a statistically significant difference, but it's showing it's not abating, they're not healing, they're not, you know --

Q. And how does -- in your view, how does this study relate to the truth or falsity of what we've marked here as the third block of the disclosure?

A. Can I see it? Would you mind lifting it up? I want to make sure I have an accurate --

So the third block -- I really can't see it.

Okay. So the last piece of it, the terminating the pregnancy -- so the last sentence there is "Terminating the pregnancy does not shorten the grieving process or allow parents to put it behind. On the contrary, abortion is a complicating factor in healing."

Well, the data provided by Davies across various indicators, we have emotional distress, we have posttraumatic distress, we have depression. So we have four --

THE COURT: The question is is that accurate?

THE WITNESS: Yes.

BY MR. SCHAERR:

Q. And does the Davies study support the accuracy of that sentence?

A. I believe it does.

Q. I actually intended to ask you about the prior sentence. The prior sentence also talks about the mental health effects of seeking a termination after a diagnosis, correct?

And how, if at all, does the Davies study affect the truth or falsity of that part of that sentence?

A. Well, the end of the sentence where it states "more quickly than those who abort due to fetal anomaly," now, the Davies study does not directly compare, but we have the studies we've just spoke about earlier all related to the choice to carry to term.

So in this literature, there's a body of evidence that looks at one choice and a body of evidence that looks at the other choice. Davies is a study that looks at the choice to terminate. And so it does indicate -- it does provide evidence that rates are higher here than what we see in the studies, any -- the other studies may have different indicators of

mental health or psychological distress, but the pattern of results tells us that it's a healthier choice to go with carrying to term for many women. I'm not saying all women, but for many women who choose to carry to term, it's affirming and it's helpful in terms of closure and resolving the loss.

THE COURT: Given your statement just there, that it's true for some women but not all women.

THE WITNESS: Yeah. I --

THE COURT: Wait just a minute. Let me finish my question.

So hold that, Mr. Schaerr. Hold that up again.

So at the very least, would that "however" sentence be more accurate and reflective of your testimony if it said, "However, some studies show that some mothers who chose to carry their baby to term recover to baseline mental health"? Is that accurate?

THE WITNESS: I wouldn't say so, Judge -- Your Honor, because I haven't seen any studies that indicate it's not healthy. All of the studies that I've reviewed have shown affirming consequences to the choice.

I was speaking hypothetically. I mean it's possible, certainly possible, that some women who decide to carry to term and use the resources of perinatal hospice may still have some difficulty. But I don't see the backing in the literature for amending that aspect of this statement.

THE COURT: Okay. Your testimony, though, suggested otherwise when you said "not all mothers, certainly."

THE WITNESS: Would choose. I think I was referring, I was -- I may have misspoke. I was -- my point was that not every mother given this will choose to carry to term. Some will choose to terminate.

THE COURT: Okay.

BY MR. SCHAERR:

Q. And when you said earlier that Davies reports higher rates, does that mean, in your view, that Davies is reporting higher rates of adverse mental health outcomes when women choose abortion instead of carrying it to term?

A. Davies reports alarmingly high rates that continue for a year, and all of the studies that I reviewed that looked at perinatal hospice outcomes show, like, no morbidity. They show resolution of the pain and suffering. And they -- many come out of the experience believing that it enriched their lives. So it's -- it not only doesn't harm women, it benefits them, from everything that I've read.

Q. Okay. So could we sum up on this point -- and let me see if you agree with this statement -- that the studies of women who choose to carry their babies to term generally show positive mental health outcomes?

A. Correct.

Q. And the studies of women who decide to terminate in the

face of a diagnosis of abnormality generally show high rates of negative outcomes?

A. Correct. And sometimes those high rates are comparable to other forms of perinatal loss.

Q. All right. Let's turn to Recollection Document No. 107, which I believe is the study by Mashiach.

MR. SCHAERR: It looks like we've just given up on our high technology.

Your Honor, you and I may be the only people in the room who remember how this was done in the old days.

THE COURT: I hate to put you in my category. My category, the judge would use a quill pen.

BY MR. SCHAERR:

Q. Okay. Dr. Coleman, do you recognize this article?

A. Yes, I do.

Q. And could you read the author and the title and the other key information for the record.

A. The first author is Mashiach. The title of the journal is the Journal of Maternal-Fetal & Neonatal Medicine, which is peer-reviewed. The title of the article is "Psychological Response to Multifetal Reduction and Pregnancy Termination Due to Fetal Abnormality."

THE COURT: What's the year?

THE WITNESS: 2013.

BY MR. SCHAERR:
Q. Did you tell us what journal that's published in?
A. Yes. The Journal of Maternal-Fetal & Neonatal Medicine."
Q. Is that a peer-reviewed journal?
A. Yes.
Q. Is it well respected in the field?
A. Yes.
Q. What were the comparison groups in this study?
A. Well, in this study -- an interesting comparison group -- it was women who terminated due to fetal anomaly, and they were compared to women who terminated one, I believe, possibly more fetuses in the case of multiple fetuses.
My understanding in medicine is, when a woman is pregnant with multiple fetuses, the recommendation is often to terminate one to increase the likelihood of the others surviving. So that was the comparison group.
Q. Okay. And can you briefly characterize what this study found?
A. Sure. They found -- the authors found -- looked at various indicators of psychological distress over time and found that the group that terminated due to fetal anomaly experienced higher rates although the rates were also elevated for the reduction group.
Q. Okay. Can we look at page 33 near the bottom right-hand corner under the heading "Discussion."

A. Yes.
Q. And beginning at the second sentence of that paragraph, does this summarize the findings of the study?
A. I believe it does. Shall I read that?
Q. Sure.
A. "The main findings of this study are as follows:
"1. Women undergoing either multifetal reduction or pregnancy termination experience significant degree of grief and anxiety. The levels of anxiety on the day of the procedure and anxiety and grief at follow-up are higher in cases of pregnancy termination. In both" --
And then No. 3, "In both groups, there's a gradual decrease in the state anxiety with time."
"4. The emotional response in these cases is affected by different background factors, such as marital status, level of education, employment status, as well as by gestational age at the time of the procedure."
And, finally, "5. A history of prior perinatal loss does not seem to affect the emotional response."
Q. Thank you. Let me ask Mr. Prince to hold the -- to hold our language board up again.
And let me ask you -- let me ask you, Dr. Coleman, what bearing, if any, does this study have on the third sentence, Block 3, of that disclosure?
A. Well, it relates to the fact that it takes longer -- or the

healing process is more prolonged in cases of termination due to fetal anomaly, also relates to the final statement in terms of it being more difficult to put the experience behind them.
Q. Okay. And, in your opinion, is that final statement true?
A. Yes.
Q. Is it nonmisleading?
A. Yes, it is nonmisleading.
Q. Okay. Dr. Coleman, you watched Dr. Grossman's testimony yesterday, correct?
A. Yes, I did.
Q. Are you aware that he expressed a different view on this issue of the benefits of abortion versus carrying a fetus to term?
A. Yes.
Q. Okay. What study or studies did he rely upon either in his testimony or in his expert report?
A. He didn't rely on any studies that related to perinatal hospice or the option of carrying to term. He relied exclusively on Dr. Steinberg's 2011 review piece that looked at the option of terminating in cases of fetal anomaly. She identified 11 studies and with various groups that she deemed appropriate, and she summarized the results relative to a claim that abortion due to fetal anomaly -- and she misspeaks and says causes psychological harm in the article. We can't determine that with this type of research. It's an

association.

So, essentially, the claim that she is investigating in her review is that abortion due to fetal anomaly is associated with harm to the woman, and she probed 11 studies for that purpose.

Q. And let's look, if we can, at Plaintiff's Exhibit 237.

MR. SCHAERR: Josh, do you want to pass that out?

THE COURT: I think he's getting it on the computer.

MS. SHAH: I believe they've already provided 237.

THE WITNESS: I almost prefer the hard copy.

BY MR. SCHAERR:

Q. You can use the hard copy.

So can you tell us what this document is?

THE COURT: Wait. Is this the Davies study again?

THE WITNESS: I think we want Steinberg.

MR. SCHAERR: It should be Steinberg.

THE COURT: We went through Davies.

MR. SCHAERR: We did.

THE COURT: Let's not do it twice or more.

So what's the number for -- do you want the Steinberg study?

MR. SCHAERR: Yes, Your Honor. And I think it's Plaintiff's Exhibit 237.

THE COURT: Well, that's what was on the screen.

MR. SCHAERR: No, I'm wrong. It's 158. I'm sorry.

BY MR. SCHAERR:
Q. Dr. Coleman, can you tell us what this is?
A. Yes. This is Dr. Steinberg's review piece published in 2011 in Women's Health Issues, is the journal.
Q. Did you review that study?
A. Yes. It's peer-reviewed. And I have to give you the title, though. It's "Later Abortions and Mental Health: Psychological Experiences of Women Having Later Abortions -- A Critical Review of Research."
Q. Okay. So if we turn to Table 1 on page S46, what is that table -- what does that table do or what does it tell us?
A. These are the studies that she chose to include in her analysis of research on this topic. She does not include studies that didn't have a comparison group. She -- so each of these studies chosen were deemed as having appropriate comparison groups except for the group -- the second set of studies here that begin with Kersting 2005, she believed the comparison group of a healthy pregnancy carried to term wasn't appropriate. It created bias. Why she included it, I'm not sure.
So, essentially, this table reflects each of the studies she reviewed, the comparison group utilized, the general findings, and then evidence relative to that claim that I spoke about. The claim she's investigating is that abortion due to fetal anomaly is associated with psychological harm.

And so she gives an assessment about the degree of evidence associated with each study.
Q. Let's look at the item third from the bottom on that table.
A. Davies.
Q. Is that the Davies study that you discussed about earlier?
A. It is.
Q. We were not going to go into that study in detail, but could I get you to read the general findings as reported by Dr. Steinberg from that study?
A. Yes. "Women in the later abortion group reported higher levels of posttraumatic stress" -- and again that was initially, not down the road -- "but equal levels of depression, grief, and general psychological health on validated psychological measures."
Q. Is it fair to say that those kinds of results are a relative disadvantage of choosing to terminate a pregnancy rather than carry it to term?
A. I would say so.
Q. And so does -- looking at this table, does Dr. Steinberg's article agree with you that the Davies paper provides support for the claim that later abortions are associated with mental health problems after a diagnosis of fetal anomaly?
A. Well, she says there that the evidence does support the claim and it does not support the claim. It is not clear why it does not. There's nothing stated in the results that

indicates it does not.

So I've read this many times, and I've tried to identify how she tempers those conclusions. But she clearly says it does and it does not. So --

Q. So do you agree with her that, to the extent that she's saying that it does not support the -- her hypothesis, do you agree with that?

A. I do not agree with that, no.

Q. And is she correct to the extent that she says this paper does support the idea that women who choose to terminate in this situation face negative mental health outcomes?

A. Yes.

Q. Now, let's turn for just a moment to Exhibit 109. Well, before we do that, what is the next study listed in Dr. Steinberg's report?

A. Rona 1998.

MS. SHAH: Your Honor, I would object to questioning on this study. This is outside the scope of Dr. Coleman's report. She does not cite this study in her report.

MR. SCHAERR: But the study is cited by Dr. Steinberg, who criticizes Dr. Coleman.

THE COURT: Well, I assume you're going to ask Dr. Coleman what her view is of that report, right?

MR. SCHAERR: I'm going to ask her her view of the Rona study, correct.

THE COURT: So if it's not disclosed in the report, she can't say that because they can't cross-examine her.

BY MR. SCHAERR:

Q. But you have read Dr. Steinberg's article, correct?

A. Correct.

Q. The 2011 article.

THE COURT: Asked and answered, Counsel.

BY MR. SCHAERR:

Q. Okay. All right. Let's move on to another topic.

Do you remember that in your report, and to some extent at the last trial, you discussed certain categories of particularly vulnerable women?

A. Yes, I recall.

Q. And do you recall that one of the categories you discussed in your report was women who have a history of prior mental illness?

A. Yes. I did address that in my report, not in my testimony for the last trial.

Q. Do you believe that women in that category would benefit from being able to read the paragraph and the perinatal hospice brochure that we have before us here?

A. I do, because there is literature to indicate that women who suffer from mental illness, and I cover within my report different diagnoses, what the literature indicates about decision-making processes for women who are -- or anyone who's

afflicted by mental illness.

So the decision-making abilities can be compromised. So in my view, receiving the information both in writing and orally, particularly this information that identifies a choice other than what the medical community generally recommends, is definitely likely to be beneficial to this sensitive group.

Q. How would you say that it may benefit women in that category?

THE COURT: She just said, Counsel. She just answered that.

BY MR. SCHAERR:

Q. Are there other benefits that you see from women in that category being able to receive this information?

A. Not particularly, no.

Q. Another group of women was teenagers seeking an abortion.

Do you believe that women in that group would benefit from receiving the information in this paragraph?

A. Well, the research on adolescent decision-making available, also reviewed in my report, indicates that adolescent decision-making tends to not be as competent at the decision-making of adult women. And they tend to react more emotionally in their decisional process, more instinctively and intuitively and rashly and so -- and that relates to brain development.

So definitely adolescents receiving the information in

writing and orally is likely to -- and hearing there's another option is likely to enhance their decisional process. I see this in my teaching. Some students need it in writing. Some need to hear it orally. There are different learning styles.

So definitely would be beneficial to adolescents.

Q. In your opinion, what impact might that have or would that have on the woman's ultimate mental health?

A. Well, if a woman chooses the option that it suits best with her morals, her beliefs, her situation in life, if she chooses what she wants to do in her heart, she is much more likely to have a positive trajectory after the -- whether it's the termination or the deciding to carry to term.

Most of the research suggests that the healthier choice is to carry to term in this instance. But I think what we all want is for women to make the choice that they believe is best for them.

Q. And is it also true with respect to women in the earlier category that we talked about, women with preexisting mental illnesses, that receiving this information could lead to improved mental health compared to the alternative of an abortion?

A. Yes. If they desire to keep their child -- without this information, if -- they don't see any support. What's really beneficial about perinatal hospice is a multidisciplinary team kicks in and really helps the woman and helps her family, and

they provide amazing support throughout the duration of the pregnancy and afterwards.

So I would say, yes, that that is protective.

Q. Based on your review of the literature, are there other groups of women who feel pressured to have an abortion?

A. Yes. There are large segments of the abortion-seeking population that experience pressure or coercion to terminate. The populations that we spoke about at the previous trial included victims of -- minors who are victims of sexual abuse, sex trafficking victims, domestic violence victims, or just situations where a partner doesn't feel ready to take on the responsibility of a child.

So partners, parents of adolescents may pressure a woman to have an abortion. They may feel alone and like their only option is abortion. That's not choice when they feel like they've got to undergo an abortion.

So this tells women who are in coercive-type situations or are experiencing even subtle forms of pressure that here's a group of people that want to help you do what you want to do and will provide assistance.

Q. And, in your opinion, would those women who are feeling some kind of pressure to get an abortion, would they benefit from receiving the information in that brochure?

A. I believe definitely it can't hurt.

Q. Could it have a positive impact on their mental health

after the decision is made?

A. It certainly can. If they decide to carry a wanted baby, regardless of the diagnosis, to term and then they have support available to them, it certainly can ameliorate any negative effects of the grief and trauma and provide opportunities like we saw in several of these studies -- in the Lathrop study, the VandeVusse study, the Wool review -- we see evidence that the trajectories are positive for these women.

Q. Now, earlier we've talked a lot about women who have received a diagnosis of fetal abnormality.

Would you consider women in that group to be vulnerable?

A. Yes. Because they -- several of the studies identify -- the Guon study that I cite in my record, 61 percent of those women felt pressure from the medical community to terminate.

So if they're feeling pressure from their doctors and other healthcare professionals to terminate yet they really don't want to, this is -- they're receiving something from an authority, the state, that is based on evidence that they see another option that is supported by people that are in positions of authority. So definitely would help.

Q. So you mentioned the Guon study. Let's take a look at that. I believe that's Plaintiff's Exhibit No. 301.

THE COURT: I think we've got it on the screen now. You have a copy anyway, don't you?

THE WITNESS: I don't have a copy.

BY MR. SCHAERR:
Q. Dr. Coleman, if you can use the screen, that would be good.
A. Do I have to scroll myself or --
Q. No. Mr. Prince will scroll for you.
THE COURT: We don't scroll one another. We scroll documents. You don't have to scroll yourself.
THE WITNESS: I might have to scroll to the restroom before cross.
THE COURT: I know. Talk to Mr. Schaerr. He's supposedly got your best interest in mind.
MR. SCHAERR: I feel the pressure from both of you.
THE COURT: So to speak.
BY MR. SCHAERR:
Q. All right. Can you tell us what this study is?
A. The title of the study is "Our Children Are Not a Diagnosis: The Experience of Parents Who Continue Their Pregnancy After a Prenatal Diagnosis of Trisomy 13 or 18."
And the lead author is Guon, Jennifer Guon, G-U-O-N.
Q. Where is it published?
A. I think you'll have to scroll for me on that.
The American Journal of Medical Genetics.
Q. Is that a peer-reviewed journal?
A. Yes.
Q. Is it well respected in the field?
A. Yes.

Q. Let's look at page 312 under heading --
A. Excuse me, Mr. Schaerr. I think we need to give the year.
Q. Oh, go ahead, please.
A. I believe it was 2013.
THE COURT: Say it into the microphone.
THE WITNESS: I believe it was 2013 but -- yes.
BY MR. SCHAERR:
Q. Thank you.
All right. Let's turn, if we may, to page 312, under the heading "Pressure to Terminate Pregnancy."
A. Shall I read that?
Q. Why don't you just summarize the findings for us there on that topic.
A. Okay. Well, I already noted that, from this study, 61 percent felt pressure to terminate. But I do think it's helpful to read one of these excerpts from the study, if that's okay.
Q. Sure.
A. The first one, "I was told by the geneticist that the only way I could get an appointment with the main obstetrician was if I was booking for a termination."
Q. Would you consider that pressure?
A. I would, yeah. Shall I read another?
THE COURT: I can read them. You don't need to read them in the record.

THE WITNESS: Okay. Thank you.

BY MR. SCHAERR:

Q. Is there another of these that strikes you particularly?

THE COURT: Counsel, I just said I could read them.

MR. SCHAERR: I'm sorry, Your Honor.

THE COURT: The document is in evidence. Let's go along with whatever is not in evidence already.

MR. SCHAERR: All right.

BY MR. SCHAERR:

Q. So how, if at all, would the information in the pamphlet, with or without the change that you would suggest, how, if at all, would that information affect women being pressured by a medical professional to terminate a pregnancy?

A. Well, I do believe I already answered that. But basically they will hear from an authoritative source -- the state -- that there is another option. It's that many are not feeling like they have the option to not terminate in these situations.

Q. So how would you characterize the overall impact of Indiana's perinatal hospice disclosure on the mental health of women in these vulnerable groups that we've discussed?

A. I believe it carries potential to preserve the mental health of many women who otherwise will not realize there is an option. Many of the women who undergo late abortions, second-, third-trimester abortions for fetal anomaly are likely to be morally opposed to abortion and they're being almost forced to

undergo a pressure that's, quote/unquote, healthy that goes against their belief system.

So I just believe that this disclosure has no harm to it and is likely to provide a healthy option for women who really are not comfortable with termination.

Q. In your opinion, what impact might this disclosure have on the amount of suffering that these women undergo as a result of being faced with this very difficult --

THE COURT: Counsel, you're going back and forth like you're ironing today. She's answered this about four times. So next question, please. I can anticipate exactly what she's going to say because she's said it.

MR. SCHAERR: Okay.

THE COURT: Speaking of old patterns, I speak of ironing.

THE WITNESS: I don't iron, myself.

BY MR. SCHAERR:

Q. Just to wrap up and sum up, Dr. Coleman, based on your review of the literature, is it your opinion that the statements on mental health and the perinatal brochure are true and nonmisleading?

A. That's my opinion, yes.

Q. Is it your testimony today that a significant number of women may experience grief if they terminate a pregnancy due to a fetal medical condition?

A. Yes, based on multiple studies.
Q. Is it your opinion that, for those women who are grieving their child, having an abortion may prolong the grieving process?
A. Yes.
Q. And do you consider perinatal hospice to be scientifically safe and beneficial to women?
A. Yes.
Q. And to a reasonable degree of scientific certainty, is the information in the brochure in any way untruthful or misleading?
A. No, it's not.
MR. SCHAERR: No further questions, Your Honor.
THE COURT: Now we'll take a morning recess.
THE WITNESS: Ah, thank you.
THE COURT: We'll reconvene in 20 minutes.
COURT CLERK: All rise.
(Recess taken.)

COURT CLERK: All rise.
(Open court.)
COURT CLERK: Court is in session.
THE COURT: You may be seated.
Attorney Shah, are you ready to cross-examine this witness?

MS. SHAH: I am, Your Honor.
THE COURT: You may proceed.
MS. SHAH: Thank you.

**CROSS-EXAMINATION**

BY MS. SHAH:
Q. Good morning, Dr. Coleman. My name is Sneha Shah, and I represent the plaintiffs in this case.
A. Good morning.
Q. Dr. Coleman, it's your view that major medical journals are willing to publish scientifically deficient results as long as the results support abortion rights initiatives, correct?
A. That's not fully correct, no.
Q. Dr. Coleman, you founded an organization called WeCare, correct?
A. Correct.
Q. That organization has a website?
A. Actually, the website is down, and I'm looking at possibilities of moving it elsewhere.
Q. The organization had a website?
A. It did.
Q. I'd like to call up Plaintiff's Exhibit 701.
If you just zoom in to that first paragraph, please. I'm sorry. Can you scroll up to the title first.
Dr. Coleman, this is an article that's written by you that was published on the WeCare website, correct?

A. Correct.
Q. The title of that article is "The Continuing Saga to Deny the Heartache that is Abortion: JAMA Psychiatry's Latest, a Primer on the Abuse of Science." Correct?
A. Correct.
Q. If you look down a couple of sentences into that first paragraph, it says, "What once appeared to be a subtle mainstream journal bias in favor of publishing results suggesting abortion poses no threat to women's psyches has morphed into a peer-review process, blind to scientific deficiencies, as long as the results further leftist abortion rights initiatives."
Did I read that correctly?
A. You read that correctly.
Q. I'm done with that exhibit.
And, Dr. Coleman, you believe that the bias in academic community in favor of abortion is also reflected in the professional organizations, correct?
A. I believe it's reflected in some journals and in some professional organizations; not all journals, not all professional organizations.
Q. Okay. Can we pull up Plaintiff's Exhibit No. 696, please.
Dr. Coleman, you give a deposition in this case, correct?
A. Yes.
Q. And you took an oath to tell the truth similar to the one

that you took this morning, correct?
A. Correct.
Q. Can we go to page 25, please, 25 of the transcript. And if we can zoom in to line 3 to 9.
A. Okay.
Q. I'm going to read this out loud, Dr. Coleman.
A. Okay.
Q. "My position is that for many years there has been a bias in the academic community that is reflected in the professional organizations. For example, the APA in 1969 issued a statement clearly identifying abortion as a civil right. Many of the professional organizations have taken a political opinion on abortion."
Did I read that correctly?
A. You read it correctly.
Q. Dr. Coleman, but you do not believe that the American Association of Pro-Life Obstetricians and Gynecologists is biased, correct?
A. I think -- I believe that they have a pro-life orientation to the field of obstetricians and gynecology. It's in their name, yes.
Q. Just to repeat my question, you do not believe that the American Association of Pro-Life Obstetricians and Gynecologists is biased?
A. Biased in what regard? In their interpretation of science,

no. But I would need a -- what exactly what do you mean by "bias"?
Q. Going back to Plaintiff's Exhibit 696, page 141, please.
THE COURT: This is the deposition?
MS. SHAH: Yes, Your Honor. It's the deposition transcript of Dr. Coleman from this case.
If we can Zoom in on lines 21 through 25, please.
Is this page 141? This doesn't seem to be the correct page but --
Okay. I will move on, and we can come back to that question.
BY MS. SHAH:
Q. Dr. Coleman, you have served as an expert in about 24 abortion cases, correct?
A. That's about right, yes.
Q. In none of those 24 cases did you opine that an abortion restriction was harmful for a woman's mental health, correct?
A. Correct.
Q. You believe a significant portion of women would be better off if abortion was prohibited, correct?
A. I believe the literature indicates that a significant percentage of women do suffer from abortion. Whether abortion is prohibited or not is really outside my area. I'm not a legal expert; I'm a content expert.
MS. SHAH: Can we pull up Plaintiff's Exhibit 696

again, please. Again, this is the deposition transcript from this case of Dr. Coleman. Can we go to page 42, please, and zooming in on lines 12 -- I mean 12 through 15, yes.

