UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WHOLE WOMAN'S HEALTH ALLIANCE, ALL-OPTIONS, INC., JEFFREY GLAZER M.D., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:18-cv-01904-SEB-MJD |
| TODD ROKITA Attorney General of the State of Indiana, in his official capacity, KRISTINA BOX Commissioner of the Indiana State Department of Health, in her official capacity, JOHN STROBEL M.D., President of the Indiana Medical Licensing Board of Indiana, in his official capacity, KENNETH P. COTTER St. Joseph County Prosecutor, in his official capacity and as representative of a class of all Indiana prosecuting attorneys with authority to prosecute felony and misdemeanor offenses, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**FINDINGS OF FACT AND CONCLUSION OF LAW**

On June 21, 2018, Plaintiffs Whole Woman's Health Alliance, All-Options, Inc., and Jeffrey Glazer, MD. (collectively, "Plaintiffs") initiated this lawsuit against Defendants Todd Rokita (previously Curtis Hill, Jr.), Attorney General of Indiana; Kristina Box, M.D., Commissioner of the Indiana State Department of Health; John Strobel, M.D., President of the Medical Licensing Board of Indiana; and Kenneth P. Cotter, St. Joseph County Prosecutor ("the State") under 42 U.S.C. § 1983, waging a global assault on the constitutionality of Indiana's statutory and regulatory restrictions on abortions. Plaintiffs' complaint challenges twenty-five separate sections of Indiana's

1

wide-ranging regime to regulate abortion, asserting that these provisions violate the

Substantive Due Process Clause of the Fourteenth Amendment (Count I), the Equal

Protection Clause of the Fourteenth Amendment (Count II), and the Freedom of Speech

Clause of the First Amendment (Count III). Plaintiffs also challenge various statutes as

unconstitutionally vague in violation of the Fourteenth Amendment's Procedural Due

Process Clause (Count IV).

Given the expansive scope of Plaintiffs' legal claims as well as challenges imposed

by the COVID-19 pandemic, the parties and the Court agreed to bifurcate the trial of

these issues into two parts. "Phase I" issues were heard during a "virtual" bench trial on

March 15, 2021; "Phase II" were presented in similar fashion on June 23, 2021.[1]

For the reasons explicated in the following decision, based on the Court's thorough

review and consideration of all evidence presented at trial, the following provisions are

ruled unconstitutional, and their enforcement permanently enjoined: The Telemedicine

Ban, the In-Person Examination Requirement, the Physician-Only Law as it relates to the

first-trimester provision of medication abortion, the Second-Trimester Hospitalization

Requirement, and the Mandatory Disclosures and Facility Requirements identified

herein. The Court also rules that the following provisions pass constitutional muster: the

Ultrasound Requirement, the Physician-Only Law as it relates to the provision of

aspiration abortion, and the limitation on preabortion counseling sessions by only

---

[1] Citations to "Phase I Tr." refer to the official transcripts for Phase I of this case, organized in volumes and docketed at Dkt. Nos. 378, 379, 380, and 381. As of the date of this Order, official transcripts for Phase II have not yet been finalized and docketed; however, unofficial copies were provided to all parties. These transcripts are cited as "Phase II Tr."

physicians and advanced practice clinicians, as well as the criminal penalties provisions imposed for violations of the abortion restrictions.

Accordingly, the following findings of facts and conclusions of law are hereby entered.

## I.     Scope of Claims

The Constitution, among its many protections and liberties, includes in poignant judicial parlance the freedom from state-required motherhood. *Roe v. Wade*, 410 U.S. 113, 152–53 (1973). The Supreme Court has recognized the primacy of a woman's right to exercise "control over her destiny and her body," an entitlement that is "implicit in the meaning of liberty." *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 869 (1992) (plurality op.).

Plaintiffs, a group of abortion providers and nonprofit intermediaries, have challenged a broad array of Indiana's statutory and regulatory restrictions on abortions, which they contend infringe upon a woman's freedom to control her own destiny and body. Indiana law, according to Plaintiffs, places futile and burdensome regulatory requirements on healthcare providers who administer abortion care, mandates the dissemination of misleading and incorrect information to patients relating to the mental and physical health risks of abortion as a condition of securing a woman's informed consent, and unreasonably restricts minors from accessing abortions. The twenty-five sections and subsections of the Indiana abortion code and their accompanying regulations are challenged as facially violative of the Fourteenth Amendment's Substantive Due Process, Procedural Due Process and Equal Protection Clauses, and the First

Amendment. The Court has previously determined in ruling on the State's summary judgment motion that certain challenges could and did not survive.

Clearly, this lawsuit reflects an attempt by Plaintiffs to reduce Indiana's prolix and often burdensome legal scheme governing abortion services, the number and complexity of which limitations have increased during the decades following *Roe v. Wade*. These controls, according to Plaintiffs, have resulted in women facing substantial obstacles to securing abortion services in Indiana. Plaintiffs expressly seek to "return [Indiana] to a system of reasonable and medically appropriate abortion regulations by striking down Indiana's unduly burdensome abortion laws." [Comp. ¶ 9].

We examine these alleged burdens in the context of the Substantive Due Process Clause, which requires consideration of "the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health Alliance v Hellerstedt¸* 136 S. Ct. 2292, 2309 (2016).

## II.    Procedural Background

### A. Plaintiffs' Successful Motion for Preliminary Injunctive Relief re: the South Bend Clinic

On May 31, 2019, the Court issued a Preliminary Injunction, which was thereafter modified on October 1, 2019. While Plaintiffs' Complaint advances facial challenges to Indiana's abortion statutes, the motion for preliminary injunction sought limited, specific relief from various procedural prerequisites to licensure relative to the opening and

operation of an abortion clinic by Whole Woman's Health Alliance ("WWHA"),[2] located in South Bend, Indiana. We held that Plaintiffs had shown a likelihood of prevailing on the merits of their claim that those licensing requirements had been applied in an unconstitutional fashion and that the Indiana State Department of Health (the "Health Department") had unconstitutionally denied WWHA's application for licensure, which decision had thereafter been affirmed by the Health Department's three-member Appeals Panel, its final decisionmaker. Though WWHA had filed a second application, it believed its efforts were futile following additional procedural roadblocks erected by the Health Department. Plaintiffs sought injunctive relief in our Court essentially to break the bureaucratic stalemate.

Following expedited briefings and oral arguments, we granted Plaintiffs' motion for preliminary injunctive relief.  Specifically, we ruled that Plaintiffs had established a likelihood of success on the merits on their claim that Indiana's requirements of licensure for clinics providing medication abortions (that is, those abortions induced by ingesting certain medications) had been applied to WWHA in a manner that was violative of the Fourteenth Amendment's Substantive Due Process and Equal Protection Clauses. This ruling was affirmed with certain procedural modifications by the Seventh Circuit. The modified preliminary injunction requires the Health Department to treat WWHA's clinic (hereinafter, the "South Bend Clinic") as provisionally licensed until a final judgment could issue on the merits of this case. The South Bend Clinic thus commenced operation

---

[2] WWHA "is a nonprofit organization committed to providing holistic reproductive healthcare, particularly abortion care." [Compl. § 14].

and continues to provide medication abortions for women up to ten weeks following gestation.

B.  The State's Motion for Summary Judgment

On November 8, 2019, the State moved for summary judgment on all the claims asserted against it. No cross-motion was filed by Plaintiffs.

Given that Plaintiffs' request for preliminary injunctive relief was unrelated to other allegations in their Complaint, the parties' extensive summary judgment briefing did not address the issues in the preliminary injunction. Indeed, as noted in our Preliminary Injunction, Plaintiffs' motion was "not strictly preliminary to anything" because the Complaint had alleged that the challenged laws were facially unconstitutional, not as applied to WWHA, which reflected the fact that the Complaint has been filed six months before WWHA received the final decision on its first licensure application. [Dkt. 116, at 50]. "Thus," as we explained, "none of the facts related to the administrative proceeding relied upon by Plaintiffs in support of their as-applied undue-burden challenge are pleaded in the [C]omplaint. None would be heard at the time of final judgment on Plaintiffs' facial challenges." [*Id.*, at 50-51]. Accordingly, the State's motion for summary judgment responded to Plaintiffs' challenges to the facial validity of the licensure requirements and various other statutes.

We granted in part and denied in part the State's Motion for Summary Judgment, holding that the following statutory and regulatory requirements are not violative of the Substantive Due Process Clause of the Fourteenth Amendment (as advanced in Count I of the Complaint):

- The <u>Licensure Requirement</u> prohibiting the performance of abortions outside of licensed abortion clinics, ambulatory surgical centers, and hospitals;

- The <u>Reporting Requirements</u> mandating that abortion providers collect detailed information about each of their patients and enter these details in a central databased operated by the Health Department;

- Certain <u>Facility Requirements</u> necessary for aspiration abortion clinics to obtain and maintain licensure;

- The <u>Inspection Requirement</u>, which requires Indiana's Health Department to inspect every abortion clinic within the state once annually and to "conduct a complaint inspection as needed."

- The <u>Admitting Privileges Requirements</u>, which requires a physician providing abortions to either maintain admitting privileges with a nearby hospital or enter into a written agreement with a physician who has such privileges;

- The <u>Dosage and Administration Requirements</u>, which requires the administration of any abortion-inducing drug to comport with the FDA guidelines for such drugs;

- The <u>Mandatory Disclosures</u> regarding the disposal of fetal tissue and the physical health risks as stated in Indiana's Perinatal Hospice Brochure;

- The <u>Ultrasound Requirement</u>, which requires an abortion provider to perform an ultrasound prior to an abortion and to show the ultrasound image to the patient;

- The <u>Eighteen-Hour Delay Requirement</u> mandating that patients delay their abortions for at least eighteen hours following the receipt of Indiana's mandatory disclosures; and

- The <u>Parental Consent Law</u>, which generally requires minors to secure either parental consent or a judicial waiver in order to receive an abortion.

Issues of material fact precluded summary judgment on Plaintiffs' Substantive Due

Process challenges to the following statutory and regulatory requirements:

- The <u>Physician-Only Law</u> limiting the performance of a first-trimester abortion or the prescription of an abortion-inducing pill to physicians;

- The <u>Second-Trimester Hospitalization Requirement</u> restricting the provision of second-trimester abortions to hospitals or ambulatory surgical centers;

- The <u>In-Person Examination Requirement</u>, which requires a physician to "examine a pregnant woman in person" before providing a medication abortion;

- The <u>Telemedicine Ban</u> prohibiting healthcare providers from using telemedicine to prescribe "an abortion-inducing drug"

- The <u>In-Person Counseling Requirement</u>, which requires that all preabortion counseling be provided "in the presence" of the patient;

- The <u>Mandatory Disclosures</u> related to fetal pain, the beginning of life, and the mental health risks of abortion contained in the Perinatal Hospice Brochure;

- The <u>Criminal Penalties</u> provisions; and

- Any and all provisions that were left unaddressed by the parties, including  the specific portions of the Judicial Bypass provision, Ind. Code § 16-34-2- 4(b)-(e), regulating minors seeking abortion care and reporting requirements tailored to minors, as well as various physical plant requirements necessary for licensure.

Summary judgment was also granted in favor of the State with respect to Plaintiffs' claim that the Indiana abortion code constitutes impermissible gender discrimination, in violation of the Fourteenth Amendment's Equal Protection Clause, as set out in Count II of the Complaint. Plaintiffs had alleged, regarding each of the statutes which they challenged as violative of the Due Process Clause, that they are violative of the Equal Protection Clause as well. We withheld a ruling on these equal protection challenges because they "ha[d] not received the kind of thorough discussion and fulsome briefing required" and thus "[were] not amenable to summary judgment." [Dkt. 297, at 116].

With respect to Count III of the Complaint, we granted summary judgment to the State in part, upholding certain mandatory disclosures as not violative of the First Amendment. We held that the State had prevailed in showing that the disclosures regarding the disposal of fetal tissue and the physical health risks stated in Indiana's Perinatal Hospice Brochure were neither untruthful nor misleading and thus satisfied the First Amendment standards. We denied summary judgment to the State, however, with respect to Plaintiffs' claims that the mandatory disclosures regarding fetal pain, the beginning of life, and the mental health risks of abortion contained in the Perinatal Hospice Brochure were violative of the First Amendment, given the significant conflicting testimony and evidence regarding the truthfulness of these assertions.

Finally, we ruled that the State was entitled to summary judgment on Plaintiffs' allegations that three sections specified of the Indiana abortion code were void for vagueness.

C.  The Structure of the Trial

A bench trial on the unresolved claims commenced on March 15, 2021. In light of the COVID-19 pandemic restrictions, the parties acceded to the Court's decision to conduct the trial in two installments or "phases."

"Phase I" of the trial encompassed Plaintiffs' challenges to the In-Person Counseling Requirement, the Ultrasound Requirement, the In-Personal Physical Examination Requirement, and the Telemedicine Ban. Plaintiffs' challenges to the In-Person Counseling and Examination Requirements and the Telemedicine Ban included both Fourteenth Amendment Substantive Due Process and Equal Protection claims.

9

Given our summary judgment ruling that the Ultrasound Requirement did not violate the Substantive Due Process Clause, only Plaintiffs' Equal Protection challenge to this provision proceeded to trial.

"Phase II" of the trial addressed Plaintiffs' Substantive Due Process and Equal Protection challenges to the following provisions: (1) the Physician-Only Law; (2) the Second-Trimester Hospitalization Requirement; (3) the Licensure Requirement;  (4) certain facility regulations governing medication and aspiration abortion clinics; and (5) the criminal penalties provisions. Plaintiffs also challenged various mandatory disclosures as violative of the First Amendment and the Fourteenth Amendment's Substantive Due Process Clause. Plaintiffs abandoned their remaining claims, even though they had survived summary judgment.

In their final pretrial filings submitted in advance of the Phase II trial, Plaintiffs asserted that they were entitled to facial relief from Indiana's Licensure Requirement on Equal Protection grounds. Plaintiffs' pretrial submissions also indicated, for the first time during the three-year pendency of this litigation, that they wished to seek permanent injunctive relief against the Licensure Requirement as applied to the South Bend Clinic.[3] The parties eventually jointly moved to defer consideration of these issues until a decision was handed down on all the other issues following trial. This request was granted; a status conference is currently scheduled for September 23, 2021, to address a plan to resolve this of these remaining licensure issues.

---

[3] In addition, counsel for Plaintiffs confirmed at the March 12, 2021 pretrial conference that no as-applied challenge would be pursued at trial. [Dkt. 366, 7:2–6].

Phase I issues were tried in a four-day "virtual" bench trial that commenced on March 15, 2021; Phase II issues were tried in a three-day hybrid (involving both live and virtual presentations of evidence) bench trial that commenced on June 23, 2021.

## III.    Findings of Fact

Because any constitutional determination regarding the statutes governing abortion must be predicated on an accurate portrayal of the underlying scientific and medical facts, we shall structure our analysis as follows: we begin with (A) an examination of certain scientific background information dealing generally with the safety of abortion procedures in the United States, drawing on evidence and arguments proffered by both parties at trial. Then, we turn to a review of (B) the data reflecting the availability of abortion care in Indiana as well as the challenges faced by women seeking to access this care. The final part of our analysis, (C), lays out the specific Indiana statutes challenged in both Phase I and II of trial.

### A.  Safety of Abortion Procedures

Abortion is a commonly performed medical procedure in the United States; in fact, approximately it is estimated that one in four women in the United States had or will have an abortion at some time during their lifetimes.  [Phase I. Tr. Vol. II, 17: 17–20].

Based on a broad consensus of views and data in reputable medical literature, abortion procedures performed in the United States are regarded as generally safe for the woman undergoing them. In 2018, the National Academies of Sciences, Engineering, and Medicine ("NASEM"), a nongovernmental body established and chartered by the United States Congress, conducted a broad-based survey and analysis of legal abortion

11

procedures being performed clinically throughout the United States. This report (hereinafter, the "NASEM report") is widely recognized as an authoritative source on the safety and quality of abortion care throughout the United States, and its findings hold that abortion is generally a safe and effective process involving minimal medical risks. [Phase I Tr. Vol. II, 21:8–25, 22:1–6, 23:3–9].

Major complications following an abortion are uncommon: a peer-reviewed study published in 2015 by *The Journal of Obstetrics and Gynecology*[4] determined that fewer than one quarter of one percent of women undergoing an abortion will experience a major complication (such as hospitalization, surgery, or blood transfusion). [Phase I Tr. Vol. II, 23:17–25, 24:1–22]. Abortion-related deaths also occur very seldomly according to the Centers for Disease Control ("CDC"). The CDC maintains a robust system of surveillance of all maternal deaths, as explained by Dr. Grossman, Plaintiffs' expert witness specializing in gynecology, abortion care, and public health.[5]

---

[4] The *Journal of Obstetrics and Gynecology* is the official journal of the American College of Obstetricians and Gynecologist ("ACOG"), which is the professional society for practicing obstetrician-gynecologists (OB-GYNs"), representing ninety percent of physicians practicing in this field in the United States.

[5] Dr. Grossman is a physician who specializes in the treatment of obstetrics and gynecology and in public health research. He is licensed and has practiced medicine in California since completion of his residency in 1998. Dr. Grossman is currently a professor at the University of California-San Francisco where he provides clinical care at San Francisco General Hospital, focusing on outpatient obstetrics and gynecology, family planning, miscarriage management, and abortion care. As a professor, Dr. Grossman works with students, residents, and fellows in the clinical setting teaching subjects such as abortion care, miscarriage management, family planning, and other aspects of obstetrics and gynecology. His *curriculum vitae* reflects an impressive and significant involvement in research and various professional organizations, including ACOG. [*See generally* Phase I Tr. Volume II, pp. 7–17]. His opinions at trial were based on his extensive clinical experiences, his expansive and thorough review of relevant medical literature, and his own research in the fields for which he was proffered as an expert witness.

The CDC compiles data through its national "Pregnancy Mortality Surveillance System" as to the prevalence of abortion-related deaths in the United States, defined as those deaths occurring within one year of pregnancy that "result[ed] from a direct complication of an induced abortion, an indirect complication caused by a chain of events initiated by an abortion, or the aggravation of a preexisting condition by the physiological or psychological effect of the abortion." [Phase I Tr. Vol. II, 27:11–25, 28:1–17].  This surveillance system collects data from multiple sources, including state vital records; media reports, including computerized search of full-text newspaper and other print media databases; individual case reports by public agencies such as maternal mortality review committees; reports from health care providers and provider organizations; and reports by private citizens and citizen groups. For each death identified by the CDC that possibly related to an abortion, the CDC receives clinical records and autopsy reports, which are reviewed independently by two medical epidemiologists to determine the cause of death and, specifically, whether it was abortion-related. [Phase II Tr. Vol. II, 116:1–25, 117:1–25]. Based on this data and review process, the CDC has determined an overall abortion mortality rate of 0.7 deaths per 100,000 abortion procedures.[6] [Phase I Tr. Vol.

---

[6] Dr. Byron Calhoun, a practicing OB-GYN who provides care to high-risk pregnancy patients in West Virginia, who was proffered by the State as an expert in the field of obstetrics and gynecology, opined that he believes the CDC may be undercounting deaths based on the fact that only twenty-six state public health agencies report potential incidences of deaths to the CDC. However, Dr. Calhoun conceded on cross-examination that the CDC gathers information from a wide  array of sources. He also conceded that he believes abortion-related deaths are occurring at hospitals, which deaths would be investigated by the CDC, and that unexpected deaths of healthy women of reproductive age would likewise be subject to investigation. Dr. Calhoun indicated that he has no personal knowledge of doctors failing to report abortion-related complications. [Phase II Tr. Vol. II, 114:11–25, 115:8–25; 116:1–25, 117: 1–25]. We find Dr. Calhoun's testimony, therefore, to have been largely speculative and outweighed by the testimony of Dr.

II, 29:8–13].  In Indiana, there have been no reports of any woman dying from abortion-related complications over the last fifteen years. [Dkt. 347, Joint Stip. Facts, ¶ 75].

Obviously, not all medical risks associated with abortion can be entirely avoided; it is, after all, a medical procedure. Generally, the level of risk varies, however, based generally on the type of abortion being performed. In the United States, abortion is performed by one of the following three methods: medication abortion, aspiration abortion, or dilation & evacuation. [Phase I. Tr. Vol. II, 17:23–25, 18:1–4]. Fundamental disagreements over the inherent risks associated with each method persist between the parties to this lawsuit. There is no dispute, however, that the risks associated with abortion, including the risk of an incomplete abortion and maternal death, increase with the gestational age of the fetus. [Dkt. 347, Joint Stip. of Fact ¶ 73; Phase I Tr. Vol. II, 29:24–25; 30:1]. We discuss below each procedure and its related level of risk.

### 1.  Medication Abortion

Medication abortion is generally available to a woman through the first seventy days (ten weeks) of gestation as measured from her last menstrual period (lmp). [Dkt. 347, Joint Stip. of Fact ¶ 63]. It involves the termination of a pregnancy through the combined administration of two medications: mifepristone and misoprostol. [*Id.* ¶ 65]. This combination of drugs is also viewed by doctors as the most effective medical treatment for miscarriage management. [Phase I Tr. Vol. II,  67:12–23].

---

Grossman. Accordingly, we have no concerns as to the reliability of the CDC's data on the grounds that it is undercounting abortion-related deaths. [Phase I Tr. Vol. II, 30:12–25].

Mifepristone (also known by its brand name, "Mifeprex") is among a small number of drugs that the Food and Drug Administration (the "FDA") subjects to a Risk Evaluation and Mitigation Strategy ("REMS"), which, among other things, prohibits mifepristone from being dispensed in pharmacies, requiring that it "be dispensed to patients only in certain healthcare settings, specifically, clinics, medical offices and hospitals, by or under the supervision of a certified prescriber." [Dkt. 347, Joint Stip. of Fact ¶ 69].

Prior to receiving a medication abortion, the woman is screened for eligibility and contraindications, is provided counseling, and is then administered the abortion-related medications. [Phase I Tr. Vol. II, 41:7–25, 42:7–8]. When the dose of mifepristone is ingested, it acts to block the hormone progesterone, which halts further growth and development of the fetus. [Phase I Tr. Vol. II, 18:5–11]. Within twenty-four to forty-eight hours after ingestion, the second drug, misoprostol, is ingested by mouth at any location of the patient's choosing, typically at home. This second drug causes the uterus to expel its contents, thereby completing the abortion. [Dkt. 347, Joint Stip. of Fact ¶ 68; Phase I Tr. Vol. II, 18:12–16, 65:10–16]. Medication abortions require no anesthesia or sedation. [Phase I Tr. Vol. II, 39:2–4].

Because the abortion-inducing medications exert their effects over time, most complications associated with a medication abortion typically occur after the patient has left the abortion facility. [Phase I Tr. Vol. II, 65:1–9].

The most common complication following a medication abortion is an incomplete abortion. This occurs when the medications do not completely empty the uterus or halt

the pregnancy; in such instances, the antidote involves providing the patient with either an additional dose of misoprostol or having her undergo an aspiration procedure to complete the abortion. [*Id.* 56:1–7]. An incomplete abortion following a medication abortion has been calculated to affect only t 3% of women. Stated otherwise, medication abortion is proven to be 97% effective. [*Id.* 56:7–13.]. Other risks of a medication abortion may include hemorrhage or infection. [Phase I Tr. Vol. III, 7–20]. Ordinarily, all these potential risks and their likelihood of occurring are communicated to women during the initial informed consent process. [Phase I Tr. Vol. II, 56:13–16].

These complications are rare, According to Dr. Grossman. "Major complications" or "clinically significant adverse events," such as excessive bleeding necessitating a blood transfusion or other complications necessitating surgery, emergency department treatment, or intravenous antibiotics, for example, affect between 0.16 and 0.31% of women, that is, less than half a percent, according to his testimony. [*Id.* at 62:22–25, 63:1; 64:13–25]. Even fewer complications—0.06%—necessitate hospital admission. [*Id.* at 64:22–25].[7] He also opined that the medical risks associated with mifepristone and

---

[7] The State proffered the expert testimony of Dr. Donna Joan Harrison, a physician specializing in obstetrics and gynecology, on the use and effects of mifepristone and Mifeprex. Dr. Harrison is a board-certified OB-GYN and  licensed to practice medicine in Michigan. She practiced as an OB-GYN from 1990-2000. Following private practice, Dr. Harrison engaged in two years of public policy research in conjunction with her Truman Scholarship. She currently serves as the CEO of the American Association of Pro-Life Obstetricians and Gynecologists, overseeing research related to mifepristone. This organization and Dr. Harrison view elective abortion as having no legitimate role in the practice of medicine. In Phase I of trial, Dr. Harrison challenged the data on which Dr. Grossman had relied regarding the risks associated with medication abortion, specifically research published in 2015 by *The Journal of Obstetrics and Gynecology*, which had calculated that a woman's risk of suffering a major complication following a medication abortion was .31%; Dr. Harrison views that calculation to be underinclusive. Dr. Harrison opined that this data apparently did not factor in that "many women who have medical

misoprostol are no greater when used to induce an abortion than they are when used to manage a miscarriage. [Phase II Tr., Vol. I: 167:12–21].

Even these (uncommon) risks of complications from a medication abortion are mitigated when a competent provider, prior to proceeding with this care, evaluates a patient, screens for and diagnoses any potential contraindications, and confirms her mental and physical capacity to undergo the medication abortion, according to all the uncontroverted evidence. Though Dr. Grossman and Dr. Harrison dispute the inherent risks posed by medication abortion, they generally agree as to the contraindications for mifepristone, which must be properly screened for prior to the provision of a medication abortion. The most common contraindications include an ectopic pregnancy (that is, a pregnancy outside of the uterus), the presence of an intrauterine device (an "IUD") that

---

abortions are told to tell the ER doc they are having a spontaneous abortion and not a medical [one]." [Phase I Tr. Volume III, 140:13–23]. It remains unclear, however, on what basis Dr. Harrison reached this conclusion; Dr. Harrison did not cite any personal experiences or research that supported it, nor did she direct the Court to medical literature supporting that view. We note as well that Dr. Harrison has never personally provided medication abortions and, in fact, no longer practices medicine, having instead chosen to dedicate her career to pro-life research. She also has not published any research on these issues in more than fifteen years. Dr. Harrison testified that this study failed to screen for other potential complications such as seizures— though, notably, seizures are not a complication associated with medication abortion identified by any of the experts testifying in this case; thus, we hold any such "failure" does not undermine the reliability or integrity of the study. [*Id.* at 141:5–10]. Finally, Dr. Harrison criticized this research for failing to consider adverse events following "illegal" abortions; however, this lawsuit focuses on the safety of abortion care when provided legally according to the appropriate standards of care. Dr. Harrison did not dispute Dr. Grossman's summarization of the likelihood of risks other than to suggest that it was a mischaracterization to categorize a 3% risk of an incomplete abortion or the .31% likelihood of significant clinical intervention as "uncommon" or "rare." [*Id.* at 124:9–16; 141:12–14]. For these reasons, to the extent a disagreement exists between Dr. Grossman and Dr. Harrison as to the complications of medication abortion, we credit the opinions of Dr. Grossman, whose resumé and testimony reflect extensive experience and research in this field. The Seventh Circuit has itself acknowledged that "complications from an abortion are both rare and rarely dangerous." *Planned Parenthood of Wisconsin, Inc. v. Schimel*, 806 F.3d 908, 912 (7th Cir. 2015).

would need to be removed, or a history of taking certain medications such as blood thinners. [Phase I Tr. Vol. II, 53: 18–24; Phase I Tr. Vol. III, 125:21–25; 126: 1–11, 129:14–20]. In addition, the experts all agree that screening for gestational age is critical to safely providing all forms of abortion care (despite some disagreement over the manner in which contraindications may be safely identified). [Phase I Tr. Vol. II, 41:18–22; Phase I Tr. Vol. III, 125:23–25, 126:1–2, 23–25]. Dr. Harrison testified that medication abortion is contraindicated for women with an "undiagnosed adnexal mass" or a "ruptured ovarian cyst." [Phase I Tr. Vol. III, 115:10–16]. The majority of contraindications associated with medication abortion remain exceedingly rare, affecting less than one percent of patients. [Phase I Tr. Vol. II, 53:13–15].

   2. *Surgical (Aspiration and D&E) Abortion*

   Aspiration abortion involves the use of suction to empty the contents of the uterus. The procedure begins by gently opening or dilating the patient's cervix, either with medications or instruments. [Phase I Tr. Vol. II, 19:1–2]. A hollow curette is then inserted into the patient's uterus. At the non-inserted end of the curette, a vacuum is applied to create suction to remove the contents of the uterus. [*Id.* at 19:2–4]. The procedure typically takes less than five minutes complete. [*Id.* at 19:5–8]. Aspiration abortion is most commonly used prior to fourteen to sixteen weeks lmp. [*Id.* at 19:9–14]. An aspiration abortion is identical to what is commonly referred to as a "dilation and curettage" ("D&C") in the context of miscarriage management. [Phase I Tr. Vol. II, 70:21–25; Phase II Tr. Vol. II, 141:14–18].

18

Dr. Grossman describe the incidence of complications following aspiration abortions as quite "rare." Complications that do occur are typically associated with the dilation of the cervix, which creates a risk of forming a false passageway in the cervix that can lead to the perforation of the uterus. [Phase II. Tr. Vol. I, 170:24–25, 171:1–2]. Aspiration abortion may also pose a risk of bleeding or infection. Similar to medication abortion, Dr. Grossman testified that studies show that only .16% of women experience a major complication requiring hospital admission, surgery, or blood transfusion following an aspiration abortion. [Phase I Tr. Vol. II, 70:1–4]. The overall complication rate (including both minor and major complications) for aspiration abortion is lower than the rate for medication abortion, given that aspiration abortions pose a lower risk of the occurrence of an incomplete miscarriage. [*Id.*, at 65:17–25].

Dilation & evacuation ("D&E") is an abortion method commonly used during the second trimester of pregnancy. It utilizes both suction and medical instruments to empty the contents of the uterus. The first step in administering this procedure is the dilation of the cervix using osmotic dilators and/or medications. The overall duration of this process depends on the gestational age of the fetus; it may take several hours on the same day that the evacuation procedure takes place, or it may be performed twenty-four to forty-eight hours in advance. Once the cervix is dilated, a combination of suction and forceps is used to empty the uterus, requiring five to ten minutes to complete. [Phase I. Tr. Vol. II, 19:18–25, 20:1–7].

D&Es are highly effective abortion procedures and rarely result in complications; they are calculated to be 99% effective, with complications occurring in only .05% to

4.0% of cases. [Phase II Tr. Vol. I, 191:12–15, 195:19–23]. These complications may include infection, bleeding, or, on rare occasions, the laceration or perforation of the uterine wall, which may lead to excessive bleeding, though such complications are rare, according to Dr. Grossman. [*Id.*, at 140:3–17, 141:1–8; *infra* Section III.C.3].