BY MS. SHAH:

Q. I'm going to read this out loud, Dr. Coleman.

"Q Do you believe that women would be better off if abortion was prohibited?

"A I believe a significant percentage of women would be better off."

Did I read that correctly?

A. Yes. Due to the evidence in the scientific literature, a significant percentage would be spared psychological harm. Yes. My opinion has not changed.

Q. Dr. Coleman, you have not studied women who would be worse off because of abortion restrictions, correct?

A. No, I have not.

Q. You've provided testimony today on the accuracy of one of the statements in the perinatal hospice brochure, correct?

A. Yes.

Q. And your expert opinion on the accuracy of the perinatal hospice brochure is based mostly on just reading the brochure, correct?

A. No. It's -- my opinion on the brochure is based on extensive review of relevant scientific literature that corresponds with the content of the brochure.

Q. Can I pull up Plaintiff's Exhibit 696, please, page 236. And if you can zoom in on line 14 all the way to the bottom. And we're going to be going on to page 237.

I'm going to read this out loud, Dr. Coleman.

A. Okay.

Q.

"Q I just want to know if you assumed that the booklet provides accurate information about resources because counsel told you that.

"A No, it wasn't just from the counsel. It was based on my understanding of what organization -- health and human services kinds of organizations provide and" --

Moving down to line 23:

-- "my assessment of the brochure was based mostly on the information that was there, the fetal development, the risks and benefits, and I saw that they used multiple sources."

Did I read that correctly?

A. Yes.

Q. And you assumed that information in the brochure was accurate, correct?

A. I didn't assume it was correct. It corresponded with my understanding of the scientific literature. Whenever I serve as a witness, I look at the information, the documents involved, and I look for convergence or divergence from the

scientific literature. It converges, as I testified earlier, with what's known in the two options in cases of fetal anomaly.
Q. Can I pull up Plaintiff's Exhibit 696 again, please, to page 237, zooming in on lines 13 through 15.
I'm going to read this out loud, Dr. Coleman.
"Q So you assumed that it was accurate information, correct?
"A Yes."
Did I read that correctly?
A. Yes, yes. Based on my knowledge, which is the backdrop to interpreting it.
Q. Thank you.
Dr. Coleman, I'd next like to discuss some of the studies you cited on direct examination in support of your opinions.
A. Okay.
Q. Starting with the Davies-Gledhill study, which I believe was Plaintiff's Exhibit 237.
A. Uh-huh. I have -- I think I have a hard copy here.
Q. Let me know when you have it in front of you.
A. Well, it's on the screen. So that's fine.
Q. Dr. Coleman, this study did not include people who, after a fetal anomaly diagnosis, carried their pregnancies to term, correct?
A. Correct.
Q. Instead, the study only included people who obtain an

abortion after a fetal anomaly diagnosis, correct?
A. Correct.
Q. And the study did not assess participants' mental health status prior to pregnancy, correct?
A. Correct.
Q. And the study did not assess participant's mental health status prior to the fetal anomaly diagnosis, correct?
A. Correct.
Q. And the study did not compare participants' mental health before the fetal anomaly diagnosis to their mental health after the fetal anomaly diagnosis, correct?
A. Correct.
Q. I'd next like to turn to the Guon study, which is -- I believe it was Defendants' Recollection Exhibit 109 and Plaintiff's Exhibit 816.
Dr. Coleman, this study did not look at parents who obtain an abortion after a fetal anomaly diagnosis, correct?
A. Correct.
Q. Instead, the Guon article only looked at parents' experiences who chose to continue their pregnancies after prenatal diagnosis of a fetal anomaly, correct?
A. Correct.
Q. This study looked at both mothers and fathers, correct?
A. Correct.
Q. In reporting its results, the study did not distinguish

between mothers and fathers, correct?
A. I'd have to look. There are a couple of different studies where parents were -- were the participants, and in some of the studies, actually based on this data set, because Janvier, that article, also used this sample of 332 individuals. So in one of them they divided; one they didn't.
So if I can take a look, I can give you a -- I want to make sure I get that correct.
Q. Sure, Dr. Coleman. And I can point you to page 310, the first paragraph under "Demographic Information."
THE COURT: Of the same study?
MS. SHAH: Of the same study, Your Honor.
BY MS. SHAH:
Q. Dr. Coleman, after reviewing that first paragraph, is it your understanding that this study did not distinguish between mothers and fathers when reporting its results?
A. From that paragraph. I'd also like to take a look at the methodology again and the results before we make that -- I believe that's the case, but I wouldn't mind looking at the results and the methodology.
Q. You believe that's the case?
A. Yeah. I'm not going to -- I'm not going to say yes looking at one -- you know, two paragraphs, when I --
THE COURT: Do you have it in front of you? Do you have that study, the Guon study?

A. Yes.

THE COURT: I mean no disrespect, but isn't it funny to have a study named Guon?

You have to find your humor in small places, Counsel.

THE WITNESS: I don't know if I received a hard copy.

THE COURT: One was passed out because I have one.

Hand her another one, please.

THE WITNESS: I have Janvier but...

MS. SHAH: Sure. I can enter -- I can provide you with another hard copy in you don't have it.

THE WITNESS: I have the Janvier.

THE COURT: It's Exhibit 301? One of the last ones that was passed up?

MR. PRINCE: We have it, Your Honor.

THE COURT: "Our Children Are Not a Diagnosis"? Got that?

MS. SHAH: Yes, Your Honor.

THE WITNESS: Yes, the answer is correct that they did not differentiate between mothers and fathers.

BY MS. SHAH:

Q. When reporting their results?

A. Correct.

Q. Thank you.

I'd next like to turn to the Janvier study that you discussed. It is Defendants' Recollection Exhibit 106, and

it's Plaintiff's Exhibit 924.
A. I do have a hard copy of that.
Q. Great. Dr. Coleman, I will wait for you.
THE COURT: What page are we looking at?
MS. SHAH: Your Honor, no page yet.
THE COURT: Okay.
BY MS. SHAH:
Q. Dr. Coleman, this study looked at both mothers and fathers, correct?
A. Correct.
Q. And this study did not distinguish between mothers and fathers when reporting its data, correct?
A. Well, Table 1 shows the number of mothers and fathers. So as with the other one, I would like to see if there's any -- if any of the analyses did differentiate.
Q. Sure. If you go to page 294, the third column, third paragraph.
A. Uh-huh.
Q. One second. It says, "For questions related to parental perspectives, we analyze responses from all respondents. For questions related to clinical outcomes, we analyze responses describing children. When two parents answered questions for the same child, we used only maternal answers."
A. Okay.
Q. So based on that, Dr. Coleman, this study did not

distinguish between mothers and fathers when reporting its results, correct?
A. Apparently not, unless they provided item data that -- in the cases where just the mothers responded. So --
Q. And the study -- excuse me. The authors had no data on women who chose to terminate their pregnancies, correct?
A. Correct.
Q. The study did not compare women's mental health before the fetal anomaly diagnosis to their mental health after the fetal anomaly diagnosis, correct?
A. Correct.
Q. Moving on to the next study.
Dr. Coleman, you testified about a study by Lathrop titled "Affirming Motherhood Validation and Invalidation in Women's Perinatal Hospice Narratives," correct?
A. Correct.
Q. That is Defendants' Recollection Exhibit 105 and Plaintiff's Exhibit 862.
A. I have that.
Q. Okay. Dr. Coleman, this was a qualitative study, correct?
A. Correct.
Q. It only looked at 15 women?
A. Yes, in a very substantive way. There are benefits to both qualitative and quantitative studies.
Q. The study only looked at 15 women?

A. Yes, in very detailed way.
Q. This study did not include people who obtain an abortion after fetal anomaly diagnosis, correct?
A. Correct.
Q. And the objective of this study was to see what made these women feel validated or invalidated, correct?
A. That was the gist of it, yes.
Q. And the study did not compare women's mental health before the fetal anomaly diagnosis to their mental health after the fetal anomaly diagnosis, correct?
A. Correct.
Q. Dr. Coleman, Lathrop and his colleagues also published another article about this -- these 15 women and the data they collected, correct?
A. Correct.
Q. And you cited that article in your report?
A. Correct.
Q. I would like to pull up Plaintiff's Exhibit No. 861.
I have a copy for you.
A. Thank you.
Q. Dr. Coleman, this study is titled "Continuity and Change in Mothers' Narratives of Perinatal Hospice," correct?
A. Correct.
Q. And this study also only included women who continued their pregnancies after a fetal anomaly diagnosis, correct?

A. Correct. It's the same sample as the previous.

Q. This study found that many of the mothers who continued their pregnancies after a fetal anomaly diagnosis experienced feelings of loss and pain and ongoing recurring feelings of grief despite the passage of time, correct?

A. Yes.

Q. And the women described their feelings of loss and pain as still ongoing when they were interviewed between one and nine years after their loss?

A. Yes, as is the case when there's any loss of a family member. It's very -- it's consistent.

Q. And the study found that the emotional pain of these women who continue their pregnancies after a fetal anomaly diagnosis was persistent?

A. Yes, as -- in conjunction with many positive recollections of their experience, like changes in relationships that are positive, spiritual growth, appreciation for life, the range of positive. And there were obviously some negative with something this serious.

Q. The authors concluded the clinical implications of their study was that the findings reinforce the admonition that approaches suggesting the prospect of rapid resolution of grief or returning to a preloss normal are unlikely to be helpful for women, correct?

A. I'd like to see the paragraph that you're referring to.

Q. Sure. If you can go to page 29 under the section of "Clinical Implications," the last sentence in the first paragraph.

A. Did you say the right column or --

THE COURT: She has it highlighted.

THE WITNESS: I'm sorry. Was looking at mine.

That's what they said. And grief is distinct from mental health or other psychological outcomes. So we should keep that in mind.

BY MS. SHAH:

Q. Thank you. And I'm done with that study.

MR. FISHER: Your Honor, I hate to interrupt. I just want to point out we do have Dr. Calhoun available. I want to make sure -- if it's appropriate to suspend this and move to that and then come back. I want to just offer that.

THE COURT: Let me ask Ms. Shah.

Can you put a time estimate on the rest of your cross-examination?

MS. SHAH: Yes, Your Honor. I just have two more studies to ask Dr. Coleman.

THE COURT: I think you can wrap it up.

BY MS. SHAH:

Q. Okay. Dr. Coleman, you testified on direct examination about an article by Mashiach, correct?

A. Correct.

Q. And that's Defendants' Recollection Exhibit 107 and Plaintiff's Exhibit 768.
    Dr. Coleman, this study compared women who terminated their pregnancies due to a fetal anomaly with women who had multifetal reductions, correct?
A. Correct.
Q. So this study did not include women who received a fetal anomaly diagnosis and chose to carry to term, correct?
A. Correct.
Q. And the study found that the state of anxiety of the participants they looked at declined in both groups with no significant differences in the decline rate over time, correct?
A. I would like to see the data. I know that -- I know the bottom line results here with both of the groups had sustained -- there was some decline, but there was also some sustained suffering.
    So is it okay to look back at the results too?
Q. Sure. If you go to page 2 under results, the sentence starting with "in both groups." I believe it's the second paragraph of results, sentence number -- it's right in the middle.
A. In both groups.
Q. 3.
A. Yes. There's evidence of decline, and I believe it was a ten-week interval in this case in both groups but still

relatively high rates.

Q. Lastly, Dr. Coleman, you testified about an article by Wool that was titled "Systemic Review of the Literature." Correct?

A. Correct.

Q. And that was Plaintiff's Exhibit -- Recall Exhibit 102 and -- I mean Defendants' Exhibit 102 and Plaintiff's Exhibit 863.

Dr. Coleman, the Wool study found that, regardless of whether a woman terminated or continued her pregnancy, after a lethal fetal anomaly diagnosis, women often experienced intense grief reactions, correct?

A. Yes, because there's loss of a child in both cases.

Q. The study found that both giving birth to a child with a life-limiting condition and termination of pregnancy for a fetal anomaly are associated with psychological morbidity?

A. Wool reviewed -- this is a systematic review. So she incorporated nine quantitative studies and two qualitative studies that related to termination due to fetal anomaly; then there were three studies that looked at women who carried to term.

So within the context of each of those studies, the findings are somewhat mixed.

Q. So based on her review of all of those nine studies that you just discussed, she found that both giving birth to a child with a life-limiting condition and termination of a pregnancy

for a fetal anomaly are associated with psychological morbidity, correct?
A. At what point?
Q. If we can zoom in on the abstract, actually.
A. The studies had a range of time. Some went to seven years. And so that question is just too generalized for a review of this nature. She may have made a general statement of that nature.
Q. If you can just highlight the sentence -- it's kind of midway before -- "both giving birth to a child."
Do you see it? You're right on top of it. Yes.
A. I think the key point here --
THE COURT: Hold on a minute. There's not a question.
THE WITNESS: Oh, sorry.
BY MS. SHAH:
Q. So Wool found that "Both giving birth to a child with a life-limiting condition and termination of pregnancy for fetal anomaly can be emotionally traumatic life events, both associated with psychological morbidity."
Did I read that correctly?
A. Yes, they can be. They are not necessarily always. I think the way you initially framed that question, that was the implication that it's -- you know, it's the way it is at all times.
Q. And Wool concluded that "It remains largely unknown if

women who choose to carry their pregnancy to its natural end exhibit negative psychological outcomes, such as PTS, anxiety, guilt, and depression at similar rates as those who choose medical termination."

A. She concluded that in 2011, yes. And the other studies that I cited are subsequent to this review, yeah.

Q. Thank you.

A. Uh-huh.

MS. SHAH: May I have one moment, Your Honor?

THE COURT: Yes.

BY MS. SHAH:

Q. I believe we had to move on from this question because I didn't have the correct transcript cite. But going back to the question of you do not believe that American Association of Pro-Life Obstetricians and Gynecologists is biased, correct?

A. I don't think they're biased in their interpretation of science. And that's my purview. That's what my profession, my job, involves.

MS. SHAH: Okay. Thank you.

No further questions, Your Honor.

THE COURT: All right. Redirect?

MR. SCHAERR: No redirect, Your Honor.

THE COURT: Dr. Coleman, thank you. You may be excused.

Is she finished?

MR. FISHER: She is finished. Thank you.

THE COURT: And the plaintiffs have no need to recall the witness?

MS. SHAH: No, Your Honor.

THE COURT: So, again, thank you very much, Dr. Coleman. You may step aside.

THE WITNESS: Thank you.

THE COURT: And we'll hear Dr. Coleman now.

MR. FISHER: Dr. Calhoun.

THE COURT: Calhoun is who I meant.

MR. FISHER: We'll call Dr. Byron Calhoun, who should be available by Zoom.

THE COURT: Good. I hope everyone got a drink of water so we can push through lunch and make it a delayed lunch today.

Mr. Fisher, call your witness, please.

MR. FISHER: The defendants call Dr. Byron Calhoun.

THE COURT: Hello, Dr. Calhoun. I'm Judge Barker. Can you see me all right?

DR. CALHOUN: Yes, ma'am, I can. Can you hear me all right, ma'am?

THE COURT: I can hear you just fine.

We're ready for your testimony. Thank you for shoehorning us into your busy day. We're busy here too. So everybody's -- all pots are on front burners today.

Go ahead, Mr. Fisher. You may ask your questions.

MR. FISHER: Your Honor, this witness has not been previously sworn in this matter.

THE COURT: I'm sorry. Thank you.

Would you be sworn, please, sir.

BYRON C. CALHOUN, MD, DEFENDANTS' WITNESS, SWORN

DIRECT EXAMINATION

BY MR. FISHER:

Q. Thank you, Dr. Calhoun. Just for the record, would you please state your name and spell it.

A. It's Byron Craig Calhoun, B-Y-R-O-N, C-R-A-I-G, C-A-L-H-O-U-N.

Q. Thank you, Dr. Calhoun. And we need to move quickly, but we do also need to establish your credentials to back up your testimony today. So please, as efficiently as you can, provide your credentials, including your education, employment history, and board certifications.

A. My education was the Air Force Academy, graduating in 1979, magna cum laude. I attended University of Iowa Medical School in Iowa City, graduating in 1983.

THE COURT: Can't go that fast, Dr. Calhoun.

Why don't we put his resume up.

Just put the CV up there, have him look at it, and say that's it right there.

MR. FISHER: We will do that. So stipulated

Exhibit 38, please.

BY MR. FISHER:

Q. Dr. Calhoun, do you recognize this document?

A. Yes.

Q. Is this a true and accurate version of your curriculum vitae?

A. Yes. This is my most recent.

Q. Okay.

THE COURT: You still live on Summit Drive?

THE WITNESS: Yes, ma'am.

BY MR. FISHER:

Q. What is your area of expertise?

A. My area of expertise is high-risk pregnancies. I take care of all patients with any medical complications, as well as advanced prenatal diagnosis of fetuses with anomalies or any sort of structural abnormalities on ultrasound.

Q. Are you familiar with the dilation and curettage procedure?

A. Yes.

Q. And how are you familiar with it?

A. I've performed hundreds, if not thousands, of those throughout my training and practice over the last 30-plus years.

Q. And what has been your role in this case?

A. My role has been to be an expert in the clinic regulations and also maternal mortality in this case for the state of

Indiana, as well as the physician-only performance of abortions.

MR. FISHER: Your Honor, we would tender this witness as an expert in the field of obstetrician-gynecology practice.

THE COURT: Any objections, Ms. Toti?

MS. TOTI: No objection, Your Honor.

THE COURT: The defendant has called this witness as an expert and may proceed accordingly. The Court recognizes him as such.

MR. FISHER: Thank you, Your Honor.

BY MR. FISHER:

Q. Dr. Calhoun, are you, in your practice and in your various roles as an OB/GYN, familiar with the data that surrounds reporting of complications or mortality from abortion?

A. Yes.

Q. What is your view of the quality of that data?

A. Well, the problem with the data that I see is that there is not accurate reporting within this country for the number of maternal mortalities that are related to either abortion and/or childbirth simply because there's no way to know the total number of abortions that are being reported, since most of that is voluntary; nor are we able to know the number of complications for abortions, since that's also reported voluntarily in most states; and that there's no data from multiple states. Only 26 states actually report to the CDC,

and California, which has the largest number of abortions, does not report. In fact Studnicki in 2017 and Pazol in 2012 both noted that there was limitation of that data and that there was inaccurate reporting.
Q. As a consequence of those deficiencies in the reporting of data, what can we infer from reports about data on abortion complications?
A. Well, the -- we really can't draw any conclusions from that because there's no ability to have accurate number of abortions performed in the denominator or complications in the numerator. So the data is not really interpretable or very difficult to understand because you don't have the numbers that are accurate.
Q. What are the procedures used in surgical abortions that are most commonly likely to create complications?
A. Well, the most likely in the surgical abortion is, when you are doing a dilatation with a dilator, you would create some sort of a false passage or perhaps lacerate the cervix or create a false passage with the use of a curette or the suction catheter. And when, of course, you are doing a suction catheter, then you end up in the --
THE COURT: Hold on a minute.
BY MR. FISHER:
Q. We just need you to slow down. And we were talking about the common complications associated with surgical procedures.

So let's slow down. Let's help the court reporter make sure she can get this down.

A. Sure. I apologize. I'm an old debater. So I need to back off my rate.

The most common complications occur when the surgical abortion is being performed using some sort of a dilator, usually metal, or the suction catheter or the curette. At the time of dilation, you would create a false passage, or when you're passing a curette or the suction catheter. And these false passages would be an entry into the muscle or myometrium, which then would, of course, either cause a perforation or perhaps a laceration laterally into the uterine arteries or ovarian arteries. If there's perforation, there could be subsequent injury to surrounding or adjacent tissues.

THE COURT: You talk faster than any person I've ever known from West Virginia.

THE WITNESS: Well, I'm not from West Virginia actually.

THE COURT: That may explain it. Pretend like you have to write down every word you're saying, and then you'll moderate a little bit.

THE WITNESS: Yes, ma'am.

BY MR. FISHER:

Q. In light of those risks that you've just mentioned, is a D&C abortion a risky procedure?

A. Yes, it very much can be, which is why I still perform my D&Cs in a surgical suite with the personnel to assist me in case I have some sort of a complication.

Q. So as you're aware, Indiana requires that only physicians may do surgical abortions.

What, in your view, are the benefits of such a requirement?

A. Well, the benefits are that physicians have had more extensive training, are more able to recognize the complications of the surgical abortion, and are then able to deal with and/or be able to fix any complications that might occur as a result of the procedure.

Q. Well, and let's be clear. Is the utility of the physician rather than, say, an APC limited to the performance itself of the abortion, or is it -- does it extend beyond that?

A. Well, it extends beyond that because you're able to answer any questions that the patients might have, which an advanced practice clinician would not be trained to answer, and would be able to provide more fully defined informed consent and also to be able to take a more holistic approach, if you will, understanding the complete procedures and the complications and answering any questions that the patient might have that an APC would not be able to answer.

Q. What about just with respect to complications? Recognizing complications, addressing complications, does a physician present any benefits in that content?

A. They absolutely do. The average physician who trains for surgery, particularly obstetrics and gynecology, undergoes their undergraduate training and then undergoes a residency of four years as well. So there's at least eight years of extra training involved in that training, especially since there's four years of surgical training.

The average APC generally goes probably two or three years, usually, and maybe another year and then maybe a year of internship. So maybe five or six years versus the -- another two or three years plus exclusively training to be a surgeon and recognizing complications.

So the surgeons -- physicians are the ones who are most qualified to take care of and/or perform these surgeries.

Q. Well, what does the leading professional organization of surgeons think about APCs performing surgical procedures?

A. Well, the American College of Surgeons in particular does not endorse any advanced practice clinician performing any surgery. And, in fact, they developed core disciplines in 2003, as well as the American College signing off on this, that surgeons should be performing these procedures because of the necessity to be board-certified, to be credentialed, to have oversight, to have the ability to deal with complications, also if you're going to provide the sedation necessary for the procedures to be able to handle complications from anesthesia. So there are -- the American College of Surgeons and the other

organizations do not endorse APCs.

MS. TOTI: Objection, Your Honor. Foundation. There's been no foundation laid for where these statements are coming from or how Dr. Calhoun is aware of them.

THE COURT: Do you want to lay the foundation, Mr. Fisher?

MR. FISHER: We can do that, Your Honor.

BY MR. FISHER:

Q. So, Dr. Calhoun, I want to direct your attention to Recollection Exhibit 123. We'll bring that up, if we can, on the screen and you should be able to see it.