Dr. Grossman testified that the pain management options for D&E abortions are similar to those for aspiration abortions, but moderate or deep sedation is more likely to be utilized. [Phase II Tr. Vol I, 191:3–11]. Deep sedation is an intravenous anesthetic that puts the patient in a sleep-like state where she feels no pain but is still able to breath on her own. [Phase II Tr. Vol. I, 39:11–13]. Hospitals in Indiana, according to Dr. Caitlin Bernard, an OB-GYN currently employed with IU Health who provides care at its associated hospitals and clinics, administer deep sedation to women receiving second-trimester abortions.  [*Id.* at 39:8–10]. Dr. Allison Cowett, testified that, in her OB-GYN practice, she typically utilizes deep sedation when providing D&E care to her second-trimester abortion patients at her medical clinic, Family Planning Associates, located in Chicago, Illinois.[8] [*Id.* at 124:23–25, 125:1–5, 138:23–35]. Dr. Calhoun agrees that a D&E should be performed utilizing deep sedation. [Phase II Tr. Vol. II,  105:20–23].[9]

---

[8] Dr. Cowett was proffered as an expert by Plaintiffs in the field of obstetrics and gynecology as well as abortion care. She currently serves as the Medical Director of Family Planning Associates Medical Group ("Family Planning Associates") in Chicago where she is the clinic's primary surgeon and is responsible for performing both aspiration and D&E abortions in the first and second trimesters. She also provides oversight for all medication abortions as well as performs the administrative responsibilities at the clinic.

[9] Dr. Calhoun later used the terms "deep sedation" and "anesthesia" interchangeably. It is not clear whether his references to "anesthesia" were inclusive of something other than the intravenous sedation described by Plaintiffs' witnesses. We note that "deep sedation" and "general anesthesia" do not appear to be interchangeable terms; rather, "moderate sedation," "deep sedation," "local anesthesia," and "general anesthesia" all denote specific types and levels

Though aspiration abortion and D&E abortion have historically been regarded as forms of "surgical abortion," neither requires making any incision into a patient's body. [Phase I Tr. Vol. II, 20:8– 9; Phase II Tr. Vol. III, 46:1–9; Dkt. 347 Join  Stip. Fact. ¶ 70].

B. <u>Prevalence of and Access to Abortion in Indiana</u>

*1. Availability of Abortion Services in Indiana*

In 2018, the year this lawsuit was filed, six abortion clinics were in operation in Indiana, three of which were located in Indianapolis [Dkt. 347, Joint Stip. Fact. ¶¶ 31, 38, 39, 41]. A seventh clinic, the South Bend Clinic, opened in 2019, *see* Dkt. 186 Modified Preliminary Injunction.

Of these clinics, two—Planned Parenthood of Lafayette and the South Bend Clinic—provide only medication abortions and no clinic provides abortion services after the first trimester. These clinics offer abortion services primarily on only one or two days of the week or once every other week. Specifically, Planned Parenthood of Merrillville offers services one day a week and one Saturday a month; Planned Parenthood of Lafayette offers services two days a month; Planned Parenthood of Bloomington offers services one day a week; Planned Parenthood of Georgetown Road (Indianapolis) offers services two days a week and one Saturday each month; Women's Med of Indianapolis offers services two days a week; and the South Bend Clinic provides services three days a month. [Phase I Tr. Vol. I, 28:11–14; 28:24–25, 29:1–23, 165:18–20, 83:5–8].

---

of pain management. [*See* Phase II Tr. Volume I, 191:6–11]. To the extent Dr. Calhoun is of the opinion that general anesthesia is necessary for second-trimester abortion care, he never clearly articulated that view and, in any event, it appears inconsistent with the standard of care employed by hospitals in Indiana, as reflected by Dr. Bernard's testimony.

These clinics report that physician recruitment and availability is a significant—if not the most significant—barrier to expanding abortion services to additional days. [*Id.* 83:9–22; Phase II Tr. Vol. I, 12:22–25, 13:1–3, 30:2–6; 44:15–25]. The physicians currently providing services to these clinics are already offering what they report to be their maximum availability in light of their other work and personal schedules. [Phase I Tr. Vol. I, 59:7–13, 60:11–16; 83:23–25, 84:1–19]. And, though these clinics have attempted to secure the services of additional physicians, they confront several significant barriers in their efforts to do so. The presence of protestors surrounding the clinics is often intimidating to physicians as well as to patients and staff, deterring them from providing care due their concerns for their safety. They also fear that protestors might attack or otherwise interfere with their private medical practices. [*Id.* at 84:20–20, 85:1–5, 85:13–17, 188:22–25, 189:1–9; Phase II Tr. Vol. I, 13:9–20, 45:23–25, 46:1–4, 77:4–22]. Such intimidation has manifested as targeted threats, one instance of which resulted in the withdrawal of one doctor from providing medical services after her daughter became the subject of kidnapping threats as reported by the FBI. [*Id.* at 30:21–25; 31:1–7]. Ms. Amy Hagstrom Miller, the President/CEO of WWHA, testified that Indiana's criminal penalties statutes also deter physicians from providing abortion care. [*Id.* at 82:14–18].

In addition to the clinics, five Indiana hospitals provide abortion services, all of which are located in Indianapolis or an adjacent suburb . [Dkt. 347, Joint Stip. Fact. ¶¶ 49-53].  However, these hospitals provide only second-trimester services and only then if

a maternal or fetal indication has presented. [Phase II Tr. Vol. I, 32:15–19]. No Indiana ambulatory surgical center currently provides abortions. [*Id.* ¶ 54].

No Indiana abortion clinics are located east of Indianapolis or south of Bloomington, which deprives residents living in Indiana's second-largest and third-largest cities, Fort Wayne and Evansville, respectively, [*Id.* ¶¶ 58-62], from convenient geographic access to these services. Women who live in these cities must travel 250 miles round trip to obtain abortion care in Indiana.

As discussed in greater detail below, Indiana law mandates that patients seeking an abortion appear twice at two separate appointments. They must first report to the abortion clinic or (an affiliated facility) to review Indiana's mandated counseling materials with a physician or advanced practice clinician in a counseling session, which includes an ultrasound procedure to screen for contraindications and gestational age, and a required viewing of the image and discussion with the patient. No sooner than eighteen hours thereafter, the patient returns to the abortion clinic where a physician must conduct a physical examination before dispensing the abortion-inducing drugs to the patient.

2. *Demographics of Women Seeking Services and Challenges to Accessing Care*

The majority of women impacted most severely by Indiana's highly restrictive statutory regulation of abortion are low-income individuals, living in households at or below 200% of the federal poverty line.[10] [Phase I Tr. Vol. II, 96:14–17, 97:3–9]. A significant number of women—upwards of 22% seeking these services—are also likely

---

[10] There is a consensus among public health researchers that the federal poverty line represents a "very low bar for what is needed to meet basic needs" and that it "underestimates what is needed for . . . an individual or family to actually meet its needs." [Phase I Tr. Volume II, 163:18-23].

to be experiencing intimate partner violence. [*Id.* 106:21–25, 107:1]. In many instances, pregnancy exacerbates intimate partner violence. [*Id.* 108:9–11].

It is undeniable that low-income women face greater barriers in accessing health care than others. Unsurprisingly, public health research, including that which was reviewed and conducted by Plaintiffs' expert, Dr. Diana Romero,[11] discloses that individuals living in poverty forego or delay all healthcare services because other costs, such as those related to securing the basic necessities of food and housing, are prioritized. [Phase I Tr. Vol. II, 170:17–25; 171:1–6]. In addition, low-wage workers often tend to have inflexible, unpredictable work schedules that do not provide them either with paid or unpaid time off or sick leave. [*Id.* at 171:23–25; 172:1–15]. As Dr. Romero testified, these obstacles make it incredibly difficult for them to access health care without risking the loss of wages or jeopardizing their jobs.  [*Id.*].

Dr. Romero's research findings are consistent with the firsthand experiences reported by women seeking abortion services in Indiana. Ms. Paulina Guerrero serves as the National Programs Manager of All-Options, a nonprofit organization whose purpose is to provide unbiased support to women navigating unplanned pregnancies.[12] [Phase I Tr. Vol. III, 5:13–17]. All-Options is the repository of the Hoosier Abortion Fund, which contributes abortion funds and provides practical support to low-income women in

---

[11] Dr. Romero, Plaintiffs' expert, specializes in public health as it pertains to poverty and racial and ethnic disparities in healthcare. Dr. Romero is employed as a professor at the City University of New York, where she teaches doctoral students and researches issues related to the relationship between poverty and maternal and child health, access to reproductive health, and access to health care among vulnerable populations. Her research has been published in a wide-range of peer-reviewed scientific journals.

[12] Ms. Guerrero was proffered by Plaintiffs as an expert on the availability of abortion care in Indiana and the burdens that Indiana residents face in accessing care.

Indiana seeking abortion services. [*Id.* at 9:16–23, 17:2–7, 18:4–6]. Ms. Guerrero testified that she has never encountered a single client who had a salaried position or a job that provided paid time-off or sick leave. Most women, she testified, are employed in the service or labor sectors and face job pressures to show up for their shifts. The majority of Ms. Guerrero's clients regard missing work as creating negative job consequences, such as termination or the loss of the employers' respect. In addition, many of these women work second or third shifts, which compounds their scheduling difficulties. [*Id.* 37:22–25; 38:1–25; 39:1–15].

The State's stated justifications for these abortion restrictions are to essentially protect women's health as well as the potential life of the unborn fetus. Indiana's reduction and restrictions of access to public benefits, however, make securing this care hugely challenging for low-income women and poverty-stricken families. Indiana's participation in various "social safety net programs" designed to assist individuals living in poverty to meet their basic living needs, such as "Temporary Assistance for Needy Families" ("TANF"), Supplemental Nutritional Assistance Program ("SNAP"), and Medicaid, come with strict standards and limitations as to the eligibility of those who might seek to receive these benefits. [*Id.* 174:7–15].

For example, SNAP, or what is commonly referred to as "food stamps," allows federal funds to flow through the states' coffers so that each may provide food-related assistance to their own poor and low-income families. The federal government permits states to offer SNAP benefits to individuals up to 200% of the federal poverty line, but

Indiana limits eligibility at 130% of the federal poverty line.[13] In addition, Indiana imposes an $2250 assets cap on families seeking to receive SNAP benefits. Consequently, any family, regardless of income, that possesses more than $2250 in assets is ineligible to receive SNAP benefits. [*Id.* 174:18-25, 175:1-8].

As another example, Indiana also restricts eligibility for TANF, which provides cash assistance to poverty-stricken families and individuals, only to Hoosiers living well-below the federal poverty line. For example, a family of three in Indiana is eligible for TANF if it earns less than $600 per month, or approximately $7000 per year. Accordingly, only those families who earn income at a level approximately 66% *below* the federal poverty line or less are eligible for these benefits. The State thus provides TANF benefits to only five out every one hundred poor families in Indiana. In addition, Indiana does not provide support to mothers with newborns through TANF; rather, Indiana is one of only twelve states that enforce a "family cap policy." Pursuant to this penurious policy, an individual with one or more children does not receive any additional TANF benefits based on those additional children. Expressed otherwise, a mother with a single child is not entitled to any additional cash assistance for her second child, even though the size of her family has increased from two to three members. [*Id.* 175:9-25; 176:1-7]. Indiana imposes this family cap restriction notwithstanding the uncontroverted fact that single mothers suffer from poverty at a strikingly disproportionate rate: whereas

---

[13] To illustrate, at the time of Dr. Romero's testimony, the federal poverty line for a family of three was $20,400. The federal government permits SNAP benefits to go to such families of three whose total annual income did not exceed $40,800; Indiana has set the level of eligibility for SNAP benefits such families of three at a total income amount not to exceed $26,520.

Indiana's poverty rate hovers around 14.5%, the rate of poverty for single mothers in Indiana is 39%. Four out of ten single mothers are thus to be viewed as struggling to meet their basic needs. [*Id.* at 164:9-13; 165:15-19; 166:8-10].

Medicaid is another, highly familiar government-funded health program that provides insurance coverage to low-income residents who qualify for its benefits. Though the federal government mandates the imposition of no work requirements as a condition of receiving health insurance, Indiana nonetheless has elected to impose such requirements as conditions precedent to coverage. Specifically, Indiana requires individuals to work a minimum of 80 hours per month in order to receive Medicaid benefits, and, to compound the hardship of this requirement, caring for children or dependents does not qualify as work.[14] [*Id.* at 176:8-25].

For women of limited financial means and/or those dealing with a lack of means for travel—which is the majority of Indiana women seeking abortion services—the

---

[14] The State called Ms. Anastasia Roth as an expert witness to testify concerning issues facing low-income or homeless women in the Fort Wayne, Indiana area. Ms. Roth is the founder and director of A Mother's Hope, a maternity home for pregnant homeless women located in Fort Wayne. [Phase I Tr. Volume IV, 59:2-7]. Ms. Roth opined that, in her judgment and experience, there were adequate resources (both public and private) in Indiana to assist low-income mothers. Ms. Roth was unaware, however, of several critical aspects of Indiana's public benefits programs. For example, she did not know that child/depending caregiving duties do not satisfy Indiana's Medicaid work requirement, that Indiana imposes a family cap on individuals receiving TANF benefits, that Indiana provides TANF benefits to only five out of one hundred low-income families, that Indiana does not permit SNAP eligibility for individuals with an income beyond 130 percent of the federal poverty line, and that Indiana imposes an assets cap on families receiving or attempting to receive SNAP benefits. In addition, Ms. Roth admitted that she has received no formal training or education on any issues related to public health. [*Id.* at pp. 77, 88-93]. These limitations on her knowledge significantly undermined the persuasiveness and relevance of her opinions. Finally, Ms. Roth's opinions on the availability of private resources were limited to her experiences working with pregnant women only in the Fort Wayne area; she was not qualified to testify regarding the struggles of low-income women throughout the state. [Phase I Tr. Volume IV, 59:2-7].

burdens imposed by Indiana's expansive abortion regulations, including the personal costs and associated health risks, seriously exacerbate their ability inability to receive this care. [Phase I Tr. Vol. I, 79:14–25; 80:1–3; Phase I. Tr. Vol. II, 98:1–5]. The travel required to obtain services and the costs associated therewith are commonly cited as barriers for low-income women, who frequently lack reliable transportation and cannot afford the costs of gasoline necessary to make the trip to the clinic, or who live in locations without easily accessible public transit. [Phase I Tr. Vol. III, 29:5–10, 29: 16–20, 34: 12–14]. Additionally, traveling to receive abortion care obviously necessitates time off from work, which, for those who do not have jobs with flexible hours or paid time off, jeopardizes their employment and/or results in lost wages. [*Id.* at 40:7–23; Phase I. Tr. Vol. I, 97:21–25; 152:2–4]. The costs of child care also must somehow be borne. [Phase I Tr. Vol. I, 97:23–25; Phase I Tr. Vol. II, 104: 17–25, Phase I Tr. Vol. III, 30:2–4, 34:12–14]. For the majority of women seeking care, "20 bucks for gas and then 20 bucks for childcare, or 40 bucks for childcare" "tends to really add up[,]" Ms. Guerrero testified. [Phase I Tr. Vol. III, 30:11–14]. Women will pull together the money for these costs in whatever ways they can, she said, including pawning belongings, taking out payday loans, and stalling on rent or utility bills. [Phase I Tr. Vol. III, 34:16–21, *see also* Phase I. Tr. Vol. II, 104:12–16].

These burdens intensify for women experiencing intimate partner violence, who often face the necessity of hiding their pregnancies from their perpetrators. [Phase I. Tr. Vol. II, 108:15–23]. To these women, accessing care may feel like "a matter of life and death," Ms. Guerrero testified.[Phase I. Tr. Vol. III, 3:12–19].

As one young woman recounted, these factors create a long and stressful "line of dominos," each of which must be carefully assembled—and then reassembled when Planned Parenthood has to reschedule her appointment because of its physician's unavailability—in order for her to access care. [Phase I. Tr. Vol. II, 190:14–21, 191:4–13].

The Hoosier Abortion Fund provides a means to alleviate some of the financial burdens of accessing care, but it has a "very limited budget, and a very high need." [Phase I Tr. Vol. 18:23–25]. On average, the Hoosier Abortion Fund pledges payments of $225 for women who are fewer than ten weeks lmp and $350 for those who have passed this threshold. Some women may still be unable to access abortion care even with this financial assistance because the associated costs of abortion services, such as paying for child care or gas, make it prohibitive. In such instances, the Hoosier Abortion Fund tries to increase its pledge by $40–50 to cover the additional costs. [*Id.*, at 31:25, 32: 1–6].

The burdens associated with client travel also often lead to delays in their accessing abortion care, which, in turn, increases the likelihood that a woman will face physical complications from her pregnancy or her abortion. [Phase I Tr. Vol. III, 30:14–25, 31:1–6; *supra* section III.A].  Patients whose abortion services are delayed past 10 weeks lmp are not eligible to receive a medication abortion, *supra* Section III.A.1, and patients whose care is delayed past the first trimester can seek an abortion only at a hospital—which, as is detailed below, increases dramatically the expense and thus limits the accessibility of this care, *infra*, at Section III.C.3. Delays also force women to endure longer the physical symptoms associated with pregnancy and increase the anxieties for

women struggling to access care or trying to keep their pregnancies secret from others, including their violent partners. [Phase I Tr. Vol. I, 138:1–23, 146:1–25; 147:1–18, Phase I Tr. Vol. II, 189:1–12, 190:1–21; Phase I. Tr. Vol. III, 30:15–24, 32:18–20, 43:2-25, 44:1–13, 44:18–25].

Though the State broadly counters with the argument that Indiana's abortion regulations do not prevent women from accessing abortion in Indiana nor qualified practitioners from providing these services, Plaintiffs have presented at this trial substantial, highly persuasive evidence to the contrary, demonstrating that under Indiana's onerous requirements, Indiana women who must contend faced with the above-referenced burdens, either struggle or ultimately fail to overcome them, causing them to travel to neighboring states. It is these burdens and obstacles to accessing care that provide the framework for our constitutional review of the challenged regulation and statutes imposed by Indiana law.

C.  Plaintiffs' (Remaining) Challenges to Indiana's Regulation of Abortion

As stated previously,  following our summary judgment determinations, Plaintiffs' surviving claims proceeded to trial in phases. Phase I addressed: (1) laws prohibiting the use of telemedicine in abortion care. Phase II addressed: Indiana's statutory and regulatory provisions (2) prohibiting non-physicians from providing first-trimester abortion care; (3) limiting the provision of second-trimester abortion care to hospitals or ambulatory surgical centers; (4) imposing purportedly unnecessary facility requirements on abortion clinics; and (5) mandating that allegedly false and/or misleading information be disclosed to women as a component of the informed consent process. Plaintiffs also

challenge (6) the criminal penalties imposed under Indiana statutes for violating these regulations.

1. *Laws Prohibiting the Use of Telemedicine, Including the In-Person Examination Requirement, the In-Person Counseling Requirement, and the Ultrasound Requirement*

Plaintiffs challenge Indiana's prohibitions on telemedicine as a means of providing abortion-related services and care. Four sections of Indiana's abortion code are targeted, each of which restricts a woman's ability to receive abortion services, particularly medication abortion services,[15] through telemedicine.

Indiana's "Telemedicine Ban" prohibits healthcare providers from using telemedicine to prescribe "an abortion inducing drug."[16]  Ind. Code § 25-1-9.5-8(a)(4).[17]

---

[15] There is no dispute among the parties that an aspiration abortion would require the patient and provider to physically be present at the same place at the same time, though, as discussed herein, providers could incorporate telemedicine into preabortion counseling sessions for patients.

[16] Indiana recently enacted Public Laws 85-2021 and 218-2021, which, in part, restrict "telehealth" from being used in abortion care, including to prescribe abortion-inducting drugs. These recent "telemedicine bans," as they are described, appear to be in all material respects identical to the telemedicine ban challenged here. On May 18, 2021, a lawsuit challenging the constitutionality of these provisions, as well as other portions of Public Laws 85-2021 and 218-2012, was filed in our court and assigned to our colleague, the Honorable James Patrick Hanlon, who has deferred a ruling on any issues relating to telemedicine or telehealth until a decision has been issued by the undersigned judge in this case. *All Options, Inc. v. Rokita*, 1:21-cv-01231-JPH-MJD [Dkt. 41].

[17] At the time this lawsuit was initiated, Indiana defined "telemedicine" as "the delivery of health care services using electronic communications and information technology, including: (1) secure videoconferencing; (2) interactive audio-using store and forward technology; or (3) remote patient monitoring technology; between a provider in one (1) location and a patient in another location." Ind. Code § 25-1-9.5-6(a). Public Law 85-2021, enacted on April 20, 2021, effective immediately, replaced the term "telemedicine" with "telehealth" in every place it appears throughout the Indiana Code. As used in Public Law No. 85-2021, "telehealth" means "the delivery of health care services using interactive electronic communications and information technology, in compliance with the federal Health Insurance Portability and Accountability Act (HIPAA) including: (1) secure videoconferencing; (2) store and forward technology; or (3) remote patient monitoring technology; between a provider in one (1) location and a patient in

The "In-Person Examination Requirement," Ind. Code § 16-34-2-1(a)(1), mandates that "[a] physician shall examine a pregnant woman in person before prescribing or dispensing an abortion inducing drug." In this context, "'in person' does not include the use of telehealth or telemedicine services." *Id.* Plaintiffs also challenge Indiana's requirement that all preabortion counseling be provided "in the presence" of the patient. *See* Ind. Code § 16-34-2-1.1(a). Finally, Plaintiffs challenge Indiana's Ultrasound Requirement, which stipulates that "the provider shall perform, and the pregnant woman shall view, the fetal ultrasound imaging and hear the auscultation of the fetal heart tone if the fetal heart tone is audible," unless the patient certifies in writing, before the abortion, that she declines to do so.  Ind. Code. § 16-34-2-1.1(a)(5). We follow the parties' lead in reviewing in tandem the Telemedicine Ban and the In-Person Examination Requirement in tandem. Thereafter, we shall turn our attention to the In-Person Counseling and Ultrasound Requirements.

### a.  The Telemedicine Ban and the In-Person Examination Requirement

As noted, the Telemedicine Ban prohibits physicians from utilizing telemedicine to prescribe an an-abortion inducing drug. The In-Person Examination Requirement requires the treating physician to examine a pregnant woman in person prior to dispensing an abortion-inducing drug and operates as a *de facto* ban on using telemedicine to provide medication abortion services.

---

another location." Ind. Code § 25-1-9.5-6(a). These amendments to the Indiana Code do not impact our analysis.

32

Significantly, the FDA prohibits mifepristone from being dispensed anywhere except a medical clinic or hospital; thus, it cannot be dispensed at pharmacy or mailed to a patient.[18] *Supra*, at Section III.A.1.Accordingly, a patient seeking a medication abortion is required to visit an abortion clinic in order to obtain mifepristone.

Given these restrictions, telemedicine is typically incorporated into the provision of abortion care not through a "direct-to-patient" model, where a patient may, from any location, connect to a health care provider, but via "site-to-site" communications, wherein the patient reports to the clinic and is remotely connected via technology to a health care provider who is not physically present at the clinic. The provider remotely reviews the patient's medical history and ultrasound results (which have typically been obtained from qualified personnel at the clinic) to screen for contraindications. The provider also conducts direct, face-to-face communications with the patients through secured videoconferencing to determine the appropriateness of the medication abortion. Through this procedure and platform, the provider reviews with the patient the risks and benefits of medication abortion, including information about normal side effects, warning signs, and follow-up care. After obtaining the patient's informed consent, the provider directs clinic staff members to dispense the abortion medications to the patient. [Phase I Tr. Vol. I, 48:8–25, pp. 49–51, 53:16–25; Phase I. Tr. Vol. II, 76:5–25, 77:1–6, 84:3–18].

---

[18] On April 12, 2021, the FDA, in response to concerns raised (and litigation initiated) by ACOG that this restriction creates unnecessary exposure to COVID-19 for both patients and providers, issued a letter indicating its intention to suspend enforcement of this provision for the duration of the COVID-19 public health emergency. Letter from Janet Woodcock, Acting Commissioner of Food and Drugs, to Maureen G. Phipps, Chief Executive Officer of American College of Obstetricians and Gynecologists, and William Grobman, President of Society for Maternal-Fetal Medicine (Apr. 21, 2021), https://www.aclu.org/letter/fda-response-acog-april-2021 (last accessed July 22, 2021).

This telemedicine methodology has been incorporated into the provision of medication abortion by Planned Parenthoods (and other clinics) in other states. Additionally, Planned Parenthoods located within Indiana use this site-to-site model in the provision of other kinds of care, including birth control and sexually transmitted infection ("STI") services. [Phase I Tr. Vol. I, 48:21–25; 49:1–25, 50:1–5, 51:6–25; 52:20–23].

Dr. Grossman attests that utilizing telemedicine for medication abortions is as safe and effective as in-person treatment. In terms of safety, Dr. Grossman's research indicates that the complication rate for medication abortion remains exceedingly low, regardless of whether the procedure is provided in-person or through site-to-site telemedicine. [*Id.*, pp. 60–63; 91–93]. One peer-reviewed study published in 2017 (for which he served as the lead author), for example, reviewed data relating to adverse events reported in a seven-year period among patients obtaining medication abortions at Planned Parenthoods in Iowa. Data reflecting in-person visits by women with a physician were compared to data relating to medication abortion for women who received their care via telemedicine. The study reviewed nearly 20,000 abortions patients, almost half of whom had received abortion care through telemedicine, and ultimately concluded that the overall rate of significant adverse events for medication abortions was very low (approximately .26%). Importantly, there was no significant difference in the rate of adverse events between patients who received telemedicine care compared to those who received in-person

services.[19] [Phase I. Tr. Vol. II, 60: 19–25, pp. 61–62]. A systematic review reporting on a variety of telemedicine models similarly found the incidence of complications to be very low.[20] [*Id.* at 93:16–18, 94: 5–21].

　　ACOG supports the provision of telemedicine care as a safe and effective method of providing medication abortion care, holding, in fact, that the utilization of telemedicine may actually improve access to early abortion, thus reducing the need for second-trimester abortion services. [*Id.*, at 94:1–3; 22–25, 95:1–3]. Though the most recent ACOG practice bulletin,[21] published in 2020, categorized this recommendation as a

---

[19] Dr. Harrison attacked this study's reliability, but her testimony reflected a critical misunderstanding of the methodology behind this research. Specifically, she opined that Dr. Grossman's research included a review the records of patients who returned to the clinics for follow-up care, which is not a reliable methodology, she said, because many women experiencing complications following an abortion do not return to the abortion provider. [Phase I Tr. Vol. III, 141:13–22]. However, as Dr. Grossman testified, this research was not based on a review solely of those women who reported complications to their abortion providers. Rather he explained that all adverse events associated with abortion were required to be reported to the FDA, regardless of whether they were identified and reported in a clinic follow-up or elsewhere. Dr. Grossman and his fellow researchers reviewed this body of data from the FDA, and analyzed *all* reports of adverse events to assess the prevalence of those which followed abortions provided through telemedicine. [Phase I Tr. Vol. IV, 225].

[20] This systematic review addressed various telemedicine models utilized globally. To the extent this review identified differences in the effectiveness or safety of medication abortion when provided via telemedicine as compared to in-person care, those differences are attributable to the different models of care being utilized outside of the United States. [Phase I Tr. Vol. II, 145, 146:1–6].

[21] A practice bulletin from ACOG publishes ACOG's official recommendations for clinical management guidelines. The practice bulletins are issued by committees at ACOG comprised of experts in the field of obstetrics and gynecology. These experts instruct the official librarians at ACOG to conduct reviews of the available medical literature on a given topic. The committees then review the published information to develop ACOG's official recommendations. The committees' findings are subject to further review by other committees at ACOG as well as ACOG's executive board. [Phase I. Tr. Vol. II, 44:13–25; 45:1–4]. ACOG's practice bulletins are considered reliable, scientific authorities in this field. [*Id.* 45:8–1].

"Level B"[22] recommendation, Dr. Grossman testified that this ranking was likely the result of limited published research on telemedicine being available during the time period in which ACOG conducted its review of the materials  incorporated into its 2020 practice bulletin, to wit, from 2018 to early 2019. Since that time, a large body of research has been produced that supports the safe provision of medication abortion care through telemedicine. Dr. Grossman anticipates that ACOG's next published practice bulletin to upgrade this recommendation. [23]  [*Id.* 131:7–25, 138:1–3, 148, 149:1–8].

Dr. Grossman also opined that the COVID-19 Pandemic has broadened and inspired innovations in the use of telemedicine. Dr. Grossman, who works primarily with low-income patients, testified that a bias that previously existed among providers predicting that patients with limited means would be generally unwilling or unable to effectively utilize telemedicine. As the pandemic unfolded, however, one of his colleagues conducted a study on this issue and found that low-income patients were highly interested in telemedicine resources  *and* could, in fact, successfully utilize them. [*Id.*, at 150:17–25, 151:1–23].  Ms. Guerrero, consistent with Dr. Grossman's opinions, also believes her clients could and would effectively utilize telemedicine for their abortion care. [Phase I. Tr. Vol. III, 32:24–25; 33:1–23]. Ms. Roth, however, voiced concerns over whether the women she encounters at A Mother's Hope in Fort Wayne

---

[22] A "Level B" recommendation is one based on "limited or inconsistent scientific evidence." [Phase I Tr. Vol. II, 130:21–23].  A "Level A" recommendation is based on "good and consistent scientific evidence." [*Id*, at 130:18–19].

[23] We note that Dr. Grossman was a co-author of this particular practice bulletin, which scholarly involvement bolstered his understanding of the state of the research that ACOG had available to it in formulating its 2020 recommendations. [*Id.*, at 112:8–25].

would benefit from telemedicine on the grounds that they often have difficulty communicating during their medical appointments. She believes that telemedicine would likely exacerbate these challenges. [Phase I. Tr. Vol. IV, 72:14–25; 73:1; 74:19–25; 75:1–6].