THE COURT: Can you see that, Dr. Calhoun?

THE WITNESS: Yes, I can see my statement.

BY MR. FISHER:

Q. So, Dr. Calhoun, let's turn, if we can, to page 24 of this document, and we're looking here at paragraphs -- in particular paragraphs 123, 124.

A. Correct. I see that.

Q. So, Dr. Calhoun, does this portion of your report refresh your recollection about the source for your statement about the American College of Surgeons?

THE COURT: He didn't say he had a failure of recollection. You never asked him that.

MR. FISHER: Very good.

BY MR. FISHER:
Q. Dr. Calhoun, do you recall the source of your statement about the American College of Surgeons?
A. Correct. It's the consensus statement from the American College of Surgeons, yes.
Q. And this is the one stated here in paragraph 123?
A. Yes, sir.
Q. And the core principles that you were mentioning are the principles set forth on pages 24 and 25 of your report?
A. Yes, sir.
MR. FISHER: Your Honor, is that sufficient foundation?
THE COURT: I hear no further objection.
MR. FISHER: Thank you.
BY MR. FISHER:
Q. So you -- you're speaking about how the American College of Surgeons would not permit APCs to do surgeries, and I just want to make sure we're clear.
Within the meaning of "surgeries," does the American College of Surgeons include a D&C procedure?
A. Yes, they do.
Q. So which are -- of these core principles that you've mentioned and that are included in your expert report, I just wondered if you could highlight a few of the most critical of that permitting APCs to do D&Cs would violate.

A. Well, the biggest one would be the core -- in the Core Principle Number 7 is that it talks about physicians performing, which is clearly what this is based upon, and that they would have board certification by one of the boards, board of medical specialities, not advanced practice clinicians; that Number 8, that they would have core privileges and being accredited to do those procedures, which would be physicians again to perform these procedures so it presumes --

THE COURT: If you want this to show up on the record, you better slow it down, Doctor.

THE WITNESS: Yes, ma'am.

THE COURT: Otherwise, we're just going to allow the court reporter to write "blur" on the transcript.

THE WITNESS: Yes, ma'am.

BY MR. FISHER:

Q. Let's back up to the core principle you were mentioning and go over that.

A. Correct. Core Principal Number 8 would be that physician would show a core privilege and accreditation by a licensed hospital or ambulatory surgical center. So it would be a physician again that has that ability to perform that procedure.

The final one would be that if, in fact, they did have these core principles, there should be someone there who could also be trained in life support and/or also resuscitation, Core

Principle Number 10.
Q. Okay. Let's turn your attention now to medication abortions. What are some of the possible complications from medication abortions?
A. The largest complication is usually hemorrhage and incomplete medical abortion, and therefore -- and also there is cases of infection as well. Those are the most common complications of medication abortion.
Q. And what do we know about the complication rate from medication abortions, at least as they have been reported?
A. They appear to be higher than surgical abortions. About 4 to 7 percent is the quotes that are usually given.
Q. Why limit medication abortions to physicians?
A. Well, there's several reasons. One, you would need to have accurate dating for medical abortions. If you do a medical abortion after 49 days, the risk of failure goes up substantially every week or every day -- really every week after 49 days.
And the individual needs to be able to identify that the pregnancy is, indeed, in the uterus; so not a tubal or ectopic pregnancy.
Also, making sure that there's no adnexal masses or other contraindications for the medical abortion.
Q. Well, are those difficult conditions to observe and diagnose and record?

A. They can be very difficult. I find after I've been doing 30-plus years of ultrasound and am considered an expert in ultrasounds, I still have problems diagnosing ectopic pregnancies on ultrasound.

So it's a bit terrifying to me to think that you would provide an APC the ability to perform ultrasounds and be able to rule that out.

Q. How does the FDA handle prescription of mifepristone?

A. Well, they have the -- what's called the REMS, which is the -- I'm having a small senior moment here -- for certification of the use of the medication. So that would be the sense that you would have to physically say you knew how to use the medication, you would certify that, in fact, you knew how to use that and that you would be responsible for that, as well as the complications that may result from that medication when you prescribe it.

So they have a definite very high level of concern about the use of Mifeprex.

Q. So would permitting an APC to prescribe and handle Mifeprex contravene the FDA's REMS?

A. It would -- according to the way I read it, yes, it would. Because it says "physician must certify."

Q. Now, turning back to something I think you alluded to earlier about your performance of dilation-curettage procedures, tell us more about the environment, the physical

environment, in which you perform that procedure.
A. Well, the environment that I do and that physicians I know that I'm familiar with perform them in surgical suites. We always have anesthesia there. We have surgical assistants, and we do them in a surgical suite or in the hospital because of our concern about risk of complications.
Q. Well, would you ever do them in a medical office?
A. We would never do them in a medical office, no.
Q. Well, anybody that you're familiar with in the practice of D&Cs would do them in an office?
A. Nobody that I have been familiar with in the last 30 years would do them in their office, no.
Q. Well, let -- so you're familiar with, of course, your ASC or surgical suite that you use for this and you're familiar with the layout of the facilities, correct?
A. Yes.
Q. So I wonder if you, based on that, could tell us your view of the benefits of having a housekeeping room with a service sink and storage capabilities.
A. Well, that's basically standard of care in every clinic or surgical suite that I've ever worked in so you could keep the most sterile, clean and dirty instruments and materials away from each other and provide safety for our patients.
Q. Well, what are the benefits of ensuring the -- a minimum of a procedure room?

A. Well, that's important so that you have the ability to -- either you can get your beds in, any equipment you might need to be used in your procedure, or if you have an emergency to get resuscitative equipment. Also so you have room for your personnel that you would need for a procedure as well.

So that space is essential to the performance of your procedure and, again, is standard of care of everywhere I've ever been, a certain amount of space or large enough space to work in.

Q. And those concerns might arise in a D&C?

A. Absolutely.

Q. So Indiana's regulations require 120 square feet for a room.

Do you have a view on the appropriateness of that size?

A. Well, it seems reasonable that you have an adequate number of square footage to be able to safely take care of your patient. Again, if you need to get emergency equipment or other personnel, you need space to perform that for your patient.

Q. Why should scrub facilities be provided and be near the entrance of a procedure room in a surgical abortion clinic?

A. Well, the last thing you want to do as you're going to do a procedure is, obviously, to wash your hands and sterilize your hands. And every surgical suite or every outpatient surgical center has the scrub sink right before the door so that you

wash your hands and are clean to take care of your patient.
Q. Well, what about corridor width? Why have a minimum corridor width in a surgical abortion clinic? Indiana requires them to be 44 inches wide.
A. That, again, is standard in -- almost everywhere you go, there's a standard width. And the reason you have a wide hallway and wide doorways is so you can get a bed or gurney down the hall or emergency -- or equipment into the room or down the hallway to take care of your patient. It's a safety issue. Or in case you need EMS to come in and provide care, you'd have that available to you.
Q. So is it a concern both as to equipment and personnel?
A. Yes, yes.
Q. What are the benefits of requiring an abortion after the first trimester to be performed only in a hospital or ambulatory surgical center?
A. Well, the benefits are realizing that after particularly the first trimester that the risk of a complication increases by every week after 12 or 13 weeks. So that the risk for laceration or perforation or a complication from the abortion procedure increase.

Due to that, you'd want to have a place where you have direct access to resuscitative equipment, surgical personnel, other people who would be able to assist you in the event you have to do a laparotomy or surgical procedure to correct any

laceration or other complication you might have. Also access to a higher level of medications and also anesthetics that you might need for the care of a complication with a surgical -- advanced surgical abortion.
Q. Could you tell us a little bit more about the procedures that occur in a second trimester. What is the most common procedure that occurs in second-trimester abortion?
A. There's -- you can do it with medication, which is using prostaglandins. Or if you're talking surgical, generally it's a multiday procedure since you have to soften and dilate the cervix generally. Then you would bring the patient in and manually dilate her cervix. And then to extract the fetus, you would have to manually use forceps to crush and grasp the fetal parts and remove them, particularly fetal skull and the chest, because those are the largest parts, and extract those.
Since those are sharp crushing instruments, they are liable to cause increased risk of laceration because of the thinner uterine wall and the access to the vasculature as well as the suction catheter that you would use to remove the placenta.
Q. What about the use of sedation in a second-trimester abortion? Is that necessary?
A. You would need what's called deep sedation, which is essentially -- it's anesthesia essentially. The patient must remain still. She should not be able to move because, when patients move, that's when you're at the most increased risk

for having something surgically happen, laceration or perforation. Because as you're doing your procedure, it's obvious that, if the patient moves, that could cause a problem.

So they need to be heavily anesthetized, and that requires really an anesthesiologist with high level of skills.

Q. What would you think of the practice of doing a second-trimester abortion without anesthesia?

A. I -- there's no way that could be done, in my experience over 30 years. You have to have the patient still. They have to be sedated and anesthetized. You just can't do that.

Q. Why is it important to -- change the subject a little bit here to the informed consent process related to, you know, the -- your practice in particular.

Why are physicians especially well equipped to provide advice to patients about serious medical procedures?

A. Well, the reason that the surgeons should be a -- surgeon should be a physician is that the surgeon has had much more advanced training, has had more advanced medical training, and knows more about the procedure and may answer in more detail any questions the patient might have.

Also has generally a deeper level of understanding simply as a matter of training for dealing with any of the surgical complications that might happen, as well as able to basically, hopefully, treat the surgical complications as well.

Q. Well, with respect to Indiana law, we have a requirement

that the preconsent disclosures be provided by a physician or an APC. And I wondered -- you know, in other words, the minimum level of training has to be that of an APC. And I wonder if you could comment on the appropriateness of that requirement.
A. Well, the idea that -- would seem to be that the physician would still oversee the consent process, would still be consenting the patient with the APC in general, and that certainly a lower level of expertise would not be acceptable because the APC at least has the training that would enable them to discuss the procedure with the patient, but certainly not deal with the complications of the procedure.
Q. So you think it's appropriate for the person performing the procedure to have the physician-level training; the person providing the informed consent perhaps doesn't have physician-level training but still needs to have more training than, for example, a registered nurse?
A. Correct. Or a licensed practical nurse, yes.
MR. FISHER: Your Honor, we may be about finished. May I have a moment to confer with my colleagues?
THE COURT: Yes, you may.
MR. FISHER: Dr. Calhoun, hang on just one second.
(Off-the-record discussion.)
BY MR. FISHER:
Q. Dr. Calhoun, just a few more questions. Going back to

medication abortions, is it significant or consequential where a medication abortion fails and the woman needs to have a D&C to complete the abortion?
A. Yes. There's a really excellent paper by Laio in 2011 that talks a lot about that, that if you fail a medical abortion and have to have a surgical completion, that that causes about a three to four times increased risk for very preterm birth, which is a birth of a baby below 1500 grams or about 28 weeks. Of course, those are the babies that are most likely to have cerebral palsy or blindness or deafness or learning disabilities. So a medical abortion that fails the required surgical completion is a devastating issue for a woman.
Q. And just so we're clear, that we're talking about in a subsequent pregnancy, that's the risk?
A. Yes. It's the pregnancy that follows the one that ends with a failed medical abortion, yes, sir.
MR. FISHER: Okay. Nothing further, Your Honor. Thank you.
THE COURT: All right. Thank you.
Ms. Toti, cross-exam.
MS. TOTI: Yes, Your Honor.
THE COURT: Hold on just one minute.
(Discussion off the record.)
THE COURT: I don't want to say it was your fault, Dr. Calhoun. That was my equipment.

THE WITNESS: I talk too fast, yes, ma'am. I melted it. I'm sorry.

THE COURT: We're ready for the cross-examination.

MS. TOTI: Okay. Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MS. TOTI:

Q. Good afternoon, Dr. Calhoun. My name is Stephanie Toti. I represent the plaintiffs in this case.

You're a member of the American Association of Pro-Life Obstetricians and Gynecologists; is that right?

A. Yes, ma'am.

Q. And you've been a member of that organization for approximately 30 years?

A. Yes, ma'am.

Q. You believe that abortion should be illegal in all circumstances except to save a patient's life; is that correct?

A. That would be an accurate statement, yes, ma'am.

Q. And you believe that, unless it would save a patient's life, abortion is never in a patient's best interest; is that correct?

A. That's what the data would tell me, yes, ma'am.

Q. You've never provided a medication abortion, correct?

A. Not to my knowledge, no.

Q. And you've never provided an aspiration abortion, correct?

A. No.

Q. And you've never provided a D&E procedure for the purpose of inducing an abortion, correct?
A. Not on a living fetus, no.
Q. And you've never obtained a patient's informed consent to an abortion, correct?
A. Not for a living fetus, no.
Q. For any abortion?
A. Not for a living fetus, no.
Q. And for an abortion at the embryonic stage of pregnancy?
A. No. Not on a living fetus, no.
Q. Dr. Calhoun, you served as an expert witness in a West Virginia case called Gravely v. Stephens; is that right?
A. Yes, ma'am.
Q. And that case was a medical malpractice action against an abortion provider in West Virginia state court?
A. Yes.
Q. You encountered the plaintiff at a hospital where she sought follow-up treatment after an abortion; is that correct?
A. Yes.
Q. And you performed an ultrasound examination on the patient; is that correct?
A. Yes.
Q. And you waited more than a year before telling the patient about your findings from that ultrasound examination, correct?
A. No, that's not quite accurate.

Q. Can we pull up Plaintiff's Exhibit 849, please. And can we go to page 10.

I just want to note for the record that there are two sets of page numbers on this exhibit, and I'm going to be referring to the page number in the upper right-hand corner.

Okay. So can we look at lines 14 through 18. So I'm going to read this for you Dr. Calhoun.

"Q And more than a year later, you contacted the patient and advised her that you observed a 13-week fetal skull in her uterus a year earlier; is that right?

"A Yes."

Did I read that correctly?

A. Yes.

Q. But the patient's medical records indicated that she was only nine weeks pregnant at the time of her abortion, correct?

A. That is the record that we received, yes, in that case.

Q. And the pathology report from your hospital showed that there were no retained fetal parts in the patient's uterus; is that correct?

A. Yes.

Q. When you contacted the patient a year after her abortion, you provided her with contact information for an attorney; is that correct?

A. Yes, ma'am.

Q. The attorney's name was Jeremy Dys, D-Y-S; is that correct?

A. Yes.
Q. And at the time, Mr. Dyes was president of the Family Policy Council of West Virginia?
A. That -- I assume he was. I don't remember actually.
Q. You served as an expert witness for the plaintiff in the Gravely case; is that correct?
A. Yes.
Q. And the judge in that case ultimately entered judgment for the defendant; is that correct?
A. Yes, ma'am.
Q. Okay. I'd like to direct your attention to Plaintiff's Exhibit 851, please, specifically to the caption at the top of the first page.
Dr. Calhoun, is this the final decision issued by the judge in the Gravely v. Stephens case?
A. It appears to be.
Q. Thank you.
MS. TOTI: Your Honor, I'd like to move Exhibit -- Plaintiff's Exhibit 851 into evidence under Federal Rule 902 as a self-authenticating public record. It's an unpublished decision. So it's not accessible in any public database.
THE COURT: Any objection?
MR. FISHER: No objection.
THE COURT: Exhibit 851 may come into evidence via that rule.

(Plaintiff's Exhibit 851 received in evidence.)

MS. TOTI: Thank you, Your Honor.

BY MS. TOTI:

Q. Dr. Calhoun, in or around 2013 you sent a record to the West Virginia attorney general indicating that you see frequent abortion-related complications in your hospital's emergency room; is that correct?

A. Yes.

Q. And, subsequently, the administrator of that hospital wrote a letter to the attorney general; is that correct?

A. I'm sorry?

Q. Subsequently, the administrator of that hospital wrote a letter to the attorney general; is that correct?

A. I know he wrote a letter. I'm not sure if it was the attorney general or not.

Q. Okay. But the administrator of the hospital wrote a letter in response to your letter; is that fair?

A. I don't know whether it was a response to my letter or a response to an inquiry. I'm sorry. I don't know.

Q. The hospital administrator was named Mr. Weber?

A. Yes.

Q. And according to Mr. Weber's letter, hospital records showed that in the year 2012 a total of two confirmed abortion-related complications were treated in the hospital's emergency room and there were three additional complications

that could have been related to abortion; is that correct?
A. I believe that's what's in the letter, yes.
Q. So according to the hospital administrator, at most, five abortion-related complications were treated in your hospital's emergency room during the year 2012; is that correct?
A. That is what the letter says, yes.
Q. And, Dr. Calhoun, you have no personal knowledge of doctors failing to report abortion-related complications; is that correct?
A. Not that I'm aware of personally, no.
Q. You testified on direct that you believe abortion-related deaths are undercounted; is that right?
A. Yes.
Q. You believe that those undercounted deaths mostly occur in hospitals, correct?
A. No. I get that from the literature, that they mostly occur because they are not reported because they're not linked to the abortions.
Q. So in answer to my question, do you believe that those deaths are mostly occurring in hospitals?
A. Well, the literature just says there's an increase death rate -- well, there might be an increased death rate because we don't have good data. That's my point I'm making. They may occur in the hospital; they may occur outside the hospital.
MS. TOTI: Can we take a look at 849 again, page 33.

Can we take a look at lines --

THE COURT: That's page -- oh, 33, 34.

MS. TOTI: There's these two different page numbers, Your Honor. I apologize about that.

BY MS. TOTI:

Q. Looking at lines 9 through 15. Okay. I'm going to read this.

"Q Where do you think the undercounted deaths are occurring?

"A Well, I think what happens is they go to the hospitals and there's not a record of a procedure being done, and so they're not calculated as an abortion-related death. So as you see in the linkage studies, that's definitely the case."

Did I read that correctly?

A. Yes.

Q. Okay. And when a healthy woman of reproductive age dies in a hospital, her death is typically investigated, correct?

A. Well, it may be.

Q. Can we --

A. The cause of death is generally looked into, yes.

Q. Okay. And when a healthy woman of reproductive age dies at home, her death is typically investigated, correct?

A. It's my understanding that usually it's a coroner's case where they are investigating it, yes.

Q. The CDC monitors abortion-related deaths through its pregnancy mortality surveillance system; is that correct?
A. Yes.
Q. And in connection with that system, the CDC collects data from multiple sources; is that correct?
A. Yes.
Q. And those sources include state vital records?
A. Yes.
Q. And those sources include media reports, including computerized searches of full-text newspaper and other print media databases?
A. Yes, they may.
Q. And those sources include individual case reports by public health agencies, including maternal mortality review committees?
A. Yes, they may.
Q. And those sources include reports by healthcare providers and provider organizations; is that correct?
A. Yes, they may.
Q. And those sources include reports by private citizens and citizens groups; is that correct?
A. They may.
Q. Can we take a look at Stipulated Exhibit 29, please. And I'd like to look at pages 4 and 5, the last paragraph on page 4 carrying over to page 5. So we can start on page 4.

Dr. Calhoun, if you could take a look at this paragraph, and then I'm going to ask for the next page to be displayed.
A. Uh-huh, yes.
Q. So you answered my last few questions by saying the CDC may consider these sources.
Now having looked at this document, would you agree that the CDC does, in fact, look at all of those sources when evaluating abortion-related deaths?
A. It would look like they would, but again -- I mean, I don't know for sure if they do every death or not. But, yes, it does look like they investigate all those databases -- or different sources of mortality, yes.
Q. And for each death identified by the CDC that is possibly related to abortion, the CDC requests clinical records and autopsy reports, correct?
A. Yes.
Q. And the CDC then has two medical epidemiologists independently review those reports to determine the cause of death and whether it was abortion-related; is that correct?
A. That's what this document says, yes.
Q. And just for clarity of the record, if we could go back to the first page of this document.
So Stipulated Exhibit 29 is the CDC's abortion surveillance report for 2013, published in Morbidity and Mortality Weekly -- published in the Morbidity and Mortality Weekly Report. Is

that correct?
A. That's what this says, yes.
Q. Okay. Thank you. Okay. We're done with this one now.
Dr. Calhoun, I believe you referenced a study in your direct testimony by Laio, L-A-I-O. Is that correct?
A. Yes.
Q. That study relies on data collected from public hospitals in Chengdu, China, from more than a decade ago; is that correct?
A. It was, yes, in 2011.
Q. Okay. And on your direct testimony, you talked about advanced practice clinicians; is that right?
A. Yes, ma'am.
Q. You're not familiar with the minimum educational requirements that a physician assistant must attain to be eligible for licensure in Indiana; is that correct?
A. No. I don't know their law in Indiana, no, ma'am.
Q. And so you're not familiar with the minimum educational requirements that a nurse practitioner must attain to be eligible for licensure in Indiana; is that correct?
A. I don't know the law, no.
Q. And you're not familiar with the minimal educational requirements that a certified nurse midwife must attain to be eligible for licensure in Indiana; is that correct?
A. No, I don't know that law.

Q. And you don't know if the scope of practice for advanced practice clinicians in Indiana differs from the scope of practice in West Virginia where you practice medicine; is that correct?
A. Not in detail, no.
Q. Dr. Calhoun, you agree that advanced practice clinicians are qualified to perform vaginal deliveries in connection with childbirth, correct?
A. Yes. Certified nurse midwives, yes.
Q. And you agree that advanced practice clinicians are qualified to perform colposcopies; is that correct?
A. Yes.
Q. Just going back to childbirth for a minute. Do you agree that nurse practitioners and physician assistants are qualified to perform vaginal deliveries in connection with childbirth?
A. I'm not sure about physician's assistants, but nurse midwives are.
Q. Okay. Can we take a look at Plaintiff's Exhibit 848, please. I'd like to look at page 23 of that exhibit.
So if we look at paragraph 117, the third sentence beginning with "it is perfectly."
So I'm going to read this -- actually let me back up. I'm sorry. Can we go to the first page of this exhibit.
Dr. Calhoun, do you recognize this document?
A. Yes.

Q. Is this a copy of the expert report that you submitted in this case?
A. Yes.
Q. I'm sorry. Now can we go to page 23 and take a look at paragraph 117.
Okay. So I'm going to read the third sentence beginning with "it is perfectly."
"It is perfectly acceptable for PAs, NPs, and CNMs to perform routine physical examinations, do vaginal deliveries, and perform minor procedures, such as colposcopies, IUD insertions, and minor skin biopsies under the supervision of a licensed physician."
Did I read that correctly?
A. Yes.
Q. What does the acronym PA mean in that sentence?
A. Physician's assistants.
Q. What does the acronym NP mean in that sense?
A. Nurse practitioners.
Q. And per what I just read, you would agree that advanced practice clinicians are qualified to insert IUDs; is that correct?
A. Yes.
Q. You're aware that Indiana law authorizes advanced practice clinicians to perform mandatory preabortion ultrasound exams; is that correct?

A. I don't remember that actually. I'm sorry. I don't.
Q. Okay. And so then you're not aware that Indiana law authorizes advanced practice clinicians to interpret those ultrasound exams and discuss the results with abortion patients?
A. No, I don't remember that, that they're performing and interpreting ultrasounds.
Q. All right. You gave some testimony about the REMS for mifepristone on direct; is that correct?
A. Yes.
Q. And REMS stands for risk evaluation and mitigation strategy; is that correct?
A. That is correct.
Q. And it's a program administered by the FDA?
A. Yes.
Q. Can we take a look at Stipulated Exhibit 14. And I'd like to take a look at the first page.
A. Is that going to get larger? I can't read that. I'm sorry.
THE COURT: It's not on the full screen.
MS. TOTI: We can't see the full-screen version of it. Can we see just the top portion of it?
THE WITNESS: It's very blurry for me. I can't really read it. I'm sorry.
THE COURT: What is that? What is that document?