In non-abortion contexts, telemedicine is increasingly and widely available. Indeed, expanded use as a means of reducing healthcare costs, increasing access to specialty care, and improving healthcare access for people in underserved communities has been widely encouraged. [Phase I Tr. Vol. II, 72:18–25; Phase I Tr. Vol. IV, 35:6–22]. In fact, Indiana has over the past five years authorized major expansions of telemedicine services. In 2015, Indiana enacted a statute requiring health insurance policies to include coverage for telemedicine services on the same terms as coverage is provided for healthcare services delivered in person. *See* Pub. L. No. 185-2015, §§ 25-27, 2015 Ind. Acts 2102-04 (codified at Ind. Code §§ 27-8-34-1 to 27-8-34-7, 27-13-1-34, 27-13-7-22). In 2016, Indiana enacted another statute broadly authorizing healthcare providers to use telemedicine to treat patients in Indiana. *See* Pub. L. No. 78-2016, § 2, 2016 Ind. Acts 711-15 (codified at Ind. Code §§ 25-1-9.5-1 to 25-1-9.5-12). One year later, in 2017, Indiana expanded telemedicine authority to include the prescription of controlled substances. *See* Pub. L. No. 150-2017, § 7, 2017 Ind. Acts 1430-31 (codified in relevant part at Ind. Code § 25-1-9.5-8).

Providers regularly utilize telemedicine to prescribe medications, and, in so doing, screen for contraindications utilizing this same medium. [Phase I Tr. Vol. II, 73:5–25, 74:1–7]. As noted, Planned Parenthoods in Indiana currently utilize telemedicine for non-

abortion services, employing both direct-to-patient and site-to-site models of care and utilizing secure platforms to ensure the patient's confidentiality. From an operational standpoint, Planned Parenthoods have been largely successful in implementing both models of telemedicine and plan to utilize telemedicine for abortion services in Indiana, if and when they are legally permitted to do so. [Phase I Tr. Vol. I, 52: 2–25, 53:1–8]. Ms. Laura Miller, the Area Services Director for Planned Parenthood Great Northwest,[24] testified that such techniques for providing care would dramatically expand the availability of appointments and reduce delays in care. [*Id.* at 53:16–25, 54:1–2]. Even though abortion patients are required to report in person to receive their medications, the utilization of telemedicine would still increase accessibility to these services because it would enable Planned Parenthoods in Indiana to use their existing roster of physicians more efficiently and effectively. [*Id.* at 66:5–17]. Specifically, if these clinics were authorized to permit remotely located physicians to provide medication abortion care, each Planned Parenthood in Indiana would be able expand medication abortion services from the currently available one or two days a week (which days' appointment slots are typically 100 percent booked) to five days a week. [*Id.* at 60:25, 61:1–2, 64:4–10].

To further illustrate, Planned Parenthood in Bloomington currently has one physician available to provide services on Thursdays. If telemedicine services were permitted, this physician could and would provide services not only to women in Bloomington, but to women from across the state. Because the remaining Planned Parenthoods have physicians available on other days of the week, telemedicine's

---

[24] This region includes Indiana, Kentucky, Alaska, and Hawaii.

expanded capacity would enable Planned Parenthood to offer abortion appointments five days of *every* week at *every* clinic. Currently, under existing restrictions, a patient living in Bloomington would need to either schedule her appointment on a Thursday or travel to a clinic at least fifty miles away (on the day of the week when that clinic had availability). If telemedicine services were permitted, a patient could access care at her local clinic any day of the week through the remote provider. [*Id.*, at pp. 61–64, 66:5–17].

For women who do not reside in the same geographic location as a clinic, the possibility and desirability of obtaining care any day of the week would greatly increase, due to the expanded access to appointments and to care. Currently, women seeking abortion services typically must wait a few days to a week and half between their first and second appointments at Planned Parenthood, and it is not uncommon for women struggling to secure child care and/or traveling long distances to be delayed even longer due to the clinics' limited appointment availability. [Phase I Tr. Vol. I, 36:5–18, 53:24–25, 54:1–2]. Such a delay may be critical in terms of whether the kind of care a patient requires and seeks is available to her. As Ms. Miller testified, Indiana's Planned Parenthoods encounter women who are less than ten weeks lmp when they first contact the clinic or when they have their counseling/ultrasound appointment, but who will become post-ten weeks lmp before their second appointment can be scheduled. Planned Parenthoods encounter women who are less than thirteen weeks, six days lmp at their initial contact or first appointment who will progress past this gestational threshold prior to being able to schedule a first-trimester aspiration procedure. [*Id.* at 45:8–25, 46:1–11].

Ms. Miller also testified that Planned Parenthoods in Indiana could easily implement telemedicine in their abortion care based on the already existing care models employed by Planned Parenthoods in both the non-abortion and abortion settings. [*Id.* at 52:15–19]. Women's Med and the South Bend Clinic reported that the incorporation of telemedicine would similarly improve accessibility for their patients by creating increased flexibility and reducing delays in scheduling appointments.

Ms. Hagstrom Miller testified that WWHA, much like Planned Parenthood, has successfully incorporated telemedicine procedures into its abortion services in other states, resulting (as predicting) in reduced costs of care and increased availability of appointments. [*Id.*, at 101:25, 102–104].  She expects the incorporation of telemedicine at the South Bend Clinic would result in a comparable, favorable impact on care, allowing the clinic to offer appointments four to five days a week and to increase its patient capacity by 50 percent. [*Id.* at 110:6–12, 121: 7–20]. Accordingly, she said, women who normally must wait one to two weeks between their first and second appointments at the South Bend Clinic would be able to access care much sooner. [*Id.* at 110:4–13]. The impact of such delays in care is not insignificant: the South Bend Clinic regularly must refer to other providers women who may not be at ten weeks lmp at the scheduling of their first appointment but who will pass this gestational line before they can access the second appointment. [*Id.* at 90:2–6]. Telemedicine would also reduce the costs of care at the South Bend Clinic by reducing the funding that is currently allocated to reimburse physicians' travel expenses. [*Id.* at 11:5–10].

Ms. Hagstrom Miller further testified that WWHA has rigorously sought feedback from patients following the implementation of telemedicine procedures and determined that there are very high levels of satisfaction with the quality of care provided via telemedicine; many express appreciation for the opportunity to receive care at an earlier time and with greater flexibility. [*Id.* at 105:19–25, 106:1–25]. WWHA clinics who offer telemedicine appointments also offer in-person appointments so that women may choose the kind of care they prefer. [*Id.* at 106:21–25, 107:1–5].

As Dr. William Haskell, the Medical Director of Women's Med, testified, Women's Med currently has very few appointments open to women because of limitations on physician availability [*Id.* at 201:5–13]. Allowing physicians to provide services from remote locations would expand the availability of services as well as access. Indeed, he said, Women's Med would be able to offer appointments five days of the week, rather than the current schedule of only one or two. [*Id* at 206:15–20]. According to Dr. Haskell, women who prefer in-person appointments with a provider would continue to have that option. [*Id.*, at 201:22–24]. Dr. Jeffrey Glazer, who also provides services at Women's Med as well as the South Bend Clinic, echoed these views with respect to the availability of telemedicine services, emphasizing that the desire to utilize telemedicine is not primarily motivated by convenience to physicians, relieving them of the burdens of travel, but by the increases patients' access to care. [*Id.* at 177:18–24, 178:1–2].

There is no real dispute that the incorporation of telemedicine techniques would impact the availability of services in the manner described above. Dr. Nancy Goodwine-

Wozniak[25] testified, however, regarding certain concerns with drug diversion of mifepristone, if telemedicine procedures were permitted, though these "concerns" were not anchored in any referenced medical research or literature or even her own personal experiences. [Phase I Tr. Vol. III, 182:10–25, 183, 184:1–21]. Her concerns arose primarily from the general problem all controlled substances posing some risks of diversion. [*Id.*]. However, Dr. Grossman testified that he has "never heard of" mifepristone diversion during his twenty years of providing medication abortion care, emphasizing that the FDA no longer requires patients to take this medication only at a clinical facility and permits ingestion to occur at home. The NASEM report also has concluded that there is no evidentiary support for a requirement that the dispensing or taking of mifepristone should occur in the physical presence of a clinician in order to ensure safety. [Phase I Tr. Vol. II, 85:11–21, 86:1–14].[26]

The In-Person Examination Requirement clearly interfaces with the restriction on telemedicine in the provision of abortion care by requiring a treating physician to conduct a physical examination of a patient prior to performing the abortion procedure.

---

[25] Dr. Goodwine-Wozniak was called as an expert by the State in obstetrics and gynecology, including the medical benefits of in-person examinations and performance of ultrasounds prior to medication abortions, the benefits of in-person counseling, and the effect of Indiana's telemedicine ban on the provision of medication abortion. We previously noted certain gaps in Dr. Goodwine-Wozniak's background reduced her ability to opine on all aspects of abortion care, for example that she has never performed an abortion nor conducted any research in this area of care. [Phase I Tr. Vol. III, 168–69, Phase II Tr. Vol. III, 147:10–16].

[26] The State's experts contend that face-to-face, in-person interactions are critical to the provision of safe abortion care which are disclosure through the informed consent process and ensure that a woman's decision to secure an abortion is not the result of coercion by others. We review each of these arguments in detail in our discussion of the in-person counseling requirement.

However, Dr. Grossman testified, there is no sound medical purpose served by requiring a physical examination as a condition precedent to obtaining a medication abortion; it simply is not included in the standard of care and neither enhances the safety nor the effectiveness of a medication abortion. [*Id.* at 53:25, 54:1–3, 16–20]. The screening of a prospective abortion patient, which includes assessing gestational age (either through an ultrasound or through a review of her menstrual cycle) and gathering a complete and thorough medical history, allows for the discovery and management of contraindications for a  medication abortion, such as the presence of an IUD necessitating removal or an ectopic pregnancy (which is rare, affecting fewer than one percent of women). These issues, according to Dr. Grossman, are most accurately identified through a thorough review of the patient's medical history and, if needed, ultrasound images. Simply put, no additional information ordinarily is gleaned from a physical examination that impacts the patient's suitability to receive care. [*Id.* at 53:4–15]. The instances where a patient reports symptoms (for example, those related to an STI) or a provider identifies a concern based on the ultrasound (such as an ectopic pregnancy) are rare. When they do occur, the provider conducts an examination or refers the patient to another provider. For most women, a physical examination by a physician is simply unnecessary. [*Id.* at 54:8–25].

The State's experts testified that in their opinions a physical examination does, in fact, enhance the safety of abortion care. Dr. Harrison and Dr. Goodwine-Wozniak opined that an examination aids with gestational dating (though, as discussed herein, they testify elsewhere that an ultrasound is certainly the most accurate way to date a

pregnancy), assists in diagnosing an ectopic pregnancy (which is also best identified through an ultrasound, according to these same experts), and reveals the presence of an IUD (the existence of which can also be readily determined via an ultrasound, or, as Dr. Grossman testified, by simply asking the patient whether she has an IUD). [Phase I Tr. Vol. III, 129:11–20, 130:8–9, 18–22, 14–18, 175:1–15, 176:1–19].[27] Conducting a physical examination also assists with establishing rapport between a physician and patient, which assists in the screening for abuse or trauma.[28] [*Id.* at 178:10–25, 179, 180:1–8].

### b.  In-Person Counseling Requirement

Indiana's In-Person Counseling Requirement directs that "consent to an abortion is voluntary and informed only if" abortion providers satisfy certain requirements, which include the furnishing of certain information—including, inter alia, the name of the physician performing the abortion, the nature of the proposed procedure, the probable

---

[27] Dr. Harrison noted that the Mifeprex label implicitly directs that the provider be physically present with the patient when it is dispensed, based on her understanding that the FDA requires screening for an ectopic pregnancy prior to prescribing Mifeprex, thereby giving rise to an "assumption that a physician would do a physical exam." [Phase I Tr. Vol. III, 157:1–6]. We agree with Dr. Grossman, however, that Dr. Harrison's opinions are not consistent with the information and directives presented on the Mifeprex label. As Dr. Grossman noted, there is nothing on the label that indicates that a patient must be in same room with the clinician providing the medication abortion. The label is completely silent on that subject. [Phase I Tr. Vol. IV, 226:1–18]. Moreover, if there are concerns of an ectopic pregnancy, the FDA directs that an ultrasound, not a physical examination, be performed. [Phase I Tr. Vol. II, 50:25, 51:1–5].

[28] The State's experts testified as to the benefit of pelvic examinations; however, Indiana law does not mandate that a pelvic examination be performed prior to an abortion. Thus, this testimony is largely irrelevant. Dr. Goodwine-Wozniak also testified to the benefits of a physical examination when attempting to diagnose a patient who presents at a hospital or clinic with symptoms, the causes of which are unknown, but this provision does not relate to or advance the benefits of a diagnostic examination for such a patient.

gestational age—to abortion patients, both orally in person and in writing, at least eighteen hours in advance of the patient's abortion. Ind. Code § 16-34-2-1.1(a)(1). Also eighteen hours in advance and in person, patients must receive a color copy of the State's "Informed Consent Brochure," and, if a fetal anomaly has been identified, a copy of the State's "Perinatal Hospice Brochure." *Id.* § 16-34-2-1.1(a)(4), (b). At issue here is the requirement that all preabortion counseling be conducted solely in person, which therefore does not include the use of telemedicine.

As previously discussed, telemedicine would enable providers to remotely review patients' medical histories and ultrasound results and to utilize videoconferencing to determine the appropriateness of medication abortion for an individual patient. Telemedicine may be delivered either through the "direct-to-patient" model or "site-to-site" model. [Phase I. Tr. Vol. II, 52:11–19].

Dr. Grossman's experiences and research again informed his view that providers utilizing telemedicine are able to obtain informed consent as effectively as if the participants were present in person. He testified that the process for obtaining informed consent via telemedicine is "identical" to the process of obtaining informed consent in person, [Phase I Tr. Vol. II, 77:14–22], that no aspect of the process differs when telemedicine is utilized, and no part of the process technically requires the physician or health care provider to be physically present in the same room with the patient. Videoconferencing technology enables the same kind of personal interaction with a patient that would occur in person and also provides various options for reviewing and signing documents. [*Id.* at 77:23–25, 78:16; Phase I Tr. Vol. II, 50:8–15, 104:4–15].

Dr. Grossman's opinions are based on his own research as well as his extensive review and knowledge of respected medical literature. Specifically, as applicable here, he coauthored a qualitative, peer-reviewed study reviewing women's experiences using telemedicine for their preabortion counseling appointments in Utah in an effort to acquire in-depth information from the patients' perspectives. As he explained, Planned Parenthoods in Utah provide patients with the option of completing their preabortion counseling appointments either via telemedicine or in-person. The women who selected the former option were provided instructions on how to access a video platform whereby they connected with a nurse, who reviewed the state-mandated information and answered any questions from the patient. [Phase I Tr. Vol. II, 78:19–25, 79, 80:2–9].

Dr. Grossman's research concluded with a finding that patients generally were very satisfied with this form of interaction. Though some reportedly possessed initial concerns about their ability to use the technology successfully, or were apprehensive about connecting via this medium, most women's concerns were alleviated once they were connected to the nurse. Women reported that they generally liked using telemedicine for their counseling appointments[29] and experienced positive interactions with the nursing staff. Patients did not have difficulty understanding the information provided to them, nor did telemedicine negatively impact their ability to ask questions of the provider. [*Id.* at 80:11–25, 81:11–19]. In conclusion, the vast majority of women

---

[29] Dr. Grossman added as a caveat his finding: most women view preabortion counseling appointments as not being particularly useful. Nor is the state-mandated information specifically helpful to their decision-making. However, given the legal requirement that they complete this informational session, women reported satisfaction with having the virtual option. [Phase I Tr. Vol. II, 80:18–25].

interviewed in this study were "very happy that they could complete their counseling appointment through telemedicine." [Phase I Tr. Vol. II, 80:10–25].

Dr. Grossman also co-authored a peer-reviewed, qualitative study to determine providers' perspectives utilizing telemedicine as a means of delivering preabortion counseling information. Dr. Grossman gleaned from this research the finding that providers felt that their interactions with patients were substantively no different when telemedicine was utilized rather than through in-person consultation. He reported that healthcare providers assess in the same manner whether a patient is providing voluntary, informed consent as they would if they were meeting with that patient in person. In both settings, the provider seeks to confirm that the patient understands what an abortion will entail as well as the risks, benefits, and alternatives to the procedure, before ultimately determining that the patient has voluntarily and knowingly elected to proceed with the abortion. [*Id.* at 8:1–17]. This process can be done "by telemedicine as easily as in person," Dr. Grossman's research revealed. [*Id.* at 82:18–25; 83:1–9]. Moreover, importantly, the incorporation of telemedicine communications allowed patients to access care sooner than otherwise would have been able to them. [*Id.* at 82:22–25].

To screen for intimate partner violence through telemedicine, a provider, through verbal prompts, seeks to have the patient disclose this information, sometimes requesting patients to complete written forms or questionnaires to elicit further this information. Dr. Grossman testified that research shows that screening for intimate partner violence through these efforts is as effective as asking the same questions in person. [*Id.*, at 83:10–20]. When utilizing telemedicine for counseling appointments, the provider, of course,

47

seeks to ensure that the patient is currently in a secure place where she can provide honest answers. In fact, in non-abortion contexts, healthcare providers screen for intimate partner violence utilizing telehealth for "all kinds of visits." [*Id.* at 84:22–25].

Because abortion patients will at some point always be required to appear in person at the clinic to receive the abortion-inducing drugs, opportunities still exist for clinic staff to meet with patients in a confidential, private settings  to determine if there are concerns of intimate partner violence, despite utilization of telemedicine techniques as part of the treatment process. [*Id.*, at 84:3–11].

Cassie Herr, a nurse practitioner at Women's Med who regularly conducts preabortion counseling sessions and who has herself received a medication abortion, testified to having no reservations concerning whether these sessions could be conducted effectively and safely via telemedicine. She specifically testified that each aspect of the counseling process—when the procedure is explained, questions answered, the patient screened for coercion or abuse and the state-mandated information and forms are disseminated—could easily be completed through telemedicine in the form of videoconferencing. Consistent with Dr. Grossman's testimony, she stated that the process would look virtually the same as if it were conducted in person. [Phase I Tr. Vol. I, 141:16–25, 142:1–4, 143:6–25, 144, 1–3].

The expansion of telemedicine, particularly during the COVID-19 pandemic, has allowed Ms. Herr to become adept at screening of and providing resources to patients potentially suffering from intimate partner violence when the patient may be at home and in the presence of a violent perpetrator. In such instances, Ms. Herr said that she offers

open-ended insights regarding resources available to women who may be suffering from intimate partner violence and informs her patients, for example, that the clinic is providing these resources to all of its patients, so as not to raise any alarms with the potentially volatile partner. [*Id.* at 154: 21–25, 155:1–12].

The State's experts, including Dr. Christopher Stroud,[30] Dr. Goodwine-Wozniak, and Dr. Aaron Kheriaty,[31] strongly emphasized, however, that face-to-face, in-person interactions with patients are critical to counseling them and obtaining from them informed consent, especially women who may be facing "decisional uncertainty" with respect to securing an abortion. Completing this process in person, they each testified, allows for enhanced personal interactions with patients, heightening the providers' capacity to detect and understand subtle cues that patients may be communicating. Building such a relationship in the abortion context is critical to ensuring that patients understand the gravity of the decision at hand.[32] [Phase I Tr. Vol. III, 187:6–15, 188:2–13;

---

[30] Dr. Stroud is a licensed practicing OB-GYN. He was proffered by the State as an expert in obstetrics and gynecology and informed consent. [Phase I Tr. Vol. III, 222:2–6; Phase II Tr. Vol. III, 6:6–8]. Dr. Stroud owns and serves as lead physician at the Holy Family Birth Center in Fort Wayne, Indiana. He is also connected with the Fertility & Midwifery Care Center.

[31] Dr. Kheriaty testified on behalf of the State as an expert in the field of bioethics and the psychological effects of obtaining an abortion. His medical practice focuses on psychology. Dr. Kheriaty is currently employed by the University of California-Irvine, where he is a professor of psychiatry and leads the medical ethics program. Dr. Kheriaty did not qualify as an expert on the impact or effectiveness of telemedicine. [Phase I Tr. Vol. IV, 192:20–25, 193:1–2, 196:21–22].

[32] Dr. Stroud last performed aspiration abortions during his medical residency during the 1990s. He testified that women seeking abortion care are commonly in "fragile" emotional states, noting that they are almost always "crying" when they present for this care. Dr. Stroud appears to conflate human emotion with "fragility." Ms. Herr, by way of contrary example, elected to have an abortion because, at the time she got pregnant, she was taking a medication that would have been detrimental to the healthy development of her fetus. Though it was admittedly an emotional experience for her, she nonetheless was confident about the rightness of her decision. Through her demeanor and testimony, Ms. Herr demonstrated that her decision to have an abortion was

Phase I Tr. Vol. IV, 20:21–25, 21–22, 25: 10–12, 25:17–23, 207:2–18]. Their shared view is that covering this information in a confidential in-person setting, providers are able to  screen for signs that a partner may be coercing the patient into obtaining an abortion. [Phase I Tr. Vol. III, 190; Phase I Tr. Vol. IV, 210:5–25, 211]. Dr. Priscilla Coleman, the State's proffered expert on psychology and abortion, testified that in-person interactions enhance autonomous decision-making for women who may be experiencing violence or coercion from a partner, for victims of sex trafficking, for juveniles, and for women who are uncertain about whether to abort.[33] [Phase I Tr. Vol. IV, 139:21–25, 140:1–14, 148–49, 153:4–9].

By enacting the requirement that patients receive in-person counseling, the travel time and expenses for women seeking abortions are obviously increased. These expenditures are increased due to Indiana's requirement that women undergo a waiting period of at least eighteen hours between their receipt of prescribed information related to informed consent and proceeding with the abortion.[34] The result is a two-trip requirement imposed on women seeking abortion services: they must travel to the abortion clinic or an affiliate to complete the counseling and, at least eighteen hours later, they must return to

---

the result of her carefully considered judgment. [Phase I Tr. Vol. I 131:14–25,132:1–2]. As Dr. Glazer testified, many women may present to abortion clinics nervous about the circumstances or the process but nonetheless confident in their decisions. [*Id.* at 168:24–25, 169:1–4].

[33] Dr. Coleman was not qualified to testify as to the effectiveness of telemedicine, nor the process of obtaining informed consent from patients, which areas were beyond her established expertise. [Phase I Tr. Vol. IV, 121:1–15, 159:1–6].

[34] As previously noted, we have upheld the statutory requirement that preabortion counseling occur at least eighteen hours prior to an abortion.

the licensed clinic to proceed with the abortion.[35] As discussed in detail, *supra* Section III.B.2, we repeat: the majority of women seeking abortions in Indiana are of low-income economic means with a limited capacity to finance and arrange the necessary travel and various expenses. For these women, the two-trip requirement compounds their burdens. [Phase I Tr. Vol. I, 200:13–23, 205:1–5; Phase I Tr. Vol. III, 28–30, 43:20–25, 441–13]. Because undertaking them is often so challenging, a significant number of women delay their second appointments for an additional week or two, rather than scheduling appointments back-to-back. [Phase I. Tr. Vol. I, 89:12–17, 152:1–3; Phase I Tr. Vol. III, 30:25, 31:1–6, 38:16–25, 39:1–3, 40:3–25, 41:18].

The two-trip requirement obviously also imposes the obligation on the women who do not live in geographic proximity to a clinic either to expend resources on travel occurring on two separate days or on overnight lodging. (We were told that women who lack the financial means to fund either of these alternatives often must make the Hobson's choice of choosing between sleeping overnight in their cars outside of the clinics or foregoing an abortion.) [Phase I Tr. Vol. I, 152:3–5; Phase I Tr. Vol. II, pp. 28–30, 45:11–21].

Telemedicine services, had they been available to Indiana women seeking abortion care, would have ameliorated the burdens of the two-trip requirement. Ms. Herr, who obtained a medication abortion at Women's Med in 2019, and Ms. Grace Hutson, who received a medication abortion at a Planned Parenthood in 2014, testified that the in-

---

[35] The first of these trips may occur at an affiliated facility, but the counseling session must be conducted in person with a physician or an APC, which imposes obvious limitations on the availability of these counseling appointments, *infra* at Section III.C.5.

51

person counseling requirements were, indeed, significantly burdensome for, rather than beneficial to them.  [Phase I. Tr. Vol. I, 131:1–7, 133:17–25, 134:1–7; Phase I Tr. Vol. II, 190:1–21, 192:22–25, 193:1–3].

### c.  Indiana's Ultrasound Requirement

Prior to an abortion, Indiana law requires that "the provider shall perform, and the pregnant woman shall view, the fetal ultrasound imaging and hear the auscultation of the fetal heart tone if the fetal heart tone is audible," unless the patient certifies in writing, before the abortion, that she declines to do so.  Ind. Code. § 16-34-2-1.1(a)(5) (the "Ultrasound Requirement"). The ultrasound must occur at least eighteen hours in advance of the abortion, though that requirement is not directly challenged here.[36] *Id.*

---

[36] The statute requiring that ultrasounds occur eighteen hours in advance of the abortion was enacted in 2016, and its enforcement was preliminarily enjoined by our colleague, the Honorable Tanya Walton Pratt. *Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r, Indiana State Dep't of Health*, 273 F. Supp. 3d 1013 (S.D. Ind. 2017), *aff'd sub nom. Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r of Indiana State Dep't of Health*, 896 F.3d 809, 2018 WL 3567829 (7th Cir. 2018), *cert. granted, judgment vacated sub nom. Box v. Planned Parenthood of Indiana & Kentucky, Inc.*, 141 S. Ct. 184 (2020). Prior to the enactment of this statute, women could travel to any affiliate of an abortion clinic for preabortion counseling and could complete the ultrasound on the day of her abortion at whichever clinic was providing that procedure. So, for example, a woman in Fort Wayne, Indiana could travel to the Planned Parenthood of Fort Wayne for counseling, but receive her ultrasound and abortion (at least eighteen hours later) at Planned Parenthood on Georgetown Road in Indianapolis. The new law was unduly burdensome in part because the affiliate facilities lacked the resources to provide ultrasounds eighteen hours in advance, which, in turn, required the Fort Wayne woman to trek to the Indianapolis clinic on two occasions, eighteen hours apart. Because the burdens of travel (among other resultant burdens detailed by Judge Pratt) were not offset by adequate medical benefits, enforcement of the law was enjoined and the injunction was affirmed on appeal.

At the time of the summary judgment briefing in our case, Judge Pratt's preliminary injunction remained in force, and we followed the parties' request in reviewing the Ultrasound Requirement as not being subject to any eighteen-hour delay requirement restrictions. Accordingly, we held at summary judgment that the Ultrasound Requirement did not violate the Substantive Due Process Clause, leaving unaddressed the issue of whether it violated the Equal Protection Clause. In the interim, the State sought Supreme Court review of the Seventh Circuit's affirmance of Judge Pratt's preliminary injunction and, ultimately, the Supreme Court granted the

As determined at summary judgment, significant medical benefits flow from the provision of an ultrasound in the context of prenatal care. At summary judgment, experts from both sides agreed that accurate determinations of gestational age are critical to the ability to provide safe and effective abortion care. Plaintiffs, at summary judgment, did not challenge the State's assertion that an ultrasound is the *sine qua non* of an accurate determination of gestational age as well as the identification other fetal anomalies, including ectopic pregnancies which are contraindications for medication abortions. [Dkt. 297, 93–94].

However, the parties disagreed at summary judgment on whether the Ultrasound Requirement enhanced patients' decision-making with respect to abortion. [*Id.* at 94]. Both at summary judgment and at the trial, the State, through its experts—Dr. Stroud, Dr.

---

petition for *writ of certiorari*, vacated the decision of the Seventh Circuit, and remanded the case to the Seventh Circuit for further consideration in light of *June Medical Services LLC v. Russo*, 591 U.S.___, 140 S. Ct. 2103, 207 L.Ed.2d 566 (2020). On remand before the Seventh Circuit, the parties agreed that the case should be remanded to the district court, stating that: "[T]he factual circumstances that have occurred in the more than three years since the district court entered its preliminary injunction are significantly different and, in recognition of this, the parties . . . agree[] that the preliminary injunction should continue until January 1, 2021, at which point the injunction should be vacated and the case dismissed." Case No. 17-1883 [Dkt. 76-1, at 3]. The referenced change in "factual circumstances" pertained to the acquisition by Planned Parenthood's affiliates of a sufficient number of ultrasound machines to overcome the burdens to women of receiving their preabortion ultrasounds at their facilities at the same time they received their preabortion counseling eighteen hours in advance of the abortion. Consistent with this stipulation, the Seventh Circuit remanded the case, and its Mandate was received on October 22, 2020. On November 2, 2020, Judge Pratt issued an order accepting the parties' stipulations; the case was subsequently closed on January 4, 2021. *See* Case No. 1:16-cv-01807-TWP-DML, Dkt. Nos. 84–90]. Accordingly, Indiana law currently requires that an ultrasound be performed eighteen hours prior to an abortion. Thus, a woman, irrespective of the In-Person Counseling Requirement at issue here, is required to make two trips to a clinic, no sooner than eighteen hours apart. Against this backdrop, we here review the narrow issue of whether the Ultrasound Requirement violates the Equal Protection Clause. Lacking authority to address the constitutionality of the eighteen-hour requirement, we treat it as settled law.

Farr Curlin,[37] and Dr. Kheriaty—maintains that conducting an ultrasound, which allows women to see an image of as well as hear the fetus's heartbeat prior to proceeding with abortion care, is crucial to her ultimate decision as to whether to terminate. [*Id.*; Phase I Tr. Vol. III, 73:15–23, 74:3–25, 75–76, 77:12–25, 78:1–20; Phase I Tr. Vol. IV, 28: 17–25, 29:1–17]. Hearing the heartbeat and observing the fetus allows a woman to appreciate the importance of the life of the fetus she is carrying. This information further informs her consent as to whether to terminate her pregnancy. [*See id*]. These opinions were buttressed by the testimony of a witness who stated that she wishes she had had the opportunity to observe her fetus, since it is likely she would have made a choice not to terminate her pregnancy. [Phase I Tr. Vol. III, 97:1–17, 23–25, 98, 104:1–7, 105:6–15]. These findings also resulted from research relied on by the State at summary judgment and submitted again at trial to prove that a woman who views a picture from the ultrasound is more likely to continue her pregnancy than a woman who does not. However, other women, who proceeded with the abortion after viewing the ultrasound, communicated that doing so helped them to feel more firm in their decisions as well. [Dkt. 297, at 51; Phase I Tr. Vol. III, 77:15–25, 78:1–19].

Plaintiffs argued at summary judgment that ultrasounds do not enhance decision-making, citing findings from two studies supporting that conclusion—one focused on patients at a Los Angeles clinic and the other focused on abortions patients in Wisconsin.

---

[37] Dr. Curlin is a licensed medical doctor and currently teaches and conducts research at Duke University's Center for Bioethics, Humanities & History of Medicine, which is housed within the university's medical school. He was proffered by the State as an expert in the field of bioethics, including the bioethics of abortion and informed consent.