MS. TOTI: It's the REMS, the REMS for mifepristone. Okay. There we go. Okay.

BY MS. TOTI:

Q. So, Dr. Calhoun, can you see the document now?

A. Yeah, I can see it now. I'm sorry.

Q. No problem. It wasn't your fault. We had a technical glitch over here.

Okay. And this is the REMS document for mifepristone last updated in April of 2019; is that correct?

A. That's what the top says, yes, 4 of 2019.

Q. Can we take a look at Roman numeral II REMS elements. Okay. And I would like to focus on Roman numeral II, Section Capital A, number 1, lowercase a, Roman numeral ii. Okay.

And can you see there it says "Complete a 'Prescriber Agreement Form'"?

A. Yes.

Q. So this document doesn't make any reference to a physician agreement form; is that correct?

A. That's what it appears to say, yes.

Q. And an advanced practice clinician is a prescriber; is that correct?

A. Correct. But if you read farther down, they have to be able to diagnose ectopics and they also have to provide surgical intervention. So I don't know how that could be an advanced practice clinician.

Q. But you would agree that any prescriber who meets those qualifications is authorized to distribute mifepristone pursuant to these REMS; is that correct?
A. Not unless they can do b and c. So that would be a physician. I mean, it says healthcare, but if you look down farther on b and c subsections, it says be able to provide surgical intervention.
Q. Can you please read c out loud?
A. Me or you? I'm sorry.
Q. Would you mind doing that, please.
A. Well, I can't see it all. I'll try. It's partly obscured here. It says, "Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding" -- is that what it says?
Q. Yes. So would you keep going --
A. -- "or made a plan to provide such care through others, and ability to assure patient's access to medical facilities equipped to provide blood transfusions and resuscitation if necessary."
Q. Thank you. I think we're done with that document.
And then you have also made reference during your direct testimony to a set of core principles by the American College of Surgeons. Is that correct?
A. Yes.
Q. And the principles that you cited in your expert report

were from a document published in 2003; is that correct?
A. Yes, ma'am, that's correct.
Q. And those documents -- I'm sorry. Those principles were subsequently updated in 2019; is that correct?
A. I'm not aware of that, I don't think. I'm not sure. I don't remember actually. I'm sorry.
Q. That's okay.
Can we take a look at Plaintiff's Exhibit 85 -- Plaintiff's Exhibit 858, please. The top of the page.
Okay. Doctor, I'm going to direct your attention -- so first let me ask you, what is the title of this document?
A. It says "Statement on Patient Safety Principles for Office-Based Surgery Utilizing Moderate Sedation or Analgesia."
Q. Below that it says "Revised September 1, 2019." Is that correct?
A. That's what it says down below, yes.
Q. And then below that, it says "The American College of Surgeons board of governors surgical care delivery work group recently revised and updated the 2004 ACS statement on patient safety principles for office-based surgery utilizing moderate sedation/analgesia, deep sedation/analgesia, or general anesthesia." Is that correct?
A. Yes.
Q. Okay. And would you agree that the set of principles, in this document as well as the earlier version, apply only to

procedures utilizing moderate sedation or a higher level of analgesia? Is that correct?
A. That's what this document says.
Q. Okay. And can you identify where in this document it discusses the scope of practice of advanced practice clinicians?
A. I haven't read this one; so I don't know. But in the other one it talks about physicians. It doesn't talk about advanced practice clinicians that I'm aware of.
Q. So the earlier version that you were referencing doesn't make any direct reference to advanced practice clinicians; is that correct?
A. Not that I'm aware of, no. I don't remember that happening, no. It's all directed to physicians because it's surgical procedures, which the College of Surgeons says would be board-certified trained surgeons who would have to have a scope of practice and would have to be at a facility that has some sort of a certification for surgical procedures.
Q. And that's surgical procedures using moderate sedation or a higher level of analgesia; is that correct?
A. That would be correct, yes.
Q. Okay. We're done with that one.
So, Dr. Calhoun, on direct you answered some questions about informed consent.
Do you recall that?

A. Yes.
Q. Would you agree that patient comprehension is critical to the informed consent process?
A. Yes. That's one of the core principles of informed consent, is the ability of the patient to understand the informed consent.
Q. In connection with the informed consent process, it would be inappropriate to use language or concepts that a patient isn't likely to understand; is that correct?
A. Yes, that's true.
Q. Okay. So moving on, Dr. Calhoun, you performed D&C procedures; is that correct?
A. Yes.
Q. Sometimes when performing D&C procedures, you have to dilate the patient's cervix; is that correct?
A. That is true.
Q. Can you describe the methods that you use for performing D&C procedures?
A. We just use usually metal dilators to get the cervix up to the size that we need, usually a 10 or 11 or 12 size dilator -- millimeters generally and then use a suction catheter to perform the D&C on the miscarriage usually.
Q. Do you ever utilize manual vacuum aspiration in a D&C procedure?
A. Not -- no, not in our hospital or that I'm familiar with

here, no.
Q. So now I'm going to ask you about D&E. Okay? Rather than D&C, just to be clear.
A. Are you talking about extraction, like -- what week's gestation are you talking? Because I'm a little confused. I'm sorry.
Q. So my question is going to be you've performed D&E procedures for second-trimester miscarriage management. Is it clear what I'm asking?
A. Yes, I understand now. Thank you.
Q. Okay. And so what's the answer? Have you performed D&E for second-trimester miscarriage management?
A. Yes, I have in the past.
Q. And the D&E procedure used for second-trimester miscarriage management is the same D&E procedure used for second-trimester induced abortion; is that correct?
A. If you're doing a surgical -- yes, if you're doing surgical abortion versus a surgical elective abortion, yes, they're the same procedure.
Q. Okay. So just so the record is clear, so surgical management of second-trimester miscarriage using D&E involves the same procedure as a D&E for induced abortion; is that right?
A. In the second trimester, yes. If you're going to do it in second trimester, yes. Basically the same procedure.

Q. Okay. In your entire career, you've performed approximately 10 to 15 D&E procedures; is that correct?
A. That's probably accurate. That would be, again, a guess. I don't really know how many.
Q. And most of those procedures, you performed decades ago; is that correct?
A. That's because we got prostaglandins available so we didn't have to do the surgical anymore.
Q. So in answer to my question, you performed most of those D&E procedures decades ago; is that correct?
A. Yes, that would be true.
Q. And you can't remember specifically the last time you performed a D&E procedure; is that correct?
A. No. It's been many years ago.
MS. TOTI: Okay. Your Honor, may I have just a moment to confer?
THE COURT: Yes, you may.
(Off-the-record discussion.)
BY MS. TOTI:
Q. So, Dr. Calhoun, I'd like to ask you just a couple of questions about IUDs, intrauterine devices.
Are you familiar with the process for inserting an intrauterine device?
A. Yes.
Q. Is it ever necessary to manually dilate the cervix prior to

inserting an intrauterine device?
A. Generally not, no.
Q. So you're saying it's never necessary to manually dilate the cervix prior to inserting an IUD?
A. I generally never say "never." So I suppose people do. But if you do it during the right time when menses is happening and the cervix is soft and already dilated, you generally don't have to do a dilation to get a IUD in. Or you do it postpartum and they are already dilated and you don't have to do that.
Q. And for a patient that's not postpartum, for a patient that's never been pregnant, would you typically manually dilate the cervix before inserting an IUD?
A. Generally not, no. You generally are able to insert them without doing a dilation if you do it at the right time of the cycle or if you soften the cervix up with the prostaglandins.
Q. How frequently do you insert IUDs for your patients?
A. Well, it depends on the week, obviously, and the patients whether it's postpartum or whether in gynecology, but probably we do it here several times a week. I couldn't tell you the number. I'm sorry. I'd be guessing.
Q. Okay. That's fine. And just one more thing just to make the record clear. Could we pull up PX849 again and look at the first page.
Just to lay a belated foundation, Dr. Calhoun, did you give a deposition in this case?

A. Yes.

Q. And did you have the opportunity to review your deposition transcript after the deposition?

A. Yes.

Q. And is Plaintiff's Exhibit 849 a copy of the transcript of your deposition in this case?

A. It appears to be, yes, ma'am.

MS. TOTI: Okay. Thank you. No further questions.

THE COURT: Redirect?

MR. FISHER: Just a few questions, Your Honor. Thank you.

REDIRECT EXAMINATION

BY MR. FISHER:

Q. Dr. Calhoun, you were asked about APCs providing other services besides D&Cs, including colposcopies and IUD insertions. And I wondered if you could explain why it might be appropriate to permit APCs to perform those procedures but not to undertake surgical abortions.

A. Well, the training that's done for the APCs is cognizant with the performance of endometrial -- or cervical biopsies and IUDs. It's not surgical training for doing abortions and dealing with the surgical complications of abortions. It's also not cognizant generally with providing informed consent for doing abortions unless they were supervised directly by the physician.

So the biggest issue is actually training and to be able to recognize complications and to be able to deal with the complications of the surgical procedure, not an outpatient procedure like a cervical biopsy which is not like an abortion whatsoever, or an IUD insertion.
Q. Why isn't it like an abortion?
A. Well, generally, you're not doing invasion into a sterile environment where there's a living fetus. You're doing a procedure that's nothing to do with that.
Q. Well, let's explain colposcopy, what that is.
A. Oh, colposcopy -- I'm sorry -- is actually doing a prolonged examination with a speculum to see the cervix, usually putting some sort of solution to highlight abnormal areas, and then taking a piece of tissue for your biopsy of cervical dysplasia or cervical cancer.
Q. And so is it fair to say that's not an invasive procedure the way -- or invasive surgery the way a D&C abortion is?
A. No, it's not even in the same realm. It's just, again, like a skin biopsy. I mean, it's uncomfortable, but it's a skin biopsy, essentially or mucosal biopsy.
Q. What about an IUD insertion?
A. Generally, an IUD insertion, as I was explaining, generally you do it around the time of the menstrual cycle and is uncomfortable, but it's not doing a procedure where you're actually doing a suction procedure or curette procedure and

generally having to dilate the cervix up to a large degree to get your catheter in to extract the fetus.

So it's not in the same realm, again, as a surgical procedure.

Q. Earlier Ms. Toti was asking you about ultrasounds and was, I think, stating that APCs are authorized in preabortion counseling to read and interpret and advise patients as to ultrasounds and what the ultrasounds show.

Do you remember that discussion?

A. Yes.

Q. Is that -- does that mean that there's no role for the physician to play in reviewing that ultrasound before permitting an abortion to go forward?

A. No. Because, as I talked about previously, ectopics and tubal pregnancies are notoriously difficult to diagnose, and also there are significant number of adnexal or ovarian masses that would have to be evaluated, which certainly an APC could not evaluate a mass for possible malignancy or possible need for surgical intervention or further follow-up.

So that's why the physician is critically important to the ultrasound and interpretation. This is not just about putting an ultrasound on and then looking at it; you have to be able to interpret and be able to deal with that.

MR. FISHER: Your Honor, may I just have one second?

THE COURT: Yes, sir.

MR. FISHER: Nothing further. Thank you.
THE COURT: All right. Recross, Ms. Toti?
MS. TOTI: Very briefly, Your Honor.

*RECROSS-EXAMINATION*

BY MS. TOTI:
Q. Dr. Calhoun, the standard of care doesn't require an IUD to be inserted when a patient is menstruating. Would you agree?
A. Not that I'm aware of, but because the fact you don't want the patient to be pregnant, you would do a pregnancy test and want her on her menses because, one, she would not be pregnant; and, two, her cervix would be the most likely to be dilated and softened and able to accept the IUD. So that's the most reasonable clinical time to insert an IUD unless it's postpartum in general.
Q. So that's your general practice, correct?
A. Well, that's the practice that I'm aware of in my community, yes.
Q. But would you agree that doctors in other communities might do it differently?
A. They might very well. We just -- again, if you look at the standard practice and care here, that's what seems to be the best practice and easiest to do and most comfortable for the women and most likely to be successful, is to have the cervix already dilated and not pregnant and place the IUD, or postpartum.

Q. And would it be fair to say that your knowledge is limited to your experience practicing in West Virginia?
A. No. I've practiced in Illinois; I've practiced in the military in Washington state; I've practiced in Mississippi. So I don't think it's that narrow.
Q. You would agree, wouldn't you, that inserting an IUD requires an invasion into a sterile environment?
A. Well, if you're going to put the IUD in, yes, it would, in fact, do that, which is why again, when you do the menses, it's less likely to be a problem so -- more likely the cervix would be dilated and you have the menstrual flow to help keep the infection down, in theory, and then also more easy insertion of the IUD really. That's really why you do it.
MS. TOTI: Thank you, Doctor. Nothing further.
THE COURT: Redirect?
MR. FISHER: Nothing further.
THE COURT: Dr. Calhoun, first, thank you from me -- but I think I speak for everyone -- for arranging your schedule so that we could work this in to the Court's schedule without too much disruption of yours.
You know how during these COVID times we've relied on Zoom and all kinds of accommodations have had to be made. This is sort of like that. But out of that context, I want to say that I really like your background sign, which I've become sort of an expert in analyzing in watching TV these days.

But every expert witness should have a little sign that says "We love our dad" right behind his head. I think that added a lot to your testimony today.

THE WITNESS: Thank you.

THE COURT: Every time I was about ready to jump on you for something, I thought, "Oh, no, no. His children love him." So I held back today.

THE WITNESS: Thank you, Your Honor. I appreciate it. I'm emotionally vulnerable.

THE COURT: Yes. Well, I know how you got that if you have children.

Okay. Thank you again.

THE WITNESS: Thank you, ma'am.

THE COURT: We'll take our recess. Good work, lawyers. This is why being a lawyer and a trial lawyer in particular requires a major amount of stamina, and I commend you for that which you have displayed today.

It's 1:30. We'll reconvene at 2:30. I hope you can still get a bite to eat in an hour. We'll see you then.

COURT CLERK: All rise.

Court is in recess.

(Recess taken.)

(Open court.)

COURT CLERK: Court is in session.

THE COURT: You may be seated. We'll hand Tums at the

next recess because of your fast lunchtime. No offense to any of you. I hope you survived all right.

Who's up to bat here, Mr. Fisher?

MR. FISHER: Your Honor, we will call next Dr. Nancy Goodwine-Wozniak.

And, Your Honor, while she's making her way up, I would like to give the Court just an overview of our remaining witnesses.

THE COURT: Good. I'm interested. I was trying to figure it out at lunch.

Come just stand by the witness chair there, please.

MR. FISHER: We will not be calling Dr. Kheriaty.

THE COURT: Okay.

MR. FISHER: And then following Dr. Wozniak, we will have Dr. Condic and then Dr. Stroud. And that will be the end of our witnesses.

THE COURT: Very good. Thank you. Thanks for updating me.

Now, Dr. Goodwine-Wozniak, I remember you from the prior trial. Hello. So you were placed under oath for that testimony. And you'll still be under oath for this testimony as well. Do you agree to that?

THE WITNESS: Yes, I do.

THE COURT: All right. You may be seated.

NANCY GOODWINE-WOZNIAC, MD, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

MR. ROWLETT: Good afternoon, Your Honor.

THE COURT: Are you ready?

MR. ROWLETT: **Yes.**

**DIRECT EXAMINATION**

BY MR. ROWLETT:

Q. My name is Robert Rowlett for the State. Good morning -- good afternoon at this point, Dr. Wozniak.

A. Good afternoon.

Q. If you could just state and spell your name for the record.

A. Dr. Nancy, N-A-N-C-Y, Goodwine, G-O-O-D-W-I-N-E, Wozniak, W-O-Z-N-I-A-K.

Q. And Dr. Wozniak, you testified at the first phase of trial in this matter, right?

A. Yes.

Q. And you were tendered and accepted as an expert witness at that time, right?

A. Yes.

Q. And you were accepted as an expert in the field of obstetrics and gynecology?

A. Yes.

Q. Dr. Wozniak, just to briefly remind the Court and all the parties here, how long have you been an OB/GYN?

A. I graduated from residency in 2004.

THE COURT: Just scoot your chair up there a little will bit if you can. Thank you.

THE WITNESS: I graduated from residency in 2004.

MR. RODRIGUEZ: Objection. And this is Juanluis Rodriguez for the plaintiffs. I just wanted to --

THE COURT: You'll have to stand up, sir.

MR. RODRIGUEZ: Yes, Your Honor. I just want to note that Dr. Goodwine-Wozniak was not accepted as an expert in obstetrics and gynecology in Phase I of this trial.

THE COURT: What was her expertise?

MR. RODRIGUEZ: I believe, based on page 168 of that transcript, that she was accepted on the medical benefits of in-person counseling before a medication abortion, the medical benefits of performing an ultrasound before medication abortion, and the effect of Indiana's telemedicine ban on the provision of medication abortion.

THE COURT: Mr. Rodriguez, what testimony do you intend to elicit from this witness for which that description of her expertise may or may not apply?

MR. RODRIGUEZ: None. I believe the witness testified that she was accepted as a witness in obstetrics and gynecology.

THE COURT: Right. I was speaking past you, actually.

MR. ROWLETT: Oh, I'm sorry, Your Honor. What was that?

THE COURT: Is everybody present after our lunch break? Let's start again.

So the tendering of the witness as an expert in the field of OB/GYN has been objected to.

And, let's see. This is counsel, Mr. Rodriguez?

MR. RODRIGUEZ: Yes, Your Honor.

THE COURT: Has described the expertise to be other than as an OB/GYN, as such. So I'm asking you, sir, what are you proffering her to testify to as an expert?

MR. ROWLETT: Certainly, Your Honor. She testified to those topics at the first trial. We conceived her as also having been accepted as a general OB/GYN, but I am happy to lay the foundation for her general expertise, if the Court would like.

THE COURT: Well, I think you should because there's an objection you have to overcome.

BY MR. ROWLETT:

Q. Okay. Dr. Wozniak, could you tell us about your occupation?

A. I have practiced as an OB/GYN for approximately 20 years. And in the last year and a half, my practice as become focused on obstetrics; however, there is some gynecology. I still cover the emergency room.

Q. Could you briefly describe your educational background.

A. Yes. I have business degree from St. Mary of the Woods

College. I completed a four-year medical degree at the University of Illinois College of Medicine. I have two years of internal medicine residency and four years of obstetrics and gynecology. I'm board-certified.

Q. Okay. That anticipated my next question. What's the nature of the licenses and professional certifications you hold?

A. As I mentioned, I am board-certified in obstetrics and gynecology. I've been licensed in Illinois. Currently Indiana, Ohio, and Tennessee.

Q. Okay. And, Dr. Wozniak, in the course of your practice, do you treat patients who have received abortions?

A. On occasion.

MR. ROWLETT: Your Honor, at this time we tender Dr. Wozniak as a general expert in obstetrics and gynecology.

THE COURT: Mr. Rodriguez?

MR. RODRIGUEZ: No objection to the extent that that expert testimony does not include any testimony on abortion, so long as it is limited to nonabortion procedures.

THE COURT: I can't tell from the scope of the proffer what the questioning is likely to entail, but you haven't established her as an expert on abortion care in the context of her obstetrical practice.

MR. ROWLETT: I can lay some additional foundation, Your Honor.

BY MR. ROWLETT:
Q. So, Dr. Wozniak, you mentioned that you treat abortion patients in the course of your duties; is that correct?
A. Yes. And my privileges include doing suction D&C for miscarriages, incomplete abortions, and covering the emergency department.
Q. And do you also provide miscarriage care for second-trimester pregnancy losses?
A. If that were to be -- yes, I'm capable of doing that, and I would be privileged to do that.
Q. Just to briefly revisit first trimester, you perform currently, as part of your practice, D&Cs?
A. On occasion.
Q. Okay. And there is no medical difference in how that procedure is accomplished for miscarriages as opposed to an abortion, right?
A. Not for a first-trimester D&C. It's the same for an elective abortion as it is for the treatment of a miscarriage.
Q. That would be the same procedure for the second trimester as well?
A. I would not do surgical D&E, but certainly an induction for a fetal demise in the second trimester is within my purview of practice.
MR. ROWLETT: I believe that sufficiently lays the foundation, Your Honor.

THE COURT: What do you intend to elicit from this witness? What's the scope of her testimony?

MR. RODRIGUEZ: Dr. Wozniak -- we intend to cover the physician-only requirement and the second-trimester hospitalization requirement.

THE COURT: So you need to establish her expertise in those areas.

BY MR. ROWLETT:

Q. Okay. So, Dr. Wozniak, are you familiar with the credentialing and educational requirements for physicians?

A. Yes.

Q. And are you also familiar, through your practice, with the credentialing and educational requirements for nonphysicians, namely, advanced practice clinicians?

A. Yes.

Q. And then do you currently practice in a hospital?

A. Yes.

Q. And you're familiar with the benefits of practicing within a hospital?

A. Yes.

Q. And the same for ambulatory surgical center?

A. Yes.

THE COURT: Mr. Rodriguez, I take it from your pause there you're proffering her as an expert in those areas; is that right? Mr. Rowlett?

MR. ROWLETT: Yes, Your Honor.

THE COURT: Say the words. Say the words, Mr. Rowlett.

MR. ROWLETT: Oh, yes. I proffer her as an expert in those areas, Your Honor, the physician-only requirement and second-trimester hospitalization.

THE COURT: Mr. Rodriguez.

MR. RODRIGUEZ: Again, Your Honor, I have not heard any testimony from the witness as to the provision of abortion care.

THE COURT: Sustained.

MR. ROWLETT: Your Honor, may she testify as to --

THE COURT: Ask your questions, Counsel. You've got a deficiency in establishing her expertise in the precise areas about which you want to inquire. That's the Court's ruling. So if you can overcome it with further questions, then go ahead.

MR. ROWLETT: Okay.

THE COURT: I take it, Dr. Goodwine-Wozniak, you don't perform abortions. Is that right?

THE WITNESS: I do not perform elective abortions.

THE COURT: Right. So with respect to second-trimester hospitalization requirements for abortion, do you have any experience in that? Have you handled any of those kinds of cases?

THE WITNESS: I have had experience with second-trimester losses that have required an induction.

THE COURT: Well, that wasn't precisely my question. So see if you can answer my question.

You're being proffered as an expert with respect to the hospitalization requirement for second-trimester abortions. So do you handle those cases?

THE WITNESS: Well, second-trimester abortions can be done either by induction or surgically.

THE COURT: Right. I'm asking --

THE WITNESS: I don't do elective abortions; I don't do surgical abortions.

THE COURT: So, Counsel?

MR. ROWLETT: Well, Your Honor, she, I believe, is testifying to the medical benefits of surgeries performed in hospitals.

THE COURT: You didn't ask her that. I didn't ask her that. You have to ask her if she has any experience that would make her familiar with that, that would make her expertise relevant to the issues before the Court.

BY MR. ROWLETT:

Q. Dr. Wozniak, in the course of your duties in practice, are you familiar with the medical benefits of surgeries performed in hospitals and ambulatory surgical centers?

A. Yes.

THE COURT: You mean generally, or do you mean abortion-related procedures? I mean, I assume that most doctors would say you ought to have brain surgery in the hospital, which is true but not relevant.

MR. ROWLETT: I mean, I anticipate her speaking to the benefits of these locations generally, Your Honor. But those, as she testified, second-trimester abortions, the procedure is identical for miscarriage management and same for first-trimester abortions. So the reasons you would perform a D&C or second-trimester abortion would be the same as for miscarriage, which is within her scope of expertise.

THE COURT: Except she doesn't do them.

MR. ROWLETT: Right. But the procedures are identical.

THE COURT: But how does she know if she doesn't do them?

THE WITNESS: The procedure for an induction --

THE COURT: Wait. I didn't ask you.