However, even these studies proffered by Plaintiffs reveal that some women's abortion decision-making was impacted by their having first viewed their ultrasounds. [Dkt. 297, at 93].

Plaintiffs also criticized the burdens of the Ultrasound Requirement on the grounds that it requires some patients to receive duplicative ultrasounds since it limits abortion providers to relying on an ultrasound performed only by an affiliated physician or technician. Plaintiffs offered no evidence to show that women are subjected to duplicative ultrasounds because of this requirement, nor did they provide "any constructive analysis as to the way(s) in which potentially duplicative ultrasounds create a substantial obstacle." [*Id.* at 93–4].

We address the additional facts cited by Plaintiffs at trial to the extent they illuminate our understanding of whether the Ultrasound Requirement comports with the requirements of the Equal Protection Clause.[38]

Plaintiffs appear to concede that the accurate dating of a pregnancy is an essential and important component of safe abortion care. Their evidence does establish that in no other prenatal (or medical) context is an ultrasound mandated by state law, despite its importance in the safe provision of prenatal care. Dr. Grossman testified that there nonetheless may be instances where an ultrasound is not necessary prior to a medication abortion. For example, a 2020 practice bulletin from ACOG states that, for those patients who have reliable menstrual cycles and who have had a period in the last 56 days and

---

[38] We do not revisit the issue of whether the Ultrasound Requirement is constitutional under the Due Process Clause; a trial does not allow additional, previously omitted evidence and theories to be advanced that could have been presented at summary judgment.

who present with no signs or symptoms of an ectopic pregnancy, an ultrasound is not required. [Phase I Tr. Vol. II, 44:14–25, 45:11–23].

Performing an ultrasound, however, remains by all accounts the "gold standard" for providing safe care, according to Dr. Harrison, even by ACOG standards. [Phase I Tr. Vol. III, 155:24, 156:1–12], whose "Level B" recommendation is that no ultrasound need to be conducted for some women. [Phase I Tr. Vol. II, 133:1–20]. ACOG's Level A recommendation counsels in favor of an ultrasound or a physical examination for all abortions patients, and the FDA directs that an ultrasound be conducted if there is any uncertainty as to gestational age or concerns of an ectopic pregnancy. [Phase I Tr. Vol. IV, 2–7, 242:21–25].  Dr. Grossman testified at his own facility, in fact, the practice includes ultrasounds being administered prior to proceeding with abortion care. [Phase I Tr. Vol. II, at 41:18–21].  The experts also agree that ultrasound technology is a highly accurate tool by which providers can and ordinarily do date pregnancies. [*Id.* 42:25, 43:1–3, 111:4–7; Phase I Tr. Vol. III, 195:14–22].

Apart from the value of performing an ultrasound, Dr. Grossman testified that there is no specific medical benefit that follows from a requirement that the ultrasound be performed by the abortion provider or an affiliate thereof rather than by an unaffiliated technician, which undercuts the limitation contained in the Ultrasound Requirement that abortion providers may not rely on ultrasounds conducted by other unaffiliated facilities nor may they refer a patient to a radiology lab near their home. [Phase I Tr. Vol. III, 77:7–13]. This restriction appears to be *sui generis*: in no other prenatal setting does such a limitation exist for women seeking medical services. The State defends this restriction

on the grounds that, though a patient may not be referred to an unaffiliated technician, the ultrasound may be performed at an affiliated facility and is not necessarily limited to the abortion clinic location. A woman could visit, for example, the Planned Parenthood of Fort Wayne (or Columbus or Evansville or Mishawaka) for her ultrasound and then have the abortion performed elsewhere at a licensed abortion clinic also operated by Planned Parenthood. [Phase I Tr. Vol. I, 32:19–25, 33:1–7].

Dr. Grossman estimates that approximately 10% of his patients have already obtained an ultrasound when they first come to him for care; in those instances, he only conducts an additional ultrasound if it were for some reason clinically necessary. [*Id.*, at 113:2–6]. Similarly, Ms. Hagstrom Miller reported that approximately one out of every ten patients, when they first come to the South Bend Clinic, have already received an ultrasound but, due to Indiana's Ultrasound Requirement, they must receive an additional ultrasound at or by the clinic. [Phase I Tr. Vol. I, 93:22–24].

Because this requirement must be satisfied at least eighteen hours in advance of receiving an abortion, it results in the two-trip regimen for patients.

2. *Indiana's Physician-Only Law*

The "Physician-Only Law" limits the performance of a first-trimester abortion in Indiana only to a physician. Ind. Code § 16-34-2-1(a)(1); *see also* 410 Ind. Admin. Code § 26-13-2(b). First enacted in 1973, this law is being challenged now, almost fifty years later, for its inconsistency with contemporary medical practice standards.

The 2016 amendment to the label for Mifeprex by the FDA removing language restrictions to the administration of  this drug solely by physicians provides context to

Plaintiffs' claim in this regard. The label as amended provides that "any certified healthcare provider" or any "certified prescriber" is authorized to dispense Mifeprex so long as the provider can diagnose ectopic pregnancies and provide surgical intervention in the case of incomplete abortion or severe bleeding or has "made a plan to provide such care through others." [Phase II Tr. Vol. I, 157:8–16; Phase II Tr. Vol. II, 122:14–15, 123:1–19; *see* Dkt. 347, Joint Stip. Fact, ¶ 67]. This amendment to the Mifeprex label, as interpreted by providers, states an implicit endorsement by the FDA of the opinion that medication abortions can be safely and competently performed by Advanced Practice Clinicians ("APCs"), such as physician assistants or nurse practitioners. [Phase II Trial, Vol. I, 157:17–21]. Indeed, ACOG, the American Public Health Association, and the World Health Organization have all also endorsed abortion care provided by APCs. [Phase II Tr. Vol. I, 152:16–25, 153:1–25, 154:1–21]. As of June 23, 2021, the evidence adduced at trial established that approximately one-third of the states currently permit APCs to provide medication abortions. In one-quarter of the states, APCs are also authorized to provide first-trimester aspiration abortions. [*Id.* at 154:22–25; 155:1–5].

In California, for example, where Dr. Grossman practices, APCs are authorized to provide both medication and first-trimester aspiration abortions. He has personally trained APCs to provide these services, which training he describes as being identical to the training a physician received for providing first-trimester abortion care. [*Id.* at 155]. Dr. Grossman's experiences in training and working with APCs as well as his in-depth review of published medical literature on this topic inform his opinion that APCs can and do provide medication and first-trimester aspiration abortions as safely and effectively as

physicians; thus, he opined, Indiana's Physician-Only Law is inconsistent with the
accepted medical knowledge and practice in the United States. [*Id.* at 156:1–13].

Included in his medical literature review was the NASEM report, which, as we
have previously noted, is the authoritative source on abortion care standards/procedures
in the United States. The report concludes as follows: "Both physicians . . . and APCs
can provide medication and aspiration abortions safely and effectively." [*Id.* at 156:19–
25]. Similarly, a 2013 peer-review study conducted by the American Journal of Public
Health determined that there was no clinically significant difference in the risk of
complications (minor or major) arising from first-trimester aspiration abortions, when the
abortion is performed by an APC as opposed to a physician. [*Id.* at 158:1–25, 160:1–25;
161:1-7]. Though an increase in minor complications was observed among the APC-
treated group, Dr. Grossman reiterated that any difference in complications did not rise to
a level of clinical significance, and, importantly, there was *no* difference between the
groups with respect to major complications. [*Id.*, 161:1–19]. Any gap between these
groups' respective proficiency levels, according to Dr. Grossman, disappears as APCs
gain experience in performing these procedure. [*Id.*, 161:8–19].

A 2015 meta-analysis comparative study examining APCs and physicians
regarding their respective provision of both medication abortion and first-trimester
aspiration abortion determined that there was nothing more than a minimal difference
between the two groups with respect to the safety and effectiveness of medication
abortion. As to first-trimester aspiration abortion, the meta-analysis cited one study in
which a "statistically significant difference" was identified regarding a risk of incomplete

abortions following aspiration abortion care (.03 percent when the care was provided by a physician versus .07 percent when provided by an APC). Again, Dr. Grossman explained that this difference was not "clinically significant" and that the study's authors were being "cautiously optimistic" regarding the safe provision of first-trimester abortion care by APCs [*Id.* at 163:1–25; 164:1-17].

APCs are authorized to provide a range of non-abortion related medical services, which Dr. Grossman contends present comparable risks to first-trimester abortion care. In Indiana, APCs can (and do) prescribe misoprostol for miscarriage management or to treat incomplete abortions. [*Id.* at 36:13–15; 165:22–25; 166:1-4]. Kelly McKinney, a nurse practitioner with the Community Health Network and Women's Med, testified that she currently provides care of this nature. [*Id.* at 66: 3–10]. IU Health also utilizes APCs to provide miscarriage management care through the use of mifepristone and misoprostol. *Id.* 36:10–15].

According to Dr. Grossman, the risks associated with misoprostol (the potential for infection, the risk of excessive bleeding, or the incomplete evacuation of the uterus, for example) are no greater in the context of the provision of abortion care than they are in the context of miscarriage management. [Phase  I Tr. Vol. II, 60:6–12; Phase II Tr. Vol. I, 167:12–18]. The challenges faced in managing any potential complications following a medication abortion would present in a similar way as those with a miscarriage management patient. [Phase II Tr. Vol. I 167:19–25]. Other medications that APCs are authorized to prescribe that pose equal or greater risks than abortion-inducing drugs include birth control and opioids. [*Id.* at 165:23–25; 166:1–7]. When prescribing

such drugs, APCs must screen in the same fashion for contraindications as would be required for abortion patients to determine whether the patient is an appropriate candidate for that kind/level of care. [*Id.* at 63:7–9, 13–23, 166:11–13].

APCs currently perform a wide range of non-abortion-related gynecological procedures: the insertion or removal of an IUD, colposcopies to evaluate for cervical cancer or dysplasia, endometrial biopsies, and loop electrocautery excising ("LEEP") procedures applied the cervix, which involve excising small bits of cervical tissue. Certified nurse midwifes are authorized to perform vaginal deliveries in connection with childbirth and related care in this context, including suturing torn vaginal tissue and administrating intravenously narcotics medication, though a physician is often available and on call in those situations.

Dr. Grossman testified that these authorized gynecological procedures are at least comparable to and sometimes riskier than first-trimester aspiration abortions. [Phase II Tr. Vol. I, 168:15–25]. The insertion of an IUD, for example, is much like a first-trimester aspiration abortion, sometimes necessitating manual dilation of the cervix, thereby creating a risk of forming a false passage way in the cervix which can lead to the perforation of the uterus. [*Id.* at 170:11–25, 171:1–15]. Dr. Grossman reiterated that an APC would manage these risks associated with aspiration abortion much like he or she would manage the risk of any of the aforementioned procedures, which may include referral to a hospital (where the patient might actually be treated by another APC) or to a physician, if the APC determined that was appropriate under the circumstances. [*Id.* at 173:1–16].

Ms. McKinney testified that she was confident that she could, if properly trained by a physician, perform a first-trimester aspiration abortion. [*Id.* at 68:15–25, 69:1–3]. Dr. Bernard testified that she would refer her patients in need of first-trimester abortion services to an APC, if she were legally permitted to do so. [*Id.* at 37:1–20].

Dr. Calhoun testified, however, that in his opinion and experience, physicians are better trained to "recognize" and to "deal with and/or be able to fix any complication that might occur as a result" of an aspiration abortion. [Phase I Tr. Vol. II, 95:4–10]. This training of physicians their encompasses years of residency in specific areas of medical practice, including obstetrics and gynecology as well as surgery. [*Id.* at 96:1–12; Phase II Tr. Vol. III, 8:7–25, pp. 9–13]. Though Dr. Calhoun and Dr. Stroud concur with Dr. Grossman that APCs are qualified to perform procedures such as colposcopies and LEEPs, these procedures, they say, are not properly viewed as being in the same "realm" as aspiration abortion, which requires the dilation of the cervix and is thus significantly more complex. [Phase I Tr. Vol. II, 40:16–24]. Dr. Calhoun agrees that the most common complication associated with an aspiration abortion or a D&C arises from the dilation of the cervix, which poses a risk of creating a false passageway that could lead to the perforation or laceration of the uterus; however, Dr. Calhoun disagrees with Dr. Grossman that the insertion of an IUD also involves the manual dilation of the cervix. His practice does not include the manual dilation of the cervix for patients in his care. [Phase I Tr. Vol. II, 94:5–14; 128:25, 129:1–20, 131:22–25, 132:1–4; 133:6–14].

Dr. Goodwine-Wozniak asserts that aspiration abortions are more invasive and complex than the procedures listed by Dr. Grossman, maintaining that physicians are

better trained to handle complications that may arise during this procedure. In agreement with the State's other expert witnesses, she holds that aspiration abortion, unlike the procedures delineated by Dr. Grossman, entails the dilation of the cervix and thus is beyond the scope of an APC's competency and practice. [*Id.*, at pp. 149–50, 151:4–13].

Dr. Stroud testified that although he employs numerous APCs in his practice,  he echoes Dr. Goodwine-Wozniak's concerns. In response to Dr. Grossman's view that APCS can provide D&Cs in the context of miscarriage management, Dr. Stroud indicated that he was not aware of any non-physicians performing D&Cs and did not believe that APCs could perform D&Cs consistent with the appropriate standard of care. He also specifically indicated that he would not permit APCs under his supervision to perform D&Cs—a procedure that he personally performs routinely in his practice. In his expert opinion, allowing APCs to perform this procedure would be medically inappropriate. [Phase II Tr. Vol. III, 13–15].

The evidence includes no specific testimony from or identification of APCs who currently provide D&Cs for miscarriage management patients or APCs who perform dilations of the cervix when inserting IUDs. Dr. Grossman clarified that such dilations are only "sometimes" necessary in those contexts.

With respect to medication abortions, Dr. Calhoun,[39] Dr. Goodwine-Wozniak, and Dr. Stroud all testified that, in their respective opinions, APCs are not equipped to

---

[39] The value of Dr. Calhoun's testimony was substantially diminished by certain errors and other shortcomings. Dr. Calhoun testified that a physician is better equipped to conduct the informed consent process, despite Indiana law permitting APCs to complete this aspect of abortion care. In addition, Dr. Calhoun erroneously asserted that the FDA requires a physician to certify the use of

diagnose ectopic pregnancies, which is a contraindication for medication abortion; we note, however, that APCs in Indiana can and do interpret ultrasounds and thus screen for ectopic pregnancies, thereafter discussing the ultrasound results with abortion patients. [Phase I Tr. Vol. I, 39:10–12, 139:19–21, 140:3–8; Phase II Tr. Vol. I, 48:12–15, 65:25, 77:1; Phase II Tr. Vol. II, 121:2–7]. These opinions by these physicians are thus clearly inconsistent with currently accepted medical standards of care in Indiana.

Dr. Goodwine-Wozniak also opined that APCs may not be qualified to manage hemorrhaging caused by the abortion—though, as we previously noted, APCs are authorized to handle this potential complication when it arises in the course of miscarriage management. Dr. Stroud shared the view that APCs are not qualified to perform D&Cs, which could be required in an incomplete medication abortion. Again, however, APCs are trusted with managing this complication with a miscarriage management patient. It is also undisputed that such complications as these most likely arise after the patient has left the abortion facility, following the ingestion of misoprostol.

In non-abortion settings, APCs are subject to all generally applicable laws/regulations defining the scope of practice and professional standards. *See* Ind. Code §§ 25-22.5-1-1.1(i)(1), 25-23-1-1, 25-23-1-19.4; 844 Ind. Admin. Code §§ 2.2-1.1-13, 2.2-1.1-16, 2.2-2-6; 848 Ind. Admin. Code §§ 3-1-1, 3-1-2, 4-1-4, 4-2-1. Physician assistants must be supervised by licensed physicians pursuant to written supervisory agreements. *See* Ind. Code § 25-22.5-1-1.1(i)(1); 844 Ind. Admin. Code 2.2-1.1-16.

---

Mifeprex, and thus permitting APCs to prescribe Mifeprex would contravene the FDA's directive. This is, as the evidence shows, simply incorrect—the FDA amended the Mifeprex label to refer to "prescriber" rather than "physician."

Nurse practitioners practicing in outpatient settings are required to collaborate with licensed physicians, also pursuant to written agreements. *See* Ind. Code § 25-23-1-19.4.

The size of Indiana's pool of abortion providers eligible to perform first-trimester abortions is obviously significantly reduced by the impact of the Physician-Only Law. Physician availability and recruitment, as previously explained, is a significant barrier to patient access of abortion services in Indiana, *supra* Section III.B.1. Because of a shortage of available physicians, the limited capacity of Indiana's licensed abortion clinics results in long wait times and an inability to expand the provision of services to additional days. [40] No Indiana-based abortion clinic is currently able to offer services more than one or two days a week or once every other week, and the recruitment of additional physicians by clinics continues to be exceedingly challenging. *Id.*

The recruitment of APCs does not pose such obstacles, however. Indeed, we were told, there exists a supply of APCs willing and able to provide abortion care, who would do so but for the Physician-Only Law. Many APCs are already employed by licensed abortion clinics, but their duties are curtailed by this statutory restriction. Planned Parenthood, for example, employs a base of twenty APCs across its three Indiana abortion clinics, who routinely provide birth control, STI testing, and pap smears, among other services, and, as mentioned, would provide abortion care if the law permitted them to do so. These APCs could "easily" step in to fill the shortage of qualified providers, according to Ms. Miller. [Phase II Tr. Vol. 13:9–22, 14].

---

[40] See our prior detailed discussion of the limitations that physicians' availability places on access to abortion services, *supra* Section III.C.1.a.

Similarly, Women's Med currently employs three APCs who prescribe contraceptives, conduct preabortion counseling, review ultrasounds, and perform follow-up examinations on abortion patients. Likewise, these APCs would perform abortion-related care at Women's Med, if the law permitted them to do so. [*Id.* at 48, 49:1–2]. The South Bend Clinic employs one APC who currently works only two Fridays a month, but, if she were permitted to provide medication abortions, she would expand her time commitment to the clinic. [*Id.* at 76:14–21, 78:25, 79:1–4].

If APCs were eligible to provide abortion services, they could staff the clinics on days when physicians are unavailable, thereby increasing the availability of abortion services to patients, and, in turn, reducing the existing delays in accessing care. Without this restriction, each licensed abortion clinic in Indiana could and would significantly expand its services: Indiana's Planned Parenthoods would offer appointments every day of the week they are open, rather than one or two days (or less for some, such as the Lafayette clinic) and Women's Med would expand its offering from two days a week to five days a week. [*Id.* at 12:22–25, 13:1–3, 49:3–9]. The South Bend Clinic would expand the number of days on which abortion appointments are available. [*Id.* at 75:3–9, 78:21–25, 79:1–7].

Allowing APCs to provide abortion services would also reduce procedural costs for patients. As. Dr. Haskell testified, APCs are employed at a lower salaries; an abortion performed by an APC would result in a cost reduction of 10%, from $700 to $630. [*Id.*, at 49:10–23]. The South Bend Clinic would also be able to reduce the cost of medication

66

abortions provided by APCs, which savings would be passed on to the patients. [*Id.*, at 75:10–19, 79:1–14].

### 3. *Indiana's Second Trimester Hospitalization Requirement*

Indiana's "Second Trimester Hospitalization Requirement" provides that "after the first trimester of pregnancy," an abortion may only be "performed in a hospital or ambulatory outpatient surgical center." Ind. Code § 16-34-2-1(2). As detailed herein, hospitals and ambulatory surgical centers are subject to heightened construction and staffing requirements necessary (among other reasons) to maintain a sterile operating environment. Such requirements are unnecessary to safely perform second-trimester abortions, according to Plaintiffs, and the hospitalization requirement reduces access and increases costs for abortions performed in Indiana.

Early second-trimester abortions, up to sixteen weeks lmp, may be performed utilizing aspiration abortion; however, the vast majority (90%) of second-trimester abortions are performed through D&Es. [Phase II Tr. Vol. I, 190:1–16].

When an aspiration abortion is performed in the second trimester, that procedure is "exactly the same" as when it is performed in the first trimester. [*Id.* 190:14–25, 191:1–2]. Currently, as we have previously noted, five of Indiana's abortion clinics are licensed to provide first-trimester aspiration abortions.

D&Es, as currently performed, utilize both suction and medical instruments to empty the contents of the uterus. The first step is the dilation of the cervix using osmotic dilators and/or medications, which process may occur over the course of two days. Once the cervix is dilated, a combination of suction and forceps is used to empty the uterus,

requiring five to ten minutes to complete. This provision of second-trimester care was developed in the late 1970s and 1980s, and has proved to be much safer than the induction care that was previously provided to second-trimester patients. D&Es techniques have continued to evolve since they were first developed. Dr. Grossman testified that he began performing D&Es during his residency in the 1990s. At that time, osmotic dilators, the use of which has simplified D&Es and increased their safety, were unavailable. At present, a combination of medication and osmotic dilators is commonly utilized to prepare the cervix for a D&E procedure. [*Id.* at 189:10–25; 190:1–5].

Plaintiffs' evidence indicates that second-trimester D&E abortions in places outside of Indiana can be and are safely performed in out-patient, office-based settings. Dr. Grossman, whose opinions, again, are anchored in his personal experiences as well as his review of relevant medical literature and his own published research, testified that there are no minimum facility requirements necessary to safely perform D&Es beyond those connected with the type of anesthesia used, which, for D&Es, is likely to be moderate sedation or intravenous deep sedation. [*Id.* 176: 16–25, 1–7; 178:10–16, 192:1–9]. Heightened construction and personnel requirements applicable to hospitals do not enhance the safety of a D&E, according to Dr. Grossman, given that the primary purpose of such requirements is to ensure the sterility of operating rooms within the context of performing sterile surgeries during which surgeons make incisions into the body. As previously noted, D&Es do not require incisions into sterile tissue. Additionally, operating rooms in hospitals and ASCs require that they be of adequate size to allow for the presence and movement of an anesthetist and general anesthesia equipment as well as

other surgical equipment. None of these needs for space apply when safely performing a D&E. [*Id.* at 181:2–15, 192].[41]

Dr. Grossman stated that an ambulatory surgical center is no better equipped than an out-patient medical clinic to treat the potential complications of a D&E, and, in any event, complications are "very, very rare." On such rare occasions when a complication does arise, both an ASC and an outpatient clinic would almost certainly transfer the patient to a hospital for consultation or collaboration with a surgeon. Accordingly, the care provided in an ASC would be no different or better or safer than that which would and could be provided by an outpatient abortion clinic. [*Id.* at 193:1–14].

Dr. Grossman's opinions find substantial support in medical literature, including the NASEM report. [*Id.* at 175:19–25, 176, 177:1–7]. Similarly, "Consensus Guidelines," developed by ACOG and the American College of Physicians as well as other professional groups,[42] state that "requiring facilities that perform office procedures, including abortion, to meet standards beyond those currently in effect for all general

---

[41] Dr. Goodwine-Wozniak opined that the pain associated with second-trimester abortions can be best managed by hospitals or ACS facilities; however, because she does not perform second-trimester D&Es in either the abortion or miscarriage management context, her opinions regarding the level of pain management required for D&E are less persuasive. [Phase II Tr. Vol. II, 156:9–14, 157:18–25, 19:1–8]. Dr. Goodwine-Wozniak did testify that she performs first-trimester D&Cs only in hospitals utilizing general anesthesia, but the evidence adduced at trial establishes that this procedure can be and is safely performed in clinical office settings, both for abortion and miscarriage management patients. [*Id.*, at 158: 6–18, 162:20–25, 163:1–12, 165:19–21].

[42] The Consensus Guidelines were developed following a comprehensive review of the published medical literature as well of studies that were in progress at the time of publication. They are based on a consensus meeting comprised of experts in a variety of areas of medicine and nursing who reviewed the available evidence from which they produced these guidelines. [Phase II Tr. Vol. I, 177:19–25, 178:1–2].

medical offices and clinics is unjustified based on [a] thorough review and analysis of available evidence." [*Id.* 177:9–25, 178:1–15].

In addition, a 2018 peer-reviewed study published in *The Journal of the American Medical Association* reviewed incidences of complications and adverse events occurring in ASCs compared to out-patient office-based settings over a three-year period. The findings of this study determined that there is no evidence that second-trimester D&Es are any safer when they are performed in an ASC compared to an office-based setting. [*Id.* at 193:16–25, 194:1–15, 195:9–14].

Dr. Grossman reports that he routinely and safely provides D&E care in an outpatient clinic setting. [*Id.*, at 195:25, 196:1–5]. He further noted that D&Es in the context of miscarriage management are provided in office-based settings, as are procedures of comparable complexity and risk, such as operative hysteroscopies, which involve dilating the cervix and then inserting instruments into the cervix to remove fibroids, polyps, or a septum of the uterus. [Phase II Tr. Vol. III, 44:10–25].

The State's experts did not counter these findings from Dr. Grossman's research.[43] However, Dr. Calhoun testified that he believes that second-trimester D&Es should occur only in facilities, such as an ASC or hospital, that are equipped with the surgical equipment or personnel necessary to treat any complications that might arise. [Phase I.

---

[43] Dr. Goodwine-Wozniak does not perform D&Es in any context but nonetheless is of the view that second-trimester D&Cs, to the extent they occur, should be performed in hospitals or APCs to better manage pain as well as potential complications, including bleeding and infection. It is unclear from Dr. Goodwine-Wozniak's testimony why a second-trimester D&C necessitates different care from a first-trimester D&C, which procedures can be and currently are safely provided in clinical settings.

Tr. Vol. II, 104:14–25, 105:1–4]. The limitations of Dr. Calhoun's expertise diminish the importance of his opinions in this regard since he has performed only 10 to 15 D&Es (in the context of miscarriage management) in the course of his medical practice. He could not recall the last time he performed this procedure though he knew it was decades ago. [*Id.*, 127:1–25, 128:1–14]. In addition, Dr. Calhoun did not specifically respond to or rebut Dr. Grossman's contention that dealing with complications on the rare occasions they might arise from a D&E would involve the same treatment process if this procedure were performed at either an ASC or an outpatient clinic, that is, the safe transfer of the patient to a hospital.[44]

Dr. Grossman's findings are consistent with Dr. Cowett's[45] experiences. She testified that her medical clinic in Chicago, Family Planning Associates, which provides approximately 12,000 abortions per year, is equipped to and does provide safe second-trimester abortions, including D&Es. According to Dr. Cowett, the vast majority of second-trimester D&E patients are treated at her clinic without any issues or complications. It is only on "extremely rare" occasions that emergency transport is necessary, which she estimates to occur approximately two to three times a year. The

---

[44] As will be discussed in our analysis, the Supreme Court has already determined (nearly forty years ago) that it is unconstitutional to restrict the provision of D&Es only to hospitals given the overall safety of this procedure. *City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 438 (1983), *overruled on unrelated grounds by Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833 (1992) ("By preventing the performance of D & E abortions in an appropriate nonhospital setting, Akron has imposed a heavy, and unnecessary, burden on women's access to a relatively inexpensive, otherwise accessible, and safe abortion procedure."); *see also Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 482 (1983) ("For the reasons stated in *City of Akron*, we held that such a requirement 'unreasonably infringes upon a woman's constitutional right to obtain an abortion.'")

[45] Dr. Cowett testified on behalf of Plaintiffs as an expert in the field of obstetrics and gynecology as well as abortion care.

71

most likely complication that would necessitate emergency transfer is post-operative bleeding potentially associated with uterine perforation or cervical laceration, which is a known albeit rare risk of D&Es. Infections may also necessitate transfer, though, again, only rarely. Dr. Cowett explained that because these complications are extremely rare, it is illogical and unnecessary to outfit her clinic with the equipment (such as that necessary for a blood transfusion) and space and personnel necessary to treat them. In those rare instances when such treatment is necessary, the appropriate care which she provides is the safe transfer of the patient to a hospital. In all instances that a patient is transferred, a Family Planning Associates staff member accompanies the patient to the hospital to ensure a continuity of care and to provide support to the patient. [Phase II Tr. Vol. I, 126:25, 127:1–7; 139:24–25, 140:1–8, 141:1–9, 14–19, 143:9–25, 144:2–25, 146:1–22, 148:21–25, 149:1–4].

   Planned Parenthood currently provides second-trimester abortion care in their clinics located in other states, including Hawaii, Alaska, Idaho, and Washington. [*Id.* at 16:2–7]. The Planned Parenthoods licensed in Indiana to provide aspiration abortion services (Merrillville, Indianapolis, and Bloomington)[46] would, but for this law, offer second-trimester abortions. These clinics regularly receive patients seeking services who have progressed into the second trimester who must be referred out-of-state. [*Id.* at

---

[46] These Indiana licensed aspiration abortion clinics are subject to a complex, extensive series of regulations requiring them, for example, to: maintain protocols for medical emergencies, which include the safe transfer of patients to a hospital for emergency care; obtain and keep available various equipment and supplies, including oxygen and resuscitation equipment, defibrillators, cardiac monitors, and pulse oximeters; and comply with various other sterilization and facility requirements. *See generally* 410 Ind. Admin. Code. § 26.

18:11–23, 19:1–21, 25:2–9]. Similarly, Women's Med of Indianapolis routinely encounters women hoping to obtain second-trimester abortions whom they would like to serve but are prohibited from doing so; indeed, Women's Med does provide second-trimester services at its Ohio clinic. [*Id.*, at 50:4–23, 52:1–19]. Second-trimester abortion services are also offered at Whole Woman's Health Clinics in Texas, Maryland, Minnesota, and Virginia. [*Id.* at 92:11–18].

As Ms. Miller testified, it would be cost-prohibitive to retrofit Planned Parenthood's existing facilities to comply with the scheme of ASC regulations. Such retrofitting would require adding space to satisfy the larger square footage requirements and installing expanded HVAC systems. [*Id.*, p. 17]. Dr. Haskell of Women's Med notes similar challenges impeding their ability to upgrade to an ASC. He estimated that it would cost more than $2 million to transform a single facility to include the required equipment, ventilation systems and operating rooms mandated for an ASC. [*Id.* at 50:24–25, 51:1–19].

There is no dispute that the Second-Trimester Hospitalization Requirement increases the costs and reduces the availability of second-trimester abortion care. Few hospitals and no ASCs currently provide any abortion services. Those hospitals that do provide second-trimester abortions in Indiana are all located within twenty miles of Indianapolis and provide D&Es only where there is maternal or fetal concern indicated. *Supra*, Section III.B.1. As a result, most women seeking this service in Indiana must travel out-of-state, typically to Illinois, Ohio, or Kentucky, to obtain care. [*Id.* at 34:2–10, *Id.* at 115:22–25, 116:1–15].