THE WITNESS: -- is identical.

THE COURT: I'm talking to the lawyer. Wait till your question is put to you, Doctor. Okay?

So I put the question back to you, Mr. Rowlett.

MR. ROWLETT: I just believe those two procedures are identical and --

THE COURT: You have to get it from the witness.

MR. ROWLETT: Well, I asked her, and she did testify a couple of questions ago that they were identical.

THE COURT: And then how did she know that?

MR. ROWLETT: I believe from her training and expertise.

THE COURT: "Do you know that from your training and expertise?" Mr. Rowlett, you have to put the questions to the witness to create the foundation for her testimony in our trial.

Start over. Give it a running start.

BY MR. ROWLETT:

Q. Dr. Wozniak, from your training and experience, are you familiar with this similarity between miscarriage management and first-trimester miscarriages compared to first-trimester elective abortions?

A. Yes.

Q. And the same for second trimester?

A. Yes.

Q. Okay. And your expertise would allow you to identify the benefits of second-trimester hospitalization in cases of abortion since it's the same as miscarriage?

A. Yes.

Q. And then as to the physician-only requirement, your expertise would permit you to discuss the medical benefits of limiting surgical procedures to physicians as opposed to APCs?

A. Yes.
Q. And that would include abortions based on the identical nature of the procedure to miscarriage management?
A. Yes.
MR. RODRIGUEZ: Objection. Foundation.
THE COURT: I'll let the witness continue to testify, and we'll see. It may be something you have to develop on cross-examination, Mr. Rodriguez.
MR. RODRIGUEZ: Thank you, Your Honor.
MR. ROWLETT: So, Your Honor, at this time I think based on that -- that was the last question I was going to ask -- I'd again proffer Dr. Wozniak as an OB/GYN as an expert in obstetrics and gynecology.
THE COURT: I'll let you proceed. There are gaps in the expertise, but I'll let you proceed and maybe it will come out in the way the questions are asked.
MR. ROWLETT: Thank you, Your Honor.
BY MR. ROWLETT:
Q. Dr. Wozniak, are you familiar with Indiana's requirement that abortions be limited to physicians, being performed by physicians?
A. Yes.
Q. Okay. In your expert opinion, is that requirement medically justified?
A. Yes.

Q. And why is that?
A. Because of the training and experience that one has both through medical school, four years of residency, and then years in practice.
Q. Would your opinion hold true for both medication and surgical abortion?
A. Yes.
Q. Dr. Wozniak, are you familiar with the term "advanced practice clinician," or APC?
A. Yes.
Q. What is your understanding of that term?
A. They are sometimes referred to as mid-level providers. Essentially, they have advanced training beyond a four-year college degree for physician assistant and some advance training beyond nursing school for a nurse practitioner.
Q. And you kind of -- you went where I was going next. Could you provide us some examples of some APCs? What types of positions are APCs?
A. So a physician assistant can have a degree, my understanding, in almost any field and then has approximately two years of additional training to be a physician assistant.
A nurse practitioner has had -- has acquired a nursing degree, usually has had some clinical experience, and then goes on and gets a master's degree to be a nurse practitioner.
Q. Dr. Wozniak, do you work with advanced practice clinicians

in your daily practice?
A. Not at this time.
Q. Have you prior in your practice?
A. Many times.
Q. And just describe the nature of how you've worked with APCs in the past.
A. So I have worked with PAs, nurse practitioners, and I should also add midwives. The role of a PA, again, is a physician assistant. They -- much of what they do clinically is very similar to a nurse practitioner. Both are under our supervision. Both can see patients relatively independently but we have to sign off on charts. And, again, they frequently come to us for advice or questions about patients.
Q. Okay. And kind of going off of that, do the clinical training and education requirements for APCs as opposed to physicians, do those differ significantly?
A. Yes.
Q. And in what way?
A. Basically, number of years training. And certainly in the case of obstetrics and gynecology, the surgical aspect of our training is very different.
Q. Okay. And elaborate on that. What's the clinical experience of an APC compared to a physician?
A. Again they have two years of additional schooling prior to becoming a physician assistant. Nurses, again, have a master's

degree. And then they acquire clinical experience as well. But the physician has four years of college, four years of medical school, and then depending on what field one goes into, anywhere from three to seven years of residency training. For OB/GYN it's four years, unless you go into a fellowship; then there's additional training.
Q. Okay. And, Dr. Wozniak, are you aware of any context in which APCs perform surgeries?
A. No.
Q. Could you give us some examples of the types of procedures that an APC would conduct?
A. They can do minor office procedures. So placement of an IUD, colposcopy, and -- from a clinical office standpoint, that would be primarily most of it. Some of them can do endometrial biopsies. But I would say those would be the top three things that an advanced practitioner might do.
Q. Those three things you just listed, in your opinion, are those of similar difficulty to something like a D&C?
A. No.
Q. Okay. And in what way is a D&C more difficult? less difficult? the same?
A. So the office procedures -- a colposcopy -- we'll start with that one -- is where there's been an abnormal Pap smear. So there is a speculum and, essentially, a microscope that looks at the cervix. A stain is applied to the cervix to find

areas of abnormality, and then biopsies performed. In colposcopy these biopsies are very superficial. There's really nothing invasive about a colposcopy.

With placement of an IUD, the IUD is inserted in a very narrow strawlike structure and is placed into the uterus and then the straw is withdrawn.

Similarly, with an endometrial biopsy, again, it's a very narrow strawlike instrument that's inserted into the uterus, withdrawn with a sample of the endometrium.

So it's markedly different than a surgical procedure for a D&C where the patient needs to have cervical dilatation and the contents of the uterus emptied, which means there's repetitive going in and out of the uterus to empty it.

Q. Thank you.

Now I want to move on here, Dr. Wozniak, to, in your expert opinion, should abortions be limited -- the practice of abortions be limited to physicians and not APCs?

A. In my opinion, yes.

Q. And why is that?

A. Because it's a much more invasive procedure. It's a surgical procedure. And the complexity is greater, and the risks are higher.

Q. Let's just talk about that a little bit. What kind of risks in particular are present, and why would an APC not be able to deal with those risks?

A. Well, the bottom-line risk is, if there's a complication, as a contingency, one should be able to manage that. And because advanced practice providers are not surgeons, they don't have the requisite education, experience, or licensure to manage a complication.
Q. In your experience working with APCs, do APCs ever assist with surgery?
A. On occasion they've assisted with C-section.
Q. And what's their role in that environment?
A. Primarily they retract. They help by being there to facilitate the surgery, but they're not doing the surgery.
Q. That was going to be my next question. But they -- in no circumstance do they perform any part of the surgery?
A. No.
Q. Okay. Now, Dr. Wozniak, in your opinion, are physicians as opposed to APCs better equipped to determine what procedures are indicated for a given patient?
A. Yes.
Q. And why is that?
A. Because surgeons perform those procedures. So it's their job to be well acquainted with the indications, contraindications, complications, and what benefit this is going to offer the patient.
Q. Okay. And what kind of complications in a first-trimester situation would an APC not necessarily have the expertise to

identify that a physician would?
A. Well, an APC could identify hemorrhage. An APC might have difficulty in managing the hemorrhage, determining the location of the hemorrhage, or the complication that caused the hemorrhage.
Q. Sticking in that first-trimester situation, and let's talk about specifically in the context like someone comes in for a medication abortion, is determining the location of the pregnancy important?
A. It's fundamental. That -- the location of the pregnancy is the fundamental question before anything else, in my opinion.
Q. And what is a physician specifically looking for on -- when identifying the location of the pregnancy?
A. Once the location of the pregnancy has been determined -- and, hopefully, it's in the uterus -- then the next question is what is the gestational age?
Q. What if it's not in the uterus? What situation is that?
A. If she has a positive pregnancy test and a pregnancy hormone level that's detectable, then either the pregnancy is what we call a pregnancy of unknown location -- in other words, it may be so early it simply hasn't -- you simply can't see it on ultrasound yet -- or it's an ectopic pregnancy.
Q. Okay. And in your opinion, would an APC be competent to diagnose and treat an ectopic pregnancy?
A. No.

Q. Why not?
A. Because ultrasounds can be difficult to read for an ectopic pregnancy. And sometimes even for, you know, a radiologist, they can't be certain. Some of these patients need serial blood tests to determine a rising pregnancy hormone level so that that hormone level reaches a threshold at which you would expect to see a pregnancy in the uterus. And if not, if it's an ectopic pregnancy, hopefully it will show up, but sometimes these things don't.
The other possibility with a relatively high pregnancy hormone level and nothing in the uterus is maybe there's twins.
Q. And, Dr. Wozniak, in the course of diagnosing ectopic pregnancies and other complications in the first trimester, do physicians sometimes even consult with other physicians in order to reach the correct diagnosis and course of treatment?
A. Yes.
Q. Now, Dr. Wozniak, say that an APC makes an incorrect determination as to a certain procedure or the presence or nonpresence of a complication. You know, what can go wrong if that occurs?
A. If they have a misdiagnosis, well, first of all, hopefully there's a question so that they pause and ask for some help from a physician. But it can be anything from, you know, what's the viability of the pregnancy to is there an ectopic or should an ectopic pregnancy be considered? What are the risk

factors if she is to miscarry as far as bleeding? Other mitigating circumstances that can increase a patient's risk.
Q. And in your practice, in your experience, have you ever observed situations where an APC has made a mistake and it was due to the lack of training that you've been describing?
A. I have on occasion.
Q. And could you share some of those examples?
A. Well, one was not abortion-related, but basically it was a case where a PA thought that a patient's leg swelling was from congestive heart failure, and by the time I saw her, it was pretty clear that she had a sizeable lymph node from her metastatic ovarian cancer, and she was gone in ten days.
Q. And that situation occurred because the physician's assistant was not equipped to identify that condition?
A. Right. The physician assistant -- it was outside their scope of practice. That wasn't what he usually did. And so he didn't think about other causes for her leg swelling.
Q. And, in your opinion, if a physician had been handling that case, there would have been a lower likelihood of that mistake being made?
A. A lower likelihood.
Q. Dr. Wozniak, when we're talking about complications and whether APCs are equipped to deal with them, are complications from the abortion procedure itself the only complications that an APC needs to be ready to identify?

A. Well, the surgical aspect would be certainly the most immediate.
Q. Are there other complications that could occur in that context?
A. Well, sure. I mean, because it all starts with proper patient selection, proper procedure selection or medication selection. These are all things that enter into that decision-making process.
Q. And moving to the second trimester, for those types of procedures, things like a D&E, is a patient normally put under general anesthesia?
MR. RODRIGUEZ: Objection. There's no foundation for this witness's knowledge about anything related to D&E.
THE COURT: Sustained.
BY MR. ROWLETT:
Q. Dr. Wozniak, are APCs -- we've been talking about addressing complications as they come up. Are APCs better -- or excuse me. Are physicians better equipped to prevent complications from occurring in the first place?
A. I think a physician's knowledge base is such that they can view patients more comprehensively and so, again, identify indications for procedure or contraindications. And I think experience definitely lends itself to that, both from breadth of training as well as years of practice.
Q. For a physician, is that in part due to the fact that --

well, let me back up.

As a physician, do you treat multiple situations that arise in the obstetrics and gynecology context?

A. Yes.

Q. And is that broad base of experience, the fact that you see different conditions, different patients, different situations, is that -- does that assist you in making those judgment calls?

A. Yes.

Q. Okay. And an APC's experience with that is much more limited, right?

A. Yes.

Q. So, Dr. Wozniak, just to wrap up a little bit on physician-only. So, in your opinion, allowing APCs to conduct abortions would be detrimental to patient safety?

A. I believe so.

Q. Okay. Dr. Wozniak, now we're going to move on to the second-trimester hospitalization requirement.

Are you familiar with Indiana's law that limits abortions, second-trimester abortions to ambulatory surgical centers or hospitals?

A. Yes.

Q. And, in your opinion, is this requirement medically justified?

A. Yes.

Q. And why?

A. Because with advancing gestational age, the risk of complications, bleeding, hemorrhage, infection, and the need for pain management is simply higher.
Q. Are you better able to manage risks in a hospital or ASC?
A. Yes.
Q. And in your own practice, when you perform D&Cs, do you perform them in a hospital, or do you feel comfortable performing them somewhere else?
A. I perform them at ASCs and in a hospital.
Q. Never in an office space?
A. Never in an office.
Q. Why is that?
A. Because -- one of the main reasons is pain management, but also, depending on gestational age, risk of bleeding, pain management, IV fluids, and anesthesia.
Q. And, Dr. Wozniak, after a first-trimester miscarriage or a D&C, do you monitor your patients?
A. Yes.
Q. And, presumably, these hospitals and ASCs, they have recovery rooms for such patients to recover?
A. Yes.
Q. How often do you typically monitor them?
A. So, typically, they would stay in -- there's a recovery bay area, and they would stay in that area for an hour.
MR. ROWLETT: Okay. At this time I don't believe I

have any further questions.

THE COURT: All right. Cross-examine, Mr. Rodriguez.

*CROSS-EXAMINATION*

BY MR. RODRIGUEZ:

Q. Good afternoon, Dr. Wozniak. My name is Juanluis Rodriguez. I'm an attorney for the plaintiffs.

A. Good afternoon.

Q. Your expert testimony today is based on your clinical experience, correct?

A. Yes.

Q. And you did not consult any medical literature in forming your opinion for this case?

A. No.

Q. And you do not have any training to provide abortion, correct?

A. First-trimester D&Cs for miscarriage are identical to that of an elective abortion in the first trimester.

Q. And so the answer to my question is you do not have any training to provide abortion; is that correct?

A. There are spontaneous abortions, and there are elective abortions. So when you use the term "abortion," you can be speaking to either.

Q. And you've had no training to provide elective abortion?

A. Correct.

Q. And you've never performed an elective abortion?

A. No.
Q. You've never observed an aspiration abortion, correct?
A. No.
Q. That is not correct or that is correct?
A. A D&C. I observed and performed D&Cs for miscarriages, spontaneous abortions. The terms are synonymous.
Q. You've never observed an aspiration abortion?
A. You're going to have to clarify what you mean because a D&C procedure for a miscarriage is an aspiration.
Q. Okay. Is your testimony today, then, that you have observed an aspiration abortion?
A. If you're using the term "abortion" to cover the broad scope of elective and spontaneous, the management is the same. So I both observed and performed D&Cs for spontaneous abortions. It's the same as elective. Unless I'm misunderstanding what you're after.
Q. I'm just asking you about aspiration abortions. And I want to have some clarity for the record whether or not you've ever observed --
THE COURT: Maybe you should have her testify if she's familiar with that term and how she defines it, and then you can move on from there.
BY MR. RODRIGUEZ:
Q. Are you familiar with the term "aspiration abortion"?
A. Yes, as synonymous with dilatation and curettage suction

abortion.
Q. How about an aspiration elective abortion?
A. The procedure is the same. It's live fetus versus a dead fetus.
Q. And have you -- so I just want to understand, then. Have you ever observed an elective aspiration abortion?
A. No.
Q. And your colleagues do not perform elective abortions?
A. No.
Q. And you have never had colleagues who provide elective abortions?
A. I have had colleagues who provided elective abortions.
Q. You have never had colleagues who provide medication abortions?
A. They may have. I wouldn't know always what my colleagues provide to their patients. It's not something that I do, but I -- I have -- I have colleagues that I've worked with that I know have done it in the past. It's kind of a broad question.
Q. I want to make sure I understand you. You have colleagues that you know have provided medication abortion?
A. In the past.
Q. Okay. And, Dr. Wozniak, you gave a deposition in this case; is that right?
A. Yes.
Q. And as part of your deposition, you took an oath to tell

the truth, like the oath you are under today?
A. Yes.
Q. And you did tell the truth at your deposition?
A. Yes.
Q. I'd like to call PX601. And Dr. Wozniak, do you recognize this as the transcript of that deposition?
THE COURT: Wait till it gets enlarged.
We have it now, Mr. Rodriguez. What page do you want us to look at?
MR. RODRIGUEZ: Page 147, please. And I'd like to focus on lines 15 through 17.
BY MR. RODRIGUEZ:
Q. Dr. Wozniak, I'm going to read this aloud.
"Q And have you had colleagues who have provided a medication abortion?
"A Not to my knowledge."
Did I read that correctly?
A. Yes.
Q. Okay. We can put that away for now.
You treat patients for second-trimester pregnancy loss; is that correct?
A. Yes.
Q. You treat those patients in a hospital?
A. Yes.
Q. You treat those patients through induction?

A. Yes.
Q. And you have never performed dilation and evacuation, or D&E?
A. No.
Q. Your colleagues do not perform D&E abortions; is that correct? Elective abortions. Excuse me.
A. No.
Q. And you have received no specific training for D&E procedures?
A. No.
Q. You are familiar with D&E procedures only from your education; is that correct?
A. Yes.
Q. And you graduated from medical school in 1998?
A. Correct.
Q. You finished your residency in 2002?
A. 2004.
Q. 2004. Excuse me. And you are aware that the D&E procedure has changed in the last 15 or so years?
A. Generally.
Q. I want to ask you a little bit now about D&Cs. You have never performed a D&C in an office-based setting; is that correct?
A. Yes.
Q. And the only setting in which you have performed a suction

D&C is a hospital?
A. Yes.
Q. You have never performed a D&C in an ambulatory surgical center; is that correct?
A. I've done it in ambulatory surgical centers.
Q. Okay. And if we could take a look again at PX601. And this is, again, the transcript from your deposition.
Page 91, please. And if we could look at lines 21 through 27. I'm sorry. Page 91 in the -- yeah, that's right. 21 through 25, please.
And that says:
"Q And to your knowledge, are aspiration abortions and suction curettage procedures performed in office settings in Indiana?
"A I have never performed a suction D&C outside a hospital."
Did I read that correctly?
A. You read that correctly. But if I may, I think, I took that in the context I've never done a D&C in an office setting. I think that's what I really meant by that.
Q. So I did read that correctly?
A. Yes.
Q. Your colleagues have never performed a D&C in an office setting; is that correct?
THE COURT: When you use the word "colleagues,"

Mr. Rodriguez, who are you referring to? You talking about everybody who practices at her hospital or everybody in her practice group? Or who does that mean?

BY MR. RODRIGUEZ:

Q. The medical practitioners with whom you work closely in your medical practice, as part of your regular medical practice.

THE COURT: Are you in a partnership?

THE WITNESS: I am currently hospital-based.

THE COURT: You're a hospitalist, as it were?

THE WITNESS: Yes.

THE COURT: So the question doesn't work, Mr. Rodriguez.

BY MR. RODRIGUEZ:

Q. You have never practiced with anyone who thought a D&C for a miscarriage was an appropriate office procedure; is that correct?

A. That is correct.

Q. Okay. And when performing a D&C, you only use general anesthesia for pain management?

A. That's all I've ever used.

Q. Okay. And you are aware that using general anesthesia increases some medical risks associated with a D&C?

A. General anesthesia has its own set of risks. I don't think it pertains to just a D&C.

Q. So you're aware that general anesthesia increases the medical risks of a given procedure?
A. General anesthesia has its own set of risks. When you say "increased risk," it's kind of compared to what?
Q. Compared to that procedure done without the general anesthesia.
A. I think the pain management outweighs those risks. Otherwise, I wouldn't use it.
Q. So you are aware that there are risks?
A. There are risks with anesthesia.
Q. You are aware that those risks include excessive bleeding?
A. Yes.
Q. It is your opinion that general anesthesia is inappropriate for an office-based setting?
A. Yes.
Q. And you have never administered general anesthesia in an office-based setting?
A. No.
Q. Okay. I want to ask you a few questions about APCs. And if I use the term APC, you will understand that I'm referring to certified nurse practitioners, certified nurse midwives, and physician assistants?
A. Okay.
Q. You are aware that ACOG, about which you testified in Phase I of this trial -- you're aware that ACOG endorses APCs

providing first-trimester abortion?
A. Generally.
Q. And you are aware that ACOG does not consider a D&C for miscarriage management to be a surgery?
A. There are varying opinions within ACOG on that.
Q. And you are aware that ACOG, as a general body, does not consider a D&C for miscarriage management to be a surgery?
A. Generally.
Q. Instead, ACOG considers D&C for miscarriage management to be a procedure; is that correct?
A. "Procedure" is a broad term. It does not always require -- mean just something you've done the same way each time. It can also refer to surgery. That's why there are surgical procedures.
Q. And are you aware that ACOG considers a D&C for miscarriage management to be a procedure?
A. Yes.
Q. You are not familiar with the medical literature concerning the provision of abortion care by APCs, correct?
A. No.
Q. You're not familiar with the medical literature?
A. I'm familiar with the medical literature generally, but if you're referring to something specific about APCs performing abortions, I'm aware more of the risks.
Q. So you are not familiar with the medical literature

concerning the provision of abortion care by APCs?
A. Not -- do you have specific articles you're asking about?
Q. Any of the medical literature concerning the provision of the abortion care by APCs.
A. I am familiar with some of it.
Q. Okay. Can we bring back up PX601 please.
And again this is the transcript of your deposition for this case.
And if we could look at page 156, lines 15 through 17, please.
"Q So the question is if you're familiar with medical literature concerning abortions performed by APCs.
"A Not specifically, no."
Did I read that correctly?
A. You read that correctly.
Q. You have never worked with an APC in the provision of abortion care?
A. No.
Q. You're not familiar with the training that an APC receives to provide abortion care?
A. I'm familiar through general reading.
Q. Reading of the medical literature?
A. Broadly.
Q. And that does not include medical literature concerning the

provision of abortion care by APCs?
A. Would you rephrase that?
Q. That does not include medical literature concerning the provision of the abortion care by APCs?
A. You know, I read broadly and I read a lot of medical literature. So I'm not sure where you're going or what you're referring to as far as specific APC training on abortion care.
Q. So you're not -- so you're not familiar with the training an APC receives to provide abortion care based on any of the medical literature?
A. Again, I read broadly, so --
THE COURT: Mr. Rodriguez, pull that question apart. You're asking her two things in one question. Is she familiar with those training requirements? And, if so, where does that familiarity come from? Isn't that your question?
BY MR. RODRIGUEZ:
Q. Are you familiar with the training an APC receives to provide abortion care?
A. Not specific. Just -- again, just from general reading.
Q. That reading would be of the medical literature?
A. Yes, broadly.
Q. But that would not include medical literature concerning the provision of the abortion care by APCs?
A. Not specific.
Q. Okay. It is your opinion that the only time an abortion is

in the interest of a pregnant woman is when her life is in danger?
A. That's correct.
Q. And it is your opinion that abortion should be illegal unless a pregnant woman's life is in danger?
A. Yes.
Q. And it is your opinion that abortion ends a life?
A. It ends the life of the fetus.
Q. So it is your opinion that abortion ends a life?
A. Yes.
MR. RODRIGUEZ: Your Honor, may I have a moment?
THE COURT: Yes, you may.
MR. RODRIGUEZ: No further questions.
THE COURT: Redirect?
MR. ROWLETT: No, Your Honor. Thank you.
THE COURT: All right. Thank you very much, Dr. Wozniak. You may step down.
All right. Your next witness.
MR. FISHER: Defense calls Dr. Maureen Condic.
THE COURT: Okay. Dr. Condic, good afternoon.
DR. CONDIC: Good afternoon, Judge.
THE COURT: Would you please be sworn.
MAUREEN L. CONDIC, PhD, DEFENDANTS' WITNESS, SWORN
THE COURT: You may be seated.
DIRECT EXAMINATION

BY MR. SCHAERR:
Q. Good afternoon, Dr. Condic.
A. Good afternoon, Counselor.
Q. Could we put Stipulated Exhibit 36 on the screen, please.
Dr. Condic, can you identify this exhibit?
A. This is a copy of my current curriculum vitae.
Q. And is it fair to say that your curriculum vitae presents a lot of information on your professional history, such as your place of employment, your education, and your degrees?
A. Yes.
Q. And is all of that information truthful on your CV?
A. Yes.
Q. Along with all the other information there?
A. To the best of my knowledge, yes.
Q. What are your areas of specialization and teaching?
A. So my research involves the development of the sensory nervous system and the contribution of stem cells to the nervous system. My teaching for the last 20 years has been to teach human medical embryology to the medical students at the University of Utah Medical School of Medicine.
Q. And in what subject is your PhD.
A. My PhD was in neurobiology, focusing on the development of the sensory nervous system.
Q. Did you also do a couple of postdoc experiences?
A. Yes, I did. My first postdoc was looking at animal

development, and my second postdoc was again looking at development of sensory neurons.
Q. And what exactly is neurobiology, which is the subject of your PhD?
A. Neurobiology is the study of the cells within the nervous system and their functions and their relationships to each other.
Q. And what is developmental neuroscience?
A. Developmental neuroscience is the study of neurobiology or how cells function but during the development of an organism.
Q. And how would you characterize the field of human embryology?
A. Human embryology is a much broader field than developmental neuroscience. It involves the development of all the systems in the body, both during the embryonic and fetal periods of life.
Q. And, Dr. Condic, did you prepare a report in this case?
A. Yes, I did.
Q. And could we look at the Recollect Exhibit No. 113.
Thank you. Now that we have that on the screen, Dr. Condic, is that the expert report that you prepared for this case?
A. Yes, it is.
Q. And what's the date on that report?
A. I am not seeing a date, counselor.