The evidence reflects that it is not uncommon for women in Indiana to need second-trimester care but be unable to access it. Dr. Bernard testified that she encounters at least one patient a month whom she must refer out of state for second-trimester services. [*Id.* at 34:20–22]. Women's Med encounters two or three second-trimester patients a week who must be referred out-of-state, typically to Ohio, and Ms. Miller of Planned Parenthood refers three to four patients a month to neighboring states. [*Id.* at 52:7–16]. About one-quarter of Ms. Guerrero's clients are in need of second-trimester care but unable to access it in Indiana. And Dr. Cowett testified that approximately one out of nine second-trimester patients for whom she provides care at Family Planning Associates has traveled to her Chicago facility from Indiana. [*Id.* 127:15–19]. These Indiana women travel there from all of over the state. [*Id.*, at 128:8–24]. She understands (and testified) that the primary factor motivating  Hoosier women to come to her facility is that they are unable to access abortion care in Indiana. [*Id.* at 129:6–25, 130:1–15, 135].[47]

Because D&Es procedures often extend over a period of time, these out-of-state trips necessitate overnight stays. The expenses associated with such arrangements are significant and burdensome for many women seeking services, who, as previously discussed, often struggle to pull together fund to cover the transportation and lodging in addition to the  money to fund abortion services, even within Indiana. [*Id.* at 130:14–25, 131:1–25, 117]. To access care, women will "scrap[e] together every penny they have" to

---

[47] The State has maintained that there is little or no demand for second-trimester services in Indiana. This position is not supported by or consistent with the evidence in the record.

pay for these expenses. [*Id.* at 117:20–23]. Many women sleep in their cars or bus stations. [*Id.* at 132:19–25, 133:1–2]. Women's stress levels related to their ability to maintain their employment relationships and secure adequate child care for other children are exacerbated further when they must travel to a neighboring state for care. [*Id.* at 117:16–19]. The emotional burdens of managing all of this, coupled with the challenges of maintaining confidentiality, are compounded especially for women in violent partnerships. [*Id.* at p. 118].

Even if a woman were successful in accessing a second-trimester elective abortion care in a hospital in Indiana, the costs of securing such care would be exponentially greater than they would be in a clinic. It is estimated that the cost of a second-trimester abortion in a clinic is between $800 and $2400, whereas the cost of a second-trimester abortion in a hospital ranges from $10,000 to $20,000. (The costs of first-trimester abortion care range from $500 to $1000 before any other expenses are factored in). [*Id.* at 12–21; Phase I Tr. Vol. III, 34:3–8]. For patients fortunate to have insurance coverage, abortion costs are not usually included. *Supra*, Section III.B.1.

### 4. *Indiana's Physical Facility Requirements*

Indiana law imposes various structural requirements on clinic facilities which provide medication and aspiration abortion services.

### a. **Restrictions on Facilities Providing Medication Abortions**

In order to obtain licensure to operate a medication abortion clinic, clinics are required to maintain on the premises a housekeeping room with a service sink and storage. 410 Ind. Admin. Code 26.5-17-2(e)(1). Plaintiffs contend that this provision is

wholly unnecessary and that abortion clinics can operate and maintain sanitary and safe facilities without requiring this separate room.

Dr. Grossman has testified that there are no specific facility standards required to ensure safe abortion care, with the exception of facility requirements tailored to the provision of certain forms of anesthesia. This opinion is supported by the NASEM report and the Consensus Guidelines. Dr. Grossman could identify no other outpatient medical facilities that are subject to any specific facilities requirements. [*Id.* at 175:16–24, 180:1–20].

With specific respect to the requirement that medication abortion clinics maintain housekeeping rooms with storage sinks, Dr. Grossman deemed this requirement as being medically unnecessary and lacking any safety benefit connection. As he explained, medication abortion does not involve the use of instruments that require any cleaning or sterilization that would necessitate this kind of separate room. Such care is provided "essentially without touching the patient." There is no reason to do more than simply disinfect surfaces similar to how providers would in any office setting in administering safe medication abortion care. [*Id.* at 185:4–12].

The effect of this facility restriction is to prevent otherwise qualified healthcare centers from providing medication abortion services, including, for example, the Planned Parenthood located in Evansville, which, as Ms. Miller testified, satisfies all requirements necessary for licensure except for this particular facility requirement  Her clinic could fully administer safe, hygienic care as it is, particularly since it outsources most of its janitorial duties to a third party that provides all cleaning supplies and removes from the

facility all materials, such as towels, that may need to be laundered. Further, Planned Parenthood's janitorial services do not use "an old-fashioned mop with a mop bucket" since "that's just not how medical spaces are cleaned anymore." Rather, most areas are cleaned using single-use materials that are discarded afterwards. Within the Evansville clinic, to the extent various materials require washing or rinsing, a clearly labeled "dirty sink" is maintained separate and apart from the sink designated for use by patients. [*Id.* at 20–21; 22:1–19].

The State proffered virtually no evidence as to the benefits of requiring medication abortion clinics to maintain a housekeeping room with a service sink and storage. Dr. Stroud testified that a separate janitorial closet was useful at his birthing center to store cleaning supplies and hazardous waste materials. He also testified that in his view facilities should keep sinks that are utilized for cleaning instruments or other medical supplies segregated from the sinks utilized by patients for handwashing. [Phase II Tr. Vol. III, 25:25, 26:1–23]. He offered no opinion, however, as to why it was necessary to install what Planned Parenthood has called a "dirty sink" inside a janitorial closet or housekeeping room or why such a room would otherwise need to be outfitted with plumbing.[48]

Planned Parenthood of Evansville made clear that it cannot simply retrofit its facility to comply with this requirement, since it would require modifications to one of its existing exam rooms to install running water, thereby reducing the availability of space

---

[48] Dr. Calhoun testified that a housekeeping room with a service sink ensures sterility for surgical suites; however, sterility requirements in the context of surgical care are irrelevant here since that kind of surgery is not performed in these locations.

for other services. Such renovations would be very expensive. Alternatively, one of its bathrooms would need to be converted into janitorial space. These are neither reasonable nor necessary modifications, according to Ms. Miller. [Phase II Tr. Vol. I, 22:20–25, 23:2–12]. No other abortion clinic operates in Evansville; the closest available clinic for women in Evansville is in Bloomington, approximately 125 miles away. [*Id.* at 13–17].

### b. Indiana's Facility Requirements for Aspiration Abortion Clinics

Plaintiffs also challenge the following restrictions imposed upon clinics performing aspiration procedures:

- Procedure rooms must be a minimum of 120 square feet for procedures requiring only local analgesia or nitrous oxide, 410 Ind. Admin. Code 26-17-2(d)(1);

- Scrub facilities must be provided near the entrance of procedure rooms, 410 Ind. Admin. Code 26-17-2(d)(4); and

- Corridors must be at least forty-four inches wide, 410 Ind. Admin. Code 26-17-2(e)(5).

Dr. Grossman's review of relevant medical literature, including the Consensus Guidelines and the NASEM report, undermines the necessity of these kinds of specific space standards for facilities providing first-trimester-aspiration abortion services.

Regarding the requirement that procedure room dimensions measure no less than 120 square feet, Dr. Grossman testified that there is no evidence indicating that this regulation enhances the safety of first-trimester aspiration abortions. The size of the room need only be large enough to accommodate the required number of people to appropriately care for the patient, the patient herself, and the equipment entailed in performing the procedure. A standard examination room thus suffices as the space

78

needed to perform a first-trimester aspiration abortion. Again, this opinion by Dr. Grossman mirrors the Consensus Guidelines. [*Id.*, at 186:2–25, 187:1–3].

Dr. Grossman further testified that a scrub facility, which includes automatic soap and water dispensers typically found within or outside operating rooms where sterile procedures are being performed, is not required to safely provide first-trimester aspiration abortion care, given that this procedure does not present any need for a sterile environment such as when an incision is made into a person's body. For first-trimester aspiration abortions, simple hand washing with soap and water is sufficient to ensure safe abortion care. [*Id.*, at 187:3–18, 188:4–15].

Dr. Grossman also testified that the requirement of 44-inch corridors does not enhance the safety of first-trimester aspiration abortion care. As he explained, this provision appears to be an extrapolation from regulations governing hospitals or surgical centers, where two wheelchairs or gurneys may need to pass one another in a hallway. However, this restriction serves no purpose in a clinic that provides only first-trimester aspiration abortion care where, given the minimal medical risks associated with this procedure, a patient would only rarely require emergency transport  and on such occasions via a wheelchair or gurney. It is a virtual certainty that two patients would never require such transport at the same time. [*Id.* at 181:20–25, 182:1–13, 188:16–25, 189:1–9]. Dr. Grossman testified that he has safely provided first-trimester aspiration services on numerous occasions in facilities that were not subject to these requirements. [*Id.* at 182:19–23].

Dr. Calhoun testified, however, that he believe each of these restrictions furthers the safety of the care being provided. Square footage requirements, for example, he said, ensure that there is adequate room for emergency personnel. The 44-inch corridor requirement allows for a gurney to be easily navigated through the hallways. A scrub facility, he testified, allows sterilization of one's hands prior to surgery. [Phase II Tr. Vol. II, 102:24–25, 103, 104:1–13]. But Dr. Calhoun did not dispute that first-trimester aspiration abortions do not mandate sterile conditions and that it is highly unlikely that two gurneys would ever be needed in the same hallway of a clinic at the same time (indeed, it is rare that even one would be needed). He also did not contest that a standard procedure room in a medical clinic provides sufficient space for the necessary personnel engaged in providing first-trimester aspiration abortion care.

Dr. Stroud, in addressing the benefits of scrub facilities,[49] explained that this requirement is critical to the safe performance of procedures and surgeries which pose  a material risk of infection. D&Cs (or aspiration abortions) qualify as such a procedure, he said, because they involve "taking objects from the outside world and placing them from the outside world into the inside world of the uterus that is not designed to have foreign objects in it." [Phase II Tr. Vol. III, 27:7–25, 28:1–5]. There is no dispute, however, that other facilities in Indiana, such as Dr. Allen Clark's office in South, Bend Indiana, administer other forms of care that encompasses the placement of "objects from the outside world into the inside world" (IUD insertions or endometrial biopsies, for

---

[49] Dr. Stroud also offered testimony relating to the appropriate procedure rooms for birthing centers. This testimony is not useful to understanding the appropriate square footage for rooms in the abortion context.

example), which are not equipped with scrub facilities. [Phase II Tr. Vol. I, 107:20–25, 108:1–24, 109:25, 110:1–4].

Clearly, regulatory restrictions (particularly unnecessary regulatory restrictions) place burdens on the operation of facilities offering  first-trimester aspiration abortion services, thereby reducing their availability. Regarding the South Bend Clinic, Ms. Hagstrom Miller testified that her efforts to locate a facility in the South Bend area that complied with these facility requirements were unsuccessful and that significant construction would be required to retrofit a facility to comply with these requirements, making it cost-prohibitive or at least infeasible or both. To come into compliance with the 120-square-foot procedure room requirement, for example, the South Bend Clinic would have to expand its current examination room(s), which would, as a result, violate the 44-inch corridor requirement. The South Bend Clinic also cannot add scrub facilities outside its procedure room; in order to do so, significant and costly construction would be required that would include installing plumbing, moving a wall, and losing the availability of a different examination room. Even if the South Bend Clinic could afford to construct these alterations, doing so would violate the 44-inch corridor requirement. Consequently, the South Bend Clinic is ineligible under Indiana law to provide aspiration abortion services and must regularly refer South Bend women to clinics in Merrillville, Indianapolis, and Chicago. [*Id.* at 82:22–25, 83, 84, 87:14–25, 88:1–13].

Ms. Hagstrom Miller also testified that no other state in which she operates first-trimester abortion clinics subjects its clinics to such requirements. [*Id.* at 88:21–25, 89:1–2].When asked whether she would proceed with the aforementioned construction if it

were feasible and affordable in order to provide the highest quality of care, Ms. Hagstrom Miller responded no, explaining that the various provisions were simply unnecessary and added no value to the quality of care that can be and is otherwise provided without such renovations. As she explained, the scrub facilities are not beneficial because clinics are already required to have handwashing facilities inside of each examination room. The other requirements similarly are of little or no value. [*Id.* at 89:9–25; 90].

5. *Indiana's Mandatory Disclosures*

Plaintiffs have also challenged certain "Mandatory Disclosures" prescribed by the State in conjunction with the informed consent process. Indiana law specifically mandates that at least eighteen hours prior to an abortion and "in the private, not group, presence of the pregnant woman," a physician or APC must provide orally and in writing certain information to the patient, including the Mandatory Disclosures discussed below, and patients are required to certify in writing that they have received this information. *Id.* § 16-34-2-1.1(a)(3).

Eighteen hours prior to the abortion, patients must also be provided a color copy of Indiana's "Informed Consent Brochure," *id.* § 16-34-2-1.1(a)(4), which contains much of the information required during the oral informed consent process.

A patient who has received a diagnosis of a lethal fetal anomaly (that is, a condition likely to be fatal before birth or shortly thereafter) must be provided additional disclosures. Again, at least eighteen hours prior to an abortion, "the physician who will perform the abortion" must "orally and in person, inform the pregnant woman of the availability of perinatal hospice services" and provide her with copies of the State's

"Perinatal Hospice Brochure" and a "list of perinatal hospice providers and programs." *Id.* § 16-34-2-1.1(b). If the woman chooses to proceed with the abortion, she must certify in writing that she received these materials. *Id.* § 16-34-2-1.1(b).

Much of the information required to be disclosed to women prior to an abortion is uncontroverted here. Other disclosure requirements, according to Plaintiffs' witnesses, are inaccurate, misleading, or ideologically biased. Plaintiffs specifically challenge the Mandatory Disclosures which include: 1) when life begins, 2) fetal pain, and 3) information relating to mental health contained with the Perinatal Hospital Brochure.

Indiana's mandated disclosure related to the beginning of life provides that, "human physical life begins when a human ovum is fertilized by a human sperm." Ind. Code § 16-34-2-1.1(a)(1)(E). Dr. Grossman testified that this disclosure does not convey objective or truthful scientific information in large part because there is no recognized medical definition for "human physical life," nor is there any scientific, medical consensus as to the moment in time or human biology when "life" beings, rendering the required disclosure at best confusing and ultimately unhelpful to women's informed decision-making. [Phase II Tr. Vol. I, 196:12–25, 197]. Ms. McKinney, who conducts preabortion counseling appointments at Women's Med, testified that most of her patients become confused and angry when they are provided with this disclosure. [*Id.* at 67:22–25, 68:1–4].

In contrast, Dr. Curlin testified that it is "beyond debate" that all living organisms begin as fertilized eggs, including all human beings. Human physical life is thus deemed to begin when the human ovum is fertilized by a human sperm thereby creating a

fertilized egg. Dr. Curlin criticized Dr. Grossman's view for conflating "physical life" with a philosophical theory, explaining that the inclusion of the word "physical" clarifies that the State's definition refers to a medical fact. This definition moots any criticisms that the required disclosure defines life in spiritual or philosophical terms. According to Dr. Curlin, this required assertion is critical to the informed consent process because the woman considering the abortion needs to understand that the procedure will "kill a living human being." [Phase II Tr. Vol. II, 6:21–25, 7–9, 10:1–20; 12:21–25].

Plaintiffs also object to the statutory requirement that abortion providers must inform their patients that "objective scientific information shows that a fetus can feel pain at or before twenty (20) weeks of postfertilization age," Ind. Code § 16-34-2-1.1(a)(1)(G). This statement, according to Dr. Grossman, is contrary to the positions endorsed by the leading medical associations, including ACOG, which group represents 90% of OB-GYNs in the United States, as well as the Royal College of Obstetrician Gynecologists ("RCOG"), the major professional organization of OB-GYNs in the United Kingdom. Dr. Grossman cites the position of ACOG, which relies, in part, on research recounted in a peer-reviewed article published by *The Journal of the American Medical Association*, that concludes that it is unlikely that a fetus is capable of perceiving or experiencing pain prior to 24 weeks postfertilization. RCOG has reached this same conclusion. This finding is extrapolated from anatomic connections existing in the brain between the thalamus and the cortex, which are not developed until 24 weeks gestation when they yield the experience of pain. No major medical organization has concluded that a fetus is capable of experiencing pain prior to this point, according to Dr. Grossman.

To claim that a fetus feels pain at 20 weeks of postfertilization age reflects a "fringe view in the medical community." [Phase II Tr. Vol. I, 198:2:25, 199, 200, 201:1–20].

Dr. Maureen Condic[50] refuted the positions of both RCOG and ACOG, testifying that in formulating their opinions, these organizations did not properly factor in research findings that show that the brain cortex is not essential for a fetus's conscious experience of pain. She testified that the neural circuitry capable of detecting and responding to pain is developed in a fetus between 10-12 weeks lmp.[51] She further testified that the circuitry present within the thalamus that is connected to the rest of the body is fully developed by 18 weeks, and it is the development of this circuitry, not the connection between the cortex and the thalamus, that results in the conscious experience of pain. [Phase II Tr. Vol. II, 183:22–25, 184, 185, 113, 187:22–25, 188:1–9, 13–25, 189:1–24; 192:10–24, 201:23–25, 202:2–19, 213–222].

Plaintiffs' final challenge is to the scientific validity of the required disclosure in the Perinatal Hospice Brochure, as follows: "Studies show that mothers who choose to carry their baby [*sic*] to term recover to baseline mental health more quickly than those who aborted due to fetal anomaly." [Stip. Exh. 17]. Dr. Grossman contested this disclosure as not being medically accurate. There simply is no medical evidence supporting the claim that a pregnant woman with a diagnosed fetal anomaly who

---

[50] Dr. Condic was proffered by the State as an expert in neurobiology, developmental neuroscience, and human embryology. Dr. Condic holds a PhD in neurobiology and currently teaches human medical embryology at the University of Utah School of Medicine. Her research focuses on the development of sensory nervous systems in animals. Dr. Condic's opinions in this case are based on her review of relevant literature as well her research in this field.

[51] The phenomenon wherein a fetus can detect and respond to pain without necessarily being consciously aware of that pain is referred to as "nociception." [Phase II Tr. Vol. II, 184:6–13, 234:25, 235:1–3].

continues her pregnancy to term is any more likely to return to "baseline" (that is, the mental health that the person had prior to her pregnancy) any more quickly than a woman who elects to have an abortion. To the extent any research has suggested such a fact, that research has been soundly debunked for its failure to include proper comparator groups and to properly control for prior mental health. [Phase II Tr. Vol. I, 202:17–25, 203, 204:1–20].

The State's expert on the "psychology of abortion," Dr. Coleman, testified that, while perhaps not entirely accurate, the "gist" of this disclosure is true, while acknowledging that there is not "sufficient empirical evidence where baseline data is collected." [Phase II Tr. Vol. II, 27:18–20, 28:24–25]. Continuing, she conceded that "women reading that [disclosure] may not really understand it." [*Id.*, at 29:2–4]. She thought it would be more helpful to inform women that "they were more likely to experience positive outcomes more quickly than those who abort," which statement she believes better captures the intent of the disclosure as currently formulated. [*Id.*, 27:8–25, 28, 29:1–16].

Plaintiffs also challenge the requirement that the various informed consent materials must be delivered only be an APC or physician, as opposed to any other appropriately trained clinic personnel. Dr. Grossman testified that it is clearly within the standard of care for physicians/APCs to delegate the provision of preabortion counseling to properly trained counselors or medical assistants. Indeed, in his own practice, patients undergo in-depth and thorough counseling sessions with a  trained counselor who is not a licensed practitioner. When the patient chooses to proceed with an abortion, either by a

physician or an APC, the provider will review the information with the patient and determine whether she has any questions to which they will respond. This preabortion counseling, however, is performed by an unlicensed individual. [Phase II Tr. Vol. I, 204:2–25, 205:1–14].

Dr. Clark, who operates a private practice providing non-abortion medical services in South Bend, similarly allows properly trained staff in his medical practice, who are not APCs or physicians, to provide patients various kind of information as part of the informed consent process; however, Dr. Clark leads his own discussion about the specific procedure with the patient. [*Id.*, at 111:8–24]. Ms. Hagstrom-Miller testified that, outside of Indiana, WWHA clinics allow preabortion counseling to be conducted by non-physicians or non-APCs, such as nurses, counselors, or medical assistants. [*Id.* at 79:20–25].

Dr. Calhoun countered that in his experiences only physicians and APCs possess the adequate training necessary to conduct preabortion counseling. As he explained, it is critical to the informed consent process that the patient understand the manner by which the abortion will occur as well as any potential risks and complications associated with the procedure. Only an APC or physician possesses sufficient competency to communicate fully about the procedures and risks and answer any questions that the patient may pose. [Phase II Tr. Vol. II, 107:2–18].

The impact of these requirements foreclosing the assistance of nonphysician/APC personnel is to reduce a clinic's ability to offer preabortion counseling services since, as Ms. Hagstrom-Miller testified, the WWHA South Bend Clinic already lacks physicians

and APCs sufficient to satisfy the demand for these appointments. If permitted, her facility would engage and utilize other properly trained staff to provide preabortion counseling, thereby allowing the clinic to expand the days on which it offers counseling appointments from three days a month to five days a week every week and to better utilize physician and APC resources. [Phase II Tr. Vol. I, 80:1–21].

### 6. *Criminal Penalties*

The majority of the abortion restrictions imposed by Indiana statutes are enforced through criminal penalties in addition to professional sanctions and civil liability. *See* Ind. Code §§ 16-21-2-2.5(b), 16-34-2-1, 16-34-2-5(d), 16-34-2-7. For example, abortion providers face criminal liability for non-compliance with administrative requirements, such as a failure to "retain a copy of the signed patient agreement form, and the signed physician's agreement form required by the manufacturer [of Mifeprex], in the patient's file." Ind. Code § 16-34-2-1(a)(1); *see also id.* 16-34-2-7(a). In no other healthcare context are healthcare providers subject to criminal penalties for such omissions and errors; elsewhere, sanctions are limited to disciplinary actions against the physicians' licensing privileges. *See* Ind. Code § 25-1-9-4. Dr. Hagstrom Miller testified that criminal penalties deter qualified, pro-choice physicians from providing abortion care at the South Bend Clinic. [Phase II Tr. Vol. I, 82:8–18].

## IV.   Conclusions of Law

Plaintiffs' legal theories are pinned primarily to the Substantive Due Process Clause of the Fourteenth Amendment. Plaintiffs' Due Process claims—as well as their Equal Protection claims—turn on whether the challenged provisions of Indiana law have,

as their purpose or effect, the imposition of substantial obstacles to women in Indiana seeking to obtain previability abortions. We begin our analysis therefore with a review of (A) the "undue burden" standard according to the Supreme Court and Seventh Circuit precedents, followed by (B) a discussion of the undue burden standard in the context of the Equal Protection clause, and, finally, (C) the application of those legal principles to the specific claims presented in this litigation.

    A.  <u>The Undue Burden Standard</u>

    The undue burden standard entails a weighing of the benefits of the challenged laws against the burdens they impose.

    Well-established legal precedent recognizes that among the liberties protected by the Substantive Due Process Clause is a woman's freedom from state-required motherhood. *See, e.g., Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309–10 (2016); *Lawrence v. Texas*, 539 U.S. 558, 565, 573–74 (2003); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851–53, 872 (1992); *Roe v. Wade*, 410 U.S. 113, 152–54 (1973). That liberty interest—first recognized in the Supreme Court's 1973 decision in *Roe v. Wade*, which ruled unconstitutional Texas's criminalization of abortion—is protected from state deprivations without due process of law, guaranteeing a pregnant woman freedom to choose whether to terminate her pregnancy before fetal viability and to do so without undue state interference. *Casey*, 505 U.S. at 871 (joint op. of O'Connor, Kennedy, Souter, JJ.[52] [hereinafter joint op.]) (reaffirming *Roe*'s "most central principle,"

---

[52] The joint opinion constitutes the holding of the *Casey* Court in relevant part under *Marks v. United States*, 430 U.S. 188, 193–94 (1977).

"[t]he woman's right to terminate her pregnancy before viability"). Without exception, "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Id.* at 879 (joint op.). *Accord id.* at 846 (maj. op.). Thus, any law  that imposes "an 'undue burden' on a woman's right to decide to have an abortion . . . is constitutionally invalid, if the 'purpose or effect' of the provision 'is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'" *Hellerstedt*, 136 S. Ct. at 2300 (emphasis omitted) (quoting *Casey*, 505 U.S. at 878 (joint op.)). "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877 (joint op.).

The State has a legitimate interest in ensuring that abortion services are provided safely. *Roe*, 410. U.S. at 150. However, "a statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Hellerstedt*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S., at 877 (plurality opinion)). Moreover, "unnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." *Hellerstedt*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S at 878).

In determining whether a statute comports with due process requirements, we must "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Hellerstedt*, 136 S. Ct. at 2309. "In other words, we are instructed to conduct a balancing test[.]" *Whole Woman's Health All. v. Hill*, 937 F.3d 864, 876 (7th

Cir. 2019), *cert. denied*, 2020 WL 3578684 (U.S. July 2, 2020).[53] We are further directed to conduct a "holistic, rigorous, and independent judicial examination of the facts of a case to determine whether the burdens are undue in light of the benefits the state is permitted to pursue." *Id.* This examination requires us to give "significant weight to evidence in the judicial record," including "expert evidence, presented in stipulations, depositions, and testimony." *Hellerstedt*, 136 S. Ct. at 2310. We are required to "not only scrutinize the reasons given for state action, but also the evidence presented by the state supporting its action." *Hill*, 937 F. 3d at 877.

The benefits of a law are measured against the state's legitimate interests in this field. First, "[a]s with any medical procedure, the State may enact regulations to further the health and safety of a woman seeking an abortion." *Casey*, 505 U.S. at 878 (joint op.). Second, the state has a legitimate interest in preserving a life that may one day become a human being. *Id.* To promote that interest, the state may enact measures to ensure the

---

[53] At summary judgment, the parties disputed whether Chief Justice Robert's concurring opinion in the Supreme Court's decision in *June Medical*, explicating his interpretation of the undue burden standard to eschew any balancing process, operated as the new controlling rule of the Supreme Court. *June Med*, 140 S. Ct. at 2141–42 (Roberts, J., conc. op). Joining the few courts that had addressed this issue at the time, we concluded that *June Medical* did not hand down a new controlling rule for applying the undue burden test in abortion cases. We thus applied the constitutional standards set forth in the Supreme Court's earlier abortion-related jurisprudence, in particular, *Casey* and *Hellerstedt*. [Dkt. 297, at 63]. The Seventh Circuit thereafter confirmed this interpretation of *June Medical* in *Planned Parenthood of Indiana & Kentucky, Inc. v. Box*, 991 F.3d 740, 741 (7th Cir. 2021). Judge Kanne dissented in that decision, and it appears that a split among the circuits is developing on this issue. The State, favoring the view advanced in Judge Kanne's dissent, has sought Supreme Court review of the Seventh Circuit's decision. However, if the State fails to offer evidence of benefits for a statute which burdens the abortion right, "the theoretical debate about the role of balancing should not affect our decision." *Id.* at n. 7. In other words, a statute which imposes substantial obstacles, in the absence of any countervailing benefits, is unduly burdensome under any test. *Id.*

woman's choice is philosophically and socially informed and to communicate its preference (if it has one) that the woman carry her pregnancy to term. *Id.* at 872 (joint op.). But such measures "must be calculated to inform the woman's free choice, not hinder it[,]" and even if so calculated may not present a substantial obstacle to its exercise. *Id.* at 877 (joint op.). Third, the state may choose to further the same interest by enacting measures "'protecting the integrity and ethics of the medical profession' . . . in order to promote respect for life," *Gonzales v. Carhart*, 550 U.S. 124, 158 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997)), but such measures equally may not impose undue burdens. *Id.*

The burdens of a law are measured by their impacts on women for whom they pose a relevant restriction on the choice to seek a previability abortion. *Hellerstedt*, 136 S. Ct. at 2313; *Casey*, 505 U.S. at 895 (maj. op.). "The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Casey*, 505 U.S. at 894–95 ("[T]he analysis does not end with the one percent of women upon whom the statute operates; it begins there[.]"). If the impacts of the law amount to a substantial obstacle to the abortion decision for a "large fraction" of this group, the burdens imposed are undue. *Hellerstedt*, 136 S. Ct. at 2313; *Casey*, 505 U.S. at 895.

The court's analysis then shifts to a determination of whether the burdens imposed by the law are "disproportionate, in their effect on the right to an abortion" compared "to the benefits that the restrictions are believed to confer." *Planned Parenthood of Wisconsin, Inc. v. Schimel*, 806 F.3d 908, 919 (7th Cir. 2015). To determine whether a

burden is undue, the court "must weigh the burdens against the state's justification, asking whether and to what extent the challenged regulation actually advances the state's interests. If a burden significantly exceeds what is necessary to advance the state's interests, it is 'undue,'" and thus unconstitutional. *Id.* at 919–20.

Hellerstedt ratified *Schimel*'s conclusion that *Casey* balancing is not conducted under a simple preponderance standard. Rather, in striking down provisions of law as imposing undue burdens on the previability abortion right, the Supreme Court and the Seventh Circuit have found the state's asserted legitimate interests to be nil or their marginal advancement *de minimis*, and the burdens on the abortion right to be substantial. *Hellerstedt*, 136 S. Ct. at 2311–13; *id.* at 2318; *Casey*, 505 U.S. at 887–898 (joint op.); *Schimel*, 806 F.3d at 916. At the same time, the Seventh Circuit has cautioned that, when an abortion-restriction statute is sought to be justified on medical grounds, "the feebler the medical grounds . . . the likelier is the burden on the right to abortion to be disproportionate to the benefits and therefore excessive." *Schimel*, 806 F.3d at 920. To that end, unless and until a woman's right to choose an abortion is revoked by the Supreme Court, "a statute likely to restrict access to abortion with no offsetting medical benefits cannot be held to be within the enacting state's constitutional authority." *Id.* at 916. In addition, "If the evidence does not support the state's proffered reason, . . . the state law cannot stand." *Hill*, 937 F.3d at 877. "This conclusion flows from the more general proposition that the Constitution does not tolerate pretext that covers up unconstitutional motives." *Id.*

    B.  The Undue Burden Standard Applies to Plaintiffs' Equal Protection and Due

Process Claims

The Fourteenth Amendment provides that no state may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1, cl. 4. This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude" to draw appropriate lines: their "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* But a heightened standard of judicial review applies to state laws predicated on certain "suspect" classifications such as race, as well as to those which "impinge on personal rights protected by the Constitution[,]" *id.*, such as the right to obtain a previability abortion. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 n.3 (1976).