Q. If I told you -- there we go.
A. August 26th, 2019.
Q. Thank you.
Now, as relevant to this stage of the proceedings, what specific topic were you retained to address?
A. I was retained to address whether the provisions of the Indiana statute regarding fetal pain reflected accurate and not misleading scientific information.
Q. Could we call up Recollection Exhibit 155. And let's highlight that provision of the statute.
Can you read that for us, Dr. Condic?
A. The statute states, "That objective scientific information shows that a fetus can feel pain at or before 20 weeks of postfertilization age."
Q. Okay. And without specifying them yet, after you completed your analysis, did you arrive at any conclusions on whether that disclosure is true and not misleading?
A. Yes, I did.
Q. And just to clarify, during the rest of your testimony when you discuss fetal age, what point are you measuring from?
A. So in the primary scientific and medical literature, the convention is to refer to fetal age as weeks postfertilization or post-sperm infusion. Within the obstetrical and gynecological literature, typically pregnancy is dated from the first date of the last menstrual period, or LMP, which would

add two weeks, roughly, to the fetal age dated from sperm-egg fusion.

Q. Just so we're clear, when you use "fetal age," you're going to be talking about the point from sperm-egg fusion; is that correct?

A. Yes.

Q. Now, what are some of the research topics within developmental neuroscience and human embryology that you believe are relevant to assessing the truth of the state's fetal pain disclosure.

A. I think it's important to understand a time course over which neural structures develop anatomically. It's important to understand when those structures become functionally active. It's important to understand what those structures do and what structures of the nervous system are both necessary and sufficient for an experience of pain.

Q. And is it also important to understand the subject of the fetal response to stimuli?

A. I think fetal response to painful stimuli can provide additional information and is an important consideration, yes.

Q. So if you would, could you briefly characterize the experience and scientific principles and data and methods that you used in coming to your conclusions about the truth of the state's fetal pain disclosure?

A. So in formulating my opinion, I relied on my education, my

undergraduate education, as well as my graduate education in neuroscience. I relied on my experience conducting research in the development of the nervous system for more decades than I want to admit to. I relied on my experience teaching medical embryology to the medical students for more than 20 years. I relied on reviews that have been written by other experts in the field. And I relied on a rigorous investigation of the current research that has been conducted since the existing reviews were published.

Q. Thank you. And approximately how many studies are cited in your expert report?

A. Well over a hundred.

Q. And did you rely on those studies in reaching your conclusions?

A. Yes, I did.

Q. Were those studies published in leading scientific journals, peer-reviewed?

A. In evaluating the data to include in my report, I relied almost -- I relied exclusively on studies that were published in peer-reviewed journals because peer review is a guarantee -- a good guarantee -- that the study meets the standards of the profession for rigor and completeness.

I further relied on studies that had been independently replicated by other research groups. So it was not simply the opinion of one researcher but was -- reflected the opinion of

multiple people, working in that area.

And, finally, I've relied on studies that had -- that were well supported outside of the direct area that the study was addressing. For example, they were well supported in the techniques that they used. The techniques were very well established, very well credentialed, were used by many people, and had been validated multiple times, thereby increasing the confidence that you have and the kind of results that were generated from those techniques.

Q. Are the scientific principles and methods on which you relied widely used in your field? Or maybe I should say three fields.

A. I would say they are universally the standard for evaluating quality of scientific evidence.

Q. And do you consider yourself an expert in each of the topics that we've discussed so far insofar as they relate to the capacity of a fetus to feel pain?

A. I do.

Q. And do you believe your testimony will be helpful in assisting the Court to understand the facts and the issues and the evidence relevant to the fetal pain disclosure?

A. It is my sincere hope that it will be helpful to the Court.

Q. Thank you.

MR. SCHAERR: Your Honor, we tender this witness as an expert in the fields of neurobiology, developmental

neuroscience, and human embryology.

THE COURT: Any objection?

MS. CHARMANI: No objection, Your Honor.

THE COURT: The witness has been proffered as an expert. The Court accepts that proffer without objection.

You may proceed accordingly.

THE WITNESS: Thank you, Your Honor.

MR. SCHAERR: Thank you.

BY MR. SCHAERR:

Q. Now, let's look again for a moment, if we could, at the state's fetal pain disclosure. Again that's Exhibit 155.

Now, I think, Dr. Condic, we've already established that you consider yourself an expert on scientific evidence pertinent to fetal pain, correct?

A. Correct.

Q. Just by way of an overview, based on your expert analysis, in your view is there any reasonable doubt as to the truth of this statement?

A. I believe there's no reasonable scientific doubt regarding the truth of this statement.

Q. Okay. And, briefly, what is your scientific understanding of what it means to feel pain?

A. I think a neutral reading of the scientific and medical literature makes it pretty clear that pain is a complicated phenomenon and it exists at many levels of the nervous system.

So the experience of pain in the most minimal sense is the ability to detect and respond to pain. But the qualitative nature of that experience can differ quite a lot at different stages of development and depending on what part of the brain we're considering is doing the analysis, the detecting and responding to the pain.

Q. Thank you.

Now, in teaching classes and in giving professional presentations on neurobiology and embryology, have you created a slide showing fetuses at different stages of development?

A. Yes, I have.

MR. SCHAERR: Okay. And if we could show that to the Court, or show it to Dr. Condic.

BY MR. SCHAERR:

Q. Dr. Condic, is that the slide that you created?

A. Yes, it is.

Q. And for the record, this is Defense Exhibit 7.

Can you just briefly explain to us what that diagram shows?

A. This diagram shows pictures of fetuses at the stages of development that are indicated below and -- below each picture or above -- between 8 weeks and 20 weeks of development.

Q. Could you just briefly describe -- describe the characteristics of a 20-week fetus.

A. So between 8 and 20 weeks, the fetus gross enormously, as you can see from these images. It develops --

(Reporter admonition.)

THE WITNESS: Sorry. I apologize, and I do ask you to gently remind me because I'm one of seven children, and if I didn't speak fast and eat fast, I never got a word or a piece of food in edgeways. So I will do my best to speak slowly. But please remind me.

So the images show that between 8 -- the reason I created this slide was to illustrate that between 8 weeks and 20 weeks, the fetus grows enormously in size and increasingly develops recognizable human features. So at ten weeks you can see eyelashes and fingernails, and by 20 weeks, the bottom picture, the fetus is much larger than at 8 weeks. It's about 6 1/2 inches long, weighs about 3/4 of a pound. It's moving. It's reacting to touch, to sound, to other sensory input, including pain. And in some situations, a fetus born at this age can survive if born.

BY MR. SCHAERR:

Q. Thank you.

And based on your knowledge and experience, does each of these four photographs accurately or fairly depict a fetus at the developmental age for which it's labeled?

A. Yes, they do.

Q. Now, Dr. Condic, did you also create a chart showing the fetal nervous system at various stages of development?

A. Yes, I did.

MR. SCHAERR: And at this point let me introduce Defense Exhibit --

THE COURT: Is Defendant's Exhibit 7 in evidence?

MR. SCHAERR: I am not sure, Your Honor.

THE COURT: Well, you should either put it in evidence or don't refer to it.

MR. SCHAERR: Therefore, I will move that Defendant's Exhibit 7 be entered into evidence, Your Honor.

THE COURT: Any objection?

MS. CHARMANI: No objection, Your Honor.

THE COURT: All right. Exhibit 7 is admitted.

MR. SCHAERR: Thank you. Let's move on to Exhibit 8.

(Defendants' Exhibit 7 received in evidence)

BY MR. SCHAERR:

Q. Dr. Condic, did you also create a chart showing -- I already described this, but tell us what this chart is.

A. I did create this chart. And it is a cartoon illustrating the maturation of the nervous system between 25 days, or roughly 4 weeks, and 100 days, or roughly 14 weeks, of human development.

Q. Okay. And just briefly, can you describe the progression of a fetus's central nervous system as depicted in that chart?

A. Yes. So, again, the major point of this illustration is to help orient everyone to the structures in the brain that we will be talking about throughout my testimony and to illustrate

the enormous increasing complexity and size of the brain. These are not drawn to scale. That's why the first exhibit is helpful to kind of orient you to the increase in size in the brain.

But what this illustration shows is the different regions of brain, from the spinal cord up through the more cranial levels or the four brain levels, and how between 25 days you see tremendous expansion in size and folding of the brain that will produce its final orientation in the mature individual.

At around 50 days, or 7 weeks of development, an important structure arises known as the diencephalon. It's shown here in the little blue, lighter blue color. And by 100 hundred days, or 14 weeks, we have all of the major subdivisions of the brain produced in the fetus.

Q. Before we talk about which areas of the fetal nervous system are necessary and sufficient for pain perception, what general areas of that system are involved in pain perception?

A. I think, as I testified earlier, the pain is a complex phenomenon, and it's represented by circuitry throughout the nervous system.

So all of the levels of the nervous system are involved in -- at some level in the detection and response to noxious or potentially damaging painful stimulus.

Q. And, briefly, how does each area assist in processing stimuli, including pain?

THE COURT: Counsel, we have this on the overhead now. You don't have to stand there holding that, unless you like being a sandwich board.

THE WITNESS: It gives him good exercise, Your Honor.

So you had asked me to briefly describe the -- what happens in each of the levels of the nervous system indicated on this slide.

Pain detection and response or the experience of pain begins in the spinal cord, where neurons in the body that are capable of detecting potentially damaging input to the body, noxious or painful stimuli, relay that information to the spinal cord and connect to motor neurons that are responsible for removing that part of the body from that sensory input.

So that's called nociception, or reflex, response to pain. And it's the simplest level at which our nervous system experiences pain, detects it and reacts to it.

Cells in the spinal cord also send information up to higher levels of the nervous system, most importantly, terminating in the diencephalon, in that light blue area you can see in this diagram at 50 days. It gets hidden by the expansion of the darker blue regions of the brain by 100 days, but it's still there; it's just deeper inside the brain.

So spinal cord neurons will send information regarding the detection of noxious stimuli up to the diencephalon and communicate with a structure known at the thalamus.

And the thalamus is really important for pain perception because it is the first place in the nervous system that actually creates a unified picture of the body. So it's the first place in the nervous system where the brain knows where information is coming from and how it relates to different parts of the body.

The thalamus will ultimately relay that painful information up to the telencephalon, or the cortex, and is an important stopping station for information that's sent from the cortex back down to the body in response to pain.

BY MR. SCHAERR:

Q. Dr. Condic, where exactly is the thalamus at 100 days? I can see that in your chart there's nothing that -- there's nothing that indicates where the diencephalon is or where the thalamus is. So where is it?

A. The cortex grows enormously, and it just comes to overlap the region of the diencephalon. So the diencephalon is in the region of the cortex but deeper into the picture.

Q. And so that means that the thalamus is also sort of deep inside the cortex?

A. Buried, sort of surrounded by the cortex, yes.

Q. So what neural circuitry is necessary for a fetus to experience and react to painful stimuli without necessarily being conscious of it?

A. As I said, all of the processing or the circuitry involved

in the detection and response to pain makes a contribution. But the most minimal circuitry that's required would be in the spinal cord -- the neurons that detect painful information, relay it to the central nervous system and enable the organism to withdraw or protect themselves from that painful experience.
Q. And you mentioned earlier the phenomenon of spinal reflex. Can you tell us what that is?
A. That would be the phenomenon I've just described; so nociception or the detection and withdrawal from a painful stimulus, which occurs in the spinal cord.
Q. And when does that reflexibility develop?
A. Between 8 to 10 weeks postfertilization age, or 10 to 12 weeks LMP.
Q. And can you briefly describe the process and developmental ages by which the spinal cord connects with the subcortical regions of the brain?
A. So beginning approximately 12 weeks of fetal life, cells within the spinal cord will project or send extensions or make connections to higher levels of the nervous system, including the diencephalon and the thalamus.
So between 12 weeks and roughly 18 weeks of fetal life, information regarding the detection and response to pain will be sent to the thalamus.
Q. So that part of the system, just so we're clear, develops between 12 and 18 weeks?

A. Correct.
Q. And is that shown by objective scientific evidence?
A. It's shown by objective scientific evidence that's completely not controversial. Every single review of the literature, including reviews that have been cited in this trial, refer to exactly the same papers and interpret them in exactly the same way.
Q. Now, can you describe the remainder of the process by which the pain responsive parts of the nervous system develop?
A. So as I stated, information about pain is transmitted to the thalamus between 12 and 18 weeks -- or the circuitry that can do that transmitting is established between 12 and 18 weeks.
Very early in development, as early as 25 days in the chart that you're looking at, neurons are born in the forebrain, a special population of neurons known as subplate neurons. They are the earliest neurons born in the brain. And starting at about 24 weeks of fetal life, cells within the thalamus are going to connect to subplate neurons and cortical neurons and transmit pain information to that region of the nervous system.
Q. And at what point does that development complete or end?
A. The connections between the thalamus and the cortex, as I said, begin around 24 weeks of fetal life, but the maturation of the cortex itself continues for an extremely long period of time. So it's a very late developing structure in the nervous

system. And a large amount of very detailed evidence demonstrates that the cortex in humans is not completely mature until about 25 years of life, postbirth.
Q. Okay. And does objective scientific evidence show when these connections occur?
A. And specify which connections?
Q. The connections between the thalamus and the cortex.
A. Beginning about 24 weeks of fetal life, yes.
Q. And is there any dispute about the -- about when that connection occurs?
A. Again, it's a very well accepted and uncontroversial piece of scientific evidence. I don't believe there's any dispute about that time frame.
Q. Okay. Now, to preview an issue that we'll discuss at length later, is it necessary for the cortex to have fully connected to the thalamus in order for there to be a conscious experience of pain?
A. In my scientific judgment and analysis of the literature, I say that it is not necessary.
Q. So what role does the development of the cortex really play in a person's experience of pain?
A. Well, so the cortex is well established to be the seat of complex computational functions of the brain. So what we call executive functions, like reasoning, choice-making. The cortex is also, as well as the diencephalon, is very involved in

emotional responses of the brain.

And so from the evidence I've looked at and from my understanding of neural function and neural development, the role of the cortex in processing pain information is largely to create associations with that information.

So in the cortex we may find a particular kind of painful experience more painful because it reminds us of when we watched our mother fall down the stairs and break her leg. And that memory and the emotional trauma we had would sort of live in the cortex and would alter the experience we have of pain based on those associations.

Q. And are there other things that the cortex does to help us process pain?

A. I'm -- given that the cortex has tremendously complex functions, I'm not sure entirely what you're asking me, Counselor.

Q. Does it help complexify the pain that we're feeling?

A. I think that's what I'm attempting to communicate, that certainly one of the functions of the cortex would be to build associations or connections between memories and emotions and the basic experience we have of pain.

Q. And now focusing especially on what you said about the thalamus and the connections between the spinal cord and the thalamus being formed between 12 and 18 weeks, what, if any, bearing does your understanding of the development of neural

circuitry have on the truth of the statement in the fetal pain disclosure that we looked at earlier?
A. It's my judgment, based on the literature, that the circuitry present within the thalamus that is connected to the body and responsive to pain beginning at 12 weeks and more or less completing its development by 18 weeks is both necessary for a conscious experience of pain and sufficient for a conscious experience of pain.
Q. Okay. And you said earlier that objective scientific evidence shows that the spinal reflex function begins back at eight weeks.
A. Correct.
Q. Right? And is that another way -- based on that fact, is that another way that we could properly say that a fetus is capable of feeling pain before -- at or before 20 weeks?
A. So in my view, our experience of pain is the ability of the nervous system to detect pain and to respond to it. And as I've noted, that happens at lots of different levels of the nervous system and in increasingly complex ways as you move to more cranial levels of the nervous system.
So, yes, the ability of a fetus to detect and respond to pain between eight and ten weeks is an experience of pain that is part of that fetus's nervous system. And, therefore, it is legitimate to consider that to be a way in which fetuses feel or experience pain.

Q. Okay. Now, you watched Dr. Grossman's testimony yesterday; is that correct?
A. Yes, I did.
Q. And do you recall him referring to an ACOG review for the proposition that, for a fetus to experience pain, the thalamus must not only be connected to the subcortical parts of the central nervous system but also must be connected to the cortex?
A. Yes, he did make that assertion.
Q. And do you agree with that assertion?
A. I disagree with that assertion.
Q. And based on your review of the literature, is there scientific evidence showing that the cortex is not a necessary component of the consciousness or of pain, generally experiencing pain?
THE COURT: Could I ask, do you disagree with ACOG assessment, or do you disagree that that is ACOG's assessment?
THE WITNESS: Oh. Thank you for asking for that clarification, Your Honor. I disagree with ACOG's assessment.
THE COURT: All right. The view that ACOG has come up with, you disagree with; is that right?
THE WITNESS: ACOG states in a one-page --
THE COURT: Well, can you just say yes?
THE WITNESS: Yes.
THE COURT: Okay.

Go ahead.

BY MR. SCHAERR:

Q. Could you give us just a brief overview of the scientific evidence that you've identified that shows that that connection is not necessary for feeling pain or even for conscious -- being consciously aware of pain.

A. So in my report I cover a very broad area of research of independent lines of evidence, people that don't have a dog in the fight, don't really even think necessarily about fetal pain, but are studying pain-related phenomenon.

So individuals who are studying the response of animal nervous systems to sensory information, people that are experimenting on animals, physicians who are treating children or adults who have damage to the brain and assessing what their experience of pain is, physicians who are treating chronic pain in adult subjects, people who are interested in analyzing and better understanding what parts of brain do what.

And those studies touch upon the question of what regions of brain are necessary for consciousness and for pain experience. All of these lines of evidence plus direct observations of fetuses and fetal behavior and newborn behavior all point to exactly the same conclusion, independently, which is that the cortex is not necessary for a conscious experience of pain.

Q. And, Dr. Condic, as I read your report, you've actually

identified 12 separate lines of evidence or 12 separate points that point in that direction. Is that fair?
A. I would probably add two more, the points upon which I agree with the prior reviews, which is the development of the anatomy of the brain and what's known about the function of those regions of brain. But in addition, yes, 12 independent lines of evidence.
Q. Each of those lines of evidence tends to refute the contention that a connection between the thalamus and the cortex is necessary for a fetus to experience pain; is that fair?
A. I would perhaps even state it more strongly. I would say that each of them, in and of themselves, is a strong refutation; and, collectively, it's almost uncontrovertible.
MR. SCHAERR: Thank you. With the Court's indulgence, I'd like to ask Mr. --
THE COURT: Mr. Sign Board?
MR. SCHAERR: -- my good friend Mr. Goodwin to keep track of these, since there are so many of them, on this whiteboard here.
BY MR. SCHAERR:
Q. Dr. Condic, is it fair to say that those 12 separate lines of evidence that you just discussed fall generally into three categories? And what would those categories be?
A. Yes, I would say they fall generally. So five lines of

evidence fall into a category that is addressing what happens when a piece of the brain is absent or damaged. Four of the lines of evidence fall into the category of what can scientific studies tell us about the function of different parts of the brain. And three of them fall into the category of how do fetuses and newborns respond to painful experiences.

Q. Okay. So let's start with the first category; that is, studies involving brain deficiencies or disorders. What is the first line of evidence that you would like to tell us about?

A. Well, the assertion that was made by ACOG and endorsed by Dr. Grossman that a fetus is incapable of experiencing pain because connections between the thalamus and the cortex don't develop until 24 weeks of fetal life or, as Dr. Grossman testified, until the third trimester -- so he pushes it back even a little bit more -- is counterindicated by the fact that many animals that don't even have a cortex naturally -- animals such as fish or frogs or chickens and other birds -- all of those animals are conscious, and all of those animals respond to pain.

So the argument that you have to have connections between the more primitive parts of brain that would be present in these animals and a cortex in order for pain experience to occur and consciousness to be present is counterindicated by animals that don't have a cortex.

Q. And how do we know that these animals have an awareness of

pain or experience of pain?
A. Well, the animals are alert. They're not asleep. They're not anesthetized. They're interacting with their environment. So they are clearly, by standard definition of what consciousness would be, they're conscious. And they react to pain in a manner that avoids it, that expresses distress. And many other measures can be applied to understanding how animals experience pain. In fact, it's a broad area of research to try to make those assessments.
Q. In your opinion, Dr. Condic, why are these animal studies relevant to understanding human neurological structures? Aren't animals so different that we can't generalize or we can't infer anything about animals to the human body?
A. Well, Counselor, if that were the case, we'd have to throw 99.9 percent of all basic scientific research out the window.
If it were the case that we could not make inference from animals to humans, we would have to disallow the vast majority of scientific -- basic scientific research, since most of what we know about the function of the brain and the function of the body is from basic studies of animals that are, in most respects, quite similar to us.
Q. So it's well accepted in your field that results from animal studies can be applied to the human central nervous system?
A. Yes, it is. So let's -- the second line of that maybe?

Q. Yes.
A. So second line of evidence is that, even if we start with an animal that naturally has a cortex -- so animals such as rodents or cats or monkeys, so similar to us as mammals -- if these animals have their cortex experimentally removed -- I know that sounds like a disgusting experiment, but scientists are known for disgusting experiments. So if you remove the cortex from these animals or if you simply disconnect it from the rest of the nervous system, such decorticate animals continue to be conscious and continue to respond very vigorously to painful stimuli, again demonstrating that the cortex cannot be necessary for a conscious awareness of pain.
Q. And is there a good example of that kind of a study in your report?
A. I provide several examples.
Q. Is the 1992 Matthies study a good example of that?
A. Yeah. That was a good study of an experiment in which --
Q. Excuse me. Just a moment. Let me --
A. Bring it up?
Q. -- bring it up. It's Exhibit 117. Please describe this study for us.
A. So this is a study. The first author is Brigitte Matthies, it was published in 1992 in the journal entitled Pain. And the title of the article is "Formalin Pain is Expressed in Decerebrate Rats But Not Attenuated By Morphine."