Plaintiffs allege here that the challenged Indiana statutes violate the Equal Protection Clause by drawing impermissible distinctions between women seeking abortion care and women seeking other, comparable medical care (such as miscarriage management). The parties initially disputed the applicable standard of judicial scrutiny for Plaintiffs' Equal Protection claims at both the preliminary injunction and summary judgment phases of litigation. In ruling on Plaintiffs' request for preliminary injunctive relief, we concluded as follows:

> We think the standard under the Equal Protection Clause is the same as that under the Due Process Clause, that is, the undue-burden standard. Defendants agree at least that the Equal Protection Clause cannot be more protective of the abortion right than is the Due Process Clause.

> As the [Supreme] Court [has] explained, "The guarantee of equal protection . . . is not a source of substantive rights or liberties, but rather a right to be free from invidious discrimination in statutory classifications and other governmental activity." [*Harris v. McRae*, 448 U.S. 297, 322 (1980)]. Thus no heightened review applies where the law "does not itself impinge on a right or liberty protected by the Constitution," or, in other words, where the law "violates no constitutionally protected substantive rights." *Id*.
>
> Whether [a law] impinges on the abortion right is defined by the Due Process Clause. And because the Equal Protection Clause is not itself "a source of substantive rights," *id.*, Plaintiffs cannot expand the substantive scope of the abortion right by resort to the Equal Protection Clause. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33 (1973) ("It is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws.").
>
> Accordingly, under the Equal Protection Clause, we review whether the [law's] classifications impinge on the exercise of the fundamental abortion right, *Plyler*, 457 U.S. at 216–17, as defined by the Due Process Clause. *Casey*, 505 U.S. at 846 (maj. op.).

[Dkt. 116, at 52–53]. In our Preliminary Injunction Order, after combining an analysis of Plaintiffs' due process and equal protection challenges, we held that Plaintiffs had prevailed in showing a likelihood of prevailing on the merits of their claim, to wit, that Indiana's licensing requirements had been applied to the South Bend Clinic in a manner that violated both the Substantive Due Process and Equal Protection Clauses of the Fourteenth Amendment. In reaching this conclusion, we analyzed the benefits and burdens which flowed from the State's application of its licensure provisions. We determined there were *de minimis* benefits from these requirements, explaining that, for Equal Protection purposes, the State must "justify its disparate treatment of . . . women seeking an abortion-inducing drug for the purposes of inducing an abortion, and . . . women seeking an abortion-inducing drug for the purposes of treating a miscarriage." In

other words, to pass constitutional muster under the Equal Protection Clause, the State must be able to establish some benefit flowing from the differential treatment of abortion patients vis-à-vis patients treated for miscarriage which justifies its restrictions. We could find no such justification. Thus, following a careful balancing of the benefits (or lack thereof) flowing from the State's application of the licensing regime against the burdens imposed on abortion patients, we held that the State's restriction as applied in the context of the South Bend Clinic violated the Due Process and Equal Protection Clauses. [*Id.* at 66, 71].

At summary judgment, contrary to our previous ruling regarding the legal standards governing review of Plaintiffs' Equal Protection claims, the parties continued to dispute the appropriate legal standard of review. Consequently, in our summary judgment order, we reiterated our interpretation of the Equal Protection Clause in this context but refrained from ruling on the State's motion for summary judgment as related to Plaintiffs' Equal Protection challenges.

Now, in determining whether the challenged statutory provisions comport with the Equal Protection Clause, we shall apply the undue burden standard, as explained above.

C.  The Undue Burden Analysis Applied to the Challenged Indiana Statutes

In determining whether under Indiana law the Constitutional rights of women seeking an abortion have been infringed, we address below Plaintiffs' challenges in the following order: (1) the statutory restrictions on facilities and physicians, (2) the telemedicine restrictions, (3) the provisions relating to informed consent, and (4) the criminal penalties provisions.

1. *Restrictions On Facilities and Physicians*

   **a. Indiana's Physician-Only Law**

We begin by addressing the constitutional challenges brought by Plaintiffs to Indiana's Physician-Only Law, Ind. Code § 16-34-2-1(a)(1). This law restricts the performance of a first-trimester aspiration abortion and the prescription of an abortion-inducing pill to only a physician.

At summary judgment, the State sought judgment in its favor on this claim based on the Supreme Court's holding in *Mazurek v. Armstrong*, which upheld a Montana law prohibiting abortions, except for those provided by licensed physicians. 520 U.S. 968 (1997). Licensed physicians along with a physician assistant sought to enjoin the Montana statute, asserting that it had an "invalid purpose."  The Supreme Court ruled that:

> [T]his line of argument is squarely foreclosed by *Casey* itself. In the course of upholding the physician-only requirement at issue in that case, we emphasized that "[o]ur cases reflect the fact that the Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed professionals, even if an objective assessment might suggest that those same tasks could be performed by others.

*Mazurek*, 520 U.S. at 973. Citing its "repeated statements in past cases," the Court held that there was "no doubt that, to ensure the safety of the abortion procedure, the State may mandate that only physicians perform abortions." *Id.* at 975.

Plaintiffs attempt to distinguish *Mazurek* from the case at bar by framing the question in *Mazurek* as whether the law had been enacted for an improper purpose, not whether it created a substantial obstacle to abortion access. In fact, they note, it was

uncontested in *Mazurek* that there was "insufficient evidence of a substantial obstacle." *Id.* at 972. Here, by contrast, Plaintiffs assert that they have proffered substantial evidence establishing the burdens on the delivery of abortion care and the obstacles to its availability to patients that are imposed by this requirement. Plaintiffs also assert that the medical landscape regarding abortions has significantly evolved since the decision in *Mazurek* was handed down nearly twenty-five years ago. Plaintiffs support their interpretation of *Mazurek* by citing to a recent ruling from the District of Idaho. *Planned Parenthood of the Great Nw. & the Hawaiian Islands v. Wasden*, 406 F. Supp. 3d 922, 928 (D. Idaho), *motion to certify appeal denied sub nom. Planned Parenthood of Great Nw. & Hawaiian Islands v. Wasden*, 410 F. Supp. 3d 1108 (D. Idaho 2019).

We agreed at summary judgment, and we agree today, with Plaintiffs' argument that *Mazurek* does not automatically foreclose further judicial review of this physician-only issue. Though the Seventh Circuit has not yet addressed *Mazurek*'s precise scope and application,[54] we read *Mazurek* to apply only to challenges to the legislative purpose, and, where the challenged statute does not, in effect, create burdens for women accessing abortion services. *See Karlin v. Foust*, 188 F.3d 446, 493 (7th Cir. 1999) ("While a plaintiff can challenge an abortion regulation on the ground that the regulation was enacted with an impermissible purpose, the joint opinion in *Casey* and the Court's later decision in *Mazurek v. Armstrong* . . . suggest that such a challenge will rarely be

---

[54] The State contends that the Seventh Circuit recently confirmed in *Planned Parenthood of Indiana & Kentucky, Inc. v. Box* that *Mazurek* supports its physician-only law. 991 F.3d at 751. This interpretation does not square with ours. There, the Seventh Circuit noted in dicta that states may limit the provision of abortion care to certain licensed professionals; it offered no analysis as to whether the provision may be limited to physicians. *Id.*

successful[.]"). The Court in *Mazurek* did not address whether a challenge to the constitutionality of a physician-only requirement would be cognizable if it posed substantial obstacles to those seeking abortions. *See Planned Parenthood of Wisconsin v. Doyle*, 162 F.3d 463, 467 (7th Cir. 1998) (noting that states "may adopt paternalistic measures for the protection of the mother's health, as by requiring that only physicians be allowed to perform abortions . . . Although such a requirement might in principle pose a substantial obstacle to abortion, the record in *Mazurek* showed that it did not in fact.").

The evidence before us establishes that the reach of Indiana's physician-only statute is substantially broader than Montana's statute in *Mazurek*. In *Mazurek*, the record reflected that only one non-physician was impacted by the new Montana statute. Here, Plaintiffs have identified dozens of APCs already working in licensed abortion facilities who would provide abortion care but for the prohibitions imposed by Indiana's Physician-Only Law. *See A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 688, 2002 WL 31050945 (7th Cir. 2002) ("Findings based on new evidence could produce a new understanding, and thus a different legal outcome[.]"). As we establish below, allowing APCs to provide abortion services would significantly increase the availability of abortion services in Indiana.

Moreover, *Mazurek* directs that physician-only laws are valid only to the extent that they "ensure the safety of the abortion procedure." 520 U.S. at 975. Here, the nature of abortion care has evolved substantially in the years since *Mazurek* was decided, and even more during the nearly fifty years since Indiana enacted its Physician-Only Law. For example, medication abortions available today did not even *exist* at the time that

99

*Mazurek* was decided or this Indiana prohibition was enacted. [Phase I Tr. Vol. II, 40:15–20]. Thus, it was not possible for the *Mazurek* court, or those that came before it, to consider whether restricting medication abortion care to physicians-only ensures the safety of the procedure. Our review of Plaintiffs' claim clearly is not foreclosed by *Mazurek*.

The benefits cited by the State conferred by the Physician-Only law reflect the state's interest in promoting the health and safety of women seeking abortions. This restriction on care limiting it to a physician ensures that a person with extensive professional, educational, and specialized training performs abortions, thereby reducing the risk of procedure-related complications and enhancing the level of care if complications do occur. In reviewing the specific benefits conferred by the Physician-Only Law, we find it helpful to distinguish between the provision of medication abortion care and aspiration abortion care.

With respect to medication abortion, Dr. Grossman, on behalf of Plaintiffs, testified that APCs provide other kinds of care that are comparable in risk, or even riskier, than medication abortions, the most obvious example of which is miscarriage management care through the use of either misoprostol or a combination of misoprostol and mifepristone.

The State's experts hold to their view that physicians by their education and training and experience are better qualified and capable than APCs to respond to complications (such as hemorrhaging or blood-clotting) relating to medication abortion. However, Indiana law permits APCs to administer misoprostol for miscarriage

management care or to treat incomplete abortions, thereby entrusting them to respond to and care for the very same complications cited by the State's witnesses. IU Health, for example, utilizes APCs in the medical management of miscarriages, which process is identical to a medication abortion. As Ms. McKinney, a nurse practitioner employed with Women's Med, testified, she already provides care of this nature, which would look no different for abortion patients.

In addition, most complications occur not while a patient remains under the direct observation of an abortion provider, since the patient typically ingests the misoprostol at home. The State's experts did not dispute that APCs can and do prescribe medications involving comparable or greater risks than abortion inducing-drugs, including birth control and opioids. Their view seems to be not so much that properly trained and supervised APCs are not qualified to manage the potential complications of a medication abortion but that physicians are better qualified. This argument sidesteps the real issue, however, which is whether a law excluding well-qualified care providers who are not physicians from providing medication abortions, when shortages of available physicians to perform them greatly reduce access to abortions and burdens unduly the patient's right to an abortion, if she chooses to secure such care, is constitutional. Such a law cannot stand.

The State's experts also testified that APCs are not qualified to interpret an ultrasound to screen for potential problems such as an ectopic pregnancy, which is a contraindication for medication abortion. Dr. Grossman, by contrast, opined that APCs are fully qualified to screen for the contraindications of medication abortion. We consider

Dr. Grossman's opinion authoritative on this point, based as it is on his personal experiences as an OB-GYN, who engages with and works side-by-side APCs in his practice, as well as his extensive medical research and knowledge of the relevant medical literature. His opinion is also consistent with the positions taken by the major medical and public health organizations, including ACOG, the World Health Organization, and the American Public Health Association. The State's experts, by comparison, drew on *no* medical literature in preparing for their testimony as the basis for their opinions offered during this portion of the case, crafting their opinions instead from their personal medical experiences and beliefs, which do not include any provision of medication abortion care by them.

Additionally, as noted by Dr. Grossman, the FDA's 2016 decision to amend the Mifeprex labeling directions to no longer restrict the dispensing of this medication to physicians appears to implicitly endorse the role of an APC in the provision of Mifeprex. Though the State's experts contend that APCs are not qualified to review ultrasounds to screen for contraindications, Indiana law does not mandate that only a physician may conduct and interpret the required preabortion ultrasound. Thus, APCs licensed to practice in Indiana are, in fact, permitted to review and interpret ultrasounds for abortion patients, screening for the potential aforementioned contraindications. Again, we credit the opinions of Dr. Grossman on this issue, based on his extensive and thorough experiences and research. The opinions proffered by the State's experts are not supported by or consistent with medical research findings/conclusions on this topic.

For these reasons, and for purposes of Plaintiffs' Due Process claim, we conclude that there is no advancement of the State's interest in the safety of maternal and fetal health derived from restricting the provision of medication abortion care to physicians only.

For purposes of Plaintiffs' Equal Protection claim, the State's case fares no better. Here, the State must be able justify its differential treatment between women seeking abortion-related drugs for the purposes of inducing an elective abortion, and women seeking abortion-related drugs for the purposes of treating a miscarriage. Given that the medical and physiological effects of these procedures are identical, the State's interest in patient health and safety evaporates

The State identified additional benefits, which it contends flow from restricting the provision of first-trimester aspiration  (as opposed to medication) abortion services to physicians only. Here, the State's experts controvert Dr. Grossman's contentions that APCs are authorized to and do perform procedures that are comparable in complexity and risk to first-trimester aspiration abortions, including, for example, endometrial biopsies, colposcopies, and LEEPs. Dr. Grossman's opinion that these procedures are similar in complexity to aspiration abortion does not take into account the differences in the manner in which these procedures, respectively, are performed. Stated otherwise, the procedures which APCs currently  perform are not technically comparable to an aspiration abortion procedure. These kinds of permissible procedures are distinguishable by virtue of the fact that the abortion procedure requires cervical dilation whereas the biopsies, colposcopies, and LEEPs involve merely the insertion of an object into the uterus.

103

The procedure most comparable to aspiration abortion, according to Dr. Grossman, is the insertion of an IUD, due to its involving utilization of a manual dilation procedure of the cervix. This process, he says, is identical to what occurs in a first-trimester aspiration abortion. Consequently, the risks posed by these procedures—including the possibility of forming a false passageway and perforating the uterus—are identical.

Dr. Calhoun concurred with Dr. Grossman respecting the identified risks of the manual dilation which occurs in a first-trimester aspiration abortion. He further agreed that APCs are qualified to insert IUDs. However, he does not view the placement of IUDs to require manual dilation, so he disagrees with Dr. Grossman that comparable risks are posed. Dr. Grossman also testified that APCs are capable of performing D&Cs in the miscarriage management context, but Dr. Stroud, who commonly performs D&Cs for his miscarriage management patients, regards it as medically inappropriate to delegate performance of that procedure to an APC.

Here, we agree with the State. The evidence establishes that regulations restricting the provision of aspiration abortion care to physicians-only serves the State's interest in ensuring the safe provision of abortion services. Aspiration abortion is a more complex procedure than medication abortion, which benefits from a heightened skill set to address and hopefully prevent unique risks. Dr. Grossman's reliance on cited medical literature in support of his opinions is countered, even he admits, by research findings that support the State's contention that fewer risks arise from aspiration abortions when the procedure is performed by physicians. It is telling that Plaintiffs provided no evidence of any APCs

who currently provide aspiration abortions, nor have they identified any APCs who perform D&Cs in the miscarriage management context, where current law does not restrict their involvement. Dr. Stroud's testimony that he would not permit an APC under his supervision to perform a D&C is particularly relevant and credible here. Plaintiffs also have not directed us to any APCs who currently perform the act of manually dilating the cervix when inserting an IUD. Even Dr. Grossman acknowledges that dilation during IUD placement is "sometimes" necessary.

We turn next to a discussion of the burdens imposed by the Physician-Only Law. Plaintiffs' evidence establishes that limited physician availability is a real and significant barrier to abortion access in Indiana. The shortage of available physicians restricts clinics from being able to schedule appointments on more than one or two days a week, causing limited capacities and long wait times often upward of two weeks. Delaying an abortion, even by a week or two, for whatever reason, leads to increased risks for maternal health and forces women to continue to endure the physical and emotional stress associated with pregnancy. The evidence clearly establishes that delays of this nature and for these reasons regularly affect the availability of abortion care services for which a woman may be eligible. Women who are delayed beyond ten weeks lmp are no longer eligible for a medication abortion. In addition, restrictions on appointment availability are particularly burdensome for low-income women (that is, the primary demographic of women seeking abortion services in Indiana), who struggle to arrange transportation, child care, and time off work, which are essential to accessing care. We have no doubt about the significance of these challenges and obstacles—these burden—for many women.

Helpfully, Plaintiffs have identified multiple APCs who, in addition to abortion-seeking patients, are also being directly impacted by this physician-only restriction, employees who would and could provide abortion services, if permitted by law to do so. With specific respect to medication abortion care, APCs already provide comparable services, including miscarriage management, and are ready, willing, and well-qualified to begin providing medication abortion services, if the enforcement of this law were to be enjoined. Significantly, the use of APCs in this setting at Indiana's licensed clinics would dramatically expand the availability of abortion services. But for the effects of the Physician-Only Law, abortion clinics in Indiana would expand to provide services five days a week, which expansions would reduce wait times and allow women to access care at an earlier point in their pregnancies and with greater convenience, reduced anxieties, and ameliorated risks that result when women are delayed in receiving abortion services and their likelihood of needing aspiration abortion care increases. The Physician-Only law thus places concrete and significant burdens on Indiana women attempting to access medication abortion services. *See Hellerstedt*, 136 S. Ct. at 2313.

We do not find evidence of similar burdens resulting from physician-only restrictions on the provision of aspiration abortion services. Arguably, enjoining this provision would increase access to care by permitting more healthcare professionals to provide such services. However, there is little proof that this law is actually burdening abortion providers, at least not to the degree of seriousness that it impacts those seeking to provide medication abortions. Plaintiffs have presented no evidence of APCs in Indiana who currently possess the requisite skills set necessary to provide safe aspiration

abortions. Though Ms. McKinney testified that she believed herself capable of acquiring necessary skills to perform aspiration procedures, she is not currently equipped to provide such care, including D&Cs or the insertion of IUDs. And, while Dr. Bernard testified that she would refer patients to APCs for first-trimester aspiration abortion, no other physician performing abortions at Indiana's licensed clinics testified that they would be willing to delegate aspiration abortion procedures to an APC. Thus, the impact of this physician-only law on access to aspiration abortion services has not been shown.

Finally, we hold, based on the evidence before us, that enjoining this law with respect to medication abortions would reduce the cost of abortion care for women seeking services—at Women's Med, for example, by $70, which is no small amount for many women seeking care in Indiana. For some, $40 may make the difference as to whether or not they can afford an abortion.[55]

In determining whether the burdens of the Physician-Only Law are disproportionate in their impact on the right to an abortion  compared "to the benefits the restrictions are believed to confer," (*Schimel*, 806 F. 3d at 916), we hold on the facts before us that the benefits to the State in restricting the provision of medication abortion care to physicians are slight to none. This fifty-year-old restriction is out of sync with contemporary medical practice standards and views as well as required safety requirements. The findings and opinions recounted in the medical literature support the provision of medication abortion care by APCs, a level of care for which APCs in Indiana

---

[55] Counsel for the State argued that this figure is nominal and cannot be considered unduly burdensome. We regard Counsel's statements to be removed from and insensitive to the realities of the majority of women seeking abortion care in Indiana.

are qualified to provide. The level and kind of care which they currently provide is comparable in complexity and risk to medication abortion. The State's rebuttal evidence, minimal as it was, does not advance the State's stated purpose and contention that this restriction furthers its interest in patient health and safety.

Whatever *de minimis* benefits there may be for this limitation, they are far outweighed in importance by the substantial burdens it places on women's access to abortion in Indiana. As previously noted: "[T]he feebler the medical grounds . . . the likelier is the burden on the right to abortion to be disproportionate to the benefits and therefore excessive." *Schimel*, 806 F.3d at 920. Such is the case here: the State has proffered at best a weak justification for restricting the provision of medication abortion care to physicians-only, a justification that does not equal or offset the resultant substantial burdens identified above. We are tempted to characterize the State's position as pretextual—that is, an effort to restrict access for the sake of restricting access.[56] The State is permitted to make abortion difficult to access by women seeking services when such restrictions reflect its superior interest of protecting the women's health, but the State does not have permission under the Constitution to enact and enforce measures that do "little or nothing for health, but rather strew impediments to abortion." *Id.* at 921. Here, there are few if any "offsetting medical benefits" to counter the substantial burdens that are imposed by statute. Thus, it does not withstand judicial scrutiny under the

---

[56] We refrain from outright labeling the statute as pretextual, given its enactment prior to the existence of medication abortion. The State's refusal, however, to update its statute to reflect the evolution of medicine is not constitutionally acceptable, given that, with the advancement of abortion care, the evidence falls well short of proving the state's proffered reason for this law. *Hill*, 937 F.3d at 877.

Substantive Due Process Clause. *Id.* at 916; *Hill*, 937 F. 3d at 877–78. Further, because the State proffered no evidence to justify the differential treatment of abortion patients compared to non-abortion patients, the physician-only restriction also does not pass judicial scrutiny under the Equal Protection Clause. *Whole Woman's Health All. v. Hill*, 388 F. Supp. 3d 1010, 1047 (S.D. Ind. 2019), *aff'd as modified*, 937 F.3d 864, 2019 WL 3949690 (7th Cir. 2019), *cert. denied*, 141 S. Ct. 189 (2020).

This analysis does not yield the same results with respect to the physician-only limitation for provision of aspiration abortion care. The evidence reflects clear benefits from that restriction, given the higher level of complexity for the performance of this procedure. Plaintiffs have identified no APCs in Indiana currently performing procedures comparable in complexity and medical risks or consequences to aspiration abortion. This void in the record bolsters the State's position that APCs are not qualified to perform the task of manual cervical dilation or to manage the risks imposed by this procedure. In addition, Plaintiffs have failed to identify any burdens which "substantially outweigh" the legitimate benefits of the physician-only requirement for performing aspiration abortions. Further, we find no deleterious impact on access to care by the enforcement of this statutory limitation. Having carefully considered the benefits flowing from this law in light of this fact, we hold in favor of the State and uphold the physicians-only restriction for the provision of aspiration abortions.

Neither does this restriction run afoul of the Equal Protection Clause. Though state law does not specifically forbid APCs from performing D&Cs or dilating the cervix when inserting an IUD, there is no evidence before us that APCs are actually providing such

109

services in Indiana. Plaintiffs have thus failed to identify any unique burdens that this law imposes on abortion patients as compared to non-abortion patients that would cause it to fail under the Equal Protection Clause.

For all these reasons, we hold that the Physician-Only Law, to the extent it restricts the provision of first-trimester medication abortion care to physicians only, is unduly burdensome, and its enforcement must be enjoined. To the extent this law limits the provision of first-trimester aspiration abortion care to physicians only, it serves the State's legitimate interests in providing for the health and safety of patients and does not impose any burdens that are undue. This portion of the law thus shall stand.

**b. Indiana's Second-Trimester Hospitalization/ASC Requirement Is Unduly Burdensome**

We examine next Indiana's requirement that all second-trimester abortions must be performed in a hospital or ASC. Ind. Code § 16-34-2-1(2).

At summary judgment, we began our analysis with a review of the two cases that the State cited as conclusive in resolving the law's constitutionality: *Gary-Northwest Indiana Women's Services, Inc. v. Bowen*, 496 F. Supp. 894 (N.D. Ind. 1980), *aff'd*, 451 U.S. 934 (1981) and *Simopoulos v. Virginia*, 462 U.S. 506, 516–17 (1983), both of which upheld this requirement.

As for the holding in *Bowen*, Plaintiffs quickly and correctly rejoined at summary judgment that this case holding that Indiana's second-trimester hospitalization requirement was *per se* constitutional under *Roe*'s trimester framework was abrogated by

*Simopoulus* and its companion cases, *City of Akron*, 462 U.S. 416, and *Planned Parenthood Association of Kansas City, Missouri, Inc. v. Ashcroft*, 462 U.S. 476 (1983).

In *Simopoulos*, the Court upheld the challenged second-trimester law requiring second-trimester abortions be performed in outpatient surgical hospitals (similar to ACSs) in part because the plaintiff there did "not attack[] [it] as being insufficiently related to the State's interest in protecting health." 462 U.S. at 517; *see Whole Woman's Health*, 136 S. Ct. at 2320 ("[T]he Court in *Simopoulos* found that the petitioner in that case . . . had waived any argument that the regulation did not significantly help protect women's health.").  In *City of Akron*, the Court recognized that recent medical advancements had made second-trimester abortions much safer over time, such that they could now be safely performed in outpatient settings. The Court thus struck down the state's requirement that second-trimester abortions be performed in hospitals. *See City of Akron*, 462 U.S. at 435–36. The Court in *Ashcroft* reached the same conclusion. 462 U.S. at 481–82.

The State maintains here that *Simopoulos* is binding on our analysis. Unlike the statutes determined to be unconstitutional in *Akron* and *Ashcroft*, Indiana does not limit its second-trimester abortions to hospital facilities. Instead, Indiana permits such abortions to be performed in ACSs, as well as in hospitals, much like the statute under review in *Simopoulos*, which was found to be constitutional. Accordingly, the State argues we should go no further in our analysis.

We find Plaintiffs' interpretation of *Simopoulos* to be much more apt, however. In *Simopoulos*, no issue was raised as to whether the challenged statute served the state's

interest in protecting health. *Simopoulos*, 462 U.S. at 517. In our case, by contrast, significant evidence has been proffered which undermines the State's asserted justifications for this restriction. Moreover, the decision in *Simopoulus* was handed down by the Supreme Court almost forty years ago. As the *Akron* Court recognized, medical advancements in administering second-trimester abortions have developed substantially since the Court's prior decision was issued, counseling that we cannot ignore the likely fact that second-trimester abortions may no longer be performed in the same ways they were in the mid-80s. *See City of Akron*, 462 U.S. at 435–36.

Indeed, there is no dispute that D&E procedures have, in fact, evolved significantly since *Simoupulus* was decided. It was not until the 1990s that osmotic dilators were introduced into the provision of D&E services, which process simplified D&Es and increased their safety. With this in mind, we proceed with our review of the constitutionality of this statute.

The evidence conclusively establishes that APCs and hospitals are both legally subject to demanding and onerous construction and staffing requirements imposed by law inter alia to ensure the sterility of operating rooms and adequate space to allow for the presence and movement of an anesthetist and general anesthesia equipment. The State did not attempt to rebut the opinions of Dr. Grossman that second trimester abortions, which are typically performed through D&Es, do not necessitate a sterile operating room, given that that do not require making of incisions into sterile tissue. Nor do D&Es require the use of general anesthesia, he said. The uncontroverted evidence thus leads easily to the conclusion  that there are no benefits which flow to the State from mandating that

second-trimester abortions be performed in spaces that satisfy these heightened structural requirements.

The State also has not refuted Plaintiffs' evidence, again presented through Dr. Grossman's testimony, that complications associated with D&E abortions are extremely rare, and that this procedure can be and is elsewhere (outside of Indiana) safely performed in out-patient, office-based settings, including in Ohio (where Dr. Glazer practices), in California (where Dr. Grossman practices), in Illinois (where Dr. Cowett practices), and numerous other states where Planned Parenthoods and WWHA operate. This opinion, like all others offered by Dr. Grossman, is based on his review of medical literature as well as his own extensive medical practice providing safe and effective D&E abortions in out-patient, office-based settings. The State does not contest that the conclusions advanced in this literature hold that there is no evidence showing that second-trimester abortions are any safer when they are performed in an ASC as compared to an outpatient, office-based setting. The State's experts did not refute that medical procedures comparable in complexity and risk are performed in these off-site locations. This enactment restricting D&E abortion procedures to hospitals and certain facilities on the grounds that those locations are best prepared to deal with medical emergencies when the care provided rarely if ever produces any medical emergency further undermines the State's claim that  this statute advances its interest in maternal health and safety. *Schimel*, 806 F.3d, at 921.

Dr. Calhoun attempted to rebut Plaintiffs' evidence and claims, testifying that he believes ASCs or hospitals are better equipped to treat complications should they arise.

However, Dr. Calhoun did not address or otherwise refute Dr. Grossman's testimony that ASCs are *not* actually any better equipped to address the specific (albeit rare) complications associated with D&Es than clinics, which may include post-operative bleeding necessitating a blood transfusion. Such a complication, regardless of whether it occurs at an ACS or a clinic, would result in the patient being transferred immediately to a hospital for care. There is no dispute that a patient could be transported and referred for such hospital-based care just as safely from an out-patient clinic as she could from an ASC.

We also note the limitations of Dr. Calhoun's expertise in this area. His opinions are not based on medical research or literature, nor did he attempt to refute the findings of relevant medical literature as discussed by Dr. Grossman. His opinions were based solely on his experiences, but his experiences were quite limited: He has performed only 10 to 15 D&Es (in the context of miscarriage management) in the course of his long medical career, and he has not performed even a single such procedure in recent decades. We thus find Dr. Grossman's opinions, grounded as they are in both experience and medical research, persuasive once again.

According to Dr. Grossman's testimony, no benefit flows from performing a D&E at an ASC as compared to an outpatient clinic comparable to those in Indiana licensed to provide aspiration abortion care.[57] For purposes of Plaintiffs' Due Process Claim, there simply is no evidence that this limitation furthers the State's purported interest in

---

[57] We note that it is not Plaintiffs' position that D&Es be performed in *any* office setting. Rather, they seek to permit this care at clinics already licensed to provide aspiration abortions, which, as we have noted, are subject to a myriad of licensure regulations.

maternal health. It is no more beneficial when viewed through an Equal Protection lens; the State has not denied that comparable procedures are performed in outpatient clinics for non-abortion patients, yet it has offered no explanation for its differential standards for treatment or care of abortion patients. *Schimel*, 806 F.3d, at 921. We thus hold, based on the record before us, that this hospital/ASC limitation does not provide benefits that support or advance Indiana's interest in promoting the health and safety of women.

Similarly, there can be no serious dispute regarding the substantial obstacles imposed by this restriction. Plaintiffs have presented testimony from numerous witnesses reporting difficulties that women encounter in obtaining second-trimester abortions in Indiana. For example, no ASC in Indiana provides abortion services, and only four Indiana hospitals, all located in and around Indianapolis, perform second-trimester abortions, and only if a fetal or maternal indication has been identified. Even assuming women *could* access abortion care at one of these hospitals, any woman living outside of Indianapolis would face significant geographical and financial disadvantages in seeking second-trimester care. In addition, because D&Es often must be performed over a period of twenty-four to forty-eight hours, these women, the majority of whom are low-income mothers, must secure overnight lodging and child care for two days. For those who live in Indianapolis or could secure transportation, the costs of a second-trimester abortion provided by a hospital are significant—upwards of $20,000, according to the estimates. It cannot reasonably be argued that such costs would be a nominal burden for a large fraction of women seeking services. *If* a woman's health needs generally are covered by insurance, policy coverage for abortion care is still usually unavailable.