Q. Is that study published in a peer-reviewed journal?
A. Yes.
Q. Is the journal well respected and in your field?
A. It's one of the leading pain journals.
Q. What's the third line of evidence? Or do you have something more on the second?
A. No. I think the conclusions of this study that we just looked at are as I described, that when you decerebrate or you remove the cortex from a rat, rats remain conscious and they remain vigorously responsive to painful input.
So third line of evidence in this general class of studies that involve loss of or impairment of regions of the nervous system are children that are born without a cortex or without large regions of the cortex.
So this is a very unfortunate medical condition. But numerous studies of such individuals has shown us that these children are human children, remain conscious in the absence of vast regions of the cortex, and they remain responsive to painful input. They respond -- they detect and respond to pain.
Q. And does the evidence suggest that they are capable of conscious suffering?
A. Well, if we consider suffering to be the conscious awareness of pain, having a sense of a me who is experiencing pain -- consciousness obviously has many dimensions. I mean,

this is, again, an enormous area of research. What is consciousness?

But I think we have a clear understanding that consciousness can exist in many shapes, consciousness exists in many different forms, it can be impaired by injuries to the brain, but that the basic characteristic of consciousness is awareness, alertness, the ability to interact with the environment.

And by that criteria, these children are clearly conscious, and they respond to pain in a manner that seems pretty unambiguous -- crying, yelling out, shaking the affected part of their body, jumping up and down. Things that normal children do when they are experiencing pain.

Q. Can we call up Recollect Exhibit No. 11. I'm sorry. 118.

Dr. Condic, is this an example of the type of study that you just discussed?

A. Yes, it is.

Q. And can you tell us more about this study?

A. I need to read the title.

Q. Go ahead and read the title, yes.

A. The first author is Barb Aleman. It was published in Acta Paediatrica in 2014. And the title is "Consciousness Without Cortex: A Hydranencephaly Family Survey."

So in this study the authors surveyed families, the parents or caregivers for individuals who had conditions where they had

absent all or much of the cortex and asked them to summarize their observations regarding the behavior and alertness of these children.

So based on the observations of parents and caregivers, they have behavioral characteristics that are compatible on multiple counts with consciousness and with pain perception.

Q. Now, is the cortex entirely absent in these studies?

A. This study does not directly assess the presence or absence of the cortex. It's based on a medical diagnosis that was given to the parents by their children's physician, which usually did involve an assessment of what the brain structures look like.

Other studies have, as part of the study, examined individual subjects. And in most cases, there's always some residual cortical material. It's very, very hard to eliminate the entirety of the cortex as a consequence of a birth detect. So most of these subjects did have some cortical material.

Q. Okay. And on what basis, then, can you say that those studies help establish that a connection between the thalamus and the cortex is not necessary to an awareness of pain, an ability to respond to pain?

A. So the argument in favor of the cortex being necessary directly hinges on the complexity and intactness of the connections within the cortex.

So the argument has always been that the cortex is not

special somehow. It doesn't contain different types of neurons or neurons that do different things. It simply contains a very large number of neurons that are massively interconnected in ways that support complex functions that cannot be supported without the massive interconnectivity of the cortical region of the nervous system.

So if you eliminate 90 percent or 80 percent or even 50 percent of the brain, you certainly would have to, based on this kind of an argument, have a loss in the complexity of the interconnectedness of the nervous system in the region of the cortex.

And if the argument hinges on only something of a sufficient level of complexity is capable of supporting consciousness, then taking away 90 percent of that complexity raises the question of whether any complexity persists. If that 10 percent that remains has nobody to talk to -- you know, if I take out four of the five computer chips in my cell phone, does my cell phone still have 20 percent function? Probably not because the function is actually due to the interconnectedness within that device. And the same would likely be true of the cortex.

Q. Shall we move on to the next line of evidence?

A. All right. So are we up to 4?

Q. Number 4.

A. A fourth line of evidence would be that there have been a

number of really large number of studies disorders of consciousness. So people who, due to stroke or injury or some other medical condition, have impaired consciousness. And all of those studies very strongly and unambiguously conclude that a loss of consciousness in mature patients is associated with loss of tissue in the thalamus, not in the cortex.
Q. And is there an example of that kind of a study that you think is particularly compelling?
A. There was a paper by Morsella, I believe.
Q. Let's call that up. It's Recollect Exhibit No. 119.
Can you read the author and the title and the publication information for this article?
A. So the first author is Ezequiel Morsella. It was published in 2010. And let's see. I'm not seeing the journal title. I'm sorry.
Q. Is it Neural Network?
A. Oh, Neural Networks, yes. Neural Networks, which is a peer-reviewed. And the title is "Minimal Neuroanatomy for a Conscious Brain: Homing in on the Networks Constituting Consciousness."
Q. Is this journal well respected in the field?
A. Yes.
Q. Why don't you tell us about the study.
A. This is a paper that makes an argument based on not data that's reported in this paper but reviews of the literature

that exists to look at where -- what regions of brain are required for consciousness and concludes that consciousness is represented at multiple levels of the nervous system, not merely in the cortex and not exclusively in the cortex.
Q. And how does the Morsella study show that?
A. I'm afraid I don't understand your question, Counselor.
Q. Anything more you want to tell us about that study?
A. No. I think that's enough.
Q. Okay. Well, let's move on to the -- I believe you said there was a fifth line of evidence in this category.
A. Yes. The fifth line of evidence has to do in the general category of what happens when you're missing or absent a part of the nervous system comes from normal development of humans. So I mentioned earlier in my testimony that the cortex is a very slow-developing part of the nervous system and it doesn't fully mature until 25 years of age.
So children -- infants and children have very, very immature cortical circuitry that only gradually, over decades, will come to its mature state. And yet with the regions of the cortex that are thought to be involved in processing pain information being among the latest to reach maturity, and yet our experience of pain is remarkably constant across our childhood and into adulthood. And, if anything, anyone who has seen a two-year-old dancing around, hopping up and down and screaming over a little paper cut, maybe kids have even a more

intense experience of pain than adults do.
Q. And do you cite some studies in your report that make this point?
A. I do. Quite a number of them.
Q. Are those associated with paragraph 39 of your report?
A. Yes.
Q. I'm sorry. Paragraph 36.
A. I think 39 is what we're --
Q. We'll go with 39.
A. Yes.
Q. Okay. All right. Well, to summarize, what do these five lines of evidence show, individually and collectively, about the proposition that the thalamus needs to be connected to the cortex in order for a person to have a conscious experience of pain?
A. I think all of these lines of evidence argue against that proposition and conclude that -- or point to the conclusion that circuitry within the thalamus, within the diencephalon, is sufficient and necessary for a conscious experience of pain.
Q. And what, if any, bearing do these five lines of evidence have on the truth of the statements in the state's fetal pain disclosure?
A. As I've noted, the connections between the body, the spinal cord, and the thalamus are developing between 12 and 18 weeks of fetal life; and therefore, this body of evidence would

support the truth of the statement in the statute.
Q. Is it fair to say, Dr. Condic, that the argument that that connection between the thalamus and the cortex has to be firmly established, that that is the -- really the only basis on which people claim that a fetus prior to the age of 20 weeks cannot experience pain?
A. I would say in my reading of the ACOG statement, which refers to the Lee review article in the Journal of Medical Association and also refers to a review by the Royal College of Obstetricians and Gynecologists that was published in 2010, both of those reviews cite everything I say. We are in complete agreement about the anatomical and functional data that they present.
The only point on which we disagree is the assertion that connections between the thalamus and the cortex have to be established before you can have a conscious experience of pain. And we in part disagree because those two reviews entirely ignore these five lines of evidence I've just covered, and as well as the other ones we're going to go over.
Q. Speaking of those, let's move to the second category. How would you characterize that group of evidence?
A. So these are four lines of evidence that address what is the role of different parts of the nervous system in supporting consciousness and supporting a conscious pain experience.
Q. And what is the first one?

A. A number of recent authoritative reviews, again looking at the literature broadly, have asked the question of where do consciousness and emotions, the ability to find something an unpleasant experience, where do those functions take place in the nervous system?

And they conclude that older areas of brain, the parts of the brain that are common between us and, say, birds or fishes, are necessary for the experience of emotions and consciousness rather than the cortex and that -- I'll quote -- "The neural substrates of consciousness can be found at all levels of the nervous system."

So they strongly disagree, based on the review of the literature that these areas represent, that consciousness requires the cortex.

Q. And did you cite any of those reviews in your report?

A. I did.

Q. Are those associated with paragraph 37?

A. Yes.

Q. And do you feel like we need to address those in detail?

A. I think we can leave that as the perspective of another set of experts on this question.

Q. So what's the next line of evidence in this category?

A. Well, turning to the question of anesthesia, so the entire point of medical anesthesia is to suppress consciousness and to inhibit pain, to suppress pain responses.

THE COURT: What's your scrivener's line there? I can't read it from here. Is that neural something?

THE WITNESS: I think it's neural basis of consciousness.

THE COURT: Thank you. Go ahead.

THE WITNESS: Although we've used anesthesia for over 150 years, we still have a remarkably poor understanding of how anesthesia actually works. However, there's been a number of recent papers that have looked at brain imagining, high-resolution brain imagining, to detect what parts of the nervous system are active in both animals and in humans when anesthesia causes a loss of consciousness.

And those studies have shown very clearly that, when an animal or a human becomes unconscious, it's associated with loss of activity in the thalamus, not in the cortex, that loss of activity in the cortex only happens later because the cortex is no longer getting information from the thalamus.

So this study shows very clearly that consciousness is associated with activity in thalamic regions of the brain and not in the cortex.

BY MR. SCHAERR:

Q. Does your report cite some studies along those lines?

A. Yes. I actually cite a very large number of studies along those lines in paragraph 38.

Q. Okay. Is there another line of evidence in this category?

A. Yes. So continuing with the kind of general theme that we're attempting with these lines of evidence to establish what parts of nervous system are required for consciousness, the most direct way to assess what parts of the brain do what is in volunteers undergoing brain surgery. Many people, because your brain doesn't experience pain, will offer to be alert during these surgeries so -- and to participate in an experiment where the surgeon will insert an electrode into the brain and provide an electrical stimulus to a small region of the brain and then ask the patient, "Well, when I turned on that part of your brain, when I forced it to become active, what did you experience?"

So you might have heard anecdotal stories about the grandmother cell in the brain or, you know, people that, you know, recall their childhood home or other things when a part of their brain is stimulated. And that all comes from experiences of this type.

THE COURT: So wait. Can you summarize this?

THE WITNESS: I'm going to summarize the results relevant to pain are that many decades of research, many, many tens of thousands of zappings of the brain in different regions, have shown almost no experience of pain can be elicited in only about 1 percent.

THE COURT: Say that again.

THE WITNESS: You don't elicit an experience of pain

by stimulating the cortex. So pain does not live in the cortex. You can't turn it on by activating cortical circuitry. And what that strongly, strongly suggests is that the experience of pain is delivered to the cortex, and then the cortex makes connections or associations or memories about that experience.

But it doesn't produce the experience of pain because if it did, we would be able to elicit it when we directly stimulate the cortex.

BY MR. SCHAERR:

Q. And you cite that study in your report?

A. I cite several studies, including a recent revisiting of the classic body of work done by Wilder Penfield in my report in paragraph 40.

Q. All right. Are we ready to move on to the final line in this category?

A. In this category, yes. So the final line is looking at patients who have chronic pain conditions. So these are people who have phantom limb pain, who have other conditions that cause them to be in a constant state of pain.

And medically what we found is that, either removing parts of the thalamus or stimulating parts of the thalamus or the periaqueductal gray, which is a region of the brain also in that same noncortical part of the brain, can provide very significant relief of pain experiences to patients, whereas

similar stimulation of the cortex provides no effective treatment of chronic pain.
Q. And you cite some of these studies in your report?
A. Yes, I do, in paragraph 41.
Q. Okay. So, in your opinion, what do these four lines of evidence tell us about the necessity of a connection between the thalamus and the cortex in order for a human organism to feel pain?
A. What they tell us is that there is strong evidence to indicate that the cortex is not required for a conscious experience of pain and that, in contrast, activity within the thalamus is associated with and required for an experience of pain and for consciousness.
Q. And by rebutting that idea of the necessity of the connection between the thalamus and the cortex, do these studies also support the truth of the statement in the state's fetal pain disclosure?
A. Yes. Because, as I testified, pain information is transmitted to the thalamus between 12 and 18 weeks, and the circuitry in the thalamus is both necessary and sufficient based on this evidence for a conscious awareness of pain. Therefore, the language of the statute is scientifically well supported.
Q. Thank you, Dr. Condic. Shall we move on now to your third and final category of evidence?

A. Sure.
Q. What is that?
A. That is observations of fetal and newborn response to painful stimuli.
Q. And in your opinion, what is the importance of these kinds of studies to understanding the fetal capacity for pain?
A. Well, some of the studies are actually done in fetuses and -- or done in premature infants that are born at stages that would be relevant to the statute.
And they allow us to apply to the fetus the same kind of measures we use for assessing pain experience in more mature patients and in animal subjects. So we have a large body of work that has established particularly a system of coding, facial gestures, that's widely used throughout medicine for people with impaired states of consciousness or language.
So people with dementia, for example, who may not be able to communicate to us what their pain experience is, we can still read out from very evolutionarily conserved facial gestures what the experience of that patient is.
So these are widely used. They're very standard. They are well validated and, as I said, even apply to animals. People have used them in sheep and in dogs to assess pain experience of those kinds of organisms.
Q. So what's the first line of evidence in this category?
A. So in this category of observing a fetus or a newborn's

response to pain, there's a large body of work, again, that I think is uncontroversial indicating that a human fetus between 18 and 22 weeks shows a hormonal and circular tower response in response to pain.

So their body reacts to a painful experience in the same way that more mature individuals react, by elaborating increases in hormones and other physiologic changes associated with stress.

Q. And are there studies that support that proposition?

A. Yes, there are a number of studies supporting it. They're cited in paragraph 43 of my report. And I would also note that these studies indicate you can relieve this stress response by anesthesia.

Q. Is the Seculuc (phonetic) study an example of that?

A. Yes. That's actually an example of the next line of evidence.

Q. Let's move on to that one.

A. The Seculuc (phonetic) study was based on the fact that very young fetuses, between 18 and 20 weeks of age, show a hormonal stress response to pain. Many anesthesiologists have concluded that it's warranted to provide anesthetic relief to a fetus during potentially painful in utero procedures. So when surgery is being done either on the mother or on the fetus itself, we will, of course, anesthetize the mother to relieve her pain experiences, but given that the fetus appears to

respond in a very similar manner to how the mother responds, anesthesiologists have recommended that fetuses be given anesthesia to prevent a pain response and in particular to prevent the known -- the known impact of painful experiences on brain development.

So stressful experiences can inhibit the development of the brain, and to prevent that from happening we want to prevent pain from happening.

Q. And, ultimately, what kinds of evidence are those studies based on?

A. They are based on the observations of the anesthesiologist. They are based on the known impact of painful experiences on brain development.

Q. And are there some of those studies that are based on doctors' actual experiences in trying to operate on fetuses and discovering that they were inflicting pain accidentally?

A. I can't speak to the motivations of the people writing these reviews. I can only speak to what they've published.

Q. But there are some examples like that, right?

A. There are some examples in the literature I cite that are reported in those terms.

Q. Okay. What's the third and final line of evidence in this category?

A. The third and final line of evidence is the application of these codified systems for encoding pain based on facial

gestures in premature infants. So in infants as early as 23 weeks, using these established systems for scoring the level of pain experienced, it's pretty unambiguous that these premature infants do experience pain in response to painful procedures.
Q. Where in your report are those studies discussed?
A. In paragraph 45.
Q. Okay. And you mentioned that those studies show those kinds of reactions as early as 23 weeks. Now, why would the reaction of a premature baby at 23 weeks be relevant to the truth of a statement about pain at 20 weeks?
A. Because at 23 weeks the purported necessary connections between the thalamus and the cortex have not occurred. And we have very limited data from premature infants born prior to 23 weeks because it's very hard to keep those infants alive.
Q. So is it fair to say that that data, those data about 23-week-old infants are relevant because they, once again, rebut the necessity of the connection between the thalamus and the cortex?
A. Yes.
Q. So how do you interpret those observations in light of the other evidence that you've discussed today?
A. I would say all of these lines of evidence have been entirely ignored by the two reviews cited, the Lee review in the Journal of the American Medical Association and the RCOG review. And together they provide a very strong body of

evidence that connections between the thalamus and the cortex are not required for consciousness or a conscious experience of pain and that activity within the thalamus is sufficient for conscious pain awareness in the fetus, which would mean that the circuitry that's present between 12 and 18 weeks would be sufficient for --

THE COURT: You have written these conclusions yourself in academic journals?

THE WITNESS: Have I written the conclusions myself?

THE COURT: Have you written any articles that are peer-reviewed to that effect?

THE WITNESS: This is not my direct area of research. I prepared this report at the request of the State of Indiana.

THE COURT: So the answer is no.

THE WITNESS: The answer is no, ma'am.

BY MR. SCHAERR:

Q. But is it fair to say that you are very familiar with these studies we've discussed today?

A. Yes, that would be fair to say.

Q. And that they're within your areas of expertise?

A. Yes.

Q. So let's talk a little bit about Dr. Grossman's testimony yesterday.

What publications do you understand to be the basis for Dr. Grossman's conclusion that a fetus cannot experience pain

before the third trimester?
A. Dr. Grossman appears to rely exclusively on a one-page statement by the American College of Obstetricians and Gynecologists that itself refers to a review published in 2005 by Lee, et al., in the Journal of the American Medical Association and a review published by the Royal College of Obstetricians and Gynecologists, which is the professional body for obstetricians and GYNs in the UK in 2010.
Q. As you understand it, did he rely on anything more than these three?
A. I believe he relied exclusively on the ACOG statement and, by extension, on the two papers cited by ACOG.
Q. Well, let's take a deeper look at the Lee paper. And let's call up, if we can, Plaintiff's Exhibit 422.
MR. SCHAERR: By the way, Your Honor, while we're calling that up, let me move to admit Exhibit DX8 into evidence. That's the chart that we were looking at before that shows the development of the nervous system.
THE COURT: Any objection?
MS. CHARMANI: No objection, Your Honor.
THE COURT: DX8 is admitted.
(Defendants' Exhibit 8 received in evidence)
BY MR. SCHAERR:
Q. Okay. Dr. Condic, you're familiar with this paper?
A. Yes.

Q. Are there things here that you agree with?
A. I agree with the vast majority of the evidence presented in this paper. It's, as I have noted in the past, not controversial. It's cited by everyone who reviews this topic and with only one interpretation. So much, if not most, of what this review covers, I am in full agreement with.
Q. In your opinion, does it provide any evidence to support Dr. Grossman's opinion that a fetus younger than 24 weeks, or younger than the third trimester, is incapable of experiencing pain?
A. It does not.
Q. And does the article itself make that claim?
A. The article itself does not make the claim with the same degree the strength that Dr. Grossman made it. If you look in the abstract of the paper under "Conclusions" on the first page, it states, "Evidence regarding the capacity for fetal pain is limited, but indicates that fetal pain perception is unlikely before the third trimester." It does not state that a fetus is incapable of feeling pain before the third trimester.
Q. Okay. And, Dr. Condic, how old is this paper?
A. This paper was published in 2005.
Q. Does that have a -- does that have a bearing on the degree of confidence that you would place in that study?
A. As I put in my report, I reviewed the literature since 2005, and I would say that a large body of literature has

arisen since 2005 that would call this conclusion into question.

Q. Okay. And those would include the 12 lines of evidence that we've discussed today?

A. Much of that evidence was, in fact, available at the time this article was written. But it was, for reasons I find hard to understand, simply ignored.

Q. Well, let's turn to the RCOG review, which I think is Recollect Number 122. I'm sorry. I'm told this is 121.

Can you give us a brief overview of what this review did?

A. So this was a review that was put together by the Royal College of Obstetricians and Gynecologists, which is the professional association of OB/GYNs in the United Kingdom in March of 2010. It was produced by a team of experts and was reviewed by another independent group of experts but, to my knowledge, was not submitted for ratification by the members of the college.

Q. Okay. And are there things in this study that you agree with?

A. Again, similar to the Lee review, I agree with the vast majority of the evidence presented in this report. I think it's uncontroversial. It's interpreted in the same manner by everyone who considers this topic.

Q. And what is it about this study that you disagree with?

A. What I disagree with in this study is exactly the

contention that I disagree with in the Lee review. Both the Lee review and this RCOG review assert without evidence that connections between the thalamus and the cortex are necessary for a fetus to have a conscious experience of pain, and I believe substantial evidence counterindicates that assertion.

Q. Well, in that regard, let's turn to the summary of this study, which is on page 11. Could you read the first two sentences once we get there. Go ahead.

A. Can we make that larger? Good. Thank you.

So this is the summary of the first section of this review, which summarizes the neurobiological evidence in support of their conclusions. And it states, "Connections from the periphery to the cortex are not intact before 24 weeks of gestation."

Q. Let me stop you there. Do you agree or disagree with that statement?

A. I agree with that statement.

Q. Okay. Let's read the next sentence.

A. "Most pain neuroscientists believe that the cortex is necessary for pain perception. Cortical activation correlates strongly with pain experience and, in an absence of cortical activity, generally indicates an absence of pain experience." And then they provide three citations for this critical assertion.

Q. And we'll look at those in a minute. But do you agree or

disagree with that particular statement?
A. Well, the authors of this review present no evidence in support --
THE COURT: Just go ahead and answer that question first.
THE WITNESS: I disagree.
BY MR. SCHAERR:
Q. Why is that?
A. I disagree because the authors present no evidence that "most pain neuroscientists believe the cortex is necessary." So it's merely an assertion. They cite no evidence to that effect.
Q. Well, and yet they do cite three studies, right? Don't those studies support their conclusion?
A. They don't support the assertion that most neuroscientists -- I mean, there's no survey of neuroscientists. There's no attempt to assess the opinion of most pain neuroscientists. They simply state that, in their view, most pain neuroscientists do believe this. And then they provide three citations in support of the specific claims that pain perception is impossible in the absence of cortical activity.
Q. And how can you find the citations to that statement?
A. So the numbers, the Footnote Numbers 52 to 54 refer to the reference in the immediately subsequent section.

Q. And why do you say that none of those articles supports the statement in the text? Shall we start with the Fransson study?
A. Yes. The Fransson study is a study of the resting brain activity in infants. It does not address pain experience, and it does not specifically address the resting brain activity of fetuses.
So while it tells us some very interesting things about what the brain does in a newborn, it does not support the assertion that the cortex is necessary for pain.
Q. Let's move on to the next study, the 2000 Rosen study.
A. So the Rosen study was a study of pain experiences in adult subjects, particularly pain -- cardiac pain. And in significant contradiction of the assertion that the cortex is required for pain, this study actually demonstrates that multiple areas of the brain are active when a patient experiences ischemic pain.
Q. Does that include noncortical regions?
A. Yes.
Q. So does that study provide any support to the statement for which it's cited?
A. Studies like this I find very hard to interpret because lots of things can be active during a process. So, for example, when you walk, your feet are moving --
THE COURT: The question was does it provide any support for what it says?

THE WITNESS: I say no.
BY MR. SCHAERR:
Q. Can you explain?
A. I can explain. Continuing the analogy I was just developing, when you walk, your feet move. That's activity in the feet. Lots of people walk by moving their hands too. And simply observing activity in the hands doesn't tell us whether activity in the hands is required for walking. But we can test it by blocking activity in the hands. If I tie the hands to the body and don't allow them to move, can the person still walk? Well, as an Eastern European, I would find it very hard to talk if I couldn't move my hands. But walking, typically people can still move, can still walk just fine, even though an activity associated with walking has been eliminated.
So simply showing activity in regions of the brain does not prove or provide strong evidence or, I would say, any evidence that that activity is required for an experience of pain.
Q. Well, Dr. Condic, surely the third study that's cited here would provide at least some support for the statement that we were talking about earlier.
THE COURT: Is that a question?
BY MR. SCHAERR:
Q. Is that correct?
A. The third study by Coghill also provides no support for the assertion of authors.