These costs, combined with the sparse availability of facilities, force most Indiana women to travel out of state to receive second-trimester abortions, further exacerbating their costs of and inconveniences in accessing care. Theses burdens of travel are particular crippling for the demographic that includes women in need of abortion services. The combined effect of these burdens, considered together, reflects the substantial obstacles that exist for a large portion of the women in need of second-trimester services in Indiana. *Hellerstedt*, 136 S. Ct. at 2313, 2316; *Hill*, 937 F.3d at 869, 878; *Schimel*, 806 F.3d at 918–20.

We have been informed by Plaintiffs' proffers that, without this law, Indiana's abortion clinics in Merrillville, Indianapolis, and Bloomington (that is, those licensed to provide aspiration abortion services) would provide second-trimester abortion care.

When, as here, the benefits of a restrictive law are nominal or nonexistent or "feeble," and the burdens of the law are substantial, these burdens cannot be deemed "due." *Schimel*, 806 F. 3d at 918–20. As Plaintiffs' evidence establishes, the Second-Trimester Hospital Requirement substantially curtails the constitutional right to an abortion by effectively foreclosing access to second-trimester abortions within the State.[58] "[A] statute that curtails the constitutional right to an abortion," such as this one, "cannot survive challenge without evidence that the curtailment is justifiable by reference to the benefits conferred by the statute." *Id.* at 921. The curtailment identified here is

---

[58] The State would prefer to dismiss any responsibility it might have for the decisions of private organizations such as ASCs and hospitals to limit their provision of second-trimester services; however, it is the State that must justify the legal restriction that authorizes only these entities to provide second-trimester abortion care. Simply stated, the State is not off the hook here.

clearly "excessive in relation to the . . . benefits likely to be conferred by it." *Id.* Stated otherwise, when this statute's absence of benefits is compared to its impact and the significant burdens it imposes, those burdens are undue and the statute cannot stand. *Id.* at 922; *Hellerstedt*, 136 S. Ct. at 2314–18.

For all these reasons, we hold that the Second-Trimester Hospitalization Requirement violates the Fourteenth Amendment's Substantive Due Process and Equal Protection Clauses.

### c.  Indiana's Facility Requirements are Unconstitutional

Plaintiffs also challenge the various, onerous facility specifications for clinics seeking to provide abortion services.

As previously explained, to obtain licensure to operate a medication abortion clinic, clinics are required to maintain a specific housekeeping room with a service sink and storage. 410 Ind. Admin. Code 26.5-17-2(e)(1). Plaintiffs' challenge this provision as unduly burdensome, arguing that it has no offsetting medical benefit vis-à-vis the burdens imposed by it.

When searching the record for specific benefits associated with this law, we can see without much difficulty that there are none. Dr. Grossman's expert testimony, again reflective of relevant medical literature and his broad-based experience providing medication abortion care, established that imposing such facility requirements on medication abortion clinics offers absolutely no safety benefits for the provision of care. This opinion went largely unrebutted. As discussed previously in our Findings of Facts, both Dr. Stroud's and Dr. Calhoun's testimony on this issue was largely irrelevant,

omitted a direct response to the issues presented, and lacked any basis in their personal experiences in this area of medical practice or their review of any relevant medical research. Ms. Miller's testimony that Planned Parenthood facilities are able to maintain clean and sanitary medication abortion clinics regardless of whether they maintain housekeeping rooms with storage sinks also went entirely unrebutted.

When viewed through the analytical lens of the Equal Protection Clause, the State's case is weaker yet, given that there was no evidence addressed to show that this particular requirement is imposed on non-abortion medical offices or other clinics providing comparable care.

The impact of this structural, facility requirement is clearly burdensome in that it restricts a clinic's ability to provide services on seemingly arbitrary grounds. The Planned Parenthood of Evansville offers a clear example of the impact of this law; it was undisputed at trial that the treatment protocols employed by the Evansville clinic, that could also be employed by other clinics, are suitable to provide safe medication abortion services. However, it is not eligible for licensure because it is unable to satisfy the facility structural requirement imposed by this law. As a consequence, the women residing in Evansville are required to travel at a minimum of 250 miles round trip to obtain medication abortion services. Such travel, as previously discussed, extracts incredible investments of time and money, which are clearly and obviously burdensome for those women seeking to obtain services, who, as we have discussed, often have limited means and lack reliable or accessible transportation. *Hellerstedt*, 136 S. Ct. at 2313, 2318; *Hill*, 937 F.3d at 869; *Schimel*, 806 F.3d at 918–19.

118

Weighing the benefits of this law against its burdens poses no difficulty, given the State's minimal evidentiary proffers. Plaintiffs' evidence, by contrast, established that no benefits of any sort flow from this facility requirement the clinics, their patients, or the State. Thus, we agree that this "requirement cannot be taken seriously as a measure to improve women's health." *Schimel*, 806 F.3d at 921. In light of these non-existent benefits, the burdens on access that this law imposes are clearly excessive. *Id.* at 922; *Hellerstedt*, 136 S. Ct. at 2318.

For these reasons, we hold that 410 Ind. Admin. Code 26.5-17-2(e)(1) unduly burdens women's abortion rights and thus does not withstand scrutiny under the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

The *de minimis* benefits produced by these specific facility requirements imposed on clinics seeking to offer first-trimester aspiration abortion services similarly lack any convincing force. To reiterate, this provision includes the following requirements:

- Procedure rooms must be a minimum of 120 square feet for procedures requiring only local analgesia or nitrous oxide, 410 Ind. Admin. Code 26-17-2(d)(1);

- Scrub facilities must be provided near the entrance of procedure rooms, 410 Ind. Admin. Code 26-17-2(d)(4); and

- Corridors must be at least forty-four inches wide, 410 Ind. Admin. Code 26-17-2(e)(5).

With respect to the first requirement, Dr. Grossman, again, relying on his experiences and his review of the NASEM report and the Consensus Guidelines, testified that this requirement is totally unnecessary, offering no enhancement to the safety of aspiration abortion care. Indeed, Ms. Hagstrom Miller testified that Whole Woman's

Health clinics operating outside of Indiana provide safe and effective first-trimester aspiration abortion services without such specific requirements. Though Dr. Calhoun testified that it was important to ensure that a procedure room was adequately sized to accommodate medical personnel and equipment, he did not rebut Dr. Grossman's testimony that a standard procedure room[59] suffices to provide safe and effective first-trimester aspiration abortion care. To the extent Dr. Calhoun believes that 120-square-foot space requirement is, in fact, necessary, his opinion is not supported by any medical research and is inconsistent with the findings of above-referenced medical literature. We thus defer again to the opinions of Dr. Grossman, concluding that this requirement does nothing to enhance the safety of aspiration abortion care.

Dr. Grossman's opinion debunking any purpose served by the 44-inch corridor requirement is similarly persuasive. Such a requirement may well enhance patient safety in a hospital setting where the emergency transport of patients via gurneys or wheelchairs is likely to occur. However, no evidence was proffered by the State to rebut Dr. Grossman's assertion that no accommodations for passing wheelchairs or gurneys are necessary in the context of first-trimester aspiration abortion care. Accordingly, we conclude that the 44-inch corridor requirement offers no medical benefits to women receiving aspiration abortion services.

Finally, Dr. Grossman testified that the presence of scrub facilities outside of procedure rooms is also unnecessary, given that sterility (not to be confused with

---

[59] For reference, the procedure rooms at the South Bend Clinic are approximately 110 square feet.

120

cleanliness) is not required to safely provide first-trimester abortion services. As Ms. Hagstrom Miller noted, clinics are already required to equip procedure rooms with handwashing sinks. Dr. Stroud testified, however, that he thought scrub facilities were important in this setting, explaining that he would, in fact, utilize a scrub facility to sterilize his hands prior to proceeding with a D&C in the context of a miscarriage. However, Indiana law does not mandate this precaution, and procedures which pose a similar risk of infection are, in fact, regularly performed in facilities in Indiana that do not have scrub sinks. We thus find no basis in the evidence to support the necessity of this requirement to ensure safe aspiration abortion care. Once again, we credit the reliable and informed opinions of Dr. Grossman, who testified that no benefits flow from this requirement that are not already satisfied by other requirements, including those which require clinics to maintain handwashing stations within procedure rooms.

To that end, and for the reasons identified above with respect to these facility requirements governing medication abortion clinics, the minimal nature of alleged benefits which flow from these provisions further demonstrate their insufficiencies when viewed under the Equal Protection Clause, given that the State does not impose any such restrictions on the provision of any other category of medical care, singling out abortion services for reasons that may be easily inferred but need not be specifically discussed.

The effect of these restrictions and requirements obviously limits the ability of otherwise qualified clinics to provide first-trimester aspiration abortion services. Such clinics are forced either to locate facilities that are already equipped with such specifications, which as Ms. Hagstrom Miller testified is exceedingly difficult, or

undergo expensive and significant retrofitting of existing structures, which construction is often cost-prohibitive for clinics providing services to primarily low-income women. We reiterate that clinics providing first-trimester aspiration abortions currently operate only in Indianapolis, Bloomington, and Merrillville, thus requiring women outside of these cities to travel for aspiration abortion services. We have already established that such travel imposes significant burdens on women seeking to access care.

Given that no medical or patient related safety benefits flow from these required structural, facility-based specifications for abortion care clinics and that Indiana does not interpose similar restrictions on facilities providing other similar medical services, these facility restrictions do not achieve any purpose beyond unnecessarily restricting who can provide abortion care and, in turn, limiting access to abortion services. These burdens cannot stand when offset by *no* medical benefit which furthers the State's interests. *See Hill*, 937 F.3d at 876–77; *Schimel*, 806 F. 3d., at 916, 919–22. In addition, the absence of similar requirements for other comparable medical care facilities gives rise to a concern that the State's purpose in enacting these provisions was to restrict the availability of abortion care, particularly considering the lack of any demonstrable medical benefits justifying these requirements. *Schimel*, 806 F. 3d., 915–16, 919–20.

For these reasons, we hold that the identified facility requirements specified herein are violative of the Substantive Due Process and Equal Protection Clauses of the Constitution and must be enjoined.

 *2. Telemedicine Restrictions*

As discussed above in detail, Plaintiffs have challenged Indiana's Telemedicine Ban as well as other statutes that create *de facto* restrictions on the use of telemedicine in the provision of abortion care, including the In-Person Examination Requirement, the In-Person Counseling Requirement, and the Ultrasound Requirement. We review each of these provisions in turn.

### a. The "Ultrasound Requirement" Does Not Violate the Equal Protection Clause

Prior to obtaining an abortion in Indiana, "the provider shall perform, and the pregnant woman shall view, the fetal ultrasound imaging and hear the auscultation of the fetal heart tone if the fetal heart tone is audible," unless the patient certifies in writing, before the abortion, that she declines to do so.  Ind. Code. § 16-34-2-1.1(a)(5) (the "Ultrasound Requirement").

We have already determined that the benefits of this statute (including determining gestational age and enhancing patient-decision making) outweighed its burdens (as previously stated, Plaintiffs' summary judgment discussion of the burdens of this requirement was severely lacking both in evidence and critical analysis). Accordingly, the only issue remaining at trial with respect to this requirement is whether it violates the Equal Protection Clause.[60]

---

[60] We have previously communicated to Plaintiffs our skepticism as to whether a claim could prevail under the Equal Protection Clause where it failed under the Due Process Clause given that the standard under these two clauses is the same, that is, the undue burden standard. As we have stated, "Plaintiffs cannot expand the substantive abortion right by resort to the Equal Protection Clause." We need not definitively answer this question here because, even after conducting the additional review that Plaintiffs requested, the Ultrasound Requirement withstands scrutiny under either clause.

In this context, the State must justify its differential treatment of women seeking abortion services by requiring the ultrasound and its review by the provider only and women seeking other prenatal services for whom ultrasounds are also critical to the safe provision of care but not legally required. Regarding this latter category, the State entrusts the healthcare provider with determining when an ultrasound is necessary and whether it may be conduct by unaffiliated but competent technician. Thus, we ask what benefits accrue to the State by classifying abortion patients differently from other prenatal patients. Because the State has not disputed that the medical benefits of an ultrasound are any different for abortion patients than other pregnant women, this classification can be sustained only to the extent it serves the State's interests in preserving a life that may one day becomes human. *Hill*, 388 F. Supp. 3d at 1047. As previously stated, the State may promote that interest through the enactment of measures that ensure the woman's choice is philosophically and socially informed.

Here, the State presented unrefuted evidence at trial that the Ultrasound Requirement informs and enhances medical and patient decision-making that is unique in the provision of abortion care. Indeed, as we ruled at summary judgment:

> With respect to the benefits of this ultrasound requirement, the State has mustered both anecdotal and statistical evidence to show that Indiana's ultrasound requirement enhances patients' decision-making and ensures that providers obtain informed consent . . . Plaintiffs make little effort to rebut either the theory or the evidence proffered by the State, relying on two studies, both of which discuss small samplings of women whose abortion decision-making was impacted by their having first viewed their ultrasounds. Indiana's ultrasound requirement thus clearly provides more than *de minimis* benefits in furtherance of its interest in enacting regulations to further the State's legitimate interest in preserving potential life.

> Accordingly, imposing the Ultrasound Requirement on abortion patients benefits

124

the State by serving its interesting in promoting fetal life and ensuring that abortion patients make informed decisions.

The primary burdens identified by Plaintiffs at summary judgment and trial include the potential for duplicative ultrasounds, which may be a triggering factor for some women who have suffered sexual assaults; however, it appears that only ten percent of abortion patients in Indiana will receive a second ultrasound because of this provision. We cannot say that ten percent is a "large fraction" of women affected by this statute—in Dr. Grossman's words, it is a "small proportion." [Phase I Tr. Vol. II, 113:2–6]. In addition, is unclear how many of these patients were sexual assault survivors or found the second ultrasound to be triggering because of their experiences with sexual assault. Plaintiffs have thus obviously mustered little concrete evidence that the potential for duplicative ultrasounds poses any major obstacle for a large fraction of women hoping to obtain care.

Plaintiffs also cite the burden of travel imposed by the requirement; though we do not intend to minimize the burdensome nature of travel imposed by Indiana's abortion restrictions, this particular travel burden is mitigated by the fact that women may obtain their preabortion ultrasounds at affiliated health centers. This mitigation is of sufficient significance that the facilities challenging the State's requirement that the ultrasound be performed eighteen hours in advance stipulated to the dismissal of their prior lawsuit once they were able to procure additional ultrasound machines for their affiliated

clinics.[61]

Weighing the unique benefits which flow from the Ultrasound Requirement in this context against these burdens, we find no basis on which to conclude that the benefits are "substantially outweighed" by any burdens that they impose. Though the Ultrasound Requirement may impose some burdens on women seeking abortion services that are not imposed on other pregnant patients, these burdens are not "undue" given the legitimate and uncontested benefits from the law identified by the State.

### b. The In-Person Counseling Requirement is Unduly Burdensome

Plaintiffs' next constitutional challenge is to the In-Person Counseling Requirement, which provides that "consent to an abortion is voluntary and informed only if" abortion providers satisfy certain requirements, which include the furnishing of certain information—including the name of the physician performing the abortion, the nature of the proposed procedure, the probable gestational age, and more—to abortion patients, both orally in person and in writing, at least eighteen hours in advance of the patient's abortion. Ind. Code § 16-34-2-1.1(a)(1). Also eighteen hours in advance and in person, patients must receive a color copy of the State's "Informed Consent Brochure," and, if a fetal anomaly has been identified, a copy of the State's "Perinatal Hospice Brochure." *Id.* § 16-34-2-1.1(a)(4), (b).The specific issue raised here by Plaintiffs is the requirement that

---

[61] We note here that the real thrust of Plaintiffs' evidence is that the Ultrasound Requirement is unduly burdensome because it enforces a two-trip minimum for abortion patients. The shortcoming of Plaintiffs' theory, however, is that the two-trip requirement is borne of the required ultrasound which must be performed eighteen hours advance of the abortion, which provision, as we have explained, in not challenged in this litigation. Thus, as we have stated, we accede to the fact that the ultrasound must occur eighteen hours prior to an abortion and analyze the remaining aspects of the Ultrasound Requirement irrespective of its mandated delay.

all preabortion counseling be conducted solely in person, which forecloses the use of telemedicine.

As we have previously discussed, telemedicine enables providers to remotely review patients' medical histories and ultrasound results and to utilize videoconferencing to determine the appropriateness of medication abortion for an individual patient. Telemedicine for preabortion counseling appointments may be delivered through either the "direct-to-patient" model or "site-to-site" model, both of which incorporate face-to-face communications with the patient through secured videoconferencing. [62]

Dr. Grossman's extensive experience and research established that providers utilizing telemedicine are able to obtain informed consent as effectively as if the participants were present in person. The process for doing so through telemedicine would look "identical" to the in-person process. In both settings, the provider will confirm that the patient understands what an abortion entails as well as the risks, benefits, and alternatives of the procedure, before ultimately confirming that the patient wishes to proceed with the abortion. And, in both settings, if the provider has hesitations as to the patient's voluntary, informed consent, he or she will not proceed with the procedure and instead direct the patient to additional resources so that she may contemplate her

---

[62] At summary judgment, the Seventh Circuit directed us to *A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 688, 2002 WL 31050945 (7th Cir. 2002), in which the Seventh Circuit, in reliance on *Casey*, upheld this very statute as facially constitutional. The State requested that we defer to that ruling. We denied the invitation, noting that the case left the door open to additional challenges and the record before us was significantly different that which was presented to the Seventh Circuit nearly twenty years ago or to the *Casey* court nearly thirty years ago. Namely, in *Newman*, videoconferencing was not readily available, and the alternative to in-person counseling was to provide the disclosures on paper or over the phone. A complete discussion of *Newman* can be found at pages 101 through 102 of our summary judgment order.

decision.

Through advancements in videoconferencing technology, the personal interactions between providers and patients are enabled to a degree that the same quality and kind of communications occurs with patients as would have occurred in person. Indeed, Dr. Grossman's research reflects high levels of both patient and provider satisfaction regarding the use of telemedicine in this aspect of abortion care. Patients find the videoconferencing platforms to be accessible, and both patients and providers report their ability to effectively communicate through this medium. Dr. Grossman's and Ms. Guerrero's testimony further establishes that telemedicine can be successfully utilized by low-income populations, dismissing biases that such individuals would be unwilling or unable to effectively utilize telemedicine.

Dr. Grossman's research is consistent with the experiences of providers and patients throughout Indiana. The witnesses in this case who lead preabortion counseling sessions and who obtain informed consent from abortion patients agree that they could complete these aspects of abortion care as effectively via videoconferencing, and these witnesses have "no reservations" about doing so. In addition, the witness testifying in this case who have received abortion care in Indiana explained that the In-Person Counseling Requirement imposed unnecessary stress and burden for them. They said they would have appreciated the opportunity to conduct their counseling sessions through telemedicine.

Dr. Grossman's research further established that intimate partner violence can be effectively screened for via telemedicine through a series of oral and written

communications. Indeed, intimate partner violence is frequently screened for via telemedicine in other aspects of healthcare. Ms. Herr, for example, explained that she is well-trained to screen for and provide resources to potential victims of intimate partner violence over videoconferencing. She has become particularly well-equipped to perform these tasks given the expansion of telemedicine that has occurred throughout the COVID-19 pandemic and quarantines. This process may be tailored to the telemedicine setting to ensure the safety (and privacy) of a patient who might be at home with a potentially violent perpetrator.

Importantly, because an abortion patient will always be required to report in person to the clinic to receive her abortion, clinic staff are not deprived of an opportunity for in-person contact with patients to provide resources to those who may be suffering from intimate partner violence. To the extent there are concerns of coercion, this appointment provides an opportunity for the patient to be segregated from the perpetrator in order to confer with her provider in a confidential, private setting. We note that the State's experts lacked any familiarity with the site-to-site telemedicine model, and thus did not indicate an understanding of the fact that a woman will still report to a clinic when expressing their concerns of coercion and intimate partner violence.

The State maintains through its expert testimony that in-person counseling inspires better engagement between provider and patient. In-person interactions lead to better eye contact, a greater ability to read body language, and the development of a person-to-person relationship, they attest. Though these opinions may be true in a general sense, they ignore the significant research and testimonials reflecting the perspective of abortion

129

patients and providers which show that these individuals—those actually involved in the process—typically find the interactions to be just as meaningful when delivered through videoconferencing and, in fact, would prefer that this option be available. We will not quarrel with the fact that in-person interactions yield some benefits in building a trusting relationship between patient and provider; however, we accord significantly greater weight to the testimony of Plaintiffs' witness as the only individuals in this case who have had extensive experience providing and receiving abortion care and researching the effectiveness of telemedicine in this setting.[63] We credit this evidence particularly in light of Indiana's otherwise vast expansion of telemedicine in other healthcare settings.[64]

Accordingly, given the broad-based societal advancements to telemedicine technology and the successful incorporation of videoconferencing into preabortion counseling care elsewhere, we find the benefits imposed by this requirement to be at best slight. Given that no other aspect of healthcare is restricted in its ability to utilize telemedicine, this provision suffers under the Equal Protection Clause analysis as well because there appears to be little to no justification for excluding abortion patients from the benefits of telemedicine.[65]

---

[63] We recognize that Dr. Stroud provided aspiration abortion care during his residency; however, that occurred decades ago, and the processes by which abortions are currently performed, as well as the capacities technology involved in telemedicine, have evolved greatly since that time.

[64] We also note that the State's experts spoke to certain categories of patients that may benefit from in-person counseling as opposed to telemedicine. Importantly, however, permitting telemedicine in this setting would not be mandated for all patients, only allowed as appropriate. Clinics would provide patients with the choice to proceed with the kind of care best-suited for them.

[65] The State's experts have alluded to the "gravity" of the abortion decision. We reiterate that these experts' opinion are far removed from both research related to the effectiveness of

The burdens imposed by this *de facto* two-trip requirement are significant, however.[66] We have discussed in detail the burdensome nature of travel, and the costs associated therewith, for the majority of women seeking abortion services in Indiana. Requiring these women to complete a second trip to the clinic obviously increases and exacerbates these burdens, forcing women to take additional time off work (which, for some, threatens the loss of their jobs) and arrange and pay for extra child care. Moreover, women who do not live near clinics must choose between expending their resources either to travel on two separate days or to secure overnight lodging, which is simply unaffordable for some women, who therefore must resort to sleeping in their cars outside of clinics. Lining up all these dominos causes a significant number of women to delay their second appointment for an additional week or two rather than scheduling back-to-back appointments, which may ultimately impact her eligibility to receive a medication abortion. And, as we have thoroughly discussed elsewhere, delays are also problematic in that they force women to endure longer the often unwelcome physical symptoms associated with pregnancy longer and exacerbate anxieties of women struggling to access care or hoping to keep their pregnancies secret from others, including violent partners. We also note that, because of various scheduling difficulties, many women do not access care at the clinic closest to them, but instead must travel to the clinic with the best (or

_____

telemedicine as well as the perspectives of providers and patients who have utilized telemedicine in this setting.

[66] The In-Person Counseling Requirement imposes its own eighteen-hour delay independent from that which is imposed by the Ultrasound Requirement. The State has previously reminded us that we are to evaluate "one statute or regulation at a time," analyzing its burdens irrespective of other laws. We do so here, given the independent operation of the two delay laws. We will nonetheless also consider the operation of the statute in the real world context, that is, by assessing the practical effect of enjoining this provision in light of the Ultrasound Requirement.

only) availability.

In light of the minimal benefits which flow from the In-Person Counseling Requirement, we find these burdens to be clearly excessive and that they would be ameliorated by telemedicine delivered services. *Schimel*, 806 F.3d at 919–20. The Supreme Court and the Seventh Circuit have both recognized that the burdens associated with travel, including the costs associated therewith and the impact on delays in accessing care, operate to create substantial burdens to access where, as here, the evidence establishes that the restrictive statute does little to actually promote the benefits asserted by the State. *Hellerstedt*, 136 S. Ct. at 2313, 2318; *Hill*, 937 F.3d at 869, 877–78; *Schimel*, 806 F. 3d at 915–16, 919–21. Because these identified burdens are substantially disproportionate to the benefits which this statute is likely to confer, we hold that it creates an undue burden on the abortion right and thus violates the Substantive Due Process Clause. And, because the State's has not persuaded us that there is a legitimate justification for excluding abortion patients from the use of telemedicine in this setting, we further hold that this provision violates the Equal Protection Clause.

This conclusion holds even in light of the fact that women must report to an abortion clinic or its affiliated facility eighteen hours in advance for their preabortion ultrasounds. Plaintiffs' evidence shows that women often struggle to schedule their counseling appointments, given the various considerations that must be accounted for. As a consequence, women frequently delay care or seek care at a location farther away. Again, we stress that these delays and this travel are significant burdens for a large fraction of women seeking services in Indiana.

By enjoining the In-Person Counseling Requirement, providers could incorporate the site-to-site telemedicine model into the provision of preabortion counseling appointments; indeed, Plaintiffs' evidence establishes that either the direct-to-patient model or the site-to-site model could be successfully incorporated into this aspect of abortion care. Doing so would provide greater accessibility to appointments and flexibility in scheduling. A woman could, for example, report to the clinic closest to her where a qualified technician conducts the ultrasound and completes the necessary intake information. These materials could then be transmitted electronically to a remote physician or APC, who could conduct the counseling session. Doing so would significantly mitigate at least some of those burdens established by Plaintiffs. Given that we have determined the effectiveness of such remote counseling sessions, the State has not justified its withholding of this expanded access to care.

### c. The Telemedicine Ban and Physical Examination Requirement are Unduly Burdensome

In reviewing the State's restrictions on the use of telemedicine in providing medication abortions, we find it useful to revisit and highlight the State's efforts to encourage and make available telemedicine in non-abortion contexts, with specific regard to the widespread expansion of telemedicine in Indiana in various other aspects of healthcare over the past five years.

In 2015, Indiana enacted a statute requiring that health insurance policies include coverage for telemedicine services on the same terms as coverage is provided for healthcare services delivered in person. In 2016, the State enacted another statute broadly

authorizing healthcare providers to use telemedicine to treat patients in Indiana. One year later, in 2017, Indiana expanded the telemedicine authority to include the prescription of controlled substances.

Healthcare providers in Indiana do, in fact, utilize telemedicine extensively outside the abortion context. Planned Parenthoods in Indiana, for example, have successfully incorporated both direct-to-patient and site-to-site models of care to provide STI testing, birth control, and other services to its patients with greater accessibility and flexibility than would otherwise be available. When clinicians prescribe medications via telemedicine (which may include medications with greater risks than the abortion-inducing drugs at issue here), they screen for any contraindications utilizing a videoconferencing medium in the same manner that they would screen for contraindications in-person.

In other states, telemedicine is already used by Planned Parenthoods and Whole Woman's Health clinics to provide medication abortion care. As explained, to comply with the FDA's REMS requirements, this care occurs through the site-to-site model of telemedicine, wherein the patient reports to the clinic and is then remotely connected via technology to a health care provider who is not physically located at the clinic. The provider can remotely review the patient's medical history and ultrasound results to screen for contraindications. The provider will also conduct direct, face-to-face communications with the patients through secured videoconferencing to review with the patient the risks and benefits of medication abortion, and ultimately to determine the appropriateness of the medication abortion.

The unrefuted evidence adduced at trial establishes that utilizing telemedicine for medication abortions is as safe and effective as in-person treatment. Dr. Grossman's extensive testimony on this topic, wherein he discussed his in-depth research into this area as well as his review of available medical literature, went unrebutted by the State's experts.

Indiana nonetheless requires that, prior to receiving an abortion, a woman must receive a physical examination by a licensed physician and that the dispensing or prescribing of abortion-inducing drugs not occur via telemedicine.

The cited benefit of these laws is sparse, and therefore so is our discussion

The In-Person Examination Requirement operates to enforce the restriction on telemedicine in abortion care by requiring a treating physician to conduct a physical examination of an abortion patient prior to proceeding with care. As Dr. Grossman opined, performing a physical examination prior to a medication abortion is simply not a part of the standard of care. As the only expert witness in this case to have provided medication abortion care and to have conducted and reviewed medical research on the safety of abortion care through telemedicine, we afford his opinion significant weight, concluding that the In-Person Examination Requirement does not offer any benefits necessary to ensure the safe provision of medication abortion services. This is particularly true in light of our ruling upholding the requirement that an ultrasound be performed prior to an abortion. An ultrasound, as we have discussed and as the State's experts agree, provides the most accurate means to gestationally date a pregnancy and to diagnose an ectopic pregnancy. Physical examinations do not appear to provide any

greater reliability or accuracy for these identification purposes than an ultrasound. The necessity of a physical examination, particularly in addition to an ultrasound, is not supported by *any* medical research proffered by the State. If an ultrasound is adequate in this regard, then the required physical examination provides no additional established benefits. In those rare instances where a patient complains of symptoms or the provider observes something problematic on an ultrasound, that patient may be triaged for additional care. For the vast majority of women, however, this need almost never arises.

The State's experts also discussed the advantages of physical examinations in establishing rapport with one's patient. We find this testimony of little value as a basis for mandating physical examinations for all patients, especially when none of the State's experts even perform medication abortions, nor have they conducted any research on this topic. By contrast, significant evidence was introduced by Plaintiffs, including extensive medical literature and the opinions of medical professionals in this field, which buttresses Plaintiffs' contention that medication abortion care can be and is being safely delivered via telemedicine without a physical examination. Moreover, if building rapport is beneficial enough to justify a requirement that an otherwise unnecessary physical examination be performed, we question why Indiana would permit the use of telemedicine in any context. The prevalence of telemedicine services throughout Indiana once again influences our analysis here.

The only remaining explanation by the State is the claim that the Telemedicine Ban is necessary to prevent the diversion of the medications used in an abortion procedure, mifepristone and misoprostol. This concern regarding drug diversion,

136

however, is entirely speculative. There is no medical research that validates this concern, and Dr. Grossman testified that he has never observed during his decades of providing medication abortion care a problem or practice of drug diversion. The State's only evidence was the testimony of physicians who upon cross-examination could not articulate any specific basis for their opinions, who have never performed medication abortions, and who hold the overarching opinion that an elective abortion is rarely, if ever, in a woman's best interest. For these reasons, the attempt by the State to sound the alarm of "drug diversion" is nothing more than that, untethered as it is from any evidentiary anchors. We give it no weight in our analysis.

Accordingly, we hold that the Telemedicine Ban and In-Person Examination Requirements, for Due Process purposes, accomplish little more than to impose unjustifiable restrictions on the use of telemedicine in abortion care. Against the backdrop of Indiana's otherwise widespread and encouraged use of telemedicine, these restrictions raise serious concerns as to their constitutionality under the Equal Protection Clause.