Q. Why is that?
A. This is also a study of adult subjects. And in this study, the 10 -- or 20 adult subjects were recruited for a pain study, and they were divided into two groups based on their response to a standard laboratory painful stimulus. So the individuals who found the stimulus very painful were in the sensitive group, and individuals who perceived the stimulus as painful but didn't find it as painful were in the less sensitive group.
And then the authors examined activity of the brain in response to painful stimuli. And what they found was the cortex was active only in those individuals who were very sensitive to pain, and yet the thalamus was active in all of the subjects.
Q. So what does that tell us about the necessity of the connection between the thalamus and the cortex in order for someone to feel pain?
A. Clearly, people can experience pain without activating their cortex.
Q. Let's turn now to the ACOG paper, which is Plaintiff's Exhibit 420. We don't have to worry about scrolling through that one.
Dr. Condic, are you familiar with this paper?
A. Yes.
Q. And how many pages is it?
A. Three-quarters, half a page.

Q. And does this short paper provide any evidence supporting Dr. Grossman's 24-week or third-trimester opinion regarding the ability of a fetus to feel pain?
A. No.
Q. What does it do?
A. It asserts the same opinion based on the RCOG 2010 review and the Lee 2005 review.
Q. And you've said that neither of those reviews actually provides any support for the assertion either, correct?
A. Correct.
Q. So, overall, what significance do these publications, these three publications have in addressing the scientific evidence that you've reviewed showing that subcortical structures are sufficient for suffering and that fetuses as early as 20 weeks are capable of suffering?
A. No significance.
Q. Okay. They don't address the subject at all?
A. Both the RCOG review and the Lee review, as I testified, present uncontroversial scientific information regarding the development of neural structures during the embryonic and fetal period and regarding the function, the known function, of those structures.
But they provide -- and though those are two pillars on which we have to rest our interpretation of fetal pain. If we don't have the structures or the structures are not capable of

functioning in a manner that is consistent with an experience of pain, well, then, obviously, the fetus is incapable. But we all agree that those structures arise between 12 and 18 weeks of fetal life.

The third pillar of the Lee review and Royal College argument is the pillar that asserts you must have connections between the thalamus and the cortex. And I think the 12 lines of evidence I've reviewed and detailed in my report demonstrate that this third leg is simply smoke and mirrors. And the whole thing falls down.

Q. Now, Dr. Condic, do you recall that Dr. Grossman referred to a scientific consensus on fetal incapacity for pain before 20 weeks, or the third trimester?

A. Yes, I recall that.

Q. Did he appear to be relying on these three studies in support of the argument that there's a scientific consensus on that point?

A. Yes, he did.

Q. So what would you conclude about the existence of a consensus on this point regarding the connections between the thalamus and the cortex?

A. I would say that the opinions of medical and scientific practitioners are not so important as the evidence and that the evidence, as I've gone through 12 independent lines of evidence, reflects a very broad body of evidence that is in

agreement regarding the necessity and sufficiency of the thalamus for a conscious experience of pain.

So I believe there is perhaps a consensus among OB/GYNs, who are the primary providers of abortion services in both the United States and in the United Kingdom, or among the leadership of their professional organizations. But I don't think it can be credibly argued that the scientific literature, data, and perhaps even the practitioners of that data, the people who have originated, all agree with that statement.

Q. Does there appear to be a consensus among those who actually study and practice in the area of neurobiology and human embryology?

A. Again, with the caveat of I have never surveyed the opinions of my colleagues on a broad level. I think there are probably several hundred thousand members of the Society for Neuroscience. But certainly the weight of the evidence that they have produced is in full agreement, full consensus.

Q. If you look just at the evidence, have you seen any dissent from the view that you've expressed here today?

A. This is a vast area of research. I can testify I have not seen dissent. But I can also testify that I have probably not read every single relevant paper of the many hundreds of thousands of papers that are probably out there.

Q. But is it fair to say that you've done a pretty thorough review of this area of the literature?

A. I have. I started with the RCOG and the Lee reviews, considered publications produced by the authors they cite since the time at which these reviews were published. And I considered, based on my knowledge and training and experience, other areas such as the areas we've covered today that were not covered by these reviews. And all of that data is in very good agreement.
Q. Now, based on his review of the Lee, RCOG, and ACOG reviews, do you recall Dr. Grossman testifying that fetal pain is not an area of "ongoing controversy in the scientific community"?
A. I do recall him making that statement.
Q. And do you agree with that?
A. I disagree.
Q. And why is that?
A. Again, the process that I went through in the preparation of my report was to consider more current literature, even literature by the same authors that were cited in the two reviews that Dr. Grossman had referred to. And I think my reading of the more current literature indicates a number of authors who explicitly deny a consensus and explicitly deny that this is not a controversial area, that it's a settled question.
Q. And is it fair to say that some of those developments are quite recent?

A. Yes.
Q. All right. Well, let's move to a different topic. If --
THE COURT: How many longer on direct, Counsel?
MR. SCHAERR: I think about five minutes, Your Honor.
THE COURT: All right. Let's wrap it up.
BY MR. SCHAERR:
Q. If we could call up Recollection Exhibit 155. And let's look for just a moment at the human life disclosure provision of Indiana law. Dr. Condic, do you recall hearing Dr. Grossman say yesterday that there is no scientific evidence on when life begins.
A. I do recall him testifying to that effect.
Q. And in your opinion, is that true?
A. I -- in my opinion, it is false.
Q. And in your opinion, when does human physical life actually begin?
A. In my opinion, human physical life begins at the fusion of human sperm and human egg.
Q. And why do you believe that?
A. I've written extensively -- two books and two peer-reviewed scientific articles -- well, five maybe -- on this topic. And I think the evidence is completely uncontested in the literature that the difference between a human cell and a human organism has to do with the ability to self-direct all of the processes of life to when you are an embryonic organism

to build the structures you need to have at more mature stages.

And so the relevant question about when human physical life begins is when can we see a real difference in the behavior of the two cells that give rise to a human being, a human organism, and a human organism itself.

And an enormous evidence indicates that, in the transition between two cells and one cell, a very fast event that takes less than a second to occur, there is an instantaneous change in the molecular properties and the functional behavior of the cell that's produced that can only be explained in terms of this cell being a developing organism.

THE COURT: Ms. Charmani?

MS. CHARMANI: Your Honor, we would object to this line of testimony and this line of questioning. Dr. Condic's report is limited to her --

THE COURT: Pull it down. You can pull it towards you.

MS. CHARMANI: Dr. Condic's report is limited to her observations about fetal pain. Her report does not include her conclusions about when human life begins.

MR. SCHAERR: Let me conclude, Your Honor.

THE COURT: No, let me ask you. That's the objection. Do you have a response to the objection?

MR. SCHAERR: Well, she's simply responding to what Dr. Grossman testified to yesterday.

THE COURT: But if it's not in her report, she can't do that. So I'll strike the testimony with respect to when life begins as being beyond her expert disclosures.

MS. CHARMANI: Thank you, Your Honor.

BY MR. SCHAERR:

Q. Just a couple more questions by way of wrap-up.

In light of the scientific evidence that you've discussed today and based on your research, training, and experience in the disciplines of neurobiology and human embryology, et cetera, have you formed an opinion on whether the fetal pain disclosure in Indiana law is truthful and not misleading?

A. Yes.

Q. And what is that opinion?

A. I believe the language of the statute is both truthful and not misleading.

Q. In your opinion, why is the state's required disclosure useful or important?

A. I think a decision to have an abortion is a very complicated decision and one that should be made by the woman in an informed manner. Many people consider the question of whether a fetus will experience pain to be a relevant feature of that decision. And I believe women deserve to have accurate information.

MS. CHARMANI: Again, Your Honor, we move to strike her testimony responding to this question. It's outside the

scope of her expert report. It's outside her expertise.

THE COURT: What in particular is outside her disclosures in her report?

MS. CHARMANI: Her opinions about how to deal with the issue of abortion and how women should deal with this issue. She has been qualified as a neurobiologist, and she's expressing an opinion on fetal pain.

THE COURT: Sustained.

MS. CHARMANI: Thank you.

BY MR. SCHAERR:

Q. Dr. Condic, do you hold each of the opinions that you've expressed today to a reasonable degree of scientific certainty?

A. Yes.

MR. SCHAERR: Thank you.

THE COURT: How long will cross-examination take?

MS. CHARMANI: I will be very brief, Your Honor, 15 minutes tops.

THE COURT: Okay. You may proceed. I want to finish at 5:30 today.

MS. CHARMANI: Okay.

THE COURT: Show the applause from my court reporter.

*CROSS-EXAMINATION*

BY MS. CHARMANI:

Q. Good afternoon, Dr. Condic.

A. Good afternoon.

Q. I believe you testified on direct that you haven't published any peer-review articles on the topic of human fetal pain; is that correct?
A. Correct.
Q. In fact, none of the research and review articles that you list on your CV are on the topic of human fetal pain, correct?
A. Correct.
Q. And none of the books and the book chapters that you list on your CV are on the topic of human fetal pain, correct?
A. Not entirely correct. So I've written two books on human embryology that touch upon the question of fetal pain, not as the major focus of the book.
Q. Okay. And it's fair to say that the vast majority of your research is not on the topic of human fetal pain, correct?
A. Correct. I am an animal biologist. I study the development of the nervous system in an animal model.
Q. And, in fact, the vast majority of everything you've written on the topic of human fetal pain has been in response to requests for expert reports and testimony in legal proceedings, correct?
A. Correct.
Q. And in your report you don't cite a study where you are the author or coauthor on the topic of human fetal pain, correct?
A. I believe you've already asked me this question, and I've answered correct.

Q. And you're not a healthcare provider?
A. I am not a medical doctor, yes.
Q. You've never obtained informed consent from a patient?
A. I am not a medical doctor; I do not obtain informed consent.
Q. And I believe, on direct testimony, you addressed the ACOG report or ACOG's view on the issue of human fetal pain, correct?
A. Yes.
Q. And you disagree with ACOG's current view on human fetal pain, correct?
A. Yes.
Q. And you also discussed RCOG's report on the issue of human fetal pain, correct?
A. Yes.
Q. And RCOG also concludes that strong evidence implies that pain is not possible until after 24 weeks of gestation, correct?
A. They conclude that based on the evidence we discussed, yes.
Q. And the RCOG review was commissioned by the United Kingdom government, correct?
A. Indirectly, yes.
Q. And as we saw during your direct testimony, RCOG relied on over 50 papers for its conclusions, correct?
A. Yes, it relied on actually quite a bit more than that if

you consider the citations that are present in the subsequent sections of the report.

Q. And although you disagree with RCOG's conclusion, you can't assert that there is evidence that disproves RCOG's conclusion?

A. I do assert that there's evidence that disproves RCOG's conclusion based on the 12 lines of evidence we reviewed in my direct testimony.

MS. CHARMANI: Can we please bring up Plaintiff's Exhibit 928.

THE COURT: Page and line, please.

MS. CHARMANI: Page 125, lines 6 to 16, please.

BY MS. CHARMANI:

Q. Dr. Condic, do you remember testifying in a case captioned Bernard v. Individual Members of the Indiana Medical Licensing Board on February 22nd, 2021?

A. I do.

Q. And you were under oath during that deposition, as you are today?

A. Yes.

Q. And I will read a little bit higher than that saying. You were testifying that you disagreed with the RCOG report.

And you said, "I am disagreeing with RCOG because RCOG asserts that the cortex is required for conscious pain perception, and I believe the weight of the evidence disproves -- I can't say disproves -- strongly argues against

that conclusion."
    Did I read that correctly?
A. You did.
Q. And I believe during direction examination you also commented and explained that you disagree with the Journal of the American Medical Association's conclusions on this issue; is that correct?
A. Are you referring to the Lee review?
Q. Yes.
A. Yes, I disagree with their conclusions also.
Q. And articles that are printed in the Journal of the American Medical Association are peer-reviewed, correct?
A. Yes.
Q. And I believe earlier today you said, "Peer review is a guarantee, a good guarantee that the study meets the standards of the profession for rigor and completeness."
    Is that correct?
A. That's correct.
Q. And the JAMA review is based on over 2,000 sources; is that correct?
A. 2,000 sources?
Q. Yes.
A. I don't believe that's correct.
        MS. CHARMANI: Can we please pull up Plaintiff's Exhibit 422.

BY MS. CHARMANI:
Q. Dr. Condic, is that the review we were just referring to and that you reviewed during direct examination as well?
A. Yes.
Q. And under "Evidence Acquisition," the review states, "English-language articles involving human participants were searched using PubMed for" -- and it goes on --
THE COURT: Wait just a minute. Your computer person is behind you.
MS. CHARMANI: I'm sorry.
THE COURT: All right. "Evidence Acquisition."
BY MS. CHARMANI:
Q. A little bit further down, note where it says here.
It explains the articles that it searched. And it goes through page 1 and all the way back page 2. It lists the articles and the numbers in each topic. And I'm going to represent to you that, if you add everything up, it's 2,106 articles.
Do you want to take the time to do the math? I can wait.
A. I don't believe I need to do the math. I'm fully confident in your ability to do the math.
But I would note that it -- this section identifies "English-language articles involving human participants were searched." It does not assert that all of those 2,000 articles made a contribution to the review.

The most direct way to determine what the authors, rather than we, 15 years after the fact, might imagine contributed to the article are the citations, of which there are 96.

Q. But what the evidence -- what the "Evidence Acquisition" section states is that they reviewed other articles apart from the articles that they thought supports their position or are noteworthy. And if you see on page 2 at the end of the relevant section, it says, "With a focus and topics addressed by earlier review articles on fetal pain, anesthesia, and analgesia" --

THE COURT: Whoa, whoa, whoa. You're going way too -- I can't even hear you that fast.

MS. CHARMANI: Apologies, Your Honor.

BY MS. CHARMANI:

Q. Exactly.

The last sentence says, "With a focus on topics addressed by earlier review articles on fetal pain, anesthesia, and analgesia, articles were reviewed for additional references."

A. Yes.

Q. Did I read that correctly?

A. You did.

Q. On the same page -- let's stay with Plaintiff's Exhibit 422 -- in the paragraph where it reads "What is Pain?"

A. Yes.

Q. Do you see the sentence that states, "The psychological

nature of pain also distinguishes it from nociception, which involves physical activation of nociceptive pathways without the subjective emotional experience of pain."

Did I read that correctly?

A. Correct.

Q. And I understand that you disagree with the distinction that JAMA is drawing here between pain and nociception, correct?

A. I do not disagree with that distinction.

Q. But do you disagree with the distinction between nociception and conscious awareness of pain?

A. I agree that, as the Lee review has stated, that there is a distinction between nociception and -- what do they call it? -- a psychological experience -- an emotional experience of pain -- a subjective emotional experience of pain. I agree.

Q. And many authors of published literature also make the same distinction between conscious awareness of pain and nociception, correct?

A. Many authors -- yes, it is correct many authors make this distinction, as do I.

Q. Can you identify -- in fact, you can't identify any medical or scientific professional organization such as ACOG or RCOG or the American Medical Association that has concluded that a fetus has the capacity to consciously experience pain prior to 24 weeks' gestation; is that correct?

A. I can't identify any?
Q. Any medical organizations or scientific professional organizations.
A. In my experience, medical organizations and professional organizations do not typically pontificate on topics such as this. The answer is --
THE COURT: That isn't the question; so try to answer the question.
THE WITNESS: I am not aware of any, no.
BY MS. CHARMANI:
Q. Thank you.
Dr. Condic, you're an associate scholar for the Charlotte Lozier Institute, correct?
THE COURT: Ms. Howie-Walters hasn't heard of that before.
BY MS. CHARMANI:
Q. Is that correct?
A. Yes. Correct.
Q. And the Charlotte Lozier Institute is the 501(c)(3) research and education institute of the Susan B. Anthony List; is that correct?
A. Correct.
Q. And the Susan B. Anthony List is an organization dedicated to electing candidates and pursuing policies that will reduce and ultimately end abortions; is that correct?

A. I -- I think that's a reasonable -- a reasonable characterization of their stated mission.

Q. Thank you. The Lozier Institute's stated mission is to diminish and ultimately overcome what its mission statement characterizes as the "scourge of abortion."

Is that accurate?

A. If that's what their mission statement states, I assume you are reading it accurately, yes.

Q. Thank you.

Would you characterize yourself as pro-life?

A. If I was -- if pro-life and antilife were my only choices, yes, I would be pro-life. I don't know what I'm contrasting it to.

Q. You believe that the abortion is the taking of an innocent human life; is that correct?

A. Yes, based on the scientific evidence.

Q. Thank you. One last question.

Can we please pull up Plaintiff's Exhibit 929.

Dr. Condic, I believe you testified during direct examination that these lines of evidence that are on the chart prove that a fetus is capable of consciously experiencing pain before 24 weeks; is that correct?

A. I said they provide consistent and strong support for that conclusion, yes.

Q. Can we please go to page 197, lines 6 to 13.

Excuse me. I think I pulled up the wrong exhibit. PX927. I apologize. Page 197, line 6 to 13.

MS. CHARMANI: Your Honor, I apologize. I need one second.

THE COURT: All right. Should we forego the search for exhibit whatever it was, 197?

MS. CHARMANI: It's Exhibit 928. Shouldn't have skipped 928.

THE WITNESS: We have too many exhibits. It's always confusing.

THE COURT: So wait. We're focused now on Exhibit 928?

MS. CHARMANI: 928.

Third time is the charm. Line 6 through 13.

BY MS. CHARMANI:

Q. Dr. Condic, during your deposition that we referenced before in the Bernard v. Individual Members of the Indiana Licensing Board case, you were asked, "And you'd agree that none of the nine lines of evidence that you present in paragraphs 32 through 42" -- I believe it was referring in the report you were preparing for that case -- "prove that a fetus is able to consciously experience pain, right?"

"A I believe none of the nine lines of evidence I present prove a fetus is capable -- or does experience pain because that kind of proof is not possible with any

scientific evidence."

Did I read that correctly?

A. Correct. Yes, you did.

MS. CHARMANI: No further questions on direct, Your Honor.

THE COURT: All right.

We have ten minutes for redirect if you need it.

MR. SCHAERR: Just a couple of questions, Your Honor.

REDIRECT EXAMINATION

BY MR. SCHAERR:

Q. Dr. Condic, let's begin with your Bernard deposition, which was just referenced a couple of times.

A. Yes.

Q. What did you mean by the statement that proof on this subject that you've been addressing today is not possible?

A. I think that quote was taken substantially out of context. My recollection at least is that we spent a fair amount of time in that deposition talking about the inability of anyone to crawl inside the head of another person and know what their pain experience really is.

And I had defined multiple times in that deposition the fact that science cannot do that. It can't do that for fetuses; it can't do that for children. It can't even do that for adults.

Thankfully, with adults, we have language. And we can ask

the subject what their experience of pain is, and they can communicate it to us. But in nonverbal subjects, in animals, in people with impaired consciousness, with dementia, with absence of language, including the fetus, it's not possible for us to know with certainty what their experience is.

And that was my intention or my recollection of why I made the statement that scientific evidence cannot prove in a strict sense because we can never know what someone else's emotional and psychological experience is. We can understand it if they communicate it to us.

Q. Dr. Condic, is there a distinction in your mind between absolute or strict proof on the one hand and very strong evidence on the other?

A. You know, I was trained --

THE COURT: Is there?

THE WITNESS: There is.

BY MR. SCHAERR:

Q. And what is that distinction?

A. I was trained by a very rigorous program --

THE COURT: No, what is the distinction?

THE WITNESS: And the distinction that I was taught was that true proof means no other hypothesis is possible. And that never happens, never.

THE COURT: Next question, Mr. Schaerr.

BY MR. SCHAERR:
Q. In your mind, what's the distinction between that and strong evidence?
A. Strong evidence is what colloquially everyone would call proof. What does science shows us? What does it tell us? What is the evidence from science? And that is strong evidence, strong support.
Q. In your opinion, Dr. Condic, is the -- are the 12 lines of evidence that you've presented here today, do they constitute strong proof of the ability of a fetus before 20 weeks to feel pain?
A. Absolutely. They are extremely strong evidence. And by the usage outside of science of the term "prove," they prove it.
Q. Okay. Let's talk just for a moment about the RCOG study and the JAMA study.
Counsel mentioned that the RCOG study was -- or you mentioned in response to her question that the RCOG study was funded in part by the UK government. Do you recall that?
A. I believe she --
Q. Or indirectly by the UK government.
A. -- stated that it was requested.
Q. Okay.
A. By the UK government or commissioned.
Q. Commissioned by the UK government?

A. Yes.
Q. Okay.
Does -- the UK government's involvement in that study, in your view, does it strengthen or undermine the credibility of the study?
A. I think it's neutral with respect to the credibility of the study.
Q. Okay. And how many articles were cited in the RCOG study for the key proposition that a connection between the thalamus and the cortex is required for a fetus to experience pain?
A. The three articles we discussed.
Q. And how many of those articles actually support that proposition?
A. None of them.
Q. With respect to the JAMA study -- which I believe is also the Lee study; is that correct?
The Lee study was published in the Journal of the American Medical Association?
A. Correct.
Q. And you recall that counsel put emphasis on the fact that that journal is a journal of the American Medical Association.
Does the association of that article with that organization, in your view, have any impact on the credibility of the study?
A. No.

Q. Okay. Are you aware whether the American Medical Association has taken an official position on abortion?
A. Not to my knowledge.
Q. Okay. In all events, in the Lee study, how many studies cited there actually address the key question about the necessity of a connection between the thalamus and the cortex in order for a fetus to experience pain?
A. None of them.
Q. Did the Lee study cite any studies or articles for that proposition?
A. They do not.
Q. Okay.
MR. SCHAERR: No further questions, Your Honor.
THE COURT: Recross?
MS. CHARMANI: No, Your Honor. Thank you.
THE COURT: All right. Good.
Thank you, Dr. Condic. You may step down. You've finished with your testimony.
Lawyers, we'll call it a day. It's coming right up to 5:30.
Tell me what's next, Mr. Fisher.
MR. FISHER: We just have one witness, Dr. Stroud, remaining.
THE COURT: Okay. So how much time will that take?
MR. FISHER: 30 to 40 minutes.

THE COURT: And then you have rebuttal?

MS. SINGH: We have maybe one rebuttal witness, but we'd like to see Dr. Stroud's testimony before deciding. And another that I think we might be able to do away with with a stipulation of facts that we're going to work on.

So we may not have any rebuttal witnesses, but we'll know after Dr. Stroud's testimony.

THE COURT: All right. Well, then, we'll reconvene at 9:30, as has become our custom.

Have a nice evening.

Now, remember, the courtroom deputy has to escort you out of here unless you want to set off alarms and cause trouble.

Have a nice evening.

(Off-the-record discussion.)

THE COURT: Good night.

(Court adjourned at 5:26 p.m.)

CERTIFICATE OF COURT REPORTER

I, Laura Howie-Walters, hereby certify that the foregoing is a true and correct transcript from reported proceedings in the above-entitled matter.

/S/LAURA HOWIE-WALTERS June 24th, 2021

LAURA HOWIE-WALTERS, FCRR, RPR, CSR
Official Court Reporter
Southern District of Indiana
Indianapolis Division