The In-Person Examination Requirement and Telemedicine Ban also impose identical burdens. Incorporating telemedicine into healthcare services generally has resulted in well-documented, widely accepted benefits in the form of reduced costs of care and expanded access thereto. Plaintiffs' evidence conclusively and indisputably established these benefits accrue even with site-to-site telemedicine procedures. Even when abortion patients must still report in person to the clinic to receive their medications, the utilization of telemedicine increases patient accessibility by allowing

clinics to realize greater efficiencies from their existing cadres of care providers. As referenced in our Findings of Fact, the introduction of site-to-site telemedicine at Indiana's abortion clinics would increase appointment days from one or two days a week or month to five days a week, without the need to recruit an additional physician or APC. Site-to-site telemedicine would allow Indiana's abortion clinics to dramatically expand the availability of appointments and reduce delays in care.

Such expanded availability would significantly impact the process by which women navigate in order to receive medication abortion services, particularly for those who do not live in the cities where licensed abortion clinics operate. Because clinics currently have limited appointment availability (which schedule is typically fully booked at any given time), women often wait a matter of weeks between their first and second abortion-related appointments. Given that women often seek abortion care when they are on the cusp of a gestational threshold, these weeks of delay are critical in terms of the kind of care available to them. Delays, of course, also force women to remain pregnant longer, requiring them to continue to endure the related-symptoms and anxieties. In view of the significant hurdles that most women must overcome in pursuing abortion care— including securing reliable transportation, juggling time off work and child care duties, etc.—any improvements/increases in accessibility would be highly significant. Telemedicine promises these benefits at a lower cost of care, according to the testimony relating to the South Bend Clinic. We have to assume it would be true elsewhere as well.

Conducting the required balancing of factors in contexts where the benefits of a particular law are unidentifiable and the burdens are significant is not a difficult

challenge. The burdens imposed by such laws which include a reduction in access to care with no offsetting medical benefits cannot be deemed anything other than undue. The State lacks constitutional authority to "strew impediments" to services without sufficient offsetting benefits that advance women's health. *Schimel*, 806 F. 3d at 921. The State's attempt to explain its basis for excluding the far-reaching benefits of telemedicine from this category of patients is feeble at best, especially given the widespread use of telemedicine throughout Indiana as well as the overall safety of medication abortions. *Schimel*, 806 F. 3d at 915, 919–22; *see also Hellerstedt*¸ 136 S. Ct. at 2318.

Having carefully weighed the respective benefits and burdens imposed by these provisions, we hold that the ban on telemedicine services and the requirement of an in-person physical examination prior to accessing a medication abortion do not comport with the Fourteenth Amendment's Substantive Due Process and Equal Protection Clauses.

### 3. *Indiana's Informed Consent Provisions*

Plaintiffs have also challenged certain "Mandatory Disclosures" that require the treating physician or the physician's designees to provide to a woman prior to receiving her abortion. *Id.* § 16-34-2-1.1(a)(1)–(2), (b). All women must be provided with the State's informed consent brochure.[67] *Id.* § 16-34-2-1.5(b). Included in these mandatory disclosures is the requirement that where a diagnosis of a lethal fetal anomaly has been made, the physician must inform the woman "of the availability of perinatal hospice

---

[67] Plaintiffs' only developed objection to the mandatory distribution of the informational brochure is that it contains false or misleading information.

services" and provide her with the state-produced "Perinatal Hospice Brochure." *Id*. § 16-34-2-1.1(b).

Much of the information required to be disclosed to women as part of the informed consent process prior to receiving abortion care is uncontroverted in this lawsuit. Plaintiffs do specifically challenge the Mandatory Disclosures which include statements regarding: 1) when life begins, 2) fetal pain, and 3) information related to the woman's mental health as contained in the Perinatal Hospice Brochure.

In reviewing the constitutionality of Indiana's mandatory disclosures relating to informed consent, we begin with the standard set out in *Casey*, wherein the Court held that "as with any medical procedure, the State may require a woman to give her written informed consent to an abortion." 505 U.S. at 881 (joint op). Further, states may "require doctors to inform a woman seeking an abortion of the availability of materials relating to the consequences to the fetus, even when those consequences have no direct relation to her health." *Id*. at 882. *Casey* thus implicitly holds that Indiana's Mandatory Disclosures further the state's interests in the health of the patient seeking the abortion as well as its interest in potential fetal life.

To promote the interest in potential fetal life, the state may enact measures aimed at ensuring that the woman's choice is philosophically and socially informed and communicate its preference (if it has one) that the woman carry her pregnancy to term. *Id.* at 872.  But such measures "must be calculated to inform the woman's free choice, not hinder it[,]" and even if so calculated may not present a substantial obstacle to its exercise. *Id.* at 877. At a minimum, to comport with the Due Process Clause, the

information provided must be "truthful and not misleading." *Id.* at 882.[68]

At trial, the parties proffered competing expert testimony on each of the three challenged provisions.

### a. The Mental Health Disclosure Contained Within the Perinatal Hospital Brochure is Unconstitutional

Indiana's mandatory disclosure, as contained in the State's Perinatal Hospice Brochure, declares: "Studies show that mothers who choose to carry their baby [*sic*] to term recover to baseline mental health more quickly than those who aborted due to fetal anomaly." Ind. Code. § 16-34-2-1.1(b)(2). As previously explained, Dr. Grossman's testimony that this disclosure is not scientifically accurate was firm and unequivocal. There is simply no medical evidence, he said, establishing that a pregnant woman who has received the unfortunate diagnosis of a fetal anomaly is more likely to return to her baseline mental health more quickly if she carries her pregnancy to term, rather than if she elects to have an abortion. He also stated that, to the extent that studies may exist to

---

[68] Plaintiffs request that we analyze the challenged provisions under two theories: first, as violative of patients' Fourteenth Amendment Substantive Due Process rights, and second, as violative of physicians' First Amendment freedom of speech rights. We concluded at summary judgment that the analysis under the First Amendment was identical to that under the Fourteenth Amendment. Accordingly, no separate analyses are necessary here. *Casey*, 505 U.S. at 884 (holding that physicians' First Amendment rights not to speak were not violated when they were required to deliver mandatory disclosures determined to be constitutionally sound under the Fourteenth Amendment in that they were truthful and non-misleading); *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 424 (6th Cir.), *cert. denied sub nom. EMW Women's Surgical Ctr., P.S.C. v. Meier*, 140 S. Ct. 655 (2019) (holding that Casey's truthful and non-misleading standard applies to First Amendment challenges to informed consent provisions in the abortion context). *See also All-Options, Inc. v. Attorney Gen. of Indiana*, No. 1:21-cv-01231-JPH-MJD, 2021 WL 2685774, at *1 (S.D. Ind. June 30, 2021) (enjoining state law requiring disclosure of information that was not truthful and non-misleading and therefore violative of the First Amendment). Moreover, to the extent a different test is applicable, there is no dispute that, under any test, the disclosures must, at a minimum, be truthful and non-misleading.

suggest such a correlation, such studies have been determined by reputable scholars in the field to be methodologically unsound.

The State called Dr. Coleman to defend the accuracy of its statements in the Perinatal Hospice Brochure. Surprisingly, the State, after eliciting from Dr. Coleman her opinion that this disclosure is, indeed, problematic, proceeded  (with the help of a poster board, a magic marker, and an associate attorney) to propose amendments to the disclosure, such that in changed form it would read as follows:

> [S]ome studies suggest that mothers who choose to carry their baby to term ~~recover to baseline mental health~~ experience positive mental health outcomes more quickly than those who abortion due to fetal anomaly.

The State then elicited Dr. Coleman's opinions regarding the amended language. Indeed, the majority of Dr. Coleman's testimony related to this *rewritten* version of the disclosure. Her testimony, therefore, was irrelevant given, that the Court is tasked with deciding the constitutionality of the disclosure as it is mandated by the State, not a redlined version thereof produced for trial purposes apparently to avoid the obvious, admitted embarrassments with the required texts.

Dr. Coleman's testimony with respect to the actual language of the mandatory disclosure does not persuade us that this statement is, in fact, truthful and non-misleading or otherwise useful in assisting women to make informed decisions as to whether to undergo abortions where there has been a fetal anomaly diagnosis. Though Dr. Coleman answered in the negative the question posed by counsel for the State as to whether she believes the disclosure was "affirmatively false or misleading," her subsequent testimony plainly did  not support that response. Consistent with the opinions of Dr. Grossman, Dr.

Coleman testified that there is not sufficient empirical evidence to support the statement that women may return to "baseline" (whatever that means) more quickly if they carry pregnancies to term. Thus, there appears to be no dispute among the experts that this mandatory disclosure is not grounded in any medical or scientific evidence. In addition, Dr. Coleman conceded that "women reading that [disclosure] may not really understand it."

We note as well that Dr. Coleman emphasized throughout her testimony that it is imperative to furnish information which allows women to "make the choice that they believe is best for them."

This provision does not comport with *Casey,* which, we say again, requires mandatory disclosures to be truthful and non-misleading and "calculated to inform the women's free choice." We do not believe that a disclosure which is not understandable to its target audience is calculated to inform or enhance autonomous decision-making. Nor do we believe that the mandated disclosure of information that is indisputably not supported by medical science and confusing for its recipients enables women to make such the choice "they believe is best for them."

For these reasons, we hold that the statement related to mental health contained within Indiana's Perinatal Hospice Brochure does not satisfy the standards laid out in *Casey*. By all accounts, this disclosure offers nothing more than confusing information that is not anchored in any fact-based scientific or medical evidence. It hinders, rather than advances, informed decision-making and consequently is violative of the Fourteenth Amendment's Substantive Due Process Clause and the First Amendment.

143

**b.  The Mandatory Disclosure Related to Fetal Pain is Unconstitutional**

Plaintiffs also object to the statutory requirement that abortion providers inform their patients that "[o]bjective scientific information shows that a fetus can feel pain at or before twenty (20) weeks of postfertilization age," Ind. Code § 16-34-2-1.1(a)(1)(G). As previously explained, the factual assertion that a fetus feels pain prior to twenty weeks of postfertilization age has been rejected by all the major medical organizations, including ACOG (the views of which are based, in part, by the findings of *The Journal of the American Medical Association*) and RCOG. These organizations have concluded from their research and related findings that a fetus cannot feel pain prior to twenty-four weeks gestation because anatomic connections between the thalamus and brain cortex, which are necessary for the experience of pain, are not developed until this time. No major medical organizations endorses a contrary view. For these reasons, Dr. Grossman has categorized this disclosure as representing at best a "fringe view" within the medical community.

Dr. Condic, the State's proffered expert, however, testified that the conclusions and findings produced by ACOG, JAMA, and RCOG are scientifically incorrect. According to her opinion, these organizations have failed to considered animal-based research which shows that connections between the thalamus and the cortex are not necessary for the fetus to have a conscious experience of pain. Her review of this research reveals instead that neural circuitry present within the thalamus as a precondition for the conscious experience of pain is fully developed by 12–18 weeks of postfertilization age.

In analyzing this disclosure, we turn again to the standard set forth by *Casey*: the information must be truthful and non-misleading so to inform, rather than hinder, a woman's decision-making. Here, two experts disagree as to whether this disclosure comports with the *Casey* standard. After careful consideration of this conflicting testimony, we hold that this mandated disclosure does not satisfy the framework prescribed by *Casey*.

As written, the disclosure communicates to women that objective scientific findings establish that a fetus is capable of feeling pain at twenty weeks gestation—or earlier. We cannot contest that there apparently exists some body of scientific research and literature, including that reviewed and discussed by Dr. Condic, supporting this view. However, it does, in fact, appear to represent a "fringe view" within the medical community. It directly conflicts with the findings of ACOG (which, as we have noted, represents 90% of licensed to practice OB-GYNs in the United States), *The Journal of the American Medical Association*, and RCOG (the United Kingdom's ACOG). This information contained within this mandatory disclosure has specifically been rejected by these leading medical organizations. The State law nonetheless mandates the disclosure of this view in a manner that most certainly risks communicating to women that scholars have factually, scientifically, reliably determined that a fetus is experiencing pain as early as twenty weeks gestation.

The mandated disclosure could have, perhaps, been framed in terms of "some scholars disagree as to when a fetus feels pain," or perhaps "some scientific research suggests that a fetus can feel pain" at twenty weeks gestation. The language of this

disclosure in its current form, however, conveys that this fact represents settled, medical science, which it does not (since the prevailing opinion among medical professionals is that pain is not perceivable until twenty-four weeks gestation).[69] Thus, while this disclosure may not be entirely "false" in that there appears to be some scientific literature supporting it, it is clearly misleading in the manner in which this information is framed. Accordingly, it fails under *Casey* for that reason.[70] *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 794 F. Supp. 2d 892, 920 (S.D. Ind. 2011) (preliminary enjoining this provision in an as-applied challenged because it appeared to be "false, misleading, and irrelevant"), *aff'd in part, rev'd in part sub nom. Planned*

---

[69] We note that Dr. Condic has not authored any peer-reviewed articles supporting her opinions on the subject of fetal pain, which she herself describes as not being within her "direct area of research." Though this deficiency alone does not disqualify her opinions (we note that this subject also does not fall within Dr. Grossman's direct area of research), the manner in which Dr. Condic conducts research with respect to fetal pain reduces the credibility of her opinions. As Dr. Condic testified on cross-examination, the vast majority of her research concerns the development of nervous systems in animals; she researches fetal pain only in response to requests to participate in legal proceedings, such as this case. Whether Dr. Condic conducts her research through an unbiased lens was also called into question during the trial proceedings when she disclosed that she conducts research on behalf of the Charlotte Lozer Institute, a non-profit whose stated mission is to diminish and overcome the "scourge of abortion" in the United States. She herself holds the belief that "scientific evidence" proves that abortion is the "taking of an innocent human life."

[70] To the extent Dr. Condic has opined that a fetus, even if not consciously aware of pain, is nonetheless capable of perceiving or detecting pain prior to twenty weeks postfertilization age (a phenomenon known as nociception), we do not believe this opinion renders the mandatory disclosure non-misleading. We discern from this testimony that a fetus may <u>detect</u> pain prior to its capacity to <u>experience</u> pain in a way that could be considered as suffering (or a "subjective, emotional experience," as Dr. Condic described it). We do not believe, however, that communicating to a pregnant woman, as Indiana requires in every case, that a fetus "can feel pain" at a certain stage would not lead her to reasonably believe that the fetus "suffers" at this stage. Though Dr. Condic often referred to what a fetus was capable of "detecting," the language communicated to a woman clearly, and we believe intentionally, is what a fetus can "feel."

*Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*, 699 F.3d 962, 2012 WL 5205533 (7th Cir. 2012).[71]

### c.  The Mandatory Disclosure Relating to Fetal Life Is Unconstitutional

Finally, we turn to Plaintiffs' challenge to the State-mandated disclosure that "human physical life begins when a human ovum is fertilized by a human sperm." Ind. Code. § 16-34-2-1.1(a)(2)(E). Plaintiffs again contend that this statement is at best misleading, conflating a religious or ideological view of when "life" begins with one sounding in science. As Dr. Grossman testified, there is no medical consensus as to when human life begins; thus, to advance such a position it not "truthful."

Dr. Curlin has rebutted Dr. Grossman's assessment, testifying that the disclosure, carefully crafted to reference only "physical" life, is not scientifically controversial. As he explained, there is no dispute among medical professionals that all living organisms begin as fertilized eggs. In other words, a living human organism is created when a human ovum is fertilized by a human sperm, and thus Indiana's mandated disclosure advances nothing more than this uncontroversial biological statement. The insertion of the word "physical," in his judgment, moots any concerns that this provision relates to an ideological and religious understanding of life.

Plaintiffs contend that the State cannot attempt to save this statute through semantics, by characterizing the prescribed statement as conveying only biological trivia rather than an assertion about the moral or ethical personhood of a fetus.

---

[71] The State did not challenge this ruling on appeal.

We share Plaintiffs' concerns in this regard, finding superficial the State's efforts to neutralize the import of this statement by declaring it medically accurate, scientifically uncontroversial, and not ideologically charged. As to whether there is any medical consensus on this issue, we find Dr. Grossman's opinions credible and ultimately more persuasive. As Dr. Grossman testified—and Dr. Curlin did not dispute—"human physical life" is *not* a medical term that is defined in any extant medical literature. Dr. Curlin's opinion that the statement is neutral is based on his personal understanding (and belief) of when a "human organism" is created; however, the mandatory disclosure at issue here does not speak of the creation of an "organism," it references the beginning of human life—a question ripe for debate among "those trained in the respective disciplines of medicine, philosophy, and theology," about which neither the State nor the judiciary may "speculate as to the answer." *Roe*, 410 U.S. at 93. We are further troubled by the reliability of Dr. Curlin's opinions on this topic, given that they are informed by his overall belief that abortion is the killing of an innocent human being and as such must be provided to women so that they may understand that proceeding with an abortion kills innocent life. Unless and until *Roe v. Wade* is overturned, these sentiments from Dr. Curlin do not serve to bolster the accuracy or usefulness or appropriateness of the State's mandated messaging.

In addition, the State has presented no evidence that this mandatory disclosure has actually ever served to inform or enhance the decision-making of a single woman; to the

contrary, the evidence before us shows that this mandatory disclosure confuses and angers women.[72]

For these reasons, we hold this mandatory disclosure does not communicate truthful and non-misleading information and thus fails under *Casey*, and its enforcement must be enjoined.

### d.  Indiana's Requirement That Only Physicians and APCs Conduct Preabortion Counseling Is Not Unduly Burdensome

Plaintiffs' final challenge in the category of informed consent pertains to Indiana's requirement that the various informed consent materials be delivered <u>only</u> by an APC or a physician.[73] Ind. Code § 16-34-2-1.1(a)(1), (a)(4).

---

[72] The State notes that our court has previously refused to preliminarily enjoin this mandatory disclosure in *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 794 F. Supp. 2d 892, 916, 2011 WL 2532921 (S.D. Ind. 2011), *aff'd in part, rev'd in part sub nom. Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*, 699 F.3d 962. (7th Cir. 2012). Though true, we find the record before us is distinguishable from that which was presented to our colleague, Judge Pratt. Judge Pratt was not presented with evidence that this provision is confusing and upsetting for women and does not enhance their decision-making. In addition, Judge Pratt's decision was based in part on her finding that the State's expert (Dr. Condic, who spoke to her expertise as an embryologist) was more persuasive and credible than was Plaintiff's expert, whose identity is not provided in the opinion. *Id.*, at 917–18, n. 9. The plaintiffs in that case did not seek appellate review of her ruling. Here, for the reasons explained above, we find Dr. Grossman to be a well-informed and highly credible witness. In addition, the respective procedural postures of these two cases is obviously different—Judge Pratt was tasked with issuing a preliminary decision on a law that was passed on May 10, 2011, and was scheduled to take effect on July 1, 2011. She heard oral arguments on June 6, 2011, and issued a decision on June 24, 2011. *Id.*, at 897. Ultimately, the parties reached a stipulation wherein plaintiffs agreed to dismiss their claims on which they were unsuccessful at the preliminary injunction phase and, in return, the State agreed that judgment should be entered in plaintiffs' favor on the claims on which they were successful. Thus no additional judicial review occurred after the preliminary injunction phase of litigation. *See* Case No. 1:11-cv-00630-TWP-DKL, Dkt. Nos. 102, 103, 106. Here, our decision reflects the evidence that the parties advanced at trial, culminating three years of litigation, including extensive discovery.

[73] Plaintiffs' pretrial briefing references the statutory requirement that the Perinatal Hospice Brochure be delivered solely by the physician providing care, Ind. Code § 16-34-2-1.1(b). Plaintiffs' Amended Statement of Claims, which they were ordered to file to provide needed

In Dr. Grossman's expert opinion, this provision does not comport with the applicable standard of care, which permits any preabortion counseling to be delegated to properly trained medical assistants. Indeed, in Dr. Grossman's clinic, patients participate in in-depth and thorough preabortion counseling sessions with trained counselors. A similar practice is utilized by WWHA clinics in other states than Indiana with the assistance and direct involvement of nurses, counselors, and medical assistants.

Dr. Calhoun testified that he believes this counseling is best conducted only by a physician or APC, which ensures that the patient is provided an opportunity to know the details of the procedure as well is the potential side effects and risks by an individual qualified and capable of leading an informed discussion and thoroughly answering any questions that the patient may have.

We agree that such benefits as identified by Dr. Calhoun attach to this mandate. As all the experts testifying at trial agreed, obtaining informed consent is an essential aspect of good medical care, and critical to the process of securing the patient's informed consent is ensuring that the patient understands what the procedure entails and is given the opportunity to ask and have answered any questions or concerns. We do not believe it is controversial to acknowledge that an APC or physician is best-suited to perform this function.

---

clarity to the State and the Court as to the specific statutory and regulatory provisions they were challenging, does not include this in their list of challenged laws, and no evidence was adduced at trial that this provision was burdensome to abortion access. We thus offer no analysis or enter any finding on the constitutionality of this provision.

Regarding the burdens imposed by this requirement, Plaintiffs' evidence reveals that in restricting preabortion counseling tasks to physicians or APCs limits their availability to perform abortions by utilizing their already limited time on tasks of lesser importance as well as clinics' capacity to offer counseling appointments. This clearly impacts women's ability to schedule the first of their two abortion-related appointments. As previously discussed in detail, navigating the two-appointment requirement is onerous for many women seeking services.

We have no doubt that this provision creates difficulties for women attempting to schedule preabortion counseling appointments. However, we expect these burdens to be mitigated by our holding that telemedicine may be incorporated into this process, which, as we have discussed, extends the reach and accessibility of providers. Indeed, as also discussed elsewhere herein, the incorporation of telemedicine will allow providers to reach patients nearly every day of the week. Accordingly, we do not believe any remaining scheduling obstacles imposed by this provision substantially outweigh the legitimate benefits which flow from ensuring that patients participate in informed consent appointments with qualified providers.

For these reasons, we hold that this requirement is not unduly burdensome and thus comports with the Due Process Clause. In addition, Plaintiffs have not identified how abortion patients are being treated differently than similarly situated non-abortion patients, and thus they have failed to show that this provision is violative of the Equal Protection Clause.

### 4. Indiana's Criminal Penalties Provisions

The final issue raised in this litigation is Plaintiffs' challenge to the criminal penalties imposed for violations of Indiana's substantive abortion regulations. *See* Ind. Code §§ 16-34-2-7(a)–(b), 16-21-2-2.5(b), 16-34-2-5(d).

The majority of the abortion statutes under Indiana law are enforced through criminal penalties in addition to professional sanctions and civil liability. In no other healthcare context are healthcare providers subject to such a vast array of criminal penalties; sanctions are ordinarily limited to disciplinary actions against them by their professional licensing boards and hospital/practice affiliations. Plaintiffs contend that these criminal penalties pose a "chilling effect" on providers, deterring them from otherwise performing abortion services.

The parties diverge in their views as to whether the Court should conduct a separate undue-burden analysis of Indiana's criminal penalties provisions. The State maintains that "these challenges do not constitute a unique constitutional issue; the criminal prohibitions are valid if the substantive restrictions they enforce are valid." The State relies on the Supreme Court's decisions in *Gonzales v. Carhart* and *Casey* as support for its view. In *Gonzales*, the Supreme Court held that the federal partial-birth abortion ban, 18 U.S.C. § 1531, which criminalizes performance of partial-birth abortions, was not void for vagueness nor was it facially unconstitutional based on its overbreadth. 550 U.S. at 124. In *Casey*, the Court upheld Pennsylvania's informed-consent requirements, which were enforced by exposure to criminal penalties. 505 U.S. at 844 (maj. op.). Plaintiffs respond that neither of these cases independently addresses the

constitutionality of the challenged laws' criminal enforcement mechanisms apart from the laws' substantive requirements because the parties in those cases did not raise this specific constitutional challenge.

Like Plaintiffs, we question the legitimacy of such expansive criminal sanctions in furthering the State's interests in maternal and fetal health; in any event, no evidence is before us indicating that Indiana's civil medical malpractice laws or civil penalties do not suffice to ensure that abortions services are provided safely and effectively in Indiana. Plaintiffs' theory that these criminal sanctions have been enacted with the purpose and effect of placing a substantial obstacle in the paths of women seeking abortion care in Indiana is not without persuasive force. On the other hand, Plaintiffs have not shown that there is a real and legitimate threat of prosecution attached to these provisions that deters qualified professionals from providing care. They have directed us to no instances where healthcare professionals providing abortion care in Indiana were actually confronted with a threat of prosecution such that other qualified providers did or would respond with a reasonable wariness deterring them from providing services because of the potential criminal consequences. Indeed, the two examples proffered by Plaintiffs of providers being deterred from offering abortion services because of a concrete threat of prosecution did not occur in Indiana.

This theory ultimately fails, however, due to Plaintiffs' failure to identify any legal authorities supporting a constitutional challenge to the criminal penalties provisions independent from the substantive prohibitions that they are intended to enforce. Though *Gonzales* and *Casey* did not address the question that Plaintiffs have presented to us in

this litigation, these cases nonetheless offer insight as to how the Supreme Court might view this issue. In those cases, the Supreme Court upheld abortion laws, which were enforced through the threat of criminal penalties, as constitutionally sound. The Court did so without any indication that the potential imposition of criminal penalties was constitutionally problematic. We find the Court's silence to be instructive, particularly given the dearth of case law supporting Plaintiffs' position. Accordingly, we hold that the criminal penalties are valid to the extent that substantive provisions that they enforce are valid.[74]

## V.   Remaining Factors for Permanent Injunctive Relief

Plaintiffs have requested permanent injunctive relief from enforcement of those statutes determined to be unconstitutional. Permanent injunctive relief is appropriate when a plaintiff has shown: "(1) success on the merits; (2) irreparable harm; (3) that the benefits of granting the injunction outweigh the injury to the defendant; and, (4) that the public interest will not be harmed by the relief requested." *Lacy v. Cook Cty., Illinois*, 897 F.3d 847, 867 (7th Cir. 2018) (internal punctuation omitted).

As explicated above, Plaintiffs have proven their constitutional injuries with respect to those statutes which we have determined to be unconstitutional at a minimum beyond a preponderance of the evidence. The State has not disputed that irreparable harm to women occurs when their fundamental right to previability abortion services is

---

[74] We note that Plaintiffs have not theorized, for example, that any of the individual criminal penalties are overly harsh in imposing a punishment which is disproportionate to the crime committed. We further note the arguments from the parties on this issue have remained largely undeveloped throughout this litigation, rendering any critical analysis difficult.

unduly burdened. It is, in fact, well-established that the enforcement of unconstitutional laws ipso facto imposes irreparable harm. *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978). We further hold that no identifiable harm will be suffered by the State from the issuance of a permanent injunction in this case, given that there is "no harm to a [government agency] when it is prevented from enforcing an unconstitutional statute." *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004); *see also Does v. City of Indianapolis*, Case No. 1:06-CV-865-RLY-WTL, 2006 WL 2927598, at *11 (S.D. Ind. Oct. 5, 2006) ("Defendants will not be harmed by having to conform to constitutional standards, and without an injunction, Plaintiffs will continue to be denied their constitutional rights.").

Any public interest to be equitably balanced in the State's favor is usually coextensive with the governmental interest appearing in the merits analysis. *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 789 (7th Cir. 2011); *United States v. Rural Elec. Convenience Coop.*, 922 F.2d 429, 440 (7th Cir. 1991). We have found these interests to be slight. Otherwise, injunctions enforcing the Constitution are in the public interest. *See Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004).

## CONCLUSION

Finding no just reason for delay, FED. R. CIV. P. 54(b), partial final judgment shall now issue.[75]

---

[75] A status conference is scheduled for September 23, 2021, to discuss to remaining issues in this litigation, to wit, Plaintiffs' allegation that Indiana's Licensure Requirement is facially violative

For all the reasons explicated above, judgment shall enter in favor of Plaintiffs with respect to the following provisions on the grounds that each violates the Substantive Due Process and Equal Protection Clauses of the Fourteenth Amendment, and henceforth their enforcement shall be permanently enjoined:

- The Physician-Only Law, to the extent it limits the provision of first-trimester medication abortion care to physicians;

- The Second-Trimester Hospitalization/ACS Requirement;

- The In-Person Counseling Requirement;

- The Telemedicine Ban;

- The In-Person Examination Requirement; and

- The Facility Requirements identified herein.

We further hold that the Mandatory Disclosures regarding fetal pain, the beginning of life, and the mental health risks of abortion contained in the Perinatal Hospice Brochure violate *Casey*'s truthful and non-misleading standard and thus are unconstitutional under the First Amendment and the Fourteenth Amendment's Substantive Due Process Clause and shall be henceforth permanently enjoined.

**A permanent injunction shall enter by separate order.**

Judgment shall enter **in favor of the State** with respect to the following provisions, which we have determined do not violate the First Amendment or the Substantive Due Process and Equal Protection Clauses of the Fourteenth Amendment:

---

of the Equal Protection Clause and their request for as-applied permanent injunctive relief against the Licensure Requirement with respect to the South Bend Clinic.

- The Physician-Only Law, to the extent it limits the provision of first-trimester aspiration abortion care to physicians;

- The Ultrasound Requirement;

- The provision requiring either physicians or APCs to conduct preabortion counseling sessions;

- The Reporting Requirements;

- The Admitting Privileges Requirement;

- The Dosage and Administration Requirements;

- The Mandatory Disclosures regarding the disposal of fetal tissue and the physical health risks stated in Indiana's Perinatal Hospice Brochure;

- The Eighteen-Hour Delay Requirement;

- The Parental Consent Law;

- The Inspection Requirements;

- The Facility Requirements for aspiration abortion clinics codified at 410 Ind. Admin. Code §§ 26-10-1(b)(5) (observance of patient during recovery), 26-11-2(a) (sterilization of equipment), 26-11-3 (laundry), 26-13-1 (anesthesia), 26-13-3(b)–(c) (equipment), 26-17-2(c)(3)–(4) (access to certain facilities or equipment), 26-17-2(d)(1)–(4) (clinical facilities requirements), (d)(6) (drug distribution station), 26-17-2(e)(1) (housekeeping), (8) (antiscalding requirements);

- The criminal penalties provisions associated with the above-referenced statutes.

Judgment shall also enter **in favor of the State** with respect to Plaintiffs' allegations that the Indiana abortion code constitutes impermissible gender discrimination in violation of the Fourteenth Amendment's Equal Protection Clause (Count II) and with respect to Plaintiffs' Vagueness Claims (Count III).

IT IS SO ORDERED.


Date:   8/10/2021

_SARAH EVANS BARKER, JUDGE_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana


Distribution to counsel of record via CM/ECF